# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| R. ALEXANDER ACOSTA, SECRETARY OF LABOR UNITED STATES DEPARTMENT OF LABOR | CASE NO. 2:18-CV-000026 |
| PLAINTIFF, | |
| v. | |
| MEDICAL STAFFING OF AMERICA, LLC ET AL. | |
| DEFENDANTS. | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Joshua L. Jewett (VSB No. 76884)
Christopher D. Davis (VSB No. 74809)
Julia A. Rust (VSB No. 87270)
Pierce / McCoy, PLLC
101 West Main Street, Suite 101
Norfolk, VA 23510
Phone: (757) 216-0226
Fax: (757) 257-0387
jjewett@piercemccoy.com
chris@piercemccoy.com
julia@piercemccoy.com

*Counsel for Defendants*

**TABLE OF EXHIBITS**

Exhibit 1, Deposition of Lisa Pitts, vol. 1, Jan. 23, 2019 ("Pitts 1st Dep.");

Exhibit 2, Deposition of Lisa Pitts, vol. 2, Feb. 21, 2019 ("Pitts 2nd Dep.");

Exhibit 3, Deposition of Christine Kim, Jan. 22, 2019 ("Kim Dep.");

Exhibit 4, Deposition of Alvaro Mazuera, Feb. 28, 2019 ("Mazuera Dep.");

Exhibit 5, Deposition of Steadfast, by Lisa Pitts, Feb. 21, 2019 ("Steadfast Dep.");

Exhibit 6, Declaration of Christine Kim ("Kim Decl.");

Exhibit 7, Declaration of Roxanne Adams ("Adams Decl.");

Exhibit 8, Declaration of Tarnicia Allen ("Allen Decl.");

Exhibit 9, Declaration of Leslie Boone ("Boone Decl.");

Exhibit 10, Declaration of Shonterria Fulton ("Fulton Decl.");

Exhibit 11, Declaration of Tanya Iwuamadi ("Iwuamadi Decl.");

Exhibit 12, Declaration of Jonathan Kidder ("Kidder Decl."); and

Exhibit 13, Declaration of Ryan Thompson ("Thompson Decl.").

## I.     INTRODUCTION

This single-count civil action brought by the United States Secretary of Labor (the "DOL") against Medical Staffing of America, LLC, d/b/a Steadfast Medical Staffing, and its owner Lisa Pitts (collectively "Steadfast"), is an unfortunate case of unsubstantiated prosecution where the undisputed evidence belies the claims brought.

Steadfast operates a "nurse registry" from which independent licensed nurses can select from a menu of available opportunities to provide nursing care at various healthcare facilities with whom Steadfast contracts. The DOL's complaint asserts that Steadfast allows nurses to be listed on its registry in violation of the Fair Labor Standards Act.  As explained herein, the DOL's initial investigation failed to secure any credible evidence to substantiate this claim, and discovery in the case has further failed to support the DOL's position.  The DOL's bias in "assuming" a violation before investigation (Mazuera Dep. 289) is demonstrated by DOL's own investigator who has performed one-hundred and forty FLSA investigations in his career and claims to have never found a single case of *properly* classified "independent contractors."  (Mazuera Dep. 22-23, 39.)

The undisputed facts are simple and fundamental: Steadfast provides nurses with a menu of available work options, nurses negotiate their times and rates of pay, work if and when they want, buy their own equipment, and get paid based on work approved by the facilities where they work.  Nurses work regularly or sporadically, sometimes with months-long gaps between jobs. They simultaneously work full-time jobs as employees for healthcare providers and describe Steadfast's opportunities as their "as needed" income.  They describe their relationship with Steadfast as their own private "business," and they treat it that way, writing off equipment purchases on their taxes and enjoying the benefits of being an independent business owner in complete control of their schedule.

Outside of submitting each nurse's timesheets to the facility for final approval and payment, Steadfast has no involvement in the nurse's work. Each nurse signs a contract with Steadfast explicitly stating that their relationship is purely contractual. "Despite the explicit language of the Contract and other indicia that the [nurses] are independent contractors, the Secretary brought this action against [Steadfast,]" *Chao v. Mid-A. Installation Services, Inc.*, 16 Fed. Appx. 104 (4th Cir. 2001), seeking to enjoin each nurse into an employment relationship with Steadfast for which they have neither asked nor agreed.

Because the undisputed record here shows that Steadfast has absolutely no involvement in the work of the registry nurses, and because each registry nurse effectively operates as a business unto themselves, judgment should be entered for Steadfast and the Secretary's case should be dismissed with prejudice.

## II.   STATEMENT OF MATERIAL FACTS TO WHICH NO MATERIAL DISPUTE EXISTS

### A.   Steadfast: What it is; What it Does

1.     Steadfast was formed in 2015. Its sole owner is Lisa Pitts. (Pitts 2nd Dep. 8-9.)

2.     Steadfast operates as a registry for independent, licensed nurses to select from available short-term or "as needed" opportunities to provide nursing services at various hospitals and nursing homes. (Kim Decl. ¶ 4; *see* Pitts 2nd Dep. 7.)

3.     Steadfast's registry is comprised of Licensed Practical Nurses (LPNs), Certified Nursing Assistants (CNAs), and Registered Nurses (RNs).[1] (Pitts 2nd Dep. 9.)

---

[1] Unlike LPNs and RNs, CNAs are not technically "nurses." CNAs provide assistance to LPNs and RNs.  However, as explained below, CNAs must complete specialized training through a state-approved program, pass a national exam, and remain licensed with the state.  For purposes of simplicity, LPNs, RNs, and CNAs are all referred to as "nurses" within this Motion.

4.      Steadfast has three primary working relationships: (1) staffing contracts with its clients, who are hospitals and nursing homes (Kim Dep. 53); (2) office employees who perform administrative tasks and coordinate schedules between clients and the nurses (Pitts 2nd Dep. 19); and (3) nurses who join Steadfast's registry to provide short-term or "as needed" services to clients. (Kim Decl. ¶ 5.)

5.      On the advice of counsel, Steadfast classified all of the nurses on the registry as independent contractors and all of its office workers as employees. (Steadfast Dep. 28.) Office employees are paid on an hourly basis and receive W-2s. *Id*. Nurses receive 1099s and are notified of the same during their recruitment process. (Pitts 2nd Dep. 65-6; Kim Dep. 64.)

6.      Steadfast employs approximately twelve office staff workers, including six staffing coordinators and two recruiters. (Pitts 1st Dep. 17, 26-7; Pitts 2nd Dep. 16, 29.) The payroll manager, Christine Kim, is also an office employee. (Pitts 1st Dep. 17; Kim Dep. 7.)

**B.  The Registry: How it Functions**

7.      Nurses are never "interviewed" by Steadfast. (Kim Dep. 19.)

8.      Instead, the prerequisites to be placed on Steadfast's registry include: confirming the nurse is licensed in the Commonwealth of Virginia and performing a basic background check (Pitts 2nd Dep. 20, 31-32, 34), passing a drug screening test (Pitts 2nd Dep. 21, 31-32), passing a tuberculosis test (Kim Dep. 20-22) and signing a HIPAA confidentiality form. *Id.*

9.      All nurses are also required to complete an Independent Contractor Agreement with Steadfast. (*See* Kim Decl. 12, Ex. B (sample agreement)) Some nurses make redline edits to the Independent Contractor Agreement, such as adding a particular pay rate. (Pitts 2nd Dep. 62-63.) In those cases, Steadfast communicates to the facility that this nurse requires a certain pay rate. *Id*.

10.     Upon confirmation of the above prerequisites and receipt of the necessary tax forms for 1099 status, the nurse will be placed on the registry. (Kim Dep. 24.)

