**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| R. ALEXANDER ACOSTA,<br>SECRETARY OF LABOR,<br>UNITED STATES DEPARTMENT OF LABOR,<br><br>Plaintiff,<br><br>v.<br><br>MEDICAL STAFFING OF AMERICA, LLC, et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 2:18cv226<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Medical Staffing of America, LLC dba Steadfast Medical Staffing ("Steadfast") and Lisa Ann Pitts' ("Defendants") have failed to prove there are no genuine issues of material fact with respect to their affirmative defense that employees listed on the Schedule A attached to Plaintiff's Complaint ("Schedule A employees") are independent contractors. All Schedule A employees are employees as defined under the Fair Labor Standards Act ("FLSA" or "Act") and, therefore, subject to the overtime requirements of the Act. Each element of the economic realities tests supports the conclusion that Schedule A employees were in fact, employees during the relevant period, August 8, 2015 through present. When one considers that Defendants' Motion for Summary Judgment primarily relies on employee declarations gained through unethical and coercive means, the futility of their Motion is all the more clear. Additionally, Defendants failed to file their Motion for Summary Judgement "within a reasonable time before the date of trial," in direct violation of Local Civil Rule 56(A). As such, Defendants' motion for summary judgment should be denied for lack of timeliness.

Accordingly, and for reasons set forth in detail below, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied in its entirety.

## I. Factual Background

A. *Defendants violated Section 7 of the FLSA by failing to pay employees time and a half for all hours worked over 40 in a workweek.*

Steadfast provides medical staffing services to healthcare facilities. ECF No. 8, Answer at ¶ 2; Exhibit A, Pitts 1-23 Dep. Tr. at 23, li. 18-23. Defendant Lisa Ann Pitts, is the CEO and 100% owner of Steadfast. *Id.*; Pitts 1-23 Dep. Tr. at 12, li. 21-23. Defendant Lisa Ann Pitts was involved in the day-to-day operations of Steadfast, including determining the rate and method of pay for employees, hiring and firing employees, controlling conditions of employment, maintaining employment records and supervising employees. Exhibit K, Kidder Decl.; Exh. L, Miltier Decl.; Exh. M, Rizer Decl.; Exh. N, Adkins Statement; Exh. O, Bryant Statement; Exh. P, Fulton Statement; Exh. R, Carter Statement; Exh. S, Smith Statement; Pitts 1-23 Dep. Tr. at 18-20.

Defendants employed Schedule A employees during the investigative period to present. These employees worked as Registered Nurses ("RNs"), Certified Nursing Assistants ("CNAs") and Licensed Practical Nurses ("LPNs") at various healthcare facilities owned and operated by Defendants' clients, providing basic healthcare services to patients at these facilities. Exhibits K-S. Schedule A employees suffered to work. Defendant Steadfast assigned employees to their client facilities that were in need of RNs, LPNs and CNAs. Exhibit B, Kim Dep. Tr. at 11, li. 14-18. Defendants paid Schedule A employees an hourly rate, which was non-negotiable. *Id.* Defendants were solely responsible for compensating Schedule A employees for their work. Exh. D; Exh. G; Exh; I. "Medical Staffing of America" appeared on all of the Schedule A employees' paystubs. Exhibit D, Sample paystubs; ECF No. 84, Stipulation of Undisputed Facts.

It is undisputed that between August 18, 2015 and present, Schedule A employees worked more than 40 hours in a workweek. Exhibit C, Response to Interrogatory Request No. 10; Exh. K-M; Exhibit D, Sample payroll records. It also is undisputed that Defendants paid Schedule A employees their straight, hourly rate for hours worked over 40 in a workweek, rather than time and a half. Exh. D; Exh. K-P; R-S.

B.  *Schedule A employees were "employees" as defined under 29 U.S.C. § 203*

Ms. Pitts interviewed Schedule A employees before hiring them. Exh. K-M. Schedule A employees completed a Steadfast job application prior to working with Steadfast. Exh. E, Steadfast Employment Application; Pitts 1-23 Dep. Tr. at 86, li. 10-13; Exh. K-M. Defendants advertised and recruited Schedule A employees using Indeed and Craigslist. Pitts 1-23 Dep. Tr. at 44, li. 13-17; Exh. L; Exhibit F, Indeed posting. Defendants required Schedule A employees to undergo and pass background checks and drug tests – which Steadfast paid for – prior to working with Steadfast. ECF No. 84, Stipulation of Undisputed Facts; Exh. K-M; Pitts 1-23 Dep. Tr. at 30-31. Defendants also required Schedule A employees to sign an "Agreement for Independent Contractor Services" at the beginning of their employment. Pitts 1-23 Dep Tr. at 76, 12-16. Despite its name, these employment contracts contained non-compete clauses, which prohibited Schedule A employees from working for Steadfast's competitors: "Contractor shall not directly provide that type of services provided to Company to any competitors of Company without first obtaining the express written permission of Company." Exhibit G, Independent Contractor Agreement, ¶ 8. Moreover, the contracts are open ended – the contract did not limit Schedule A employees' work for Defendants to a set term. *Id.* at ¶ 1.

Defendants assigned employees to their client facilities that were in need of RNs, LPNs and CNAs. Kim Dep. Tr. at 11, li. 14-18. These employees handled and passed out medications,

cared for patients, treated wounds, monitored patients, and took notes. *Id.*; Exh. K-M. Defendants' client facilities did not require Schedule A employees to have any special training in order to do the work. Kim Dep. Tr. at 39, li. 10-25; Tr. at 40, li. 1. Schedule A employees did not create their own schedules while working for Steadfast. Exh. K-M. Defendants dictated what hours and where Schedule A employees would work. *Id.*  If they were late for, or had to cancel, a shift, Defendants required them to notify Ms. Pitts. *Id.* If they wanted to take time off, they would notify Ms. Pitts. *Id.* Lisa Pitts told Schedule A employees that if they took time off, she would lose money. Exh. K-M; N-O. When Schedule A employees had scheduling conflicts, Defendants did not allow them to send another CNA, LPN, or RN in his or her stead. Kim Dep. Tr. at 40, li. 23-26-Tr. at 41, li. 1-2; Exh. K-M. The length of a Schedule A employee's particular assignment varied from several months to several years. Exh. K-P; R-S; Exhibit H, Sample payroll records.

