**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| EUGENE SCALIA, <br> SECRETARY OF LABOR, <br> UNITED STATES DEPARTMENT OF LABOR, <br><br>                Plaintiff, <br><br>       v. <br><br> MEDICAL STAFFING OF AMERICA, LLC, a limited liability company,  d/b/a STEADFAST MEDICAL STAFFING, and LISA ANN PITTS, individually and as owner and officer of the aforementioned company, <br>                Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 2:18-cv-226 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Eugene Scalia, Secretary of Labor, U.S. Department of Labor's ("Plaintiff" or "Secretary") Motion for Summary Judgment should be granted because there are no genuine issues of material fact-  Defendants Medical Staffing of America, LLC, d/b/a Steadfast Medical Staffing and Lisa Ann Pitts violated Sections 7 and 11 of the Fair Labor Standards Act ("FLSA" or the "Act"). In *Steadfast I* (Case No. 2:18-cv-226), between August 18, 2015 and June 9, 2017, Defendants failed to pay overtime to the 84 individuals listed on the Schedule A to the Complaint. In *Steadfast II* (Case No. 2:19-cv-475), Defendants willfully violated Section 7 of the FLSA when they failed to pay an additional 453 employees (all of whom Defendants hired after June 9, 2017) the overtime premium during workweeks falling between June 10, 2017 and September 11, 2019.[1] Exh. G: 228: 11 ("it's a volume based business."). In both *Steadfast I* and *II*, Defendants misclassified the Certified Nursing Assistants ("CNAs"), Registered Nurses ("RNs") and Licensed Practical Nurses ("LPNs") working for Steadfast as independent contractors to avoid paying them the proper overtime premium as required under the FLSA. And in both *Steadfast I* and *II*, Defendants continued to violate the FLSA through the present. As a result, Defendants are liable for back wages totaling $1,654,389.93 and an equal liquidated damages in *Steadfast I*, and back wages totaling $1,654,389.93 and an equal amount of liquidated damages in *Steadfast II*.

Defendants admit that they meet the jurisdictional requirements subjecting them to the FLSA. There is also no genuine issue of material fact as to Defendant Lisa Pitts' status as an employer under 29 U.S.C. § 203(d). Defendant Pitts admits that from August 18, 2015 she was

---

[1] On January 10, 2020, the Court consolidated *Steadfast I*, Docket No 2:18-cv-226, and *Steadfast II*, Docket No. 2:19-cv-475. On January 29, 2020, the Court struck the Plaintiff's Motion Summary Judgment and granted the parties leave to file a single motion for summary judgment that addressed both *Steadfast I* and *Steadfast II*.

an "employer" of the employees listed in Schedule A of the *Steadfast I* and *II* Complaints

("Schedule A employees") within the meaning of Section 3(d) of the Act and remains an

"employer" of these Schedule A employees to date.  The undisputed facts establish Defendants

failed to pay overtime compensation for hours worked over 40 in a workweek, instead paying

straight time for overtime hours worked in violation of Section 7 of the Act. Indeed, these

overtime violations are apparent on the face of Defendants' own payroll records.  During the

relevant time period, August 18, 2015 to present, Defendants also failed to maintain accurate

payroll records reflecting: (1) employees' total daily or weekly straight-time earnings, and (2) the

total premium pay for overtime hours and total additions to or deductions from wages paid each

pay period  in violation of Section 11(c) of the Act.

Defendants also are liable for liquidated damages under 29 U.S.C. § 216(c). When an

employer is liable under the FLSA for failing to pay employees the overtime premium rate, a

Court must award an equal amount of liquidated damages. *See Perez v. Mountaire Farms, Inc.*,

650 F.3d 350, 375 (4th Cir. 2011); *see also* 29 U.S.C. § 216(c). The sole exception to mandatory

liquidated damages is set forth in 29 U.S.C. § 260, which requires that an employer prove with

"plain and substantial" evidence that it has a "good faith" defense for the violations of the FLSA.

Defendants have failed to produce any evidence to meet their burden of proving this affirmative

defense.

The Court should also grant Plaintiff's request for injunctive relief pursuant to Section 17 of

the Act due to Defendants' prior conduct, their failure to come into compliance with the FLSA

despite being advised of their non-compliance, and the likelihood that Defendants will continue to

violate the FLSA. Accordingly, and for reasons set forth in detail below, Plaintiff is entitled to

judgment as a matter of law with respect to all claims in the *Steadfast I and II* Complaints.

Plaintiff respectfully requests the Court grant his Motion for Summary Judgment.

## I.   UNDISPUTED FACTS

### A.   Jurisdiction, Venue and FLSA Coverage

1.   Jurisdiction of this action was conferred upon the Court by Sections 16(c) and 17 of the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. §§ 216(c) and 217, and by 28 U.S.C. §§ 1331 and 1345. ECF No. 84: ¶ 1.

2.   Since at least August 18, 2015, Defendants have been an enterprise within the meaning of Section 3(r) of the Act. ECF No. 84: ¶8; Exh M-4: *Steadfast II* Response to Request for Admission, No. 4.

3.   Since at least August 18, 2015, Steadfast has been a limited liability corporation with a place of business at 5750 Chesapeake Boulevard, Norfolk, Virginia 23513. ECF No. 84: ¶1.

### B.   Defendants' Business Operations and Defendant Pitts' Liability Under 29 U.S.C. § 203(d)

4.   Defendant Steadfast provides medical personnel support services to healthcare facilities ("facilities" or "client facilities"). *Steadfast I* ECF No. 8, at ¶ 2; *Steadfast II* ECF No. 188, at ¶ 2.  However, it is not an employment agency.[2] Exh. M: Facility Contracts; Exh. M-2(a): Rothlisberger Letter dated August 7, 2017. Since at least August 18, 2015, Defendant Steadfast has placed Registered Nurses ("RNs"), Certified Nursing Assistants ("CNAs") and Licensed Practitioner Nurses ("LPNs") in facilities that are in need of nurses. Exh. A: Pitts 1-23 Dep. Tr.

---

[2] The terms "registry" and "agency" are used interchangeably throughout this Memorandum for simplicity and to reflect common terms used in the industry. The title an entity uses does not determine whether it is obligated to comply with the FLSA; instead, the particular facts and circumstances outlined herein control.

23:18-23; Exh. B: Kim Dep. Tr. 11:14-18; Exh. B-1: Christine Kim Declaration at ¶6(a). Since at least August 18, 2015, Defendants have retained, and currently retain, RNs, CNAs and LPNs in and about their places of business in the activities of an enterprise engaged in commerce or in the production of goods for commerce, including providing nursing services for businesses located across state lines. ECF No. 8, Answer at ¶ 5. The enterprise has had an annual gross volume of sales made or business done in an amount not less than $500,000.00. *Id.;* ECF No. 84: ¶2; Exh. M-4: *Steadfast II* Response to Request for Admission No.2. Specifically, the adjusted gross revenue of Steadfast was $123,866.00 in 2015, $2,179,584 in 2016, $5,641,138 in 2017, and $10,316,855 in 2018. Exh X: ADV Documentation; Exh. M-2: *Steadfast II* Supplemental Answers to Interrogatories No. 16.

5.      Since at least August 18, 2015, Defendant Lisa Ann Pitts has been the CEO and 100% owner of Steadfast. ECF No. 84: ¶ 5; Exh. A: 13:21-23; Exh: G: Pitts Dep. Tran, 13:6-14:1.

6.      Since August 18, 2015, Defendant Lisa Ann Pitts has met the definition of an employer under Section 3(d) of the Act. Exh. A: 15:19-25; 16: 1-5; 18:3-5; 20: 9-12; Exh. C: Pitts 2-21 Dep. Tr., 45: 20-25, 46:1-25, 48:1-7; Exh. D: Employee Declarations - D-1:Miltier Decl. at ¶¶ 5, 6, 11, 15, 16, 18, 20; Exhibit D-2: Rizer Decl. at ¶¶ 11, 15, 17, 18, 21, 22, 23, 24, 26, 27, 29; Exhibit D-3: Adkins Statement; Exhibit D-4: Bryant Statement; Exhibit D-5: Carter Statement; Exhibit D-6: Smith Statement. Defendant Pitts is involved in the day-to-day operations of Steadfast, including determining the rate and method of pay for employees, hiring and firing employees, controlling conditions of employment, maintaining employment records, supervising employees, and developing and directing the implementation of payroll policies. *Id*; ECF No. 84 at ¶ 6; Exh. G: 14:17-23.

7. Since at least August 18, 2015, Steadfast's employees reported directly to Ms. Pitts. Exh. D-1: ¶ 15, 16, 18, 19, 20; Exh. D-2: ¶ 23; Exh. D-3; Exh. D-4; Exh. D-5; Exh. D-6, Exhibit D-7, Kidder Decl.: ¶ 13;  D-8: Ozirus Statement; Exh. D-9: Massey Decl:12 ¶; Exh. D-10: Grant Decl.: ¶ 23, 21, 24, 6; Exh.D- 11: Ward Statement; Exh D-12: Smith Statement; D-13: Cox Statement; Exh. D-14: Thompson Statement; Exh. D-15: Collins; Exh. D-16: Pettigrew; Exh. G: 14:17-23.

8. The 84 individuals listed in the *Steadfast I* Schedule A (Docket 2:18-cv-226, ECF No. 1-2) ("*Steadfast I* employees") all worked for Defendants at some point during the original investigative period, i.e., between August 18, 2015 and June 9, 2017. Exh. B: 14:3-25, 15:1-9; Exh. B-1: ¶6(g). Some of the *Steadfast I* employees continued to work for Defendants after June 9, 2017. Exh: T-1: Wage and Hour Transcript. The 453, known and unknown, individuals listed in the *Steadfast II* Schedule A (Docket 2:19-cv-475, ECF No. 1-2) ("*Steadfast II* employees") did not work for Defendants during the original investigative period, but instead were hired by and worked for Defendants at some point between June 10, 2017 and September 11, 2019. Exh: T-2: Wage and Hour Transcript. Some of the *Steadfast II* employees continued to work for Defendants after September 11, 2019. *Steadfast I* and *II* employees (collectively "employees" or "nurses") worked as RNs, CNAs, and LPNs providing basic healthcare services at various healthcare facilities with which Defendants contracted. Exh. B: 14:14-17; Exh. B-1: ¶6(a); Exh. D-1 at ¶ 3; Exh. D-2: ¶¶ 3, 13; Exh. D-3; Exh. D-4; Exh. D-5; Exh. D-6; Exh. N: Facility Declarations.

