```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                      Norfolk Division

3  - - - - - - - - - - - - - - - - - -
                                      )
4                                     )
   MARTIN J. WALSH, Secretary of      )
5  Labor, United States Department    )
   of Labor,                          )
6                                     )
           Plaintiff,                 )
7                                     )   CIVIL ACTION NO.
   v.                                 )   2:18cv226
8                                     )
   MEDICAL STAFFING OF AMERICA,       )
9  LLC, doing business as            )
   STEADFAST MEDICAL STAFFING        )
10  And                               )
   LISA ANN PITTS, individually      )
11  and as owner and officer of the   )
   aforementioned company,            )
12                                     )
           Defendant.                 )
13  - - - - - - - - - - - - - - - - - -

14
                   TRANSCRIPT OF PROCEEDINGS
15
                           DAY 1
16
                     Norfolk, Virginia
17
                     August 31, 2021
18

19
   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
20          United States District Judge

21
   APPEARANCES:
22
           UNITED STATES DEPARTMENT OF LABOR
23         By:  Ryma N. Lewis
                Chervonti Jones
24              Mohamed E. Seifeldein
                Oscar Hampton, III
25              Counsel for the Plaintiff
```

```
1

2    APPEARANCES CONT'D:

3

4
              PIERCE McCOY, PLLC
5             By:  Joshua L. Jewett
                   Julia A. Rust
6                  Counsel for the Defendants

7

8

9                       I N D E X

10   PLAINTIFF'S
     WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS
11
     COURTNAY HOPE DRAUGHN   22        43       53         --
12   YETUNDE TAYLOR          54        77       --         --
     CHRISTOPHER RYAN        85        102      109        --
13   HOPSON
     SAUDIA BOYKINS          113       128      134        --
14   ROXANNE ADAMS           136       154      166        --
     DAWN M. WOOTEN          170       187      --         --
15

16   DEFENDANT'S
     WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS
17

18   NONE

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter

**E X H I B I T S**

| **PLAINTIFF'S**<br>**NO.** | **PAGE** |
|---|---|
| PX53-002 | 58 |
| PX25-001 | 63 |
| PX25-002 | 63 |
| PX25-003 | 63 |
| PX25-004 | 63 |
| PX25-005 | 63 |
| PX53-01 | 69 |
| PX32 | 75 |
| PX26-1 | 88 |
| PX26-2 | 88 |
| PX26-3 | 88 |
| PX26-22 | 116 |
| PX26-23 | 116 |
| PX26-24 | 116 |
| PX25-16 | 118 |
| PX25-17 | 118 |
| PX25-18 | 118 |
| PX26 | 173 |

| **DEFENDANT'S**<br>**NO.** | **PAGE** |
|---|---|
| NONE | |

```
 1              (Hearing commenced at 10:32 a.m.)
 2              THE CLERK:  Martin J. Walsh, Secretary of Labor,
 3   United States Department of Labor, versus Medical Staffing of
 4   America, LLC, a Limited Liability Company, doing business as
 5   Steadfast Medical Staffing and Lisa Ann Pitts, individually
 6   and as owner and officer of the aforementioned company, in
 7   civil action 2:18cv226 and consolidated case 2:19cv475.
 8              Ms. Lewis, is the plaintiff ready to proceed?
 9              MS. LEWIS:  Yes.  Good morning, Your Honor.  Ryma
10   Lewis on behalf of the Department of Labor with co-counsel
11   Mohamed Seifeldein and Chervonti Jones.  Also appearing in
12   the courtroom today is the regional solicitor of the
13   Department of Labor, Oscar Hampton.
14              THE COURT:  Thank you.
15              THE CLERK:  Ms. Rust, are the defendants ready to
16   proceed?
17              MS. RUST:  Yes, Defendants are ready.  Julia Rust
18   on behalf of the defendants, along with my co-counsel,
19   Joshua Jewett.
20              THE COURT:  Counsel, thank you very much.  At this
21   juncture, if you wish to make an opening statement, you may
22   do so.
23              MS. LEWIS:  May I approach the lectern?
24              THE COURT:  You may.  I think I will issue this
25   instruction.  For purposes of trying to speak, if you're
```

1     fully vaccinated, you can pull down the mask enough to talk,

2     but when you leave, we want you to kind of wipe down the

3     microphone and the area.

4           MS. LEWIS:  Do I need to turn this on?

5           THE COURT:  It's already on.

6           MS. LEWIS:  Okay.  Can I turn to face you?  This

7     is --

8           THE COURT:  You can.

9           MS. LEWIS:  Thank you.  Good morning, Your Honor.

10    When you know better, you do better, as so goes the old

11    adage.  You do better by treating your employees with the

12    integrity and respect they deserve.  You do better by paying

13    employees the compensations they have earned without excuses

14    or delay.  You do better by complying with the law.

15          But here the evidence will show that Lisa Pitts,

16    the 203(b) employer under the act, the sole owner and CEO of

17    Medical Staffing of America, doing business as Steadfast

18    Medical, the individual who is responsible for the

19    day-to-day operations of Steadfast, including determining

20    the rate and method of pay, hiring and firing of employees,

21    and developing payroll policies, failed to do better.

22          She failed to do better by refusing to pay time and

23    a half to her nurses, her employees, the individuals who

24    have been providing critical and acute care to patients at

25    medical facilities each workweek in excess of 40 hours per

1    workweek since at least August 18, 2015.

2         Although she knew better from the Department of

3    Labor's investigation, which looked at her record and

4    informed her that her compensation of records and practices

5    were in violation of the act, she failed to do better by

6    intentionally providing misinformation about her obligations

7    to pay overtime, although she knew better after speaking to

8    other temporary staffing agencies that the nurses must be

9    classified as employees under the act because they, too,

10   have been subject to investigation, audits, and findings and

11   misclassification.  Indeed, the evidence will show that

12   defendants are subject to the act.  Lisa Pitts is

13   unquestionably a 203(b) employer as defined by the act.

14        There is an employer/employee relationship between

15   defendants and the nurses employed to provide temporary

16   medical personnel services at contracted facilities; that

17   defendants have repeatedly and willfully refused to properly

18   compensate their employees, the nurses, for the work they

19   have performed for defendants and are entitled to be paid

20   time and a half for overtime hours worked over 40 rather

21   than straight time since at least August 18, 2015; and that

22   defendants did not make, keep, or preserve daily and weekly

23   hours worked by their employees between August 18, 2015, and

24   August 22nd, 2016; and that defendants failed to accurately

25   report total premium pay for overtime hours and total

1  additions to her deductions from wages paid each pay period.

2          You will hear from a number of current and former

3  employees who will testify regarding their experience

4  working at the express direction, control, and supervision

5  of Lisa Pitts who is undoubtedly a 203(b) employer under the

6  act.  They will confirm that defendants took a series of

7  calculated, intentional steps in directing their work with

8  the employee/employer relationship.

9          For example, you will hear how the nurses' and

10  CNAs' only opportunity for profits and loss depended on the

11  defendants permitting and making work opportunities

12  available for them.  In fact, a number of nurses, and the

13  facilities will confirm the same during their testimony,

14  that defendants prohibited their employees, the nurses, from

15  scheduling directly with the contracted client facilities

16  without Lisa Pitts' express approval and/or knowledge.

17          You will also hear from several employees who will

18  detail the level of control defendants exercised over them

19  by relaying conduct expectations which were regularly

20  communicated in writing, and defendants' discipline policy,

21  both explicit and *ad hoc* to ensure uniformity of the company

22  values of character and integrity.

23          These employees will confirm, with the weight of

24  evidence, leads to no doubt but to conclude that the nurses,

25  which defendants contend are independent contractors, are,

1    in fact, employees entitled to over 180,000 hours of

2    overtime equating to 3.4 million in back wages that

3    defendants have refused to pay since August 18, 2015.

4    Defendants cannot meet their burden by proving by clear and

5    convincing evidence that the nurses are independent

6    contractors under the act.

7          After hearing from the employees, you will hear

8    testimony from the contracted facilities, which defendants

9    have contracted with over the years.  These facilities will

10   likewise confirm that defendants have known of their

11   obligation to control, supervise, and pay their employees.

12   These facilities will detail the scheduling process and how

13   defendants enforce the non-solicitation and buyout placement

14   (b) clauses which in most cases began at $2,000.

15         These various mechanisms of oversight indisputably

16   demonstrates defendants' knowledge that the nursers were

17   their employees, they had a monetary, vested interest as

18   their employees, and were subject to the act.  The

19   facilities will also detail that in the terms of their

20   contract, defendants have not only an explicit obligation to

21   comply with the act but actual knowledge of the same.

22   Again, another opportunity that defendants have known better

23   but have failed to do better.

24         Such evidence invariably undermines any arguments

25   the defendants are not subject to the act.  You will also

1    hear plain and substantial factual evidence which confirms

2    what the act already mandates; liquidated damages are

3    required here.

4         Defendants will not be able to meet their burden of

5    proving the affirmative defense of good faith, which is the

6    only exception to the rule regarding liquidated damages.

7    Other local and national agencies will testify that they had

8    discussions with Defendant Pitt from the nursing agency

9    business model, including how they hire nurses, schedule

10   nurses, supervise nurses, and pay nurses.

11        Such evidence will confirm that the defendants knew

12   that the healthcare facilities they worked at required

13   Steadfast defendants to comply with the act and that

14   defendants' misclassification of nurses was an unlawful

15   strategy to depress lawful competition.

16        The evidence will show that defendants had actual

17   notice that they needed to do better.  It's anticipated that

18   defendants will acknowledge that these employees are an

19   integral part of Steadfast.  Defendants will acknowledge,

20   through their deposition testimony and other documentary

21   evidence, that but for the nurses' work, the company would

22   cease to exist and their gross revenue in 2006/2015 would

23   not have exceeded $37 million.

24        During the same period they undercompensated their

25   workers, their employees by 3.4 million.  Yet, with these

```
 1    acknowledgements through Lisa Pitts' 203(b) employer
 2    testimony, defendants will attempt to meet their burden of
 3    proving the affirmative defense of good faith that the
 4    scheduled individuals are independent contractors rather
 5    than employees by arguing that although they recruited,
 6    hired, trained on HIPAA and abuse and sexual harassment,
 7    require nurses to enter non-compete designed shifts that
 8    contracted facilities and paid nurses directly from their
 9    bank account on established regular payday and in many cases
10    the next day.
11          Defendants did not control these employees, and,
12    therefore, the nurses are not employees under the broad
13    reach definition of the act.  However, such arguments should
14    be unavailing and viewed evidence of the admissions of an
15    employer that has known better, an employer that cannot meet
16    the burden of good faith that adopted with subjective good
17    faith and objective reasonableness.  This is not an employer
18    that is simply trying to stay afloat, but, rather, an
19    employer that is taking advantage of hardworking first
20    responders, nurses.
21          As such, should the Court decide with us, not just
22    because we want you to but because there is a wrong that has
23    occurred, and the law requires that the evidence be viewed
24    through the lens of the act which requires employers to pay
25    a fair day's pay for a fair day's work.
```

1          The law mandates that an employer who knowingly

2    violates the law must make those employees whole and

3    compensate those employees for the hardship caused by the

4    employer's harm by paying mandatory liquidated damages in

5    amounts equal to the unpaid compensation.

6          Indeed, the act's very purpose and the evidence

7    will show that this very type of behavior perpetuates

8    economic and professional inequality.  The defendants knew

9    of their obligation under the act but did not move to comply

10   with those dictates.

11         Defendants took advantage of the position they were

12   in.  They broke the covenant that governs the basic tenets

13   of an employer/employee relationship.  As the employer is

14   scheduling employees, defendants knew of their obligation,

15   responsibility to pay overtime.  They simply chose not to

16   pay their employees; yet, in some cases billed facilities at

17   a premium rate when the employees the company relied upon to

18   determine the business that they owned of 40 hours in a

19   workweek and in some cases 112 hours or more.  That is

20   unconscionable.

21         Defendants cannot show that they had reasonable

22   grounds for believing that its actions were not a violation

23   of the law.  Rather, the evidence will show that the

24   defendants had been well aware of their obligation to pay

25   overtime.  But because the law did not suit them, defendants

1    chose to ignore the law.  Defendants were advised by at

2    least two of their former attorneys that its classification

3    of nurses was at best questionable but certainly

4    problematic.

5         Both of those attorneys counseled defendants

6    regarding its hiring practices, the non-compete agreement,

7    and the level of control and oversight Lisa Pitts, the

8    203(d) owner, exercised over her nurses.

9         Both attorneys advised defendants on

10   changes defendants should make to its management and

11   compensation practices to be in compliance with the act.

12   But despite this advice, defendants continued to fail to do

13   better.  Defendants failed to take any steps to comply with

14   the law.

15        Rather, defendants ignored the advice, and as

16   recently as January 2021, have taken an ostrich-like

17   approach to its responsibilities to comply with the law by

18   implementing technology which provides a mechanism to

19   monitor and avoid violating the FLSA.

20        The defendants deliberately disabled the feature

21   within the technology.  Undoubtedly, defendants know better.

22   Here the violations of the act are not just egregious

23   because defendants failed to pay overtime, while forcing

24   over 37 million in revenue since at least 2013, while

25   shortchanging their employees by 3.4 million overtime

1    compensation, but they are egregious because this is an

2    employer who has known better.

3           The evidence you will receive at trial is concrete

4    and will leave no room to conclude that defendants have

5    willfully violated Section 7 and 11 of the act and that

6    defendants cannot meet their burden by proving by clear and

7    convincing evidence that the Schedule A workers are

8    independent contractors rather than employees.

9           Defendants have known better.  They have taken the

10   right of property of another, stolen the wages of nurses and

11   CNAs who have selfishly dedicated their service to a company

12   to be improperly compensated.  Defendants will not be able

13   to show that they had a good faith defense to these simple

14   FLSA requirements.  Defendants have violated the act.

15          Thank you, Your Honor.

16          THE COURT:  Thank you.  I think you have to wipe

17   down the microphone.

18          MS. LEWIS:  Yes.

19          THE COURT:  Thank you.

20          MS. LEWIS:  Thank you.

21          MR. JEWETT:  May it please the Court.

22          THE COURT:  Mr. Jewett.

23          MR. JEWETT:  Ms. Lewis, members of the Department

24   of Labor.  Steadfast is a registry.  At its core, the

25   company matches nurses in a database who are seeking as

 1   -needed work with healthcare facilities seeking as-needed

 2   nursing services.

 3          For more than 40 years the Department of Labor has

 4   maintained a position that a company that facilitates this

 5   matchmaking service between clients and between workers is a

 6   registry and not an employer under the Fair Labor Standards

 7   Act.

 8          On July 13th, 2018, the Department of Labor

 9   published field assistance bulletin 2018-4.  This is two

10   months after the Department of Labor filed this lawsuit.  In

11   that publication, here is what the Department of Labor told

12   the public, "Consistent with the wage and hour division's

13   longstanding position, a registry that simply facilitates

14   matches between clients and caregivers -- even if the

15   registry also provides certain other services, such as

16   payroll services -- is not an employer under the FLSA."

17          So the question in this case is straightforward.

18   Does Steadfast facilitate or control?  Is Steadfast at the

19   core of its model in the business of facilitating matches

20   between facilities and nurses or is Steadfast in the

21   business of controlling the manner in which the nurses

22   practice nursing, setting, controlling their schedules, and

23   preventing them from obtaining other work?

24          Now, the department has also sued Lisa Pitts

25   personally.  She has a compelling story which she will

1    briefly explain to the Court when we call her as a witness

2    in our case.  She was a runaway teenager.  She graduated

3    high school with a third grade -- on a third grade reading

4    level.  She worked as an LPN for 20 years, and at the time

5    she began thinking about starting a business, she was

6    working long hours that were controlled by her healthcare

7    employer.  No flexibility.  She was a single mother with

8    four children.

9         Sir, she had this vision to start a registry with

10   this idea of flexibility, the freedom to schedule in mind.

11   So she had a business license, but she didn't have a

12   computer in those days, so a friend gave her one, and she

13   got her first break on a contract.  She was initially turned

14   down in the interview to get the contract, but a kind

15   gentleman, who happened to be The Director of Nurses for the

16   facility, called her afterwards and gave her a break, and so

17   she started Steadfast with one contract, three nurses with

18   this vision of flexibility and independence in mind for the

19   nurses who were to take shifts through this registry.

20        Now, the Court's going to hear us refer to

21   Steadfast throughout this trial as a registry, but I'd like

22   to take just a few moments to explain what a registry

23   actually is.

24        THE COURT:  Don't waste your time.  The Court

25   already knows, but you can move on.

1          MR. JEWETT:  Understood, Your Honor.  Understood.

2    So the way the scheduling works through the registry is a

3    healthcare facility contacts Steadfast, typically in an

4    e-mail, and then Steadfast sends out a communication blast

5    to the nurses on database, and the nurses are free to accept

6    shifts or not accept shifts, but to them there are

7    variations in the way the scheduling works, but that is sort

8    of the core model.  That is the core of the Steadfast

9    registry model.

10         What the evidence is going to show in this case is

11   a little bit about the nurse staffing industry.  The

12   hospitals, the nursing homes, the evidence will show that

13   they don't just have contracts with Steadfast exclusively.

14   They also have contracts with other staffing agencies who

15   are basically Steadfast competitors.

16         The evidence is also going to show that the nurses

17   who take shifts at a Steadfast registry, they also take

18   shifts in these other staffing agencies, Steadfast

19   competitors, and the nurses also work full-time jobs as W-2

20   employees with other hospitals and nursing homes.  So it's a

21   classic registry model that falls right in line with these

22   notions of flexibility and freedom that independent

23   contractors enjoy.

24         Now, the important question is this:  How does this

25   model fit within the Fourth Circuit economic realities?  The

1    Fourth Circuit hasn't issued a decision on a registry model

2    yet.  I won't go through the factors.  The important point,

3    of course, is that the Fourth Circuit has emphasized that

4    the first factor, the degree of control factor, is the most

5    important factor for our evaluation.

6         The Court's going to hear lots of evidence in this

7    trial on this control factor, mostly from the Department of

8    Labor, and their strategy, we think, is going to be sort of

9    be death by a thousand cuts, lots of volume, along with a

10   volume of information.  But at the end of the day, through

11   their evidence, we submit that there are three questions,

12   three critical questions for this case that The Department

13   cannot answer.

14        The first question is this:  Are the nurses free to

15   set their own schedules or does Steadfast set the schedules

16   for them?  If you're an employee, your employer sets your

17   schedule for you Monday through Friday, 9 to 5 or whatever

18   it is.  You're not free.  You're independent.  Here is the

19   second question:  Are nurses free to work for other

20   employers, such as healthcare facilities, or other agencies?

21   An employer is not going to allow an employee to go to their

22   competitor to do the exact same thing while the employee is

23   still working for the company.  Not how it works.

24        If you're an independent contractor, you get to do

25   that.  You have independence to do things like that.  There

1    is a third question:  Does Steadfast control the manner in

2    which the nurses nurse, the manner in which they practice

3    nursing, or do the nurses practice nursing without

4    Steadfast's input?  That might be the most important

5    question in the case, according to the Fourth Circuit.

6              The evidence that the Court is going to hear on

7    these factors is that Steadfast provides no training, no

8    orientation, no handbook, no policy manual, no how-to guide,

9    nor performance evaluations, no corrective actions, no

10   supervision.  Steadfast does not provide an actual place for

11   nurses to work.  Steadfast does not provide equipment, and

12   it does not set the nurse's schedules.

13             At the same time, the evidence will also show that

14   the nurses do set their own schedules.  They are free to

15   accept other clients' shifts.  They are free to work as

16   little or as much as they wish, and they work the nurse

17   independently without direction of supervision from

18   Steadfast on how to nurse.  They work directly for the

19   healthcare facilities as W-2 employees, and they take shifts

20   with competing agencies.

21             Now, it's interesting that in The Department's

22   opening statement, it doesn't address any of those factors,

23   and they're critical factors for the case.  The Department's

24   case, we think, is going to hinge on a few things, as

25   Ms. Lewis summarized in her opening.  They are going to call

```
 1    the healthcare facilities' corporate representatives in
 2    these healthcare facilities who either have or used to have
 3    contracts with Steadfast, and these corporate
 4    representatives are going to point to the language of these
 5    long contracts that were prepared by their attorneys, and
 6    they're going to say, "Look at all these requirements that
 7    we have, that Steadfast has to supervise these employees."
 8    But the language of the contract is not part of the
 9    six-factor test.
10          In fact, the Courts have been very clear that what
11    matters in the economic realities test is the reality of how
12    the relationship works.  How do things operate when boots
13    are on the ground, when people are talking, e-mailing,
14    calling and nursing.
15          We think they are also going to call Steadfast
16    competitors in here to talk about the industry standard.
17    These are the very people who stand to benefit if Steadfast
18    loses this case.  There is a pending motion on these
19    witnesses, but we would trust the Court, even if they do get
20    to present evidence, the Court wouldn't give their testimony
21    a whole lot of weight.
22          Primarily, the Department of Labor is going to
23    present evidence through anecdotes of nurses.  There is
24    going to be some stories the Court is going to hear.
25    Ms. Pitts is a competitor.  She hustles.  She has contracts
```

1    to honor, and you don't build a successful business by

2    sitting on your hands and letting things happen.

3         When it comes to these stories the Court's going

4    the hear during this trial, we would ask the Court to

5    consider two questions about them.  The first is this:  Are

6    all 800 or so nurses who take shifts in Steadfast registry

7    responsible people, that the core of being an independent

8    contractor is personal responsibility.  Nobody sets your

9    schedule for you.  You have to keep track of it.  If you

10   show up to a hospital and you commit a bad act, the hospital

11   doesn't give you progressive discipline.  They just tell you

12   to leave, they put you on a do-not-return list, and they

13   replace you.

14        The reality is that, and the Court is going to hear

15   this, some of these stories that some of these nurses can be

16   irresponsible, and when that happens at a hospital, what the

17   hospitals do is they put the nurse on a do-not-return list,

18   and Ms. Pitts, to honor the contract, has to communicate

19   that to the nurse.

20        Here is the second question we ask the Court to

21   consider when it hears the anecdotal stories from the

22   Department of Labor.  Is that sufficient to meet The

23   Department's burden of proof in this case?  The Fourth

24   Circuit is clear that in an independent contractor case, the

25   burden is on the plaintiff to establish the existence of an

1    employment relationship in the first instance.

2         So the Court might hear 3, 5, 20 -- we are not

3    sure -- anecdotes from the Department of Labor from

4    Steadfast nurses, but that's out of 800, 900 nurses, that's

5    1 to 2 percent.  On trial in this case is the Steadfast

6    registry model.  What's not on trial is the stories of a

7    handful of nurses, and are we prepared to say that a handful

8    of anecdotes is sufficient to collapse the entire registry

9    model on behalf of another 800 nurses?  It's our position

10   that it's not.

11        THE COURT:  Well, how many would you suggest they

12   call?  A handful 60, 70, 80, 100?  Never mind.  Continue.  I

13   shouldn't have suggested that.

14        MR. JEWETT:  Your Honor, let me conclude by going

15   back to the three questions I asked earlier.  We don't think

16   The Department is going to address these questions.  Are the

17   nurses free to set their own schedules?  Are the nurses free

18   to work directly for healthcare facilities and competing

19   agencies?  Does Steadfast control the manner in which the

20   nurses nurse?

21        We don't believe The Department can address those

22   questions because evidence doesn't exist to address them,

23   and it doesn't exist because when Lisa Pitts started this

24   company, she started it with a vision of flexibility and

25   independence in mind how nurses could take shifts at the

```
 1   registry.
 2          The very first question I asked the Court in the
 3   beginning of my opening was whether Steadfast controls or
 4   facilitates.  The overwhelming evidence is that the
 5   Steadfast model facilitates matches.  They don't control,
 6   and without control, the nurses can't be enjoined into an
 7   employment relationship with a company it did not ask for
 8   because of the Department of Labor prosecution.
 9          Thank you, Your Honor.
10          THE COURT:  Thank you.  You may call your first
11   witness.
12          MS. LEWIS:  Thank you, Your Honor.  Ms. Courtnay
13   Draughn Hope.
14          May I approach the podium when he is done?
15          (Witness was sworn.)
16          COURTNAY HOPE DRAUGHN, called by the Plaintiff,
17   having been first duly sworn, was examined and testified as
18   follows:
19                     DIRECT EXAMINATION
20   BY MS. LEWIS:
21   Q.  Good morning.  May you please state your name for the
22   record and spell your last name.
23   A.  Courtnay Hope Draughn, D-r-a-u-g-h-n.
24   Q.  Are you familiar with Steadfast Medical?
25   A.  Yes, ma'am.
```

Draughn, C. - Direct                                              23

```
 1   Q.   And how are you familiar with that company?
 2   A.   I worked there for a little less than two years.
 3   Q.   Do you have any ownership interest in Steadfast?
 4   A.   No, ma'am.
 5   Q.   What type of services does Steadfast provide?
 6   A.   Sending nurses and CNAs out into the field to pick up
 7   shifts at various facilities like nursing homes or hospitals
 8   or jails.
 9   Q.   And what type of nurses are -- does Steadfast employee?
10   A.   As far as the nurses, it was LPNs and RNs and then there
11   were CNAs as well.
12   Q.   When you worked at Steadfast, what was your job title?
13   A.   It started off as a call center agent and then
14   transitioned the titles to account manager.
15   Q.   And who transitioned the title?
16   A.   Lisa Pitts.
17   Q.   Who was your supervisor?
18   A.   Lisa Pitts.
19   Q.   What were your job duties and responsibilities?
20   A.   My -- I would get the staffing needs from the various
21   facilities and match up LPNs and RN facilities to make sure
22   that we had the correct person to fill the shift.
23   Q.   If you had a new nurse that came in, what would you do
24   for the new nurses?
25   A.   The new nurses, I would take a look at their credentials,
```

1  make sure everything was valid, the nursing license, CPR,

2  first aid, and a copy of their I.D., and make sure everything

3  was valid and current.  Then I would then take those nursing

4  credentials and see what availability I had for -- you know,

5  as far as the nursing title.  Then once a week make -- they

6  would send me a text message of their availability for the

7  week, and I would fill those shifts and tell them where they

8  are going to be working.

9  Q.  What if you had an established nurse?

10 A.  With the established nurse, they need to send me those

11 text messages on Mondays, and then I would then reply with

12 their shifts, what their week was going to be.

13 Q.  Can you describe your day-to-day activities within the

14 company.

15 A.  My day-to-day activities, we would come in in the

16 morning, confirm the shifts for everyone who was going to be

17 working second shift and take care of any additional needs

18 the facility would give us for a second or third shift, if

19 there was, verify anyone who wanted to work second shit.  We

20 would then move to anyone going to work at 7:00 p.m., repeat

21 the same thing, confirming those shifts, making sure the

22 facilities weren't adding or taking away any shifts, then

23 transition into confirming night shift as well.

24 Q.  So what were your interactions like with the nurses?

25 A.  Um, I talk to my nurses a lot.  I would make sure that

```
 1    they were available for those shifts that they gave me and

 2    making sure that all their credentials were still up to date

 3    and that could fill the role I was asking them to do.

