```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                       )
 4   MARTIN J. WALSH, SECRETARY OF     )
     LABOR, UNITED STATES              )
 5   DEPARTMENT OF LABOR,              )
                                       )
 6          Plaintiff,                 )
                                       )   CIVIL ACTION NO.
 7   v.                                )       2:18cv226
                                       )
 8   MEDICAL STAFFING OF AMERICA,      )
     LLC, etc., et al.,                )
 9                                     )
            Defendants.                )
10   - - - - - - - - - - - - - - - - - -

11

12                 TRANSCRIPT OF PROCEEDINGS

13                ** Bench Trial - Day 2 **

14                    Norfolk, Virginia

15                   September 1, 2021

16

17   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
18

19

     APPEARANCES:
20

             UNITED STATES DEPARTMENT OF LABOR
21           By:  Ryma N. Lewis
                  Chervonti Jones
22                Mohamed E. Seifeldein
                  Counsel for the Plaintiff
23
             PIERCE McCOY, PLLC
24           By:  Joshua L. Jewett
                  Julia A. Rust
25                Counsel for the Defendants
```

```
1                        I N D E X

2    PLAINTIFF'S
     WITNESSES                                    PAGE
3
       JOHNESE JONES
4          Direct Examination By Ms. Lewis        195
           Cross-Examination By Ms. Rust          208
5          Redirect Examination By Ms. Lewis      212
       ASHLEY MEGGIE
6          Direct Examination By Ms. Lewis        214
           Cross-Examination By Ms. Rust          223
7      KIMBERLY BELLAMY
           Direct Examination By Mr. Seifeldein   227
8          Cross-Examination By Ms. Rust          238
           Redirect Examination By Mr. Seifeldein 242
9      TERESA MOREY (Via ZoomGov.com)
           Direct Examination By Ms. Lewis        245
10         Cross-Examination By Ms. Rust          254
       TATIANNA CANADY
11         Direct Examination By Ms. Jones        260
           Cross-Examination By Ms. Rust          274
12         Redirect Examination By Ms. Jones      277
       COURTNEY TURNER (Via ZoomGov.com)
13         Direct Examination By Ms. Jones        281
       TYWANN WHITE
14         Direct Examination By Ms. Lewis        288

15

16                    E X H I B I T S

17   PLAINTIFF'S
     NO.                                          PAGE
18
       PX-55                                      217
19     PX-54                                      254

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

J. Jones - Direct

```
 1              (Proceedings resumed at 1:00 p.m.)

 2              THE COURT:  Good afternoon, counsel.

 3              MR. SEIFELDEIN:  Good afternoon.

 4              MS. RUST:  Good afternoon.

 5              THE COURT:  We are ready to begin again.  Next

 6    witness.

 7              MS. LEWIS:  Your Honor, we'll be calling Ms. Johnese

 8    Jones.

 9              (Witness sworn.)

10              JOHNESE JONES, called by the Plaintiff, having been

11    first duly sworn, was examined and testified as follows:

12                         DIRECT EXAMINATION

13    BY MS. LEWIS:

14    Q.  Good afternoon, Ms. Jones.

15    A.  Good afternoon.

16    Q.  Would you please state your name for the record and spell

17    your last name.

18    A.  Johnese Jones, J-o-n-e-s.

19    Q.  Are you familiar with Steadfast Medical?

20    A.  Yes.

21    Q.  How are you familiar with that company?

22    A.  I work for that company.

23    Q.  Okay.  When were you employed there?

24    A.  August '18 through December of 2019, if I'm not mistaken.

25    Q.  What type of services does Steadfast provide?
```

J. Jones - Direct

1   A.  It's a staffing agency for nurses and CNAs to facilities.

2   Q.  When you first started at Steadfast, what was your job

3   title?

4   A.  A CNA.

5   Q.  And did there come a time that your position changed?

6   A.  Yes.

7   Q.  And when was that?

8   A.  Was it in -- I think it was in July 2019 when I became a

9   staffing coordinator.  I had broke my foot.

10  Q.  So you were, both, out in the field at one point and then

11  in the office?

12  A.  Yes, ma'am, correct.

13  Q.  When you switched to working in the office, did you need

14  to reapply for that position?

15  A.  No, ma'am.

16  Q.  Okay.  Did you work for any other agencies?

17  A.  Yes, ma'am.

18  Q.  During that time?

19  A.  Yes, ma'am.

20  Q.  What other agency did you work for?

21  A.  First Choice Nurses.

22  Q.  Did you ever work over 40 hours there?

23  A.  No, ma'am.

24  Q.  Okay.  And why not?

25  A.  They didn't offer overtime.  They gave you a cap at 40

─────────── J. Jones - Direct ───────────

1   hours.

2   Q.  When you first started working for Steadfast as a CNA,

3   how did you apply?

4   A.  I went into the office and applied in person.

5   Q.  Did you have to submit any paperwork when you applied?

6   A.  Yes, ma'am, I did.

7   Q.  What did you have to complete?

8   A.  Of course a paper application and I had to bring my

9   certifications in, copies of my PPD, CNA license, CPR

10  certification.

11  Q.  I want to direct your attention to an exhibit that's been

12  marked as Plaintiff's 26.11 through 14.  If you could just

13  take a minute to review this document.

14          MS. LEWIS:  If you could scroll to the next page,

15  please.  If you could go back up to the top when you are done

16  scrolling, please.  It starts on Page 11, Ms. Jones.

17  BY MS. LEWIS:

18  Q.  And that's the date that you had submitted the

19  application, and that's August 2018; is that right?

20  A.  Yes, ma'am, that's correct.

21  Q.  And this information asked for your availability, as you

22  indicated?

23  A.  Yes, ma'am.

24  Q.  And so is this a true and accurate representation of the

25  employment application that you submitted?

———J. Jones - Direct———

1    A.  Yes, ma'am.

2          MS. LEWIS:  Your Honor, I move to admit PX-26.  I

3    can't recall if we admitted that.

4          THE COURT:  What we did was --

5          MS. LEWIS:  We did the whole entire exhibit.

6          THE COURT:  -- the entire exhibit.

7          MS. LEWIS:  Okay.

8    BY MS. LEWIS:

9    Q.  How much were you paid per hour when you worked as a CNA?

10   A.  15.

11   Q.  Who set and established those rates of pay?

12   A.  To my understanding, Ms. Pitts.

13   Q.  Was the rate specified, or did it vary based upon your

14   personal experience or skills?

15   A.  No, ma'am.

16   Q.  Were taxes withheld from your paycheck?

17   A.  No, ma'am.

18   Q.  Did you communicate with the facilities you worked at to

19   negotiate your hourly rate?

20   A.  No, ma'am.

21   Q.  Why not?

22   A.  Their hourly rate was set for each building that you

23   worked at.  Each building had a different rate of pay.

24   Q.  So other than your hourly pay rate, did you receive any

25   profits besides the hourly rate that was predetermined by

—————J. Jones - Direct—————

1    Steadfast?

2    A.   No, ma'am.

3    Q.   Did you ever make any more than the rate you received

4    from Steadfast?

5    A.   No, ma'am.

6    Q.   And who paid you for the care that you provided to the

7    residents at the facilities?

8    A.   Steadfast.

9    Q.   So you indicated that at a certain point you became a

10   scheduler.  Can you tell me how that came about.

11   A.   I had broke my foot outside of work, and I needed to have

12   some income coming in, so I called Ms. Pitts personally and

13   asked her was there anything that I could do to still make

14   income, and she allowed me to come into the office and staff

15   CNAs out to facilities.

16   Q.   And how much were you paid when you worked as a

17   scheduler?

18   A.   I think it was 10.50 or 10.25.

19   Q.   And who set and established that rate of pay?

20   A.   Ms. Pitts.

21   Q.   Coming back to when you -- we'll separate them.

22         When you worked as a CNA, did you ever work more

23   than 40 hours in a workweek?

24   A.   Yes, ma'am.

25   Q.   What about when you worked as a scheduler?  Did you ever

1    work more than 40 hours?

2    A.   Only if I was on call for the weekend, it may have ran

3    into overtime for that week.

4    Q.   So on average, when working as a CNA, approximately how

5    many hours did you work each day?

6    A.   Eight, but sometimes I worked eight, and sometimes I

7    worked 16, depending if I did a single or a double shift.  It

8    varied.

9    Q.   I'm sorry.  I didn't mean to interrupt you.

10   A.   It varied.

11   Q.   Okay.  So when you said eight or 16, you are referring to

12   hours?

13   A.   Yes, ma'am.

14   Q.   And what about when you were in the office?

15   Approximately how many hours did you work each day?

16   A.   Approximately eight.

17   Q.   You indicated that -- if you had weekend or were on call,

18   how many additional hours did you work on those occasions?

19   A.   It would be an eight-hour shift on a Saturday and -- did

20   I come in on Sunday?  I don't think I came in on Sunday, just

21   on Saturday.

22   Q.   Okay.  So when you worked as a CNA and you worked over 40

23   hours, what rate were you paid when you worked over 40?

24   A.   Still the 15.

25   Q.   And when you worked as a scheduler in the office and you

———J. Jones - Direct———

1   worked over 40, what rate were you paid?

2   A.  It was time and a half.

3   Q.  When you were hired, were you required to complete any

4   assessments?

5   A.  Yes, ma'am.

6   Q.  What kind of assessments?

7   A.  If I'm not mistaken, I think it was, like, a test that

8   they ask you about CNA skills, like a skill assessment test.

9   Q.  When you were hired, were you required to complete any

10  refreshers or trainings?

11  A.  Not to my knowledge.

12  Q.  I'd like to direct your attention -- if you could take a

13  look at PX-32.

14          MS. LEWIS:  If you could just scroll through that so

15  she can review it.

16  BY MS. LEWIS:

17  Q.  When you're done reviewing and she's done scrolling, if

18  you could look up at me.

19  A.  (Witness reviewing.)

20  Q.  Do you recognize these documents?

21  A.  Yes, ma'am.  That was in the application packet.

22  Q.  It was part of the application?

23  A.  Yes, ma'am.

24  Q.  So these are refreshers or trainings on HIPAA.  Do you

25  recognize that one?

———————————J. Jones - Direct———————————

1    A.  Yes, ma'am, I do.

2    Q.  What about substance abuse?

3    A.  Yes, ma'am.

4    Q.  Abuse and neglect?

5    A.  Yes, ma'am.

6    Q.  And then the assessment skills test you referred to with

7    respect to care that CNAs provide?

8    A.  Yes, ma'am, that's correct.

9    Q.  When you were working as a CNA, were you given the option

10   to be classified as an independent contractor or an employee?

11   A.  To my understanding, we were independent contractors.

12   Q.  I'm sorry?

13   A.  To my understanding, that's what we were classified as,

14   independent contractors.

15   Q.  With the new hire paperwork, the employment application,

16   did you sign an employment agreement with Steadfast?

17   A.  I don't remember.

18   Q.  Okay.  I want to direct your attention to PX-25.

19        MS. LEWIS:  Starting on Page 13, Ms. Jones.

20   BY MS. LEWIS:

21   Q.  Take a moment to review that as she scrolls.

22        Is that your signature there?

23   A.  Yes, ma'am.

24   Q.  Okay.  So do you recognize this document?

25   A.  No.

                          ┌─────── J. Jones - Direct ───────┐

 1    Q.  I'm sorry?

 2    A.  Actually, no.

 3    Q.  But you recognize your signature?

 4    A.  It's my signature.  Yes, ma'am, it is.

 5    Q.  And going to the top, is that your handwriting?

 6    A.  Not my name, it is not.

 7    Q.  Okay.  So that's not --

 8    A.  No, ma'am.

 9    Q.  What is wrong with your name?  Is it spelled incorrectly?

10    A.  No, it's spelled correctly.  That's just not how I write.

11    Q.  Okay.  Thank you.

12            Were you able to structure the terms of your working

13    relationship with the facilities you were placed at?

14    A.  Meaning?

15    Q.  Meaning were you able to initially set your schedule,

16    establish the rate of pay that you were going to be paid?

17    A.  It was set in the schedule.  You were not supposed to,

18    but once you went to a facility, you pretty much did if you

19    had a good rapport with the scheduler for that facility.

20    Now, as far as the rate of pay, no, you couldn't negotiate

21    the rate of pay.

22    Q.  Okay.  So when you say you're not supposed to, what do

23    you mean by that?

24    A.  Because from us working for Steadfast, Steadfast had to

25    schedule us to make sure that, I guess, the time sheets and

———————J. Jones - Direct———————

1  stuff came back so they could make sure they're getting paid

2  the correct amount.

3  Q.  Okay.

4  A.  So we couldn't book ourselves without the company being

5  aware.

6  Q.  So you mentioned time sheets, but were you required to

7  complete time sheets as a CNA?

8  A.  Yes, ma'am.

9  Q.  How often were you required to submit the time sheets

10  when you worked?

11  A.  They wanted you to submit a time sheet after each shift.

12  Q.  Who told you when you were required to submit time sheets

13  when you worked as a CNA?

14  A.  I can't remember who told us.  I just know that that's

15  what you were supposed to do.

16  Q.  Was it the facility or Steadfast?

17  A.  No, it was Steadfast.

18  Q.  Okay.  Someone at Steadfast.

19       Were you required to provide notice to Steadfast if

20  you were unavailable to work?

21  A.  Yes.

22  Q.  And who would you call?

23  A.  You'd have to call the on-call scheduler at Steadfast.

24  Q.  What if it was after hours?

25  A.  There was always someone on call for them.

J. Jones - Direct

1   Q.   So a scheduler, whomever was on call?

2   A.   Yes, ma'am.

3   Q.   And how much notice were you required to provide if you

4   were unavailable?

5   A.   You're supposed to give a two-hour advanced notice.

6   Q.   If you were running late for a shift or have to cancel a

7   shift, did you have to notify Steadfast?

8   A.   Yes, we did.

9   Q.   Who would you call?

10  A.   You would call the scheduler, whoever is on call for that

11  day.

12  Q.   If you had a scheduling conflict, did Steadfast allow you

13  to send another CNA in your place?

14  A.   No, ma'am.

15  Q.   Who would send someone?

16  A.   Steadfast would have to find a replacement for you.

17  Q.   Were you allowed to employ another CNA to complete a

18  shift that Steadfast paid you for?

19  A.   No, ma'am.

20  Q.   Did you have a supervisor when you worked at Steadfast?

21  A.   Yes, ma'am.

22  Q.   Who was your supervisor?

23  A.   Lisa Pitts.

24  Q.   What was Lisa's involvement in the supervision of nurses

25  at the facilities?

———— J. Jones - Direct ————

1   A.   She would make sure we, you know, knew the code of
2   conduct, make sure we went to work on time and completed our
3   shifts.
4   Q.   Are you aware of Lisa ever disciplining or counseling
5   employees?
6   A.   Yes, ma'am.
7   Q.   What do you know about that?
8   A.   Well, when I worked in the office as a scheduler, you
9   know, if people would miss a shift or didn't show up, I would
10  hear her on the phone disciplining them.
11  Q.   Okay.  Did you ever hear her say anything?  What would
12  she say to them?
13  A.   She would be like, "Look, you fucking with my money."
14  Q.   Anything else?
15  A.   "If you don't go to work, you're F'ing with my money."
16  "You signed up for these shifts.  I need you-all to be there.
17  You-all know you're supposed to be at work.  This is what
18  you're supposed to do."
19  Q.   Did she say anything about whether it was their business
20  or her business?
21  A.   Just like, "You're messing with my money."  So pretty
22  much her business.
23  Q.   So did Steadfast have a code of conduct or behavior
24  expectations?
25  A.   Yes, ma'am, they did.

J. Jones - Direct

1   Q.  What were the expectations Steadfast had regarding

2   conduct?

3   A.  To act professional, you know, go to work like you're

4   supposed to, show up on time and do what you're supposed to

5   do as whatever you are, a CNA or a nurse.

6   Q.  If you were interested in a placement that Steadfast had

7   available, how would a nurse, like yourself, or even as a

8   scheduler, because you have it on both sides, find out more

9   about a placement opportunity, an assignment?

10  A.  Repeat the question.

11  Q.  Sure.

12          How would a nurse or CNA get an assignment?

13  A.  We would call out and ask nurses or CNAs whether or not

14  they were available for a shift.

15  Q.  After being placed at a facility, were you interviewed to

16  work by the facility, or did you just get to work right away?

17  A.  You just went to work right away.

18  Q.  If you did not receive pay from Steadfast, would you have

19  been able to meet your financial obligations?

20  A.  No.

21  Q.  Do you have an ownership interest in Steadfast?

22  A.  No, ma'am.

23  Q.  Are you on officer, manager, or director of the business?

24  A.  No, ma'am.

25  Q.  Do you own a percentage of Steadfast?

————————————— J. Jones - Cross —————————————

1    A.  No, ma'am.

2    Q.  When you went to different facilities that Steadfast had

3    contracts, were you required to wear a badge identifying you

4    as a Steadfast nurse?

5    A.  Yes, ma'am.

6    Q.  And have you ever received any back wages from Steadfast

7    for the hours you worked over 40?

8    A.  No, ma'am.

9         MS. LEWIS:  No further questions for this witness,

10   Your Honor.

11        THE COURT:  Cross-examination.

12                   CROSS-EXAMINATION

13   BY MS. RUST:

14   Q.  Good afternoon, Ms. Jones.

15   A.  Good afternoon.

16   Q.  My name is Julia Rust.  I'm an attorney for the

17   defendants, Steadfast and Lisa Pitts.

18   A.  Yes, ma'am.

19   Q.  I have a couple of questions about what you discussed.

20        So you worked as a CNA, and then you also worked in

21   the call center, right?

22   A.  Correct.

23   Q.  And you were paid overtime when you worked over 40 hours

24   in a workweek for the call-center shifts; is that correct?

25   A.  Yes, ma'am.

———————J. Jones - Cross———————

1   Q.  And you talked about when Lisa Pitts would -- you said

2   there were circumstances where she might discipline people

3   over the phone and that she would get mad when people picked

4   up shifts.  I think you said she said, "You signed up for

5   these shifts."

6           So were those instances where people canceled the

7   shifts last minute and she would get frustrated about that?

8   A.  Yes, ma'am.  Or a no show.

9   Q.  And a no call, no show.

10          And in those instances, did Steadfast try to fill

11  those shifts before they started or --

12  A.  Yes, ma'am.

13  Q.  Okay.  And does it require a little bit of -- well, when

14  you have to fill a shift at the last minute because somebody

15  no-showed or canceled at the last minute, that would require

16  the call center to make a lot of phone calls quickly, or

17  reach out to nurses quickly to find someone who is willing to

18  stop what they're doing and go take a shift at the last

19  second, right?

20  A.  Correct.

21  Q.  Okay.  Is that a lot of work, to try and find somebody?

22  A.  Very.  A whole lot of work.

23  Q.  I bet.  Okay.

24          You mentioned the behavioral expectations; to be

25  professional and show up on time as a nurse.  Have you ever

─────────────────── J. Jones - Cross ───────────────────

1   worked a job where those were not the expectations?

2   A.   No, ma'am.

3   Q.   Whether that job classified you as a contractor or as an

4   employee?

5   A.   No, ma'am.

6   Q.   Okay.  And when you worked as a CNA, were there

7   facilities that you preferred to work at over others?

8   A.   I only went to three facilities.  I really stayed on the

9   Peninsula side, in Newport News where I lived, so that's the

10  facility that I preferred to go to, so that's where I would

11  work at.

12  Q.   So when you would call Steadfast and ask for available

13  shifts, if that was one of the options, you would choose that

14  facility over the others; is that correct?

15  A.   Yes, ma'am.

16  Q.   Okay.  And were you allowed to schedule as many shifts as

17  you wanted?

18  A.   Yes, ma'am.

19  Q.   And you were able to negotiate higher rates of pay for

20  shifts with facilities; is that right?

21  A.   No.

22  Q.   What if there was a last-minute need in the call center,

23  did Steadfast -- well, let me rephrase that.  That was

24  confusing.

25          From the call center, if you're trying to schedule a

————————J. Jones - Cross————————

1  shift last minute, would the facility often allow you to

2  offer a higher rate of pay than what was originally offered

3  for that shift?

4  A.  Not the facility, but we could get it approved through

5  Lisa to offer a higher rate of pay.

6  Q.  Okay.  And did you receive training and education in

7  order to get your --

8        You said you were a CNA, right?

9  A.  Yes, ma'am.

10  Q.  -- in order to get your CNA certificate?

11  A.  Yes, ma'am.  I've been a CNA since 2001.

12  Q.  Did Steadfast pay for any of your education or testing

13  for that?

14  A.  No, ma'am.

15  Q.  Without that certificate, would you be able to work as a

16  CNA?

17  A.  No, ma'am.

18  Q.  And you have never seen Lisa Pitts on site at a facility

19  while you were providing CNA services; is that right?

20  A.  No, ma'am.

21        MS. RUST:  Okay.  I have no further questions.

22  Thank you, Ms. Jones.

23        THE WITNESS:  You're welcome.

24        THE COURT:  Any redirect?

25        MS. LEWIS:  Just briefly, just one question.

J. Jones - Redirect

REDIRECT EXAMINATION

1

2   BY MS. LEWIS:

3   Q.  Ms. Jones, when you were questioned about being able to

4   offer a higher rate of pay after receiving Ms. Pitts'

5   approval, was that an hourly amount or a lump-sum amount?

6   A.  It would be an hourly amount.  It just really depends on

7   what the circumstance was.

8   Q.  Okay.

9   A.  Because I've had to offer somebody, like -- where if they

10  needed a place to stay, like, she would pay for that hotel

11  fee or something like that.

12  Q.  So in those approvals in those situations, was that a

13  regular occurrence or based upon Steadfast's needs to be able

14  to fill shifts?

15  A.  It was based upon the needs to fill shifts.

16  Q.  So it wasn't based upon the nurses negotiating a rate, it

17  was Steadfast's needs; is that right?

18  A.  Yes, ma'am.

19          MS. LEWIS:  No further questions.

20          THE COURT:  May the witness be permanently excused?

21          MS. LEWIS:  She may.

22          THE COURT:  You may step down, ma'am.

23          (Witness excused.)

24          THE COURT:  Your next witness?

25          MS. LEWIS:  One moment, Your Honor.

———J. Jones - Redirect———

 1          MS. RUST:  Your Honor, if I may, as a housekeeping

 2     matter, which, perhaps, might expedite some of the testimony,

 3     I know the Department has asked quite a few of the nurse

 4     witnesses if they were paid hourly rates and if they were

 5     paid overtime.  The pretrial order stipulated in paragraph 5

 6     that nurses were paid hourly rates and overtime.  So

 7     that's -- well, that's what's stipulated to.

 8          THE COURT:  Wait a minute.  You said there's a

 9     pretrial stipulation they were paid hourly rates and

10     overtime?

11          MS. RUST:  Sorry.  They were paid hourly rates and

12     that they were not paid overtime for hours over 40.

13          THE COURT:  That is established.  You need not

14     establish that.

15          MS. LEWIS:  Right.  It's -- it was a foundational

16     question.

17          THE COURT:  It's a foundational question?

18          MS. LEWIS:  Yes, it's a foundational question, Your

19     Honor.

20          THE COURT:  Well, I'll put it this way:  In view of

21     the fact that it's foundational, you hit it, and you keep on

22     moving, we'll let it go.  But you're right; we don't dwell on

23     things already established.

24          MS. RUST:  Thank you.

25          (Witness sworn.)

─────A. Meggie - Direct─────

1          ASHLEY MEGGIE, called by the Plaintiff, having been

2     first duly sworn, was examined and testified as follows:

3                    DIRECT EXAMINATION

4     BY MS. LEWIS:

5     Q.  Good afternoon.

6     A.  Good afternoon.

7     Q.  If you could please state your name and spell your last

8     name for the record.

9     A.  Ashley Meggie, M-e-g-g-i-e.

10    Q.  Are you familiar with Steadfast?

11    A.  Yes.

12    Q.  And how are you familiar with the company?

13    A.  I was an employee.

14    Q.  What was your job title?

15    A.  CNA.

16    Q.  When were you employed at the company?  And if you could

17    speak up a little bit.

18          THE COURT:  Much louder.

19    BY MS. LEWIS:

20    Q.  You have to leave your mask on.  Just speak up.

21    A.  From the fall of 2019 to present.

22    Q.  So, currently, you are still employed at Steadfast; is

23    that right?

24    A.  Correct.

25    Q.  And as a CNA, what were your job duties and -- as a CNA

A. Meggie - Direct

1   at Steadfast, what are your job duties and responsibilities?

2   A.   To report for my shifts, take care of the assigned

3   residents that I was assigned, and to turn in my time sheets.

4   Q.   Did you ever work more than 40 hours in a workweek?

5   A.   Yes.

6   Q.   How many hours do you typically work each week?

7   A.   Anywhere from 60 to 108 hours a week.

8   Q.   You indicated a moment ago that part of your

9   responsibilities is submitting time sheets.  To whom do you

10  submit time sheets?

11  A.   To Steadfast.

12  Q.   And when do you submit them?

13  A.   We're supposed to submit them by 9:00 a.m. on Tuesday.

14  Q.   I'm going to direct your attention to a document that has

15  now been marked as Plaintiff's 55.

16       MS. LEWIS:  If you could scroll through that

17  document, please, Ms. Jones.

18  BY MS. LEWIS:

19  Q.   Do you recognize these documents?

20  A.   Yes.

21  Q.   What are they?

22  A.   My time sheets.

23  Q.   And these are the time sheets that you submit to

24  Steadfast?

25  A.   Yes.

A. Meggie - Direct

1  Q.  Are they a true and accurate reflection of just some of

2  the time sheets that you've submitted?

3  A.  Yes.

4  Q.  You indicated that you could work anywhere between 60 and

5  108 hours a week.

6          MS. LEWIS:  If you could scroll up, Ms. Jones.

7  BY MS. LEWIS:

8  Q.  Who do you send your time sheets to at Steadfast?

9  A.  Can you repeat that, please.

10 Q.  Sure.

11         Who do you send your time sheets to at Steadfast?

12 A.  To payroll.

13 Q.  And you e-mail them?

14 A.  Yes.

15 Q.  And is this a true and accurate reflection of one of the

16 e-mails that you sent?

17 A.  Yes.

18 Q.  Is that your sort of summation of how many hours, rate of

19 pay, et cetera, for one workweek that you worked in?

20 A.  Yes.

21         MS. LEWIS:  Your Honor, I move to admit Plaintiff's

22 55.

23         THE COURT:  Any objection?

24         MS. RUST:  No objection.

25         THE COURT:  Plaintiff's Exhibit 55 is hereby

─────A. Meggie - Direct─────

1    admitted.

2              (Plaintiff's Exhibit PX-55 received in evidence.)

3    BY MS. LEWIS:

4    Q.   How much were you paid per hour?

5    A.   Usually $25 an hour.

6    Q.   Have there been cases that you have been paid more or

7    less?

8    A.   Certain buildings where we were paid more.

9    Q.   Okay.  Why the range?

10   A.   It was just told to us by the staffing coordinators that

11   that building would pay us that much.

12   Q.   And when you say the staffing coordinator for that

13   building, is that someone at the facility or someone at

14   Steadfast?

15   A.   At Steadfast.

16   Q.   Were you able to negotiate different pay?

17   A.   No.

18   Q.   Who set the rate of pay?

19   A.   Steadfast.

20   Q.   And who told you that it was Steadfast that set the rate

21   of pay?

22   A.   The coordinators.

23              THE COURT:  The what?

24              THE WITNESS:  The staffing coordinators.

25              THE COURT:  I'm still having difficulty hearing you.

A. Meggie - Direct

1   Who told you that?

2           THE WITNESS:  The staffing coordinators.

3           THE COURT:  Okay.  Thank you.

4   BY MS. LEWIS:

5   Q.  Does Steadfast make the ultimate decision to effectively

6   set your rate of pay?

7   A.  Yes.

8   Q.  What rate were you paid for hours worked over 40 in a

9   workweek?

10  A.  I was not paid for any overtime.

11  Q.  How frequently are you paid?

12  A.  Weekly.

13  Q.  Okay.  In the past, have you ever done an expedited pay?

14  A.  Yes.

15  Q.  What is that called?

16  A.  Next Day Pay.

17  Q.  Can you tell me -- well, first, before going into

18  Next Day Pay, you said currently you are paid weekly.  When

19  are you paid?  What day of the week?

20  A.  Friday.

21  Q.  And you said in the past you did Next Day Pay?

22  A.  Yes.

23  Q.  Approximately how long ago was that?

24  A.  From 2019 to April of this year.

25  Q.  Okay.  And tell me, what is Next Day Pay?

A. Meggie - Direct

1    A.  You can get paid --

2    Q.  If you could speak up a little bit.

3    A.  You can get paid the next day, and, also, they take a

4    6 percent fee out of getting your pay early.

5    Q.  Okay.  How are you paid the next day?  What do you need

6    to do, or is there anything that you need to do?

7    A.  You need to turn in your time sheets to a separate e-mail

8    that's designated for Next Day Pay.

9    Q.  And this e-mail here, is that the one reflected on the

10   screen in front of you, that PDF Page 19?

11   A.  Yes.

12   Q.  For the Next Day Pay, is it total the hours that you

13   work?  Do you ever receive a pay stub at the end of the week

14   that you could use to verify "I worked X amount of hours; so,

15   therefore, this was my Next Day Pay for this entire week"?

16   A.  No.

17   Q.  Did you ever get pay stubs?

18   A.  We never got pay stubs.

19   Q.  Did you ever have any issues with your paychecks?

20   A.  Yes.

21   Q.  What was the issue?

22   A.  The pay amounts weren't correct for dates that I turned

23   in that weren't paid out.

24   Q.  Did you do Next Day Pay and always get paid the next day

25   when you did it?

220

——A. Meggie - Direct——

1   A.  No.  Sometimes it was late.

2   Q.  And was that 6 percent still taken out even when it was

3   late?

4   A.  Yes.

5   Q.  How did you -- so you said sometimes it would be the

6   wrong amount, not getting paid, still the 6 percent.

7           So how did you keep track of the pay you received

8   from Steadfast?

9   A.  I would ask them to send an e-mail, like the displayed

10  e-mail, breaking down the shifts and pay rates.

11  Q.  Is there anything you did separate and apart from

12  reaching out to Steadfast to keep track of the pay you

13  received from Steadfast?

14  A.  Yes.

15  Q.  What was that?

16  A.  I had a separate bank account that I used just for

17  deposits coming from Steadfast.

18  Q.  And the purpose of you opening the separate account just

19  for pay from Steadfast was for what reason?

20  A.  So that I could verify that I was employed and that I was

21  making a steady income.

22  Q.  Did you receive a 1099 tax form from Steadfast in

23  February of each year?

24  A.  I received one in April.

25  Q.  Okay.  So my understanding is you had started working for

A. Meggie - Direct

1    Steadfast in 2019; is that correct?

2    A.   Yes.

3    Q.   Did you receive a 1099 from Steadfast for 2019?

4    A.   No.

5    Q.   Did you receive a 1099, I guess, for last year?  Is that

6    the one you are referring to that you received in April?

7    A.   Yes.

8    Q.   Did the 1099 accurately reflect the pay you received from

9    Steadfast?

10   A.   No.

11   Q.   How do you know?

12   A.   I printed out all of my bank statements and added the

13   amounts together.

14   Q.   Was the amount more or less than what Steadfast actually

15   paid you?

16   A.   The amount that I added up was more than what was on the

17   1099.

18   Q.   Have you received any back wages from Steadfast for hours

19   worked over 40?

20   A.   No.

21   Q.   And have you ever complained about not receiving

22   overtime?

23   A.   Yes.

24   Q.   When did you complain?

25   A.   The first week that I worked with Steadfast.

A. Meggie - Direct

1   Q.   And what was their response to your complaint?

2   A.   "The reason you get the higher pay rate is because we're

3   not paying you overtime."

4   Q.   Have you worked at other staffing agencies?

5   A.   Yes.

6   Q.   Did those other staffing agencies pay you overtime?

7   A.   Yes.

8   Q.   In terms of your experience working at other staffing

9   agencies, when you worked at the facilities, was their

10  supervision the same or different than Steadfast's when you

11  went to work?

12  A.   The same.  The same.

13  Q.   What about in terms of setting the pay rate when you

14  worked at those other agencies relative to Steadfast?  Were

15  you able to negotiate the rate of pay?

16  A.   No.

17  Q.   So with the other agencies, you couldn't, and with

18  Steadfast, it was the same?

19  A.   Yes.

20  Q.   What about the payment?  How did Steadfast pay you?  Was

21  it Steadfast that paid you or the facilities?

22  A.   Steadfast.

23  Q.   And Steadfast paid you directly into your bank account;

24  is that correct?

25  A.   Yes.

A. Meggie - Cross

1   Q.  So when you worked with the other agencies, did they,

2   likewise, pay you directly?

3   A.  Yes.

4   Q.  As a CNA, when you go and provide care for residents and

5   patients at facilities, whether you're working for Steadfast

6   or another agency, was the type of care that you provided

7   different?

8   A.  No.

9         MS. LEWIS:  No further questions for this witness,

10  Your Honor.

11        THE COURT:  Cross.

12                      CROSS-EXAMINATION

13  BY MS. RUST:

14  Q.  Hi, Ms. Meggie.  My name is Julia Rust.  I'm an attorney

15  for the defendants.

16        You said that there were some instances where your

17  paycheck was incorrect; is that right?

18  A.  Yes.

19  Q.  And were you -- did you alert anybody at payroll at

20  Steadfast of those discrepancies?

21  A.  Yes.

22  Q.  And were those discrepancies resolved or explained?

23  A.  No.

24  Q.  What was the issue?

25  A.  Sometimes they would say you're getting paid $25 an hour

———A. Meggie - Cross———

1    and then --

2                THE COURT:  Raise your voice, please.

3                THE WITNESS:  Sometimes they said we were going to

4    get paid $25 an hour, and then we were paid less.  Or

5    sometimes I would turn in time sheets, and they forgot to

6    submit it, and I didn't get paid for that day.

7    BY MS. RUST:

8    Q.  And were you able to notify them about the missing time

9    sheets?  And they would resolve that, right?

10   A.  I notified them.  It was not resolved.

11   Q.  Okay.  But if you submit the time sheets and they're

12   accounted for, you get paid for them, right?

13   A.  I did submit them.  They were not paid out.  So it was

14   not resolved.

15   Q.  And do you know if there was an issue with the facility

16   approving the time that you had submitted for?

17   A.  No, there was no issue with the facility.

18   Q.  There was no issue, or you're not sure if there was an

19   issue?

20   A.  I asked why I didn't get paid, and they said, "Oh, well,

21   you know, we're working on it."  I never got paid.

22   Q.  Okay.  And you didn't follow up, so you don't know what

23   the issue was?

24   A.  I wasn't explained what the issue was.

25   Q.  So with the other agencies that you worked with, do you

A. Meggie - Cross

1   schedule shifts through multiple agencies at the same time

2   generally?

3   A.  I'm sorry.  Can you repeat that?

4   Q.  Of course.

5           Do you typically schedule shifts through multiple

6   agencies at the same time?

7   A.  I don't schedule my shifts.  The staffing coordinators

8   schedule it.

9   Q.  Let me back up.

10          You said you worked with other registries or

11  agencies, right?

12  A.  In the past, yes.

13  Q.  Did you work at those at the same time you picked up

14  shifts with Steadfast?

15  A.  Not necessarily.

16  Q.  Well -- okay.  Are there certain facilities that you

17  prefer to work at?

18  A.  No.

19  Q.  You are happy with any facility you go to, typically?

20  A.  Yes.

21  Q.  Are there any facilities you don't enjoy going to?

22  A.  No.

23  Q.  Okay.  Well, that's good.

24          So when you're discussing your availability with a

25  scheduling planner at Steadfast, are you allowed to select

A. Meggie - Cross

```
 1   which of the facilities that they have available for your
 2   schedule?  Right?
 3   A.  I usually give my entire availability, and they will tell
 4   me which facility needs help more.
 5   Q.  Okay.  And that's because you provided the availability
 6   you wanted to fill, right?
 7   A.  It just doesn't change.  It's always the same.
 8   Q.  Okay.  And you don't specify that you want to be at a
 9   specific facility?
10   A.  No.
11   Q.  You just provide your availability and say "I'm happy
12   with whatever you've put in the schedule," right?
13   A.  Yes.
14   Q.  Okay.
15           MS. RUST:  I have no further questions.  Thank you.
16           MS. LEWIS:  No redirect, Your Honor.
17           THE COURT:  May the witness be permanently excused?
18           MS. LEWIS:  Yes, Your Honor.
19           THE COURT:  You may step down, ma'am.
20           (Witness excused.)
21           MS. LEWIS:  Your Honor, what time will our break be?
22           THE COURT:  Our break will be at 3:00.
23           MS. LEWIS:  Kimberly Bellamy.
24           (Witness sworn.)
25           KIMBERLY BELLAMY, called by the Plaintiff, having
```

K. Bellamy - Direct

1  been first duly sworn, was examined and testified as follows:

2                  DIRECT EXAMINATION

3  BY MR. SEIFELDEIN:

4  Q.  Good afternoon, Ms. Bellamy.

5  A.  Hello.

6  Q.  Could you state your full name for the record and spell

7  your last name, please.

8  A.  It's currently Kimberly Ann Summers, S-u-m-m-e-r-s, but

9  it was Bellamy.

10 Q.  And when did it change to Summers?

11 A.  About a year ago.

12 Q.  Are you familiar with the company Steadfast?

13 A.  Yes.

14 Q.  What type of service does Steadfast provide, Ms. Bellamy?

15 A.  They staff different facilities with nurses and CNAs.

16 Q.  Were you employed by Steadfast?

17 A.  Yes.

18 Q.  What was your job title when you worked for Steadfast?

19 A.  LPN.

20 Q.  When did you stop working for Steadfast?

21 A.  Around January or February of 2020.

22 Q.  I'm sorry?

23 A.  Around January or February of 2020.  You said when did I

24 stop?

25 Q.  Okay.  You stopped in 2020.  When did you start?  I

K. Bellamy - Direct

1    apologize.  I wasn't very clear.

2    A.   Oh, around June of 2017.

3    Q.   And did you have to apply to work for Steadfast?

4    A.   Yes.

5    Q.   And what did you do to work for Steadfast?  What did you

6    fill out?

7    A.   I went to them, and I filled out an application, which

8    consisted of, you know, background checks and drug testing

9    and stuff like that, and my nursing license.

10   Q.   Okay.  An employment application?

11   A.   Yes, sir.

12   Q.   Okay.  And after you completed the job or employment

13   application with Steadfast, did you meet with anyone at

14   Steadfast?

15   A.   I met with -- I think her name was, like, Christine.  She

16   did payroll.

17   Q.   What is her name?

18   A.   Christine.

19   Q.   Christine Kim is the person you met with?

20   A.   Yes.

21   Q.   And when you met with Christine Kim, did she ask you

22   about your availability?

23   A.   No.  I just gave her my payroll information.  And then,

24   as far as my availability, I spoke with a lady named Hope.  I

25   gave her my availability and my schedule, and she told me

K. Bellamy - Direct

1    what they had available.

2    Q.   Okay.  So you spoke to Miss Hope, and she gave you that

3    information.

4           Before you left the building or at any point after

5    that, did Steadfast issue you a badge?

6    A.   Yes.

7    Q.   Did the badge have the name "Steadfast" on it?

8    A.   Yes.

9    Q.   Did it have a picture on it as well?

10   A.   Yes.

11   Q.   And did Steadfast take that picture?

12   A.   Yes.

13   Q.   And were you paid on an hourly basis?

14   A.   Yes.

15   Q.   Were you able to negotiate a different rate with

16   Steadfast?

17   A.   No.

18   Q.   Did Steadfast make the ultimate decision to effectively

19   set your rate of pay?

20   A.   Yes.

21   Q.   Were you able to structure the terms of your work

22   relationship with the facility directly?

23   A.   No.

24   Q.   Who did you set that working relationship with?

25   A.   The schedulers at Steadfast.

K. Bellamy - Direct

1   Q.   Did Steadfast give you an option to be classified as an

2   employee or independent contractor?

3   A.   No.

4   Q.   They just told you this is what you are?

5   A.   Uh-huh.

6   Q.   Do you recall what they told you your classification is?

7   A.   Say that again.

8   Q.   Did they tell you what you were classified as?

9   A.   Just a 1099 contractor.

10  Q.   And as part of working for Steadfast and getting

11  compensation, were you required to submit time sheets to

12  Steadfast?

13  A.   Yes.

14  Q.   And who issued you those time sheets that you were

15  required to submit to Steadfast?

16  A.   We picked them up at the building.

17  Q.   And did these time sheets have the name "Steadfast" on

18  them?

19  A.   Yes.

20  Q.   And was Steadfast's name on top of the time sheet --

21  A.   Yes.

22  Q.   -- on the header?

23  A.   Uh-huh, yes.

24  Q.   And who told you that you were required to submit these

25  time sheets?

K. Bellamy - Direct

```
 1   A.  I'm not sure of her exact name, but I do know I received
 2   an e-mail from Christine saying that it had to be submitted
 3   by Monday at a certain time.  But who initially told me, I'm
 4   not sure.
 5   Q.  But it was someone from Steadfast?
 6   A.  Yes.
 7   Q.  So once you submitted these time sheets, did you ever
 8   submit a time sheet where you worked more than 40 hours in a
 9   workweek?
10   A.  Yes.
11   Q.  And on average how many hours did you work per week?
12   A.  I would say between 40 and 60.
13   Q.  Between 40 and 60.
14        When you worked more than 40 hours in a workweek,
15   what rate of pay did Steadfast pay you for those hours when
16   you worked over 40?
17   A.  It was the same rate of pay based upon the building that
18   we went to.
19   Q.  So you were paid straight time, not time and a half?
20   A.  Right.
21   Q.  And once you received your check or direct deposit, did
22   you ever complain to Steadfast about not receiving overtime
23   or time and a half for the hours you worked over 40 hours?
24   A.  Initially, I didn't, because they said we was
25   contractors, we wasn't supposed to be paid overtime, but when
```

———————K. Bellamy - Direct———————

1   I talked to some other people that worked for a different

2   agency who was contractors as well, they said their agency

3   was paying overtime.  So I did inquire were we supposed to

4   get paid overtime, and they said, no, that contractors don't

5   get paid overtime.

6   Q.  So you expressed concerns to Steadfast at some point

7   about not being paid overtime --

8   A.  Yes.

9   Q.  -- and the response was "We don't pay overtime"; is that

10  correct?

11  A.  Yes.

12  Q.  Do you, roughly, recall when that was?  You said you

13  started working in 2017.  Was it in '17, '18?

14  A.  Probably close to the end of '17.

15  Q.  Okay.  So from '17 all the way through 2020 when you

16  left, Steadfast had not paid you time and a half for the

17  hours you worked over 40?

18  A.  No.  Unless it was holiday pay, but not overtime.

19  Q.  Okay.  I understand.

20          So if you weren't -- if you were not available to

21  work, did you have to give Steadfast a notice of your

22  unavailability?

23  A.  Not -- no, not unless I picked up a shift and then I

24  couldn't make it, then I had to tell them, but that was about

25  it.

K. Bellamy - Direct

1   Q.   So if you did pick up a shift and you were canceling the
2   shift, did you have to notify Steadfast?
3   A.   Yes.
4   Q.   Who told you that you needed to notify Steadfast?
5   A.   The scheduler there.
6   Q.   Was there a time frame or a period where you had to
7   notify Steadfast?
8   A.   At least two hours prior to our shift.
9   Q.   And does that work for both late arrival and cancellation
10  or just for cancellation?
11  A.   Late -- it works for both.  Even if we were going to be
12  late, we were supposed to let them know that we were going to
13  be arriving to the facility late.
14  Q.   How about if you had a scheduling conflict and you
15  couldn't work?  Could you send another LPN to take your place
16  without Steadfast's approval?
17  A.   No.  No.
18  Q.   Were you allowed to employ another LPN to complete a
19  shift that Steadfast had assigned to you?
20  A.   No.
21  Q.   And if you were having issues with those time sheets we
22  talked about earlier that you submitted to Steadfast, who
23  would you communicate those concerns to?
24  A.   Christine.
25  Q.   Christine.  So you would communicate the concerns to

K. Bellamy - Direct

1  Steadfast?

2  A.  Steadfast, yes.

3  Q.  Why wouldn't you communicate those concerns to the

4  facilities that you worked in?

5  A.  Because we were already instructed that we don't deal

6  directly with the facility.  They are not the ones paying us.

7  We deal with Steadfast.

8  Q.  Who instructed you to do that?

9  A.  Steadfast.

10  Q.  Did you have a supervisor at Steadfast?

11  A.  Not directly, but Hope is the one I normally talked to

12  about any concerns that I had.

13  Q.  Okay.  So what sort of concerns, other than the pay

14  issue, did you discuss with Hope?

15  A.  You know, just like I said, if I couldn't get to work on

16  time or if I needed more hours, I would go to her.  If I had

17  an issue at a facility, like, with one of the employers --

18  one of the other employees at a facility, then I would tell

19  Hope about it, and she would reach out to the managers there

20  and try to facilitate some type of agreement.

21  Q.  So if there was an issue that you were experiencing at a

22  facility, you would address it with Steadfast, not the

23  facility?

24  A.  Right.

25  Q.  Did Steadfast have a code of conduct that they expected

────────────K. Bellamy - Direct────────────

1    you to adhere to?

2    A.   Yes.

3    Q.   Could you tell me about that.

4    A.   Basically, report to work on time.  When we get to work,

5    we go to the manager and let them know that we're there.  We

6    should be dressed appropriately, you know, professional, have

7    all of our supplies ready.  Make sure we submit our time

8    sheets on time.  Just a regular professional code of conduct.

9    Q.   Did Steadfast provide you with sort of a booklet or

10   pamphlet of these expectations at any point?

11   A.   Not a booklet, but it came over in, like, an e-mail

12   fashion.

13   Q.   Okay.  E-mail.

14        Once you were placed at a facility, did you

15   negotiate the rate of pay with the facility?

16   A.   No.

17   Q.   Were you interviewed by a facility once you got there?

18   A.   Not concerning pay.

19   Q.   Did you receive any profit from Steadfast?

20   A.   What do you mean "profit"?  Just my regular paycheck.

21   Q.   Just your paycheck, nothing else?

22   A.   No.

23   Q.   Okay.  And you don't have any ownership interest in

24   Steadfast; is that correct?

25   A.   No.

K. Bellamy - Direct

1   Q.  Did you ever advertise that you are a business to
2   Steadfast or to anyone?
3   A.  No.
4   Q.  As an LPN, what type of equipment do you need to perform
5   your duties?
6   A.  Blood pressure cuff, stethoscope, thermometer, pen,
7   paper, uniform.
8   Q.  Are these normal tools of the trade that LPNs usually
9   carry with them?
10  A.  Yes.
11  Q.  Once you were sent to a facility or received an
12  assignment from Steadfast, did you have to buy special tools
13  to complete that shift?
14  A.  Yes, I had -- I bought my own.
15  Q.  I'm sorry?
16  A.  I bought my own.
17  Q.  Other than those you talked about, did you have to buy
18  any specific --
19  A.  Oh, no.
20  Q.  You did not buy equipment to complete a shift that
21  Steadfast assigned you?
22  A.  No.
23  Q.  And once you arrived at the facility, they had their own
24  equipment, correct, the bigger stuff?
25  A.  Yes.

K. Bellamy - Direct

1   Q.  Now, you are required to maintain a license to practice;
2   is that correct?
3   A.  Yes.
4   Q.  And is this license required regardless of which facility
5   Steadfast sent you to?
6   A.  Yes.
7   Q.  And the type of care that you provide to patients, is
8   that the same, also, regardless of which facility that you're
9   sent to?
10  A.  Yes.
11  Q.  And the care that you provide requires the same skill
12  levels of all LPNs?
13  A.  Yes.
14  Q.  To your knowledge, is Steadfast Medical providing other
15  services?
16  A.  I'm sorry?
17  Q.  To your knowledge, does Steadfast provide any other
18  services other than assigning nurses to facilities?
19  A.  No.
20  Q.  Since you stopped working for Steadfast, did you ever
21  receive back wages for the overtime hours that you worked?
22  A.  No.
23  Q.  Okay.
24         MR. SEIFELDEIN:  No further questions for this
25  witness, Your Honor.

```
                         ──K. Bellamy - Cross──
```

 1          THE COURT:  Cross-examination.

 2                     CROSS-EXAMINATION

 3   BY MS. RUST:

 4   Q.  Hi, Ms. Summers.

 5   A.  Hello.

 6   Q.  My name is Julia Rust.  I'm an attorney for the

 7   defendants.  I have a couple of questions regarding your

 8   testimony.

 9          You talked about your hourly rate.  You said it was

10   when -- your hourly rate as a CNA, it was based on the

11   building?

12   A.  As an LPN.

13   Q.  I'm sorry.  As an LPN, yes, it was based on the building.

14   So there were different rates depending on which facilities

15   you worked at; is that right?

16   A.  Yes.

17   Q.  When you were scheduling shifts with Steadfast, you said

18   you provided your availability, right?

19   A.  Yes.

20   Q.  And Hope would tell you which shifts matched up with that

21   availability?

22   A.  Uh-huh, yes.

23   Q.  I'm sorry?

24   A.  Yes.

25   Q.  And then were you able to pick which shifts she told you

K. Bellamy - Cross

1    were available that you wanted to work?

2    A.   Yes.

3    Q.   And would you choose a shift that had a higher hourly

4    rate over a lower hourly rate?

5    A.   I would choose a shift that was available and closest to

6    my home.

7    Q.   So the location was important to you?

8    A.   Yes.

9    Q.   So you could choose the facilities that were closer if

10   they were available to you?

11   A.   Yes.

12   Q.   Were there facilities you preferred to work at?

13   A.   Just like I said, whatever was closest to me, but if I

14   had to go further out, then I would because I have four kids

15   to take care of.

16   Q.   Okay.  That's a lot.

17   A.   Yeah.

18   Q.   Were you able to request any pay advances or bonuses for

19   shifts from Steadfast when you were talking to Steadfast

20   about the shifts?

21   A.   Not pay advances, no.  But if she called on short notice

22   and asked if I could go somewhere, she might would try to

23   say -- well, she would say, "Well, I can help you with gas

24   or" -- if it was further out, "I could help you with gas or

25   maybe put you in a hotel for a couple days if you do a couple

K. Bellamy - Cross

1   of double shifts," or something like that.  But as far as a

2   pay advance, no.  But she did offer to help with gas if we

3   had to go further out.

4   Q.  Okay.  So typically when there was a last-minute need,

5   you were able to get additional incentives for a shift?

6   A.  Yes, if I so chose to go.

7   Q.  And did you ever work with any other staffing agencies or

8   registries?

9   A.  I did work with one other staffing agency.

10  Q.  Was it at the same time that you were working on

11  Steadfast's registry?

12  A.  It was a short transition.

13  Q.  Okay.  And were you -- well, have you ever seen Lisa

14  Pitts on site at a facility while you were working a shift

15  for Steadfast?

16  A.  You said did I receive -- what?

17  Q.  Sorry.

18          Have you ever seen Lisa Pitts on site while you were

19  working a shift for Steadfast?

20  A.  No.

21  Q.  So nobody from the Steadfast office has ever supervised

22  you while you provided nursing services?

23  A.  Not in the building, no.

24  Q.  Okay.

25  A.  But they have called to the facility to give specific

─────K. Bellamy - Cross─────

1   instructions.

2   Q.  As an LPN, you're subject to certain regulations and

3   requirements that are set by the Board of Nursing; is that

4   right?

5   A.  Yes.

6   Q.  And you are required to follow those?

7   A.  Yes.

8   Q.  And are those the regulations and requirements that set

9   your scope of practice as an LPN?  Is that right?

10  A.  Yes.

11  Q.  And you've never provided LPN services at Steadfast's

12  office in Norfolk; is that right?

13  A.  At the building?

14  Q.  Yeah, in Steadfast's office in Norfolk.

15  A.  No, not at that building, just the buildings they

16  contract.

17  Q.  And you talked about the code of conduct.  You said

18  Steadfast wanted you to be on time, be professional, and

19  submit time sheets on time; is that right?

20  A.  That was a list of some, yes.

21  Q.  Have you ever worked a job where those were not the

22  expectations?

23  A.  As an employee?

24  Q.  As an employee or a contractor, any job.

25  A.  No.

————————K. Bellamy - Redirect————————

1          MS. RUST:  Okay.  Thank you.  I have no further

2     questions for you.

3          MR. SEIFELDEIN:  Briefly, Your Honor.

4          THE COURT:  Briefly.

5          MR. SEIFELDEIN:  Thank you.  I understand.

6                    REDIRECT EXAMINATION

7     BY MR. SEIFELDEIN:

8     Q.  Ms. Bellamy, Ms. Rust asked you about you providing your

9     availability to Ms. Hope and then you picking the shifts that

10    are available.

11         Would you know -- actually, strike that.

12         You could only work the shifts that Miss Hope

13    presented to you, correct?

14    A.  Yes.

15    Q.  So if you wanted to work at another facility and they did

16    not present it to you, you wouldn't know if Steadfast

17    actually had that shift available, correct?

18    A.  Right.

19    Q.  And you could not go to the facility that's nearest your

20    home and ask them, "Hey, I want to work this shift," correct?

21    A.  No, we couldn't.

22    Q.  And you would have to go through Steadfast?

23    A.  Yes.

24    Q.  Ms. Rust asked you about working for another agency.

25         Which agency did you work for?

243

K. Bellamy - Redirect

1   A.   First Choice Nurses.

2   Q.   First Choice.   Okay.

3        And when you worked for First Choice, did you ever

4   work more than 40 hours in a workweek?

5   A.   Yes.

6   Q.   When you worked more than 40 hours in a workweek with

7   First Choice, did they pay you overtime?

8   A.   Initially, they didn't, but then they began to pay

9   overtime.   They said it had to be approved prior by the

10  facility that we were going to, and if they agreed to pay us,

11  then we could work overtime, but if they didn't, then we

12  couldn't work past the 40 hours.

13  Q.   So you didn't work more than 40 hours, but when you did

14  work more than 40 hours, they did pay you overtime?

15  A.   Yes.

16  Q.   And when you worked for First Choice, did you set your

17  schedule in a similar manner as you did with Steadfast?

18  A.   Yes.

19  Q.   And the pay, was it done in a similar manner as it was

20  with Steadfast?

21  A.   Yes.

22  Q.   So you were scheduling to go through First Choice and not

23  the facility?

24  A.   Yes.

25  Q.   But the facility -- excuse me -- First Choice did pay

K. Bellamy - Redirect

 1  overtime, correct?

 2  A.  Yes.

 3  Q.  And Steadfast did not pay you overtime?

 4  A.  No.

 5          MR. SEIFELDEIN:  No further questions, Your Honor.

 6          THE COURT:  May the witness be permanently excused?

 7          MR. SEIFELDEIN:  Yes, Your Honor, the witness may be

 8  excused.

 9          THE COURT:  Step down.

10          (Witness excused.)

11          THE COURT:  Next witness?

12          MS. LEWIS:  Your Honor, we have a remote witness.

13  It looks like she was on and then she was gone.  Is there a

14  way that we can try to take a moment so we can try and see

15  what's going on?  She's out of the country, and I know

16  there's weather going on there right now, and I want to be

17  sure that if she's not going to be available, we're not

18  holding things up.

19          THE COURT:  Okay.

20          MS. LEWIS:  Thank you.

21          (Pause in the proceedings.)

22          THE COURT:  I would note that you are reaching the

23  point of being overly cumulative.

24          MS. LEWIS:  Understood.

25          (Witness sworn remotely.)

———————T. Morey - Direct———————

1           TERESA MOREY, called by the Plaintiff, having been

2    first duly sworn, was examined and testified via ZoomGov.com

3    as follows:

4                        DIRECT EXAMINATION

5    BY MS. LEWIS:

6    Q.  Good afternoon, Ms. Morey.  I'm Ryma Lewis on behalf of

7    the Department of Labor.

8           If you could, please state your name for the record

9    and spell your last name.

10   A.  Teresa Morey, M-o-r-e-y.

11   Q.  Are you familiar with Steadfast Medical Staffing?

12   A.  Yes, I am.

13   Q.  How are you familiar with the company?

14   A.  I worked for Lisa Pitts, the owner of Steadfast.

15   Q.  And what was your job title?

16   A.  LPN, Licensed Practical Nurse.

17   Q.  When did you start working for Steadfast?

18   A.  I believe May of 2017.

19   Q.  Do you still currently work for Steadfast?

20   A.  No, I do not.

21   Q.  How did you apply to work for the company?

22   A.  Online.  The application was sent to me through Lisa, and

23   I was to fill it out and send it back.

24   Q.  Was that an employment application?

25   A.  Yes, ma'am.

─────────────── T. Morey - Direct ───────────────

1   Q.  And did it have you submit references?

2   A.  Yes, ma'am.

3   Q.  Were you required to complete a drug test?

4   A.  Yes, ma'am.

5   Q.  Did you pay for that test?

6   A.  No.

7   Q.  Were you required to complete a background test?

8   A.  Yes, ma'am.

9   Q.  And did you pay for that test?

10  A.  No.

11  Q.  How much were you paid per hour?

12  A.  $30 an hour.

13  Q.  And was that -- did that rate vary?

14  A.  It was a flat rate of 30 an hour unless she got a call

15  and was desperate and needed someone to go somewhere, and she

16  would call and say, "I will give you an extra $2 an hour if

17  you pick this shift up."

18  Q.  Were you paid a different rate for hours worked over 40?

19  A.  No, we were not.

20  Q.  And who set the rate of pay?

21  A.  Lisa Pitts.

22  Q.  Did you ever work more than 40 hours in a single

23  workweek?

24  A.  Yes, ma'am.

25  Q.  When did you work over 40 hours in a workweek?  Was it a

T. Morey - Direct

1   consistent or inconsistent thing?

2   A.  No.  Pretty much -- pretty much every week I would work

3   sometimes 40 or more hours over a week.

4   Q.  I want to direct your attention to what's been marked as

5   54.  Can you see the document?

6   A.  It's --

7           MS. LEWIS:  Actually, let's go to 6 instead.

8   BY MS. LEWIS:

9   Q.  I want to direct your attention to what's been marked as

10  Plaintiff's 6, starting at Page 251.

11          So in a workweek, approximately how many hours were

12  you working?  You said over 40.  Can you provide me a range?

13  A.  Basically 70 to 80 to somewhere upwards of 120 hours a

14  week.

15  Q.  How in the world would you be able to work over 100 hours

16  in a workweek?  Can you tell me what your schedule looked

17  like?

18  A.  Pretty much three or four hours of sleep a night seven

19  days a week; some days, 16-plus hours.  One day in

20  particular, I believe I worked 21 and a half hours.

21  Q.  In this exhibit that you see here in front of you, can

22  you see the total amount of hours?  It's the third line there

23  that is highlighted by your name.

24  A.  I apologize.  I can't.  It's so blurry on the computer.

25  Q.  That's fine.  It's no problem.

———T. Morey - Direct———

1          So how did you submit your time?

2   A.  I would fill out a time sheet, and I would either e-mail

3   it in or take a picture and send it in via text message.

4   Q.  I want to direct your attention to, now, an

5   exhibit that's been marked as 54.

6   A.  Okay.

7          THE COURT:  Did you move the previous exhibit into

8   evidence?

9          MS. LEWIS:  No, Your Honor, that was just to refresh

10  recollection.  If I may, she's having trouble figuring out

11  which document she needs to point to.

12          (Pause in the proceedings.)

13  BY MS. LEWIS:

14  Q.  Can you see these documents?

15  A.  The document on the screen says "Payroll Details" at the

16  top, and it has my name highlighted, and it's --

17  Q.  I think you have a delay on your end.

18  A.  Okay.

19  Q.  Can you see it now?

20  A.  Yes.  Right now it's just showing me the courtroom.

21  Q.  We'll come back to this until it catches up with us.

22          Were you restricted from accepting placement

23  opportunities with other companies when you worked at

24  Steadfast?

25  A.  Yes, ma'am.

---T. Morey - Direct---

 1   Q.  Did you have to wait a period of time before you could

 2   start working at the facility?

 3   A.  It would have to be -- after you terminated your

 4   employment with Lisa, you would have to wait a year before

 5   you could work for any of the companies that you had worked

 6   for under her.

 7   Q.  Who told you that?

 8   A.  Lisa Pitts.

 9   Q.  Why would you have to wait?

10   A.  Because you were an employee of hers, and in order for

11   you to work for another company, they would have to buy out

12   your agreement with her.

13   Q.  Did this occur with you?  Did you personally experience

14   this?

15   A.  Yes.  I started at Avante in Lynchburg as a floor nurse,

16   and they moved me into an LPN position -- I mean, as a unit

17   manager position, still up under Lisa; and, eventually, they

18   went to -- Avante management went to Lisa to buy my contract

19   out.  I don't know the details because I wasn't involved with

20   that.

21   Q.  When that happened, did Lisa approach you about that?

22   A.  She spoke with me, but they handled all the details

23   between her and Avante.

24   Q.  So did you receive any funds from Lisa for the buyout?

25   A.  No, not at all.

———— T. Morey - Direct ————

1   Q.   Were you involved in that negotiation?

2   A.   No.

3   Q.   Do you know how much she received for the buyout?

4   A.   I don't.  I was told it was 10,000 or more, but I don't

5   know the details.  That's just hearsay.

6            MS. RUST:  Objection.  Hearsay.

7            THE WITNESS:  I'm sorry.  I was told through the DON

8   at the facility.  I did not hear that directly.

9            MS. LEWIS:  I'll move on.

10  BY MS. LEWIS:

11  Q.   So when this buyout period was happening, were you still

12  working for Steadfast?

13  A.   Yes.

14  Q.   Did anything happen with your hours?

15  A.   Yes.  I was told I had to cut back hours -- this was

16  through Lisa -- until they finished getting everything worked

17  out.

18  Q.   Okay.  And so during that time, were you able to work at

19  any other facilities, or did your income just sort of

20  decrease during that time?

21  A.   No.  I wasn't allowed to work at any other facility.  It

22  was decreased.

23  Q.   Were you required to maintain your own malpractice or

24  liability insurance?

25  A.   No.

T. Morey - Direct

1   Q.  Were you required to maintain your own Workers' Comp

2   Insurance?

3   A.  No.

4   Q.  Were you given the option to be classified as an

5   independent contractor or an employee?

6   A.  No.  My understanding is I was an employee of Lisa's.

7   Q.  I want to come back to the buyout that we were just

8   talking about a moment ago.

9           Did Lisa tell you whether or not you would be faced

10  with consequences if you just stopped working for her?

11  A.  If I stopped working for her and then just went to work

12  for Avante, yes.

13  Q.  What did she tell you?

14  A.  I could be held liable and she could file a civil suit

15  against me.

16  Q.  On what basis?  What did she tell you she would file a

17  civil suit against you for?

18  A.  Because if you work for her, once you terminate your

19  employment with her, you have to wait a year before you can

20  work at any of the facilities that you worked for under her.

21  Q.  And who was your supervisor at Steadfast?

22  A.  Lisa Pitts.

23  Q.  Have you received any back wages from Steadfast for hours

24  worked over 40?

25  A.  No.

—————T. Morey - Direct—————

1    Q.  Did you ever question Steadfast and/or Lisa about being
2    paid overtime?
3    A.  Yes.  And I was told that Lisa told me herself that they
4    do not pay overtime.  It's a flat rate of $30 an hour, or
5    whatever your pay is.  Mine, in particular, was 30 an hour.
6    Q.  Did she ever tell you -- make any other representations
7    about whether or not they would permit you to work overtime,
8    over 40 hours in a week?
9    A.  Oh, yeah, I could work all the overtime I wanted.  I just
10   wasn't paid time and a half.  I was only paid the flat rate
11   of 30.
12   Q.  I want to go back and see if we can get this exhibit to
13   work.  Tell me if you can see these.
14   A.  It's just a white screen on my end.
15   Q.  Okay.  Give it a second.
16          THE CLERK:  Your Honor, this is what she sees.  This
17   is what we see.
18          THE COURT:  We don't know what the reason for that
19   is?
20          THE CLERK:  I do not.  It's technical.
21   BY MS. LEWIS:
22   Q.  Can you see anything now?
23   A.  It's just a white screen.
24          THE COURT:  Well, I think, Ms. Lewis, you will have
25   to figure out some way to navigate around that.

————T. Morey - Direct————

1          MS. LEWIS:  Okay.

2     BY MS. LEWIS:

3     Q.  So, coming back, you submitted time sheets to Steadfast;

4     is that right?

5     A.  Yes.

6     Q.  And you submitted them, and the time sheets reflected

7     your schedule that you worked at whatever specific facility?

8     A.  Yes.

9     Q.  And you had to sign those time sheets?

10    A.  Yes.

11    Q.  And then they were submitted to -- then the time sheets

12    were submitted to Steadfast as a concurrent or near-time

13    record of the hours that you worked at whichever facilities

14    you worked; is that right?

15    A.  Yes.  I had to sign them, and, also, management personnel

16    at the facility, verifying that those were hours I actually

17    worked, had to sign them, and then I submitted them to Lisa.

18         THE COURT:  The Court will simply suggest that you

19    were leading your witness.

20         MS. LEWIS:  Okay.  Your Honor, I move to admit

21    Plaintiff's 54.

22         THE COURT:  Any objection to Plaintiff's 54?

23         MS. RUST:  No, Your Honor.

24         MS. LEWIS:  No further questions for Ms. Morey.

25         THE COURT:  Plaintiff's 54 is admitted.

Carol L. Naughton, Official Court Reporter

—————————————T. Morey - Cross—————————————

1            (Plaintiff's Exhibit PX-54 received in evidence.)

2            MS. LEWIS:  Stand by, Ms. Morey.  Opposing counsel

3    will have some questions for you.

4                         CROSS-EXAMINATION

5    BY MS. RUST:

6    Q.  Hi, Ms. Morey, my name is Julia Rust.  I'm an attorney

7    for the defendants.  I have a couple of questions about your

8    testimony.

9            You're not currently working on Steadfast's

10   registry; is that right?

11   A.  No.

12   Q.  Are you currently employed directly by a facility?

13   A.  Yes.

14   Q.  Are you employed by Avante or Accordius?

15   A.  No, I'm not.

16   Q.  When did you start your current employment?

17   A.  February of this year.

18   Q.  And when did you stop working on Steadfast's registry?

19   A.  I believe it was November of 2017.

20   Q.  Okay.  So you were just there for a couple of months?

21   A.  May, June -- May through November, I believe, is what it

22   was.

23   Q.  Where did you go after that?  What were you doing for

24   work after that?

25            MS. LEWIS:  Your Honor, objection as to relevance.

—————————————T. Morey - Cross—————————————

1          THE COURT:  Sustained.

2          MS. RUST:  Well, Your Honor, she testified regarding

3    whether she was allowed to work for a year after her time at

4    Steadfast.

5          THE COURT:  Okay.  If that's the basis for it, then

6    the Court would permit it, but as the Court recalls, I think

7    the testimony was she was threatened and she was told --

8    maybe it was a year.

9          MS. LEWIS:  Your Honor, if I may, Ms. Morey's

10   testimony is she wasn't allowed to work for the facility she

11   was working at that Steadfast had placed her with for a year.

12   She didn't testify "I wasn't allowed to work anywhere."  She

13   said she wasn't allowed to work at the facility.

14          The testimony and the line of questioning was

15   related to her relationship with Steadfast, the facility she

16   was working at for Steadfast, and what restrictions, if any,

17   Steadfast placed on her ability to take a permanent position

18   at that facility or other facilities Steadfast placed her at.

19          THE WITNESS:  Yeah.

20          THE COURT:  Well, okay.  Even with that, the Court

21   is going to permit her to answer that question.

22          MS. RUST:  Thank you, Your Honor.

23   BY MS. RUST:

24   Q.  Ms. Morey, I'll go ahead and restate that for you.

25          So after you stopped working on Steadfast's

—————————————————T. Morey - Cross—————————————————

1   registry -- you said around November 2017 -- where did you

2   work after that?

3   A.   I worked at Avante in Lynchburg, because they bought my

4   contract out from Lisa.

5   Q.   Did Lisa Pitts or anybody else at Steadfast tell you that

6   the contract had actually been bought out?

7   A.   Yes.  Lisa did.

8   Q.   You said you were not part of the negotiations between

9   Steadfast and Avante regarding any buyout, though, right?

10  A.   No.

11  Q.   So you don't know what the ultimate determination was

12  between --

13  A.   No, I don't.

14  Q.   So it's possible, then, that they did not negotiate a

15  buyout, but Steadfast did not pursue any liability against

16  you for working at Avante after that?

17            THE COURT:  Sustained.

18            MS. LEWIS:  If I can just make it for the record.

19            THE COURT:  Your objection was?

20            MS. LEWIS:  My objection was speculation.

21            THE COURT:  The Court anticipated that.  You're

22  calling for speculation.  So the objection is sustained.

23            MS. RUST:  Of course.  Thank you.

24  BY MS. RUST:

25  Q.   Have you ever been involved in Steadfast's negotiations

—————T. Morey - Cross—————

1  with facilities for the contracts it has to staff those
2  facilities?
3  A.  Only aspect I was involved in is once I was working
4  officially through Avante, our staffing needs of what holes
5  we needed to fill, I would give that to the DON, and then she
6  would go through Lisa to cover holes.
7  Q.  So if I understand correctly, it was only once you were
8  working through Avante, you might have -- is that what you
9  said?  You were negotiating on behalf of Avante with
10  Steadfast?
11  A.  No.  The only thing I did is, based on our schedule, we
12  have to have X amount of nurses and X amount of CNAs for our
13  patient-to-staff ratio.  So when I was the unit manager, when
14  we didn't have staffing, based on what the needs were to get
15  nurses and CNAs in there, I would say, "We have X holes.  I
16  need X amount of nurses and X amount of CNAs on this day or
17  that day."
18         I would give that information to the DON of the
19  facility, who would then call and speak with Lisa and get
20  those holes filled when she could.  That would be my only
21  part in it.
22  Q.  Okay.  I see.  But you've never been involved in the
23  actual negotiation of the staffing contracts between
24  Steadfast and --
25  A.  No.

T. Morey - Cross

1  Q.  Okay.  And when you mentioned in your testimony that it

2  was -- you typically received $30 an hour, unless there was a

3  situation where there was a last-minute need to pick up a

4  shift; is that right?

5  A.  Yeah.  That would be up to Lisa.  If she was going to

6  offer -- she would call and ask, "Hey, can you pick up such

7  and such," but if she was desperate and couldn't get anybody

8  to pick it up, she would say something like, "I'll give you

9  an extra $2 an hour if you could cover this for me."

10 Q.  So in those instances, you could negotiate a higher

11 hourly rate for a shift; is that right?

12 A.  No.  There was no negotiation.  It was --

13 Q.  She would --

14        THE COURT:  Only one of you-all can talk at a time.

15 Let's back up.  What was the question again?

16 BY MS. RUST:

17 Q.  I think the last question I asked was:  So you could

18 negotiate a higher rate in those instances?

19        THE COURT:  Your answer?

20        THE WITNESS:  No.  The incident in particular, she

21 called me.  There was a need at Autumn Care in Altavista on

22 third shift.  She said, "I know you just worked all day,"

23 she's like, "I know you haven't had any sleep, but if you

24 will cover this for me, I'll give you an extra $2 an hour."

25 BY MS. RUST:

Carol L. Naughton, Official Court Reporter

———————T. Morey - Cross———————

1   Q.  Do you have any knowledge as to whether that increase in

2   hourly rate was authorized by the facility or not?

3   A.  I don't handle that.

4   Q.  Okay.

5         MS. RUST:  I think those are all the questions I

6   have for you.  Thank you, Ms. Morey.

7         THE COURT:  The Court hasn't heard any evidence in

8   the case that the facilities where these people worked

9   controlled the rates they were paid.  That was with respect

10  to your last question.  But move on.  No problem.

11        MS. RUST:  Well, Your Honor, I would just proffer

12  that it would be something that we would intend to discuss in

13  our case in chief, at least, for the defense.

14        THE COURT:  So you are raising a question based on

15  something not in evidence at this juncture.

16        MS. RUST:  Understood.  If I may, I believe I was

17  ask -- well, questioning the witness's knowledge as to who

18  was actually making an offer of an increased hourly rate,

19  because the witnesses have said that it was offered by

20  Steadfast.  They may have received that information from

21  Steadfast, but they aren't aware of who actually authorized

22  that offer.

23        THE COURT:  I thought your question was whether the

24  facility approved that $2 increase that she offered.  That's

25  what the Court is referring to.

Carol L. Naughton, Official Court Reporter

────────T. Canady - Direct────────

1      Okay.  Let's just move on.  May this witness be

2   permanently excused, or is there any redirect?

3          MS. LEWIS:  Permanently excused.

4          Thank you, Ms. Morey.

5          THE WITNESS:  Thank you.

6          (Witness excused.)

7          THE COURT:  Thank you very much.

8          MS. JONES:  Tatianna Canady.

9          (Witness sworn.)

10          TATIANNA CANADY, called by the Plaintiff, having

11   been first duly sworn, was examined and testified as follows:

12                   DIRECT EXAMINATION

13   BY MS. JONES:

14   Q.  Hi, Ms. Canady.  Could you please state and spell your

15   name for the record.

16   A.  Tatianna, T-a-t-i-a-n-n-a.  My last name is C-, as in

17   cat, -a-n-a-d-y.

18   Q.  And, Ms. Canady, are you familiar with Steadfast Medical

19   Staffing?

20   A.  Yes.

21   Q.  To your knowledge, what type of services does Steadfast

22   provide?

23   A.  Travel nurse agency.  She sends nurses to facilities.

24   Q.  And were you employed or are you currently employed by

25   Steadfast?

────────T. Canady - Direct────────

1    A.  Yes, I was.

2    Q.  And when were you employed by Steadfast?

3    A.  2018 until 2020.

4    Q.  And what was your job title when you were employed by

5    Steadfast?

6    A.  Licensed practical nurse.

7    Q.  And if you recall, how did you apply to work for

8    Steadfast?

9    A.  I applied online, and then I went in to finish.

10   Q.  And when you say you applied online, what specifically

11   did you complete online?

12   A.  Something was sent through e-mail.  It's not applied.  I

13   was given paperwork from the receptionist over the phone,

14   that when I contacted Steadfast, she sent to my e-mail what I

15   needed to fill out, and then I had to come in and finish the

16   rest.

17   Q.  So the online documents that were e-mailed to you, did

18   that include some sort of employment application?

19   A.  Yes.

20   Q.  Okay.  And do you recall what type of information was

21   requested on that employment application?

22   A.  I don't.

23   Q.  And you indicated that you went into the office to

24   complete certain things.  What did you go into the office to

25   complete?

T. Canady - Direct

1    A.   A big packet, paper-wise.  I had to finish a bigger

2    packet.

3    Q.   Did that bigger packet contain any type of training

4    materials to your recollection?

5    A.   No.

6    Q.   Did it contain an independent contractor agreement?

7    A.   I received an independent contractor agreement after I

8    was already working.

9    Q.   Okay.  And as part of the application process, did you

10   have to submit for a drug test?

11   A.   Yes.

12   Q.   And what about a background check?

13   A.   I filled paperwork out for it.

14   Q.   And once you submitted all of those documents and the

15   drug test and the background check, were you hired to work

16   for Steadfast?

17   A.   Correct.  I worked the exact same day.

18   Q.   And how were you offered the position?  Who offered the

19   position to you?

20   A.   Lisa Pitts.

21   Q.   And did you have a formal interview with anyone?

22   A.   I -- I had a conversation with Ms. Lisa Pitts.

23   Q.   And when you were employed by Steadfast, were you paid an

24   hourly rate, or were you paid a salary?

25   A.   Hourly.

T. Canady - Direct

1   Q.  Okay.  And did your hourly rate ever vary?

2   A.  Yes.

3   Q.  To your knowledge, why did your rate vary?

4   A.  I was informed it was because of the facilities we went

5   to.  Every facility's price wasn't the same.

6   Q.  And was there ever any incidents where you were told you

7   would be paid one hourly rate but were paid a lower hourly

8   rate?

9   A.  Yes.

10  Q.  When would you be made aware that your hourly rate would

11  be lower?

12  A.  When I saw my check and I contacted Steadfast.

13  Q.  And what did you do when you contacted Steadfast about

14  that lower hourly rate?

15  A.  We were informed to try to get in touch with

16  Miss Christine, and I would e-mail Miss Christine, but

17  nothing was ever resolved.

18  Q.  Did Miss Christine ever respond to your e-mails?

19  A.  Yes.

20  Q.  And what was the response regarding that lower hourly

21  pay, if you recall?

22  A.  Most of the time, she'll check into it.

23  Q.  When you say Miss Christine, is Miss Christine an

24  employee of Steadfast?

25  A.  I was informed that she ran payroll.

————T. Canady - Direct————

1  Q.  She ran payroll for Steadfast?

2  A.  Correct.

3  Q.  And during your time with Steadfast, were you ever able

4  to structure your relationship with the facility directly?

5  A.  No.

6  Q.  Were you required to go through Steadfast?

7  A.  Correct.

8  Q.  And to your knowledge, who negotiated your hourly rate of

9  pay?

10  A.  Lisa.

11  Q.  And were you required to maintain your own malpractice or

12  liability insurance?

13  A.  I wasn't informed, if I was.

14  Q.  I'm sorry?

15  A.  I was not informed of that, if I was.

16  Q.  So was that a no, you didn't provide it?

17  A.  No.  I did not provide it, no.

18  Q.  And what about Workers' Compensation Insurance?

19  A.  No, I didn't have anything with that either.

20  Q.  Were you given the option to be classified as an

21  independent contractor or as an employee?

22  A.  No.  Again, I received the independent contractor after,

23  through e-mail, because I guess paperwork wasn't all the way

24  up-to-date, so we received extra paperwork later on to

25  complete, and that's when the independent contractor came up,

───────T. Canady - Direct───────

1  the agreement.

2  Q.  Do you know how -- prior to receiving that agreement, do

3  you know how Steadfast classified you?  Did they classify you

4  as an employee or independent contractor?

5  A.  Independent contractor.

6  Q.  And that was even before you signed that agreement?

7  A.  Yes, ma'am.

8  Q.  And just based upon your general knowledge, do you know

9  what is required to be considered an independent contractor?

10  A.  I do now.

11  Q.  So you identified as an independent contractor because

12  that's what Steadfast identified you as?

13  A.  I identified as contractor.  I didn't know the

14  independent part, but yes, ma'am, we were identified as

15  contractors.

16  Q.  And do you advertise your healthcare services in any way?

17  A.  I'm sorry.  What was that?

18  Q.  Do you advertise your healthcare services as an LPN in

19  any way?

20  A.  Advertise?  Can you --

21  Q.  Do you specifically, as Tatianna Canady, represent your

22  services to any facility on your own, independently of

23  Steadfast or any other facility?

24  A.  Not other than Steadfast, no.

25  Q.  And when you were employed by Steadfast, were you

—————T. Canady - Direct—————

1    required to submit time sheets?

2    A.  Correct.

3    Q.  And were you required to submit those time sheets to

4    Steadfast?

5    A.  Correct.

6    Q.  And how often did you submit those time sheets?

7    A.  It should have been after every shift.

8    Q.  And who told you that you were required to submit time

9    sheets?

10   A.  It was within the packet that we received once we got --

11   when I got to the facility -- I mean, to Steadfast to finish

12   the rest of my paperwork.  One of the paperworks did state

13   that we were supposed to sign -- get a signature after every

14   shift.

15   Q.  And you got the signature from -- from who did you get

16   the signature on the time sheet from?

17   A.  Most of the time it was whatever nurse for that facility

18   that was working with me.  If we did not have a nurse at that

19   facility, whatever nurse I was working with at that time.

20   Q.  And then after, you would submit that signed time sheet

21   to Steadfast?

22   A.  Correct.

23   Q.  And let's talk a little bit about your work schedule when

24   you were working with Steadfast.  What was your schedule?

25   A.  I didn't have a schedule.  I picked my hours.

———T. Canady - Direct———

1   Q.  So what hours did you generally work?

2   A.  Nights, days, evenings.  I worked all of them.

3   Q.  So, specifically, how many hours would you work each

4   shift that you worked?

5   A.  16-plus.

6   Q.  And so how was your -- you indicated that you picked your

7   shifts.  How did you pick your shifts?

8   A.  I would tell them what days I was available, and they

9   would inform me if there was availability there.  If not, I

10   will ask for a different recruiter who also worked in maybe a

11   different area to pick up whatever I couldn't get from that

12   one recruiter.

13   Q.  So would Steadfast provide you the facilities for your

14   schedule?

15   A.  Correct.

16   Q.  Have you ever turned down a shift Steadfast offered you?

17   A.  Correct, yes.

18   Q.  I'm sorry.  What was that last word?

19   A.  Yes.

20   Q.  Did Steadfast do anything in response to that?

21   A.  I was apprehended [sic].  I definitely got taken off the

22   shift for two weeks if I did not do what they wanted me to

23   do.

24   Q.  If Steadfast offered you a shift -- strike that.

25        Did you ever work more than 40 hours in a workweek?

————T. Canady - Direct————

1   A.  Yes.

2   Q.  And how often would you say that you worked more than 40

3   hours?

4   A.  How do you -- I guess I don't know exactly how I can say

5   it, but maybe three weeks out of a month every month.  I

6   definitely did a lot of overtime -- a lot.

7   Q.  And when you worked those overtime hours, how were you

8   compensated?

9   A.  I was told that we had a straight-across-the-board price.

10  So I was just paid whatever the hourly was for that facility.

11  Q.  So were you ever paid time and a half for overtime hours

12  worked while you worked for Steadfast?

13  A.  No.

14  Q.  Were you required to provide notice to Steadfast if you

15  were unavailable to work?

16  A.  No.  Most of the time I told them if we could work.

17  Q.  I'm sorry.  What was that?

18  A.  We only told them if we could work.

19  Q.  If you were running late for a shift, would you ever have

20  to call anyone to let them know?

21  A.  Yes.

22  Q.  And who would you call?

23  A.  I would contact the recruiter.

24  Q.  And that is the recruiter for Steadfast?

25  A.  Correct.

─────────────── T. Canady - Direct ───────────────

1    Q.  Were you allowed to employ any other LPN to assist you in

2    completing the shift assigned to you by Steadfast?

3    A.  "Employ"?

4    Q.  Yes.  Could you hire another LPN to do the work for you?

5    A.  No.  I just gave the information to Steadfast if I knew

6    another worker, a referral.

7    Q.  So you are saying you referred other LPNs to work for

8    Steadfast?

9    A.  Correct.  Yes, ma'am.

10   Q.  But they could not cover your shift?

11   A.  No.  Not if we didn't call to see if it was okay, because

12   I did that and I ended up getting in trouble.

13   Q.  So you got in trouble for trying to have someone cover

14   your shifts?

15   A.  No.  I tried to get somebody else's shift, and I didn't

16   know I was in trouble at that time.  So I ended up getting in

17   more trouble.

18   Q.  So what do you mean you were in trouble?

19   A.  I guess I didn't do something prior for Ms. Pitts, and I

20   got tooken off the schedule for a facility that I never got

21   canceled for that day.  So when I went in, I thought I was on

22   the schedule.  I was tooken off.  So, instead, I asked

23   someone who had a double shift if I could take their morning

24   and they take the evening, and she said it was fine, but we

25   have to contact the facility.

Carol L. Naughton, Official Court Reporter

────────────── T. Canady - Direct ──────────────

1          Once we contacted Steadfast to see if it was okay,

2   the recruiter gave an okay, but then she got a call back, and

3   the recruiter stated exactly, "I don't know what Lisa and

4   Tatianna have going on, but you better stay out of it.  She

5   cannot take your shift and leave it alone."  And I was off

6   the schedule for two weeks.

7   Q.  So Steadfast removed you from the schedule for two weeks

8   for attempting to take someone else's shift -- a part of

9   someone's double shift?

10  A.  No.  She took me off before the shift.  I didn't know I

11  was off.  So when I tried to take that shift, it was pretty

12  much letting me know, no, you cannot take the shift, and, no,

13  you are not working at all.

14  Q.  So as a result of that, did you state that you were taken

15  off the schedule completely for two weeks?

16  A.  I was.  I was informed by the recruiter to just give her

17  time to cool down.

18  Q.  Give who time to cool down?

19  A.  Miss Lisa, because I was tooken off because of her.

20  Q.  So during the times you were working with Steadfast, did

21  they ever allow you to negotiate your rate of pay with the

22  facility directly?

23  A.  No.

24  Q.  So who was responsible for the negotiation with the

25  facility?

---T. Canady - Direct---

1    A.  Steadfast.

2    Q.  And when you were at the facility, did you interview with

3    them prior to starting the shifts there?

4    A.  No.  I just went straight to work.

5    Q.  Did you ever communicate with the facilities you worked

6    for directly to establish the shifts?

7    A.  Sometimes, yes.  Because I started noticing if I did not

8    go through the facility, I would be tooken off schedules

9    without knowing information.

10   Q.  And if you did schedule a shift with the facility, would

11   you be required to let Steadfast know that you were picking

12   up a shift?

13   A.  We were required, yes.

14   Q.  And do you know why you were required to let Steadfast

15   know?

16   A.  I was not.  I don't know why.  I don't.

17   Q.  Other than your hourly rate, did you receive any other

18   profits from Steadfast?

19   A.  We would be told -- if it was, like, a last-minute shift

20   or anything, we would get incentives, but once I got paid, my

21   incentives was never there, really.

22   Q.  So outside of your hourly rate and the rates that you

23   were paid to work at the facility, did you receive any other

24   compensation?

25   A.  Not often, but like I said, if she gave us $2 extra,

———T. Canady - Direct———

1   sometimes I probably would see it, and others, I would not.
2   Q.  But just to clarify, that was because of your work at the
3   facility?
4   A.  Correct.
5   Q.  And who paid you for the work and the services that you
6   provided at the facilities?
7   A.  Steadfast.
8   Q.  If you didn't receive your check or compensation from
9   Steadfast, would that impact your ability to meet your
10  financial obligations?
11  A.  Yes.
12  Q.  And do you have any ownership interest in Steadfast?
13  A.  No.
14  Q.  And as an LPN, what type of equipment or supplies do you
15  use to complete your job?
16  A.  Stethoscope, blood pressure cuff, thermometer.  We have
17  bags, pens, papers, clipboards.
18  Q.  Are those items that you detailed, are those considered
19  normal tools of the trade?
20  A.  Correct.
21  Q.  When you are at a facility for an assignment, are you
22  required to provide your own supplies outside of the tools of
23  the trade that you would use?
24  A.  Correct.
25  Q.  And are you required to hold a license to practice as an

─────────T. Canady - Direct─────────

1    LPN?

2    A.  Correct.

3    Q.  Is this license required regardless of what facility you

4    are placed to work in?

5    A.  Yes.

6    Q.  And as an LPN, what type of care do you provide to

7    patients?

8    A.  I pass medications --

9    Q.  What type of care -- oh, sorry.

10   A.  I pass medications to the residents.  Sometimes I have

11   hands-on, but most of the times, it's passing meds.

12   Q.  And do you do these same type of services regardless of

13   the facility you are placed in?

14   A.  Yes, ma'am.

15   Q.  And did you ever complain about not receiving time and a

16   half for hours worked over 40?

17   A.  Yes.

18   Q.  Who did you complain to?

19   A.  Mostly the recruiters is who we had more contact with.

20   Q.  And what was their response?

21   A.  I really don't remember.

22          THE COURT:  What was that?

23          THE WITNESS:  I don't remember.

24   BY MS. JONES:

25   Q.  After those conversations, did you ever receive time and

—————T. Canady - Cross—————

1   a half or overtime?

2   A.  No.

3           MS. JONES:  I have no further questions.

4           THE COURT:  The Court has a question, and maybe I

5   should ask it before your cross in case you want to follow up

6   on it.

7           Did you have health benefits when you were working

8   for Steadfast?

9           THE WITNESS:  No, sir.

10          THE COURT:  No health insurance?

11          THE WITNESS:  No health insurance.

12          THE COURT:  Okay.  So Steadfast didn't offer health

13  benefits?

14          THE WITNESS:  No, sir.

15          THE COURT:  All right.  Thank you.

16          Cross-examination.

17                     CROSS-EXAMINATION

18  BY MS. RUST:

19  Q.  Hi, Ms. Canady.

20  A.  Hello.

21  Q.  My name is Julia Rust.  I'm an attorney for the

22  defendants.

23          You said you were able to schedule some shifts

24  directly with the facility; is that right?

25  A.  Some, yes, ma'am.

————T. Canady - Cross————

1   Q.   And when you were on site or -- let me -- actually, you

2   talked about time sheets?

3   A.   Yes.

4   Q.   When you would get a signature from somebody, from a

5   facility nurse, did they verify the number of hours that you

6   said you worked on the time sheet?  Is that what the

7   signature was for?

8   A.   That is what it was supposed to be for, yes.

9   Q.   Okay.  And when you would -- you talked about the process

10  for picking up shifts and that you would tell Steadfast what

11  you had available and pick your hours.

12          When they provided you with the available

13  opportunities, were you able to choose which facility you

14  wanted to be at, if any of them at all?

15  A.   No.

16  Q.   And if I need to rephrase -- that was a long question.

17  So if I need to rephrase, just tell me.

18  A.   Yes.  I think it's rephrasing.  I don't know if I

19  understand correctly but --

20  Q.   Let me rephrase it for you, then, so we're not confused.

21  A.   Okay.

22  Q.   So when you would call and tell what your availability

23  was and somebody at Steadfast would tell you what available

24  opportunities there were --

25  A.   Uh-huh.

—T. Canady - Cross—

1   Q.  -- then -- tell me if I'm wrong -- you would pick which
2   shifts you wanted to pick up, right?
3   A.  Correct.
4   Q.  And you could pick whether you wanted it based on the
5   time of the shift or the location of the shift; is that
6   right?
7   A.  Correct.
8   Q.  Okay.  And based on the hourly rate that was offered for
9   that shift; is that right?
10  A.  We didn't know our hourly rate, ma'am.
11  Q.  I think you said the hourly rate varied at each facility.
12  A.  Yes.  But we never knew what facility was what price.
13  That wasn't a specific.
14  Q.  And you said as part of the type of care that you offer
15  as an LPN was passing medications, right?
16  A.  Correct.
17  Q.  When you're on site at a facility, has Lisa Pitts or any
18  of the other office employees at Steadfast been on site to
19  supervise how you pass medications?
20  A.  No.
21  Q.  Okay.
22          MS. RUST:  I have no further questions.  Thank you,
23  Ms. Canady.
24          THE COURT:  Any redirect?
25          MS. JONES:  Just two quick questions, Your Honor.

T. Canady - Redirect

1                    REDIRECT EXAMINATION
2     BY MS. JONES:
3     Q.  Ms. Canady, you indicated that you could pick your
4     schedule, but the schedule was based on what Steadfast
5     presented to you?
6     A.  Yes.
7     Q.  So if they didn't present a facility to you, were you
8     able to work there?
9     A.  No, not at all.
10    Q.  So, essentially, your schedule was based on what
11    Steadfast provided to you?
12    A.  Correct.
13              MS. JONES:  I have no further questions, Your Honor.
14              THE COURT:  May the witness be permanently excused?
15              MS. JONES:  Yes, Your Honor.
16              (Witness excused.)
17              THE COURT:  I think what the Court is going to do is
18    just go on and take about a 15-minute break right here in
19    between these witnesses.
20              MS. LEWIS:  If I may, Your Honor, as a housekeeping
21    matter.  We provided our list of anticipated additional
22    witnesses today, and we have at least five no-shows that
23    we've been trying to get in touch with.  They were
24    subpoenaed, but with that, we don't -- yeah, we called them
25    last night to confirm, and they confirmed.  They are not here

──────────── T. Canady - Redirect ────────────

 1   today now.

 2           THE COURT:  All five of these left are no-shows?

 3           MS. LEWIS:  Yes, Your Honor.  And some of them we

 4   had to move around from other days because of the changes.

 5   So three of them -- Courtney Turner, Tiffany Trogdon, and

 6   Ryan Thompson were moved up.  And Andrea White and Tywann

 7   White, they should be here, for sure, and we don't know where

 8   they are.

 9           THE COURT:  Okay.  Well, the Court will extend the

10   break by five minutes, and maybe 20 minutes will give you

11   more time to see if you can find someone.  Otherwise, you

12   have no one to go forward with after we come back?

13           MS. LEWIS:  That is correct, Your Honor.

14           THE COURT:  Well, let's hope that something happens

15   over the break so that you can find some of these people.

16           MS. LEWIS:  Yes, thank you.

17           (Recess from 2:49 p.m. to 3:19 p.m.)

18           THE COURT:  Counsel, if you could update the Court

19   on the status of these witnesses.  You can do it right there.

20           MS. LEWIS:  Thank you, Your Honor.

21           Your Honor, we have had -- as indicated to the

22   Court, there were five witnesses today that we subpoenaed to

23   testify, in addition to there was one yesterday.  So that's a

24   total of six witnesses, all of whom are current employees of

25   Steadfast, that have been responsive and indicated a

———————— T. Canady - Redirect————————

1    willingness to testify, and they are under subpoena.

2          There's at least one individual who initially

3    indicated to us, when we were just able to reach him, that he

4    was scheduled to work today.  Now, the Court has heard

5    numerous times what has happened if they cancel or turn down

6    shifts, and I just confirmed with him last night that he

7    would be here.

8          Now, it would be inappropriate to maintain a report

9    that something is amiss, but something is not right.  And

10   this is -- nonappearance of these witnesses directly

11   undermines our ability to put on evidence in our case.

12         THE COURT:  Okay.  For the record, list the names of

13   the witnesses who got subpoenas and have not showed.  As a

14   matter of fact, come to the podium.  I thought it would be

15   quicker.  Come on around.

16         MS. LEWIS:  Andrea Tirado, T-i-r-a-d-o; Tywann

17   White, T-y-w-a-n-n; Courtney Turner; Tiffany Trogdon; Ryan

18   Thompson; and Brandi Plummer.

19         THE COURT:  Brandi who?

20         MS. LEWIS:  Plummer.

21         Now, we have on the phone -- we were able to get in

22   touch with two of those six.  Currently holding via video is

23   Ms. Courtney Turner.  Tywann White initially indicated that

24   he was scheduled, but he said he would be able to leave his

25   shift and come, and he's on his way.  But we have not been

T. Canady - Redirect

1   able to reach the remaining four.

2          THE COURT:  Here's the procedure:  Anyone who does

3   not show up in here faces the likelihood of fine and going to

4   jail.  And the Court will issue a Show Cause to each of these

5   people who do not show as to why they should not be held in

6   contempt of this court, and the Court will have the U.S.

7   Marshals serve them.  They will be brought to this Court, and

8   the Court will conduct a hearing.  It won't be done during

9   this trial, but that's exactly what's going to happen here,

10  now, unless they in some kind of way find time to show up

11  here.  But you're not going to ignore a subpoena from this

12  Court.  I don't know where that idea popped into somebody's

13  head, but it doesn't work that way.

14          That being the case, we're prepared to move on, but

15  somebody is in serious jeopardy.

16          MS. LEWIS:  Understood, Your Honor.  If I may, just

17  with respect to -- the Court had indicated a little bit

18  earlier today that -- never mind, Your Honor.  Excuse me.

19  Thank you for your time.

20          THE COURT:  So is a witness here?

21          MS. JONES:  Courtney Turner is on the Zoom.

22          (Pause in the proceedings.)

23          (Witness sworn remotely.)

24          COURTNEY TURNER, called by the Plaintiff, having

25  been first duly sworn, was examined and testified via

─────C. Turner - Direct─────

 1   ZoomGov.com as follows:

 2                        DIRECT EXAMINATION

 3   BY MS. JONES:

 4   Q.   Ms. Turner, could you please state and spell your last

 5   name for the record.

 6   A.   Yes.  C-o-u-r-t-n-e-y T-u-r-n-e-r.  Courtney Turner.

 7   Q.   Are you familiar with Steadfast?

 8   A.   Yes, I am.  That's where I work.

 9   Q.   And how long have you worked with Steadfast?

10   A.   Ever since 2016.

11   Q.   And what is your position with Steadfast?

12   A.   A traveling CNA.

13   Q.   Do you recall how you applied when you began working for

14   Steadfast?

15   A.   By paper.

16   Q.   And by "paper," do you mean a paper application?

17   A.   Absolutely.

18   Q.   Do you recall what type of questions were asked on that

19   application?

20   A.   No.  Many moons ago.

21   Q.   Do you recall if you were required to give references?

22   A.   Yes, I do know that.

23   Q.   Were you required to provide any documents in support of

24   that application?

25   A.   As far as our credentials, first aid, CPR, updated

─────C. Turner - Direct─────

1   license, you know, necessities for working in the building.

2   Q.  Were you required to have a drug test?  Can you hear me?

3   A.  I'm sorry?

4   Q.  Were you required to have a drug test?

5   A.  Yes.  That's how you could pass.  You go to Greenwich

6   Road, you take a drug test, and then they report it to

7   Miss Lisa.

8   Q.  After you submitted those applications and those

9   accompanying materials, were you interviewed by anyone at

10  Steadfast?

11  A.  Melissa, at the time, meaning she was there for Lisa.

12  Q.  After that interview with Melissa, were you hired by

13  Steadfast?

14  A.  Yes.  That was the whole process.

15  Q.  And do you recall how you were offered the position to

16  work with Steadfast?

17  A.  Yes.  Once we took our drug screening, they reported it

18  to Miss Lisa, and her callers then offered you shifts, and

19  you could say "yea" or "nay."

20  Q.  Are you paid an hourly rate or a salary?

21  A.  Hourly rate, depending on where you go at the time.

22  Q.  And who negotiates that hourly rate?

23  A.  I'm guessing Miss Lisa.

24  Q.  Do you negotiate that rate yourself with the facilities?

25  A.  No.

C. Turner - Direct

```
 1   Q.  Have you ever had any issues getting shifts during your
 2   employment with Steadfast?
 3   A.  No.  Not -- no.  Only like if you don't -- we can't get
 4   written up, verbal warnings.  We're agency.  So we get what
 5   is called DNR'd, and that's do not rehire.  So Lisa, what
 6   she'll do is, I guess, you just won't be on the schedule for
 7   a couple of days.  That's part of -- if you're late, you
 8   know, these are things as an adult you should do, but that's
 9   how she handles things.
10   Q.  Are you required to submit time sheets?
11   A.  Yes, Steadfast Medical time sheets.  Steadfast Medical
12   pays -- pays from the time sheets.
13   Q.  Are you saying that you e-mail those time sheets?
14   A.  Yeah, we e-mail the time sheets in, yeah.
15   Q.  How often are you required to submit those time sheets?
16   A.  I submit mine after every shift.
17   Q.  And do you recall who told you that you are required to
18   submit those time sheets?
19   A.  Yeah.  Lisa, Miss Lisa, you know, and her company, I
20   guess you would say.  They e-mail you.  They communicate,
21   this is how you do this, this is how you do that.
22   Q.  When you say this is how you do this and this is how you
23   do that, is there anything specific that you're referring to?
24   A.  Yes, ma'am.  You fill out your time sheet; you make sure
25   you put your .5 for your break; don't put a double shift on
```

C. Turner - Direct

1  one sheet; and e-mail it.

2  Q.  And the "they" you are referring to is Steadfast?

3  A.  Yes.

4  Q.  And what is your schedule when you work for Steadfast?

5  A.  As you set it.  It's how you set it.  I take many shifts,

6  whether it be 7:00 to 3:00, 3:00 to 11:00, anything that's

7  available.  You're in total control of what you do.

8  Q.  Have you ever worked more than 40 hours in a workweek?

9  A.  Absolutely.  From the beginning.

10  Q.  And when you say "absolutely," does that mean you do it

11  frequently?

12  A.  Yes.  I barely like to not to work overtime.  I have an

13  abundance of kids, so I'm going to work overtime.

14  Q.  That's totally understandable.

15       If you're interested in a placement that Steadfast

16  has, how do you find out about that opportunity?

17  A.  Sometimes -- well, now, it's different, because now, you

18  know, they have this little phone app, and communication is

19  much better.  And we can't compare the times because we

20  didn't have this accessibility, but back then, you would call

21  her scheduler.

22  Q.  And would the scheduler provide you information about the

23  shifts?

24  A.  Yes.  People always know -- they deal with 100-and-some

25  people.  So if I'm just working with Betty Boop over here --

C. Turner - Direct

1   being facetious -- but if I'm working with her and she's just
2   talking and I hear it and I ask, they never turn us down, but
3   it's not always offered to you if you didn't hear it through
4   the grapevine, so to speak.
5   Q.  So just to confirm what you just said, you would have to
6   ask -- you could ask for a facility, but it wasn't always
7   offered to you to work at that facility?
8   A.  Yes, because it might be a new facility and they're
9   not -- they're trying to get into the swing of things.  They
10  already have solidified facilities that they know you can
11  work.  I might just hear something, or, you know, "Did you
12  know Lisa has dah, dah, dah," or here or there, you know, and
13  then I'll call and "What is the schedule like?"  You know,
14  "What do they need?"  It's to promote yourself.
15  Q.  And you said Steadfast identifies the facilities you're
16  already able to work for.  Is that what you said?
17  A.  (Inaudible response.)
18  Q.  We have to have a verbal response because you are on
19  video.
20  A.  Yes.
21  Q.  And when you get to those facilities that you're working
22  with, do you ever negotiate your pay rate with those
23  facilities?
24  A.  No.  I didn't, huh-uh.
25  Q.  And have you ever communicated with a facility directly

C. Turner - Direct

1   to schedule a shift?

2   A.  Yes.

3   Q.  In those instance, would you have to let Steadfast know

4   that you scheduled the shift?

5   A.  Yes, you do.  Because if not, it would be a whole mix-up.

6   Q.  If you didn't, what would happen?  Has it ever happened

7   that you did not --

8   A.  Sometimes you could be double-booked.  Sometimes the

9   scheduler at Steadfast or somewhere else found somebody, but

10  you're talking to them, but they already had somebody in

11  place.  So it's like you're overstepping, kind of, so to

12  speak.  You kind of, you know -- (inaudible).

13  Q.  And who compensates you for the services you provide at

14  the various facilities?

15  A.  Lisa.

16  Q.  And so to clarify, do your checks come from Steadfast or

17  your direct deposits come from Steadfast?

18  A.  Yes, ma'am.

19  Q.  You indicated that you work over 40 hours in a workweek.

20  Have you ever complained about not receiving time and a half

21  for hours worked over 40?

22  A.  I have, but not, I guess, to them, just to the girls,

23  mostly the girls, really.  But, you know -- (inaudible).

24  Q.  And when your assignment at the facility ends, does

25  Steadfast provide you a new placement?

Carol L. Naughton, Official Court Reporter

─────────────── C. Turner - Direct ───────────────

1   A.  Absolutely.  You are not out of work, unless you mess up
2   your name.  You only have one name in this outfit.  If you
3   mess up your name, that's on you.  The work is there.  If you
4   carry yourself right, work is there.
5           MS. JONES:  I have no further questions for this
6   witness.
7           THE COURT:  Any cross?
8           MS. RUST:  No cross, Your Honor.
9           THE COURT:  May this witness be permanently excused?
10          MS. JONES:  Yes, she may.
11          THE COURT:  Thank you, ma'am.  You may be
12  permanently excused.
13          THE WITNESS:  Thank you, Your Honor.  You have a
14  good one.
15          (Witness excused.)
16          THE COURT:  Okay.  So where are we now, Counsel?
17          MS. LEWIS:  As indicated, one of the six, Mr. White,
18  said that he would leave a shift and come.  So I don't know
19  where he is, and I suspect the Court is not inclined to wait
20  for him today.
21          THE COURT:  Do you have a cell phone number?
22          MS. LEWIS:  We do have a cell phone number for him.
23          THE COURT:  The Court will take a brief recess, and
24  you go call him on the cell phone and find out how far is he
25  from this courthouse.

──────────────T. White - Direct──────────────

1           MS. LEWIS:  Thank you, Your Honor.

2           THE COURT:  Where was he working, first of all?

3           MS. LEWIS:  I don't know what facility he said he

4    was working at.

5           THE COURT:  Well, find out how far away is he.

6           MS. LEWIS:  Okay.  Thank you.

7           THE COURT:  Recess.

8           (Recess from 3:35 p.m. to 4:25 p.m.)

9           THE COURT:  Call your next witness.

10          MS. LEWIS:  Thank you, Your Honor.  Tywann White.

11          (Witness sworn.)

12          MS. LEWIS:  Thank you, Your Honor, for the Court's

13   patience today, for allowing this witness to get here this

14   afternoon.

15          TYWANN WHITE, called by the Plaintiff, having been

16   first duly sworn, was examined and testified as follows:

17                    DIRECT EXAMINATION

18   BY MS. LEWIS:

19   Q.  Mr. White, thank you for being committed to providing

20   your testimony.

21          If you could please state your name for the record

22   and spell your first and last name, please.

23   A.  Tywann White, T-y-w-a-n-n, last name is W-h-i-t-e.

24   Q.  Are you familiar with Steadfast Medical?

25   A.  Yes, ma'am.

T. White - Direct

1   Q.   And how are you familiar with the company?

2   A.   I work with them.

3   Q.   Approximately when did you start working at Steadfast?

4   A.   Roughly, August 2017.

5   Q.   About four or five years ago?

6   A.   Yes, ma'am.

7   Q.   And what type of nurse are you?

8   A.   I'm a certified nursing assistant.

9           THE COURT:  Raise your voice, please.

10          THE WITNESS:  Certified nursing assistant.

11          THE COURT:  That's it.

12  BY MS. LEWIS:

13  Q.   And did you apply to work at the company?

14  A.   Yes, ma'am.

15  Q.   How did you apply?

16  A.   I went in person and applied.

17  Q.   Did you submit a job application?

18  A.   Yes, ma'am.

19  Q.   Did you submit anything else with that application?

20  A.   Yes, ma'am.

21  Q.   What did you have to provide?

22  A.   My CNA certificate, licensing, a drug screen, and that's

23  all I can remember.

24  Q.   Okay.  So you submitted to a drug screen, you said?

25  A.   Yes, ma'am.

───────────── T. White - Direct ─────────────

1    Q.  Did you pay for that?

2    A.  No.

3    Q.  And a background check?  Did you take a background check?

4    A.  I cannot answer that question.

5    Q.  Do you remember if you took a background check?

6    A.  I do not remember about the background check.

7    Q.  Were you given the option to be classified as an

8    independent contractor or an employee?

9    A.  No.  It was written in the contract.

10   Q.  Okay.  So you signed a contract that specified that you

11   would be one of those two things?

12   A.  Yes, ma'am.

13   Q.  Which one?

14   A.  The independent contractor.  It's in the contract.

15   Q.  Do you know if it's required to be an independent

16   contractor?

17   A.  Not really.

18   Q.  Okay.  When you worked at Steadfast, did you own your own

19   healthcare business?

20   A.  No, ma'am.

21   Q.  Did you advertise your healthcare services in any way to

22   healthcare facilities separate and apart from Steadfast?

23   A.  No, ma'am.

24   Q.  Do you recall what the agreement says that you signed?

25   A.  No, ma'am.

291

—————————T. White - Direct—————————

1   Q.   Okay.  Did you ever financially invest in Steadfast?

2   A.   No, ma'am.

3   Q.   Do you have an ownership interest in Steadfast?

4   A.   No, ma'am.

5   Q.   Are you an officer, manager, or director of Steadfast?

6   A.   No, ma'am.

7   Q.   Do you own a percentage of Steadfast?

8   A.   No, ma'am.

9   Q.   Were you paid on an hourly or salaried basis?

10  A.   Hourly.

11  Q.   And how much are you paid per hour?

12  A.   25.

13  Q.   Have you always been paid that same rate?

14  A.   No, ma'am.

15  Q.   What were you previously paid?

16  A.   Before COVID, it was 15 an hour.

17  Q.   And did your rate of pay vary?

18  A.   It depends upon different facilities.

19  Q.   Were you able to negotiate a different pay?

20  A.   No, ma'am.

21  Q.   If you tried to negotiate a different pay, what would be

22  Lisa's response to that?

23           MS. RUST:  Objection.  Calls for speculation.

24           THE COURT:  Sustained.

25  BY MS. LEWIS:

T. White - Direct

1   Q.  Have you ever tried to negotiate a different rate with
2   Lisa?
3   A.  I asked for 1 or 2 dollars extra, but majority of the
4   time, you cannot, you know, negotiate.
5   Q.  So who set the rate of pay?
6   A.  I would assume it's Lisa Pitts because it's her company.
7   Q.  So does Steadfast make the ultimate decision to set your
8   rate of pay?
9          MS. RUST:  Objection.  Calls for speculation.
10          THE COURT:  Sustained.
11  BY MS. LEWIS:
12  Q.  Are you aware whether the facility sets your rate of pay?
13  A.  No, ma'am.
14  Q.  Who pays you for the services that you provide when
15  placed at facilities?
16  A.  As my pay sheet states, it's Medical Staffing Solutions,
17  and the owner of the company is Lisa Pitts.
18  Q.  Other than your hourly pay rate, did you receive any
19  profits besides the hourly rate that was set by Steadfast?
20  A.  No, ma'am.
21  Q.  Do you know whether the facilities pay Steadfast
22  overtime?
23  A.  I'm aware that Medical Solutions -- what is it? -- MFA, I
24  used to work for them.  I know that they pay Steadfast
25  overtime.

T. White - Direct

1  Q.  If you didn't receive pay from Steadfast, would you be

2  able to meet your financial obligations?

3  A.  Yes, ma'am.

4  Q.  Okay.  You would be -- if you didn't receive a paycheck

5  from Steadfast, you'd be able to meet your bills?

6  A.  No, ma'am.  I mean, I would have other means, but if I

7  didn't -- no.  I'm sorry.

8  Q.  What day of the week -- when are you paid?

9  A.  I use Next Day Pay.

10  Q.  What is Next Day Pay?

11  A.  Next Day Pay is just like a bonus, kind of like incentive

12  to get paid faster.  You submit your time sheet.  They

13  process it one day with the facility, and then you'll have it

14  around 5:30 the next following day.

15  Q.  You said they process it with the facility.  So the

16  facility pays you for Next Day Pay?

17  A.  The facility confirms if I showed up, the times and

18  things of that nature.

19  Q.  Who do they confirm that with?

20  A.  The schedulers.

21  Q.  So the facility confirms the hours that you worked with

22  the schedulers?

23  A.  Yes.

24  Q.  And then who pays you?

25  A.  Steadfast.

T. White - Direct

1  Q.  And since you do Next Day Pay, is there a fee associated

2  with that?

3  A.  6 percent.

4  Q.  Do you get a pay stub with Next Day Pay?

5  A.  No, ma'am.

6  Q.  Have you ever asked for a pay stub?

7  A.  Yes, ma'am.

8  Q.  And what was the response when you asked?

9  A.  The response that I got was with Next Day Pay, you cannot

10  get a pay stub.  You only can get a proof of income, but my

11  proof of income didn't match my bank statement, so I kind

12  of --

13  Q.  So are you saying that the proof of income that Steadfast

14  provided you was not accurate based upon the compensation

15  Steadfast did a direct deposit to?

16  A.  Yes, ma'am.

17  Q.  Have you worked for other agencies?

18  A.  Yes, ma'am.

19  Q.  And which agencies?

20  A.  Favorite Staffing, Crucial Staffing.

21  Q.  I'm sorry.  What were the names of those agencies?

22  A.  Oh, it's Favorite Staffing, Crucial Staffing, Hamilton

23  Staffing, Essential Medical Staffing.

24  Q.  And did you work as a CNA for those agencies as well?

25  A.  Yes, ma'am.

T. White - Direct

1   Q.  Are your job duties and responsibilities the same or

2   equivalent at Steadfast as with those other agencies?

3   A.  Yes, ma'am.

4   Q.  Do those agencies pay you time and a half?

5           MS. RUST:  Objection to the line of questioning

6   whether another agency --

7           THE COURT:  I think the Court said the practices of

8   other agencies are not really at issue in this case.  What is

9   at issue here is whether Steadfast has properly refused to

10  pay overtime.  So there's really no need for us to compare,

11  and I mean as to "us," as to the parties.

12          MS. LEWIS:  Your Honor, with respect to this line of

13  questioning, it's in regard to -- well, first of all, it's

14  foundational with respect to the next questions that I intend

15  to ask with respect to his interactions with Steadfast.

16          Within their opening statement, defendants

17  represented that "We're different.  We're not like any of

18  these other agencies.  We are a matchmaking service.  We're

19  not a registry."

20          THE COURT:  Two things:  To the extent they made

21  that representation in their opening statement, that's

22  irrelevant.

23          MS. LEWIS:  I'm sorry?

24          THE COURT:  That's irrelevant whether they're like

25  other agencies.  They made that statement in their opening

———— T. White - Direct ————

1   statement.  I'm back to what the Court has to find in this

2   case.

3           Now, you said it was foundational, so you can

4   continue into something else that the Court will find

5   eventually as relevant.

6           MS. LEWIS:  Okay.  So may he answer that last

7   question, or I just need to move on?

8           THE COURT:  Well, to the extent you said they raised

9   it in opening statement, I said that is irrelevant, whether

10  they are like other agencies or not.  The question is whether

11  they are in compliance with the law.  So I don't think

12  there's any need to be going into that.  So, no.  I sustain

13  the objection.  They raised it, but it's going nowhere.

14          All right.  Next question.

15  BY MS. LEWIS:

16  Q.  Does Steadfast communicate behavior expectations to you?

17  A.  I really can't answer that because I don't recall

18  being --

19  Q.  Let me ask it a different way.

20          Does Steadfast tell you how or give you guidance

21  with respect to how you should conduct yourself?

22  A.  No.  I just know how I should conduct myself in a

23  healthcare setting.

24  Q.  I'm sorry.  I didn't quite understand what you said.

25  What was your response?

————— T. White - Direct —————

1   A.  I said -- I haven't really spoken with Steadfast.  So I
2   just, you know -- they kind of put you on, and then you
3   really don't hear any more from them, so I just go in and do
4   as I would if I were a regular CNA.
5            So I would say, no, I have not heard anything about
6   behavioral expectations.  There's really no supervision.
7   Q.  Has Steadfast communicated to you their expectations
8   regarding professionalism?
9   A.  No, I haven't spoken with Steadfast.
10  Q.  You haven't spoken to Steadfast at all or ever?
11  A.  In regards to that statement, no.  In regard to
12  professionalism, no.
13  Q.  You worked last night for Steadfast, correct?
14  A.  Yes, ma'am.
15  Q.  So within the past week, you've worked shifts for them?
16  A.  Yes, ma'am.
17  Q.  And you've communicated with the scheduler?
18  A.  Yes, ma'am.
19  Q.  And you've been given -- you've been compensated for that
20  work, correct?
21  A.  No, ma'am.  I mean, are you asking about compensated --
22  Q.  Have you been paid by Steadfast for the work you've
23  performed?
24  A.  Yes, ma'am.
25  Q.  What rate were you paid for the shifts you did this week?

─────────── T. White - Direct ───────────

1    A.  25 flat.

2    Q.  Who scheduled those shifts?

3    A.  I scheduled them through the scheduler or through the DON

4    of the facility.

5    Q.  Did you talk to Lisa this week?

6    A.  No, ma'am.

7    Q.  Last week?

8    A.  No, ma'am.

9    Q.  Last night?

10   A.  No, ma'am.

11          THE COURT:  Have you talked to her about this case

12   at any point?

13          THE WITNESS:  No, ma'am -- no, sir.

14          THE COURT:  Thank you.

15   BY MS. LEWIS:

16   Q.  You indicated a moment ago that -- so who determined the

17   hours that you worked?

18   A.  There's not really, like, a set schedule.  You kind of

19   just get where you can fit in.  So if you can find a shift,

20   you can work that shift.  There's no such schedule.

21   Q.  Are you required to complete time sheets?

22   A.  Yes, ma'am.

23   Q.  And how often are you required to submit time sheets?

24   A.  Every shift, after every shift that you work.

25   Q.  So I understand that you -- you said you sort of get in

─────────── T. White - Direct ───────────

1   where you can, but you need to contact the schedulers to do

2   so; is that right?

3   A.  Yes, ma'am.  They have to confirm your shifts.

4   Q.  And if you have to cancel a shift, do you have to provide

5   notice?

6   A.  You have to provide two hours' notice, or you could be

7   penalized by the facility.

8   Q.  And who do you provide that notice to?

9   A.  It's supposed to be going through the scheduler through

10  Steadfast, and then they communicate it to the facility.

11  Q.  Have you received any back wages from Steadfast for hours

12  you've worked over 40?

13  A.  No, ma'am.

14  Q.  Have you received any other compensation from Steadfast?

15  A.  No, ma'am.

16  Q.  Have you ever complained about not receiving overtime?

17  A.  Yes, ma'am.

18  Q.  And who did you complain to?

19  A.  To payroll.  Her name is Christine.  And they have

20  Next Day Pay payroll too.

21  Q.  Do you ever talk to Lisa?

22  A.  No, ma'am.

23  Q.  What did they say to you when you complained about

24  overtime?

25  A.  They stated, as an independent contractor, you are not

```
1    eligible for overtime, and that was basically it.
2              MS. LEWIS:  No further questions for this witness.
3              THE COURT:  Cross.
4              MS. RUST:  One moment, Your Honor.
5              (Pause in the proceedings.)
6              MS. RUST:  No cross, Your Honor.
7              THE COURT:  May the witness be permanently excused?
8              MS. LEWIS:  Yes, Your Honor.
9              THE COURT:  You may step down, sir.
10             (Witness excused.)
11             THE COURT:  It's the Court's understanding that you
12   have no further witnesses for the day?
13             MS. LEWIS:  That is correct, Your Honor.
14             THE COURT:  Just one thing, just housekeeping notes.
15             You can have a seat there.
16             A couple breaks ago, I ordered you to call the
17   witness.  When I ordered you to call the witness, that's what
18   the Court meant, for you to call the witness, not to
19   reevaluate whether the witness should be called.  And then,
20   eventually, the courtroom deputy called the witness.  But
21   when the Court says to do something, it intends just that.
22             Second thing.  I think you've called 13 witnesses
23   now.  At least 12 of them have been, in my view, testifying
24   about the same thing regarding the procedures and practices
25   of Steadfast.
```

```
 1              Now, that is getting very deep into the cumulative
 2     side.  If you are trying to explain to the Court exactly the
 3     way the business works, the Court has heard it.  So with
 4     respect to going forward, I don't know how many more
 5     witnesses you have, but unless there's something different
 6     about one of these records, the Court doesn't want to hear
 7     any more testimony about the same thing.  That's cumulative.
 8              And so I'm hoping that you have on hold some
 9     witnesses that can shift to something else in this case.  I
10     think that's a better use of the Court's time in here.
11              Any questions?
12              MS. LEWIS:  Excuse me.
13              (Pause in the proceedings.)
14              MS. LEWIS:  Your Honor, may I have a five-minute
15     sidebar just to review the list so I can properly respond?
16              THE COURT:  Sidebar with the Court?
17              MS. LEWIS:  Sidebar with the solicitor.
18              THE COURT:  Sidebars are usually with the Court, but
19     if you want to talk for just a second, go right on.
20              MS. LEWIS:  Thank you.
21              (Pause in the proceedings.)
22              MS. LEWIS:  Thank you, Your Honor.
23              THE COURT:  Okay.
24              MS. LEWIS:  I apologize.
25              THE COURT:  Yes, ma'am.
```

1          MS. LEWIS:  Your Honor, I would like to proffer that
2      we have --
3          THE COURT:  Wait a second.  Let me get this
4      technology to stop goofing around up here.
5          Okay.  Go on.
6          MS. LEWIS:  Okay.  Your Honor, the Secretary has
7      approximately eight additional witnesses that will testify
8      consistent with the witnesses, the employee witnesses that
9      the Court has already heard from, but we do want to make sure
10     that with respect to all of the evidence, that the Court has
11     enough information into the record with respect to, as you
12     indicated, the policy and practices.
13         So based upon the Court's information, we just
14     wanted to make sure that it was clear, with respect to the
15     represented testimony, that we've established a pattern.
16         THE COURT:  Here's what I'm representing to you:
17         You can go back, just as the Court can, and review
18     the testimony --
19         You can have a seat, sir.
20         -- and review the testimony of each one of those
21     witnesses in terms of what they got out and what they
22     presented to the Court.
23         Now, if you have another witness who has something
24     to add regarding past practices of the defendant in this
25     case, then you can call that witness.  In other words, I

```
 1    don't want to keep calling witnesses that say the same thing.

 2    If there's something additional that you missed, another

 3    witness can address it, then the Court will listen at it.

 4    That's the only thing the Court is saying.

 5              MS. LEWIS:  With that, Your Honor, with respect to

 6    the eight, and certainly we would reserve some for rebuttal.

 7    So...

 8              THE COURT:  All right.  That's fine.  That's fine.

 9              All right, then.  What we're going to do is come

10    back in here tomorrow morning at 10:00 and get started.

11              Now -- yes, ma'am?

12              MS. RUST:  Well, I just want to clarify with respect

13    to the global trial schedule.  If they'll -- if they don't

14    anticipate calling eight witnesses they had scheduled, are

15    they still anticipating going a full five days as originally

16    estimated, just so that we can make sure that our witnesses

17    are ready to go.

18              Our witnesses we instructed that our case would be

19    going on next week based on the representation of their

20    schedule.  So we certainly want to have ours ready to go once

21    they are done.  So if they have a different estimation of

22    their case in chief...

23              THE COURT:  Well, I can say this much, based on the

24    Court's practice, you be prepared to bring some witnesses in

25    case their case ends early.
```

```
 1          MS. RUST:  Of course.

 2          THE COURT:  You have somebody.

 3          Now, I don't know how many more witnesses they do

 4   have or whether those witnesses will take up -- tomorrow is,

 5   what, Thursday?  And potentially Friday, two days.  I don't

 6   know.

 7          Do you have any idea?

 8          MS. LEWIS:  Your Honor, we anticipate with the

 9   remaining witnesses that we'll go till Friday.

10          THE COURT:  They will take till Friday.

11          MS. LEWIS:  They will take till Friday.

12          THE COURT:  With that being the case and with that

13   representation, we will anticipate that if she starts on

14   Friday and she quits at 12:00, we will still start on

15   Monday -- Tuesday.  Okay.  On Tuesday.

16          MS. RUST:  Thank you for that clarification.

17          THE COURT:  We'll recess court until tomorrow

18   morning at 10:00.

19          (Proceedings adjourned at 4:47 p.m.)

20

21

22

23

24

25
```

1

2                                CERTIFICATION

3

4        I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7

8                    _____/s/_____

9                           Carol L. Naughton

10                          October 4, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carol L. Naughton, Official Court Reporter