```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3    - - - - - - - - - - - - - - - - - -
                                        )
 4    MARTIN J. WALSH, SECRETARY OF     )
      LABOR, UNITED STATES              )
 5    DEPARTMENT OF LABOR,              )
                                        )
 6           Plaintiff,                 )
                                        )      CIVIL ACTION NO.
 7    v.                                )         2:18cv226
                                        )
 8    MEDICAL STAFFING OF AMERICA,      )
      LLC, etc., et al.,                )
 9                                      )
             Defendants.                )
10    - - - - - - - - - - - - - - - - - -

11

12                   TRANSCRIPT OF PROCEEDINGS

13                ** Bench Trial - Day 3 **

14                      Norfolk, Virginia

15                     September 2, 2021

16

17    BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge

18

19    APPEARANCES:

20            UNITED STATES DEPARTMENT OF LABOR
              By:  Ryma N. Lewis
21                 Chervonti Jones
                   Mohamed E. Seifeldein
22                 Counsel for the Plaintiff

23
              PIERCE McCOY, PLLC
24            By:  Joshua L. Jewett
                   Julia A. Rust
25                 Counsel for the Defendants
```

```
1                       I N D E X

2   PLAINTIFF'S
    WITNESSES                                           PAGE
3
      CHANTELLA SMITH
4         Direct Examination By Ms. Jones               308
          Cross-Examination By Ms. Rust                 320
5         Redirect Examination By Ms. Jones             324
      ANDREA TIRADO
6         Direct Examination By Ms. Lewis               329
          Cross-Examination By Ms. Rust                 345
7         Redirect Examination By Ms. Lewis             348
      ERICA JOHNSON
8         Direct Examination By Mr. Seifeldein          360
          Cross-Examination By Mr. Jewett               387
9         Redirect Examination By Mr. Seifeldein        406
          Recross-Examination By Mr. Jewett             412
10    DAVID RAWLINGS
          Direct Examination By Mr. Seifeldein          414
11        Cross-Examination By Mr. Seifeldein           434
          Redirect Examination By Mr. Seifeldein        448
12    ROBERTO MELENDEZ
          Direct Examination By Ms. Lewis               449
13        Cross-Examination By Ms. Rust                 462
          Redirect Examination By Ms. Lewis             467
14    YAOZU XIONG (Via ZoomGov.com)
          Direct Examination By Ms. Lewis               470
15        Cross-Examination By Ms. Rust                 488
          Redirect Examination By Ms. Lewis             501
16

17
                       E X H I B I T S
18
    PLAINTIFF'S
19  NO.                                                 PAGE

20    PX-8                                              312
      PX-10                                             387
21    PX-7                                              456
      PX-21                                             461
22    PX-7a                                             479
      PX-22                                             488
23    PX-43                                             503

24

25
```

```
 1              (Proceedings resumed at 10:00 a.m.)
 2              THE COURT:  Good morning, counsel.  We're ready to
 3    get started again.   The United States may call the next
 4    witness.
 5              MS. LEWIS:  Good morning, Your Honor.  Chantella
 6    Smith.
 7              THE COURT:  I appreciate your aspiration if you
 8    think you can get through 16 witnesses today, but we shall
 9    see.
10              MS. LEWIS:  We're just trying to make up and keep
11    this train moving down the track, Your Honor.
12              THE COURT:  Okay.
13              (Witness sworn.)
14              MS. RUST:  Your Honor, I think there's a witness for
15    the plaintiff in the room, and we're just going to move to
16    exclude the witness pending other witness testimony.
17              THE COURT:  Each party is entitled to have a
18    representative in the courtroom, though that party may very
19    well testify.  As I understand it, this individual is a
20    representative for the Secretary.
21              Am I correct?
22              MS. JONES:  Yes, Your Honor.
23              THE COURT:  So a representative for a party under
24    the Rules of Federal Court can stay in the courtroom though
25    that individual is going to testify.
```

—————C. Smith - Direct—————

```
 1              MS. RUST:  Okay.  We were unaware of who he was.
 2     I'm sorry.
 3              MS. JONES:  That's Roberto Melendez.  He's a
 4     district director that will be testifying regarding the
 5     back-wage computations.
 6              MS. RUST:  Okay.  Thank you.  We were unaware.
 7              Thank you.
 8              THE COURT:  Okay.
 9              CHANTELLA SMITH, called by the Plaintiff, having
10     been first duly sworn, was examined and testified as follows:
11                         DIRECT EXAMINATION
12     BY MS. JONES:
13     Q.  Ms. Smith, could you please state and spell your name for
14     the record, please.
15     A.  Chantella, C-h-a-n-t-e-l-l-a, last name Smith, S-m-i-t-h.
16     Q.  And are you familiar with Steadfast Medical Staffing?
17     A.  Yes, ma'am.
18     Q.  To your knowledge, what type of services does Steadfast
19     provide?
20     A.  It's a medical staffing company for nurses and CNAs.
21              THE COURT:  Can you speak a little louder.
22              THE WITNESS:  Okay.  It's a medical staffing agency
23     for nurses as well as CNAs.
24     BY MS. JONES:
25     Q.  Were you or are you currently employed by Steadfast?
```

C. Smith - Direct

```
 1    A.  I was employed.

 2    Q.  When were you employed by Steadfast?

 3    A.  I believe it was September 2016 up until February 2017.

 4    Q.  Why did you stop working for Steadfast?

 5    A.  I wasn't given my paycheck.

 6    Q.  When you're saying you weren't getting your paycheck, are

 7    you saying that you weren't paid for the hours you worked?

 8    A.  Yes.  I wasn't paid for the hours I worked.

 9    Q.  And when you were employed by Steadfast, what was your

10    job title?

11    A.  I was a charge nurse at various facilities.  I assisted

12    with medication administration, reporting to the doctor if

13    there's any change of condition, and supervising the CNAs on

14    the floor.

15    Q.  If you recall, how did you apply to start working with

16    Steadfast?

17    A.  It was online, and I spoke with Lisa.

18    Q.  When you say -- sorry.  I didn't mean to interrupt you.

19    A.  I contacted Lisa Pitts, and I was e-mailed an

20    application.

21    Q.  And do you recall what type of information was requested

22    on that application?

23    A.  I can recall some.

24    Q.  Can you tell us what you can recall?

25    A.  It was a basic employment application.
```

Carol L. Naughton, Official Court Reporter

C. Smith - Direct

1   Q.  So did it ask for things such as work history and

2   references, if you recall?

3   A.  Yes, ma'am.

4   Q.  And were you required to provide any documents in

5   addition to that application?

6   A.  Yes, ma'am.  My driver's license, my CPR card, a copy of

7   my nurse's license, and references.

8   Q.  And what tax form did you complete, if you can recall?

9   A.  I don't recall filling out a tax form.  I questioned my

10  earnings for 2016, and I was told that I was an independent

11  contractor and was going to get a 1099.

12  Q.  And do you recall who told you you were an independent

13  contractor?

14  A.  Lisa Pitts.

15  Q.  And do you know what is required to be considered an

16  independent contractor?

17  A.  No, I don't.

18          MS. RUST:  Objection.  Foundation.

19          THE COURT:  First of all, whether she knows or does

20  not know, I'll sustain the objection.  It doesn't make any

21  difference.

22          MS. JONES:  I'll move on, Your Honor.

23          THE COURT:  All right.

24  BY MS. JONES:

25  Q.  You indicated that you spoke with Ms. Pitts.  Was that

C. Smith - Direct

1   before or after you submitted your application?

2   A.  It was before and after.

3   Q.  And after you submitted your application, when you spoke

4   to Ms. Pitts, was it some sort of interview?

5   A.  Not so much of an interview.  She let me know which

6   facilities that she had and which shifts.

7   Q.  And so when you were offered to work for Steadfast, how

8   were you offered the position?

9   A.  Over the phone, I would say.

10  Q.  And do you recall taking a drug test?

11  A.  Yes.

12  Q.  What about a background check?

13  A.  Yes.

14  Q.  Were you paid an hourly rate or a salary basis?

15  A.  Hourly.

16  Q.  How much were you paid per hour?

17  A.  It was $30 an hour.

18  Q.  Did that pay ever vary?

19  A.  It could vary depending on which facility that you went

20  to.

21  Q.  Were you always paid the rate that was told to you?

22  A.  According to my pay stubs, no.  There was some

23  discrepancies in the pay.

24          MS. JONES:  Could you please pull up Exhibit 8.

25  BY MS. JONES:

─────────── C. Smith - Direct ───────────

1    Q.  I would like to direct your attention to Exhibit 8, if

2    you could just scroll through.  At the top, starting at

3    Page 1, is this the --

4              MS. RUST:  I'm sorry, Ms. Jones.  Our screen is not

5    working.

6              MS. JONES:  Okay.  Let me know when you're ready.

7              (Pause in the proceedings.)

8    BY MS. JONES:

9    Q.  I would like to direct your attention to what has been

10   identified as Exhibit 8.

11             MS. JONES:  And could you scroll through the

12   document, Ms. Lewis.

13   BY MS. JONES:

14   Q.  Are these the statements that you were referring to?

15   A.  Yes.

16   Q.  Okay.  And have you seen these documents before?

17   A.  Yes, ma'am.

18             MS. JONES:  I would like to move to admit these

19   documents in evidence.

20             THE COURT:  Any objection?

21             MS. RUST:  No objection, Your Honor.

22             THE COURT:  Exhibit 8 will be admitted.

23             (Plaintiff's Exhibit PX-8 received in evidence.)

24             MS. JONES:  Could you please turn to Page 10 of this

25   document, Ms. Lewis.

C. Smith - Direct

1   BY MS. JONES:

2   Q.  You indicated that the pay rates would be different.

3   When you say they would be different, would they be higher or

4   lower than what was represented for that shift?

5   A.  They're usually higher.

6   Q.  So is it your position that you agreed to work for $10.68

7   per hour for a shift?

8   A.  Never.

9   Q.  So in this instance, would the pay rate be lower than

10  what you were told it would be?

11  A.  Yes.  It's a lot lower.

12  Q.  Did anyone tell you that it would be lower?

13  A.  No.

14  Q.  And how did you discover that you would be receiving

15  lower pay?

16  A.  I discovered going through my -- going through my pay

17  stubs that I had been paid at the lower rate.

18          THE COURT:  What was that?

19          THE WITNESS:  I discovered it when I went through my

20  pay stubs, that I was being paid at a lower rate.

21  BY MS. JONES:

22  Q.  And did you ask anyone about this lower pay rate?

23  A.  At the time, no, because I had already submitted this to

24  the Department of Labor.

25  Q.  Were you able to negotiate a different rate of pay with

314

—————C. Smith - Direct—————

1    anyone?

2    A.   If you could negotiate, it would be through Lisa Pitts.

3    Q.   Would you ever negotiate with a facility directly

4    regarding your rate of pay?

5    A.   No.

6    Q.   And so, to your knowledge, who set the rate of pay that

7    you received?

8    A.   It was supposed to be $30 an hour.

9    Q.   Who set that rate for you?

10   A.   Oh, Lisa Pitts.  I'm sorry.

11   Q.   And were you ever able to structure the working

12   relationship with the facilities directly?

13   A.   No.

14   Q.   And who did that for you?

15   A.   Lisa Pitts.

16   Q.   Okay.  And when you worked for Steadfast, were you ever

17   restricted from working with any other agency?

18   A.   We were pretty much told that we were employed by

19   Steadfast, that we needed to work solely through her.

20   Q.   And while working with Steadfast, were you required to

21   maintain any malpractice or liability insurance?

22   A.   No, ma'am.

23   Q.   During the time you worked for Steadfast, did you own

24   your own healthcare agency?

25   A.   Never.

C. Smith - Direct

1    Q.   And were you required to submit time sheets?

2    A.   Yes.

3    Q.   And who were those time sheets submitted to?

4    A.   Lisa Pitts.

5    Q.   Was the facility in which you were placed required to

6    sign off on those time sheets?

7    A.   Yeah, at the end of the shift.

8    Q.   After that, when would you submit the time sheets to

9    Steadfast?

10   A.   Weekly.  We would submit them weekly.

11   Q.   Do you recall who told you that you were required to

12   submit those time sheets?

13   A.   Lisa Pitts.

14   Q.   And what was your work schedule when you worked with

15   Steadfast?

16   A.   It varied.  It varied.  3:00 to 11:00, 11:00 to 7:00.

17   Q.   Would you ever do double shifts?

18   A.   I would do double shifts every week.  I would work a

19   total of 80-plus hours.

20   Q.   And how was your schedule determined?

21   A.   Lisa Pitts would -- we would talk with Lisa Pitts at the

22   beginning of the week.  She would pretty much tell us what

23   she had opening and what facility that she had available for

24   us to go to.

25   Q.   Okay.  And have you ever turned down a shift that

C. Smith - Direct

1    Steadfast offered to you?

2    A.  I attempted to turn down a shift because I had a death in

3    my family.

4    Q.  And when you say you "attempted to," what do you mean by

5    that?

6    A.  When I called Lisa Pitts to call out, she pretty much

7    told me that she doesn't accept call-outs.  So I had to go

8    into the shift.

9    Q.  And you indicated that you worked, in some instances, 80

10   hours a week.  So based upon that, would you say that you

11   worked more than 40 hours in a workweek?

12   A.  Yes, ma'am.

13   Q.  When you worked those hours over 40 in a workweek, how

14   were you paid?

15   A.  I was told by Lisa Pitts that we were independent

16   contractors and it was straight pay, that she didn't have to

17   pay time and a half.

18   Q.  So you received straight pay for the overtime hours

19   worked?

20   A.  Yes.

21   Q.  Were you required to provide notice to Steadfast if you

22   were unavailable to work?

23   A.  Yeah.  If you had an issue, yeah, you were supposed to

24   report to her.

25   Q.  When you say "report to her," who do you mean by "her"?

C. Smith - Direct

 1   A.  Lisa Pitts.

 2   Q.  And if you were ever running late for your shift, did you

 3   have to contact anyone?

 4   A.  We would contact Lisa Pitts at Steadfast.

 5   Q.  If you ever had a scheduling conflict, did Steadfast

 6   allow you to send another nurse in your place?

 7   A.  No, ma'am.

 8   Q.  To your knowledge, who was responsible for that?

 9   A.  Lisa Pitts.

10   Q.  Were you ever allowed to assign your shifts to different

11   LPNs?

12   A.  No.

13   Q.  Other than your hourly rate that you received from

14   Steadfast, did you receive any profits?

15   A.  No.

16   Q.  If you were interested in a placement Steadfast had

17   available, how would you find out about that opportunity?

18   A.  Can you repeat that?

19   Q.  Absolutely.

20        If you were interested in a placement that Steadfast

21   had, how would you find out more about that opportunity?

22   A.  You would contact Lisa Pitts.

23   Q.  So after you would go to the facility that you were

24   assigned to work for, would you have an interview with that

25   facility, or would you just begin working?

C. Smith - Direct

1   A.   No.   You would just begin working.

2   Q.   And did you ever communicate directly with the facility

3   to establish your shifts?

4   A.   No.

5   Q.   And who paid you for the services you provided to the

6   facilities?

7   A.   Lisa Pitts at Steadfast.

8   Q.   If you did not receive your pay from Steadfast, would

9   your ability to meet your financial obligations be

10  compromised?

11  A.   Yes.

12  Q.   Do you have any ownership interest in Steadfast?

13  A.   No.

14  Q.   As an LPN, what type of equipment or supplies do you use

15  to complete your tasks at the facilities in which you are

16  placed?

17  A.   We use basic medical supplies; thermometers, blood

18  pressure cuffs, stethoscopes, et cetera.

19  Q.   And would those be considered general tools of the trade

20  of an LPN?

21  A.   Yes, ma'am.

22  Q.   And other than those tools, were you required to purchase

23  any additional equipment to complete the tasks at the various

24  facilities in which Steadfast placed you?

25  A.   Just your uniform.

C. Smith - Direct

```
1          THE COURT:  What was that?
2          THE WITNESS:  Your uniforms.
3   BY MS. JONES:
4   Q.  But nothing outside your uniforms?
5   A.  No.
6   Q.  And are you required to hold a license to practice as an
7   LPN?
8   A.  Yes.
9   Q.  Is that license required regardless of what facility you
10  work at?
11  A.  Yes.
12  Q.  And as an LPN, what type of care do you generally provide
13  to patients?
14  A.  We provide direct care.  We do assessments.  As I stated
15  previously, we administer medication.  We respond to
16  emergencies and report any findings to the doctor.
17  Q.  And are those the same tasks that you provided to the
18  facilities when you were working with Steadfast?
19  A.  Yes.
20  Q.  When you were working at the various facilities when
21  working with Steadfast, were you required to wear a badge?
22  A.  Yes.
23  Q.  And what badge was on -- what name was on that badge?
24  A.  Steadfast Medical Staffing.
25  Q.  Do you know why you were required to wear that badge?
```

C. Smith - Cross

1    A.  Because we were employed by Steadfast and not the

2    facility.

3            MS. JONES:  I have no further questions for this

4    witness.

5            THE COURT:  Cross-examination.

6                    CROSS-EXAMINATION

7    BY MS. RUST:

8    Q.  Good morning, Ms. Smith.

9    A.  Good morning.  How are you?

10   Q.  Good.  Thank you.  My name is Julia Rust.  I'm an

11   attorney for the defendants.  I have a few questions about

12   your testimony.

13   A.  Okay.

14   Q.  You said that at the beginning of the week, you would

15   call Steadfast about shifts, and they would tell you what's

16   available, right?

17   A.  Yes.

18   Q.  And that's how you would decide which shifts to pick up,

19   based on the availability that they told you, right?

20   A.  Yes.

21   Q.  And if you did not call at the beginning of the week or

22   at any point during the week, then you were not assigned or

23   picked up any additional shifts, correct?

24   A.  If I didn't call?  She would call us.

25   Q.  And they might tell you what was available?

—————C. Smith - Cross—————

1    A.   Yes.

2    Q.   Okay.  You have never seen Lisa Pitts or any of the other

3    office employees from Steadfast on site while you were

4    providing nursing services.  Is that true?

5    A.   On site?

6    Q.   Yes.

7    A.   No.  I've seen other nurses employed by her.  I've never

8    seen Lisa Pitts on site.

9    Q.   So you never -- Lisa Pitts has never supervised you while

10   you provided any of the services you described before.  You

11   said reporting changes in conditions to the doctor.

12   A.   Uh-huh.

13   Q.   No one from Steadfast has ever told you how to report

14   those changes; is that right?

15   A.   Those are things that you would communicate with the --

16   that's what the job entails.  I'm not sure what you're asking

17   me.  Can you elaborate?

18   Q.   Yes.

19        You said that as part of the responsibilities when

20   you're providing your nursing services, one of the things you

21   do is report changes and conditions to the doctor; is that

22   right?

23   A.   Yes.

24   Q.   Has Lisa Pitts ever told you how to report changes to the

25   doctor?

─────────────C. Smith - Cross─────────────

1   A.  No.

2   Q.  Has Christine Kim ever told you how to report changes to

3   the doctor?

4   A.  No.

5   Q.  Has Lisa Pitts or Christine Kim or anybody else from the

6   front office at Steadfast told you how to pass medication?

7   A.  No.

8   Q.  Okay.  You said you stopped working in February 2017; is

9   that right?

10  A.  Correct.

11  Q.  Because you did not get paid?

12  A.  Yes.

13  Q.  And is that because the facility did not sign off on the

14  time sheets for that pay period?

15  A.  No.

16          MS. JONES:  Objection.

17          THE WITNESS:  No.

18          THE COURT:  What is the objection?

19          MS. JONES:  Speculation, Your Honor.

20          MS. RUST:  Well, she testified that --

21          THE COURT:  Simply rephrase the question.  "Did you

22  know the reason why you were not paid?"

23          MS. RUST:  Of course.

24          THE COURT:  That's the question that you ask her.

25  BY MS. RUST:

Carol L. Naughton, Official Court Reporter

—————————————C. Smith - Cross—————————————

1    Q.  Do you know why you were not paid for that week?

2    A.  Yes.

3    Q.  And was it because the facility rep did not sign your

4    time sheet, to the extent that you know?

5            MS. JONES:  Objection.

6            THE COURT:  Objection overruled.  She can use

7    leading questions on cross-examination.

8    BY MS. RUST:

9    Q.  Did the facility rep sign off on the time sheets for the

10   weeks that you did not get paid?

11   A.  Yes.

12   Q.  And were those timely submitted to Steadfast?

13   A.  Yes.

14   Q.  And for the weeks that you did not get paid, is that

15   because you -- the facility you were working at reported that

16   you showed up to work drunk and left --

17           MS. JONES:  Objection, Your Honor.

18           THE COURT:  What is the objection?

19           MS. JONES:  Calls for speculation, Your Honor, and

20   hearsay.

21           THE COURT:  The Court will sustain that because I

22   told you you need to ask her "Do you know the reason you were

23   not paid?"

24   BY MS. RUST:

25   Q.  Did you show up to work drunk for a shift that you

C. Smith - Redirect

1    scheduled through Steadfast at any point?

2    A.   No.  I don't drink.

3    Q.   And a facility has never asked -- or a facility has never

4    told you not to come back because you had showed up to work

5    drunk?

6    A.   No.

7    Q.   And you've never had any performance complaints by a

8    facility for showing up to work in an incapacitated state?

9    A.   I got a complaint from Lisa Pitts.  I was told that a

10   resident complained that she didn't get some medication and

11   that I needed to take a drug test within two hours.  I took a

12   drug test within 30 minutes, and the drug test was negative.

13   So I was cleared, and I was available to go back to work per

14   Lisa Pitts.

15           THE COURT:  This line of inquiry started off about

16   why she was not paid.  That's what it started off on.  I'll

17   leave it to you.  Continue.

18           MS. RUST:  I have no further questions.  Thank you,

19   Ms. Smith.

20           THE COURT:  Any redirect?

21           MS. JONES:  Briefly, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MS. JONES:

24   Q.   Ms. Smith, I just have a few follow-up questions.

25           You stated that Lisa Pitts contacted you regarding

C. Smith - Redirect

1  an incident at a facility.

2  A.  Yes.

3  Q.  And is it your testimony that, based upon that, she

4  disciplined you in some capacity?

5  A.  Can you repeat that?

6  Q.  Based upon that call from Ms. Pitts, is it your testimony

7  that she disciplined you --

8          MS. RUST:  Objection.  Leading.

9          THE COURT:  Sustained.

10  BY MS. JONES:

11  Q.  What happened when Ms. Pitts contacted you?

12  A.  Ms. Pitts contacted me when I was headed to the facility,

13  and she stated that there was a discrepancy in medication and

14  that I needed to go take a drug test.  And I went and took

15  the drug test.  I made a U-turn.  I took the drug test within

16  30 minutes of her asking for it, and it was negative.

17  Q.  And she contacted you based upon something that was

18  reported to her from the facility, if you know?

19  A.  That's what she said, yes.

20          MS. JONES:  I have no further questions, Your Honor.

21          THE COURT:  Thank you.  May the witness be

22  permanently excused?

23          MS. JONES:  Yes, Your Honor.

24          THE COURT:  The question the Court has is did the

25  Court learn anything from this witness that it has not

```
 1    learned through the past ten witnesses?  If not, we're being
 2    cumulative and repetitive.
 3              MS. LEWIS:  Your Honor, we would like to put on
 4    evidence for one additional and then provide an offer of
 5    proof with respect to the remaining employee witnesses.
 6              THE COURT:  All right.
 7              MS. LEWIS:  Thank you.
 8              Andrea Tirado.
 9              THE COURT:  Well, if you want to make an offer of
10    proof, that would be for appellate purposes.  Is that what
11    you're doing?
12              MS. LEWIS:  That is correct, Your Honor.
13              THE COURT:  So you want to make an offer of proof
14    for cumulative evidence.  Is that it?  If it's an offer of
15    proof that the witnesses would say the same things that these
16    witnesses have said, that's an offer of proof for cumulative
17    evidence, and the Court clearly has control over cumulative
18    evidence.
19              MS. LEWIS:  Okay.  Understood, Your Honor.
20    Nonetheless, after this additional witness, based upon the
21    Court's indication that it's heard enough of these employee
22    witnesses' testimony in the plaintiff's case in chief and the
23    Secretary's need to address the concerns regarding cumulative
24    testimony, the Secretary would like to offer proof regarding
25    the testimony of the additional six employee witnesses.
```

```
1              THE COURT:  Six employee witnesses on the same
2    issue?
3              MS. LEWIS:  Six employee witnesses who have
4    different information with respect to their experience in
5    terms of representative testimony of approximately 1,100
6    scheduling employees who have been identified.  So the
7    Secretary is seeking to preserve the record in the event that
8    this matter is --
9              THE COURT:  The Court said to the Secretary
10   yesterday in clear English, if you had a witness to provide
11   information different from what you've already provided, you
12   could do that.  If that is what you're saying, there's no
13   need to make an offer of proof.  You can call the witness.
14             The only thing the Court was putting a limit on was
15   having witnesses after witnesses say the same thing.  If
16   there is something different you want to put into the record,
17   you call the witness.
18             MS. LEWIS:  Your Honor, I understand the Court's
19   position with respect to the clarification of what it is that
20   the Court would like to -- it's not inclined to hear from,
21   but in the interest again, Your Honor, of preserving the
22   record, we would like to make it on the record.
23             THE COURT:  Well, in the interest of preserving the
24   record, if it's the same thing the Court has heard the last
25   day and a half, denied.  You can appeal it if you don't
```

```
 1    prevail, but the Court is just telling you that that is an
 2    unusual thing that you're trying to do.
 3              MS. LEWIS:  So the Court is denying the Secretary
 4    from putting an offer of proof on the record?  I want to be
 5    very clear.
 6              THE COURT:  For cumulative evidence.
 7              MS. LEWIS:  Okay.  Understood.
 8              THE COURT:  For cumulative evidence.  That's the
 9    Court's ruling.  If it's cumulative, the same things the
10    Court has heard from the last 11 or 12 witnesses, the Court
11    is denying it.  You can put that in writing, your proffer,
12    and file it in the record.
13              MS. LEWIS:  I want to make sure I'm clear, Your
14    Honor.  So the Court is instructing us to file, if we would
15    like to have an offer of proof, file it with the Court via
16    ECF.  You don't want to hear it.
17              THE COURT:  Simply that.
18              MS. LEWIS:  Okay.
19              THE COURT:  Now, if the Court finds anything in that
20    proffer that is different from what these other witnesses
21    said, then you have a problem, because the Court told you if
22    it's different, you call the witness.
23              MS. LEWIS:  Understood.
24              THE COURT:  All right.  Bring the witness in here.
25              (Witness sworn.)
```

329

———————A. Tirado - Direct———————

1              ANDREA TIRADO, called by the Plaintiff, having been

2     first duly sworn, was examined and testified as follows:

3                         DIRECT EXAMINATION

4     BY MS. LEWIS:

5     Q.  Good morning.

6     A.  Good morning.

7     Q.  May you please state your first and last name for the

8     record, spelling your last name, please.

9     A.  Sure.  Andrea Tirado, T-i-r-a-d-o.

10    Q.  Are you familiar with Steadfast Medical Staffing?

11    A.  Yes.

12    Q.  What type of services does Steadfast Medical Staffing

13    provide?

14    A.  LPN, CNA staffing for buildings.

15    Q.  And were you employed by Steadfast?

16    A.  Yes.

17    Q.  When was that?  When did you start working for Steadfast?

18    A.  2016, June.

19    Q.  You have to leave your mask on up there in the well.

20            And what was your job title?

21    A.  LPN.

22    Q.  Did you apply to work for the company?

23    A.  Yes.

24    Q.  And how did you apply?

25    A.  Went to the office, filled out paperwork, gave a copy of

A. Tirado - Direct

1   my BLS, and went to work.

2   Q.  When you say you filled out paperwork, did that paperwork

3   include an application?

4   A.  Yes.

5   Q.  Did you have to provide references in support of that

6   application?

7   A.  It was part of it, but I don't think they were called.

8   Q.  Who hired you to work for Steadfast?

9   A.  Lisa.

10  Q.  And were you paid on an hourly or salary basis?

11  A.  Hourly.

12  Q.  How much were you paid per hour?

13  A.  It depended on the facility.

14  Q.  What was the range?

15  A.  40 to 50 sometimes, or 30 to 50.  It just depends.

16  Q.  Do you know why that rate of pay varied?

17  A.  No.  It's just whatever, you know, she told us the

18  building was.

19  Q.  Were you able to negotiate a different pay rate?

20  A.  No.

21  Q.  Did you have any say-so with respect to what rate of pay

22  you would receive when you worked at the facilities that you

23  provided LPN care?

24  A.  No.

25  Q.  So who made the ultimate decision to effectively set your

A. Tirado - Direct

1   rate of pay?

2         MS. RUST:  Objection.  Calls for speculation.

3   BY MS. LEWIS:

4   Q.  Do you know who made the ultimate decision as to who set

5   your rate of pay?

6   A.  Whatever the agency said, whatever Lisa...

7   Q.  Were you given the option to be classified as an

8   independent contractor or an employee?

9   A.  No.  I mean, we were just employees, told we were

10  contractors.

11  Q.  After you were hired, did you enter into any contracts

12  detailing the relationship between you and Steadfast?

13  A.  No.

14  Q.  Do you recall receiving an agreement that specified the

15  relationship between you and Steadfast?

16  A.  It did say that, you know, I was a contractor.  It did

17  say that.

18  Q.  Okay.  Do you recall how long that agreement was?

19  A.  I only filled it out one time, and that was in the

20  beginning.

21  Q.  Let me clarify.

22        How many pages was that agreement?

23  A.  One page.

24  Q.  Did it specify the rate you would be paid for the service

25  of providing LPN care?

A. Tirado - Direct

1   A.  No.

2   Q.  Was there anything in the contract that said whether you

3   had to provide notice if you no longer wanted to work for

4   Steadfast?

5   A.  No.

6   Q.  Did anyone tell you whether or not you would have to

7   provide notice?

8   A.  No.  Not at -- that didn't happen until I actually went

9   with a building and became a permanent employee, and then

10  that's when that issue came up.

11  Q.  Okay.  Let's take a step back.

12          Can you tell me about that incident?

13  A.  So I was working at Charlottesville Health & Rehab.  I

14  had been there for, like, six months or something.  And I was

15  there every day, really, and they had a unit manager position

16  open.  So they asked me to apply because I was there all the

17  time anyway.

18          And I went to Lisa, and I said, "Hey, you know, they

19  want this to happen," and she said that there was a -- I had

20  to give a 60-day notice -- I had to give her a 60-day notice

21  and that she contacted the building, because I had already

22  gotten approved and had gotten the position.

23          And then they told me that they couldn't hire me

24  because I had to work for Lisa an additional 60 days, plus

25  they had to pay, like, a -- kind of like a finder's fee, I

A. Tirado - Direct

1    guess is what it's called, and that was like $4,000 or

2    something like that.

3         And I was like, "Well, that's weird because, like, I

4    can quit and go anywhere and do something else," but they

5    were like, "Well, this is what she's saying, so you're going

6    to have to give her this time."  So I still stayed in the

7    building, worked those 60 hours, or whatever, and then, you

8    know, became a unit manager of their building.

9    Q.  So do you currently work for Steadfast Medical?

10   A.  I do.

11   Q.  And had you stopped working there for a period of time?

12   A.  Yes.

13   Q.  And when was that?

14   A.  Let's see.  Last year from October all the way to June of

15   this year.

16   Q.  Okay.  Were you still working in your capacity as an LPN

17   somewhere else?

18   A.  Yes.  With First Choice.

19   Q.  Were you providing the same type of services?

20   A.  Yes.

21   Q.  Did there come a time that you then came back to start

22   working at Steadfast?

23   A.  Yes.  After my contract with First Choice was over.

24   Q.  When was that, approximately?

25   A.  June the 1st.

─────A. Tirado - Direct─────

```
1    Q.   Were you required to complete time sheets?
2    A.   Yes.
3    Q.   Were you required to submit time sheets to Steadfast?
4    A.   Yes.
5    Q.   How often are you required to submit time sheets?
6    A.   It's supposed to be after every shift.
7    Q.   Who told you you were required to submit time sheets?
8    A.   The company.
9    Q.   Which company?
10   A.   Oh, sorry.  Steadfast.
11   Q.   Did you have any issues with your pay?
12   A.   Yes.
13   Q.   What were those issues?
14   A.   Sometimes it was, you know, they would take out 30
15   minutes for lunch that we didn't actually -- that I didn't
16   actually have.
17           In the last couple weeks, it's been -- I worked
18   COVID, you know, worked a COVID building and didn't get COVID
19   pay and then had to go back and, like, put everything in an
20   e-mail to let them know that these are the hours, this is
21   what this is, this is COVID, you know, and then after like a
22   week or so, you know, they put the money back in.
23   Q.   Okay.  Did you have any issues -- have you ever not been
24   paid for hours that you've worked?
25   A.   Yes.
```

─────A. Tirado - Direct─────

1   Q.  And can you tell me about those instances or instance?

2   A.  It was the end of 2016.  Lisa and I had gotten into, you

3   know, an issue.  I was having an issue with my son at the

4   time, and she wanted me to go work.  I couldn't work because

5   there were too many other things going on, and she just kind

6   of, like, held my paycheck for a while.

7          The next time it happened I was in Canada on

8   vacation, and I was supposed to get a $3,000 check, and I

9   got, like, 250 or $300 put in my check instead.  And when I

10  called, she was like, "Well, you've got to talk to payroll."

11         And when I talked to payroll, they were like, "Well,

12  you've got to talk to Lisa."  And so we went back and forth,

13  back and forth.  And they were like, "Bottom line, you're

14  just not going to get paid.  You just have to wait."

15         So I was in a whole 'nother country, you know,

16  didn't have what I needed, and I didn't get paid until that

17  following Friday.

18  Q.  After that instance, did you have any issues with respect

19  to getting further assignments or shifts with Steadfast?

20  A.  There were a couple other times where, you know, I was on

21  vacation -- because Lisa would send me in to fix situations,

22  you know, where she had too many people that, like, didn't

23  show up, or, you know, they left a bad taste in their mouth,

24  or whatever, so I was like a fixer.  So I would go in and

25  make sure everything was, you know, nice, deal with the

A. Tirado - Direct

1    scheduler, do all of my own scheduling.

2         I went on vacation.  So the scheduler was aware and

3    Lisa was aware, and I guess she couldn't find anyone to fill

4    my shifts when I was gone.  So when I came back, I said,

5    "Hey, don't forget I'm ready to start Monday," or whatever,

6    and they were like, "No, she canceled your shifts, like you

7    can't work in the building anymore."

8    Q.  So were you required to provide notice to Steadfast if

9    you were unavailable to work?

10   A.  No.  We were just supposed to let them know.  There

11   wasn't anything in writing that said she needed two weeks or

12   a month or anything like that.  We're per diem.  So we really

13   just show up.  It's not, you know -- we're only supposed to

14   give them a four-hour window of whether or not we're going to

15   show up or not.

16   Q.  When you say "per diem," what does that mean within the

17   nursing healthcare industry?

18   A.  So "per diem" means that you're only there for, like,

19   that particular day.  Right?  So you have per diem, and you

20   have contractor, and then you have, you know, regular

21   employees who work, you know, hourly or salary.

22        Per diem employees pick the days that they want to

23   work.  So, you know, I'll say, okay, I'm just going to work

24   Monday, Tuesday, and Friday, right, 7A to 7P.  That doesn't

25   mean that they necessarily have, you know, shifts that are

—————————————A. Tirado - Direct—————————————

1   open.  That's just what I'm saying my availability is.  And
2   they don't have to guarantee that I can get those days.
3   Q.  So per diem is a daily basis, not a guaranteed schedule,
4   essentially?
5   A.  Right.  Correct.
6   Q.  But in the past when you have been unavailable to work,
7   have you given notice to Steadfast?
8   A.  Yes.
9   Q.  And how do you go about doing that?
10  A.  Just calling Lisa, texting Lisa.
11  Q.  What is the longest amount of time that you've given them
12  notice with respect to being unavailable for per diem work?
13  A.  I've given them, like, a month.  If I'm going on
14  vacation, I know ahead of time, and I give them something.
15  Q.  When you gave them a month's notice, was that the
16  incident that you referred to that your subsequent shifts got
17  canceled?
18  A.  Yes.  Because at that particular time in that building, I
19  was doing all my own scheduling.  Lisa wasn't doing any
20  scheduling at all.  So I was with the building, and I was
21  dealing with the building.  So during that week, she couldn't
22  find anybody to fill my shifts.  So it was a deal when I came
23  back.
24  Q.  So with respect to the month scheduling, you said you
25  were doing it with the facilities, but did you have to relay

──────A. Tirado - Direct──────

1   that to Steadfast in terms of the scheduling?

2   A.  They would send an e-mail to her to let her know.

3   Q.  Okay.  So even though -- since you were there long term,

4   you still needed to communicate with Steadfast with respect

5   to the schedules that --

6   A.  Yes.  They were paying us, ultimately, and I still had to

7   turn in a timecard to them.

8   Q.  So to get back onto the schedule, within Lisa's good

9   graces, what did you have to do?

10  A.  It really just depended.  Sometimes she would be in a

11  bind, and she would be like, "Okay, I'm going to help you out

12  this time," whatever, and then she would send you somewhere

13  you didn't want to go, you know, an hour or two hours away,

14  or whatever.  You would do that for a while, and then she

15  would let you come back.

16  Q.  Did she ever make you have to apologize to get back in on

17  the schedule?

18  A.  Once or twice.  You know, she was like, "You put me in a

19  bind.  You really should make it right."  That's what that

20  scheduler had said.

21  Q.  Have you ever turned down a shift Steadfast has offered

22  you?

23  A.  Yes.

24  Q.  If you could verbalize your answer.

25  A.  Yes.

A. Tirado - Direct

```
 1  Q.  The court reporter can take down everything but not body
 2  movements.
 3  A.  Yes.
 4  Q.  And did Steadfast do anything in response when you turned
 5  down shifts?
 6  A.  You could get calls from, like, four other people.  Like,
 7  Lisa would call, you know, or other people in the office
 8  would call, or you would get text messages, you know, "Could
 9  you come," "Could you come," "Could you come," "Could you
10  please do this," "Could you please do that," whatever.
11  Q.  If you had a scheduling conflict, did Steadfast allow you
12  to send another LPN in your place?
13  A.  No.
14  Q.  And why not?
15  A.  Because you were the one who signed up for the shift.
16  Q.  Were you allowed to employ another LPN to complete a
17  shift that Steadfast paid you for?
18  A.  No.
19  Q.  And why not?
20  A.  Because that's just not how it works.  I mean, when we
21  sign up for a shift, our name is on the schedule, so we are
22  the one who is supposed to show up.
23  Q.  So, ultimately, whose responsibility is it to fill that
24  shift?
25  A.  Yeah, it's my responsibility to fill the shift.
```

A. Tirado - Direct

```
 1   Q.  But if you're unavailable since --
 2   A.  Then what would happen is that --
 3           MS. RUST:  Objection to the extent it calls for
 4   speculation.
 5           THE WITNESS:  Then --
 6           THE COURT:  Hold on a second.
 7           The objection is overruled.  If she knows how it
 8   works, she can testify to it.
 9   BY MS. LEWIS:
10   Q.  Do you know how that works?
11   A.  Yes.  So what happens is, is that let's say -- like
12   today, for instance, right, so I'm here in court today, and I
13   was supposed to be --
14           MS. LEWIS:  I'm sorry, Your Honor.  If we could hold
15   for just a moment.  This is an employee witness.  I want to
16   make sure that he's not...
17           THE COURT:  In the courtroom.
18           Okay.  You may continue.
19           THE WITNESS:  So like today, I was supposed to be in
20   Lexington.  Right?  So I contacted Lexington after I got the
21   e-mail and everything about, you know, I needed to come to
22   court, so I contacted Lexington to let them know, "Hey, FYI,
23   I can't make this shift."
24           And they are like, "Well, why?"
25           "I have to be in court."  I'm like, "If you guys
```

—————A. Tirado - Direct—————

1    need proof, I can send it."

2          And they're like, "Well, do you know anybody who can

3    fill the shift?"

4          "I don't."

5          They are like, "Okay."  So they said they would

6    contact Steadfast.

7    BY MS. LEWIS:

8    Q.  To be clear, Steadfast scheduled you for a shift today?

9    A.  Yeah.  So they have an app now where you go in and you

10   can claim a shift, and then the facility will say "yea" or

11   "nay" to whether or not they have the need, don't have the

12   need.  And then the people in the office will put you down

13   as, you know, you being in that building.

14   Q.  Were you scheduled for a shift yesterday as well through

15   Steadfast?

16   A.  All week, yeah.  I was scheduled all week, two different

17   buildings.

18   Q.  Were you allowed to have other LPNs assist you in the

19   performance of the services -- strike that.

20          If Steadfast offered you a shift but you could only

21   cover part of it, would Steadfast let you work only part of

22   that shift?

23   A.  No.  I was never offered half shifts like that.

24   Q.  What rate were you paid for hours worked over 40 in a

25   workweek?

A. Tirado - Direct

1   A.   The same hourly wage.

2   Q.   Did you ever receive time and a half for overtime, for

3   hours you worked over 40 in a workweek?

4   A.   No.

5   Q.   Did you have a supervisor at Steadfast?

6   A.   Lisa.

7   Q.   As your supervisor, would Lisa retaliate against you if

8   you did not comply with her scheduling and/or behavior

9   expectations --

10          MS. RUST:  Objection.

11          MS. LEWIS:  If I could finish my question, please.

12          THE COURT:  Let her finish it, then you object

13   before she answers.  Then the Court knows what the basis of

14   the objection is.

15          MS. RUST:  Of course.

16   BY MS. LEWIS:

17   Q.   As your supervisor, would Lisa retaliate against you if

18   you did not comply with her scheduling and/or behavior

19   expectations?

20          MS. RUST:  Objection.  Leading the witness.

21          THE COURT:  Overruled.

22          THE WITNESS:  So it would just depend.  Initially,

23   like, for instance, there was a time where my daughter had a

24   whole lot of anxiety.  I was scheduled for a bunch of shifts.

25   I was like, "I can't do it, you know, my kid has just too

A. Tirado - Direct

1    many things going on," and then the same scheduler in the

2    building would call me and tell me "I have all these open

3    shifts," but then Lisa would tell me there wasn't anything.

4    So, yes.

5    BY MS. LEWIS:

6    Q.   The time period that you had left Steadfast last year,

7    did you have things going on personally with respect to

8    caring for your children?

9    A.   Yes.

10   Q.   And did that influence your decision to take time off

11   from picking up shifts from Steadfast, based upon your

12   previous experience with them in terms of scheduling?

13   A.   I needed something more stable.  So I decided on contract

14   instead of per diem.

15   Q.   Would you negotiate your rates with the facilities?

16   A.   No.

17   Q.   Who would?

18   A.   Lisa.

19   Q.   Do you know how the rate was established with the

20   facilities?

21   A.   Not how it was established, no.  I just know, because I

22   was a regular employee and then -- because I was an agency

23   employee and then a regular employee, that, you know,

24   overtime and all that kind of thing was being paid.  I just

25   know that just from business, you know, meetings and whatnot

A. Tirado - Direct

1   that I had to go to.

2   Q.  Did you ever financially invest in Steadfast?

3   A.  No.

4   Q.  Do you have an ownership interest in Steadfast?

5   A.  No.

6   Q.  Are you an officer, manager, or director of the business?

7   A.  No.

8   Q.  Do you own a percentage of Steadfast?

9   A.  No.

10  Q.  Have you received any back wages from Steadfast for the

11  hours that you worked over 40?

12  A.  No.

13  Q.  And on average, how many hours did you work each

14  workweek?  You can give a range, not an hour.

15  A.  It would really just depend.  Sometimes it could be 40,

16  sometimes it could be 90, it just really depends.  Sometimes

17  it was six 16s.  It just depended on, you know --

18  Q.  So that would be six times 16 hours a week?

19  A.  Yes.

20  Q.  And do you receive overtime from Steadfast now?

21  A.  No.

22  Q.  Had you ever complained to Steadfast about not receiving

23  overtime?

24  A.  We've had a conversation about it a couple of times, and

25  she just said that we were independent contractors, and

A. Tirado - Cross

1   that's just what it was.

2           MS. LEWIS:  No further questions for this witness,

3   Your Honor.

4           THE COURT:  Cross.

5                       CROSS-EXAMINATION

6   BY MS. RUST:

7   Q.  Hi, Ms. Tirado.  My name is Julia Rust.  I'm an attorney

8   for the defendants.  I just have a couple of questions for

9   you.

10          You talked about some of your schedule with the

11  facility.  To the extent you know, are you aware whether

12  facilities will ask certain nurses not to come back?

13  A.  Yes.

14  Q.  And do the facilities cancel shifts sometimes for their

15  temporary staffing?

16  A.  Yes.

17  Q.  And when you -- you said you were doing all your own

18  scheduling with the facility when -- I think you said when

19  you were on vacation.

20  A.  When I went, it was scheduled in my schedule that I was

21  going on vacation.

22  Q.  So you had picked up the shifts --

23  A.  No.

24  Q.  -- and then you --

25  A.  So --

A. Tirado - Cross

1    Q.   -- went on vacation?

2    A.   So it's a 30-day calendar, right?  So I would put in the

3    days that I was working and then let them know that from the

4    7th to the 14th, I was unavailable, and then these were my

5    other days.  So then they would say, "Okay, no problem.  I

6    know you can work these days, not these days.  This week you

7    will be off.  I'll have Lisa send somebody over."

8    Q.   Okay.  And then with respect to the app that you talked

9    about --

10   A.   Uh-huh.

11   Q.   -- now you can just voluntarily claim or voluntarily

12   choose whichever shifts that are in the app, right?  Is that

13   what you said?

14   A.   Now, yes.  Now we can, yeah.

15   Q.   And you voluntarily signed up for the shift yesterday and

16   the shift for today that you talked about, correct?

17   A.   Correct.

18   Q.   And just to clarify what you said before, you went to

19   work with First Choice around October 2020, right?

20   A.   Correct.

21   Q.   And then you said around June, you stopped working with

22   First Choice.

23   A.   Correct.

24   Q.   And since then, you've been back on Steadfast's registry

25   picking up shifts?

—————————————————— A. Tirado - Cross ——————————————————

1   A.   Yes.

2   Q.   Okay.

3           MS. RUST:  I have no further questions.  Thank you.

4           THE COURT:  The Court has a couple questions before

5   you come back.

6           You can go on.

7           Were you subpoenaed to testify in this case?

8           THE WITNESS:  Yes.

9           THE COURT:  And do you recall when you got your

10  subpoena?

11          THE WITNESS:  I got it in the mail in, like, 2018.

12          THE COURT:  20' what?

13          THE WITNESS:  2018.

14          THE COURT:  Okay.  And did you share the fact that

15  you were subpoenaed to testify in this case with Steadfast?

16          THE WITNESS:  No.

17          THE COURT:  So when they scheduled you, is it

18  correct that they did not know you were scheduled to testify

19  in this case?

20          THE WITNESS:  Correct.

21          THE COURT:  Okay.  But you knew when you accepted

22  the assignment that you were scheduled to testify in this

23  days.  Did you?

24          THE WITNESS:  Well, yes.

25          THE COURT:  In other words, it's not due and owing

A. Tirado - Redirect

1    to a conflict with Steadfast that you were scheduled to work
2    and scheduled to testify too?
3             THE WITNESS:  Correct.
4             THE COURT:  Okay.  I just wanted to be clear.
5             All right.  You may redirect.
6             MS. LEWIS:  Thank you.
7                      REDIRECT EXAMINATION
8    BY MS. LEWIS:
9    Q.  So just a couple follow-up questions.  First, we'll sort
10   of go where the Judge went.
11            Did you come to court yesterday?
12   A.  Yes.
13   Q.  And what happened when you got here?
14   A.  The person out front sent me back to my car, like, four
15   different times with another reason why I couldn't come in.
16   And I kept going back to the parking deck and coming back and
17   going back to the parking deck and coming back.  I asked him
18   if he would get the lawyer.  And he said, you know, I could
19   get that taken care of when I came back.
20            So after the fourth time, I was, like, this is
21   insane, like, I really just need to get into court, and he
22   said -- he was like, "Well, as soon as you, you know, get" --
23   what did I have then?  He was complaining about my wallet, or
24   whatever.
25            And I was like, "You want me to leave my cell phone,

A. Tirado - Redirect

1    my watch, and my wallet?"  Like, I'm four hours away from
2    home.  Like, that's insane.  I'm too far away.  And then he
3    was complaining about my key chain on my car keys.
4    Q.  Did you provide -- did we speak last night regarding your
5    nonappearance?
6    A.  Yes.
7    Q.  Did you provide any proof of your parking receipt?
8    A.  I did.
9    Q.  So you did appear yesterday.  You had an issue at the
10   front door; is that correct?
11   A.  Correct.
12   Q.  Now, with respect to your testimony regarding the app,
13   when did you start using that app?
14   A.  June.
15   Q.  I'm sorry?
16   A.  June.
17   Q.  And when you go on to the app system, you can request --
18   how does it work?
19   A.  So it gives you all the facilities that have something
20   available, and then you can -- it tells you how much you will
21   be paid, and then you click on it, and it will say, like,
22   "claim a shift," and then you have to wait for it to be
23   approved to know whether or not you can do it.  And then you
24   can clock in and out on the app and all those kinds of
25   things.

Carol L. Naughton, Official Court Reporter

——————A. Tirado - Redirect——————

1    Q.   So to be clear, even though you go on and select shifts,

2    Steadfast still has to approve you for those shifts --

3          MS. RUST:  Objection.

4    BY MS. LEWIS:

5    Q.   -- is that what you were saying?

6          MS. RUST:  Objection.  Mischaracterization of

7    testimony and leading.

8          THE COURT:  Misinterpretation?

9          MS. RUST:  Yes.  She testified earlier that the

10   facility had to approve it.  She did not say that Steadfast

11   had to approve it.  She said it had to be approved.

12         THE COURT:  Here's what we're going to do:

13         Let's try this again, because the Court can't

14   remember what she said, and the Court doesn't know which way

15   you're going here.  So let's ask the question again.

16   BY MS. LEWIS:

17   Q.   We'll start from the top.

18   A.   Okay.

19   Q.   Who has extended this app to you?

20   A.   Steadfast.

21   Q.   How do you use the app?

22   A.   So on the app, you open it, you click on whatever

23   facility it is, and it will say "claim shift."  So you click

24   it.  It will go yellow -- or not yellow, it will turn white,

25   and it will be sort of pending.  Then the facility will say

A. Tirado - Redirect

1  "yes" or "no," whether or not they are going to take it or

2  not, and then they let Steadfast know that you're going to be

3  working that day.

4  Q.  So how do you know that it's the facility that has to

5  approve rather than Steadfast if it's Steadfast's app?

6  A.  The only reason I know that is because I deal with the

7  schedulers in the building, and they will tell me, "Okay,

8  well, in the app, I put you in for this day, this day, this

9  day, but not this day, this day."  So I'm sending it to

10  Steadfast so they are aware.

11  Q.  So, either way, Steadfast is still in the middle of you

12  having to be approved for a shift; is that correct?

13          MS. RUST:  Objection.  Leading.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes, because otherwise I can't get

16  paid.  They are the ones who pay me.

17  BY MS. LEWIS:

18  Q.  Going to the time period where you stopped working for

19  Steadfast, in between that time, were you working for

20  Steadfast and First Choice during that same period of time?

21  A.  No.

22  Q.  It was just one?

23  A.  It was just the one, yes.

24  Q.  And with respect to -- also just clarifying for the

25  subpoena, did you also receive a subpoena again this year?

```
 1   A.   I did.
 2            MS. LEWIS:   Okay.   No further questions, Your Honor.
 3            THE COURT:   May the witness be permanently excused?
 4            MS. LEWIS:   Yes, she may.
 5            THE COURT:   You may step down.
 6            (Witness excused.)
 7            MS. LEWIS:   Your Honor, with respect to yesterday
 8   and the concerns that the Department raised, the Secretary
 9   has reconciled all of those issues with respect to those five
10   witnesses.
11            THE COURT:   What I want to know is, with respect
12   to -- you were down to three that did not show or you didn't
13   get the testimony.   Did you subpoena those three?
14            MS. LEWIS:   Yes, they were.
15            THE COURT:   If you subpoenaed those three and they
16   did not honor the subpoenas, it becomes a question of what
17   the Court's response would be, no matter what you want to do,
18   because we cannot have people ignoring subpoenas.
19            Can you provide the Court documents showing that
20   they were served with the subpoena?   Do you have the returns?
21            MS. LEWIS:   Right, Your Honor.   So we served the
22   subpoenas via e-mail.   We requested a response of "received
23   and accepted."   We have e-mails confirming that.
24            With respect to two of those individuals -- and I'll
25   say them by name as they were mentioned on record earlier.
```

353

```
 1   The first one is -- if I may get my computer, because I want
 2   to be accurate.
 3            THE COURT:  Okay.
 4            MS. LEWIS:  The three remaining, Your Honor --
 5   Tiffany Trogdon and Ryan Thompson are two of the three.
 6   Ms. Trogdon, there was a -- best way to describe it, a
 7   misunderstanding with respect to whether she was in person or
 8   remote.  It was not an intentional nonappearance.
 9            With respect to Mr. Thompson, his subpoena was for a
10   later day, and because of the shifting, there was a
11   miscommunication with respect to when he needed to appear,
12   but he will be able to appear at the date indicated on his
13   original subpoena.
14            THE COURT:  What date is that?
15            MS. LEWIS:  He has been reserved as a rebuttal
16   witness.
17            THE COURT:  Okay.
18            MS. LEWIS:  So much later on.
19            The last individual, we have not been able to get in
20   touch with, which is Brandi Plummer.
21            THE COURT:  Though you subpoenaed her and she
22   indicated she would be here?
23            MS. LEWIS:  Yes.  We subpoenaed her.  We talked to
24   her.  She was actually subpoenaed the day before.  So we
25   don't know her status.
```

```
 1              THE COURT:  Okay.  Well, then, I'll tell you what
 2    we'll do.  We will inquire for her status because no one gets
 3    a pass on ignoring subpoenas.
 4              MS. LEWIS:  Understood.  But that's where we are.
 5              THE COURT:  Just make sure that the name -- for the
 6    record, again, here name was Brandi what?
 7              MS. LEWIS:  Brandi Plummer.
 8              THE COURT:  Okay.  And any information you have
 9    dealing with the e-mails you sent, e-mails you received, I
10    want you to provide that to the courtroom deputy before the
11    case is ended.
12              MS. LEWIS:  Certainly, Your Honor.
13              THE COURT:  Now, let me go back to something because
14    I want the record to be very clear.
15              This witness provided some testimony slightly
16    different or in addition to what the others provided.  To the
17    extent that is happening -- first of all, let me ask you
18    this:
19              How many witnesses are you wanting to make the
20    proffer on in that?
21              MS. LEWIS:  Six additional.
22              THE COURT:  Six.  Now, would these six witnesses
23    provide the same testimony regarding the procedures and
24    practices of Steadfast consistent with what we've heard from
25    the previous witnesses?
```

```
1              MS. LEWIS:  Yes, Your Honor.

2              THE COURT:  Same testimony?

3              MS. LEWIS:  Same similar testimony.

4              THE COURT:  Okay.  Then the Court will stand by its

5    objection to cumulative evidence being provided in the

6    record.  It will stand by that.

7              And since you said it's the same testimony, the

8    Court sees no need for you to be making an oral proffer, but

9    if you insist on doing this, the Court is permitting you to

10   put it in writing, as long as it's consistent with the same

11   thing that's previously been admitted.

12             But it's just a proffer.  It's not something that

13   the Court is going to consider in disposing of this case,

14   because it's cumulative.

15             MS. LEWIS:  Understood, Your Honor.

16             THE COURT:  All right.  Next witness.

17             MS. LEWIS:  Thank you.  If I may talk to my

18   co-counsel.

19             (Pause in the proceedings.)

20             MS. LEWIS:  Your Honor, if we may release the

21   employee witnesses who are here, based upon the discussion we

22   just had.

23             THE COURT:  If they are providing the same testimony

24   and we're not going to learn anything new, you may release

25   them.
```

```
1              MS. LEWIS:  Thank you.

2              The next witness we'll call is the Farmville

3    facility.

4              Your Honor, if I may, we're still calling Farmville,

5    but with that, the list that we talked about earlier today,

6    the 16, is now down by six.

7              Last night I indicated to defense counsel that

8    because a number of -- not a number, but one witness,

9    Christine Kim, who is a payroll manager, needed to appear

10   today, it's my understanding from defendants that she will be

11   unable to appear today because today is the day that they run

12   payroll, but she's one of our sort of last witnesses in terms

13   of our case in chief.

14             THE COURT:  Okay.

15             MR. JEWETT:  We object to this next witness.  When

16   we received the Secretary's list last night -- when we

17   received the Secretary's witness list last night, we did not

18   see this particular witness.  This was not in the Final

19   Pretrial Order that was entered.

20             THE COURT:  Is the witness's name anywhere on the

21   Pretrial Order?

22             MR. SEIFELDEIN:  Yes, Your Honor, we believe that it

23   is.

24             If you can pull it up, Ms. Lewis.

25             This is the representative of the Farmville
```

```
1    facility.  This is Pastor Gregory Ashley, and we can verify
2    that.
3              THE COURT:  Here's the way it works:
4              If the witness is on the pretrial list, you can call
5    them.  The matter of giving each other the list of who you're
6    going to call the next day is a courtesy to facilitate moving
7    the case along.  It doesn't bar the witness from testifying.
8              So if it has been previously provided in the
9    Pretrial Order, then the witness can be called.  Of course,
10   it works a lot better if you would be consistent with what is
11   on the list that you give them, but that doesn't bar the
12   witness from testifying.
13             Mr. Jewett is talking.  Only one of you-all can
14   address an issue at a time.
15             Is there another question about this?
16             MR. JEWETT:  Your Honor, I'm sorry, I didn't hear
17   the last thing you said.
18             THE COURT:  What I said is, if the witness is on the
19   pretrial list as someone they may call, the fact that,
20   perhaps, they didn't give them to you overnight does not bar
21   the witness from testifying, as long as he has been
22   previously listed as someone that would be called.  But if
23   you've never even heard of the witness, he's never been on
24   the Pretrial Order, that's a different story.
25             MR. JEWETT:  That is our position, Your Honor.  We
```

1    are on Page 16 of the Final Pretrial Order.

2              THE COURT:  You've never heard of this witness?

3              MR. JEWETT:  We do not see this witness on the Final

4    Pretrial Order.

5              MR. SEIFELDEIN:  We're checking the Pretrial Order.

6    We believe that he was identified, but perhaps the witness

7    may be under the legal name of the facility, but as of now,

8    we do not see Farmville on the list.

9              MS. LEWIS:  What is the legal name?

10             MR. SEIFELDEIN:  The legal name is Farmville Rehab

11   Center.  Actually, I have the contract here.  It is Farmville

12   Rehabilitation Healthcare Center.

13             THE COURT:  The Court is going to take a five-minute

14   recess.  If the witness is not on the pretrial list, you

15   never raised him, never listed him, then you're not going to

16   be calling the witness.

17             We'll be in recess for five minutes.

18             (Recess from 11:00 a.m. to 11:08 a.m.)

19             MR. SEIFELDEIN:  Good morning, Your Honor, and thank

20   you for indulging us.

21             Your Honor, indeed, on or about August 10, 2021, the

22   plaintiff identified to Steadfast, on its 15th Supplemental

23   Response to Request for Production, Farmville; identified it

24   and then also provided the contract between Farmville and

25   Steadfast.

1           And to answer the Court's question, the Final
2     Pretrial Order did not include the name "Farmville," but we
3     believe that in the interest of justice, that individual
4     should be allowed to testify as the defendants have not
5     articulated a harm that would come to them or how they would
6     be prejudiced.
7           THE COURT:  Here's the situation:  The witness
8     should have been on the Final Pretrial Order.  What the Court
9     will do is this:
10          You're not required to give notice of a witness held
11    for rebuttal.  This witness may testify as a rebuttal
12    witness, depending upon what the defendants have to say about
13    their practices.  He's not going to testify in the case in
14    chief.  He can testify as a rebuttal witness.  So you need to
15    call another witness.
16          MR. SEIFELDEIN:  I understand, Your Honor.
17          THE COURT:  I understand it's in the interest of
18    justice, but that's just basic trial practice.  You have
19    800-some witnesses in there.  If the witness you want to call
20    is not in there, rebuttal.  You have him called for rebuttal
21    but not the case in chief.
22          Next witness.
23          MR. SEIFELDEIN:  The plaintiff will call Ms. Erica
24    Johnson from Princess Anne facility.
25          (Witness sworn.)

1          ERICA JOHNSON, called by the Plaintiff, having been

2    first duly sworn, was examined and testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. SEIFELDEIN:

5    Q.  Good morning, Ms. Johnson.

6    A.  Good morning.

7    Q.  Could you please state your name for the record and spell

8    your last name.

9    A.  Erica Johnson, J-o-h-n-s-o-n.

10   Q.  Where are you currently employed, Ms. Johnson?

11   A.  Princess Anne Health & Rehab Center.

12   Q.  How long have you been employed with Princess Anne

13   healthcare?

14   A.  Since 2017.

15   Q.  Okay.  And what is your job title?

16   A.  Administrator.

17   Q.  And what are your responsibilities as an administrator at

18   Princess Anne?

19   A.  I oversee operations for the facility, ensuring that

20   quality patient care is taken care of, and employee safety

21   reports.

22          THE COURT:  Can you keep your voice up, please,

23   Ms. Johnson.

24          THE WITNESS:  Yes.  Is that better?

25          THE COURT:  Yes, ma'am.

E. Johnson - Direct

```
 1            THE WITNESS:  Do you want me to take my mask off?
 2            THE COURT:  No, you can't, but you can speak closer
 3    to the microphone.
 4    BY MR. SEIFELDEIN:
 5    Q.  Did you say you oversee the operation of the facility?
 6    A.  Yes.
 7    Q.  Has this always been your job title?
 8    A.  At Princess Anne, yes.
 9    Q.  And I'm sorry, you said it has been your title with
10    Princess Anne since 2017?
11    A.  Yes.
12    Q.  And prior to that, did you work for Princess Anne as well
13    before you became the admin?
14    A.  Yes.  For Medical Facilities of America.
15    Q.  When did you start that?
16    A.  In 2008.
17    Q.  So you've been with them for quite a bit?
18    A.  Yes.
19    Q.  What is the general nature of the business of Princess
20    Anne Health & Rehab?
21    A.  We provide nursing and therapy services to residents,
22    specifically the geriatric population.
23    Q.  Is that long-term care and short-term care?
24    A.  Yes.
25    Q.  And what sort of healthcare professional does Princess
```

E. Johnson - Direct

1   Anne use to provide these services that you just mentioned?

2   A.   CNAs, LPNs, RNs, physical/occupational/speech therapists.

3   Q.   Does Princess Anne hire your staff directly?

4   A.   Yes.

5   Q.   That's how you fulfill your staffing needs?

6   A.   Yes.

7   Q.   And does Princess Anne use supplemental staffing?

8   A.   Yes.

9   Q.   Could you just explain to us, what is supplemental

10  staffing?

11  A.   Supplemental staffing is whenever our employees cannot

12  meet all of the requirements that we need, we reach out to

13  supplemental staffing to fill those shortages.

14  Q.   I understand.

15        And are you familiar with the company called

16  Steadfast Medical Staffing?

17  A.   Yes.

18  Q.   Has Princess Anne ever used Steadfast to fulfill some of

19  its staffing needs?

20  A.   Yes.

21  Q.   When did Princess Anne begin working with Steadfast, if

22  you recall?

23  A.   2018.

24  Q.   And what positions, staffing-wise, did Princess Anne

25  request of Steadfast to fulfill?

E. Johnson - Direct

1    A.   Nursing, CNAs, RNs, LPNs.

2    Q.   Did Princess Anne enter into a contractual agreement with

3    Steadfast?

4    A.   Yes.

5    Q.   Let's look at Plaintiff Exhibit 10.

6         MR. SEIFELDEIN:  If the Court will indulge me, Your

7    Honor?

8         (Pause in the proceedings.)

9         MR. SEIFELDEIN:  Thank you, Your Honor.

10   BY MR. SEIFELDEIN:

11   Q.   We'll just scroll through this document, Ms. Johnson, and

12   see if you recognize it.  Let me know if you recognize that

13   document when you're done with that.

14   A.   Yes, I do.

15   Q.   What is it?

16   A.   It is our contract with Steadfast for supplemental

17   staffing.

18   Q.   Is this contract made in the regular course of business?

19   A.   Yes.

20   Q.   Is the contract kept in the regular course of business?

21   A.   Yes.

22   Q.   Is this a true and accurate copy of the contract between

23   Princess Anne Health & Rehab and Steadfast?

24   A.   Yes.

25   Q.   And does this contract generally provide -- does it

E. Johnson - Direct

```
 1   define the scope of services provided by the Steadfast
 2   nurses?
 3   A.   Yes.
 4   Q.   Did there come a time when Princess Anne stopped
 5   contracting with Steadfast?
 6   A.   Stopped contracting?
 7   Q.   Well, yeah.  Let me rephrase that.
 8           Did there come a time when Princess Anne stopped
 9   working or using Steadfast nurses?
10   A.   Yes.
11   Q.   Do you recall when that was?
12   A.   The exact date, I do not recall.
13   Q.   Do you recall the year?
14   A.   I believe '19.
15   Q.   2019.  Okay.
16           Does Princess Anne enter into individual contracts
17   with the Steadfast nurses?
18   A.   No.
19   Q.   And why not?
20   A.   Our contract is with Steadfast Medical Staffing.
21   Q.   So if Princess Anne wants to fulfill some of those
22   staffing needs that you talked about earlier, who would you
23   contact?
24   A.   Steadfast's office.
25   Q.   And would Princess Anne contact -- why would Princess
```

E. Johnson - Direct

```
1    Anne contact Steadfast rather than the nurses directly?

2    A.  Because we have the contract with Steadfast.

3    Q.  Once you call Steadfast and ask for those additional

4    staffing, does Steadfast provide you the phone numbers or the

5    contact information of the nurses?

6    A.  No.  Their scheduler would reach out to their employees

7    that were available to fill those needs.

8    Q.  And why wouldn't they provide you the numbers to call

9    them and contact them yourself?

10   A.  Because they are employees of Steadfast, not Princess

11   Anne's.

12   Q.  Let's look at PX-10, Page 128, or Bates 128.

13          Do you see the staffing services?  Are those the

14   duties of the staffing services by Steadfast?

15   A.  Yes.

16   Q.  Can you describe the work typically performed by the

17   Steadfast nurses.  For example, the LPNs, the RNs, the CNAs,

18   take them one by one, please.

19   A.  Sure.  The CNAs are responsible for activities of daily

20   living, providing those services to the patients, taking

21   vital signs, and following through with any direction that

22   the charge nurse is giving to them.  And then RNs and LPNs

23   are responsible for medication administration, treatment

24   administration, any other task that is assigned to them,

25   assessing the patients clinically.
```

E. Johnson - Direct

1   Q.  If you wanted to change a Steadfast nurse's duties, would
2   Steadfast have to agree to those changes?
3   A.  Yes.
4   Q.  Why would you have to contact Steadfast to make any
5   changes to the duties described within the contract -- the
6   general scope of the services provided by the nurses?
7   A.  Because we would follow up with their supervisor, which
8   would be Steadfast.
9   Q.  So Steadfast would negotiate any changes to the contract?
10  A.  Correct.
11  Q.  Why wouldn't it be the nurses?
12  A.  Because the contract is with Steadfast Medical Staffing
13  and not with the employee or the nurse.
14  Q.  All right.  So are the nurses involved in any way in the
15  negotiation of this contract between Princess Anne and
16  Steadfast?
17  A.  No.
18  Q.  I want to direct your attention to Page 136,
19  paragraph 12.  Are you able to see that, Ms. Johnson?
20  A.  Yes.
21  Q.  Was it Princess Anne's expectation that Steadfast would
22  follow federal laws with respect to the employees?
23  A.  Yes.
24  Q.  Was it Princess Anne's expectation that Steadfast would
25  follow labor and employment laws with respect to the

E. Johnson - Direct

1   employees?

2   A.   Yes.

3   Q.   How are the services rendered once -- excuse me.

4        How are services rendered once a nurse is actually

5   placed at the facility?

6   A.   Well, the nurse or the CNA would get report -- do you

7   mean about their job duties or...

8   Q.   Yeah, just generally.

9   A.   Yeah, the nurse or CNA would get report from the previous

10  shift, and they would be given an assignment, and they would

11  follow through with making sure that proper care was done.

12  Q.   I understand.

13       Let me just back up a little bit here.  We talked

14  about the placement of the nurses by Steadfast at your

15  facility, and if I recall correctly, you said you call

16  Steadfast, not the nurses, for the scheduling, correct?

17  A.   Correct.

18  Q.   When you do call them, what information do you provide to

19  Steadfast regarding the assignments?

20  A.   We would tell Steadfast that I have, for example, two

21  nurse holes that needs to be filled or three CNAs, and their

22  scheduling office would say, "Okay, I will supply you with

23  these names, and they will be there at whatever shift and

24  date."

25  Q.   Are the Steadfast nurses themselves permitted to directly

————————E. Johnson - Direct————————

1    contact you for placements or work?

2    A.   No.   They would call their scheduling office.

3    Q.   And why don't you allow them to contact you directly for

4    work?

5    A.   Because our contract is with Steadfast.   They provide the

6    needs to us.

7    Q.   Who determines which of the Steadfast nurses are placed

8    at Princess Anne?

9    A.   Steadfast.

10   Q.   Does Steadfast provide Princess Anne access to its entire

11   list of vetted nurses?

12   A.   No.

13   Q.   So who ultimately selects which Steadfast nurses are

14   placed at your facility, Princess Anne?

15   A.   Steadfast.

16   Q.   And who structures the term of the relationship between

17   Princess Anne and the nurses -- excuse me, between

18   Princess -- yes, Princess Anne and the nurses?

19   A.   Steadfast.

20   Q.   Regarding credentials and skills, what information does

21   Steadfast provide to Princess Anne before they place a nurse

22   at your facility?

23   A.   Information and skills.

24   Q.   What credentials?

25   A.   None, generally.

1  Q.  If I could have you look at Page 140 of the exhibit.  Do

2  you see that?

3  A.  Yes.

4  Q.  Does Princess Anne do any screening of the Steadfast

5  nurses prior to their placement at Princess Anne?

6          Let me ask it this way:

7          Does Princess Anne interview the nurses before they

8  are placed at Princess Anne?

9  A.  No.

10  Q.  Who does that -- why not?  Why don't you do interviews?

11  A.  Because they aren't our employees, they are Steadfast

12  employees.

13  Q.  Does Princess Anne conduct background checks on the

14  nurses before they are placed at your facility?

15  A.  No.

16  Q.  And why not?

17  A.  Because they are employees of Steadfast.

18  Q.  So who would do that?

19  A.  Steadfast Medical Staffing.

20  Q.  The background checks?

21  A.  Yes.

22  Q.  And does Princess Anne verify the nurse's credentials

23  that are placed at your facility by Steadfast?

24  A.  No.

25  Q.  Why?

E. Johnson - Direct

1    A.  Because Steadfast runs their license to make sure that
2    they are valid before they send them to us to work.
3    Q.  Okay.  Does Princess Anne verify the Steadfast nurses'
4    references?
5    A.  No.
6    Q.  What obligations, if any, Ms. Johnson, does Princess Anne
7    have to accept the Steadfast nurses once they are referred to
8    your facility?
9    A.  What obligation?
10   Q.  Yeah.  Can you decline a nurse that has been referred to
11   you for placement by Steadfast?
12   A.  Yes.
13   Q.  Okay.  And have you done that before?
14   A.  Yes.
15   Q.  And who do you communicate that to?  Steadfast or the
16   nurse?
17   A.  Steadfast.
18   Q.  Why do you communicate that to Steadfast and not the
19   nurse?
20   A.  Because the nurse is employed through Steadfast.  So if
21   there is any issues, we contact Steadfast's office so that
22   they can either counsel their employee or rectify the
23   situation.
24   Q.  And let me have you look at Page 131 of this document,
25   paragraph 5.  Do you see that?

```
                          ┌─ E. Johnson - Direct ─┐

 1    A.   Yes.

 2    Q.   And does Steadfast mandate that you notify them of any

 3    removal or the like of a nurse?

 4    A.   Yes.

 5    Q.   And is Princess Anne able to cancel a scheduled nurse's

 6    shift?

 7    A.   Yes.

 8    Q.   Let's look at the same page, letter D here.  Do you see

 9    that?

10    A.   Uh-huh.

11    Q.   So if Princess Anne cancels a shift, is there a time

12    period in which you have to notify Steadfast?

13    A.   Within two hours.

14    Q.   And do you notify the nurse?

15    A.   No.  We notify Steadfast.

16    Q.   Why do you notify Steadfast and not the nurse?

17    A.   Because Steadfast then calls their employee to cancel

18    them, and sometimes we don't even know who they are sending

19    us, so we wouldn't have the staff member's name.

20    Q.   And so what if a nurse fails to show up or is running

21    late?  Who would you contact?

22    A.   Steadfast staffing agency.

23    Q.   Why would you contact Steadfast instead of the nurse?

24    A.   So that they can either find a replacement or figure out

25    where that person -- or what time that person will arrive.
```

E. Johnson - Direct

1   Q.  So then Steadfast would contact them, and then they'll
2   contact you back and give you a status update?
3   A.  Correct.
4   Q.  Let's look at Page 134, Ms. Johnson, paragraph 10.
5        Are the Steadfast nurses who are placed at your
6   facility employees of your facility?
7   A.  No.
8   Q.  Would you consider them employees of Steadfast?
9        MR. JEWETT:  Objection.  Calls for speculation.
10       THE COURT:  Calls for opinion.  Sustained.
11       I realize that through the testimony she referred to
12  them as employees, but that's still not cause for her
13  opinion -- well, on second thought, objection overruled.
14  That's just asking for her assessment on what they are, and
15  that's not binding on the Court.
16       MR. SEIFELDEIN:  The Court has the ultimate
17  decision, correct, Your Honor.
18       THE COURT:  That's correct.
19       MR. SEIFELDEIN:  Very good, Your Honor.
20  BY MR. SEIFELDEIN:
21  Q.  Ultimately, they are not your employees?
22  A.  Correct.  They are not Princess Anne employees.
23  Q.  Actually, let's look at that, the opinion -- actually,
24  not the opinion, the document itself here, and I want to have
25  you look at the second sentence there.  This is the contract

Carol L. Naughton, Official Court Reporter

─────E. Johnson - Direct─────

1    between Steadfast and the facility, and I will read it for

2    you.

3            And it starts with "It is specifically understood

4    and agreed that the temporary personnel assigned by

5    supplemental staffing services to the healthcare center is

6    the sole employee of supplemental staffing services and not

7    an employee," end quote, in your facility.

8            Correct?  Is that what it says?

9    A.  Correct.

10   Q.  And this is an acknowledgment between you and Steadfast

11   because it's in the contract, correct?

12   A.  Correct.

13   Q.  And, also, let's look at Page 142 of the same document,

14   an Acknowledgment and Waiver.  That's Exhibit C of the

15   contract.

16   A.  Yes.

17   Q.  Generally, what is this Acknowledgment and Waiver here?

18   A.  It's acknowledging the contract between Steadfast and

19   Princess Anne.

20   Q.  And is it true, then, based on the contract in this

21   acknowledgment, that Steadfast agreed that the nurses are,

22   indeed, its employees?

23   A.  Yes.

24   Q.  Does Princess Anne discipline the Steadfast nurses?

25   A.  No.

374

─────────────────────── E. Johnson - Direct ───────────────────────

1   Q.   Why not?

2   A.   Because they aren't Princess Anne employees, we can't

3   hold them accountable.

4   Q.   And to the extent there is a concern with an employee,

5   who do you communicate that to?

6   A.   Steadfast.

7   Q.   Is Princess Anne involved in providing -- well, does

8   Steadfast require the facility, Princess Anne, to provide

9   feedback regarding the employee's performance or any issues?

10  A.   Yes.  I would say yes.

11  Q.   And if a nurse is not performing her or his duties up to

12  your standards, how would you handle that?  With the nurse or

13  with Steadfast?

14  A.   We would call Steadfast.

15  Q.   You address performance issues with Steadfast?

16  A.   Correct.

17  Q.   Do you address performance issues directly with the

18  nurses?

19  A.   No.

20  Q.   Let's talk about the billing briefly here.  Let me have

21  you look at Page 141 of the contract.

22          THE COURT:  Excuse me, Counsel.

23          MR. SEIFELDEIN:  Yes.

24          THE COURT:  The Court cannot see it on the screen.

25  You're leaving Page 142?

Carol L. Naughton, Official Court Reporter

—————E. Johnson - Direct—————

1          MR. SEIFELDEIN:  141, Your Honor.

2          THE COURT:  You're leaving Page 141 of Exhibit 10?

3          MR. SEIFELDEIN:  Pardon me, Your Honor?

4          THE COURT:  Okay.  I just want to be sure which page

5    it was.

6          MR. SEIFELDEIN:  You can see it?

7          THE COURT:  I can see it now.

8          MR. SEIFELDEIN:  Thank you, Your Honor.

9    BY MR. SEIFELDEIN:

10   Q.  So does the contract between Princess Anne and Steadfast

11   detail the billing rate for Steadfast?

12   A.  Correct, yes.

13   Q.  And does it state the amount that you would pay

14   Steadfast?

15   A.  Yes.

16   Q.  And as far as you know, this is the billing rate that

17   Steadfast asked of you?

18   A.  Correct.

19   Q.  And do you know the pay rate that Steadfast pays to

20   nurses?

21   A.  No.

22   Q.  Okay.  And you don't know if it's this amount?

23   A.  No.

24   Q.  So $55 per hour, for example, for an RN, that's what you

25   pay Steadfast?

E. Johnson - Direct

1    A.   Correct, through invoice.

2    Q.   Pardon?

3    A.   I said, "Correct, through invoice."

4    Q.   Through an invoice.

5            And then you don't know if Steadfast pays that $55

6    to the nurse?

7    A.   Correct, I do not know.

8    Q.   Okay.  And this price here, did Princess Anne negotiate

9    the compensation with any of the Steadfast nurses?

10   A.   No.

11   Q.   And why not?

12   A.   Because they are employees of Steadfast, and the contract

13   is with Steadfast, not the nurses.

14   Q.   So the Steadfast nurses have no say in this amount that

15   was set in the contract between the facility and Steadfast?

16   A.   Correct.

17   Q.   Does Princess Anne compensate the Steadfast nurses for

18   the services that they provide at the Princess Anne facility?

19   A.   No.

20   Q.   And who do you provide the compensation to for the care

21   provided by these nurses?

22   A.   Steadfast Medical Staffing.

23   Q.   Is Princess Anne responsible for paying the Steadfast

24   nurses for the hours they work?

25   A.   No.

E. Johnson - Direct

1  Q.  Okay.  Let's have a look at Page 129, paragraphs 2 and 4,

2  of the agreement between Steadfast and Princess Anne.

3  A.  Yes, I see it.

4  Q.  Okay.  Let's begin with paragraph 2 there.

5       Who is responsible for paying the Steadfast nurses?

6  A.  Steadfast.

7  Q.  And I'm just looking at the first sentence there.  It

8  says:

9       "Assume sole and exclusive responsibility for

10 payment of wages, including overtime where applicable, to

11 temporary personnel for services performed at the healthcare

12 center..."

13      Is that correct?

14 A.  Correct.

15 Q.  Is that the expectation, that Steadfast would be the sole

16 entity responsible for paying the nurses, including overtime

17 to the extent nurses worked over 40 hours in a workweek?

18 A.  Correct.

19 Q.  This is a contract that Steadfast signed, correct?

20 A.  Correct.

21 Q.  Does Princess Anne have any role in determining or

22 setting the hourly rate that Steadfast pays its nurses for

23 the care provided at Princess Anne?

24 A.  No.

25 Q.  Earlier you mentioned to me, Ms. Johnson, invoices.  I

E. Johnson - Direct

1  want to talk to you about that a little bit.
2          Does Princess Anne provide the Steadfast nurses a
3  time sheet?
4  A.  Princess Anne does not provide them with a time sheet,
5  no.
6  Q.  Does Princess Anne require Steadfast nurses to fill out a
7  time sheet?
8  A.  No.  Steadfast gives them the time sheet for our team to
9  sign.
10 Q.  Why does your team sign the time sheet that Steadfast
11 provides these nurses?
12 A.  Just stating the hours worked for that day.
13 Q.  And is that part of the billing practice?
14 A.  Yes.
15 Q.  So if there is a discrepancy regarding the hours worked,
16 for example, on one of the Steadfast nurses' time sheet,
17 would the nurses contact you, Princess Anne, or would they
18 contact Steadfast to resolve the issue?
19 A.  Steadfast.
20 Q.  Why would they contact -- not "why would they," what
21 would you do if they contact you regarding pay issues and
22 time sheet issues?
23 A.  Call Steadfast.
24 Q.  You would tell them to call Steadfast?
25 A.  Yes.

E. Johnson - Direct

1   Q.   Why would you tell them to call Steadfast when they
2   actually provided the services at your facility?
3   A.   Because Steadfast pays them.
4   Q.   Are they employees of yours, the nurses?
5   A.   No, they are not our employees.
6   Q.   And once these time sheets are completed, you talked
7   about receiving an invoice.  Let's get into that.  Let's look
8   at Page 131 of the document at the very top.  And looking at
9   paragraph 3 there, and we'll have you look at E as well.  3
10  and E.
11  A.   Yes.
12  Q.   So how does Princess Anne compensate Steadfast for the
13  care provided by the nurses?
14  A.   Through an invoice.
15  Q.   So Steadfast sends you an invoice, and what is included
16  within that invoice, typically?
17  A.   Typically, their hours worked and the time sheets that
18  were signed on those days.
19  Q.   So time sheets are submitted with the invoices by
20  Steadfast?
21  A.   Correct.
22  Q.   And if you look at E, directing your attention to letter
23  E of Page 131 of this exhibit, it states:
24           "Healthcare center shall submit payment to
25  supplemental staffing services within 45 days upon receipt of

E. Johnson - Direct

1    accurate invoice."
2           Is that how long it usually takes you, within 45
3    days that you have to pay the Steadfast invoice?
4    A.  Yes.
5    Q.  Does Princess Anne pay Steadfast the next day after
6    receiving an invoice?
7    A.  No.
8    Q.  Does Princess Anne have some sort of a Next Day Pay
9    agreement with Steadfast?
10   A.  No.
11   Q.  And you don't know whether Steadfast pays its nurses the
12   next day or not?
13   A.  I do not know that, no.
14   Q.  I understand.  Thank you.
15          Talk to us briefly about the process of invoicing.
16   I know you said you receive the invoice with the time sheets.
17   A.  Uh-huh.
18   Q.  Tell us about that process.
19   A.  So we would receive an invoice through our accounts
20   payable department.  It would get forwarded over to our
21   scheduler, just to make sure the invoice is accurate, and
22   then we would submit it for payment once it's completely
23   accurate.
24   Q.  Okay.  And to make sure that the invoice is accurate,
25   does that take you a little bit of time?

E. Johnson - Direct

1    A.   Yes.

2    Q.   More than a day, perhaps?

3    A.   Yes.

4    Q.   And once you receive an invoice and you have some

5    concerns about the hours worked, who does Princess Anne

6    contact?

7    A.   Steadfast.

8    Q.   Why would you contact Steadfast?

9    A.   So that we can get further clarification or dispute

10   anything.

11   Q.   Why wouldn't you contact the nurses?

12   A.   Because they are employees of Steadfast, and the contract

13   is with Steadfast.

14   Q.   So once the invoice has been verified, who do you pay?

15   A.   Steadfast.

16   Q.   Not the nurses?

17   A.   Not the nurses, no, sir.

18   Q.   Do the nurses submit these time sheets to you directly?

19   A.   No.

20   Q.   Ms. Johnson, let me have you look at Page 132,

21   paragraph 8, and then Page 133 of the contract between

22   Steadfast and Princess Anne.

23        Do you see number 8 there where it says "Insurance"?

24   A.   Yes.

25        MR. SEIFELDEIN:  Let's scroll down, Ms. Lewis, to

Carol L. Naughton, Official Court Reporter

E. Johnson - Direct

1    Page 131 of the agreement.  Pause right there.

2    BY MR. SEIFELDEIN:

3    Q.  Do you see that, Ms. Johnson?

4    A.  Yes.

5    Q.  Is Steadfast required to carry insurance, as part of its

6    contract here, on its nurses?

7    A.  Yes.

8    Q.  And what kind of insurance is Steadfast required to have

9    for its nurses that are placed at your facility?

10   A.  Commercial general liability, automobile liability,

11   Workers' Compensation, employer's liability, fidelity bond,

12   umbrella liability, cyber liability.

13   Q.  And malpractice as well?

14        MR. SEIFELDEIN:  If you could scroll back to the

15   first page, paragraph 8, Ms. Lewis.

16   BY MR. SEIFELDEIN:

17   Q.  Is Steadfast required to have professional malpractice

18   liability insurance covering itself and its nurses?

19   A.  Yes.

20   Q.  Is it the expectation that these insurances cover the

21   nurses for providing care at your facility?  Correct?

22   A.  Correct.

23   Q.  Does Princess Anne require -- well, actually, is

24   Steadfast required to have Workers' Compensation for the

25   nurses that are placed at your facility?

E. Johnson - Direct

1   A.  Yes.

2   Q.  Let's go back to, Ms. Johnson, to Page 132 of this

3   exhibit, the contract between Steadfast and Princess Anne.

4          We're looking at paragraph 6 here.  Would you look

5   at paragraph 6, Ms. Johnson.

6   A.  Uh-huh.

7   Q.  Are there any contracts or restrictions to Princess Anne

8   recruiting, hiring, or retaining any of the Steadfast nurses

9   that are placed at your facility?

10  A.  Yes.

11  Q.  And is that a time-period restriction?

12  A.  Yes.

13  Q.  And how many days?

14  A.  60.

15  Q.  60 days.

16          And do you have to provide a notice to Steadfast to

17  the extent that you want to retain/hire one of the Steadfast

18  nurses that are placed at your facility?

19  A.  Typically, the nursing staff would do that.

20  Q.  If you look at the third line from the bottom of

21  paragraph 6.

22          "...staffing service agrees to release temporary

23  personnel upon 60 days' written notice."

24          Is that the 60 days' notice that you have to give to

25  Steadfast before you can retain --

Carol L. Naughton, Official Court Reporter

─────E. Johnson - Direct─────

1    A.   Yes.

2    Q.   Let me talk to you briefly about equipment here.

3            What type of equipment, if any, do the nurses use in

4    the performance of their work at your facility?  These are

5    the CNAs, LPNs and RNs.

6    A.   General equipment, vital sign machines, blood glucose

7    monitor, med cart, treatment cart.

8    Q.   And these equipment, does Princess Anne provide these to

9    Steadfast nurses?

10   A.   Yes.

11   Q.   Would a nurse be able to bring some of these smaller

12   equipment that you talked about, like the stethoscope or

13   vital sign --

14   A.   Yes.

15   Q.   But they are available there, correct?

16   A.   Correct.

17   Q.   So it's more of a personal preference, maybe?

18   A.   Yes.

19   Q.   Do you require the nurses to purchase their own equipment

20   to work once they are placed at your facility?

21   A.   No.

22   Q.   Ms. Johnson, would it be fair to say that based on your

23   work with Steadfast and the contract, that Steadfast controls

24   the assignments, the selection, and other conditions of

25   employment of the nurses that are placed at your facility?

```
                          ─E. Johnson - Direct─
```

 1         MR. JEWETT:  Objection.  He's asking the witness for

 2    an opinion.

 3         THE COURT:  Objection overruled.  Based on reading

 4    the contract, I think she can answer that question.

 5    BY MR. SEIFELDEIN:

 6    Q.  You can answer.

 7    A.  No.

 8    Q.  Let me repeat that.

 9    A.  Yes.

10         THE COURT:  What was your answer?

11         THE WITNESS:  I said, "No," but I didn't hear

12    everything you said because he jumped in.

13    BY MR. SEIFELDEIN:

14    Q.  Let's have you hear the question before you answer it.

15         Based on what you've talked about today in the

16    contract, would it be fair to say that Steadfast controls the

17    assignment of the nurses, the selection of the nurses, and

18    other terms and conditions of employment of the nurses that

19    are placed at your facility?

20    A.  Oh, yes.

21         MR. JEWETT:  Objection, Your Honor.  This was asked

22    and answered.  She answered "no."  He directed her to change

23    her answer.

24         THE COURT:  No.  He asked her to be sure she knows

25    what she's answering before she speaks.  So the objection is

———————————— E. Johnson - Direct ————————————

1   overruled.

2          MR. JEWETT:  Thank you.

3          MR. SEIFELDEIN:  Thank you, Your Honor.  No further

4   questions for this witness.

5          THE COURT:  What we're going to do here is -- we're

6   overdue -- we're going to take our break, and then we'll come

7   back for cross-examination.  We're still going to stop at

8   1:00.

9          All right.  15-minute break.

10          (Recess from 11:50 a.m. to 12:10 p.m.)

11          THE COURT:  Before we get started, I want to address

12   the status of Exhibit 10.  Counsel, did you ever move to

13   admit Exhibit 10?

14          MR. SEIFELDEIN:  I was just going to do that, Your

15   Honor.  I would like to move to admit Exhibit 10, 128 through

16   142, which is the contract between Steadfast and Princess

17   Anne.

18          THE COURT:  Okay.  If you're going to admit the

19   exhibit, we don't need to go through and make excerpts of the

20   pages.  The exhibit contains everything that's in the exhibit

21   if the Court admits the exhibit.

22          MR. SEIFELDEIN:  The exhibit, Your Honor, contains

23   the sampling of the contract between Steadfast and many of

24   the facilities.

25          THE COURT:  The exhibit is the exhibit.

1           MR. SEIFELDEIN:  Absolutely.

2           THE COURT:  Any objection?

3           MR. JEWETT:  We would object to the entire

4    Exhibit 10.  We don't have objection to admitting just the

5    contract that Ms. Johnson went over.

6           MR. SEIFELDEIN:  Your Honor, with the exception of

7    this one, which has been admitted by this witness, and maybe

8    another one, these are business records of Steadfast,

9    produced by Steadfast.

10          THE COURT:  The objection is overruled.  Exhibit 10

11   is admitted.

12          We're going to be in the same position we were in

13   the other day.  We end up going back to the exhibit again and

14   end up with separate numbers for the exhibit because you're

15   talking about an item that is in Exhibit 10.

16          So there's one Exhibit 10.  And then counsel,

17   defendant and the Secretary, can go to whatever they want in

18   that exhibit.

19          (Plaintiff's Exhibit PX-10 received in evidence.)

20          THE COURT:  All right.  Cross-examination.

21          MR. JEWETT:  Thank you.

22                      CROSS-EXAMINATION

23   BY MR. JEWETT:

24   Q.  Good morning, Ms. Johnson.

25   A.  Good morning.

388

                              ┌─── E. Johnson - Cross ───┐

1   Q.   My name is Josh Jewett.  I'm an attorney for Steadfast,

2   and I have a few questions for you --

3   A.   Okay.

4   Q.   -- based on your testimony today.

5            You testified that you're familiar with the way in

6   which the facility staffs agency nurses.  Did I get that

7   right?

8   A.   Yes.

9   Q.   And you're generally familiar, then, with your facility's

10  needs when it comes to temporary staffing of nurses?

11  A.   Correct.

12  Q.   You also testified, I believe, that your facility no

13  longer uses Steadfast, since 2019?

14  A.   Correct.

15  Q.   Did you begin using a different staffing agency at that

16  time?

17  A.   At one point, we were not using any supplemental staffing

18  agencies.

19  Q.   Okay.  At the time you were using Steadfast, were you

20  using any other staffing agencies at the same time?

21  A.   Yes.

22  Q.   And how many others?

23  A.   Just one.

24  Q.   The name of that one?

25  A.   I believe it's First Choice.

389

————E. Johnson - Cross————

1   Q.  So if at the time you were using both Steadfast and First

2   Choice, do you send your staffing needs to -- did you send

3   your staffing needs to both First Choice and Steadfast at the

4   same time, in other words, a request for staffing?

5   A.  Correct.

6   Q.  You didn't decide which staffing agency to use, one

7   versus the other?

8           MR. SEIFELDEIN:  Your Honor, objection.  Object to

9   the relevance of the line of questioning about other

10  facilities that they had.

11          THE COURT:  The Court has said repeatedly in this

12  case that the focus has to be on the practices and procedures

13  of Steadfast, not what happened with other facilities.  So I

14  sustain the objection.

15          MR. JEWETT:  I'll move on.

16  BY MR. JEWETT:

17  Q.  At any given time, how many temporary staffing nurses

18  does your facility use?

19  A.  It depends on what the needs are.

20  Q.  Does it fluctuate from day to day and week to week?

21  A.  Correct.

22  Q.  What are some of those factors that determine the needs?

23  A.  Depends on census, how many patients we have.

24  Q.  The first thing you said it depends on?

25  A.  Census.

─────E. Johnson - Cross─────

1   Q.   Census?

2   A.   Uh-huh.

3   Q.   Okay.  So you testified you no longer use Steadfast, and

4   when your facility stopped using Steadfast, I didn't quite

5   hear you.  You said you did continue to use temporary nurses

6   at that time?

7   A.   Yes.

8   Q.   When you stopped using Steadfast, then, did your

9   facility's needs for temporary nurses -- did that go up,

10  down, or stay the same?

11           MR. SEIFELDEIN:  Your Honor, I'm going to have to

12  object again to the relevance of these questions.  It's

13  clearly outside of the scope, and it's not discussing

14  Steadfast, as the Court just noted.

15           THE COURT:  Well, you know, the Court is trying to

16  figure out where counsel is going, so the Court will overrule

17  the objection, but let's get to the point.

18           THE WITNESS:  Can you repeat the question?

19  BY MR. JEWETT:

20  Q.   Sure.

21           When your agency stopped using Steadfast, did your

22  agency -- excuse me -- did your facility's needs for staffing

23  nurses -- did it go up, down, or stay the same?

24  A.   Stayed relatively the same.

25  Q.   Stayed relatively the same.

391

————E. Johnson - Cross————

1          When that happened, did you have nurses from

2    Steadfast's registry continue staffing with your facility

3    through another agency?

4    A.  I can't speak to that.  I don't know.

5    Q.  Mr. Seifeldein went over some of the terms of your

6    contract with Steadfast with you.  I'd like to ask you a few

7    questions about that.

8    A.  Okay.

9    Q.  I'm showing you what's been admitted as Plaintiff's

10   Exhibit 10.  Do you recognize this as the contract that you

11   discussed with Mr. Seifeldein?

12   A.  Yes.

13   Q.  And this contract, was it prepared by Princess Anne?

14   A.  Yes.

15   Q.  And have you seen, in your position, other contracts that

16   Princess Anne uses with other temporary staffing facilities?

17   A.  Yes.

18   Q.  Is this contract the same or similar to those contracts?

19   A.  Yes.

20   Q.  Let me ask you about Schedule A on here.  Can you see

21   that okay?

22   A.  Yes.

23   Q.  This listing of Schedule A, are these your facility's

24   requirements?

25   A.  Yes.

E. Johnson - Cross

1    Q.   Okay.  Why does your facility require nurses to enter
2    your facility to have these requirements?
3    A.   It's based off of federal and state regulations for
4    nursing homes.
5    Q.   Okay.  If a nurse does not have these requirements, is
6    the nurse allowed to practice nursing in your facility?
7    A.   No.
8    Q.   So at the end of the day, is it fair to say that your
9    facility retains the right to decide who gets to practice
10   nursing in your facility or not practice nursing in your
11   facility?  Is that fair?
12   A.   We can cancel anyone and --
13   Q.   Let me rephrase the question.
14            What I'm trying to ask is:
15            If a nurse does not -- if a nurse is sent to you,
16   for example, from Steadfast and the nurse does not have these
17   credentials to meet the requirements, your facility reserves
18   the right to not allow that nurse to practice nursing in your
19   facility?
20   A.   Correct.
21   Q.   Let me direct your attention to paragraph 4.  Can you see
22   that okay?
23   A.   Yes.
24   Q.   Okay.  Paragraph 4(C) states:  "Healthcare center has the
25   right to cancel an assignment not less than two hours before

E. Johnson - Cross

1    the time temporary personnel is scheduled to report without

2    incurring liability."

3            Why does your facility have that term in its

4    contract?

5    A.  Two hours is typically a time of window so that we can

6    try to, I guess, fill any other holes.

7            Are you referring to specific liability?

8    Q.  No, I'm sorry.  I'm referring to -- it says your facility

9    retains the "right to cancel an assignment not less than two

10   hours."

11           Why does your facility retain the right to cancel an

12   assignment not less than two hours?

13   A.  Because we work really hard to provide our own staff, and

14   two hours is a good rule of window to -- for them to get

15   someone to come in if we -- if we can't fill it ourselves.

16   Q.  So just to make sure I understand it, if Steadfast had

17   scheduled a nurse at your facility, under the terms of this

18   contract, you could cancel that assignment up to two hours

19   before the shift starts; is that correct?

20   A.  Yes, without liability.

21   Q.  And Steadfast wouldn't have the right to challenge that

22   decision.  Is that fair?

23   A.  Yes.

24   Q.  Okay.  Do you remember signing a statement under oath

25   earlier in this case?

Carol L. Naughton, Official Court Reporter

———E. Johnson - Cross———

1    A.  Yes.

2    Q.  And in that statement, you testified that your facility

3    does not supervise Steadfast nurses.  Do you remember that?

4    A.  Yes.

5    Q.  Is that still accurate?

6    A.  Yes.

7    Q.  I'd like to ask you a few questions about that.

8           The nurses -- I think this was assumed from your

9    testimony with Mr. Seifeldein, but the nurses, they perform

10   the work in your facility; is that correct?

11   A.  Correct.

12   Q.  Okay.  And you said the facility does not supervise them?

13   A.  Correct.

14   Q.  Does the facility instruct the nurses how to practice

15   nursing?

16   A.  In an aspect, yes.

17   Q.  What do you mean by that?

18   A.  Well, there's general procedures that an RN, an LPN, a

19   CNA are required to do in regards to their license.  So...

20   Q.  So does your facility supervise the nurses, the

21   administration of those duties that you just listed?

22   A.  Yes.  You could say that.

23   Q.  Well, in what way does it do that?

24   A.  Well, if an area of their work was not completed, for

25   instance, if a nurse hasn't charted on a patient, it would

E. Johnson - Cross

1   come up as a red flag, and so in order to correct the red
2   flag, we would call Steadfast --
3   Q.  I see.
4   A.  -- so that they could come back and complete their job
5   duty.
6   Q.  Let me be more specific, I guess, then.
7           When Mr. Seifeldein was talking to you, you listed
8   some of the duties that the LPN does, and the CNA, such as
9   checking vital signs, administering medications, and things
10  like that.
11  A.  Uh-huh.
12  Q.  Does your facility train the nurses how to do those
13  things?
14  A.  No.
15  Q.  Okay.  Does your facility provide them a how-to guide
16  when they're practicing nursing?
17  A.  No.
18  Q.  Let me rephrase that.
19          Before they go out and take a shift, do you provide
20  them a how-to guide?
21  A.  No.
22  Q.  So you don't tell them how to draw blood, take blood
23  pressure, or a variety of other things that nurses come into
24  your facility to do?
25  A.  We do not.

E. Johnson - Cross

1   Q.  Do you give them critical feedback?

2   A.  Yes.

3   Q.  In what way?

4   A.  For instance, the example that I just gave you; if they

5   didn't complete a job task, we would let the agency know so

6   that they could inform their staff.

7   Q.  What I was asking, though, does your nurse supervisor

8   specifically go to a Steadfast nurse and say, "Here are the

9   things you did wrong.  You need to do it better next time."

10  Or do you communicate that to Steadfast?

11  A.  No.  We communicate that to Steadfast.

12  Q.  So it sounds like before a temporary nurse comes into

13  your facility, the expectation is that they know how to

14  practice nursing.  Is that fair?

15  A.  Correct.

16  Q.  And then when the nurses are in your facility, they are

17  given some discretion in the manner in which they practice

18  nursing?

19  A.  Correct.

20  Q.  Is there a Steadfast supervisor present at your facility

21  when their nurses are practicing nursing?

22  A.  No.

23  Q.  Okay.  And so you'd agree, then, that if a Steadfast

24  supervisor isn't present, they aren't actually supervising

25  the nurses while they are practicing nursing in your

Carol L. Naughton, Official Court Reporter

E. Johnson - Cross

1   facility?

2   A.   That's a fair assumption.

3   Q.   Okay.

4            THE COURT:  Keep your voice up, ma'am.

5            THE WITNESS:  What's that?

6            THE COURT:  Keep your voice up.

7   BY MR. JEWETT:

8   Q.   Mr. Seifeldein asked you some questions about -- I think

9   he called them "do not returns."  Do you remember that?

10  A.   Yes.

11  Q.   And you talk about those as well in the signed statement

12  that you provided earlier in this case.  Do you recall that?

13  A.   Yes.

14  Q.   And is that part of your statement still accurate?

15  A.   Yes.

16  Q.   So these DNRs, this is something that the facility has a

17  right to do as a matter of contract; is that right?

18  A.   Yes.

19  Q.   And the facility at the end of the day has a

20  responsibility to decide who can and cannot care for its

21  patients.  Is that fair?

22  A.   Yes.

23  Q.   And under the terms of this contract, the DNR provision,

24  the facility's right to DNR a Steadfast nurse, that's

25  absolute; is that right?

E. Johnson - Cross

1    A.   Yes.

2    Q.   Steadfast doesn't have a right to challenge a DNR

3    decision?

4    A.   Correct.

5    Q.   So at the end of the day, it sounds like your facility

6    maintains a decision about whether a nurse gets to continue

7    to practice nursing in your facility or not.  Is that fair?

8    A.   That's fair.

9    Q.   Okay.  Have you ever been to Steadfast's office?

10   A.   No.

11   Q.   Do you have specific knowledge about Steadfast's inner

12   operational workings?

13   A.   No.  Outside of the contract, no.

14   Q.   Do you have specific knowledge if a Steadfast nurse is

15   free to accept a shift or not to your facility?

16   A.   No, I don't have any knowledge of that.

17   Q.   You testified -- one more question -- strike that -- on

18   one of those lines.

19          Now, do you personally, in your position, observe

20   sort of how things work on a day-to-day basis with the

21   Steadfast nurses?  Are you observing them while they are

22   practicing nursing?

23   A.   Yes.

24   Q.   You do.  Okay.

25          You testified earlier -- Mr. Seifeldein pointed out

———E. Johnson - Cross———

1    the provision, I think, in the contract to you, and I thought
2    I heard you say that the contract requires Steadfast to
3    provide feedback to the facility about the performance of its
4    nurses.  Did I hear you say that correctly?
5            MR. SEIFELDEIN:  Objection, Your Honor,
6    characterization.  I think it was that -- sorry.
7            THE COURT:  Okay.  Rephrase.  Sustained.  Rephrase.
8            MR. JEWETT:  I'm asking the witness to clarify
9    something I thought she said, Your Honor.  I'll rephrase the
10   question.
11           THE COURT:  All right.
12           MR. JEWETT:  Because I didn't -- I don't know if I
13   have my notes down right.
14   BY MR. JEWETT:
15   Q.  I thought I heard you testify when you were speaking with
16   Mr. Seifeldein about the provision in your contract that
17   required Steadfast to provide feedback to the facility about
18   the performance of its nurses.
19           Did I hear you say that correctly?
20           MR. SEIFELDEIN:  Same objection, Your Honor,
21   characterization.
22           THE COURT:  If he's wrong, she will tell him he's
23   wrong.  So overruled now.
24           Answer the question if you can.
25           THE WITNESS:  I don't mean to laugh.  I'm sorry.

E. Johnson - Cross

```
 1              THE COURT:  What was that?
 2              THE WITNESS:  I do not mean to laugh.  I apologize.
 3         What I gather what you're trying to ask me is, in
 4    the contract, is it required for me to give Steadfast
 5    feedback about the performance of their nurses?  And yes.
 6    BY MR. JEWETT:
 7    Q.  Okay.  I understand now.  I think I had it the other way
 8    around.
 9              So going back to this contract, you said that this
10    is your facility's contract.  This was -- well, I guess I
11    shouldn't assume.  This was prepared by your company's
12    attorney?
13    A.  Yes.  They oversee the final contracts.
14    Q.  Sure.
15              Is this an in-house attorney or external?
16    A.  It's throughout our company.  They are internal.
17    Q.  Internal.  Okay.
18              Do these attorneys who prepare your contracts -- do
19    they, to your knowledge --
20              MR. SEIFELDEIN:  Your Honor, I have to object.
21              MR. JEWETT:  Let me finish the question, please.
22    BY MR. JEWETT:
23    Q.  -- do they actually come down and observe the nurses
24    nursing before they prepare the contracts?
25    A.  No.
```

E. Johnson - Cross

```
 1              MR. SEIFELDEIN:  Your Honor --
 2              THE COURT:  Yes, sir?
 3              MR. SEIFELDEIN:  I was making an objection to the
 4    line of questioning asking about what the attorneys do for
 5    the facility, and whether they come down or not is outside of
 6    her --
 7              THE COURT:  The Court was told that that was the
 8    last question about the attorneys.
 9              MR. JEWETT:  It is.
10              MR. SEIFELDEIN:  Not relevant also.
11    BY MR. JEWETT:
12    Q.  Let me ask you about this -- I believe this is -- this is
13    paragraph 8, Insurance.  Are you tracking with me?
14    A.  Yes.
15    Q.  Mr. Seifeldein asked you about this paragraph 8 and some
16    of these insurance requirements.  The contract, for example,
17    requires $1 million in automobile liability.  Do you see
18    that?
19    A.  I do.
20    Q.  Why is that required?
21    A.  I believe it's required for any other reason insurance is
22    required, for liability purposes.
23              Are you referring to the amount?
24    Q.  No, I'm referring to the actual requirement to have
25    automobile liability insurance under the terms of this
```

Carol L. Naughton, Official Court Reporter

—————E. Johnson - Cross—————

```
 1   staffing contract.
 2          MR. SEIFELDEIN:  Your Honor, objection.  The
 3   automobile liability is not relevant to the case at hand.
 4   This is a Fair Labor Standard question.
 5          THE COURT:  Well, I don't know whether this witness
 6   is even qualified to get into the details of what the
 7   attorneys put in this contract, Mr. Jewett.
 8          MR. JEWETT:  May I, Your Honor?
 9          THE COURT:  Yeah.  What are you asking?
10          MR. JEWETT:  The point I'm trying to make for this
11   line of questioning, Your Honor, is that the terms of the
12   contract are sometimes incongruent with the reality of
13   relationships.
14          THE COURT:  Well, whether they are or not, these are
15   the terms that your client signed.  It may very well be, but
16   these are the terms of the contract.
17          MR. JEWETT:  Very well.  I'll move on.
18   BY MR. JEWETT:
19   Q.  Let me direct your attention to the last page of this
20   contract.  Mr. Seifeldein went through quite a few of these
21   terms with you, but let me ask you about one more that your
22   company agreed to and Steadfast agreed to.
23          This is Exhibit B.  Can you see that okay?
24   A.  Yes.
25   Q.  Do you see here on Exhibit B that your facility agreed
```

—————— E. Johnson - Cross——————

1    that the Steadfast personnel are independent contractors?

2    A.  Yes.  I agree that there's a job code for an independent

3    contractor.

4           THE COURT:  Mr. Jewett, what page number were you

5    just on that you just pointed to?

6           MR. JEWETT:  Sorry.  This is Plaintiff's 10, 141.

7           THE COURT:  Okay.  Thank you.

8           MR. JEWETT:  Yes.

9    BY MR. JEWETT:

10   Q.  Let me return to -- just a moment -- the signed statement

11   that you provided.  Do you recognize this document?

12   A.  Yes.

13   Q.  Okay.  I'm going to just flip through it.

14          THE COURT:  For what purpose are you using this

15   document, Mr. Jewett?

16          MR. JEWETT:  My intention is to -- it's a line of

17   questioning, Your Honor, about whether she's the person who

18   wrote this contract, whether or not this contract was written

19   after meeting with the Department of Labor -- I'm sorry.  I

20   said "contract," I meant "statement" -- and then the extent

21   to which her testimony was prepared by the Department of

22   Labor today.

23          THE COURT:  All right.

24          MR. JEWETT:  Okay.

25   BY MR. JEWETT:

1   Q.  Ms. Johnson --

2         MR. SEIFELDEIN:  Your Honor, we're going to object

3   to the relevance.

4         THE COURT:  The Court has got to find out what he's

5   saying first, and then I can say just how relevant it is.

6         MR. SEIFELDEIN:  Your Honor, if I could represent to

7   the Court, to our understanding there's a potential

8   attorney-client privilege here that is being asked about by

9   Steadfast as it's understood that this declaration was

10  prepared in working with the witness and her attorneys, the

11  facility's attorneys.

12        MR. JEWETT:  I have no intention to ask about that.

13        MR. SEIFELDEIN:  That is exactly what we say to a

14  representative, Your Honor, that intends to go -- who

15  drafted --

16        THE COURT:  Nothing like the actual question.  Let's

17  see what the questions are, and then your objection may

18  become appropriate, but let me see what the questions are

19  first.

20        MR. JEWETT:  Thank you.

21  BY MR. JEWETT:

22  Q.  Ms. Johnson, going back to this declaration, did you

23  write the language in this declaration?

24  A.  Yes.

25  Q.  You did.  You sat down at your computer and wrote this

---

E. Johnson - Cross

1  out?
2  A.  Not the entire document.  I provided information to my
3  attorney before it was concluded.
4          MR. SEIFELDEIN:  Your Honor, I must reiterate that
5  the --
6          THE COURT:  Okay.  Mr. Jewett, the only thing you
7  can find out is are the statements in the declaration
8  accurate.  Doesn't matter if Santa Claus wrote it.  If she
9  signed it, are they accurate?  That's all.
10         MR. JEWETT:  Understood, Your Honor.  I'll withdraw
11  my questions, and I have no further questions.
12         Thank you, Ms. Johnson.
13         THE COURT:  The Court has a question before you
14  stand back up.  I want to be clear about something.
15         This supplemental staffing agreement here,
16  Ms. Johnson.
17         THE WITNESS:  Yes, sir.
18         THE COURT:  This was between your facility, Princess
19  Anne, and Steadfast; is that correct?
20         THE WITNESS:  Yes, sir.
21         THE COURT:  Do you know who signed it on behalf of
22  your agency?
23         THE WITNESS:  Yes.
24         THE COURT:  Who was it?
25         THE WITNESS:  Keith Helmer, my chief operating

---

—————E. Johnson - Redirect—————

1    officer.

2            THE COURT:  And who signed it on behalf of

3    Steadfast?

4            THE WITNESS:  Lisa Pitts.

5            THE COURT:  And Ms. Pitts is in court today?

6            THE WITNESS:  I've never met Ms. Pitts before.

7            THE COURT:  Never met her?

8            THE WITNESS:  No.

9            THE COURT:  But Lisa Pitts on behalf of Steadfast?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  All right.  That's all.

12           Hold a second.  Let's see if he has any more

13   questions.

14           MR. JEWETT:  No more questions.  Thank you, Your

15   Honor.

16           THE COURT:  All right, then.  Fine.

17           Any redirect?

18           MR. SEIFELDEIN:  Yes, Your Honor.

19           THE COURT:  Let's let him clear out first.

20                    REDIRECT EXAMINATION

21   BY MR. SEIFELDEIN:

22   Q.  Thank you, Ms. Johnson.  A few follow-up questions for

23   you here.

24           Mr. Jewett, I believe, asked you about Plaintiff

25   Exhibit 131, the cancellation and the two hours' notice.  If

1    the facility were to cancel -- excuse me.  Strike that.

2           When the facility cancels a scheduled shift, would

3    there be a liability fee to Steadfast?

4    A.  Yes.

5    Q.  And would you have to pay Steadfast an amount of money

6    for cancelling a shift?

7    A.  Yes.

8    Q.  And you talked earlier about -- let me ask it this way:

9           Who ultimately sends the nurses to your facility?

10   A.  Steadfast.

11   Q.  And who selects them?

12   A.  Steadfast.

13   Q.  Do you get a list of nurses to pick from before they are

14   sent to you?

15   A.  No.

16   Q.  Do you get the number of the nurses before they are sent

17   to you?

18   A.  No.

19   Q.  And is it your expectation, consistent with Exhibit A,

20   the screening procedure that we went through, that Steadfast

21   will provide nurses who are competent to perform the duties

22   that they are there to perform?

23   A.  Yes.

24   Q.  And you were asked about your ability, the facility's

25   ability, to decline nurses and the requirements that the

———————E. Johnson - Redirect———————

1    nurses must have before they come to your facility.

2    A.   Yes.

3    Q.   Are those requirements generally set by the state for a

4    nurse, for example, to practice?

5    A.   Yes.

6    Q.   And does your facility actually perform the screening of

7    these nurses?

8    A.   No.

9    Q.   Does Steadfast actually provide you with the screening

10   that it has performed of these nurses?

11   A.   No.

12   Q.   So you accept Steadfast's representation that the nurses

13   are competent to practice?

14   A.   Yes.

15   Q.   And these requirements, actually, what is the purpose of

16   having them before a nurse is sent to your facility,

17   regarding the care that you provide?

18   A.   To make sure that we are in compliance with regulations

19   and patient safety.

20   Q.   Patient safety.

21           Now, I won't get too much into this.  You were asked

22   questions about terms used throughout the contract, and you

23   indicated that you did not draft the contract, correct?

24   A.   Yes.

25   Q.   And you wouldn't necessarily -- you're the administrator,

E. Johnson - Redirect

1   correct?

2   A.  Correct.

3   Q.  And you have an understanding of what is required by the

4   contract?

5   A.  Correct.

6   Q.  But you don't understand every term that is in the

7   contract, do you?

8   A.  I do.

9   Q.  You do.  Okay.  So when, for example, when Mr. Jewett was

10  asking you -- actually, forget the automobile liability.

11  It's not relevant.  Strike that.

12         Are the nurses given a discretion to perform the job

13  at your facility?

14  A.  Are they given a discretion?

15  Q.  Uh-huh.

16  A.  Are Steadfast nurses given a discretion to work at our

17  facility?

18  Q.  The jobs that are being performed, you indicated that the

19  nurses are trained to perform these jobs, correct?

20  A.  Yes.

21  Q.  And as far as, for example, when they arrive at the

22  facility and they are told to administer medication --

23  A.  Yes.

24  Q.  -- you don't tell them how to administer the medication.

25  A.  No.  It's common practice.

—————————E. Johnson - Redirect—————————

1    Q.  Common practice.  They're expected to have that knowledge
2    in performing these duties?
3    A.  Yes.
4    Q.  So would you consider that supervision?
5    A.  No.
6          THE COURT:  I think he asked those questions on
7    cross-examination.  What you asked and what you're getting is
8    not inconsistent with what she gave previously.
9          MR. SEIFELDEIN:  Your Honor, if I may, I think what
10   defendants were getting at, that the facilities were
11   supervising the nurses, where I believe Ms. Johnson testified
12   that these are duties that nurses are expected to perform.
13   So you're here to perform a duty; therefore, you do it.
14   There's no direct supervision as to how to administer certain
15   medication.
16         THE COURT:  The Court understood that while she was
17   testifying to it, but go ahead.
18         MR. SEIFELDEIN:  Thank you, Your Honor.  I think the
19   point is made.
20         MR. JEWETT:  May I ask a single question on recross?
21         THE COURT:  Well, let's see whether the Court is
22   going to grant any recross first.  Let's see whether that's
23   necessary.  The Court generally doesn't do recross and "sur"
24   recross in here.  So let's see whether there is anything that
25   comes out of any significance of this redirect that would

—————————————E. Johnson - Redirect—————————————

1    necessitate a recross.

2         MR. JEWETT:  I'm sorry.  I thought Mr. Seifeldein

3    was finished.  I didn't mean to interrupt.

4    BY MR. SEIFELDEIN:

5    Q.  Ms. Johnson, to your knowledge, the standard of care that

6    you just talked about required by regulations, are those

7    supervisions?

8    A.  No.

9    Q.  And you have to comply with the law; is that correct?

10   A.  Yes.

11   Q.  Is it typical for an agency personnel -- excuse me.

12        Is it typical for agency administrators/employers to

13   come to the facility that they send nurses to?

14   A.  No.

15   Q.  Going back to the DNR list, when there is an issue

16   regarding the safety of the residents that you talked about,

17   who do you communicate that to?

18   A.  Steadfast.

19   Q.  And why don't you communicate that to the nurses?

20   A.  Because they are employees of Steadfast, and our contract

21   is with Steadfast, not with the individual nurse.

22   Q.  My last question for you was going to be "Who signed the

23   contract" and show it to you, but the Court got into that

24   already.

25        MR. SEIFELDEIN:  I have no further questions for

─────────── E. Johnson - Recross ───────────

 1   this witness, Your Honor.  She may be excused with the

 2   Court's...

 3           THE COURT:  Now, if the Court permits you to do

 4   recross, it has to be pertaining to something that he has

 5   said during his redirect, but not something that you've

 6   already covered in your first cross.

 7           MR. JEWETT:  Understood, Your Honor.

 8           THE COURT:  With that guidance, do you need to

 9   recross?

10           MR. JEWETT:  I have a single question about --

11           THE COURT:  Okay.  If it's within the guidance the

12   Court has given you, all you have to do is just ask your

13   question.

14           MR. SEIFELDEIN:  Your Honor, I object to recross.

15   The redirect did not introduce any new information that was

16   not --

17           THE COURT:  That's not your authority.  The Court

18   decides whether there is going to be recross.

19           MR. SEIFELDEIN:  Absolutely.  I just needed to

20   object for the record.

21           THE COURT:  You cannot object to recross.  It's the

22   Court's discretion.

23           MR. SEIFELDEIN:  Thank you, Your Honor.

24                    RECROSS-EXAMINATION

25   BY MR. JEWETT:

413

E. Johnson - Recross

1   Q.  Thank you, Ms. Johnson.

2        Mr. Seifeldein, in his redirect, asked you a

3   question about the two-hour cancellation policy.  Do you

4   recall that?

5   A.  Yes.

6   Q.  I believe he asked you if your facility could incur

7   liability if you cancelled within the two-hour time window.

8   Do you recall that?

9   A.  Yes.

10  Q.  Can you recall a single situation where your facility

11  cancelled within that two-hour window and incurred some

12  liability for it?

13  A.  Yes.

14  Q.  What is that example?

15  A.  So if you cancel before two hours, you will be billed

16  four hours for that employee.

17  Q.  Is that under the terms of the contract?

18  A.  I believe there is a cancellation fee in the contract.

19  Q.  Okay.  And so that is something that your facility

20  presumably agreed to pursuant to the terms of the contract?

21  A.  Yes.

22        MR. JEWETT:  Thank you.  No further questions.

23        THE COURT:  May this witness be permanently excused?

24        THE WITNESS:  Thank you.

25        MR. SEIFELDEIN:  Yes, Your Honor, this witness may

D. Rawlings - Direct

1    be excused.

2             MR. JEWETT:  Yes, Your Honor.

3             (Witness excused.)

4             THE COURT:  We're going to terminate right here, and

5    we'll be back in here at 2:25 to recommence.

6             (Recess from 12:49 p.m. to 2:27 p.m.)

7             THE COURT:  Okay.  We're ready to commence.  Where

8    are we?

9             MR. SEIFELDEIN:  Your Honor, the Secretary will call

10   Dave Rawlings of Dunlop House.

11            (Witness sworn.)

12            DAVID RAWLINGS, called by the Plaintiff, having been

13   first duly sworn, was examined and testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. SEIFELDEIN:

16   Q.  Good afternoon, Mr. Rawlings.

17   A.  Good afternoon.

18   Q.  Could you please state your full name for the record and

19   spell your last name.

20   A.  David Lewis Rawlings, R-a-w-l-i-n-g-s.

21   Q.  Are you currently employed?

22   A.  Yes.

23   Q.  Where are you currently employed?

24   A.  Coordinated Services Management.

25   Q.  And how long have you been employed by Coordinated

Carol L. Naughton, Official Court Reporter

D. Rawlings - Direct

1   Services Management?

2   A.  A little over 23 years.

3   Q.  And what is Coordinated Services Management's

4   relationship with Dunlop House?

5   A.  We're the property management company and consultant for

6   the Dunlop House.

7   Q.  And what is your title at Dunlop House?

8   A.  My title at Dunlop House is management agent.  My title

9   at Coordinated Services Management is vice president of

10  operations.

11  Q.  Just for the record, we're going to refer to Coordinated

12  Services Management and Dunlop House as "Dunlop House," for

13  efficiency purposes.

14  A.  Okay.

15  Q.  What are your job responsibilities at Dunlop House?

16  A.  I provide oversight for the regional directors who are

17  specifically providing the consultation and property

18  management for the Dunlop House.

19          THE COURT:  Where is Dunlop House?  Where is this?

20  Where is this business located?  Where is he from?

21  BY MR. SEIFELDEIN:

22  Q.  You may answer.

23  A.  Dunlop House is located in Colonial Heights, Virginia.

24          THE COURT:  Thank you.

25  BY MR. SEIFELDEIN:

416

D. Rawlings - Direct

1   Q.  Sorry, I believe you were talking about your job
2   responsibilities and duties.
3   A.  I believe I answered that.  Property management and
4   consultation, yes.
5   Q.  Has this always been your title?
6   A.  No, it's not always been my title.
7   Q.  What other positions have you held within the industry?
8   A.  I've had regional director positions.  I've also been an
9   administrator for both nursing homes and assisted living.
10  Q.  And what is the general nature of Dunlop House, its
11  business?
12  A.  It's a licensed assisted living community.
13  Q.  What type of service does Dunlop House provide?
14  A.  It provides activities of daily living care for residents
15  who require help with their day-to-day living.
16  Q.  And what healthcare professionals compose the staff of
17  Dunlop House?
18  A.  We have registered nurses, licensed practical nurses,
19  certified nursing aides, and registered medication aides.
20  Q.  And how does Dunlop House maintain its staffing needs?
21  A.  Through a recruitment retention program.
22  Q.  Is that through direct hire?
23  A.  Yes.
24  Q.  Other than direct hire, how does Dunlop House maintain
25  its staffing needs?

D. Rawlings - Direct

1   A.   From time to time, Dunlop House has used agency staffing.

2   Q.   And are you familiar with Steadfast Medical Staffing?

3   A.   Yes.

4   Q.   How are you familiar with it?

5   A.   I'm familiar that there was an agreement between the

6   Dunlop House and Steadfast.

7   Q.   So Dunlop House has used Steadfast to provide some

8   nurses?

9   A.   Yes.

10  Q.   Okay.  And when did Dunlop House begin working with

11  Steadfast, from your knowledge?

12  A.   I'm familiar with an agreement that was dated April 8,

13  2019.

14  Q.   And what positions did Dunlop House ask Steadfast to

15  staff?

16  A.   Based on the agreement, it was for licensed practical

17  nurses, certified nursing aides, and medication technicians

18  or registered medication aides.

19  Q.   You just mentioned that you -- excuse me -- Dunlop House

20  entered into an agreement with Steadfast.  I'm going to have

21  you look at Plaintiff Exhibit 10, Pages 116 through 119.

22          Do you recognize this document, sir?

23  A.   Yes.

24  Q.   What is it?

25  A.   This is the agreement between Steadfast and Dunlop House.

418

———————D. Rawlings - Direct———————

1    Q.   Is this contract made in the regular course of business?

2    A.   Yes.

3    Q.   Is it kept in the regular course of business?

4    A.   Yes.

5    Q.   Is it a true and accurate copy of the contract between

6    Dunlop House and Steadfast?

7    A.   As far as I know, yes.

8    Q.   Does this contract generally govern the scope of services

9    provided by Steadfast to Dunlop House?

10   A.   Yes.

11   Q.   Does Dunlop House enter into contracts with the Steadfast

12   nurses?

13   A.   Directly with the Steadfast nurses?

14   Q.   Correct.

15   A.   No.

16   Q.   Why not?

17   A.   Because it would be an agreement between the staffing

18   agency with Steadfast.  We have our own employees.

19   Q.   If Dunlop House requires the services of Steadfast

20   nurses, would Dunlop House contact Steadfast or the nurse?

21   A.   Steadfast.

22   Q.   Why would you contact Steadfast and not the nurse?

23   A.   It's part of the agreement that that is how the

24   arrangements are made.

25   Q.   Okay.  Would you be permitted to contact the nurses?

D. Rawlings - Direct

1    A.  That's not a normal course of --

2              MR. JEWETT:  Objection.  Foundation.

3              THE COURT:  Foundation?

4              MR. JEWETT:  I don't think Mr. Seifeldein has

5    established that he has the working familiarity with the

6    actual facility.  I heard the witness say he's testifying

7    based on his knowledge of the contract.

8              THE COURT:  Well, you're testifying about the

9    practice based upon what -- the normal practice based upon

10   what?

11             THE WITNESS:  I'm familiar, Your Honor, with how

12   these contracts are used at all of the communities that

13   Coordinated Services Management manages.

14             THE COURT:  All right.  Overruled.

15   BY MR. SEIFELDEIN:

16   Q.  I'm sorry.  So the question, I believe, was if Dunlop

17   requires the services from Steadfast, who do you contact?

18   And I believe you said the nurses, and the question was why

19   not?  The following question was why not?  Why not contact

20   the nurses -- sorry.  Let me rephrase that.  Strike that.

21             Why contact Steadfast instead of the nurses was the

22   question.

23   A.  Because the agreement is between Dunlop House and

24   Steadfast.

25   Q.  What was the expectation of the type of care and services

420

D. Rawlings - Direct

1    that these nurses would provide at Dunlop House once they are

2    placed there by Steadfast?

3    A.   There's a scope of practice based on the individuals who

4    may be requested to provide the services, and then there's a

5    standard of practice.

6    Q.   By "standard," what are you referring to?

7    A.   An LPN has a certain standard of practice in how they

8    document, give medications, how they do assessments, and it

9    would be different for a certified nursing assistant, who

10   would have a different standard of practice in how they

11   provide activities of daily living, those things related to

12   bathing, dressing, feeding, that kind of thing.

13   Q.   Is that standard of practice part of them getting the

14   license?

15   A.   It is.

16   Q.   If you wanted to make changes to this contract, who would

17   you contact?

18   A.   Steadfast.

19   Q.   Why would you contact Steadfast?

20   A.   Because the agreement is with Steadfast.

21   Q.   Would you be involved -- I'm sorry.

22        Would you be -- would the nurses be involved in the

23   contract negotiations?

24   A.   No.

25   Q.   Let me have you look at Page 117 of this exhibit,

Carol L. Naughton, Official Court Reporter

─────────────── D. Rawlings - Direct ───────────────

1    letter I, on the top of the page there.

2            Are you able to see it, sir?

3    A.  The line that says that Steadfast will be compliant with

4    all state and federal laws?

5    Q.  Yes.

6            Was it Dunlop House's expectation that Steadfast

7    will follow federal laws with respect to the nurses?

8    A.  Yes.

9    Q.  And what was that expectation?

10   A.  That they would be compliant involving those state and

11   federal laws regulating their employees.

12   Q.  Let me have you look at Page 119 of the agreement.

13           Does this contract generally detail the rates that

14   Dunlop House pays Steadfast?

15   A.  Yes.

16   Q.  Did Dunlop House negotiate compensation with the

17   Steadfast nurses directly?

18   A.  No.

19   Q.  Who do you negotiate the rate of pay with?

20   A.  It would be negotiated with Steadfast.

21   Q.  Does Dunlop have any role in determining or setting the

22   hourly rate Steadfast pays its nurses for the services

23   provided at Dunlop House?

24   A.  No.

25   Q.  And why not?

422

D. Rawlings - Direct

1    A.   Because they're not Dunlop House employees, they are

2    Steadfast employees.

3    Q.   Let me direct your attention to Page 118, letter H.

4         Is Dunlop House responsible for paying the Steadfast

5    nurses for hours worked at Dunlop House?

6    A.   No.

7    Q.   Excuse me.  I misidentified that.  I said Page 118, I

8    meant 117.

9         Are you able to see that, sir?

10   A.   Where it says "Steadfast shall assume sole and exclusive

11   responsibility for the payment of wages"?

12   Q.   Yes.

13   A.   I see -- yes, I see that.

14   Q.   So who is responsible for paying the nurses for the

15   services provided at Dunlop House?

16   A.   Steadfast.

17   Q.   Let's have you look, sir, at Page 117, the same page

18   we're on.  Just look further down under "Facility

19   Responsibilities," and I want you to look at letter B.

20   A.   Yes.

21   Q.   And just before I ask you that question, who presented --

22   who drafted this contract?  Do you know who drafted this

23   contract, Dunlop House or Steadfast?

24   A.   Steadfast.

25   Q.   So are there any contracts or restrictions on Dunlop

D. Rawlings - Direct

1    House in recruiting, hiring, or retaining some of the
2    Steadfast nurses who are placed at your facility?
3    A.   Yes.
4    Q.   Okay.  And does the contract restrict you from recruiting
5    the Steadfast employees without paying a rate -- excuse me --
6    a certain amount of money?
7    A.   The contract stipulates a buyout clause.
8    Q.   And tell me about this buyout clause.  What amount of
9    money would you have to pay Steadfast if you were to retain
10   one of their nurses?
11   A.   A registered nurse is $4,000; a licensed practical nurse
12   is $3,000; and a certified nursing aide is $2,000.
13   Q.   Are the nurses that are placed at Dunlop House your
14   employees?
15   A.   No.
16   Q.   Does Dunlop House discipline the Steadfast nurses?
17   A.   No.
18   Q.   Let's have you look at the same exhibit, Plaintiff
19   Exhibit 10, Page 117, the letter G.  Look at it and look up
20   when you're done.
21          Is Dunlop House required to provide Steadfast
22   feedback on the nurse's performance?
23   A.   To assist them with feedback on performance?
24   Q.   Yes.
25   A.   Yes.

D. Rawlings - Direct

1  Q.  If a nurse is not performing duties up to the facility's

2  standard, how is that handled by Dunlop House?

3  A.  It's communicated to Steadfast.

4  Q.  Okay.  Let's have you look at the same page number of the

5  exhibit, 10, Page 117, letters I and J.

6  A.  Okay.

7  Q.  Would you tell me your understanding of what your duties

8  are when it comes to addressing performance issues?

9  A.  So if there were any problems regarding a Steadfast

10 employee, we would contact Steadfast.

11 Q.  And do you address these problems with the nurses?

12 A.  Directly?

13 Q.  Yes.  I need to verbalize that.  Yes.  Do you address the

14 performance issues with the nurses directly?

15 A.  Not from a disciplinary standpoint.  If there was a

16 standard of practice that was -- that needed to be corrected

17 immediately because of safety or the care of a resident, yes,

18 but not from a disciplinary standpoint.

19 Q.  And why would you address these concerns with Steadfast?

20 A.  Because they're Steadfast employees.

21 Q.  Let's have you look, sir, at Page 118 of this contract --

22 I'm sorry.

23        Yes, that's correct, Page 118 of the contract, and

24 look at paragraphs A and B under "Insurance."  Do you see

25 that, sir?

D. Rawlings - Direct

1   A.   Yes, I do.

2   Q.   Is Steadfast required to carry any insurance as part of

3   its contract with Dunlop House?

4   A.   Yes.

5   Q.   What kind of insurance?

6   A.   They are to provide general liability and professional

7   liability insurance coverage.

8   Q.   Is it for $1 million?  Not less than $1 million?

9   A.   $1 million per occurrence and $6 million in the

10  aggregate.

11  Q.   And you said -- I'm sorry -- this is the contract that

12  was drafted by Steadfast, correct?

13  A.   Yes.

14  Q.   Does Dunlop House require the nurses to carry insurance,

15  the Steadfast nurses to carry insurance?

16  A.   No.

17  Q.   Earlier you talked about you contact Steadfast when you

18  need some of the nurses for your staffing needs.  What

19  information does the facility, Dunlop House, provide to

20  Steadfast regarding the assignment?

21  A.   Whether it needs to be a licensed practical nurse, a

22  certified nursing aide, or a medication technician, and the

23  shift that needs to be covered, and sometimes the number of

24  days needed.

25  Q.   Okay.  Are the nurses, the Steadfast nurses, permitted to

D. Rawlings - Direct

```
 1   directly contact you, Dunlop House, for shift placements?
 2   A.  No.
 3   Q.  And why not?
 4   A.  Because they are employees of Steadfast, and our
 5   arrangement is with Steadfast.  That's how we get the nurses.
 6   Q.  Who determines which Steadfast nurses are placed at
 7   Dunlop House?
 8   A.  The individual itself, the person?  I don't think I
 9   understand your question.
10   Q.  Let me rephrase that.
11          When you contact Steadfast and you say "I need an
12   LPN," who makes the determination as to which LPN will be
13   presented to Dunlop House?
14   A.  Steadfast.
15          MR. JEWETT:  Objection.  Calls for speculation.
16          THE COURT:  Overruled.
17   BY MR. SEIFELDEIN:
18   Q.  Does Steadfast provide Dunlop House access to its entire
19   list of vetted nurses before it assigns someone to your
20   facility?
21   A.  I'm sorry.  Ask that question again, please.
22   Q.  Sure.
23          When your facility calls Steadfast and says "I need
24   an LPN," does Steadfast give you a list of its entire vetted
25   nurses to select from, or does it send someone?
```

D. Rawlings - Direct

1    A.   No.

2    Q.   Tell me about that.

3    A.   When a request is made for services to fill a vacancy,

4    Steadfast would make the determination as to who the

5    individual is that would come and fill that vacancy.

6    Q.   Do the Steadfast nurses contact Dunlop House to structure

7    the terms of the working relationship once they are placed at

8    the facility?

9    A.   No.

10   Q.   Who structures the terms of the relationship between

11   Dunlop House and the Steadfast nurses?

12   A.   I would assume that Steadfast would do that.  They are

13   Steadfast employees.

14   Q.   Is that based on the contract?

15   A.   Yes.

16   Q.   Regarding credentials, what information does Steadfast

17   provide to Dunlop House before placing a nurse at your

18   facility?

19   A.   There are a number of credentials that may need to be

20   provided, including their license, their background check.

21   Q.   And are they always provided?

22   A.   They are provided when requested.

23   Q.   These credentials, are they sent to you by Steadfast with

24   every nurse that is placed at your facility?

25   A.   No.

D. Rawlings - Direct

1    Q.   Why is this information needed, the credentials?

2    A.   Because the Dunlop House is a licensed assisted living

3    community, and it's governed by certain state regulations

4    that are required.

5    Q.   So it's a state regulation compliance matter?

6    A.   Correct.

7    Q.   Does Dunlop House screen the Steadfast nurses before they

8    are placed at your facility?

9    A.   No.

10   Q.   Does Dunlop House interview the nurses before they are

11   placed at the facility?

12   A.   No.

13   Q.   Does Dunlop House interview the nurses after they are

14   placed at the facility?

15   A.   No.

16   Q.   Why not?

17   A.   They are Steadfast employees.

18   Q.   Does Dunlop House conduct background checks on the

19   Steadfast nurses that are placed at your facility?

20   A.   No.

21   Q.   Does Dunlop House verify the nurses' employment history?

22   A.   No.

23   Q.   Why not?

24   A.   They are Steadfast employees.

25   Q.   Does Dunlop House verify the employees' work references?

D. Rawlings - Direct

1   A.   No.

2   Q.   Why not?

3   A.   They are Steadfast employees.

4   Q.   Does Dunlop House provide the nurses that are placed by

5   Steadfast at your facility with an employee handbook?

6   A.   No.

7   Q.   What obligations, if any, does Dunlop House have to

8   accept the Steadfast nurses once they're referred to your

9   facility?

10  A.   There's no obligation.

11  Q.   Can the facility decline a nurse that is placed there by

12  Steadfast?

13  A.   Yes.

14  Q.   And how is that communicated?

15  A.   It would be communicated directly to Steadfast.

16  Q.   Why would you communicate it to Steadfast, not the

17  nurses?

18  A.   Because the agreement is between the Dunlop House and

19  Steadfast.

20  Q.   Let me have you look at Plaintiff Exhibit 10, Page 117,

21  the letter L at the very bottom of that page.

22  A.   Yes, sir.

23  Q.   So if Dunlop House cancels a shift, does it contact

24  Steadfast to cancel the shift or the nurses?

25  A.   They would contact Steadfast.

D. Rawlings - Direct

1   Q.   And to the extent that you do cancel a shift, is there a

2   fee associated with that cancellation?

3   A.   Yes.

4   Q.   And tell me about that.

5   A.   If the cancellation happens less than two hours before

6   the reporting time, then Dunlop House would be billed for

7   four hours at the hourly rate of the personnel that the

8   employee, Steadfast employee, was supposed to come.

9   Q.   That's the billing rate?

10  A.   Yes.

11  Q.   The billing rate on the agreement?

12  A.   The billing rate on the agreement.

13  Q.   And do you know how much Steadfast actually pays its

14  nurses?

15  A.   No.

16  Q.   So if a Steadfast nurse fails to report to the facility

17  or is late, what does Dunlop House do?

18  A.   Contact Steadfast.

19  Q.   And why would you contact Steadfast, not the nurse?

20  A.   Because the agreement is with Steadfast.

21  Q.   Does Dunlop House compensate Steadfast for the services

22  that the nurses provide at Dunlop House?

23  A.   I'm sorry.  Ask the question again.

24  Q.   Sure.

25          The services that are provided by the nurses, who do

D. Rawlings - Direct

1    you pay for those services?

2    A.   Steadfast.

3    Q.   Let's have you look at Page 118 of Plaintiff Exhibit 10

4    under "Billing Procedures," letters A and B.

5    A.   Okay.

6    Q.   How does Dunlop House compensate Steadfast for the care

7    provided by the Steadfast nurses at your facility?

8    A.   Steadfast would send an invoice to the Dunlop House.

9    Q.   And how often would the invoice be sent?

10   A.   On a weekly basis.

11   Q.   And what would be included within the invoice that you

12   receive from Steadfast?

13   A.   The personnel who were provided to the Dunlop House, the

14   hours worked at their hourly rate based on the contract.

15   Q.   And is it true, based on letter B here of the contract,

16   that Dunlop House must pay the invoice within 35 days of

17   receiving that invoice?

18   A.   Yes.

19   Q.   Does Dunlop House use Next Day Pay to pay Steadfast?

20   A.   No.

21   Q.   Once you receive the bill from Steadfast, what do you do

22   from your end to verify its correctness, if any?

23   A.   It would be verified against the timecard that was

24   provided to Dunlop House to verify the hours.

25   Q.   And does that usually take more than 24 hours?

D. Rawlings - Direct

1    A.   Yes.

2    Q.   Okay.  And based on this contract here, is it true that

3    if the facility does not make the payment within 35 days, is

4    interest charged?

5    A.   Yes.

6    Q.   Do you know whether -- actually, let me back up.  I'll

7    move on.

8            So you get these invoices and the bills, and you go

9    through your verification process.  What if the nurse is

10   having an issue with the time sheet or its pay?  How would

11   you handle that?

12   A.   Dunlop House wouldn't handle that.

13   Q.   And so if a nurse comes to you with that issue, what

14   would you do?

15   A.   I would -- Dunlop House would have that nurse go back to

16   Steadfast.

17   Q.   And why would you send them to Steadfast instead of you

18   addressing it?

19   A.   Because it's their Steadfast employee.

20           THE COURT:  You've given him the answer about five

21   times now, and I think the questions you asked, you already

22   knew the answer, Mr. Seifeldein.

23           MR. SEIFELDEIN:  Noted, Your Honor.

24   BY MR. SEIFELDEIN:

25   Q.   Does Dunlop House pay the invoices directly to the

D. Rawlings - Direct

1    Steadfast nurses?

2    A.   No.  It's paid to Steadfast.

3    Q.   Now, you talked about these invoices containing time

4    sheets.  Are these time sheets provided to the nurses by

5    Dunlop House?

6    A.   No.

7    Q.   Do you know who provides the time sheets to the nurses?

8    A.   I would think it would be Steadfast who provides the time

9    sheets to the nurses.

10   Q.   I understand.

11        Do the Steadfast nurses use any medical equipment to

12   perform their care at Dunlop House?

13   A.   Medical equipment that's present at the Dunlop House,

14   which is available to the Dunlop House employees, are

15   available to Steadfast nurses, like vital machines.

16   Q.   Does Dunlop House require that Steadfast nurses purchase

17   certain equipment before they come or they are assigned to

18   Dunlop House?

19   A.   No.

20   Q.   Do, on occasion, nurses bring their own personal

21   equipment?

22   A.   Yes.

23   Q.   Are these large or small equipment?

24   A.   Typically, they would be blood pressure cuffs,

25   stethoscopes, those kind of things.

─────────────────D. Rawlings - Cross─────────────────

1    Q.  Would those be considered tools-of-the-trade equipment?

2    A.  Yes.

3           MR. SEIFELDEIN:  No further questions for this

4    witness.

5           THE COURT:  Cross-examination.

6                        CROSS-EXAMINATION

7    BY MR. JEWETT:

8    Q.  Hello, Mr. Rawlings.  My name is Josh Jewett.  I'm an

9    attorney for Steadfast.  I have a few questions to ask you

10   based on your testimony.

11   A.  Yes, sir.

12   Q.  You spoke with Mr. Seifeldein about the contract that

13   Dunlop agreed to between Steadfast and Dunlop House.

14   A.  Yes.

15   Q.  Does Dunlop review the terms of a contract before

16   agreeing to the terms?

17   A.  Yes.

18   Q.  I want to direct your attention first -- I have a few

19   questions about this contract, as Mr. Seifeldein did -- to

20   paragraph B right here.  Can you see that on the screen?

21   A.  Yes.

22   Q.  Okay.  Under paragraph B, there are a list of things that

23   Dunlop House requires of a nurse before the nurse enters a

24   facility.  Do you see that?

25   A.  Yes.

D. Rawlings - Cross

1  Q.  Why does Dunlop require these things?

2  A.  I'm sorry?  Ask the question again.

3  Q.  Sure.

4         Why does Dunlop House require a nurse entering the

5  facility to go through these things?

6  A.  Because of regulatory compliance.

7  Q.  Regulatory compliance.  Okay.

8         And this is a service that Steadfast provides for

9  Dunlop under the terms of the contract; is that correct?

10  A.  Yes.

11  Q.  That's one of the purposes of the relationship -- is that

12  fair? -- for Steadfast to make sure these regulatory

13  requirements are in place so when a nurse comes to your

14  facility, your facility can be sure that they've had all the

15  boxes checked before they start practicing nursing?

16  A.  It's standard practice, yes.

17  Q.  Okay.  Now, if a nurse were to show up at the Dunlop

18  House facility and hadn't completed one of these items, would

19  you permit that nurse to practice nursing at your facility?

20  A.  Yes.

21  Q.  You would still allow a nurse to practice nursing at the

22  facility if a nurse hadn't completed one of the items on this

23  contract?

24  A.  I'm sorry.  I misunderstood your question.  If there was

25  something that was not completed, like a current license,

—D. Rawlings - Cross—

1   then they could not work at the Dunlop House.

2   Q.  So it sounds like, then, Dunlop House ultimately reserves

3   the right to decide what nurse can practice nursing at its

4   facility.  Is that fair?

5   A.  I don't think I would characterize it like that.  I would

6   say that it's Steadfast's responsibility to be sure that the

7   nurses that they are sending or the staff that they are

8   sending meet the requirements of state regulations.

9   Q.  Well, you can't just let any nurse enter your facility to

10  practice nursing.  You reserve the right to allow and not

11  allow a particular nurse to enter your facility --

12          MR. SEIFELDEIN:  Objection, Your Honor.

13  BY MR. JEWETT:

14  Q.  -- based on these credentials?

15          MR. SEIFELDEIN:  Objection, Your Honor.

16  Argumentative.

17          MR. JEWETT:  It's a cross-examination.

18          THE COURT:  Well, you're permitted to use leading

19  questions.  So overruled.

20          THE WITNESS:  I'm sorry.  Ask the question again,

21  please.

22  BY MR. JEWETT:

23  Q.  Sure.  The point I was making to you is you just can't

24  allow any nurse to enter the facility, right?  And so my

25  question to you is:

─────D. Rawlings - Cross─────

1          Dunlop House ultimately reserves the right to decide

2    which nurses can enter its facility to care for its patients

3    or not enter its facility to care for its patients.  It's

4    part of your company's responsibility; is that fair?

5    A.  I would disagree that it's ultimately Dunlop House's

6    responsibility.  The nursing agency has a responsibility to

7    be sure that the nurses that they are placing into the Dunlop

8    House meet not only the scope of practice, but understand the

9    standard of practice in order to be able to care for the

10   residents who live at the Dunlop House.

11   Q.  Let me turn to the next page here and direct your

12   attention to part B.

13          You agreed with me a few moments ago that -- we went

14   through this list -- let me give it to you again.  It's on

15   Page 1, part B.  It says PX-10, Page 116 -- a list of vetting

16   requirements that Steadfast does for Dunlop by contract, and

17   you agree that's part of the relationship for Steadfast to do

18   that for you?

19   A.  Yes.

20   Q.  So Mr. Seifeldein asked you some questions about part B

21   on Page 117, Plaintiff's 10, right here, the "Buyout Clause."

22   Do you see that?

23   A.  Yes.

24   Q.  You said Steadfast verifies these credentials for your

25   agency as part of the contract, right?

─────── D. Rawlings - Cross ───────

1   A.   Yes.

2   Q.   And Steadfast performs these background checks as part of

3   its service to Dunlop House, correct?

4   A.   Yes.  Not just for Dunlop House.

5   Q.   Sure.  I'm talking about the terms of your contract with

6   Steadfast.

7   A.   Yes.

8   Q.   And they do that to make sure that these nurses have the

9   right credentials, the ones that you talked about in your

10  testimony?

11  A.   Correct.

12  Q.   And Steadfast performs these functions so Dunlop House

13  does not have to, I think you said.  Is that true?

14  A.   That's correct.

15  Q.   Because that would be an expense for the facility to have

16  to do that on its own.  You would have to pay for background

17  checks, maybe some administrative expenses that go into that?

18  A.   Because they are Steadfast employees.

19  Q.   Right.  But if you had to do this on your own -- when I

20  say "you," of course I mean Dunlop House -- there would be an

21  expense that goes into that.

22  A.   There would be.

23  Q.   And so when Steadfast -- or Steadfast were to provide

24  you -- strike that.

25           And so if your facility were to decide to directly

439

D. Rawlings - Cross

1    hire a Steadfast nurse -- say the director of nursing thought

2    this was a great nurse.  If your facility were to decide to

3    hire a Steadfast nurse, Steadfast has already performed those

4    background and administrative tasks for you, so Dunlop House

5    does not have to.

6    A.  They would be done again as part of our -- it's part of

7    Dunlop's policy to reverify the information.

8    Q.  Let me ask you about, next, paragraph E here.  Can you

9    see that okay?

10   A.  Yes.

11   Q.  Okay.  Paragraph E says "Facility agrees that Steadfast

12   Medical Staffing's duty to fill assignments is subject to

13   availability of qualified contractors."

14           Why is that clause in there?

15   A.  Because there may not be someone to fill the need from

16   time to time.

17   Q.  And that's because Steadfast can't guarantee that a

18   particular nurse can show up to your facility when you need

19   one, true?

20           MR. SEIFELDEIN:  Objection, Your Honor.  Calling for

21   speculation as to what Steadfast would do.

22           MR. JEWETT:  I'm going through the language on the

23   contract, Your Honor.

24           THE COURT:  Go back to the section that you're

25   relying on for that purpose.

Carol L. Naughton, Official Court Reporter

D. Rawlings - Cross

 1          MR. JEWETT:  Yes.  So I'm on the second page, Your
 2    Honor, Page 117, Section E, under "Facility
 3    Responsibilities."
 4          THE COURT:  Okay.  Objection overruled.
 5          MR. JEWETT:  Okay.
 6          I've lost my train of thought.  Could you please
 7    repeat me question to me.
 8          THE COURT:  We usually don't do that.
 9          MR. JEWETT:  Oh, I'm sorry.
10    BY MR. JEWETT:
11    Q.  So we're on section -- I'll just read it to you again.
12          "Facility agrees that Steadfast Medical Staffing's
13    duty to fill assignments is subject to availability of
14    qualified contractors."
15          And I asked you why that's in there.  And can you
16    please repeat your answer.
17    A.  I said it's based on the availability of someone to be
18    placed when a request is made to Steadfast.
19    Q.  Right.  Okay.
20          And that's because Steadfast can't guarantee that a
21    particular nurse is going to be available when Dunlop needs
22    that nurse?
23          MR. SEIFELDEIN:  Your Honor, objection.  Asking the
24    witness to speculate about what Steadfast could or would
25    have.  The witness already answered the question that --

———— D. Rawlings - Cross ————

1    THE COURT:  All right.  The Court is going to have

2    you rephrase that, Counsel, because, in a way, it calls for

3    speculation after the fact; what they would have done, could

4    have done.  So let's try it again.

5    BY MR. JEWETT:

6    Q.  Let me try to be more concrete.

7        Are you aware of a situation, in your position,

8    where Dunlop House asked Steadfast to fill a shift and

9    Steadfast wasn't able to do that?

10   A.  I'm not aware.

11   Q.  Okay.  Sticking to the same page, you said you're not

12   aware of any instances where Steadfast was unable to fulfill

13   a shift.  Mr. Seifeldein asked you about paragraph I here,

14   "Facility will notify Steadfast of any problems regarding

15   Steadfast contractors."

16       In your position, are you aware of any specific

17   instances where your facility notified Steadfast of -- let me

18   make sure I use the language of the contract -- of any

19   problems regarding Steadfast contractors?

20   A.  No, I'm not aware.

21   Q.  Okay.  So as far as you know, this paragraph has never

22   come up in the relationship with Steadfast?

23       MR. SEIFELDEIN:  Your Honor, objection.  Calls for

24   speculation.  Asked and answered as well.

25       MR. JEWETT:  Your Honor, I said, "as far as you

─────D. Rawlings - Cross─────

1    know."  I qualified the question.

2         THE COURT:  Well, usually the form of your question

3    calls for the objection, but the Court will overrule.  You

4    simply asked whether you know if the issue has come up or

5    not.

6         You can answer that.

7         THE WITNESS:  I'm not aware, Your Honor.

8    BY MR. JEWETT:

9    Q.  Okay.  I think I'm almost done with this page.

10        You testified that Dunlop House reads its contracts

11   before they sign them.  Do you recall that?

12   A.  Yes.

13   Q.  And so on paragraph G here -- I'm circling -- do you see

14   where Dunlop House agreed that the contractors assigned to

15   the facility pursuant to this agreement for the purposes of

16   this contract be considered contractors for Steadfast Medical

17   Staffing.  Did I read that correctly?

18   A.  Yes.

19   Q.  Do you see where you agreed to that?

20   A.  It's in the agreement, sir.

21   Q.  Okay.  Mr. Seifeldein asked you some questions about the

22   pay rates.  Those are listed on Page 4 of the contract there.

23   Do you see those?

24   A.  Yes.

25   Q.  Those rates vary depending on the credentials of the

D. Rawlings - Cross

1    professional, right?

2    A.   Yes.

3    Q.   Okay.  I think you testified that you don't have any

4    knowledge what Steadfast actually pays the nurses?

5    A.   Correct.

6    Q.   Okay.  Does the facility ever receive cancellations from

7    staff nurses?

8    A.   Directly?

9    Q.   Well, either directly from the nurse or from Steadfast.

10   A.   Any cancellations would come directly from Steadfast.

11   Q.   What about no call/no show?  Does the facility receive

12   those?

13   A.   If they did, they would contact Steadfast to let them

14   know that the individual who they said they were placing

15   didn't show up.

16   Q.   Okay.  And I would imagine if a no-call, no-show happened

17   or there was a last-minute cancellation, it would put the

18   facility in a jam for staffing purposes.  Fair?

19   A.   I don't think that that necessarily characterizes what

20   might happen.

21   Q.   Okay.  Well, would you at least agree that it would leave

22   you a little short-handed at the facility if there was a

23   no-call, no-show from a Steadfast nurse?

24   A.   I would not agree with that.

25   Q.   Why is that?  You're down one --

444

———— D. Rawlings - Cross ————

1    A.   Because our staffing patterns are such that we expect to

2    have a certain level, but it doesn't mean that we are

3    necessarily down in order to be able to meet the needs of the

4    residents.   So being short, no, that doesn't necessarily mean

5    that.

6            THE COURT:   That question calls for speculation

7    about what might have happened if the person didn't show.   So

8    let's just move on.

9    BY MR. JEWETT:

10   Q.   I do have a follow-up question about that, though.

11           When the facility receives a no-call, no-show, under

12   the terms of the contract, it's Steadfast's obligation to try

13   to fulfill or fill that vacancy, right?

14   A.   Yes.

15   Q.   Okay.   And in those situations, isn't it true that the

16   facility will agree to a higher rate of pay to get a

17   replacement there?

18   A.   I'm sorry.   Ask that question again.

19   Q.   Sure.

20           In those situations that we're talking about right

21   now, it's true, isn't it, that the facility will actually

22   agree to a higher rate of pay to get a nurse there to fill

23   that vacancy?

24   A.   Higher than what's been stated in the contract?

25   Q.   Higher rate than what is stated here in the contract.

———D. Rawlings - Cross———

1   A.   I'm not aware of that.

2   Q.   Mr. Seifeldein asked you a few questions about the duties

3   of the Steadfast nurses at the facility.  He asked you if you

4   give them a handbook.

5   A.   Yes.

6   Q.   I believe you said "no."

7   A.   Correct.

8   Q.   Does the facility instruct the nurses how to carry out

9   their duties of nursing, such as taking blood pressure and

10  all the many things that nurses do?

11  A.   That's a scope of practice, a standard of practice that

12  they would not be oriented to do.  It would be expected that

13  they would already know how to do that.

14  Q.   You would expect that they already know how to do that

15  sort of thing independently.

16  A.   Correct.

17  Q.   Without someone sitting there telling them how to do it.

18  A.   Correct.

19  Q.   Okay.  Do you provide them a how-to guide on how to do

20  these things, like when they get to the facility, "Here's a

21  sheet.  Here's how to..."

22  A.   It would be oriented to the unit that they are working

23  and provided certain documents based on the assignment that

24  they have.

25  Q.   Okay.  And beyond that, do you give them, like, a tour of

———— D. Rawlings - Cross ————

 1   the facility or anything?

 2   A.  Of the unit that they are working on.

 3   Q.  Sure, sure.

 4         So you said that it's a scope-of-practice issue,

 5   that these are things that you expect them to do

 6   independently.

 7         So the nurses at your facility, it sounds like they

 8   are given discretion in the manner in which they practice

 9   nursing at your facility.

10   A.  Discretion within the scope of their responsibilities and

11   standard of practice, yes, sir.

12   Q.  Okay.  I want to ask you -- turning back to the contract

13   here.  Here's Page 1.  I'm going to turn to Page 2.  I'm

14   going to ask you about Section K there.  Do you see that?

15   A.  Yes.

16   Q.  Okay.  I think you mentioned this in your testimony, but

17   when a nurse engages in something incompetent -- let me just

18   put it in terms of the contract here -- incompetent,

19   negligence, engages in misconduct, the facility will notify

20   Steadfast.  Is that what you said?

21   A.  Correct.

22   Q.  And the facility will put that nurse, in some occasions,

23   some situations, on a -- will ask them not to return that

24   nurse; is that fair?

25   A.  Yes, it could --

D. Rawlings - Cross

1    Q.  Do they call that a "do not return" list, a DNR list?

2    A.  I'm not aware of the terminology.

3    Q.  Fair.

4         And this is something that the facility has as a

5    matter of right to do under the terms of this contract, under

6    Section K, right?

7    A.  Correct.

8    Q.  After all, the facility has a responsibility to decide

9    who can and can't care for its patients.  Fair?

10   A.  Yes.

11   Q.  Okay.  And under the terms of this contract, Steadfast

12   doesn't have the right to challenge the decision to say "We

13   can't have this nurse at our facility anymore."  You retain

14   all discretion on that, right?

15   A.  Under these circumstances, yes.

16   Q.  And so at the end of the day, it sounds like your

17   facility ultimately decides who gets to practice nursing in

18   your facility or not practice nursing.  You get to decide who

19   ends up practicing and who gets excluded.

20        MR. SEIFELDEIN:  Your Honor, that question has been

21   asked and answered.

22        THE COURT:  Sustained.

23        MR. JEWETT:  Okay.  No further questions.  Thank

24   you.

25        THE WITNESS:  Thank you.

Carol L. Naughton, Official Court Reporter

———————D. Rawlings - Redirect———————

 1          THE COURT:  Mighty brief.  I take it you're going to

 2   do a redirect?

 3          MR. SEIFELDEIN:  Real brief, Your Honor.

 4          THE COURT:  Okay.

 5                    REDIRECT EXAMINATION

 6   BY MR. SEIFELDEIN:

 7   Q.  Sir, is it Dunlop House's expectation that Steadfast will

 8   maintain the screening records that Steadfast does before it

 9   places nurses at your facility?

10   A.  Yes.

11          MR. SEIFELDEIN:  No further questions, Your Honor.

12          THE COURT:  Thank you.

13          May this witness be permanently excused?

14          MR. SEIFELDEIN:  Yes, Your Honor.

15          THE COURT:  Thank you, sir.  You may step down.

16          (Witness excused.)

17          THE COURT:  Your next witness?

18          MS. LEWIS:  Your Honor, housekeeping matter.  What

19   time is our next break?

20          THE COURT:  4:00.

21          MS. LEWIS:  District director Roberto Melendez,

22   Your Honor.

23          (Witness sworn.)

24          ROBERTO MELENDEZ, called by the Plaintiff, having

25   been first duly sworn, was examined and testified as follows:

449

—————————————R. Melendez - Direct—————————————

```
 1                        DIRECT EXAMINATION
 2    BY MS. LEWIS:
 3    Q.  Good afternoon.  May you please state and spell your name
 4    for the record.
 5    A.  Roberto Melendez.  R-o-b-e-r-t-o M-e-l-e-n-d-e-z.
 6    Q.  Where are you currently employed?
 7    A.  At the Wage and Hour Division of Department of Labor.
 8    Q.  What year did you join the Department of Labor?
 9    A.  In 2010.
10    Q.  What is your current position?
11    A.  District director.
12    Q.  How long have you been in this position?
13    A.  Since January of 2021.
14    Q.  Prior to holding that position as the district director,
15    did you hold any other positions within the Department of
16    Labor?
17    A.  Yes, I did.
18    Q.  What were they?
19    A.  I was an investigator and also an assistant district
20    director.
21    Q.  What dates were you an investigator?
22    A.  Approximately 2010 to 2015.
23    Q.  And what dates were you an assistant district director;
24    also for shorthand, ADD?
25    A.  From September 2015 to January 2021.
```

R. Melendez - Direct

1    Q.  And within these various positions within the Wage and
2    Hour Division of the Department of Labor, what have been your
3    general job duties and responsibilities?
4    A.  Generally to enforce labor laws; as a supervisor, to
5    supervise cases that are being investigated by investigators.
6    Q.  When you joined the Wage and Hour Division, what kind of
7    trainings did you receive?
8    A.  We received training identified as Basic 1 and Basic 2.
9    Q.  And, generally, what is Basic 1?
10   A.  Basic 1 is an introduction to the Fair Labor Standards
11   Act and investigative process.
12   Q.  What is Basic 2?
13   A.  Basic 2 is additional training that deals with more
14   complex laws, such as immigration law, Family Medical Leave
15   Act, and government contracts.
16   Q.  Have you received any other trainings related to the Act,
17   the Fair Labor Standards Act, since completing Basic 1 and
18   Basic 2?
19   A.  Yes.
20   Q.  What other trainings have you completed?
21   A.  The training is continuous.  It's ongoing throughout the
22   year.  In the Fair Labor Standards Act, there's many
23   different things that come up, such as initiatives that the
24   agency is doing.
25   Q.  You indicated that you had trainings in the Fair Labor

R. Melendez - Direct

1    Standards Act.  Approximately how many hours of training have
2    you had?
3    A.  Difficult to say how many hours.  The initial Basic 1
4    training is approximately three weeks of classroom training.
5    Q.  And who is the FLSA applicable to?
6    A.  The FLSA is applicable to any employer who does gross
7    annual sales of $500,000 or more, to employees whose duties
8    involve the movement of interstate commerce, as well as
9    employees whose duties are subject to -- excuse me -- they're
10   critically essential and directly -- I'm sorry -- directly
11   essential to the movement of interstate commerce.
12   Q.  And were you trained on the regular rate of pay within
13   that meaning within the FLSA?
14   A.  Yes.
15   Q.  What is the regular rate?
16   A.  The regular rate is the result of taking an employee's
17   gross pay and dividing it by all the hours worked.
18   Q.  What is the frequency of that calculation?  Weekly?
19   Annually?
20   A.  It could be weekly, biweekly.  It's really based on the
21   employer's pay period.
22   Q.  And were you trained in the overtime provisions of the
23   Fair Labor Standards Act?
24   A.  Yes.
25   Q.  Under the FLSA, when is an employer required to pay

———R. Melendez - Direct———

1   overtime?

2   A.  An employer is required to pay overtime when an employee

3   works more than 40 hours in a workweek.

4   Q.  What is a workweek?

5   A.  A workweek is seven consecutive 24-hour days, not to

6   exceed 168 hours.

7   Q.  What is the rate an employer must pay after 40 hours in a

8   workweek?

9   A.  Time and a half the regular rate.

10  Q.  So for overtime, what were you trained to look for when

11  determining if an employer is in compliance with the FLSA?

12  A.  One of the things that we look for is to see if the -- if

13  there is a separate line item in the record books that

14  demonstrate additional half-time pay for hours over 40.

15  Q.  Is it a violation of the FLSA to not pay overtime?

16  A.  Yes.

17  Q.  Were you trained on the recordkeeping requirements of the

18  FLSA?

19  A.  Yes.

20  Q.  Under the FLSA, what information is an employer required

21  to keep related to payroll?

22  A.  So the employer is required to keep identifying

23  information of the employee, hours that the employee worked,

24  the day -- the date and time that they started the work, the

25  date and time that they ended the work, hours worked during

R. Melendez - Direct

1    the week, and to separate any hours for overtime purposes.
2    Q.  Does an employer's pay records have to specify the
3    regular rate of pay?
4    A.  Yes.
5    Q.  Does an employer's pay records have to specify the
6    overtime premium rate?
7    A.  Yes.
8    Q.  Are you familiar with Medical Staffing of America doing
9    business as Steadfast Medical?
10   A.  Yes.
11   Q.  How are you familiar with that company?
12   A.  I was the supervisor of the investigator who conducted
13   the investigation.
14   Q.  And was this during your time as district director or
15   ADD?
16   A.  Assistant district director.
17   Q.  Okay.  And when you were the assistant district director
18   supervising the investigator, did you verify the back wages
19   for the investigation?
20   A.  Yes.
21   Q.  What time period did you verify back wages?
22   A.  From approximately -- it was June 2015 to December 30,
23   2018.
24   Q.  So for the time period of the investigation, did you
25   review Steadfast's payroll records?

454

R. Melendez - Direct

```
 1   A.   Yes.

 2   Q.   For that time period, what records did you review?

 3   A.   Payroll summaries.

 4   Q.   Were there any payroll records missing between August 18,

 5   2015, and December 30, 2018?

 6   A.   Yes.

 7   Q.   What dates were missing?

 8   A.   The records that were missing were from approximately

 9   August of 2015 to August of 2016.

10   Q.   As a result of those missing records, were you able to

11   compute back wages for that time period?

12   A.   No.

13   Q.   I want to direct your attention to what we've previously

14   marked as Plaintiff's 7.  It's really tiny.  I can barely see

15   it myself.  There we go.

16        Do you recognize this document?

17   A.   I do.

18   Q.   What is it?

19   A.   A payroll summary.

20   Q.   Who provided these documents?

21   A.   Steadfast.

22   Q.   What information is on this document?

23   A.   Employees' names, the hours they worked, the total paid.

24   Q.   Is there a column for deductions?

25   A.   There is.
```

R. Melendez - Direct

1   Q.  Does it appear --

2           MS. LEWIS:  If we can scroll through the document,

3   please, Ms. Jones.  Keep going.

4           Your Honor, if I may approach, in the interest of

5   there is 68 pages here.

6           THE COURT:  You may.

7           (Pause in the proceedings.)

8   BY MS. LEWIS:

9   Q.  Sorry.  We were looking at the wrong one.  Now we're on

10  the right track.  But if you can -- we were looking at the

11  wrong exhibit.  This is the one that is in the binder.

12          Nonetheless, does it appear, when scrolling through

13  this document, whether the employer made some sort of

14  deductions -- made any sort of deductions?

15  A.  I don't see any.  All right.  There's one there.

16  Q.  The sixth column over is deductions.  So sixth column

17  over.

18  A.  There's some deductions, there is.

19  Q.  Did DOL receive these documents in the course of the

20  investigation?

21  A.  Yes.

22  Q.  Is this an accurate representation of the payroll

23  summaries that were provided during the investigation?

24  A.  Yes.

25          MS. LEWIS:  Now, the exhibit binder that has been

R. Melendez - Direct

1    presented to the Court has a sampling, if you could scroll

2    through.  We printed out 69, but there is a disk attached

3    that has all of the payroll summaries.  We move to admit the

4    entirety of Plaintiff's 7.

5              THE COURT:  First of all, you're moving to amend it?

6              MS. LEWIS:  No, admit.

7              THE COURT:  Any objection to Plaintiff's 7?

8              MS. RUST:  No objection, Your Honor.

9              THE COURT:  Plaintiff's Exhibit 7 will be admitted.

10             (Plaintiff's Exhibit PX-7 received in evidence.)

11   BY MS. LEWIS:

12   Q.  Can you tell whether the employer was in compliance with

13   Section 7 of the FLSA based upon this document, the payroll

14   summary?

15   A.  Yes.

16   Q.  Was the employer in compliance?

17   A.  The employer was not in compliance.

18   Q.  How can you tell?

19             MS. RUST:  I'm going to object to the foundation.

20   We're still dealing with whether the individuals were

21   classified.  If they're not classified as employees, then

22   they're not going to have deductions.  That doesn't

23   necessarily mean they are not in compliance with the FLSA.

24             THE COURT:  That's the ultimate issue.  What you can

25   do is you can cross-examine him on what he says.  The Court

Carol L. Naughton, Official Court Reporter

R. Melendez - Direct

```
 1   will have to take into consideration his statement that there
 2   were not deductions in compliance as well as whatever you
 3   determine on cross-examination.  So I'll just have to hear it
 4   all.
 5           MS. RUST:  Okay.  Thank you, Your Honor.
 6   BY MS. LEWIS:
 7   Q.  The question asked was:  How can you tell, regarding the
 8   compliance?
 9   A.  You can see that there are hours over 40.  There is no
10   separate line item to identify the payment of overtime, and
11   it seems to be just a gross amount paid.
12   Q.  Okay.  Can you provide an example of where you have
13   deduced these conclusions with respect to the Section 7
14   half-time not being paid?
15           Let me streamline this a bit.
16           (Pause in the proceedings.)
17   BY MS. LEWIS:
18   Q.  Can you tell whether or not Valerie McQueen was receiving
19   half-time?
20   A.  That's probably not a good example.  It's only 15 hours.
21   Q.  All right.
22           MS. LEWIS:  Try another example, Ms. Jones.
23           THE COURT:  Can you pick an example of what you're
24   testifying to?
25           THE WITNESS:  I could.  If I had a calculator, then
```

Carol L. Naughton, Official Court Reporter

458

R. Melendez - Direct

1   I can do the computation of taking the total pay divided by

2   the hours worked and establish a regular rate.

3          MS. LEWIS:  Okay.

4          THE COURT:  Hold on.  We can do this.

5          THE WITNESS:  So looking at -- I'm focusing here.

6   Looking at -- I think it's the last name of Mueller.  I can't

7   read the first name.  That person worked 53 hours and was

8   paid 2,120.  If you take the total pay divided by the hours

9   worked, it comes out to $40 an hour.

10  BY MS. LEWIS:

11  Q.  Piers Mitiliers is the one that you're referring to, in

12  between the names "Lakisha Miller" and "Natalia Moore" on

13  3/31/2017.  Is that the one you're looking at?

14  A.  Yes.

15  Q.  Based on this example, did the employer pay half-time?

16  A.  The employer did not pay half-time.

17  Q.  Was there any information provided to Wage and Hour that

18  confirmed the employer only paid straight time?

19  A.  Say that one more time.

20  Q.  Yes.

21          Did the employer provide any information to Wage and

22  Hour that confirmed its practice of paying straight time?

23  A.  Yes.

24  Q.  What information was provided?

25  A.  The information was provided during the initial

459

R. Melendez - Direct

1   conference between the investigator and the employer as well

2   as information from interviews.

3   Q.   Okay.  And to compute the back wages for the time period

4   of August 23, 2016, to December 3, 2018, were these payroll

5   summaries used to compute the back wages?

6   A.   Yes.

7   Q.   Were additional records reviewed to verify the accuracy

8   of the payroll summaries?

9   A.   There were additional records in addition to the payroll

10  summaries.  There might have been some invoices and time

11  records.

12  Q.   When you say "time records," are you referring to time

13  sheets?

14  A.   Yes.

15  Q.   Based upon the review of these additional records, was

16  there any reason to question the accuracy of the information

17  on the payroll summaries?

18  A.   No.

19  Q.   Were there any records not used to compute back wages --

20  sorry.  Strike that.

21          So based upon the payroll records that Wage and Hour

22  received, specifically the payroll summaries, how was an

23  individual's regular rate of pay determined?

24  A.   By taking their gross pay and dividing it by the total

25  hours that they worked.

460

R. Melendez - Direct

1  Q.  And that arrives at the regular rate?

2  A.  Yes.

3  Q.  Once a regular rate was determined, how were the rest of

4  the back wages determined for an overtime violation?

5  A.  So you -- you -- it's the half-time that's due for any

6  hours over 40.

7  Q.  Okay.  So what do you do with the regular rate?  What is

8  the equation?

9  A.  So half the regular rate times any hours over 40.

10 Q.  How did you know the total hours worked based on the

11 payroll summaries?

12 A.  They are taken from the payroll summaries and time

13 records.

14 Q.  So on the face of the records?

15 A.  Yes.

16 Q.  Okay.  And directing your attention to Plaintiff's 21, do

17 you recognize these documents?

18 A.  I do.

19 Q.  And what is it?

20 A.  They are Wage Transcription and Computation sheets.

21 Q.  Was this document created during the regular course of

22 business by the Department of Labor?

23 A.  Yes.

24 Q.  Where did the information come from that was used to

25 create these calculations?

R. Melendez - Direct

1  A.  From the employer's payroll summaries.

2  Q.  Is this document a true and accurate representation of

3  the employees who are owed back wages between August 2016 and

4  December 30 of 2018 based upon the payroll records defendants

5  provided?

6  A.  Yes.

7  Q.  Do these calculations follow the methodology for

8  computing overtime due that you just explained?

9  A.  Yes, they do.

10        MS. LEWIS:  Your Honor, I move to admit

11 Plaintiff's 21.

12        THE COURT:  Any objection?

13        MS. RUST:  No objection.

14        THE COURT:  Exhibit 21 will be admitted.

15        (Plaintiff's Exhibit PX-21 received in evidence.)

16 BY MS. LEWIS:

17 Q.  Based upon the last payroll records for the time period

18 you reviewed that supported the back-wage computation -- that

19 is, the December 2018 date -- did this -- strike that.

20        Based upon the last set of payroll records for the

21 period that you reviewed -- that was the August 2016 through

22 December 2018 -- did the employer pay time and a half for

23 hours worked over 40?

24 A.  They did not.

25 Q.  And how did they pay them?

—————————————R. Melendez - Cross—————————————

1   A.  At straight time.

2   Q.  Is this practice a violation of the FLSA?

3   A.  It is.

4          MS. LEWIS:  No further questions for this witness,

5   Your Honor.

6          THE COURT:  Cross.

7          I don't know how long your cross will be, but it may

8   be interrupted by a break, but you will be permitted to

9   finish it, Ms. Rust.

10          MS. RUST:  I think it will be short.

11          THE COURT:  Okay.

12          (Pause in the proceedings.)

13                       CROSS-EXAMINATION

14   BY MS. RUST:

15   Q.  Hi, Mr. Melendez.  My name is Julia Rust.  I'm an

16   attorney for the defendants.  I just want to clarify a few

17   things that you talked about.

18          First of all, your determination -- well, Ms. Lewis

19   asked you whether the payroll practices, as far as paying

20   overtime, were in compliance with the FLSA.

21          That determination is ultimately based on whether

22   the Court decides whether these individuals are properly

23   classified as independent contractors; is that correct?

24          MS. LEWIS:  Objection, Your Honor.  Argumentative.

25   The Court has already stated that it maintains the ultimate

R. Melendez - Cross

1    conclusion.  So to the extent that they are seeking -- it's,

2    one, argumentative and, two, calls for a legal conclusion.

3            THE COURT:  I'm trying to determine whether you're

4    asking him a legal question.  I think the Court has made it

5    clear that he can get these records in.  You can talk about

6    it being a violation, but ultimately, the Court has to decide

7    whether it's a violation of the Federal Labor Standards Act

8    based upon whether the defendant is, in fact, an employer.

9            So the Court understands the question that you asked

10   him.  The Court will let it go.  There's no jury in here.

11           MS. RUST:  Thank you, Your Honor.

12   BY MS. RUST:

13   Q.  And to clarify, an individual is only entitled to

14   overtime pay as an employee, not as an independent

15   contractor, correct?

16   A.  That would be correct.

17   Q.  And if the payroll records we -- when Ms. Lewis reviewed

18   the payroll summary with you on the screen, the example you

19   gave was on 3/31/2017 for an individual named Piers

20   Mitiliers.  He worked 53 hours and was paid 2,120.  I think

21   you calculated that at $40 an hour, right?

22   A.  Yes.

23   Q.  But the payroll summary did not specify what the

24   flat-time hourly rate for that individual was, correct?

25   A.  It did not.

────────── R. Melendez - Cross ──────────

1    Q.   So you don't -- you aren't able to determine, based on

2    the payroll summaries, if that individual actually was paid

3    overtime.   Basically, your calculation is on the assumption

4    that his hourly rate was only $40 an hour the entire time for

5    that payroll period.

6    A.   That's what the calculation came up to, yes.

7    Q.   Okay.   And the manner in which you calculated the Wage

8    Transcription and Computation worksheets, are those

9    calculations done manually?

10   A.   So they are done manually, and I'm going to assume that

11   the investigator who did it put it -- input it into the sheet

12   to make the computation, yes.

13   Q.   Okay.   So there is room for human error in the

14   transposition of information; is that correct?

15   A.   Yes.

16   Q.   And this is a pretty significant volume of damages

17   calculations, right?

18   A.   Yes.

19   Q.   So there is a likelihood that there are errors in the

20   calculations based on high volume, right, in what you just

21   said?

22   A.   Yes.

23   Q.   So you can't verify the accuracy of the information in

24   PX-22; is that correct?

25   A.   In regards to the sheet that was provided and the

465

R. Melendez - Cross

1    computation that was made, yes, that was an accurate

2    computation.

3    Q.   It's an accurate computation if the information was

4    transposed correctly?

5    A.   Yes.

6    Q.   Okay.  And you just stated that it may not have been

7    transposed correctly.

8            MS. LEWIS:  Objection.  Misstates the testimony.

9            THE COURT:  Sustained.

10   BY MS. RUST:

11   Q.   Okay.  Let me back up.

12           You just agreed with me -- tell me if I'm

13   misstating.  You just agreed with me that there is room for

14   human errors in the calculation on these worksheets because

15   it's based on manual transposition of information, right?

16   A.   Yes.

17   Q.   So in a volume of this size, there is a likelihood of an

18   error in calculations, correct?

19   A.   Yes.

20   Q.   Okay.  And you did not personally go through and

21   calculate every single one of these Wage and Hour computation

22   worksheets, correct?

23   A.   Correct.

24   Q.   So you did not personally verify the accuracy of the

25   calculations, correct?

————— R. Melendez - Cross —————

1   A.  So there's always a portion of taking some records that

2   are in the file and bouncing it off of some records that the

3   employer provided.  To go through all of them, no one

4   necessarily does all that.

5           If the scope of the investigation is this large, we

6   will take a sampling to identify if things were done

7   correctly.  But to do every single one of them, no, that

8   would not be efficient of our agency to do that.

9           THE COURT:  The Court understands that we're

10  engaging in speculation that there's some inaccuracy here,

11  and this is speculation going on backwards and forwards.

12          MS. RUST:  Understood, Your Honor.  I think I only

13  have one more question.

14  BY MS. RUST:

15  Q.  Are you familiar with the liquidated damages provision

16  under the FLSA for classification purposes?

17  A.  I'm familiar with liquidated damages, yes.

18          THE COURT:  That's beyond the scope of the direct.

19          MS. RUST:  Well, it goes to calculations, Your

20  Honor.  I have one question --

21          THE COURT:  I know, but there's been no discussion

22  of liquidated damages on direct here.  As a matter of fact,

23  there was no indication of what the total damages were here,

24  let alone whether liquidated damages are involved.

25          MS. RUST:  Then I'll wrap up.  That's all I have.

──────────────R. Melendez - Redirect──────────────

1    Thank you.

2              THE COURT:  May the witness be excused?

3              MS. LEWIS:  Brief redirect.

4                       REDIRECT EXAMINATION

5    BY MS. LEWIS:

6    Q.  For the time period that you were responsible for

7    supervising the investigator and reviewed the back-wage

8    computations, are you aware whether defendants provided

9    precise information with respect to any discrepancy in the

10   calculations that Wage and Hour came to?

11   A.  I am aware of some discrepancies, yes.

12   Q.  And then when those discrepancies were brought to your

13   attention, were they resolved for the time period -- the

14   2016-2018 period?

15   A.  I believe that they were.

16   Q.  Okay.  Now, in terms -- going back to the exhibit,

17   defendant asked whether -- what information Wage and Hour had

18   with respect to knowing the regular rate.

19              Whose responsibility is it to maintain the regular

20   rate on payroll records?

21   A.  The employer's.

22   Q.  And if an employer doesn't do that, then how does the

23   Department of Labor, Wage and Hour Division, go about

24   determining the regular rate?

25   A.  The same computation, taking the gross pay divided by the

468

———————————R. Melendez - Redirect———————————

1    total hours worked.

2    Q.  So does the Department of Labor only have the employer's

3    own records to rely upon with respect to determining regular

4    rate when it's not indicated?

5    A.  So we can use records, or we can conduct interviews.

6              MS. LEWIS:  No further questions, Your Honor.

7              THE COURT:  Well, you know, the Court said a few

8    minutes ago it was speculation about the accuracy of the

9    records, and then you raised the question whether there had

10   been any discrepancies.  So the Court will permit Ms. Rust,

11   if she wishes, to go back on recross to address that issue.

12             MS. LEWIS:  Your Honor, if I may?  When this trial

13   was initially scheduled in 2019, the Court directed defendant

14   to perform a math check.  They did so, and they have not done

15   any subsequent since that time.

16             So pursuant to the Court's own order, defendant has

17   represented through his testimony that that math check was

18   performed for the time period that he's speaking to.

19             THE COURT:  All right.

20             MS. RUST:  Well, if I can address that?  During the

21   pretrial conference, we stated -- it's in the Pretrial Order

22   that we are objecting to the accuracy of the computations,

23   but if liability is established, then we would work with the

24   plaintiff to verify the accuracy.  We didn't receive a final

25   calculation of damages until August 26th.

———————————R. Melendez - Redirect———————————

1         THE COURT:  Let's put it this way:  If liability is

2    determined, the Court will be having to make the

3    determination about what the calculations will be, not,

4    per se, the parties getting together and deciding now we're

5    going to decide what damages there are.

6         The damages need to be established in this case, and

7    the Court, based on the information it gets from the record

8    and what is presented, will determine what the damages will

9    be.

10        So the simple fact is, if the parties wanted to get

11   together before this case started and reach an agreement and

12   stipulate to what the potential damages would be, if, in

13   fact, it was found that the defendant was an employer, you

14   had a chance to do that.

15        MS. LEWIS:  Your Honor, and just to be clear for the

16   regard, the order I'm referencing is ECF 84.  And with

17   respect to counsel's representations that the computations

18   were provided on whichever date it was, I'd note for the

19   Court that the last set of records defendants produced, which

20   will be testified to by the investigator, were on the Tuesday

21   before trial for -- and he'll testify about that.

22        So this time period, there is an ECF and a direction

23   from the Court for defendants to complete a math check.  Such

24   math check was done.  So in terms of any argument regarding

25   that, I refer the Court to its previous order and direction

1    to the defendants.

2              THE COURT:  All right.  This is the end of the

3    discussion, then.  Step down.

4              MS. LEWIS:  Thank you.

5              (Witness excused.)

6              THE COURT:  The Court is going to take a 15-minute

7    break, and then we'll come back and continue.

8              (Recess from 3:53 p.m. to 4:15 p.m.)

9              THE COURT:  Okay.  You may call your next witness.

10             MS. LEWIS:  Xiong Yaozu.  He's on Zoom.

11             THE COURT:  Okay.

12             (Witness sworn remotely.)

13             YAOZU XIONG, called by the Plaintiff, having been

14   first duly sworn, was examined and testified via ZoomGov.com

15   as follows:

16                        DIRECT EXAMINATION

17   BY MS. LEWIS:

18   Q.  Good afternoon.  If you could please state your name and

19   spell your name for the record.

20   A.  My name is Yaozu Xiong.  First name spelled Y-a-o-z-u.

21   Last name spelled X-i-o-n-g.

22   Q.  Where are you currently employed?

23   A.  I am employed with the U.S. Department of Labor, Wage and

24   Hour Division.  My station is at the New York City District

25   office.

Y. Xiong - Direct

1    Q.   And what is your current position?

2    A.   I am one of the Wage and Hour investigators.

3    Q.   How long have you been in this position?

4    A.   I've been in the position for about five years now.

5    Q.   Okay.  So since approximately 2016?

6    A.   Yes.

7    Q.   What year did you join the Department of Labor?

8    A.   Joined the Department of Labor back in 2015.

9    Q.   Have you held any other positions prior to being an

10   investigator?

11   A.   Yes.

12   Q.   What other positions have you held?

13   A.   I was a Wage and Hour assistant.

14   Q.   What were your duties and responsibilities in the

15   positions that you've held within the Wage and Hour Division,

16   generally speaking?

17   A.   As an assistant, we deal with complaint intakes and help

18   out with the administrative tasks of the office; and as an

19   investigator, I get assigned cases and investigate employers

20   that have potential Fair Labor Standards Act violations.

21   Q.   When you joined the Wage and Hour Division, what type of

22   trainings did you receive?

23   A.   When I joined the Wage and Hour Division, I received a

24   Basic 1A training.  That is for the assistant position.  And

25   when I became the investigator, I went through the Basic 1

Y. Xiong - Direct

1    training, Basic 2 training, and also with a lot of ongoing
2    refresher -- annual refresher trainings as well.
3    Q.   Generally, what is Basic 1?
4    A.   Basic 1 is the basic concept -- understanding basic
5    concepts of FLSA, the Fair Labor Standards Act, which include
6    the hours worked, hours paid, recordkeeping.
7    Q.   And you also mentioned Basic 2.  What did you learn in
8    Basic 2?
9    A.   Basic 2 is a little bit more advanced on top of the
10   Basic 1.  It talks about more -- other laws that Wage and
11   Hour enforces.  For example, the Family and Medical Leave
12   Act, the Davis-Bacon Act, and the Service Contract Act.
13   Q.   Does Wage and Hour provide any other training after the
14   completion of these courses that you mentioned?
15   A.   Yes.
16   Q.   What sort of other trainings?
17   A.   We have periodic just-in-time training.  We also have the
18   micro training about the Fair Labor Standards Act and other
19   laws that we enforce as well.
20   Q.   You indicated that within Basic 1 you learned about the
21   Fair Labor Standards Act.  Approximately how many hours of
22   FLSA training have you had?
23   A.   It's hard to quantify.  Basic training consists of,
24   together, about 13 weeks, and plus the ongoing training,
25   there are too many.

Y. Xiong - Direct

1    Q.   Were you trained on the regular rate of pay?

2    A.   Yes.

3    Q.   And what is the regular rate?

4    A.   Regular rate, we have a formula to compute the regular

5    rate.  It arrives when you use the total amount paid divided

6    by total hours worked for that workweek.

7    Q.   Were you trained on the overtime provisions of the FLSA?

8    A.   Yes.

9    Q.   Under the FLSA, when is an employer required to pay

10   overtime?

11   A.   Under the FLSA, the employer is required to pay at least

12   time and a half of the regular rate when hours worked exceed

13   40 in a workweek.

14   Q.   What is a workweek?

15   A.   A workweek is seven consecutive days of a 24-hour day in

16   any week.

17   Q.   Okay.  Is it a violation of the FLSA for an employer not

18   to pay overtime?

19   A.   Yes.

20   Q.   What is the rate an employer must pay after 40 hours in a

21   workweek?

22   A.   The employer is required to pay at least time and a half

23   of the regular rate when hours worked exceed 40.

24   Q.   For overtime, what were you trained to look for when

25   determining if an employer is in compliance with the FLSA?

Y. Xiong - Direct

1   A.   I was trained to look for any additional premium payment

2   that the employer makes when hours worked exceed 40.

3   Q.   Were you trained on the recordkeeping requirements of the

4   FLSA?

5   A.   Yes.

6   Q.   Under the FLSA, what records is an employer required to

7   keep?

8   A.   Under the FLSA, the employer is required to keep about 14

9   items.   Relevant to this case, the employer is required to

10  keep the name, full name of the employee, Social Security

11  number, the position, rate of pay, total hours worked, and

12  total amount paid.

13  Q.   Are employers required to keep a record of the regular

14  rate of pay?

15  A.   Yes.

16  Q.   Are you familiar with Medical Staffing of America doing

17  business as Steadfast Medical?

18  A.   Yes.

19  Q.   And how are you familiar with that company?

20  A.   I assisted in computing back wages for the case.

21  Q.   For what period of time did you compute back wages?

22  A.   The period that I computed was from December 30, 2018, to

23  June 27, 2021.

24  Q.   In computing these back wages, did you review Steadfast's

25  payroll records?

475

—————— Y. Xiong - Direct ——————

1   A.   Yes.

2   Q.   What records did you review?

3   A.   I reviewed their payroll summaries and the Next Day Pay.

4   Q.   Were there any payroll records missing between

5   December 30 of 2018 and June 27 of 2021?

6   A.   Yes.

7   Q.   What type of records were missing?

8   A.   The NDP records.  Some of them were missing about 90

9   days.

10   Q.   And just to clarify, and moving forward, Next Day Pay,

11   we'll refer to shorthand as "NDP."  Are we on the same page?

12   A.   Yes.

13   Q.   So you indicated that you also used payroll summaries.

14           What information was on the payroll summaries that

15   you reviewed in computing back wages?

16   A.   The information on the payroll summaries were the name of

17   the employee, total hours worked, and total amount paid.

18   Q.   On the payroll summaries that the employer provided, was

19   there a regular rate?

20   A.   No.

21   Q.   So how did you determine the regular rate since it was

22   not listed on the payroll summaries?

23   A.   I determined the regular rate using the total amount paid

24   divided by total hours worked.

25   Q.   I'm going to direct your attention to what has previously

Carol L. Naughton, Official Court Reporter

---Y. Xiong - Direct---

1   been marked as Plaintiff's 7, starting at 7.011.

2          Can you see this document?

3   A.  Yes.  It's blurry, though.  It's not clear.

4   Q.  Okay.  I'll make it a little bigger and see if that

5   helps.

6   A.  All the wordings are blurry.  Can't see.

7          MS. LEWIS:  Just keep making it bigger.  We'll try

8   going up a little bit.

9   BY MS. LEWIS:

10  Q.  How about now?

11  A.  There you go.  Yes.

12  Q.  Okay.  Good.

13          What is this document?  Do you recognize this

14  document?

15  A.  Yes.

16  Q.  What is it?

17  A.  This is the payroll summary that I used to compute the

18  back wages.

19  Q.  Where did this record come from?

20  A.  It was -- this record was provided by the employer.

21  Q.  And did you receive payroll summaries for the period of

22  time that you computed the back wages?

23  A.  Yes.

24  Q.  Is this an accurate representation of the payroll

25  summaries provided to you?

—————— Y. Xiong - Direct ——————

1   A.   Yes.

2   Q.   Can you tell whether the employer was in compliance with

3   Section 7 of the FLSA based on this document?

4   A.   Yes.

5   Q.   What can you tell from this document regarding

6   compliance, the employer's compliance, with Section 7 of the

7   FLSA?

8   A.   I see that the employer is not in compliance with

9   Section 7 of the FLSA.

10  Q.   How?  What section?  Can you clarify, please?

11  A.   Sure.

12          So based on the highlighted example here, Latasha

13  Barnes-Jenkins, one of the licensed practical nurses, she

14  received $2,640 of total pay for that week with 66 hours

15  worked.

16          Now, if you used 2,640 divided by 66, it arrives at

17  her regular rate of pay, which I believe was $40.  And I do

18  not see any additional amount paid to this person.  That

19  means the employer only paid a straight-time pay for total

20  hours worked.

21  Q.   So to be clear, based upon this example in this record,

22  does it appear as though the employer paid time and a half?

23  A.   No.

24  Q.   Besides the payroll summaries, did you receive any other

25  records that reflected time worked and pay?

Carol L. Naughton, Official Court Reporter

─────── Y. Xiong - Direct ───────

1    A.   Yes.

2    Q.   What other records did you receive?

3    A.   The NDP, the Next Day Pay record.

4    Q.   Did you use the Next Day Pay records for computations?

5    A.   Yes.

6    Q.   What information did you use on the Next Day Pay records

7    for computations?

8    A.   Similar to the payroll summary, I used -- I get the name

9    of the person, the worker, the date of the pay, the amount of

10   number of hours worked, and the amount paid to that worker

11   for that date.

12   Q.   I want to direct your attention to what's been marked as

13   Plaintiff's Exhibit 7a.  Can you see these?

14   A.   You might want to adjust the clarity.

15   Q.   How is that?

16   A.   Okay.  Yeah, I can see it now.

17   Q.   Do you recognize this document?

18   A.   Yes.

19   Q.   What is it?

20   A.   This is the Next Day Pay that I used to compute the back

21   wage.

22   Q.   And, likewise, who provided these records?

23   A.   The employer provided the record.

24   Q.   And is this a true and accurate representation of the

25   Next Day Pay records that the Department of Labor received

————Y. Xiong - Direct————

1    from Steadfast?

2    A.  Yes.

3           MS. LEWIS:  Your Honor, I move to admit

4    Plaintiff's 7a in its entirety, which, likewise, is

5    included -- all of the records received from defendants are

6    on the CD-ROM.  A sampling, which has been printed, is in the

7    exhibit binders.

8           THE COURT:  I think we previously admitted 7.

9           MS. LEWIS:  Right.  7a is a separate...

10          THE COURT:  Any objection to 7a?

11          Hearing no objection, 7a is admitted.

12          (Plaintiff's Exhibit PX-7a received in evidence.)

13          MS. LEWIS:  If you could, Ms. Jones, scroll to

14   Page 19.

15   BY MS. LEWIS:

16   Q.  Based upon this record, on this entry, does it appear

17   that the employer is paying overtime on the Next Day Pay

18   records?

19   A.  We cannot determine that because this is the daily hours

20   worked and not the weekly hours worked.

21   Q.  Based on the records shown on the screen, do you see any

22   indication that there is an overtime rate paid?

23   A.  No.

24   Q.  So you indicated that, as a whole, you cannot tell

25   whether the employer is paying overtime based on this

Carol L. Naughton, Official Court Reporter

Y. Xiong - Direct

1   document?

2   A.  That's correct.

3   Q.  And why is that?

4   A.  Under the FLSA, when we compute back wages, we look at

5   total weekly hours worked instead of on a daily basis, but we

6   are able to figure out whether the employer -- whether they

7   were paying the time and a half or not when we combine all

8   the hours.

9   Q.  So since this does not have weekly total hours worked,

10  how were these records used to compute back wages?

11  A.  I combined these NDP records for the hours worked and the

12  total amount paid with the payroll summary.

13  Q.  And specifically, how did you combine those?  Was that

14  manually or via computer?

15  A.  This was exported to an Excel spreadsheet when I did the

16  payroll summary, and after that, we have added the week

17  ending, because the Wage and Hour Division is looking at each

18  week, standard long, so we're looking at on the weekly basis.

19  Q.  How were you able to determine workweek ending since it's

20  not on this record?

21  A.  From the employer and the employee interview, the

22  employer had told us that the week ends on Sunday.  So that's

23  the basis that I add the week ending, workweek ending, for

24  overtime purposes.

25  Q.  Okay.  So I just want to be clear.  After you determined

Carol L. Naughton, Official Court Reporter

Y. Xiong - Direct

1    the workweek ending dates for the Next Day Pay records, how
2    did you then combine the hours for the Next Day Pay and the
3    payroll summaries?
4    A.   Right.  So I added the workweek ending.  All of the hours
5    falling within the same workweek will be combined along with
6    the payroll summary to arrive at the total hours worked for
7    that person.
8    Q.   After combining the hours from the two different payroll
9    records -- that is, the NDP and the payroll summaries -- were
10   there instances that had an excessive amount of hours worked
11   in a workweek?
12   A.   Yes.
13   Q.   How did you define "excessive"?
14   A.   Excessive is, on a weekly basis, when hours worked exceed
15   168, because that's the maximum hours that anyone is possible
16   to work.  There's only 168 hours in a week.
17   Q.   So in those instances, after combining the Next Day Pay
18   payroll summary and -- the Next Day records and the payroll
19   summaries where you had the excessive amount of hours, what
20   did you end up doing with those hours that were over 168?
21   A.   We used an average of 112 hours as the maximum hours
22   worked to adjust the back-wage computation.
23   Q.   Why did you use 112 hours as the maximum hours as opposed
24   to 168 hours?  What was the basis for the 112?
25   A.   It was based on employee interviews and employer records.

Carol L. Naughton, Official Court Reporter

Y. Xiong - Direct

1  Q.  I'm sorry.  And employer records?

2  A.  Yes.

3  Q.  What records are you referring to?

4  A.  I'm referring to the NDP and the payroll summary.

5  Q.  So to be clear, the NDP and payroll summary records is

6  what was used.  Am I following correctly?

7  A.  Yes.

8  Q.  Okay.  So after combining these records, what were your

9  next steps in determining whether there was overtime due?

10  A.  After combining the records, the NDP and the payroll

11  summary, we had also combined the total amount paid, and we

12  determined the regular rate.  Once we've determined the

13  regular rate, then we had computed the additional half-time

14  for the employees.

15  Q.  Okay.  So what number did you use for computing the

16  half-time in terms of hours?  Were there any steps between

17  taking the regular -- regular rate over what amount of hours?

18  A.  Oh, yes.  So much of the values of the formula was -- we

19  were using any hours exceeding 40 times the regular rate

20  times half-time.

21  Q.  So when you said "formula," is this within Excel that you

22  set up a formula, and then Excel computed it for you?

23  A.  Yes.

24  Q.  Okay.  So it wasn't by hand with a pen and paper?

25  A.  No.

—————————————Y. Xiong - Direct—————————————

1   Q.   Okay.  Directing your attention to Plaintiff's 21,

2   starting at Page 482.

3            Do you recognize this document?

4   A.   It's a little bit blurry.

5   Q.   We'll make it bigger for you.

6   A.   There you go.  No, I got it.  Yeah, I see it.

7   Q.   Do you recognize this document?

8   A.   Yes.

9   Q.   What is it?

10  A.   It's just a master computation I did.

11  Q.   And this master computation was the Excel document that

12  you just indicated that you set up the formula, et cetera?

13  A.   Yes.

14  Q.   So does this document reflect the back-wage computations

15  that you just detailed?

16  A.   Yes.

17  Q.   Can you tell me what each of the columns mean?

18  A.   Sure.

19           The first column, you see the date.  That's the

20  workweek ending day and, of course, the first name, last

21  name, gross amount.  Gross pay is the total amount paid

22  combined with the NDP and the payroll summary.  Same thing

23  with the total hours worked.  The regular rate is calculated

24  based on the total amount paid divided by the total hours

25  worked.  And, of course, you have the overtime hours here.

Carol L. Naughton, Official Court Reporter

Y. Xiong - Direct

1            Now, the next one is kind of blurry, but it's
2    Section 7 regular rate due.  That's the difference between if
3    there is any deficiency or any discrepancy about the rate of
4    pay.  If it's lower than what is required, then it will show
5    up here.

6            The next column is Section 7 half-time due.  And
7    that is the column where I mentioned earlier with the
8    formula.  It will calculate the half-time rate times the
9    number of overtime hours.  That will equal the Section 7
10   half-time due.

11           And the next column is blocked by my screen, but I
12   believe -- yeah, that's Section 7 total due.  And that's the
13   amount calculated, pretty much the total between Section 7
14   regular rate due plus the Section 7 half-time due.

15   Q.  Okay.  So did you create this document?

16   A.  Yes.

17   Q.  And where did the information come from that you used to
18   create this document?

19   A.  The information was provided by the employer, the payroll
20   summary and the NDP.

21   Q.  Is this document a true and accurate representation of
22   employees who are owed back wages between December 30, 2018,
23   and June 27, 2021?

24   A.  Yes.

25           MS. LEWIS:  Your Honor, I move to admit

485

—Y. Xiong - Direct—

1    Plaintiff's 21 as a whole.

2              THE COURT:  Any objection?

3              THE CLERK:  It's already in.

4              THE COURT:  It's already admitted.

5              MS. LEWIS:  Oh, we already did?  Okay.  All right.

6    BY MS. LEWIS:

7    Q.  If the Next Day Pay records were not used, would the

8    total weekly hours worked be accurate for employees who

9    received Next Day Pay?

10   A.  It would not.

11   Q.  If only the payroll summaries were used to compute back

12   wages, would the back-wage amount be accurate?

13   A.  No.

14   Q.  Why not?

15   A.  It would undercount the hours worked under the NDP

16   record.

17   Q.  Why would that happen?

18   A.  Because those are the actual hours worked per day by the

19   employees.  So we have to add together with the payroll

20   summary to determine the total hours worked for the

21   employees.

22   Q.  To make sure I'm clear, are the Next Day Pay hours on the

23   payroll summaries?

24   A.  Yes.  There are hours worked on the NDP and the payroll

25   summary.

Y. Xiong - Direct

1   Q.   Let me make sure I'm being clear.   Do the hours worked on

2   the Next Day Pay payroll -- let me start again.

3          On the payroll summaries, do they include the Next

4   Day Pay hours?

5   A.   No, they do not.

6   Q.   I want to direct your attention to what's been marked as

7   Plaintiff's 22.   Take a look at this document.   Can you see

8   it?

9   A.   Yes.

10  Q.   What is this document?

11  A.   This is the back-wage summary, which has the total amount

12  due to each employee.

13  Q.   Did you create this document?

14  A.   Yes.

15  Q.   And where did the information come from that you used to

16  create this document?

17  A.   It was coming from the master computation sheet, which

18  the information was provided by the employer, which consists

19  of the NDP and the payroll summaries.

20  Q.   And on this document, are there -- it includes the back

21  wages for the entire period of this investigation for

22  Steadfast dating back to 2016?

23  A.   No.

24  Q.   If you could take a look --

25  A.   Well, actually, yes, it is.   This is the summary that I

─────── Y. Xiong - Direct ───────

1    created along with the back wages computed for the previous
2    years.
3    Q.   Okay.  Is this document a true and accurate
4    representation of the employees who are owed back wages for
5    the entire period for which records were provided?
6    A.   Yes.
7    Q.   Directing your attention to the bottom, what were the
8    total amount of back wages that were computed as being owed
9    to employees for this entire period?
10   A.   It's $3,619,716.49.
11   Q.   To the right of that total on the back-wage summary,
12   there's another column, and there's the equal amount.  What
13   is that column?
14   A.   That is the liquidated damages amount.
15   Q.   And how were the liquidated damages computed for this
16   back-wage summary computation?
17   A.   Liquidated damages is the equal amount of the back wage
18   due.
19   Q.   What is the total amount due for back wages and
20   liquidated damages?
21   A.   It's $7,239,432.98.
22         MS. LEWIS:  No further questions, Your Honor.
23         THE COURT:  Cross.
24         MS. LEWIS:  Sorry, Your Honor.  I forgot to move to
25   admit -- I'd like to move to admit Plaintiff's 22.

─────────────── Y. Xiong - Cross ───────────────

1              MS. RUST:  We have no objection to authenticity,

2    with the reservation for our objection as to accuracy.

3              THE COURT:  All right.  Exhibit 22 will be admitted.

4              (Plaintiff's Exhibit PX-22 received in evidence.)

5                        CROSS-EXAMINATION

6    BY MS. RUST:

7    Q.  All right.  Hello, sir.  My name is Julia Rust.  I'm an

8    attorney for the defendants.  I have a couple of questions

9    for you regarding the records.

10             First, you mentioned that there were about 90 days

11   of NDP records missing.  Is that correct?

12   A.  Yes.

13   Q.  And were you aware that -- well, let me ask you this:

14             When was the last time you received any NDP records?

15   A.  You mean the date?

16             MS. LEWIS:  Your Honor, if I may object.  This was

17   discovery.  So it came through me, as counsel, and then

18   passed along.  Counsel is aware of the date that she provided

19   those records, which was on August 23rd.

20             MS. RUST:  Well, the issue was that --

21             THE COURT:  All right.  That's noted.  Let's see

22   what he says about when he got them.

23   BY MS. RUST:

24   Q.  When was the last time you received any NDP records from

25   the plaintiff's attorneys?

Carol L. Naughton, Official Court Reporter

──────Y. Xiong - Cross──────

1    A.  I received the NDP -- additional NDP records from counsel

2    on August 23rd.

3    Q.  And do you know exactly what dates you're saying of the

4    NDP records were missing?

5    A.  I don't remember the exact dates.  I believe it was about

6    three or four months on and off.

7    Q.  And were they scattered dates, or was it a consecutive 90

8    days?

9    A.  I believe they were consecutive.  Most of them, yes,

10   consecutive.

11   Q.  But you don't recall for sure?

12   A.  I do not recall that off the top of my head.

13   Q.  In your review of the missing dates, did any of those

14   dates include -- well, let me ask you this:

15          Your determination that 90 days were missing, is

16   that based on an expectation to receive Next Day Pay records

17   for every single day?

18          MS. LEWIS:  Objection.  Form.  Confusing.

19          THE COURT:  All right.  Well, let's rephrase it.

20   The Court is a little confused on the question too.  So could

21   you rephrase.

22          MS. RUST:  Yes, of course.

23   BY MS. RUST:

24   Q.  You said about 90 days were missing, right?

25   A.  Uh-huh.

———————————Y. Xiong - Cross———————————

1   Q.  And you said -- well, tell me if I'm wrong.  You said
2   they may have been scattered, but you think a chunk of them
3   were consecutive days; you're not sure, though?
4   A.  Yes.
5           MS. LEWIS:  Your Honor --
6           THE COURT:  You're getting ready to object, but I
7   want to find out what's the question she's getting ready to
8   get out first.  What is the objection?
9           MS. LEWIS:  My objection is confusing with respect
10  to the characterization of the previous question that I
11  didn't object to because it assumes -- she said
12  "consecutive," but I'm not sure what she is defining as
13  consecutive -- consecutive versus scattered.  And he
14  indicated it was over a three-year period of time.  So the
15  question as a whole is confusing to me.
16          THE COURT:  All right.
17          MS. RUST:  Well, this was a discovery issue.  And I
18  think the confusion is that this -- there was communications
19  regarding some dates that the Department raised that were
20  missing, and we responded and provided dates, and there was
21  no information about that afterward.
22          THE COURT:  Maybe the Court can unconfuse itself.
23          Were the records that were missing, from your
24  determination, consecutive; or were they scattered over a
25  period of years or months?  That's to the witness.

—————————————Y. Xiong - Cross—————————————

1         MS. RUST:  I'm sorry?

2         THE COURT:  That's what the Court wants to get from

3    the witness.

4         MS. RUST:  Okay.

5    BY MS. RUST:

6    Q.  Sir, to repeat the Court's question, were the dates that

7    were missing, the approximately 90 days, was that a

8    consecutive 90 days, or were they 90 days scattered over the

9    three-year period?

10   A.  Consecutive.

11   Q.  Do you recall specifically which dates were missing?

12   A.  I do not recall the specific dates.

13   Q.  And you have no idea whether those -- well, I'll leave it

14   at that.

15        Okay.  And you stated that your calculations were

16   based on a pay period based on the workweek ending on a

17   Sunday; is that right?

18   A.  That's correct.

19   Q.  So if the workweek was actually -- if the company ended a

20   workweek on a different day, would that change the

21   accuracy -- or impact the accuracy of your calculations?

22        MS. LEWIS:  Objection.  Calls for speculation.

23        MS. RUST:  I think that goes to the calculation

24   formula he described.  But I can rephrase.

25        THE COURT:  Hold it.  Overruled.  Let's see if he

Carol L. Naughton, Official Court Reporter

—————————————Y. Xiong - Cross—————————————

1    can answer that.

2    BY MS. RUST:

3    Q.  Do you need me to repeat the question?

4    A.  Yes.

5    Q.  You said that your calculations were based on the

6    workweek ending on a Sunday.  If the company actually ended a

7    workweek on a different day of the week, would that impact

8    the accuracy of your back-wage calculations?

9    A.  I don't think so, because the hours worked as a whole

10   will not change.  The total amount of hours worked will be

11   the same whether the week ends on a Sunday or on a different

12   day.

13   Q.  Well, if the -- so you're aware that -- okay.  Let me say

14   this:

15          In your review of these payroll records, did you

16   observe that there were hours worked on all seven days of the

17   week?  Meaning were the individuals only working a

18   Monday-through-Friday workweek, in your observation?

19   A.  Most of -- most of the employees worked Monday through

20   Friday, and I did see that there are days that fall under

21   Saturday and Sunday.

22   Q.  Okay.  So if the workweek actually started on a Tuesday,

23   then would that impact the accuracy of your back-wage

24   calculation because different -- well, I'll stop there.

25   Would that impact the accuracy of your calculation for

———————— Y. Xiong - Cross ————————

1    calculating 40 hours in a workweek?

2    A.  If a workweek is ending on a different day, it will

3    change the number of hours worked for that workweek ending,

4    but it will not change the total hours worked as a whole.

5    Q.  Right.  But it might change whether there were actually

6    40 hours worked in a workweek.

7              MS. LEWIS:  Objection.  Asked and answered.

8              THE COURT:  As a matter of fact, we're getting into

9    the speculative range.  The Court let you go on and ask the

10   question a few minutes ago, but we're getting to be very

11   speculative.

12             MS. RUST:  Understood, Judge.

13   BY MS. RUST:

14   Q.  Sir, are you aware that Steadfast actually starts its pay

15   period on a Tuesday and ends on a Monday?

16             MS. LEWIS:  Objection.  Assumes facts not in

17   evidence.

18             MS. RUST:  Well, he testified regarding the workweek

19   start date that he was aware of.

20             THE COURT:  I think that you need to rephrase the

21   question.  Ask him "Do you know what the workweek is?" and

22   see what he says.

23             MS. RUST:  Understood.

24   BY MS. RUST:

25   Q.  Sir, do you know what day Steadfast Medical Staffing

Carol L. Naughton, Official Court Reporter

─────────────────Y. Xiong - Cross─────────────────

1    starts its weekly pay period -- what day of the week?

2    A.   The workweek starts from Monday to Sunday.

3    Q.   Okay.  You talked about -- so your back-wage calculation

4    that you went over with Ms. Lewis, you said that those

5    calculations were based on your review of payroll summaries

6    and Next Day Pay only; is that correct?

7    A.   That's correct.

8    Q.   And you did not review payroll detail reports; is that

9    correct?

10   A.   No, I did not.  Yes.

11   Q.   So when you were calculating or when you were reviewing

12   the payroll summaries, did the payroll summaries identify the

13   hourly rate for that individual for that payment?

14   A.   It did not.

15   Q.   And I think you testified that you -- you testified how

16   you calculated an hourly rate without that information

17   specifically provided, correct?

18   A.   Yes.

19   Q.   Okay.  So if an individual in a pay period was making

20   different hourly rates, would that impact the accuracy of

21   your calculations?

22               MS. LEWIS:  Objection --

23               THE WITNESS:  No.

24               MS. LEWIS:  -- calls for speculation.

25               THE COURT:  Objection overruled.

Carol L. Naughton, Official Court Reporter

—————————————— Y. Xiong - Cross ——————————————

1    BY MS. RUST:

2    Q.  I'm sorry.  You said "no"?

3    A.  No.

4    Q.  So if an individual made -- well, so -- let me make sure

5    I understand.

6            So you testified that to determine the hourly rate,

7    you divided the total wages and the number of hours worked,

8    correct?

9    A.  It's the gross amount paid divided by the total hours

10   worked.

11   Q.  Okay.  So that would arrive to a singular hourly rate,

12   correct?

13   A.  It will arrive at the regular rate.

14   Q.  Okay.  So if an individual was working hours during that

15   workweek where they received different hourly rates for

16   different hours, you would not -- that would not be factored

17   into your calculations then?

18           MS. LEWIS:  Objection, Your Honor.  Calls for

19   speculation and improper hypothetical.

20           THE COURT:  Objection overruled.

21           THE WITNESS:  So when an employee --

22           THE COURT:  Excuse me for a second.

23           Ms. Pitts, do not disturb the examination by what

24   you're doing over there.  If you want to confer with counsel,

25   let him talk to you, but otherwise, refrain.  Now go back to

—————————Y. Xiong - Cross—————————

1   what you were doing.

2   BY MS. RUST:

3   Q.   Do you need me to restate the question, sir?

4   A.   Yes, please.

5   Q.   So I think I asked if an individual was working different

6   shifts during that pay period and received, for example, 20

7   hours per -- or $20 per hour for one shift and then received

8   $25 an hour for another shift, you would not have factored

9   that into your calculation, based on the payroll summaries?

10   A.   No.

11   Q.   Okay.  And so you would not be able to determine if that

12   impacted the accuracy of your calculation?

13   A.   I don't believe it will impact the calculation because

14   overall when we compute the back wages, we have to come out

15   with the regular rate, and the only way -- the way that we

16   come out with the regular rate is using total amount paid

17   divided by total hours worked.

18   Q.   Right.  But --

19   A.   Because rate of pay can be changed, depending on the

20   amount paid to the employees.  So if the employer did not

21   specify the rate of pay on any of the recordkeeping

22   requirements, it is for us to calculate the regular rate.

23   Q.   Okay.  But you were not provided with payroll detail

24   reports, correct?

25   A.   I was not.

497

Y. Xiong - Cross

1   Q.   Okay.  And do you know whether Steadfast did provide

2   payroll detail reports in this litigation?

3   A.   Not in the records that I reviewed.

4   Q.   Okay.  So you don't know if those payroll detail reports

5   actually included an hourly rate for a pay period; is that

6   correct?

7   A.   Yes.

8   Q.   Okay.  And you did not review any of the facility

9   invoices that were provided and produced in this litigation

10  either; is that correct?

11  A.   That's correct.

12  Q.   Okay.  So you did not review those to see what the hourly

13  rate was for each nurse for each shift that they worked; is

14  that correct?

15  A.   I did not review those records.

16  Q.   Okay.  And when you're calculating an hour -- a regular

17  rate, you're using the regular rate to determine the overtime

18  rate, correct?

19  A.   That's correct.

20  Q.   So if a regular rate is $20 an hour, the overtime rate

21  would be $30 an hour -- is that right? -- total?

22  A.   If you're talking about time and a half, yes.

23  Q.   Okay.  So if the regular rate was $25 an hour, what would

24  the overtime rate be?

25  A.   That will be -- if you're talking about time and a half,

498

───────────Y. Xiong - Cross───────────

1    that would be time and half after 25.  Now, once we know that
2    the employer paid straight time, we're not looking for that
3    time and a half.  We're looking for additional half-time
4    premium.
5    Q.  Right.  But the half-time premium is a different amount
6    if --
7    A.  It will be based on the calculated regular rate since the
8    employer did not provide the regular rate.
9    Q.  And you don't know whether Steadfast provided the hourly
10   rate for each shift worked, correct?
11   A.  They indicated the regular rate on the NDP but not on the
12   payroll summaries.
13   Q.  Okay.  Got it.
14        And regarding the calculation -- you testified right
15   at the end of your testimony with Ms. Lewis that the
16   liquidated damages was equal to the back wage; is that
17   correct?
18   A.  Yes.
19   Q.  Would you be able to recalculate the amount of liquidated
20   damages if the period for liquidated damages was determined
21   to be shorter than the full period for back-wage damages?
22   A.  Recalculate -- I'm not sure what you're asking.
23   Q.  Sure.  That was a long question.  Let me rephrase.
24        So the back-wage calculations, the back-wage total
25   that you calculated was for the full period on -- I think it

499

———————— Y. Xiong - Cross ————————

1    was Plaintiff's 22, and you said that the liquidated damages

2    was equal to that number, so they were based on the same

3    period of time, correct?

4    A.   Yes.

5    Q.   So if the liquidated damages was determined to actually

6    be for a shorter period of time, would you be able to

7    calculate the appropriate liquidated damages for a reduced

8    period of time?

9           THE COURT:  Wait a minute, Ms. Rust.  Liquidated

10   damages is simply double the back wages.  So you asked him

11   about calculating liquidated damages on a shorter period, and

12   that's not the Court's understanding of the way it works

13   here.  Once you calculate the wages that were not paid, then

14   the liquidated damages simply double that, not for a shorter

15   period.  So the Court doesn't understand the question that

16   you asked.

17          MS. RUST:  Understood, Your Honor.  Our -- well, our

18   argument would be that even if there is discretion in the

19   period of -- to the extent the Court determines that

20   liquidated damages would be appropriate, there is discretion

21   to award for a limited period of time based on information,

22   and so the question is pertaining to whether that calculation

23   would be possible.

24          THE COURT:  Based on what limited period?

25          MS. RUST:  Well, it would go to -- well, I would ask

———————Y. Xiong - Cross———————

1     the Court to indulge.  This would be information that would

2     be presented in our defense as far as --

3            THE COURT:  Okay.  Well, then, you're asking him

4     something -- maybe you're asking him a question based on

5     facts that are not in evidence, is the reason the Court is

6     getting a little confused on what you're doing, but even the

7     question appears to the Court to be inconsistent with the way

8     you calculate liquidated damages.

9            Now, if you said the Court has some discretion about

10    what it does, then I think you probably would need to be

11    arguing that after you put on some evidence showing that

12    there is such a limited period on which you can base

13    calculated damages.  But I don't know that that's a question

14    for him.  That's a question the Court has to determine,

15    whether liquidated damages are appropriate.  We just need the

16    be facts.

17           MS. RUST:  I'm good with that.  Then that wraps up

18    my questions.  Thank you, Your Honor.

19           If the Court will permit.  Thank you.

20           (Pause in the proceedings.)

21           MS. RUST:  No further questions, Your Honor.  Thank

22    you.

23           THE COURT:  All right.

24           MS. LEWIS:  Very brief, as I'm aware of the time,

25    Your Honor.

─────Y. Xiong - Redirect─────

1                    REDIRECT EXAMINATION

2    BY MS. LEWIS:

3    Q.  You indicated that the workweek that you -- what was the

4    workweek again?

5    A.  The workweek ends on Sunday.

6    Q.  Okay.  And the entire workweek would be seven days?

7    A.  Yes.  The seven days would be Monday through Sunday.

8    Q.  Okay.  And you received that information from the

9    investigative file from Wage and Hour; is that right?

10   A.  Yes.

11   Q.  Directing your attention to Plaintiff's 43, I believe you

12   stated that --

13          MS. LEWIS:  If you could scroll to the top of the

14   page, Ms. Jones.

15   BY MS. LEWIS:

16   Q.  Can you see that document?

17   A.  Yes.

18   Q.  I believe you stated that you received that information

19   from the notes from the initial conference that was in the

20   investigative file; is that right?

21   A.  That's correct.

22   Q.  And is this the document with the notes --

23          MS. LEWIS:  Scrolling down, please, Ms. Jones.

24   BY MS. LEWIS:

25   Q.  -- that the investigator took at the initial conference?

─────Y. Xiong - Redirect─────

1        MS. LEWIS:  Is he frozen?

2   BY MS. LEWIS:

3   Q.  Did you hear me?

4   A.  Yes.

5   Q.  I thought you were frozen.

6        Are these the notes from the investigative file that

7   the investigator took that is part of the DOL file?

8   A.  Yes.

9   Q.  And this record was created within the regular course of

10  business?

11  A.  That's correct.

12  Q.  And this is a true and accurate representation of the

13  initial conference notes that was in the Wage and Hour

14  investigative file?

15  A.  Yes.

16        MS. LEWIS:  Your Honor, I move to admit

17  Plaintiff's 43.

18        MS. RUST:  I'm going to object as it's out of the

19  scope, and it's hearsay.  He did not make these notes.

20        MS. LEWIS:  Well, he's an agency representative.

21  The investigator, as the Court is aware, is unavailable.  We

22  can likewise designate the deposition testimony.

23        THE COURT:  If he's familiar with it and she's laid

24  the proper foundation -- and she has -- the document will be

25  admitted.

———Y. Xiong - Redirect———

1          MS. LEWIS:  Thank you.

2          THE COURT:  As a matter of fact, it's not outside

3    the scope because you did raise questions about when the week

4    began and, et cetera, when it ended, so it's not outside the

5    scope.

6          (Plaintiff's Exhibit PX-43 received in evidence.)

7    BY MS. LEWIS:

8    Q.  In terms of the regular rate calculation, you kept saying

9    the same formula over and over again.

10          Where does that formula that you used for

11   calculating regular rates -- where does that come from?  Did

12   you just make it up?  Where does it come from?

13   A.  It's within our regulation, the FOH, the Field Operations

14   Handbook, and also the 29 CFR.

15   Q.  And 29 CFR, that's the Federal Code of Regulations, is

16   what you're referring to?

17   A.  That's correct.

18   Q.  And in terms of if there was another rate, there was a

19   lot of questions, "Well, what if the rate was this," and if

20   there was another rate and the employer provided this, based

21   upon the information that you have received, did the employer

22   confirm that they were paying straight time?

23   A.  The employer did not confirm that they were paying

24   straight time, but for the record, it shows that the employer

25   did not make additional half-time payments to the workers for

504

1    the hours worked over 40.

2              MS. LEWIS:  All right.  No further questions for

3    this witness, Your Honor.

4              THE COURT:  May this witness be permanently excused?

5              MS. LEWIS:  Yes, Your Honor.

6              THE COURT:  I'm asking both counsel.

7              MS. RUST:  Oh, yes.

8              THE COURT:  All right.  Then you may be excused,

9    sir.  Thank you for coming.

10             THE WITNESS:  Thank you.

11             (Witness excused.)

12             MS. LEWIS:  Your Honor, if I may, Mr. Melendez was

13   likewise under subpoena to appear, even though he's also the

14   agency representative.  So I just wanted to make it -- that

15   he is in the clear to leave as well -- is that correct? --

16   after today?

17             THE COURT:  If the parties do not want an agency

18   representative here by --

19             MS. LEWIS:  Well, what I'm indicating is he may be

20   here -- it may be somebody else tomorrow.  He doesn't have to

21   keep coming back.

22             THE COURT:  Let's put it this way:  We don't need a

23   different agency representative in here every day.  You get

24   one, not multiple coming and going.  So if you want one here,

25   he's the man.  If you're not going to have one, you're not

505

```
 1    going to have one.  But we're not going to have multiple
 2    agency representatives bouncing in and out of here.
 3            MS. LEWIS:  So to clarify, Mr. Hampton, who is a
 4    solicitor, is he -- so that's what I'm referring to, because
 5    he'll be back.
 6            THE COURT:  The Court was never told he was the
 7    agency representative because I thought he was the deputy
 8    solicitor.
 9            MS. LEWIS:  Right.  The regional solicitor for the
10    Department of Labor, this region.  He's not testifying.
11            THE COURT:  Okay.  Well, he can come on back, but in
12    terms of sitting over there at that table, that means you
13    just don't have an agency representative.  That's all.
14            MS. LEWIS:  Understood.  Thank you.
15            THE COURT:  So if he wants to leave, he can leave,
16    but there's no other agency representative coming.
17            All right.  We will get started again tomorrow
18    morning at 10:00, and we'll see where we go.
19            All right.  Recess court.
20            (Proceedings adjourned at 5:04 p.m.)
21
22
23
24
25
```

```
 1                        CERTIFICATION

 2

 3        I certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled matter.

 5

 6

 7              _____/s/_____

 8                       Carol L. Naughton

 9                       October 4, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter