```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                       )
 4   MARTIN J. WALSH, SECRETARY OF     )
     LABOR, UNITED STATES              )
 5   DEPARTMENT OF LABOR,              )
                                       )
 6           Plaintiff,                )
                                       )        CIVIL ACTION NO.
 7   v.                                )            2:18cv226
                                       )
 8   MEDICAL STAFFING OF AMERICA,      )
     LLC, etc., et al.,                )
 9                                     )
             Defendants.               )
10   - - - - - - - - - - - - - - - - - -

11

12                  TRANSCRIPT OF PROCEEDINGS

13                  ** Bench Trial - Day 4 **

14                     Norfolk, Virginia

15                     September 3, 2021

16

17   BEFORE:   THE HONORABLE RAYMOND A. JACKSON
                United States District Judge
18

19   APPEARANCES:

20           UNITED STATES DEPARTMENT OF LABOR
             By:  Ryma N. Lewis
21                Chervonti Jones
                  Mohamed E. Seifeldein
22                Counsel for the Plaintiff

23           PIERCE McCOY, PLLC
             By:  Joshua L. Jewett
24                Julia A. Rust
                  Aaron D. Siegrist
25                Counsel for the Defendants
```

```
 1                          I N D E X

 2    PLAINTIFF'S
      WITNESSES                                    PAGE
 3
       LISA PITTS
 4          Direct Examination By Ms. Lewis         511
            Cross-Examination By Mr. Jewett         552
 5          Redirect Examination By Ms. Lewis       562
            Recross-Examination By Mr. Jewett       567
 6     CHRISTINE KIM
            Direct Examination By Ms. Jones         572
 7          Cross-Examination By Ms. Rust           599
            Redirect Examination By Ms. Jones       604
 8     PEYTON LEX
            Direct Examination By Ms. Jones         616
 9          Redirect Examination By Ms. Jones       625

10


11                       E X H I B I T S

12    PLAINTIFF'S
      NO.                                          PAGE
13
       PX-39                                        516
14     PX-17                                        517
       PX-24                                        522
15     PX-37                                        538
       PX-34                                        539
16     PX-19                                        540
       PX-16                                        542
17     PX-12                                        572
       PX-28                                        572
18     PX-9                                         588
       PX-11                                        591
19     PX-2                                         608
       PX-3                                         608
20

21

22

23

24

25
```

```
 1                (Proceedings resumed at 10:00 a.m.)
 2          THE COURT:  Good morning, counsel.  We are prepared
 3    to go forward this morning.
 4          MS. LEWIS:  Yes, Your Honor.
 5          THE COURT:  Call your first witness.
 6          MS. LEWIS:  Lisa Pitts, Your Honor.
 7          MS. RUST:  Your Honor, we --
 8          THE COURT:  Come up to the podium.
 9          MS. RUST:  Of course.
10          Your Honor, the Department notified us last night
11    that they had three witnesses on the schedule for today,
12    including Ms. Pitts and Ms. Kim, and another witness, First
13    Choice.
14          Ms. Kim was subpoenaed by the Department for
15    September 7th, for Tuesday, and Steadfast made a bunch of
16    rearrangements to the schedule to accommodate Ms. Kim to be
17    here on Tuesday, in light of the payroll schedule she has to
18    manage.
19          When the Department's case -- when it looked like
20    the pace of their witnesses was going to be moving quicker
21    and they might be finishing on Friday, we reached out and
22    said if you need her before Tuesday, we could try to work
23    with you and make her available on Friday.
24          The issue right now is that she needs to finish
25    running payroll by 1:30 today.  So we asked if she could be
```

1   put on as the first witness so that she could get back to the
2   office and finish running payroll, since we are making her
3   available and moving up.  We understand trial witness
4   schedules change a lot, and that's just par for the course,
5   but the Department is not willing to move her up to the first
6   witness.
7          THE COURT:  Okay.  First thing, the Court has
8   pressed the plaintiff to get through this case and to
9   eliminate witnesses.  So to the extent that the schedule is
10  changing, it's due and owing to the Court's taking the view
11  that it has in terminating cumulative witnesses.
12         Secondly, the Court doesn't tell either party the
13  order in which they should call witnesses.
14         The third thing is, it's like jury duty.  These
15  cases often end up being an inconvenience and an obstruction
16  to people who have to leave their private responsibilities
17  and come to court.
18         So what the Court is simply saying is the Court is
19  not going to tell them which witness to call first.
20  Christine Kim is going to have to work around it.  She'll
21  have to go back and finish payroll after 1:30, whatever.
22  Payroll may be delayed.  That's a consequence of these cases.
23         And so the Court is not going to compel them to move
24  the witness.  It's not going to do that.
25         MS. RUST:  Understood, Your Honor.  We just wanted

1    to make it on the record and make the Court aware that the

2    timely delivery of payroll would be jeopardized if Ms. Kim

3    has to testify longer than -- or if she has to wait around

4    longer than if she were to be put on first.

5            And we understand that this is often an

6    inconvenience for witnesses, and that's standard, but we were

7    hoping that there would be an accommodation as a professional

8    courtesy.  So we understand that Court's order.

9            THE COURT:  Well, it's obvious that you all haven't

10   worked together very well in this case, in any event, so

11   that's no surprise.  But I'm not going to order them to put

12   on one witness versus another.  Okay?

13           MS. RUST:  Understood.

14           THE COURT:  Do you have some response you want to

15   make?  If so, come around to the microphone.

16           MS. LEWIS:  Good morning, Your Honor.  I just want

17   to respond briefly, and not to dwell on this, but this case

18   has been continued three times.  Ms. Kim has been subpoenaed

19   three times.  They have known that this case was happening,

20   as the Department has, for years at this point.

21           If their practice is to run payroll on Fridays, then

22   it was incumbent upon defendants to make the appropriate

23   accommodations such that their employee witness was

24   available.

25           Defendants were notified on Wednesday at the Court's

L. Pitts - Direct

1    inquiry with respect to when the Department anticipated

2    concluding its case, and at that time, a reasonable person

3    would take a look at the employee witness list.  And Ms. Kim

4    has been identified repeatedly -- and we spoke about it on

5    Wednesday -- that we intended to call her on Thursday.

6           We did extend a professional courtesy of rearranging

7    our witnesses yesterday to not call Christine Kim because it

8    was represented by defendants that she would be available

9    today.  Last night, at approximately 11:59 p.m., we were

10   notified that she was not going to be available again today

11   because of their payroll processing.

12          Given the fact that defendants have had, within this

13   week, three conversations about it, any characterization of

14   lack of professional courtesy that's been put on the record,

15   the Secretary takes issue with because we have been as

16   accommodating as we could, given the movement of this trial.

17          THE COURT:  Thank you.  No, don't need any response.

18   This is over.  Let's get on with the witnesses.  Call the

19   first witness.

20          MS. LEWIS:  Ms. Lisa Pitts.

21          (Witness sworn.)

22          LISA PITTS, called by the Plaintiff, having been

23   first duly sworn, was examined and testified as follows:

24                         DIRECT EXAMINATION

25   BY MS. LEWIS:

L. Pitts - Direct

1  Q.  Good morning.  Would you please state your name for the

2  record.

3  A.  Lisa Pitts.

4  Q.  You're the owner and president and director of Medical

5  Staffing of America, doing business as Steadfast Medical; is

6  that correct?

7  A.  I'm a member.

8  Q.  I'm sorry?

9  A.  I'm a member.

10  Q.  And you're the owner as well?

11  A.  The LLC paperwork states I'm a member.

12  Q.  My question is:  You're the owner of the company; is that

13  correct?

14  A.  I'm an owner, but it doesn't state I'm an owner on the

15  LLC.  It says I'm a member.

16  Q.  So I'm going to ask you questions, and if you could, just

17  respond to that.

18       Are you the owner of Steadfast Medical?

19  A.  I'm a member on the LLC.

20  Q.  You own 100 percent of the company?

21  A.  I own 55 percent.  Someone else owns the rest.

22  Q.  I'm sorry.  You said you own how much?

23  A.  It's 55 or 60 percent.  My ex-husband is still up there

24  for the other 49 percent.  That was never changed.

25  Q.  Do you recall taking a deposition in this matter?

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    A.   Excuse me?

2    Q.   Do you recall being deposed in this matter?

3    A.   Yes, I do.

4    Q.   And you were deposed on multiple occasions, correct?

5    A.   Yes.

6    Q.   Do you recall being asked on January 23rd, 2019, that --

7    you had a deposition?

8    A.   Yes.

9         THE COURT:  The proper procedure here is to

10   determine whether she was under oath when she took the

11   deposition.

12   BY MS. LEWIS:

13   Q.   You were under oath when you took the deposition?

14   A.   Yes.

15   Q.   And at the deposition, you were questioned regarding your

16   percentage ownership of the company; is that correct?

17   A.   Yes.

18   Q.   And you were asked, "What percentage ownership do you

19   have in the company?"  And you responded, "100 percent."

20   Isn't that correct?

21   A.   Well -- yes.

22   Q.   Steadfast is a limited liability corporation; is that

23   right?

24   A.   Yes, it's registered as an LLC.

25   Q.   And its primary business location is at 5750 Chesapeake

L. Pitts - Direct

1    Boulevard in Norfolk, Virginia --

2    A.   Yes.

3    Q.   -- 23513?

4    A.   Yes.

5    Q.   And the core business activities for Steadfast is

6    providing medical personnel support services to healthcare

7    facilities on a per diem, short-term, and PRN basis to cover

8    facility needs?

9    A.   Yes.

10   Q.   And since at least August 18, 2015, Steadfast has had

11   contracts with over 50 facilities; is that right?

12   A.   Roughly.

13   Q.   And Steadfast places registered nurses, certified nursing

14   assistants, and licensed practitioner nurses in facilities

15   that are in need of nurses?

16   A.   Yes.

17   Q.   And Steadfast's gross annual income and revenue has been

18   over 500,000 every year since 2015.

19   A.   Yes.

20   Q.   In 2015, it was, based upon your tax return, $123,866.

21   A.   I'd have to see the tax return to say yes.

22   Q.   2016, over 2 million.

23   A.   Roughly.  I have to see the tax return to give you exact.

24   Q.   2017, over 5 million.

25   A.   Roughly.

515

L. Pitts - Direct

1    Q.   And 2018, '19, and '20, over 10 million.

2    A.   Roughly.

3    Q.   You've invested substantially into the business to grow

4    it and to make it what it is today?

5    A.   Yes.

6    Q.   You paid to have a website created?

7    A.   Yes.

8    Q.   Directing your attention to Plaintiff's 29.

9            MS. LEWIS:  Sorry, Your Honor.  Brief indulgence.  I

10   need to grab my exhibit list.

11           (Pause in the proceedings.)

12           MS. LEWIS:  39.

13           THE COURT:  What are we doing here?

14           MS. LEWIS:  We have a new captain at the ship, at

15   the computer here today.  I apologize, Your Honor.  Let me

16   help him out.

17           THE COURT:  Do you have a hard copy of what you're

18   trying to get him to put up on the screen?

19           MS. LEWIS:  Yes, Your Honor.  It's in the exhibit

20   binder under tab 39.  We have hard copies of everything.

21           Do you have it?  Go ahead and plug it in there.

22           And can you scroll down, please.

23   BY MS. LEWIS:

24   Q.   Back when the investigation started -- this is dated

25   9/21/2017 -- this is what your website looked like; isn't

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1   that correct?

2   A.  Yes.

3   Q.  And this is a true and accurate representation of the

4   website's imagery from 2017?

5   A.  Yes.

6          MS. LEWIS:  Your Honor, I move to admit

7   Plaintiff's 39.

8          THE COURT:  Any objection?

9          MS. RUST:  No objection.

10          THE COURT:  It will be admitted.

11          (Plaintiff's Exhibit PX-39 received in evidence.)

12   BY MS. LEWIS:

13   Q.  You lease office space for Steadfast's business office;

14   is that correct?

15   A.  Yes.

16   Q.  And you purchase office supplies?

17   A.  Yes.

18   Q.  You also pay for background checks, which in some cases

19   can go up to 5,000 or $6,000, for the nurses that work with

20   your company; is that right?

21   A.  Yes.

22   Q.  And you pay for the drug tests as well?

23   A.  Correct.

24   Q.  Coming back to the purchases, office supplies, and the

25   like, directing your attention to Plaintiff's 17.  And you

L. Pitts - Direct

1   keep track of the accounting in terms of the expenses of the

2   business.  You have an accountant that helps you to manage

3   the business, correct?

4   A.  He does everything.

5   Q.  And he prepares these profit-and-loss statements?

6   A.  Yes, he does.

7   Q.  And these are the -- going through, this is a true and

8   accurate representation of profit-and-loss statements for the

9   company for at least one year, 2019.  Is that accurate?

10  A.  I'm going to say approximately.  I don't know the exact

11  offhand.  Like I said, they are prepared by the CPA.  So I

12  don't remember the totals, but he prepared this for

13  Steadfast.

14  Q.  So it's a business record of Steadfast.

15          MS. LEWIS:  Your Honor, I move to admit 17.

16          MR. JEWETT:  No objection.

17          THE COURT:  17 will be admitted.

18          (Plaintiff's Exhibit PX-17 received in evidence.)

19  BY MS. LEWIS:

20  Q.  And you've networked.  We've talked about the number of

21  contracts you have.  You've networked to obtain these

22  contracts extensively; is that right?

23  A.  Depends.  There's a nursing shortage, so everyone calls

24  us.  Mostly referrals.

25  Q.  So as a CEO and owner of Steadfast, you're actively

L. Pitts - Direct

1    involved in the day-to-day operations of the company.

2    A.   Yes.

3    Q.   As an owner and CEO, you're over all operations of

4    Steadfast.

5    A.   Yes.

6    Q.   You're aware of the different type of individuals who

7    work for the company.

8    A.   Yes.

9    Q.   The individuals who support the operations of Steadfast.

10   A.   Yes.

11   Q.   Steadfast has employees that work in the office.

12   A.   Yes.

13   Q.   There's a receptionist.

14   A.   Yes.

15   Q.   Recruiters or schedulers.

16   A.   Yes.

17   Q.   There's someone responsible for payroll and accounting.

18   A.   Yes.

19   Q.   And there are also individuals who work out in the field

20   at facilities; is that right?

21   A.   Individuals?

22   Q.   Yes, individuals.

23   A.   No.

24   Q.   LPNs.

25   A.   Yeah, independent contractors, LPNs, RNs, and CNAs.

L. Pitts - Direct

1    Q.   So LPNs, RNs, and CNAs work out in the field.

2    A.   As independent contractors do.

3    Q.   My question is:  RNs, LPNs, and CNAs work out in the

4    field.

5    A.   Yes, they do.

6    Q.   And Steadfast maintains a list of those individuals with

7    notations regarding their eligibility to work.

8    A.   The independent contractors?

9    Q.   The nurses.

10   A.   The independent contractors, we do.

11   Q.   We're getting caught up on -- I'm asking this question

12   using a specific term.

13         Does Steadfast keep track of the nurses' eligibility

14   to work at specific facilities?

15   A.   Steadfast keeps track of the independent contractors to

16   work at the facilities, RNs, LPNs, and CNAs.

17         THE COURT:  Ms. Pitts, you don't have to keep making

18   your point that they're independent contractors.  The Court

19   is going to determine that at the end of this case.  She's

20   just asking you about the various professions and

21   occupations.  She hasn't asked you about the status.  So just

22   answer the question.

23         THE WITNESS:  RN, LPN, and CNA.

24   BY MS. LEWIS:

25   Q.   Are nurses LPNs and RNs and CNAs?  Right?

L. Pitts - Direct

1   A.   Yes.

2   Q.   And certified nursing assistants, they don't have the

3   same skills and qualifications.  So generically throughout

4   this, I'll refer to them all -- so I don't have to say

5   "nurses and CNAs," I'll just say "nurses."  Okay?

6          So Steadfast keeps a list of the nurses -- and I'm

7   referring to RNs, LPNs, and CNAs -- regarding their

8   eligibility to be placed out at the facilities with Steadfast

9   contracts; is that correct?

10  A.   Yes.

11  Q.   Directing your attention to Plaintiff's 24, do you

12  recognize this document?

13  A.   Yes.  It's a registry.

14  Q.   Do you recognize this document?

15  A.   Yes.

16  Q.   And this is a list of the nurses, LPNs, and CNAs that

17  Steadfast keeps track of that Steadfast provides placement

18  opportunities; is that correct?

19  A.   Yes.

20  Q.   And on this list --

21          MS. LEWIS:  Going back to the top, Mr. Seifeldein.

22  BY MS. LEWIS:

23  Q.   -- the headers you have here, you kept the nursing title;

24  is that right?

25  A.   Yes.

L. Pitts - Direct

1   Q.   CPR expiration and PPD expiration?

2   A.   Yes.

3   Q.   The license in which these individuals hold licenses

4   related to the type of nurse that they are?

5   A.   Yes.

6   Q.   Date of the license expiration?

7   A.   Yes.

8   Q.   You also have a column indicating whether or not they've

9   signed an independent contractor agreement.

10  A.   Yes.

11  Q.   You also have information related to their health status

12  and information that you guys have gathered within the course

13  of onboarding them at Steadfast and the drug screens.

14  A.   Yes.

15  Q.   And then there's also -- this is a newer one.  You have

16  the COVID status, whether or not they've been vaccinated or

17  otherwise.

18  A.   Yes.

19  Q.   And then there's a notes column.

20  A.   Yes.

21  Q.   Is this a true and accurate representation of the list

22  with notations regarding the nurses' eligibility to work that

23  Steadfast maintains?

24  A.   This is not the updated one.

25  Q.   Right.  But it's one of the lists.  You guys regularly

L. Pitts - Direct

1    update it, correct?

2    A.   Every day.

3    Q.   So this is at least one version.   This is how it looks.

4    A.   Yes.

5         MS. LEWIS:   Your Honor, I move to admit

6    Plaintiff's 24.

7         MR. JEWETT:   No objection.

8         THE COURT:   Plaintiff's 24 will be admitted.

9         (Plaintiff's Exhibit PX-24 received in evidence.)

10   BY MS. LEWIS:

11   Q.   Since at least August 18, 2015, you have classified these

12   nurses as independent contractors; is that right?

13   A.   Correct.

14   Q.   And to date, even with this litigation and the DOL's

15   investigation, they are still classified as independent

16   contractors.

17   A.   Correct.

18   Q.   They are paid the same rate for all hours worked.

19   A.   The rates vary.

20   Q.   Right, the rates vary, but in terms of the base rate,

21   that doesn't change.   In other words, you all don't pay

22   overtime for the independent -- for the individuals you've

23   classified as independent contractors; is that correct?

24   A.   Correct.

25   Q.   And all of these individuals, they are integral to

L. Pitts - Direct

1    Steadfast's business operations, which is providing medical

2    personnel on a per diem/PRN basis to healthcare facilities;

3    is that right?

4    A.   Correct.

5    Q.   And as such, Steadfast needs to regularly and actively

6    recruit these nurses for the business to keep going.

7    A.   Correct.

8    Q.   And as part of the application process, Steadfast

9    requires nurses to complete an application and also sign an

10   independent contractor agreement.

11   A.   Correct.

12   Q.   And every nurse that takes an assignment through

13   Steadfast is required to sign an independent contractor

14   agreement.

15   A.   Correct.

16   Q.   And as part of this agreement, in the interest of the

17   investment Steadfast has placed in recruiting and hiring

18   these nurses for placement opportunities at these facilities,

19   Steadfast discourages the nurses from working for

20   competitors.

21   A.   That's not true.

22   Q.   I'm going to direct your attention to Plaintiff's 36.

23   Take a moment to review those.  If you can look up at me once

24   you're done reading, or at least when you need Mr. Seifeldein

25   to scroll.

L. Pitts - Direct

```
 1          Is that your signature at the bottom of the
 2   document?
 3   A.  Yes.
 4   Q.  And you prepared this memo?
 5   A.  Sure did, yes.
 6   Q.  It's a true and accurate representation of a memo that
 7   was provided to the nurses that work with you?
 8   A.  Yes.
 9          MS. LEWIS:  Your Honor, I move to admit
10   Plaintiff's 36.
11          MR. JEWETT:  No objection.
12          THE COURT:  Well, first of all, that document does
13   not come into evidence.  You used that document to impeach
14   her, and impeachment items don't come into evidence.
15          MS. LEWIS:  Okay.
16          THE COURT:  So, now, you were using the document to
17   impeach her.  So what was your follow-up question?  I stopped
18   you on the admission, but do you have a question to follow
19   up?
20          MS. LEWIS:  No.  No further questions on this
21   document, Your Honor.
22          THE COURT:  Okay.
23          MS. LEWIS:  Well, maybe I do.
24   BY MS. LEWIS:
25   Q.  You indicated that you provided this document to nurses
```

L. Pitts - Direct

1   who work with Steadfast nurses -- I mean, nurses who

2   Steadfast sends out to facilities, right?  Strike that.  You

3   already answered that question.

4           As owner and CEO, you have taken the lead in

5   establishing relationships with healthcare facilities; is

6   that right?

7   A.  Yes.

8   Q.  And Steadfast has contracts with each of the facilities

9   in which CNAs, LPNs, and RNs are placed?

10  A.  Yes.

11  Q.  And you're the sole signatory on the contract Steadfast

12  enters into with these facilities?

13  A.  Correct.

14  Q.  Directing your attention to Plaintiff's 10, there's 115

15  pages here, so we're not going to go through all of them, but

16  these are some contracts that Steadfast has entered into with

17  facilities; is that right?

18  A.  Correct.

19          MS. LEWIS:  And just go to the last page,

20  Mr. Seifeldein.  Right there.

21  BY MS. LEWIS:

22  Q.  And as indicated, you signed this document.  You signed

23  the contract for Steadfast?

24  A.  Correct.

25  Q.  Directing your attention to the title by the signature

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1   line, you've identified yourself as CEO; is that right?

2   A.   Correct.

3   Q.   Because that's your title for Steadfast.

4   A.   CEO/member.

5   Q.   And these contracts are a true and accurate

6   representation of the contracts that Steadfast has entered

7   into with facilities?

8   A.   Correct.

9   Q.   And you've kept them in the regular course of business --

10  these contracts.

11  A.   Excuse me?

12  Q.   You've maintained these contracts.  In other words, you

13  have a copy of them at the office, and you keep them.

14  A.   Yes.

15  Q.   Okay.

16          MS. LEWIS:  Your Honor, I move to admit

17  Plaintiff's 10.

18          THE COURT:  That's already in evidence.

19          MS. LEWIS:  It is.

20          THE COURT:  Exhibit 10 is already in evidence.

21  BY MS. LEWIS:

22  Q.   As the owner and CEO of Steadfast, you're responsible for

23  the contact and negotiating contracts with the facilities; is

24  that right?

25  A.   Yes, I'm the liaison.

L. Pitts - Direct

1   Q.  And those contracts include terms and conditions which

2   nurses will work at those facilities.

3   A.  Excuse me.  Can you repeat that?

4   Q.  Sure.  No problem.

5           The contracts include the terms and conditions where

6   the nurses will work at the facility?

7   A.  Correct.

8   Q.  And the contracts specify how much the facility is going

9   to pay the nurses -- going to pay Steadfast?

10  A.  Correct.

11  Q.  And under the terms of those contracts, Steadfast is paid

12  a premium rate for holidays?

13  A.  Well, we haven't.  The facility has certain holidays that

14  pay the nurses -- independent contractor nurses, CNAs, and

15  all them, they pay them time and a half.

16  Q.  Let me repeat the question because I'm not sure you heard

17  it.

18          Under the contract, there is a pay rate sheet,

19  correct?

20  A.  Correct.

21  Q.  And under those pay rate sheets, on all of them there's a

22  premium rate that Steadfast is able to bill the facilities

23  for for holidays.

24  A.  Correct.

25  Q.  And under certain contracts, Steadfast also receives

L. Pitts - Direct

1   overtime pay for the facilities, if that's part of the

2   contract terms.

3   A.  No, that's never part of the contract terms.

4          MS. LEWIS:  Mr. Seifeldein, if you could scroll down

5   to -- let's show 112.  Let's try 101.

6          Your Honor, if I could take a moment.  This is

7   challenging.

8          (Pause in the proceedings.)

9   BY MS. LEWIS:

10  Q.  Directing your attention to PX-10.57, this is a rate

11  sheet that we had talked about earlier that every contract

12  has.  Some are different than others.

13         And for this particular facility, or these

14  entities -- I believe it's Bon Secours.  B-o-n S-e-c-o-u-r-s

15  is the name of the entity that owns a number of different --

16  has a number of different facilities.  Steadfast has the

17  ability to bill them for overtime -- isn't that correct? --

18  based upon this rate sheet?

19  A.  Yes.  That's their standard, what they give to every

20  facility.  Everyone who wants a contract with them, that's a

21  standard, but we don't -- they know we have independent

22  contractors, and we don't pay overtime.

23  Q.  There's a requirement within those contracts that

24  Steadfast provide professional liability insurance coverage

25  to personnel Steadfast places at the facilities.

—————————— L. Pitts - Direct ——————————

1   A.   No.   Steadfast has personal liability over Steadfast.

2           MS. LEWIS:   Mr. Seifeldein, if you could go up to

3   the first contract in the liability term section.

4   BY MS. LEWIS:

5   Q.   Directing your attention to Plaintiff's 3 and

6   paragraphs A and B, it specifies that "Steadfast must

7   maintain, during the terms of this agreement, any subsequent

8   renewals of general liability and professional liability

9   insurance coverage for all acts and omissions in the

10  provision of the designated services with limits of not less

11  than $1 million per occurrence and $6 million aggregate."

12          That's a standard term within all of the contracts.

13  The amounts and terms of the insurance may cover -- but the

14  requirement for Steadfast to maintain professional liability

15  is consistent in all the contracts.

16  A.   Yes.   Steadfast -- I spoke with an attorney.   Steadfast

17  Medical Staffing has insurance to cover --

18          MS. LEWIS:   Your Honor, I move to strike the

19  nonresponsive portion.   The question was:   Is that a standard

20  term?

21          THE COURT:   Just respond to her question.   If she

22  wants to know anything else, she will follow it up with a

23  question.

24          But for future procedures, a witness may answer

25  "yes" or "no" to a question and then respond.

L. Pitts - Direct

```
1              But otherwise, just respond to the question.
2              THE WITNESS:  Yes.
3   BY MS. LEWIS:
4   Q.  Directing your attention to Plaintiff's 28.  And
5   Steadfast has, indeed, complied with these requirements of
6   maintaining a Certificate of Insurance; is that right?
7   A.  Correct.
8   Q.  And this is a copy of an insurance certificate
9   identifying Steadfast's maintaining such professional
10  liability insurance.  Is that accurate?
11  A.  Correct.
12  Q.  And this is a true and accurate copy of the liability
13  insurance.
14  A.  Correct.
15             MS. LEWIS:  Scroll a little bit.  Keep going.
16  BY MS. LEWIS:
17  Q.  And Steadfast, within these insurance certificates, is
18  identified as a "nursing firm"; is that right?
19  A.  Yes.  At the time, that was the only bracket that we
20  filled in -- that we could come under, that title for that
21  insurance company.
22  Q.  Coming back to Plaintiff's 10, within these contracts
23  with the facilities, there's also a hold harmless clause
24  between the facilities and Steadfast regarding any acts of
25  negligence or actions by Steadfast nurses; is that right?
```

L. Pitts - Direct

```
 1   Are you familiar with those terms, indemnification clauses
 2   within these contracts that you entered into with the
 3   facilities?
 4   A.  I need to see it.
 5   Q.  Okay.  It's light there, but it's titled
 6   "Indemnification."  Do you see that?
 7   A.  Yes, I see that.
 8   Q.  Okay.  And that's a standard term in the standard
 9   contract, as we established yesterday, in most of the
10   contracts that you've entered into with Steadfast; is that
11   right?
12   A.  Correct.
13   Q.  There's also a requirement that Steadfast is to comply
14   with all laws, including the responsibility to pay the nurses
15   that Steadfast provides the PRN/per diem services within
16   these contracts, correct?
17           MR. JEWETT:  Objection.  Foundation.
18           THE COURT:  The objection is overruled.
19           THE WITNESS:  Can you repeat the question?
20   BY MS. LEWIS:
21   Q.  Sure.  No problem.
22           Within these contracts, there's also a requirement
23   including the responsibility that Steadfast is to pay the
24   nurses -- it's Steadfast's responsibility to pay the nurses
25   that it places at the facility; is that right?
```

L. Pitts - Direct

1   A.  Can you show me where that is?

2   Q.  Sure.

3        MS. LEWIS:  Mr. Seifeldein, go back up to the

4   responsibilities.

5   BY MS. LEWIS:

6   Q.  Paragraph H:  "Steadfast Medical shall assume sole and

7   exclusive responsibility for the payment of wages to such

8   contractors for services performed by them."

9        That's in every contract that you've entered into

10  with these facilities; is that right?

11  A.  Yes.

12  Q.  And there's also a requirement for Steadfast to complete

13  background screenings of nurses Steadfast places at

14  facilities.

15  A.  Correct.

16  Q.  And the facility is required to drug-test, which

17  Steadfast completes through a third-party service provider.

18  A.  Correct.

19  Q.  And some, if not all, of the contracts that Steadfast

20  enters into with these facilities require the facilities to

21  pay Steadfast if they want to hire Steadfast's nurses to work

22  there permanently.

23  A.  Repeat that, please.

24  Q.  Sure.

25        Some, if not all, of these contracts that Steadfast

L. Pitts - Direct

1    enters into with the facilities requires the facilities to

2    pay Steadfast if the facilities want to hire the nurses that

3    Steadfast places at those facilities.

4    A.   Correct.

5    Q.   And the rate that the facilities have to pay Steadfast

6    for permanent placement varies, or a change of employer; is

7    that right?

8    A.   Excuse me?

9    Q.   Sure.

10           The rate that the facilities have to pay, it varies.

11   There's different --

12   A.   Correct.  Correct.

13   Q.   Some contracts, directing your attention to 15 of

14   Plaintiff's 10 --

15           MS. LEWIS:  Scroll down, please, Mr. Seifeldein.

16   BY MS. LEWIS:

17   Q.   -- require RNs to be paid 4,000 -- paragraph B -- LPNs,

18   3,000; and CNAs, 2,000.  That's one of the ranges, right?

19   A.   Correct.

20   Q.   Other contracts require a minimum of a 60-day notice to

21   Steadfast; otherwise, the facilities are required to pay

22   Steadfast the rate that you all mutually negotiate and

23   determine.

24   A.   Correct.

25   Q.   So there's a number of terms that are standard in these

L. Pitts - Direct

1    contracts.  Also among the terms and conditions that you

2    negotiate is a rate that Steadfast is paid for providing

3    temporary nurses at the facility; is that right?

4    A.  Can you repeat the question.

5    Q.  Sure.  Let me ask it differently.

6          The amount Steadfast pays nurses is less than the

7    amount the facilities pay Steadfast.

8    A.  Correct.

9    Q.  And to ensure predictability regarding -- or some level

10   of predictability regarding the amount of profit Steadfast

11   receives, you establish the range which to pay the nurses.

12         In other words, there's a set amount that the

13   facility pays you, and you've decided, okay, in order for me

14   to make a profit, this is the most I can afford to pay a

15   nurse for going into that facility.

16   A.  Correct.

17   Q.  As the CEO of Steadfast, to ensure proper business flow,

18   you develop and establish certain payroll policies in terms

19   of the way that Christine Kim is supposed to manage payroll;

20   is that right?

21   A.  Correct.

22   Q.  So coming back to the office, or, really, all of the

23   individuals that support Steadfast, they are paid an hourly

24   rate.

25   A.  In the office?

L. Pitts - Direct

1    Q.   In the office and in the field, everybody gets paid

2    hourly --

3    A.   Yes.

4    Q.   -- there's nobody on salary.

5            And occasionally, office employees work over 40

6    hours in a single workweek -- office.

7    A.   Excuse me?

8    Q.   Yeah, office employees.

9    A.   Okay.  Can you repeat the question?

10   Q.   Sure.

11           Occasionally, office employees work over 40 hours in

12   a workweek.

13   A.   Correct.

14   Q.   And when those office employees work over 40 hours in a

15   single workweek, Steadfast has paid them time and a half for

16   those overtime hours.

17   A.   Repeat the question.

18   Q.   So when the office employees have worked over 40 hours in

19   a single workweek, Steadfast pays them time and a half for

20   hours worked over 40.

21   A.   Correct.  I'm just trying to make sure I hear you.

22   Q.   No.  It's my long...

23   A.   Yeah.

24   Q.   In terms of Steadfast knowing about the obligation to pay

25   overtime, Steadfast knows that if it's an employee, you have

L. Pitts - Direct

1    to pay time and a half.

2    A.  Correct.

3    Q.  As owner and CEO of Steadfast -- as the CEO of Steadfast,

4    you're aware of how payroll is processed.

5    A.  Correct.

6    Q.  You've developed, directed, and implemented the processes

7    for processing payroll that whomever your payroll manager is

8    or your staff is, they know what to do.  They know the

9    established procedures for processing payroll.

10   A.  Correct.

11   Q.  You've sent out reminders and memos to employees about

12   submitting their time sheets.  Steadfast has sent out

13   reminders and memos to nurses about submitting their time

14   sheets.

15   A.  Correct.

16   Q.  Directing your attention to Plaintiff's 37.  And it goes

17   out in a big blast on occasion.  It looks like this at the

18   top --

19          MS. LEWIS:  Scroll down, please.

20   BY MS. LEWIS:

21   Q.  -- with various reminders about "You need to submit

22   time" --

23          MS. LEWIS:  Go back up to the last one, please.

24   Scroll down, please, to the blue text.

25   BY MS. LEWIS:

L. Pitts - Direct

1   Q.  -- "Reminder:  Make sure you get your time sheets in.

2   It's a holiday."

3           This is very similar of the type of reminders that

4   Steadfast sends; is that right?

5   A.  Can you scroll down?

6   Q.  Oh, it's the blue text.

7   A.  Excuse me?

8   Q.  The blue text, can you see it?

9   A.  Oh, okay.  Yes.

10  Q.  And these reminders that are contained within this

11  exhibit are true and accurate representations of the

12  reminders that Steadfast sends out in terms of timely

13  submitting time sheets.

14  A.  Correct.

15  Q.  And they are made within the regular course of

16  Steadfast's business; is that right?

17  A.  Excuse me?  What did you say?

18  Q.  I said they are made within the regular course of

19  business.

20  A.  Yes.

21          MS. LEWIS:  Your Honor, I move to -- we already --

22  did we do 37?

23          Move to admit Plaintiff's 37.

24          MR. JEWETT:  Your Honor, we don't object to the

25  admission of the one shown, but they've only shown Ms. Pitts

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    a quarter of the memos.

2         THE COURT:  Well, she's only moving to admit this

3    memo, right?

4         MS. LEWIS:  No, the entire 37.  So there's 43

5    similar e-mails in here.  So if we want to take the time,

6    there's a binder behind her that it may be faster for her to

7    flip through.

8         THE COURT:  The whole point is that she sends

9    information to the nurses and the RNs to remind them to file

10   their time sheets and et cetera, and this is an example, and

11   the Court overrules the objection.

12        The document is admitted.

13        (Plaintiff's Exhibit PX-37 received in evidence.)

14   BY MS. LEWIS:

15   Q.  Since April 2019, Steadfast has a pay practice called

16   "Next Day Pay"; is that right?

17   A.  Correct.

18   Q.  With Next Day Pay, nurses are able to be -- are supposed

19   to be paid or have an option to be paid outside of their

20   regular established payday, which, as we've talked about

21   today, is typically Friday; is that correct?

22   A.  Yes, it's typically Friday.

23   Q.  Right, a typical payday is Friday, but on Next Day Pay,

24   you can submit your time sheet on Monday and, ideally, get

25   paid on Tuesday.  That's the way it works.

L. Pitts - Direct

1   A.   Yes.  And you also can submit your time that day, and
2   sometimes we pay out that day.
3   Q.   Okay.  Directing your attention to Plaintiff's 34.  And
4   back in -- I think I initially said April 2019, but here it
5   looks like beginning February 2019, that's when you all
6   started to offer Next Day Pay.
7   A.   Correct.
8   Q.   And this memo was sent out to nurses that work with
9   Steadfast letting them know we have this new option available
10  for you all.
11  A.   Correct.
12  Q.   And this is a true and accurate representation of the
13  memo that was sent out advising the nurses that this option
14  was available.
15  A.   Correct.
16        MS. LEWIS:  Your Honor, I move to admit
17  Plaintiff's 34.
18        MR. JEWETT:  No objection.
19        THE COURT:  Plaintiff's 34 will be admitted.
20        (Plaintiff's Exhibit PX-34 received in evidence.)
21  BY MS. LEWIS:
22  Q.   You, also, as CEO of Steadfast, oversee the payroll
23  accounts for the company; is that right?
24  A.   Yes.
25  Q.   Directing your attention to Plaintiff's 19.  And you're

L. Pitts - Direct

1    the signatory for those accounts.  You're the only signatory

2    for the payroll accounts.

3    A.  Correct.

4    Q.  And those accounts are through BB&T; is that right?

5    A.  Correct.

6    Q.  Is this a sampling of some of the payroll accounts

7    that -- the checking accounts that payroll is processed

8    through?  Is that correct?

9    A.  Correct.

10            MS. LEWIS:  Your Honor, I move to admit

11   Plaintiff's 19.

12            MR. JEWETT:  No objection.

13            THE COURT:  Plaintiff's 19 will be admitted.

14            (Plaintiff's Exhibit PX-19 received in evidence.)

15   BY MS. LEWIS:

16   Q.  Additionally, you all also use ADP to support your

17   payroll processing; is that right?

18   A.  Correct.

19   Q.  Directing your attention to an exhibit previously marked

20   as Plaintiff's 16, you reach out to ADP to make certain

21   changes to the ADP management side of the nurses' information

22   that is input there for payroll processing; is that right?

23   A.  Correct.

24   Q.  You've inquired about setting up child support

25   garnishments for 1099s with ADP.

————— L. Pitts - Direct —————

1    A.  Correct.

2    Q.  You've approved or directed employee address changes --

3    I'm sorry.

4           You've approved or directed address changes for

5    CNAs, LPNs, and RNs through ADP, the communications that you

6    had.

7    A.  Correct.

8           MS. LEWIS:  Scrolling down a bit further.  Right

9    there at the top of the page.

10   BY MS. LEWIS:

11   Q.  You're able to generate through ADP, at your direction or

12   with their assistance, a document that is called a "Change

13   Report."

14   A.  Exactly, correct.

15   Q.  And on this ADP report, it identifies a hire and term

16   date for, i.e., when they were entered into the payroll for

17   Steadfast.

18   A.  Correct.

19   Q.  And also other identifying information for each nurse

20   that works with Steadfast.

21   A.  Yes, in the ADP form.

22   Q.  In the ADP form.

23   A.  In their form, yes.

24   Q.  And this is a true and accurate representation of these

25   Change Reports, communications, and the like that Steadfast

—————————————— L. Pitts - Direct ——————————————

1   has had with ADP.

2   A.  Correct.

3           MS. LEWIS:  Your Honor, I move to admit

4   Plaintiff's 16.

5           MR. JEWETT:  No objection.

6           THE COURT:  It will be admitted.

7           (Plaintiff's Exhibit PX-16 received in evidence.)

8   BY MS. LEWIS:

9   Q.  In the processing of payroll, you also regularly review

10  payroll to ensure accuracy of the rates that the nurses are

11  paid and the pay that they are receiving.

12  A.  Correct.

13  Q.  And as owner and CEO of Steadfast, you're concerned about

14  the company's reputation.

15  A.  Correct.

16  Q.  And that reputation flows from the nurses that are placed

17  at the facilities by Steadfast schedulers.

18  A.  It flows from everybody; in-house, everybody.

19  Q.  Everybody.

20          So from time to time, you've sent out memos to

21  nurses about Steadfast's expectation about how they should

22  conduct themselves when Steadfast places them in those

23  facilities.

24  A.  That's not correct.

25  Q.  I want to direct your attention to Plaintiff's 33.

L. Pitts - Direct

```
1            Going to the top of this memo, this is on
2    Steadfast's letterhead, correct?
3    A.  Correct.
4    Q.  Going to the bottom of this page, that's your signature
5    there, right?
6    A.  Correct.
7    Q.  Going to the actual text of what this document is talking
8    about, do you recognize this document?
9    A.  Yes.  The facility asked us to send a memo out.
10   Q.  So my question was:  Do you recognize this document?
11   A.  Yes, I do.  Yes, I do.
12   Q.  And the document says:  "No sleeping in residents' rooms.
13   Some residents have cameras in the room."
14           You sent out that memo, correct?
15   A.  Correct.
16           MS. LEWIS:  And go to the next one on Page 2,
17   please.
18   BY MS. LEWIS:
19   Q.  Another memo of the same effect, on Steadfast's
20   letterhead, and it's called "Memo of the Week," 2/17/2017.
21           "If you need to reach Lisa, please call her."  And
22   it's your number listed.  "You can contact her 24 hours a
23   day, seven days a week, 24/7.  Absolutely no sleeping on the
24   job.  If caught, you will be reported to the Board of
25   Nursing.  It is called neglect."
```

```
                            L. Pitts - Direct
```

 1            And you signed this memo, too?

 2   A.  Correct.

 3            MS. LEWIS:  Going to the next one, please.

 4   BY MS. LEWIS:

 5   Q.  Again, on Steadfast's letterhead; is that right?

 6   A.  Correct.

 7   Q.  And on this memo, it indicates:  "Please chart on all

 8   residents before leaving the facility."  There's a cute

 9   little JPEG image there.  And scrolling down some more,

10   there's your signature again.

11   A.  Correct.

12   Q.  And you also have a note there again reminding about when

13   they need to submit time sheets and to whom.

14   A.  Correct.

15   Q.  So coming back to the top of my first question, Steadfast

16   sends a memo of the week; is that correct?

17   A.  No.

18   Q.  Okay.  Let's go back to this one, because this is another

19   memo of the week dated August 26, 2016.  This one is a

20   couple -- the same blurb at the top, providing the office

21   number.  "If you need to reach Lisa, call her at this number

22   24 hours a day, seven days a week."

23            The memo says:  "No smoking on facility grounds.  No

24   cell phones on the facility.  No exceptions.  No head wear in

25   the facility; scarfs, hats, headbands, et cetera.  Leave

─────────── L. Pitts - Direct ───────────

```
 1    copies of time sheets to scheduler.  Please be" -- in all

 2    caps -- "on time for each shift.  Time slips must be in the

 3    office by Monday," a time sheet reminder, and again, your

 4    signature -- no, not on this one.

 5            MS. LEWIS:  Keep scrolling, please.

 6    BY MS. LEWIS:

 7    Q.  Here's another memo just directing -- dated July 14,

 8    2017, again, about how to communicate with Steadfast, what

 9    the expectations are.

10            Do you recognize this document?

11    A.  Yes.

12    Q.  Signed by you?

13    A.  Yes.

14    Q.  As CEO?

15    A.  Yes.

16            MS. LEWIS:  Next page, please.

17    BY MS. LEWIS:

18    Q.  This one is a reminder about nurses working at certain

19    facilities, and the second bullet point says:

20            "If you're asked to" -- "If you're asked who you

21    work for, please let them know you're contracted through

22    Atlantic Shores and your supervisor is LaShawn."

23            This is a memo that Steadfast -- you sent out and

24    signed June of 2017, reminding them that they are contracted,

25    not employees of that facility, correct?
```

─────────────── L. Pitts - Direct ───────────────

1   A.   Scroll the memo up, please.

2          No.   They are contracted through Atlantic Shores.

3   Q.   Right, contracted.

4   A.   Yeah.

5   Q.   Not employees.

6          MS. LEWIS:   Going to the next page, please.

7   BY MS. LEWIS:

8   Q.   This is another memo of the week dated --

9          THE COURT:   Now, if your intent was to impeach the

10  witness on whether she gave instructions and et cetera to

11  these nurses and LPNs, you've gone through about five of

12  these now.

13         MS. LEWIS:   Well, when I was going through it, she

14  still indicated that she hadn't.   So I wanted to -- sorry.

15         THE COURT:   Even though she says she has not and

16  you've shown multiple ones, you can move on.

17         THE WITNESS:   I didn't say I had not.   I didn't say

18  I had not.   I said I was instructed by the facility to send

19  certain memos.

20         MS. LEWIS:   Keep scrolling, please.

21  BY MS. LEWIS:

22  Q.   So since at least August 18, 2015 -- strike that.

23         Steadfast didn't consult with any personnel within

24  the Department of Labor to determine whether their

25  compensation and overtime policies which had been in effect

L. Pitts - Direct

1   since August 18, 2015, have complied with the FLSA; is that

2   right?

3   A.   I consult with my attorneys.

4   Q.   My question was:  Steadfast did not consult with anyone

5   in the Department of Labor to determine whether their

6   compensation, meaning Steadfast's compensation, and overtime

7   policies which have been in effect since August 18, 2015,

8   complied with the FLSA.

9            In other words, you didn't talk to anybody at the

10  Department of Labor about your policies that were in effect

11  in 2015, correct?

12  A.   What policies?  See that's --

13  Q.   Your pay policies, your compensation policies, the reason

14  we're here.  You haven't talked to anybody at the Department

15  of Labor --

16  A.   No --

17  Q.   -- you didn't talk to anyone in 2015 --

18  A.   -- I talked to my attorney.

19  Q.   My question was at the Department of Labor.

20           THE COURT:  Okay.  That's three times.  Ms. Pitts,

21  answer the question, and then if you need to explain,

22  explain.  But answer the question.  We're not going to keep

23  going over and over --

24           THE WITNESS:  I don't understand the question.

25           THE COURT:  What?

L. Pitts - Direct

1        THE WITNESS:  I didn't understand it.

2        THE COURT:  The question was very clear.  Have you

3   spoken or did you consult with anyone at the Department of

4   Labor about how you were paying your wages and whether they

5   were in compliance with the FLSA?  That's what the question

6   is.

7        THE WITNESS:  When they came to my office.

8   BY MS. LEWIS:

9   Q.  In 2015?

10  A.  That's when they came to the office.

11  Q.  Directing your attention to the Request for Admission,

12  Number 8.

13       Do you recall receiving written discovery in this

14  matter?

15  A.  Personally, my attorneys received everything.  So I don't

16  remember seeing this.  I know we had that.  They flashed it.

17  They showed me what came from the Department of Labor, but I

18  didn't read it.  My attorneys were handling this.

19  Q.  So you signed -- within this discovery, you indicated

20  that you had not spoken to any -- let me go back.

21       Discovery was sent, propounded in this matter,

22  correct, sent to defendants in this matter, sent to you?

23  A.  Yes, to my attorneys.

24  Q.  Okay.  And they provided answers to those discovery

25  responses.

549

L. Pitts - Direct

```
 1    A.  Correct.
 2    Q.  And you had to review and sign the answers with a sworn
 3    affidavit indicating that those answers were truthful and
 4    accurate.
 5    A.  Correct.
 6    Q.  And one of those requests was whether or not you,
 7    defendants, had discussed the compensation policies with the
 8    Department of Labor, and you admitted that you had not.
 9    A.  Yeah, but when they came to my office, they discussed
10    everything.  When they first came to my office and did their
11    investigation, they discussed the things with me.
12    Q.  You also talked with colleagues, other businesses, such
13    as WTS and First Choice, about compensation practices of
14    registries and agencies; is that right?
15    A.  No.  I haven't discussed anything with WTS.
16    Q.  First Choice?
17    A.  I talked to him because he asked about my business.
18    That's the last time that I talked to him.
19    Q.  Do you recall being in a deposition on February 21st with
20    the Department of Labor?
21    A.  Repeat the question.
22    Q.  Do you recall having a deposition with the Department of
23    Labor again on February 21st --
24    A.  Correct.
25    Q.  -- 2019?
```

———— L. Pitts - Direct ————

1   A.   Correct.

2   Q.   Directing your attention to --

3          MS. LEWIS:  Go to the very beginning.

4          If I could help him.  Thank you.

5          (Pause in the proceedings.)

6   BY MS. LEWIS:

7   Q.   And you were sworn and you were under oath at that

8   deposition, correct, to testify truthfully and accurately?

9   And at the deposition, you were asked:  "Okay" --

10          THE COURT:  Ms. Lewis, you asked the witness a

11   question and never permitted her to answer your question.

12          MS. LEWIS:  My apologies.

13   BY MS. LEWIS:

14   Q.   Were you under oath at that deposition?

15   A.   Yes, I was.

16   Q.   And at that deposition, you were asked:

17          "Okay," question, "aside from WTS and your

18   attorneys, did you speak to anyone else about how you pay

19   these individuals?"

20          And you answered:  "Yeah.  Yes.  I spoke to First

21   Choice Nursing."

22   A.   Yes.  We talked about that when he offered to buy my

23   company.  We talked about pay rates and what I was paying my

24   nurses.

25   Q.   So you participated in a final conference with the

---

L. Pitts - Direct

1   Department of Labor that was in 2018.  That was when you met

2   with Investigator Mazuera; is that right?

3   A.  Yes.

4   Q.  And at that conference you were informed, as a result of

5   the Department of Labor's investigation, DOL was making a

6   finding that Steadfast's pay practices violates the FLSA.

7   A.  Yes.

8   Q.  Do you recall that discussion?

9   A.  Yes.

10  Q.  But after that conference, you continued to pay straight

11  time for all hours worked to nurses.

12  A.  Correct.

13  Q.  And you continued to do so to this day.

14  A.  Correct.

15  Q.  After the Department of Labor filed suit in this matter,

16  you haven't changed your practices, your pay practices.

17  A.  Because my attorneys told me I didn't have to.

18  Q.  You continue to treat every new nurse that is placed and

19  works at the facility that Steadfast places them with as

20  independent contractors.

21  A.  Correct.

22  Q.  And so you've continued to classify these nurses as

23  independent contractors after your conference with the

24  Department of Labor and suit has been filed in this matter.

25  A.  Correct.

---

L. Pitts - Cross

1          MS. LEWIS:  No further questions for this witness.
2                    CROSS-EXAMINATION
3    BY MR. JEWETT:
4    Q.  Hello, Ms. Pitts.
5    A.  Good morning.
6    Q.  I have just a few questions for you based on your
7    testimony.
8          Do you recall Ms. Lewis asked you if you ever
9    consulted with the Department of Labor about your practices?
10   A.  Correct.
11   Q.  Okay.  And you had a little trouble with that question.
12   I'm going to actually clarify the question for you.  Okay?
13   A.  Okay.
14   Q.  Did you ever call the Department of Labor and ask them if
15   you're complying with the law?
16   A.  No, sir.
17   Q.  Did you ever send them an e-mail or letter and ask them
18   if you're complying with the law?
19   A.  No, sir.
20   Q.  Okay.  Ms. Lewis showed you a series of memos.  Do you
21   recall that?
22   A.  Yes.
23   Q.  She pointed out that the top of, maybe, several of the
24   memos said "Memo of the Week."
25   A.  Uh-huh.

———————L. Pitts - Cross———————

1   Q.  Do you actually send a memo every week?

2   A.  No.

3   Q.  She also showed you an e-mail about reminders about time

4   sheets.  Do you recall that?

5   A.  Yes.

6   Q.  Why are those sent out?

7   A.  Because it was a lot of issues with the facility not --

8   they have to leave a copy of the time sheets at the facility,

9   and they wasn't leaving them at the facility.  We were

10  getting the time sheets.  We had to give them back to the

11  facility.  And getting them paid by a certain time could not

12  happen unless we get the time sheets in a timely manner.

13  Q.  If a nursing registry were to not submit a time sheet on

14  time, would that jeopardize the nurse's ability to get paid

15  on time?

16  A.  Correct.

17          MS. LEWIS:  Objection.  Confusing.  I'm not sure I

18  understood the question.

19          THE COURT:  Hold a second.  The Court didn't

20  understand.

21          MR. JEWETT:  Sure.

22          THE COURT:  The Court didn't understand the

23  question, either.  So now you can start again.

24          MR. JEWETT:  Yes, sir.

25  BY MR. JEWETT:

─────L. Pitts - Cross─────

1  Q.  Ms. Pitts, my question is:  If the nurse failed to submit

2  the time sheet on time, would that jeopardize the nurse's

3  ability to get paid on time?

4  A.  Correct.

5  Q.  Ms. Lewis asked you about some of the employees in your

6  office.

7  A.  Correct.

8  Q.  Do you remember that?

9  A.  Correct.

10 Q.  She asked you if there were hourly employees.

11 A.  Correct.

12 Q.  What about Christine Kim?  Is she paid hourly or salary?

13 A.  She was paid hourly, and now she's salary.  We moved her

14 to salary.

15 Q.  Thank you for that clarification.

16        Okay.  Ms. Lewis also asked you some questions about

17 professional liability or malpractice coverage.  Do you

18 recall that?

19 A.  Yes.

20 Q.  Do you have professional malpractice liability coverage

21 for all 800-plus nurses on your registry?

22 A.  No.  It's only for Steadfast Medical Staffing, to protect

23 the name and the brand of the company.

24 Q.  What do you base that on?

25 A.  Well, I spoke with an attorney, and I thought I had to

1    have it on everyone, and he said you've got to protect the

2    company because in the healthcare industry when they sue,

3    they sue everybody.  They're going to sue your company.

4            THE COURT:  Excuse me.  You know that's all hearsay,

5    what the attorney said.  So just answer his question.  You

6    can indicate you consulted with counsel, but you can't go

7    into what he said to you.

8            THE WITNESS:  I consulted with counsel.

9    BY MR. JEWETT:

10   Q.  Thank you.

11           Okay.  Ms. Lewis showed you a document that I

12   believe was marked as Plaintiff's 36.  This was a letter that

13   you sent out regarding Tammi Odom.  Do you recall that?

14   A.  Yes, sir.

15   Q.  Who is Tammi Odom?

16   A.  She used to be my assistant.

17   Q.  She wasn't a nurse?

18   A.  No, sir.

19   Q.  And why did you send that letter out?

20   A.  Because she had went in my office, stole all of our

21   paperwork to start our company, and she went to start her own

22   company and used all our paperwork.  And then she was going

23   to get contracts and saying she was part of Steadfast, her

24   company Steadfast was a joint company, and she did it with

25   Corrections, and it caused a big mess.

L. Pitts - Cross

 1          And they was asking me questions about that, and I
 2     said, "I don't know anything about it."  So that's why we had
 3     to put something so we didn't get blamed if something
 4     happened.
 5          MR. JEWETT:  Thank you, Ms. Pitts.  I have no
 6     further questions.
 7          THE WITNESS:  Thank you.
 8          THE COURT:  The Court has a series of questions
 9     here.  You may have a seat.
10          The Court is a little confused about something.
11     Have you always considered all the nurses, LPNs, and CNAs
12     that you hire at Steadfast to be independent contractors?
13          THE WITNESS:  Yes, sir.
14          THE COURT:  I notice on Exhibit 16 -- I think it's
15     Exhibit 16.  It's called a Change Report.  Can we go back to
16     Exhibit 16, please.  I think it's the Change Report.
17          MS. LEWIS:  Yes.  It's connected.
18          THE COURT:  Employee Change Report.
19          THE WITNESS:  This is from ADP.
20          THE COURT:  From ADP.
21          THE WITNESS:  Yes, sir.  It's not Steadfast.  I had
22     to use their forms.
23          THE COURT:  Can we go back to the agreement that
24     Steadfast has with, I think it's Princess Anne.  That's
25     probably it.  I wanted to put that agreement back up on the

───────────────L. Pitts - Cross───────────────

 1    screen, please.  I have some questions about it.

 2              THE WITNESS:  The MFA form.

 3              THE COURT:  I think it came out during the testimony

 4    of Erica Johnson, the representative from Princess Anne.

 5    That's when that report --

 6              MS. LEWIS:  I have it up, Your Honor.

 7              THE COURT:  Okay.  Can you scroll through the report

 8    very slowly for the Court.  Keep going.  Keep going.

 9    Continue.  Continue.  Keep up.  Hold.  Hold up a second.

10    Keep on moving.

11              MS. LEWIS:  Next page, Your Honor.

12              THE COURT:  Next page.  Keep moving.  Keep moving.

13    Continue.  Continue.  Okay.  Stop right there for the time

14    being.

15              In this paragraph, you indicate the supplemental

16    staffing service would maintain through the term of the

17    agreement certain insurances:  commercial general liability,

18    automobile liability, Workers' Compensation, employer's

19    liability, fidelity bond, umbrella liability, and cyber

20    liability.  Is that correct?

21              THE WITNESS:  Yes, that's what it states.

22              THE COURT:  That Workers' Compensation, do you pay

23    Workers' Compensation for independent contractors?

24              THE WITNESS:  Yes.  By law, we have to.

25              THE COURT:  You've always done that?

                              ─────L. Pitts - Cross─────

1              THE WITNESS:  From day one, sir.

2              THE COURT:  And you were told you had to do that.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Okay.  Continue.  Next page.  Hold it.

5      Continue.

6              Now, in this paragraph 10, it says that it's

7      "specifically understood and agreed that temporary personnel

8      assigned by supplemental staffing service to the healthcare

9      center is the sole employee of" -- not independent

10     contractor -- "sole employee of supplemental staffing service

11     and not an employee or joint employee of the healthcare

12     center."

13             It doesn't say "independent contractor."  It just

14     says "the sole employee of supplemental staffing service,"

15     which is Steadfast, "and not an employee or joint employee of

16     the healthcare center."

17             Did you read this contract before you signed it?

18             THE WITNESS:  I sent them my contract.  It was done

19     at their corporate office in Roanoke.  I sent -- they

20     inquired about us staffing all the facilities.  I sent them

21     our contract.  They said they have a standard contract for

22     all the staffing agencies, if you want to do business with

23     them.

24             They also said -- I said, "Well, I have independent

25     contractors.  We don't take out taxes."  He said --

1          THE COURT:  Ms. Pitts, this is your contract.  No

2     matter where you got it from, this is your contract, and it

3     says that they're the sole employee of the supplemental

4     staffing service, which is Steadfast.

5          THE WITNESS:  This is not my contract.  This is

6     MFA's contract that they sent me that I had to sign.

7          THE COURT:  That they sent you and you signed it.

8          THE WITNESS:  Yes, sir.  I sent them my contract,

9     and they said, "We can't use your contract because we have a

10    standard contract that's drawn up by the attorneys in Roanoke

11    that everybody has to use."

12         THE COURT:  So you signed the contract saying that

13    the LPNs and RNs, the folks you send out there from

14    Steadfast, were employees of Steadfast.

15         THE WITNESS:  He told me to put in the -- in our

16    rate sheet that's attached, to put it up there that they are

17    all independent contractors.  They can't change theirs.

18         THE COURT:  Thank you.

19         Keep scrolling on through there.  Hold up.  Keep on

20    moving.  I still haven't found what I'm looking for.  So keep

21    rolling.  Keep moving.  Continue to move.  Is that the end of

22    it?  Hold it.  Back up.  Continue on through it.

23         Okay.  The Court was looking through this document.

24    The Court recalled, when that document came up on the screen,

25    a paragraph being in there that specifically said that the

———— L. Pitts - Cross ————

1  people, the LPNs and et cetera, were the employees of

2  Steadfast, and the Court may not find it now, but the Court

3  will have time to go back and look at it.  That's what the

4  Court was looking for.

5          MS. LEWIS:  Your Honor, we know where it's at.  We

6  can direct you to it.

7          THE COURT:  That's the paragraph the Court was

8  looking for in this agreement.  It said in clear terms that

9  they were the employees of Steadfast.  We're not going to

10 spend any more time trying to find it.  The Court will review

11 the document at a later point.

12         MS. LEWIS:  I think this is what you were looking

13 for, Your Honor.

14         THE COURT:  An Acknowledgment and Waiver.  This is a

15 sample.  Is this Acknowledgment and Waiver signed by all

16 people who work for Steadfast out in the field?

17         THE WITNESS:  No.  No, sir.  All MFA -- yes, they

18 had to sign it because of their computer system.

19         THE COURT:  So if I understand, "I acknowledge and

20 agree that I am solely employed by Steadfast" -- so the Court

21 understands that.  I don't think this is the language the

22 Court was looking for.

23         MS. LEWIS:  Okay.

24         THE COURT:  But that's okay.  The Court has spent

25 enough time on that.

———L. Pitts - Cross———

```
 1              I guess one of my final questions I have is there

 2    has been some testimony in here that you were in some way

 3    involved in disciplining employees, these nurses and

 4    registered nurses and LPNs, when something happened at the

 5    facilities.

 6              Is it your practice to be involved in the discipline

 7    of an independent contractor?

 8              THE WITNESS:  May I speak, sir?

 9              THE COURT:  No.  Answer my question, and then you

10    may explain.

11              Is it your practice to be involved in the discipline

12    of an independent contractor?  "Yes" or "no" and then --

13              THE WITNESS:  No, it's not a practice.

14              THE COURT:  It's not a practice?

15              THE WITNESS:  No, sir.

16              THE COURT:  And do you consider -- having the

17    facilities report to you on any alleged violations, are you

18    taking any action to be involved in discipline?

19              THE WITNESS:  They report to me on actions because

20    sometimes they reach out to the Board of Nursing, and they

21    have to get demographics from me.  But I can't discipline any

22    of them because there's nothing I can do to discipline them.

23    I don't have a handbook.  I don't have rules for disciplining

24    nurses.

25              THE COURT:  So, then, you deny the claims or the
```

─────── L. Pitts - Redirect ───────

1   testimony that you would sometimes basically respond by not

2   giving them shifts or things of that nature.

3          THE WITNESS:  Yes.  I don't do that.  If they're

4   DNR'd from the facility, I can't control that.

5          THE COURT:  Okay.  All right.  The Court has no

6   further questions, unless someone has some questions based on

7   something the Court said.

8          MS. LEWIS:  Your Honor, I have very brief redirect.

9          THE COURT:  Okay.  Fine.  I interrupted your

10  opportunity to do the redirect.

11         MS. LEWIS:  Just two more questions, Your Honor.

12                 REDIRECT EXAMINATION

13  BY MS. LEWIS:

14  Q.  In addition to previously having provided written

15  responses to Request for Admissions, you also provided

16  written responses to interrogatories.

17         MS. LEWIS:  Go to 19, please.

18  BY MS. LEWIS:

19  Q.  And you all -- Steadfast didn't claim any exemptions for

20  any employees.  You didn't claim exemptions for Christine Kim

21  because she wasn't salaried at the time that you all provided

22  these responses, correct?

23  A.  She was a W-2, correct.

24  Q.  She was a W-2.

25  A.  Correct.

L. Pitts - Redirect

1    Q.  But she wasn't paid on an hourly basis.  And defendants

2    never provided any supplements advising the Department that

3    she had been changed to a salaried basis; isn't that right?

4    A.  Excuse me?

5    Q.  Steadfast never informed the Department of Labor, after

6    providing this response at Interrogatory Number 5, that

7    Christine Kim -- that you all were seeking an exemption for

8    her.

9    A.  No, because I didn't know I had to.

10   Q.  Coming back to the information with respect to the WTS

11   memo, you explained to your counsel why you sent that memo

12   out.

13   A.  You want me to explain?

14   Q.  No.  I was leading up to a question.

15          You had another deposition again on March 12, 2020.

16   Do you recall?

17   A.  I have to see it.

18   Q.  Do you recall sitting in a room with me somewhere in

19   Norfolk?

20   A.  I don't remember the date, but I remember sitting with

21   you.

22   Q.  Okay.  So that was a deposition, and you were under oath

23   at that deposition, correct?

24   A.  Yes.

25   Q.  And at that deposition, we talked about that memo.  Do

─────L. Pitts - Redirect─────

```
 1   you recall?
 2   A.  I don't recall talking about it.  I have to see it again,
 3   see the deposition.
 4   Q.  Tammi Odom is her name, right?
 5   A.  Yes.  I remember talking about her.
 6   Q.  You indicated during your testimony that you were
 7   considering pressing charges against her because she stole
 8   some proprietary information from you when she worked for
 9   you, right?
10   A.  Correct.
11   Q.  And that propriety information being the list of nurses
12   that Steadfast placed on, you know -- provides assignments
13   to.
14   A.  Yes.
15   Q.  Because that nurse list is part of the bread and butter
16   of your business.  If somebody else has it, it could cause
17   Steadfast financial harm; is that right?
18   A.  Well, they work for different agencies anyway, so, yeah.
19   Q.  That was part of the issue; is that right?
20   A.  It was part of the issue, yes.
21   Q.  And so to try and address the fact that she had stolen
22   your list of nurses, you sent out that memo.
23   A.  No, that's not why I sent it out.
24           THE COURT:  The Court is having some difficulty
25   determining how this line of inquiry is within the scope of
```

---

L. Pitts - Redirect

1   the cross-examination, which was very brief.

2          MS. LEWIS:  Well, on redirect, counsel sought to

3   elicit that she did not send out that memo to WTS and the

4   reasons behind it.

5          THE COURT:  You're doing the redirect.

6          MS. LEWIS:  I'm sorry?

7          THE COURT:  You're doing the redirect.

8          MS. LEWIS:  Right.  I meant, during cross, counsel

9   sought clarification with respect to that memo and then tried

10  to make a distinction with respect to the reason that memo

11  was sent.

12         THE COURT:  Okay.  Now the Court is following you.

13  BY MS. LEWIS:

14  Q.  This is what we talked about.  During the deposition, I

15  asked:

16         "Did you file any criminal charges?"

17         Your response:  "I don't know if I did.  I doubt

18  it."

19         "Did you go to court?"

20         "We didn't.  No, we didn't go to court."

21         And I asked:  "How did you -- I want to go back to

22  the statement you made earlier that she stole everything;

23  clients, contracts, independent contractors to the registry."

24         And you interrupted and then said:  "Rosters --

25  rosters, all of those things."

Carol L. Naughton, Official Court Reporter

—— L. Pitts - Redirect ——

1           "As it relates to independent" -- and I asked:  "As

2     it relates just to the independent contractor rosters, why is

3     that a problem?"

4           And your response was:  "Well, you worked for me,

5     and you were doing my marketing, and that's a problem that

6     you stole my independent contractor roster without getting my

7     permission.  That belongs to my company."

8           THE COURT:  So what is the question?

9     BY MS. LEWIS:

10    Q.  So my question is:  You sent out that memo because it was

11    an issue that she had your list of nurses that Steadfast

12    relies upon to do business; isn't that right?

13    A.  No.

14          MR. JEWETT:  Objection, Your Honor.  This has been

15    asked and answered.

16          THE COURT:  Objection overruled.  She just answered

17    you "no."

18          MS. LEWIS:  No further questions, Your Honor.

19          MR. JEWETT:  Your Honor, may I ask one additional

20    question of the witness about the contract that you asked the

21    witness about?

22          THE COURT:  I don't usually allow recross, but you

23    can come on back and ask a question.  We may end up with

24    sur-recross or sur-whatever.  Just pull it up, and you may go

25    forward.

—— L. Pitts - Recross ——

```
 1              MR. JEWETT:  The terminology kind of throws me too.
 2          Can you please expand the screen.  Can you please
 3      scroll up.
 4                        RECROSS-EXAMINATION
 5      BY MR. JEWETT:
 6      Q.  Ms. Pitts, do you see that this is the MFA contract that
 7      Judge Jackson asked you about?
 8      A.  Yes.
 9      Q.  The Court asked you why you signed this contract, and I
10      believe you said that you originally sent your contract to
11      the MFA representative.  Is that accurate?
12      A.  Yes.
13      Q.  And then you told the Court that you were informed that
14      this is their standard contract to sign.  Do you recall that?
15      A.  Yes.  By their attorneys.
16      Q.  I believe you also referenced that you asked them to sign
17      an attachment indicating that the nurses are not independent
18      contractors.  Do you recall saying that?
19      A.  Yes.
20      Q.  What I'm showing on the screen here is Exhibit B to that
21      particular contract with the MFA.  Is this the attachment
22      that you referenced to the Judge?
23      A.  Yes.
24              MR. JEWETT:  Can you scroll back up so she can see
25      it, please?
```

```
 1            THE WITNESS:  Yes.
 2   BY MR. JEWETT:
 3   Q.  This is the attachment that you referenced that indicated
 4   independent contractors.
 5   A.  Yes.
 6   Q.  At the bottom there, is that the signature of MFA?
 7   A.  Yes.
 8            MR. JEWETT:  Can you please show her the signature.
 9   BY MR. JEWETT:
10   Q.  Is that the MFA's signature?
11   A.  Yes.
12            MR. JEWETT:  Thank you.  No further questions.
13            THE COURT:  Okay.  We're going to take a break, and
14   we'll be back in 15 minutes.
15            You may step down, Ms. Pitts.
16            (Witness stepped down.)
17            (Recess from 11:27 a.m. to 11:51 a.m.)
18            THE COURT:  Next witness.
19            MS. LEWIS:  Your Honor, before moving to the next
20   witness, I realized I had a couple of housekeeping matters
21   with respect to exhibits from Ms. Pitts' testimony that I
22   neglected to move into evidence, if I may.
23            THE COURT:  Okay.
24            MS. LEWIS:  Starting from the top, during Ms. Pitts'
25   testimony, we were testifying regarding the contract terms,
```

1    which is Plaintiff's 12, which is a summary pursuant to

2    Federal Rules of Evidence 1006, of all of the contracts that

3    were produced within discovery that Ms. Pitts provided.

4              THE COURT:  Excuse me.  Were those contracts within

5    Exhibit 10?

6              MS. LEWIS:  No.  So we printed out a sampling of the

7    contracts, but we were provided -- thank you.

8              THE COURT:  You can have a seat while she finishes,

9    and then you can come up when she finishes.

10             MR. JEWETT:  Yes, sir.

11             MS. LEWIS:  So Exhibit 10, we had printed out 10

12   because of the voluminous nature.  So 12 is all of the

13   contracts that were produced in discovery with the central

14   contract terms that we were discussing with Ms. Pitts.  So

15   it's a summary under Federal Rules of Evidence -- is it under

16   1001 or 1006?

17             THE COURT:  1006.  Okay.

18             MS. LEWIS:  So Plaintiff's 12.

19             Plaintiff's 28, and that was the insurance policy,

20   the Certificate of Insurance page that we had discussed.  I

21   laid the foundation, but I did not request to move it in.

22             THE COURT:  Any others?

23             MS. LEWIS:  And there's just one more, but I'll

24   leave that.  It's fine.  Just those two.

25             THE COURT:  Any objection to those exhibits?

```
1              MR. JEWETT:  We do not object to the insurance
2    policy.  We do object to the 1006 exhibit.  The standard for
3    1006 is accuracy and completeness.  There are 58 contracts
4    listed in 1006.  I don't have an exact count.  We had
5    compared the record this morning, and the record is missing
6    maybe 40 percent of them.  That's number one.
7              Number two, at least one of the columns contains
8    inaccurate information.  It says that Steadfast has a
9    non-solicit with the hospitals -- excuse me -- the
10   facilities, and the non-solicit actually goes the other way
11   around; Steadfast is prohibited from soliciting facility
12   employees.
13             THE COURT:  Well, let's back up for a minute, now.
14   With respect to Exhibit 28, that will be admitted.  You have
15   no objection to that.
16             MR. JEWETT:  Yes.
17             THE COURT:  But you went back, and you objected to
18   an exhibit which is a compilation, as I understand it.
19             MR. JEWETT:  Yes, sir.
20             THE COURT:  And you can introduce a compilation if
21   you have, in fact, had an opportunity, of course, to talk
22   about your records, about seeing all the underlying records.
23   So you can introduce a compilation.  They're sometimes
24   referred to as a summary chart or a calculation.
25             Do you have the actual full documents in Number 12?
```

```
 1              MS. LEWIS:  Yes, Your Honor, they were provided by
 2    defendants in discovery.  So Exhibit 12, what is highlighted
 3    as blue is what is in Plaintiff's 10.  So those are all the
 4    ones that we copied.  What is not highlighted are the
 5    remaining ones.  There's two pages to Plaintiff's 12.  So we
 6    have our summary, and then the second page has the list with
 7    the Bates numbers that defendants provided.
 8              MR. JEWETT:  Your Honor, may I comment?
 9              THE COURT:  No.  Let me tell you something.  This is
10    a very simple problem you have here.  They are your
11    documents.
12              MR. JEWETT:  Yes, sir.
13              THE COURT:  It's not like they came from another
14    planet.  They are your documents that you produced to the
15    plaintiff in discovery.  What they have is a summary of those
16    documents, and then the documents are attached.
17              Now, that's a little farther than you usually go,
18    because usually sometimes you can just put in the summary
19    alone.  But you have the documents.  Anyway, there's no
20    prejudice to the defendant because the defendant produced the
21    documents.  So what is the problem?
22              MR. JEWETT:  Okay.  That's well taken, Your Honor.
23              The second objection to the 1006 is to its accuracy.
24    One of the columns in here says that Steadfast has a
25    non-solicit preventing the facilities from hiring Steadfast
```

——————C. Kim - Direct——————

1   employees.  It's the other way around.  The non-solicit says

2   that the Steadfast can't hire the facility employees.  What

3   Steadfast does have is the buyout clause that we've all seen.

4           THE COURT:  So you said that column is in the

5   summary that the plaintiffs intend to produce, right?

6           MR. JEWETT:  Yes, sir.

7           THE COURT:  Well, the Court happens to know from

8   looking at the evidence in here that what you suggested is

9   not accurate.  The Court has seen something in here

10  indicating that the facility cannot hire Steadfast's

11  employees.

12          Objection overruled.  Exhibit 12 will be admitted.

13          (Plaintiff's Exhibits PX-12 and PX-28 received in

14  evidence.)

15          MS. LEWIS:  Thank you, Your Honor.

16          Our next witness, Ms. Christine Kim.

17          (Witness sworn.)

18          CHRISTINE KIM, called by the Plaintiff, having been

19  first duly sworn, was examined and testified as follows:

20                      DIRECT EXAMINATION

21  BY MS. JONES:

22  Q.  Ms. Kim, could you please state and spell your full name

23  for the record.

24  A.  Christine Lee Kim.  C-h-r-i-s-t-i-n-e L-e-e K-i-m.

25  Q.  Are you currently employed?

C. Kim - Direct

1   A.   I am.

2   Q.   And where are you currently employed?

3   A.   At Steadfast Medical Staffing.

4   Q.   You're the payroll manager for Steadfast?

5   A.   Correct.

6   Q.   And you've had this position since November 2017?

7   A.   Correct.

8   Q.   As a payroll manager, you oversee the administrative

9   portion of Steadfast?

10  A.   Yes.

11  Q.   And that includes the payroll administration, billing and

12  invoicing of accounts receivable?

13  A.   Yes.

14  Q.   Steadfast operates a business that places nurses at

15  various healthcare facilities; is that right?

16  A.   Correct.

17  Q.   If Steadfast did not have any nurses to place at the

18  facilities, the business would essentially cease to exist?

19  A.   Say that one more time.

20  Q.   If Steadfast did not have any nurses to place at the

21  various facilities, the business would essentially cease to

22  exist?

23  A.   Yes.

24          THE COURT:  Ms. Jones, it's the form of your

25  question.  You cannot use leading questions on direct.

C. Kim - Direct

1          MS. JONES:  Your Honor, she is an adverse witness.

2     She is the payroll --

3          THE COURT:  I hate to cut you off but -- well, go on

4     and say it, and then I'll respond.

5          MS. JONES:  From my general understanding, pursuant

6     to Federal Rules of Evidence 611(c), Ms. Kim is an adverse

7     witness, which is why she was seated in the hallway.  She is

8     the payroll manager for Steadfast, and she works closely with

9     Ms. Pitts.  She was identified as a corporate representative

10    in 30(b)(6) depositions.

11         THE COURT:  Notwithstanding that rule, she has to

12    demonstrate to the Court that she's going to be hostile with

13    your questions.  If the Court declares her a hostile witness,

14    then you can use leading questions.  So far, she has not.

15         So you ask your questions.  If we reach the point

16    where she is evasive and does not answer you, then the Court

17    makes the determination whether she's a hostile witness and

18    you can use leading questions.  So just ask your questions.

19         MS. JONES:  I understand, Your Honor.

20         THE COURT:  Until she becomes evasive or hostile.

21         MS. JONES:  So is it the Court's position that she

22    is not considered an adverse --

23         THE COURT:  She has not failed to respond to

24    anything you said so far.  So you asked them in the regular

25    form, and then we shall see.

─────C. Kim - Direct─────

1   BY MS. JONES:

2   Q.  So to your knowledge, are the CNAs, LPNs, and RNs that

3   Steadfast places at the various facilities an integral part

4   of Steadfast's business?

5   A.  I'm sorry.  Repeat that.

6   Q.  The CNAs, RNs, and LPNs that Steadfast places at the

7   various facilities, they are an integral part of Steadfast's

8   business?

9   A.  So just to answer that, Steadfast doesn't place any of

10  the nurses at the facilities.  They accept the shifts at the

11  facilities.

12  Q.  So let me ask it this way:

13          Are Steadfast nurses an integral part of Steadfast's

14  business?  Would you consider Steadfast nurses to be an

15  integral part of Steadfast's business?

16  A.  Yes.

17  Q.  Are you familiar with the nurses who are placed at the

18  various facilities on behalf of Steadfast to work?

19  A.  So, again, just the wording where you're stating that

20  Steadfast is placing the nurses, the contractors aren't

21  placed at the facilities.

22  Q.  Are you aware of the nurses that Steadfast assigns shifts

23  to?

24  A.  Am I aware of the nurses?

25  Q.  Are you familiar with them?

––––––––––––––––C. Kim - Direct––––––––––––––––

1   A.   Familiar with them in a personal matter?

2   Q.   Are you familiar with their names?

3   A.   So just for clarification, you're asking me do I -- if I

4   were -- if you were to show me a list of names, would I

5   recognize them?

6   Q.   That's exactly the question, Your Honor -- I mean, that's

7   exactly the question.

8   A.   Then, yes.

9   Q.   I would like to direct -- you said "yes"?

10   A.   Yes.

11   Q.   I would like to direct your attention to Plaintiff's

12   Exhibit 23.

13          MS. JONES:  Ms. Lewis, could you slowly scroll

14   through this exhibit.

15          THE WITNESS:  Can you scroll slower, please.

16          THE COURT:  While you're looking for this,

17   Ms. Jones, the Court is going to reverse its ruling and

18   permit you to use leading questions.

19          MS. JONES:  Thank you, Your Honor.

20   BY MS. JONES:

21   Q.   Would it be easier for you to see a paper copy of this

22   list?

23   A.   I think that would be faster.

24          THE COURT:  Okay.

25          (Witness reviewing.)

————C. Kim - Direct————

1          THE COURT:  What are we looking for, Ms. Jones?

2          MS. JONES:  I wanted to move to admit Exhibit 23

3    into evidence, Your Honor.

4          THE COURT:  All right, then.  Let's move on here.

5          Ms. Kim -- are you trying to see if she can identify

6    those names?

7    BY MS. JONES:

8    Q.  Do you recognize the names in that list?

9    A.  All of the names?  Or...

10   Q.  Do you recognize the names in that list to be nurses from

11   Steadfast?

12   A.  So not all of the names on your Tenth Revised Schedule

13   are nurses, because you have people that are employees on

14   this list that work in the office.

15   Q.  Do you recall providing a declaration on -- I'd like to

16   direct your attention to what has been identified as

17   Plaintiff's Exhibit 1.

18          Do you recall providing a declaration on --

19          MS. JONES:  Could you scroll to the bottom so I can

20   see the date, please.

21   BY MS. JONES:

22   Q.  -- on March 10, 2020?

23          MS. JONES:  And if you could scroll up to

24   paragraph 1.

25          THE COURT:  Did you answer that question?

578

——————C. Kim - Direct——————

1    BY MS. JONES:

2    Q.  Could you use verbal responses.

3           Do you recall signing a declaration in March 2020?

4    A.  Yes.

5    Q.  And at the time you signed this declaration, you

6    indicated, in subsection D, that "The individuals attached to

7    the Complaint all worked for Steadfast at some point between

8    June 10, 2017, and the present.  The RNs, CNAs, and LPNs

9    identified on Schedule A attached to the Complaint in this

10   case provide basic healthcare services at various healthcare

11   facilities with which Steadfast contracted."

12          Is that correct?

13   A.  Correct.  However, this is a Tenth Revised Schedule A.

14   At that point, this list wasn't the same that was attached to

15   this declaration.

16   Q.  Okay.  What is your role in the hiring process?

17   A.  Hiring process for the employees in the office or for the

18   contractors?

19   Q.  Let's start with the employees in the office.

20   A.  Okay.  So I typically interview them.  I see if they are

21   a good fit for the job description that is available.  We

22   then usually have them come in -- well, I'm sorry.

23          So we usually have a phone -- I talk to them over

24   the phone and see when is a good time for them to come into

25   the office.  They'll come into the office, and we'll do a

―――――――C. Kim - Direct―――――――

1    face-to-face interview.  In that interview, if they are a

2    good fit for the job that is available, we will -- I will set

3    the hours based on the job.

4           We discuss, you know, the expectations.  We go over

5    pretty much the job description if they -- and it's mutual,

6    if they feel like they're going to be a good fit and I feel

7    they are going to be a good fit, then we tell them a start

8    date.

9    Q.  What is Ms. Pitts' involvement with the hiring process of

10   the office employees?

11   A.  They're interchangeable.

12          THE COURT:  Go on.

13          THE WITNESS:  If I'm not available, then she also

14   does the interviews also.

15   BY MS. JONES:

16   Q.  So does Lisa Pitts have the ultimate determination of the

17   office employees that are hired?

18   A.  So just -- can you requestion that?

19   Q.  I'll rephrase it.

20          So to clarify, Lisa Pitts is involved in the hiring

21   of the office employees, correct?

22   A.  Correct.

23   Q.  Is she involved in the firing of the office employees?

24   A.  Is she involved?  Like, does she have --

25   Q.  Does she fire office employees?

580

C. Kim - Direct

1   A.   Yes.

2   Q.   There are also LPNs, CNAs, and RNs who are placed at

3   various facilities who are considered Steadfast nurses,

4   correct?

5   A.   I'm sorry.  Repeat the question.

6   Q.   There are also CNAs, RNs, LPNs who work for Steadfast,

7   correct?

8   A.   Correct.

9   Q.   And Lisa Pitts is responsible for determining if a CNA,

10  RN, or LPN will work for Steadfast?

11  A.   No.

12  Q.   Who is responsible for that?

13  A.   The contractor.  So if they have the prerequisites that's

14  required, then no one establishes if they are willing -- if

15  they are qualified.

16  Q.   Well, who determines if they meet the prerequisites?

17  A.   They bring their own prerequisites.

18  Q.   Who reviews their prerequisites?

19  A.   The office staff.

20  Q.   And who on the office staff specifically?

21  A.   The front desk coordinator and the recruiter.

22  Q.   So is it your testimony that Lisa Pitts does not review

23  any of the prerequisites for the nurses, LPNs, and RNs that

24  work on behalf of Steadfast?

25  A.   Could you rephrase that.

Carol L. Naughton, Official Court Reporter

—————————C. Kim - Direct—————————

1    Q.  So is it your testimony that Lisa Pitts does not -- is

2    not -- does not review any of the prerequisites for the LPNs,

3    RNs, and CNAs who work on behalf of Steadfast?

4    A.  Correct.

5    Q.  Is Lisa Pitts responsible for determining if a CNA, RN,

6    or LPN is no longer eligible to work for Steadfast?

7    A.  Could you say that again.

8             THE COURT:  Let's get something straight here.  You

9    speak clear English, and you're a professional.  We're not

10   going to repeat every question two times in here.  Enough of

11   it.

12            Ask that question one more time, and we're going to

13   put an end to this.

14   BY MS. JONES:

15   Q.  Lisa Pitts is responsible for determining if a CNA, RN,

16   or LPN is no longer eligible to work for Steadfast, correct?

17   A.  She doesn't determine that.

18   Q.  So it's your testimony that Lisa Pitts is not responsible

19   for determining if a nurse can work for Steadfast or can no

20   longer work for Steadfast?

21   A.  Correct.

22   Q.  Do you recall taking a -- being deposed by the Department

23   of Labor in January 2019?

24   A.  Yes.

25   Q.  And that you were under oath at the time you were

—————————————C. Kim - Direct—————————————

 1   deposed, correct?

 2   A.  Correct.

 3        MS. JONES:  Could you please bring up Ms. Kim's

 4   January 22nd, 2019, deposition, and please turn to Page 9.

 5        Actually, could we begin on -- actually, begin on

 6   Page 8 at the bottom.

 7   BY MS. LEWIS:

 8   Q.  Beginning at line 21, it reads:

 9        "So they are the W-2s, W-4s that are in-house; the

10   front desk coordinator and administrative assistants and

11   payroll account managers, the call center account managers.

12        "QUESTION:  And what is your role in the hiring

13   process?

14        "ANSWER:  I review their resume.  I call them in for

15   preliminaries and for a post interview, and if Lisa and I --

16   if Lisa agrees with me, you know, they're pretty much --

17   they've accepted our terms as far as employment, then I hire

18   them."

19        So based upon your testimony at the time of that

20   deposition, Lisa does review for office employees, hire/fire

21   office employees?

22   A.  So it's interchangeable.  If I'm not available, then Lisa

23   would be doing the interviews.  If Lisa is not available,

24   then I would be doing the interviews.

25   Q.  Lisa Pitts is responsible for setting pay rates for

─────────────C. Kim - Direct─────────────

1   Steadfast workers, correct?

2   A.   Steadfast workers in the office?

3   Q.   Yes, we'll start with in the office.

4   A.   Yes.

5   Q.   She's also responsible for setting the pay rates for the

6   CNAs, RNs, and LPNs, right?

7   A.   For the standard rates.

8   Q.   Is that a "yes"?

9   A.   Yes, the standard rates.

10  Q.   Lisa Pitts is responsible for recruiting the CNAs, RNs,

11  and LPN, correct?

12  A.   Incorrect.

13  Q.   I want to go back to that January deposition that we just

14  discussed briefly.  And, again, you were under oath at that

15  time, correct?

16  A.   Yes.

17  Q.   Could you please turn to 18.  I will read the question.

18  Question, at line 10:

19          "QUESTION:  Are you involved in recruiting what

20  you're referring to as the independent contractors in any

21  way?

22          "ANSWER:  No.

23          "QUESTION:  Who is responsible for that?

24          "ANSWER:  Lisa."

25          So based upon your testimony in January of 2019,

584

—————————————C. Kim - Direct—————————————

1    Lisa Pitts was responsible for recruiting the nurses,

2    correct?

3    A.  So the question that you asked earlier, you were stating

4    Lisa was responsible for bringing all of the nurses to

5    Steadfast.  The majority of the contractors that are on our

6    registry, it's either by word of mouth -- their interest in

7    coming to Steadfast is either by word of mouth or by

8    referral.

9         What you have in front of me, what's in the

10   deposition, is in regard to the recruiting process for our

11   marketing.

12   Q.  The question I asked is:

13        Lisa Pitts is responsible for recruiting CNAs, RNs,

14   and LPNs.  Did that phrase say the word "all"?

15   A.  Okay.  For the recruitments, then, yes.

16   Q.  Steadfast classifies some workers as employees and some

17   workers as independent contractors, correct?

18   A.  Yes.

19   Q.  Specifically the office employees are classified as

20   employees, according to Steadfast?

21   A.  Correct.

22   Q.  And Lisa Pitts made that determination to classify the

23   office staff as employees, right?

24   A.  Yes.

25   Q.  Steadfast classifies the CNAs, RNs, and LPNs as

C. Kim - Direct

1   independent contractors, correct?

2   A.   True.

3   Q.   Steadfast maintains personnel files for office employees,

4   correct?

5   A.   Correct.

6   Q.   What do the personnel files consist of?

7   A.   Personnel files for the employees in the office consists

8   of their resume, the notes during the interview, their

9   application, their ID, their Social Security card, any form

10  of reprimands, write-ups, tardiness, requests for times off

11  dates, any changes to their financial forms.  That's about

12  it.

13  Q.   And Steadfast also maintains personnel files for the

14  CNAs, RNs, and LPNs, correct?

15  A.   Correct.

16  Q.   Steadfast CNAs, RNs, and LPNs are paid hourly, right?

17  A.   Paid hourly, correct.

18  Q.   And Lisa Pitts determines that hourly rate for them,

19  correct?

20  A.   She determines the standard rate of pay.

21  Q.   And what do you mean the standard rate of pay?

22  A.   So there are many events where a contractor will want to

23  negotiate their pay rate.

24  Q.   And so I'm -- it's still unclear what the standard rate

25  is.  So what is the standard rate?  Is that the hourly rate

—————————————C. Kim - Direct—————————————

1   that they are paid?

2   A.   Correct.   So if a CNA goes to a facility, the standard

3   rate of pay is X amount for that contract, for that

4   assignment.

5           And there's an example.   If that CNA wants to -- or

6   if they have to travel and they want a higher pay or if they

7   want a special exception or bonuses, then, again, they would

8   negotiate their pay.

9   Q.   And they would negotiate that pay with Steadfast?

10  A.   They would negotiate that with Lisa.

11  Q.   Steadfast has contracts with each of the facilities in

12  which the CNAs, LPNs, and RNs are placed?

13  A.   Yes.

14  Q.   And those contracts specify how much the facility is

15  going to pay Steadfast for the services provided by the

16  nurses?

17  A.   Yes.

18  Q.   And Lisa Pitts negotiates those rates of pay with the

19  facilities, correct?

20  A.   I think that's a Lisa question.

21          THE COURT:   What was your response to that question?

22          THE WITNESS:   To refer to Lisa.

23          MS. JONES:   Court's indulgence?

24          THE COURT:   You don't know whether your boss

25  negotiates those contracts?

——————C. Kim - Direct——————

```
 1              THE WITNESS:  I don't believe it's a matter of
 2    negotiation.  It's what the facility agrees to pay.
 3              THE COURT:  My question was:  You don't know whether
 4    your boss negotiates those contracts.  What they agree to pay
 5    is at the end of the negotiation.
 6              My question was:  Do you know whether, or you don't
 7    know whether, your boss is involved in the negotiation of
 8    those contracts?
 9              THE WITNESS:  She's involved in the contracts, but
10    as far as negotiating for the rates, it's really what the
11    facility is willing to pay.
12              THE COURT:  Who demands or asks what rate would be
13    paid or can be paid or they're willing to pay?  From
14    Steadfast, who does that?
15              THE WITNESS:  Lisa.
16    BY MS. JONES:
17    Q.  Steadfast requires CNAs, RNs, and LPNs to submit time
18    sheets, correct?
19    A.  Correct.
20    Q.  And they are required to submit time sheets generally
21    after each shift?
22    A.  Yes.
23    Q.  And how are they required to submit these time sheets?
24    A.  We ask them to submit them via e-mail or by fax.
25    Q.  And I would like to direct your attention to what has
```

C. Kim - Direct

1     been marked as Plaintiff's Exhibit 9.

2            MS. JONES:  Ms. Lewis, can you scroll through the

3     exhibit, please.

4     BY MS. JONES:

5     Q.  And have you seen these documents before?  It's just a

6     sampling.

7     A.  Of the time sheets, yes.

8     Q.  And to confirm, these are a sample of the time sheets

9     that the nurses submit to Steadfast?

10    A.  Correct.

11    Q.  And who provides these time sheets to the nurses?

12    A.  Steadfast does.

13           MS. JONES:  Your Honor, I would move to admit

14    Exhibit 9 into evidence.

15           THE COURT:  Any objection?

16           MS. RUST:  No objection, Your Honor.

17           THE COURT:  The exhibit will be admitted.

18           (Plaintiff's Exhibit PX-9 received in evidence.)

19    BY MS. JONES:

20    Q.  Steadfast invoices the facilities for the CNAs they place

21    in facilities, correct?

22    A.  Yes.

23    Q.  And I would like to direct your attention to Exhibit 11.

24           Do you recognize these documents?

25    A.  Yes.

C. Kim - Direct

1   Q.  And is this an example of an invoice that Steadfast sends

2   to client facilities to receive compensation for services

3   rendered by Steadfast nurses?

4   A.  Yes.

5   Q.  And the payroll manager compiles the information from the

6   time sheets that nurses submit to create the invoice?

7   A.  So the time sheets -- once the time sheets are received

8   by Steadfast, then they manually calculate them, calculate

9   the hours.  They'll transpose them into decimal format.

10  They'll write down -- as you can see on the time sheet,

11  they'll write the calculation on the time sheet, and they'll

12  collect that data and put it into a spreadsheet.

13  Q.  Just to clarify, the information used to compile the

14  invoices is based upon the time sheet submitted by the nurse

15  for the specific facility, correct?

16  A.  So, yes; however, all the time sheets are submitted for

17  confirmations for approval from the facility.  There are

18  times where a time sheet may not reflect the invoice based

19  upon what was given by the facility.

20  Q.  So Steadfast uses the invoices to bill the facility for

21  services rendered by the nurses, correct?

22  A.  Correct.

23  Q.  Lisa Pitts signs or otherwise approves all invoices prior

24  to them being submitted to the facilities?

25  A.  Correct.

C. Kim - Direct

1   Q.  The information compiled by the payroll manager is also

2   provided to the in-house ADP processing clerk?

3   A.  So the information from the time sheets is collected by

4   the payroll team.  The payroll team, what they collect, that

5   data is given to the processor.

6           MS. JONES:  Your Honor, I would like to move

7   Exhibit 11 into evidence.

8           THE COURT:  Any objection?

9           MS. RUST:  Our only objection would be that the way

10  they were produced was with underlying time sheets, and this

11  exhibit only --

12          THE COURT:  You need to speak into your microphone.

13          MS. RUST:  I apologize.

14          Our only objection would be that this exhibit only

15  includes the facility invoice itself, and the way they were

16  produced was with underlying time sheets for each invoice.

17  So they are not complete.

18          THE COURT:  Yes, ma'am.

19          MS. JONES:  Your Honor, we were just providing a

20  sample so that the Court has an idea of what the invoices

21  look like, and I do believe they are provided on a CD.

22          THE COURT:  Were these documents produced to you

23  from the defendant?

24          MS. JONES:  They were during discovery, Your Honor.

25          THE COURT:  Objection overruled.  The document will

C. Kim - Direct

 1    be admitted.

 2              (Plaintiff's Exhibit PX-11 received in evidence.)

 3              THE COURT:  Don't know how helpful it will be to the

 4    Court, since the Court understands the process after being

 5    here for days, but you can continue.

 6              MS. JONES:  Thank you, Your Honor.

 7    BY MS. JONES:

 8    Q.  So I want to discuss compensation and payroll a little

 9    bit briefly.

10              So Steadfast uses employee time sheets to compensate

11    the Steadfast nurses, correct?

12    A.  We use the time sheets -- so the contractors submit the

13    time sheets in order for us to calculate and process that for

14    payroll.

15    Q.  So you rely on the time sheets to process payroll.

16    A.  So we get that initial information, and we send that to

17    the facility for confirmation, and then the facility will

18    confirm/deny/contest.

19    Q.  So you rely on the approved time sheets submitted by

20    Steadfast employees to process payroll -- time sheets that

21    are approved by the facility?

22    A.  So I rely on the facility's confirmations in order to

23    compensate the contractors.

24    Q.  And confirmation based upon what information?

25    A.  The time sheets submitted.

——————————C. Kim - Direct——————————

1   Q.   Nurses, which includes CNAs -- I'm just going to use the

2   general term "nurses" -- are paid on a weekly basis, correct?

3   A.   Weekly or daily.

4   Q.   You said, "weekly or daily."  And the regular pay

5   generates a payroll summary, correct?

6   A.   The regular pay?

7   Q.   Uh-huh.

8   A.   The weekly pay?

9   Q.   The weekly pay.

10  A.   Correct.

11  Q.   You said that nurses are paid daily.  Is that through

12  Next Day Pay?

13  A.   Correct, if they choose to do so.

14  Q.   I'm sorry.  I didn't hear that last part.

15  A.   If they choose to do so.

16  Q.   One more time.

17  A.   If they choose.

18  Q.   If they choose, correct.

19        Next Day Pay hours of compensation is not on the

20  payroll, correct?

21  A.   Is not on the payroll?

22  Q.   Correct.

23        You indicated that there were employees who are paid

24  weekly and that there are also employees who are paid daily

25  through Next Day Pay, correct?

C. Kim - Direct

1   A.   Correct.

2   Q.   Are the Next Day Pay payroll or compensation, is that --

3   that's not detailed on the payroll records, correct?

4   A.   What payroll records are you referring to?

5        MS. JONES:  Could you pull up Exhibit 7, please.

6   BY MS. JONES:

7   Q.   This is a sample of payroll summaries from Steadfast.

8   A.   Okay.  I recognize the payroll.

9   Q.   Do you recognize these are some of the payroll summaries?

10  A.   That's one report from ADP, a payroll summary.

11  Q.   Right.

12       So the payroll from ADP, does this include

13  Next Day Pay?

14  A.   No.

15  Q.   So the payroll summaries would not include any hours

16  worked or anything that is detailed on Next Day Pay records,

17  correct?

18  A.   On that -- on the payroll summary that I'm looking at,

19  no.

20  Q.   Okay.  Thank you.

21       So I would like to direct your attention to

22  Exhibit 7a.  And have you seen these documents before?  Have

23  you seen these documents before?

24  A.   Yes.

25  Q.   And these are Next Day Pay records, correct?

594

————————C. Kim - Direct————————

1   A.   Next Day Pay summaries.

2   Q.   Next Day Pay summaries.

3           What information is used to process these

4   Next Day Pay -- this Next Day Pay summary?

5   A.   Time sheets submitted by the contractors.

6   Q.   And how many times per week is Next Day Pay processed?

7   A.   Five days a week.

8   Q.   And a nurse can be paid using both payroll and

9   Next Day Pay in a workweek, right?

10  A.   When you mean "payroll," you mean ADP?

11  Q.   Yes, payroll meaning ADP.

12  A.   Yes.   They can choose either, if they want ADP or through

13  Next Day Pay.

14  Q.   And when a nurse receives compensation through

15  Next Day Pay and ADP payroll during the pay period, the

16  Next Day Pay compensation is still not listed on payroll,

17  correct?

18  A.   No, because those are two separate processors.   So

19  Next Day Pay is processed differently than ADP.   So the

20  payroll summary that you've shown me is a report just

21  generated by ADP.

22  Q.   Is there any consolidation of the ADP payroll and

23  Next Day Pay records to determine the number of hours that a

24  nurse may have worked during a given week?

25  A.   Nothing on the report.   Not based on the payroll summary

595

—————————— C. Kim - Direct ——————————

 1   report.

 2   Q.  What document would have that information?

 3   A.  An invoice.

 4   Q.  An invoice?

 5   A.  Correct.

 6   Q.  I would like to direct your attention to Page 46 of this

 7   document.  And do you see the name highlighted in red that

 8   says Shawvone Brockman?

 9   A.  Yes.

10   Q.  And it says "Active Garnishment."

11          What is an active garnishment?

12   A.  So we received a garnishment summons from the Court.

13   Q.  And it can be any type of garnishment.  It's just not

14   specified here.  It could be a garnishment for wages for any

15   type of judgment?

16   A.  Yes.

17   Q.  Are there instances in which Steadfast will not allow a

18   nurse to be compensated with Next Day Pay?

19   A.  So based on the Court's summons for the garnishment, it

20   stated that it had to be within -- the wage that was

21   garnished would have to be within a certain time period.  So

22   that's why they weren't able to do Next Day Pay.

23   Q.  Is that the only instance in which a Steadfast nurse

24   would not be eligible to be compensated through Next Day Pay?

25   A.  To my knowledge, yes.

C. Kim - Direct

1   Q.  Would a nurse who had court-ordered child support

2   deducted from their pay be eligible to be paid using

3   Next Day Pay?

4   A.  Child support is a form of garnishment.

5   Q.  So that would be a "yes"?

6   A.  So that would still be classified from the prior

7   question.

8   Q.  So would that be yes or no?

9   A.  No, they would not do Next Day Pay.

10  Q.  So if employees are not taking advantage of Next Day Pay,

11  Steadfast adds all hours worked for the workweek on one

12  paycheck?

13  A.  You mean a contractor?

14  Q.  For the Steadfast nurses, if they opt out of

15  Next Day Pay, Steadfast would pay all of their wages for the

16  week on one paycheck.

17  A.  So it varies how the contractor submits their time

18  sheets.  It's at their liberty or their freedom as far as

19  when they want to submit their time sheets and how they want

20  it.  If they want it Next Day Pay, then they get it processed

21  and paid out through Next Day Pay.  If they want it through

22  weekly pay, then they will process it through weekly pay.

23  Q.  So the question that I actually asked was:  If they opted

24  not to do Next Day Pay for that particular week, would all of

25  their hours be paid through payroll?

C. Kim - Direct

1   A.  If they submit their time to weekly pay.  They have to
2   submit their time sheets in order for them to be processed.
3   Q.  So if they submit their time sheets, all their time
4   sheets, would all the hours be on payroll?
5   A.  Weekly pay Friday, yes.
6   Q.  So the client facilities in which the nurses are placed,
7   they do not process the payroll for the nurses, correct?
8   A.  Correct.
9   Q.  And the facilities do not pay the nurses directly, right?
10  A.  Correct.
11  Q.  And Lisa Pitts established the compensation practices,
12  correct?
13  A.  Correct.
14  Q.  And I just have a quick -- a few more questions on
15  Exhibit 46.  Strike that.
16          So Steadfast is responsible for processing the
17  payroll for the nurses?
18  A.  Yes.
19  Q.  To your knowledge, does Steadfast bill facilities for
20  overtime?
21  A.  No.
22  Q.  Do you recall having another deposition in February of
23  2019 with the Department of Labor?
24  A.  I can't confirm the exact dates, but I do recall in 2019.
25  Q.  So you recall two depositions in 2019?

C. Kim - Direct

1   A.   Was it two in 2019?  I thought there was one in 2019 and

2   one in 2020.  I can't confirm the dates, but I do recall

3   being deposed twice.

4   Q.   So this is a transcript from a deposition from

5   February 28, 2019, and it's a deposition of Christine Kim.

6          And Christine Kim is you, correct?

7   A.   Correct.

8   Q.   And this deposition was under oath, correct?

9   A.   Yes.

10  Q.   And I would like to draw your attention to Page 71 of

11  this document.

12          "QUESTION:  Have they ever weighed in on the issue

13  of overtime with respect to these workers?"

14          And you put:  "No, they do not.  They do not because

15  it's addressed in the contract with the client that no

16  overtime would be paid to us, to Steadfast."

17  A.   Correct.

18  Q.   And so it's your position that they don't bill overtime.

19  A.   It's not in my position.  It's because our -- in our

20  staffing agreements, there are no differentials in overtime.

21  Q.   Can I direct your attention to Exhibit 7a, I believe, the

22  facility invoices -- Exhibit 11.  So I want to take a look at

23  Stephanie Griffin's hours worked.

24  A.   Okay.

25  Q.   And it says that she made $23, and then it was increased

```
                              ─C. Kim - Cross─
```

1   to 34.50, and that appears to be an overtime rate, correct?

2   A.  It wasn't overtime.  It was because December 31st was New

3   Year's Eve.  So that's holiday.

4   Q.  So holidays you pay overtime?

5   A.  So holiday pay rates are time and a half of that shift

6   per the contract.  Each contract has a list of approved

7   holidays that the facility considers holidays.

8          MS. JONES:  I have no further questions, Your Honor.

9          THE COURT:  Cross.

10                         CROSS-EXAMINATION

11  BY MS. RUST:

12  Q.  Hi, Christine.  I just have a few questions for you.

13          You referred to the office staff at Steadfast that

14  are classified by the company as employees.  Can you just

15  clarify which positions, which Steadfast positions those are,

16  typically?

17  A.  Front desk coordinator, administrative assistants,

18  payroll processors, payroll account managers, recruiters,

19  call center account managers, payroll managers.

20  Q.  Okay.  And I just want to clarify.  I think there may

21  have been some confusion on the questions regarding

22  controlling the hiring and firing of employees versus nurses.

23          So you, as far as the hiring and firing of the

24  office employees at Steadfast, the positions we looked over,

25  was it your testimony that you and Lisa interchangeably

C. Kim - Cross

```
 1   handle hiring and firing of those positions?
 2   A.   Yes.
 3   Q.   And as far as the nurses, what was your testimony as far
 4   as who can hire and fire those, just to clarify?
 5   A.   So there really is no firing by Steadfast.  So the
 6   nurses, if they have the prerequisites and their credentials
 7   are valid, then they are added.  I consider it more of an
 8   onboarding to our registry.
 9          There's no -- there's no time when a nurse would be,
10   quote, "fired" by Steadfast unless if they don't have a valid
11   license or if they don't keep up with their credentials.
12   It's not a matter of being fired.  They would be inactive.
13   So the nurse wouldn't be fired by Steadfast.
14   Q.   And why would they be -- to the extent you know, why are
15   they required to have those prerequisites?
16          MS. JONES:  Objection.  Outside the scope of the
17   direct.
18          MS. RUST:  Well -- sorry.
19          THE COURT:  The Court is going to overrule it
20   because I think you got slightly into this area.
21          Haven't specifically got there far enough, but you
22   can keep on with this question.  Continue.
23   BY MS. RUST:
24   Q.   I can rephrase that question too.
25          I think there was a question to you about if a nurse
```

C. Kim - Cross

1   is no longer eligible, is eligibility for the roster based on

2   those prerequisites?

3   A.  Correct.

4   Q.  And those prerequisites, I believe we went over some of

5   them regarding the licensure, et cetera; is that right?

6   A.  CPR, PPD.

7   Q.  And that just involves verifying whether those

8   prerequisites are still current; is that right?

9   A.  Correct.

10  Q.  Ms. Jones asked you if Steadfast keeps personnel files

11  for nurses.  Can you tell me what is typically maintained in

12  the company's file for a nurse?

13  A.  It will have their credentials.  It will have a copy of

14  their CPR, their PPD, their nursing license, their license

15  look-up, the acknowledgment forms, independent contractor

16  agreement, and finance forms.

17  Q.  Okay.  And those are -- are those all collected during

18  that onboarding process you talked about for the prerequisite

19  for the registry?

20  A.  Correct.

21  Q.  Okay.  Ms. Jones, showed you, I believe it was PX-11, the

22  facility -- the invoices that Steadfast submits to the

23  facilities.

24          When Steadfast submits those invoices to the

25  facilities, what is included in that document?

C. Kim - Cross

1   A.  So the front cover was a copy of the invoice and then

2   supporting time sheets behind.  So every individual that's

3   placed on an invoice, there's a supporting time sheet, a

4   signed time sheet, from the facility behind there.

5   Q.  And those are the time sheets that were -- you said you

6   request approval from the facility on those time sheets

7   before billing them?

8   A.  Correct.

9   Q.  And if you needed, does the -- I believe you also -- let

10  me start over.

11          Ms. Jones showed you an example of a facility

12  invoice, and there were two different pay rates for, I think,

13  Ms. Griffin.

14          So do the invoices show the nurse's hourly rate paid

15  for each shift?

16  A.  It will show their bill rate to the facility.

17  Q.  Okay.  Correct.  Okay.

18          MS. RUST:  I don't have any further questions for

19  you.  Ms. Jones may have some more.

20          THE COURT:  The Court has some before you stand back

21  up, so that both parties get a chance to address any

22  questions the Court may have.

23          With respect to the relationship between Steadfast

24  and the nurses and the CNAs out in the field, if one of the

25  nurses or RNs or LPNs or CNAs fail to show up for work at a

─────C. Kim - Cross─────

1    designated place, what role, if any, does Steadfast play in
2    dealing with that issue?
3            THE WITNESS:  To the contractor or to the shift?
4            THE COURT:  I'm talking about to the individual who
5    is supposed to show up.
6            THE WITNESS:  Really, nothing.
7            THE COURT:  So Steadfast does nothing to that
8    particular individual who fails to show up?
9            THE WITNESS:  Correct.
10           THE COURT:  What does Steadfast do if an individual
11   LPN or RN or CNA is reported to have failed to perform
12   satisfactorily?  What does Steadfast do?
13           THE WITNESS:  Usually in those events, at the
14   request of the facility, they ask that that individual not
15   return back to the facility.
16           THE COURT:  Does Steadfast take action with respect
17   to the individual whether the facility makes a request or not
18   regarding what should happen to the individual?
19           THE WITNESS:  No.
20           THE COURT:  So it's your testimony that if a
21   facility doesn't ask anything to be done to an individual who
22   fails to show or fails to satisfactorily perform, Steadfast
23   doesn't do anything to that individual?
24           THE WITNESS:  Correct.
25           THE COURT:  Thank you.

Carol L. Naughton, Official Court Reporter

─────C. Kim - Redirect─────

1          Okay.  Any redirect?

2          MS. JONES:  Yes, Your Honor, just a few quick

3     questions.

4          THE COURT:  Ask her about any questions about

5     anything the Court said.  That goes to either party.

6                    REDIRECT EXAMINATION

7     BY MS. JONES:

8     Q.  You indicated that, when Ms. Rust was questioning you, a

9     nurse could be considered ineligible to remain on the

10    Steadfast roster.  Do you recall that?  Without having the

11    prerequisites or updated license or various reasons?

12    A.  Correct.

13    Q.  To be considered ineligible means being unable to work,

14    correct?

15    A.  Because they don't have a valid license.

16    Q.  But that means you're not able to work, correct?

17    A.  Correct.

18    Q.  And do you recall Ms. Rust asking you about a pay stub, I

19    believe, for Ms. Griffin?

20    A.  Yes.

21    Q.  And so based upon that, Steadfast bills a premium pay

22    rate in certain instances, correct?

23    A.  I didn't get that.

24    Q.  They bill a premium rate in certain instances to the

25    facilities?

Carol L. Naughton, Official Court Reporter

———C. Kim - Redirect———

1    A.  So each facility's contract, the staffing agreement, they

2    have an approved list of days that they consider holidays.

3    So in that example, where the differential was, was it was

4    New Year's Eve, and that facility has New Year's Eve as an

5    approved holiday.

6    Q.  And so you billed essentially a premium overtime rate to

7    that facility?

8    A.  A time-and-a-half rate.

9    Q.  And do you pay that time-and-a-half rate to the Steadfast

10   nurse?

11   A.  Correct.

12   Q.  And you indicated that nothing is done when the Court

13   asked you if anything is done if a nurse fails to show up for

14   a shift.

15          Are nurses required to inform Steadfast if they are

16   not going to show up for a shift?

17   A.  We ask, as a courtesy -- we ask, as a courtesy, for the

18   nurses to let us know.

19   Q.  Is that a two-hour notice that they are required to

20   provide?

21   A.  I don't know the hours, but we just -- I know generally

22   that we do ask for a courtesy if they know that they will not

23   be able to make the shift that they accepted.

24          MS. JONES:  Could you pull up Exhibit 7a for a quick

25   moment, please.

C. Kim - Redirect

1   BY MS. JONES:

2   Q.  I have one final question.

3          MS. JONES:  Could you scroll to Page 9, please.

4   BY MS. RUST:

5   Q.  Do you see the name for Alliyah Gaston?

6   A.  Yes.

7   Q.  And it has a "two-hour show-up."  Can you please explain

8   what that is?

9   A.  So when the facility -- or when, for this example, the

10  nurse -- she accepted the shift on the 6th for 11:00 p.m.

11  She showed up to the facility, and the facility sent her

12  home.

13  Q.  So this is a fee that is paid to a nurse for showing up

14  to a facility but is unable to work because the shift is

15  cancelled?

16  A.  Correct.

17         MS. JONES:  I have no further questions, Your Honor.

18         MS. RUST:  I have no further questions based on what

19  the Court asked.

20         THE COURT:  May the witness be permanently excused?

21         MS. JONES:  Yes, Your Honor.

22         MS. RUST:  Yes.  We've subpoenaed her for our case,

23  but for the plaintiff's case.

24         THE COURT:  But she may be excused?

25         MS. RUST:  Yes.

Carol L. Naughton, Official Court Reporter

1            THE COURT:  Ma'am, you may be permanently excused.

2            (Witness excused.)

3            MS. LEWIS:  May I approach, Your Honor?

4            THE COURT:  Yes, ma'am.

5            MS. LEWIS:  Your Honor, before we move to our next

6    witness, we would like to move to admit Plaintiff's 2 and 3,

7    Plaintiff's 2 being the deposition transcript excerpts for

8    the 30(b)(6) deposition deponents.  Consistent with local

9    rules, Plaintiff's 3 is the deposition summary and is

10   accompanying the same.

11           THE COURT:  It's the deposition for which witness?

12           MS. LEWIS:  The corporation, the 30(b)(6)

13   depositions for the corporation.

14           THE COURT:  All right.

15           MS. LEWIS:  Additionally -- I probably should have

16   separated them --

17           THE COURT:  What exhibit number is that?

18           MS. LEWIS:  That's 2.

19           THE COURT:  Any objection to Number 2?

20           MS. LEWIS:  I need to get into the second part.

21   There's also -- I should have made this one 2 and then 3.  My

22   apologies to the clerk.  But there is also another 30(b)(6)

23   for Zira Technologies, which is the app that has been

24   discussed throughout this proceeding.  That deponent is not

25   available.  So Plaintiff's 2 are only 30(b)(6) deposition

 1   transcripts.

 2            THE COURT:  So Exhibits 2 and 3 you're asking to be

 3   admitted?

 4            MS. LEWIS:  Yes, Your Honor.

 5            THE COURT:  Hearing no objection, they are admitted.

 6   I said they are admitted.

 7            MS. LEWIS:  Oh, okay.  Sorry.

 8            (Plaintiff Exhibits PX-2 and PX-3 received in

 9   evidence.)

10            MS. LEWIS:  With that, Your Honor, we have our last

11   witness, and I see the time, so I'll defer to the Court with

12   respect to how you want to handle it.

13            THE COURT:  All right.  Thank you.

14            So are you saying -- you said that's your last

15   witness, and the plaintiff is resting?

16            MS. LEWIS:  Plaintiff's case in chief, yes, Your

17   Honor.

18            THE COURT:  Okay.  Thank you very much.

19            Ms. Rust, it's about time to take a lunch break

20   here.  Does the defendant have any witnesses they are able to

21   call?

22            MS. RUST:  No, Your Honor.  Based on your comments

23   earlier this week, if the plaintiff went into Friday

24   afternoon, then the Court would plan to break for the day.

25   So based on the notice for witnesses, we anticipated that it

609

```
 1    would go into the afternoon.
 2            THE COURT:  Okay.  Now, my question:  How many days
 3    do you anticipate you will need starting Tuesday of next
 4    week?
 5            MS. RUST:  We believe we can complete it in three
 6    days.
 7            THE COURT:  In three days.  All right.  That being
 8    the case, the Court will terminate here.  Everyone have a
 9    safe weekend, and we will --
10            MS. LEWIS:  We still have a remaining witness, Your
11    Honor.  The plaintiffs have one witness.
12            THE COURT:  I asked you if the plaintiff rested.
13            MS. LEWIS:  After this witness.
14            THE COURT:  It was not clear to me.  I was asking
15    you were you resting your case; was that the end?
16            MS. LEWIS:  Miscommunicated.  We have one more
17    witness.  I thought we were just trying to get an idea of
18    where we were in terms of time.
19            THE COURT:  No.  Resting means you're ending your
20    case.
21            MS. LEWIS:  No, Your Honor.  We indicated we have
22    one more witness.
23            THE COURT:  All right.  The Court will be in recess
24    until 2:30.
25            (Recess from 12:52 p.m. to 2:30 p.m.)
```

610

```
 1              THE COURT:  Okay.  We're prepared to go with the
 2    next witness.
 3              MS. JONES:  Yes, Your Honor.
 4              MS. RUST:  Your Honor, I'm sorry to interrupt.  I
 5    had one housekeeping item I wanted to check with before we
 6    get to this witness regarding the Plaintiff's Exhibit --
 7              THE COURT:  Turn your microphone on.
 8              MS. RUST:  Of course.  Thank you.
 9              -- regarding Plaintiff's Exhibit 2 that had been
10    admitted, which was deposition transcript designations.  One
11    of those included a deposition of a 30(b)(6) witness for Zira
12    Technologies.
13              The defendants have filed counter-designations to
14    that deposition.  Ms. Lewis and I had discussed this.  She
15    acknowledged the counter-designations.  I was under the
16    impression that she would be submitting them jointly.  She
17    was under the impression that I would be submitting the
18    counter-designations separately in my case.
19              So I just wanted to raise it before the Court, if
20    the Court had a preference for the counter-designations to be
21    submitted together or in the defense case.
22              THE COURT:  Well, the counter-designations could
23    have been submitted at the same time, but the Court will
24    permit you to put the counter-designations in the record, in
25    any event.
```

1           MS. RUST:  Okay.

2           THE COURT:  There will be no problems with it.  If

3     you agreed there would be -- well, you have a right to

4     counter-designations.  So you will be able to put them in the

5     record independently, or you may wait for your case in chief.

6           MS. RUST:  I have a paper copy of them if the Court

7     would prefer them now, or I'm happy to do them at a separate

8     time.

9           THE COURT:  Yes, ma'am.

10          MS. LEWIS:  Yes, Your Honor.  So those were

11    plaintiff's exhibits, and since they are

12    counter-designations, presumably it would be, from our

13    perspective, most appropriate to be in her case in chief, so

14    however the Court wants to manage it...

15          THE COURT:  The Court will take it either way.  Hold

16    on to them, and you can pass them up during your case.

17          MS. RUST:  Very well.  Thank you, Judge.

18          Your Honor, before we start with this witness, we

19    have a pending motion in limine on testimony regarding this

20    witness.

21          MS. JONES:  Your Honor, their motion in limine

22    regarding testimony from this witness was denied.

23          THE COURT:  Was that motion in limine presented to

24    the Magistrate Judge?

25          MS. RUST:  Yes.  And the Magistrate deferred it to

612

1   the trial judge.

2            THE COURT:  Was it denied or deferred?

3            MS. JONES:  I thought it was denied.  Let me just

4   check, Your Honor.

5            MS. RUST:  The order said that it was denied because

6   the Court cannot make the determinations prior to trial.

7            THE COURT:  Which means it was denied.  Therefore,

8   if there's anything you want to raise about this witness,

9   this Court has to determine it, and I don't know what the

10  grounds for the motion in limine were.

11           Tell you what, I don't want you talking back there,

12  and you standing at the podium.  So you return to your seat,

13  Attorney Jones, and you come up and explain to me what it is

14  that you're raising in limine about this witness.

15           First of all, I need to get straight on the name of

16  the witness.  I didn't hear it.

17           MS. JONES:  It's Peyton Lex of First Choice.

18           THE COURT:  Now you may raise some motion in limine.

19  Let me ask you something.  When did the Magistrate Judge deny

20  the motion in limine?

21           MS. RUST:  It is dated May 18th.

22           THE COURT:  You know, you had a right to appeal that

23  motion in limine.  He said he couldn't decide it before

24  trial.  Maybe the Judge could have, but you didn't appeal it,

25  so we're starting afresh here on whatever it is, but a lot of

1    times, the judges like to know ahead of time about motions in

2    limine.  That's the usual way that a motion in limine is

3    filed before trial.

4            He said he couldn't decide.  So let's see what issue

5    you're raising here.  How is the Court going to handle this?

6            MS. RUST:  Of course, Your Honor.

7            The defendants are moving to exclude evidence of

8    industry standard during the plaintiff's case in chief

9    because evidence of industry standard has no bearing on

10   liability.  The only issue that industry standard is relevant

11   to is the good-faith defense, and the defendants have the

12   right to determine whether they want to raise that defense.

13           So our position is that whether Steadfast was

14   compliant or not compliant with industry standards is not

15   relevant to the analysis under the economic realities test.

16   The manner in which other companies do business is not -- is

17   not considered under the test.

18           So if Steadfast chooses to present evidence of

19   industry standard as a good-faith defense, then the

20   Department can raise it in rebuttal, but it is not relevant

21   to their case in chief as to liability.

22           THE COURT:  I'm not sure that it's relevant to the

23   defendants' case, to be candid with you, given what the issue

24   is.  So you may not get to raise it, either.

25           MS. RUST:  We may not, but the motion --

614

```
 1            THE COURT:  I'm just telling you ahead of time.  I
 2    said repeatedly that no matter what the other companies may
 3    be doing out there with respect to compliance with the Fair
 4    Labor Standards Act, the question is, factually, whether
 5    Steadfast is in violation of the rules of the Fair Labor
 6    Standards Act; no matter what First Choice, Third Choice, or
 7    anybody else might be doing.  And so if that is what is going
 8    on here -- let me find out if that is where the plaintiffs
 9    are going with this testimony.
10            MS. JONES:  May I respond?
11            THE COURT:  So is that accurate, that you're trying
12    to put in the industry standard?
13            MS. JONES:  No, Your Honor.  As detailed in our
14    opposition to their motion in limine, ECF 276, this line of
15    testimony goes towards willful.  It specifically speaks to
16    the defendants' knowledge and state of mind during the
17    relevant period regarding her requirement to pay overtime in
18    compliance with FLSA.
19            And as detailed in her testimony today, she
20    indicated that she spoke to First Choice regarding
21    compensation.  That was her testimony today.  So based upon
22    that information that she presented today and in depositions,
23    we contacted First Choice to understand their compensation
24    practices to get a better insight on her knowledge into the
25    willfulness of this matter.
```

1         THE COURT:  But you're not going into First Choice's

2    procedures, are you?

3         MS. JONES:  We will be asking them about their

4    compensation practices.

5         THE COURT:  Well, the simple truth is, it doesn't

6    matter what their compensation practices are.  Now, if it's a

7    situation where First Choice said to Ms. Pitts, "You know

8    you're required to do A, B, C, and D" and she gave a specific

9    response, it might be, in some way, relevant to her state of

10   mind on this case, is one thing, but we don't need to spend

11   any time going into their standards.

12        It has to do with what, if anything, did she say to

13   First Choice that would indicate her state of mind regarding

14   compliance with the FLSA.  That's what the Court will permit.

15   But in terms of going through all of what they do, that

16   doesn't help.

17        MS. JONES:  But based upon the testimony today, she

18   did have a discussion regarding compensation.  So she would

19   have knowledge of the requirement to pay overtime to her

20   nurses based upon that correspondence.

21        THE COURT:  As I said, if there's anything that they

22   have that would be indicative of her state of mind, the Court

23   is going to permit you to do that --

24        MS. JONES:  Okay.

25        THE COURT:  -- but to question her.  That's surely

─────────────────────── P. Lex - Direct ───────────────────────

1   spending a lot of time talking about who First Choice pays.

2          Now, I could give you a hypothetical.

3   Hypothetically, if they explain their position, and they told

4   her that, and she said something that reflects what her

5   position is regarding the Fair Labor Standards Act, then that

6   is something that may be relevant.  But just to talk about

7   their standards and et cetera, that would not be helpful to

8   the Court.

9          So I guess we have to get started and see where

10  we're going.

11          MS. JONES:  Thank you, Your Honor.

12          THE COURT:  But that's the guidance the Court gives

13  you.

14          (Witness sworn.)

15          PEYTON LEX, called by the Plaintiff, having been

16  first duly sworn, was examined and testified as follows:

17                      DIRECT EXAMINATION

18  BY MS. JONES:

19  Q.  Can you please state and spell your name for the record.

20  A.  My name is Peyton Lex, P-e-y-t-o-n, and my last name is

21  Lex, L-e-x.

22  Q.  Are you currently employed?

23  A.  I am.

24  Q.  Where are you currently employed?

25  A.  First Choice Nurses of Eastern Virginia.

P. Lex - Direct

1    Q.  What is the general nature of the business of First

2    Choice?

3    A.  We're a medical staffing company.  We provide medical

4    staff to various healthcare providers.

5    Q.  And what type of services does First Choice provide?

6    A.  We offer registered nurses, licensed practical nurses,

7    and certified nursing assistants, and some other

8    professionals to healthcare providers to -- so they can --

9    ancillary to their own staff.

10   Q.  What occupations compose the staff of First Choice?

11   A.  Mostly certified nursing assistants, LPNs, licensed

12   practical nurses, and registered nurses.

13   Q.  What type of facilities does First Choice staff?

14   A.  We staff acute care settings in hospitals.  We staff

15   long-term care facilities, nursing homes, and residential

16   treatment centers, and retirement communities.

17   Q.  And given the nature of First Choice's business, do you

18   consider the services that the nurses provide to the client

19   facilities to be an integral part of the business?

20   A.  Yes.

21   Q.  And what is your specific title at First Choice?

22   A.  I'm the president of the company.

23   Q.  How long have you been the president of the company?

24   A.  A little over ten years.

25   Q.  Are you familiar with Steadfast Medical Staffing?

P. Lex - Direct

1   A.   I am.

2   Q.   How are you familiar with Steadfast?

3   A.   Steadfast is one of our competitors in the local

4   marketplace.

5   Q.   And have you ever spoken to anyone from Steadfast?

6   A.   Yes.  I spoke to Lisa Pitts, I don't know, a year ago,

7   early 2020.

8   Q.   And do you have a relationship with Steadfast?

9   A.   Not -- no, we don't.

10  Q.   When you say you spoke with Lisa, what did you

11  specifically speak about?

12  A.   Well, I called Lisa just to float the idea of possibly

13  buying Steadfast at the time.  I was advised that maybe that

14  would be a good idea.  So I spoke to her briefly about it.

15  She was not interested in it, and so that was the end of it.

16  Q.   Did you ever speak with her about being audited?

17  A.   Yeah, I might have.  I don't quite remember.  I don't

18  remember if I did or not.

19  Q.   Does First Choice and Steadfast contract with some of the

20  same facilities?

21  A.   Yes.

22  Q.   Are you familiar with Steadfast's compensation practices?

23  A.   Only -- yes, what the -- we share nursing personnel, and

24  I hear what they tell me.

25  Q.   Okay.  To your knowledge, how does Steadfast compensate

P. Lex - Direct

1    its nurses?

2    A.   They consider their nurses to be independent contractors.

3    Q.   And based upon the classification of independent

4    contractors, how do they compensate their nurses?

5    A.   Well, I believe they compensate them without taking --

6    without taking taxes out, paying unemployment taxes, or

7    providing healthcare or overtime.

8    Q.   And how does Steadfast's practice impact your business

9    organization?

10   A.   Well, as someone who --

11           MS. RUST:  Object to relevance.  We're still not

12   getting to the --

13           THE COURT:  Sustained.

14   BY MS. JONES:

15   Q.   How does First Choice classify its nurses?

16   A.   Our nurses are employees of First Choice.

17   Q.   I'm sorry, I couldn't hear the last part.

18   A.   Our nurses are employees of First Choice.

19   Q.   Has First Choice always classified its nurses as

20   employees of First Choice?

21   A.   No.  We started out -- I bought -- purchased the company,

22   and at the time of purchase, the model was to consider our

23   nurses as independent contractors, and I was told at the time

24   that that was a legitimate way to run it.

25           So we started out that way.  We did have an audit

Carol L. Naughton, Official Court Reporter

————————P. Lex - Direct————————

1    with the Virginia Employment Commission, and basically, they

2    determined that we had misclassified our nursing staff, and

3    so I was -- I looked into it and read cases involving the

4    Department of Labor and the Virginia Employment Commission

5    and talked to people about it and really came to the

6    determination that I needed to change my company's structure

7    so that the nurses were employees.

8    Q.  When did that occur?

9    A.  That occurred in the period of time between 2016 and '17.

10   We made the switch in January of 2018.

11   Q.  And for clarification, who conducted the audit or the

12   investigation into your compensation practices?

13   A.  The Virginia Employment Commission.

14           The specific person, are you asking me?

15   Q.  No, just the agency or --

16   A.  The Virginia Employment Commission.

17   Q.  Okay.  And did you ever consult with any attorney or law

18   firm regarding the classification?

19   A.  You know, at the time --

20           MS. RUST:  Objection.  Relevance.

21           THE COURT:  Sustained.

22           MS. JONES:  I have no further questions -- one

23   moment, Your Honor.

24           (Pause in the proceedings.)

25           MS. JONES:  A few more questions, Your Honor.

─────────────────── P. Lex - Direct ───────────────────

1  Apologies to the Court.

2  BY MS. JONES:

3  Q.  So you indicated that -- do you believe that Steadfast's

4  practice of not paying overtime has suppressed wages?

5         MS. RUST:  Objection.  Relevance.

6         THE COURT:  Sustained.

7         MS. JONES:  Your Honor, this line of questioning

8  goes to the reason why we bring about these investigations.

9  It speaks directly to the injunctive relief that we are

10  seeking in this matter.

11         THE COURT:  So maybe you need to clarify the nature

12  of your question.  You said, "Do you believe it suppressed

13  wages?"  In what way?  Are you talking about with respect to

14  the nurses and LPNs?

15         MS. JONES:  Yes, Your Honor.

16         THE COURT:  Then overruled.  I thought you were

17  talking about suppression of wages with respect to the

18  industry or something.

19         THE WITNESS:  Yes, I do.

20  BY MS. JONES:

21  Q.  Do you believe it has also impacted the competition with

22  regards to placing nurses at your facilities?

23  A.  Yes.

24         MS. RUST:  I'm going to object again for relevance

25  and also opinion.  There's no foundation, as well, that this

--------------------P. Lex - Direct--------------------

 1    witness can speak to the industry at large.

 2            THE COURT:  I'll sustain as to the last question,

 3    Ms. Jones.

 4            MS. JONES:  Again, Your Honor, this speaks directly

 5    to why we bring about these actions and these investigations,

 6    and it also speaks toward injunctive relief.  By Steadfast

 7    not paying overtime, they have an advantage over the agencies

 8    that are following the dictates of the FLSA and are actually

 9    paying overtime.

10            THE COURT:  I'll tell you what, you need to pass me

11    up some case law, something that shows that that is a

12    relevant inquiry for your injunctive relief.  I don't have a

13    problem waiting until you find a case.  The Court is just not

14    familiar with that.

15            MS. JONES:  I will, Your Honor.  Thank you.

16            I have no further questions.

17            THE COURT:  Hold on a second.  You said it's

18    relevant.  Now, the Court doesn't want to exclude something

19    that's relevant if the case law says it's appropriate

20    inquiry.

21            We're going to take a break.  Give me something that

22    the Court can rely on to permit me to pursue that line of

23    inquiry.  That's what the Court wants to do.

24            MS. JONES:  All right.  Thank you, Your Honor.

25            THE COURT:  The Court will be in recess for 15

—————————————P. Lex - Direct—————————————

1    minutes.

2           Meanwhile, don't discuss anything with anybody while

3    the Court is in break.

4           (Recess from 2:49 p.m. to 2:54 p.m.)

5           THE COURT:  Okay.  The Court still wants the

6    research, but here's we're going to do:

7           The Court is going to go on and let you ask the

8    questions of Mr. Lex so he won't have to come back in next

9    week.  But if over the weekend you conduct the research --

10   both parties -- and the Court finds that that testimony is

11   not relevant, the Court will strike it.  That's what we'll

12   do.

13          MS. JONES:  Thank you, Your Honor.

14          THE COURT:  All right.  You may proceed.

15          MS. JONES:  And I'll just repeat, these are the

16   final questions for this witness.

17   BY MS. JONES:

18   Q.  Do you believe that the practice of -- Steadfast's

19   practice of not paying overtime has impacted its competition

20   in the industry regarding the placement of your nurses?

21   A.  Yes.

22   Q.  How?  In what way?

23   A.  Well, you know, if we're scheduling a CNA, for instance,

24   with a nursing home and they are getting ready to go over 40

25   hours in their workweek, we have to get permission, often

─────────────────────── P. Lex - Direct ───────────────────────

1    denied; so that we're not able to place that person over 40

2    hours anywhere.

3              So if you're able -- if you're not paying overtime,

4    then you're able to charge the facility the same flat rate

5    that you already are charging them without the overtime, and

6    the worker can work as many hours as they wish.

7              MS. JONES:  No further questions, Your Honor.

8              THE COURT:  Before you start cross-examining, so you

9    can take advantage of whatever the Court asks -- you may have

10   a seat.

11             A few minutes ago you said you had a conversation

12   with the defendant, Ms. Pitts.

13             THE WITNESS:  Yes.

14             THE COURT:  Did you have a conversation with her

15   about how she went about paying wages?

16             THE WITNESS:  I don't believe I talked to her about

17   that, no.

18             THE COURT:  Okay.  Fine.

19             THE WITNESS:  I don't remember that being -- part of

20   the conversation being about that.

21             THE COURT:  All right.  That's it.  Thank you.

22             Cross-examination.

23             MS. RUST:  No cross, Your Honor.

24             THE COURT:  May the witness be permanently --

25             MS. JONES:  I just want to ask one question based

P. Lex - Redirect

1    upon the question that you presented, Your Honor.

2           THE COURT:  Oh, okay.  You may do that.  That's

3    permissible.

4           MS. JONES:  Thank you.

5           (Pause in the proceedings.)

6           THE COURT:  Waiting on you, counsel.

7                      REDIRECT EXAMINATION

8    BY MS. JONES:

9    Q.  Mr. Lex, you indicated that you had a conversation with

10   Lisa Pitts, but the Judge asked you if you remembered any

11   discussion about compensation.

12          Do you recall how you came to have any discussions

13   with Ms. Pitts at all?

14   A.  Yeah.  So I was speaking with a colleague -- not a

15   colleague, a colleague in a different industry at that time,

16   who was helping us develop some software, and he -- I was

17   telling him what I heard through the grapevine that --

18          THE COURT:  You cannot tell us what he said to you.

19   You can tell us what you did as a result of speaking to him,

20   but do not tell us what he said.

21          THE WITNESS:  So as a result of that conversation, I

22   called Ms. Pitts to inquire about buying her business.

23   BY MS. JONES:

24   Q.  During that conversation, was there any discussion about

25   the incident with your audit?

P. Lex - Redirect

```
 1              MS. RUST:  Objection.  Asked and answered on direct.
 2              THE COURT:  Did you ask that question?  The Court
 3     does not recall.
 4              MS. JONES:  I don't recall asking that question.
 5              THE COURT:  The Court doesn't recall, either.
 6              So overruled.  Let's find out if he can answer it.
 7     BY MS. JONES:
 8     Q.  Did you have any discussion with Ms. Pitts regarding the
 9     investigation and audit into your business?
10     A.  No, not that I recall.
11     Q.  Do you recall -- what was that discussion regarding when
12     you called?
13     A.  I called and we talked briefly about general topics, and
14     basically, then it came to the point where I asked her if she
15     was interested in selling her business.  She discussed her
16     situation with the Department of Labor briefly, saying that
17     she was confident she would win, and, you know, because we
18     weren't going to go any further in the discussion about the
19     sale, it ended there.  That's where the conversation ended.
20     Q.  When you say she discussed her situation, what do you
21     mean?
22     A.  She said she was -- that the Department of Labor had
23     filed a suit against her, and she was looking at ways to
24     defend herself.
25              MS. JONES:  No further questions, Your Honor.
```

```
 1            THE COURT:  Any examination?
 2            MS. RUST:  No, Your Honor.
 3            THE COURT:  May this witness be permanently excused?
 4            MS. JONES:  Yes, Your Honor.
 5            (Witness excused.)
 6            THE COURT:  Now, is there anything else the
 7    plaintiff wishes to present, or do you wish to reserve your
 8    closing until Monday, or are you -- what is your status?
 9            MS. LEWIS:  Yes, Your Honor.  So the Department
10    wishes to reserve our closing until after defendants' case in
11    chief, and with respect -- so we don't have any further
12    witnesses in terms of --
13            THE COURT:  I don't mean your closing argument.  I'm
14    trying to find out whether you're resting.
15            MS. LEWIS:  Yes, we're resting in our case in chief,
16    with respect to rebuttal witnesses after defendants' present
17    their case, so, yes.
18            THE COURT:  Okay.  All right.  With that, then,
19    since you rest, then on Tuesday morning at 10:00, we will be
20    prepared to go with any witnesses that the defense wishes to
21    call.  And over the weekend, each party can look to the
22    relevance of that testimony you raised regarding the fact
23    that you want injunctive relief.
24            MS. RUST:  Your Honor, when would you like those?
25    Would you like those filed, or would you like us to be
```

```
 1   prepared to make those arguments?

 2           THE COURT:  Well, you know, if you've got anything

 3   you can file in writing, you make it short, three pages at

 4   the most, if you wish to file anything.  Otherwise, I will

 5   hear what you have to say regarding the issue on Monday.  But

 6   the Court would prefer that it get it early enough so the

 7   Court can at least look at the cites that you raise.

 8           MS. RUST:  Thanks for the direction.

 9           THE COURT:  Okay.  So you will have a very busy

10   holiday.

11           (Proceedings adjourned at 3:01 p.m.)

12

13                        CERTIFICATION

14

15       I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18

19           _____/s/_____

20                     Carol L. Naughton

21                     October 4, 2021

22

23

24

25
```

Carol L. Naughton, Official Court Reporter