```
1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2                          Norfolk Division

3    - - - - - - - - - - - - - - - - - -
                                       )
4    MARTIN J. WALSH, SECRETARY OF      )
     LABOR, UNITED STATES              )
5    DEPARTMENT OF LABOR,              )
                                       )
6            Plaintiff,                )
                                       )        CIVIL ACTION NO.
7    v.                                )           2:18cv226
                                       )
8    MEDICAL STAFFING OF AMERICA,      )
     LLC, etc., et al.,               )
9                                      )
             Defendants.               )
10   - - - - - - - - - - - - - - - - - -

11

12                    TRANSCRIPT OF PROCEEDINGS

13                   ** Bench Trial - Day 5 **
                        (Morning Session)
14
                       Norfolk, Virginia
15
                       September 7, 2021
16

17

18   BEFORE:   THE HONORABLE RAYMOND A. JACKSON
               United States District Judge
19

20   APPEARANCES:

21           UNITED STATES DEPARTMENT OF LABOR
             By:   Ryma N. Lewis
22                 Chervonti Jones
                   Mohamed E. Seifeldein
23                 Counsel for the Plaintiff

24           PIERCE McCOY, PLLC
             By:   Joshua L. Jewett
25                 Julia A. Rust
                   Aaron D. Siegrist
                   Counsel for the Defendants
```

```
 1                        I N D E X

 2
     DEFENDANTS'
 3   WITNESSES                                        PAGE

 4    PENNY CLARK
           Direct Examination By Ms. Rust            633
 5         Cross-Examination By Ms. Lewis            642
           Redirect Examination By Ms. Rust          648
 6    NAPOLEAN ALSTON
           Direct Examination By Ms. Rust            651
 7         Cross-Examination By Ms. Lewis            666
           Redirect Examination By Ms. Rust          678
 8    TAWANDA HALL
           Direct Examination By Mr. Siegrist        681
 9         Cross-Examination By Ms. Jones            691
      DASELINE HALL (Via ZoomGov.com)
10         Direct Examination By Mr. Siegrist        696
           Cross-Examination By Ms. Lewis            714
11         Redirect Examination By Mr. Siegrist      723

12

13

14                     E X H I B I T S

15                     (None offered.)

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings resumed at 9:59 a.m.)

 2              THE COURT:  Good morning, counsel.

 3              I understand we, at least, have turned back one

 4    person this morning because of the COVID concerns.  I do not

 5    want anyone coming in to testify who has not been vaccinated

 6    or who has not been tested.  So if you have a witness of that

 7    nature, just see if you can make some arrangement to do some

 8    type of virtual testimony.

 9              All right.  Last week the Secretary rested.  So we

10    are prepared to go forward this morning.  You may call your

11    first witness.

12              MS. RUST:  Your Honor, I believe when we broke on

13    Friday, you said you would want to address brief arguments on

14    the issue regarding the final witness for the plaintiff

15    concerning the injunction.

16              Did you want to handle that first?

17              THE COURT:  That will be fine.  Okay.  I forgot all

18    about that issue.  You had to remind me.

19              Okay.  Does the Secretary wish to make any argument

20    in reference to that issue?

21              MS. JONES:  Briefly, Your Honor.  As detailed on

22    Friday, we believe the testimony that was provided by First

23    Choice can be considered by the Court when determining

24    whether injunctive relief should be applied to this case.

25              Mr. Lex testified regarding the wage suppression
```

1    caused to the nurses as a result of defendants' failure to

2    pay overtime, and he also spoke about the unfair competition

3    that resulted in them complying with the law and Steadfast

4    failing to pay proper overtime.

5            And as detailed on Friday, in addition to protecting

6    employees, the FLSA, likewise, prevents employers from

7    gaining an unfair advantage against competitors.  And I will

8    submit to the memorandum we submitted in support of our

9    position.

10           THE COURT:  All right.  Thank you very much.

11           Anything you wish to say, Ms. Rust or Mr. Jewett?

12           MR. JEWETT:  I'll be very brief, Your Honor.

13           We did have a chance to research this issue, per the

14   Court's instructions.  Every case we found, was the three

15   factors for an injunction are employer's past conduct,

16   employer's current conduct, and whether the employer can be

17   counted on to follow the law following the Court's decision.

18           None of those cases took the position the Secretary

19   has taken here, that market forces bear on the injunction

20   decision.

21           The Secretary did list two old cases in its bench

22   memo.  We haven't had a chance to look at those yet.  They

23   could still be good law.  I would suggest the fact that they

24   come from the '60s and '70s means that it's kind of an

25   unusual issue.  So that's our position on the topic right

P. Clark - Direct

1   now.

2           THE COURT:  What the Court will do, the Court will

3   look at whatever memoranda has been filed, and the Court will

4   resolve that issue as it makes its ruling on this case.

5   Simple as that.

6           The Court will have an opportunity to research the

7   law, and if the Court finds that that testimony is not

8   admissible or may not be used, then the Court will so

9   indicate in its ruling in the case.

10          All right.  Call your first witness.

11          MS. RUST:  The defense's first witness is Napolean

12  Alston.

13          He may just be arriving.  If Penny Clark is here, we

14  can call her first.

15          (Witness sworn.)

16          PENNY CLARK, called by the Defendants, having been

17  first duly sworn, was examined and testified as follows:

18                      DIRECT EXAMINATION

19  BY MS. RUST:

20  Q.  Good morning, Ms. Clark.

21          Can you state your name for the record, and please

22  spell both your first and last name.

23  A.  Yeah.  Penny Clark, P-e-n-n-y C-l-a-r-k.

24  Q.  Thank you, Ms. Clark.

25          And what is your occupation?

P. Clark - Direct

 1    A.   I am a nurse.

 2    Q.   Are you a registered nurse?

 3    A.   I'm a registered nurse.

 4    Q.   And are you familiar with Steadfast Medical Staffing?

 5    A.   Yes, I am.

 6    Q.   Are you on Steadfast Medical Staffing's registry?

 7    A.   Yes, ma'am.

 8    Q.   How long have you been on Steadfast's registry?

 9    A.   Since about 2007, on and off.

10    Q.   Okay.

11    A.   And I'm currently working there now.

12    Q.   Okay.  Have you ever been to Steadfast's office in

13    Norfolk?

14    A.   Yes.

15    Q.   Do you go there regularly?

16    A.   Not recently since everything -- a lot of things are

17    online.  But I used to go in, like, 2008 -- 2007, 2008 to

18    pick up time sheets or pick up paychecks.

19    Q.   Okay.  Have you ever been scheduled to work to provide

20    nursing services as an RN at Steadfast's office in Norfolk?

21    A.   I don't understand the question.

22    Q.   Sure.

23         Have you ever provided nursing services at

24    Steadfast's office in Norfolk?

25    A.   No.

P. Clark - Direct

1   Q.   Okay.  Has Steadfast ever provided you with any equipment
2   to provide nursing services?
3   A.   No.
4   Q.   How do you schedule shifts through Steadfast?
5   A.   Well, now there's an app.  We can use the app, or usually
6   I call the office, or they might call me or text me.
7   Q.   Okay.  So when you call the office, what do you do with
8   the schedule?
9   A.   Whatever I want or whatever they have available.
10  Q.   Okay.  So do you -- you call the office and you let them
11  know you want to schedule shifts?
12  A.   Exactly.
13  Q.   What do they tell you?
14  A.   They tell me what shifts they have at what facilities.
15  Q.   Okay.  And can you pick up whichever of those shifts you
16  want for your licensure?
17  A.   Yes, absolutely.
18  Q.   Can you decline any shifts that are available?
19  A.   Yes.
20  Q.   Have you ever experienced any consequences for declining
21  a shift?
22  A.   No.
23  Q.   So you just said they might -- well, I believe you
24  said -- tell me if I'm wrong -- that they would tell you what
25  is available, right?

P. Clark - Direct

1    A.   Right.

2    Q.   Would there be more than one facility available --

3    A.   Yes.

4    Q.   -- typically?

5    A.   They would tell me what they have available, and I would

6    tell them what I had available, and I would take something

7    from the availability.

8    Q.   Okay.  And if they present you with a few different

9    options that are available, what are some factors that you

10   consider when you are choosing whether you want to pick up

11   one of those available shifts?

12   A.   If it's a facility that I've been to before, and I'm

13   familiar with it, and I like it; the distance for travel is

14   another consideration.  Usually those two things.

15   Q.   Okay.  So if you like the facility and whether you need

16   to travel, those are factors you consider?

17   A.   Correct.

18   Q.   And, of course, if it lines up with your availability; is

19   that right?

20   A.   Yes.

21   Q.   Okay.  So have there been instances when you've chosen to

22   work at a facility that was farther than you wanted to go but

23   it was because you liked the facility, based on the factors

24   you just described?

25   A.   Yes.

637

P. Clark - Direct

1    Q.  Have there been instances when you have chosen to work at
2    a facility for -- well, let me ask you this:
3            Is the hourly rate a consideration when you are
4    choosing whether to pick up an available shift?
5    A.  It can be, but it's pretty steady.
6    Q.  Okay.
7    A.  Or pretty, you know -- pretty much the same at most
8    places.
9    Q.  Okay.  So if Steadfast had shifts that were farther than
10   you wanted to travel and you didn't like the facility, have
11   you declined those options before?
12   A.  Yes.
13   Q.  Who determines your work schedule, then?
14   A.  I do.
15   Q.  You mentioned the app briefly before for scheduling.  You
16   said that was an app you can use to schedule; is that right?
17   A.  Yes.
18   Q.  And have you used that in the past to schedule shifts
19   with Steadfast?
20   A.  Just recently.
21   Q.  Okay.  And can you just briefly tell me what your ability
22   is on that app.
23   A.  On the app, there are multiple dates, facilities,
24   location, and the pay, and if I want to pick up a shift, I
25   would click on it and claim it, and then Steadfast would be

638

P. Clark - Direct

1    in touch to confirm it.
2    Q.   Okay.  So have you ever needed to cancel a shift that
3    you've already picked up?
4    A.   Yes.
5    Q.   And in your experience, what do you need to do to cancel
6    a shift that you've picked up?
7    A.   I just have to notify the agency.  I try to -- if I've
8    had to call out, I would try to give as much notice as
9    possible so they could get someone else.
10   Q.   Okay.  And have you ever been running late for a shift
11   that you signed up for through Steadfast?
12   A.   Every now and then.
13   Q.   Okay.  And what do you do in that situation?
14   A.   I would notify Steadfast and they would call the
15   facility.
16   Q.   Okay.
17   A.   And let them know I was running late.
18   Q.   Have you ever been required to request permission from
19   Steadfast to take vacation or time off?
20   A.   No.
21   Q.   On Steadfast's registry, are you required to work a
22   minimum or a maximum number of hours?
23   A.   No.
24   Q.   Currently, approximately, how often are you picking up
25   shifts with Steadfast?

P. Clark - Direct

1   A.   Three shifts a week, average.

2   Q.   Have you always picked up about three shifts a week?   You

3   said, I think before, you were on and off the registry.

4   A.   Yeah.   When I'm active, that's about my normal.

5   Q.   Okay.   And has it ever been more or less than three

6   shifts a week at any point?

7   A.   Yeah.   When I was in RN school, because I was an LPN

8   first, I only worked, like, maybe every weekend or every

9   other weekend.

10  Q.   Okay.   So were you able -- well, have you worked for

11  other registries at the same time that you were working on

12  Steadfast's registry in the past?

13  A.   In the past.

14  Q.   Were there any benefits or what was the reason you

15  decided to work on more than one registry at the same time in

16  the past?

17  A.   Well, a lot of nurses or healthcare workers are on more

18  than one registry in case one has less work or one is going

19  to a facility that you like better.

20  Q.   And is that your experience?

21  A.   Yes.

22  Q.   Is that why you've --

23  A.   Yeah, that's why I did.

24  Q.   Okay.

25  A.   But that was, like, 2008.   Currently, I'm only on

─────────── P. Clark - Direct ───────────

1    Steadfast.

2    Q.  And why are you only working on Steadfast's registry as

3    opposed to working on multiple, for the reasons you've stated

4    just a moment ago?

5    A.  Because there's plenty of facilities available.

6    Q.  Okay.  So are you able to -- you said you are picking up

7    about three shifts a week right now?

8    A.  Uh-huh.

9    Q.  Are those all the shifts --

10   A.  That's all I want.

11   Q.  Okay.  Has Steadfast ever provided you with any training

12   for nursing services?

13   A.  No.

14   Q.  Has Steadfast ever provided any instructions or guidance

15   to you on how to provide nursing services at a facility?

16   A.  No.

17   Q.  Is anyone from Steadfast's office, meaning their -- I'm

18   not asking about maybe other nurses who are working shifts at

19   a facility, but if you know, have you ever seen anybody from

20   Steadfast's office on site at a facility while you're

21   working?

22   A.  No.

23   Q.  Have you ever received a performance evaluation from

24   Steadfast?

25   A.  No.

P. Clark - Direct

1   Q.  Have you ever negotiated your rate of pay for shifts
2   you've picked up on Steadfast's registry?
3   A.  Not so often but sometimes -- not recently, but in the
4   past, Steadfast would offer a bonus or something if they were
5   really short-staffed or a facility really needed somebody at
6   the last minute.
7   Q.  Okay.  Are those the typical circumstances --
8   A.  That's not typical.  But it has happened.
9   Q.  Okay.  Let me -- okay.  So you said when there's a short
10  staff --
11  A.  Immediate, emergent need.
12  Q.  And do you track your own hours for the shifts you pick
13  up through Steadfast?
14  A.  I do.
15  Q.  How do you submit those -- or do you submit those hours
16  to Steadfast?
17  A.  I do.  I e-mail a picture of my time sheet with my name
18  and my title and the facility I worked and the date along
19  with a signature from someone at the facility.
20  Q.  Okay.  And what is the -- do you know what the purpose of
21  getting a signature from the facility is on your time sheet?
22  A.  To verify the time between Steadfast and me and them.
23  Q.  Okay.  You said you've been on and off with the
24  registry --
25  A.  Correct.

Carol L. Naughton, Official Court Reporter

P. Clark - Cross

```
 1    Q.  -- for Steadfast?
 2            Have you worked in full-time employment since you've
 3    been with Steadfast since around 2008?
 4    A.  Other employment, yes.
 5    Q.  And why have you -- you're not currently employed by a --
 6    directly with a facility; is that right?
 7    A.  That's correct.
 8    Q.  Why do you choose to work through a registry?
 9    A.  Well, with the agency, it's very flexible.  You make -- I
10    can make my own hours, and I do like having a home facility,
11    but, you know, like a work family, but, you know, some places
12    aren't a good fit.  So Steadfast is always there, has always
13    been there, you know, in between with lots of work.
14            MS. RUST:  Okay.  Those are all the questions I have
15    for you.  Someone from the Department may have a few
16    questions for you.  Thank you, Ms. Clark.
17            THE COURT:  Any cross-examination?
18            MS. LEWIS:  Yes, Your Honor.
19                       CROSS-EXAMINATION
20    BY MS. LEWIS:
21    Q.  Good morning, Ms. Clark.
22    A.  Good morning.
23    Q.  Ryma Lewis from the Department of Labor.  I just have a
24    couple of questions for you in follow-up to the responses you
25    gave a moment ago.
```

P. Clark - Cross

```
1            So you've been a long-term nurse with Steadfast, you
2    said, since approximately 2007?
3    A.  Uh-huh, yes.
4    Q.  And first you worked at Steadfast as an LPN?
5    A.  Correct.
6    Q.  And 2017, you became an RN; is that right?
7    A.  Correct.
8    Q.  And you've worked with them, since 2007, on a part-time
9    basis, more or less; is that right?
10   A.  More or less.
11   Q.  And you've worked part time because you have a
12   dual-income household and your husband has a good job, so you
13   don't need to work full time; is that correct?
14   A.  Yes.
15   Q.  And when you first signed up with Steadfast back in 2007,
16   they did different types of work; they were doing home health
17   as well, correct?
18   A.  Steadfast?
19   Q.  Yes.
20   A.  I don't think I ever did a home-health case with them.
21   Q.  Okay.  Are you aware that they did home health back in
22   2007?
23   A.  I'm thinking, because I did do a couple of home-health
24   cases with the other agency, but I don't think I did one with
25   Steadfast.  If I did do one, I don't remember.
```

644

———P. Clark - Cross———

```
 1   Q.   Okay.  So when you signed up to work with them back in
 2   2007, that was as an LPN, right?
 3   A.   Yes.
 4   Q.   And when you signed up back then, you were interviewed to
 5   work at Steadfast in 2007, right?
 6             MS. RUST:  Objection.  Outside the scope.
 7             THE WITNESS:  Yes.
 8             THE COURT:  Objection overruled.
 9   BY MS. LEWIS:
10   Q.   And in between 2007 and when you came back in 2017, when
11   you came back as an RN, your -- well, let me ask it this way:
12             How much were you paid as an LPN when you worked at
13   Steadfast?
14   A.   I don't remember back then -- back then, in 2007-2008,
15   and then, you know, I was there '14, '15, a little bit in
16   '17.
17   Q.   So somewhere between '14 and '17 as an LPN?
18   A.   No.  That's the years that I worked there.  I don't
19   remember the pay.  Maybe $30 or 35 an hour.
20   Q.   And then when you came back to work as an RN, your rate
21   of pay didn't increase that much, correct?
22   A.   Correct.
23   Q.   And you talked to Lisa about that, because LPN, RN,
24   there's a higher level of responsibility associated with
25   being an LPN versus RN in terms of the job duties and
```

P. Clark - Cross

1    responsibilities; isn't that right?

2    A.   Yeah.   Yes.

3    Q.   Okay.   And Lisa -- when you talked to her about it, you

4    tried to negotiate a higher rate because now you are an RN,

5    not an LPN, and Lisa, she wouldn't budge on increasing your

6    amount to the range that RNs were paid, correct?

7    A.   Correct.

8    Q.   And so the only time that Steadfast has given you an

9    increased rate of pay is based upon Steadfast's needs, right?

10           MS. RUST:   Objection.   Calls for speculation.

11           THE COURT:   Objection overruled.

12           THE WITNESS:   What was the question?

13   BY MS. RUST:

14   Q.   Sure.

15           So the only time that you received an increased rate

16   of pay, in your testimony earlier, you said it was because

17   Steadfast had a -- you know, they were in a bind, they

18   were -- they needed a nurse at the facility, right?

19   A.   Right.

20   Q.   So it wasn't based upon your skills and experience; it

21   was based upon Steadfast's needs.   Is that right?

22   A.   Or the facilities that was -- hired Steadfast.

23   Q.   The facilities that would hire Steadfast?

24   A.   Yeah.

25   Q.   So at the end of the day, Steadfast's needs, correct?

────────────────── P. Clark - Cross ──────────────────

1           MS. RUST:  Objection.

2           THE COURT:  Now I'm going to sustain it.

3           MS. LEWIS:  Okay.

4    BY MS. LEWIS:

5    Q.  You also testified about using the app that Steadfast

6    recently -- you said you started to recently use the app.

7    When did you start to use that app?

8    A.  Just in the last few months.

9    Q.  Okay.  Can you give me a range?  Just give us an idea so

10   when we say "last few months" --

11   A.  Yeah, two months.  I mean, it's been up there for several

12   months, but it wasn't working properly for the first, I don't

13   know how long, three or four months, but it's working now.

14   Q.  Okay.  So initially when they rolled it out, you were

15   still going about the same process of getting shifts through

16   the schedulers at Steadfast, correct?

17   A.  Correct.

18   Q.  And now with the shifts, you sometimes get them through

19   the app, still sometimes get them through the scheduler; is

20   that correct?

21   A.  Correct.

22   Q.  And whether you are using the app or the schedulers, you

23   still have to confirm your shifts directly with Steadfast; is

24   that right?

25   A.  Correct.

─────────────────── P. Clark - Cross ───────────────────

1   Q.  You also indicated during your testimony that you have

2   worked with other agencies; is that right?

3   A.  I did in 2008.

4   Q.  In 2008?

5   A.  Uh-huh.

6   Q.  But not in your second go-round, coming back as an RN?

7   A.  No.  Correct.

8   Q.  And you've never spoken to facilities directly about

9   scheduling, correct?

10  A.  I have.

11  Q.  And when you talked to the facilities directly about

12  scheduling, were you reprimanded by Lisa at Steadfast?

13  A.  Yes.

14  Q.  Can you tell us about that?

15  A.  I was told to go through the office and not directly

16  through the facility.

17          MS. LEWIS:  No further questions for this witness.

18          THE COURT:  The Court has a question.

19          You indicated that you are still working on the

20  registry at Steadfast; is that correct?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Did you volunteer to come testify this

23  morning?

24          THE WITNESS:  Yeah.

25          THE COURT:  Did you volunteer to come in?

P. Clark - Redirect

```
1              THE WITNESS:  Did I volunteer?
2              THE COURT:  Yes.
3              THE WITNESS:  I was subpoenaed.
4              THE COURT:  You were subpoenaed to testify.  Okay.
5              And in coming in to testify this morning, do you
6    have any concern about your ability to continue to work for
7    Steadfast?
8              THE WITNESS:  No.
9              THE COURT:  Thank you very much.
10             Any further questions?
11             MS. RUST:  Brief redirect, Your Honor.
12             THE COURT:  All right.
13             THE WITNESS:  I just don't feel like I'm very
14   helpful.
15                    REDIRECT EXAMINATION
16   BY MS. RUST:
17   Q.  It's okay, Ms. Clark.  Just asking you to respond to the
18   questions.  I just have a couple of follow-up questions.
19             Regarding the questions about scheduling directly
20   with the facility, were there some instances where there were
21   shifts that got double-booked when you scheduled through the
22   facility?
23             MS. LEWIS:  Objection.  Calls for speculation.
24             THE COURT:  Well, if she knows.  Overruled.
25   BY MS. RUST:
```

P. Clark - Redirect

1    Q.   So let me state the question again, then.

2             THE COURT:  Let's specify.  When you say

3    "double-booked," let's clarify.  Double-booked with respect

4    to her or what?

5             MS. RUST:  Her schedule, if she was double-booked

6    for --

7             THE WITNESS:  Two showing up for one position, is

8    that what you mean, when two nurses show up for one position?

9    BY MS. RUST:

10   Q.   No.  So my question is:

11            In the instances where you were scheduling with the

12   facility or talking to the facility about scheduling directly

13   with them, was there ever an instance where you

14   double-booked -- your shifts were double-booked, meaning you

15   were supposed to be in more than one facility at a time or

16   you had overlapping shifts?

17   A.   No.

18   Q.   You're not aware of picking up multiple shifts?

19   A.   No.

20   Q.   Did Lisa talk to you about getting double-booked?

21   A.   No.

22   Q.   Ms. Lewis asked you some questions about your rate of

23   pay.  Are you aware of other facilities on Steadfast's

24   registry that pay a higher rate than the facility you are

25   currently taking shifts at?

P. Clark - Redirect

1    A.   Yes.   There's a few facilities that are paying a higher

2    rate.

3    Q.   Okay.   And do you like those facilities?

4    A.   No.   I don't want to travel that far.

5    Q.   Okay.   So you testified earlier that the factors that

6    were important to you in picking up shifts were whether you

7    like the facility and the distance, right?

8    A.   Correct.

9    Q.   So have you declined to take opportunities with those

10   higher hourly rate shifts because of those factors?

11   A.   Yes.

12   Q.   Okay.   And could you take shifts at those other

13   facilities that pay higher hourly rates if you wanted?

14   A.   Yes, probably.

15           MS. RUST:   Okay.   Those are all the questions I have

16   for you.   Thank you, Ms. Clark.

17           THE COURT:   May the witness be permanently excused?

18           MS. RUST:   Yes, Your Honor.

19           MS. LEWIS:   Yes, Your Honor.

20           THE COURT:   You are permanently excused, ma'am.

21   Have a good day.

22           THE WITNESS:   Thank you.

23           (Witness excused.)

24           THE COURT:   Next witness.

25           MS. RUST:   The defendants' next witness is Napolean

—N. Alston - Direct—

1   Alston, and I understand he has arrived.

2           (Witness sworn.)

3           NAPOLEAN ALSTON, called by the Defendants, having

4   been first duly sworn, was examined and testified as follows:

5                    DIRECT EXAMINATION

6   BY MS. RUST:

7   Q.   Good morning, Mr. Alston.

8   A.   Good morning.

9   Q.   Can you state your name for the record and spell it for

10  the court reporter.

11  A.   Napolean, N-a-p-o-l-e-a-n, A-l-s-t-o-n, and I'm a Jr.

12  Q.   Okay.  Napolean Alston, Jr.  And just so you know, you

13  have to keep your mask on the whole time, but you've got the

14  mic, so just try to speak as clearly as you can so that the

15  court reporter can get down everything that you're saying.

16  A.   Okay.

17  Q.   So, Mr. Alston, what is your occupation?

18  A.   Licensed practical nurse.

19  Q.   Okay.  And are you -- how long have you been a licensed

20  practical nurse?

21  A.   About 21 years.

22  Q.   Okay.  Are you familiar with Steadfast Medical Staffing?

23  A.   Absolutely.

24  Q.   Are you on Steadfast's registry?

25  A.   I am.

N. Alston - Direct

1   Q.   How long have you been on Steadfast's registry?

2   A.   I wouldn't know exactly, but if I can guesstimate it,

3   since probably about 2014 or 2015 --

4   Q.   Okay.

5   A.   -- roughly.

6   Q.   And are you currently picking up shifts on Steadfast's

7   registry?

8   A.   I am.

9   Q.   Okay.  How often are you picking up shifts?

10  A.   Very often.  Every week.

11  Q.   Every week?

12  A.   Uh-huh.

13  Q.   Do you pick up the same number of shifts every week?  Or

14  does it vary?

15  A.   It varies according to what I want to do.

16  Q.   What was the last thing you said?

17  A.   According to what I want to do, you know, how I want to

18  work.

19  Q.   Okay.  So are you -- I'm going to come back to that, but

20  just to follow up, have you been picking up shifts on

21  Steadfast's registry regularly since 2015?

22  A.   Yes.

23  Q.   Has it always been every week?

24  A.   Yes.  There might have been -- I was at Old Dominion

25  University, so I think there was like a year that I kind of

————N. Alston - Direct————

1   didn't work a lot or hardly at all.

2   Q.  I'm sorry.  I can't understand.

3   A.  I'm sorry.  I have a bad lisp, and this mask is not

4   helping it.

5           There was about a year -- I went to Old Dominion

6   University.  I graduated from there, and there was about a

7   year, while I was going to school there, that I didn't take

8   shifts that often, but I was in school at the time.  But then

9   as soon as I finished, I picked the shifts back up.

10  Q.  Okay.  So have you ever been to Steadfast's office in

11  Norfolk?

12  A.  Yes.

13  Q.  Have you ever provided nursing services at Steadfast's

14  office in Norfolk?

15  A.  I don't know what you mean by that.  Nursing services at

16  the office?

17  Q.  Correct.

18  A.  Like, working in the office?

19          THE COURT:  Do not ask her questions, Mr. Alston.

20  Just tell her you don't understand.

21          THE WITNESS:  I don't understand -- have I served as

22  a nurse in the office?

23  BY MS. RUST:

24  Q.  Yes.  Have you provided nursing services in the office at

25  Steadfast's --

654

N. Alston - Direct

1    A.  No, ma'am.

2    Q.  -- office?

3         Okay.  Tell me about picking up shifts.  How do

4    you -- when you're taking shifts from the registry, first,

5    are you going to various facilities currently?

6    A.  Typically, you would go to various facilities that are

7    available for hours that suit my needs.  I would say for the

8    past year, I've been primarily at one facility that I've been

9    working that has a lot of needs.  I like the facility.  So

10   I've been primarily there the whole time.  I haven't gone

11   anywhere else.

12   Q.  Okay.  And have you wanted to pick up shifts at other

13   facilities, or you want to only pick up shifts at this

14   facility?

15   A.  Oh, no.  I stay there.  I like this facility, so I've

16   stayed there.  I can pick up shifts at other facilities, but

17   I choose to stay at this one.

18   Q.  Okay.  So how do you schedule shifts from the registry

19   right now?

20   A.  Well, there's a website.  You will go on the website, and

21   there will be a list of facilities and needs, hours, and you

22   can scroll down and choose what you want -- you know, what

23   facility you would like to go to and what shift you can work,

24   and you would click on it and claim a shift.

25         There's a little time in between where the --

─────────── N. Alston - Direct ───────────

1   Steadfast will confirm it.  Once you claim the shift, they
2   will confirm with that facility, do you still need this, you
3   know, these hours and this availability, because we have a
4   nurse that claimed the shift.
5          Once that facility confirms, yes, we still do need
6   that, then Steadfast will reply to that website, saying that
7   the shift has been confirmed, they do still need you, so, you
8   know, you can go during that shift.
9   Q.  Okay.  And have you scheduled a shift through that site
10  that way recently?
11  A.  With the facility I'm at now, I've been there so long,
12  I've kind of, you know -- as with nursing, you kind of get
13  used to things, and people get used to you.  So the facility
14  likes my work a lot, so I've kind of been on a personal basis
15  with them.
16         So, recently, I just go to the management at the
17  facility, and they will tell me, "We need you this, this,
18  this, and this."  So I haven't gone through the registry in,
19  you know, the past couple of months due to that.
20         I just go to them directly and ask them, you know,
21  "What do you need me for?"
22         And they'll say, "We need you this day, this day,
23  this day."
24         And I'll say, "Okay."  Then I'll just let Steadfast
25  know that I'm working these days here.

———N. Alston - Direct———

1   Q.  So when you are talking to the facility about the shifts,

2   those are still shifts that you're working through Steadfast,

3   though; is that right?

4   A.  Absolutely.

5   Q.  Okay.  So tell me again, who are you talking to at the

6   facility?  Is there a certain position that you typically --

7   A.  The actual facility scheduler, the person that schedules

8   shifts through different agencies, you know, that their own

9   employers -- I mean, employees -- I actually go through them.

10  Q.  So when you talk to the scheduler and pick up shifts

11  directly with the scheduler at the facility --

12  A.  Yes.

13  Q.  -- do you confirm with Steadfast what you've picked up

14  through the facility?

15  A.  Yes.  You know, as a courtesy, I let Steadfast know I've

16  picked up these hours and --

17  Q.  Sorry.  I don't mean to cut you off.

18        Do you always let Steadfast know if you've picked up

19  shifts directly with the facility?

20  A.  You know, honestly, there might have been, maybe, some

21  weeks that I didn't let them know some days, but I just turn

22  in my time sheets at the end of the week, and Steadfast

23  always confirms the hours with the facility.

24        They will call them and say, you know, "We've got

25  these time sheets from Napolean that say he was there Monday,

N. Alston - Direct

```
 1   Wednesday, Thursday, at these hours."
 2           And the facility will confirm and say, "Yes, he was,
 3   and he worked," and then Steadfast will pay me for it.
 4   Q.  So have you ever been reprimanded or suffered any
 5   consequences when scheduling shifts directly with the
 6   facility?
 7   A.  Not -- well, I've been told that that is not the way that
 8   they would like it to go, and can I please stick to the
 9   guidelines of Steadfast, yes.
10   Q.  Okay.  Have there been any consequences, though, for
11   doing that?
12   A.  No.
13   Q.  Okay.  After you were told by Steadfast that -- I think
14   you said they were the guidelines to not schedule --
15   A.  Yes, ma'am.
16   Q.  Have you still scheduled through the facility after
17   receiving those comments?
18   A.  No.  The owner of Steadfast has got someone that will
19   take lightly not following rules.  So, no, if after I was
20   told, you know, you need to follow the guidelines, I
21   typically will revert back to following and letting them know
22   that, "Hey, I got these hours.  Is that okay?"
23           So I would send a text to a number, and I would say,
24   "I've got this day, this day, this day, these hours.  Is it
25   okay if I work these hours?"
```

N. Alston - Direct

1          And they will text back and say, "Yes, you can work

2    the hours."

3    Q.  And in the instances when you did not notify Steadfast,

4    there were no issues, though, no consequences; is that right?

5    A.  Yeah.

6          MS. LEWIS:  Objection.  Asked and answered.

7          THE COURT:  Sustained.

8          MS. LEWIS:  This is prior testimony.

9    BY MS. RUST:

10   Q.  Have you ever worked in a different staffing agency

11   besides Steadfast?

12   A.  Yes.

13   Q.  Have you worked with a different staffing agency at the

14   same time as being on Steadfast's registry?

15   A.  Yes.

16   Q.  And why would you choose to work with more than one

17   registry at a time?

18   A.  With agency nursing, sometimes our hours are not

19   available.  With the agency you're working, you work when

20   facilities need help.  So to supplement your lifestyle, to

21   make sure you are paying your bills on time, sometimes

22   it's -- it's beneficial for you to have more than one area

23   that you can go to to meet the needs of your lifestyle.

24   Q.  Okay.

25   A.  To make ends meet.

659

—— N. Alston - Direct ——

1   Q.  So when you've worked for Steadfast and other registries

2   at the same time, how would you choose to split up shifts

3   amongst the registries?

4   A.  So the other agency does mostly occupational health.  So

5   with that, I do -- I work at, like, Smithfield packing plant

6   in their clinic and the Surry Nuclear Power Plant/Dominion

7   Energy in their clinic.

8           So they would say, "We need a nurse for this day,

9   this day, this day," and I will write it down, their needs,

10  and then if it only comes out to, let's say, 24 hours, then I

11  would say, "That's only 24 hours, but I need, you know, 40 to

12  meet my needs financially," or "I need this amount."

13          So I will go to Steadfast, pick up hours at other

14  shifts; and then, total, I will meet my goal of 40 or 50

15  hours, however many I need.  If I'm going on vacation, I will

16  try to do 80.

17  Q.  Okay.  Let me come back to that in a minute.

18          So I want to clarify, when you're scheduling, have

19  you ever contacted -- you talked about scheduling through the

20  site and potentially with the facility.

21          Have you ever called Steadfast to schedule shifts?

22  A.  No.

23  Q.  Okay.  Has Steadfast ever called you about available

24  shifts?

25  A.  Oh, years ago.  That's not the way they work now.  The

─────N. Alston - Direct─────

1  way they work now is you go on the site and see if you want
2  to do something, and you choose it.  Years ago, you know, in
3  the very beginning, when I first started, it was -- you know,
4  schedulers would call you and say, "We have a need at this
5  facility, we have a need at that facility, are you
6  available?"  And you would, you know, say yes or no.
7  Q.   Okay.  So whether you're talking to a scheduler on the
8  phone at Steadfast or looking at the website or maybe even
9  talking to the facility, are you able to choose whichever of
10 those shifts that are available?
11 A.   Absolutely.
12 Q.   And what factors do you consider when you are choosing
13 which shifts or facilities to pick up with?
14 A.   In nursing, it's more of a -- we kind of go off of word
15 of mouth with facilities that are not -- how can I explain
16 it?
17         The way I choose my shifts is according to what my
18 lifestyle is.  So let's say I want to go on a two-week
19 vacation.  I will schedule a lot of shifts, as many as I can,
20 because I want to save money to go.
21         Or if I have to take time off for school and I miss
22 six days of not working, then I'll say the next week, "Let me
23 pick up extra hours to make up what I didn't make."  That's
24 what I love about contracting.
25         On occasion, it's also according to facilities.

Carol L. Naughton, Official Court Reporter

N. Alston - Direct

1    Some facilities are very hard, as far as the work, than

2    others.  So if there is a facility that I know to be very,

3    you know, short-staffed a lot and you will go and you will

4    work very hard, I kind of shy away from those facilities, try

5    to choose some that are a little easier.  It just depends on

6    how I choose shifts and choose facilities.

7              THE COURT:  Mr. Alston, try to make your responses

8    concise, and she will follow up if she does not get

9    everything she needs from you.

10             THE WITNESS:  Okay.

11   BY MS. RUST:

12   Q.  Okay.  So I think you said that if the facility is

13   difficult, you will consider that when picking a shift?

14   A.  I consider a less difficult one.  But if it's not

15   available, then I have no problem with working any facility.

16   Q.  Okay.  So are there any other factors besides the level

17   of difficulty or, I think you said the availability of

18   shifts, based on how much you want to work in a week versus

19   vacation, et cetera.

20   A.  Uh-huh.

21   Q.  Is there anything about a particular facility or the

22   aspects of that shift that are important for you to consider

23   when picking it up?

24   A.  No.

25   Q.  Okay.  Can you decline any of the available shifts that

Carol L. Naughton, Official Court Reporter

—————N. Alston - Direct—————

1    are on the registry?

2    A.   Yes.

3    Q.   Have you ever -- have you ever declined any shifts?

4    A.   It's not really a question of declining because you

5    wouldn't -- you wouldn't click the shift if you didn't want

6    it.  So it's not like you would say, "No, I'm not going to

7    work it," because you wouldn't -- you would only click it if

8    you wanted to do it.

9    Q.   Okay.  What about when you've been, in the past, talking

10   to a scheduler at Steadfast on the phone, if you're talking

11   about availability?

12   A.   They would call and say, "We have this facility, these

13   hours.  Can you do that?"

14            "No, I can't do it that day," or, "Yes, I can do

15   it."

16   Q.   Have there been any -- have you ever experienced any

17   consequences for declining to take available shifts?

18   A.   No.

19   Q.   And on Steadfast's registry, are you required to work a

20   minimum or maximum number of hours?

21   A.   No.

22   Q.   So who would you say determines your work schedule?

23   A.   Me.

24   Q.   What do you do if you want to -- you've mentioned you've

25   taken some breaks from Steadfast's registry in the past.

─────N. Alston - Direct─────

```
 1          What do you do if you want to take a break or stop
 2   taking shifts for a while?
 3   A.  I do it.
 4   Q.  Do you have to notify Steadfast?
 5   A.  No.
 6   Q.  Do you notify Steadfast when you are going on vacation?
 7   A.  No, ma'am.
 8   Q.  Has Steadfast ever provided you with any training?
 9   A.  We had -- in the very beginning, we had training, but
10   that's every nursing job you take.  So you go over, you know,
11   your HIPAA violations and your normal nursing training, yes.
12   Q.  And you said that it was normal nursing training?
13   A.  Yeah.  Anywhere you go, you will have the standard
14   nursing training.  Like, you'll have a short test on
15   medications or a short test on scenarios and what you would
16   do, HIPAA violations and HIPAA laws, and things like that.
17   So, yes.
18   Q.  And that's been your experience at the various facilities
19   you've worked at in your career.  Is that what you're saying?
20   A.  Yes, ma'am.
21   Q.  Okay.  Have you ever received a formal performance
22   evaluation from Steadfast?
23   A.  Sort of.  The performance evaluation comes from the
24   facilities.  So I've gotten plenty evaluations from
25   facilities of how awesome I am, but Steadfast will relay that
```

—N. Alston - Direct—

1  to me.  But, yeah.

2  Q.  Okay.  So it's coming from a facility?

3  A.  Yes.

4  Q.  Okay.

5  A.  Because they are the ones that, you know, are watching me

6  work.

7  Q.  And is the rate of pay consistent with every shift or

8  facility, or does it vary?

9  A.  Sometimes it varies, but pretty much, it will be a set

10  rate.  But sometimes it will vary according to how far you

11  are going, what facility it is, the emergence of the need.

12  Sometimes you'll have a facility that needs someone, and they

13  call at 8:00 in the morning, and they need someone for 3:00.

14          So that would be, like, a short-notice kind of

15  thing, and Steadfast would call and say, "This was on short

16  notice, and they are willing to pay extra if you can make it

17  out there."

18  Q.  Okay.  And do you track your own hours for the shifts you

19  pick up through Steadfast?

20  A.  Yes.

21  Q.  Do you notify Steadfast what your hours are?

22  A.  Yes.  Or we turn in the time sheets, and I, you know,

23  track my own hours.

24  Q.  Okay.  And does a facility -- somebody from a facility

25  sign that time sheet?

—————N. Alston - Direct—————

```
 1   A.  Yes, ma'am.

 2   Q.  And is that to verify the hours that you said you worked

 3   on the time sheet?

 4   A.  Yes, ma'am.

 5   Q.  Have you ever experienced any errors or discrepancy in

 6   the pay that you have received from Steadfast?

 7   A.  Never.

 8   Q.  So you've been nursing for 20 years, right?

 9   A.  Yes, uh-huh.

10   Q.  Why do you choose to work through an agency or a

11   registry?

12   A.  When you work for a regular employer, which I've had

13   plenty -- I did it more for the freedom.  Like I said, I

14   started back at Old Dominion University, and for the freedom

15   of kind of setting my own hours and doing my own thing as

16   opposed to -- I mean, I love the fact that I can say I'm

17   going to Chicago next week for six days and not have to go to

18   someone and say, "Can I go to Chicago?"

19        "Well, no, we can't let you go.  Maybe you can go

20   next month."

21        I can go and come as I please.  I have the luxury of

22   saying I'm going to take six days off and being able to make

23   up six days however I want to do it the next week.  It's the

24   freedom to work the way I want to work, how I want to work,

25   take what I want to make, when I want to make it.
```

N. Alston - Cross

1        MS. RUST:  Okay.  Those are all the questions I have

2   for you.  Opposing counsel may have a couple questions.

3        THE WITNESS:  Okay.

4        THE COURT:  Any cross?

5        MS. LEWIS:  Yes, Your Honor.

6                    CROSS-EXAMINATION

7   BY MS. LEWIS:

8   Q.  Good morning, Mr. Alston.

9   A.  Good morning.

10  Q.  My name is Ryma Lewis.  I'm an attorney for the U.S.

11  Department of Labor.

12  A.  Yes, ma'am.

13  Q.  I understand you have been working with Steadfast for

14  quite some time, at least since 2014?

15  A.  Yes, ma'am.

16  Q.  And when you started working at Steadfast, you completed

17  an Employment Application; isn't that correct?

18  A.  Yes, ma'am, I did.

19  Q.  I want to direct your attention to this document.

20       MS. RUST:  I'm going to object.  This is outside the

21  scope.

22       MS. LEWIS:  Your Honor, she asked about when he

23  started working there.

24       THE COURT:  Continue.

25  BY MS. LEWIS:

N. Alston - Cross

1   Q.  When you completed this Employment Application, you had

2   to provide the shifts available to work, and you put

3   everything and anything pretty much, correct?

4   A.  Yes, ma'am.

5   Q.  And there was also an option for you to decide what type

6   of assignments that you would work, and there was full time,

7   part time, per diem, permanent, travel, variety.  And what

8   did you select?  What kind of work?

9   A.  The type of assignment?

10  Q.  Yes.

11  A.  Per diem.

12  Q.  Okay.  Now, within -- you've been a nurse for 21 years.

13       What is per diem?

14  A.  Per diem is basically how I just explained to where you

15  would -- you would have the freedom of dictating what days

16  you want to work, what hours you want to work.  That's

17  basically what per diem is.

18       So full time would be hours set for you

19  specifically.  Part time would be hours set for you

20  specifically but not at the expense of full-time hours; it

21  would be somewhere between 20 and 25 hours.

22  Q.  So per diem is daily basis, as needed?

23  A.  Right.  As I --

24  Q.  And in your 21 years of working as an LPN, have you --

25  you've worked per diem and also full time?

N. Alston - Cross

1    A.  Yes, ma'am.  I've had full-time positions.

2    Q.  And you also alluded to working at other agencies.

3    You've also worked per diem in those capacities as well,

4    correct?

5    A.  Yes, ma'am.

6    Q.  And you've worked in facilities, be it hospitals or

7    nursing homes as well?

8    A.  Correct.

9    Q.  And within those settings, per diem, that's just

10   something that is particular to the healthcare profession; is

11   that right?

12   A.  Yes, ma'am.

13   Q.  And so being per diem with Steadfast versus a hospital,

14   it's still the same.

15   A.  It is.

16   Q.  You work on a daily basis based upon the schedule you

17   want, correct?

18   A.  Yes, ma'am.  This -- yes, per diem would mean that, yes.

19   Q.  So even if you were to work at a hospital per diem, you

20   still have that same degree of flexibility.

21   A.  With an employer, per diem can be a little bit different,

22   because they will dictate -- like, Sentara wouldn't say you

23   can work per diem and not work this month.  They will say you

24   can work per diem, but you have to do this many weekends in a

25   month and this many days.  So however you do it during the

—N. Alston - Cross—

1   month is your, you know, discretion, but you need to do at
2   least one weekend and, let's say, three or four days.
3            So that would be more indicative of working for,
4   like, a company like Sentara, or when I worked at Eastern
5   State or -- that would be a requirement; whereas when you're
6   contracting through an agency, I did not work a month or two
7   months, and there's no ramifications for it.
8   Q.  Okay.  And that's been the case -- scrolling down the
9   application, you also indicated -- when you worked at other
10  agencies too.  First Choice, for example.
11  A.  Yes, ma'am.
12  Q.  And you indicated, in terms of scheduling -- so you
13  mentioned that there's a website.  It's an app on your phone,
14  correct?
15  A.  Yes, ma'am.
16  Q.  And when did you start using that app?
17  A.  This application is fairly new.  I just started using it
18  this year.
19  Q.  Okay.  Approximately what month?
20  A.  I honestly don't remember.  I'm sorry.  If I can
21  guesstimate it --
22            THE COURT:  Don't speculate.
23            THE WITNESS:  I honestly don't remember.
24  BY MS. LEWIS:
25  Q.  Okay.  Well, you've mentioned that you've been at your

Carol L. Naughton, Official Court Reporter

N. Alston - Cross

1  current placement through Steadfast for a while now; is that
2  right?
3  A.  Yes, ma'am.
4  Q.  When did you start there?
5  A.  I would say I started at -- working at this facility
6  November of 2020.
7  Q.  The app wasn't in place when you started working at that
8  facility --
9  A.  No, ma'am.
10  Q.  -- correct?
11  A.  No, ma'am, it wasn't.
12  Q.  So you got that assignment directly through Steadfast and
13  not the app; is that right?
14  A.  Correct.
15  Q.  So you didn't need to use the app to schedule that
16  initial placement at that facility, correct?
17  A.  Not at that time, no.
18  Q.  And so since you've been there, since approximately
19  November, you haven't regularly had the occasion to use the
20  app because, as you testified, you've only been working at
21  that facility; is that right?
22  A.  Correct.
23  Q.  And so when you were detailing how you go through the
24  app, you don't really know, because you were placed at that
25  facility back in November through Steadfast, this additional

N. Alston - Cross

1   means of scheduling; isn't that right?

2   A.  That's a little bit incorrect.

3            MS. RUST:  Objection.

4            THE COURT:  When they object, you have to stop.

5            What is the objection?

6            MS. RUST:  Mischaracterization of testimony.

7            MS. LEWIS:  Your Honor, he indicated he has been

8   there since November.  He hasn't worked at any other

9   facility.

10           THE WITNESS:  That's not totally correct.

11           THE COURT:  Mr. Alston, you don't talk when they are

12  talking to the Court.

13           THE WITNESS:  Okay.

14           THE COURT:  When they object, you stop talking.

15           THE WITNESS:  Yes, sir.  This is my first time.

16           MS. LEWIS:  I'll restate the question.

17           THE COURT:  No need.  The Court understood exactly

18  what the examination was.  The objection is overruled.

19  BY MS. LEWIS:

20  Q.  So, Mr. Alston, if you could answer my question.  My

21  question was:

22           You did not schedule your shifts with your current

23  placement through the app, correct?

24  A.  Not in the beginning, no.  So I don't do it through the

25  app now, no, but I have worked at other facilities since

Carol L. Naughton, Official Court Reporter

N. Alston - Cross

1    November of last year where I did use the app.

2    Q.  Which other --

3          THE COURT:  What he did on the app on the other

4    facilities is irrelevant.  We're just talking about what he's

5    done with Steadfast.

6          MS. LEWIS:  Right.

7    BY MS. LEWIS:

8    Q.  That's the question, what you have done with Steadfast.

9    A.  I've gone on Steadfast's app while working at Elizabeth

10   Adam Crump.  If Crump didn't have the hours that I needed, I

11   have used the app maybe more than ten times to get other

12   shifts to supplement what I need.

13         So if I was to say -- it's incorrect that I have

14   only worked at Crump for the -- since November.  It's not

15   correct.  I've worked at other facilities through Steadfast,

16   but Crump is 95 percent of where I've gone, but I have gone

17   to other facilities using the app.  That's how I know how it

18   works.

19   Q.  And so when you used the app on those other occasions,

20   you still had to get Steadfast's approval to confirm those

21   shifts, correct?

22   A.  Yes, ma'am.

23   Q.  And on the app, it doesn't have the rate of pay for those

24   facilities; isn't that right?

25   A.  That's correct.

N. Alston - Cross

1   Q.  So you still need to contact Steadfast to see how much

2   you would be paid if you were to work at those other

3   facilities.

4   A.  Correct.

5   Q.  It's not established.

6   A.  Yes, ma'am.

7   Q.  So Steadfast is still in the middle with respect to your

8   placement at other facilities.  Is that a correct

9   characterization?

10  A.  In the middle?

11  Q.  In the middle in terms of you being able to go work at a

12  facility.  They have to confirm the shifts, and they have to

13  tell you what you would be paid; is that right?

14  A.  Yes.

15  Q.  You don't negotiate your rate of pay directly with the

16  facilities?

17  A.  No.  Sometimes with Steadfast, but not the facility.

18  Q.  You still have to submit time sheets through Steadfast?

19  A.  Correct.

20  Q.  Steadfast pays you directly, not the facilities, correct?

21  A.  Right.

22  Q.  You also talked about how you also do occupational health

23  with other per diem agencies; is that right?

24  A.  Yes, ma'am.

25  Q.  And that's separate and apart from LPN, or is that just a

674

———N. Alston - Cross———

1    different --
2    A.  It's still in the scope of the nursing practice, just a
3    different type of nursing.
4    Q.  Okay.  And Steadfast doesn't provide you occupational
5    health placements; is that right?
6    A.  I don't know if they have those or not.  I've never done
7    any of them with them.  I just have done what I've done.
8    I've never done it.
9    Q.  So if you want to utilize that skill set, you use a
10   different agency?
11   A.  Right now, yes.
12   Q.  Okay.  And you rely on Steadfast to provide you -- you
13   indicated you've got a little bit of a hustler spirit,
14   hustling in terms of getting money --
15   A.  Uh-huh.
16   Q.  -- right?
17          And so Steadfast is one of your primary sources of
18   income, but if you want more money, just like any position,
19   you go out and look for more jobs, right?
20   A.  Exactly.
21   Q.  So in order to make more income from Steadfast, you just
22   have to work more hours; is that right?
23   A.  Correct.
24   Q.  So it's nothing of an entrepreneurial spirit with respect
25   to your position at Steadfast; it's just "If I want to make

1    more, I have to work more hours"; is that right?

2    A.  Correct.

3    Q.  So you don't independently market yourself to the

4    facilities directly; you go to Steadfast.

5    A.  Correct.

6    Q.  In terms of -- you talked about the training.  I mean,

7    you indicated that, in the beginning, when you signed up to

8    work with Steadfast, you had some, you said in the beginning,

9    training on HIPAA, normal nurse training.

10           Do you recall that testimony?

11   A.  Yes.

12   Q.  And within that -- that was with Steadfast.  When you

13   signed up with Steadfast, you had to take a skills test with

14   Steadfast to demonstrate your competency as an LPN; is that

15   right?

16   A.  Yes, ma'am.

17   Q.  And when you signed up, you also had to complete some

18   abuse and neglect training as well.

19   A.  Absolutely.

20   Q.  And that was through Steadfast and not the facilities.

21   A.  Yes.  The facility, when you go there, in most cases,

22   they will have their own training.  So when you get there,

23   they will give you their own in-services and training

24   according to what their company requires and how they do

25   things and their fire drills.  So you will go through some

N. Alston - Cross

1    trainings with the facilities that you go to.

2    Q.  So it was both, Steadfast and the facility.

3    A.  Yes, ma'am.

4    Q.  I just want to make sure I'm clear.

5    A.  Uh-huh.

6    Q.  Okay.  You also mentioned to the facilities -- well,

7    before I get there, have you ever been placed on any

8    do-not-return list?

9    A.  No, ma'am.

10   Q.  You also indicated that some facilities have provided you

11   evaluations; is that right?

12   A.  Yes.

13   Q.  Which facilities were those?

14   A.  Elizabeth Adam Crump, Waverly, Princess Anne Nursing

15   Rehab.

16          THE COURT:  What is the relevance of whether other

17   facilities have given an evaluation?

18          MS. LEWIS:  Well, Your Honor, with respect -- they

19   asked the question if they -- defendants in their direct

20   asked whether or not he had received any evaluations from the

21   facilities, trying to -- presumably trying to demonstrate a

22   lack of control.

23          My next question, if the Court would indulge for a

24   moment, is whether or not he is aware of the contractual

25   obligations between Steadfast and the facilities with respect

N. Alston - Cross

1    to the evaluations.

2            THE COURT:  Well, with respect to "his" evaluation.

3            MS. LEWIS:  Right, his evaluation.

4            THE COURT:  Okay.  All right, then.  Fine, now,

5    because even though that question was asked, you didn't

6    object to it.  It wasn't relevant.  The question is what goes

7    on with the evaluation between Steadfast and those people it

8    considered to be independent contractors.

9            So go on and ask him the question with respect to

10   his evaluations.

11   BY MS. LEWIS:

12   Q.  With respect to the evaluations that you've had, are you

13   aware of whether -- are you aware of the contractual

14   obligations, of the facilities to provide you feedback, that

15   Steadfast has with the facilities?

16   A.  No.

17   Q.  And we've talked about your hours.  Approximately how

18   many hours a week do you work on average?  Or a range, if you

19   can't give an average.

20   A.  An average would probably be about 50 to 60 hours.

21   Q.  Okay.  And when you work over 40 hours in a workweek,

22   have you ever received overtime compensation from Steadfast?

23   A.  No.

24   Q.  Have you questioned them about receiving overtime?

25   A.  No.

———N. Alston - Redirect———

 1          MS. LEWIS:  No further questions for this witness,

 2    Your Honor.

 3          THE COURT:  Thank you.

 4          MS. LEWIS:  Oh, I'm sorry, Your Honor.  One more

 5    question.

 6    BY MS. LEWIS:

 7    Q.  One last question about the evaluation.

 8          You said that you received feedback from the

 9    facilities about your performance.  Is it Steadfast that

10    relayed that feedback to you regarding their confidence or

11    their appreciation of your performance?

12    A.  Yes.

13    Q.  So that the facilities reported to Steadfast and you the

14    same in terms of, you know, their pleasure with your work?

15    A.  Yes, ma'am.

16          MS. LEWIS:  No further questions, Your Honor.

17          THE COURT:  Any redirect?

18          MS. RUST:  Very brief, Your Honor.

19                    REDIRECT EXAMINATION

20    BY MS. RUST:

21    Q.  Mr. Alston, regarding your -- Ms. Lewis asked you some

22    questions about, to make more money, you had to work more

23    hours; is that right?

24    A.  Yes, ma'am.

25    Q.  We talked earlier during your testimony about the factors

N. Alston - Redirect

1   that were important to you when choosing which facilities or
2   shifts to pick up.
3   A.   Yes, ma'am.
4   Q.   The hourly rate a facility or a shift is paying, is that
5   one of the factors you consider?
6   A.   No.  The hourly rate, to me, is wonderful.  It's actually
7   pretty good.
8   Q.   Okay.  So you could, if you wanted to -- so would you say
9   that you could choose -- can you choose shifts, though, that
10  do pay a higher hourly rate as opposed to a shift that is
11  available that pays a lower hourly rate?
12  A.   Through Steadfast?
13  Q.   Correct.
14  A.   Normally, it's a set rate no matter what the shift is.
15  Q.   I'm sorry?
16  A.   It's a set rate no matter the shift.
17  Q.   For every facility?
18  A.   Every facility is a little bit different.  So, yes, some
19  pay more than others.
20  Q.   Okay.  So you could choose -- so you are aware that some
21  facilities pay different hourly rates than others?
22  A.   Yes, ma'am.
23  Q.   So you could choose a facility that pays a higher rate as
24  opposed to a facility that pays a lower rate?
25  A.   Yes.

N. Alston - Redirect

1    Q.   Okay.  And to maximize your ability to earn money, you

2    could focus on higher hourly rate shifts; is that right?

3    A.   Yes, ma'am.

4    Q.   Okay.

5             THE COURT:  You know, both of you have gone over

6    what he could do.  The question is what he did do.  But

7    continue.

8             MS. RUST:  Sure.

9    BY MS. RUST:

10   Q.   So in the past, have you chosen a facility specifically

11   because the offered hourly rate was higher than another

12   available opportunity?

13   A.   Yes, ma'am, I have.

14   Q.   Okay.  And have you ever been in an -- has Steadfast ever

15   given you an in-service training?

16            MS. LEWIS:  Objection.  Asked and answered.  We've

17   been down this line of training several times.

18            THE COURT:  Sustained.  You asked that on your first

19   direct.

20            MS. RUST:  Okay.  I have no further questions.

21   Thank you, sir.

22            THE COURT:  May Mr. Alston be permanently excused,

23   counsel?

24            MS. LEWIS:  Yes, Your Honor.

25            MS. RUST:  Yes, Your Honor.

─────T. Hall - Direct─────

1           THE COURT:  You are permanently excused, sir.

2           (Witness excused.)

3           THE COURT:  Your next witness.

4           MS. RUST:  Your Honor, our next witness is Tawanda

5   Hall.

6           (Witness sworn.)

7           TAWANDA HALL, called by the Defendants, having been

8   first duly sworn, was examined and testified as follows:

9                       DIRECT EXAMINATION

10  BY MR. SIEGRIST:

11  Q.  Good morning, Ms. Hall.

12  A.  Good morning.

13  Q.  Please state your name for the record.

14  A.  Tawanda Hall.

15  Q.  Can you spell that for the Court, please.

16  A.  T-a-w-a-n-d-a H-a-l-l.

17  Q.  What is your occupation, Ms. Hall?

18  A.  LPN.

19  Q.  How long have you been an LPN?

20  A.  13, 14 years.

21  Q.  Are you familiar with the company Steadfast Medical

22  Staffing, Ms. Hall?

23  A.  Yes.

24  Q.  Are you working on Steadfast's registry currently?

25  A.  Yes.

```
                          ─────T. Hall - Direct─────
```

1   Q.   How long have you been on the registry?

2   A.   Approximately three and a half years.

3   Q.   And you are currently picking up shifts on the registry?

4   A.   Yes.

5   Q.   About how often are you picking up shifts?

6   A.   Every day.

7   Q.   Every day?

8        Can you give the Court an idea of how much you tend

9   to work per week.

10  A.   Probably 48 hours a week, depending on the hours of the

11  facility.

12  Q.   Does that vary from time to time?

13  A.   Yes.

14  Q.   Okay.  Of these shifts you just mentioned, have you ever

15  performed any nursing services at Steadfast's office?

16  A.   No.

17  Q.   Have you ever been to Steadfast's office?

18  A.   Yes.

19  Q.   Ms. Hall, has Steadfast ever supplied to you any

20  equipment to provide nursing services?

21  A.   No.

22  Q.   Okay.  Do you provide any of your own equipment to

23  provide nursing services?

24  A.   Yes.

25  Q.   What do you provide?

───────────── T. Hall - Direct ─────────────

1    A.   My stethoscope, blood pressure cuff, thermometer, pulse

2    ox machine, pens, notebooks.

3    Q.   Do you bring those with you to the facilities where you

4    work?

5    A.   Yes.

6    Q.   Okay.  Is there a reason you bring those with you?

7    A.   Sometimes the facilities don't have enough to go around,

8    and sometimes I just need it right away.  You never know

9    what's going on, so just knowing that I have it, I can

10   perform my duties.

11   Q.   Are you able to do your job without those pieces of

12   equipment?

13   A.   Not really.

14   Q.   Okay.  Ms. Hall, do you maintain your own liability

15   insurance for nursing services?

16   A.   No, I don't.

17   Q.   Have you considered it?

18   A.   Yes.

19   Q.   If you have considered it, is there a reason why?

20   A.   Because I'm a contractor and just want to be safe.

21   Q.   Understood.

22        Ms. Hall, I want to talk to you a little bit about

23   how you select assignments on the registry.

24        If you are going to select a particular shift, how

25   do you go about doing that through Steadfast's registry?

Carol L. Naughton, Official Court Reporter

———————T. Hall - Direct———————

1   A.  I usually call one of the schedulers, or I'll text the

2   schedulers, or sometimes if I go to a facility, often I will

3   go to their scheduler and ask them what shifts they have

4   available, and I would schedule with Steadfast and with the

5   scheduler at the facility.

6   Q.  Let's talk a little bit about your communications with

7   the Steadfast scheduler.

8         When you are having these conversations, what do you

9   all talk about?

10  A.  What is available, what shifts are available at certain

11  facilities.

12  Q.  Okay.  And then do you -- then what do you tell them?  Do

13  you tell them what you would like, or do you discuss

14  preferences for what you do or don't want in terms of a shift

15  or assignment?

16  A.  I just tell them my availability, and they just let me

17  know what they have available.

18  Q.  Okay.  So who determines your work schedule?

19  A.  I do.

20  Q.  Are you available to pick up any shifts that are

21  available for your licensure?

22  A.  Yes.

23  Q.  What about if you don't want to take a shift?  Are you

24  able to say "I don't want to take that shift"?

25  A.  Yes.

T. Hall - Direct

1   Q.   Okay.  And is that true even if you called the scheduler
2   directly and said, "Let's talk about availability"?
3   A.   Yes.
4   Q.   Is there any consequence if you tell a scheduler, "I
5   don't want to take this shift or that shift"?
6   A.   No.
7   Q.   Does the registry require you to work any minimum number
8   of shifts or number of hours?
9   A.   No.
10  Q.   Have they ever limited the number of shifts you take?
11  A.   No.
12  Q.   Have they ever limited the number of facilities that you
13  could work for?
14  A.   No.
15  Q.   When you are talking with the schedulers, do they give
16  you options of -- is it just one facility, or are there
17  shifts available at different facilities?
18  A.   They give you an option.
19  Q.   Okay.  Is there any limitation on -- let's say you want
20  to work at three facilities or five facilities or one
21  facility.  Is there any limitation on how many different
22  facilities you can select shifts at?
23  A.   No.
24  Q.   I think you mentioned earlier you scheduled shifts
25  directly with the facility before.

———————T. Hall - Direct———————

1   A.   Yes.

2   Q.   Who do you communicate with if you're going to do that?

3   A.   The scheduler at the facility.  And then I let the

4   scheduler know at Steadfast that I picked up those shifts.

5   Q.   Okay.  So you'll discuss with the facility, "I want to

6   work these shifts," and then communicate that to Steadfast

7   that you're taking the shift?

8   A.   Yes.

9   Q.   Is that accurate?

10  A.   Yes.

11  Q.   Okay.  How do you determine whether you want to work at a

12  particular facility?

13  A.   How do I determine?

14  Q.   Let me ask it a different way.

15        Are there any factors that you consider to

16  determine, maybe, "I like this facility better than that

17  facility"?  Are there things personal to you that you think

18  about when figuring out where you want to work?

19  A.   No.  Everyone needs help, so I just go.

20  Q.   Okay.  Have you ever decided "I don't like working at

21  that facility, I don't want to go there anymore"?

22  A.   Yes.

23  Q.   Okay.  Ms. Hall, what, in your experience, happens if,

24  let's say, you picked up a shift and you need to cancel it?

25  What process do you go through to go about doing that?

─────────T. Hall - Direct─────────

1   A.  You call the one -- call the scheduler at Steadfast and
2   let them know that you're not available, that you have to
3   call in and cancel that shift.
4   Q.  Okay.  Are there any consequence if you need to cancel?
5   A.  No.
6   Q.  Have you ever been running late for a shift, Ms. Hall?
7   A.  No.
8   Q.  So in your experience, do you know the process by which
9   you would let someone know if you were running late?
10  A.  I would call the scheduler on call --
11          MS. JONES:  Objection.  Calls for speculation.
12          THE COURT:  Well, no, the question -- rephrase the
13  question.  "In the past, what have you done when you were..."
14          First of all, have you ever run late?
15          THE WITNESS:  No, sir.
16          THE COURT:  Okay.  Then that's the end of that.
17  BY MR. SIEGRIST:
18  Q.  Ms. Hall, what do you want to do if you want to stop
19  accepting assignments for a period of time?
20  A.  What I would do, I would just contact the scheduler and
21  let them know that "I will be off the grid for a couple of
22  days, and I'll contact you when I'm ready to pick up a
23  shift."
24  Q.  Okay.  So do you need permission from Steadfast to --
25  let's say you want to go on vacation.  Do you need permission

—————————————T. Hall - Direct—————————————

1  from Steadfast to go ahead and do that?

2  A.  No.

3  Q.  And have you, in the past, taken periods of time where

4  you weren't taking shifts?

5  A.  Yes.

6  Q.  Okay.  Have you done that recently?

7  A.  Yes.

8  Q.  Ms. Hall, do you work on any other nursing registries

9  currently?

10  A.  No.

11  Q.  Is there a reason that you are not, or is that a personal

12  preference?

13  A.  Personal preference.  I like working for the company I

14  work with.

15  Q.  Have you ever worked full time for a facility directly?

16  A.  Yes.

17  Q.  What capacity did you work -- well, first, which

18  facilities have you worked at as a full-time employee?

19          MS. JONES:  Objection.  Relevance.

20          THE COURT:  Sustained.

21  BY MR. SIEGRIST:

22  Q.  In your experience working for facilities in the past,

23  can you describe how your schedule is determined when you're

24  going to work.

25          MS. JONES:  Objection.

———————————————— T. Hall - Direct ————————————————

1    THE COURT:  I just sustained that.  We're limiting

2  this case to working for Steadfast.

3  BY MR. SIEGRIST:

4  Q.  Ms. Hall, has Steadfast ever provided you with any

5  training or orientation?

6  A.  No.

7  Q.  Has Steadfast ever given you instructions on how to

8  perform nursing facilities at the facilities where you work?

9  A.  What do you mean?

10  Q.  Let me rephrase that.

11    Have you ever gotten direction from somebody at

12  Steadfast about how to go about providing nursing services at

13  the facilities where you work?

14  A.  No.

15  Q.  Is anyone from the Steadfast office ever on site at the

16  facilities when you are performing nursing services there?

17  A.  I can recall just once.  That's all.

18  Q.  Okay.  And to clarify, I'm not referring to other nurses

19  who are taking shifts from the registry, but are there any

20  other folks from the office who are at the facilities, when

21  you are working there, providing you directions on how to

22  nurse?

23  A.  Oh, no.

24  Q.  Have you ever received a performance evaluation from

25  Steadfast?

Carol L. Naughton, Official Court Reporter

—————————T. Hall - Direct—————————

1   A.   No.

2   Q.   Have you ever received discipline or corrective action

3   from Steadfast?

4   A.   No.

5   Q.   Do you track your own hours for shifts that you work?

6   A.   Yes.

7   Q.   And how do you go about tracking those?

8   A.   I just write it down on a calendar that I have to keep up

9   with my schedule, the hours that I've worked.

10  Q.   Do you submit that to anybody when you are done doing

11  that?

12  A.   I submit it to Steadfast weekly.

13  Q.   Okay.  And what information is on those documents?

14  A.   You put your time in, your time out, and your lunch, how

15  long you took for lunch, the signature of a staff member at

16  the facility, and my signature as well.

17  Q.   Okay.  And does that get verified by anybody at

18  Steadfast?

19  A.   Yeah -- yes.

20  Q.   Does that get verified by the facility?

21  A.   Yes.

22  Q.   Okay.  Has there ever been an error in any of the pay

23  that you've received through your work on the registry?

24  A.   I just recall once, when I first started.  That was it.

25  Q.   Okay.  Were you able to get that resolved?

—————————————————————T. Hall - Cross—————————————————————

1   A.  Oh, yes.  That was resolved in an hour.

2   Q.  Ms. Hall, you mentioned earlier that you had previously

3   worked as a full-time employee.

4           Why do you choose to work as a registry nurse?

5   A.  The flexibility and the pay increase.

6   Q.  Understand.

7           MR. SIEGRIST:  No further questions for the witness.

8           Ms. Hall, the attorney for the Department may have

9   some questions for you.

10          THE COURT:  Cross-examination.

11          MS. JONES:  Thank you, Your Honor.

12                       CROSS-EXAMINATION

13  BY MS. JONES:

14  Q.  Hi, Ms. Hall.  My name is Chervonti Jones from the

15  Department of Labor.  I have a few questions based upon the

16  responses you just provided.

17          You indicated that you worked for Steadfast,

18  correct?

19  A.  Yes.

20  Q.  And you've worked there for three to four years, roughly?

21  A.  Yes.

22  Q.  And do you recall how you began to work for Steadfast?

23  A.  I went into the office and filled out an application.

24  Q.  And if I could direct your attention to the monitor.

25          And is this a copy of the application that you

———————T. Hall - Cross———————

1   provided when you began working with Steadfast?

2   A.   Yes.

3   Q.   And this lists information and requests things, such as

4   your name, correct?

5   A.   Yes.

6   Q.   And your availability, correct?

7   A.   Yes.

8   Q.   And those are the type of shifts you wish to work,

9   correct?

10  A.   Yes.

11  Q.   Okay.  And you also indicated that you work -- that

12  during your work with Steadfast, you often provide your own

13  equipment; is that right?

14  A.   Yes.

15  Q.   And is that normally equipment just general tools of the

16  trade for general LPNs who provide similar services?

17  A.   Yes.

18  Q.   I'm sorry.  I couldn't hear you.

19  A.   Yes.  I'm sorry.

20  Q.   Thank you.

21       And I want to discuss the assignments.  You

22  indicated that you get assignments in two ways.

23       You contact Steadfast, correct?

24  A.   Yes.

25  Q.   And you contact the facility in which you want to be

T. Hall - Cross

1    placed, correct?

2    A.   Yes.

3    Q.   When you get an assignment from Steadfast, your only

4    options are the facilities they provide to you, correct?

5    A.   Yes.

6    Q.   So if they don't identify a facility, you can't work

7    there, correct?

8    A.   Correct.

9    Q.   So would you say the facilities in which you work are

10   based upon what Steadfast provides to you?

11   A.   Yes.

12   Q.   And when you provide that schedule with the facilities,

13   you are required to let Steadfast know that you are going to

14   be working at that facility, right?

15   A.   Yes.

16   Q.   And why are you required to let Steadfast know that you

17   will be working at that particular facility?

18   A.   So they'll know I'm scheduled that day, and if they have

19   someone or they have that shift available, they will know

20   that that shift has already been picked up.   It's

21   communication.

22   Q.   So just to clarify here, you are letting Steadfast know

23   so that they will know that the shift is covered?

24   A.   Yes.

25   Q.   And you are also letting them know to confirm that you

—————————————T. Hall - Cross—————————————

 1  will receive compensation for the work you provided, correct?

 2  A.  Correct.

 3  Q.  And you testified that you've never received any type of

 4  evaluation while working with Steadfast.

 5  A.  Correct.

 6  Q.  However, if something happened at a facility, would you

 7  let Steadfast know about it?

 8  A.  Yes.

 9  Q.  And I want to talk a little bit about tracking hours.

10          You say that you track your hours, correct?

11  A.  Yes.

12  Q.  And is that done on a time sheet?

13  A.  Yes.

14  Q.  Is that time sheet provided by Steadfast or the facility?

15  A.  Steadfast.

16  Q.  And you submit that time sheet to Steadfast, correct?

17  A.  Yes.

18  Q.  And you submit that time sheet to Steadfast to be paid

19  for the hours you worked, correct?

20  A.  Yes.

21  Q.  And as an LPN, do you need to have a certain level of

22  competency to complete your job functions?

23  A.  Yes.

24  Q.  Could you explain what some of those competency skills

25  are?

———————T. Hall - Cross———————

1   A.  You have to know how to read a doctor's order, know what

2   medications -- what they do for the patient.  You have to

3   know some of the critical values of labs, critical values

4   of -- I just said labs.  You have to know trachs and G-tubes

5   and how to treat dialysis ports and things like that.

6   Q.  And is that level of competency required regardless of

7   the facility that Steadfast places you to work?

8   A.  Can you repeat that?

9   Q.  Absolutely.

10          The competencies that you just described, are those

11  competencies the same skill that you are required to have

12  regardless of the facility you are placed to work in on

13  behalf of Steadfast?

14  A.  That's how -- we're taught that in school, so, yes.

15          MS. JONES:  I have no further questions, Your Honor.

16          THE COURT:  Any redirect?

17          MR. SIEGRIST:  No redirect for this witness, Your

18  Honor.

19          THE COURT:  You may step down.  You are permanently

20  excused.

21          (Witness excused.)

22          THE COURT:  We're going to take the break now and

23  come back and continue.  Fifteen minutes.

24          (Recess from 11:21 a.m. to 11:38 a.m.)

25          THE COURT:  Okay.  Your next witness.

─────D. Hall - Direct─────

1          MR. SIEGRIST:  Daseline Hall, Your Honor.

2          THE CLERK:  She's virtual.

3          THE COURT:  She's virtual?

4          THE CLERK:  Yes, sir.

5          (Witness sworn virtually.)

6          DASELINE HALL, called by the Defendants, having been

7     first duly sworn, was examined and testified via ZoomGov.com

8     as follows:

9                          DIRECT EXAMINATION

10    BY MR. SIEGRIST:

11    Q.  Good morning, Ms. Hall.

12    A.  Good morning.

13    Q.  Can you please state your name for the record.

14    A.  Daseline Hall.

15    Q.  Would you mind spelling that for the Court, please.

16    A.  D-a-s-e-l-i-n-e, last name H-a-l-l.

17    Q.  Ms. Hall, what is your occupation?

18    A.  Registered nurse.

19    Q.  And how long have you been a registered nurse?

20    A.  I've been a registered nurse since 2018.

21    Q.  Are you registered in the State of Virginia?

22    A.  Yes.

23    Q.  Before becoming a registered nurse, did you have a

24    different nursing licensure?

25    A.  A licensed practical nurse.

D. Hall - Direct

1  Q.  Did you work -- did you have a different nurse licensure

2  prior to becoming a registered nurse?

3  A.  Yes.  An LPN.

4  Q.  And when did you become an LPN?

5  A.  In 2008.

6  Q.  Okay.  So, Ms. Hall, about how long have you been in the

7  nursing field?

8  A.  About 12 years or more.

9  Q.  Ms. Hall, are you familiar with the company Steadfast

10  Medical Staffing?

11  A.  Yes.

12  Q.  Ms. Hall, have you ever worked as a nurse on Steadfast's

13  registry?

14  A.  Yes.

15  Q.  Ms. Hall, do you recall when you first joined Steadfast's

16  registry?

17  A.  Yes.

18  Q.  And when was that?

19  A.  In October of 2008.

20  Q.  Ms. Hall, have you lived in Virginia since 2008?

21  A.  Yes.

22  Q.  Is that a yes?

23  A.  Yes.

24  Q.  Okay.  Did you move away for a while, or did you move to

25  a different -- let me ask this:

D. Hall - Direct

```
 1           Which part of Virginia do you live in currently?
 2  A.   Hampton Roads.
 3  Q.   Have you lived in the Hampton Roads area since 2008?
 4  A.   Yes.
 5  Q.   Ms. Hall, you said that you joined the registry in 2008;
 6  is that correct?
 7  A.   Yes.
 8  Q.   Okay.  Are you still picking up shifts on Steadfast's
 9  registry?
10  A.   Not at the current moment.
11  Q.   Do you recall when the last time was that you picked up a
12  shift?
13  A.   In 2020.
14  Q.   So you were accepting shifts from the registry, you said,
15  from 2008 to 2020?
16  A.   Yes.
17  Q.   Okay.  During that time period, do you recall how often
18  you would accept assignments through the registry?
19  A.   It all just depended on my needs at that time.
20  Q.   Do you know whether the number of assignments that you
21  would accept through the registry would vary over that time
22  period?
23  A.   Yes, it would.
24  Q.   What are some of the factors that dictate how often you
25  will work shifts through the registry?
```

D. Hall - Direct

1    A.   My availability, the pay, the shifts.  Like, I like to
2    work preferably day shift.  So...
3    Q.   Do you have an idea of, roughly, how many hours you tend
4    to work or you tended to work per week on assignments through
5    the registry during the time period when you were taking
6    shifts?
7    A.   I would say typically about, probably, 30 hours or so or
8    less, maybe, sometimes, but it would all depend, like I say,
9    on my needs.
10   Q.   So would that workload vary from time to time during that
11   time period when you were accepting shifts?
12   A.   Yes.
13   Q.   And would you accept shifts at -- well, would you work
14   shifts at different facilities during that time period?
15   A.   Yes.
16   Q.   Ms. Hall, have you ever worked for a facility directly?
17           MS. LEWIS:  Objection.  Relevance.
18           MR. SIEGRIST:  Your Honor, if I may?
19           THE COURT:  Sustained.  If you're talking about
20   Steadfast, fine, but otherwise, sustained.
21   BY MR. SIEGRIST:
22   Q.   Ms. Hall, what do you do for work now?
23   A.   I'm an acute dialysis RN.
24   Q.   Can you repeat?
25   A.   Dialysis.

D. Hall - Direct

1    Q.  Can you repeat -- I'll just ask it again.

2              What is your current position?

3    A.  I'm an acute dialysis RN.

4    Q.  An acute dialysis registered nurse?

5    A.  Yes.

6    Q.  Who do you work for?

7    A.  Fresenius Medical Care.

8    Q.  Can you repeat that one more time for me.

9    A.  Fresenius Medical Care.

10   Q.  When did you start that position?

11   A.  In November of 2020.

12   Q.  Ms. Hall, I want to ask you some questions about the

13   equipment that you would use to perform nursing services

14   during the time period when you were accepting shifts from

15   the Steadfast registry.

16             During that time period, did Steadfast ever provide

17   you any equipment that you needed to perform nursing

18   services?

19   A.  No.

20   Q.  Now, when you would accept shifts at a particular

21   facility, would you ever bring equipment with you?

22   A.  Yes.  I provided my own equipment.

23   Q.  Is that equipment that you purchased?

24   A.  Yes.

25   Q.  Can you give me an idea of what that equipment would have

Carol L. Naughton, Official Court Reporter

D. Hall - Direct

1    consisted of?

2    A.  My personal stethoscope, blood pressure cuff,

3    thermometer, pens, things of that sort.  Just my own personal

4    equipment that nurses would purchase.

5    Q.  Did you write any of those investments off on your taxes

6    or anything like that?

7    A.  Yes.

8    Q.  Do you happen to recall what year you would have done

9    that?  Or if it was more than one year?

10   A.  It was more than one year.

11   Q.  Do you remember that year by chance?

12          THE COURT:  What is the relevance of that,

13   Mr. Siegrist?

14          MR. SIEGRIST:  Your Honor, I think it's relevant to

15   the ultimate question of whether she is in business for

16   herself.  Writing off something as a tax expense indicates

17   that.

18          THE COURT:  We understand that.  But I'm just saying

19   in terms of what is the relevance of the year that she wrote

20   it off?

21          MR. SIEGRIST:  Understood, Your Honor.  I'll

22   withdraw the question.

23   BY MR. SIEGRIST:

24   Q.  Ms. Hall, do you maintain your own liability insurance

25   for nursing services?

──────────────D. Hall - Direct──────────────

1   A.   Yes.

2   Q.   Okay.  You pay for that yourself?

3   A.   Yes.

4   Q.   Okay.  Do you write that off on your taxes as well?

5   A.   Yes.

6   Q.   Okay.  Ms. Hall, I want to talk to you a little bit about

7   the time period when you were accepting shifts from the

8   registry, how you would go about determining which shift you

9   would work.

10          How would you go about accepting or determining

11  which shifts you were going to work through Steadfast's

12  registry during the time period when you were accepting

13  shifts?

14  A.   I would go about -- like I say, it's based off of my

15  availability.  So if I was available on the days that they

16  had available on the locations or facilities that they had

17  contracts with that I actually wanted to work, that's how I

18  would sign up for the places --

19  Q.   Understood.

20  A.   -- where I work at.

21  Q.   Let me ask you a question about the process by which you

22  would do that.

23          Would you talk to somebody to determine what was

24  available?

25  A.   It would be either by phone, or I would come in person

—————————————D. Hall - Direct—————————————

1   into the office to one of the schedulers.

2   Q.  Let's talk about the phone portion first.

3        Give me an idea of what you would do on these phone

4   calls when you are determining which shifts to take.

5   A.  I would talk to one of the schedulers.  We would go over

6   which facilities had which openings, dates, and times, and we

7   would just fill in my name or just put my name in that

8   opening.

9   Q.  Now, would you call them, or would they call you?

10  A.  Well, I would call the scheduler, like, at the beginning

11  of the week or at the end of the week so I can go over for

12  the next following week.

13  Q.  Understood.

14       So you would call the scheduler and discuss what

15  shifts were available; is that right?

16  A.  Correct.

17  Q.  Okay.  Now, the shifts that you would discuss, were those

18  shifts all at one facility, or did they offer shifts at

19  different facilities?

20  A.  It would be for different -- it would just be for

21  anything that was available or any shift that I wanted,

22  because not every facility would have every opening --

23  Q.  Understood.

24  A.  -- for what I wanted to work.

25  Q.  Okay.  So you would discuss over the phone with the

Carol L. Naughton, Official Court Reporter

———— D. Hall - Direct ————

1  scheduler and discuss availability, and is it fair to say
2  then you would determine which shifts you wanted to take?
3  A.  Yes.
4  Q.  So as part of that process, who ultimately determined
5  your work schedule?
6  A.  Me.  I did.
7  Q.  Okay.  And who determined which facilities you were going
8  to work at?
9  A.  I did.
10  Q.  Okay.  Now, if you're on the phone with a scheduler
11  discussing availability, did you ever tell a scheduler, "I
12  don't want to take this shift even though it is available"?
13  A.  Yes.
14  Q.  Okay.  You weren't required to take any particular shift?
15  A.  No.
16  Q.  Were you able to select any shifts that were available
17  for your licensure at the time?
18  A.  Yes.
19  Q.  Now, is that true of the shifts available at any of the
20  facilities that had openings?
21  A.  Any facility that I wanted that was in my radius, I could
22  go to if I wanted to.  It was always my choice.
23  Q.  When you mentioned your radius a moment ago, what do you
24  mean by that?
25  A.  Like, for me, like, I didn't want to travel so far out

—————————— D. Hall - Direct ——————————

1    mile-wise, so that's why I stated my radius.

2    Q.  Okay.  You're talking about the --

3    A.  -- travel distance-wise.

4    Q.  Okay.  You are referring to the amount of distance you

5    were willing to travel?

6    A.  Yes.

7    Q.  Okay.  So did you ever turn down a shift at a facility

8    because you thought it was too far away?  "I don't want to go

9    that far."

10   A.  Yes.

11   Q.  Okay.  On Steadfast's registry, are you required to work

12   any set number of shifts?

13   A.  No.

14   Q.  Do you know, for example, if there's a minimum number of

15   shifts you have to take, anything like that?

16   A.  Not that I'm aware of, no, sir.

17   Q.  You mentioned that you had a radius of a certain distance

18   that you were willing to travel.

19           Were there any other -- did you discuss those

20   considerations with the scheduler?

21   A.  Yes, I think those were.  I mean, they knew I really

22   didn't like working nights, so they would not ask me to work

23   night shifts, or that would not be something that they would

24   really offer to me too much.

25           I think once me and the scheduler started building a

─────────── D. Hall - Direct ───────────

1   relationship and had a better rapport, I think me and her

2   started to understand, "Okay, this is what Daseline likes, so

3   I'm not introducing assignments in these facilities to

4   Daseline because I understand she doesn't like X, Y, Z."

5   Q.  And I think you said earlier your preference was day

6   shifts?

7   A.  Yes.

8   Q.  Other than the amount of distance you would travel and

9   the time of the shift, were there any other factors that

10  determined what shifts you would take and reject?

11  A.  Pay is always a factor.

12  Q.  You said "pay"?

13  A.  Yes.

14  Q.  Did the pay vary based on the shift available?

15  A.  And location.

16  Q.  Now, you mentioned that you've worked with Steadfast

17  schedulers about accepting or declining shifts.

18        Would you ever discuss shift availability with a

19  facility directly?

20  A.  Not so much, because I never really wanted to get into

21  that gray area of confusion.

22  Q.  During the time period where you were accepting shifts

23  from the registry, do you happen to remember how many

24  different facilities you would have worked at?

25  A.  Too many to keep count of.  It was several.

———————D. Hall - Direct———————

1   Q.  Other than timing of the shift and the distance you

2   travel, is there any particular type of work that you like to

3   perform?

4   A.  Just nursing overall.  No, like, specialty.

5   Q.  There's not a type of facility that you prefer, a

6   specialty, or practice area that you prefer doing?

7   A.  No, not so much.

8   Q.  Ms. Hall, during the time period where you were accepting

9   shifts in the registry, were you ever running late for a

10  shift?

11  A.  No.

12  Q.  Did you -- were you ever in a situation where you had

13  accepted a shift and then decided you wanted to cancel it?

14  A.  Sometimes I did cancel.

15  Q.  Can you tell the Court a little bit about the process you

16  would go through to cancel that shift.

17  A.  Typically, if you do have to cancel, you have to give a

18  two-hour notice with the scheduler.  You will call them and

19  just inform them that you are unable to make your shift.

20  Q.  Ms. Hall, I want to talk to you a little bit about time

21  off now.

22          During the time period where you were accepting

23  shifts on the registry, what would you do if you wanted to

24  stop taking shifts for a period of time?

25  A.  If I just wanted to stop taking time, I just would stop

─────────D. Hall - Direct─────────

```
 1   taking time.  I wouldn't pick up any shifts.
 2   Q.  You would just not take any assignments during that time
 3   period?
 4   A.  Correct.
 5   Q.  So you determined -- let's say, for example, you wanted
 6   to go on a vacation.  You would just not accept shifts for
 7   any of the days you wanted to go on vacation.  Is that fair
 8   to say?
 9   A.  Correct.  Yes.
10   Q.  Were you ever required to get permission from Steadfast
11   to take time off or stop taking shifts for any period of
12   time?
13   A.  No.
14   Q.  During this time period we've been talking about, was
15   there any period of time where you stopped taking shifts for
16   an extended period of time?
17   A.  Yeah, it has been times, like.
18   Q.  In any of those, do you recall any situations where maybe
19   you decided you didn't want to take shifts for an extended
20   period of time?
21           MS. LEWIS:  Objection.  Asked and answered.
22           THE COURT:  Sustained.
23   BY MR. SIEGRIST:
24   Q.  Ms. Hall, when you were taking shifts on Steadfast's
25   registry, did you have other sources of income during that
```

─────────D. Hall - Direct─────────

1    time period?

2    A.   Yes.

3    Q.   Okay.  Can you give the Court an idea of where those

4    other sources of income came from.

5              MS. LEWIS:  Objection.  Relevance.

6              THE COURT:  Sustained.

7    BY MR. SIEGRIST:

8    Q.   Ms. Hall, would the amount of income you received from

9    other sources vary during the time period where you were

10   accepting shifts on Steadfast's registry?

11             MS. LEWIS:  Objection.  Foundation.

12             THE COURT:  Sustained.  What we're boiling down to

13   is this:  We're focusing on her relationship with Steadfast.

14   It doesn't matter where she got other money from.

15             MR. SIEGRIST:  I understand, Your Honor.  I'm trying

16   to get to, really, the dependence issue.

17             THE COURT:  Well, that doesn't make any difference,

18   either.  The question is what was her relationship with

19   Steadfast.  You can focus on how many times she worked and

20   give an idea of what the relationship was, but her

21   dependence, the Court doesn't know that that is relevant in

22   determining whether Steadfast was an employer or not.

23   BY MR. SIEGRIST:

24   Q.   Ms. Hall, when you were working for Steadfast, were there

25   any other registries that you were working with?

Carol L. Naughton, Official Court Reporter

—————D. Hall - Direct—————

1    A.   When I was -- at the same time, no.

2    Q.   What about at different times?

3    A.   At different times, yes.

4    Q.   Okay.  Ms. Hall, while you were accepting shifts on

5    Steadfast's registry, did Steadfast ever provide you with an

6    orientation?

7    A.   That's -- a Steadfast orientation?  No.

8    Q.   Okay.  Did Steadfast ever tell you how to perform the

9    nursing services that you would perform at the facilities

10   where you worked?

11   A.   I really don't understand that question.  Can you

12   rephrase it a little?

13   Q.   If you were at a facility, was there ever somebody from

14   Steadfast who was giving the directions on "Here's how you

15   should do" -- you know, "Here's how you should perform," for

16   example, "taking somebody's blood pressure"?

17          Would somebody from Steadfast ever tell you "This is

18   how you should take the blood pressure of this patient"?

19   A.   No.

20   Q.   And, more broadly speaking, would anybody from Steadfast

21   ever tell you how to perform any of the nursing services that

22   you provided at these facilities where you worked?

23   A.   No.

24   Q.   Was there ever anybody from Steadfast's office on site at

25   the facilities where you were working?

─────────────── D. Hall - Direct ───────────────

1   A.  No.

2   Q.  You mentioned that you are a registered nurse; is that

3   right?

4   A.  Yes.

5   Q.  In your capacity as an RN, did you ever act -- did you

6   ever supervise other people at facilities, other nurses?

7   A.  Yes.

8   Q.  Did you ever report back to Steadfast on the performance

9   of any of those nurses that you were supervising?

10  A.  No.

11  Q.  Ms. Hall, I want to talk to you a little bit about rate

12  of pay.  You mentioned earlier the rate of pay was one of the

13  factors that informed whether you work at a particular

14  facility.

15          Did you ever negotiate your rate of pay with anybody

16  at Steadfast while you were accepting shifts on the registry?

17  A.  I wouldn't -- when it comes to negotiate, I would just

18  state that I would say -- I would let -- I would let them

19  know certain -- I wouldn't want to work, I guess, unless --

20  for a certain pay.  If it's not a certain pay, I wouldn't

21  want to work, if that makes sense.

22  Q.  So did you have a rate of pay that you were willing to

23  accept?

24  A.  Yes.

25  Q.  Okay.

———— D. Hall - Direct ————

```
1   A.   And if it was under that, I just did not want to work for
2   any facility, regardless.
3   Q.   Understood.
4        So you would not take shifts from facilities that
5   weren't paying the amount that you had decided you wanted.
6   A.   Yes.
7   Q.   When you were working at these facilities, did you track
8   your hours?
9   A.   Yes.
10  Q.   Okay.  And how would you go about doing that?
11  A.   I personally had a -- downloaded an app on my phone where
12  I could just track my hours.
13  Q.   You said an application on your phone?
14  A.   Yes.
15  Q.   Was that some sort of timekeeping application?
16  A.   Yes, sir.
17  Q.   Okay.  Was that something -- was that an application
18  developed by Steadfast?
19  A.   No, sir.
20  Q.   Okay.  This is a third-party application?
21  A.   Yes.
22  Q.   And you would log your hours that way?
23  A.   Yes.
24  Q.   Okay.  And then did you send a report of your hours to
25  anybody after you had logged them?
```

——————D. Hall - Direct——————

1   A.  After every shift, we were to fax in -- to e-mail our

2   time sheets into the office after each shift.

3   Q.  Did the facility verify your recording of the hours that

4   you had worked?

5   A.  Yes.

6   Q.  Okay.  Ms. Hall, during the time period where you were

7   accepting shifts from the registry, what prompted you to be a

8   registry nurse during that time period?

9   A.  To supplement my income and also to have extra

10  flexibility over my hours of work.

11  Q.  And you mentioned earlier that you have not accepted a

12  shift from the registry in a while.

13  A.  Yes.

14  Q.  Okay.  If your circumstances were different, was that

15  something that you would be willing to do?

16          MS. LEWIS:  Objection.

17          THE WITNESS:  Yes.

18          THE COURT:  Sustained.

19  BY MR. SIEGRIST:

20  Q.  Ms. Hall, would you be willing to accept shifts from

21  Steadfast's registry in the future?

22  A.  Yes.

23          MS. LEWIS:  Objection.

24          THE COURT:  Sustained.  Strike that answer.  That's

25  calling for speculation about what she would do in the

```
                        ─────── D. Hall - Cross ───────
 1    future.

 2              MR. SIEGRIST:  Well, Your Honor, I'm just asking her

 3    whether in her prior experience she be willing to, and her

 4    willingness is a present state of mind.

 5              THE COURT:  So would she be willing to work with

 6    Steadfast in the future?  Is that what you're asking her?

 7              MR. SIEGRIST:  Right.

 8              THE WITNESS:  Yes.

 9              MS. LEWIS:  Objection to the relevance, Your Honor.

10    I'm not sure how this has to do with the relationship.

11              THE COURT:  That's the biggest problem, is the

12    relevance.  Sustained.

13              MR. SIEGRIST:  I have no further questions for you,

14    Ms. Hall.  An attorney from the Department of Labor might

15    have some questions for you.  Thank you very much.

16              THE COURT:  Cross-examination.

17                          CROSS-EXAMINATION

18    BY MS. LEWIS:

19    Q.  Good morning, Ms. Hall.  My name is Ryma Lewis.  I'm an

20    attorney with the U.S. Department of Labor.  I have a few

21    follow-up questions to the information you just provided the

22    Court.

23              You indicated that you used equipment -- I believe

24    you said thermometers, pulse ox, blood pressure cuffs -- in

25    performing nursing care and services at facilities that you
```

D. Hall - Cross

1   worked with as an RN or LPN; is that right?

2   A.   Yes.

3   Q.   And that equipment that you used, they are normal tools

4   of the trade, right?

5   A.   Correct.

6   Q.   And you've had those since nursing school, presumably, I

7   mean, not those specific ones, but some variety of the same;

8   is that right?

9   A.   Right.

10  Q.   In terms of the investments that you've made in terms of

11  providing nursing care and services, when you were placed at

12  assignments with Steadfast, you didn't make any substantial

13  capital investments; is that right?

14         I can clarify if you don't understand the question.

15  A.   Can you, please.

16  Q.   Sure.

17         You don't lease office space, correct?

18  A.   No.

19  Q.   You don't hire or employ nurses of your own to perform

20  assignments that Steadfast gives you?

21  A.   No.

22  Q.   You don't have payroll to manage or a third-party

23  provider that manages payroll?

24  A.   No.

25  Q.   You don't have a website that you use to solicit

D. Hall - Cross

1   contracts and get contracts at facilities to provide nursing
2   care and services?
3   A.  No.
4   Q.  So that the investments that you've made, they're not
5   substantial; they are not a large dollar amount.  Is that
6   right?
7              MR. SIEGRIST:  Objection.  That calls for
8   speculation.
9              THE COURT:  Overruled.
10  BY MS. LEWIS:
11  Q.  You can answer the question.
12  A.  I'm sorry.  What was the question again?
13  Q.  Sure.
14             The investments that you've made to provide services
15  at the facilities that Steadfast has placed you at, they're
16  not substantial investments.
17  A.  No.
18  Q.  Meaning you haven't spent a lot of money.  Okay.
19             You also were asked about maintaining
20  professional -- your own liability insurance coverage.
21             Do you recall that line of questioning?
22  A.  Yes.
23  Q.  If you were working at a facility that Steadfast placed
24  you at, if something occurs there resulting in an injury,
25  would you contact Steadfast?

D. Hall - Cross

```
 1   A.  I would contact Steadfast.
 2   Q.  And why would you contact Steadfast?
 3            MR. SIEGRIST:  Yeah, I'm going to object to
 4   speculation.
 5            THE WITNESS:  Why would I contact --
 6            THE COURT:  Hold on a second.
 7            You have an objection.  Stand up, sir.
 8            MR. SIEGRIST:  I do, Your Honor.  We're
 9   discussing --
10            THE COURT:  Well, stand.
11            MR. SIEGRIST:  I'm sorry, Your Honor.  My apologies.
12            We're discussing hypotheticals here, Your Honor.
13   This question calls for speculation.
14            THE COURT:  Sustained.
15   BY MS. LEWIS:
16   Q.  Have you had an injury that has occurred at a facility
17   that you've worked at?
18   A.  No.
19   Q.  Any needle pricks?
20   A.  I have, but not under Steadfast.
21   Q.  Okay.  Have you been injured when you worked at any of
22   the facilities that Steadfast placed you at?
23   A.  No injuries, no.
24   Q.  Let's go back to when you first started working at
25   Steadfast some time ago.
```

———————— D. Hall - Cross ————————

1       I believe you said you worked there between 2008 and
2   2020; is that right?
3   A.  Correct.
4   Q.  So approximately 12 years.
5       And when you first applied to work at Steadfast,
6   like any other place that you work at, you submitted a job
7   application; is that right?
8   A.  Correct.
9   Q.  And on that application, you were asked about your
10  availability?
11  A.  Yes.
12  Q.  And throughout the years, the 12 years that you worked
13  with Steadfast, you gave periodic updates to Steadfast about
14  your availability for work, right?
15  A.  Yes.
16  Q.  And you were also asked, when you initially applied, your
17  preferred schedule for work, right?
18  A.  I probably was.  That was back in 2008.  Yes.
19  Q.  And over that 12-year period of time, again, you
20  periodically updated Steadfast about your preferred schedule?
21  A.  Yeah, I would say.
22  Q.  So on the application that you completed were normal
23  things that one would find on a job application, right?  It
24  asked you your name?
25  A.  On a, yeah, job application.

D. Hall - Cross

1   Q.   References?  Asked you for your references?
2   A.   I'm not sure if the reference part was up there.  I can't
3   recall that.
4   Q.   It asked you about past employment history?
5   A.   Probably, initially, when I did back in 2008.
6   Q.   That was so long ago.
7   A.   I haven't had to fill out -- yeah.
8   Q.   So in order to pick up shifts at Steadfast, you would
9   contact Steadfast to get assignments; is that right?
10  A.   I would contact the scheduler.
11  Q.   And you did not schedule directly with the facilities;
12  isn't that right?
13  A.   No, not directly with.
14  Q.   And you indicated that you work generally about 30 hours
15  or so a week; is that right?
16          MR. SIEGRIST:  I'm going to object.
17          THE WITNESS:  It would vary.
18          THE COURT:  Objection is overruled.  It's a leading
19  question.  Still within the scope.
20  BY MS. LEWIS:
21  Q.   You irregularly worked more than 40 hours a week,
22  correct?
23  A.   I can't really recall.  Like I just said, the hours would
24  really vary just depending upon my needs at that time.
25  Q.   Okay.  So Steadfast was supplemental income?

720

```
────────────────────D. Hall - Cross────────────────────
```

1   A.  Yes.

2   Q.  You said it varied.  So when you did work more than 40

3   hours a week -- and you did, at times; is that right?

4   A.  At times.

5   Q.  But you can't necessarily quantify how frequently that

6   was, right?

7   A.  Right.

8   Q.  Okay.  So when you did work, you didn't receive time and

9   a half of the rate that was established; is that right?

10  A.  Honestly, I can't say yes or no because I can't really

11  remember.

12  Q.  Right.

13          Were you paid the same hour -- the same rate for all

14  hours that you worked?  Let me ask it this way.

15  A.  No.  Because a different facility may be a different

16  amount.

17  Q.  Okay.  So let's say you worked at one facility, and when

18  you worked that one facility, you may have worked more than

19  40 hours in a week.  Were you paid the same rate?

20          MR. SIEGRIST:  I'm going to object.  I think this

21  misstates prior testimony.  I don't think the witness said

22  she worked more than 40 hours a week for any facility.

23          MS. LEWIS:  That's all right.  I'll move on.

24          THE COURT:  Okay.  Question withdrawn.

25  BY MS. LEWIS:

Carol L. Naughton, Official Court Reporter

─────D. Hall - Cross─────

1  Q.  So Steadfast established the rate you would be paid by

2  each facility?

3  A.  Yeah.  They had a rate.

4  Q.  So in terms of the question, there was a question about

5  whether or not you would be able to negotiate.

6           Wasn't the situation "take it or leave it"?  There

7  really wasn't a negotiation; is that correct?

8           MR. SIEGRIST:  I'm going to object.

9           THE WITNESS:  No, I wouldn't say it's --

10          MR. SIEGRIST:  Withdraw the objection.

11          THE COURT:  Restate the question.  Was there a

12  negotiation with the facility for your amount you would be

13  paid?

14  BY MS. LEWIS:

15  Q.  Was there a negotiation with the facility on the amount

16  that you would be paid?

17  A.  With the facility --

18  Q.  Yes.

19  A.  -- on how much I would be --

20  Q.  Uh-huh.

21  A.  Meaning how much the -- I don't understand that question.

22  Q.  Sure.

23          Would you negotiate with the facilities your rate of

24  pay?

25  A.  No, I wouldn't negotiate with the facilities.

Carol L. Naughton, Official Court Reporter

                                    ─────D. Hall - Cross─────

1   Q.  You indicated that you had an app that you used to keep

2   track of your own hours that you worked; is that right?

3   A.  Yes.

4   Q.  But that was for you.  You had to submit a time sheet to

5   Steadfast to be paid; is that right?

6   A.  Yes.

7   Q.  Okay.

8           MS. LEWIS:  Your Honor, just one moment, please.

9           (Pause in the proceedings.)

10  BY MS. LEWIS:

11  Q.  And when you submitted those time sheets, Steadfast paid

12  you, correct, not the facility?

13  A.  Yes.

14          MS. LEWIS:  No further questions of this witness,

15  Your Honor.

16          THE COURT:  The Court has a question, just in case

17  you want to follow up on it.

18          When you worked for a facility and you were late, to

19  whom did you report the fact that you were going to be late?

20          THE WITNESS:  I would notify the scheduler if I was

21  running late.

22          THE COURT:  The scheduler where?

23          THE WITNESS:  At Steadfast.  So that she could

24  notify whoever at the facility because we would not always

25  know which unit or which, I guess, wing we were on, so they

                    Carol L. Naughton, Official Court Reporter

D. Hall - Redirect

1   could notify the correct person at that facility.

2             THE COURT:  Okay.  That's all.

3             Redirect if you wish, if you have any.

4             MR. SIEGRIST:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6   BY MR. SIEGRIST:

7   Q.  Ms. Hall, a moment ago I believe you were discussing your

8   communications with Steadfast's schedulers about your

9   preferences for shift availability.  Is that correct?

10  A.  Yes.

11  Q.  Okay.  And I think you were discussing your

12  communications with the scheduler about which facilities you

13  would like to work at, your preferences, in other words; is

14  that right?

15  A.  Yes.

16  Q.  Okay.  Were these communications part of your discussions

17  with the schedulers about when and where you wanted to work?

18  A.  Yes.

19  Q.  And these are -- does this occur in situations where you

20  are calling the scheduler to determine what shifts they have

21  available?

22  A.  Yes.

23  Q.  Okay.  Were you required to communicate your preferences

24  to the facility, or is this something that you were doing as

25  part of those conversations?

D. Hall - Redirect

1   A.   When I would tell her my preference, it would be, for

2   instance, times when it was gaps of time when I haven't

3   worked for Steadfast in a period of time.  So it was, like,

4   "Oh, let me make sure they know how or what shifts I would

5   like to work for now."  So...

6   Q.   Is it fair to say you would do that to make sure that you

7   were selecting shifts that you wanted to take?

8            MS. LEWIS:  Objection.

9            THE WITNESS:  Yes.

10           THE COURT:  Sustained.  Leading.  You are leading

11   your witness.  You are on direct.

12           MR. SIEGRIST:  I'll rephrase the question, Your

13   Honor.

14   BY MR. SIEGRIST:

15   Q.   Ms. Hall, why would you communicate those preferences to

16   Steadfast when you would call the scheduler?

17   A.   So that they could have the nearest -- the nearest of

18   shifts that I wanted, you know, preference that I wanted to

19   work.

20           MR. SIEGRIST:  No further questions, Your Honor.

21           THE COURT:  May the witness be permanently excused?

22           MS. RUST:  Yes, Your Honor.

23           MS. LEWIS:  Yes.

24           THE COURT:  Thank you, ma'am.  You are permanently

25   excused.  Thank you.

```
 1              (Witness excused.)

 2              THE COURT:  Your next witness?

 3              MS. RUST:  Your Honor, the defendants' next witness

 4      is Renay Hellinger.

 5              MS. LEWIS:  Your Honor, with respect to this

 6      witness, Mr. Seifeldein would like to be heard.

 7              THE COURT:  Okay.  Step to the podium.

 8              MR. SEIFELDEIN:  Good morning, Your Honor, counsel.

 9              Your Honor, it's our understanding this witness is a

10      former employee of one of the facilities.  The defendants, in

11      their pretrial disclosure -- pretrial statement, stated that

12      they would have a corporate designee from the facility.  Our

13      understanding is that this employee is no longer working

14      there; therefore, they are not a corporate designee and have

15      not been identified.

16              THE COURT:  Has this witness been identified as a

17      witness, period, just as a witness?

18              MR. SEIFELDEIN:  No, Your Honor.  Just last night.

19              THE COURT:  Never been identified in pretrial?

20              MR. SEIFELDEIN:  No, Your Honor, not to our

21      understanding.

22              The facility has been identified, but the facility

23      representative/designee has already testified for the

24      Secretary.  That was Princess Anne, Erica Johnson, for MFA.

25              THE COURT:  So when did you learn of this witness?
```

```
 1              MR. SEIFELDEIN:  Last night at 11:30 or something
 2    like that.
 3              THE COURT:  You haven't deposed this witness?
 4              MR. SEIFELDEIN:  I'm sorry?
 5              THE COURT:  Have you ever deposed this witness?
 6              MR. SEIFELDEIN:  This witness, we have not deposed,
 7    Your Honor, no.  As I said, the corporate designee for the
 8    company already testified.
 9              THE COURT:  Okay.  Let me hear from counsel.
10              Mr. Jewett, what is your authority for calling this
11    witness?
12              MR. JEWETT:  Certainly, Your Honor.
13              As the Court knows, this case has a long history to
14    it.  It's been on the docket a long time.  We have designated
15    Charlottesville Health & Rehab as a witness in this case
16    since pretty much the get-go.
17              During a prior iteration of this trial, I believe
18    the last time it was scheduled, we submitted the subpoena for
19    the corporate designee to attend.  Ms. Renay Hellinger was
20    identified as the corporate designee.  The trial was, of
21    course, postponed.  When we resubmitted our subpoena to
22    Charlottesville Rehab, we sent the subpoena to corporate
23    designee or Ms. Hellinger.
24              My understanding -- I was not a part of that
25    conversation, but my understanding is what happened then is
```

1    the facility's, I believe, attorney forwarded our subpoena to

2    Ms. Hellinger who was supposed to be the corporate designee

3    earlier in this case.  She is the person who dealt with

4    Steadfast at this facility.

5           THE COURT:  Was she identified in the Final Pretrial

6    Order as a witness?

7           They are saying they heard last night at 11:30 that

8    you are going to call her.  It doesn't make any difference

9    what you were doing long before the case was continued.  The

10   Court relies on, and you are required to put in the Final

11   Pretrial Order who you are calling as witnesses.

12          Was she in the Final Pretrial Order, no matter what

13   they talked about previously?

14          MR. JEWETT:  Understood, Your Honor.

15          So what is identified in the Final Pretrial Order is

16   our number 43, designated corporate representative,

17   Charlottesville Health & Rehab.  And then we learned after

18   that that she had left the facility, that she's no longer

19   there.  But she is the person who had been identified by the

20   facility as the corporate designee in this case.

21          THE COURT:  But it doesn't work that way.  This case

22   has been pending long enough for you all to have straightened

23   this out, no matter what the facility has done.  You can't

24   come up with a witness that you haven't identified and just

25   say "the corporate representative," and then you come back to

1   a witness that you have not placed in the Final Pretrial

2   Order.

3            This witness is stricken.  This witness may not be

4   called.  So you have to call the next witness.

5            MR. JEWETT:  Your Honor, would the Court permit us,

6   as with the Secretary, to put a proffer on the record

7   tonight, on the ECF?

8            THE COURT:  You can put a proffer here, but the

9   Court controls that.  That is just plain basic, Mr. Jewett.

10  Everyone's making proffers, but I'm telling you, you are

11  basically wasting your time -- both parties.

12           It's basic trial practice, and we follow it forever

13  and a day.  You identify witnesses in the Final Pretrial

14  Order, and you don't spring them on people at 11:30 at night.

15  It just doesn't do it.

16           So, no, you can put a proffer in there, and what the

17  Court says in the record will stand.

18           Next witness.

19           MS. LEWIS:  Your Honor, if I may?

20           With respect, the Secretary would just like to note

21  an objection to such proffer.

22           As previously filed and identified with the Court,

23  Medical Facilities of America actually provided a declaration

24  of the administrator for that facility as a corporate

25  designee.  At no point has this individual's name been

1    designated as a corporate representative.

2            So, for the record, we're noting an objection to any

3    prospective proffer with respect to this being a corporate

4    designee for MFA.

5            THE COURT:  Only one party can speak at a time,

6    Ms. Rust.

7            It's a waste of your effort, Mr. Jewett, to be

8    putting the proffer in here on something that you are just

9    plain dead wrong.  But if you want to put that piece of paper

10   in the record, the Court will let you put it in there.

11   Simple as that.  But it should not be that you're calling a

12   witness when you had a corporate representative.  You can't

13   spring one out here.

14           All right.  Next witness.

15           MS. RUST:  Your Honor, the next two witnesses we

16   have are remote.  One of them had a medical emergency and was

17   supposed to be --

18           THE COURT:  Step to the podium and talk to the

19   Court, please.

20           MS. RUST:  Your Honor, we have a few witnesses left

21   on our call sheet for today; Leslie Boone, Racharlotte

22   Coates, Christine Kim.  And then we received confirmation

23   from another witness, Ozey Thorpe, late, late last night

24   after the call sheet was submitted.

25           Leslie Boone and Racharlotte Coates and Ozey Thorpe

1    are all remote witnesses.  Leslie Boone was supposed to be

2    here in person but had to leave the state unexpectedly due to

3    a family medical emergency.  We've been in touch with her.

4    She's in and out of medical appointments today.  She said

5    that she has -- I believe she said she has an appointment

6    until about 2:00.  And Ms. Coates gets off work at 3:00 p.m.

7           Mr. Thorpe we were expecting to call after lunch.  I

8    can reach out to him and see if he can log in prior to the

9    lunch break.

10          THE COURT:  What about Christine Kim?

11          MS. RUST:  Christine Kim's testimony would probably

12   take a few hours, so I would anticipate the Court wouldn't

13   want her to start prior to the lunch break.

14          THE COURT:  The Court needs a witness in here.  It's

15   12:30.

16          MS. RUST:  Yes, Your Honor.  So if the Court would

17   allow a brief recess, I can reach out to Mr. Thorpe and have

18   him log in.  Otherwise, the rest of our witnesses, without

19   Ms. Hellinger, would be available after the lunch break.

20          THE COURT:  Okay.  I'll tell you what.  We're going

21   to take about a five- or ten-minute break, and you have

22   Mr. Thorpe to log in.

23          Approximately how long is Mr. Thorpe's testimony?

24          MS. RUST:  Consistent with the other nurses, 30

25   minutes or less.

731

```
 1              THE COURT:  Here's what the Court is going to do:
 2              That's just going to break it up over lunch.  The
 3    Court is going to stop right here for lunch, and we are going
 4    to be back in here at 2:00.  And you have whatever witnesses
 5    you want in here, but we will not waste any time today
 6    because of a shortage of witnesses.
 7              The Court will be in recess until 2:00 p.m.
 8              (At 12:28 p.m., a luncheon recess was taken.)
 9
10                          CERTIFICATION
11
12       I certify that the foregoing is a correct transcript
13    from the record of proceedings in the above-entitled matter.
14
15
16              _____/s/_____
17                        Carol L. Naughton
18                        October 4, 2021
19
20
21
22
23
24
25
```

Carol L. Naughton, Official Court Reporter