```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                         NORFOLK DIVISION

 3

 4  MARTIN J. WALSH, Secretary of Labor,)
    United States Department of Labor,  )
 5                                      )
                 Plaintiff,             )
 6  v.                                  ) Civil Action No.:
                                        )     2:18cv226
 7  MEDICAL STAFFING OF AMERICA, LLC,   )
    et al.,                             )
 8                                      )
                 Defendant.             )
 9


10                  TRANSCRIPT OF PROCEEDINGS

11                  ** Bench Trial – Day 5 **
12                     (Afternoon Session)

13                     Norfolk, Virginia

14                     September 07, 2021

15

16  BEFORE:    THE HONORABLE RAYMOND A. JACKSON
                  United States District Judge
17


18

19  Appearances:

20        UNITED STATES DEPARTMENT OF LABOR
                  By: Chervonti Jones
21                    Ryma Naje Lewis
                      Mohamed Elnour Seifeldein
22                    Counsel for Plaintiff

23        PIERCE McCOY PLLC
                  By: Julia Amato Rust
24                    Aaron Daniel Siegrist
                      Joshua Lee Jewett
25                    Counsel for Defendant
```

733

I N D E X

WITNESSES ON BEHALF
OF PLAINTIFF:                                    Page

**CHRISTINE LEE KIM**
Direct Examination by Ms. Rust.............      736
Cross-Examination by Ms. Jones.............      792
Redirect Examination by Ms. Rust..........       807

**RACHARLOTTE LEE COATES**
Direct Examination by Ms. Rust.............      810
Cross-Examination by Mr. Seifeldein.......       821
Redirect Examination by Ms. Rust..........       836


E X H I B I T S

Defendant Exhibit No.                          Received

        75                                        746
       201                                        780
       202                                        784
       203                                        843

734

```
1                      P R O C E E D I N G S

2

3              (Commenced at 2:00 p.m. as follows:)

4

5              THE COURT:  Just a housekeeping note here.

6              Mr. Siegrist?

7              MR. SIEGRIST:  Yes, Your Honor?

8              THE COURT:  You didn't introduce yourself when you

9    came in the court this afternoon and before we started

10   questioning witnesses and Court inadvertently called you Mr.

11   Jewett.

12             MR. SIEGRIST:  I heard that, Your Honor.  My

13   apologies.  I unfortunately had to miss the first week, but glad

14   to be here for Week Two.

15             THE COURT:  We're glad to have you here.

16             MR. SIEGRIST:  Thank you, sir.

17             THE COURT:  Another housekeeping matter.  You may have

18   a seat.  I note that you listed Christine Kim as a witness.  She

19   was called in the Secretary's case, and she testified about the

20   payroll and you cross-examined her.  And I understand you said

21   she would be a two-hour witness.  I don't know on what.  I will

22   say this:  The Court will not have repetitive testimony.  She's

23   testified to it in direct examination, the cross-examination,

24   even in the Secretary's case.  The Court will not hear the same

25   evidence again.  So if you have something new to offer, that's
```

735

```
1   different, you may certainly go forward, but she cannot get on
2   the stand and repeat the same thing that the Secretary brought
3   out when you cross-examined her.  So I don't know what it is,
4   but I just want to raise that.
5          MS. RUST:  Thank you, Your Honor.  We do have other
6   testimony she'll be bringing.  There will be some discussion
7   regarding payroll, but we are not intending to repeat what was
8   already discussed.
9          THE COURT:  Okay.
10         MS. RUST:  There may be some minor repeat just to get
11  us into the right topic, but I'm not intending to belabor things
12  that were already discussed.
13         THE COURT:  That's fine.
14         MS. RUST:  I understand.
15         THE COURT:  Where are we on the witnesses this
16  afternoon?
17         MS. RUST:  So we will be calling Christine Kim as our
18  next witness.  And as I said before, we expect her direct exam
19  to run for quite some time.  It may carry us through to the end
20  of the day between cross and redirect.  If not, we have a
21  virtual witness who has confirmed that she would be available
22  towards the end of the day.
23         THE COURT:  Okay.  Call your next witness.
24         MS. RUST:  The defense calls Christine Kim as their
25  next witness.
```

```
 1            THE COURT:  Ms. Kim is still under oath from her

 2  previous appearance in here.  The Court will simply tell her

 3  that when she comes on the stand.

 4            (Witness entered the courtroom.)

 5            THE COURT:  Ms. Kim, you are still under oath from

 6  your previous appearance in this court.

 7            THE WITNESS:  Yes, sir.

 8            MS. LEWIS:  Your Honor, before we begin, there was a

 9  rule on witnesses, and as Court had noted she has been called in

10  our case-in-chief, but just a reminder with respect to

11  discussing her testimony prior, even current, in that this does

12  carry through.

13            THE COURT:  The Court will certainly give her that

14  warning in the event this is not in the record.  She certainly

15  cannot have any contact with any other expected witnesses in the

16  case.  No discussion.

17            Okay.  You may commence.

18            MS. RUST:  Thank you, Your Honor.

19            CHRISTINE LEE KIM, having been previously duly sworn,

20  was examined and testified as follows:

21                      DIRECT EXAMINATION

22  BY MS. RUST:

23  Q.   Ms. Kim, thank you for returning.

24       Just for the record, could you restate your name for the

25  record.
```

```
1   A.    Christine Lee Kim.

2   Q.    And we -- you talked about a handful of things in your last

3   testimony, so I want to skip through to some things that we did

4   not talk about.

5         So regarding your role as payroll manager, I want to go

6   through -- you testified briefly about some of the

7   responsibilities that you had.  I want to go through some of

8   those in more detail though.

9         So what are the categories of the business aspects that you

10  oversee in your role as payroll manager?

11  A.    I oversee the administrative side, over the front desk

12  coordinator, the recruiters and the payroll department.

13  Q.    Okay.  And you testified last week I believe -- or -- yes,

14  last week, that you oversee or supervise the office employees in

15  the office, right?

16  A.    Correct.

17  Q.    I wanted to talk a little bit about how that works and the

18  practices with office employees.

19        So with respect to the office employees' schedules, do

20  you -- what is the schedule for an office employee as far as

21  their work schedule?

22  A.    So it varies with their role, with their position in the

23  office.  The front desk coordinator works Monday through Friday

24  10 to 6, the recruiter works Monday through Friday 9 to 5, the

25  payroll department works Monday through Friday; however, their
```

1    hours slightly vary.  Monday through Wednesday, typically it's a

2    9 a.m. to 7 o'clock-type day.  Thursdays and Fridays, roughly

3    around 9 to 5-type hours.

4    Q.    Okay.  And those -- you said the front desk recruiting and

5    the payroll, are those the positions and areas and employees you

6    oversee, right?

7    A.    I oversee.

8    Q.    So are you setting -- how are those schedules determined

9    for those employees?

10   A.    So I try to, I try to set their schedule based on

11   efficiency of the operations of the office.  So prime-time phone

12   calls usually come in, my front desk coordinator and my

13   recruiters are the first people who answer those phones, so I

14   primarily want them on 9-to-5-type hours.  Payroll we have

15   deadlines to meet, so Monday through Wednesday, although their

16   hours might fluctuate, it really varies on what time they may

17   leave the office, so I may modify it throughout the week.

18   Q.    When you're hiring these individuals for these employment

19   positions, is their schedule something that is considered by

20   Steadfast in determining whether to hire them?

21   A.    Absolutely.

22   Q.    If they are, if you -- have you ever interviewed an

23   applicant for an employment position that did not have

24   availability for schedules you set for these positions?

25   A.    Yes.

1   Q.   In those instances have you determined whether to hire or

2   not hire that person based on that availability?

3   A.   That would be a very -- that would be a deciding factor to

4   see if they would be able to work.

5   Q.   Okay.  Are there employees in the office other than

6   positions we talked about who you are not responsible for

7   supervising?  Just give us a picture.

8   A.   I don't interview the call center.

9   Q.   So as far as supervising these office employees, you talked

10  about the front desk coordinator, the recruiter and the payroll

11  department.  As the supervisor of those positions, in what ways

12  do you supervise those employees and their work?

13            THE COURT:  Counsel, the Court wanted to give you

14  latitude on putting on your case, but the Court's trying to

15  determine what is the relevance of having this witness go into

16  how she supervises the office employees and how she hired the

17  office employees when that is not the focus of the case?

18            MS. RUST:  Understood, Your Honor.  We consider it

19  relevant because Steadfast, Steadfast has classified the nurses

20  on the registry as contractors, but they've also classified the

21  employees in the office as employees.  So I'd like to talk to

22  Ms. Kim about the difference in the way Steadfast handles those

23  two classifications to compare the levels of control and manner

24  that they oversee the work.

25            THE COURT:  Well, you know the question is what do

1    they do -- doesn't make any difference how do they compare.  The

2    question is what they do with the folks they call independent

3    contractors.  They can do anything they want to do with those

4    office employees, but the question is what do they do with the

5    people they call independent contractors.  That's the question.

6    They may be wrong in what they're doing with the office

7    employees.  That's the question we need to stick to in this

8    case.  What do you do with the people you call contractors?

9    Independent contractors.

10          MS. RUST:  Agreed, Your Honor. I completely agree

11   that's the focus.  We did consider at least a discussion of the

12   operations in the in-house side relevant to show that Steadfast

13   is aware of differences in what they can and cannot do between

14   the two classifications.

15          THE COURT:  All right.  We're going a little far, but

16   we're not going to be on this long, because the Court still

17   takes a view it doesn't matter what she did with the employees,

18   the question is whether she is right or wrong and what you're

19   doing with these individuals you call independent contractors.

20   People on the registry.

21          MS. RUST:  Okay, Your Honor.  I'll abbreviate this

22   portion.

23          THE COURT:  Okay.

24          MS. RUST:  Thank you.

25   BY MS. RUST:

1  Q.   Okay.  So let me back up and restate that so we can move

2  through that a little bit quicker.

3       For the employees you oversee, do you set certain policies

4  and procedures that you require them to follow in the manner in

5  which they perform the work for Steadfast?

6  A.   I do.

7  Q.   Okay.  And that applies to the front desk coordinator, the

8  recruiter and the payroll department?

9  A.   Correct.

10  Q.   The in-office employees, do you require them to request

11  time off?

12  A.   I do.

13  Q.   And can Steadfast approve or deny those requests?

14  A.   Yes.

15  Q.   And have there been occasions when you have denied those

16  requests?

17  A.   I have.

18  Q.   Were those occasions based on staffing needs or -- what

19  were those based on typically?  Just generally.

20  A.   Okay.  Usually if we're short, if someone else has

21  requested that date off in that department and I don't have any

22  coverage in the department.

23  Q.   Okay.  And what about disciplining office employees, is

24  that something that you handle?

25  A.   I do.

1   Q.   And do you, do you have a process in place for how you can

2   go through the disciplining process?

3           MS. LEWIS:  Your Honor, I'm going to make an objection

4   with respect to the relevance of this line of testimony.

5   Christine Kim previously testified, as we heard from other

6   employees and witnesses in the Secretary's case-in-chief, about

7   sort of office management and organization.  I don't think it's

8   in dispute that there's two different sides, there's two

9   different practices, policies and procedures.  As the Court

10  noted with respect to its inquiry to counsel, the primary focus

11  of this case is what happens in the field with these nurses.  So

12  any testimony with respect to the office policy which they have

13  already admitted to within the testimony of Christine Kim, they

14  paid time and a half, the policies, practices and procedures,

15  they know their employees, so I'm having a hard time trying to

16  understand the relevance of this questioning with respect to the

17  case at large.

18          THE COURT:  The Court's going to sustain the objection

19  because the Court hears what your explanation was you wanted the

20  Court to compare.  The Court doesn't need to compare.  The Court

21  needs to understand the full range of controls that Steadfast

22  has over the nurses, the LPNs and people working at the

23  facility.  That's where the focus needs to be.  And so I'm --

24  the Court tried to lead you there, but that's where you need to

25  be.  It doesn't matter how she supervised the employees.  The

```
 1   question is what's happening with the individuals that the Labor
 2   Department claims are employees, but you claim they're
 3   independent contractors.  So let's concentrate on what goes on
 4   with them.
 5          MS. RUST:  Yes, Your Honor.  I was trying to run
 6   through those questions a little bit quicker.  As I said before,
 7   I do think it goes to the issue of --
 8          THE COURT:  And I just told you it does not help you,
 9   so now let's get to where the Court is telling you you need to
10   go.
11          MS. RUST:  I'm sorry, Judge, just to be clear for the
12   record, your ruling is that it does not go to the relevance of
13   the issue of willfulness?
14          THE COURT:  Well, I'm saying it goes to you might be
15   doing one thing with regard to your employees within the office,
16   but the point here is the Court has to determine what conduct
17   you're engaging in with the individuals you call independent
18   contractors.  And you're saying, okay, if you're looking at it
19   to determine whether it's a willful violation of FLSA because I
20   do certain things with the office employees and I treat these
21   differently, so there's no willfulness.  I understand the
22   argument you're making.  But I think you've certainly had her
23   already testify to various things that you do with office
24   employees.  I don't know how much farther you want to go with
25   it, but the Court sustains the objection.  I think you've gotten
```

```
 1   it in the record with what she does.

 2           MS. RUST:  Thank you, Your Honor.  I wasn't going much

 3   further, so I think we're good.

 4           THE COURT:  Okay.

 5   BY MS. RUST:

 6   Q.   Okay.  Ms. Kim, let's move on to the next topic.

 7        I want to talk to you about -- are you aware whether

 8   Steadfast has used any online applications or apps to assist

 9   with scheduling recently?

10   A.   Yes.

11   Q.   What app is that?  What's it called?

12   A.   Zira.

13   Q.   Can you spell that for the record?

14   A.   Z-i-r-a.

15   Q.   Okay.  So the Zira app.  When did Steadfast start using

16   that app?

17           MS. LEWIS:  Objection, Your Honor.  Ms. Kim previously

18   testified she's not involved at all with the scheduling.  So

19   objection with respect to lack of personal knowledge and

20   foundation on the same basis on her prior testimony.

21           MS. RUST:  I can lay a little bit of foundation.

22           THE COURT:  Okay.  If you can lay a foundation to get

23   around the objection, the Court gives you the opportunity.

24           MS. RUST:  Thank you, Your Honor.

25   BY MS. RUST:
```

```
1   Q.   My last question was approximately when did Steadfast start
2   utilizing that app?
3   A.   Early 2021.
4   Q.   Okay.  And are you familiar with how the app works?
5   A.   Yes.
6   Q.   And for the next two questions, can you briefly state what
7   the app is used for?
8   A.   So the app, it's pretty much like a digital version of our
9   schedules that we have in the call center.  So there's a
10  platform online for access for our clients to use and for our
11  contractors to see and claim a patient.
12  Q.   And just to clarify, when you say clients, are you
13  referring to the facilities that --
14  A.   Correct.
15  Q.   Do you use those terms interchangeably?
16  A.   Yes.
17  Q.   Okay.  Just to make sure we're talking about the same
18  terms.
19       So are you familiar with how the app works for a nurse to
20  generally schedule a shift via the app?
21  A.   So a nurse --
22  Q.   Just, just asking if you are familiar with it.
23  A.   Yes.
24  Q.   And are you familiar with how a facility can add shifts via
25  the app?
```

1   A.   Yes.

2   Q.   Okay.  All right.  I'm going to turn to Exhibit 75.

3            MS. RUST:  And that's PX-75, sorry.

4   BY MS. RUST:

5   Q.   Can you see that on your screen, Ms. Kim?

6   A.   I can.

7   Q.   And can you just scroll through the pages briefly so

8   Ms. Kim can see what they are?

9        And Ms. Kim, can you tell me do you recognize these

10  documents?

11  A.   Yes.

12  Q.   And what are these documents?

13  A.   These are screenshots of our Zira scheduling app.

14  Q.   Okay.  Did you take these screenshots?

15  A.   I did.

16  Q.   Okay.  Are these true and accurate screenshots of the Zira

17  Scheduling Platform at the time you took them?

18  A.   Yes.

19           MS. RUST:  Okay.  I'm move to admit PX-75 -- or DX-75,

20  I'm sorry.

21           THE COURT:  I take that there is no --

22           MS. JONES:  Objection to authentication, Your Honor.

23           THE COURT:  On what ground?  She said she's familiar

24  with it, it's from the company and she took the screenshots, so

25  objection's overruled.  The exhibit will be admitted.

1                   (DX-75 received in evidence.)

2    BY MS. RUST:

3    Q.    Okay.  Ms. Kim let's go through a couple of these pages.

4    So I'm going to start with the first page, which is Bates

5    stamped Steadfast 6087520.  Can you tell me what we're looking

6    at on this screen?

7         Can you see it clearly?  Is it zoomed in enough?

8    A.    I can see it.

9    Q.    What is that a screenshot of?

10   A.    This is a screenshot of the Team tab.  On the left where it

11   says Team, if you click that it actually shows the list of the

12   individuals that were sent invitation links to gain access to

13   the scheduling app.

14   Q.    So is this a screenshot, is this from Steadfast account, is

15   this a view that Steadfast has from its account for this app?

16   A.    Correct.

17   Q.    Okay.  So you said it's a team page, and then we've got a

18   list of individuals, individual names here in the first column

19   on the left.  Can you say again what you said that was?  I'm

20   sorry.

21   A.    The first on the far left?

22   Q.    The names.  The list of names.

23   A.    So the names are -- those are individuals that were sent an

24   invitation to get access to the scheduling app.

25   Q.    Okay.  And does it show if they activated their account on

1    this screenshot?

2    A.    Correct.

3    Q.    Just to briefly go walk through some of the basics, on the

4    far left column, what page features do we have here?

5    A.    So the Dashboard is just a general, I guess, a summary of

6    today's coverage.  Team has a list of the individuals that were

7    given the invitation for the scheduling app.

8    Q.    That's what we're looking at here?

9    A.    Correct.

10   Q.    And what is the Chat setting?

11   A.    Chat, it's a function within the application where it

12   allows the contractors and the client to communicate via chat.

13   Q.    Okay.  And Schedule?

14   A.    Schedule is a more detailed view of specific dates in mind

15   for each facility.

16   Q.    Okay.  Let's go to the second page of the exhibit, which is

17   Bates stamped Steadfast 6087521.

18       What are we looking at on this screenshot?

19   A.    So this is a dashboard tab for the facility according to

20   Charlotte.  It shows today's coverage with the nurses that

21   claimed those shifts.

22   Q.    So according to Charlotte, that's the facility that

23   scheduled with Steadfast, correct?

24   Q.    Okay.  I'm sorry, you said it's showing today's coverage

25   for this facility, right?

1    A.    Correct.

2    Q.    These are just the Steadfast nurses that are on for today's

3    coverage for that facility; is that right?

4    A.    Correct.

5    Q.    Does Steadfast use the app -- or does Steadfast require

6    nurses to -- well, does Steadfast require nurses to clock in or

7    clock out on this app?

8    A.    No.

9    Q.    So let's go to the third page, which is Bates stamp

10   Steadfast 6087522.  What is this screenshot showing us?

11   A.    So this is if one were to click the Schedule tab, that's

12   where they can be a little more intimate as far as the dates,

13   the ranges.  Up on the top you can see the range, February 22nd

14   to the 28th.  So you can kind of modify the dates, the range for

15   a specific facility.

16   Q.    And is this the -- it looks like the schedule here, there's

17   nothing on it.  What is this scheduled for on this page?

18   A.    So this one shows the dates February 22nd to the 28th for

19   Steadfast Staffing for the schedules at that staffing agency.

20   Q.    Okay.  And do -- so this is for -- before we saw like a

21   screenshot of coverage for a facility.  So is this a schedule

22   for Steadfast?  Is that what you're saying?  Steadfast office?

23   A.    It's not a schedule for Steadfast.  We don't do any

24   schedules for Steadfast itself.  We use this generally just as a

25   template.  So what happens is we preprogram a majority of our

```
 1  facilities, they have very similar shifts.  So there's 7 to 3, 3
 2  to 11, 11-to-7-type shifts.  So we program all that into our
 3  Steadfast Staffing Agency profile so that when we add a new
 4  client or we revise, we don't have to start from the beginning,
 5  we can just duplicate that template so it works a little more
 6  efficiently, a little more user-friendly.
 7  Q.   Okay.  So the template can be changed if a facility doesn't
 8  use those scheduling shifts?
 9  A.   Yes.
10  Q.   Okay.  Let's skip to the fifth page, the last page in the
11  exhibit.
12       What is this a screenshot showing?
13  A.   So this is for Accordius, Charlotte.  This is their
14  schedule for the week range February 22nd to the 28th.
15  Q.   Okay.  So looking the Calendar portion of it, the top row
16  says Unassigned.  What is that telling us?
17  A.   So that means that the facility published their needs,
18  shifts, that have not been claimed yet by contractors.
19  Q.   Okay.  So it's showing us several shifts between Friday the
20  26th, 27th and 28th, so those four shifts have not been claimed
21  by a contractor?
22  A.   Correct.
23  Q.   But the facility has published them as available; is that
24  what you said?
25  A.   Correct.
```

1   Q.   So then below the Unassigned row there is several rows of

2   names.  What is that showing us there?

3   A.   So this is for nurses who claimed the shift and was

4   approved by the facility.

5   Q.   Okay.  And who inputs the shifts into the app, the open

6   shifts?

7   A.   An authorized individual from the facility:  The scheduler,

8   the DON, the administrator.

9   Q.   Okay.  Let's go back to the fourth page in the exhibit,

10  Bates stamp Steadfast 6087523.  And tell me what we're looking

11  at on this page.

12  A.   So this is the dashboard tab.  It's a sky view for

13  Steadfast so we can scroll through and see all of our clients,

14  their coverage based on the day.  So if we were to continue to

15  scroll, the screenshot shows, if they went further down, it

16  would list all of our facilities and their coverage for the day.

17  Q.   Okay.  And is this a page that you said it was a sky view?

18  Is it for Steadfast's account view?

19  A.   Correct.

20  Q.   Okay.  So for here it shows Accordius Charlotte is listed,

21  and there's several names listed under there.  So that's showing

22  coverage for the day?

23  A.   Correct.

24  Q.   Those are nurses whose shifts that had been picked up in

25  the app?

```
1   A.    Yes.

2   Q.    Okay.  Does the nurse's view of the scheduling app look

3   different than Steadfast's view?

4   A.    Yes.

5   Q.    I'm going to pull up on the screen DX-77 which is a video

6   file.

7             MS. LEWIS:  Your Honor, I'm going to object to this

8   for authentication.  It was not introduced -- it wasn't created

9   by -- it was created by a developer for their technology who

10  provided deposition testimony, and they're not here for us to

11  cross-examine.

12            MS. RUST:  Ms. Kim told us she took the screen

13  recording herself.

14            THE COURT:  She what now?

15            MS. RUST:  Ms. Kim will testify that she took this

16  screen recording, and the plaintiff did depose Zira Technologies

17  regarding all these exhibits.

18            MS. LEWIS:  Your Honor, if I may, during the

19  deposition the video was played.  It's a minute and 44 seconds.

20  The video was observed.  The question was asked:

21            "Do you recognize that video?"

22            The response was:  "Yes".

23            "And did you create this video?

24            "Yes.

25            "And when did you create that video?
```

```
 1              "About a month or so ago.

 2              "Who asked that you create this video?

 3              "Steadfast."

 4              So in our --

 5              MS. RUST:  We're starting -- maybe we're looking at

 6  the wrong exhibit numbers.  We're starting with a --

 7              THE COURT:  Wait a minute.

 8              MS. RUST:  -- video of 36 seconds.

 9              THE COURT:  The video is 36 seconds.  And your

10  objection is?

11              MS. RUST:  The one that we were produced is a

12  44-second video.

13              THE COURT:  So we have two different videos, one 44

14  seconds, one 36 seconds.  And do you know which one they have?

15  Which one are you trying to introduce?

16              MS. RUST:  Yes.  So there were three videos produced

17  in discovery.  I'll be going through two of them with Ms. Kim.

18  DX-77, which is 36 seconds, and then DX-78 which is a minute 44

19  seconds.  And she'll testify that she took both of those screen

20  recordings for these videos.

21              MS. LEWIS:  Well, we won't know until we --

22              (Plaintiff counsel conferred.)

23              THE COURT:  Wait a minute.  What did you say?

24              MS. JONES:  I said we won't know until we see the

25  videos, but it's our position that these aren't the videos that
```

 1   were presented during the deposition of the actual developer.

 2           MS. RUST:  They were produced --

 3           THE COURT:  If they're not the same videos then you

 4   cannot introduce them.  We're going to wait and reserve your

 5   objection, you see what she's offering, okay, and then we'll

 6   come back to it.  If she objects to it, it's not the same thing

 7   that's on the deposition, then the Court will sustain.

 8   Otherwise we'll keep on going.

 9           MS. RUST:  Okay.

10   BY MS. RUST:

11   Q.   Well, before we press Play, do you know what this is a

12   video of?

13   A.   Yes.

14   Q.   And what is it?  Just generally, what is it a video of?

15   A.   It's a perspective from a client logging into their app.

16   Q.   And did you take this screen recording video?

17   A.   I did.

18   Q.   Okay.  And is this -- did you have an opportunity to review

19   this video?

20   A.   Yes.

21   Q.   And is it a fair and accurate video of a contractor's

22   perspective on the Zira scheduling app?

23   A.   Yes.

24           MS. RUST:  Okay.  I was going to move to admit it, but

25   if the Court would prefer we look at the video first then I can

1    move to admit it after?

2            THE COURT:  All right.

3    BY MS. RUST:

4    Q.   We'll play through the video, 36 seconds, then we'll talk

5    about what we saw, okay?

6            MS. RUST:  You can play the 36-second video.  And just

7    for the record, there's no audio on this video.

8            (Video exhibit played.)

9            MS. JONES:  Your Honor, I'm going to make an

10   objection.  We do not have that video that they're showing.

11   We -- at the deposition, further testimony says:

12           "Sorry, I just want to make sure we authenticated the

13   other two newer videos that were produced, which will be, I

14   think, Defendant's 77 and 76.  Really quick I can share my

15   screen.  I do not have them up."

16           THE COURT:  All right.  Okay.  First of all, what is

17   it you're trying to -- you can have a seat.

18           What is it you're trying to establish by showing these

19   videos in the first instance?  What are you trying to show?

20           MS. RUST:  So I'd like to walk through the way that a

21   nurse can pick up a shift via the app, what shows up, how it

22   works, since the way that nurses can schedule shifts is relevant

23   to the level of control and flexibility they have and whether

24   they work and when they work and what information is available

25   to them.

```
 1              THE COURT:  But do you need these videos to establish

 2    it?  Her testimony is the nurses can establish shifts through

 3    the app.  Do you need to show the Court the apps that they're

 4    complaining about that they have not seen to establish that

 5    point?  Her testimony is the best testimony.  That's what's

 6    corroborated.  But their objection here is they have not seen

 7    what you're trying to show.  So the Court has no objection to

 8    her giving the testimony that they establish the nurses can pick

 9    their schedule using the app.  What they're objecting to is

10    attempting to show the videos to prove that they can do it,

11    okay?  Since there's an objection to the video you're using, the

12    Court will sustain that objection.  But that doesn't take away

13    the testimony she gave that they can use the app to schedule.

14    All right?

15              MS. RUST:  Well, Your Honor, as if I may, there is

16    testimony regarding the availability and knowledge of the shifts

17    that are available to nurses, and while we -- of course you know

18    the testimony of the Steadfast representatives is the best

19    evidence, we do think that the issue, the evidence, using these

20    videos would make it more likely to support their testimony on

21    what's available so that the Court can actually see what is

22    there.  It's available to us to view.  It's been authenticated.

23    And that would assist the Court in determining a material fact.

24              THE COURT:  That's the issue here.  It's an

25    authentication issue here.  That's the problem we have.  That's
```

```
 1    the problem we have in trying to use the video.  That's the

 2    problem.

 3              MS. RUST:  So --

 4              THE COURT:  She's objected to it.  Now you can show

 5    one -- if you have a video in there showing how the nurses can

 6    schedule using the app that they have seen and you all agree on

 7    it, use that one.  But to the extent they said they have not

 8    seen that one, then the Court will sustain that objection.  You

 9    have three, I understand.  Use one that you've shown in

10    deposition.

11              MS. RUST:  Your Honor, this is a video showing how

12    nurses can schedule a shift.  With respect to whether the

13    plaintiff has seen it, this was produced to them in discovery,

14    they have never -- it's been identified as an exhibit in the

15    pretrial order, and there's never been any representation to us

16    that they didn't see the video.  So if that's an issue, it

17    sounds like there needs to be a conversation that we've never

18    been made a aware of, we shouldn't be prejudiced by not being

19    able to use them in the testimony.

20              THE COURT:  Was it produced in discovery?

21              MS. LEWIS:  Your Honor, the videos that were produced

22    in discovery were provided by Zira App.  The Court's prior

23    rulings is these were untimely produced and said you all can

24    have a 30(b)(6) deposition with respect to these videos, as

25    defendants represented at the pretrial conference and summarily
```

1  in the deposition of Zira that they were created by Zira.  The

2  objection made at the pretrial conference was to authentication,

3  because they were not created by Steadfast.

4       Now it's my understanding today that that deposition

5  was not needed because they weren't created by Zira, well, then

6  I'm very confused about what happened in the deposition when

7  Ms. Rust stated that they needed to authenticate these videos by

8  Zira because they were created by Zira.  Now the testimony today

9  is that they were created by Steadfast, but on two occasions, at

10  the pretrial conference and at the 30(b)(6) deposition, it was

11  represented that they were created by Zira App and the 30(b)(6)

12  representative for that deposition likewise confirmed the same.

13       THE COURT:  Who created it?  Who created it?

14       MS. RUST:  These two individuals, Christine Kim

15  testified she created them.  The third video, it's our

16  understanding that somebody from the Zira development company

17  created that video.  We're not looking at that video on

18  Christine Kim's testimony.  But as far as authentication,

19  whether we wanted or asked or were considering having Zira

20  authenticate exhibits, these two videos, 77 and 78, more than

21  one individual can authenticate a document, so...

22       THE COURT:  Where are the ones that this witness,

23  Ms. Kim, created?  Which exhibit is that?

24       MS. RUST:  This exhibit, 77, and then the next

25  Exhibit, which is 78, which is --

1          THE COURT:  Okay.  Now, were the exhibits that this

2    witness created, were they provided to the Secretary?

3          MS. RUST:  Yes.

4          THE COURT:  And were they listed in the initial -- in

5    the final pretrial order?

6          MS. RUST:  Yes.

7          THE COURT:  And were there objections raised to those

8    videos in the final pretrial order; that is, those created by

9    this witness?  Did she raise objections to it?

10         MS. LEWIS:  Yes, Your Honor.  We raised objections to

11   it.  And if I may share my screen from the deposition transcript

12   where she's dealing with this very exact exhibit, Defendant 77,

13   speaking to the Secretary's objection from ECF 261 with respect

14   to the authentication, I understand that 78 was not produced,

15   but 77 which is on the screen was the very issue in which we had

16   the deposition.  I'm at the Zira deposition transcript at

17   Page 156, and Ms. Rust stated:  "Make sure we authenticated the

18   other two Zira videos that were produced, which would be, I

19   think, Defendant's 77 and 76."  Now Ms. Rust is referencing the

20   78, which we don't have.

21         THE COURT:  Okay.  Here's what we are going to do:

22   Where is 77?

23         MS. RUST:  It's on the screen.

24         MS. LEWIS:  And this is the one that she said was

25   created by Zira.  Ms. Kim did not create this.

1           THE COURT:  Okay.  Tell you what you're going to do:

2    I'm going to defer admission of the exhibit.  You go through it,

3    then on cross-examination you can cross-examine on what she

4    created, what she didn't, then I'll rule.

5           MS. LEWIS:  Thank you, Your Honor.

6           THE COURT:  77 is the only one we're going to use, and

7    you can question her on 77.  On 78, the Court has sustained the

8    objection to 78.  Use 77.  On cross-examination you can question

9    what she had to do with 77.

10          MS. RUST:  For 78 is the objection sustained because

11   of the representation they did not receive it?

12          THE COURT:  Objection sustained on 78, all right?

13   Period.

14          MS. RUST:  Okay.

15   BY MS. RUST:

16   Q.   Ms. Kim let's move forward with looking at this video.  So

17   we already played it briefly once, and I want to go through the

18   different aspects of it.  So we can restart from the beginning

19   and pause.

20          (Video exhibit published.)

21   BY MS. RUST:

22   Q.   Can you just tell me what this screen is showing on the

23   video?

24          MS. RUST:  For the record we're at two seconds.

25   A.   So the contractor logs into the app at the login page.

 1           MS. RUST:  Okay.  And let's go forward to about five

 2   seconds on this screen.

 3           Okay, pause.

 4   BY MS. RUST:

 5   Q.   What is this showing now that we've moved on to five

 6   seconds on the video?  What is this showing?

 7   A.   On the mobile app there's a few different icons there.  Now

 8   we're in the Calendar tab.  So the Calendar tab shows pretty

 9   much a brief summary of any open shifts that are available if

10   they have already claimed a shift.  Just gave people the

11   capability to go through the different dates to see what open

12   shifts there are.

13           MS. RUST:  Let's keep playing the video.  Let's pause

14   at 10 seconds right there.

15   BY MS. RUST:

16   Q.   We're at 11 seconds on the screen.  Tell us how this has

17   changed.  Where in the app is this?

18   A.   So when the individual was scrolling through the calendar

19   they saw that there was an open shift on Friday, March 5th.  The

20   shift was 9 to 5.  So they click that for more detail, and on

21   the bottom of this you see the black button where it says Claim

22   Shift.  This gives them the ability to claim the shift.

23           MS. RUST:  Okay.  So let's keep going through the

24   screen, through the video.

25           And let's pause right there at 15.

1   BY MS. RUST:

2   Q.   It says Account at the top of the screen.  What are you

3   looking at here?

4   A.   So that's just their profile account that has their name,

5   their phone number, Edit Personal Info if they want to change

6   their phone number or any personal information.  And then in the

7   middle there is a section for Time Preference where they have a

8   specific preference in time that they're available.  It gives

9   them -- I mean, they can log out from here also.

10  Q.   Okay.  So they -- this is their account page that they can

11  update?

12  A.   Correct.

13         MS. RUST:  Okay.  Let's keep going through a few more

14  seconds.  Play the video to stop at 20.

15  BY MS. RUST:

16  Q.   What are we seeing here at 21 seconds on the video?

17  A.   So this is an open shift for Saturday, March 6.  The shift

18  is from 9 a.m. to 5 p.m., has the facility's name, has the

19  ability for them to claim that shift.

20         MS. RUST:  Okay.  Let's play.  Stop.

21  BY MS. RUST:

22  Q.   Okay.  At 27 seconds, what's on the screen now?

23  A.   The notification stating that it successfully was claimed,

24  and that it just notifies you.  It has a little notification

25  saying we will let you know when it's approved.

1   Q.   Okay.  So it's a pop-up at the bottom of the screen -- just

2   explaining what's on the screen -- the pop-up at the bottom of

3   the claim says Claim Requested, and then it says "We will let

4   you know when it's approved."  Right?

5   A.   Correct.

6           MS. RUST:  And let's keep just playing through to the

7   end of the video.

8   BY MS. RUST:

9   Q.   Okay.  So is that -- based on your understanding, of how

10  you use the app, is that how -- the process for how a

11  scheduler -- excuse me.

12       Based on your understanding of how to use the Zira app for

13  a contractor, is that generally the process for how a nurse on

14  the Steadfast registry can view available shifts on the app and

15  select a shift on the app?

16  A.   Yes.

17  Q.   Okay.  And are you familiar with how a facility can

18  schedule -- well, let me start there:

19       Do the facilities that Steadfast contracts with, are they

20  provided with the opportunity to access this app?

21  A.   Yes.

22  Q.   Okay.  And what can they do generally -- just a brief

23  description -- what can they do on this app from the facility

24  perspective?

25  A.   So they can go through the schedule and they can add open

```
 1   shifts, pretty much all the needs that they have at their

 2   facility.  They can see the --

 3   Q.   I'll stop there.  We'll walk through a little bit.

 4        So the facility has its own account?

 5   A.   Correct.

 6   Q.   And can they post shifts that they want to post on the app

 7   for Steadfast nurses to select?

 8   A.   Correct.

 9   Q.   Okay.  And are they on the app -- if a nurse claims a shift

10   like we just saw in DX-77, the nurse claims a request, then in

11   the app do the -- is the facility notified in the app?

12   A.   So they get the notification stating that that individual

13   has claimed that shift.

14   Q.   Okay.  And then does the -- what does the facility do as

15   their next step as far as confirming the shift?

16   A.   They can either approve it or deny it.

17   Q.   Okay.  And then will they be able to see from their

18   facility account page any unclaimed open shifts and any shifts

19   that have been approved and confirmed by them?

20   A.   Yes.

21   Q.   Okay.  Let's move to the next topic.  I want to talk to you

22   about payroll.  I know we talked about some of the aspects of

23   payroll last week.  I want to discuss a few of the specifics

24   with you.

25        So first of all, let's pull up PX-9, which --
```

1      All right.  And are these -- is this a photo of the time

2   sheet for Steadfast?

3   A.   Yes.

4   Q.   Okay.  So I want to talk about the specific process for

5   how, how Steadfast processes these time sheets for payroll.  So

6   when this time sheet is submitted by a nurse to Steadfast,

7   what's the first thing that happens?

8   A.   So the payroll team will look at the time sheet and they do

9   a quick review and audit to make sure all the tables are

10  properly completed.  They look for the date, they look for the

11  legibility on the time sheet, make sure that the client is a

12  valid client, a signature both from the facility and from the

13  contractor.

14  Q.   So looking at PX-9 that you have on your screen, just the

15  first page, does that time sheet have all of the information

16  that would be needed to process this time sheet?

17  A.   Yes.

18  Q.   If the time sheet is illegible or missing information,

19  which you said they're looking for when this comes in, what did

20  the payroll processer do at that point?

21  A.   So we would respond back to -- respond to that time sheet

22  and list the discrepancies or what further action would be

23  needed.

24  Q.   Okay.  And if the -- and is that typically via email?

25  A.   Yes.

```
1   Q.    Okay.  So you will reply to the email with the information

2   that's needed?

3   A.    Yes.  Correct.

4   Q.    And if the contractor doesn't respond, what happens with

5   the time sheet for that pay period?

6   A.    So we do the courtesy of trying to reach out them to let

7   them know we're still waiting for them; however, if we don't

8   receive any further information then we don't process the time

9   sheet.

10  Q.    Why aren't you able to process the time sheet if they don't

11  respond with the information you asked for?

12  A.    The information that's on the time sheet is important to

13  properly process the time sheet.  Depending on the discrepancy,

14  if there is no time, if the facility is missing, if the date is

15  missing, those -- that data is required in order for us to send

16  that to the facility.

17  Q.    Okay.  So if we -- looking at the first page of PX-9, you

18  said this has all the information that would be needed to

19  process this time sheet, right?

20  A.    Correct.

21  Q.    If we have all the information, what does the payroll

22  processor do next?

23  A.    So if -- for this example we would send a confirmation

24  receipt to the contractor with the date, the time in and time

25  out at the facility, and we would write Received and Sent For
```

1    Processing.  That information then is printed, we manually

2    calculate the hours in decimal format, and we transfer all that

3    data into a spreadsheet.

4    Q.   So as far as -- let's scroll down a little bit on the first

5    page of PX-9.

6         So does this, the first page here, does it indicate that

7    the payroll processor manually calculated those hours into

8    decimal format?

9    A.   Correct.

10   Q.   Okay.  And is that the handwriting directly under the image

11   of the time sheet?

12   A.   Yes.

13   Q.   Okay.  And is this stating that there was, it was

14   calculated in decimal format for 8.5 hours; is that right?

15   A.   Correct.

16   Q.   Okay.  Once the hours are manually calculated like this,

17   then what happens?

18   A.   That information is transferred onto a spreadsheet.  The

19   spreadsheet is then sorted by the facility and then the data is

20   sent to the facility for confirmation.

21   Q.   Okay.  When it's sent to the facility for confirmation,

22   what happens next then?

23   A.   So we just ask for the authorized person from the facility

24   to review the information to confirm that they have worked, the

25   authorized person responds back either approving them, denying

1  them or contesting the information that we gave them.

2  Q.   Okay.  So if it's approved, we'll come back to that.  As

3  far as contesting or denying, is there a difference between

4  those two options?

5  A.   Yes.  So --

6  Q.   What is contesting?

7  A.   So usually if the person at the facility can confirm that

8  the person was there, they might have some issues with the hours

9  that were logged.  So for example if this information from 7 to

10 4 was given to the facility and they're contesting it, they can

11 say, hey, this individual didn't arrive to the facility until

12 10 a.m.

13 Q.   Okay.  And then what does denying the time sheet mean in

14 comparison to contesting?

15 A.   So that means that the facility cannot confirm.

16 Q.   Confirm the shift at all?

17 A.   Correct.

18 Q.   Okay.  So if the time sheet's approved then do you pay out

19 on it?  What do you do?

20 A.   Yes.  So then we send it -- so then now once it's confirmed

21 from the facility then we pay the contractor.

22 Q.   Okay.  So let's talk a little bit about the approval

23 process though, if there's an issue with it.

24      So when the facility contests or denies a nurse's time

25 sheet, you said you send it to them to review, and they can

1    contest or deny.  What is the process for handling a contested

2    or denied time sheet?

3    A.   So it would vary.  So if the facility is saying that

4    they're contesting it based upon the hours or if they are

5    denying it, depending on what the reason is from the facility,

6    we then relay that information to the contractor.  We say, hey,

7    you know, you submitted your time sheet from 7 to 4; however,

8    the facility states that you arrived at 10 a.m.  So your

9    approved hours is 10 a.m. to 4 p.m.; however, we find this

10   information not accurate, please provide us detailed information

11   for us to forward back to the facility for them to approve.

12   Q.   So if a nurse responds to that email with information to

13   support the times they have put on the time sheet, do you

14   forward that to the facility?

15   A.   Yes.

16   Q.   Do you always forward that information to the facility?

17   A.   Yes.

18   Q.   And do you make any judgment call as to the credibility or

19   sufficiency of the information provided to the nurse in

20   determining whether to send it to the facility?

21            MS. LEWIS:  Objection, confusing.

22            THE COURT:  You what?

23            MS. LEWIS:  Objection, confusing.  I didn't --

24   confusing.  Form.  Confusing.

25            MS. RUST:  I can break it down.  That was a long

 1   question.

 2              THE COURT:  Rephrase it.

 3              MS. RUST:  Sure.

 4   BY MS. RUST:

 5   Q.   So if the nurse sends information back, you said you always

 6   send it to the facility.  When you're sending it to the facility

 7   though, do you ever -- has there ever been an instance where you

 8   look at the information the nurse sent and think -- do you

 9   consider whether the nurse's information is sufficient or

10   credible before sending it?

11   A.   No.  So I don't, I don't use -- so I literally, any

12   information that's vague or is detailed, I send that information

13   to the facility for the facility to approve or deny.

14   Q.   Okay.  Do you offer any -- during this process do you offer

15   any input to the facility as to whether to approve or deny the

16   invoice based on what the nurse sends you or sends to them?

17   A.   No.

18   Q.   Do you offer any input to the nurse as to how to support

19   the time sheet?

20   A.   I ask them to be as detailed as possible.

21   Q.   Okay.  And any further instruction on how to support it?

22   A.   No.

23   Q.   Okay.  And if a nurse doesn't respond to your email

24   regarding the facility contesting or denying the time sheet,

25   what would be the next step then if you don't have further

1   information on the time sheet?

2   A.   So typically I encourage, you know, we -- as a courtesy we

3   reach out to the contractor, again, ask them for the

4   information.  If we still don't receive that then we process

5   what the facility has approved.

6   Q.   Okay.  So is it fair then that the nurses are -- Steadfast

7   is only --

8        Let me restart that question.

9        Is it fair then that the nurses can only get paid for what

10  the facility approves to pay the nurse?

11            MS. LEWIS:  Your Honor, I'm going to object.  A lot of

12  these are leading questions.  But I'm kind of -- this is very

13  much leading territory.

14            THE COURT:  Sustained.  Also calling for an opinion as

15  the way you started that question:  "So is it fair then".

16            MS. RUST:  Understood.  I was trying to summarize what

17  we're talking about.  But I can, I can rephrase this.

18  BY MS. RUST:

19  Q.   So if you -- if the facility -- if you don't get any

20  information from the nurse to support the time sheet, then I

21  think what you said is you just have what the facility approves

22  and that's what gets paid out?

23  A.   Correct.

24  Q.   So does Steadfast only pay a nurse for what's approved by

25  the facility?

1  A.    Correct.

2  Q.    Okay.  All right.  So does Steadfast use any clock-in our

3  clock-out software that they require the nurses to use to track

4  time?

5  A.    No.

6  Q.    And so can Steadfast process payroll without receiving time

7  sheets?

8  A.    No.

9  Q.    Can Steadfast process payroll without receiving facility

10 confirmation?

11 A.    No.

12 Q.    If a nurse didn't submit a time sheet, would Steadfast on

13 the payroll side even know if the nurse worked that shift?

14 A.    No.

15 Q.    So if a nurse signs up for a shift though, and you don't

16 have a time sheet for it, will you -- does Steadfast pay out for

17 that shift without the time sheet?

18 A.    No.

19           THE COURT:  Keep your voice up, please.

20           MS. LEWIS:  Your Honor, I was going to object.  I'm

21 going to sit down.  No objection.  Thank you.

22 BY MS. RUST:

23 Q.    From a payroll perspective, is -- why can't the payroll

24 department pay a nurse without the time sheet even if there

25 might be a record that they had picked up the shift on the

1   schedule somewhere?

2   A.   So the contractor has to submit that information for the

3   payroll department to process in order for that information to

4   be relayed over to the facility.

5   Q.   So -- okay.  What is the first and last day of Steadfast's

6   pay period in a week?

7   A.   For weekly pay, our pay period starts on Tuesday and ends

8   on Monday.

9   Q.   Okay.  And when do you have -- when do you need the time

10  sheets to be submitted to Steadfast to run weekly payroll?

11  A.   So we request that they submit them no later than Tuesday

12  morning at 9 a.m.

13  Q.   Okay.  And have nurses ever submitted time sheets after the

14  Tuesday morning deadline for weekly payroll?

15  A.   Yes.

16  Q.   What is Steadfast's policy for handling those submissions?

17  A.   We typically try to process as many as we can, but to

18  understand with respect to our deadline we have a lot to do,

19  that's why we have that request for them to submit them no later

20  than 9 a.m. on Tuesday.  But if they do submit them after a

21  specific deadline we try our hardest to process as many as we

22  can.

23  Q.   Okay.  Is there any penalty for submitting a time sheet

24  after the Tuesday morning deadline for a weekly payroll?

25  A.   No.

1  Q.   Have you had nurses submit -- you said you had nurses

2  submit time sheets late, right?

3  A.   Correct.

4  Q.   Have you ever received time sheets for more than the

5  previous pay period that week, that previous week?

6  A.   Yes.

7  Q.   So are they submitting time sheets for more than a week at

8  a time?

9  A.   Yes.

10 Q.   What do they -- does Steadfast -- will Steadfast still

11 process those time sheets?

12 A.   Yes.

13 Q.   And when do those time sheets get processed?

14 A.   At the time of submission.

15 Q.   For that weekly payroll?

16 A.   Correct.

17 Q.   Okay.  Even if the time sheets were from three weeks ago?

18 A.   Yes.

19 Q.   And are there -- in your experience with processing the

20 payroll, are there nurses who tend to submit time sheets late or

21 in long periods of -- batches of long periods of time?

22 A.   Yes.

23 Q.   What are some -- can you think of any nurses off the top of

24 your head that have done that recently?

25 A.   The names?

1   Q.    Just a couple examples, yes.

2   A.    Jolonda Able.  Ashley Meggie.  Ashlee Starks.

3   Q.    And for those individuals, is there any consequence for

4   them submitting time sheets outside of the week of the work?

5         MS. JONES:  I'm going to object to this line of

6   questioning.  Relevance, Your Honor.

7         THE COURT:  Sustained.

8         MS. RUST:  Your Honor, there was testimony from

9   previous witnesses regarding discrepancies or the timing of pay,

10  and so I think the testimony is relevant to show that there are

11  time sheets that are submitted much later and that Steadfast

12  would still process them as soon as they received.

13        THE COURT:  To be candid, I probably should have

14  stated then, I don't know how helpful that is to the Court.  To

15  be candid with you, you had that testimony.  I'll say the same

16  thing about this testimony now:  About the lateness of the time

17  sheets, she has explained in detail how time sheets are

18  submitted, calling some examples of people who may have

19  submitted them late, et cetera.  We're just drifting here.

20        MS. RUST:  Understood, Your Honor.  Trying to be

21  thorough, but...

22        THE COURT:  I wouldn't call that thorough, I would

23  call that drifting.  So go on.

24        MS. RUST:  Understood.

25  BY MS. RUST:

1    Q.    So let me close this up then.

2          So you received -- I'll close this up.

3          So if you received multiple time sheets over multiple weeks

4    and they're processed in a single pay period, will -- how will

5    that be reflected in that nurse's pay in the payroll reports?

6    A.    So there's two reports that can be generated from ADP.  And

7    so it will reflect how many hours that they worked, how much

8    they were paid in that pay period.

9    Q.    Okay.  So which payroll report are you talking about?

10   A.    There's a Payroll Summary Report.

11   Q.    Okay.  So on the Payroll Summary Report, that's reflecting

12   the number of hours that were paid for that period?

13   A.    Correct.  For that week.

14   Q.    Okay.  And is that always indicative of the number of hours

15   that that nurse worked during that period?

16   A.    No.

17   Q.    Okay.  I'm going to show you an exhibit.  We're going to

18   look at PX-11, which are the facility invoices.  And actually --

19          MS. RUST:  So this exhibit was admitted as a

20   voluminous file.  I think the plaintiff's had an excerpt.  I

21   have a different excerpt that we're going to look at today.

22   I'll provide a copy.

23          MS. LEWIS:  Your Honor, this was not submitted as

24   voluminous.  We only provided samples of PX-11, just to clarify.

25          THE COURT:  This exhibit was not submitted?

```
 1            MS. LEWIS:  It was submitted, but as counsel

 2  represented, it was part of voluminous.  It wasn't -- we only

 3  put sample exhibits in our PX-11.  So what's there is what's

 4  there.  There's no more.

 5            MS. RUST:  Okay.  I'm sorry, did -- was there a ruling

 6  on the objection?

 7            THE COURT:  It was just a comment to the Court.  She

 8  doesn't object, she was simply saying this is not derived from a

 9  summary, this is the exhibit.  That's all she said.  It's a

10  single exhibit, it's not a compilation from a voluminous

11  document.

12            Do you agree with that?

13            MS. RUST:  Well, when the exhibit was identified in

14  the pretrial order it was identified as Steadfast facility

15  invoices, and when we received the copy of those -- of that

16  exhibit it was only an excerpt.

17            THE COURT:  So it's an excerpt.

18            MS. RUST:  Yes.

19            THE COURT:  In other words, we didn't have a pile of

20  invoices from which this was summarized; it was represented that

21  this is an excerpt of invoices.

22            MS. RUST:  Correct.

23            THE COURT:  That's all she's saying.  It's a single

24  document.  Let's move on.

25            MS. RUST:  Okay.
```

```
 1   BY MS. RUST:

 2   Q.    Okay.  So looking at this document --

 3            MS. RUST:  And for the record, this is marked

 4   Steadfast 6077516 through 0775366 are the Bates stamps.

 5   BY MS. RUST:

 6   Q.    And is this -- do you recognize this document?

 7   A.    I do.

 8   Q.    And can you tell me what it is?

 9   A.    This is an invoice for the facility Accordius Health at

10   Creekside.

11   Q.    Can you go up there just really quick the next few pages?

12         Are these -- what's attached to this invoice here?

13   A.    The time sheets and supporting documents.

14            MS. RUST:  We can scroll back up to the top.

15   BY MS. RUST:

16   Q.    Is this an accurate copy of the invoice of Steadfast

17   invoices to Accordius Health at Creekside Care dated 9/17/2020?

18   A.    Correct.

19            MS. RUST:  And Your Honor, I would move to admit this

20   under PX-11, but we can move to admit it under a different

21   exhibit for the defendants?

22            MS. JONES:  Your Honor, that's not our PX-11.  We

23   didn't attach underlying time sheets to our exhibits.  This has

24   time sheets, so I'm not sure where this exhibit derives from.

25            THE COURT:  The only thing you are saying is this is
```

1   the basic sheet, but you're indicating that the other time

2   sheets were not attached to the exhibit?

3          MS. JONES:  Yes, Your Honor.  She can admit it under a

4   different exhibit.

5          MS. RUST:  So I can move it under a different exhibit.

6   I was just saying my understanding when they identified these

7   documents in the pretrial order, it was just identified as

8   Steadfast facility invoices.  So we believe they were

9   identifying all of the facility invoices, and we did not know

10  until the day or two before trial when they dropped off their

11  exhibit binder it was a select excerpt.  So I'm happy to put

12  this in as a different exhibit under the defendants.

13         THE COURT:  When who dropped off their invoices?

14         MS. RUST:  Plaintiff's counsel on the day before

15  trial.

16         THE COURT:  So are you maintaining an objection to the

17  attachments?

18         MS. LEWIS:  Your Honor, our representation is this is

19  not our PX-11.  Probably make it simpler just to give her a new

20  exhibit number, because this is not -- our PX-11 is simply

21  invoices.  This exhibit has time sheets with invoices.

22         THE COURT:  So you make it Defense?

23         MS. RUST:  No problem.

24         THE COURT:  What is the number?

25         COURTROOM DEPUTY CLERK:  201.

```
 1              THE COURT:  201.

 2              MS. RUST:  Thank you, Your Honor.

 3              THE COURT:  We're going to admit 201.

 4              MS. LEWIS:  No objection.

 5                   (DX-201 received in evidence.)

 6              THE COURT:  All right.  Let's move on.

 7   BY MS. RUST:

 8   Q.   Okay.  I just want to walk through the basic information

 9   that's on the facility invoice for Steadfast.

10              THE COURT:  I think -- continue.

11              MS. RUST:  Okay.

12   BY MS. RUST:

13   Q.   Can you just tell me what information, I'm going to walk

14   through the obviously we've got the information regarding the

15   facility up top.  But the chart down here with the columns at

16   the top columns says Date, Independent Contractor, Bill Rate and

17   Total.

18        What information is indicated in this?  Let's start with

19   the left column, the date.

20   A.   That's the date of the time sheet.  That goes to the name

21   of the contractor followed by the title of the contractor, the

22   hours that were calculated in decimal format, the hours in and

23   out, the bill rate, and the total.

24   Q.   Okay.  And so the left column, you said this is for the

25   time sheet, so that's a shift, a date of the shift that was
```

1    worked?

2    A.    Correct.

3    Q.    Okay.  And this invoice was -- this invoice is dated 9/17.

4    Are these -- how frequently are you invoicing facilities?

5    A.    Weekly.

6    Q.    So which dates would this invoice cover for that week?

7    A.    I would have to see a calendar.

8    Q.    That's fine.  I guess my question is --

9    A.    So it would be Tuesday to Monday.

10   Q.    So like directly -- are you invoicing them like a week

11   later or typically like right at the end of the week?  How

12   quickly are the invoices issued, is what I'm asking.

13   A.    So it's a Tuesday to Monday.  That date, because it's a

14   Monday, it would be Thursday.

15   Q.    Okay.  So in this invoice, were all of these shifts worked

16   within the pay period directly preceding this invoice?

17   A.    No.

18   Q.    Okay.  So for example -- we'll go through some other

19   exhibits we'll look at.  Are there any shifts on here that were

20   worked at least a week prior to the invoice being issued?

21   A.    So for the invoice date of 9/17, Nurse Tatianna Canady, her

22   dates are in August, so that's two or three weeks prior to the

23   reflecting pay period date.

24            MS. RUST:  I want to look at the corresponding payroll

25   summary, which my understanding was -- and plaintiff's counsel

1   can correct me if I'm wrong -- but PX-7 included all of the

2   payroll summaries which was our understanding until we received

3   the exhibit binders, okay?  So then this is an excerpt of PX-7

4   which is already --

5           THE COURT:  Is this another example of a payroll

6   summary of invoices other than PX -- I mean defendant's exhibit

7   that you just questioned her on?  Is it another example of

8   invoices submitted for payment other than the one you just gave

9   the Court?

10          MS. RUST:  I am just following through the payroll

11  reports to show how it comes up which was --

12          THE COURT:  Okay.  The point is, if you're showing the

13  Court the invoices that you submit and the detail of how you

14  submit these invoices for payment, then you don't need to go

15  back to the payroll provided.  The Court just heard her testify

16  about how you get these and get this information off the time

17  sheets.  It's put in that summary that you just put into the

18  record and they use that to pay.  So the Court doesn't need

19  another one.  I mean --

20          MS. RUST:  Okay.

21          THE COURT:  -- just being repetitive.

22          MS. RUST:  Understood.  If that is clear then we will

23  not need to look at that document.

24  BY MS. RUST:

25  Q.   Okay.  The next one's PX-6, which is a document we've not

1   looked at before.  This is an excerpt of PX-6.  It covers -- the

2   Bates stamps are Steadfast 6074733 to 074818.

3        Do you recognize this document, Ms. Kim?

4   A.   I do.

5   Q.   And what is this, what is this document?

6   A.   It's a generated detail -- payroll detail report by ADP.

7   Q.   Okay.  And does it say -- is this for a specific period of

8   time that this report's generated for?

9   A.   Yes.  It's from July 3rd, 2020 to September 25th, 2020.

10  Q.   Okay.  Just looking at the first page, can you just tell us

11  what -- and if this needs to be zoomed in just let me know --

12  but can you tell me what the payroll detail report is showing?

13  And let's just use Jamie Adames, whose name is listed on the

14  first page here as an example.

15  A.   So it does a breakdown, it's a more intimate view of the

16  breakdown of what they were paid, how many hours for that pay

17  period they were paid at the rate and the total, and it gives

18  them -- it shows us how they were paid, how it was delivered, if

19  it was direct deposit or a check, reflecting each check date,

20  how it was delivered, their account information and the total.

21  Q.   Okay.  And the top of the double column, one of them is

22  Rate.  So following that column down to Jamie Adames there is

23  several different notes.  What is that telling us?

24  A.   Different columns?  So the --

25  Q.   For the rate column.

```
 1  A.    For the rate column.

 2  Q.    Did you understand what I was asking?

 3  A.    For each column?

 4  Q.    So looking at the rate column, following that down to Jamie

 5  Adames, the example we're looking at?

 6  A.    Okay.

 7  Q.    Why are there different numbers listed here on the right?

 8  A.    Because they were paid differently per assignment.

 9  Q.    Okay.  So does this -- what is this breaking down for us to

10  read this report?

11  A.    It shows that for the hours of 112.5 hours at a facility

12  that paid $16 an hour, then it goes to 156.5 hours at the

13  facility that she worked at that paid out 17 an hour.

14  Q.    Okay.  That's good.  Okay.  Thank you.

15          MS. RUST:  I'll move to admit PX-6.  It will be as a

16  defense exhibit if the Court would prefer it admitted as a

17  defense.

18          MS. LEWIS:  No objection, Your Honor.

19          THE COURT:  Defendant 6 will be admitted.

20          MS. RUST:  Is it marked as PX-6?

21          COURTROOM DEPUTY CLERK:  Do you want it marked as a

22  defense exhibit and not a plaintiff's?

23          THE COURT:  Change it to defense exhibit.

24          COURTROOM DEPUTY CLERK:  202.

25                  (DX-202 received in evidence.)
```

```
 1            THE COURT:  That should be the exhibit given to the
 2    courtroom deputy.  Have you got it?
 3            COURTROOM DEPUTY CLERK:  Yes, sir.
 4    BY MS. RUST:
 5    Q.   Okay.  I want to talk a little bit about payroll complaints
 6    or discrepancies.  What happens if a nurse complains about a
 7    discrepancy in their pay?  Is there a process?
 8    A.   Yes.  So depending if they call in or if they email the
 9    discrepancy, someone from our team will address it and ask for
10    the information to pretty much review where the discrepancy was.
11    Q.   Okay.  And what information are they asking for, or how do
12    they resolve that?
13    A.   So, I mean, numerous reasons why they would be asking
14    specific questions to target what problem they were trying to
15    resolve.  If a contractor calls stating that, you know, my check
16    is short, I was expecting to receive this amount, then the
17    payroll team member would ask them, you know, where did they
18    work and we would ask them what shifts they worked.  We would
19    review that against what we have on file, kind of reverse
20    engineer and, you know, where they, where the contractor is
21    stating that they have that discrepancy.
22    Q.   Okay.  And do you oversee the payroll department's handling
23    of those complaints and discrepancies?
24    A.   I do.
25    Q.   Are you familiar with an individual on the registry named
```

1   Ashley Meggie?

2   A.    I am.

3   Q.    Have you ever spoken directly to Ms. Meggie about alleged

4   discrepancies in her pay?

5            MS. JONES:  Objection, hearsay.

6            THE COURT:  Well, she can testify if she has spoken to

7   her, but she certainly can't tell us what she said.  Let's see

8   where we're going here.

9   BY MS. RUST:

10  Q.    So the question is have you ever spoken directly with

11  Ms. Meggie about alleged discrepancies in her pay?

12  A.    Yes.

13  Q.    Okay.  Approximately when was that conversation?

14  A.    March of this year.

15  Q.    March of this year?

16  A.    Of this year.

17  Q.    Okay.  And what was the discrepancy concerning?

18           THE COURT:  Before we go into all of that, what's the

19  relevance of getting into the discrepancy of one particular

20  person to a defect in their pay?  The Court's given you lot of

21  latitude, Ms. Rust, but you know, there's a limit.  What is the

22  purpose of getting into this discrepancy?

23           MS. RUST:  Of course Ms. Meggie testified last week

24  and alleged that there were discrepancies in her pay that were

25  not resolved, so Ms. Kim will testify about what information

1  that the company has regarding that to impeach that testimony.

2          THE COURT:  Okay.  So this is rebuttal testimony?

3          MS. RUST:  Yes.

4          THE COURT:  All right.  Then continue.  As long as

5  she's not going to say what she said, court will let you go.

6  Continue.

7          Move it along.  What did you do in response to the

8  alleged discrepancy?

9  BY MS. RUST:

10 Q.   Okay.  So what was the alleged discrepancy regarding?

11 A.   She stated that her 1099 --

12         MS. JONES:  Objection, hearsay.

13         THE COURT:  Sustained.  You cannot tell us what she

14 said.  You can tell us what you did as a result of her

15 complaint.

16         MS. RUST:  Okay.

17 BY MS. RUST:

18 Q.   So you had a conversation with her regarding an alleged

19 discrepancy, right?

20 A.   Correct.

21         MS. JONES:  Objection, leading.

22         MS. RUST:  I'm just recapping so we can --

23         THE COURT:  Overruled.

24         MS. RUST:  -- move forward.

25 BY MS. RUST:

1  Q.    And what is the -- was the alleged discrepancy resolved?

2  A.    Yes, to the best of my knowledge.

3  Q.    And did you review records with Ms. Meggie in the effort to

4  resolve that discrepancy?

5  A.    Yes.

6  Q.    And were, were you able to confirm Ms. Meggie that there

7  was no further issues with the alleged discrepancy that she

8  raised?

9  A.    Correct.

10  Q.    And as a result of that conversation did you take any

11  further action to -- regarding that alleged discrepancy?

12  A.    I did not.

13  Q.    Okay.  Are you familiar with an individual on the registry

14  named Tatianna Canady?

15  A.    I am.

16  Q.    Okay.  And have you ever spoken directly with Ms. Canady

17  about alleged discrepancies in her pay?

18  A.    No.

19         MS. JONES:  Your Honor, I'm going to object to the

20  relevancy of this on the testimony.

21         THE COURT:  Well, for what purpose are you pursuing

22  this?

23         MS. RUST:  Same purpose:  Impeaching.

24         THE COURT:  Objection overruled.

25  BY MS. RUST:

1   Q.   What was the answer to your question?

2   A.   No, not directly.

3   Q.   You have not spoken directly with Mrs. Canady?

4   A.   Correct.

5   Q.   And can you -- are you aware of any instances when a

6   complaint was submitted to the payroll department regarding

7   Ms. Canady's pay?

8   A.   Yes.

9   Q.   And are you aware whether that was resolved?

10            MS. JONES:  Objection, Your Honor.  Hearsay.

11            THE COURT:  No, she hadn't said anything yet, so the

12   Court overrules the objection.

13   A.   Yes.

14   BY MS. RUST:

15   Q.   Okay.  So you said you were aware that it was resolved; is

16   that what you said?

17   A.   Yes.

18   Q.   Okay.  And as a result of that did you take any further

19   action in response to that to deal with the alleged discrepancy

20   that was reported?

21   A.   I did not.

22   Q.   Okay.  And did you direct anyone in your payroll department

23   to take further action?

24   A.   After they informed me it (inaudible).

25            COURT REPORTER:  I'm sorry, what was your answer?

1              THE WITNESS:  After they informed me that it was

2   resolved, no.

3   BY MS. RUST:

4   Q.   All right.  I just have a couple more things to go through

5   with you.  We're right at the end.

6        So are you generally familiar with -- in your experience

7   running the payroll and reviewing payroll, are you generally

8   familiar with the frequency or different frequencies that nurses

9   work on the registry?

10  A.   Yes.

11  Q.   Okay.  And are the -- is that work consistent?  How would

12  you describe the -- your understanding of the frequency with

13  which the nurses work on the registry?

14  A.   I mean, there's a lot of nurses that will -- I'll see them

15  one time or I'll see their names a few times and I'll never see

16  them again.  I have a few contractors that, they usually have a

17  pattern of holiday time, usually anticipate them working around

18  holidays, and then there's a few handful that, you know, if it's

19  specific, last-minute requests they will say, hey, you know,

20  I'm --

21  Q.   You don't have to recount what somebody else said, but

22  okay.

23  A.   Yeah.

24  Q.   And on average how many, when you're running payroll

25  weekly, approximately how many payrolls are you running for

1  nurses in a week?

2  A.   Approximately 200.

3  Q.   Okay.  Is it always the same list of nurses that you're

4  running payroll for each week?

5  A.   No.

6  Q.   Okay.  And approximately how many -- are there nurses that

7  you see regularly on the payroll?

8  A.   Yeah, there's a handful.

9  Q.   Okay.  Just a handful?  More?

10          MS. JONES:  Objection, asked and answered.

11          THE COURT:  Sustained.  As a matter of fact, the Court

12  has a relevancy question about how many -- about the question

13  anyway, Ms. Rust.

14          MS. RUST:  I'm sorry, Your Honor?

15          THE COURT:  The Court has a question of relevancy of

16  how many names do you see.

17          MS. RUST:  Well, she testified regarding the frequency

18  with which they were working.  So with respect to the side of

19  payroll, if it was just a handful of the people working

20  regularly, the side of payroll is relevant to assessing the

21  handful.

22          THE COURT:  After that she said it was approximately

23  200.

24          MS. RUST:  Okay.  Understood.

25          Okay Ms. Kim, I think those are all the questions I

```
1   have for you.  Opposing counsel may have some questions for you.

2             THE COURT:  We'll be taking a 15-minute break.

3             Do not discuss your testimony on the break.

4             We'll be back in 15 minutes.

5             (Recess taken from 3:28 p.m. to 3:44 p.m.)

6             THE COURT:  Cross-examination.

7                         CROSS-EXAMINATION

8   BY MS. JONES:

9   Q.   Hello, Ms. Kim.

10  A.   Hello.

11  Q.   You were found guilty of embezzlement on May 21st of 2015,

12  correct?

13  A.   Correct.

14            MS. RUST:  Objection, relevance.

15            MS. JONES:  Your Honor, this goes to character

16  evidence pursuant to Federal Rule of Evidence 609 admitted to

17  attack credibility.

18            THE COURT:  Well, under 609, if it's a felony.

19            MS. JONES:  Yes it is, Your Honor.

20            THE COURT:  Well, then the objection is overruled.

21  BY MS. JONES:

22  Q.   You were also found guilty of embezzlement on October 19,

23  2011, correct?

24            MS. RUST:  I'll re-assert my objection again as to

25  relevance.
```

```
 1              THE COURT:  You may raise previous convictions for

 2   crimes of moral turpitude, even if it's a misdemeanor or a

 3   felony conviction, to impeach a witness under Rule 609.

 4              MS. JONES:  May I proceed, Your Honor?

 5              THE COURT:  You may.

 6   BY MS. JONES:

 7   Q.   And Steadfast has been one of your only jobs since your

 8   2015 conviction, right?

 9   A.   Yes.

10   Q.   And so essentially Lisa --

11        Just for clarification, you were also found guilty of

12   embezzlement on October 19th, 2011, correct?

13   A.   Yes.

14   Q.   And Steadfast has been one of your only jobs since your

15   2015 conviction, right?

16   A.   Yes.

17   Q.   And so essentially Lisa Pitts gave you a second chance, for

18   lack of a better term?

19   A.   Correct.

20   Q.   And so because of that you're extremely loyal to her,

21   correct?

22   A.   I'm thankful, but I'm loyal -- just -- it's a just a

23   personal character trait that I have.

24   Q.   You would not say anything that would undermine her case

25   even if you knew it was not accurate, right?
```

```
 1   A.    No, I would -- I don't agree with that.

 2   Q.    I would like to direct you -- do you recall seeing

 3   Defendant's Exhibit 75, which was I believe a screenshot of the

 4   Zira app?

 5   A.    What was the question?

 6   Q.    Do you recall seeing Defendant's Exhibit 75 which was a

 7   screenshot of the Zira app?

 8   A.    Yes.

 9   Q.    And that is what Steadfast used, correct?

10   A.    Can I see the screen -- I mean the screenshots?  Can I see

11   the screenshots?

12   Q.    Absolutely.

13         MS. JONES:  Is there an extra witness binder -- I

14   don't have the electronic copy of that exhibit.

15         THE COURT:  Let's see if you can find a hard copy

16   then.

17         MS. JONES:  I'm sorry, Your Honor?

18         THE COURT:  Let's see if we can find a hard copy.

19         All right.

20   BY MS. JONES:

21   Q.    This is previously identified as Defendant's Exhibit 75.

22   Do you recall seeing this document?

23   A.    I do.

24   Q.    And this is what Steadfast used, correct?

25   A.    Yes.
```

1   Q.   And this is what Steadfast uses for -- in the Zira app,

2   correct?

3   A.   That is what we use?  Could you clarify?

4   Q.   Strike that.

5        So this is what Steadfast uses?

6   A.   Correct.

7   Q.   This is not what the nurse sees, right?

8   A.   Correct.

9   Q.   And this app was not used at least until February 2021,

10  correct?

11  A.   Approximately early 2021.

12  Q.   And so to your knowledge Steadfast reached out to Zira in

13  December 2020 to develop this app, correct?

14  A.   It was latter of 2020.

15  Q.   This app was not used in 2020, correct?

16  A.   Correct.

17  Q.   This app was not used in 2019, correct?

18  A.   Correct.

19  Q.   And this app was not used at any time between 2015

20  and 2018, correct?

21  A.   Correct.

22  Q.   And I would like to --

23            THE COURT:  Let me stop.  Has the Court admitted this

24  exhibit?

25            MS. JONES:  Yes, Your Honor.  Exhibit 75 was admitted.

1          THE COURT:  Well, why wasn't this raised when the

2     Court was raising, considering whether it was admissible or not

3     if it wasn't even in use?

4          MS. JONES:  It was admitted into evidence, Your Honor.

5     I mean, they're saying it was in use in 2021 which is during the

6     time period we're alleging that the violations have --

7          THE COURT:  That's exactly why the Court said it

8     should have raised it at that point because it becomes a

9     relevancy question if it's not even being used at the time the

10    alleged violations took place.

11         MS. JONES:  Your Honor, it's our position that the

12    alleged violations had preceded from 2015 through present.

13    Quite frankly we computed back wages at least through, I

14    believe, July of 2021, which means the application --

15         THE COURT:  Okay.  Then the Court --

16         Go.  Continue.

17    BY MS. JONES:

18    Q.   And do you recall seeing Defendant's Exhibit 77, which I

19    believe was a video of the functioning of the app?

20    A.   Do I get to see it?

21    Q.   I don't have access to the video.  It was not provided to

22    me, so I can't pull it up.

23         MS. JONES:  Are defendants able to pull up the video

24    that's identified as Defendant's Exhibit 77?

25         MS. RUST:  Yes, we'll pull it up for you.

1           MS. JONES:  Thank you.

2   BY MS. JONES:

3   Q.   You did not create this app, this -- correct?

4           MS. RUST:  Objection.  Mischaracterizes her testimony.

5           THE COURT:  It's a leading question.  Overruled.

6   BY MS. JONES:

7   Q.   Did you not create this functional video, correct?

8   A.   I created multiple videos, and I do recall doing a

9   screenshot of this video.

10  Q.   So you did a screenshot, but you did not actually create

11  the functional video that this shows?

12          MS. RUST:  Objection.  Confusing.

13          MS. JONES:  Strike that.

14  BY MS. JONES:

15  Q.   Zira created this video as a demo for Steadfast, correct?

16  A.   So I was given a dummy account, and I logged in to the

17  dummy account and this screen recording.

18  Q.   So you recorded the video of this?

19  A.   So that is me on my phone.  I pressed Screen Record and I

20  went through the app.

21  Q.   So to your knowledge did Zira create a similar video for

22  Steadfast?

23  A.   Has Zira?  I'm sorry, has...

24  Q.   Has Zira created a video for Steadfast on how to use the

25  app?

1  A.   For training purposes, yes.

2  Q.   And is this a different video than the video that was

3  provided for training purposes?

4  A.   So I've never seen Zira create a video like that.

5  Q.   So would your response be yes, that's a different video

6  that was provided by Zira?

7  A.   Yes.

8  Q.   To your knowledge did Zira also create a video for the

9  facilities on how to use the application?

10  A.   I don't know.

11         MS. JONES:  And would you mind playing this a bit, the

12  video?

13         (Video exhibit published.)

14         MS. JONES:  You can stop it here.

15  BY MS. JONES:

16  Q.   So if you look at the top right-hand corner of this video

17  shot, this still of the video, it says zero dollars.  And is it

18  safe to assume that a nurse isn't working for zero dollars per

19  hour to accept a shift?

20  A.   No.  So there is a function in Zira's scheduling app where

21  you can put a, just a value amount, because they have it

22  calculated.  So if 9 to 5 is eight hours, eight hours times the

23  rate, if a rate was plugged in would populate right there.  So

24  it's a function that the Zira app has.

25  Q.   But this video that you took that you created does not

1   include a rate of pay for the shift, correct?

2   A.   Correct.

3   Q.   And so if this was a screenshot that was provided to a

4   nurse, a nurse would have to contact Steadfast to find out the

5   rate of pay for this shift, correct?

6   A.   So at that time I did not put in any rates; however, if a

7   contractor is utilizing the app right now it can see what the

8   rate of pay would be at the facility based on which facility it

9   is.

10  Q.   But in this video that you created does not have a rate of

11  pay -- if a nurse were to utilize this, that you created, it

12  wouldn't have a rate of pay, correct?

13  A.   Correct.  Because the facility isn't even valid.

14  Q.   And just to clarify, you knew how to go into Zira and

15  create a demo of how to use the application in Zira?

16  A.   Yes.

17  Q.   Just to clarify, how were you trained to do this?

18  A.   On Zoom.

19  Q.   Zira has a how-to video on Zoom?

20  A.   No.  We had a training session with the support team.

21  Q.   The support team of Zira?

22  A.   Correct.

23  Q.   And you previously testified that within the application a

24  facility can list an assignment, correct?

25  A.   Correct.

1  Q.    And you likewise testified that a nurse can accept a

2  assignment, correct?

3  A.    Correct.

4  Q.    However, Steadfast is still required to confirm that

5  assignment?

6  A.    I'm sorry, repeat the question?

7  Q.    Steadfast is still required to confirm that the assignment

8  has been accepted?

9  A.    Confirm it with who?

10 Q.    Let's start with the facility.  I mean with the nurse.

11 Steadfast has to confirm that the assignment has been accepted

12 by the nurse, correct?

13 A.    No.

14 Q.    So it wasn't your testimony that when a nurse accepts a

15 shift --

16 A.    Correct.

17 Q.    -- it just notifies someone, I don't know who, that they

18 selected the shift, correct?

19 A.    Yes.  So a notification is sent to the facility stating

20 that Jane Doe has claimed the open shift.

21 Q.    And is Steadfast required to confirm that assignment?

22 A.    No.  The facility approves or denies it.

23 Q.    Does Steadfast have the ability to decline a nurse's

24 assignment in Zira?

25 A.    Do we have the -- does Steadfast have the capability?

```
 1   Q.    Yes.

 2   A.    Yes.

 3   Q.    And do you recall Ms. Rust asking you about the time

 4   sheets?

 5         You recall Ms. Rust asking you about the Steadfast time

 6   sheets, correct?

 7   A.    Yes.

 8   Q.    And Steadfast requires employees to submit time sheets,

 9   right?

10   A.    The contractors?

11   Q.    The nurses.  I'm using the global term for the RNs, CNAs,

12   LPNs similar to what you said on direct.  I'm classifying them

13   as nurses.

14   A.    Okay.

15   Q.    So I'll repeat the question:  Steadfast requires nurses to

16   submit time sheets, correct?

17   A.    Yes.

18   Q.    And Steadfast creates invoices based on those time sheets,

19   correct?

20   A.    Correct.

21   Q.    And so Steadfast has a two-step process in terms of the

22   times -- of the invoices, correct?

23   A.    A two-step process?

24   Q.    Right.  They create -- Steadfast creates the invoices using

25   the time sheets, correct?
```

1    A.   We create the invoices based off of the confirmations from

2    the facilities.  The data is from the time sheets.

3    Q.   So I ask again, Steadfast uses the time sheets which are

4    signed by the facilities to create the invoices, correct?

5              MS. RUST:  Objection, asked and answered.

6              THE COURT:  I don't think it was answered.  Overruled.

7    BY MS. JONES:

8    Q.   It's a yes or no question.

9    A.   Yes.

10   Q.   And then Steadfast sends the invoices to the facilities to

11   verify the hours worked on the invoice, correct?

12   A.   We don't send them the invoice.  So we send them the

13   information that's off of the time sheet onto a spreadsheet,

14   that data is collected and sent to the facility.  Once the

15   facility approves, denies, whatever their response is, that is

16   what's on the invoice.

17   Q.   So the facility essentially gives a confirmation on the

18   invoice, correct?

19   A.   A confirmation of the time sheets that were received.

20   Q.   So does the -- the facility responds with a yes or no, then

21   you can send an invoice?

22   A.   So they -- however they respond, based off of their

23   response, we would reflect how they responded and transfer that

24   information on to an invoice.

25   Q.   Do you recall Ms. Rust asking you about the payroll

```
 1   details?

 2   A.   Yes.

 3   Q.   And the payroll details does not include Next Day Pay

 4   hours, correct?

 5   A.   Correct.

 6   Q.   So the payroll details do not include all hours worked by

 7   the nurses, correct?

 8   A.   That specific payroll detail, no.

 9   Q.   But in general, payroll details do not include Next Day Pay

10   hours, correct?

11   A.   Correct.  Because they're separate processors.

12   Q.   The question submitted was does the payroll details list

13   Next Day Pay compensation in hours?

14            MS. RUST:  Objection, asked and answered.

15            THE COURT:  Well, I'm going to overrule the objection

16   and give her a chance to answer directly.

17   A.   It does not reflect that.

18   BY MS. JONES:

19   Q.   So just to clarify, the payroll details that Ms. Rust asked

20   you about reflect hours worked by nurses who could reflect hours

21   worked by nurses who were also compensated using Next Day Pay?

22   A.   Correct.

23   Q.   And you indicated that Steadfast invoices the facility;

24   however, Next Day Pay is allegedly paid the next day, correct?

25   A.   Correct.
```

1   Q.   So if this is true, is the Next Day Pay reflected on the

2   invoices submitted to the facilities?

3   A.   Correct.

4   Q.   So Steadfast pays nurses for the hours worked for Next Day

5   Pay prior to the time it's approved by the facilities, correct?

6   A.   No.  So the facility confirms the hours that were submitted

7   and then we would pay the nurses.  From that time to processing

8   on an invoice there's no parallel.  So if I have a response to a

9   facility to that specific shift, it could be days later until we

10  transfer that on to an invoice.

11  Q.   So the question was, with the Next Day Pay, it's under the

12  assumption that the nurse submits her time sheet on a Tuesday

13  and gets compensated on a Wednesday through Next Day Pay,

14  correct?

15  A.   Correct.

16  Q.   And Steadfast would not have invoiced the facility and been

17  compensated for the Next Day Pay at the time Steadfast pays the

18  nurse using next Day Pay, Correct?

19  A.   Correct.

20  Q.   And to confirm, the Next Day Pay comes from Steadfast

21  accounts, correct?

22  A.   What comes from Next Day?

23  Q.   The worker's wages for the hours that they worked and

24  submitted through Next Day Pay is paid through Steadfast

25  accounts?

```
 1   A.    Yes.

 2   Q.    And nurses are paid weekly, correct?

 3   A.    It's at their discretion, if they want Next Day Pay or

 4   weekly.

 5   Q.    Nurses who are paid via payroll are paid weekly, correct?

 6   A.    Through ADP weekly, yes.

 7   Q.    And the ADP payroll is also paid from a Steadfast account,

 8   correct?

 9   A.    Correct.

10   Q.    And so is it safe to say that Steadfast is in the middle of

11   the review and approval process of time for the nurses'

12   compensation?

13   A.    We don't approve their time, but we do review them.

14   Q.    So you reviewed their time and then sent it to the

15   facility, correct?

16   A.    Correct.

17   Q.    And you paid them based upon the facility approving the

18   hours worked by that nurse, correct?

19   A.    Correct.

20   Q.    And Steadfast keeps track of where nurses work, correct?

21   A.    We don't keep track of it.  We can find where they're

22   working based off of an invoice.

23   Q.    So is it your testimony that Steadfast has no knowledge

24   where their nurses are working on a different day?

25   A.    I can, I can utilize the scheduling app or -- there are
```

1    times where there are nurses that pick up shifts directly

2    through the facilities which we have no records of.

3    Q.   So is it your testimony that Steadfast doesn't know where

4    its nurses work?

5    A.   It could be a possibility.

6    Q.   So even using utilizing the current app which details the

7    shifts that a nurse can select, is it your testimony that

8    Steadfast would not know where a nurse is placed even utilizing

9    the application?  The Zira app?

10   A.   Correct.  Because not all nurse are utilizing the app.

11   Q.   So is it your testimony based upon your recent statement

12   that Steadfast does not keep track of weekly hours worked for

13   its nurses?

14   A.   Correct.

15   Q.   And do you recall Ms. Rust asking you about nurses who

16   submit a large number of time sheets at one time?

17   A.   Yes.

18   Q.   And Steadfast doesn't segregate those hours, correct?

19   A.   No.

20   Q.   Is it just pays them straight out on a payroll, correct?

21   A.   So for that pay period upon the date of submission, if

22   they're approved by the facility, then it's paid out to the

23   nurse.

24   Q.   So Steadfast does not go back to compute hours worked for

25   the later-submitted, the later-submitted time sheets?

1    A.    I'm sorry, repeat the question?

2    Q.    So Steadfast would not -- if they submitted 50 time sheets

3    a day, Steadfast would not go back to the previous weeks to

4    compute the wages owed for them?

5    A.    No.  We would ensure that they're not -- it hasn't been

6    priorly processed, but if they submit 50 time sheets on one day

7    it's the same process:  We would calculate, we would submit it

8    to the facility for approval, upon approval we would pay the

9    contractor.

10              MS. JONES:  I have no further questions, Your Honor.

11              THE COURT:  Court has a question.

12              After Steadfast pays Next Day Pay and pays nurses

13   generally, how does Steadfast get its money?

14              THE WITNESS:  So that's the part of the invoice.  So

15   we -- there's -- different facilities have different net terms

16   as far as when a payment is due.  So we invoice the facility and

17   we get compensated by the client based on the invoice that was

18   submitted.

19              THE COURT:  So the facilities reimburse Steadfast for

20   paying the salaries of the nurses and the other persons working

21   at their facilities?

22              THE WITNESS:  That's correct.

23              THE COURT:  Okay.  Thank you.  Any redirect?

24              MS. RUST:  Just a few very quick questions, Your

25   Honor.

```
 1                  THE COURT:  Okay.

 2                     REDIRECT EXAMINATION

 3   BY MS. RUST:

 4   Q.   Ms. Kim, have you had any criminal convictions since 2015?

 5   A.   No.

 6   Q.   And have you told the truth today?

 7   A.   Yes.

 8   Q.   And did your prior convictions impact your ability to

 9   understand Steadfast's payroll practices?

10   A.   No.

11   Q.   Did your prior convictions impact your ability to

12   understand any of the other items you testified about today or

13   last week?

14            MS. JONES:  Objection, relevance, Your Honor.

15            MS. RUST:  It's directly relevant to their --

16            THE COURT:  Well, the Court's going to overrule it,

17   but the Court makes the credibility findings.

18            You can continue.

19            MS. RUST:  Of course.

20   BY MS. RUST:

21   Q.   Just to clarify, are ADP and NDP, Next Day Pay, are they

22   separate payment processors --

23   A.   Yes.

24   Q.   -- for Steadfast?

25   A.   Yes.
```

1   Q.   The payroll summary reports and the payroll detail reports

2   we reviewed during your testimony, were -- which processor did

3   those reports come from?

4   A.   ADP.

5   Q.   ADP.  Okay.

6        So are they going to reflect -- are they only going to

7   redirect information in the ADP process?

8   A.   Yes.

9   Q.   And when you're processing Next Day Pay, Ms. Jones asked

10  you about the approval process with the facilities.  Just want

11  to clarify, is it still Steadfast -- is it Steadfast's process

12  to still get a facility to approve a time sheet before paying on

13  the Next Day Pay time sheet?

14  A.   Correct.

15            MS. RUST:  Those are all the questions.

16            THE COURT:  Before you sit down, the Court has another

17  question.

18            When you pay a nurse or an LPN or any one of these

19  people who are on this registry, whose name is on the check as

20  the payor?  Not the payee; on whose account does it reflect the

21  check is drawn, Steadfast?

22            THE WITNESS:  Steadfast Medical Staffing.

23            THE COURT:  Okay.  Thank you.

24            All right.  May the witness be affirmatively excused?

25            MS. RUST:  Yes, Your Honor.

```
 1              MS. JONES:  Yes, Your Honor.

 2              THE COURT:  You may step down.

 3              Next witness?

 4              MS. RUST:  Your Honor, the defendant's next witness is

 5  Racharlotte Coates.

 6              THE COURT:  Who?  I couldn't understand you.

 7              MS. RUST:  Racharlotte Coates.  And she will be a

 8  remote witness.

 9              Is she logged in?  Has she been logged in?

10              COURTROOM DEPUTY CLERK:  No.

11              MS. RUST:  Your Honor, I just spoke to her during the

12  break, so if the Court would allow us to make a brief phone call

13  to make sure she didn't have difficulty accessing the Zoom app

14  or if the deputy would prefer to call?

15              THE COURT:  Court will take a five-minute recess.

16              MS. RUST:  Thank you, Your Honor.

17              (Recess taken from 4:14 p.m. to 4:21 p.m.)

18              THE COURT:  Next witness?

19              MS. RUST:  The defense called Racharlotte Coates.

20              THE COURT:  All right.  Ms. Coates.

21              RACHARLOTTE LEE COATES, having been duly sworn, was

22  examined and testified via videoconference as follows:

23                        DIRECT EXAMINATION

24  BY MS. RUST:

25  Q.   Hi, Ms. Coates.
```

```
 1   A.    Hi.

 2   Q.    Thank you for joining us today.

 3         Can you state your name for the record?

 4   A.    Racharlotte Lee Coates.

 5   Q.    Ask you to spell your name for the court reporter?

 6   A.    R-a-c-h-a-r-l-o-t-t-e, Lee, L-e-e, and last name Coates,

 7   C-o-a-t-e-s.

 8   Q.    Thank you, Ms. Coates.

 9         What is your occupation?

10   A.    Licensed practical nurse.

11   Q.    Okay.  And are you familiar with Steadfast Medical

12   Staffing?

13   A.    I am.

14   Q.    You've been on Steadfast's registry as a nurse?

15   A.    I have.

16   Q.    Are you currently on Steadfast's registry during -- are you

17   currently picking up shifts on Steadfast's registry?

18   A.    I've relocated.  I live in a different state now.

19   Q.    Okay.  How long -- well, approximately when did you join

20   Steadfast's registry?

21   A.    Around 2016.  Mid 2016.

22   Q.    Okay.  And when, when was the last time approximately that

23   you worked on Steadfast's registry?

24   A.    May of this year.

25   Q.    Okay.  And that's when you relocated?
```

1  A.   Yes.  I relocated in April and I moved back to North

2  Carolina and did some work.

3  Q.   Okay.  I'm going to ask you some questions about your

4  experience with Steadfast.

5       So when you were working shifts with Steadfast's registry,

6  did Steadfast ever provide you with any equipment to provide

7  nursing services?

8  A.   No.

9  Q.   Do you provide any of your own supplies to provide nursing

10  services when you're picking up a shift on Steadfast's registry?

11  A.   I do.

12  Q.   Can you give an example of some of the equipments that you

13  bring with you?

14  A.   I mean, you know, your basic healthcare stuff:

15  Stethoscope, blood pressure cuff, pulse oximeter, gloves.

16  Depending sometimes on the facility you go to you may need to

17  take gloves and sanitizer.

18  Q.   Why do you bring those items with you on shifts that you

19  pick up through Steadfast?

20  A.   Well, because sometimes the facilities don't offer it so

21  you need it in order to get your job done.

22  Q.   Okay.  Do you maintain your own liability insurance for

23  your nursing services?

24  A.   Yes.

25  Q.   Why do you maintain insurance for that?

```
1   A.   It's a good thing to do when you're in the field that we're

2   in.  Like a doctor having malpractice insurance.

3   Q.   How do you schedule shifts through Steadfast?

4   A.   I personally, for the time that I've been there, I mean,

5   and that's been before the app, I just used to just call and,

6   you know, ask.  Or if they call me.  It could go both ways.

7   Q.   Okay.  So when you would call, what was the conversation --

8   how did you get a shift scheduled by calling?

9   A.   I would just give them my availability and they would see

10  what they had available and they would either be a yes or a no

11  depending on the shift that I wanted or the location.

12  Q.   And who would say yes or no?

13  A.   It would be whoever the scheduler is.  The schedulers

14  changed on several occasions, so it would really just depend on

15  who was manning the office at that time.

16  Q.   That you spoke to?

17  A.   Yeah.

18  Q.   Okay.

19  A.   I mean, if there was something that needed to go through

20  Ms. Lisa then, you know, they would, you know, take -- tell you

21  we have to get Lisa, you know, to see if that's okay.

22  Q.   Okay.  So when you're talking to Steadfast about the shifts

23  you said that they would let you know what's available and then

24  it was a yes or a no?

25  A.   Yeah.
```

1   Q.   So could you pick any of those opportunities that they

2   discussed with you on the phone?

3   A.   Yeah.  I mean, it's up to me if I wanted to take it or not.

4   Q.   Okay.

5   A.   I mean, they could call me and say, hey, we have this

6   available and I could say yes or no.

7   Q.   Okay.  So who determines your work schedule when you're

8   picking up shifts through Steadfast?

9   A.   Well, whatever schedule they had available, if you want to

10  work that schedule, it could be a 7a to 7p, a 7p to 7a, it could

11  be a 7a to 3p.  It really depended on the facility and what they

12  offered, what they needed.  Could be a four-hour shift if they

13  just needed coverage.  So it just really depended on what's

14  available and what you're willing to work.

15  Q.   You mentioned an instance when maybe Steadfast would call

16  you with an available shift, and have you ever -- in the past

17  when they have called you about available shifts, have you

18  declined the shifts that they offered on the phone?

19  A.   Of course.

20  Q.   And --

21  A.   If I'm not already booked somewhere else with another

22  company or, you know, I'm already working or I just don't feel

23  like working, then yeah, I'd say no, I'm not available.

24  Q.   Okay.  And have you ever experienced any consequences for

25  declining to take a shift?

1    A.    No.

2    Q.    Okay.  Have you ever canceled a shift that you've already

3    picked up through Steadfast?

4    A.    I have.

5    Q.    Okay.  And in your experience -- well, first of all, how do

6    you cancel that shift?

7    A.    So you just call -- for me personally, you always have to

8    call your, your company, let them know that you can't make it,

9    and then typically they're supposed to contact the facility, but

10   I would also contact the facility since I was the one working.

11   Q.    Okay.

12   A.    So I would do both.

13   Q.    Okay.  And have you -- in your experience have you ever

14   been running late for a shift that you picked up through

15   Steadfast?

16   A.    I have.

17   Q.    And when that happens do you notify anybody?

18   A.    Sometimes.  It depends on the time of day.  I'm a

19   night-shifter, so sometimes somebody's not always available to

20   answer the phone at night.  But I would call, leave a voicemail,

21   or like maybe send an email.  But then I would always call the

22   facility, because they were the one waiting on me.

23   Q.    Okay.  When you're scheduling shifts with Steadfast, are

24   you, have you -- in your experience, have you ever been required

25   to request permission to take vacation or time off?

1   A.   No.

2   Q.   Have you --

3   A.   You mean somebody -- someone saying to you you work this

4   amount of hours, you must take a vacation time or something like

5   that?

6   Q.   Let me ask a follow-up question.  Have you -- when you've

7   been working on Steadfast's registry have there been times where

8   you took a vacation or took a period away from scheduling with

9   Steadfast?

10  A.   Oh, sure.  Of course.

11  Q.   And did you notify them that ahead of time that you were

12  doing that?

13  A.   No.  I mean, you just don't pick up a shift if you don't

14  want to.

15  Q.   Okay.

16  A.   So if I'm working with several other companies

17  that's not -- Steadfast's not the only company I work for, so if

18  I work for two other companies, there may be a company, a

19  facility that's paying more.  So go there.  Or they're giving

20  more hours that you're looking for.  Or like a community setup

21  that you're interested in.  You know every, every agency does

22  not work within the same buildings.  So sometimes some buildings

23  are a little more desirable than others.

24  Q.   Okay.  So let me ask you some more questions.  Maybe we'll

25  touch on the things you talked about.  So it sounds like you

```
 1  have worked with other agencies, other staff nursing agencies,

 2  and have you --

 3  A.    Yes.

 4  Q.    -- and have you worked with them at the same time that

 5  you've been on Steadfast's registry?

 6  A.    Absolutely.

 7  Q.    And would you, were you required to work a minimum or

 8  maximum number of hours for Steadfast's registry?

 9  A.    Not me personally, no.

10  Q.    And when you are considering whether to pick up a shift,

11  what are some factors that are important to you --

12  A.    For me?

13  Q.    -- whether to pick it up?

14  A.    My decision?  My personal decision?  Finance first.

15  Q.    What was that?

16  A.    Financial.  Financial consideration.  How much you're

17  paying me an hour.

18  Q.    Okay.  So are you looking at the hourly rate?

19        Ms. Coates, did you --

20  A.    Okay.

21  Q.    Sorry.  I said so are you looking at the hourly rate for a

22  shift when you're considering whether to pick it up?

23  A.    Of course.

24  Q.    Okay.  And any other considerations when you're deciding

25  whether to pick up a shift?
```

1  A.    Location of the facility itself.

2  Q.    Okay.

3  A.    You know, agency work is a tight-knit little community, so

4  you get the word of mouth from other nurses, what's a good place

5  to go to and what's a not-so-great place to go to.  So, but some

6  people will go to a place that's five minutes from their house

7  even though it's terrible.  I just choose not to go there.  But

8  I've driven hours to get to a place and work.

9  Q.    Why do you prefer -- or why do you schedule with multiple

10 agencies at the same time?

11        MR. SEIFELDEIN:  Your Honor, objection as to

12 scheduling with other facilities.  The Court has repeatedly said

13 Steadfast.  There's really no relevance to that line of

14 questioning.

15        THE COURT:  Sustained.

16        MS. RUST:  I'm not asking about the practices of the

17 other agencies, but her scheduling preferences.

18        THE COURT:  No, you've already asked her whether she

19 scheduled with other agencies at the same time.  That question

20 has been asked repeatedly during this case, as the Court

21 understands it, to show that they have some control over their

22 schedule.  So I think I'll sustain the objection.  We've gone

23 far enough with that.

24        MS. RUST:  Okay.  I'll move on.

25 BY MS. RUST:

```
1  Q.   Has Steadfast ever provided you with any training or
2  orientation?
3  A.   No.
4  Q.   Has Steadfast ever provided instructions or guidance to you
5  for performing nursing services at a facility?
6  A.   No.
7  Q.   Have you ever seen anyone from Steadfast's office -- and
8  I'm not referring to other nurses on the regular industry, but
9  Steadfast management -- have you ever seen someone from
10 Steadfast management on-site at a facility with you?
11 A.   No.  You have to remember, Steadfast is in Virginia, I work
12 and live in North Carolina.
13 Q.   Well, when you were picking up shifts through --
14 A.   Oh, when I -- no.  No.  Because I worked overnight too.  So
15 you have to think about who's coming out at midnight or one,
16 two o'clock in the morning.
17 Q.   Okay.  Of course.
18 A.   I mean, unless was an issue, but I mean, I'm a
19 professional, so I've always handled myself accordingly.
20 Q.   Okay.  Have you ever received a performance evaluation from
21 Steadfast?
22 A.   No.
23 Q.   Have you ever received discipline or corrective action from
24 Steadfast?
25 A.   No.
```

```
 1   Q.    And have you ever -- are there circumstances where you have

 2   negotiated for a different rate of pay?

 3   A.    There have been.

 4   Q.    What did -- can you give an example of some of those

 5   circumstances, just briefly?

 6   A.    I worked in Baltimore one time for like a three -- 16-hour

 7   shift -- a three-day, 16-hour shift from like Friday to Sunday

 8   and negotiated a higher rate then and then stayed out there and

 9   then came back home.

10   Q.    Okay.  And do you track your -- when you've picked up

11   shifts on Steadfast's registry, do you track your own hours for

12   the shifts that you worked?

13   A.    Now see, remember, that's new to me.  Everything with me

14   was -- before that came about, it was all just paper and, you

15   know, phone calls --

16   Q.    Okay.  So let me -- talking about when you were picking up

17   shifts at Steadfast's registry, during that time, how did you

18   keep track of your hours for the shifts you picked up with

19   Steadfast?

20   A.    I'm not -- I mean -- well, I mean, I personally had like a

21   calendar.  You just write down what days you got.  But once

22   you're in the business and the way we work, you're pretty much

23   kind of keeping it in your head, like who you're working with

24   this week.  Like I can work in one building for two different

25   agencies in one day.
```

1  Q.   And do you have to submit any information to Steadfast

2  about the hours that you've worked on their registry?

3  A.   You just submit your time slip as you work.  I mean, *per*

4  *diem*.

5  Q.   Okay.  And in your experience, does the facility have to

6  sign that time sheet when you finish a shift?

7  A.   Yes.  Yes.  The facility -- whoever's the charge nurse or

8  the scheduler has to sign or you can't get paid.  But that's

9  with any company.

10 Q.   Okay.  And how long have you been in the nursing industry?

11 A.   I've been a nurse nine years.  I was a CNA for 12 before I

12 became a nurse.

13 Q.   Okay.  Why do you, why have you chosen to work as a nurse

14 in an agency when you were doing that?

15 A.   Because it pays more money.

16 Q.   Okay.  Any other reasons, or is that --

17 A.   I'm just not, I'm not -- I don't like to be complacent.  I

18 like to come and go as I please.

19 Q.   I'm sorry, I didn't hear the last sentence.

20 A.   I said I like -- I don't like to become complacent so I

21 look to move around.

22          MS. RUST:  All right.  Thank you for your testimony,

23 Ms. Coates.  The attorney for the plaintiff might ask you a few

24 questions if you can hold on just a moment.

25          THE WITNESS:  Okay.

```
 1              THE COURT:  Cross-examination?

 2                       CROSS-EXAMINATION

 3  BY MR. SEIFELDEIN:

 4  Q.   Good afternoon, Ms. Coates.

 5  A.   Good afternoon.

 6  Q.   This is Mohamed Seifeldein from the Department of Labor.

 7  A.   Okay.

 8  Q.   So just to begin with, the company that you worked for is

 9  called Steadfast Medical Staffing, correct?

10  A.   That's correct.

11  Q.   You don't know the difference between a staffing agency and

12  a registry, do you?

13  A.   I don't.

14  Q.   Okay.  And --

15  A.   First time I've heard it called a registry before.

16  Q.   This is the first time?

17  A.   First time.

18  Q.   Now, you talked briefly with Ms. Rust about time slips and

19  payment.  Steadfast required you to submit a time sheet,

20  correct?

21  A.   Correct.

22  Q.   And if you did not provide that time sheets back to

23  Steadfast with the hours you worked, you would have a issue

24  receiving payment for the services or the care you provided,

25  correct?
```

```
1   A.    That's correct.

2   Q.    And these time sheets that Steadfast provided to you had

3   the name Steadfast on them, correct?

4   A.    Correct.

5   Q.    And when you went to facilities and worked, you did work

6   more than 40 hours in the work week at some point, correct?

7   A.    Sure.  Yes.  Correct.

8   Q.    When you worked more than 40 hours in the work week

9   Steadfast did not pay you overtime, correct?

10  A.    So that's where -- see, I -- with me personally, I just

11  worked.  So because I worked for multiple companies, I never

12  paid attention to something like that.  I just knew I was

13  working a lot.

14  Q.    Did you get time and a half -- well, let me ask it this

15  way:  What was your hourly rate when you worked for Steadfast?

16  A.    30 was the base rate when I left.

17  Q.    So if 30 was the base rate -- and that was set by

18  Steadfast, correct?

19  A.    Correct.

20  Q.    Okay.  So when you worked more than 40 hours in a work

21  week, your hourly rate was still $30, correct?

22  A.    Correct.

23  Q.    And when you were sent to a facility by Steadfast you did

24  not bring anyone with you to work the shift with you, correct?

25  A.    No.  You can't do that.
```

```
 1   Q.   And you cannot hire anyone to complete the shift on your

 2   behalf and then Steadfast would pay you, correct?

 3   A.   That would be -- no, you cannot do that.

 4   Q.   And --

 5   A.   I can't even imagine, but you can't do that.

 6   Q.   I can't either.  Thank you.

 7        I'm sorry?

 8   A.   No, I was saying no, you just can't do that.  You can't do

 9   that.

10   Q.   And that's Steadfast's requirement, correct?

11   A.   I mean, that would be any company -- I mean, I don't know.

12   Would that be any company's requirement?  I'm the nurse, but I'm

13   going to send what my daughter out on my behalf --

14   Q.   I'm asking specifically --

15   A.   -- she's not a nurse.

16   Q.   I'm sorry.

17        I'm asking specifically about Steadfast.

18   A.   Oh, okay.  No.  No, you can't do that.

19           THE COURT:  You have to wait.  Can't but one of you

20   talk at a time, so wait for him to finish his question before

21   you give an answer.

22           THE WITNESS:  Okay.  Sorry.

23           MR. SEIFELDEIN:  I know you're sitting outside, so I

24   appreciate your patience.

25   BY MR. SEIFELDEIN:
```

1  Q.    And when you work at a facility -- I know you do a solid

2  job.  If there's a issue, you address it with Steadfast,

3  correct?

4  A.    Correct.

5  Q.    You would not address it with the facility?

6  A.    I would do both.

7  Q.    You would address it with Steadfast?  Would you call Lisa

8  or would you --

9  A.    You would call them.  Yeah, you would call them.

10 Q.    And those instructions were given to you by Steadfast,

11 correct?

12 A.    Correct.

13 Q.    And Ms. Rust talked to you briefly about equipment that you

14 may use to perform some of your duties, correct?

15 A.    Correct.

16 Q.    And you mentioned some of those equipments that you use,

17 right?

18 A.    Correct.

19 Q.    Those equipments are normal tools of the trade that an LPN

20 usually uses regardless of what type of facility she performs

21 her duties, correct?

22 A.    Correct.

23 Q.    And some of these equipments are more of a personal

24 preference, correct?

25 A.    Correct.

1   Q.   And when you went to a facility, the larger equipment were

2   provided by facility, correct?  Like the computer, the charting

3   and things like that?

4   A.   Correct.

5   Q.   And you didn't pay any money out of your pocket once

6   Steadfast assigned you a shift to pay for this equipment every

7   time?

8   A.   No.

9   Q.   Okay.  Now, you talked to Ms. Rust about receiving

10  incentives to drive far to go to Baltimore when you worked the

11  three-day shift, 16 hours --

12  A.   Correct.

13  Q.   -- a lot of hours, and --

14  A.   Correct.

15  Q.   -- as an incentive for you to go to Baltimore Steadfast

16  paid for your hotel, correct?

17  A.   Correct.

18  Q.   And the reason they paid for your hotel was because they

19  were in a bind and they needed someone to cover the shift,

20  correct?

21            MS. RUST:  Objection, calls for speculation.

22  A.   Correct.

23            THE COURT:  Sustained.

24  BY MR. SEIFELDEIN:

25  Q.   And other than the hourly rate that Steadfast paid you and

1  the incentive we just talked about, you didn't receive any

2  profit from Steadfast, correct?

3  A.   Correct.

4  Q.   And you couldn't -- well, did you assign a shift to another

5  nurse at any point when you worked at Steadfast?

6  A.   Never.

7  Q.   Would you need Steadfast's approval?

8  A.   Excuse me?  Can you clarify?  What do you mean "assign it

9  to someone else?"  Like... how is that possible?

10  Q.   So you were assigned a shift by Steadfast and you can't

11  make it for some reason and then you called Steadfast like you

12  testified and say, hey, I can't make it, can I send, you know,

13  LPN Taylor?

14  A.   No.  If I couldn't make it I would just cancel and say I

15  can't make it.  But I would do it in enough time that they can

16  try to get someone else to cover it.

17  Q.   And with those you talked to Ms. Rust about, if you were to

18  run late, you -- you don't -- actually strike that.

19      You provided a notice to Steadfast and the facility,

20  correct?

21  A.   Of course.

22  Q.   Okay.

23  A.   Correct.

24  Q.   And that notice has to be within two hours; is that

25  correct?

1   A.    Within -- correct.

2   Q.    And that's required by Steadfast, correct?

3   A.    Correct.

4   Q.    And Steadfast determined the service that you would provide

5   based on your classifications as an LPN, correct?

6           MS. RUST:  Objection, mischaracterization of

7   testimony.  Also outside of the scope.

8           THE COURT:  Well, if she knows.  It's overruled.

9           MR. SEIFELDEIN:  Okay.

10          THE COURT:  Rephrase the question.

11          MR. SEIFELDEIN:  Sure, Your Honor.  Thank you.

12  BY MR. SEIFELDEIN:

13  Q.    Do you know how Steadfast assigns your shift?  Based on

14  what?

15  A.    I mean they -- my assumption is when they send you it's

16  because it's for an LPN or whatever my scope of practice is.

17  Q.    Right.

18  A.    I know what my scope of practice is when I go in any

19  building.

20  Q.    And that scope of practice as an LPN is the same regardless

21  of which building you work in on behalf of Steadfast, correct?

22  A.    Correct.

23  Q.    And as far as you know, Steadfast is a company that

24  provides temporary personnel to nursing homes or other medical

25  facilities, correct?

1   A.   Correct.

2   Q.   And to your knowledge that's the only service that

3   Steadfast provides, correct?

4   A.   Correct.

5   Q.   Now, you talked about scheduling with Ms. Rust, and that

6   Steadfast will call you or you will call them for assignments,

7   correct?

8   A.   Correct.

9   Q.   And you've indicated that ultimately you pick from the

10  options that Steadfast gives you, correct?

11  A.   Correct.

12  Q.   So absent those options, you would not be able to pick up a

13  shift with a facility directly, correct?

14  A.   Correct.

15  Q.   And you cannot talk to the facility directly -- in fact,

16  you did not talk to the facility directly about how much you

17  would get paid for the care you provided at the facility,

18  correct?

19  A.   Correct.

20  Q.   And Steadfast did that for you?

21          MS. RUST:  Objection, calls --

22  A.   Correct.

23          MS. RUST:  -- for speculation.

24          THE COURT:  Overruled.

25  BY MR. SEIFELDEIN:

1   Q.   When you provided care to the facility, who paid you for

2   the care that you provided?  Steadfast?

3   A.   My paycheck would come from Steadfast.

4   Q.   And the paychecks that you received had the name Steadfast

5   on them, correct?

6   A.   Correct.

7   Q.   And so going back to the scheduling, ultimately the shifts

8   you picked were based on what Steadfast provided?

9   A.   I'm sorry I didn't hear you.  Can you repeat that?

10   Q.   Ultimately -- I'm sorry, yeah.  Technology.  There's a

11   delay here, I think.

12   A.   Yeah.

13   Q.   Ultimately you, depended on Steadfast to provide those

14   options for you, correct?

15   A.   Correct.

16   Q.   And you did not have your own business when you worked for

17   Steadfast, correct?

18   A.   Correct.

19   Q.   And you did not advertise your business in any way when you

20   worked for Steadfast, correct?  Because you didn't have one.

21   A.   Correct.  I don't have one.  I can't advertise something I

22   don't have.  I'm my own advertisement.  I work.

23   Q.   It speaks for itself.  I understand.  I understand.

24        You said you worked for Steadfast from 2016 up until

25   roughly May 2021, correct?

1  A.   Correct.

2  Q.   And only if you know, during that time period early on did

3  you know if Steadfast had insurance on you?

4  A.   I don't know.

5  Q.   And you're not privy to any information or discussion that

6  Steadfast had with the facilities about insurance, correct?

7  A.   I don't.  I don't know.  Correct.

8  Q.   And if you were having issues with your time sheets or your

9  paycheck, you would address them with Steadfast, correct?

10 A.   You would address them with Steadfast, correct.

11 Q.   And have you ever received Next Day Pay from Steadfast?

12 A.   I've done it several times, but Next Day is never next day,

13 it's only certain days you get paid for Next Day.

14 Q.   Within a couple of days or so?

15 A.   Yeah.  It's every Tuesday and Thursday, I believe.  So if

16 you work Friday you wouldn't get paid until the next Tuesday.

17 Q.   And you testified that you -- that Steadfast began using an

18 app recently, correct?

19 A.   Correct.

20 Q.   And you've had experience with that app, correct?

21      MS. RUST:  Objection.  Mischaracterization of the

22 testimony.

23      THE COURT:  It's a leading question whether she's had

24 experience with it.  She can answer yes or no.  So overruled.

25 BY MR. SEIFELDEIN:

1    Q.    You had experience with the app, correct?

2    A.    Correct.

3    Q.    And that related to you working hours that you put on the

4    app but were not reflected on your paycheck, correct?

5    A.    Say -- I don't understand that question.

6    Q.    So you had issues with the app when you put hours in,

7    correct?

8    A.    Correct.

9    Q.    And as a result of filling the hours in the app, Steadfast

10   did not pay you for certain of those hours, correct?

11   A.    Well, let me just explain.  The issue that I had with that

12   app, which is called Zira, I believe, I wasn't clear on how to

13   actual -- it actually worked, so I didn't know that you had to

14   also submit a time slip once you clocked in.  I thought once you

15   clocked in you were, that was it, that was your time keep.  So

16   for, I want to say maybe three days, I worked and it didn't

17   submit -- you're supposed to submit your time slip at the end of

18   each shift, but I didn't do that because I thought -- my

19   assumption was once you clocked in, that was the time keep.

20   Q.    So as a result --

21   A.    And then when I --

22   Q.    I'm sorry, go ahead.

23   A.    No.  I was just saying that when I didn't get paid, I had

24   to contact them to find out what was going on, and then I was

25   explained how it actually worked.  So the scheduler forwarded my

```
1    time to them so I could get paid.
2    Q.    So you still have to submit an app -- I'm sorry.  You still
3    have to submit a time sheet when you're using the app, correct?
4    A.    Correct.
5    Q.    And you submit that to Steadfast, correct?
6    A.    Correct.
7    Q.    In order to get paid, correct?
8    A.    Correct.
9    Q.    And you've had -- you attempted to claim a shift through
10   the app, correct?  Or picked up a shift?
11   A.    I -- yes.  You're asking me --
12   Q.    You've tried to use the app to schedule a shift?
13   A.    That, that app was very -- it wasn't user-friendly.  Not
14   for me.
15   Q.    Right.  So as a result --
16   A.    I would always just call.
17   Q.    You had to call.
18         So as a result, you still have to call Steadfast for
19   approval for them to assign you a shift?
20   A.    Correct.  Which you would typically get a text or a phone
21   call, but mostly a text saying that you've been approved for
22   this shift or this date is confirmed.  It would just say
23   confirmed.
24   Q.    So even when you sign up with the app you get a
25   confirmation or approval from Steadfast?
```

1   A.   Right.  You got to get a confirmation before you can go.

2   Q.   Right.  So ultimately Steadfast is still in control?

3   A.   Well, yeah.  Because you can't go -- if you go you won't

4   get paid.

5   Q.   Right.  And you get access to the app -- only Steadfast

6   allows to you use the app, correct?

7          MS. RUST:  Objection, calls for speculation.

8          THE COURT:  Wait a minute.

9          MR. SEIFELDEIN:  I'm sorry?

10         THE COURT:  Let me rule on the objection.  That's a

11  conclusory statement, but it's a leading statement and she can

12  answer yes or no.  Objection overruled.

13  BY MR. SEIFELDEIN:

14  Q.   So can you answer the question?

15  A.   Can you ask that again, please?

16  Q.   Sure.  Ultimately Steadfast was in control?

17       Well, you have to get Steadfast approval to pick up the

18  shifts, correct?

19  A.   Correct.

20  Q.   So ultimately Steadfast was in control of the shifts that

21  you worked or you picked?

22  A.   Well, I mean, it's their app, so yeah.  You download the

23  app on your phone and, yeah.

24  Q.   And you get the app through a notification from Steadfast,

25  correct?

1  A.   Correct.

2  Q.   And the app has the name Steadfast on it, correct?

3  A.   I don't remember from the last time I used it.

4  Q.   Okay.  So you couldn't use this app to pick up a shift in

5  New Jersey where you are right now, correct?

6  A.   No.

7  Q.   Now, regarding your testimony today, did you receive a

8  notice from defendants about what this case is about when you

9  spoke with them?

10  A.   I mean, they called me and just, like, asked me questions

11  like you're asking me now.

12  Q.   Other than the subpoena that you received from

13  defendants -- let me show you something here.

14  A.   Okay.

15       Yeah, I remember seeing the subpoena.

16  Q.   This is not the subpoena.  Can you look at it closely?

17  A.   Okay.  I see it now.  Notice from the Court.

18  Q.   Did the defendants provide you with this notice?

19  A.   I don't recall that one.

20  Q.   Okay.

21  A.   I mean, I may have.  I don't recall it.  I'm honestly going

22  to tell you, I'm not big on checking emails or my mail.

23  Q.   Okay.  And just to be clear, when you worked over 40 hours

24  in the work week you said you were paid straight time, correct?

25  A.   Correct.

1    Q.    And ever since you left Steadfast in May to this point you

2    have not received back wages for the overtime hours that you

3    worked, correct?

4    A.    Correct.

5    Q.    And to the extent that -- well, would you like to be paid

6    for the overtime hours that you worked?

7    A.    Yes.  If I worked and earned it, yes.

8             MR. SEIFELDEIN:  No further questions, Your Honor.

9             THE COURT:  Any redirect?

10             MS. RUST:  Just a few quick questions.

11                         REDIRECT EXAMINATION

12    BY MS. RUST:

13    Q.    Okay.  Ms. Coates, I have a couple of quick questions for

14    you?

15    A.    Okay.

16    Q.    When you were talking to Mr. Seifeldein you said I'm my own

17    advertisement at work; is that right?

18    A.    Well, because you're asking me, you asked me a question

19    about having a business, I mean --

20    Q.    Yeah.

21    A.    -- I don't own a business.  I would be my business if I'm

22    working.  I'm an LPN, you know.  I'm coming as a nurse, is what

23    I'm saying.

24    Q.    Right.  So what did you mean by saying you're your own

25    advertisement?

```
 1   A.   I mean if I -- if I walk into the nursing home and I had a
 2   nursing uniform, what would you assume that I was?  I would
 3   either be a nurse or a CNA.  I would be one of the two, is what
 4   I'm saying.
 5   Q.   Okay.  And Mr. Seifeldein also asked you, he asked you
 6   about the opportunities presented by Steadfast to you, and if --
 7   I think he asked whether those would -- you would rely on them
 8   to let you know about the opportunities.
 9        I'm sorry I lost you again.
10           THE WITNESS:  I'm sorry.  Uh-oh.  Wait a minute.
11   There's a tow truck behind me.
12           (Off-screen) I'm on the phone!  I'm okay!  Thank you!
13           THE WITNESS:  I'm sorry.  My apologies.  I'm on the
14   side of the road --
15           MS. RUST:  Okay.  I'm sorry.
16           THE WITNESS:  -- on the Turnpike and -- thank you.
17           My apologies to the Court.
18           MS. RUST:  Is everything okay, Ms. Coates?
19           THE WITNESS:  Yeah.  It -- well, I guess the cops
20   thought I might be in trouble because I'm sitting on side of the
21   road with my hazards on.
22           MS. RUST:  All right.  Well, let us know if thinking
23   anything changes.
24           THE WITNESS:  I'm okay.  Okay.  He's pulling off.
25   BY MS. RUST:
```

1    Q.    Okay.   Just a couple quick questions and then you can be on

2    your way.

3    A.    Sorry.

4    Q.    Okay.   So I think my question was Mr. Seifeldein asked you

5    about when you're scheduling, you can only pick from the options

6    that are provided to you; is that right?

7    A.    That's correct.

8    Q.    Okay.   And is that your -- do you have any reason to

9    believe that Steadfast would not tell you about other available

10   opportunities that they have for your licensure?

11          MR. SEIFELDEIN:   Objection, Your Honor.   Calls for

12   speculation.

13          THE COURT:   Sustained.

14   BY MS. RUST:

15   Q.    When you pick up, when you pick up shifts with Steadfast,

16   are you able to pick up as many shifts as you want or as little

17   as you want based on --

18   A.    Personally, me, yes.

19   Q.    Okay.   And then I just want to follow up on

20   Mr. Seifeldein's question about that notice from the court

21   really quick.

22   A.    Hm-hmm.

23   Q.    Can you see this document?

24   A.    I can.

25   Q.    Okay.   And in the To column here, is that your email

1   address?

2   A.   It is.

3   Q.   Okay.  And can you -- the date here, can you read that?  If

4   you can't, I can zoom in.

5   A.   Yeah.  Well, I can see it's highlighted.

6           THE COURT:  Don't let the witness speculate.  We will

7   not have the witness speculate what the document says.

8           MS. RUST:  Yeah, I'm sorry.

9   BY MS. RUST:

10  Q.   Are you able to read through the highlighting or --

11          MR. SEIFELDEIN:  Objection, Your Honor.

12          THE WITNESS:  I see --

13          MR. SEIFELDEIN:  Objection, Your Honor.  Misleading,

14  mischaracterization of the document, as it says "When we spoke

15  last year on the phone about your experience working for

16  Steadfast."

17          THE COURT:  The basic problem here with the document

18  is the document is hard to see on the screen here.  So we have

19  to find some other way to question the witness.

20          Well, now you've sharpened it some, maybe that will

21  improve.

22          Now what's your objection?  We can see the document.

23  What's your objection?

24          MR. SEIFELDEIN:  This says "When we spoke last year",

25  so it does not capture the proposition that defense counsel is

1    trying to establish.

2             MS. RUST:  Perhaps I can ask her a few questions then

3    he'll know what I'm trying to establish.

4             THE COURT:  All right, then let's see what she's

5    trying to establish.

6             MS. RUST:  Okay.

7    BY MS. RUST:

8    Q.   Ms. Coates, are you able to read the date on this email now

9    that I've zoomed in a little bit?

10   A.   Yes.

11   Q.   Can you say what the date of the email is?

12   A.   August 13th, 2021 at 12:14 p.m.

13   Q.   Okay.  And do you recognize the name right above the date?

14   A.   Yeah.

15   Q.   And do you recall receiving this email?

16        And let me know, I can zoom out so you can read further a

17   little bit.

18   A.   I don't recall the email, but I just recall, I recall

19   speaking to someone on different occasions.

20   Q.   Okay.  Do you recall receiving an email from me maybe a

21   month ago or a few weeks ago?

22   A.   It's possible.  It's possible.  I, I honestly am, truly am

23   pretty terrible with going over my email if it does not pertain

24   to the --

25   Q.   That's okay.  So I want to confirm --

 1              MR. SEIFELDEIN:  Objection, Your Honor, calls for

 2    speculation because the witness already answered the question.

 3              THE COURT:  We have another problem, Ms. Rust:  Be

 4    careful not to interject yourself into the middle of your

 5    testimony here.

 6              MS. RUST:  Understood.  Okay.

 7    BY MS. RUST:

 8    Q.   Ms. Coates, do you recall signing a statement regarding

 9    your experience with Steadfast Medical Staffing?

10    A.   I don't -- I can't say yes or no, because I don't verbatim

11    remember.  I mean, I'm kind of all over.  I work a lot and I'm

12    in different places.  Like, I'm in New Jersey.  My focus is

13    not -- I'm sorry --

14    Q.   That's okay.

15    A.   -- if it's not in my sight it's not on my mind.

16    Q.   If I showed you the document, might that refresh your

17    recollection as to whether you signed a statement?

18    A.   If you show me it's my signature I can tell you if it's my

19    signature or not.

20              MR. SEIFELDEIN:  Your Honor, objection.  This is

21    outside of the scope as well and --

22              THE COURT:  Let's find out what you're trying to do

23    with the document.  What are you trying to do with the document

24    distinctly?

25              MS. RUST:  Mr. Seifeldein specifically asked her about

1   whether she received that notice from the court regarding

2   information that we were to provide to witnesses, and I am going

3   through testimony establishing the various times she was

4   informed of that information.

5           THE COURT:  That she what?

6           MS. RUST:  That she was informed of that information

7   or provided a copy.

8           THE COURT:  If you can use the document to refresh her

9   recollection, that's the only thing -- it doesn't come into

10  evidence -- but to use it to refresh her recollection, you may

11  proceed.

12          MS. RUST:  That's all I'll do.

13          MR. SEIFELDEIN:  Your Honor, the statement that

14  Ms. Rust is talking with about was from June 27, 2020, and the

15  last document was from August 31st, 2021.  The notice was

16  supposed to be provided before the statement was even drafted.

17  But also, Your Honor, the witness, when I asked her the question

18  she says she doesn't recall, so I'm not sure this is the most

19  useful use of the Court's resources.  It's not relevant.

20          THE COURT:  You can use almost anything to refresh a

21  witness's recollection.  Now, if you have a problem of when this

22  document there was submitted to her versus the date that you're

23  inquiring about in 2021, there's a problem.  But ordinarily you

24  can use anything to refresh a witness's recollection.

25          MS. RUST:  Okay, Your Honor.  Thank you.

1              THE COURT:  If it can refresh it.

2              Other thing:  It needs to be marked too.

3              MS. RUST:  For refreshing?

4              THE COURT:  Yes, ma'am.  Even though it's not coming

5    in, it has to be marked so we can track whatever was shown to a

6    witness.

7              MS. RUST:  Of course.

8              THE COURT:  So what exhibit number is it?

9              COURTROOM DEPUTY CLERK:  203.

10             THE COURT:  203.  So see if we can get the witness to

11   refresh her recollection using 203.

12                      (DX-203 received in evidence.)

13   BY MS. RUST:

14   Q.   I'll zoom out a little bit on this document.  This is the

15   first page, and I'll show you the second page as well.

16             THE COURT:  You may ask her to read the pertinent part

17   to kind of speed things along.

18             MS. RUST:  Of course.

19   BY MS. RUST:

20   Q.   Here is the second page.  Do you recognize your signature?

21   A.   That is my signature.

22   Q.   Okay.  You can read through this to yourself and let me

23   know if it refreshes your recollection as to my question about

24   whether you were provided a notice from -- regarding this case?

25   A.   I mean, I'm looking over it, again.  Honestly, I will just

 1   say I may have skimmed through it, but I never really took into

 2   detail about what exactly it pertained to.

 3   Q.   Okay.  That's fine.  I only want you to talk about what you

 4   remember.

 5            MS. RUST:  Okay.  Ms. Coates, I don't have any other

 6   questions for you.  Thank you very much for your time today.

 7            THE COURT:  Is the witness permanently excused,

 8   Counsel?

 9            MS. RUST:  Yes, Your Honor.

10            THE COURT:  You're excused.  Thank you for taking the

11   time, Ms. Coates.

12            THE WITNESS:  Thank you.  I'm done?  I can hang up

13   now?

14            THE COURT:  You can leave.  You can drive.

15            THE WITNESS:  Okay.  Thank you, Your Honor.  Take

16   care.

17            THE COURT:  Okay.  It's ten past 5:00.  We're going to

18   quit right here and we're going to resume tomorrow morning at

19   10 o'clock.

20            Now, having gone through today, do you have an

21   estimate of how many witnesses you're going to be calling

22   tomorrow, Ms. Rust?

23            MS. RUST:  Yes.

24            THE COURT:  You can share it with the plaintiff -- as

25   long as you know where you're going, to save some time, you can

1    share it with the Court and the plaintiffs tomorrow morning.

2              MS. RUST:  Of course.  We'll send out the list

3    tonight, as has been the practice.  As far as the estimated

4    length of our case, if that's what the Court is asking for, I

5    think we will go through tomorrow and probably spill into the

6    next morning, but I don't believe we'll need all of -- what's

7    today, Tuesday?  I don't think we'll end up using all of

8    Thursday.  I will update counsel accordingly, but that's our

9    estimate right now.

10             THE COURT:  Just remember the Court's precaution about

11   being repetitive and cumulative.

12             MS. RUST:  Of course.  Thank you.

13             (Whereupon, proceedings concluded at 5:10 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

846

1                           *CERTIFICATION*

2

3          *I certify that the foregoing is a true, complete and*

4  *correct transcript of Volume 5, Afternoon Session, of*

5  *proceedings held in the above-entitled matter.*

6

7          _____

8                    Paul L. McManus, RMR, FCRR

9                         _____

10                             Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25