Scheduling Shifts on the Registry

11.     The nurses choose how often, when, and where they work. (Kim Decl. ¶ 6.) Nurses will commonly reach out to a "scheduler" at Steadfast and ask what shifts are available or provide their interest and availability. (Pitts 1st Dep. 25; Kim Dep. 24; Adams Decl. ¶ 6; Boone Decl. ¶ 13; Iwuamadi Decl. ¶ 9; Kidder Decl. ¶¶ 8, 10.)

12.     If a nurse has a particular facility they prefer, sometimes they will call the facility directly, select an available shift, and then the facility will let Steadfast know what the nurse chose. (Allen Decl. ¶ 4.) Other times, staffing coordinators will reach out to nurses about available shifts and let them choose if, when, and where they want to work. (Pitts 2nd Dep. 19, 36.)

13.     Sometimes a facility will request a specific nurse by name; Steadfast will notify the nurse and the nurse can decide whether they want to accept the shift. (Pitts 2nd Dep. 26; *see* Pitts 1st Dep. 52; Adams Decl. ¶ 6.)

Timesheets & Invoicing

14.     The total number of hours a nurse works at a facility during a particular pay period are tracked through timesheets. (Pitts 2nd Dep. 85-86.) Nurses are responsible for maintaining and submitting their own timesheets. (Kim Dep. 11, 16; *see* Pitts 2nd Dep. 85.)

15.     The facility must sign off on a nurse's timesheet before it's submitted to Steadfast; Steadfast never signs off on timesheets. (Kim Dep. 71; *see* Allen Decl. ¶ 15.)

16.     If a nurse works a shift during a particular week, he or she must submit timesheets to Steadfast by the following Tuesday to be compensated for hours worked that previous pay period. *Id*. at 72. Steadfast will then manually calculate the total hours a nurse worked at each

facility and transpose them onto an invoice for the client facility that reflects the nurse's name, license, hours, and the shift worked. (Kim Dep. 33.)

17.    On Wednesdays, Steadfast sends invoices to the client facilities along with the underlying timesheets. (Kim Dep. 59; Pitts 2nd Dep. 58-9.) The invoices reflect the exact time recorded on the timesheets; Steadfast does not round the time up or down. (Kim Dep. 61-2.) The client reviews the timesheets and confirms that the timesheets are accurate. (Pitts 2nd Dep. 59.)

### C.  Nurses Make Their Own Schedule and Decide When to Work

<u>Nurses Contact Steadfast When They Want to Work to See What is Available.</u>

18.    The nurses, not Steadfast, control their schedule. (Fulton Decl. ¶¶ 3, 6; *see* Kim Dep. 10, 24-25.) Nurses enjoy the freedom to work only when and if they want to work with the opportunities offered by Steadfast. (Pitts 1st Dep., 17-19, 53-54, 71-73.)

19.    Nurses are not "hired" or "fired" by Steadfast, and instead nurses are provided a "menu" of work opportunities to choose from. (Allen Decl. ¶¶ 3-4, 6; Boone Decl. ¶ 9; Iwuamadi Decl. ¶¶ 7, 9; Kidder Decl. ¶ 5; Thompson Decl. ¶¶ 5-7.) One nurse explains it like this:

> Steadfast didn't "hire" me. That's not how it works. I'm just on the registry and I work when I want to. They can't "fire" me either. If I don't want to work, I just don't. Steadfast never assigns any particular job or facility to me. They just tell me what's available and I choose. . . . I make my own work schedule. I work whenever I want and wherever I choose. If I want to work three days, I work three.

(Adams Decl. ¶¶ 4-5.)

20.    The nurses are free to pick and choose what, if any, shifts they would like to work, how many days a week, and the particular hours. (Kim Dep. 10, 24-25; Adams Decl. ¶ 6.)

<u>Nurses Can Accept or Decline Any Available Shift.</u>

21.    Steadfast never assigns any particular shifts to nurses. (Adams Decl. ¶ 4; Allen Decl. ¶ 4; Fulton Decl. ¶ 3; Kidder Decl. ¶ 10; Thompson Decl. ¶ 7.)

22.     When an opportunity is available, a nurse can decline a shift for any reason such as the nurse does not like or prefer the location, facility, specialty or field, date/time of shift, availability, or pay rate. (Pitts 1st Dep. 98-99; Kim Dep. 25.)

23.     Steadfast's CEO, Ms. Lisa Pitts, explains, "they have a choice to pick and choose whether they want to work for that rate . . . . It's up to them. So if they say, for instance, you make $30 an hour, I don't want to make $30 an hour, I'll go work somewhere else." (Pitts 1st Dep. 98.)

24.     Even if a facility requests a specific nurse, the nurse can still refuse the placement. (Pitts 1st Dep. 53-54.) There is no ramification or negative consequence to the nurse if he or she declines or refuses to work any particular shift at a facility. (Kim Dep. 25.)

25.     In sum, complete freedom of choice is uniformly enjoyed and understood by the nurses. (*See* Adams Decl. ¶ 4 ("If I don't want to work, I just don't."); Allen Decl. ¶ 4 ("I can accept as many or as few jobs as I want. I choose."); Boone Decl. ¶¶ 10-11 ("[A]ll Steadfast does is give you options and you pick the date, time and facility you want. . . . Or I can just choose not to work at all."); Fulton Decl. ¶ 9 ("If they tell me a facility is paying this much money, I might go there. If it's not paying enough money, I just don't choose shifts at those facilities."); Decl. Iwuamadi ¶ 9 ("Lisa would say I have two shifts available . . . and then I would say, yes or no."); Thompson Decl. ¶ 9 ("Steadfast tells me what the facility is offering and I accept or reject it. I can choose to pick the one that pays more than the other . . . It's always my decision.").) One nurse explains, "If I don't want to go somewhere, I don't have to. That's what I've done numerous times too. I don't like to go to certain facilities, so I'll say no." (Kidder Decl. ¶ 8.)

<u>There are No Set Number of Hours Nurses Must Work.</u>

26.     Nurses are not required to work any set or "minimum" number of hours for Steadfast. (Boone Decl. ¶ 14; Thompson Decl. ¶¶ 9, 16; Kidder Decl. ¶ 11; Fulton Decl. ¶ 8; *see*

Thompson Decl. ¶ 8 ("I'm not required to work a certain number of hours for Steadfast.")) Conversely, Steadfast does not "limit" nurses in the number of hours that a nurse may work. (Kim Dep. 10.)

27.     Also, the nurses do not make "any promise or commitment to stay on Steadfast's registry for any length of time." (Adams Decl. ¶ 3.)

<u>Nurses are Not Required to Request Time Off.</u>

28.     Nurses are not required to request time off, seek "permission," or give "notice" for leave, nor are they required to schedule their unavailability with Steadfast. (Adams Decl. ¶ 5; Allen Decl. ¶ 8; Fulton Decl. ¶ 8; Pitts 1st Dep. 71-73.)

29.     A nurse doesn't need permission from Steadfast to "[not] work at all" (Boone Decl. ¶ 14) or "[not] work for the rest of the year." (Thompson Decl. ¶ 8.) For example, a nurse can "leave Steadfast, take a break for a few months, take a vacation, anything [the nurse] wanted" without "anyone's permission." (Iwuamadi Decl. ¶ 12.)

30.     Many nurses take extended leaves and vacations. For example, one nurse explains that she "can quit for six months and pick right back up if I want to." (Fulton Decl. ¶ 5.) Another nurse explains that "[I] come and go as I wish." (Kidder Decl. ¶ 6.) "If I don't want to work, I don't need permission from Steadfast." *Id.* at ¶ 11. He elaborates as follows:

> Like last year, I did two vacations back to back. That's the advantage of being a contractor. I was able to go to Disney World by working a week and a half through Steadfast. And then I took a seven day vacation to Myrtle Beach shortly after that. If I was an employee, they would control my schedule.

*Id.* at 7.

<u>Nurses are Free to Negotiate Their Rate and Volume of Pay.</u>

31.     The nurses may negotiate their pay rate for a particular shift with Steadfast. (Pitts 2nd Dep. 41-42.)

32.     Similarly, a facility may request a specific nurse and "usually, if they need her bad enough, [the facility will] change their rates to fit what the independent contractor wants." (Pitts 2nd Dep. 42-43.) One nurse explains it this way:

> The facilities make and handle the contracts with Lisa at Steadfast, and that's where the money comes from. But I have negotiated my rates of pay with Lisa at Steadfast. For example, if Lisa has a shift available in North Carolina, that's a little far. If Steadfast quotes [me] $15/hr, I may say I'll do that one for $17/hr, and then we see if that works.

(Boone Decl. ¶ 15; *see also* Adams Decl. ¶ 12 ("[s]ometimes I negotiate the pay rate for a certain project with Lisa Pitts. . . . I've never had a problem where she didn't have room to negotiate."); Thompson Decl. ¶ 11 ("I've never heard of not having an option to negotiate pay. Depending on the project, sometimes you can negotiate to be paid more or less.")

33.     Further, by being able to select as many or as few shifts as they want, nurses can control the volume of their pay. (*See* Kidder Decl. ¶ 9 ("[I]t's just a matter of how much you want to make. It's cut and dry. Simplest contract relationship ever."); Iwuamadi Decl. ¶ 10 ("There were no set hours with Steadfast. It was only dependent on how much money I wanted to make. Steadfast didn't limit me.").)

<u>Nurses Can Cancel or Schedule a Shift by Communicating Directly with the Facility.</u>

34.     If a nurse is "running late" or needs to "cancel a shift," they can communicate directly with the facility; they are not required to communicate through Steadfast. (Pitts 1st Dep. 71-73; Adams Decl. ¶ 5; Allen Decl. ¶ 8; Iwuamadi Decl. ¶ 8; *see* Fulton Decl. ¶ 7 ("Nine times out of ten, I just tell the facility"); Thomas Decl. ¶ 13 ("I'm allowed to call Steadfast or the facility . . . whenever I want. . . .") Some nurses call both the facility *and* Steadfast. (Boone Decl. ¶ 18.)

35.     Also, a nurse can request to work a shift by communicating directly with the facility, bypassing Steadfast. A former nurse with Steadfast explains, "When I did work with

Steadfast, I was mostly working as a nurse in the prisons. If I wanted a shift, I would call the prison and let them [know] when I could work, they would put me on the schedule and then *they* would let Lisa Pitts know." (Iwuamadi Decl. ¶ 7) (emphasis added).

36.    Some nurses *never* schedule their shifts with Steadfast directly. For example, Ms. Fulton explains that, "I give the prison my available schedule and they put me on the schedule if needed. And if they have another need at the prison, the prison emails me or calls me to pick up the shift if I'm available." (Fulton Decl. ¶ 3).

**D.  Steadfast Does Not Train Nurses or Control Their Performance.**

<u>Steadfast Does Not Control the Nurses or How to Perform Their Job at the Facilities.</u>

37.    Steadfast does not control the nurses' activities or tell them how to perform their jobs as nurses. (*See* Adams Decl. ¶ 8 ("Steadfast has no ability to control me or what I do. They never tell me how to do my job."); Allen Decl. ¶ 13 ("Steadfast doesn't do anything to control me. . . . They've never told me how to care for patients."); Kidder Decl. ¶ 15 ("Steadfast never manages my day to day activities as a nurse. . . . Steadfast doesn't try to control what I do every day.").)

38.    As one nurse explains: "Nobody at Steadfast tells me what to do or when to do it. . . . Steadfast does not direct or control any of the work I do for a facility. Steadfast doesn't try to control what I do every day." (Thompson Decl. ¶¶ 8, 15.)

39.    Steadfast does not have or issue any kind of "handbook" for nurses on the registry. (Kim Decl. ¶ 7.)

<u>The Facility Provides Training and Orientation, Not Steadfast.</u>

40.    Steadfast does not provide any orientation or offer any training to the nurses. (Pitts 1st Dep. 69; Allen Decl. ¶ 11; Boone Decl. ¶ 19; Fulton Decl. ¶ 11; Iwuamadi Decl. ¶ 10; Kidder Decl. ¶ 14; Thompson Decl. ¶ 14.)

41.     Steadfast has never required any of the nurses to take any special or additional training before being placed with a facility, and there are no special skills or requirements that are unique to just Steadfast nurses. (Pitts 1st Dep. 69.) Steadfast specifically does not provide any training that addresses behavior, such as tardiness. (Pitts 2nd Dep. 51-52.)

42.     Often the facilities will provide some sort of orientation or training to set "the expectations and requirements" for the nurse, and the nurse will have to follow the facilities' "guidelines," "procedures" and "facility protocols," all of which "comes from the facilities, not Steadfast." (Kidder Decl. ¶ 12; *see* Thompson Decl. ¶ 14; Pitts 2nd Dep. 51-52.) Facilities may provide the nurses with a packet or orientation to share *the facility's* rules and policies. (Pitts 2nd Dep. 52.) One nurse explains, "[t]he only training I ever got was from the facilities themselves. Steadfast never instructed me how to do my job." (Iwuamadi Decl. ¶ 10.)

<u>The Facilities Supervise the Nurses' Work, Not Steadfast.</u>

43.     Once a contractor accepts a certain job, they "then talk to the facility about the particular things they want [the nurse] to do." (Allen Decl. ¶ 7.) The "facility provides [nurses] with the rules and policies and [they] have to follow the facility's rules." (Adams Decl. ¶ 7; *see* Pitts 1st Dep.19.)

44.     Steadfast doesn't supervise the nurses, only the facilities do. (Adams Decl. ¶ 8; Allen Decl. ¶ 13; Boone Decl. ¶ 10.) Only the "nurse supervisor at that facility" tells the nurses "what needs to be done." (Fulton Decl. ¶ 12; *see also* Iwuamadi Decl. ¶ 10; Kidder Decl. ¶ 15.)

45.     One nurse explains it this way: "When I work shifts at Atlantic Shores at Seaside, we have a charge nurse and they have management on duty. They are in charge during my shifts there and they supervise and correct me on anything. So if there was any discipline issues, the facility would be responsible for handling that." (Allen Decl. ¶ 14.)

46.     Finally, Steadfast has never provided any nurses with performance reviews or evaluations. (*See* Kidder Decl. ¶ 16; Thompson Decl. ¶ 15; Iwuamadi Decl. ¶ 10; Allen Decl. ¶ 14; Boone Decl. ¶ 20; Adams Decl. ¶ 9.)

<u>The Facility Communicates to the Nurses Directly About any Performance Issues.</u>

47.     Once a nurse accepts "a particular job with [a] facility" the nurse will then "work with the facility directly regarding the particular things" tasked to the nurse. (Thompson Decl. ¶ 10.) Because nurses report directly to the facility's management on duty, "if there were any discipline issues, the facility would be responsible for handling it." (Allen Decl. ¶ 14.)  Facilities address disciplinary issues onsite and directly. (Pitts 2nd Dep. 50; *see* Fulton Decl. ¶ 12 ("If something goes wrong, the facility decides if I get disciplined. Steadfast has nothing to do with [it]."); *see also* Thompson Decl. ¶ 15).)

48.     Steadfast is not involved in the disciplinary process with nurses, and Ms. Pitts has never disciplined any nurses. (Pitts 1st Dep. 73.)

<u>The Facility Has the Ability to "Terminate" a Nurse, Not Steadfast.</u>

49.     Because Steadfast does not "hire" nurses and instead simply places them on its registry, Steadfast cannot "fire" those nurses. (Pitts 1st Dep. 17-18; Kim Dep. 8; *see* Adams Decl. ¶ 6 ("Steadfast didn't 'hire' me [and] can't 'fire' me either."); Allen Decl. ¶ 3 ("I wasn't 'hired' by Steadfast [and t]hey can't 'fire' me either."); Boone Decl. ¶ 11 ("[A nurse at Steadfast] can't be hired or fired."); Kidder Decl. ¶ 6 ("Steadfast did not hire me and it could not fire me."); Thompson Decl. ¶ 6 ("Steadfast can't 'hire or fire' me.").)

50.     The nurses recognize that "[being a]n independent contractor means that I'm responsible; I'm independent for the job. *I basically have my own business.* Anything that happens during a job I select, I'm responsible." (Boone Decl. ¶ 8) (emphasis added). One nurse explains

that, "[i]f you're not performing your duties up to the facility's standards, they will put a 'do not return' on your name." (Adams Decl. ¶ 7.) "While you're in the facility, you have to follow your chain of command at the facility. As an independent contractor, *you're basically expendable*." (Adams Decl. ¶ 7) (emphasis added).

<u>The Facility Approves the Nurses' Timesheets, Not Steadfast.</u>

51.     All nurses must keep track of their own time. (Kim Dep. 11, 16; Adams Decl. ¶ 10; Iwuamadi Decl. ¶ 15; Allen Decl. ¶ 15.) Once filled out by the nurse, the timesheets must be approved and "signed by a specific staff member at the facility – the administrator, Director of Nursing, or Unit Manager." (Adams Decl. ¶ 10; *see* Fulton Decl. ¶ 13 ("Someone at the facility has to sign the timesheet agreeing on what time we arrived and left.").)

52.     Steadfast doesn't approve or sign off on any nurses' timesheets. (Pitts 2nd Dep. 58; Kim Dep. 71; *see* Adams Decl. ¶ 10 ("Steadfast only pays me what the facility approves.").)

**E. The Nurses in Steadfast's Registry Provide All of Their Own Equipment and Are Responsible for Their Own Certifications and Training.**

<u>The Nurses Provide Their Own Equipment</u>.

53.     The facilities articulate what supplies or equipment the nurses are expected to provide. (Pitts 1st Dep. 66-68.)

54.     Steadfast does not provide the nurses with any equipment, and instead the nurses are "responsible for whatever supplies they need to have through the client." (Pitts 2nd Dep. 78-79.)  The DOL's investigator into this matter, Mr. Mazuera, confirmed that Steadfast does not provide any "equipment or material" to the nurses. (Mazuera Dep. 207.) As one nurse explains, "Steadfast didn't provide any equipment for me. . . . Lisa Pitts and Steadfast didn't pay for any of our equipment. We are contractors. We take our own stuff in. We buy it from Walmart or the

pharmacy, or you can order it online." (Iwuamadi Decl. ¶ 4; *see* Allen Decl. ¶ 12 ("[a]s a contractor . . . I can write that off on my taxes.").)

55.     The equipment purchased by nurses are usually items such as stethoscopes, pen lights, scrubs, and blood pressure cuffs. (Allen Decl. ¶ 12, Fulton Decl. ¶ 10; Iwuamadi Decl. ¶ 4; Boone Decl. ¶ 16; Thompson Decl. ¶ 12.) When traveling, the nurses must pay for their "own rooms, lodging, taxes, transportation, etc." (Kidder Decl. ¶ 5.) Some nurses maintain their own liability insurance. (Allen Decl. ¶ 12; Adams Decl. ¶ 12.)

56.     All of the work performed by the nurses takes place at the facilities, not at Steadfast. (*See* Boone Decl. ¶ 17 ("I don't perform any work at the Steadfast headquarters. All of the work takes place at the facilities."); *see also* Allen Decl. ¶ 6; Iwuamadi Decl. ¶ 11; Kidder Decl. ¶ 13; Thompson Decl. ¶ 13 (same).) Therefore, it is the facilities, not Steadfast, that "have the big equipment." (Boone Decl. ¶ 16.) "The facilities have everything else, like a computer, login information, blood pressure machines, thermometers, wound care supplies, medications, and hand sanitizers." (Thompson Decl. ¶ 12.). Mr. Mazuera, confirmed that "independent contractors or nurses typically rely on the equipment that's in the hospital" and typically only bring their own items, such as "scrubs" and "stethoscopes." (Mazuera Dep. 203.)

The Nurses are Responsible for Acquiring Their Own Training and Education.

57.     Nurses on Steadfast's registry must obtain and maintain their own licensure within the Commonwealth of Virginia. (Pitts 1st Dep. 30.)

58.     RNs must complete an accredited nursing program such as ADN or BSN and pass the Virginia National Counsel Licensure Examination ("NCLEX") for Registered Nurses exam

($200), undergo a criminal background check ($30-$75), and complete a CPR/AED certification ($70). Virginia RNs renew their license biennially ($140) and earn 24 continuing education hours.[2]

59.  CNAs must complete training through a state-approved program, pass the National Nurse Aide Assessment Program exam ($120), obtain CPA/AED certification ($70), and renew their certification annually.[3]

60.  LPNs complete a one-year practical nursing program, the average cost of which is $10,000-$15,000 nationally. LPNs must also pass the Virginia NCLEX for Practical Nurses, at a cost of $170, and complete a CPR/AED certification ($70). LPNs must renew their license every two years ($120) and complete various continuing education courses, the cost of which can vary.

### F.  Nurses in Steadfast's Registry Work Concurrently in the Registries of Steadfast's Competitors and Also as *Employees* for Healthcare Providers

61.  Steadfast "does not restrict" nurses from working for anyone else; they can "work for any competitor if [they] wanted to." (Boone Decl. ¶ 21; *see* Thompson Decl. ¶ 16 ("I can work for any competitor that I want.").). For example, Ms. Iwuamadi "worked for a similar registry as Steadfast at the same time, and [she] was also working another job." (Iwuamadi Decl. ¶ 13.)

62.  Similarly, many registry nurses simultaneously work as full or part-time employees for other healthcare providers. (*See, e.g.*, Boone Decl. ¶¶ 5, 21.) One registry nurse who is also full- employee at a hospital describes Steadfast as "my 'as needed' job." (Thompson Decl. ¶ 3.)

### G.  The Nurse's Hours Fluctuate Greatly from Month-to-Month and Year to Year

63.  The nurses have "no set schedule . . . they can work as little or work as much as they like." (Kim Dep. 10.) Steadfast has had nurses "that work for one day and have never heard

---

[2] https://www.dhp.virginia.gov/nursing/nursing_forms.htm (last visited Apr. 26, 2019).
[3] https://www.dhp.virginia.gov/nursing/nursing_forms.htm (last visited Apr. 26, 2019).

from them again . . . but then we have other contractors that I see pretty frequently on my payroll roster." (Kim Dep. 44-5.)

64.     Many nurses' schedules fluctuate greatly from week to week, month to month, or year to year. (*See* Kim Decl. ¶ 9; *see also* Kidder Decl. ¶ 6 ("There was a point that I took a break for 3-4 months where I didn't work through Steadfast at all. I come and go as I wish."); Boone Decl. ¶ 14 ("If I don't want to work for the rest of the year, I just don't call and take any shifts.").)

65.     Attached to Ms. Kim's declaration is a spreadsheet summary of weekly payroll records for Schedule A workers for the pay periods covering November 27, 2018 through April 15, 2019. The data reflected in Exhibit A is a fair representative sampling of a 20-week period. (Kim Decl. 8, Ex. A.)

66.     While some nurses do regularly work shifts through the registry, that is only a small portion of the nurses. (*See* Kim Decl. Ex. A.) Many nurses will work one pay period or a few in a row and then never work another shift. (Kim Decl. ¶ 10.)

67.     Most nurses use the registry to pick up a few shifts here and there to supplement other income, so they'll take shifts throughout the year but only every few weeks. (Kim Decl. ¶ 11.)  Melissa Ozirus, Emma Hill, Ashley Straton, Ashley Vaughn, and Nicole Williams are examples of such nurses. (Kim Decl. Ex. A.)

68.     Further examples are the many blank lines in the chart demonstrating that these nurses from Schedule A no longer work through Steadfast or have taken extended breaks.

## III.     LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute will not defeat a motion for summary judgment, and

factual disputes that are irrelevant or unnecessary are to be ignored. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Rather, to avoid summary judgment, the Secretary must "go beyond the pleading" and by affidavits, depositions, answers to interrogatories, or admissions "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## IV.    ARGUMENT

The undisputed record in this case shows that the independent nurses who participate in Steadfast's registry are independent contractors. The Court should therefore not enjoin them into an employment relationship with Steadfast as the Secretary requests, and judgment should be entered for Defendant.

The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" is defined under the FLSA as "to suffer or permit to work." 29 U.S.C. § 203(g). Although the FLSA generally requires employers to pay their "employees" time and one-half for any hours worked over forty hours per work week, 29 U.S.C. § 207(a)(1), the rights afforded to employees under the statute do not apply to independent contractors.

Whether a worker is an employee or independent contractor under the FLSA is ultimately a legal question. *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (citations omitted). To answer that question, courts look to the "economic realities of the relationship between the worker and the putative employer." *Schultz*, 466 F.3d at 304.

To determine the "economic reality" between the worker and the business entity, the Fourth Circuit employs a six-factor test:

1. [T]he degree of control that the putative employer has over the manner in which the work is performed;

2. the worker's opportunities for profit or loss dependent on his managerial skill;

3. the worker's investment in equipment or material, or his employment of other workers;

4. the degree of skill required for the work;

5. the permanence of the working relationship; and

6. the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 304-05.[4]

No single factor is dispositive. *Id.* And, rather than "applying these factors 'mechanically'" through addition and subtraction of each factor, *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 671 (D. Md. 2000), the Court looks to the "totality of the circumstances presented" to determine the economic reality of the relationship. *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 241 (4th Cir. 2016). Ultimately, to prevail on his claim, the Secretary must establish that the Schedule A nurses were employees of Steadfast rather than independent contractors under the six-factor test.[5]

**A. The Degree of Control Over the Manner in which the Work is Performed**

The first *Silk* factor weighs the "degree of control the putative employer has over the manner in which the work is performed," *Schultz*, 466 F.3d at 305, which the Fourth Circuit has emphasized as the "most critical" factor of the economic realities test. *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016); *accord Schultz*, 466 F.3d 305 (emphasizing that the

---

[4] The six-factor test is often referred to as the "*Silk* factors" in reference to *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and are thus referred to as such throughout this motion.

[5] Because the FLSA does not apply to independent contractors, the Secretary's "burden to demonstrate that the FLSA applies to the defendants and the workers in question[.]" *Acosta v. At Home Pers. Care Servs. LLC*, No. 118CV549LMBIDD, 2019 WL 1601997, at *7 (E.D. Va. Apr. 15, 2019) (citing *Briggs v. Chesapeake Volunteers in Youth Servs., Inc.*, 68 F. Supp. 2d 711, 714 (E.D. Va. 1999).

degree of control factor is "an important part of the *Silk* test"); *Cf Hall v. DIRECTV, LLC*, 846 F.3d 757, 774 (4th Cir. 2017), *cert. denied,* 138 S. Ct. 635 (2018) (reversing district court dismissal of case where "Defendants collectively influenced nearly every aspect of Plaintiffs' work as DIRECTV technicians").[6]

In *McFeeley*, the Fourth Circuit cautioned that:

[A] worker [does not] automatically become[ ] an employee covered by the FLSA the moment a company exercises any control over him. After all, a company that engages an independent contractor seeks to exert some control, whether expressed orally or in writing, over the performance of the contractor's duties and over his conduct on the company's premises. It is rather hard to imagine a party contracting for needed services with an insouciant 'Do whatever you want, wherever you want, and however you please.'

*McFeeley*, 825 F.3d at 242.

Thus, in *Chao v. Mid-A. Installation Services, Inc.*, 16 Fed. Appx. 104 (4th Cir. 2001) (unpublished), the Fourth Circuit held that the degree of control factor showed the existence of an independent contractor relationship between the putative employer and a collective of cable installers, even where the putative employer required the Installers to meet strict installation specifications, "assign[ed] daily routes to the Installers and require[d] them to report their progress to a dispatcher periodically." *Id.* at 106. Similarly, in *Hardison v. Healthcare Training Sols., LLC*, PWG-15-3287, 2017 WL 2276840 (D. Md. May 25, 2017), Judge Grimm found that the degree of control factor plainly showed the existence of an independent contractor relationship for a nurse instructor, even where the nurse "used [the] curriculum and lesson plans developed by [the Defendant]." *Id.* at *3. In each of those cases, although the defendant exerted *some* control over

---

[6] The Fourth Circuit has also noted that "degree of control" is the "touchstone inquiry" under the nine-factor *Reid* test for Title VII claims. *Farlow v. Wachovia Bank of N. Carolina, N.A.*, 259 F.3d 309, 313 (4th Cir. 2001).

the work, the defendant exerted very little control over the *manner* in which the work was performed, which therefore evinced an independent contractor relationship.

Here, in contrast to the above cases where some control was exerted but an independent contractor relationship was nonetheless found, Steadfast exercises zero control over the manner in which the work is performed by the nurses on its registry. ***First***, Steadfast does not provide training or orientation, (Pitts 1st Dep. 69; Allen Decl. ¶ 11; Boone Decl. ¶ 19; Fulton Decl. ¶ 11; Iwuamadi Decl. ¶ 10; Kidder Decl. ¶ 14; Thompson Decl. ¶ 14.), does not have or issue a handbook to nurses on the registry, (Kim Decl. ¶ 7), does not provide performance evaluations, (*See* Kidder Decl. ¶ 16; Thompson Decl. ¶ 15; Iwuamadi Decl. ¶ 10; Allen Decl. ¶ 14; Boone Decl. ¶ 20; Adams Decl. ¶ 9), and does not otherwise instruct nurses about their work or standards of expected conduct. (Pitts 2nd Dep. 51-52) Indeed, to the extent the nurses receive training, orientation, or direction about their conduct, the training and direction comes entirely from the healthcare facilities at which they work, rather than Steadfast. (Pitts 2nd Dep. 51-52; *see* Fulton Decl. ¶ 11; Adams Decl. ¶ 8; Boone Decl. ¶ 10; Thompson Decl. ¶ 14)

***Second***, Steadfast has no involvement in supervising or otherwise directing the work of the registry nurses. Instead, to the extent the nurses have their work directed or supervised, it comes from the facility. (Adams Decl. ¶ 8; Allen Decl. ¶ 13; Boone Decl. ¶ 20; Thompson Decl. ¶ 15; Fulton Decl. ¶ 12; *see also* Iwuamadi Decl. ¶ 10; Kidder Decl. ¶ 15) Indeed, the facility, rather than Steadfast, "provides [nurses] with the rules and policies[, they] have to follow the facility's rules," (Adams Decl. ¶ 7; *see* Pitts 1st Dep.19), and the facility provides the nurse with instructions about "the particular things that they want [the nurse] to do." (Allen Decl. ¶ 17). In fact, if a nurse is running late" or needs to "cancel a shift," the nurse can communicate directly with the facility;

they are not required to communicate through Steadfast.  (Pitts 1st Dep. 71-73; Adams Decl. ¶ 5; Allen Decl. ¶ 8; Iwuamadi Decl. ¶ 8; *see* Fulton Decl. ¶ 7; Thomas Decl. ¶ 13).

*Third,* any performance or disciplinary issues involving a nurse are handled by the facility or the Board of Nursing, not Steadfast. (Pitts 1st Dep. 73; Pitts 2nd Dep. 50; Adams Decl. ¶ 7) Thus, "[i]f something goes wrong, the facility decides if [the nurse] get[s] disciplined. Steadfast has nothing to do with how [the nurse does her] job at a facility." (Fulton Decl. ¶ 12; *see also* Allen Decl. ¶ 14 ("if there were any discipline issues, the facility would be responsible for handling it."))

*Fourth,* Steadfast does not, and cannot, terminate the nurses. (Pitts 1st Dep. 17-18; Kim Dep. 8; *see* Allen Decl. ¶ 3 ("I wasn't 'hired' by Steadfast [and t]hey can't 'fire' me either"). Instead, if a nurse has performance issues or commits misconduct warranting discharge, the facility will place the nurse on a "do not return" list, (Adams Decl. ¶ 7) and the matter may be handled by the Board of Nursing. (Thompson Decl. ¶ 15)

*Fifth,* Steadfast does not even "approve" timesheets for the nurses, (Pitts 2nd Dep. 58; Kim Dep. 71), which, like virtually every other aspect of the nurses' work, is a matter handled between the nurse and the facility. (Adams Decl. ¶ 10; Fulton Decl. ¶ 13) Steadfast's only involvement is receiving the timesheet from the nurse, sending it to the facility for final approval and payment, and then paying the nurse for her work. (Kim Dep. 25, 27, and 31)

Taken together, it would be difficult to imagine a contractual relationship where the entity exercises less control over the contractor. Steadfast's only involvement is providing the economic opportunity through the registry – of which the nurse is free to take advantage or not – and submitting the nurse's timesheets to the facility for final approval and payment. Although the Fourth Circuit recently opined that "[i]t is rather hard to imagine a party contracting for needed services with an insouciant 'Do whatever you want, wherever you want, and however you please,'"

*McFeeley*, 825 F.3d at 242, that is effectively the extent of the relationship here between Steadfast and the nurses who participate in its registry.

Steadfast exercises no control over the manner in which the nurses perform their work. The "most critical" *Silk* factor, *Id.* at 241, therefore shows the complete absence of an employment relationship, and judgment should therefore be entered for Steadfast.

### B. The Permanence of the Working Relationship

The next *Silk* factor – the permeance of the working relationship – also strongly weighs in favor of finding an independent contractor relationship here. Under this factor, courts within the Fourth Circuit consider whether the "worker is 'free to find other work," whether the worker worked "for multiple [employers] at the same time," *Hardison*, 2017 WL at *4 (quoting *Randolph v. PowerComm Const., Inc.*, 309 F.R.D. 349, 356–57 (D. Md. 2015) and *McFeeley v. Jackson St. Ent., LLC*, 47 F. Supp. 3d 260, 272 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016)),[7] and the permanency of the relationship. *Schultz*, 466 F.3d at 309; *see also Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782, 784 (11th Cir. 2006) (unpublished) (affirming summary judgment for Defendant under same six-factor test where cable installer was able "to take jobs from other installation brokers . . . [and] could take as many or as few jobs as he desired.").

When the worker is free to work for other entities, and in fact does so, the degree of permanence factor weighs in favor of independent contractor status. Thus, in *Hardison*, Judge

---

[7] In *McFeeley*, both the District Court and the Fourth Circuit noted that courts have historically accorded the "permanence of the working relationship" factor "little weight in challenges brought by exotic dancers given the inherently 'itinerant' nature of their work." *McFeeley*, 825 F.3d at 244; *see also McFeeley*, 47 F.Supp. 3d at 272 (listing cases). Unlike the work of an exotic dancer, there is nothing "inherently itinerant" about the work of a nurse, and it appears that the Fourth Circuit was careful to note in *McFeeley* that its deemphasis of the "permanence of the working relationship" factor was based on the nature of the exotic dancing industry itself, rather than a generalized deemphasizing of the particular *Silk* factor.

Grimm found the evidence "strongly support[ed] independent contractor status" where a nurse instructor's income from the Defendant fluctuated from year to year, and where she worked for two other organizations during the statutory period. 2017 WL 2276840, at *4. Similarly, in *Chao*, the Fourth Circuit affirmed summary judgment for the Defendant, where the district court found that a long-term relationship was possible with the Defendant, but was "not necessarily the norm, nor [was] it required." 16 Fed. Appx. at 107 (4th Cir 2001).

Here, the very nature of a nurse registry lends itself to impermanence. The nurses are entirely free to accept or decline an available shift, and they can work as many or as few hours as they wish or no hours at all. The nurses are also free to accept work from a competing registry or work directly for a healthcare facility as an employee, and they in fact do just that. (*See*, *e.g.*, Boone Decl. ¶ 21 (noting that she is "free to work for a competitor"); Thompson Decl. ¶ 16 ("I can work for any competitor that I want."); Iwuamadi Decl. ¶ 13 (Boone Decl. ¶¶ 5, 21) (noting that she concurrently holds part-time jobs while accepting work on Steadfast's registry)

Because the nurses have "no set schedule…they can work as little or work as much as they like." (Kim Dep. 10.) Thus, Steadfast has had nurses who "work for one day and have never heard from them again," while other contractors appear more frequently. (Kim Dep. 44-5) Accordingly, many nurses' schedules fluctuate greatly from week to week, month to month, or year to year. (*See* Kim Decl. ¶ 9; *see also* Kidder Decl. ¶ 6 ("There was a point that I took a break for 3-4 months where I didn't work through Steadfast at all. I come and go as I wish."); Boone Dec. ¶ 14 ("If I don't want to work for the rest of the year, I just don't call and take any shifts.")) Although there are a few nurses who regularly work shifts through the registry, they make up only a small percentage of the nurses on the registry. Instead, the majority of the nurses who use the registry do so irregularly to supplement other income. (Kim Decl. ¶ 8, Ex. A (payroll schedule))

Thus, like the cable installer in *Freund* and the nurse instructor in *Hardison*, the evidence here shows that the Schedule A nurses are free "to take jobs from other [registries or employers] . . . [and] could take as many or as few jobs as [they] desired." 185 Fed. Appx. at 784. The evidence also shows that the majority of the nurses who participate in the registry do so irregularly and use the registry as a source of supplemental income. The degree of permanence factor therefore weighs in favor of an independent contractor relationship.

### C.  The Workers' Opportunity for Profit or Loss

Although time-oriented work, as a general rule, weighs toward an employment relationship under the "opportunity for profit or loss" factor, *see Schultz*, 466 F.3d at 308, that the work is hourly does not preclude a finding of independent contractor status. *See Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (holding that pipe welders who were paid a fixed hourly rate could nonetheless control their profit or loss by consistently finding welding work with other companies and maximizing costs).[8]

Here, despite the work being time-oriented, several factors militate against finding that the "profit or loss" factor favors an employment relationship. ***First***, it is undisputed here that the nurses "can control their own profits and losses by agreeing to work more or fewer hours," as the installers in *Chao*, 16 Fed. App. At 107. Indeed, it is undisputed here that the nurses had complete freedom to accept or decline an available shift, and that they can work as many or as few hours as they wish or work no hours at all. The nurses viewed that complete freedom as giving them the potential to increase their volume of shifts as a means to increase their profit. (*See* Kidder Decl. ¶ 9 ("If you don't work, you don't get paid— it's just a matter of how much you want to make."); Iwuamadi

---

[8] The Fifth Circuit utilizes the same six *Silk* factors as the Fourth Circuit.

Decl. ¶ 10 ("There were no set hours with Steadfast. It was only dependent on how much money I wanted to make.  Steadfast didn't limit me."))

*Second*, the nurses are able to exercise autonomy and increase profit either by selecting opportunities that pay a higher rate or ones closer to home that reduce travel expenses. *See Heningburg v. CSS Corp.*, 1:13-CV-2184-ODE, 2015 WL 13081182, at *9 (N.D. Ga. Aug. 14, 2015) (noting that CNAs in nurse registry could exercise managerial skill to increase profits by selecting assignments closer to home and thereby reducing travel costs). As one nurse testified, if an available shift required more travel, she would exercise managerial discretion and negotiate her rate of pay. (Boone Dec. ¶ 15)

*Third*, the nurses are free to negotiate their rate of pay for a particular shift, and in fact do so. (Pitts 2nd Dep. 41-42; *see also* Boon Dec. ¶ 15; Adams Decl. ¶ 12; Thompson Decl. ¶ 11) If, for instance, a facility wants a specific nurse because of her skill or familiarity with the facility, the facility will "change their rates to fit what the independent contractor wants." (Pitts 2nd Dep. 42-43) The relationship is therefore not one where the prices are dictated to the contractors, but one in which the contractors are free to engage in free market activity and bargain a better deal. Thus, Ms. Boone testifies that, as an independent contractor who accepts jobs from Steadfast's registry, she viewed herself as "basically hav[ing her] own business." (Boone Decl. ¶ 8)

In sum, nurses could increase profit by increasing the volume of work, negotiating a higher rate of pay, and reducing travel expenses. These factors cut against the general rule that time-oriented work points toward an employment relationship.

### D.  The Workers' Investment in Equipment or Material

The next *Silk* factor looks at the workers' investment in equipment or material. Before weighing this factor, however, the Court would need to answer an underlying legal question that

the Fourth Circuit has not explicitly answered: Does the Court only look to the *workers'*

investment, or does it *compare* to the workers' investment to the investment of the Defendant?

Although some courts have declined a comparative approach to the "workers' investment"

factor,[9] the Fourth Circuit unmistakably employed such an approach in the recent exotic dancer

case. *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 241 (4th Cir. 2016). There, when

addressing the dancers' investment in their work under the *Silk* test, the Court explicitly did so by

*comparing* the dancers' investment to the investment of the club:

> In terms of investment, defendants paid "rent for both clubs; the clubs'
> bills such as water and electric; business liability insurance; and for radio
> and print advertising," as well as wages for all non-performing staff. The
> dancers' investment was limited to their own apparel and, on occasion,
> food and decorations they brought to the clubs.

*Id.* at 243 (internal citations omitted); *see also Schultz*, 466 F.3d at 308 (noting that, in comparison

to the security agents' investment, the Defendant "supplied almost every piece of equipment the

agents used[.]") The same approach should be employed here.

When assessing this factor, the Court should note that the "tools" required of a healthcare

worker are not the traditional tools of a tradesman, such as what was used by cable installers in

*Chao*, but skill and knowledge acquired through licensing and education. Therefore, a nurse's

investment in her tools of her trade includes the following:

- Registered Nurses (RN) must complete an accredited nursing program, which can
  either be a two-year ADN[10] or a four-year BSN,[11]  pass the NCLEX-RN exam ($200),
  complete a background check ($30-$75), and complete a CPR/AED certification ($70).

---

[9] *See, e.g.. Heningburg v. CSS Corp.*, 1:13-CV-2184-ODE, 2015 WL 13081182, at *9 (N.D. Ga.
Aug. 14, 2015) (rejecting comparative approach in nurse registry case because it had never been
employed by the Eleventh Circuit),

[10] The estimated cost of an ADN at Tidewater Community College is $11,862.40, which does not
include textbooks and supplies. (https://www.tcc.edu/academics/health-
professions/programs/nursing-degree)

[11] The estimated cost of a BSN at Old Dominion University is $47,170.00
(https://www.odu.edu/tuition-aid/costs-tuition/tuition/tuition-rates)

They must also, on a biannual basis, complete 24 CE hours, the cost of which can vary, and renew their license ($140).[12]

- <u>Licensed Practical Nurses (LPN)</u> must complete a one-year practical nursing program, the average cost of which is $10,000 - $15,000 nationally. The must pass the NCLEX-PN exam, at a cost of $170, complete a background check ($30-$75), and complete a CPR/AED certification ($70). They must also, on a biannual basis, renew their license ($120) and complete various course work or CE's, the cost of which can vary.

- <u>Certified Nursing Assistants (CNA)</u> must complete training through a state-approved program,[13] complete the NNAAP exam ($120), and obtain a CPR/AED certification ($70).

In addition to investing in the intellectual training to conduct their work, the nurses in Steadfast's registry are entirely responsible for providing whatever physical equipment is necessary to complete the job, which is dictated not by Steadfast but by each facility. (Pitts 2nd Dep. 78-79; Pitts 1st Dep. 66-68; Pitts 2nd Dep. 78-79.) Generally, in addition to providing their own transportation to each job such as the cable installers in *Chao*, 16 Fed.Appx. at 107, the nurses also purchased their own equipment, such as stethoscopes, pen lights, scrubs, and blood pressure cuffs, which the nurses can "write off" on their taxes. (Allen Decl. ¶ 12) In addition, when traveling for a job, the nurses must pay for their "own rooms, lodging, taxes, transportation, etc."  (Kidder Decl. ¶ 5) Some nurses even maintain their own liability insurance. (Allen Decl. ¶ 12) All other equipment, such as medication or larger hospital machinery, is provided by the healthcare facilities. (Thompson Decl. ¶ 12)

Steadfast, by comparison, provides only the registry. It provides no equipment. It does not assist the nurses with paying for their licensing and CE's. It does not even provide the facility at which the nurses perform their work. *Cf. McFeely*, 825 F.3d at 243 (noting that strip club's investment in *Silk* included, *inter alia*, paying the rent at the club where the exotic dancers

---

[12] Found at https://www.dhp.virginia.gov/nursing/nursing_fees.htm
[13] The estimated cost of the CNA program at Tidewater Community College is $861.75

performed their work); *Farlow*, 259 F.3d at 314 (4th Cir. 2001) (Smith, J sitting by designation) (working remotely "clearly suggests and independent contractor relationship" under *Reid* test)

Thus, although the actual physical equipment each nurse brings to the job (stethoscope, blood pressure cuffs) may not be all that expensive, the nurse's total investment into the trade required to complete each job is great when the nurse's "investment in the equipment or material" is contextualized to the healthcare industry. The factor therefore weighs toward finding an independent contractor relationship, but particularly so when compared to Steadfast's lack of investment in the nurses' work.

### E.  The Degree of Skill Required

The final *Silk* factor discussed here considers whether the service rendered by the nurses requires a special skill.[14] For this factor, the Fourth Circuit has held that cable installers possess a degree of skill that favors independent contractor status, *Chao*, 16 Fed. Appx. at 107 (noting that the "skills of cable installers are akin to those of carpenters, construction workers, and electricians, who are usually considered independent contractors"), whereas exotic dancers, *McFeeley*, 825 F.3d at 244, and security agents do not. *Schultz*, 466 F.3d at 308.

The fact that a nurse performs markedly different work than the tradesmen approved by the *Chao* Court (cable installers, carpenters, construction workers, and electricians) does not render the work any less skilled. Indeed, unlike the cable installers in *Chao*, nurses first acquire their skill through educational environments and must then pass an exam before being licensed or certified

---

[14] The final *Silk factor* – the degree to which the work forms an integral part of the business – "does not turn on whether the individual worker was integral to the business . . . [but] whether the service the worker performed was integral to the business." *Montoya v. S.C.C.P. Painting Contractors, Inc.,* 589 F.Supp.2d 569, 582 (D.Md.2008). As a nursing registry, the work of the nurses on Steadfast's registry comprise an integral part of Steadfast's business.

to practice. Also, unlike the cable installers in *Chao*, nurses are required to keep up with the latest medical practices through required continuing education credits regulated by the Board of Nursing. The cable installers, by comparison, acquired their specialized skills through apprenticeship programs and on-the-job training, which nurses, of course, do as well.

Moreover, it surely is not lost on the Court that while the cable installer profession and other trade professions validated by *Chao* are certainly skilled professions, they are also the skilled professions of an industry that is largely male.[15] Nursing, on the other hand, is largely the chosen skilled profession of women.[16] While the Fourth Circuit has never apparently addressed whether a nurse meets the "degree of skill" factor under the *Silk* test, it would seem disconnected and inherently inequitable if the DOL takes the position in this case that these nurses are any less skilled than the men who worked as cable installers in *Chao*.

### F.  The Nurses all Sign Independent Contractor Agreements and Are Issued 1099s

Finally, although not a factor under *Silk*, federal courts, including those within the Fourth Circuit, have considered whether the parties have executed independent contractor agreements or

---

[15] According to the Bureau of Labor Statistics, women make up only **9.1 percent** of all jobs in the construction industry, and approximately half of those jobs are in administrative or sales roles (i.e, not in the field). *See* Statistics of Women in Construction (found at https://www.nawic.org/nawic/Statistics.asp); *see also* Women in the Labor Force: A Data Book (Table 13), U.S. Bureau of Labor Statistics, found at https://www.bls.gov/opub/reports/womens-databook/2016/pdf/home.pdf)

[16] "In 2013, the United States Census Bureau published an American Community Survey Highlight Report entitled **"Men in Nursing Occupations."**   While the number of men in the profession has tripled since 1970, the numbers are still scant, with **less than 10 percent** representation in the RN field." Nursing Demographics, Maryville University. (Found at https://online.maryville.edu/blog/nursing-demographics/) The gender ratio in the nursing profession has hardly changed since the U.S. Department of Labor published a factsheet in 2003 reporting that women comprised 92.1% of all Registered Nurses across the country. (Found at: https://www.dol.gov/wb/factsheets/qf-nursing.htm)

receive a 1099 from the entity. Indeed, in *Chao*, the Fourth Circuit began the second paragraph of its decision affirming judgment against the Secretary with the following line: "***Despite the explicit language of the Contract*** and other indicia that the Installers are independent contractors, the Secretary brought this action against Comcast and MAT[.]" *Chao*, 16 Fed.Appx. at 105; *see also Dixon v. Open Hands Nurseing Agency, LLC*, 4:17-CV-02132-RBH, 2018 WL 5995127, at *6 (D.S.C. Nov. 14, 2018) (finding that nurse assistant signing independent contractor agreement and received a 1099 "tends to support a finding that Plaintiff is an independent contractor").

Here, it is undisputed that every nurse is required to complete an Independent Contractor Agreement with Steadfast and receives a 1099 tax form for the work that they complete out of Steadfast's registry. (Kim Dep. 20) But, what is more, the nurses plainly know that they are independent contractors, and seem to testify in their declarations that that is exactly how they prefer it. (*See*, *e.g.,* Boone Decl. ¶ 8 ("[being a]n independent contractor means that I'm responsible; I'm independent for the job. *I basically have my own business.* Anything that happens during a job I select, I'm responsible" (emphasis added). That the nurses here explicitly agree that an employment relationship does not exist cuts against finding such a relationship under the FLSA.

\* \* \* \*

It would be difficult to imagine a contractual relationship where the entity exercises less control over the work of a contractor than Steadfast does here. Although there is a total of six factors to consider, Steadfast's complete lack of control under the "most critical" *Silk* factor dispositively shows the lack of an employment relationship here. Indeed, in *McFeeley*, although the Fourth Circuit briefly discussed the other five factors, the strip club's complete control over

the dancers' work was dispositive to the Court's ruling.[17] On a summary judgment record at the opposite end of the control spectrum as the one there, Steadfast's lack of control therefore warrants an opposite finding here.

Importantly, the economic realities test does not weigh one factor against the other but looks to the totality of the circumstances. A good example of weighing those factors was recently employed by Judge Grimm in a decision cited through this motion. *Hardison*, 2017 WL 2276840, at *4. There, despite four of the six factors favoring an employment relationship, the one that mattered the most – the degree of control – decisively did not. Combined with the "permanence" factor also favoring independent contractor status, Judge Grimm correctly found that a nurse instructor was not in an employment relationship with the entity. *Id.*

Here, in addition to the degree of control factor dispositively showing an independent contractor relationship for the nurses who have participated in Steadfast's registry, the summary judgment record also shows an absence of permanence, that the nurses perform the work of a "skilled" professional, that they were invested in their work, and that they employed free market principles to their contractual relationship, despite being paid by the hour. That explains the sworn testimony in the nurse declarations, who, across the board, testify that they fully understand and, indeed agree, with the fact that they are independent contractors. For these reasons, and other addressed herein, Steadfast respectfully requests that the Court enter judgment in its favor.

Steadfast asks that the Court Grant its Motion for Summary Judgment.

---

[17] There, the Court held that a club exercised control over a collective of exotic dancers that showed the existence of an employment relationship where the Defendant: (1) required the dancers to sign in upon arrival; (2) the club dictated the schedule; (3) the club imposed written and detailed guidelines for the dancers; (4) the club set the fees for private dances with patrons; (5) the club personally instructed dancers on behavior and work conduct; and (6) the club controlled the atmosphere of the place of work. *Id.* at 242.

Dated: April 29, 2019

Respectfully Submitted,

By: */s/ Joshua L. Jewett*
Joshua L. Jewett (VSB No. 76884)
Christopher D. Davis (VSB No. 74809)
Julia A. Rust (VSB No. 87270)
Pierce / McCoy, PLLC
101 West Main Street, Suite 101
Norfolk, VA  23510
Phone: (757) 216-0226
Fax: (757) 257-0387
jjewett@piercemccoy.com
chris@piercemccoy.com
julia@piercemccoy.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April 2019, I electronically filed this document with the Clerk of the United States District Court for the Eastern District of Virginia using the CM/ECF system which will copy of the following users:

Karen Barefield (VSB 42572)
LaShanta R. Harris (*pro hac vice*)
Avni J. Amin (pro hac vice)
Office of the Regional Solicitor
U.S. Department of Labor
201 12th Street South
Arlington, VA 22202
Telephone: (202) 693-9370
Facsimile: (202) 693-9392
Barefield.karen@dol.gov
Harris.LaShanta@dol.gov
Amin.avni.j@dol.gov
*Counsel for Plaintiff*

By: */s/ Joshua L. Jewett*
 Joshua L. Jewett (VSB No. 76884)
 Christopher D. Davis (VSB No. 74809)
 Julia A. Rust (VSB No. 87270)
 Pierce / McCoy, PLLC
 101 West Main Street, Suite 101
 Norfolk, VA 23510
 Phone: (757) 216-0226
 Fax: (757) 257-0387
 jjewett@piercemccoy.com
 chris@piercemccoy.com
 julia@piercemccoy.com
 *Counsel for Defendants*