Steadfast's clients, i.e., healthcare facilities with which Steadfast contracted, paid Defendants a set hourly rate for hours worked by Schedule A employees. Pitts 1-23 Dep. Tr. at 96, li. 9-19. The client facility at which the Schedule A employee was placed negotiated this hourly rate with Defendants – not Schedule A employees. Pitts. 1-23 Dep. Tr. at 96, li. 23-15- Tr. at 97, li. 1-3. Indeed, Defendants did not pay that same set hourly rate to Schedule A employees. *Id.* Instead, Defendants retained a percentage of that hourly rate – which, again, they did not negotiate with Schedule A employees – and paid employees a lower hourly rate. Pitts. 1-23 Dep. Tr. at 96, li. 11-19. Notably, the hourly rate did not take into account the employee's work performance, experience, or skill. Exh. K-M; Pitts Dep. Tr at 69, li. 13-15. Schedule A employees did not negotiate their rates of compensation. *See* Pitts Dep. Tr. at 37, li. 9-19; Kim Dep. Tr. at 26, li. 14-17; Exh. K-P; R-S.

Schedule A employees had no ability to profit from their work for Steadfast. Exh. K-P; R-S. Schedule A employees did not own or invest in Steadfast. *Id.* Accordingly, they could not gain profit or lose money providing services to Defendants' clients. Schedule A employees could only increase their income by working more hours. Exh. K-P; R-S. Schedule A employees did not have any contractual or economic relationships with the facilities for which were placed to work through Defendants. Exh. K-P; R-S; Exh. I.

Schedule A employees depended entirely on Defendants to find job assignments and Defendants, in turn, controlled the terms and conditions of the employment relationship. Employee interviews. When Schedule A employees worked at a facility, Defendants expected them to perform basic nursing tasks and submit their timesheets to Defendants on a weekly basis. Kim Dep. Tr. at 16, li. 14-18; Exh. K-M. If Schedule A employees did not turn their timesheets in, they would not get paid, or their paychecks would be delayed. Exh. K-M.

Schedule A employees directly reported to Lisa Pitts. Exh. K-M. Defendants disciplined Schedule A employees and routinely advised them on the importance of punctuality and humility in the workplace. Exhibit J, Steadfast January 27, 2017 Memorandum Regarding Humility and Punctuality. If a client facility had an issue with a Schedule A employee regarding tardiness, conduct and other similar issues, the facility contacted Ms. Pitts and Ms. Pitts addressed the disciplinary issue with the employee directly, either by speaking to the employee directly and/or circulating a memorandum addressing the issue with all of the nurses. Exh. K-M.

Defendants did not permit Schedule A employees to hire their own employees or contractors to do their work or assist them at Defendants' clients' facilities. Exh. K-M; Exh. G. Indeed, the non-compete clause in their "Agreement for Independent Contractor Services" expressly forbade Schedule A employees from, "directly provid[ing] that type of services

5

provided to Company to any competitors of Company." Exh. G. In short, Defendants could not work for another company who provided medical staffing services, nor could they operate their own business that provided medical staffing services. *Id*. Additionally, the Agreement for Independent Contract Services contained a section that barred Schedule A employees from assigning their work to third parties "without the prior written consent of Company [Steadfast]." *Id.* Defendants also admit they did not allow Schedule A employees to subcontract out their work. Kim. Dep. Tr. at 40, li. 23-25- Tr. at 41, li. 1-25; Exhibit I, Agreement between Steadfast and Facility, p. 2. ("Facility will take no steps to recruit as its own employees those Contractors provided by Steadfast Medical Staffing, LLC, during the term of this agreement.").

Defendants' clients provided all of the tools and equipment Schedule A employees needed to perform their jobs, including stethoscopes and blood pressure cuffs. Exh. K-P; R-S. While some Schedule A employees used their own stethoscopes and blood pressure cuffs, they did so as a preference, rather than as a requirement. *Id.* Defendants also reimbursed Schedule A employees for hotel expenses for jobs that required them to travel to facilities that they could not readily commute. Exh. K. Notably, the "Agreement for Independent Contractor Services" is silent on reimbursement for mileage and expenses. Ex. G.

## II. Summary Judgment Standard

Summary judgment is warranted if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-

movant." *Brock v. Entre Computer Ctrs.,* 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). Facts are deemed material if they might affect the outcome of the case. In other words, the moving party's submission must foreclose the possibility of the existence of facts from which a jury could make inferences favorable to the non-movant. *Id.*

In deciding a summary judgment motion, the court must view the record as a whole and in the light most favorable to the non-moving party. *Terry's Floor Fashions, Inc. v. Burlington Indus.,* 763 F.2d 604, 610 (4th Cir. 1985). Either party may submit as evidence "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits" to support or rebut a summary judgment motion. Fed. R. Civ. P. 56(c).

### III.    Argument

Defendants have failed to show the absence of genuine issues of material fact, let alone that they are entitled to judgment as a matter of law. The economic realities test is a weighing test. The factors that comprise the test weigh in favor of an employment relationship. Further, Defendants rely almost exclusively on seven employee declarations they obtained using coercive and unethical techniques. Even if this Court allows Defendants to rely on these declarations, said declarations still do not warrant summary judgment.

A.    *Defendants violated Section 7 of the FLSA by failing to pay employees time and a half for all hours worked over 40 in a workweek.*

The FLSA requires an employer pay employees one-and-a-half times their regular rate of pay for hours worked over 40 in a workweek. 29 U.S.C. § 207(a)(1) (emphasis added); *see also Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997). Courts have consistently construed the Act "liberally to apply the furthest reaches consistent with congressional direction." *Alamo Found'n v. Secy. of Labor*, 471 U.S. 290, 296 (U.S. 1985) (citing *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 358 U.S. 211 (1959) (applying the economic

realities test in determining FLSA applied to employees who received benefits in lieu of wages)). Here, Defendants admit they failed to pay the employees in the Schedule A the overtime premium rate for hours worked over forty in a workweek as is required under Section 7 of the FLSA. Exhibit C, Response to Request No. 10; Exhibit D, Sample payroll records; Kim Dep. Tr. at 27, li. 2-14.

The Secretary has established liability. Under the FLSA an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The term "employ" means "to suffer or permit to work." *Id.* § 203(g). The individuals in Schedule A to the Complaint are employees; it is clear Schedule A employees suffered to work. There is no dispute that between August 18, 2015 and present, Schedule A employees worked for Defendants. Steadfast is a medical staffing company and Schedule A employees provide basic healthcare services in Steadfast's name. Exh. K-P; R-S; Exh. G; Exh. I. Defendants assigned employees to their client facilities that were in need of RNs, LPNs and CNAs. Kim Dep. Tr. at 11, li. 14-18. Defendants paid Schedule A employees a non-negotiable hourly rate. Exh. K-P; R-S. Defendants dictated what hours and where Schedule A employees would work. *Id.* Defendants paid employees directly, with paychecks with "Medical Staffing of America" across the top. Exh. D. Thus, Plaintiff has established an employer-employee relationship existed between Defendants and Schedule A employees that triggered overtime obligations under the FLSA.

Defendants violated Section 7 of the FLSA because they paid CNAs, LPNs and RNs straight time, i.e., their normal hourly rate, for hours worked over forty in a workweek rather than one and one-half times their regular rate of pay. Indeed, Defendants' overtime violations are apparent on the face of Defendants' own payroll records, which consistently show that employees worked more than 40 hours in a workweek and that Defendants paid said employees

their straight time rate for all hours worked. Exh. H. The facts on this issue are not in dispute and the record does not allow for any other conclusion than Defendants violated Section 7 of the Act.

   B. *Defendants have failed to satisfy their burden of proving by clear and convincing evidence that Schedule A employees are independent contractors.*

The individuals identified on Plaintiff's Schedule A are unquestionably employees and, therefore, covered under the FLSA. Defendants' allegation that the individuals listed in the Schedule A are independent contractors is an affirmative defense. *See Iontchev v. AAA Cab Serv., Inc.,* 685 Fed. Appx. 548, 549 (9th Cir. 2017) (employer has the burden of proving by "clear and convincing evidence that [employees] are independent contractors under the FLSA"); *Piña v. Pakalex Inc.*, No. CV TDC-15-0638, 2015 WL 6082372, at *2 (D. Md. Oct. 14, 2015); *Leon v. Alvarez*, No. CBD-16-0416, 2017 WL 4236813, at *2 (D. Md. Sept. 25, 2017); *Ceant v. Aventura Limousine & Transp. Serv., Inc.*, 874 F. Supp. 2d 1373, 1383 (S.D. Fla. 2012); *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97 (1974) (An exemption must be asserted as an affirmative defense to a claim under the FLSA). Indeed, any exemption under the FLSA is an affirmative defense. *See* 29 U.S.C. § 207(e). Employers bear the burden of proving each element of an FLSA exemption defense by clear and convincing evidence. *Desmond v. PNGI Charles Town Gaming, LLC*, 564 F.3d 688, 691-92 (4th Cir. 2009) (citing *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993)).

Defendants have failed to satisfy their burden of proving the individuals in Schedule A are independent contractors. To satisfy their affirmative burden of proof, Defendants must provide facts that prove: (1) the degree of control the putative employer has over the manner in which the work is performed; (2) the worker's opportunity for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working

relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business. *United States v. Silk,* 331 U.S. 704, 716 (1947). *See Schultz v. Capital Intern Sec, Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (citing *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 671 (D. Md. 2000)). No single factor is determinative for the Court's analysis. *See Schultz*, 466 F.3d at 305. It is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer. *See Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 676 (1st Cir. 1998). The focal point of this analysis is "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Schultz*, 466 F.3d at 304. Defendants have failed to meet their burden of proving Schedule A employees were not economically dependent on Steadfast, let alone provided 'significant probative evidence' to support the allegations." *Anderson*, 477 U.S. at 249.

      1. Courts Have Consistently Held that RNs, LPNs, CNAs Working for Registries and Other Staffing Agencies Are Employees under the FLSA and Entitled to Overtime Compensation.

Courts have consistently held that RNs, LPNs, CNAs who work for registries or other staffing agencies are employees under the FLSA and, therefore, entitled to overtime compensation. *See Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365 (N.D. Fla. 2015) (finding CNA employed by nurse registry, which contracted with government agencies and arranged for CNAs to provide services at patients' residences, was an employee of the registry); *Crouch v. Guardian Angel Nursing, Inc.*, Civil Action No. Action No. 3:07–cv–00541, 2009 WL 3737887 (M.D. Tenn. 2009) (finding LPNs who worked for nurse staffing agency that contracted with home health agencies to supply them with LPNs to provide private-duty nursing to home health agencies' patients were employees of the staffing agency for purposes of FLSA, rather than independent contractors); *Gayle v. Harry's Nurses Registry*, 594 Fed.Appx. 714 (2d Cir.

2014) (finding nurses working for health-care service engaged in providing nurses to individuals, hospitals, and nursing homes were employees of the service, rather than independent contractors); *LeMaster v. Alternative Healthcare Solutions, Inc.*, Case No. 3:08–1101, 726 F.Supp.2d 854 (M.D. Tenn. 2010) (finding Defendant nursing and domestic staffing company that recruited nurses and referred them to home healthcare agencies and nursing homes to be employer).

Similar to the nurses in the above-listed cases, Schedule A employees in the present case also worked for a medical staffing company and provided services directly to that company's clients. Exh. K-P; R-S; Exh. G; Exh. I. Their schedules were also dictated by the staffing agency and/or registry they worked for and they could not negotiate their rates of pay. Exh. K-M. They were counseled and disciplined by the staffing agency and/or registry. *Id.* The nurses not own their own business, and did not advertise their services. Exh. K-M. Thus, just like the LPNs, RNs and CNAs in *Hughes, Crouch,  Gayle, and LeMaster*, Schedule A employees here were employees as defined under the Act and were entitled to overtime compensation for hours worked over forty in a workweek.

2.    Defendants' exerted control over Schedule A employees.

"[T]he control element may be satisfied where the putative employer sets the workers' schedules, directs them to particular work sites, requires them to fill out time sheets, and can fire them at will." *Randolph v. PowerComm Const., Inc.*, 309 F.R.D. 349, 357 (D. Md. 2015). "An employer need not supervise, control, or otherwise exercise authority continuously over their employees to be an employer." *Perez v. Ocean View Seafood Rest., Inc.*, 217 F. Supp. 3d 868, 877–78 (D.S.C. 2016) (citing *Irizarry v. Catsimatidis*, 722 F.3d 99, 111 (2d Cir. 2013)). Rather, "control may be restricted, or exercised only occasionally without removing the employment

relationship from the protections of the FLSA." *Id*. (citing *Donovan v. Janitorial Servs., Inc*., 672 F.2d 528, 531 (5th Cir. 1982) (stating "that [the employer] exercised that authority only occasionally ... does not diminish the significance of its existence")). Indeed, "the issue is not the degree of control that an alleged employer has over the manner in which the work is performed in comparison to that of *another employer.* Rather, it is the degree of control that the alleged employer has in comparison to the control exerted by the *worker.*" *See Schultz,* 466 F.3d at 305. Here, Defendants exerted the requisite control over Schedule A employees to demonstrate the existence of an employment relationship.

Schedule A employees were economically dependent on Defendants. Schedule A employees did not operate their own businesses; instead, they relied on Steadfast to assign them work. Exh. K-P; R-S. Many of the Schedule A workers' sole source of income was derived from their work with Defendants. Exh. M; Exh. H. In fact, Defendants restricted Schedule A employees' ability to work for similar companies – and to operate their own similar business – and required them to sign a contract which contained a non-compete clause that expressly stated: "Contractor shall not directly provide that type of services provided to Company to any competitors of Company without first obtaining the express written permission of Company." Exh. G. The existence of a non-compete clause goes directly against the nature of a true independent contractor. *Hughes*, 117 F. Supp. 3d at 1372; *Harris v. Skokie Maid and Cleaning Serv., Ltd.,* No. 11–8688, 2013 WL 3506149, at *9 (N.D. Ill. July 11, 2013); *Swinney v. AMcomm Telecommunications, Inc.,* 30 F. Supp. 3d 629, 634 (E.D. Mich. 2014). Similarly in *Gayle v. Harry's Nurses Registry*, the defendant nursing registry assigned nurses to work with individuals, in hospitals and nursing homes. 594 Fed. Appx. at 714. However, the registry prohibited nurses from "contracting independently with placements." *Id.* at 717.  Ultimately, the

12

Court found that this factor weighed in favor of employment status. *Id.* A true independent contractor owns his/her own business and works with multiple companies performing the same tasks. Here, Defendants explicitly prohibited Schedule A employees from working with any business other than Steadfast. Exh. G. That restriction demonstrates the existence of an employer-employee relationship.

Defendants also subjected Schedule A employees to a comprehensive hiring process. Defendants required Schedule A employees to complete an employment application, which inquired into the employee's employment history and skill set. Exh. E; Exh. K-M; P. The application also required a list of references. *Id.* Defendant Pitts then conducted in-person interviews and questioned employees about their employment history and experience. Exh. L-M; P. Defendants also required all Schedule A employees submit to background checks and drug testing; Steadfast paid for both services. Stipulation of Undisputed Facts, ECF No. 84; Exh. K-M. Once Schedule A employees cleared this process, Defendants hired the employees and they were eligible to begin working for Steadfast. If the employee refused the shift, they faced severe repercussions. One employee said that if she dared turn down a shift or did that on one too many occasions, Ms. Pitts intentionally stopped offering her work hours for and "blacklist" her. Exh. L. Another employee states that when he turned down a shift, Ms. Pitts threatened: "'don't mess with my money.'" Exh. K.

Just as Defendants had the ability to hire Schedule A employees, they also fired employees. If nurses refused to take shifts Steadfast assigned to them, Defendants "blacklisted" them, i.e., no longer assigned the employee work. Exh. K-L. Clearly refusing to assign an employee work is equivalent to firing. *See, e.g.*, *Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 295 (2d Cir. 2008); *Renteria-Camacho v. DirecTV, INC.,* No. 14-2529, 2017 WL 4619354, at *6

(D. Kan. Oct. 16, 2017). Evidence of Defendants' hiring and firing of employees demonstrates the control Defendants exerted over Schedule A employees and fully supports the conclusion that Defendants employed these individuals. *Cf. Hughes*, 117 F. Supp. 3d 1365, 1370 (finding nurse registry exerted control over CNA even though CNA could refuse work without consequence, may agree to work only on certain days, refuse to work with certain patients or in a particular county). Schedule A workers were forced to take the shifts Ms. Pitts offered or risk losing working hours, income and possibly their job. Exh. K-L.

Defendants assigned work by contacting Schedule A employees and informing them of the location and shift of the assignment. Exh. K-M; R. If a Schedule A employee could not take an assigned shift, Ms. Pitts typically did not assign that employee work. Exh. K-L If the employee took the assignment, she could not contact the client directly to change any aspect of the assignment. Exh. K-M. Instead, Defendants required that employees contact Steadfast if he or she was no longer able to take the assignment. *Id.* Defendants also prohibited Schedule A employees from contacting the facilities directly to obtain shifts. Exh. I.

Defendants also counseled nurses on professionalism and their behavior. Contrary to Defendants' claim that Defendants did not "instruct nurses about their…standards of expected conduct," Lisa Pitts admits she routinely addressed conduct with the Schedule A employees. Pitts 2-21 Dep. Tr. at 47-48.  Ms. Pitts distributed a memorandum to Schedule A employees directing them to "be on time for all shifts." *Id.* Defendants also concede they addressed behavioral issues with the nurses. Pitts 2-21 Dep. Tr. at 47-48. If a client took issue with a Schedule A worker, whether about performance, tardiness or behavior, the client informed Ms. Pitts and Ms. Pitts, in turn, addressed the problem with the Schedule A employee. Pitts 2-21 Dep. Tr. at 47-48.  In February or March of 2017, an LPN states that when she was working in

Charlottesville Health and Rehabilitation, there was a misunderstanding with another LPN at the facility. The other LPN contacted Ms. Pitts to complain. However, without hearing the nurse's side of the story, Ms. Pitts threatened to "fire" the employee for the employee's alleged "'behavior.'"  Exh. M.

Defendants also set Schedule A employees' rates of pay. Schedule A employees did not negotiate their rates of pay. Instead, Defendants negotiated the hourly rate the client facilities paid Defendants for Schedule A employees' services . Pitts 2-21 Dep. at 25, li. 2-6 ("We have a contract with these different facilities." "So they'll call us and go over…the pay they'll pay, and we'll negotiate with them."); Kim Dep. Tr. at 26, li. 14-17; Exh. K-P; R-S. *See Hughes*, 117 F. Supp. 3d 1365, 1372 (finding control factor was not met where nursing registry determined contract rates with government entities and nurses had no ability negotiate the rate for a job she was offered). After Defendants negotiated pay with the client, Defendants took a percentage of that negotiated hourly rate – which varied contract to contract based on Steadfast's preferences – and paid the remainder to the Schedule A employee. Pitts 1-23 Dep. Tr. at 96, li. 11-19. The Schedule A employee did not determine what percentage of the hourly rate Steadfast could take for the work performed by the employee. Exh. K-P; R-S. The employee was not a party to Defendants' negotiations with clients regarding the hourly rate. *Id.* Instead, once Defendants set the pay rate with the client, Lisa Pitts refused to negotiate that rate with the Schedule A workers. Exh. K-P; R-S; Pitts 1-23 Dep. Tr. at 96, li. 11-19.

Further, Defendants paid employees directly. Defendants paid Schedule A employees with paychecks with "Medical Staffing of America" across the top.[1] Exh. D. Defendants also

---

[1] It also should be noted that Schedule A employees wore "Steadfast Medical Staffing" identification badges. Exh. K-M. They were provided to the nurses by Steadfast and Steadfast required them to wear these badges at all times while they worked in the client facilities. *Id.*

required Schedule A employees to complete time sheets in order to receive their wages. Exh. K-M. Schedule A employees were required to send the timesheets to Steadfast on a daily basis. Exh. K-M; Exh. J (noting all timesheets must be submitted "after every shift."). *See Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp.2d 762, 769 (D. Md. 2008) (the control element may be satisfied where the putative employer sets the plaintiffs' schedules, directs them to particular work sites, requires them to fill out time sheets, and can fire them at will.). Nurses did not get paid if they did not turn in their timesheets in a timely manner. Exh. K-M; Kim Dep. Tr. at 72, li. 8-13; ECF 80-10 ("I submit [my] timesheet to Steadfast so they know how many hours to pay me for."). Similarly, in *Hughes*, CNAs were required to keep accurate records of time worked. 594 Fed. Appx. at 1371-72. If they failed to submit timesheets on time, their compensation would be held or forfeited altogether. *Id.* at 1372. In that case, the Court found those facts supported a finding that the registry asserted control over the CNAs. *Id.*

Defendants also required Schedule A employees to notify them in case of absence. For example, if a Schedule A employee was sick and could not attend to a shift, or had to leave early, he or she was required to immediately notify Defendants, providing at least six hours' notice. Exh. L-N. Defendants prohibited Schedule A employees from contacting clients when they needed to cancel a shift. *Id.* Further, Defendants expected Schedule A employees to notify them in advance when they intended to take planned time off vacation. *Id.*;Exh. P. Schedule A employees were also forbidden from subcontracting out their work. Exh. K-P; R-S.

All of the above demonstrates the control Defendants exerted over Schedule A employees on a daily basis. This factor weighs heavily in favor of employee status.

3. *Schedule A employees had no opportunity for profit and loss.*

"Where the putative employee's work is, by its nature, time oriented, not project oriented, courts have weighed the second [economic realities test] factor in favor of employee status." *PowerComm Const., Inc.*, 309 F.R.D. at 357. In other words, if employees are paid by the hour and the only way they can increase their income is to increase their work hours, that individual does not have an opportunity for profit and loss and is more likely an employee. *Id.*; *see also Harry's Nurses Registry*, 594 Fed. Appx. at 717 (finding nurses were employees because they had "no opportunity for profit or loss whatsoever; they earn[ed] only an hourly wage for their labor and ha[d] no downside exposure."); *LeMaster*, 726 F. Supp. 2d at 862 (findings LPNs had no opportunity for profit or loss because they were compensated at an hourly rate for their and their earnings were not at all tied to performance); *Genesee County Cmty. Mental Health Servs.*, 45 F. Supp. 2d at 614 (finding the regular contract rate defendant paid nurses was not a "'profit,'" but rather their "'earnings.'"). Here, it is undisputed that Defendants paid Schedule A employees on an hourly basis. Exh. K-P; R-S; Exh. H; Pitts 1-23 Dep. Tr. at 54, li. 15-19. As such, Schedule A employees did not have an opportunity for profit and loss.

Whether a worker has opportunities for profit or loss is dependent on his managerial skills. *See Harry's Nurses Registry*, 594 Fed. Appx. at 717 ("The relevant inquiry here is whether Ms. Hughes's opportunity for profit or loss depends more upon FLC's provision of work orders and Ms. Hughes's technical skill and efficiency than on her managerial skill."); *Silk*, 331 U.S. at 716. In this case, Schedule A employees had no managerial skills— they did not supervise other employees or operate their own companies – indeed, Defendants expressly forbade it. Exh. K-P; R-S; Exh. G ("Contractor shall not directly provide that type of services provided to Company to any competitors of Company...") Instead, they provided basic

healthcare services to patients, including dispensing medication, treating wounds, updating patient's charts, etc. Exh. K-P; R-S. Schedule A employees also did not negotiate their hourly rates, further demonstrating they did not have an opportunity for profit while working for Defendants. Exh. K-P; R-S. *See Hardison v. Healthcare Training Solutions, LLC,* Case No. PWG-15-3287, 2017 WL 2276840, at *4 (D. Md. 2017) (paying a worker an hourly rate "militates in favor of employee status").

Schedule A employees also could not make the business strategy decisions necessary to increase the profits of an independent business, such as the type and amount of equipment to use, what types of jobs to take, whether to hire assistants, whether to invest in advertisements, or whether to adjust pricing. Exh. K-P; R-S. In fact, had they done so, they would have been acting in direct violation of their non-competition agreement with Defendants. Exh. G. *See Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365 at 1371-72 (rejecting defendant registry's claim that nurses had "substantial opportunity to realize profit, and loss" because they were "free to *limit* her jobs to those in a certain geographical area, or those which would pay more than others" because a nurses only freedom with respect to the jobs she undertook was the freedom to limit those she accepted); *Crouch*, 2009 WL 3737887 at *18 (finding that nurses who were paid by the hour for the number of hours they actually worked, regardless of how well they perform their jobs, had no opportunity for profit or loss because they had little control over how much work they received from the defendant staffing agency, beyond being able to turn down work or shifts they did not want).

Schedule A employees did not invest in Defendants' business, nor did they own any percentage of Steadfast. Exh. K-P; R-S. Therefore, they also could not suffer financial losses working for Steadfast. Again, their income depended solely on the number of hours they worked

– there was no risk of loss or potential for profit. These facts demonstrate Schedule A employees were not independent contractors. In fact, the nature of the employment relationship between Defendants and Schedule A employees precluded Schedule A employees making any profit in the healthcare industry. That Defendants required Schedule A employees to sign agreements which contained non-competition clauses, therefore, limited their ability to profit outside of earning an hourly rate from Steadfast is further evidence of an employment relationship. *See Hughes*, 117 F. Supp. 3d at 1372; *Harris*, 2013 WL 3506149, at *9; *Swinney,* 30 F. Supp. 3d at 634.

    4.    *Schedule A employee skills are indicative of an employment relationship.*

This element does not address the skill of the work itself, but instead, whether nurses used their skills in an "independent" way or whether they are dependent on referrals to find job assignments. *See Richardson v. Genesee County Cmty. Mental Health Servs.,* 45 F. Supp. 2d 610, 614 (E.D. Mich. 1999) (finding RN plaintiffs' reliance on others for job placements indicative of employment as opposed to independent contractor status); *Brock v. Superior Care, Inc.*, 840 F.2d 1054,1060 (2d Cir. 2016) (finding that while nurses do possess "technical skills," "nothing in the record reveals that they used these skills in any independent way," where nurses "depended entirely on referrals to find job assignments."); *Guardian Angel Nursing, Inc.,* 2009 WL 3737887, at *17 (finding that, while the degree of skill possessed by LPNs might ordinarily weigh in favor of independent contractor status, where nursed did not use these skills in any independent way and depended entirely on referrals to find job assignments, the degree of skill did not weigh in favor of finding independent contractor status); *LeMaster*, 726 F. Supp. 2d at 861 (finding "skills' factor weighed in favor of employee status, noting "[n]othing in the record suggests that the plaintiffs here were capable of finding their own clients.").

In the present case, Schedule A employees relied solely on Defendants to place them with client facilities. Exh. K-M. Schedule A workers could not, for example, contact Defendants' clients directly to offer their services. *Id.* In fact, Defendants expressly forbade Schedule A employees from doing so, per the Agreement for Independent Contractor Services they signed. Exh. G.  Defendants also forbade the "business-like initiative" required to satisfy this element by prohibiting Schedule A employees from "**directly provid[ing] [nursing] services provided to Company to any competitors of Company without first obtaining the express written permission of Company" for a period of twelve months after leaving Steadfast's employment**." *Id.* Defendants also precluded themselves from showing Schedule A employees possessed the requisite skills and initiatives to find their own clients.

"Although certain highly specialized job skills support independent contractor classification, '[s]kills are not the monopoly of independent contractors,' as all jobs require some modicum of skill." *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1077 (N.D. Ill. 2014) (quoting S*ec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)); *Solis v. A+ Nursetemps, Inc.,* No. 5:07–cv–182–oc–10PRL, 2013 WL 1395863, at *6 (M.D. Fla. Apr. 5, 2013) (The work of a nurse in "this society is not necessarily a specialty job in the sense that members of the public do not typically seek them out for private or individual engagements; rather, the nurses involved in this case work, instead, on an hourly basis in institutional settings like the hospices, hospitals and detention facilities."). A variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees under the FLSA. *See, e.g., Richardson,* 45 F. Supp. 2d at 614 (registered nurses); *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 666–67 (5th Cir. 1983) (welders); *Walling v. Twyeffort, Inc.,* 158 F.2d 944 (2d Cir. 1947) (tailors); *cf. Donovan v. DialAmerica Marketing, Inc., supra,*

757 F.2d at 1387 (where distributors in home research business exercised "business-like initiative" in recruiting new home researchers, skill factor weighed in favor of independent contractor status).

Here, Schedule A workers were required to provide the services prescribed by the facility and physicians, a practice which is standard in this industry. Exh. M; ECF No. 80-10 ("The facility has their particular doctors assigned, and you have to follow their guidelines and procedures. You fall in line with facility protocols."). Schedule A CNAs, LPNs and RNs performed tasks commonly associated with their respect fields—they passed out medication, updated patient charts, treated wounds, took vital measurements, etc., in accord with the mandates of the state board of nursing. Exh. K-M. Thus, Schedule A employees performed the skilled work Defendants and their clients directed them to perform, without discretion or the use of independent judgment. This fact, therefore, weighs heavily in favor of a finding Schedule A employees were employees under the Act.

5. *Schedule A employees did not invest in equipment or material, nor did they employ other workers.*

Schedule A workers did not employ other workers – in fact, Defendants expressly forbade Schedule A workers employing other workers or subcontracting out their work to third parties. Exh. K-P; R-S; Exh. G. The Agreement forbade them from "provid[ing] [nursing] services … to any competitors of Company," which clearly includes providing nursing services for their own business, if that business involved assigning healthcare professionals, including themselves, to work at healthcare facilities. Exh. G. Indeed, the Agreement, by its very nature, barred Schedule A employees from operating their own nursing care companies. The Agreement also prohibited Schedule A employees from assigning their Steadfast work to a third party. *Id.* Defendants did not allow Schedule A employees to subcontract out their work. Exh. G; Kim. 1-

23 Dep. Tr. at 40, li. 23-25- Tr. at 41, li. 1-25. *See Harry's Nurses Registry*, 594 Fed. Appx. at 717 (staffing agency deemed employor of nurses when it prohibited them from subcontraacting shifts to other nurses).

Additionally, Schedule A employees did not invest in, or pay for, any equipment or material to perform their jobs. "As for investment in equipment or materials, [i]nvestment in this instance is understood to be large expenditures, such as risk capital, or capital investments, and not negligible items or labor itself." *PowerComm Const., Inc.,* 309 F.R.D. at 358; *see also Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) ("[T]he appellants' investment in light equipment hoes, shovels and picking carts is minimal in comparison with the total investment in land, heavy machinery and supplies necessary for growing the strawberries.").  Here, Steadfast's client facilities provided all of the tools and equipment Schedule A employees needed to perform their jobs, including stethoscopes and blood pressure cuffs. Exh. L-M. While some Schedule A employees used their own stethoscopes and blood pressure cuffs, they did so as a preference, rather than as a requirement. *Id*; *See Schultz*, 466 F.3d at 308 (finding the fact that agents chose to use their own firearms when their employer supplied firearms to those who wanted did not weigh in favor of classifying the workers as independent contractors); *Guardian Angel Nursing, Inc.*, 2009 WL 3737887, at *17; *see also Herman,* 164 F.Supp.2d at 675 (weighing factor strongly in favor of independent contractor status where installers made considerable investments in their own vehicles, specialty tools, and insurance premiums). Further, it is not particularly relevant that the clients, rather than Defendants, invested in medical equipment. *Guardian Angel Nursing, Inc.*, 2009 WL 3737887, at *17. Indeed, Defendants' investment in the business of placing LPNs, RNs and CNAs substantially

outweighs Plaintiffs' investment in the tools of their trade. [2] *Id.* (finding Defendants' investment in the business of placing LPNs with patients to provide nursing care substantially outweighs Plaintiffs' investment in the tools of their trade, which includes stethoscopes, uniforms and gloves); *LeMaster*, 726 F. Supp. 2d at 862 (same).

It also should be noted that Defendants reimbursed Schedule A employees for hotel expenses for jobs that required them to travel to facilities that they could not readily commute. Exh. K. For example, one LPN states Defendants reimbursed her hotel expenses when he had to work in a facility that was approximately 216 miles from his home. Exh. K. Notably, the Agreement for Independent Contractor Services did not require Defendants to reimburse Schedule A employees for these expenses – thus, Defendants did not reimburse employees due to a contractual obligation. Exh. G.

6.    *The transient nature of the nursing work force is not dispositive of independent contractor status.*

Nursing, especially through the use of the staffing agency, is inherently transient in nature. *Guardian Angel Nursing, Inc.*, 2009 WL 3737887, at **14–15; *LeMaster*, 726 F. Supp. 2d at 861. Therefore, the fact that some Schedule A workers did not work for Steadfast for more than a few months, is not dispositive of independent contractor status. The "'lack of permanence [in the nursing industry] is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative.'" *Superior Care,* 840 F.2d at 1060-61; *Guardian Angel*

---

[2] LPNs, CNs, and RNs maintaining their nursing licenses is immaterial for purposes of determining whether they are independent contractors. LPNs, CNs, and RNs are required to maintain a license to work in their respective industries, regardless of whether they are employees or independent contractors. Pitts 1-23 Dep. Tr. 24, li. 5-9; *See, e.g., Schultz*, 466 F.3d at 308 ("Although the agents arguably had an investment in their individual PPS licenses, this investment is immaterial for our purposes. Licensing is required of all persons working as personal protection specialists in Virginia regardless of whether they are employees or independent contractors.").

*Nursing, Inc.*, 2009 WL 3737887, at **14–15. In *Superior Care,* the Court held that the transient nature of the nursing work force, including seeking placement through referral services, was "not dispositive of independent contractor status." *Id.* at 61. The fact that some Schedule A employees worked for other staffing agencies is also not dispositive. *Superior Care. Superior Care,* 840 F.2d at 1060 (noting employees may work for more than one employer without losing their benefits under the FLSA.). In this case, however, despite the transient nature of the nursing workforce, many of the Schedule A workers worked for Defendants for multiple years. Exh. L-M; Exh. P; ECF No. 80-7 ("I've been working on Steadfast's registry since 2015."); 80-8 ("I have been a contractor on Steadfast's registry since 2005 or 2006."); ECF No. 80-10 ("I started on Steadfast's registry around 2016.); *See Superior Care,* 840 F.2d at 1060–61 (despite the fact that 78% percent of the plaintiffs had worked for the defendant for thirteen weeks or fewer, plaintiffs were nevertheless found to be employees).

In many instances, Schedule A employees worked exclusively for Defendants. Exh. M-N; R-S. Defendants' claim that a majority of the nurses who worked for Steadfast did so "irregularly to supplement other income." ECF No. 80, p. 24. In support of this statement, Defendants offer an analysis of a small percentage of their payroll records, starting in November 2018 and ending in April 2019. However, the period of investigation in this matter ran from August 18, 2015 through June 9, 2017, and computations were updated from the end of the period of investigation through April 2019 for Defendants' continued violation of the FLSA. Defendants' reliance on a small percentage of the payroll records is misleading and prejudicial. Such an analysis also falsely presumes these nurses were interested in working a traditional forty-hour workweek, or that because they did not work a minimum of forty-hours a week for Defendants, they must have

been working for other companies. Both suppositions are unsupported by any independent evidence in the record. *See* Exh. M.

Furthermore, Defendants required Schedule A employees to sign agreements, which included a non-compete clause that prohibited Schedule A employees from working for Defendants' competitors during and after their Steadfast employment. Exh. G. Defendants cannot have it both ways—they cannot classify their CNAs, RNs and LPNs as independent contractors, who would traditionally be free to use their skills wherever they please, and simultaneously prevent them from working for their competitors. *See Harris,* 2013 WL 3506149, at *9 (holding that defendant's non-compete provision weighed in favor of considering the plaintiff maids as employees rather than independent contractors). Moreover, Defendants imposed a twelve-month moratorium on Schedule A employees' ability to work for one of Steadfast's competitors once they left Steadfast. Exh. G. This restriction contradicts Defendants' argument that these employees were free to come and go as they pleased, without consequence, because even if Schedule A workers wanted to work for another employer in their chosen profession, they were precluded from doing so by this provision.

The fact that those same Agreements fail to limit Schedule A employees' work to a set term is further evidence of an employer-employee relationship. *See* Exh. G ("This Agreement will become effective on the date stated above and will continue in full force and effect until the services in Exhibit A are completed."). The open-ended nature of these agreements—rather than setting a specific period for work to be completed—further evidences an employment relationship.

 "Even assuming a certain degree of transience, the evidence in the record does not suggest that the overall transience of the relationship somehow contributes to a conclusion

that Plaintiffs were in business for themselves as opposed to being dependent upon Defendants for the opportunity to render service, the ultimate question the balancing test was designed to determine." *Crouch*, 2009 WL 3737887, at **14–15. Accordingly, this "factor under the circumstances should be given little emphasis to begin with." *Crouch*, 2009 WL 3737887, at *14–15; *Wilson v. Guardian Angel Nursing, Inc.,* No. 3:07-0069, 2008 WL 2944661, at *12 (M.D. Tenn. 2008) (likewise concluding that "the relative transience of Plaintiffs as a group of workers [would] be given little weight" as it signaled, "not that Plaintiffs are an enterprising group who successfully brokered their skills for isolated assignments, but rather that the industry as a whole does not guarantee steady work with one company for those in need of full-time hours.").

That being said, Schedule A employees worked for Steadfast for years, some as far back as 2005, before the company abruptly closed and reopened in 2015. Exh. K-L; Q; ECF No. 80-7 ("I've been working on Steadfast's registry since 2015."); 80-8 ("I have been a contractor on Steadfast's registry since 2005 or 2006."); ECF No. 80-10 ("I started on Steadfast's registry around 2016.). Therefore, this factor also weighs in favor of an employment relationship.

> 7.   *The services Schedule A employees provide are an integral part of Defendants' business.*

Defendants operate a medical staffing agency. Their only business and, indeed, their sole source of income, is derived from placing CNAs, LPNs and RNs in healthcare facilities. Pitts Dep. Tr. at 23, li. 18-22 ("Steadfast is a registry." "[W]e register nurses to work as contractors out in the field.") Without the Schedule A employees, Defendants' business would cease to exist. Defendants admit Schedule A employees "rendered services that were an integral part of Defendants' business." ECF No. 84, Stipulation of Undisputed Facts. *See Guardian Angel Nursing*, 2009 WL 3737887, at *17 (staffing agency that places LPNs at client sites as home

health aides is at the heart of Defendants' business; therefore, integral to their business); *Harry's Nurses Registry*, 594 Fed. Appx. at 717 (finding "the nurses are not just an integral part but the sine qua non of defendants' registry business" and that business of placing nurses accounts for defendants only income). Therefore, this element weighs in favor of a finding that Schedule A workers are employees.

> 8.  *Contracts and 1099 forms have no bearing on Schedule A employees' status as employees.*

Defendants claim that because the individuals in Schedule A signed "independent contract agreements" with Defendants, they cannot be treated as employees covered under the Act. Defendants are wrong. Employers may not circumvent the FLSA by requiring employees to sign agreements stating that they are exempt employees and thus not entitled to overtime compensation. *See Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 302 (1985); *see also Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (stating, regarding the "nonwaivable nature" of employees' rights, that "FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate") (internal citations and quotations omitted); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) ("putting on an 'independent contractor' label does not take the worker from the protection of the Act.") (citations omitted); *Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452, 457 (D. Md. 2000) (courts do not look at the "employee" or "independent contractor" label of a worker, but rather to the underlying economic reality between the putative employer and the worker); *Rudolph v. Metro. Airports Comm'n*, 103 F.3d 677, 680 (8th Cir. 1996) ("Employers and employees may not, in general, make agreements to pay and receive less pay than the statute provides for such agreements are against public policy and unenforceable."); *Real v. Driscoll Strawberry Assocs.,*

*Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) ("the subjective intent of the parties to a labor contract cannot override the economic realities" of the employment relationship); *see also Quinteros v. Sparkle Cleaning, Inc.,* 532 F.Supp.2d 762, 768 (D.Md. 2008) ( "[E]ven if a contract clearly defines the relationship as one of client/ subcontractor, it may still constitute an employer/ employee relationship for purposes of the FLSA."). Similarly, Defendants' use of Form 1099 for the Schedule A workers also has no bearing on their misclassification as independent contractors. Simply because Defendants required Schedule A employees sign documents identifying themselves as independent contractors does not render it so. Such an argument is analogous to arguing that if one writes a million dollar check, he is a millionaire. For these reasons, the fact that Schedule A employees may have signed independent contractor agreements or received 1099s is irrelevant to an analysis of their employment status.

9.    *The primary evidence Defendants rely upon in moving for summary judgment – seven employee declarations – is unreliable and should be disregarded.*

Plaintiff recently learned defense counsel initiated a campaign to secure declarations from employees listed in Schedule A of the Complaint for the purpose of summary judgment without informing said witnesses that signing such statements are directly against their interests, while at the same time cutting off Plaintiff's access to those same witnesses employees by directing them not to speak with Plaintiff's counsel. Exhibit U, Letter from Attorney Davis. The cumulative effect of Defendants' misconduct has distorted the fact-finding process and compromised the integrity of this litigation.

Defense counsel admits to engaging in conduct that is a clear abuse of the judicial process and a direct violation of Local Rule 83.1(I) and Virginia Supreme Court Rule of Professional Conduct 3.4.  It is undisputed that Defendants have directed employees listed in

Schedule A of the Complaint and on Plaintiff's April 22, 2019 Witness List – key employee witnesses for whom Plaintiff is seeking back wages – not to speak with counsel for the Secretary. Defense counsel admits directing at least three employees listed in Schedule A of the Complaint not to speak with counsel for the Secretary. *See* Exhibit U, at 2.  Defense counsel admits communicating this directive both verbally and via text message. *Id*. A Schedule A employee has confirmed defense counsel directed him not to speak with counsel for the Secretary. *See* Exhibit V. This misconduct alone warrants the Court disregarding those seven employee declarations. *See Acosta v. Austin Elec. Servs., LLC*, 322 F. Supp. 3d 951, 958 (D. Ariz. 2018) ("[A]n employer is prohibited from obtaining, under coercive circumstances, employee declarations, particularly declarations that are relevant to and go to the heart of pending claim that the employee failed to fully compensate employees."); *Acosta v. Southwest Fuel Management, Inc*., No. CV16–4547 FMO, 2018 WL 2207997, at *4 (C.D. Cal. Feb. 20, 2018). ("[S]oliciting and extracting coerced declarations . . . constitutes an adverse employment action for purposes of the FLSA anti- retaliation provision.").

Defendants' misconduct also violates Section 215(a)(3). Under the FLSA, it is unlawful "for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any [FLSA] proceeding . . . or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3). In addition to directing employees not to cooperate with the Secretary, defense counsel admits questioning employees about whether they have spoken with the Department of Labor, an attempt to breach the government's informants privilege. *See* Exhibit U, at 3; *see also* Exh. V. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (finding an attorney representing the individual's employer asking whether the employee cooperated with the same government

agency seeking a monetary judgment against the employer clearly would have a chilling effect and "dissuade[] a reasonable worker from making or supporting a claim of a violation of the FLSA."); Va. Rule Prof. Cond. 4.4. Defense counsel also questioned and sought statements from employees included in Schedule A of Plaintiff's Complaint without informing them that their interests in this litigation – a potential award of back wages – is directly adverse to Defendants' interests in this case. Exh. V-W. *See Acosta v. Southwest Fuel Management, Inc.*, 2018 WL 2207997, at *4; *Longcrier v. HL–A Co., Inc.*, 595 F. Supp. 2d 1218, 1230 (S.D. Ala. 2008). One witness stated, "[h]ad I known I could receive back wages for overtime in this case, I would not have signed the statement written by Attorney Davis." Exh. V. These facts, combined with the inherent coercive nature of unsupervised communications urging individuals to waive their right to collect wages due under the FLSA, when the parties are engaged in an ongoing employer-employee relationship, evidence Defendants' violation of 29 U.S.C. § 215(a)(3).

Defendants have made concerted efforts to improperly interfere with Plaintiff's right to interview employees for whom he is seeking back wages. Therefore, the seven statements they obtained for purposes of summary judgment should be disregarded in their entirety.

**IV.    Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.


                                        Respectfully submitted,


Mailing Address:                        **UNITED STATES DEPARTMENT OF LABOR**

U.S. Department of Labor                Kate S. O'Scannlain
Office of the Regional Solicitor        Solicitor of Labor
201 12th Street South
Suite 401                               Oscar L. Hampton III
Arlington, VA 22202-5450                Regional Solicitor

| | |
|---|---|
| (202) 693-9393(voice) | Samantha N. Thomas |
| (202) 693-9392 (fax) | Associate Regional Solicitor |
| | |
| amin.avni.j@dol.gov | /s/ Avni J. Amin |
| lewis.ryma@dol.gov | Avni J. Amin |
| | Trial Attorney |
| | *appearing pro hac vice* |
| | |
| | /s/ Ryma Lewis |
| | Ryma Lewis (VA Bar No. 83322) |
| | Trial Attorney |

Date: May 13, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2019, a true and correct copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically notify Defendants by electronically serving a copy to Defendants' counsel:

> Joshua J. Jewett
> Julia A. Rust
> Christopher D. Davis
> Pierce/McCoy PPLC
> 101 W. Main St., Suite 101
> Norfolk, VA 23510
> jjewett@piercemccoy.com
> julia@piercemccoy.com
> chris@piercemccoy.com

*/s/* Ryma Lewis

Ryma Lewis (VA Bar No. 83322)

**PLAINTIFF'S INDEX OF EXHIBITS**

Exh. A      Deposition Transcript of Lisa Pitts (1-23)

Exh. B      Deposition Transcript of Christin Kim

Exh. C      Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories

Exh. D      Sample Paystubs

Exh. E      Steadfast Employment Application

Exh. F      Steadfast job posting

Exh. G      Agreement for Independent Contractor Services

Exh. H      Sample Payroll Records

Exh. I      Agreement between Steadfast and Facility

Exh. J      Steadfast January 27, 2017 Memorandum Regarding Punctuality

Exh. K      Declaration of Jonathan Kidder

Exh. L      Declaration of Piers Miltier

Exh. M      Declaration of Stephanie Rizer

Exh. N      Interview Statement of Hubert Adkins

Exh. O      Interview Statement of Richard Bryant

Exh. P      Interview Statement of Shonterria Fulton

Exh. Q      Interview Statement of Melisa Ozirus

Exh. R      Interview Statement of Erica Carter

Exh. S      Interview Statement of Chantella Smith

Exh. T      Deposition Transcript of Lisa Pitts (2-21)

Exh. U      Letter from Attorney Davis

Exh. V      Employee Declaration 1

Exh. W      Employee Declaration 2