9. Individuals who applied to work for Defendants completed an employment application which sought, among other things, employment history, skill set and references. Exh. A: 85: 1-25, 86:1-19; Exh. B: 20:11-14; Exh. B-1 at ¶ 6(e); Exh. D-1 at ¶ 5; Exh. D-2: ¶ 4; Exh.

K: Steadfast Employment Application; Exh. D-12: Smith Statement. Defendants also interviewed employees as part of the application process. Exh. D-1:¶ 6; Exh. D-2: ¶ 5; Exh. D-3; Exh. D-4; Exh. D-5; Exh. D-6.

10.     Defendants also required that employees get screened for Tuberculosis and PPD, have a CPR certification, and sign a consent and acknowledgment of HIPAA confidentiality. Exh. B: 20: 11-14. Additionally, Defendants required employees to undergo and pass background checks and drug tests – which Steadfast paid for – prior to working with Steadfast. ECF No. 84: ¶9; Exh. D-1: ¶ 7; Exh. D-2: ¶ 6; D-12; Exh. W-3: Princess Anne Decl.: ¶19. Exh. W-2: Consulate Decl.: ¶16. A cover letter enclosing Steadfast's employment application states: "Your *application for employment* is only one of the components of our screening and *hiring* process." Exh. K: Steadfast Employment Application (emphasis added). Also as part of its onboarding process, Steadfast provided in-service training on topics such as Abuse and Neglect, the Health Insurance Portability and Accountability Act, and Sexual Harassment. Exh. E: Training Materials.

11.     Defendants require employees to sign an "Agreement for Independent Contractor Services" at the beginning of their employment. Exh. A: 76:12-16; Exh. B-1: ¶6(e). The "Agreement for Independent Contractor Services" contained a non-compete clause, which prohibited Schedule A employees from working for Steadfast's competitors: "Commencing from the first date of the Contractor's engagement by Company and continuing for a period of twelve (12) months from the effective date of expiration or termination of this agreement, Contractor shall not directly provide that type of services provided to Company to any competitors of Company without first obtaining the express written permission." Exh. L: Agreement for

Independent Contractor Services at ¶ 8; Exh. L-1: Agreement for Independent Contractor Services.

12.     Defendants prohibited facilities with which they contracted ("client facilities" or "facilities") from recruiting or hiring Steadfast employees, without Steadfast's written consent. Exh. N: Facility Contracts. If a facility desired to hire a Steadfast employee, and if Steadfast agreed, the client facility was required to compensate Steadfast and/or provide Steadfast notice of intent to hire their employees. Exh. W-1: Charlottesville Decl.: ¶¶ 7(c), 22; Exh. W-2: Consulate Facilities Decl.: ¶ 11(c).

13.     Defendants did not require any special skills from employees, as an advanced degree was not required. Defendants' only requirements were that nurses be over 18 years of age, pass a background check, submit to drug test, provide references, and hold applicable state licensure. Exh. A; 47: 12-17; Exh. J: Job Posting; Exh K: Employment Application; Exh. B-1: ¶ 6(e); Exh. G:178:15-180:25.

14.     Steadfast required the nurses, who it classified as independent contractors, to complete W-9s. Exh. B: 20:16-19; Exh. B-1: ¶ 3; Exh. Q: Sample 1099.

15.     Since at least August 2015, Defendant Steadfast assigned employees to client facilities. Exh. B: 11:14-18; Exh. B-1: ¶¶ 3, 6(g)-(h); Exh. F: Sample Steadfast Placements; Exh. N: Facility Contracts; Exh. W-1: ¶ 3; Exh. W-2: ¶ 4; Exh. W-3: ¶ 3; Exh. G: 16:3-7. Steadfast's office staff solicited and managed assignments for nurses who worked at client facilities. Exh. A: 19:7-17; Exh. B-1: ¶ ¶ 3, 6(d). Specifically, Steadfast's nurse coordinator(s) either contacted client facilities or received a request from client facilities to place a Steadfast nurse at the facility. The nurse coordinators then contacted Steadfast nurses to satisfy the facility's needs. Exh. W-1: ¶¶ 12, 13, 14, 15; Exh. W-2: ¶¶ 17, 18, 19, 20; Exh. W-3: ¶¶ 9, 10, 11; Exh. D-1: ¶ 11;

Exh. D-2: ¶ 15; Exh. D-3; Exh. D-4; Exh. D-5; Exh. D-6; Exh. D-7: ¶ 13; Exh. D-9: ¶ 6; Exh. D-10: ¶ 7, Exh. D8: ¶ 16; Exh. F: Sample Steadfast Placement. After Steadfast's nurse coordinators assigned shifts to nurses, Defendant Pitts provided the client facility with a list of the names of nurses assigned to work at the facility, along with each nurse's assigned shift and discipline/skills. Exh. F; Exh. B-1: ¶6(g); Exh. D. When seeking nursing services from Steadfast, client facilities did not request any nurses by name. Exh. F; Exh. W-2: ¶¶ 18, 19, 20; Exh. W-3: ¶¶ 10, 11. Steadfast did not provide client facilities with a list of all Steadfast nurses from which the facilities could choose. Exh. G: Pitts Dep. Tran. 3:12. Additionally, Steadfast did not provide client facilities with phone numbers or other contact information for Steadfast nurses. *Id.* Exh. W-1: ¶ 13; Exh. W-2: ¶ 18; Exh. W-3: ¶ 11; Exh. O-7: Holiday Closure Memo dated December 18, 2017 ("all correspondences must be relayed with Steadfast Medical Staffing and NOT the facilities."). Indeed, Steadfast's scheduling office was solely responsible for assigning nurses to client facilities. Exh. B-1: ¶ 3; Exh. W-1: ¶¶ 12, 13, 14, 15; Exh. W-2: ¶¶ 17, 18, 19, 20; Exh. W-3: ¶¶ 9, 10, 11.

  16. Employees did not create their own schedules while working for Defendants. Exh. D-1: ¶ 11; Exh D-2: ¶ 15; Exh. D-3; Exh. D-9: ¶ 6, 14; Exh. D-10: ¶ 7, 16; Exh. D-8, 9-16. Steadfast employees were prohibited from contacting facility's directly regarding scheduling. Exh. O-7. Similarly, client facilities could not directly contact Steadfast employees to assign them a work shift. Exh. W-1: ¶¶ 12, 13, 14, 15; Exh. W-2: ¶¶ 17, 18, 19, 20; Exh. W-3: ¶¶ 9, 10, 11. If a Steadfast employee contacted a facility regarding scheduling or assignment, the facility would contact Steadfast to obtain approval of the assignment and confirm all assignment details with Steadfast. Exh. W-1: ¶ 14. If employees were late for, or had to cancel a shift, Defendants required them to notify Defendant Pitts and not the facility. Exh. D-1 at ¶ 15; Exh. D-2 at ¶ 22;

Exh. D-4; Exh. D-7: ¶ 22; D-9: ¶ 13, 18; Exh. D-10: 20; Exh. D-8, 11-18. If employees wanted to take any time off, they had to notify Defendant Pitts. *Id*. Defendants prohibited employees from contacting client facilities when they needed to cancel a shift. Exh. D-1: ¶ 16; Exh. D-2: ¶ 21;  Exh. D-3 – D-7: ¶ 22; Exh. D-9: ¶ 22 13, 18, Exh. D-10: ¶ 20;  D-8, 11-18; Exh.O-7.

17.　　The contracts negotiated by Defendant Lisa Pitts between Steadfast and the client facilities dictated the services rendered by nurses and the terms of the business arrangement between Steadfast and the client facilities. Exh. N; Exh. W-1: ¶ 7; Exh. W-2: ¶ 11; Exh W-3: ¶ 8. Under those contracts: (1) Steadfast determined the hourly rate for nurses, (2) client facilities paid Steadfast based on the number of hours Steadfast nurses worked, (3) Steadfast nurses could only perform the services set forth in the contract between Steadfast and the client facility absent approval from Steadfast, (4) client facilities could not recruit, hire or retain Steadfast nurses without Steadfast's written consent, and (5) Steadfast maintained liability and professional insurance coverage for acts performed by Steadfast nurses. Exh H: Insurance Policy; Exh. W-1: ¶ 7; Exh. W-2: ¶ 11; Exh W-3 at ¶ 8; Exh. D-1: ¶ 11; Exh. D-2: ¶ 15; Exh. D-3; Exh. D-4; Ex. D-5; Exh. D-6; Ex. D-7: ¶¶ 13, 14; Exh. G. In addition, those contracts required client facilities document and immediately notify Steadfast of any problems (behavioral, performance or otherwise) with Steadfast nurses. Exh. N; Exh. W: ¶ 19; Exh. W-2: ¶ 24; W-3: ¶¶ 13, 15, 17. Steadfast also requested the Consulate Facilities provide information regarding nurses' work performance. Exh. N-2; Exh. W-2: ¶ 11(d).

18.　　Defendants exercised control over their employees by dictating their work hours and schedules, assigning those employees to work at specific client facilities, measuring employee performance, disciplining employees, and limiting client facility access to Steadfast employees. Exh. C: 47:11-25; 48:1-7; Exh. D-1: ¶¶ 11, 20; Exh. D-2: ¶¶ 15, 18, 19, 27; D-3- D-

7: ¶¶ 13, 14-15, 23, 27, D-9: ¶¶ 6, 14; D-10: ¶¶ 7, 16. D 8, 11-16.  Employees could not select

the facilities at which they wanted to work; rather, their assignments were dictated by

Defendants. Exh. D-9: Massey Decl., ¶15.

19.     Client facilities paid Defendants a set hourly rate for hours worked by Schedule A

employees, established by predetermined Term Sheet Defendants provided to the facility during

contract negotiations. Exh. A: 54:15-19; Exh. B: 26:1-3; Exh. B-1: ¶ 6(f); Exh. N; Exh. W-1: ¶

7(a); Exh. W-2: 11(a); Exh. W-3: ¶¶ 5, 18.  The client facility negotiated this hourly rate directly

with Defendants. Exh. A: 96:23-25; 97:1-3; Exh. N. Steadfast did not negotiate an overtime rate

with facilities, even though other companies similar to Steadfast did negotiate overtime rates

with those facilities. Exh. W-2: ¶¶ 26, 27. Client facilities were prohibited from negotiating,

establishing, or discussing compensation with Steadfast employees. Exh. N; Exh. D-1: ¶ 13; Exh.

D-2: ¶ 17; Exh, 7: ¶ 18. Indeed, Steadfast's employees did not have any contractual or economic

relationships with the client facilities at which they were placed to work through Defendants.

Exh. D-1: ¶¶ 10, 11; Exh. D-2: ¶¶ 9, 14, 15, 29; Exh. D-7: ¶¶ 12, 16, 17, 25; Exh. D-9: ¶¶ 15, 17;

Exh. D-10, at ¶¶ 14, 18; Exh. N; Exh. Y: Pitts Dep; Exh. W-1 at ¶¶ 5, 6. Exh. W-2: ¶¶ 6, 7, 8;

Exh. W-3: ¶¶ 6, 7;  Exh. G: 178:18-22 ("They are using *our* nurses"), 223:14-15. Defendants

retained a percentage of the hourly rate established by the contracts with the client facilities,

resulting in employees receiving a lower hourly rate than that negotiated between Steadfast and

the client facilities. Exh. A: 96:11-19; Exh. Y.

20.     Steadfast's employees did not negotiate their rates of compensation with

Defendants. Exh. B: 26: 14-17; Exh. D-1: ¶ 13; Exh. D-2: ¶ 17; Exh. D-3 through D-18. Rather,

Defendants determined the hourly rate paid to employees without taking into account the

employee's work performance, experience, or skill. Exh. B: 26: 4-5; Exh. B-1: ¶6(f); Exh. C: 36:1-25; 37: 1-37; 38: 1-25; 39: 1-25; 40: 1-25; Exh. W-1: ¶ 4; Exh. W-2: ¶ 6; Exh. W-3: ¶ 6.

21.     Defendants provided their employees with an ID badge that said "Steadfast Medical Staffing" to wear when working at Defendants' client facilities. Exh. D-1: ¶ 18; Exh. D-2: ¶ 26; Exh. D-7: ¶ 26; Exh. D-9: ¶ 22; Exh. D-10: ¶ 22; Exh. D-12. Defendants paid employees with paychecks with "Medical Staffing of America" across the top. Exh. P: Sample Paystubs.

22.     Defendants not only required their employees to track their hours when working at Defendants' client facilities using timesheets, but also actively verified the hours worked by their employees. Exh. B: 72: 3-5; Exh. C: 54: 6-10; Exh. D-1: ¶ 17; Exh. D-2: ¶ 24; Exh.O-2 – O-7. Steadfast created the timesheets used by employees. Exh. C:52: 22-23; Exh.O-2 – O-7. Defendants told employees they would not be paid unless they timely submitted timesheets after each completed shift. Exh. B: 72:3-5; Exh. B-1: ¶¶ 6(g) and 6(h); Exh.O-2 – O-7; Exh. D-7: ¶ 24; Exh. D-9: ¶ 20; Exh. D-10: ¶ 21. The facilities did not require Steadfast's employees complete timesheets for compensation, nor were facilities involved in any compensation issues between Steadfast and their employees. Exh. W-1: ¶ ¶ 9, 10; Exh. W-2: ¶¶ 14, 15; Exh. W-3: ¶¶ 20, 21; D-12. Rather, the facilities required Steadfast to submit invoices detailing the total hours worked by Steadfast's employees for the sole purpose of compensating Steadfast for services rendered. Exh. W-1: ¶¶ 9, 10; Exh. W-2: ¶¶ 14, 15; Exh. W-3: ¶¶ 22, 23, 24; Exh. O.

23.     Since August 18, 2015, Defendants were solely responsible for compensating their employees for their work. Exh. B: 25:21-25. Steadfast paid their employees from their own accounts, rather than directly from the client facilities, or an escrow account. Exh. U: Sample BB&T Bank Statements and Documents; Exh. O-8: Next Day Pay Memo.  In other words, Steadfast paid their employees, regardless of whether Steadfast received compensation from their

client facilities. *Id*.; Exh. O-2 – O-8; Exh. P: Sample Paystubs. Further, since at least February 19, 2019, Steadfast began a "pay day advance" program where their employees could request an advance of their next paycheck. Exh. O-8.

24.    Steadfast's employees depended entirely on Defendants to find job assignments and Defendants, in turn, controlled the terms and conditions of the employment relationship. Exh. D-1: ¶ 11; Exh. D-2: ¶ 15; Exh. D-6 – D-18.

25.    Steadfast's employees had no ability to profit from their work for Steadfast beyond the hourly wage Steadfast paid. D-6. Defendants paid a set hourly rate for hours worked by employees and controlled the terms and conditions of the working relationship. Exh. D-1:¶ 8; Exh.D-2: ¶ 9; Exh. D-3 – D-18. Exh. R: Sample Payroll Summaries. The only opportunity employees had to earn additional income was to work additional hours. Exh. D-5, D-6.

26.    Steadfast's employees did not hold an ownership interest or invest in Steadfast. Exh. A: 15: 13-15. Employees did not maintain their own businesses or offices, nor did they retain their own employees. Exh. D-1:¶ 10; Exh. D-2:¶ 14; Exh. D-3- D-18. They also did not advertise their services. *Id*.

27.    Steadfast's employees directly reported to Lisa Pitts. Exh. D-2: ¶ 23; Exh. D-3:- D-18; Exh. W-1: ¶ 18; W-2: ¶ 23; W-3: ¶ 15. Defendants disciplined their employees and routinely advised them on the importance of punctuality and humility in the workplace. Exh. D-1: ¶ 20; Exh. D-2: ¶ 27; Exh. M. Defendants solicited feedback from client agencies as to their employees' conduct. Exh. D-5; Exh. N. If a client facility had an issue with a Steadfast employee regarding tardiness, conduct and other similar issues, the facility contacted Defendant Pitts and Defendant Pitts addressed the disciplinary issue with the employee directly, by speaking to the employee and/or circulating a memorandum addressing the issue with all of the nurses. Exh. A:

45: 20-25; 46:1-4, 22-25; 47:1; 48: 1-7; Exh. D-1:¶ 20; Exh. D-2: ¶ 27; Exh. D-5; Exh. O. The facilities did not discipline Steadfast's nurses. Exh.W-1: ¶ 19: Exh. W-2: ¶ 24; Exh. W-3: 17.

28.     Defendants did not permit their employees to hire their own employees or contractors to do their work or assist them at Defendants' clients' facilities. Exh. D-1: ¶ 14; Exh.D-2: ¶ 20; Exh. D-5 – D-18.; Exh. L: Agreement for Independent Contractor Service at ¶ 12. The Agreement for Independent Contractor Services contained a provision that barred employees from assigning their work to third parties "without the prior written consent of Company [Steadfast]." Exh. L: ¶ 12. Additionally, when scheduling conflicts arose, Defendants did not allow employees to send another CNA, LPN or RN in his or her stead. Exh. B: 40: 223-26; 41:1-2; Exh. B-1: ¶ 6(j); Exh. D-1: ¶ 14; Exh. D-2: ¶ 20; Exh. L:¶ 12. Defendants did not permit employees to assign their shift to others. Exh. D-1:¶ 14; Exh. D-2: ¶ 20; Exh D-3 – 18; Exh. L: ¶ 12. Defendants did not allow employees to subcontract out their work. Exh. B: 40: 23-25; 41:1-25; Exh. B-1: ¶6(j); Exh. D-7: ¶¶ 19, 20; D-9: ¶ 17; D-10: ¶ 19.

29.     Steadfast's employees handled and passed out medications, cared for patients, treated wounds, monitored patients, and took notes. Exh. D-2: ¶13; Exh. D-3, D-4, D-5, D-6. Exh. W.

30.     The Agreement for Independent Contractor Service was open-ended – the contract did not limit Steadfast employees' work for Defendants to a set term. Exh. L: ¶ 1. Some employees worked for Defendants as long as three years. Exh. D-1: ¶ 2.

31.     Although Steadfast's employees preferred to use their own stethoscopes and blood pressure cuffs when rendering services, client facilities allowed employees to use tools and equipment needed to perform their jobs. Exh. D-1: ¶ 12; Exh. D-2: ¶ 16; Exh. W-2: ¶ 25.

Defendants reimbursed employees for hotel expenses for jobs that required them to travel to facilities to which they could not readily commute. Exh. D-7: ¶16; Exh. G: 211:7-213:13.

### C.    Defendants' Overtime Violations

32.    Since August 18, 2015, Defendants have classified the employees that appear on the Schedule As attached to the *Steadfast I* and *II* Complaints as independent contractors. Exh. B: 14:7-25; 15:1-9; Exh. B-1: ¶ 8; Exh. M-1, Interrogatory Response No. 1.

33.    Since August 18, 2015, Steadfast's employees have worked more than forty hours per workweek. Exh. B: 27: 2-6; Exh. D-1: ¶ 9; Exh. D-2:¶ 10; Exh. D-3:- D-18; ECF No. 84: ¶3.

34.    Since August 18, 2015, Defendants have paid their employees their normal hourly rate for all hours worked, including hours worked over 40 in a workweek. Exh. B: 27: 8-13; Exh. B-1: ¶¶6(k), (m); Exh. D-1: ¶¶ 8, 9; Exh. D-2:¶¶ 9, 10; Exh. D-3: - D-18.

35.    Since August 18, 2015, Defendants have not paid their employees at a rate of one and one-half times their regular rate of pay for hours worked over 40 hours in a week. Exh. B: 27: 1-13; Exh. C: 85:22-25; Exh. D-1: ¶¶ 8, 9; Exh. D-2: ¶¶ 9, 10; Exh. D-5: Exh. D-6; Exh. D-7: ¶¶ 8, 9; Exh. D-9: ¶¶9, 10; D-10: ¶¶ 11, 12, 13; D-8, 11, 13-16.Exh. P; Exh. R.

36.    Defendants did not change their practice of paying their employees straight time for overtime, even after the Department of Labor advised Defendants' that their compensation practice was unlawful, nor did they change this practice after multiple employees complained about not receiving overtime pay. Exh.B-1: ¶3; Exh. D-9-16. After the final conference, of *Steadfast* I, Defendants continued to fail to pay nurses the overtime premium rate for hours worked over 40 hours in a workweek. Exh. B-1: ¶ 6(m).

### D.    Defendants' Recordkeeping Violations

14

37.     Defendants' payroll summaries confirm Defendants paid employees straight time for hours worked over forty in the workweeks falling between August 18, 2019 and December 27, 2019. Exh. R.

38.     Steadfast's payroll summaries accurately identify the total hours worked by employees between August 18, 2015 and December 23, 2019, as well as their gross weekly wages. Exh. R.

39.     However, Steadfast failed to accurately record total premium pay for overtime hours and total additions to or deductions from wages paid each pay period. Exh. R; Exh. I: Sample Payroll Details; Exh. B: 74:22-25; 75:1-3; Exh. B-1: ¶ 6(i); Exh. G: 219:8-17.

### E.     Secretary's Method of Calculating Back Wages Owed as Result of Defendants' Overtime Violations

40.     The proper method of calculating unpaid overtime owed to employees who were paid straight time for overtime hours worked, is to multiply each employee's regular rate by .5 and to multiply the resulting half-time rate by the number of hours each employee worked in excess of 40 in the workweek. To determine an employee's regular rate of pay, the individual's gross weekly wage should be divided by the amount of hours worked. Exh. S: Mazura Decl. ¶ 14.

41.     Plaintiff's Wage and Hour Transcriptions addressing Defendants' FLSA violations are based on Defendants' Payroll Summaries. Exh. S. Plaintiff's Wage and Hour Transcriptions accurately reflect the total hours worked each week by *Steadfast I* and *II* employees between August 18, 2015 and present (the last day for which Plaintiff calculated back wages was December 27, 2019) as well as their gross weekly wages. Plaintiff's Wage and Hour Transcriptions are a true and accurate reflection of the back wages owed as a result of Defendants' failure to pay overtime as required under Section 7 of the Act. Based on these

15

computations, Defendants owe a total $1,373,444.93 in back wages to 537 employees for overtime violations between August 18, 2015 and December 27, 2019. Exh. T1 and T2.

42. With regard to *Steadfast I*, Defendants did not consult with an attorney to determine whether their compensation and overtime policies, which were in effect between August 18, 2015 and June 9, 2017, complied with the FLSA. Exh. C: 70:11-21; Exh. M-4: Resp. to Request for Admissions No. 8; Exh. M-2: Resp. No. 17.

43. With regard to *Steadfast I* and *II*, Defendants did not consult any personnel within the Department of Labor to determine whether their compensation and overtime policies, which were in effect between August 18, 2015 and present, complied with the FLSA. Exh. M-1: Interrogatory Response No. 13; Exh. M-4: Resp. to Request for Admissions No. 8; Exh. M-2: Resp. No. 17.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, summary judgment will be granted unless a reasonable fact-finder could return a verdict for the nonmoving party on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Chao v. A-One Medical Services, Inc.*, 346 F.3d 908 (9th Cir. 2003). A party opposing a properly supported motion for summary judgment may not rest on unsupported denials, but must respond with affidavits or other evidentiary materials as provided in Rule 56(e). *See Disney v. Entenmann's, Inc.*, No. Civ. H-99-2247, 2000 WL 1721793, at *4

(D. Md. Nov. 17, 2000) (citation omitted). The non-moving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *See Adler v. Walmart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *See Schamann v. O'Keefe*, 314 F. Supp. 2d 515, 522 (D. Md. 2004) (citation omitted).

## II.   LAW AND ARGUMENT

Plaintiff has met his burden and is entitled to judgment as a matter of law with regard to: (1) Defendant Wright's status as a 3(d) employer in *Steadfast I* and *II*; (2) Defendants' violations of Section 7 of the FLSA in *Steadfast I* and *II*; (3) Defendants' willful violation of Section 7 with respect to *Steadfast II*; (4) the amount of back wages owed in *Steadfast I* and *II*; (4) the Secretary's entitlement to an equal amount of liquidated damages in *Steadfast I* and *II*; (5) Defendants' violations of Section 11 of the FLSA in *Steadfast I* and *II*; and (6) the Secretary's entitlement to injunctive relief.

### A.   Defendant Pitts is a 3(d) employer and individually liable for all violations.

There are no material facts in dispute regarding Defendant Lisa Pitts' status as a 3(d) employer. Indeed, Defendants concede she is an employer under the Act. *See* SOF ¶ 6. The Act defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *See* 29 U.S.C. § 203(d). Defendant Pitts has been the CEO and sole owner of Steadfast at least since August 18, 2015. *See* SOF ¶¶ 6, 11, 15, 27. As the CEO and owner, Defendant Pitts is responsible for the day-to-day operations of Steadfast, including determining the rate and method of pay for employees, hiring and firing employees, controlling conditions of employment, maintaining employment records and supervising employees, and developing payroll policies. *See* SOF ¶ 6; *See Kerr v. Marshall Univ. Bd. of Governors,* 824 F.3d

17

62, 83 (4th Cir. 2016). Defendants Pitts is also the sole signatory on Steadfast's contracts with client facilities that address the terms and conditions of the nursing services *Steadfast I* and *II* employees provide. Exh. W; Exh. N. She also monitored employee performance, assigned work, and directly supervised employees. SOF ¶ 6. Therefore, Defendant Pitts meets the definition of an employer under Section 3(d) of the Act and should be held jointly and severally liable for Defendants' violations of the Act.

**B.    Defendants violated Section 7 of the FLSA by failing to pay employees time and a half for all hours worked over 40 in a workweek.**

Section 7 of the FLSA forbids an employer from employing any worker "for a workweek longer than forty hours unless such employee receives compensation ... at a rate not less than one and one-half times the [worker's] regular rate" for the excess hours. 29 U.S.C. § 207(a)(1); *see also Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997). The Act broadly defines employment as "to suffer or permit to work." *See* 29 U.S.C. §203(g). Both Congress and the courts have recognized that this definition of employee is broader than under any other piece of social legislation.  *See McComb v. Homeworkers' Handicraft Cooperative*, 176 F.2d 633, 636 (4th Cir. 1949); *Donovan v. DialAmerica Marketing, Inc*., 757 F.2d 1376, 1382 (3d Cir. 1985), *cert. denied* 474 U.S. 919 (1985). There is no dispute here that the 84 employees listed in the *Steadfast I* Schedule A and the 453 employees listed in the *Steadfast II* Schedule A suffered to work for, and were permitted to work by, Defendants.

There also is no dispute that Defendants failed to pay employees the overtime premium rate for hours worked over forty in a workweek. SOF ¶ 16, 17, 20, 31. Specifically, between August 18, 2015 and present, Defendants' paid employees straight time, i.e., their normal hourly rate, for overtime hours worked. SOF ¶ 20, 32, 33, 34. Not only have Defendants' employees confirmed that they were paid straight time for all hours worked, including overtime hours, but

Defendants' own records confirm Defendants paid straight time for overtime hours worked.[3] SOF ¶ 34, 35, 38; Exh. R. Further, Defendants have continued to violate the FLSA by failing to pay their employees time and a half for overtime hours worked. *Id*; *see also* ECF No. 1. The facts on this issue are not in dispute and the record does not allow for any conclusion other than Defendants violated Section 7 of the Act.

**C.    Defendants' overtime violations in *Steadfast II* were willful.**

Upon showing Defendants willfully violated the FLSA in *Steadfast II*, the Secretary will be entitled to back wages and liquidated damages for a three-year statutory period. 29 U.S.C. § 255(a). To establish willfulness, Plaintiff has the burden of showing Defendants "knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the Act. *Mountaire Farms, Inc.*, 650 F.3d at 375. Reckless disregard can be shown through "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Mumby v. Pure Energy Services (USA), Inc.,* 636 F.3d 1266, 1270 (10th Cir. 2011). Notably, a finding of willfulness does not necessarily require prior violations or litigation. *Reich v. Montfort, Inc.,* 144 F.3d 1329, 1334-35 (10th Cir. 1998).

Record evidence shows Defendants knew their overtime practices were prohibited by the FLSA and that, regardless of that knowledge, they continued to implement those practices with respect to *Steadfast II* employees. After the DOL conducted its investigation into Defendants overtime practices between August 18, 2015 and June 9, 2017, Investigator Mazura met with Defendants at the final conference to review the results of that investigation. SOF ¶ 36 During

---

[3] Defendants have not produced all time and pay records to confirm all workweeks which employees were underpaid as a result of the overtime violations. However, the pay records that Defendants have produced thus far confirm that Defendants have failed to pay their employees time and half their regular rate for overtime hours. SOF ¶ 34.

the final conference, Investigator Mazura reviewed FLSA requirements with Defendants, and informed Defendants that their practice of classifying *Steadfast I* employees (the only employees at issue during the investigative period) as independent contractors violated the FLSA. *Id*. Investigator Mazura also told Defendants they were obligated to pay *Steadfast I* employees overtime for hours worked over 40 in a workweek. *Id*. After that final conference, Defendants continued to treat *Steadfast I* employees as independent contractors. Exh. B-1: ¶ 8. More importantly, after that conference, Steadfast continued to treat every new hire retained after the investigative period (i.e., *Steadfast II* employees) as independent contractors and failed to pay them overtime. *Id*. In short, Defendants made a conscious decision to continue misclassifying employees as independent contractors after DOL informed Defendants that this very practice violated the FLSA. SOF ¶ 36. After the events that led to the Secretary filing *Steadfast I* and *after* being informed that their practices were unlawful, Defendants made a separate decision to continue to misclassify their employees after July 10, 2017 (the close of the *Steadfast I* investigative period), and to refuse to pay their employees overtime compensation. *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999); *Montfort, Inc.,* 144 F.3d at 1334-35 (willfulness established where employer knew about violations from a sister plant); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) (finding willfulness where employer "could easily have inquired into" relevant compliance issues after learning of their illegality). When one considers several employees complained to Defendant Pitts regarding not receiving overtime to which they were entitled, the willfulness of Defendants' FLSA violation is all the more clear. Exh. D-9: ¶ 10 and D-10: ¶ 13. As Defendants knew of their FLSA obligations and knew that their overtime practices were unlawful – after being informed of such by the sole government agency tasked with enforcing the FLSA – Defendants' decision to continue with the

practice and to continue violating the FLSA with respect to *Steadfast II* employees, was undisputedly willful.

> **D.      Defendants have failed to meet their burden of proving *Steadfast I* and *II* employees are independent contractors and, therefore, not entitled to overtime pay.**

*Steadfast I and II* employees are covered by the FLSA and, therefore, entitled to overtime compensation. 29 U.S.C. § 203(e)(l) (defining employee as "any individual employed by an employer."); *see also Harbourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 658-59 (4th Cir. 2016). Notwithstanding, Defendants contend these employees were independent contractors and, therefore, not subject to the requirements of the FLSA. Defendants' allegation that the *Steadfast I and II* employees are independent contractors is an affirmative defense for which they have the burden of proof. *See Iontchev v. AAA Cab Serv., Inc.,* 685 Fed. Appx. 548, 549 (9th Cir. 2017) (employer has the burden of proving by "clear and convincing evidence that [employees] are independent contractors under the FLSA"); *Piña v. Pakalex Inc*., No. CV TDC-15-0638, 2015 WL 6082372, at *2 (D. Md. Oct. 14, 2015); *Leon v. Alvarez*, No. CBD-16-0416, 2017 WL 4236813, at *2 (D. Md. Sept. 25, 2017); *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97 (1974) (An exemption must be asserted as an affirmative defense to a claim under the FLSA). Indeed, any exemption under the FLSA is an affirmative defense. *See* 29 U.S.C. § 207(e).

Defendants have failed to satisfy their burden of proving *Steadfast I and II* employees are independent contractors. To establish this affirmative defense, Defendants must provide facts that prove: (1) the degree of control the putative employer has over the manner in which the work is performed; (2) the worker's opportunity for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and

(6) the degree to which the services rendered are an integral part of the putative employer's business. *United States v. Silk,* 331 U.S. 704, 716 (1947). *See Schultz v. Capital Intern Sec, Inc.*, 466 F.3d 298, 304 (4th Cir. 2006). No single factor is determinative for the Court's analysis. *See Schultz*, 466 F.3d at 305. It is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer. *See Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 676 (1st Cir. 1998).  The focal point of this analysis is "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Schultz*, 466 F.3d at 304. Defendants have failed to meet their burden of proving *Steadfast I and II* employees were not economically dependent on Steadfast, let alone provided 'significant probative evidence' to support the allegations." *Anderson*, 477 U.S. at 249.

Notably, courts have consistently held that RNs, LPNs, CNAs who work for registries or other companies (like Defendant Steadfast in the present case) are employees under the FLSA and, therefore, entitled to overtime compensation. *See Hughes v. Family Life Care, Inc*., 117 F. Supp. 3d 1365 (N.D. Fla. 2015) (finding CNA employed by nurse registry, which contracted with government agencies and arranged for CNAs to provide services at patients' residences, was an employee of the registry); *Crouch v. Guardian Angel Nursing, Inc.*, Civil Action No. Action No. 3:07–cv–00541, 2009 WL 3737887 (M.D. Tenn. 2009) (finding LPNs who worked for the agency that contracted with home health agencies to supply them with LPNs to provide private-duty nursing to home health agencies' patients were employees of the agency for purposes of FLSA, rather than independent contractors); *Gayle v. Harry's Nurses Registry*, 594 Fed. Appx. 714 (2d Cir. 2014) (finding nurses working for health-care service engaged in providing nurses to individuals, hospitals, and nursing homes were employees of the service,

rather than independent contractors); *LeMaster v. Alternative Healthcare Solutions, Inc.*, Case No. 3:08–1101, 726 F.Supp.2d 854 (M.D. Tenn. 2010) (finding Defendant nursing and domestic company that recruited nurses and referred them to home healthcare agencies and nursing homes to be employer). Similar to the above-listed cases, here, each of the six factors of the "economic realities" test supports the conclusion that *Steadfast I* and *II* employees are, in fact, employees and not independent contractors.

   *1. Defendants' exerted control over Steadfast I and II employees.*

  "[T]he control element may be satisfied where the putative employer sets the workers' schedules, directs them to particular work sites, requires them to fill out time sheets, and can fire them at will." *Randolph v. PowerComm Const., Inc*., 309 F.R.D. 349, 357 (D. Md. 2015). "[A]n employer need not supervise, control, or otherwise exercise authority continuously over their employees to be an employer." *Perez v. Ocean View Seafood Rest., Inc*., 217 F. Supp. 3d 868, 877–78 (D.S.C. 2016). Rather, "control may be restricted, or exercised only occasionally without removing the employment relationship from the protections of the FLSA." *Id*. Indeed, "the issue is not the degree of control that an alleged employer has over the manner in which the work is performed in comparison to that of another employer. But, it is *the degree of control that the alleged employer has in comparison to the control exerted by the worker*." *See Schultz,* 466 F.3d at 305 (emphasis added). Here, Defendants exerted substantial control of *Steadfast I and II* employees. Defendants required employees to comply with terms and conditions Steadfast "Independent Contractor Agreement." Exh. L, p. 20. Defendants negotiated the hourly rate the client facilities paid Defendants for *Steadfast I and II* employees' services. Exh. C, 25:2-6; Exh. B: 26:14-17; Exh. B-1: ¶¶ 3, 6(f); *See Hughes*, 117 F. Supp. 3d 1365, 1372 (finding control factor was not met where nursing registry determined contract rates with government entities and nurses had no ability to negotiate the rate for a job she was offered). After Defendants negotiated

pay with the client, Defendants took a percentage of that negotiated hourly rate – which varied contract to contract – and paid the remainder to the employee. Exh. A, 96: 11-19. The employee did not determine what percentage of the hourly rate Steadfast took for the work performed by the employee. SOF ¶ 19. The employee was not a party to Defendants' negotiations with clients regarding the hourly rate. *Id.* Instead, once Defendants set the pay rate with the facility, Defendant Pitts refused to negotiate the pay rate with *Steadfast I and II* employees. Exh. D; Exh. A: 96: 11-19; Exh. D-7: at ¶¶ 8 and 18; D-9: 7, 16; and D-10: at ¶8, 10; D-10-11, D-13-16.

Defendants also assigned work by contacting employees and informing them of the location and shift of the assignment. SOF ¶ 16; Exh. D; Exh. N. Specifically, upon fielding a request from a client facility, Steadfast's nurse coordinator(s) assigned the shift to the nurse of their choosing and checked his/her availability. SOF ¶15. Client facilities did not request Steadfast nurses by name nor did they contact nurses directly – indeed, Steadfast did not even give client facilities *Steadfast I and II* employees' contact information. *Id*; Exh. G: 232:2-4, 233:10-234-9.  If an employee could not take an assigned shift, Ms. Pitts typically did not assign that employee any future work. SOF ¶ 17. If the employee took the assignment, he/she could not contact the client directly to change any aspect of the assignment. *Id*.; ECF 157-2; Exh. N, p. 47; Exh. O-7; Exh. W. Instead, Defendants required employees contact Steadfast if he/she was no longer able to take the assignment. SOF ¶ 17; Exh. O-1- O-8; Exh. W. Defendants also prohibited employees from requesting shifts from client facilities and required employees to notify them – with at least 6 hours' notice – of absences. *Id*.; Exh. D-7: ¶ 22; D-9: ¶¶ 8, 13; D-10: ¶ 20; Exh W; Exh. N. Defendants prohibited employees from contacting clients when they needed to cancel a shift. *Id.;* Exh D-7: ¶ 22; D-9: ¶¶ 8, 13; D-10: ¶ 20; Exh. N; Exh. W. Indeed, Defendants expressly prohibited direct communication between client facilities and Steadfast I

and II employees. Exh. O; Exh D.  Further, Defendants expected employees to notify them in advance when they intended to take planned time off. *Id.*; Exh. D; Exh. O.

Defendants' also measured employee performance and disciplined employees. Exh. D; Exh. N. Defendant Pitts admits she routinely addressed conduct with *Steadfast I and II* employees. Exh. C, 47-48; *see also* Exh. 1 and 2; Exh. D-7: ¶ 27; D-9: ¶23; 8; D-10: ¶ 24. Indeed, the facility contracts Defendants negotiated with client facilities required Defendants to maintain "performance evaluations" for employees. Exh N, p.47. Defendants also concede they addressed behavioral issues with the nurses. Exh. B, 47-48. If a client took issue with a Steadfast nurse, whether about performance, tardiness or behavior, the client informed Defendant Pitts and Defendant Pitts, in turn, addressed the problem with the employee, sometimes even putting the employee on notice of potential disciplinary actions that Defendants would take. Exh. C: 47-48; Exh. W; Exh. N. Indeed, such reporting was a requirement of Steadfast's service contract with the facilities. Exh N, p. 47.

Defendants' hiring and firing of employees demonstrates the control Defendants exerted over *Steadfast I and II* employees and fully supports the conclusion that Defendants employed these individuals. *Cf. Hughes*, 117 F. Supp. 3d 1365, 1370 (finding nurse registry exerted control over CNA even though CNA could refuse work without consequence, may agree to work only on certain days, refuse to work with certain patients or in a particular county). Employees stated that if they declined a shift, Ms. Pitts intentionally stopped offering her work hours and "blacklist[ed]" them. Exh. D-2: ¶ 15; Exh. D-7: ¶13, 23; D-10: ¶ 23; *see also* SOF ¶ 17.  Clearly, refusing to assign an employee work is equivalent to firing. *See, e.g.*, *Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 295 (2d Cir. 2008); *Renteria-Camacho v. DirecTV, INC.,* No. 14-2529, 2017 WL 4619354, at *6 (D. Kan. Oct. 16, 2017). One LPN reports that, in February or March 2017,

Defendant Pitts threatened to "fire" her after she had a misunderstanding with another LPN at the Charlottesville Health and Rehabilitation. Exh. D-2: ¶ 19. As to hiring, Defendants required *Steadfast I and II* employees to complete an employment application, which inquired into the employee's employment history, skill set and references. SOF ¶ 8; Exh. D-1: ¶5; Exh. D-2: ¶¶ 5, 6; Exh. D-3; Exh. D-4; Ex. D-7 ¶ 4; D-9: ¶ 4, 5, 6; D-10: 5, 6. Defendants then conducted interviews. *Id*.; Exh. D-1: ¶ 6; Exh. D-2: ¶ 5. Defendants also required all employees complete background checks and drug testing at Defendants' cost. *Id.;* Exh. D-1: ¶ 7; Ex. D-2: ¶ 6; Exh. D-10: ¶ 7; Exh. K; Exh. W-1: ¶ 11; Exh. W-2: ¶ 16; Exh. G:178:15-180:25. Notably, facilities did not interview, screen or assess Steadfast Nurses assigned to work at the facility. Exh. W-2: ¶13; Exh. W-1: ¶ 11.

Defendants were solely responsible for approving timesheets and paying employees. Exh N, p.47; Exh. O; Exh. W-3: ¶ 21. Indeed, the facilities had no involvement in the payroll and recordkeeping processes required for Steadfast employees to be compensated. *Id;* Exh. W-1: ¶¶ 9, 10; Exh. W-3 ¶¶ 21, 22, 23; Exh. N. Steadfast invoiced the facilities for services provided by employees and Steadfast, in turn, paid its employees. *Id*.; Exh. W-1: ¶¶ 9, 10: Exh. W-2: ¶¶ 12, 13, 14, 15; Exh. W-3 ¶¶ 21, 22, 23; Exh. N.  Defendants required employees complete daily timesheets to receive their wages. Exh. D-1: ¶ 17; Exh. D-2: ¶ 24; Exh. D-4: ¶ 24; Exh. D-7: ¶ 24; D-9: ¶ 20; 8, D-10: ¶ 21; D-8, 11-16; *see also* Exh. 1 and 2; *see Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp.2d 762, 769 (D. Md. 2008) (the control element may be satisfied where the putative employer sets the plaintiffs' schedules, directs them to particular work sites, requires them to fill out time sheets, and can fire them at will.). Defendants did not pay employees if they did not turn in their timesheets on time. Exh. B: 72:8-13; Exh. B-1: 6(h); ECF 80-10; Exh. D-7: ¶ 24; D-9: ¶ 20; D-10: ¶ 21; D-8, 11-16; Exh. N; *Hughes*, 117 F. Supp. 3d at

1372 (employer withholding payment if CNAs failed to timely submit timesheets was indicative of an employment relationship). The fact that Defendants paid employees with paychecks stating "Medical Staffing of America" further supports a finding that *Steadfast I and II* employees were employees under the FLSA. Exh. P, p.1.

>    2.   *Steadfast I and II employees had no opportunity for profit and loss.*

"Where the putative employee's work is, by its nature, time oriented, not project oriented, courts have weighed the second [economic realities test] factor in favor of employee status." *PowerComm Const., Inc*., 309 F.R.D. at 357. In other words, if employees are paid by the hour and the only way they can increase their income is to increase their work hours, that individual does not have an opportunity for profit and loss and is more likely an employee. *Id*.; *see also Harry's Nurses Registry*, 594 Fed. Appx. at 717; *LeMaster*, 726 F. Supp. 2d at 862; *Genesee County Cmty. Mental Health Servs.,* 45 F. Supp. 2d at 614. Here, it is undisputed that Defendants paid employees on an hourly basis. Exh. D-1: ¶ ; Exh. D-2: ¶9; Exh. D-3; Exh. D-4; Exh. D-5; Exh. D-6; Exh. D-7: ¶8; Exh. D-7: ¶¶ 8, 18; D-9: ¶¶ 7, 16; 8; D-10: ¶ 8, 10; D-8, 11-16. Steadfast employees also did not negotiate their hourly rates with client facilities, further demonstrating they did not have an opportunity for profit. Exh. D-7: ¶ 24; D-9: ¶ 20; 8, D-10: ¶ 21; D-8, 11-16. *See Hardison v. Healthcare Training Solutions, LLC,* No. PWG-15-3287, 2017 WL 2276840, at *4 (D. Md. 2017). In fact, facilities were prohibited from hiring Steadfast employees, "unless it first arranged with Steadfast Medical Staffing, LLC." Exh. N, p.47. Further, employees had no managerial skills— they did not supervise other employees or operate their own companies. Exh. W-1: ¶ 5; Exh. W-2: ¶7; Exh N. In fact, Defendants expressly forbade it. Exh. D-7: ¶¶ 13, 15, 17; D-9: ¶¶ 13, 15; 17, 21, D-10: ¶ 14, 18, 19; D-8, 11-16. *See Harry's Nurses Registry*, 594 Fed. Appx. at 717 ("The relevant inquiry here is whether [employee's] opportunity for profit or loss depends more upon [ employer's] provision of work orders and [employee's] technical skill

and efficiency than on her managerial skill."); *Silk*, 331 U.S. at 716.

Steadfast employees did not invest in Defendants' business, nor did they own any percentage of Steadfast. Exh. D-7: ¶¶ 12, 16, 17, 25; D-9: ¶ 15; 16; 8, D-10: ¶ 14, 18; D-8, 11-16. Therefore, they also could not suffer financial losses working for Steadfast. Moreover, Defendants contractually barred employees from working for similar companies – and operating their own similar business. SOF ¶ 28. Indeed, a non-compete agreement goes directly against the nature of a true independent contractor. *Hughes*, 117 F. Supp. 3d at 1372; *Harris v. Skokie Maid and Cleaning Serv., Ltd.,* No. 11–8688, 2013 WL 3506149, at *9 (N.D. Ill. July 11, 2013); *Swinney v. AMcomm Telecommunications, Inc.,* 30 F. Supp. 3d 629, 634 (E.D. Mich. 2014). In *Gayle v. Harry's Nurses Registry*, the defendant nursing registry assigned nurses to work at various locations but prohibited them from "contracting independently with [registry nurses]" and the Court found this factor weighed in favor of an employer-employee relationship. *Gayle v. Harry's Nurses Registry, Inc*., 594 F. App'x 714, 717–18 (2d Cir. 2014). *Steadfast I and II* employees also could not make the business strategy decisions necessary to increase the profits, such as the type and amount of equipment to use, what types of jobs to take and whether to hire assistants, invest in advertisements, or adjust pricing. Exh. D-7: ¶ 17; D-9: ¶ 15; D-10: ¶ 18. *See e.g. Family Life Care, Inc*., 117 F. Supp. 3d at 1371-72; *Crouch*, 2009 WL 3737887 at *18. In fact, had they done so, they would have been acting in direct violation of their contract with Defendants. Exh. L, p.20

       3.   *Steadfast I and II employees' skills are indicative of an employment relationship.*

This element does not address the skill of the work itself, but instead, whether nurses used their skills in an "independent" way or whether they are dependent on referrals to find job assignments. *See Richardson v. Genesee County Cmty. Mental Health Servs.,* 45 F. Supp. 2d 610, 614 (E.D. Mich. 1999); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 2016);

*Guardian Angel Nursing, Inc.,* 2009 WL 3737887, at *17; *LeMaster*, 726 F. Supp. 2d at 861.

While Steadfast employees were required to complete certain programs of study to obtain

licenses to provide certain healthcare service, "'[s]kills are not the monopoly of independent

contractors,' as all jobs require some modicum of skill." *Perez v. Super Maid, LLC*, 55 F. Supp.

3d 1065, 1077 (N.D. Ill. 2014); *Solis v. A+ Nursetemps, Inc.,* No. 5:07–cv–182–oc–10PRL, 2013

WL 1395863, at *6 (M.D. Fla. Apr. 5, 2013) (The work of a nurse in "this society is not

necessarily a specialty job in the sense that members of the public do not typically seek them out

for private or individual engagements; rather, the nurses involved in this case work, instead, on

an hourly basis in institutional settings like the hospices, hospitals and detention facilities.").

Here, Steadfast employees were required to provide the services prescribed by the facility and

physicians. Exh. K, p. 16; ECF 80-10 ("The facility has their particular doctors assigned, and you

have to follow their guidelines and procedures. You fall in line with facility protocols."); Exh. N,

p. 47. Steadfast CNAs, LPNs and RNs performed tasks commonly associated with their fields—

they passed out medication, updated patient charts, treated wounds, took vital measurements,

etc., in accord with the mandates of the state board of nursing. Exh. D-2: ¶ 13; Exh. D-7: ¶ 11.

Thus, employees performed the work Defendants and their clients directed them to perform,

without discretion or the use of independent judgment. Exh. N, p.47. ("Facility shall utilize

assigned Contractors only for the specific need requested, unless Facility, Steadfast, and

Contractor agree to a change in duties."). This fact weighs heavily in favor of finding that

*Steadfast I and II* employees were employees under the Act.

Further, *Steadfast I and II* employees relied solely on Defendants to place them with

client facilities. Exh. D-6; Exh. D-7: ¶¶15, 13, 14, 21; D-9: at ¶6, 10. D-10: 7, 16. Schedule A

workers could not, for example, contact Defendants' clients directly to offer their services. *Id*;

Exh. N ("Facility will take no steps to recruit its own employees those Contractors provided by Steadfast."); Exh. W-2: ¶ 11(c). In fact, Defendants expressly forbade employees from doing so, per the Agreement for Independent Contractor Services. Exh. L, p. 20. Steadfast employees, therefore, did not use any specialized skills in an "independent" way to obtain work or profit. *See, e.g., Richardson,* 45 F. Supp. 2d at 614; *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 666–67 (5th Cir. 1983); *Walling v. Twyeffort, Inc.,* 158 F.2d 944 (2d Cir. 1947).

> 4. *Steadfast I and II employees did not invest in equipment or materials.*

The investments this factor considers are "large expenditures, such as risk capital, or capital investments, and not negligible items or labor itself." *PowerComm Const., Inc.,* 309 F.R.D. at 358; *see also Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979). Here, Defendants' client facilities provided all of the tools and equipment employees needed to perform their jobs, including stethoscopes and blood pressure cuffs. Exh. D-7: ¶ 17; D-9: at ¶ 15, D-10: at ¶ 18.  While some employees used their own stethoscopes and blood pressure cuffs, they did so as a preference, rather than as a requirement. *Id*; Exh N; Exh. W-1: ¶ 21; Exh. W-2: ¶ 25. *See Schultz*, 466 F.3d at 308 (finding the fact that agents chose to use their own firearms when their employer supplied firearms to those who wanted did not weigh in favor of classifying the workers as independent contractors); *Guardian Angel Nursing, Inc.*, 2009 WL 3737887, at *17. These incidental supplies do not qualify as investment in business for purposes of determining employment status due to their negligible capital value. *Gayle,* 2009 WL 605790, at **5-9. Further, it is not particularly relevant that the clients, rather than Defendants, invested in medical equipment. *Guardian Angel Nursing, Inc.*, 2009 WL 3737887, at *17. Defendants' investment in the business of placing LPNs, RNs and CNAs substantially outweighs Plaintiffs'

investment in the tools of their trade. [4] Exh. G: 166:16- 20; *Id.* (finding defendants' investment in

the business of placing LPNs with patients to provide nursing care substantially outweighs

Plaintiffs' investment in the tools of their trade, which includes stethoscopes, uniforms and

gloves); *LeMaster*, 726 F. Supp. 2d at 862. That Defendants reimbursed *Steadfast I and II*

employees for hotel expenses further evidences an employment relationship, as does the fact that

Defendants barred employees from operating their own business and employing other workers,

*see.* Exh. D-7: ¶ 16; Exh. B, 40:23-25, 41:1-25; Exh. B-1:  ¶ 3, 6(j). *See Harry's Nurses Registry*,

594 Fed. Appx. at 717.

> 5.  *Transient nature of nursing is not dispositive of independent contractor status.*

Nursing, especially through the use of the agency, is inherently transient in nature. [5]

*Guardian Angel Nursing, Inc.*, 2009 WL 3737887, at **14–15; *LeMaster*, 726 F. Supp. 2d at

861. Therefore, the fact that some *Steadfast I and II* workers did not work for Steadfast for more

than a few months, is not dispositive of independent contractor status. *Superior Care,* 840 F.2d at

1061. The fact that some employees worked for other agencies also is not dispositive. *Id.* at 1060

(noting employees may work for more than one employer without losing their benefits under the

FLSA.). In this case, however, despite the transient nature of the nursing workforce, many of the

Schedule A workers worked for Defendants for multiple years. Exh. D-7: ¶ 2; D-9: ¶2, D-10: ¶2,

---

[4] LPNs, CNs, and RNs maintaining their nursing licenses is immaterial for purposes of
determining whether they are independent contractors. LPNs, CNs, and RNs are required to
maintain a license to work in their respective industries, regardless of whether they are
employees or independent contractors. Pitts 1-23 Dep. Tr. 24, li. 5-9; *See, e.g., Schultz*, 466 F.3d
at 308 ("Although the agents arguably had an investment in their individual PPS licenses, this
investment is immaterial for our purposes. Licensing is required of all persons working as
personal protection specialists in Virginia regardless of whether they are employees or
independent contractors.").

[5] Courts have consistently concluded this "factor under the circumstances should be given little
emphasis to begin with." *Crouch*, 2009 WL 3737887, at *14–15; *Wilson v. Guardian Angel
Nursing, Inc.,* No. 3:07-0069, 2008 WL 2944661, at *12 (M.D. Tenn. 2008).

D-8, 11-16; *see Superior Care,* 840 F.2d at 1060–61 (despite the fact that 78% percent of plaintiffs worked for defendant less than thirteen weeks, plaintiffs were deemed to be employees). And most *Steadfast I and II* employees worked exclusively for Defendants. Exh. D. Most importantly, record evidence clearly shows that employees were not free to take jobs from other companies. Exh. D. Defendants cannot have it both ways—they cannot classify their CNAs, RNs and LPNs as independent contractors, who would traditionally be free to use their skills wherever they please, and simultaneously prevent them from working for their competitors. *See Harris,* 2013 WL 3506149, at *9.

6. *The services Steadfast I and II employees provide are integral to Steadfast.*

Defendants operate a business that places nurses at various healthcare facilities. Without the *Steadfast I and II* employees, Defendants' business would cease to exist. *See Guardian Angel Nursing*, 2009 WL 3737887, at *17 (staffing agency that places LPNs at client sites as home health aides is at the heart of Defendants' business; therefore, integral to their business); *see also Harry's Nurses Registry*, 594 Fed. Appx. at 717. Indeed, Defendants do not contest the fact that this factor has been met. *See* ECF 84 at ¶8.

The mere fact that certain, limited facts support the conclusion that *Steadfast I and II* employees are independent contractors does not, alone, create a genuine issue of material fact. Indeed, the economic realities test is a balancing test. Courts should expect that there may be different facts supporting an employment relationship, as well as facts supporting the absence of such a relationship. *See, e.g. Heart II Heart v. Acosta*, 2:17-cv-01242, 2019 WL 7629239, (W.D. Pa. Oct. 3, 2019); *Hughes v. Family Life Care, Inc*., 117 F. Supp. 3d 1365 (N.D. Fla. 2015); *Crouch v. Guardian Angel Nursing, Inc.*, Civil Action No. Action No. 3:07–cv–00541, 2009 WL 3737887 (M.D. Tenn. 2009); 594 Fed. Appx. 714 (2d Cir. 2014). The fact that different facts exist supporting or contradicting each element does not create a genuine issue of material fact

precluding summary judgment. *Schultz v. Capital Int'l Sec., Inc*., 466 F.3d 298, 304 (4th Cir. 2006) ("The ultimate conclusion as to whether a worker is an employee or independent contractor under the FLSA presents a legal question."). It simply means the Court must compare each fact – not to make a credibility determination, but to determine whether said fact is indicative of *Steadfast I and II* employees being economically dependent on Defendants. Accordingly, the question here is whether the facts supporting an employment relationship outweigh the facts that support the opposite conclusion. Here, record evidence clearly shows the answer to that question is yes.  Accordingly, the Court should find Defendants liable for violating Section 7 of the Act.

**E.    Defendants owe $1,373,444.93 in back wages as a result of their violations of Section 7 of the Act in *Steadfast I* and *II*.**

Defendants paid employees their normal hourly rate for all hours worked, including hours in excess of 40 (straight time for overtime). This clear violation of the FLSA from August 18, 2015 to December 27, 2019, has resulted in $ 1,373,444.93, in back wages owed to 537 employees.[6] In calculating the back wages owed to these employees, Plaintiff first identified each employee's regular rate. Exh. S. To identify the regular rate, Plaintiff divided the gross compensation[7] the employee received during the workweek (as set forth in Defendants' Payroll

---

[6] Defendants have failed to produce Payroll Summaries to present for all employees. Plaintiff has filed a Motion to Compel to address Defendants failure to comply with their discovery obligation and to compel production of full and complete discovery responses. *See* ECF No. 198.

[7] In some workweeks, some employees received non-discretionary bonuses. Exh. G: 215:9-219:17. Defendants promised these bonuses to employees in advance of the work performed. *Id*. Defendants further paid out these bonuses on a weekly basis, pursuant to prior contracts, agreements, and/or promises. Exh. R.  Although the bonuses were included in the paychecks employees received, Steadfast did not include the bonuses when calculating any of the overtime premium due to employees for hours worked over 40 in a workweek. Because Steadfast did not include the bonus amounts when calculating the regular rate upon which to base any overtime premium due, the affected employees did not receive a rate of at least one and one half times the regular rate at which they were employed for hours worked in excess of 40 in a workweek. *Id*.

Summaries) by the number of hours the employee worked that week (as set forth in Defendants' Payroll Summaries). Exh. S. Once Plaintiff calculated the regular rate, he multiplied that number by one-half to determine each employee's half time rate – as the employer paid *Steadfast I* and *II* employees straight time for overtime hours worked, Plaintiff only needed to calculate overtime owed based on the half-time rate. Exh. S. Plaintiff then multiplied the half-time rate by the number of hours the employee worked over 40 during the applicable workweek to determine the amount of compensation due. Exh. S. *See* 29 C.F.R. § 778.100.

Plaintiff performed this calculation for all *Steadfast I* and *II* employees. For example, Chantella Smith worked a total of 56.5 hours during the workweek ending October 21, 2016. Exh. V: Chantella Smith Back Wage Computations. Of the 56.5 hours she worked that week, 16.5 were overtime hours and should have been paid at time and a half. *Id.* Her gross pay for this pay period was $1469.00. To calculate her regular rate, Plaintiff divided $1,469.00 by the number of hours she worked, 56.5, ($1469/56.5 = $26.00). *Id.*; Exh. S: ¶¶ 11, 14, 15. This calculation resulted in a regular rate of $26.00 per hour. Plaintiff then multiplied that regular rate by one-half to determine Ms. Smith's half-time rate. Exh. V; Exh. S: ¶ 14. Plaintiff multiplied the resulting half-time rate, $13.00, by the number of overtime hours worked that workweek, 16.5, to determine the amount of compensation due. Based on this calculation, Ms. Smith is due

---

Per the plain text of the FLSA, the regular rate "shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee." *O'Brien v. Town of Agawam*, 350 F.3d 279, 294 (1st Cir. 2003), quoting 29 U.S.C. § 207(e). An employee's "regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked." 29 C.F.R. § 778.112; *see also* 29 C.F.R. § 778.109; *Lee v. Vance Exec. Prot., Inc.,* 7 Fed. Appx. 160, 163 (4th Cir. 2001). The regular rate includes an employee's "total remuneration" and includes bonuses. 29 U.S.C. § 207(e); 29 C.F.R. § 778.109; 29 C.F.R. § 778.208. All remuneration must be considered in determining an employee's "regular rate." 29 U.S.C. § 207; *see also Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 330 (3d Cir. 2016); *O'Brien*, 350 F.3d at 295.

$214.50 (16.5 x $13.00) for the workweek ending on October 21, 2016. *Id.* Using this formula for all 537 employees whom Defendants paid straight time for overtime in *Steadfast I* and *II* between August 18, 2015 and present (the last day for which we have payroll records is December 27, 2019) yields a back wage total of $1,373,444.93. Exh. T: Wage and Hour Transcriptions.

### F. Defendants are liable for liquidated damages in *Steadfast I* and *II*.

"The FLSA provides for mandatory liquidated damages in an amount equal to the unpaid … compensation." *Mountaire Farms, Inc.*, 650 F.3d 350, 375; *see also* 29 U.S.C. § 216(c). Liquidated damages are the "norm" in cases in which the FLSA is violated. *See Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir 1986) ("Double damages are the norm, single damages the exception[.]"); *Lockwood v. Prince George's Cty., Md.*, 58 F. Supp. 2d 651, 657 (D. Md. 1999), *aff'd*, 217 F.3d 839 (4th Cir. 2000). Thus, once it is determined that Defendants are liable for back wages, as Plaintiff has established here, Plaintiff is entitled to an additional equal amount in liquidated damages. *See* 29 U.S.C. § 216(c); *see also Acosta v. Team Environmental, LLC*, No. 2:16-cv-3491, 2017 WL 6734169, at **5-6 (S.D.W. Va. Dec. 29, 2017).

Defendants bear the burden of proving by a preponderance of the evidence that Plaintiff is not entitled to liquidated damages because Defendants violated the FLSA in good faith, as set forth in 29 U.S.C. § 260. That burden is a high one. Indeed, Defendant must present "plain and substantial" evidence that it acted with subjective good faith and objective reasonableness to assert a good faith affirmative defense. *See* 29 U.S.C. § 260; *see also Richard, et al. v. Marriott Corp.*, 549 F.2d 303, 306 (4th Cir. 1977); *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 357 (4th Cir. 1994); *Lockwood*, 58 F. Supp. 2d at 657. To meet this burden, an employer must

affirmatively establish a subjective defense, i.e., that the employer acted in good faith by taking active steps to ascertain the dictates of the FLSA and then moved to comply with them. The employer also must establish an objective defense, i.e., that there were reasonable grounds for believing the employer was in compliance with the Act.  *Lockwood,* 58 F. Supp. 2d at 658; *Anderson*, 2007 WL 2819533, at *2; *Marshall*, 668 F.2d at 753; *see also* 29 C.F.R. § 790.22. This burden "is a difficult one to meet, however, and '[d]ouble damages are the norm, single damages the exception....'" *Lockwood*, 58 F. Supp. 2d at 657; *Mayhew*, 125 F.3d at 220. Indeed, before relieving Defendants of their obligation to pay liquidated damages under Section 216(c), the Court must conclude, among other things, that Defendants demonstrated they investigated their potential liability under the FLSA before implementing their pay practice of paying straight time for overtime hours worked. *See Quirk v. Baltimore Cty., Md*., 895 F. Supp. 773, 788 (D. Md. 1995) ("Good faith requires some investigation of potential liability. An employer cannot simply remain blissfully ignorant of FLSA requirements."); *accord, Fraternal Order of Police, Lodge 3 v. Baltimore City Police Dep't*, No. Civ. B-92-1066, 1996 WL 1187049, at *17 (D. Md. Oct. 30, 1996).

Defendants in this matter have not come forward with any affirmative evidence, plain, substantial or otherwise, that they acted in good faith and had reasonable grounds for believing that their pay scheme was in compliance with the Act. In *Steadfast I*, Defendants contend they relied on Attorney Wanda Cooper's legal advice when they classified employees as independent contractors. However, mere reliance on the advice of counsel, alone and regardless of the nature of said advice, is insufficient to satisfy a defendant's burden in proving good faith. *See Fuentes v. CAI Int'l, Inc*., 728 F. Supp. 2d 1347, 1358 (S.D. Fla. 2010); *see also Rakip v. Paradise*

*Awnings Corp.*, No. 10–20004–CIV, 2010 WL 4553675, at *7 (S.D. Fla. Nov. 3, 2010).[8] Here, Attorney Cooper testified that she gave Defendants advice related to the corporate formation of Steadfast, not advice regarding compliance under the FLSA. Exh. Y-1: Cooper Dep. Tr.14:12-20. In fact, Attorney Cooper testified that she did not give Defendants any advice about the FLSA or the overtime provisions of the FLSA. *Id.*, at 22:5-11. Notably, Defendant Lisa Pitts admits that when she consulted Attorney Cooper, they did not discuss overtime or Defendants' obligation to pay overtime to Schedule A employees. *See* Exh.C: 70:19-21, 22-25, 72:1-3. As both Defendant Pitts and Attorney Cooper agree Defendants neither sought nor received any advice regarding compliance with the FLSA, Defendants cannot show they took active steps to ascertain the dictates of the Act nor can they show they moved to comply with those dictates.

In *Steadfast II*, Defendants contend they sought the advice of two additional attorneys (Arlene Klinedinst and John Bredehoft) regarding their compliance with the FLSA.[9] Defendants are not permitted to rely on any evidence related to advice provided by Ms. Klinedinst when asserting this affirmative defense. When Plaintiff deposed Ms. Klinedinst regarding any advice she provided to Defendants, Defendants asserted the attorney-client privilege to nearly every questions. Exh Y-3: Arlene Klinedinst Dep. Tran.  Defendants, however, cannot pursue a good faith affirmative defense based on advice provided by Ms. Klinedinst, and then assert the attorney-client privilege when the Secretary seeks discovery related to that advice. *In re Grand Jury Subpoena*, 341 F.3d 331, 337 (4th Cir. 2003); *United States v. Moazzeni*, 906 F. Supp. 2d

---

[8] On March 18, 2020, the Court granted Plaintiff's Motion *in Limine* to Exclude finding that Attorney Cooper's advice was irrelevant and should be excluded from trial. ECF No. 202.

[9] Plaintiff intends to file a Motion for an Adverse Inference or, in the Alternative, Motion *in Limine* to Exclude All Evidence Regarding Advice Provided by Wanda Cooper and Arlene Klinedinst.

505, 512 (E.D. Va. 2012); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir. 1982); *United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1252 (D. Md. 1995).

Defendants also allege they received advice from John Bredehoft, for whom they, did not claim the attorney-client privilege. Mr. Bredehoft acknowledges that he gave Defendants advice regarding classifying nurses as independent contractors. Exh. Y-2: Bredehoft Dep. Tran. 25:5-19, 25:23-28-4. Specifically, he advised Defendants that if they wanted to properly classify employees as independent contractors, they had to: (1) no longer require nurses enter into the "Agreement for Independent Contractor Services," and (2) no longer require employees to complete employment applications. Exh. Y-2: 39:22- 41:4-11. Defendants did not comply with this advice and, to this day, still require nurses sign the "Agreement for Independent Contractor Services" and complete employment applications. Exh. L-2: Agreement for Independent Contract Services (2018). Thus, these failure precludes Defendants from satisfying the subjective prong of the good faith affirmative defense. *Perez v. Am. Future Sys., Inc.*, No. CV 12-6171, 2015 WL 8973055, at *13 (E.D. Pa. Dec. 16, 2015) ("[w]here such a legal opinion has been sought and obtained, defendant cannot demonstrate that it has acted in good faith unless it comes forward with at least some evidence that it acted in conformance with that legal advice (or, at the very least, that it has not contravened the legal advice)."), *aff'd sub nom. Sec'y United States Dep't of Labor v. Am. Future Sys., Inc*., 873 F.3d 420 (3d Cir. 2017); *Roy v. Cty. of Lexington, S.C.,* 141 F.3d 533, 543 (4th Cir. 1998). Mr. Bredehoft further testified that when he offered his analysis regarding the classification of nurses as independent contractors, Defendants failed to provide information key to the analysis. *See e.g.* Exh. Y-2, 61:19-23:  For example, they failed to inform him that they regularly directed nurses on performance expectation by providing employee memos (Exh. O); set a caregiver's rate of pay without the caregiver making the

ultimate determination, Exh. B-1: ¶6(f); and established and enforced policies for Steadfast nurses' time off from work. Exh. O-5:  Certainly, Defendants cannot argue there were reasonable grounds for believing they were in compliance with the Act, when they withheld information for the attorney from whom they were seeking advice.Further, when one considers Mr. Bredehoft failed to interview a single employee, review a single document, or speak to a single facility regarding his Defendants' relationship with said facility, the holes in Defendants' good faith defense become all the more apparent. Exh. Y-2: 48:13-51:13, 54:24-60:7.

Even if the Court were to allow Defendants to rely on that advice received from Ms. Klinedinst and Mr. Bredehoft, Defendants still cannot satisfy the objective prong of the good faith affirmative defense. Specifically, because DOL – the sole government agency tasked with enforcing the FLSA – informed Defendants that their overtime practices violated the FLSA, Defendants cannot prove they had reasonable grounds for believing they were in compliance with the Act when they continued to pay *Steadfast II* employees straight time for overtime between June 10, 2017 and present. Therefore, the Court must award Plaintiff $1,373,444.93 in liquidated damages in *Steadfast I* and *II*, in addition to the $1,373,444.93 in total back wages.

### G.      Defendants failed to maintain records in violation of Section 11 of the Act.

Defendants failed to maintain records in accordance with Section 11(c) of the FLSA, which requires employers subject to the provisions of the Act to make, keep, and preserve records of their employees' wages, hours, and other conditions and practices of employment, as prescribed by the Secretary's regulations. 29 U.S.C. § 211(c). From August 18, 2015 to present, Defendants failed to accurately record straight time pay and hours worked separately from overtime pay and hours worked. SOF ¶ 38; 29 C.F.R. § 516.2(a). Defendants also admit that they failed to accurately record total premium pay for overtime hours and total additions to or

deductions from wages paid each pay period. SOF ¶ 40; 29 C.F.R. § 516.2(a). Therefore, there are no material facts in dispute as to Defendants' violations of Section 11 of the Act.

**H.      Defendants' violations of the FLSA warrant injunctive relief.**

The FLSA authorizes district courts to issue injunctive relief "restrain[ing] violations" of Sections 206 and 207 upon a showing of cause. 29 U.S.C. § 217. Whether to issue injunctive relief is a decision within the sound discretion of the court. *See Martin v. Funtime,* 963 F.2d 110, 113 (6th Cir. 1992). In determining whether to issue a prospective injunction under the FLSA, courts consider (1) the employer's previous conduct, (2) its current compliance (or noncompliance), and (3) the dependability of any assurances that it will comply with the FLSA in the future. *Id.* at 114; *see e.g., Reich v. Petroleum Sales,* 30 F.3d 654, 657 (6th Cir. 1994) A court should normally issue an injunction against the commission of future violations when there is a finding of clear violations of the FLSA. *See McComb v. Homeworks' Handicraft Co–op*, 176 F.2d 633 (4th Cir. 1949).

Here, all three factors favor granting injunctive relief. Defendants' previous conduct includes a decision to misclassify employees as independent contractors and failing to pay them overtime. In fact, Defendants are still violating the FLSA as of the date of this Motion – even after the Secretary warned them that their overtime practice was unlawful. Defendants' indifference to the requirements of the Act and their failure to ensure future compliance make injunctive relief against Defendants justified and necessary.

**III.      Conclusion**

For the foregoing reasons, the Court should grant Plaintiff's Motion for Summary Judgment in its entirety, award back wages and liquidated damages totaling $2,746,889.86 and grant Plaintiff's request for injunctive relief.

Respectfully submitted,

| | |
|---|---|
| Mailing Address: | UNITED STATES DEPARTMENT OF LABOR |
| | |
| U.S. Department of Labor | Kate S. O'Scannlain |
| Office of the Regional Solicitor | Solicitor of Labor |
| 201 12th Street South | |
| Suite 401 | Oscar L. Hampton III |
| Arlington, VA 22202-5450 | Regional Solicitor |
| | |
| (202) 693-9369(voice) | Samantha N. Thomas |
| (202) 693-9392 (fax) | Associate Regional Solicitor |

Leah A. Williams
Regional Wage and Hour Counsel

*/s/ Ryma Lewis*
Ryma Lewis (VSB No. 83322)
Senior Trial Attorney
lewis.ryma@dol.gov

/s/ Chervonti Jones
Chervonti Jones
Trial Attorney
*appearing pro hac vice*
jones.chervonti.j@dol.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2020, a true and correct copy of the forgoing Plaintiff's

Memorandum in Support of Plaintiff's Motion for Summary Judgment was electronically filed

with the Clerk of Court using the CM/ECF system, which will automatically notify Defendants

by electronically serving a copy to Defendants' counsel:

Joshua J. Jewett, jjewett@piercemccoy.com
Julia A. Rust, julia@piercemccoy.com
Christopher D. Davis, chris@piercemccoy.com
Pierce/McCoy PPLC
101 W. Main St., Suite 101
Norfolk, VA 23510

/s/ Ryma N. Lewis
Ryma N. Lewis