 4    Q.  And how frequently would you be in touch with the nurses

 5    you were responsible for?

 6    A.  Definitely weekly if not daily.

 7    Q.  And how were you paid?  Hourly or salary?

 8    A.  Salary.

 9    Q.  And how much were you paid per hour?

10    A.  $12 an hour.

11    Q.  What was your work schedule?

12    A.  It was supposed to be 10 to 6, but at least definitely

13    stayed later most of the time up to 10-hour days.

14    Q.  So approximately how many hours a week did you work?

15    A.  Anywhere between 48 and 54.

16    Q.  And what days of the week did you work?

17    A.  Monday through Friday and every other Saturday day, and

18    that would then most of the time include every other whole

19    weekend taking the phones home.

20    Q.  Okay.  I'm sorry.  It's a little low.  Can you say the

21    last part of what you said.  Speak up a little bit.

22    A.  If I wasn't taking the phones home for the weekend for

23    all the calls.

24    Q.  Okay.  Were you able to take lunch breaks?

25    A.  No, ma'am.
```

1  Q.  Did you work hours in which you were uncompensated?

2  A.  Yes, ma'am.

3  Q.  When did that occur?

4  A.  That would occur on the on-call schedule.  There was a

5  flat rate, but we would still be expected to work the

6  whole -- about an 18-hour day.

7  Q.  And so how much were you paid when you worked on call?

8  A.  On call, during the week, the overnight was $100, on the

9  weekends it was 125.

10  Q.  So was this amount prevalent to your regular hourly rate?

11  A.  Absolutely not.

12  Q.  And how do you figure that math out?

13  A.  It was an 18-hour day, and so it would come out to be

14  about $5.40 an hour.

15  Q.  Given your position and familiarity with the office, how

16  is the business organized?

17  A.  The business is organized, there is an office that

18  actually has two parts; business office and the call center.

19  And then we have the nurses and CNAs out in the field.

20  Q.  Okay.  Within the office, you said there is two sides.

21  Can you tell me about those two sides.

22  A.  So there was the business office side where the actual

23  human resources, on-boarding, payroll, and things of that

24  nature were done on that side, well the business office side.

25  I worked in the call center side where we actually talked to

Draughn, C. - Direct                                           27

```
 1    the nurses on that weekly or daily basis and talked with the
 2    facilities on a daily basis about matching up those needs.
 3    Q.  And then you said the other side, the people who worked
 4    in the field.  What's the field?
 5    A.  The field would be what we consider to be the nursing
 6    homes, hospitals, jails, and those facilities where the
 7    actual shift work was done.
 8    Q.  Okay.  And so who worked in the field?
 9    A.  The nurses and CNAs.
10    Q.  So what was Ms. Pitts' role and involvement in Steadfast?
11    A.  Lisa is very, very, very hands-on, has to approve
12    everything.  There was -- the word that I would use to
13    describe it is micromanaging.
14    Q.  Within the office was there someone who managed payroll?
15    A.  Christine Kim.
16    Q.  And who was responsible for processing and reviewing
17    invoices to the facilities?
18    A.  Christine and Lisa did that.
19    Q.  Who established the work schedule for office, for the
20    office side?
21    A.  Lisa Pitts.
22    Q.  And what about the field?
23    A.  We did that as account managers, but Lisa approved each
24    and every one.
25    Q.  How are the nurses recruited?
```

1    A.   Traditionally through word of mouth.  We -- Lisa would

2    occasionally run an ad on Craig's List if there was a

3    specific need in a specific area, but generally it was word

4    of mouth.

5    Q.   Can you describe the hiring process.

6    A.   They would -- if the nurse was local and able to come to

7    the office, they would come in and bring those credentials

8    that we spoke about, fill out an application.  Then they were

9    sent out to do the drug screen.  Then they would come back to

10   the office to take a picture for I.D. photo.

11   Q.   Okay.  And if they weren't local was there a different

12   process?

13   A.   Slightly different, yes, ma'am.

14   Q.   What is that?

15   A.   They would -- the application was received via fax or

16   e-mail, so they would fill that out remotely.  We would then

17   direct -- well, they were then directed to a drug testing

18   facility in their area, and when they took their drug test

19   and the badge was made off the picture that they submitted,

20   and they received that in the mail.

21   Q.   Were you familiar with the independent contractor

22   agreement that nurses -- that were part of the -- were you

23   familiar with the independent contractor agreement?

24   A.   Yes, ma'am.

25   Q.   And were their agreements part of the application?

Draughn, C. - Direct                                            29

```
 1   A.  Yes, ma'am.

 2   Q.  Were the agreements always acknowledged and signed?

 3   A.  No, ma'am.

 4   Q.  If not -- if they weren't signed, what would happen?

 5   A.  Lisa would sign them.

 6   Q.  Okay.  And how do you know that?

 7   A.  I have seen her do it.

 8   Q.  Who set and determined the rates of pay for the nurses

 9   and CNAs?

10   A.  Lisa Pitts.

11   Q.  And how were nurses compensated, on an hourly or salary

12   basis?

13   A.  Hourly.

14   Q.  And how were those rates set?

15   A.  Lisa set those rates.

16   Q.  Okay.  When were they set?

17   A.  They were set -- Lisa would let me know -- let all of us

18   in the office know what the rate was going to be for the

19   facility, and it was written at the top of each staffing

20   sheet what the rate was.

21   Q.  Was there ever ambiguity or question about the rates that

22   the nurses would be paid?

23   A.  The standard rate, no, ma'am.  There was -- there was a

24   standard rate and so that it was impossible to miss at the

25   top of the sheet.
```

Draughn, C. - Direct                                                    30

1   Q.  Were nurses permitted to discuss their compensations with

2   each other?

3   A.  No, ma'am, absolutely not.

4   Q.  And how do you know?

5   A.  Lisa would absolutely forbid that and have an absolute

6   fit if she found out someone had done that.

7   Q.  And what happened if somebody did?

8   A.  Most of the time she would remove them from the schedule

9   for a while.

10  Q.  Were nurses permitted to discuss the compensations with

11  the facilities?

12  A.  Absolutely not.  No, ma'am.

13  Q.  And why not?

14  A.  Because Lisa felt that that was something the nurse or

15  CNA was going behind her back, and she would then take them

16  off the schedule for a while there as well.

17  Q.  Going behind their back to do what?

18  A.  To make a better deal with the facility.

19  Q.  And how do you know that?

20  A.  Many, many times and have listened to the discussions

21  many times.

22  Q.  And so what would happen if Lisa found out that the

23  nurses had tried to discuss their compensations with the

24  facilities directly?

25  A.  She would then take them off the schedule for a while.

Draughn, C. - Direct                                              31

```
 1   Q.  Are you aware of the non-solicitation clauses in

 2   Steadfast's contracts with the facilities?

 3   A.  Yes, ma'am.

 4   Q.  What is the non-solicitation clause?

 5   A.  The non-solicitation clause addressed how long -- if a

 6   nurse or CNA tried to go to work directly for a facility that

 7   we staffed instead of staffing through Steadfast.

 8   Q.  Did you have any involvement in monitoring the

 9   non-solicitation clause as in your position at Steadfast?

10   A.  My part in that was that Lisa always expected me to know

11   where anyone -- where any of my nurses were working.  I was

12   to keep track of, if they picked up another job, whether it

13   was at another facility or was another staffing agency, I was

14   always expected to know where they were working.

15   Q.  So was the non-solicitation clauses enforced?

16   A.  Yes.

17   Q.  How were they enforced?

18   A.  Lisa had some sort of formula that determined how long

19   the nurse had been working for Steadfast and how long we had

20   been staffing that particular facility, and then she would

21   come up with the number to buy out the contract with the

22   facility.

23   Q.  Did you or other of the staff negotiate rates of pay with

24   employees when scheduling?

25   A.  No, ma'am.
```

JODY A. STEWART, Official Court Reporter

Draughn, C. - Direct                                          32

1   Q.   Why not?

2   A.   If it was a set rate that reflected what was at the top

3   of the staffing sheet, that was the set rate.  However, if

4   you were one of Lisa's favorite nurses that she favored and

5   they knew what their special rate was, there was no need to

6   discuss that.  They knew what their special rate was going to

7   be regardless of shift and regardless of facility, they knew

8   what their special rate was.

9   Q.   For the people who didn't have a special rate, you said

10  there was a regular rate.  Were there ever instances in which

11  those people could get a special rate or a different amount?

12  A.   So what would happen was, she wouldn't negotiate the

13  change in the rate that's listed at the top of the sheet.

14  She would give them a bonus, and that would impact their

15  hourly rate, and we were instructed to not work out how that

16  math would impact the hourly rate, just offer them the bonus.

17  Q.   So just to be clear, who would set that bonus amount?

18  A.   Lisa did.

19  Q.   And was it a set amount for the bonus?

20  A.   No, ma'am.  It would vary.

21  Q.   Was the bonus a lump sum or an hourly rate?

22  A.   A lump sum.

23  Q.   Okay.  Did Steadfast ever pay overtime to the nurses and

24  CNAs?

25  A.   No, ma'am.

1    Q.   And did any nurses ever complain to you that they were

2    not paid overtime?

3    A.   Quite frequently, yes, ma'am.

4    Q.   And what would your response be?

5    A.   I was told to give them the response that they were

6    independent contractors, and that was what -- that was part

7    of what the independent contractor was, that there is no

8    overtime rate.

9    Q.   Who told you to provide them that response?

10   A.   Lisa Pitts.

11   Q.   Did any nurses ever complain that they weren't paid for

12   all hours worked?

13   A.   Yes, ma'am.

14   Q.   And how often did this happen?

15   A.   On a weekly basis.

16   Q.   And what would your response be to those complaints?

17   A.   They would have to direct them to Lisa or Christine for

18   resolution.

19   Q.   Do you know whether defendants withheld funds from

20   nurses' paychecks for garnishments as independent

21   contractors?

22   A.   Yes, ma'am.

23   Q.   And who did they withhold garnishments from?

24   A.   Two nurses come to mind:  Felicia Banks Cooper and

25   Shavonne Brochman come to mind.

Draughn, C. - Direct                                                    34

1   Q.  And how do you know about these two instances?
2   A.  Ms. Banks -- well, both of them came in to confront and
3   question Lisa about them, and they were quite upset.
4   Q.  Tell me about -- what about Ms. Banks Cooper and that
5   issue?
6   A.  Ms. Banks Cooper had a garnishment as it related to a
7   car, and Lisa took the money -- was withholding the money
8   from her paycheck, and then Ms. Banks Cooper found out when
9   she returned to court that the garnishment hadn't been paid
10  on.
11  Q.  Do you know how this was ultimately resolved?
12          MS. RUST:  Actually, I'm going to object to the
13  line of questioning regarding the withholding of
14  garnishment.  That has no bearing on the classification of
15  the nurses as contractor or employee, so it's not relevant.
16  It wouldn't have anything to do with their overtime wages.
17          THE COURT:  Your response.
18          MS. LEWIS:  Your Honor, it absolutely has to do
19  with the classification as independent contractors versus
20  employees.  The employees can have wages garnished.
21  Independent contractors cannot.
22          THE COURT:  Objection overruled.
23  BY MS. LEWIS:
24  Q.  What happened with Ms. Brockman?
25  A.  Ms. Brockman had a garnishment as it related to some

1   furniture, and it was the same scenario.  She found out that

2   the garnishment hadn't been paid on with the court.

3   Q.  And when did these two instances that you're aware of

4   occur?

5   A.  These happened in my last three months of employment with

6   Steadfast.

7   Q.  So we had talked a bit earlier about your job duties and

8   responsibilities.  Can you tell me a bit, how were the nurses

9   provided assignments?

10  A.  When they would provide me with that text message or

11  e-mail for their availability for the week, I would then

12  respond to them with what shifts I needed them to fulfill and

13  where.

14  Q.  Were nurses permitted to contact the facilities directly

15  to set their own schedules?

16  A.  Absolutely not.

17  Q.  And what would happen if the nurses did that?

18  A.  They were taken off the schedule for a while.

19  Q.  Who would take them off the schedule?

20  A.  Lisa Pitts.

21  Q.  Were nurses allowed to employee another nurse with the

22  same nursing titles, complete a shift that Steadfast was

23  compensating them to complete?

24  A.  Absolutely not.

25  Q.  Why not?

1   A.  Because if -- there was two reasons for that:  Because

2   the facility would sometimes hesitate to pay if the name that

3   I deemed them did not match the name of the person who showed

4   up to fulfill the shift.  So that would be an issue as far as

5   billing.  And then if it was a nurse that Lisa had taken off

6   the schedule for a while, then Lisa did not want that nurse

7   to work regardless.

8   Q.  So who decided how many days a week a nurse or CNA could

9   work?

10  A.  Lisa approved the final schedule.

11  Q.  When swifts were offered, could a nurse refuse or decline

12  to take an assignment or shift?

13  A.  That was highly frowned upon.

14  Q.  And what -- why would that -- what happened?

15  A.  Because Lisa felt like that that was -- if you gave the

16  availability, then you work where you say -- where we say

17  you're going to work.

18  Q.  So there was an established expectation?

19  A.  Yes, ma'am.

20  Q.  And who established this policy and procedure with

21  respect to, you know, notifying availability and scheduling

22  the same way one would provide a schedule and say I can work

23  this way?

24  A.  Well, I established my own system of organization with

25  it, but it was how Lisa had it set up.

```
 1   Q.  Okay.  So if a nurse didn't work the schedule that they
 2   had relayed to you as a scheduler, and they declined shifts,
 3   was it disciplinary the action of removing them from the
 4   schedule?
 5   A.  Yes, ma'am.
 6   Q.  If a nurse had a scheduling conflict, did the defendants
 7   permit the nurses of another nurse with the same nursing
 8   title without Steadfast's approval?
 9   A.  Absolutely not.
10   Q.  And why not?
11   A.  For those same reasons about matching up the names on the
12   schedule, as well as that nurse may be out of favor, and Lisa
13   may have felt like someone that Lisa had taken off the
14   schedule for a while.
15   Q.  If a nurse started at a client site but had to leave due
16   to an illness, were they required to notify Steadfast?
17   A.  Absolutely, yes, ma'am.
18   Q.  And why is that?
19   A.  Because Lisa needed to know if there was a way of
20   establishing something from the shifts, and also she needed
21   to know how that would impact the money that she was
22   anticipating of getting from that shift.
23   Q.  So if a nurse did that, what would happen?
24   A.  She was going to be taken off the schedule.
25   Q.  Were you expected to have nurses on standby?
```

Draughn, C. - Direct                                              38

1   A.  Absolutely.  You would fulfill -- expectation was to

2   fulfill 100 percent of the facilities' needs and then have an

3   extra person or two.

4   Q.  And who established this practice as policy?

5   A.  Lisa Pitts.

6   Q.  Who decided which facilities the nurse would work at in a

7   given week?

8   A.  Well, that would be decided by a few factors; their

9   nursing qualifications, of course.  They would need to match

10  the right person with the right, you know -- with the right

11  needs, and then also if the nurses is not in -- you know, in

12  or out of favor at the moment.

13  Q.  Okay.  Did Steadfast maintain a list of nurses which were

14  not permitted to work at certain facilities?

15  A.  Yes, ma'am, we absolutely did.

16  Q.  And what was that list referred to as?

17  A.  The DNR list, which stood for do not return.  That was

18  done by each facility.  So it was listed at the bottom of the

19  staffing sheet.

20  Q.  Were there other notes that were kept with respect to

21  nurses and their ability -- the ability for you as a staffer

22  be able to schedule them?

23  A.  Yes, ma'am.  Lisa kept notes in the phones' as to any

24  type of transgression a nurse may have submitted.

25  Q.  Were nurses required to submit time sheets?

Draughn, C. - Direct                                                39

```
 1   A.   Absolutely, yes, ma'am.

 2   Q.   When?

 3   A.   It was -- we ask that they do it after each shift, but

 4   definitely on a weekly basis.

 5   Q.   And to whom were they required to submit time sheets?

 6   A.   To ultimately to Christine Kim.

 7   Q.   Did Steadfast communicate behavior expectations to nurses

 8   in the field at any point during employment?

 9   A.   Yes.

10   Q.   And what were those expectations?

11   A.   Punctuality is key because that would be how -- that was

12   done out at the shift, you know.  You want to have the person

13   there for the entire time of the shift.

14   Q.   Were there any other expectations?

15   A.   There was the expectation of completing all of your

16   documentation and doing all of what's called your MARS and

17   TARS so that you wouldn't have to go back and complete

18   anything later.

19   Q.   And what are MARs and TARs for -- that's not in the

20   medical field?

21   A.   The MARs are the medication administration record and the

22   TARs is the treatment administration record.

23   Q.   And was that -- you said that was an expectation of

24   Steadfast?

25   A.   Yes, ma'am.
```

Draughn, C. - Direct                                                    40

1    Q.  If these behavior expectations were not met, what would

2    happen?

3    A.  Um, first they would have to find ways to get the nurse

4    to finish that documentation, because, of course, that has to

5    be done for the facility, and then there would be a question

6    of Lisa would let them go anywhere else for a while.

7    Q.  Okay.  Would Lisa communicate with the nurses when

8    behavior expectations were not met?

9    A.  Yes, ma'am.

10   Q.  And how would she communicate with them?

11   A.  Mostly screaming.  There was a lot of -- sometimes they

12   would do it over -- she would have that session over the

13   phone, and sometimes she would actually call the person in.

14   Q.  When would she call the person in and on what occasions

15   would that happen?

16   A.  Usually the first offense she would just kind of take

17   note of, and sometimes, depending upon what they did, of

18   course, she would just kind of take note of -- by the second

19   or third offense, they are definitely going to have to have a

20   one-on-one with her about what happened.

21   Q.  Were you ever involved in any of the discipline of any of

22   the nurses or CNAs?

23   A.  Yes, ma'am.

24   Q.  Do you recall any by name in which you were involved that

25   the discipline -- the discipline nurses?

1   A.  Off the top of my head, there was a nurse named Jeralin

2   Robinson and Jeralin was a very good nurse.  I mean, she did

3   her shift, and she did all of the expected work as she was

4   supposed to, never had any complaints about her work.  But

5   Jeralin had some confidentiality and different issues, and

6   sometimes would over social media, and Lisa called her into

7   the office after one offense and just absolutely let her have

8   it.

9   Q.  And were you part of that discussion?

10  A.  Normally, the only thing I would view on these types of

11  sessions, is I would present what the facilities said, the

12  factual basis of what the facility said this, this, and this

13  happened, and then Lisa took over the discussion from there.

14  Q.  And were these discussions disciplinary in nature?

15  A.  Yes, ma'am.

16  Q.  What would be the disciplinary outcome of these

17  conversations besides being yelled at?

18  A.  Lisa would determine how long to take the nurse off the

19  schedule.

20  Q.  Did Lisa Pitts hire and fire nurses and CNAs?

21  A.  Hiring, yes, but she would try to avoid using the word

22  "fire."

23  Q.  And what is it that she did then?

24  A.  She would end the relationship, or we won't be staffing

25  you anymore, or there is no need for you to call with your

Draughn, C. - Direct                                          42

```
 1   availability anymore.  She would say something ambiguous like
 2   that.
 3   Q.  So based upon your previous work experience, was this
 4   firing?
 5   A.  Yes, ma'am.
 6   Q.  Okay.  Do you recall any nurses by names in which -- that
 7   you know were fired by Steadfast?
 8   A.  Christina Evans comes to mind.
 9   Q.  I'm sorry.  I interrupted.  Tell me about Ms. Evans.
10   A.  Christina Evans had some accusations of drug diversion,
11   actually quite a few in the short time that she worked for
12   Steadfast, and when I received the report from the facility
13   or get that message from the facility that, you know, there
14   was that drug diversion issue, and they did not want her to
15   come back, of course, I would have to relay that to Lisa.
16          Lisa let it go the first three or four times, and
17   then we got to a point Ms. Evans just didn't have anywhere
18   else to send her and so Lisa told her not to call anymore
19   with her availability, and we would end the relationship with
20   her.
21   Q.  Any other examples that you're aware of, personally aware
22   of that the nurses that were fired?
23   A.  Not that I can think of off the top of my head, no,
24   ma'am.
25   Q.  If a nurse was injured at a facility, was the nurse
```

1   required to notify Steadfast?

2   A.  Yes, ma'am.

3   Q.  And why?

4   A.  Lisa said it was a workman's comp issue.

5   Q.  And if those worker's compensation issue arose, who would

6   be responsible for handling the claim and the process?

7   A.  Lisa took that whole process over.

8   Q.  Were you aware of any injuries that resulted in worker's

9   compensation claims against Steadfast?

10  A.  The one that comes out to my mind is Tramia Hardy.  She

11  got a needle stick.

12  Q.  And do you know how that was ultimately resolved?

13  A.  Lisa took that issue.  She took care of that workman's

14  comp.

15          MS. LEWIS:  No further questions for this witness,

16  Your Honor.

17          THE COURT:  Cross-examination.  Ladies and

18  gentlemen, we will take a break at some point here.  Let's

19  take it in between this cross and the next witness.

20                      CROSS-EXAMINATION

21  BY MS. RUST:

22  Q.  Good morning or afternoon, Ms. Draughn.  My name is Julia

23  Rust.  I'm an attorney for Steadfast and Ms. Pitts in this

24  case.  You only ever worked in the call center, right?  You

25  did not work on Steadfast registry?

Draughn, C. - Cross                                          44

```
 1   A.  No, ma'am.
 2   Q.  Sorry?
 3   A.  I did not work on the registry.
 4   Q.  Okay.  Thank you.  And when you worked in the call
 5   center, you say you were supervised by Lisa, right?
 6   A.  Yes, ma'am.
 7   Q.  And she supervised your performance of your job duties?
 8   A.  Yes, ma'am.
 9   Q.  How you actually handled your job duties, did she look
10   over your shoulder?  Did she tell you what to do?
11   A.  Every day, yes, ma'am.
12   Q.  And were you required to work these shifts that Steadfast
13   set for you?
14   A.  When you say these shifts, do you mean the 10 to 6?
15   Q.  Yeah.  Did Steadfast set your schedule, your work
16   schedule, right?
17   A.  Yes.
18   Q.  And you were required to show up for the work schedule
19   that they set for you, right?
20   A.  Yes.
21   Q.  And if you failed to show up for your shift or if you
22   were late, would you be reprimanded?
23   A.  Yes.
24   Q.  And if you wanted to take time off, were you required to
25   submit a time off request form?
```

Draughn, C. - Cross                                              45

```
 1    A.  Yes, ma'am.
 2    Q.  And you were reprimanded on several occasions for failing
 3    to show up or finishing your shift; is that right?
 4    A.  No.
 5    Q.  No?
 6    A.  No.
 7    Q.  You never received any written reprimand from Steadfast?
 8    A.  Not for failing to show up for my shift, no, ma'am.
 9    Q.  Did you receive a written reprimand for not completing
10    your shift?
11    A.  No.
12    Q.  Did you receive any written reprimand?
13    A.  She reprimanded me for taking too many sick days.
14    Q.  For taking too many sick days?
15    A.  Uh-huh.
16    Q.  Those were the only reprimands you received?
17    A.  That's the only thing I could think of.
18    Q.  Permission to approach to show the witness a document.
19          THE COURT:  Okay.  Do you want to impeach the
20    witness?  I think you would have to mark the document for
21    identification.
22          MS. RUST:  I was going to use it to refresh her
23    recollection first.  Then I'm happy to admit it.
24          THE COURT:  Even to refresh recollection, you have
25    to have the document marked.  Ms. Thompson will give you a
```

Draughn, C. - Cross                                                46

```
 1    number.
 2            MS. LEWIS:  Your Honor, if I may see whatever
 3    document she is handing the witness.
 4            THE COURT:  Absolutely.  Let her mark it first.
 5    What number are you putting on there?
 6            THE CLERK:  DX200.
 7            THE COURT:  All right.  DX200 for identification
 8    may be shown to the witness.  You are requiring her to view
 9    that document, then ask her any questions she has.
10            THE WITNESS:  I've never seen this.
11            THE COURT:  No, I said wait for her questions.
12            THE WITNESS:  I'm sorry.
13    BY MS. RUST:
14    Q.  Have you reviewed both of these pages or did you just
15    review one of them?
16            Let's start with the one that's dated October 10th,
17    2018.  Have you seen this document before?
18    A.  This one, yes.
19    Q.  Okay.  The document dated October 10th, 2018, you've seen
20    this document before?
21    A.  Yes.
22    Q.  Okay.  And the second page, the document dated January
23    21st, 2019, have you seen that document?
24    A.  No.
25    Q.  The one titled "Employee final notice"?
```

Draughn, C. - Cross                                                47

1   A.   Yeah, I never seen it before.

2   Q.   Okay.  Let's look at the one dated October 10th.  It

3   says -- I'll read it.  Tell me if I'm reading it correctly,

4   "No problem, no show for work 10-9-2018, reprimand concerning

5   communication relating to work and return to work,

6   understands that responsible for account prior to leaving,

7   however, an emergency left but discussed will openly

8   communicate for future events"?

9        THE COURT:  The question was, you were shown those

10  documents to fresh your recollection, but she is supposed to

11  read it, and then you're supposed to ask has your

12  recollection been refreshed, and then read what you just

13  read.  So the question on the floor was, does the document

14  refresh her recollection with whether she has ever been

15  reprimanded?

16       MS. RUST:  Thank you, Judge.  Since we were

17  admitting them, but I'm happy to stick with that.

18       THE COURT:  The documents for recollection are not

19  admitted.  They are not admissible.  They are for

20  recollection only, refreshing recollection.

21  BY MS. RUST:

22  Q.   Okay.  So let me back up.  Does the document dated 10-10,

23  did you read that through to yourself, and does that refresh

24  your recollection as to whether you've ever received a

25  reprimand?

Draughn, C. - Cross                                                    48

```
 1   A.  But it has been edited, so, no.  This was not like this.
 2   No.  This is an edited.
 3   Q.  Okay.  So are you saying you -- it's still your position
 4   that you've never been reprimanded for relating to showing up
 5   or leaving work --
 6   A.  So this was a day when I left early, but it didn't say
 7   all of this when I signed it.  There is stuff that's been
 8   added to this since I signed it.  So this document I've never
 9   seen.
10   Q.  So did you receive a reprimand relating to you leaving
11   work early that day?
12   A.  At the time when I signed it, it was not labeled
13   reprimand, so, no, ma'am, I did not.  It was not labeled as
14   reprimand.  This was not here.  And this is not here labeling
15   it as a no call/no show, so, no, ma'am, I did not receive
16   this reprimand, no.
17   Q.  Okay.  But there was at least a discussion from either
18   Lisa or Christine at Steadfast regarding you leaving work
19   early that day?
20   A.  Correct.
21   Q.  Before your shift ended?
22   A.  Correct.
23   Q.  And did they imply that it was disciplinary nature of
24   that discussion?
25   A.  No.
```

Draughn, C. - Cross                                              49

```
 1   Q.  Okay.  And the second page, the one dated January 21st,
 2   2019, does this refresh your recollection as to whether
 3   you've ever received a written reprimand regarding your
 4   attendance at work?
 5   A.  Ask the question again.
 6   Q.  Okay.  Then after you read through this second page dated
 7   January 21st, does it refresh your recollection as to whether
 8   you've ever received a reprimand from Steadfast regarding
 9   your attendance at work?
10   A.  So the same thing.  This has been edited.  So, no, I did
11   not receive this document at all, no, ma'am.
12   Q.  Okay.  And is that your signature at the bottom?
13   A.  Yes, it is.  But my name is spelled wrong at the top, so
14   I think I'd recognize my name is spelled right.
15   Q.  All right.  I want to talk to you about a few things that
16   you discussed with Ms. Lewis on your testimony.  So you
17   discussed scheduling shifts for the nurses, right?  You
18   weren't able to schedule a shift for a nurse unless they sent
19   you their availability, right?
20   A.  Traditionally, that was how I liked to operate.
21   Q.  Okay.  You talked about how there was a rate set for each
22   facility, right?  You said it was posted?
23   A.  Uh-huh.
24   Q.  Okay.  And you said on your -- during your testimony it
25   was set by Lisa, right?
```

 1   A.   Yes.

 2   Q.   But Lisa provided the rate that the facility agreed to

 3   pay for that, is that right, to you?

 4   A.   The rate that the facility agreed to pay?

 5   Q.   I mean, let me rephrase that.  It wasn't a good question.

 6   The rate that you would see posted for a shift, that

 7   information was provided to you or wherever it was posted by

 8   Lisa --

 9   A.   Uh-huh.

10   Q.   -- right?

11   A.   Yes, ma'am.

12   Q.   And were you involved in negotiating Steadfast contracts

13   with facilities?

14   A.   No, ma'am.

15   Q.   And did you -- okay.  You also discussed being able to --

16   you were discussing some special rates and some bonuses that

17   you could offer the nurses; is that right?

18   A.   Uh-huh, yes, ma'am.

19   Q.   And you were not aware of whether the facilities approved

20   Lisa to offer those bonuses, are you?

21   A.   No, ma'am.

22   Q.   Okay.

23           THE COURT:  Waiting on you, Ms. Rust.

24           MS. RUST:  Sorry, Judge.  Just reviewing some

25   notes.

Draughn, C. - Cross                                              51

BY MS. RUST:

Q.  You talked about the DNR list as well, and you said that
the DNR was determined or a facility would let Steadfast know
whether they did not want a nurse to return to their
facility; is that right?

A.  Correct.

Q.  In fact, you would rely or you said at least on some
occasion you were involved in relaying the information from
the facility that the facility would provide to Steadfast
regarding an issue, right?

A.  Yes.

        MS. LEWIS:  Objection, form, Your Honor,
mischaracterizes the testimony.

        THE COURT:  All right.  You can rephrase the
question and still ask it.

BY MS. RUST:

Q.  Okay.  You said in your testimony that you would get a
report from the facility, right?

A.  Yes, ma'am.

Q.  And that the facility wanted to DNR that nurse?

A.  Yes.

Q.  Okay.  So you talked about Christina Evans, right?

A.  Yes.

Q.  And in her situation she was DNR'd from multiple
facilities; is that right?

```
1    A.  Yes, ma'am.

2    Q.  And to the point where there were no more facilities that

3    Steadfast had contracts with that they could schedule her

4    with, right?

5    A.  Yes.

6    Q.  Okay.  So in each of those instances the facility DNR'd

7    her?

8    A.  Yes.

9    Q.  So Steadfast didn't have any available contracts that she

10   could work shifts on, right?

11            MS. LEWIS:  Objection, form, Your Honor.

12   Evidence -- that information was not previously presented in

13   testimony.

14            THE COURT:  That evidence what?

15            MS. LEWIS:  Was not previously produced in

16   testimony, so evidence not in -- testimony -- not in

17   evidence.

18            THE COURT:  Okay.  Your response to that?

19            MS. RUST:  I can rephrase, perhaps.

20   BY MS. RUST:

21   Q.  At the facilities that you could schedule Ms. Evans at,

22   every one of them had DNR'd her; is that right?

23   A.  Of my facilities.

24   Q.  Okay.

25   A.  But there were other facilities that I did not staff that
```

Draughn, C. - Redirect                                        53

1    she could have gone to.

2    Q.  Okay.  And then you said that Steadfast was in the

3    business of sending nurses to facilities in the field, right?

4    A.  Yes.

5    Q.  So with respect to if a nurse did not show up or couldn't

6    finish the shift, you said you were supposed to have a nurse

7    on standby, right?

8    A.  Yes, ma'am.

9    Q.  And that's because it was -- Steadfast was in the

10   business of sending nurses to fill the shifts to these

11   facilities, right?

12   A.  Yes.

13          MS. RUST:  Okay.  I have no further questions.

14          THE COURT:  Redirect?

15          MS. LEWIS:  Very briefly.

16          THE COURT:  Always in the scope of what she's

17   asked.

18          Okay.

19                    REDIRECT EXAMINATION

20   BY MS. LEWIS:

21   Q.  Just very brief question with respect to the firing, the

22   severing of the relationship.  For Ms. Evans, the

23   relationship was severed because she posed a consistent

24   liability; is that correct?

25   A.  Correct.

Taylor, Y. - Direct                                                          54

```
 1              MS. LEWIS:  No further questions.
 2              THE COURT:  All right.  We will take a 15-minute
 3     break.
 4              First of all, may this witness be permanently
 5     excused?
 6              MS. LEWIS:  My apologies for not asking permission
 7     to move.  Yes, she may, Your Honor.
 8              THE COURT:  All right, ma'am.  You may be
 9     permanently excused.  Step down.
10              We will take a 15-minute break, come back and
11     continue.
12              (Witness excused.)
13              (Recess from 11:43 a.m. to 12:00 p.m.)
14              THE COURT:  You may call your next witness.
15              MR. SEIFELDEIN:  We call Yetunde Taylor.
16              THE COURT:  Who did you say you were calling?
17              MR. SEIFELDEIN:  Ms. Yetunde Taylor.
18              (Witness was sworn.)
19              YETUNDE TAYLOR, called by the Plaintiff, having
20     been first duly sworn, was examined and testified as
21     follows:
22                        DIRECT EXAMINATION
23     BY MR. SEIFELDEIN:
24     Q.  Good afternoon, ma'am.  Can you hear me?
25     A.  Good afternoon, sir.
```

Taylor, Y. - Direct                                                          55

1    Q.   Can you state your full name for the Court, please?

2    A.   Yetunde Taylor.

3    Q.   Can you spell your last name?

4    A.   T-a-y-l-o-r.

5    Q.   All right.  Are you familiar with Steadfast Medical

6    Staffing?

7    A.   Yes.

8    Q.   What type of services does Steadfast Medical Staffing

9    provide?

10   A.   An LPN, nursing, healthcare.  Healthcare.

11   Q.   They provide healthcare services?

12   A.   Yes, sir.

13   Q.   Were you employed by Steadfast Medical Staffing?

14   A.   Yes.

15   Q.   What was your job title?

16   A.   I was a registered nurse.

17   Q.   A registered nurse?

18   A.   Yes, sir.

19   Q.   When did you start working for Steadfast?

20   A.   In around October through November 2017.

21   Q.   Did you have to fill out an application to work for

22   Steadfast?

23   A.   Yes.

24   Q.   Where did you get the application from?

25   A.   Through an e-mail.

Taylor, Y. - Direct                                                      56

```
 1   Q.  And who sent you the e-mail?
 2   A.  Ms. Pitts.
 3           THE COURT:  Ma'am, I know you have a mask on but
 4   you will have to speak a little louder.
 5           THE WITNESS:  I'm sorry.
 6   BY MR. SEIFELDEIN:
 7   Q.  Who did you say sent it?
 8   A.  Lisa Pitts.
 9   Q.  Lisa Pitts?
10   A.  Yes.  From Steadfast.
11   Q.  Let me direct your attention to Plaintiff's Exhibit 53,
12   Page 2.  Do you recognize this document?
13   A.  Yes.
14   Q.  When was it sent to you?
15   A.  March -- I'm trying to look.  25 September 2017.
16   Q.  What is it?  What is this document?
17   A.  It's an obligation for -- it's application to PDS.
18   Q.  Do you recognize your e-mail in there from the 2 section?
19   Can you go to Page 2, please.
20   A.  Yes.
21   Q.  I'm sorry.  Excuse me.  Page 2.  002.
22           Ms. Taylor, at the bottom do you recognize your
23   e-mail address?
24   A.  Yes.
25   Q.  Okay.  And is it YetundeTaylor@Yahoo.co.uk?
```

```
 1    A.  Yes, please.

 2    Q.  And in the front section do you recognize that e-mail

 3    address, says, Apps.Steadfast@Gmail.com?

 4    A.  Yes.

 5    Q.  Is that the e-mail address that you received this

 6    document from?

 7    A.  Yes, please.

 8    Q.  Is this document -- what document did you receive on this

 9    application?

10    A.  It contains the application form.

11    Q.  An application form?

12    A.  Uh-huh.

13    Q.  Do you see the body of this e-mail?  Do you recognize it,

14    first of all?

15    A.  Yes, sir.

16    Q.  And did Steadfast send you a 36-page application to fill

17    out as part of your hiring process?

18    A.  Yes.

19    Q.  And was there a document attached to this e-mail?

20    A.  Yes.

21            MR. SEIFELDEIN:  And for Your Honor, I'd like to

22    admit that one first, PX53-02.

23            THE COURT:  Any objection?

24            MS. RUST:  No.

25            THE COURT:  Hearing no objection, the document has
```

Taylor, Y. - Direct                                                              58

```
 1   been admitted.  This is Exhibit number?
 2              MR. SEIFELDEIN:  PX53-002.
 3              (Plaintiff's Exhibit PX53-002 received in evidence.)
 4              THE COURT:  Okay.
 5              MR. SEIFELDEIN:  Thank you, Your Honor.
 6   BY MR. SEIFELDEIN:
 7   Q.  All right.  And if we click on that application, is it a
 8   true and accurate representation of the attachment that was
 9   sent to you?
10   A.  Can you repeat that?
11   Q.  Let me direct your attention to PX26-025.  Do you
12   recognize this document?
13   A.  Yes.
14   Q.  All right.  Is this the application that was attached to
15   the e-mail you just looked at?
16   A.  Yes.
17   Q.  Is this a true and accurate representation of that
18   application that you received?
19   A.  Yes.
20              MR. SEIFELDEIN:  Your Honor, I'd like to move
21   PX26-025 to 035 into evidence.
22              THE COURT:  Was the document that you just
23   referenced attached to the e-mail that you first admitted?
24              MR. SEIFELDEIN:  That's correct, Your Honor.
25              THE COURT:  Didn't they have a single number, the
```

```
 1    letter plus the attachment?
 2              MR. SEIFELDEIN:  I'm sorry?
 3              THE COURT:  Didn't the e-mail have an attachment,
 4    wasn't that one document?
 5              MR. SEIFELDEIN:  Yes.  That is an e-mail.
 6              THE COURT:  So you didn't need to separately
 7    introduce the attachment because you identified the
 8    document, and she said she identified the attachment, so you
 9    don't need another case number.  It all comes in under the
10    one we admitted.
11              MR. SEIFELDEIN:  It hasn't been shown, Your Honor,
12    but I understand.
13    BY MR. SEIFELDEIN:
14    Q.  Did you fill out the application, Ms. Taylor?
15    A.  Yes, I did.
16              MS. RUST:  I'm sorry.  Before you go, can you
17    address how many pages in Exhibit 26?  Is it all of it?
18              MR. SEIFELDEIN:  PX26, Your Honor, 025 through 035.
19    BY MR. SEIFELDEIN:
20    Q.  And you filled this application out, Ms. Taylor?
21    A.  Yes, sir, I did.
22    Q.  After you completed this application did you speak with
23    anyone at Steadfast?
24    A.  Yes.
25    Q.  Who did you speak with?
```

Taylor, Y. - Direct                                              60

1    A.   Ms. Lisa Pitts, L-i-s-a P-i-t-t-s.

2    Q.   What did she speak to you about?

3    A.   She said that I need to complete the application form.

4    She asked me to complete all the application form.

5    Q.   Okay.  And after you spoke with Ms. Pitts and you

6    completed the application form, were there any questions that

7    Ms. Pitts asked you?

8    A.   She said, after she reviewed the application form, and I

9    will have to do some drug tests, and also she is expecting an

10   application to go through and then through the process.

11            MS. RUST:  I couldn't make out what she said.

12            THE COURT:  Repeat.

13            THE WITNESS:  And she said I need to do some drug

14   test, drug test.  She was -- sent something to me, and she

15   would give me information of where to go and take my blood,

16   drug test.

17   BY MR. SEIFELDEIN:

18   Q.   And you performed that drug test?

19   A.   Yes, sir.

20   Q.   And listened to directions?

21   A.   Yes, sir.

22   Q.   And who hired you?

23   A.   Lisa Pitts.

24   Q.   Okay.  And were you paid on an hourly or a salary basis?

25   A.   Hourly.

Taylor, Y. - Direct                                                        61

1   Q.   Okay.  How much were you paid an hour?

2   A.   $14 an hour.

3   Q.   As a registered nurse were you able to negotiate a

4   different rate of pay with Ms. Pitts?

5   A.   No, not at that point.

6   Q.   Okay.  Did you try to negotiate?

7   A.   Yes.

8   Q.   And what did she say to you?

9   A.   She said that's the amount she's paying everybody.

10  Q.   And who set that amount rate for you?

11  A.   Ms. Lisa Pitts.

12  Q.   As part of your application, were you required to sign an

13  agreement?

14  A.   Yes.

15  Q.   Okay.  Let me direct your attention to PX25 beginning

16  with Page 1 through Page 5.  Do you recognize this document,

17  Ms. Taylor?

18  A.   Yes, sir.

19  Q.   I want you to look at Page 4 of 5 of that document, the

20  signature.  Is that your signature?

21  A.   Yes.

22  Q.   Okay.  Go to the following page, please.

23           Is that your information there?

24  A.   Yes.

25  Q.   And this is a document that you signed, correct, as part

Taylor, Y. - Direct                                              62

1    of your application?

2    A.  Yes.

3    Q.  Let me direct your attention to Page 3, Paragraph 8, the

4    non-competition clause there.  Do you see it?

5    A.  Yes.

6    Q.  Okay.  When you worked for Steadfast, was there an

7    instance when you wanted to work for another agency and

8    Ms. Pitts prevented you from doing so?

9    A.  Yes.

10   Q.  Could you tell me about that.

11   A.  Um, she said if I work for another agency, and I will be

12   fired, and I will be blacklisted.

13   Q.  I'm sorry?

14   A.  I'll be prevented from working for any DOC.

15   Q.  What did you understand by that?

16   A.  That I would not be able to work for another agency

17   except her.

18   Q.  All right.  Was there an agency trying to recruit you?

19   A.  Yes.

20   Q.  Do you recall that agency?

21   A.  Yes.

22   Q.  Tell me about what happened when you talked to Ms. Pitts

23   about it.

24   A.  She said I will be blacklisted, or I'll be fired, and

25   then I would not be able to work.  That's what she told me, I

Taylor, Y. - Direct                                                          63

1   wouldn't be able to work for any DOC.

2   Q.  And did you believe her?

3   A.  Yes.

4   Q.  Were you given the option by Steadfast and Lisa Pitts to

5   be classified as an employee or independent contractor?

6   A.  I was classified as an independent contractor, but I was

7   treated like I'm an employee because she set the salary and

8   where -- when I'm supposed to work, where I'm supposed to be

9   working.  She took application from everything.  I was

10  treated like -- well, like an employee.

11          MR. SEIFELDEIN:  Your Honor, like to admit PX25-001

12  through Page 5.

13          THE COURT:  Any objection?  Hearing no objection

14  it's admitted.

15          (Plaintiff's Exhibit PX25-001 through PX25-005

16  received in evidence.)

17          MS. RUST:  Sorry.  I only -- PX version you sent

18  us, PX-25, the numbers are not adding up.  But my only

19  objection is the PDF copies of Plaintiff's exhibit that they

20  had provided to our office, the page numbers are not lining

21  up.  So, for example, PX-25, Page 1 that is -- it says,

22  "Both file of a lot of independent contractor agreements,"

23  but the first one is not for Ms. Yetunde as indicated on the

24  documents on the screen here.

25          THE COURT:  Do you have the document that's on the

Taylor, Y. - Direct                                                64

1    screen, whether it's formatted the same way, do you have it?

2          MS. RUST:  I would have it in this PDF somewhere

3    that's 816 pages that they sent me.

4          THE COURT:  Okay.  If the document is pulled up on

5    your screen now, and you can see fully what he has shown

6    her; is that correct?

7          MS. RUST:  Yes.

8          THE COURT:  And you can see that Paragraph 8?

9          MS. RUST:  Yes.

10         THE COURT:  So that's something you all need to

11   discuss over the lunch hour, but they provided you the

12   document, just not formatted the way it is there?

13         MS. RUST:  Yes.

14         MR. SEIFELDEIN:  Your Honor, we have provided the

15   paper copy which should be consistent with that.  We

16   provided three copies to the firm.

17         THE COURT:  You provided copies?

18         MR. SEIFELDEIN:  That's correct, Your Honor.

19         MS. RUST:  Yes.  So I just -- all I want to point

20   out for the record is that we got some digital copies with

21   some of their exhibits back when we were doing the pretrial

22   order.  We got paper copies of all of their exhibits

23   yesterday, which encompassed at least six binders, probably

24   5,000 pages.

25         So to the extent there is a difference in pages as

Taylor, Y. - Direct                                                    65

```
 1    what we were provided with at the pretrial conference, I
 2    just want to point that out for the record so that there
 3    might be some confusion on finding page numbers.
 4              THE COURT:  All right.  Your objection is noted.
 5    The document is admitted.  Let's move on.
 6              MR. SEIFELDEIN:  Thank you, Your Honor.
 7    BY MR. SEIFELDEIN:
 8    Q.  Ms. Taylor, let me direct your attention to Plaintiff's
 9    Exhibit 32-18.  Do you recognize this document, Ms. Taylor?
10    A.  Yes.
11    Q.  What is it?
12    A.  It's the HIPAA --
13    Q.  Pardon me?
14    A.  It's the -- substance abuse policy and procedure
15    substance abuse.
16    Q.  So it's a document that you received from Steadfast along
17    with the application, correct?
18    A.  Yes.
19    Q.  Okay.  And this -- did Steadfast provide you with
20    in-service training?
21    A.  No.
22              MS. RUST:  Objection.  Foundation.
23              THE COURT:  Wait a minute.  Your objection, you
24    need to stand up and tell me what's your objection.
25              MS. RUST:  I'm going to object as to foundation.
```

1    She didn't testify as to this training that she received.

2           THE COURT:  This is a totally, this is a new

3    question to the witness that he's asking her.

4           MR. SEIFELDEIN:  That's correct.

5           THE COURT:  Objection overruled.

6    BY MR. SEIFELDEIN:

7    Q.  Did Steadfast provide in-service training to you?

8    A.  No.  That is through this documentation that we are to

9    complete everything.  I didn't have any training.

10   Q.  So what sort of training through this documentation did

11   Steadfast provide, and take your time looking at it.  Let's

12   begin with PX-32 Page 4 through 6.

13   A.  HIPAA, H-I-P-A-A, participant training guide.

14   Q.  Okay.  Then if you could scroll down to the next session,

15   Ms. Lewis.  As part of the hiring and this training that was

16   provided to you by Steadfast, do you have to complete the

17   HIPAA training module test?

18   A.  Yes.

19   Q.  Was that required by Pitts and Steadfast?

20   A.  Yes.

21   Q.  If we go to Page 8 of the same document.

22          Did Steadfast provide you with substance abuse

23   training?

24   A.  Yes.

25   Q.  And is this the document that Steadfast provided you for

Taylor, Y. - Direct                                            67

```
 1   training for substance abuse?
 2   A.  Yes.
 3   Q.  If you go to Page 11, did Steadfast provide you with
 4   sexual harassment training?
 5   A.  Yes.
 6   Q.  And is this the training that Steadfast provided to you?
 7   A.  Yes.
 8   Q.  Did Steadfast provide you with abuse and neglect training
 9   as well?
10   A.  Yes.
11   Q.  And is this the document that provided that?
12   A.  Yes.
13   Q.  Let me direct your attention again to 53-01, the
14   September 28th e-mail.  Do you see that document?
15   A.  Yes.
16   Q.  Were you required to complete time sheets?
17           THE COURT:  Wait a minute.  Hold on a second,
18   counsel.
19           MR. SEIFELDEIN:  Yes, sir.
20           THE COURT:  Is this a new document you're directing
21   her attention to?
22           MR. SEIFELDEIN:  Document has multiple e-mails.
23           THE COURT:  53 what?
24           MR. SEIFELDEIN:  53-01, a September 28th e-mail.
25           THE COURT:  Okay.  So you may continue.  Want to
```

Taylor, Y. - Direct                                              68

```
 1   make sure that it's clear it's a new document, something she
 2   recognizes.
 3            MR. SEIFELDEIN:  Yes, Your Honor.
 4   BY MR. SEIFELDEIN:
 5   Q.  Were you required to complete time sheets?
 6   A.  Yes.
 7   Q.  And is this the e-mail that Steadfast sent to you saying
 8   you have to complete time sheets?
 9   A.  Yes.
10   Q.  And within this e-mail did Steadfast send you a copy of
11   the time sheets?
12   A.  Yes.  They did.
13   Q.  And how often were you required to submit time sheets to
14   Steadfast?
15   A.  Weekly.
16   Q.  Weekly?
17   A.  Yes.
18   Q.  Who told you you were required to submit these time
19   sheets?
20   A.  Ms. Pitts.
21   Q.  Ms. Taylor, did you ever work more than 40 hours in a
22   workweek?
23   A.  Yes.
24   Q.  How often did you work more than 40 hours in a workweek?
25   A.  Weekly, every week.
```

1    Q.  Every week?

2    A.  Uh-huh, yes.

3    Q.  On average approximately how many hours did you work each

4    day?

5    A.  12 hours.

6    Q.  12 hours.

7          THE COURT:  Before you go too far, this document,

8    53-01, what's the status?  Are you admitting this document

9    or what are you doing?

10          MR. SEIFELDEIN:  Yes, Your Honor.  The document has

11   been admitted.

12          THE COURT:  The document has not been admitted.

13          MR. SEIFELDEIN:  Understand, Your Honor.  Would

14   like to admit it, then, 53-01.

15          THE COURT:  All right.  Then, hearing no objection

16   53-01 will be admitted.

17          (Plaintiff's Exhibit PX53-01 received in evidence.)

18   BY MR. SEIFELDEIN:

19   Q.  What range were you paid per hour when you worked over 40

20   hours in a week?

21   A.  $14 an hour.

22   Q.  Is that the same as your regular rate?

23   A.  Yes.

24   Q.  Did you ever receive time and a half for hours worked

25   over 40 hours in a workweek?

Taylor, Y. - Direct                                                    70

```
 1   A.  No.
 2   Q.  Did you ever speak with anyone from Steadfast or with
 3   Ms. Pitts about not receiving overtime?
 4   A.  Yes.
 5   Q.  And what was said to you?
 6   A.  I spoke to Ms. Pitts about not being paid overtime, and
 7   also many times I worked Christmas, public holidays like
 8   Christmas, New Years, Thanksgiving, and I wasn't paid over --
 9   the -- one time and a half.  So I spoke to her, and she told
10   me that the DOC doesn't pay holiday, that she just pay the
11   flat rate, which was $14 an hour, and that is how much she's
12   paying me.
13   Q.  I understand.  Were you required to provide a notice to
14   Steadfast if you weren't -- if you were not available to
15   work?
16   A.  Yes.
17   Q.  Okay.  All right.  Look at this same document we are
18   looking at -- I'm sorry, PX-53, Page 3, an e-mail dated
19   December 4th, 2007.  Is this a document that Steadfast, Lisa
20   Pitts, sent you requiring you to provide a notice if you're
21   not available to work?
22   A.  Yes.
23   Q.  And who were you required to provide the notice to?
24   A.  Lisa.
25   Q.  And how far ahead in advance did you have to provide this
```

1   notice?

2   A.  At least -- two hours before your work time.

3   Q.  Okay.  And this is if you're running late?

4   A.  Yes.

5   Q.  What about if you weren't going to be working, for taking

6   time off, did you have to provide a notice as well?

7   A.  Yes.

8   Q.  And did you have -- how often did you have to file a

9   notice in advance?

10  A.  Maybe a week.

11  Q.  And who told you that you needed to provide this notice?

12  A.  Lisa.

13          THE COURT:  Keep your voice up.

14          THE WITNESS:  Lisa Pitts, sir.

15  BY MR. SEIFELDEIN:

16  Q.  Was there times when you tried to provide a notice to

17  Ms. Pitts?

18  A.  Yes.

19  Q.  Did Steadfast or Lisa Pitts accept your notice when you

20  tried to take off, provide that notice?

21  A.  No.

22  Q.  Okay.  What was the response from Ms. Pitts or Steadfast?

23  A.  She said you can't take any time off, or you can't

24  take -- you can't call out because if you call off, you are

25  going to get fired.

Taylor, Y. - Direct                                                72

```
 1   Q.  Did you end up working?

 2   A.  Yes.

 3   Q.  And why did you end up working when she told you that you

 4   were fired?

 5   A.  Because there -- because I'm a single mom.  At that time

 6   I was a single mom, and my eldest was at VCU studying

 7   accounting.  I'm also having my last child is son as of

 8   today, so I was the only one taking care of them at that

 9   time.

10   Q.  You needed to work?

11   A.  Yes.

12   Q.  Directing your attention to the same document, 53-01, an

13   e-mail dated Monday, October 2nd, 2017, at 9:54.  Do you see

14   that?

15   A.  Yes.

16   Q.  Did Steadfast provide you with a badge?

17   A.  Yes.

18   Q.  Page 1.  And did Steadfast ask you which address they

19   should send the badge to?

20   A.  Yes.

21   Q.  Did the badge that Steadfast send you have the name of

22   the company on it?

23   A.  Yes.

24   Q.  Which company name was on the badge?

25   A.  So Steadfast Medical.
```

Taylor, Y. - Direct                                              73

```
 1    Q.  Were you required to wear the badge when Steadfast sent
 2    you to facilities to work?
 3    A.  Yes.
 4    Q.  If you had a scheduling conflict, Ms. Taylor, did
 5    Steadfast allow you to send another nurse in your place?
 6    A.  I'm sorry.  That has never been a discussion to me.  I
 7    was never made aware of that so...
 8    Q.  Were you allowed to employ another nurse to complete a
 9    shift that Steadfast compensated you for?
10    A.  That --
11              MS. RUST:  Objection.
12              THE WITNESS:  That never been discussion.
13              THE COURT:  Wait a minute.  There is an objection.
14    You have to wait and let the Court listen at what the
15    objection is.
16              MS. RUST:  Objection, asked and answered.
17              MR. SEIFELDEIN:  It has not.  That was a different
18    question.  The previous question was if you had a scheduling
19    conflict did Steadfast Medical Staffing allow you to send
20    another RN.  This one is were you allowed to employ another
21    RN to complete a shift that Steadfast has assigned you.
22              THE COURT:  Objection overruled.
23    BY MR. SEIFELDEIN:
24    Q.  I'll repeat the question again, Ms. Taylor.  Were you
25    allowed to employ another registered nurse to complete a
```

1   shift that Steadfast assigned to you?

2   A.   No.  That has never been a discussion.

3   Q.   Were you allowed to have another individual assist you in

4   the shift that Steadfast assigned you to?  Could you bring

5   someone with you to assist you?

6   A.   No.  That has never been a discussion.  I was never made

7   aware of that, never, uh-uh.

8   Q.   Who determined where you worked for opportunities at

9   Steadfast?

10  A.   Ms. Pitts and also the facility like the DOC that I'm

11  working, the facility.

12  Q.   And how do you know about these shifts from Steadfast?

13  A.   From Lisa or the facility.

14  Q.   Okay.  So would Steadfast call you?

15  A.   Yes.

16  Q.   Would you negotiate, once you were completed the shift or

17  assignment, when you were assigned the shift, would you

18  negotiate your rate of pay with the facility directly?

19  A.   No.  It's never a discussion.

20  Q.   Okay.  And who would?

21  A.   Lisa.

22  Q.   After you were placed at a facility, were you interviewed

23  to work by the facility?

24  A.   No.

25  Q.   Other than your hourly rate from Steadfast, did you

Taylor, Y. - Direct                                                    75

1    receive any profits?

2    A.   No.   No.

3    Q.   Who paid you for the services that you provided on behalf

4    of Steadfast?

5    A.   Steadfast.

6    Q.   If you did not receive pay from Steadfast, could your

7    ability to meet your financial obligations be compromised?

8    A.   Yes.

9    Q.   Did Ms. Pitts ever threaten you?

10   A.   Yes.

11   Q.   And what happened?

12   A.   Many times, she would just -- anything I tried -- if I

13   tried to say anything she just -- you need to listen,

14   Ms. Taylor.  You need to go right now or else you be fired,

15   and you'll be blocked from working in any DOC.

16          MR. SEIFELDEIN:  Your Honor, I believe we

17   admitted -- excuse me -- PX32.

18          THE COURT:  Okay.  Then there is no objection, PX32

19   will be admitted.

20          MR. SEIFELDEIN:  Thank you.

21          (Plaintiff's Exhibit PX32 received in evidence.)

22   BY MR. SEIFELDEIN:

23   Q.   Ms. Taylor, do you have any ownership in Steadfast?

24   A.   No.

25   Q.   Are you a manager, director of the business Steadfast?

Taylor, Y. - Direct                                          76

1   A.  No.

2   Q.  Do you own a percentage of Steadfast?

3   A.  No.

4   Q.  Ever since you left Steadfast have you received any back

5   wages for the overtime hours that you worked?

6   A.  No.

7           MR. SEIFELDEIN:  No further questions for this

8   witness.

9           THE COURT:  The Court has a question before

10  cross-examination.  How long did you work for Steadfast and

11  when?

12          THE WITNESS:  I can't remember the date, but there

13  was a time that I work for them, and then I left and worked

14  for another agency, but I was still on the register, and

15  then I was working, came back again.  I can't remember

16  specifically, but it was in between those period like

17  October to November 2017 to April 20, 2019.  But in between,

18  you know, there was stuff, but I can't remember when because

19  it's been a long time.

20          THE COURT:  I thought I heard you say something

21  about 2017.

22          THE WITNESS:  Yes.  That is when I started working

23  for them.

24          THE COURT:  Started 2017.  Thank you very much.

25          THE WITNESS:  Thank you, sir.

```
 1              THE COURT:  Cross-examination.
 2                        CROSS-EXAMINATION
 3    BY MS. RUST:
 4    Q.  Hi, Ms. Taylor.  My name is Julia Rust.  I'm an attorney
 5    for Steadfast and Ms. Pitts.  You said that Steadfast was in
 6    the business of healthcare services?
 7    A.  Yeah, nursing, healthcare nursing.
 8    Q.  Are you aware of whether any nursing services are
 9    provided at Steadfast's office?
10    A.  No.  I don't know anything.  I have never been to the
11    office so I don't even know.
12    Q.  Okay.  You've never been to the office?
13    A.  No.
14    Q.  Okay.  And we went over some training forms.  Those --
15    you never received any in-service training from Steadfast,
16    right?
17    A.  I've never been yet in a room environment to receive any
18    type of nothing, except that, just showed you, just completed
19    in my own home.  I have never been anywhere.
20    Q.  Okay.  So the forms that we looked at are the only
21    information you received from Steadfast --
22    A.  Yes.
23    Q.  -- on those topics?
24    A.  Yes.
25    Q.  Okay.  And when you -- you said earlier you complained
```

1    about not being paid a holiday rate; is that right?

2    A.   Yes.

3    Q.   And Lisa, tell me if I'm wrong, you said Lisa told you

4    that the facility doesn't pay a holiday rate, right?

5    A.   I said I complained to Ms. Lisa that I have not been paid

6    for Christmas holidays, Thanksgiving holidays, any kind of

7    holidays, and also I wasn't paid overtime.  Like when I was

8    over 40 hours, I was never paid overtime.  So I complained to

9    her, and she told me that DOC, means The Department of

10   corrections, paid only a flat rate of $14 an hour, and that

11   is the amount she paid me, that they never paid overtime of

12   something for me working overtime or working holidays.

13   That's what she told me, uh-huh.

14   Q.   So it was based on what the facility, the DOC, would

15   agree to pay?

16   A.   I don't know, but she had the discussion with DOC.  I

17   don't know what she had with DOC, but that's what she told

18   me.  I don't know.

19   Q.   Okay.  And did you -- you scheduled shifts directly

20   through the facility at times; is that right?

21   A.   No.  Because, like -- I would see it on the paper, you

22   know.  They have the -- for the whole month, they may have

23   the names written, but then Lisa provided it to me, the

24   information that this is -- she would call me and tell me

25   this is the days I'm working.

1   Q.  Now, you said earlier on your direct that you would learn

2   of shifts either through Lisa or the facility?

3   A.  Yes, because it comes like -- the whole month may be

4   there, like in a diary or -- like a calendar.  People's name

5   maybe be overwritten, you know, from Monday people's name,

6   Tuesday, you know, just --

7   Q.  I understand.

8   A.  -- for everybody to see.

9   Q.  I understand.  So isn't it true that you would have

10  conversations with the scheduler at the facility, for

11  example, on a correctional and pick up shifts directly

12  through the facility's scheduler?

13  A.  No.  That come from Lisa.

14  Q.  After?

15  A.  Because we work hand in hand, so it comes from -- I can

16  see in the diary, calendar, that it comes from Lisa.  Lisa

17  has to talk to me, that these are the days you are working,

18  but all the calendar is open to everybody.  Everybody can

19  see.  So you don't -- everybody can see the calendar, that,

20  you know, everybody comes and see who is working on this day

21  and this day, that is what I'm trying to tell you, uh-huh.

22  Q.  Okay.  You said you would work hand in hand with the

23  facility; is that what you said?

24  A.  No, I work hand in hand with Lisa.

25  Q.  With Lisa on your availability --

1   A.   Yes.

2   Q.   -- and your schedule?

3   A.   Yes.   Everybody knows when everybody supposed to be

4   working.   Like Monday, everybody's name is written so you can

5   always -- everybody can see --

6   Q.   I understand.

7   A.   -- who is working.

8   Q.   And did you -- you said that you worked on and off of

9   Steadfast registry, right?

10   A.   No.   I worked two times with them.

11   Q.   What was that?

12   A.   I worked two times with Lisa.

13   Q.   Okay.   So let me clarify.   When the judge asked you when

14   you were working, you said on and off between 2017 and 2019?

15   A.   Yes.   In between those times -- months there was a month

16   that I worked for another agent, but I can't remember.

17   Q.   Okay.   And then you came back to Steadfast registry?

18   A.   No.   I was always with Steadfast, too.   I was never

19   pulled out of working with Steadfast.   If I want to work, I

20   can.   I want to work so I was never off.

21   Q.   Okay.   So you could tell Steadfast when you wanted to

22   work, and you were allowed to work for another registry,

23   right?

24   A.   No, I wasn't allowed.

25   Q.   But you did work for another registry?

1    A.  I never told her, she never asked me, so I didn't, you

2    know -- because there was a threat already that if I worked

3    with another agency, I will be fired.

4    Q.  But you did work for another agency, right?

5    A.  Yes.

6    Q.  Okay.  And didn't you have problems getting paid from

7    that other agency?

8    A.  A problem getting paid?  No.  There was no discussion

9    about being paid.  What do you mean?

10          MR. SEIFELDEIN:  Your Honor, this is outside of the

11   scope of direct, and it's not relevant.

12          THE COURT:  Objection overruled.

13   BY MS. RUST:

14   Q.  So let me go back to the question.  Didn't you have

15   problems getting paid from that other agency at one point?

16   A.  There was never discussion --

17          MR. SEIFELDEIN:  Your Honor, objection.

18          THE WITNESS:  No discussion.

19          THE COURT:  Wait a minute.  Don't answer when he is

20   saying object.

21          MR. SEIFELDEIN:  Assumes facts not in evidence.

22          MS. RUST:  I'm on cross.  I can ask her leading

23   questions.

24          THE COURT:  Yeah, you can ask her leading

25   questions, of course, as long as it has some relevance to

```
 1    what's going on.  The Court permitted her to ask the
 2    question about work for other agencies, but you were trying
 3    to link through her direct testimony the fact that she was
 4    exercising certain conduct indicative of being an employee,
 5    and this whole question she is asking here goes to the
 6    opposite direction, potentially.  So the Court overrules
 7    your objection.
 8            Let's see can we get through this now.  Ms. Taylor,
 9    make your answers as short and clear as possible.
10            THE WITNESS:  Yes, sir.
11            THE COURT:  If there needs to be some follow-up,
12    let the counsel ask you a follow-up question, that way we
13    avoid this going backward and forwards and getting lost in
14    everything here.
15    BY MS. RUST:
16    Q.  Okay.  When you worked at a facility through Steadfast
17    registry, was there -- there was never anyone from Steadfast
18    on site at that facility with you; is that correct?
19    A.  Can you repeat that?
20    Q.  Of course.  When you would take a shift at a facility
21    through Steadfast registry, there was never anyone from
22    Steadfast at the facility on site with you, right?
23    A.  I can't understand what you mean somebody from Steadfast.
24    Q.  Sure.  So was Lisa Pitts ever on site with you during --
25    A.  Oh, no.
```

Taylor, Y. - Cross                                                  83

```
 1    Q.  Was Christine Kim ever on site with you during one of
 2    your shifts?
 3    A.  No.  No.
 4    Q.  And what -- you received a degree to become an RN; is
 5    that correct?
 6    A.  Yes.
 7    Q.  Did Steadfast contribute to that education in any way?
 8    A.  No.
 9    Q.  Have you ever been DNR'd by a facility?
10    A.  No.
11    Q.  Okay.  And as an RN you're subject to certain regulations
12    set by the Virginia Board of Nursing; is that right?
13    A.  Yes.
14    Q.  And those regulations would set the scope of your
15    practice; is that correct?
16    A.  Yes.
17    Q.  And you've never received any equipment from Steadfast
18    other than a badge; is that correct?
19    A.  Yes.
20    Q.  Actually, did you receive the badge that you were talking
21    about with --
22    A.  Yes.  Yes.  Yes.
23    Q.  Okay.  And in order to take a shift for the facility, you
24    have to have an active RN license; is that right?
25    A.  Yes.
```

Taylor, Y. - Cross                                                        84

```
 1    Q.  And do you bring your own equipment to a facility for a
 2    shift, any of your own equipment?  Do you bring a stethoscope
 3    or a blood pressure cuff?
 4    A.  Yes.
 5    Q.  Okay.  Has Steadfast ever provided you with a blood
 6    pressure cuff or a stethoscope?
 7    A.  No.
 8    Q.  Are those equipment and tools required to do your job at
 9    a facility?
10    A.  Yes.
11    Q.  Okay.  And if those -- if you forgot your blood pressure
12    cuff, for instance, would you likely get one from the
13    facility during your shift?
14    A.  Yes.
15    Q.  Okay.  And if you didn't have an active and current
16    nursing license, would you be able to take a shift at the
17    facility?
18    A.  No.
19    Q.  Okay.  And you have never been involved in any of
20    Steadfast's negotiations with the facilities over the
21    Steadfast facility's contracts; is that correct?
22    A.  No.
23    Q.  So you've never been involved in Steadfast --
24    A.  No.
25    Q.  -- or discussion of the rate of pay of the facility?
```

```
 1   A.   No, no, no, no.
 2            MS. RUST:  Okay.  No further questions.
 3            THE COURT:  Any redirect?
 4            MR. SEIFELDEIN:  Yes.  Yes, Your Honor.
 5            No, we don't, Your Honor.
 6            THE COURT:  May the witness be permanently excused?
 7            MR. SEIFELDEIN:  Yes, Your Honor, she may.
 8            THE COURT:  You may step down.
 9            MR. SEIFELDEIN:  Thank you, Ms. Taylor.
10            (Witness excused.)
11            THE COURT:  Your next witness.
12            MR. SEIFELDEIN:  Your Honor, calling Christopher
13   Hopson.
14            THE COURT:  Okay.
15            (Witness was sworn.)
16            CHRISTOPHER RYAN HOPSON, called by the Plaintiff,
17   having been first duly sworn, was examined and testified as
18   follows:
19                      DIRECT EXAMINATION
20   BY MS. JONES:
21   Q.   Mr. Hopson, could you please spell and state your name
22   for the record.
23   A.   Christopher Ryan Hopson, C-h-r-i-s-t-o-p-h-e-r
24   H-o-p-s-o-n.
25   Q.   And are you familiar with Steadfast Medical Staffing?
```

Hopson, C. - Direct                                              86

1    A.   Yes, I am.
2    Q.   And, to your knowledge, what type of services does
3    Steadfast provide?
4    A.   Basic nursing needs for long-term care.
5    Q.   And were you employed or are you currently employed by
6    Steadfast?
7    A.   Yes, I am currently employed.
8    Q.   Okay.  And what is your job title?
9    A.   Licensed practical nurse.
10   Q.   And when did you start working for Steadfast?
11   A.   2016.
12   Q.   And during that time frame did you ever work for any
13   other agency?
14   A.   Yes, I did.
15   Q.   And why did you work any other agencies?
16   A.   I just tried to balance out nursing in general.
17   Q.   And when did you start working for other agencies?  Was
18   it at the same time that you began working for Steadfast?
19   A.   Yes, it was at the same time.
20   Q.   What other agent do you work for in addition to
21   Steadfast?
22   A.   First Choice.
23   Q.   Are there any differences in your work for Steadfast and
24   First Choice?
25   A.   No, it's the same title, pretty much I do the same thing.

```
 1    Q.  Are there any differences in the compensation?
 2    A.  Yeah.  The difference in the compensation is one reason
 3    why I chose Steadfast.  They pay a little bit more in
 4    compensation.
 5    Q.  Are there any differences in compensation in terms of
 6    overtime between First Choice and Steadfast?
 7    A.  Yes.  First Choice pays overtime and Steadfast doesn't
 8    pay overtime.
 9    Q.  And what kind of company is First Choice?
10    A.  It's the same, nursing staffing agency.
11    Q.  Okay.  I want to talk a little bit about your work with
12    Steadfast.  If you recall, how did you begin working for
13    Steadfast?  How did you apply?
14    A.  It was a walk-in.  I did an application.
15    Q.  Okay.  And if I could direct your attention to
16    Plaintiff's Exhibit 26 on Page 1.  Was this the -- an
17    example, could you please go through the first three pages.
18    A.  Yes.
19    Q.  Mr. Hopson, do you recognize this document?
20    A.  Yes, I do.
21    Q.  And is this a copy of the application you completed when
22    you began working for Steadfast?
23    A.  Uh-huh.
24    Q.  And based upon this application, what information were
25    you required to provide when you began working for Steadfast?
```

Hopson, C. - Direct                                              88

```
 1    A.  If I recall at the time, I do believe my Social Security
 2    card and -- I do want to say I did get a background check.
 3    That's pretty much -- and also my nursing license and my CPR
 4    certification.
 5    Q.  Just to clarify, in terms of the application, what
 6    information did this application require you to provide?
 7    A.  Just the document that I've given.
 8    Q.  Did it require you to provide your name?
 9    A.  Yes.
10    Q.  Did it require you to provide references?
11    A.  Yes.
12    Q.  Did it require you to provide an address?
13    A.  Yes.
14          MS. JONES:  Your Honor, I'd like to move to admit
15    Plaintiff's Exhibit 26, Page 1 through 3, Mr. Hopson's
16    employment application process into evidence.
17          THE COURT:  Any objection to Plaintiff's Exhibit
18    26, Pages 1 through 3?
19          MS. RUST:  No objection.
20          THE COURT:  The document will be admitted.
21          (Plaintiff's Exhibits 26-1 to 3 received in
22    evidence.)
23    BY MS. JONES:
24    Q.  You indicated that you were required to provide documents
25    in addition to the application, and you mentioned a CPR card.
```

Hopson, C. - Direct                                                89

1    What other documents are you required to provide?

2    A.  I believe that's all.

3    Q.  Did you mention a Social Security card and a license --

4    and a nursing license?

5    A.  Uh-huh.  Yes.

6    Q.  And do you recall if you were required to complete any

7    tax forms when you began working for Steadfast?

8    A.  No, not when I began working with Steadfast.

9    Q.  Okay.  To your knowledge, were there any taxes taken out

10   of your paycheck for Steadfast?

11   A.  No, there's no taxes taken out.

12   Q.  And after you submitted your application and submitted

13   those additional forms, were you interviewed by anyone at

14   Steadfast?

15   A.  Yes.  I was interviewed by Lisa.

16   Q.  By Lisa.  And do you recall what type of questions were

17   asked in that interview?

18   A.  Yes.  She did ask pretty much a general history on my

19   nursing and my background and the job that I was previously

20   working at before.

21   Q.  Okay.  And were you asked about your availability to

22   work?

23   A.  Yes.

24   Q.  And so after your job interview, were you hired to work

25   with Steadfast?

Hopson, C. - Direct                                                      90

1   A.  Yes, I was.

2   Q.  And do you recall who hired you to work as an LPN for

3   Steadfast?

4   A.  Lisa hired me to work as an LPN for Steadfast.

5   Q.  Okay.  And are you paid an hourly rate or a salary basis

6   for working at Steadfast?

7   A.  Hourly rate.

8   Q.  And how much are you paid per hour?

9   A.  In the beginning or now?

10  Q.  You can tell me -- let's start with the beginning.

11  A.  In the beginning it started off around $25 an hour, and

12  now it's around 40 an hour.

13  Q.  And is there any reason why your compensation has changed

14  throughout the three years that you've been working there?

15  A.  I think the changes with nursing, you know, as far as the

16  COVID goes and stuff like that kind of changed the pay over

17  time.

18  Q.  Okay.  And other than COVID is there any reason that your

19  hourly rate would vary?

20  A.  I believe it depends on sometimes the location.  If I go

21  to Richmond sometimes, it will be a little bit more, you

22  know, pay in compensation.

23  Q.  So if you have to travel farther to a facility, you may

24  be paid a higher hourly rate?

25  A.  Yes.  Yes.

Hopson, C. - Direct                                                    91

1    Q.   And are you able to negotiate a different hourly rate?

2    A.   Yes.

3    Q.   And who do you negotiate that rate with?

4    A.   Lisa.

5    Q.   Do you ever negotiate that hourly rate with the

6    facilities?

7    A.   No.

8    Q.   Okay.  So ultimately who is in charge of determining what

9    you receive for each hour worked?

10   A.   Lisa.

11   Q.   And with regards to your working relationship, are you

12   able to structure your relationship directly with the

13   facilities or do you do that through Steadfast?

14   A.   I do that through Steadfast.

15   Q.   And were you given the option to be classified as an

16   independent contractor or an employee?

17   A.   No.  Immediately once I started working with Steadfast,

18   it's always been under a 1099 contractor.

19   Q.   And were you ever given the option to be classified -- I

20   mean, strike that.

21        Do you know what's required to be considered an

22   independent contractor?

23   A.   I do know as far as an independent contractor, the

24   research I did do is there is no taxes to be taken out.  We

25   do pay the employer tax, and also doing further research, we

Hopson, C. - Direct                                                          92

```
 1   also are due overtime, time and a half.
 2   Q.  You say you're due overtime and time and a half?
 3   A.  Yeah, as a 1099 contractor.
 4   Q.  Okay.  But does Steadfast pay you time and a half --
 5   A.  No.
 6   Q.  -- for overtime hours worked?
 7   A.  No.
 8   Q.  So since your employment with Steadfast have you ever
 9   owned your own business?
10   A.  No.
11   Q.  Have you ever advertised your healthcare in any way?
12   A.  No.
13   Q.  Okay.  And I want to talk a little bit about your -- how
14   you keep track of time.  So how do you keep track of time at
15   the facilities that you work at?  Are you required to submit
16   time sheets?
17   A.  Yes.
18   Q.  And how often are you required to submit those time
19   sheets?
20   A.  Every week we have to submit our time sheets.
21   Q.  I'm sorry, what's the last part?
22   A.  Every week we have to submit our time sheets.
23   Q.  And who -- go ahead.
24   A.  Weekly, we have to submit them weekly to be paid.
25   Q.  Okay.  Who do you submit those time sheets to?
```

1   A.   To the payroll e-mail.

2   Q.   And is it the payroll e-mail at the facility or with

3   Steadfast?

4   A.   It's with Steadfast.

5   Q.   Who told you that you were required to submit those time

6   sheets?

7   A.   Our -- Lisa did.

8   Q.   And you indicated that you had to submit the time sheets

9   in order to be paid, so if you don't submit a time sheet, are

10  there issues with being paid by Steadfast?

11  A.   Yes.

12  Q.   I want to talk a little bit about your work schedule.

13  What is your work schedule like when working with Steadfast?

14  A.   Originally, when I first started working with Steadfast,

15  I would do a lot of overtime, double shifts, other night

16  shifts, a little bit under 40 hours a week.

17  Q.   Now, when you say double shift, how many hours is that?

18  A.   16 hours in a day.

19  Q.   16 hours a shift.  How often would you do those double

20  shifts with Steadfast?

21  A.   Sometimes in the beginning I will do them three or four

22  days in a row.

23  Q.   And in the times that you did those double shifts, how

24  many hours would you work in a workweek?

25  A.   I'd say between 68 and 74 hours, I would say around

1    there.

2    Q.  So based upon that schedule would you work more than 40

3    hours in a workweek?

4    A.  Yes.

5    Q.  And how is your schedule determined?

6    A.  Oh, I can -- a few ways.  I'll reach out to the scheduler

7    that we had on the on-call.

8    Q.  When you say you reach out to the scheduler or the

9    on-call, is that the scheduler on call at Steadfast?

10   A.  Yes.

11   Q.  And what happens after you contact the scheduler or the

12   on-call person at Steadfast?

13   A.  We just pretty much confirm our shifts through the text

14   message.  So, say, for example, I -- say I work Tuesday,

15   Thursday and Friday, I do 73s, I submit them over to them, or

16   they will let me know what they have in the text message and

17   just say confirm, that's all.

18   Q.  So Steadfast will let you know the facilities that are

19   available for you to work for?

20   A.  Yes.

21   Q.  And in the instances when you worked those 60 hours per

22   workweek, how were you compensated for those hours that you

23   worked?

24   A.  I had a direct deposit.

25   Q.  Were you paid your -- were you paid time and a half or

Hopson, C. - Direct                                               95

```
 1   were you paid straight time for those hours worked over 40 in
 2   that workweek?
 3   A.  It was straight time.
 4   Q.  And just to clarify, did you ever receive time and a half
 5   for any hours worked over 40 in a workweek?
 6   A.  No.
 7   Q.  And if you decided to take a shift but you weren't able
 8   actually -- but you weren't able to actually complete that
 9   shift or work the shift, were you required to give notice to
10   Steadfast?
11   A.  Yes.
12   Q.  And who were you required to give notice to?
13   A.  The same on-call number.
14   Q.  And about how much notice were you required to give?
15   A.  Call in two hours.
16   Q.  And if you were running late for a shift, would you have
17   to give notice to anyone?
18   A.  Yes.
19   Q.  And who would you have to give notice to?
20   A.  The on-call.
21   Q.  And would that be the on-call for Steadfast or the
22   facility?
23   A.  For Steadfast.
24   Q.  Okay.  During your employment with Steadfast, have you
25   ever incurred any costs or expenses as a nurse?
```

Hopson, C. - Direct                                                        96

1   A.   Could you repeat that?
2   Q.   Absolutely.  During the time that you worked for
3   Steadfast, have you incurred any costs or expenses?
4   A.   Oh, yes.
5   Q.   And what type of expenses or costs have you incurred?
6   A.   Gas, mileage.  Sometimes I travel out to the Richmond
7   area and stuff, and that's pretty much gas mileage is what I
8   incur.
9   Q.   Have you ever incurred a hotel expense or anything like
10  that?
11  A.   No.
12  Q.   So if you were interested in a placement Steadfast had
13  available, how would you find out about that opportunity?
14  A.   I'll call the on-call.
15  Q.   And so who determines where you work for Steadfast?
16  A.   The scheduler.
17  Q.   And I know that you said that there were -- there were
18  calls and texts, but are the available shifts presented in
19  any other way outside of the calls and the texts?
20  A.   No.  That's how they are presented.
21  Q.   And once you are at a facility for your assignment, are
22  you able to negotiate that hourly rate with the facility?
23  A.   No.
24  Q.   And do you know who negotiates the hourly rate with the
25  facility?

Hopson, C. - Direct                                              97

1    A.  I believe Lisa negotiates it.  I'm not sure who

2    negotiates it.

3    Q.  But is -- is it someone at Steadfast?

4    A.  Yes, it's Steadfast.

5    Q.  And so after you go to the facility, I recall you stating

6    that you were interviewed by Lisa.  Are you also interviewed

7    by anyone at the facility that you're placed to work?

8    A.  No.

9    Q.  And do you communicate with the facilities you work at

10   directly to establish your schedule?

11   A.  No.  We are supposed to accept our schedule through

12   Steadfast.

13   Q.  I'm sorry?

14   A.  We are supposed to establish our schedule through

15   Steadfast.

16   Q.  So other than your hourly rate do you receive any other

17   profits from Steadfast?

18   A.  No.

19   Q.  Okay.  And who pays you for the services that you render

20   at the facilities on behalf of Steadfast?

21   A.  You say who pays for the services?  Who pays me for the

22   services?

23   Q.  Yes.

24   A.  Steadfast pays me for the services.

25   Q.  If you don't receive your paycheck from Steadfast, would

1   that impact your ability to meet your financial obligations?

2   A.   Yes.

3   Q.   And do you have any ownership interest in Steadfast?

4   A.   No.

5   Q.   Other than being an LPN for Steadfast, are you a manager

6   or any other director for Steadfast?

7   A.   No.

8   Q.   And so what type of equipment do you use as an LPN to

9   complete your job duties?

10  A.   Stethoscope, blood pressure cuff, heart rate monitor.

11  Q.   And are those tools of the trade that every nurse has in

12  their possession?

13  A.   Oh, no.  We have to purchase those ourself.

14  Q.   And is that standard practice across the profession?

15  A.   Yes, it is.  It's a benefit if the facilities have the

16  actual machine.

17  Q.   When you receive the facility assignment from Steadfast,

18  do you have to have any other additional equipment or

19  supplies beyond the tools that you just mentioned?

20  A.   My uniforms.

21  Q.   And your uniform?

22  A.   Uh-huh.

23  Q.   But if there is something like a wheelchair or a bed, are

24  you required to provide those?

25  A.   No.

Hopson, C. - Direct                                               99

```
 1    Q.  So who would provide those items?
 2    A.  I believe -- depending on the setting, if it's a
 3    long-term care, because that's the section I worked in, the
 4    facility will have those beds and wheelchairs available.
 5    Q.  Are you required to hold or maintain a license to be a
 6    practicing LPN in Virginia?
 7    A.  Yes.
 8    Q.  And is this license required regardless of the facility
 9    that you are assigned to work for?
10    A.  Yes.
11    Q.  And as an LPN what other types of services that you
12    provide when you're placed at the facility?
13    A.  Rehab services, basic nursing care.  Those are the
14    services I provide.
15    Q.  And do you provide these types of services as an LPN
16    regardless of the facility that you're placed to work?
17    A.  Yes.  Depending on the facility, yes, those are the
18    services I provide.
19    Q.  And is the same level of skill required to complete those
20    tasks?
21    A.  Yes.
22    Q.  And when your assignment ends at a facility, does
23    Steadfast provide you a new placement?
24    A.  Yes.
25    Q.  When you're at the different facilities that Steadfast
```

Hopson, C. - Direct                                              100

```
 1    has placed you to work, are you required to wear a name
 2    badge?
 3    A.   Yes.
 4    Q.   What company name is on that name badge?
 5    A.   Steadfast.
 6    Q.   To your knowledge, does Steadfast Medical Staffing
 7    provide any other services other than what you mentioned at
 8    the beginning of your testimony?
 9    A.   Not to my knowledge.
10    Q.   I recall you say that you received straight time for the
11    overtime hours that you worked.  Did you ever complain about
12    not receiving time and a half for overtime?
13    A.   Yes, I did.
14    Q.   And to whom did you complain to?
15    A.   To the payroll person, Christine.
16    Q.   And what did they say about overtime compensation?
17    A.   Well, Christine told me that overtime is not due to me
18    because I'm a 1099 contractor, and I explained to her that
19    when I did my research, you know, I found out that, you know,
20    as an independent contractor, I am due time and a half, and
21    pretty much that was our conversation and conflict that we
22    had.
23    Q.   And do you recall when you had that conversation with
24    Christine?
25    A.   You say when do I recall it?
```

Hopson, C. - Direct                                                        101

1   Q.  Do you recall the date or the time frame in which you had

2   that conversation?

3   A.  I don't recall the exact date that I had that

4   conversation with her.

5   Q.  Okay.  And to date have you ever received any back wages

6   for the overtime that you've worked?

7   A.  No.

8   Q.  And currently are you paid overtime for the overtime

9   hours that you work working with Steadfast?

10  A.  No.

11  Q.  And I recall you saying that you had a background check.

12  Did you have a drug test also when you began employment with

13  Steadfast?

14  A.  I don't recall having a drug screen, to be honest, in

15  2016.  I don't recall having a drug screen.

16        MS. JONES:  I have no further -- just one further

17  question.

18  BY MS. JONES:

19  Q.  You indicated that you did research.  What research did

20  you do in terms of independent contractor?

21  A.  Well, I searched online because originally when -- when

22  someone tells you -- when you come from a W-2 background, and

23  you're used to getting time and a half, and then your whole

24  job description changes to an independent contractor, it's

25  told to you that an independent contractor doesn't receive

1    time and a half, it kind of puts a little confusion in your

2    mind.

3            So even after I was working in the hours I was

4    working, whether it was a year or so later I -- I did my

5    research.  I looked online.  I looked up independent

6    contractor, 1099, and I looked up to see if independent

7    contractors are due overtime, and during my research, looking

8    up seeing it, we were due overtime.  That's when I just

9    reached out.

10           MS. JONES:  All right.  I have no further

11   questions, Your Honor.

12           THE COURT:  We will take up cross-examination after

13   lunch.  We will be in recess until 2:30.

14           During your break do not discuss your testimony

15   with anybody.

16           All right.

17           (Luncheon recess from 1:02 p.m. to 2:30 p.m.)

18           THE COURT:  You may commence cross-examination.

19           MS. RUST:  Thank you, Your Honor.

20                         CROSS-EXAMINATION

21   BY MS. RUST:

22   Q.  Hello, Mr. Hopson.

23   A.  Hey.  How you doing?

24   Q.  My name is Julia Rust.  I'm an attorney for Steadfast and

25   Ms. Pitts.  So I want to ask you a couple of questions about

1    what you discussed on your direct exam.  You talked about

2    your time sheets.  So when you finish a shift at a facility,

3    before you leave do you get somebody from the facility to

4    sign off on that time sheet; is that right?

5    A.  That's correct.

6    Q.  And is that just a -- for the facility to confirm, hey,

7    yes, you worked these hours here?

8    A.  That's correct.

9    Q.  Okay.  And you -- have you been successful when you have

10   asked for a higher pay rate for a certain shift before?

11   A.  Yes.  Yes.

12   Q.  I think you mentioned in your direct that when you're

13   traveling a distance, you can usually get paid more; is that

14   right?

15   A.  That's correct.

16   Q.  Are there other instances when you can get paid more, for

17   example, if it's a last-minute need?

18   A.  Yes, there is.

19   Q.  You can negotiate a higher rate for that shift?

20   A.  Yes, you can -- or it could be like a hundred-dollar

21   bonus or something along those lines.

22   Q.  Okay.  So either a higher hourly rate or some kind of

23   bonus?

24   A.  That's correct.

25   Q.  And is that because the facility agrees to that higher

 1   rate or that bonus?

 2           MR. JEWETT:  Objection, speculation.

 3           THE COURT:  Sustained.

 4   BY MS. RUST:

 5   Q.  To the extent -- are you aware of whether the facility

 6   has to agree --

 7           MR. JEWETT:  Objection, same, speculation.

 8           THE COURT:  No, I think you can rephrase your

 9   question, if you know whether.

10   BY MS. RUST:

11   Q.  Yes.  Do you know whether the facility has to approve

12   your request for a higher pay rate or bonus for a shift?

13   A.  No, I do not.

14   Q.  You do not know?

15   A.  No.

16   Q.  Okay.  So if you want to make more per shift, could you

17   just prioritize, selecting shifts that are farther away where

18   you can get paid a higher rate for traveling a distance?

19   A.  Yes, you can.

20   Q.  Okay.  So you mentioned also that you worked for another

21   agency, First Choice, right?

22   A.  That's correct.

23   Q.  And you like to balance your hours between the agencies?

24   A.  That's correct.

25   Q.  Could you work for even a third agency at the same time

1    if you wanted?

2    A.  Yes, I can.

3    Q.  So if you can work for as many agencies as you want at

4    the same time?

5    A.  That's correct.

6    Q.  And can you -- do you typically decide which shifts you

7    want to pick up with what agencies?

8    A.  Yes, I do.

9    Q.  And you can say, okay, I want to work more shifts with

10   Steadfast this week and more shifts with First Choice next

11   week, is that an option you have?

12   A.  That's correct.

13   Q.  So when you're on multiple registries, that gives you

14   more options --

15   A.  Uh-huh.

16   Q.  -- for work, right?

17   A.  Yes.

18   Q.  Does it give you more flexibility with the options you

19   have, too?

20   A.  Yes.

21   Q.  And are you aware -- let's see.  Do you know, only if you

22   know, do you know if First Choice and Steadfast both have

23   contracts with the same facility?

24   A.  I'm not aware of that.

25   Q.  Okay.  So when you are setting up your schedule between

```
 1    the different registries, do you just tell one registry when
 2    you're available or just pick up whichever shift you want at
 3    one and then go to the other one?
 4    A.   That's correct.
 5    Q.   So if, for example, if Steadfast went out of business
 6    tomorrow, you could just sign up with another agency?
 7    A.   That's correct.
 8    Q.   And you would be able to take shifts with that other
 9    agency?
10    A.   That's correct.
11    Q.   So you could maintain a full schedule or as much of a
12    schedule as you want?
13    A.   Yes.
14    Q.   Do you have a facility you prefer going to?
15    A.   Not in particular.
16    Q.   Okay.  Do you have some facilities you don't like going
17    to?
18    A.   No, I don't.
19    Q.   Are there facilities that you've chosen not to go back to
20    for one reason or another?
21    A.   There have been.
22    Q.   Okay.  So when you call -- for example, if you call
23    Steadfast and say, what -- you know, what's available, they
24    give you a couple of facilities that have some shifts open,
25    if you don't really like any of those facilities, you can
```

1    say --
2              THE COURT:  I think this is calling for speculation
3    here, what he would do with future events.  So rephrase it.
4              MS. RUST:  Let me rephrase, of course.
5              THE COURT:  If it's something that you can get out
6    without calling for speculation.
7              MS. RUST:  Understood.  I think we can rephrase
8    that.
9              THE COURT:  Okay.
10   BY MS. RUST:
11   Q.  So in the past, have you called -- well, we have already
12   talked about that.  You've called Steadfast and said, here is
13   my availability, what facilities do you have; is that right?
14   A.  That's correct.
15   Q.  And has there been an instance in the past where they
16   have said, here is a couple of options, and you just declined
17   for whatever reason to take any of those shifts?
18   A.  Yes.
19   Q.  Okay.  And when you're on site at a facility, is anyone
20   from Steadfast ever on site?
21   A.  Yes.  There are staff workers there.  Are you saying are
22   there Steadfast employees also at the location I'm at; is
23   that what you're asking?
24   Q.  Fair question.  Let me be more specific.  So I'm not
25   talking about other nurses, LPNs or RNs, but, for example,

1    has Lisa Pitts ever been on site at a facility with you?

2    A.   No.

3    Q.   Has Christine Kim ever been on site at a facility with

4    you?

5    A.   No.

6    Q.   And has anybody from the front desk at Steadfast, to your

7    knowledge, been on site at a facility with you?

8    A.   No.

9    Q.   And Steadfast has never told you how to practice nursing,

10   right?

11   A.   Could you ask that question again?

12   Q.   Of course.

13           THE COURT:  Wait a minute.  Let's figure out

14   something here.  Don't ever ask the lawyer a question.  You

15   can't do that.  You can say you do not understand but don't

16   ask the lawyer questions, do anything, okay.

17           THE WITNESS:  All right, Your Honor.

18           THE COURT:  Let's continue.

19           MS. RUST:  Thank you, Your Honor.

20   BY MS. RUST:

21   Q.   So as an LPN, has Steadfast ever told you, for example,

22   how to take somebody's blood pressure?

23   A.   No.

24   Q.   Have they ever told you how to perform any of your

25   duties, your nursing duties?

1   A.  No.

2          MS. RUST:  And have you -- okay.  I have no further

3   questions.  Thank you very much.

4          THE COURT:  Redirect.

5          MS. JONES:  Yes, Your Honor.

6                    REDIRECT EXAMINATION

7   BY MS. JONES:

8   Q.  Mr. Hopson, I just have a few follow-up questions.  You

9   indicated that you work for other staffing agencies,

10  specifically First Choice.  Does that company pay you

11  overtime?

12  A.  Yes.

13  Q.  But Steadfast pay you overtime?

14  A.  No.

15  Q.  I want to talk a little bit, if I could, about the

16  research that you did you mentioned previously.  Do you know

17  the factors to be considered independent contractor?

18  A.  You say do I have the documents?

19  Q.  Do you know the factors to be considered an independent

20  contractor?

21          THE COURT:  Then let's leave something to the

22  future Court.  The Court will have to decide whether one is

23  an employee or independent contractor.  It doesn't matter

24  what a witness's definition may be.  So the Court doesn't

25  find it appropriate to ask any witness about what are the

1   indicia of an independent contractor.  You just ask them

2   about their duties, and the Court has to decide as a matter

3   of law what's an independent contractor here and what's an

4   employee.  So both counsel been getting into that.  Don't

5   get into it.  That's a Court decision, a legal decision.

6           MS. JONES:  Okay, Your Honor.  I'll move on.

7   BY MS. JONES:

8   Q.  In regard to the bonuses, is that a lump sum or is that

9   incorporated into your hourly pay when you travel to the

10  farther facilities?

11  A.  So it's separate from the hourly pay.  So say, you know,

12  work 40 hours a week, some say it's 600, throwing a number

13  out there.  It would be -- your final paycheck will be 600

14  plus the additional hundred dollars so it will be $700.

15  Q.  So would that bonus be based upon the need of Steadfast

16  for you having to drive farther than a normal facility that

17  you work for?

18  A.  Yes.  It would be based off the need at like a

19  short-term -- a short-term need, they will say, I will give

20  you a $50 bonus or, you know, a hundred-dollar bonus,

21  whatever the case bonus will be for that particular, that is

22  what they will offer you.

23  Q.  I want to talk a little bit about the time sheet.

24  Opposing counsel asked you if the time sheet had to be signed

25  by the facility.  But even though it's signed by the

1    facility, you still turn it into Steadfast?

2    A.   That's correct.

3    Q.   And is it just to confirm that you actually work at the

4    facility?

5    A.   That's correct.

6              MS. JONES:  No further questions, Your Honor.

7              THE COURT:  May the witness be permanently excused?

8              MS. JONES:  Yes, Your Honor.

9              MS. RUST:  Yes.

10             THE COURT:  All right, sir.  You may step down.

11   You're permanently excused.

12             (Witness excused.)

13             THE COURT:  Next witness.

14             MS. LEWIS:  Your Honor, if I may, with respect to

15   housekeeping sort of where we are in terms of time, the

16   secretary indicates having approximately four more witnesses

17   today.  We will not run into this, you know, issue with

18   witnesses moving forward, but I did just want to apprise the

19   Court in terms of where we are in terms of --

20             THE COURT:  You have approximately four more

21   witnesses?

22             MS. LEWIS:  Yes.  I apologize that we are short

23   today because, as I indicated, and we talked about, we do

24   have a lot.

25             THE COURT:  Uh-huh.

```
 1          MS. LEWIS:  But we weren't sure when we were going
 2   to get started, these are hourly workers, but we will have
 3   plenty for you tomorrow.
 4          THE COURT:  Well, then we are going to start
 5   tomorrow at 1:00.
 6          MS. LEWIS:  Right.  And we are going to have
 7   plenty.
 8          THE COURT:  Let's see where we go today.  You know
 9   the Court hates to run out of witnesses.
10          MS. LEWIS:  Don't I know it, Your Honor.  So thank
11   you.
12          THE COURT:  Call your next witness.
13          MS. LEWIS:  Dawn Wooten.  She is remote.
14          THE CLERK:  Your Honor, the video control shut down
15   so I have to bring it back up.  I may have to call back.
16          THE COURT:  Okay.  Little technical difficulties,
17   so we will wait a little longer.
18          MS. LEWIS:  Okay.  I was going to say because we
19   have another in-person witness we can call while we get it
20   going, if that would -- if you just wanted to wait.
21          THE COURT:  Bring in the in-person witness.
22          MR. SEIFELDEIN:  I call Ms. Boykins, Saudia
23   Boykins.
24          (Witness was sworn.)
25          SAUDIA BOYKINS, called by the Plaintiff, having
```

1   been first duly sworn, was examined and testified as

2   follows:

3                        DIRECT EXAMINATION

4   BY MR. SEIFELDEIN:

5   Q.  Good afternoon, Ms. Boykins.

6   A.  Hi.

7   Q.  Can you state your full name for the record and spell it,

8   please.

9   A.  Saudia Boykins.

10  Q.  Speak up.

11  A.  Saudia Boykins.

12  Q.  Can you spell it.

13  A.  S-a-u-d-i-a B-o-y-k-i-n-s.

14  Q.  Are you familiar with Steadfast Medical Staffing?

15  A.  Yes.

16  Q.  What type of service does Steadfast provide?

17  A.  Nursing; CNAs, LPNs and RNs.

18  Q.  To whom?  To whom do they provide these services?

19  A.  Excuse me?

20  Q.  To whom does Steadfast provide these services?

21  A.  To the various nursing homes that I know of.

22  Q.  Were you employed by Steadfast?

23  A.  Yes.

24  Q.  And when did you start working for Steadfast?

25  A.  2017.

Boykins, S. - Direct                                            114

```
 1    Q.   Are you currently working for Steadfast?
 2    A.   Yes.
 3    Q.   And have you been employed by Steadfast since 2017?
 4    A.   Yes.
 5    Q.   And what is your job title?
 6    A.   CNA.
 7    Q.   Have you worked for any other agencies during the time
 8    you worked for Steadfast?
 9    A.   No.
10    Q.   How did you apply to work for Steadfast?
11    A.   By in person, by application.
12    Q.   And how did you find out about Steadfast?
13    A.   My sister told me about it.
14    Q.   Okay.  I'm going to direct your attention to Plaintiff's
15    Exhibit 26, beginning on Page 22 through Page 24.  Pull that
16    up and look at it, please.
17         Do you recognize this document?
18    A.   Yes.
19    Q.   Okay.  Is that the application you filled out?
20    A.   That's my handwriting, yes.
21    Q.   And did you provide references in support of this
22    application?  If you can look at the screen.
23    A.   I think so.  It's been awhile.
24    Q.   Well, you have the application right there, look at the
25    screen see if that --
```

Boykins, S. - Direct                                    115

```
 1   A.  Okay.  Okay.  Yeah, I see it.
 2   Q.  You did provide references?
 3   A.  Yes.
 4   Q.  Were you required by Steadfast to provide any other
 5   document?
 6   A.  I had to have my TB skin test and a CPR and my nursing
 7   license, driver's license.  I think that's all.
 8   Q.  After you submitted your application to Steadfast, did
 9   you meet with anyone at Steadfast?
10   A.  Yes.
11   Q.  Who did you meet with?
12   A.  I think I met with -- if I'm not mistaken, her name was
13   Lucy.
14   Q.  Okay.  And did Lucy ask you some questions about your
15   application?
16   A.  I'm not sure.  I don't think so.
17   Q.  Did she ask you --
18   A.  She might have.
19   Q.  I understand.  Did she ask you about your availability?
20   A.  Yes.
21   Q.  When you submitted the application and after you spoke
22   with Lucy, who hired you?
23   A.  Steadfast.
24   Q.  Okay.  And when you were hired, were you paid on an
25   hourly or a salary?
```

Boykins, S. - Direct                                                    116

```
1   A.  Hour.
2   Q.  Hourly.  Were you able to negotiate a different pay rate
3   for your hourly rate?
4   A.  No, sir.
5   Q.  And who set the rate of pay for you?
6   A.  Steadfast.
7   Q.  As part of your application were you required to sign an
8   agreement?
9   A.  Agreement?
10  Q.  Yes.  I'm sorry, independent contract agreement?
11  A.  I'm not really sure.
12  Q.  All right.
13  A.  I can't remember.
14          MR. SEIFELDEIN:  Sure.  Before I ask my next
15  question, Your Honor, Plaintiff would like to admit
16  Plaintiff's Exhibit 26, Pages 22 through 24.
17          THE COURT:  Any objection?
18          MS. RUST:  No.
19          THE COURT:  Document will be admitted, number 26,
20  Pages 22 through 24.
21          (Plaintiff's Exhibits 26-22 to 26-24 received in
22  evidence.)
23  BY MR. SEIFELDEIN:
24  Q.  If I could direct your attention to Plaintiff's Exhibit
25  25, Page 16 through 17.  Do you recognize this document,
```

1   beginning from the first page?

2   A.   Yes.

3   Q.   And you signed this document?

4   A.   I did.   That's my writing.

5   Q.   Is that your signature right there?

6   A.   Yes.

7   Q.   And is this your information on the following page as

8   well?

9   A.   Yes.

10  Q.   Were you able to structure the terms of your work

11  relationship with the facility directly?

12  A.   No.

13  Q.   Who did you structure work relationship with?

14  A.   Steadfast.

15  Q.   Were you required to maintain your own malpractice or

16  liability insurance by Steadfast?

17  A.   No, sir.

18  Q.   Were you required to maintain workman's compensation

19  insurance by Steadfast?

20  A.   No, sir.

21  Q.   Were you required to submit time sheets?

22  A.   Yes.

23  Q.   Okay.   And who required you to submit these time sheets?

24  A.   Steadfast.

25  Q.   How often were you required to submit the time sheets?

1    A.  Every week.

2    Q.  And who told you you were required to submit these time

3    sheets?

4    A.  Steadfast.

5         MR. SEIFELDEIN:  Your Honor, I'd like to admit

6    Plaintiff's Exhibit 25, Pages 16 through 17 -- I'm sorry,

7    through 18.

8         THE COURT:  Any objection?

9         MS. RUST:  No objection.

10        THE COURT:  Document will be admitted.

11        (Plaintiff's Exhibits 25-16 to 25-18 received in

12   evidence.)

13   BY MR. SEIFELDEIN:

14   Q.  Did you set your schedule directly with the facilities?

15   A.  No.  I set it through Steadfast.

16   Q.  Why did you set your schedule through Steadfast, not the

17   facility?

18   A.  Did you say why didn't I?

19   Q.  Why did you set your schedule with Steadfast and not the

20   facility?

21   A.  I don't work for the facility.  I work for Steadfast.

22   Q.  And have you ever tried to set up your schedule with the

23   facility, and, if so, what did they do?

24   A.  Say that again.  I'm sorry.

25   Q.  Did you ever try to set your schedule with the facility?

1    If so, what did they do?

2    A.  I think I did that one time when I first started, but

3    they told me that you have to go through the agency.

4    Q.  Steadfast?

5    A.  Steadfast, yes.

6    Q.  Once you were scheduled with the facility, would you call

7    to let the facility know that you were coming?

8    A.  No.

9    Q.  Who would do that?

10   A.  Steadfast.

11   Q.  Did you ever turn down a shift that Steadfast offered

12   you?

13   A.  Yes.

14   Q.  Okay.  And what was Steadfast's response when you turned

15   down a shift?

16   A.  Do you mean what would they say?

17   Q.  Yes.  When you did turn down that shift, what did

18   Steadfast do?

19   A.  Well, they would -- well, they would be the scheduler

20   there I would talk to and they would say okay.

21   Q.  When you turned down shifts did Steadfast continue to

22   offer you shifts?  Was there a different response?

23   A.  There are sometimes when, if I didn't do a shift, all of

24   a sudden my future shifts that I would have, I would lose

25   them.

Boykins, S. - Direct                                                      120

1    Q.  You would lose them.  How would you lose them?  How would

2    you find out about losing future shifts when you canceled the

3    shifts?

4    A.  That they canceled me.  I've had a lot of cancellations.

5    Q.  And Steadfast would do that?

6    A.  Yes.

7    Q.  Okay.  Did you observe any Steadfast employees who turned

8    down shifts?

9    A.  Yes.

10   Q.  And how did Steadfast respond to that?

11   A.  Almost the same thing, I mean, they would lose -- you

12   would lose shifts.

13   Q.  Did you view that as some sort of discipline or

14   punishment?

15   A.  After once or twice, I started to feel like, yeah, they

16   were doing that because, you know, I turned down or whatever.

17   Q.  Did you ever work more than 40 hours in a workweek for

18   Steadfast?

19   A.  Yes, I did.

20   Q.  And on average approximately how many hours did you work

21   each day?

22   A.  Oh, goodness, um, there have been times I -- anywhere

23   from 16 to 18, sometimes 19 in one shift.

24   Q.  And when you say 16 to 18, is that a double shift that

25   you worked?

Boykins, S. - Direct                                                        121

1    A.  Yes.

2    Q.  And what is a double shift, I'm sorry?

3    A.  3:00 to 11:00, 11:00 to 7:00, but there were times where

4    even at 7:00, after I do that double, I will still be there

5    till maybe 9:00 or 10:00 in the morning.

6    Q.  The double shift is essentially working back-to-back

7    shifts?

8    A.  Yes.

9    Q.  And when you worked those double shifts and more than 40

10   hours in a workweek, what rate of pay did you get per hour?

11   A.  I started out at 17, but during the COVID it was 35.

12   Q.  When you work with more than 40 hours in a workweek, does

13   Steadfast pay you time and a half or straight time?

14   A.  Just straight.

15   Q.  Did Steadfast ever pay you time and a half when you

16   worked more than 40 hours in a workweek?

17   A.  No, sir.

18   Q.  Did you ever complain to Steadfast about not being paid

19   time and a half when you work over 40 hours in a workweek?

20   A.  I asked about it once, but I was told that they didn't do

21   overtime, so I didn't -- I just left it alone.

22   Q.  Was that by Lucy?

23   A.  Yes.

24   Q.  Were you required to provide a notice to Steadfast if you

25   were not available to work?

Boykins, S. - Direct                                                122

```
1    A.  Well, they would want you to call them, yes.
2    Q.  Okay.  And how far in advance would you have to call
3    them?
4    A.  They would -- they would like at least two hours.
5    Q.  Two hours?
6    A.  As far as I remember.
7    Q.  And who told you that you need to call within that
8    two-hour window?
9    A.  I believe it was Lucy.
10   Q.  And Lucy worked for Steadfast; is that correct?
11   A.  She did.
12   Q.  If you had a scheduling conflict, did Steadfast allow you
13   to send another CNA in your place?
14   A.  No, sir.
15   Q.  Were you allowed to employ another CNA to complete a
16   shift that Steadfast compensated you to complete?
17   A.  No, sir.
18   Q.  Were you allowed to have other individuals assist you in
19   the performance of services for which Steadfast compensated
20   you for?
21   A.  No, sir.
22   Q.  Okay.  Were you allowed to assign your shift to another
23   CNA without Steadfast approval, another CNA that worked for
24   Steadfast?
25   A.  No, sir.
```

Boykins, S. - Direct                                              123

1    Q.  So if you were interested in working those shifts you

2    talked about earlier, how did you find out about them?

3    A.  I would call Steadfast and tell them, ask them do they

4    have any doubles, if I want to do them.

5    Q.  And would Steadfast also call you with their available

6    shifts?

7    A.  At times they have.

8    Q.  Okay.  Now, once you schedule by Steadfast, and you were

9    sent to the facility, would you negotiate how much would be

10   paid with the facility?

11   A.  No, sir.

12   Q.  And what did you do -- I'm sorry, why not?

13   A.  I'm not employed for the -- with the facility.

14   Q.  So who would negotiate your rate of pay with the

15   facility, as far as you know?

16   A.  Steadfast.

17   Q.  Did Steadfast allow you to negotiate -- I'm going to

18   rephrase my question.  When you were paid those straight

19   times for the overtime hours you received, was your check

20   constant or did it vary from time to time?

21   A.  It varied.

22   Q.  It varied?  Did it vary depending on the hours you

23   worked?

24   A.  Yes, sir.

25   Q.  Your check was not a fixed amount?

1   A.   Right.

2   Q.   Okay.  Once you arrived at the facility, were you

3   interviewed by the facility?

4   A.   No, sir.

5   Q.   The facility just -- you went in and started working?

6   A.   Yes.  If I'm on that schedule.

7   Q.   Thank you.  So did you communicate with the facility

8   itself that you worked at to establish your schedule once you

9   were there?

10  A.   Say that again.

11  Q.   Did you communicate with the facility directly to

12  establish your schedule?

13  A.   No, sir.

14  Q.   Did Steadfast provide you with a badge?

15  A.   Yes.

16  Q.   Did the badge have the name of the company on it?

17  A.   Yes.

18  Q.   What was the name of the company on the badge that

19  Steadfast provided you?  Oh, you have it?

20  A.   Steadfast Medical.

21  Q.   Would you show it to the Court, please.

22  A.   (Complied.)

23  Q.   What did this badge signify to you?

24  A.   CNA.

25  Q.   And what else, in your relationship with Steadfast?

1    A.   Independent contractor.

2    Q.   I'm sorry?

3    A.   That's what I was told I was.

4    Q.   Steadfast told you you were that?

5    A.   Independent contractor, yes.

6    Q.   Okay.  And you don't know the difference between

7    independent contractor and employee, correct?

8    A.   No.

9    Q.   Other than your hourly rate, did you receive -- well, did

10   you receive any profit when you worked for Steadfast?

11   A.   No, sir.

12   Q.   If you did not receive -- who paid you for the services

13   that you provided for Steadfast?

14   A.   Steadfast.

15   Q.   Okay.  And if you didn't receive a payment for the

16   services you provided for Steadfast, would your ability to

17   meet your financial obligations be compromised?

18   A.   Absolutely.

19   Q.   How so?

20   A.   I wouldn't have the money, yeah.

21   Q.   You've got to pay the bills?

22   A.   Yes.  Don't work, you don't get paid.

23   Q.   That's right.  Do you have an ownership in Steadfast?

24   A.   No.

25   Q.   Are you an officer, manager, or director of Steadfast?

Boykins, S. - Direct                                        126

1    A.   No, sir.

2    Q.   Were you ever?

3    A.   No, sir.

4    Q.   Okay.  As a CNA, what type of equipment do you need to

5    complete your job duties?

6    A.   Thermometer, blood pressure machine, the O2, and like the

7    basic clean linen and stuff like that.

8    Q.   When you received the facility assignment from Steadfast,

9    did you have to purchase this equipment?

10   A.   No, sir.

11   Q.   Now, were you required to hold a license to work as a

12   CNA?

13   A.   Yes.

14   Q.   Is this license required regardless of which facility you

15   worked at?

16   A.   Yes.

17   Q.   As a CNA, generally, what type of service do you provide?

18   A.   Take care of the residents, give them their basic, you

19   know, the care, and make sure that they're ready for their,

20   like, dialysis when they have to go out, and, you know, make

21   sure that they are fed and clean and just take care of them,

22   medical care that they need, yeah, within reason.

23   Q.   And do you provide this type of services that you just

24   described regardless of which facilities Steadfast sends you

25   to?

Boykins, S. - Direct                                              127

```
 1    A.  Yes.

 2    Q.  And is this the same level of skills that required from

 3    all CNAs?

 4    A.  Yes, sir.

 5    Q.  Okay.  Earlier you talked about you complained to

 6    Steadfast once about not receiving time and a half; is that

 7    correct?

 8    A.  Yes, sir.

 9    Q.  Uh-huh.  And why didn't you ask about it a second time?

10    A.  Why didn't I?

11    Q.  Right.

12    A.  Because I was told that they didn't do time and a half.

13    Q.  Okay.  And you are still working for Steadfast but have

14    you received any back wages from prior years working over 40

15    hours in a workweek?

16    A.  No, sir.

17    Q.  Do you receive overtime now?

18    A.  No, sir.

19         MR. SEIFELDEIN:  No further questions, Your Honor.

20         THE COURT:  Cross.  Are you concerned at all the

21    fact that you are here testifying that you may not get any

22    more work from Steadfast?

23         THE WITNESS:  I hope not, but, you know, I -- I

24    haven't really thought about it really --

25         THE COURT:  What did you say?
```

Boykins, S. - Cross                                          128

```
 1            THE WITNESS:  I said I'm not -- I don't know.  I'm
 2   not really concerned.
 3            THE COURT:  Thank you.  Cross-examination.
 4                      CROSS-EXAMINATION
 5   BY MS. RUST:
 6   Q.  Good afternoon, Ms. Boykins.
 7   A.  Hi.
 8   Q.  My name is Julia Rust.  I'm an attorney for Steadfast and
 9   Lisa Pitts.  I'm going to ask you a couple of questions about
10   what you discussed on your direct.  So let's go over a few
11   things.  First, are you -- you're licensed in Virginia and
12   North Carolina; is that right?
13   A.  Yes.
14   Q.  Do you work shifts in both states?
15   A.  Yes, I do.
16   Q.  So do you go back and forth?
17   A.  Yes.
18   Q.  And are you able to choose the facilities that you want
19   to work in based on which state you want to be in?
20   A.  It depends.  I would call them and ask what they have.
21   If I feel like doing North Carolina, I'll ask about North
22   Carolina.
23   Q.  Okay.
24   A.  And if there's nothing there, then I'll do Virginia.
25   Q.  Okay.  But if there is an opportunity in North Carolina,
```

Boykins, S. - Cross                                              129

1    and that's where you want to be, that is what you will take;
2    is that right?
3    A.  Yes.
4    Q.  Okay.  So you have the flexibility to work in the
5    locations where you want to be; is that right?
6    A.  Yes.
7    Q.  Okay.  Are there any facilities that you particularly
8    like going to?
9    A.  Well, I like most of them that I've been to.  There is
10   one or two -- there is one that I really particularly like,
11   yeah.
12   Q.  Okay.  And do you -- so if you call Steadfast and you
13   asked what's available, and there is a shift at that
14   facility, will you choose that one over other options?
15   A.  I'll ask about that, and if they have it, I'll take it,
16   but if not, then I'll go another direction.
17   Q.  Okay.  And are there facilities you have not particularly
18   enjoyed working at?
19   A.  There's one, but I go anyway because I have a job to do.
20   Q.  Okay.  That's fair.  And if you called Steadfast and
21   asked for available facilities and that was the only one
22   available, would you be able to decide if you wanted to go
23   back to that facility or not?
24   A.  I would take it because I have to work.
25   Q.  Okay.  So the money is important enough to you you will

Boykins, S. - Cross                                                    130

1   take it?

2   A.  Yes.

3   Q.  Okay.  When you -- you talked about picking up double

4   shifts.  The long hours working double shifts or if your

5   shifts run longer than what you were scheduled for, that's,

6   in your experience, pretty typical in your industry?

7   A.  Yes.

8   Q.  So the facility that you mentioned you particularly liked

9   going to, you've been there a bunch of times; is that right?

10  A.  Yes.

11  Q.  Are you -- so you're familiar with the personnel at the

12  facility?

13  A.  Not all of them, just one in particular, yeah.

14  Q.  Okay.  Does that person handle any scheduling?

15  A.  Yes.  She does now.  At the time she didn't, but now she

16  does, yeah.

17  Q.  So were you able to communicate to her directly when

18  you're already there working about any upcoming opportunities

19  and pick up some shifts with her directly?

20  A.  No, ma'am.  No.

21  Q.  Okay.  Is that because you just haven't -- that

22  conversation hasn't come up?

23  A.  I have to go through Steadfast.  I can't just ask them.

24  Q.  Okay.  So has the facility -- the facility ever called

25  you when they had an -- well, the facility ever called you

JODY A. STEWART, Official Court Reporter

Boykins, S. - Cross                                              131

1   for any reason to pick up a shift?

2   A.   They have.

3   Q.   Okay.  Have you -- you mentioned on your direct exam that

4   you have not worked for other agencies?

5   A.   That's right.

6   Q.   Have you applied or tried to work for other staffing

7   agencies?

8   A.   No, I haven't.

9   Q.   Could you?  You could apply to another registry if you

10  wanted, right?

11  A.   Yes.

12  Q.   Okay.  We went over Exhibit PX26, which was your

13  application, and Mr. Seifeldein asked you some questions

14  about your references.  Do you have any idea whether

15  Steadfast called those references?

16  A.   I have no idea.

17  Q.   Okay.

18  A.   I don't know.

19  Q.   He asked you also about your time sheets, and you said

20  you submit them weekly?

21  A.   Yes.

22  Q.   Just to clarify, you're only required to submit time

23  sheets in a week if you worked that week; is that right?

24  A.   Only if I worked, yes.

25  Q.   And when you work a shift at a facility, does some --

1    someone from the facility have to sign off on that time sheet

2    for you?

3    A.  Yes.

4    Q.  Is that so that they can confirm you actually worked

5    those hours?

6    A.  That's right.

7    Q.  So the time sheet you submit to Steadfast has to have a

8    facility signature on it?

9    A.  That's right.

10   Q.  Okay.  You mentioned also -- you were talking about how

11   your rate, when you first started, was around $17 an hour,

12   and it has gone up to $35 an hour, right?

13   A.  During COVID, yes.

14   Q.  During COVID?

15   A.  Yes.

16   Q.  And that's because the need for people in your industry

17   was higher, is that right, your knowledge?

18          MR. SEIFELDEIN:  Objection, Your Honor, calls for

19   speculation.

20          THE COURT:  Sustained.

21   BY MS. RUST:

22   Q.  And you mentioned when you were picking -- about picking

23   up shifts, you would -- when you're interested in picking up

24   some shifts, you said that you would call Steadfast, right?

25   A.  Yes.

Boykins, S. - Cross                                          133

1    Q.  And you would request available shifts that were double

2    shifts; is that right?

3    A.  If I felt like doing double, yes.

4    Q.  If you were up to it?

5    A.  Yes.

6    Q.  And you said at times they have call you, Steadfast has

7    called you?

8    A.  They have, yes.

9    Q.  Okay.  Would you say more often than not you called

10   Steadfast to request available shifts?

11   A.  Kind of even, I think.

12   Q.  And when you were on site at a facility, has anyone from

13   Steadfast been on site with you?

14   A.  Can you say that again?  I'm sorry.

15   Q.  Yeah, sure.  So when you've worked at a shift at a

16   facility, are you aware whether anyone from Steadfast has

17   ever been on site at that facility with you?

18   A.  No.

19   Q.  So Steadfast hasn't ever observed you performing your

20   duties as a CNA on site, right?

21   A.  Right.

22        MS. RUST:  Okay.  I have no further questions.

23   Thank you very much.

24        THE COURT:  Thank you.

25        MR. SEIFELDEIN:  Briefly, Your Honor.  I apologize,

 1  Your Honor.

 2                      REDIRECT EXAMINATION

 3  BY MR. SEIFELDEIN:

 4  Q.  Ms. Boykins, briefly, when Steadfast calls you for shifts

 5  or you call them, you don't know what they have; is that

 6  correct?

 7  A.  That's right.

 8  Q.  You only know what they offer you?

 9  A.  Right.

10  Q.  So you wouldn't know, for example, they have another

11  facility that you want to work at if they don't present it to

12  you, correct?

13  A.  Yes.

14  Q.  You only know what Steadfast offers?

15  A.  Right.

16  Q.  Okay.  So Ms. Rust asked you about an instance one time

17  where a facility called you for a shift?

18  A.  They didn't exactly call me.  I was there already, and

19  they asked me can I stay, or they say can you come tomorrow.

20  Now, would you be available tomorrow or something like that.

21  Q.  Did you notify Steadfast?

22  A.  Yeah.

23  Q.  And why did you notify Steadfast?

24  A.  You say why do I call them?

25  Q.  Why did you notify Steadfast if the facility asked you to

1    come the next day?

2    A.  Well, a lot of times -- well, the time that they asked me

3    I didn't do it anyway so...

4    Q.  Right.

5    A.  I didn't -- I didn't pick up because most likely I

6    believe I was already scheduled somewhere else --

7    Q.  Okay.

8    A.  -- when they had asked me.

9    Q.  Okay.  Along with working at the facilities and going to

10   the time sheets, Ms. Rust asked you whether it was -- the

11   time sheet requires the signature of the facility, and you

12   said yes.  Who do you have to send that time sheet to?

13   A.  E-mail it to Steadfast.

14   Q.  Okay.  And once you e-mail to Steadfast, were you paid

15   for those hours that you worked by Steadfast?

16   A.  Yes.

17   Q.  Did you -- were you paid by the facilities?

18   A.  No.

19   Q.  Did you submit them to the facility, the time sheets?

20   A.  No.

21   Q.  And just -- who set the rate of pay for you, the rate

22   that you received?

23   A.  Steadfast.

24           MR. SEIFELDEIN:  No further questions.

25           THE COURT:  May the witness be permanently excused?

```
 1              MR. SEIFELDEIN:  The witness may.

 2              THE COURT:  You may step down.

 3              (Witness excused.)

 4              THE COURT:  Okay.  What we are going to do, is we

 5    can get the witness, we will be taking a break at 4:00, give

 6    us an opportunity to try to recall her and straighten things

 7    out at that time.  So call another in-person witness if you

 8    have one.

 9              MS. LEWIS:  Ms. Roxanne Adams.

10              (Witness was sworn.)

11              ROXANNE ADAMS, called by the Plaintiff, having been

12    first duly sworn, was examined and testified as follows:

13                         DIRECT EXAMINATION

14    BY MS. LEWIS:

15    Q.  Good afternoon, Ms. Adams.

16    A.  Good afternoon.

17    Q.  Are you familiar with Steadfast Medical -- I'm sorry,

18    before we get there, can you please state your name, spelling

19    your last name for the record.

20    A.  Roxanne Adams.  My last name is spelled A-d-a-m-s.

21    Q.  Are you familiar with Steadfast Medical?

22    A.  Yes, ma'am.

23    Q.  And how are you familiar?

24    A.  I used to be employed by Steadfast Medical Staffing.

25    Q.  Okay.  When were you -- when was that?
```

1    A.   I can't recall the exact date.  I was employed when she

2    first opened up and then again the second time, I want to say

3    an approximate date probably again in 2016.

4    Q.   Okay.  You said the first time she opened up.  Was

5    Steadfast a different kind of business when you first worked

6    for her?

7    A.   No, ma'am, it was the same.

8    Q.   Okay.  What was your job title?

9    A.   First time it was licensed practical nurse; the second

10   time around was registered nurse.

11   Q.   Okay.  Did you have a supervisor when you worked at

12   Steadfast?

13   A.   Yes, ma'am.

14   Q.   And who was your supervisor?

15   A.   The scheduler and Lisa.

16   Q.   How were you supervised?

17   A.   Could you repeat that question again?

18   Q.   Sure.  You said you had two supervisors, Lisa and the

19   scheduler.  How did they supervise you?

20   A.   As in, say, in the -- what was available to work, when

21   should we work, sending us e-mails on what should we be doing

22   while we are out in the field working, just basically giving

23   us like queues of what should we be doing while we are out in

24   the field, what shouldn't we be doing while we are out in the

25   field, to watch a call-out, to, you know, try to do your best

Adams, R. - Direct                                              138

```
 1   you can do while you're out in the field.
 2   Q.  Okay.  How much were you paid per hour when you worked at
 3   Steadfast?
 4   A.  The second time around, $40 an hour.
 5   Q.  And who set that rate?
 6   A.  Steadfast.
 7   Q.  Did you ever receive time and a half, overtime for the
 8   hours you worked?
 9   A.  No, ma'am.
10   Q.  Were you able to change the rate of pay with the facility
11   that Steadfast placed you at directly?
12   A.  No, ma'am.
13   Q.  Other than the hourly pay rate, did you receive any
14   profits beside the hourly rate that was predetermined by
15   Steadfast?
16   A.  Repeat that again.
17   Q.  Other than the rate that Steadfast set, did you receive
18   any other money from Steadfast?  Did you receive any profits
19   from the business that --
20   A.  No profits from the business, but, um, I did do some home
21   health, and it was almost like a different rate.
22   Q.  Okay.  So who paid you for the care that you provided,
23   Steadfast or the facilities?
24   A.  Steadfast.
25   Q.  Were you required to complete time sheets?
```

Adams, R. - Direct                                                        139

```
 1    A.   Yes, ma'am.
 2    Q.   Who did you submit the time sheets to?
 3    A.   I submitted the time sheets into a e-mail address.
 4    Q.   And how often were you required to submit the time
 5    sheets?
 6    A.   Weekly.
 7    Q.   And how many hours did you normally work a week?
 8    A.   My amount of hours is I worked -- I mostly traveled the
 9    second half of my employment with Steadfast, so I usually
10    probably worked about 112 hours every week, but I only worked
11    two weeks on and two weeks off.
12    Q.   Okay.  I just want to make sure.  You said 112 hours a
13    week?
14    A.   Yes, ma'am.  I used to work 16 hours per day seven days a
15    week for two weeks straight.
16    Q.   Okay.  And so you regularly worked 40 hours a week during
17    the time you worked at Steadfast; is that right?
18    A.   Repeat that.
19    Q.   So you worked more than 40 hours during the time that you
20    worked there?
21    A.   Yes, ma'am, I did.
22    Q.   Are you familiar with next-day pay?
23    A.   Yes, ma'am, I am.
24    Q.   What is that?
25    A.   It is something that Steadfast offered for you to get
```

1    next-day pay, but I never -- just to get, I never did it.

2    Q.  So you said they offer it.  How would you go about, if

3    you did use it, how would you go about taking advantage of

4    it?

5    A.  You would let them know that you wanted next-day pay.

6    You submit your time sheet, and this is just from other

7    employees.  I never did it.  You never got next-day pay.  It

8    was always the next -- the day after, and it was a percentage

9    of the pay.

10   Q.  Okay.  So what was that fee amount that they would charge

11   for doing it?

12   A.  6 percent of the pay.

13   Q.  What was your regular payday since you didn't do next-day

14   pay?

15   A.  Every Friday.

16   Q.  Did you have issues with your paycheck?

17   A.  No, ma'am.

18   Q.  Were your paychecks on time?

19   A.  Not all the time.

20   Q.  So is that a problem with your paycheck?

21   A.  It's a problem if you complain about it.

22   Q.  Okay.  Fair enough.  Were you given the option to be

23   classified as an independent contractor or an employee?

24   A.  No, ma'am.

25   Q.  When you worked at Steadfast, did you own your own

1    business?

2    A.   No, ma'am.

3    Q.   Advertise the healthcare that you provided in any

4    independent way?

5    A.   No, ma'am.

6    Q.   Were you required to maintain your own malpractice or

7    liability insurance?

8    A.   No, ma'am.

9    Q.   Were you required to maintain your own workers'

10   compensation insurance?

11   A.   No, ma'am.

12   Q.   Were you allowed to employ or have other individuals

13   assist you in the performance of your services for which

14   Steadfast paid you to complete?

15   A.   No, ma'am.

16   Q.   Were you allowed to assign your shifts to other RNs

17   without Steadfast's approval?

18   A.   No, ma'am.

19   Q.   Where do you presently work?

20   A.   Essential Medical Staffing.

21   Q.   Okay.  And how long have you been in that position?

22   A.   A year.

23   Q.   Okay.  And did you -- was that your position -- let me

24   ask this:  When did you stop working at Steadfast?

25   A.   March of 2020.

Adams, R. - Direct                                                        142

```
 1   Q.  And then when did you start working at Essential?
 2   A.  April of 2020.
 3   Q.  And what is your job title there at Essential?
 4   A.  Basically, I'm the finance manager.
 5   Q.  Okay.  What kind of services do they provide?
 6   A.  It's a medical staffing agency, so we provide basically
 7   the same type of a service.  We provide them -- we send RNs,
 8   LPNs, CNAs, RNAs to different nursing homes, jails, long-term
 9   care facilities.
10   Q.  So the same thing Steadfast does?
11   A.  Yes, ma'am.
12   Q.  And what is your job duties and responsibilities there?
13   A.  I make sure that when our money is collected, make sure
14   the invoices are sent out, make sure that we are in
15   compliance with everything that needs to be in compliance
16   with in reference to the finances.
17   Q.  Do you have any involvement in scheduling the nurses?
18   A.  Yes, ma'am, sometimes.
19   Q.  What do you do in support of that effort?
20   A.  Because we are not a large company, so we all have to
21   help out with -- if -- when the facility sends us hours, we
22   put the hours out for the nurses or LPNs and RNs, CNAs to
23   pick up, and they will call us and say, well, hey, I may want
24   this shift or I may want that shift.  You call the facility,
25   you get that shift confirmed.  We let them know that their
```

Adams, R. - Direct                                              143

```
 1   shift is confirmed, and they go to work.
 2   Q.  Is that the same thing that you used to get work through
 3   Steadfast?
 4   A.  Sometimes, yes, ma'am.
 5   Q.  Does Essential pay overtime when the nurses work over 40
 6   hours in a workweek?
 7   A.  Yes, ma'am.
 8   Q.  Are the nurses at Essential required to hold and maintain
 9   licenses to be practicing in Virginia?
10   A.  Yes, ma'am.
11   Q.  And then based upon the type of license you hold, does
12   that dictate the type of care the nurse can provide?
13   A.  Yes, ma'am.
14   Q.  Are time sheets required for Essential nurses?
15   A.  Yes, ma'am.
16   Q.  Is that the same or different from Steadfast?
17   A.  The same.
18   Q.  Are time sheets created by Essential or the facilities?
19   A.  Essential.
20   Q.  And is that the same or different than Steadfast?
21   A.  It's the same.
22   Q.  Does Essential require the facility to sign the time
23   sheets?
24   A.  Yes, ma'am.
25   Q.  And is that the same or different from Steadfast?
```

1   A.  It's the same.

2   Q.  If there is an issue with an Essential nurse at a

3   facility, does the facility contact Essential?

4   A.  Yes, ma'am.

5   Q.  And is that the same or different from Steadfast?

6   A.  It's the same.

7   Q.  Does Essential set the rate of pay for nurses that are

8   offered shifts?

9   A.  Yes, ma'am.

10   Q.  And is that the same or different from Steadfast?

11   A.  It's the same.

12   Q.  Does Essential provide an opportunity for nurses to

13   negotiate the rate of pay before taking an assignment?

14   A.  Yes, ma'am.

15   Q.  Is that the same or different from Steadfast?

16   A.  That's different.

17   Q.  How so?

18   A.  You --

19   Q.  And how is it different from Steadfast?

20   A.  You didn't negotiate your pay.  Your rate was $40, and

21   that's what you got, $40.  If your rate was 30, that's what

22   you got, $30.

23   Q.  Has Essential been subject to an audit or investigation

24   regarding its compliance with the act, the Fair Labor

25   Standards Act?

Adams, R. - Direct                                                          145

```
 1    A.  Yes, ma'am.

 2    Q.  When was that?

 3    A.  The approximate -- it's an approximate, around August of

 4    last year.

 5    Q.  And what happened?

 6    A.  We were misclassifying our employees, and we were -- we

 7    kind of based our company off of thinking that they were

 8    independent contractors, and what we found out was during the

 9    compliance, that it really is a fine line between being an

10    independent contractor and not being an independent

11    contractor.  So what happened with us was we complied.  They

12    gave us -- they told us what we needed to do.  We needed to

13    pay back -- back wages for overtime.  We paid all our back

14    wages, and then from there forward, that day on, we had to

15    pay overtime for all hours made after 40 hours.

16    Q.  Have any of Ms. Pitts' attorneys contacted you?

17    A.  Yes, ma'am.

18    Q.  How many?

19    A.  Three.

20    Q.  How have they contacted you?

21    A.  Telephone.

22    Q.  Have you received correspondence through any other means

23    from them?

24    A.  Yes, ma'am.  I received two subpoenas with two -- two

25    hundred dollar checks, and that's it.
```

Adams, R. - Direct                                                      146

```
1   Q.  Okay.  You indicated --
2   A.  I'm sorry.  E-mail.  Excuse me.
3   Q.  You've mentioned that they contacted you by phone.
4   Approximately how many times did they contacted you by phone?
5   A.  I can't go back to the -- well, in the beginning it was a
6   lot more than in recent.  In the beginning they were
7   contacting me more frequent than in recent -- than now.  So
8   it was like probably when the case first started.
9   Q.  Okay.  And what was the nature of the conversation?
10  A.  As I can recall, the nature of the conversation was just
11  talking about what the answers -- asking me questions, just
12  almost similar questions to what you're asking me, and me --
13  me giving answers, but I was never really told exactly why.
14  So I just went along with it.  I was still employed by
15  Essential -- I mean, by Steadfast Medical Staffing.
16  Q.  So to clarify, when they were contacting you at the
17  beginning, you were still working for Steadfast at that
18  point --
19  A.  Yes, ma'am.
20  Q.  -- is that correct?
21  A.  Yes, ma'am.
22  Q.  And did they ever tell you what this matter was about?
23  A.  No, ma'am.
24  Q.  Were you ever provided any documents explaining what the
25  case was about?
```

```
1   A.  No, ma'am.
2           MS. LEWIS:  Your Honor, the Court's brief
3   indulgence.  I need to grab something.
4   BY MS. LEWIS:
5   Q.  I'm going to show you a document and let me know if this
6   refreshes your recollection.  Do you recognize this document?
7   A.  No, ma'am.
8   Q.  Did they ever provide you this document?
9   A.  No, ma'am.  Only document I was provided was the answers
10  to my questions.
11  Q.  So that was the initial contact, you said about four
12  years ago, so it was about 2019.  So in 2020 and '21, they
13  never gave you that notice; is that correct?
14  A.  No, ma'am.  That is correct, yes, ma'am.  I never got
15  this document.
16  Q.  So you weren't aware what this case was about?
17  A.  In the beginning, I was not aware.  But after everybody
18  started talking about it, I was made aware by other
19  employees, never by the attorney or the owner.
20  Q.  Did Steadfast attorneys provide you with a statement to
21  sign?
22  A.  Yes, ma'am.
23  Q.  Do you know who prepared that statement?
24  A.  They asked me questions.  As for me knowing who typed
25  them up, no, ma'am, I do not.
```

1    Q.  Do you know, who did you speak to who asked you questions

2    then?

3    A.  Yes, ma'am.

4    Q.  What is that individual's name?

5    A.  Christopher.

6    Q.  Okay.  And did he ask you to sign the statement?

7    A.  Yes, ma'am.

8    Q.  I direct your attention to what's going to come up as

9    Plaintiff's 5-53/54.  Do you recognize this document?

10   A.  Yes, ma'am.

11   Q.  What is it?

12   A.  It was the questions that I was asked during our

13   conversation on the phone.

14   Q.  If you could scroll to the bottom, please.  Is that your

15   signature at the bottom of the document?

16   A.  Yes, ma'am, it is.

17   Q.  Is that statement an accurate reflection of the

18   statements you provided to the Steadfast attorneys?

19   A.  Not all of them.

20   Q.  Okay.  I want to direct your attention to Paragraph 4.

21   And if you'd just take a moment to review it.  And you just

22   look up at me when you're done.

23         Is there anything misleading or inaccurate in that

24   paragraph?

25   A.  Yes, ma'am.

1   Q.  What is it?

2   A.  Steadfast didn't hire me.  That's not how it works.

3   Q.  You can go on.  I'm sorry to interrupt.

4   A.  "I'm just on the registry, and I work when I want to.

5   They can't fire me either."

6   Q.  Those statements are inaccurate?

7   A.  They are inaccurate, yes, ma'am.

8   Q.  What's the reality?

9   A.  The reality was I was actually hired by Steadfast, and if

10  I did something wrong, you can get fired.

11  Q.  What about the assignment part?  Is there anything

12  inaccurate or misleading about that?

13  A.  Well, they tell you a lot of assignments.  You can pick

14  them up if you want to, but you most likely were persuaded to

15  pick up assignments that you didn't want because sometimes

16  they will tell you that's all that I have.  So if you wanted

17  to work, you worked overtime.

18  Q.  Directing your attention now to Paragraph 5.  If you

19  would take a moment to review that paragraph and look up at

20  me when you're done.

21       Is there anything misleading or inaccurate in that

22  paragraph?

23  A.  Yes, ma'am.

24  Q.  What is it?

25  A.  Misleading, um, "I don't have to get permission to take

Adams, R. - Direct                                          150

```
 1    time off."  You do have to let them know that you're taking
 2    time off and ask for time off.  You're not allowed to call
 3    the facility.  You had to call Steadfast, if you're running
 4    late or if you wanted to call off, you had to call Steadfast.
 5    Q.  Well, what would happen if you called the facility?
 6    A.  You'd get in trouble.  You'd get an e-mail, so forth,
 7    saying, "Don't call the facilities.  Call us.  Let us know
 8    that you're calling off or that you're canceling the shift."
 9    Q.  Directing your attention to Paragraph 8.  If you'd take a
10    moment to review that and look up at me when you're done.
11          Is there anything misleading or inaccurate in this
12    paragraph?
13    A.  Yes, ma'am.
14    Q.  And what is it?
15    A.  "They never tell us how to do my job.  Sometimes when you
16    work a shift a new facility -- at a new facility, the
17    facility will have Steadfast relay some of the facility's
18    policies or instructions to us.  But Steadfast doesn't
19    supervise me, only the facility supervises what I do."
20          The facility never supervises us.  If anything goes
21    on in the facility, they call Steadfast, and Steadfast let us
22    know that we have done something wrong, may it be that we
23    have been DNR'd, or whatever, but we never get anything like
24    that from the facility itself.
25    Q.  Directing your attention to Paragraph 10, if you could
```

Adams, R. - Direct                                         151

```
 1    take a moment to review that and look up at me when you're
 2    done.
 3            Is there anything misleading or inaccurate in this
 4    paragraph?
 5    A.  Only the part that says, "Steadfast only pays me what the
 6    facility approves."  I have no idea what the facility
 7    approves.
 8    Q.  And last one, Paragraph 12.  If you take a moment, it's a
 9    little bit longer, and look up at me when you're done.
10            Is there anything misleading or inaccurate in that
11    paragraph?
12    A.  Yes, ma'am.  You can try to negotiate, but you never
13    get -- you never negotiate your rate.
14    Q.  And why is that?
15    A.  Well, she's really stern about what she's going to pay
16    you, and that's what it's going to be.  But you can try to
17    negotiate.
18    Q.  So that's your signature at the bottom of this page?
19    A.  Yes, ma'am, it is.
20    Q.  Why did you sign this statement if it was inaccurate?
21    A.  At the time I signed the statement because I was still
22    employed by Steadfast.  I believed in my company that I was
23    working for.  I believed that I was never being wronged by
24    the company.  I was afraid of losing my job.  I needed my
25    job.  I was afraid of being retaliated against, because in
```

Adams, R. - Direct                                         152

```
 1    that scenario you do, you would be -- you -- she would take
 2    your hours.  She would take your hours from you.  You won't
 3    be getting paid.  If I don't work, I don't get paid, so my
 4    bills don't get paid, so I signed it.
 5    Q.  So you were scared of not -- of losing your job?
 6    A.  Yes, of being retaliated against.
 7    Q.  Have you heard of any other employees being retaliated
 8    against for not signing statements?
 9    A.  I've heard other employees --
10          MS. RUST:  Objection.
11          THE COURT:  Sustained.  Calls for hearsay.
12    BY MS. LEWIS:
13    Q.  How did you feel when you were contacted by her attorneys
14    no less than four times?
15    A.  I don't understand the question.
16    Q.  Sure.  You indicated that Steadfast, defendant's
17    attorneys contacted you a number of times.
18    A.  Uh-huh.
19    Q.  How did that make you feel when they continued to contact
20    you?
21    A.  Well, when it continued, and it was so many different
22    ones, you feel a little pressure.
23    Q.  So after you signed this statement, did you prepare any
24    other statements?
25    A.  There was another statement after this statement.
```

1   Q.   How many others?

2   A.   One other one after this statement that one of her other

3   attorneys collected, and I signed.

4   Q.   Was that statement different than this statement?

5   A.   It was a lot different, yes, ma'am.

6   Q.   What was different about it?

7   A.   It's just a little -- the terminologies that I used was a

8   little different.  It was a little bit more accurate.

9   Q.   Okay.  Well, you pointed out a number of things in

10  inquiries that most of these paragraphs that were different.

11  So was it the terminology or was it your experiences that

12  were reflected differently?

13  A.   It was more truthful.

14  Q.   And so why did the statement change?

15  A.   Because it wasn't accurate.  It wasn't the truth.  I

16  mean, I felt that I had to tell the truth, and then with a

17  lot of -- how could I put this?  Some of her attorneys were a

18  little bit more nicer than the others.  They weren't as pushy

19  and as demanding as saying this is what, you know, we want

20  you to say.  So that second statement, which I don't know

21  where it is, it was a little more truthful.

22  Q.   Were you still working at Steadfast at the time that you

23  prepared the second statement?

24  A.   Yes, ma'am, I was.

25  Q.   How long was it between you left Steadfast and you

1    started at Essential that you submitted that statement?  Was

2    there a long period of time between when you were leaving and

3    going to your next job?  In other words, did you have

4    immediate future prospects of other employment?

5    A.  No, ma'am.  No, ma'am.

6    Q.  Okay.  Have you had any discussions with Lisa about this

7    matter?

8    A.  Only one.

9    Q.  Okay.  What was discussed?

10   A.  The only thing that she ever mentioned to me about this

11   case was, "I'm not supposed to be telling you this.  Thank

12   you.  You're the reason why the case was pushed back because

13   one of the judges was partial to you."  That was it.

14   Q.  Have you received any back wages from Steadfast Medical

15   for the hours you worked over 40?

16   A.  Excuse me?

17   Q.  Have you received any back wages or compensation?

18   A.  No, ma'am.

19            MS. LEWIS:  I have no further questions of this

20   witness.

21            THE COURT:  Cross.  I think they are trying to get

22   your attention before you sit down.

23            MS. LEWIS:  I'm sorry.  Excuse me.  May I?

24            THE COURT:  You may.  Cross-examination.

25                         CROSS-EXAMINATION

Adams, R. - Cross                                               155

```
 1   BY MS. RUST:
 2   Q.  Hi, Ms. Adams.
 3   A.  Hello.
 4   Q.  All right.  So you are an owner at Essential Medical
 5   Staffing; is that right?
 6   A.  No, ma'am.
 7   Q.  Just the finance manager?
 8   A.  Yes, ma'am.
 9   Q.  No ownership?
10   A.  No, ma'am.
11   Q.  Okay.  At Essential Medical Staffing, when you first --
12   let me ask you this:  I think you said Essential Medical
13   Staffing you've been with them since April 2020; is that
14   right?
15   A.  Correct.
16   Q.  And is that when the company first started?
17   A.  No, ma'am.
18   Q.  When did it first start?
19   A.  It first started February 3rd, 2020.
20   Q.  Okay.  So two months after it opened is when you started?
21   A.  Correct.
22   Q.  Okay.  When you first joined Essential Medical Staffing
23   you said that they were originally classifying the nurses as
24   1099 contractors, right?
25   A.  Correct.
```

Adams, R. - Cross                                                      156

1    Q.  And is -- were you involved in the decision to classify

2    as contractors?

3    A.  Yes, ma'am.

4    Q.  Okay.  And is that based on your experience in the

5    industry?

6    A.  That's based off only my experience at Steadfast Medical

7    Staffing.

8    Q.  Okay.  And Essential Medical Staffing would not have

9    reclassifying its nurses to W-2s but for the FLSA

10   investigation or audit; is that true?

11            MS. LEWIS:  Objection.

12            THE WITNESS:  Would you please repeat that

13   question.

14            THE COURT:  No.  No.  No, no, no.  There is an

15   objection to that question.  Calls for speculation.

16   BY MS. RUST:

17   Q.  If you know the answer --

18            THE COURT:  It calls for her to speculate.  Still

19   speculation.  So objection still is sustained to that

20   approach to the question.

21            MS. RUST:  Okay.  May I try to rephrase one more

22   time?

23            THE COURT:  If you are asking her about what

24   Essential would have done if A, B, C had been done, then it

25   is still speculation.

```
 1              MS. RUST:  Okay.
 2   BY MS. RUST:
 3   Q.  Prior to the FLSA audit or investigation, prior to that
 4   are you aware whether Essential Medical Staffing intended or
 5   was planning to re-classify its nurses --
 6              MS. LEWIS:  Objection.
 7              MS. RUST:  -- at that time?
 8              MS. LEWIS:  Objection.  Calls for speculation, also
 9   lacks foundation because, remember, she started in April of
10   2020.
11              THE COURT:  All right.  Sustained.
12              MS. RUST:  She said she was involved in the
13   decision for classification, though.
14              THE COURT:  At what point, though?  So that's the
15   problem we are having here.  I think we need to leave this
16   alone, something else.
17              MS. RUST:  Of course.
18   BY MS. RUST:
19   Q.  So since -- when -- just for timeline purposes, tell me
20   when Essential Medical Staffing re-classified its nurses to
21   W-2 employees.
22   A.  We went through this process starting in August.
23   Q.  Of this year?
24   A.  Last year.
25   Q.  Last year?  And you said your -- well, I'll skip that.
```

Adams, R. - Cross                                          158

```
1    So Steadfast -- as the finance manager at Essential Medical
2    Staffing, would you view Steadfast Medical Staffing as a
3    competitor of Essential Medical Staffing?
4    A.  I would hope it wouldn't be competitors, but that's the
5    question, yes.
6    Q.  Okay.  Well, you're in the same industry; is that true?
7    A.  It's the same industry, and there are multiple other
8    agencies in the same industry as well.
9    Q.  Of course.
10   A.  So we are all competitors, yes, you can say.
11   Q.  Does Essential Medical Staffing have contracts with
12   facilities that, to your knowledge, Steadfast also has
13   contracts with?
14   A.  I have no idea who Steadfast has contracts with.
15   Q.  Okay.  When you were working on Steadfast registry, you
16   said that, during your direct exam, you mentioned that your
17   supervisors were the schedulers and Lisa, right?
18   A.  Correct.
19   Q.  And the extent of that supervision was talking about your
20   availability to work and to do your best in the field; is
21   that right?
22            MS. LEWIS:  Objection, Your Honor, misstates and
23   mischaracterizes her testimony.  She listed at least six
24   things.
25            THE COURT:  Can you rephrase it to include
```

1   everything.

2   BY MS. RUST:

3   Q.  When you described the supervision at Steadfast, were you

4   supervised in other ways beyond discussing your availability

5   to work and doing your best in the field?

6   A.  Yes, ma'am.

7   Q.  Okay.  And did it relate to submitting time sheets in a

8   timely manner?

9   A.  Yes, ma'am.

10  Q.  Okay.  And did it relate to just being generally

11  professional in the field?

12  A.  Yes, ma'am.

13  Q.  Okay.  When you were on site at a facility, was Lisa

14  Pitts ever on site with you?

15  A.  She's come on site before when we were on site, yes,

16  ma'am.

17  Q.  When you were working a shift through Steadfast, you've

18  seen Lisa Pitts on site at a facility?

19  A.  Yes, ma'am.

20  Q.  Since 2017, is that when you said you started at

21  Steadfast?

22  A.  No, ma'am.  I couldn't recall the exact date I started.

23  I started two separate occasions.  I started there when she

24  first opened, and then again I started the second time

25  around -- it was around 2016.

Adams, R. - Cross                                         160

1  Q.  Right.  Thank you for the clarification.  So since the
2  second time around, have you observed Lisa Pitts on site at
3  the facilities while you were taking a shift?
4  A.  Yes, ma'am.
5  Q.  Was she working there?
6  A.  No, ma'am.
7  Q.  Was she there for a medical reason?
8  A.  No, ma'am.
9  Q.  Was she there to supervise you?
10 A.  She came into the facility so we can have a meeting on
11 the facility property in reference to us making sure we turn
12 our time sheets in, making sure we are clocking in and out on
13 time, yes, ma'am.
14 Q.  And did you schedule that meeting with Lisa?
15 A.  No, ma'am.
16 Q.  So when the meeting was scheduled between facility and
17 Lisa?
18 A.  I have no idea how that meeting was scheduled.  I was
19 only present at the meeting.
20 Q.  Okay.  So it was -- Lisa was visiting the facility to
21 discuss issues with the facility, to your knowledge?
22          MS. LEWIS:  Objection, Your Honor.  Misstates the
23 testimony.
24          THE COURT:  Sustained.  She said --
25          MS. RUST:  Fair enough.

JODY A. STEWART, Official Court Reporter

```
 1              THE COURT:  -- at the facility.
 2              MS. RUST:  That's fair.
 3     BY MS. RUST:
 4     Q.  Let me ask you this:  Has Lisa Pitts ever supervised you
 5     while you took someone's blood pressure?
 6     A.  No, ma'am.
 7     Q.  She ever supervise you while you were administering care
 8     to a patient at a facility?
 9     A.  Could you re --
10              THE COURT:  Well, don't ask her a question.  Just
11     don't.  If you don't understand the question, just say you
12     don't understand.
13              THE WITNESS:  I don't understand that question.
14     BY MS. RUST:
15     Q.  Okay.  Lisa Pitts has never supervised you while you were
16     providing nursing services at a facility; is that right?
17     A.  I don't understand the line of questioning.  It's
18     confusing.  I'm sorry.
19     Q.  I can move on.  You talked about your hours.  Tell me if
20     this is wrong, but you said you had traveled, and you liked
21     to set it up as two weeks on and two weeks off; is that
22     right?
23     A.  Yes, ma'am.
24     Q.  And was that because that schedule -- let me rephrase
25     that.  That scheduling was your preference; is that right?
```

JODY A. STEWART, Official Court Reporter

1   A.  That scheduling, I'm going to say -- I mean, I traveled

2   because I thought that was all that was -- they had, because

3   I was told that, you know, this is what we have.  But there

4   were facilities closer to my home, but I just did not get

5   placed in those facilities as often as I would if I traveled.

6   Q.  Okay.  So there were more opportunities available at

7   facilities that were a further distance, is that right, to

8   your knowledge, what you were made aware of that was

9   available?

10  A.  To my knowledge.

11  Q.  Okay.  And you chose to take enough shifts that you would

12  work significant hours, you said over a hundred hours a week

13  sometimes, right?

14  A.  Correct.

15  Q.  Okay.  And so if you wanted to -- if you chose facilities

16  closer to home, is it true that it might be difficult for you

17  to get the quantity of hours you wanted?

18  A.  I was not given the choice to choose the facilities that

19  was closer to my home.

20  Q.  Because you wanted more hours, right?

21  A.  Incorrect.

22  Q.  Okay.  So you still picked --

23  A.  It was because I was one of the ones that would travel.

24  Q.  Okay.  So you agreed to travel for shifts so that you

25  could get the number of hours that you wanted and the

```
 1   schedule, two weeks on/two weeks off-type schedule; is that
 2   right?
 3   A.  I'm not understanding the way you're wording the
 4   question.
 5   Q.  That's okay.  You worked on other registries before?
 6   A.  Yes, ma'am.
 7   Q.  Did you work on them the same time that you were working
 8   at Steadfast registry?
 9   A.  Yes, ma'am.
10        MS. LEWIS:  Objection, Your Honor.  Outside the
11   scope of direct.
12        THE COURT:  Sustained.  Another thing.  The Court's
13   been listening at it for some time now, and the fact that
14   something different happened at another registry is not all
15   that relevant to this Court's fact finding.  It's what
16   happened at Steadfast, whether it complied with the Fair
17   Labor Standards Act, no matter what they were doing at the
18   other registry.  So for the future, just be aware of that.
19        MS. RUST:  Understood.  Thank you, Your Honor.
20   BY MS. RUST:
21   Q.  Okay.  So you talked a little bit about what -- you
22   talked quite a bit about this declaration that you signed in
23   May of -- or, excuse me, April of 2019, the one that
24   Ms. Lewis showed you?
25   A.  Yes, ma'am.
```

Adams, R. - Cross                                                    164

1   Q.  You said in your testimony that before you signed that
2   statement in April, you had not received that notice from the
3   Court, which was the first document she sent you; is that
4   right?
5   A.  Correct.  I had not received that, and I still haven't to
6   this day received that form I just saw.
7   Q.  And is that because the notice from the Court was dated
8   in May of 2019, after you signed the declaration?  Is that
9   why you did not receive it before you signed the declaration?
10  A.  I have no idea why I did not receive it.
11  Q.  Okay.  So you had an opportunity to read through the
12  statement before you signed it; is that right?
13  A.  Did I read through the statement before I signed it?
14  Q.  Yes.
15  A.  No, ma'am, I did not.
16  Q.  You did not read the statement?
17  A.  No, ma'am, I did not.  That is the honest answer.  I did
18  not.
19  Q.  Okay.  But you signed it.  That was your signature,
20  right?
21  A.  Correct.
22  Q.  Okay.  So you received a copy of that statement, right,
23  and then you elected not to read it, and you signed it; is
24  that correct?
25  A.  No, ma'am.  The lawyer called on the phone.  We went over

 1    the questions.  They typed it up.  He sent it to me.  I did

 2    not sign it for the first couple of days.  They kept calling

 3    me telling me I needed to sign it, I needed to turn it in.

 4    I'm still employed by Steadfast Medical Staffing.  I was

 5    afraid of my job, so I signed it.  I didn't read it at that

 6    particular time.  Later on, I did read it.  After I read it,

 7    another attorney called me, and I changed some of my answers.

 8    That's the way it went.

 9            THE COURT:  I don't know how many questions you

10    have, Ms. Rust, but we will take a 15-minute break, and you

11    can come back and finish up with this witness.

12            (Recess from 3:59 p.m. to 4:17 p.m.)

13            THE COURT:  You may continue.

14            MS. RUST:  Thank you, Your Honor.  I just have a

15    few more brief questions.

16    BY MS. RUST:

17    Q.  Ms. Adams, just continuing on with some questions

18    regarding the declaration that you signed, the one that was

19    dated April 19th, 2019.  You said on your direct that you

20    spoke with several attorneys, several Steadfast attorneys; is

21    that right?

22    A.  Correct.

23    Q.  Do you recall whether any of those attorneys were female?

24    A.  I can't -- only one that I can tell you the name of that

25    I spoke with a lot more than the others is Christopher, I

1    think his last name.  I'm not sure -- I don't even want to

2    say it.

3    Q.  That's okay.  You don't have to answer if you don't

4    remember.  You spoke with several different attorneys from

5    our team; is that right?

6    A.  Correct.

7    Q.  And one of them may have been female?  You don't

8    remember?

9    A.  I can't recall.

10   Q.  Okay.  And do you recall, when you received this

11   statement before you signed it, do you recall one of the

12   attorneys going over this statement with you on the phone?

13   A.  No, ma'am, I can't recall that verbatim we went over each

14   individual line and tell what it says, no, ma'am.

15   Q.  So you don't recall an attorney reading paragraph by

16   paragraph with you asking for your approval in each

17   paragraph?

18   A.  No, ma'am.

19           MS. RUST:  Okay.  I have no further questions.

20           THE COURT:  May the witness be permanently excused?

21           MS. LEWIS:  Brief redirect, Your Honor.

22           THE COURT:  Oh, okay.  Brief.

23           MS. LEWIS:  Brief.

24                      REDIRECT EXAMINATION

25   BY MS. LEWIS:

Adams, R. - Redirect                                                    167

1    Q.  I just want to be clear.  The testimony that you provided
2    earlier about your experiences, and we were going -- talking
3    about working at Steadfast and even the statement, that was
4    related to your experience from 2016 onward, correct?
5    A.  Repeat the question again.
6    Q.  Sure.  Your testimony, which you told the Court about
7    your experience working at Steadfast, was that from 2016
8    until you left in approximately 2020?  Was it about that?
9    A.  Correct.  The latter experience, correct.
10   Q.  Going back to the statement, as a general matter, that
11   was around your statement that was made under duress; is that
12   correct?  Is that how you would describe it?
13            MS. RUST:  Objection, mischaracterization.
14            THE COURT:  Sustained.
15   BY MS. LEWIS:
16   Q.  Do you regret making that statement?
17            MS. RUST:  Objection, leading.
18            THE COURT:  No, overruled.
19            THE WITNESS:  Yes, ma'am, I do regret making the
20   first statements within the declaration, yes, ma'am.  I
21   regretted it, and that's why it was changed.
22   BY MS. LEWIS:
23   Q.  And so that statement is, as written and signed, it's
24   wrong, it's inaccurate, correct?
25   A.  Correct.

Adams, R. - Redirect                                                168

```
 1   Q.  And you're telling the truth now regarding your
 2   experiences as an employee at Steadfast; is that right?
 3           THE COURT:  You're leading your witness.  Same
 4   question.  Just phrase it differently.
 5   BY MS. LEWIS:
 6   Q.  Okay.  Are you telling the truth now with respect to the
 7   testimony you provided to this Court today?
 8   A.  Yes, ma'am.
 9   Q.  And you're telling the truth -- are you telling the truth
10   because you had a real fear of retaliation?
11           MS. RUST:  Objection, leading.
12           THE COURT:  Sustained.
13   BY MS. LEWIS:
14   Q.  Did you have a fear of retaliation at the time that you
15   made that statement?
16   A.  Yes, ma'am.
17   Q.  And was that fear real?
18   A.  Yes, ma'am.
19           MS. LEWIS:  Your Honor, if I could go back to the
20   statement, I'd like to move to admit Plaintiff's 53 --
21   plaintiff's slide 53 and 54 into the record.
22           THE COURT:  Well.
23           MS. LEWIS:  I didn't move to admit it previously.
24           THE COURT:  Oh, her statement?
25           MS. LEWIS:  Yes, just her statement, the exhibit.
```

Adams, R. - Redirect                                               169

 1              THE COURT:  Not the statement declaration?

 2              MS. LEWIS:  This statement declaration, which is

 3     PX5-53 and 54, which we reviewed as she testified to.

 4              THE COURT:  Yeah, but what's the reason for

 5     admitting it because -- what was the reasons it was

 6     presented to her in the first place?

 7              MS. LEWIS:  I'm sorry.  I didn't hear.

 8              THE COURT:  For what purpose was it submitted to

 9     her in the first place?  It wasn't to refresh recollection?

10     What purpose did you show it to her in the first place?

11              MS. LEWIS:  For her to -- it was to refresh her

12     recollection and to testify regarding her experiences within

13     the statement.

14              THE COURT:  Then the statement doesn't come in.  It

15     was for refreshing recollection, even though both of you all

16     got all into it, it doesn't come in.

17              MS. LEWIS:  May I try to move it in through a

18     different means?

19              THE COURT:  What's the other evidentiary basis for

20     bringing it in?

21              MS. LEWIS:  Business record as an exception, Your

22     Honor, and it's also part of the record of the case.  This

23     was an exhibit, if you can direct your attention to the top

24     of this.

25              THE COURT:  I understand.  I'm not going to admit

1    it because the best -- I'll give you something else.  The

2    best evidence in here is her testimony on the stand, not

3    that statement.  So the statement is not coming in.

4            MS. LEWIS:  Thank you.  No further questions.

5            THE COURT:  Next witness.

6            May this witness be permanently excused?

7            MS. LEWIS:  Yes, she may.

8            THE COURT:  All right.  You may step down.

9            (Witness excused.)

10           MR. SEIFELDEIN:  Your Honor, the Department is

11   calling in Dawn Wooten as our next witness.

12           (Via videoconference.)

13           THE CLERK:  Ms. Wooten, can you hear me?

14           THE WITNESS:  Yes, ma'am.

15           THE COURT:  Okay.

16           (Witness was sworn.)

17           DAWN M. WOOTEN, called by the Plaintiff, having

18   been first duly sworn, was examined and testified as

19   follows:

20                       DIRECT EXAMINATION

21   BY MR. SEIFELDEIN:

22   Q.  Good afternoon, Ms. Wooten.

23   A.  Good afternoon.

24   Q.  Can you please state your full name for the record and

25   spell it.

1    A.  Dawn, D-a-w-n; Michelle, M-i-c-h-e-l-l-e; Wooten,

2    W-o-o-t-e-n.

3    Q.  Ms. Wooten, are you familiar with Steadfast Medical

4    Staffing?

5    A.  Yes.

6    Q.  What type of services does Steadfast provide?

7    A.  They do nursing, staff relief.

8    Q.  Were you employed by Steadfast?

9    A.  Yes.

10   Q.  What was your job title at Steadfast?

11   A.  LPN.

12   Q.  And when did you work for Steadfast?  Between what dates?

13   A.  From 2016 -- I think it was November of 2016 to June of

14   2019.

15   Q.  Okay.  What time did you apply to work for Steadfast?

16   A.  I went into the office and filled a piece of paper out.

17   Q.  Okay.  Ms. Wooten, I want to direct your attention to

18   Plaintiff's Exhibit 26, Pages 8 through 10.  If you'd just

19   look at that document.  Do you recognize it?

20   A.  Yes.

21   Q.  Is it the employment application you submitted to

22   Steadfast?

23   A.  Yes.

24   Q.  And what information did Steadfast ask you to put on the

25   job -- I mean, the employment application?

1    A.  My license number, my CPR, and my driver's license and

2    Social Security card.

3    Q.  Did it ask to provide your employment history?

4    A.  Yes.

5    Q.  Did it provide you -- did it ask you to provide

6    references?

7    A.  Yes.

8    Q.  Okay.  And were those references provided on Page 10?

9    A.  I couldn't hear.  Can you repeat that?

10   Q.  Are those the references you provided?

11   A.  Yes.

12        MR. SEIFELDEIN:  Your Honor, I'd like to admit

13   Plaintiff's Exhibit PX26, 8 through 10, Dawn Wooten's

14   employment application.

15        MS. RUST:  No objection.

16        THE COURT:  What pages were they again?

17        MR. SEIFELDEIN:  And that's Plaintiff's Exhibit 26,

18   Pages 8 through 10.

19        THE COURT:  I have a question for you.  You have a

20   number of probably applications in Exhibit 26, right?

21        MR. SEIFELDEIN:  Correct.

22        THE COURT:  But they are on different pages.

23        MR. SEIFELDEIN:  That is correct.

24        THE COURT:  Do you know how many more you have in

25   that same exhibit?

Wooten, D. - Direct                                          173

```
 1              MR. SEIFELDEIN:  I'm sorry?

 2              THE COURT:  Do you know how many more applications

 3    you have in that same exhibit?

 4              MR. SEIFELDEIN:  It was about five, Your Honor.

 5              THE COURT:  Because I think it will probably be

 6    more appropriate simply just admit Exhibit 26, and then you

 7    can go to any page in Exhibit 26 that you want instead of

 8    keeping putting into the record multiple Exhibit 26s.  We

 9    are going to put in one.  Exhibit 26 is admitted.  You can

10    go to any page you want to in Exhibit 26 without having to

11    move it in again.

12              MR. SEIFELDEIN:  Well taken, Your Honor.  We would

13    like to admit Plaintiff's Exhibit 26 in its entirety.

14              THE COURT:  We are already admitted it in here.

15              MR. SEIFELDEIN:  All right.

16              (Plaintiff's Exhibit 26 received in evidence.)

17              THE COURT:  Just go to the pages you want.

18              MR. SEIFELDEIN:  Thank you, Your Honor.  Very good.

19              THE COURT:  All right.

20    BY MR. SEIFELDEIN:

21    Q.  Ms. Wooten, were you required to provide any documents

22    when you applied?

23    A.  Yes.  My driver's license, Social Security card, nursing

24    license, CPR card.

25    Q.  When you filled out the application, were you required to
```

Wooten, D. - Direct                                                    174

```
 1    complete any forms or do you have to complete any sort of
 2    test or quizzes?
 3    A.  Yes.
 4    Q.  What sort of quizzes do you have to fill out and answer?
 5    A.  The HIPAA, the elderly abuse or like little test.
 6    Q.  And who asked you to fill out that quiz and those
 7    sections you just talked about?
 8    A.  Lisa.
 9    Q.  And were there consequences if you did not get it
10    correctly or did you not fill it out?
11            MS. RUST:  Objection.  Requires speculation and
12    foundation.
13            THE COURT:  Overruled.
14    BY MR. SEIFELDEIN:
15    Q.  You can answer.
16    A.  You have to pass them to be able to go onto an
17    assignment.
18    Q.  And was that a requirement by Steadfast?
19    A.  Yeah.
20    Q.  After you completed the application, did you meet with
21    anyone from Steadfast?
22    A.  Lisa.
23    Q.  Okay.  And did she interview and asking you questions?
24    A.  Yes.
25    Q.  Did she question you about your work experience?
```

1    A.  Yes.

2    Q.  Did they refer you for -- excuse me, did Ms. Pitts refer

3    you for drug screening or testing as part of your employment

4    requirement?

5    A.  Yes.

6    Q.  And after you had this interview with Ms. Lisa Pitts, who

7    hired you to work for Steadfast?

8    A.  Lisa.

9    Q.  And when you were hired, were you paid on an hourly

10   basis?

11   A.  Yes.

12   Q.  How much were you paid an hour, Ms. Wooten?

13   A.  I believe it was 38 an hour.

14   Q.  And who set that rate of pay for you?

15   A.  Lisa.

16   Q.  Ms. Wooten, did you ever work more than 40 hours in a

17   workweek?

18   A.  Yes.

19   Q.  And how often did you work more than 40 hours in a

20   workweek?

21   A.  Most of the time.

22   Q.  On average approximately how many hours did you work each

23   day?

24   A.  Well, it was different.  A lot of them -- a lot of times

25   it was 16 hours.

Wooten, D. - Direct                                                    176

```
 1   Q.  Was that a double shift that you worked when you got 16
 2   hours per day?
 3   A.  Yes.
 4   Q.  Throughout your employment period with Steadfast, how
 5   many hours did you work per week on average?
 6   A.  Um, anywhere like 70, 80 hours.
 7   Q.  And when you worked between 70 to 80 hours on average per
 8   week with Pitts, did you receive time and a half for the
 9   hours you worked?
10   A.  No.
11   Q.  Did you ever talk to Ms. Pitts about not receiving time
12   and a half when you worked over 40 hours in a workweek?
13   A.  I did.  And --
14   Q.  Okay.  Go ahead.  I'm sorry.
15   A.  I said I asked about it in the beginning.
16   Q.  And what did she say to you?
17   A.  She told me that it's straight pay and that the pay that
18   she was paying me was a good rate.
19   Q.  Were you required to maintain malpractice insurance by
20   Ms. Lisa Pitts?
21   A.  No.
22   Q.  Were you required to maintain your own workers'
23   compensation by Steadfast?
24   A.  No.
25   Q.  When you worked for Steadfast, did you own your own
```

1    healthcare business?

2    A.   No.

3    Q.   Did you advertise the healthcare business when you worked

4    for Steadfast?

5    A.   No.

6    Q.   Which facilities did you typically work at?

7    A.   I worked at Henrico Healthcare, I've worked at Culpeper

8    Health & Rehab.  I've worked at Avante in Harrisonburg,

9    Charlottesville Health & Rehab.

10   Q.   And when you worked for those facilities through

11   Steadfast, were you able to express the terms of your working

12   relationship with the facilities directly or did you have to

13   go through someone else?

14   A.   Everything went through Lisa.

15   Q.   Did there come a time where Lisa Pitts pulled you out of

16   one of those facilities that you've just mentioned?

17   A.   The one in Harrisonburg.

18   Q.   And is that because they tried to hire you?

19   A.   Yes.

20   Q.   Okay.  What was Lisa's response when you were told that

21   the facility was trying to hire you?

22   A.   She got mad, and she told me they would have to pay her a

23   finder's fee, and then the following week, I was out.

24   Q.   What do you mean you were out?

25   A.   She pulled me out.

1    Q.  Out of the facility?

2    A.  Yes, sir.

3    Q.  Did Lisa Pitts or Steadfast require you to complete time

4    sheets?

5    A.  Yes.

6    Q.  And were you required to submit those time sheets to

7    Steadfast Medical Staffing?

8    A.  Yes.

9    Q.  And how often were you required to provide these time

10   sheets?

11   A.  You do it after every shift or once a week.

12   Q.  Okay.  And who told you you were required to submit the

13   time sheets?

14   A.  Lisa.

15   Q.  Okay.  And did Lisa/Steadfast provide you the time

16   sheets?

17   A.  Yes.

18   Q.  Do you recall the time sheets had the name of Steadfast

19   Medical Staffing as the header on them?

20   A.  They do.

21   Q.  And if you could not submit your time sheets to

22   Steadfast, would you have issue receiving pay for the hours

23   you worked?

24   A.  Correct, you would not get paid.

25   Q.  If you were having issues with your time sheets or

1   payment, who would you contact?

2   A.   Lisa Pitts.

3   Q.   Would you contact the facility that you worked for?

4   A.   No.

5   Q.   Why would you contact Lisa instead of the facility?

6   A.   Because she was our boss, not the facility.

7   Q.   She was your supervisor?

8   A.   Yes.

9   Q.   Ms. Lisa Pitts?

10  A.   Yes.

11  Q.   Okay.  Have you ever turned down a shift offered by

12  Steadfast?

13  A.   Yes.

14  Q.   And what did Steadfast or Lisa do in response to you

15  turning down a shift?

16  A.   If she asked you to take a shift, and you didn't take it,

17  she would put you on what I call punishment by making you sit

18  out a couple of shifts till she needed you.

19  Q.   Did she ever call you when you turned down a shift,

20  Ms. Lisa Pitts?

21  A.   Yes.  Yes.

22  Q.   I'm sorry.  Go ahead.

23  A.   No, I just said yes.  I'm sorry.

24  Q.   And when she called you, what did she say?

25  A.   She would ask you to take it, and if you said no, she

1    would ask you why, and then ask you again to take it, and if

2    you still said no, then she would get upset.

3    Q.  And did she get upset with you?

4    A.  Yeah.

5    Q.  Were you required to provide a notice to Steadfast if you

6    didn't take work shifts?  I'm sorry, let me rephrase that.

7    Were you required to provide a notice to Steadfast if you

8    couldn't work?

9    A.  If -- like say you were calling out?

10   Q.  Yes.

11   A.  Yes.

12   Q.  Okay.  And how much notice did you have to provide to

13   Steadfast if you were calling out?

14   A.  Four hours.

15   Q.  What if you were not available to work, did you have to

16   provide a notice as well?

17   A.  If you were scheduled a shift, and you couldn't work it,

18   yes.

19   Q.  If you had a scheduling conflict, Ms. Wooten, did

20   Steadfast allow you to send another LPN in your place?

21   A.  No.

22   Q.  Were you allowed to call another LPN to work a shift for

23   you?

24   A.  No.

25   Q.  Were you allowed to assign your shift to another LPN

1   without Steadfast approval?

2   A.   No.

3   Q.   Did Steadfast send out memos about expectations of how

4   you should behave when you were sent to other facilities?

5   A.   Yes.

6   Q.   And what sort of memos did Steadfast send to you?

7   A.   To be there for your shift, to be on time to your shift,

8   to be off your phone, and to dress properly.

9   Q.   And which medium did she communicate these memos to you?

10  How did she send them to you?

11  A.   Through e-mail.

12  Q.   How did Steadfast determine your schedule?

13  A.   They would call and ask you to pick a shift up, and if

14  you agreed, then that was your day to work.  If not, then,

15  no.

16  Q.   How far in advance did Steadfast give you your schedule?

17       MS. RUST:  Objection.  Foundation, mischaracterizes

18  her prior testimony.

19       THE COURT:  Yes, sir.

20       MR. SEIFELDEIN:  I asked a question.  I didn't

21  restate the witness's testimony.  The question was how far

22  in advance did Steadfast give you your schedule?  I'm not

23  sure how that's a mischaracterization of the statement that

24  the witness said.

25       MS. RUST:  She just previously testified right

1    before that the scheduled shift she would call and see what

2    was available.

3            THE COURT:  That doesn't tell us how far ahead of

4    time that is.

5            MR. SEIFELDEIN:  I believe she said, Your Honor,

6    that Lisa or Steadfast called to ask if she wanted to work a

7    shift.

8            THE COURT:  All right.  Objection overruled.  Let's

9    move on.

10           MR. SEIFELDEIN:  Okay.  Thank you, Your Honor.

11   BY MR. SEIFELDEIN:

12   Q.  How far in advance did you get your schedule?

13   A.  Depending on the facility, if you were going there,

14   sometimes it was a daily thing, or it could be a week to

15   weeks at a time if you were going to one particular facility.

16   Q.  Okay.  Once you were provided -- once Lisa Pitts provided

17   you the schedule, would Steadfast follow up to confirm the

18   shift?

19   A.  No.

20   Q.  Would Steadfast send you text messages about your

21   upcoming shifts?

22   A.  No.  Once you were confirmed the original confirmation,

23   they didn't call back to confirm every day.

24   Q.  So once you received clarification what your schedule and

25   your shift, did you have any further contact with Steadfast

Wooten, D. - Direct                                              183

1   after you accepted the assignment?

2   A.  No, not unless there's a problem.

3   Q.  Okay.  So then once you got to the facility, would you

4   negotiate your rate of pay with the facility?

5   A.  No.

6   Q.  Who would do that?

7   A.  Lisa.

8   Q.  Ms. Pitts?

9   A.  Yes.

10  Q.  Did Steadfast allow you to -- after being paid at a

11  facility, were you interviewed by the facility?

12  A.  No.

13  Q.  Did Ms. Pitts allow you to communicate directly with the

14  facility to establish your schedule?

15  A.  Yes.

16  Q.  Okay.  And if she did that, what would you have to do?

17  A.  If you were going to be there for a long time, the

18  scheduler would come to you and make a schedule with you, and

19  then you would have to call and have it verified by Lisa to

20  be approved before you work it.

21  Q.  Okay.  So even on the occasions when you got familiar

22  with the facility, you would still have to call Lisa, and

23  they would have to approve it before you can work the

24  assignment?

25  A.  Yes.

Wooten, D. - Direct                                                184

Q.  And who -- did you receive any profits from Steadfast
other than your just regular pay?

A.  No.

Q.  And who paid you for the services that you provided on
behalf of Steadfast?

A.  Lisa Pitts.

Q.  If you did not receive a pay for the care that you
provided on behalf of Steadfast, would your ability to meet
your financial obligation be compromised?

A.  Yes.

Q.  Do you have ownership interest in Steadfast?

A.  No.

Q.  And when you worked for Steadfast, were you an officer or
manager or director of the company?

A.  No.

Q.  As an LPN, Ms. Wooten, what type of equipment do you
usually need to complete your job duties?

A.  Stethoscope and blood pressure cuff and an oximeter and
pins.

Q.  And when you received the assignment from Steadfast, did
you buy any equipment beyond the normal tools of the trade
that you just mentioned?

A.  No.

Q.  And are you required to hold a license to practice in
Virginia?

1   A.   Yes.

2   Q.   And is this license required regardless of what type of

3   facility that you went to in Virginia?

4   A.   Yes.

5   Q.   And as an LPN, what type of services do you provide?

6   A.   Patient care and medication administration.

7   Q.   Okay.  And the care that you provide, are those the type

8   of -- is that the type of care that you provide regardless of

9   which facility you were sent to?

10   A.   Yes.

11   Q.   And the same license still required of all LPNs?

12   A.   Yes.

13   Q.   And just for the record, what is an LPN?

14   A.   Licensed practical nurse.

15   Q.   To your knowledge, does Steadfast Medical Staffing

16   provide any other services other than the ones you described

17   earlier?

18   A.   No.

19   Q.   Did you complain to Ms. Pitts about not receiving the

20   overtime?

21   A.   Yes.

22   Q.   Okay.  Did you do it more than one time?

23   A.   Yes.

24   Q.   How often would you say that you complained about not

25   receiving overtime?

1    A.  It was multiple times because I was working a lot of

2    hours for her.

3    Q.  And you never received overtime for those hours?

4    A.  No.

5    Q.  And since leaving Steadfast, did you receive any back

6    wages for those overtime hours you worked?

7    A.  No.

8    Q.  Let me talk to you briefly about your compensation with

9    Steadfast.  Have you had any discussions with Steadfast about

10   this trial at any point?

11   A.  When it first started, their lawyer contacted me, and I

12   declined to speak with them.

13   Q.  Was there a point where you spoke with Ms. Pitts, and she

14   told you not to testify?

15   A.  When it first happened, she did say something to me about

16   it and accused me of the ones that brought it up, and I told

17   her it was not me.

18   Q.  What did she say to you about not testifying at the

19   trial?

20   A.  She asked me not to do it.

21   Q.  Did she tell you why she (sic) didn't testify at trial?

22   A.  She didn't.  No.

23   Q.  Okay.  She just told you not to do it?

24   A.  She asked me not to testify.

25   Q.  And provided no reason?

1    A.   But she accused --

2    Q.   Please, continue.

3    A.   She accused me of filing the thing against her, and it --

4    and that's how it all started.

5    Q.   What thing?

6    A.   The lawsuit.

7    Q.   Okay.  She accused you of filing this lawsuit?

8    A.   Correct.

9    Q.   And she told you not to testify?

10   A.   Correct.

11   Q.   Was this in March of 2019 that she asked you not to

12   testify at this trial?

13   A.   Yes.

14           MR. SEIFELDEIN:  Ms. Wooten, thank you for

15   testifying today.

16           No further questions, Your Honor.

17           THE COURT:  Cross.

18                        CROSS-EXAMINATION

19   BY MS. RUST:

20   Q.   Hi, Ms. Wooten.  My name is Julia Rust.  I'm an attorney

21   for Steadfast and Lisa Pitts.  I'm going to ask you a couple

22   of questions about your testimony.  How did you hear about

23   Steadfast before you applied for, submitted an application?

24   A.   A previous employer.

25   Q.   Was that another registry or was it a facility you worked

Wooten, D. - Cross                                                        188

```
 1  full-time with?
 2  A.  No.  Sorry.  A previous employee of hers.
 3  Q.  Oh, a previous employee of hers?
 4  A.  Yes.
 5  Q.  Was -- to clarify, is that another nurse in a facility?
 6  A.  Yes.  It was another nurse that I was working with on an
 7  assignment.
 8  Q.  Okay.  And at that time were you -- the facility you were
 9  at, were you working directly for that facility or were you
10  there through another agency or registry?
11  A.  I was there with another agency.
12  Q.  Okay.  Did you continue to work for that agency or any
13  other agency while you were on Steadfast's registry?
14  A.  Yes.
15  Q.  Okay.  And while you were working for multiple registries
16  at the same time, did you pick up shifts with all of them
17  regularly or did you --
18  A.  No.
19  Q.  Did you only schedule with one of them at a time?
20  A.  Only did one of them at a time.
21  Q.  Would you work -- go ahead.
22  A.  I did travel nursing, so when I was home on my breaks is
23  when I would work for Lisa, and then when I was home-home, I
24  fully worked for Lisa.
25  Q.  Okay.  So you would take travel assignments with other
```

1    registries, but then when you were in the area here, you

2    would pick up shifts through Steadfast registry; is that

3    right?

4    A.  Correct.

5    Q.  Okay.  So you were not required to pick up shifts while

6    you were traveling out of state; is that right?

7    A.  No.

8    Q.  Okay.  And when you were -- well, when you were here and

9    were interested in picking up shifts through Steadfast

10   registry, you were able to pick up whichever shifts that were

11   available for you that you wanted to pick up; is that right?

12   A.  Correct.

13   Q.  Okay.  And could you stop working on Steadfast registry

14   at any time you wanted?

15   A.  I did stop working for her --

16   Q.  Okay.

17   A.  -- totally.

18   Q.  And you were free to continue working with other

19   registries after you stopped on Steadfast; is that right?

20   A.  Yes.  I continued to work for the other agency.

21   Q.  Okay.  And you were able to maintain a consistent income

22   after you quit Steadfast registry, right?

23   A.  Yes.  I moved out of state.

24          MS. RUST:  Okay.  I have no further questions.

25   Thank you.

```
1              THE WITNESS:  Thank you.

2              THE COURT:  Redirect.

3              MR. SEIFELDEIN:  No further questions, Your Honor.

4              THE COURT:  All right.  May the witness be excused

5    permanently?

6              MR. SEIFELDEIN:  The witness may be excused, Your

7    Honor.  Thank you.

8              THE COURT:  Ms. Rust, may this witness be excused?

9              MS. RUST:  Yes.

10             THE COURT:  Okay, ma'am.  You are permanently

11   excused.  Thank you for coming.

12             THE WITNESS:  Thank you.

13             (Witness excused.)

14             THE COURT:  All right.

15             MS. LEWIS:  I was just going to let the Court know

16   I thought I was going to be short on time, but it appears as

17   though we're good.

18             THE COURT:  Just a housekeeping matter here.  The

19   final pretrial order is supposed to permit the Court to be

20   able to see what the order of proof is going to be, what the

21   witnesses are going to be called.  But I looked at this

22   order, and the secretary has listed 737 witnesses in this

23   order.  I have no idea what witnesses you are calling.  Now,

24   a couple of them I can't even find them in the order.  Maybe

25   you know where they are.  I saw one of them on Page number
```

1    113, or somewhere or another, 152.  Where are these

2    witnesses coming from, because you're skipping all over the

3    place, and the Court doesn't have any idea who you're

4    calling or whether these are in order.  Tell me, for

5    example, where is Courtnay Draughn in this final pretrial

6    order?

7              MS. LEWIS:  Court's indulgence, Your Honor.  She's

8    listed as Courtnay Hope.  If you look at the supplement,

9    directing your attention to ECF Number --

10             THE COURT:  Well, I tell you what we are going to

11   do.  We are going to work this out tomorrow morning.  You

12   come in here tomorrow and you have some idea what witnesses

13   you are calling.  Let the Court know which witnesses you're

14   calling that day.  You're not bound by it, but at least give

15   me some idea of where you are going, and I'll be able to

16   locate them and figure out what is what here.

17             We are going to come in here tomorrow at 1:00, and

18   we are going to get started.  The only thing I would say is

19   you can tell, we are moving on.  Pregnant pauses during the

20   cross-examination or even the direct, the Court doesn't have

21   time for it so be able to move to your next question, and we

22   can get on through this case.  We have a long way to go.

23             Anyway, everybody be safe, be well.  I'll see you

24   tomorrow at 1:00 p.m.

25             (Hearing adjourned at 4:52 p.m.)

1                          CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6

7              X_____/s/_____x

8                      Jody A. Stewart

9              X_____9-20-2021 _____x

10                      Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter