```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                        )
 4   MARTIN J. WALSH, SECRETARY OF       )
     LABOR, UNITED STATES               )
 5   DEPARTMENT OF LABOR,                )
                                        )
 6          Plaintiff,                   )
                                        )    CIVIL ACTION NO.
 7    v.                                 )       2:18cv226
                                        )
 8   MEDICAL STAFFING OF AMERICA,        )
     LLC, etc., et al.,                  )
 9                                       )
            Defendants.                  )
10   - - - - - - - - - - - - - - - - - -

11

12                    TRANSCRIPT OF PROCEEDINGS

13                   ** Bench Trial - Day 6 **

14                       Norfolk, Virginia

15                      September 8, 2021

16

17   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
                United States District Judge
18

19   APPEARANCES:

20            UNITED STATES DEPARTMENT OF LABOR
                By:  Ryma N. Lewis
21                   Chervonti Jones
                     Mohamed E. Seifeldein
22                   Counsel for the Plaintiff

23            PIERCE McCOY, PLLC
                By:  Joshua L. Jewett
24                   Julia A. Rust
                     Aaron D. Siegrist
25                   Counsel for the Defendants
```

1                        I N D E X

2
    DEFENDANTS'
3   WITNESSES                                          PAGE

4    LESLIE BOONE (Via ZoomGov.com)
          Direct Examination By Ms. Rust              849
5         Cross-Examination By Mr. Seifeldein         858
     DIXIE DeLUTIS (Via ZoomGov.com)
6         Direct Examination By Ms. Rust              878
          Cross-Examination By Ms. Lewis              883
7         Redirect Examination By Ms. Rust            889
     LISA PITTS
8         Direct Examination By Mr. Jewett            896
          Cross-Examination By Ms. Lewis              993
9         Redirect Examination By Mr. Jewett         1049

10

11

12                      E X H I B I T S

13  PLAINTIFF'S
    NO.                                                PAGE
14
     PX-100          (For ID only)                    859
15   PX-25                                            1013

16

17  DEFENDANTS'
    NO.                                                PAGE

18   DX-58                                            947
     DX-59                                            948
19   DX-42                                            977
     DX-44                                            977
20   DX-46                                            977
     DX-41                                            978
21   DX-50                                            979
     DX-64                                            993

22

23

24

25


                Carol L. Naughton, Official Court Reporter

L. Boone - Direct

```
 1              (Proceedings resumed at 9:59 a.m.)
 2              THE COURT:  Good morning, ladies and gentlemen.
 3              We are ready to get started once again, and we're
 4    prepared to go forward with a series of witnesses.  I see at
 5    least three of them are remote.  I hope none are on the
 6    New Jersey Turnpike.
 7              MS. RUST:  I hope so too, Your Honor.
 8              THE COURT:  Call your first witness.
 9              MS. RUST:  The defendant calls Leslie Boone.
10              (Pause in the proceedings.)
11              THE COURT:  Perhaps the Court will simply take a
12    break while you work this out with her.  We're going to take
13    a five-minute break.
14              (Recess from 10:04 a.m. to 10:08 a.m.)
15              THE CLERK:  Ms. Boone, the Court has taken the
16    bench.  I'm going to ask you if you could please raise your
17    right hand to be sworn.
18              (Witness sworn remotely.)
19              LESLIE BOONE, called by the Defendants, having been
20    first duly sworn, was examined and testified via ZoomGov.com
21    as follows:
22                         DIRECT EXAMINATION
23    BY MS. RUST:
24    Q.  Good morning, Ms. Boone.  This is Julia Rust, the
25    attorney for Steadfast Medical Staffing and Lisa Pitts.
```

———L. Boone - Direct———

```
 1   A.   Good morning.

 2   Q.   I'm well.  Good morning.

 3            Could you please state your name for the record.

 4   A.   My name is Leslie Boone.

 5   Q.   And can you spell your name for us too.

 6   A.   Yes.  L-e-s-l-i-e B-o-o-n-e.

 7   Q.   Can I just confirm, that's L-e-s-l-i-e B-o-o-n-e; is that

 8   correct?

 9   A.   Correct.

10   Q.   Okay.  Ms. Boone, what is your occupation?

11   A.   I am a CNA.

12   Q.   And are you familiar with Steadfast Medical Staffing?

13   A.   Yes.

14   Q.   How are you familiar with Steadfast?

15   A.   (Indiscernible.)

16   Q.   Sorry.  We didn't catch that.  Can you speak a little

17   slower.

18   A.   It is an agency that I'm employed through.

19   Q.   Okay.  What work do you do for Steadfast?

20   A.   I'm a self-contractor through Steadfast.

21   Q.   Say that again.

22   A.   I am a self-contractor through Steadfast.

23   Q.   And when did you first start working with Steadfast?

24   A.   Oh, boy.  I believe 2015, maybe, or 2016.  I'm not sure.

25   Q.   Okay.  That's all right.
```

Carol L. Naughton, Official Court Reporter

851

L. Boone - Direct

1        Do you currently take work with Steadfast?

2  A.  I still do, yes.

3  Q.  Okay.  On average, how often are you taking shifts with

4  Steadfast?

5  A.  One to two days a week.  Sometimes more.  But mostly two

6  days.

7  Q.  I'm sorry.  We didn't catch that.  Could you repeat that

8  a little slower for us.  The connection is a little spotty.

9  A.  I'm sorry.  I said maybe one to two days a week.

10  Normally two days a week.  Sometimes more, sometimes less.

11  Q.  Okay.  And how do you take shifts with Steadfast?

12  A.  Sometimes they go through the -- they have a scheduler --

13  Steadfast has a scheduler, and sometimes the scheduler will

14  give you assignments or ask you if you are willing to pick up

15  shifts, and sometimes when you want to take an assignment and

16  you go to a facility, they will schedule your shifts.

17  Q.  When you talk to Steadfast about the shifts, do you

18  discuss what is available or what your availability is?

19  A.  I discuss my availability, and then they try to match it.

20  Q.  Okay.  And who decides which shifts you will work?

21  A.  I do.

22  Q.  Can you repeat that?  I'm sorry.

23  A.  I do.

24  Q.  Did you say you do?

25  A.  I do.  Yes, I do.

L. Boone - Direct

1  Q.  Ms. Boone, have you ever had to cancel a shift you had

2  picked up with Steadfast?

3  A.  Yes.  I have had to cancel.  And when I cancel -- if I

4  cancel a shift, I call Steadfast or the facility.  It all

5  depends on the time for me.

6  Q.  And in the event when you have called to cancel the

7  shift, has there ever been any consequence for cancelling?

8  A.  No.  No.  I'm going to leave it like that.  No.

9  Q.  No.  Okay.

10        Ms. Boone, have you ever received any training from

11  Steadfast?

12  A.  No.

13  Q.  Okay.  And have you ever received a performance

14  evaluation from Steadfast?

15  A.  No.

16  Q.  Okay.

17  A.  No, ma'am.

18  Q.  And when you have picked up shifts with Steadfast, have

19  you gone to different facilities, or do you go to the same

20  facility?

21  A.  No.  I go to different facilities.  I go to different

22  cities.  I even go to different states.

23  Q.  Okay.  And when you have gone -- when you have worked

24  Steadfast shifts at different facilities, have you ever

25  received feedback from the facility regarding your

Carol L. Naughton, Official Court Reporter

L. Boone - Direct

1    performance?

2    A.  Yes.

3    Q.  Okay.  Can you describe an example of that, when you

4    received feedback from the facility?

5    A.  Yes --

6           MR. SEIFELDEIN:  Objection, Your Honor.

7           THE COURT:  Wait a minute.

8           What is your objection?

9           MR. SEIFELDEIN:  Hearsay.  This is inquiring about

10   statements from other individuals.

11          THE COURT:  Well, she can tell us -- I think she can

12   answer the question without giving hearsay.

13          You just cannot testify about what -- you cannot

14   state what someone else said to you, but she can still answer

15   the question without engaging in hearsay.

16          So let's see how she is going to answer the

17   question.

18          MS. RUST:  Okay.

19   BY MS. RUST:

20   Q.  Ms. Boone, did you hear that?  Did you understand that?

21   A.  Yes, I do.

22          So I'll give you a "for instance."  Is it

23   permissible to say the facility name, or do I need to make up

24   a different facility name?  Because what happens is --

25   Q.  Ms. Boone, let me pause you.  It was a little hard to

L. Boone - Direct

1   understand.  If you could speak slower, it will be easier.
2   A.   Yes, ma'am.
3   Q.   Go ahead.
4   A.   If I go into a facility today and work a 7:00 to 3:00
5   shift, while working that 7:00 to 3:00 shift, my supervisor
6   or the scheduler for that facility, the charge nurse will
7   then say to you, "Ms. Boone, can you please pick up these
8   shifts?  We want you to come back."  So that's the feedback
9   that I would get.
10          THE COURT:  All right.  Objection sustained.
11   Objection sustained.
12          MS. RUST:  Well, may I reask the question?  I think
13   she may not have -- I asked her about a specific experience.
14          THE COURT:  Well, I'll give you an opportunity,
15   Ms. Rust, to try to get this out without hearsay, and that's
16   the best the Court can do.  She cannot testify about what
17   someone told her to do.
18          THE WITNESS:  No.  Okay.  Okay.  I got it.  I
19   understand what you're saying.  I was asked to come back.
20   BY MS. RUST:
21   Q.   Hold on one moment, Ms. Boone.  Let's make sure we've got
22   a question in front of you.
23          MS. RUST:  If the Court may allow me to ask a couple
24   of follow-up questions?
25          THE COURT:  Okay.  But we're not going to keep doing

L. Boone - Direct

1    this.  When the Court's ruled, it's ruled.  We'll give her

2    one more chance, and then we're moving on.

3           MS. RUST:  Understood.  Thank you, Your Honor.

4    BY MS. RUST:

5    Q.  Ms. Boone, in your experience, can you tell us if --

6    without describing what the facility told you, can you tell

7    us, have you ever received feedback from a facility about a

8    specific instance?

9    A.  Yes.

10   Q.  Okay.  And was that feedback positive or negative?

11   A.  Positive.

12          MR. SEIFELDEIN:  Your Honor, same objection.  Still

13   asking about what --

14          MS. RUST:  I'm sorry.  What did you say?

15          MR. SEIFELDEIN:  It's leading and still asking about

16   what someone else said to her rather than what she --

17          THE COURT:  That has not violated the hearsay rule

18   by asking her whether it was positive or negative.  So that

19   is overruled.

20          MS. RUST:  Okay.

21   BY MS. RUST:

22   Q.  I'm sorry.  Did you say the feedback was positive?

23   A.  Yes.

24   Q.  Have you ever received negative feedback?

25   A.  Yes.

Carol L. Naughton, Official Court Reporter

L. Boone - Direct

1   Q.   Okay.  And was -- well, when you received negative
2   feedback, what happened?  What was the process?
3   A.   We found out that it was the wrong person in question.
4   Q.   Okay.  You said --
5   A.   It was the wrong person in question.
6   Q.   Okay.
7   A.   Right.  They were describing a situation that I was not
8   present.
9   Q.   Okay.
10          MR. SEIFELDEIN:  Your Honor, it's hard to understand
11   the witness.  I could not hear what the witness was saying.
12          MS. RUST:  I'll follow back with her.
13   BY MS. RUST:
14   Q.   Ms. Boone, what you just said, it was something about it
15   was the wrong person.  Could you just repeat that more
16   slowly.
17   A.   Yes, ma'am.
18          I said the negative feedback I heard, that I had
19   gotten back, came back to me, but it was the wrong person in
20   question.  They mistook me with someone else's identity.
21   Q.   Did you discuss that incident about feedback with anyone
22   at Steadfast?
23   A.   Yes.
24   Q.   Okay.  And did Steadfast -- did you receive any
25   discipline from Steadfast as a result of that feedback?

L. Boone - Direct

1    A.  No.  Ms. Pitts, at that point, did an investigation as

2    well.

3    Q.  Can you say the last sentence again.

4    A.  I said Ms. Pitts, at that point, did an investigation

5    herself, and we found that it was the wrong person.

6    Q.  Okay.  Did you continue to pick up shifts with Steadfast

7    after that?

8    A.  Yes, ma'am.

9    Q.  Okay.  And then, Ms. Boone, I think this is my last

10   question for you.

11          Can you just briefly describe why you have -- why

12   you choose to pick up shifts or work shifts through

13   Steadfast, personally?

14   A.  I still pick up shifts through Steadfast.  It's more

15   convenient for me.  It fits my needs.

16   Q.  I'm sorry.  Can you say that slower.  One more time and

17   that will be it.

18   A.  It fits my needs.

19   Q.  It fits your needs?  Is that what you said?

20   A.  Yes.

21          MS. RUST:  Those are all the questions.  If you

22   could stay right there, the attorney for the plaintiff may

23   ask you a few questions.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Cross-examination.

Carol L. Naughton, Official Court Reporter

—————L. Boone - Cross—————

1         MR. SEIFELDEIN:  Good morning, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. SEIFELDEIN:

4   Q.  Good morning, Ms. Boone.

5   A.  Good morning.

6   Q.  My name is Mohamed Seifeldein.  I'm an attorney with the

7   Department of Labor.  I've got a few follow-up questions for

8   you here.

9   A.  Yes, sir.

10  Q.  Now, you were hired by Steadfast, correct?

11  A.  Correct.

12  Q.  And as part of that hiring process, you had to fill out

13  an application, correct?

14         MS. RUST:  Objection.  Outside the scope.

15         THE WITNESS:  Correct.

16         THE COURT:  Not yet.  Not yet, Counsel.  Overruled.

17         MS. RUST:  Okay.

18  BY MR. SEIFELDEIN:

19  Q.  You had to fill out an application, correct?

20  A.  Correct.

21  Q.  And that application asked you for references, correct?

22  A.  I don't remember.

23  Q.  Okay.

24  A.  I don't remember.

25  Q.  All right.  Let me show you a document and see if that --

859

L. Boone - Cross

 1    your Employment Application and see if that refreshes your
 2    memory.
 3    A.  Okay.  I can't see nothing but you.
 4            THE COURT:  What document are you using?  Again, to
 5    refresh recollection, you have to mark this document for
 6    identification, and then you show it to the witness.
 7            What document number?
 8            MR. SEIFELDEIN:  This is her application, Your
 9    Honor, that she submitted to Steadfast, and it's marked as
10    Steadfast 6.  And what is the number there?  Beginning with
11    0966 --
12            THE CLERK:  PX-100.
13            THE COURT:  PX-100.  So you are showing her PX-100.
14            (Plaintiff's Exhibit PX-100 marked for
15    identification purposes only.)
16    BY MR. SEIFELDEIN:
17    Q.  I'm showing you a document that has been marked as
18    PX-100.
19            Do you recall filling this document out -- this
20    application out for employment?
21    A.  I cannot see anything, sir.  I don't see anything but me.
22    I don't see any document.  I don't see anything.
23    Q.  We're having a technical difficulty.  Bear with us.
24    A.  Okay.
25            THE COURT:  Counsel, you are going to have to move

L. Boone - Cross

1   past this.  The only way we can do it is by share screen, and

2   she's not able to do share screen.  So find another way to

3   get to the point that you want to address with her.

4   BY MR. SEIFELDEIN:

5   Q.  However, you did fill out an application when you applied

6   for Steadfast, correct?

7   A.  Yes, sir.

8   Q.  And when you filled out that application, you spoke with

9   someone from Steadfast, correct?

10  A.  Correct.

11  Q.  And they asked you about your availability?

12  A.  Yes.

13  Q.  And then you were, after that, hired, correct?

14  A.  Correct.

15  Q.  And as part of the hiring process, you filled -- you did

16  a background check and a drug-screening test, correct?

17  A.  Correct.

18  Q.  Okay.  And Steadfast paid for those, correct?

19  A.  Correct.

20  Q.  Okay.  Now, when Steadfast assigned you to a facility,

21  you were required to submit a time sheet?

22  A.  Correct.

23  Q.  And the time sheet was provided to you by Steadfast?

24  A.  Correct.

25  Q.  And this time sheet had Steadfast's name on the top of

L. Boone - Cross

```
 1   it, correct?

 2   A.  Correct.

 3   Q.  And you were required to submit this time sheet either

 4   weekly or daily, correct?

 5   A.  Correct.

 6   Q.  And you can only work shifts that Steadfast provided to

 7   you, correct?

 8   A.  I beg your pardon?

 9   Q.  The shift that you worked --

10   A.  I can't hear you.

11   Q.  -- was provided to you by Steadfast.

12   A.  (Indiscernible.)

13           THE COURT:  She's breaking up.

14   BY MR. SEIFELDEIN:

15   Q.  Ms. Boone, we're having connection problems here, so if

16   you could just pause for a second.  And the question was a

17   yes-or-no answer.  It might be easier that way.

18           So the shifts --

19   A.  (Indiscernible.)

20   Q.  The shifts that you picked up with Steadfast were

21   provided to you by Steadfast; is that correct?

22   A.  No, sir.

23   Q.  So you worked for Steadfast from, what, 2016; is that

24   correct?  Or '15?

25   A.  If you have the application in front of you, you can tell
```

L. Boone - Cross

1    me more better.
2            THE COURT:  Okay.  Try another question,
3    Mr. Seifeldein.
4            MR. SEIFELDEIN:  Okay.
5    BY MR. SEIFELDEIN:
6    Q.  As part of working for Steadfast, you had to get
7    assignments, correct?
8    A.  Yes.  You are offered assignments.
9    Q.  The assignments were provided to you by Steadfast more
10   often than not, correct?
11   A.  Yes.
12   Q.  And you have to get Steadfast's approval to work those
13   assignments, correct?
14   A.  No, sir.
15   Q.  So you could work for another facility -- for a facility
16   that Steadfast pays you for without having to go through
17   Steadfast?
18   A.  What are you -- no.  That's not what I'm saying.  That's
19   not what I'm saying.
20   Q.  Okay.  When you worked for Steadfast, you did not invest
21   in capital funds or anything like that, did you?
22   A.  What is that?  No.
23   Q.  And when you worked for Steadfast, you didn't have your
24   own business, correct?
25   A.  I beg your pardon?

L. Boone - Cross

1  Q.  When you worked for Steadfast, you did not have your own

2  business?

3  A.  What do you mean?  If I'm a self-contractor, isn't that

4  your own business?

5  Q.  So you had a business that was established?

6  A.  If you are -- if you are a contractor, isn't that your

7  own business?  I'm not understanding the question.

8  Q.  If you don't understand the question, say that, but you

9  don't get to ask questions.  Okay?

10         The question is:  Did you have an established

11  business formerly?

12  A.  No.

13  Q.  Okay.  You did not.

14         And when you worked for Steadfast after that

15  interview when they hired you, Steadfast set how much you get

16  paid, correct?

17  A.  Yes.

18  Q.  And you could not talk about how much you get paid with

19  the facility, correct?

20         MS. RUST:  I'm going to object.  Outside the scope

21  at this point.

22         THE COURT:  Well, you put the witness on.  You

23  explored the relationship the witness had with Steadfast.  So

24  the Court is overruling the objection.

25         MS. RUST:  Your Honor, if I may, we limited

───────────── L. Boone - Cross ─────────────

 1    Ms. Boone's testimony based on the Court's direction to avoid

 2    cumulativeness.  So we limited it to specific aspects of that

 3    relationship.  We are going far afield of that.  We would've

 4    modified the direct.

 5            THE COURT:  Let me explain it this way:

 6            If you're trying to avoid being cumulative, then you

 7    don't put on another witness, then, to go into this

 8    relationship of whether they work for Steadfast, and

 9    et cetera, because you opened the door generally to it.

10    That's what I'm talking about.

11            When you open the door to it, then the Court will

12    allow, on cross-examination, them to explore the

13    relationship.  So you opened the door to all of this.

14            But I'll say this to you, Mr. Seifeldein.

15            MR. SEIFELDEIN:  Yes?

16            THE COURT:  The Court has heard over and over about

17    these relationships with Steadfast.  So the Court doesn't

18    need to hear it all again from every witness that takes the

19    stand.

20            MR. SEIFELDEIN:  I understand.

21            THE COURT:  Cut right to the part of the best

22    questions that you've got, and then let it go.

23            Overruled.  If you keep opening the door on the same

24    thing, then we end up going over the same thing again about

25    who assigns the job, how the registry works.  I've heard it

L. Boone - Cross

```
 1   over and over.
 2          MR. SEIFELDEIN:  Understood, Your Honor.  As you
 3   noted, when defendants open the door, the Secretary has to
 4   respond.
 5          THE COURT:  The Court is going to put a limit on you
 6   replowing everything the Court has heard for the last three
 7   days.
 8          MR. SEIFELDEIN:  Is the Court determining that the
 9   testimony is cumulative?
10          THE COURT:  Well, we don't need to go back into all
11   the details of that because we've heard it time and time
12   again from every witness that has come on this stand, how the
13   registry works.  And that's another one.  If you have
14   something different, go right on, as long as it's within the
15   scope of the fact that she opened the door on all of this.
16          MR. SEIFELDEIN:  Understood, Your Honor.
17   BY MR. SEIFELDEIN:
18   Q.  When you worked for Steadfast --
19   A.  Yes, sir.
20   Q.  When you worked for Steadfast, you didn't employ another
21   nurse to assist you with the work, correct?
22   A.  Yes.
23   Q.  And Ms. Rust talked to you briefly about cancellation,
24   and when you needed to cancel a shift, you had to notify
25   Steadfast with a two hours' notice at least, correct?
```

L. Boone - Cross

1    A.   No.

2    Q.   Did you have to notify Steadfast?

3    A.   (Indiscernible.)

4    Q.   I apologize.  We're having difficulty hearing you.  So

5    let me repeat the question.  If you could just answer with a

6    "yes" or "no."

7              When you were cancelling a shift or running late,

8    you had to notify Steadfast, correct?

9    A.   No.

10   Q.   Okay.  Actually, if you needed to change your incentives

11   or compensation for working for Steadfast, you needed

12   Steadfast's approval, correct?

13   A.   No.

14   Q.   No?

15   A.   No.

16   Q.   Didn't you, in fact, provide a declaration and stated so

17   much, that you -- excuse me.

18             You provided a declaration in which you stated that

19   Lisa has to approve any changes --

20   A.   No.

21   Q.   -- or incentives?

22   A.   No.  Not that I know of, no.

23   Q.   I'd like to show you the statement, but I don't think

24   we'll be able to see it.

25   A.   Okay.

L. Boone - Cross

```
 1          MR. SEIFELDEIN:  Your Honor, I'm going to stop here
 2    at this point and just respectfully note for the record that
 3    this may cause some unfairness to the Secretary in putting
 4    forward some of his testimony to rebut what was
 5    discussed about -- what was -- excuse me -- what defendants
 6    discussed and put into the record, because the witness --
 7          MS. RUST:  I'm going --
 8          THE COURT:  Wait a minute.
 9          You can certainly -- you said "unfairness to the
10    Secretary."  Just because you can't show her the statement
11    doesn't mean you cannot ask precise questions to get to the
12    heart of the problem.
13          MR. SEIFELDEIN:  Right.  And then she does not
14    recall -- or excuse me, Your Honor.  She said she did not put
15    a statement out.  So to that extent, the Court needs to see
16    it, but we'll just stop here.
17          THE COURT:  The Court has to be the trier of fact.
18    The Court can't try the case until we get clarification here.
19          Ms. Boone?
20          THE WITNESS:  Yes, sir.
21          THE COURT:  Do you recall making a statement in this
22    case?
23          THE WITNESS:  Yes, I do.
24          THE COURT:  And who took the statement from you?
25          THE WITNESS:  I think I did a statement with -- I'm
```

L. Boone - Cross

1  not sure of the lady's name.  It was a lady.  She worked for

2  the Department of Labor.  I'm not sure of her name.

3          THE COURT:  And do you know when you made that

4  statement?

5          THE WITNESS:  I believe it was 2018 or 2019.

6          THE COURT:  That's all the Court is going to do.

7  You certainly have the opportunity, because you're talking

8  about the unfairness or disadvantage to the Secretary, to

9  question the witness to narrow it down piece by piece,

10 Mr. Seifeldein, just as the Court began to do it.

11         MR. SEIFELDEIN:  Appreciate your indulgence, Your

12 Honor.  No further questions.

13         MS. LEWIS:  No.

14         MR. SEIFELDEIN:  If I may consult with counsel.

15         (Pause in the proceedings.)

16         MR. SEIFELDEIN:  All right.  Your Honor, I apologize

17 to the Court again.

18         It appears that I did not hear what Ms. Boone said.

19 The declaration that we're talking about, in fact, was not

20 provided to or by the Department of Labor.  We believe it was

21 from defendants.  So that needs to be clarified.

22         And as far as the unfairness that we talked about,

23 it's that the ability for the Department due to technology to

24 put forward the documents to rebut what was said and also to

25 protect the record and admit them into the record if so

—————L. Boone - Cross—————

1   needed.

2          THE COURT:  Wait a minute, now.  Wait a minute, now.

3   You are talking about admitting something into the record.

4          Do you have a copy of the declaration you are trying

5   to use to refresh the witness's recollection?

6          MR. SEIFELDEIN:  Right.  I was referencing, Your

7   Honor, but due to the difficulties -- I was going to show her

8   the Employment Application, the Independent Contractor

9   Agreement, and then the declaration as we just saw that it

10  was necessary.

11         THE COURT:  Okay.  So the simple truth is you are

12  unable to do it because of the technological problem we're

13  having here.

14         MR. SEIFELDEIN:  Correct.

15         THE COURT:  All right.

16         Yes, ma'am?

17         MS. RUST:  Your Honor, I would assert my objection

18  as to the contentions regarding the declaration.  He was only

19  using it to question the witness regarding refreshing her

20  recollection, which wouldn't be admitted anyway, and she

21  already testified that she didn't recall.

22         THE COURT:  Well, there's no objection to be lodged,

23  Ms. Rust.  The simple truth is he was simply attempting to

24  use a document that the defendant had to refresh her

25  recollection about what has happened, and we can't do it

---

L. Boone - Cross

 1    because we can't do share screen with the witness.  That's

 2    just the bottom line.

 3              Are you finished?

 4              MR. SEIFELDEIN:  Yes, Your Honor.

 5              THE COURT:  The Court has a couple questions.

 6              Ms. Boone, you mentioned an example of where a

 7    complaint was made and it was determined that they had the

 8    wrong person, it was not you.  Do you remember that?

 9              THE WITNESS:  Correct.  Yes, sir.

10              THE COURT:  Who first brought that complaint or

11    issue to your attention?

12              THE WITNESS:  Steadfast.

13              THE COURT:  Who?

14              THE WITNESS:  Steadfast.  Steadfast brought it to my

15    attention because the facility had tried to call me, and

16    because I didn't recognize the number, I did not answer the

17    phone call.

18              THE COURT:  Okay.  And so you indicated that

19    Ms. Pitts conducted an investigation to resolve it?

20              THE WITNESS:  Ms. Pitts, yeah, she did as well.  You

21    need to understand; we are mandated reporters.  We are

22    mandated reporters, and she is also a mandated reporter.  So

23    if there's an allegation of some type of abuse, you have to

24    do an investigation into it.

25              THE COURT:  Okay.

1           THE WITNESS:  So it was the wrong person that they

2    were accusing, and Ms. Pitts stepped in.

3           THE COURT:  Thank you.  That's all the Court has.

4           Any redirect?

5           MS. RUST:  No, Your Honor.

6           THE COURT:  All right.  Thank you, Ms. Boone.

7           May the witness be excused?

8           MS. RUST:  Yes, Your Honor.

9           MR. SEIFELDEIN:  Yes, Your Honor.

10          THE COURT:  You may be excused.  Thank you,

11   Ms. Boone.

12          THE WITNESS:  Thank you, sir.

13          (Witness excused.)

14          THE COURT:  What we have is one of the drawbacks of

15   the technology.  When it works, it's great.  When it doesn't

16   work, it's just a problem.  And that is one situation where

17   it did not work very well.  So we hope that going forward we

18   will have a better experience with these remote witnesses.

19          All right.  Let's move on to the next witness.

20          MS. RUST:  The defendants call Dixie DeLutis, which

21   would be a remote witness.

22          MS. LEWIS:  Your Honor, the Secretary, very much

23   like yesterday, likewise objects to this witness testifying.

24          She was not identified in the Pretrial Order, nor

25   was her name in any of the discovery responses.  We did a

1    basic search last night, and it appears that at some point in

2    time, back in, approximately, 2008, at least according to her

3    LinkedIn profile, she worked at one of the facilities,

4    Bon Secours, but she was an RN nurse manager, from 2009 to

5    2011; however, that time predates Steadfast's interactions at

6    that facility by at least seven years, because Steadfast did

7    not begin to contract, at least based upon the discovery

8    documents that they produced, with Bon Secours until 2018.

9            So two issues:  One, she wasn't identified in the

10   pretrial conference or any of the discovery documents; and,

11   two, to the extent that she is being used for something else

12   relative to that facility or otherwise, it predates

13   Steadfast's involvement with the facility.

14           THE COURT:  Ms. Rust, first question:  Was this

15   witness in the Pretrial Order?

16           MS. RUST:  No.  We're calling her for impeachment

17   purposes only.

18           MS. LEWIS:  Impeachment of whom, Your Honor?  This

19   is their case in chief.

20           THE COURT:  Hold it.

21           This is your case in chief.  You cannot call her in

22   your case in chief.

23           MS. RUST:  We're calling to impeach a witness --

24   testimony provided by a witness from the Department of Labor.

25           THE COURT:  But you cannot call her in your case in

```
1   chief.  This is your case in chief that you're putting on.
2   And you didn't identify her in the Pretrial Order.
3           And is it true that she worked from 2010 to 2011
4   before these issues even came up in this case?
5           MS. RUST:  No.  Her testimony will be that she was
6   working at a Sentara facility when one of the witnesses that
7   the plaintiff called was there, and she will testify
8   regarding a specific incident that that witness testified
9   regarding dealing with a disciplinary issue.
10          So the evidence is for impeachment by contradiction
11  and to rebut the evidence provided.
12          THE COURT:  Okay.
13          MS. RUST:  So we wouldn't have known what testimony
14  that witness would be putting on.  So there's no way we could
15  have identified her.  She was called solely to rebut and
16  impeach that witness.
17          THE COURT:  When did you discover this witness that
18  you're calling an impeachment witness?
19          The testimony just came out here in the last three
20  or four days.  When did you identify this witness as a
21  rebuttal or impeachment witness, as you say?
22          MS. RUST:  This weekend, after the testimony from
23  Ms. Chantella Smith on the plaintiff's case in chief.
24          MS. LEWIS:  Your Honor, I submit to the Court that,
25  one, starting from the top, these are all nurses that
```

```
 1    Steadfast has a relationship with.  So to the extent that
 2    there was surprise with respect to Ms. Chantella Smith, that
 3    information, particularly if it dates back to whenever this
 4    was, has been within defendants' custody, possession, and
 5    control.
 6            Secondly, the discovery response -- and if the Court
 7    would give me the indulgence to bring up interrogatories
 8    specifically asking for disciplinary actions, et cetera, no
 9    such information was provided.
10            Again, there's been multiple opportunities for
11    this representation of surprise of whatever information
12    Ms. Chantella Smith testified to that should have been
13    disclosed within the discovery process.
14            Moreover, Your Honor, this case is about the
15    relationships as a whole, and I find it difficult to find the
16    tangential relationship between one specific incident to a
17    witness, that we just found out about last night at 11:30,
18    who has never been identified as a facility POC from any of
19    defendants' supplements or otherwise.
20            THE COURT:  Here's what we're going to do with this.
21            MS. RUST:  Your Honor, may I respond to some of the
22    representations made?
23            As far as the relationship and the allegations of no
24    surprise, as the Court has noted, there's hundreds of nurses
25    listed as potential witnesses in this case.  There is no way
```

1    for us to know which witnesses the plaintiff may call and

2    which -- what testimony that they might bring up.  So when

3    the testimony was brought up, then we learned of the

4    information, and we can bring it up as rebuttal impeachment.

5             We looked into the incident and identified

6    Ms. DeLutis over the weekend, over the last few days, who has

7    personal knowledge regarding the testimony that Ms. Chantella

8    Smith testified to.

9             We had specifically asked Ms. Smith regarding

10   testimony about disciplinary actions or showing up

11   incapacitated or being sent home from a facility and how that

12   was resolved.  She testified that Ms. Pitts -- there was no

13   such event that occurred, that Ms. Pitts required her to take

14   a drug screen, and she did so within 30 minutes.

15            Ms. DeLutis will testify that she was on the floor

16   that day and observed Ms. Chantella Smith's behavior.  She

17   observed that she was incapacitated and sent her home and

18   spoke to Steadfast about it in that it was Sentara's policy

19   to require a drug screen, and it was not Steadfast's

20   decision.

21            That does go to the relationship between the nurses

22   and Steadfast because it deals with the level of control of

23   disciplinary actions and whether Steadfast is deciding to

24   discipline or send somebody home or it's the facility.

25            THE COURT:  Let's put it this way:

876

1           The Court is going to permit her to put the

2   testimony on, but I want both of you to understand if you

3   read the law, whether there's an employee-employer

4   relationship here does not turn on one single incident.

5           It's a case-specific inquiry that looks at a number

6   of factors.  And this case is not going to turn on what

7   happened on one alleged disciplinary event.  It's not going

8   to happen.  There's more to it than that, but we can strike

9   here and there and all over the place here, but it's a

10  cumulative issue.  Okay?

11          I understand what your position is, but the Court

12  knows how to handle all of it.  So put her on.

13          MS. LEWIS:  Your Honor, if I may?

14          The Secretary, likewise, we still may have rebuttal

15  witnesses because, again, there was an opportunity to cross.

16  She did cross her about this, and since we're going down this

17  path --

18          THE COURT:  You can call rebuttal witnesses when

19  she's finished.  You certainly can.

20          MS. LEWIS:  Thank you.

21          THE COURT:  The Court still has some concerns.  The

22  Court is simply putting it in the record because there's no

23  jury here.  The Court has the capability to put it all in the

24  proper perspective.

25          So let's get on with it.  But let's be specific.

```
 1   We're not going to go all over the place.
 2             MS. RUST:  It will be very specific, Your Honor.
 3             THE COURT:  What is this business that it's always
 4   11:30 at night when you all are exchanging information?
 5             I say to you, as counsel in this case, I've never
 6   heard of such a thing.  It's always 11:30 at night that you
 7   are receiving something.  What is this all about?
 8             MS. LEWIS:  What I will say, Your Honor -- and I
 9   think defendants will, likewise, be on the same page with us
10   with respect to the witnesses the day before.
11             So at least for the Secretary, we confirmed our
12   witnesses weeks, months, days before; but the day before
13   trial, to make sure people show up and where they need to be,
14   we confirm the same when we get back to our hotels or
15   respective offices, and that takes time to do.
16             So the objection -- and let me be clear with respect
17   to the late disclosure of Ms. DeLutis.
18             It's not that we got it at 11:30 at night; it's that
19   we've never seen this name before.  So I understand that,
20   much in trial practice, we have calls to make, and there's a
21   list of people, but the fact is, for this particular witness,
22   we've never seen her name before.
23             MS. RUST:  I will not disagree with Ms. Lewis's
24   description of contacting nurses the night before to confirm
25   their availability for the following day.
```

D. DeLutis - Direct

1           THE COURT:  The Court is going to give you a pass,
2      but if you pick another one out of here, it's not going to
3      happen.  Go on with this one.
4           MS. RUST:  Okay.  Thank you, Your Honor.
5           (Witness sworn remotely.)
6           DIXIE DeLUTIS, called by the Defendants, having been
7      first duly sworn, was examined and testified via ZoomGov.com
8      as follows:
9                         DIRECT EXAMINATION
10     BY MS. RUST:
11     Q.  Good morning, Ms. DeLutis.  This is Julia Rust, the
12     attorney for Steadfast and Lisa Pitts.
13     A.  Good morning.
14     Q.  Can you state your name for the record, please.
15     A.  Yes.  Dixie DeLutis.
16     Q.  Can you spell your name.
17     A.  Dixie, D-i-x-i-e; DeLutis, D-e capital L-u-t-i-s.
18     Q.  Okay.  Thank you.
19           And what is your occupation, Ms. DeLutis?
20     A.  I am an RN.
21     Q.  Okay.  And are you familiar with Steadfast Medical
22     Staffing?
23     A.  Yes.
24     Q.  How are you familiar with Steadfast?
25     A.  I have worked with them in a couple of different

———————D. DeLutis - Direct———————

1  facilities as they are a staffing agency that provides nurses

2  for us.

3  Q.  You said a "staffing agency that provides nurses for us."

4          Did you work for Steadfast or --

5  A.  No.  They were a contracting company that worked with the

6  company that I worked with in the past.

7  Q.  Okay.  And what position did you hold at the facility

8  where they staff nurses?

9  A.  Director of nursing.

10  Q.  Are you familiar with an individual named Chantella

11  Smith?

12  A.  Yes.

13  Q.  How are you familiar with Ms. Smith?

14  A.  She worked for us through Steadfast when I worked at

15  Hampton through Sentara.

16  Q.  Through Sentara.  Okay.

17          And you said she worked -- can you clarify, she

18  worked for Steadfast or at Sentara?

19  A.  She worked for Steadfast.

20  Q.  Okay.  And did you ever observe Chantella Smith while she

21  was working at your Sentara facility while on a Steadfast

22  shift?

23  A.  Yes.

24  Q.  And do you recall the last time you saw Chantella Smith?

25  A.  Yes.

─────D. DeLutis - Direct─────

1    Q.   And where was that?

2    A.   That was in the rehab unit at Sentara in Hampton.

3    Q.   Okay.  And were you working as the DON at that time as

4    well?

5    A.   Yes.

6    Q.   Okay.  Do you recall what occurred during that shift?

7    A.   Yes.

8    Q.   Okay.  And did you personally interact with Ms. Smith

9    during that shift?

10   A.   Yes.

11   Q.   Did Ms. Smith work the entire shift she was scheduled for

12   that day?

13   A.   No, she did not.

14   Q.   Do you recall why she did not work the entire shift?

15   A.   I do recall.

16   Q.   Okay.  Can you tell me what happened?

17   A.   Yes.

18   Q.   And what you observed personally.

19           THE COURT:  Concisely.

20   BY MS. RUST:

21   Q.   Concisely.

22   A.   Yes.  I went down to the department where she was working

23   and noticed that her demeanor was different than it had been

24   in the past.  Her eyes were glazed over.  Her gait was

25   different.  Her verbal articulation was different.  She just

D. DeLutis - Direct

1  appeared in a different -- different than she had in the
2  past.
3  Q.  Okay.  And when you observed that behavior, what action
4  did you take, if any?
5  A.  I called Steadfast and verbalized my concern.  I asked if
6  we could remove her from the shift because I was concerned.
7  Q.  And what specifically was your concern that you relayed?
8  A.  I was concerned that she was impaired.
9  Q.  What was the last word you said?
10  A.  I was concerned that she was impaired and not safe to
11  perform her job duties.
12  Q.  Okay.  So you called Steadfast.  I think you said you
13  asked about removing her from the shift; is that right?
14  A.  Correct.
15  Q.  Okay.  And then was -- what was the next action that you
16  took?
17  A.  I spoke with Ms. Pitts, and she and I talked about what
18  the concerns were.  She had asked me to go down to the
19  department to remove Chantella and ask her to call her, so
20  that's what I did.  I went down and told her that we were
21  going to take her off the rest of the shift and that she
22  needed to call Steadfast.
23  Q.  Okay.  And do you recall approximately how far into the
24  shift she was sent home?
25  A.  I do not know exactly, but I do know it was within a

D. DeLutis - Direct

1   couple of hours.

2   Q.  Okay.  And who made the decision as to whether to send

3   Ms. Smith home from Sentara from that shift?

4   A.  I had to make her leave because, per policy, if we have

5   any concerns that someone is potentially impaired, we have to

6   remove them to protect the safety of our patients.

7   Q.  Okay.  And did you permit Ms. Smith to return to the

8   facility?

9   A.  She could have.  I just asked that I have confirmation of

10  a negative drug and alcohol screen.

11  Q.  Okay.  And why did you request confirmation of a negative

12  drug and alcohol screen?

13  A.  Because that was my concern, that she was impaired by a

14  substance.

15  Q.  Okay.  So you said she could have returned if you had

16  the -- the negative confirmation.

17          So did Ms. Smith ever return to your facility

18  through Steadfast?

19  A.  She did not.

20  Q.  Okay.  Did you ever receive the negative confirmation of

21  a drug screen?

22  A.  I did not.

23  Q.  Okay.  Did you follow up to find out if that had

24  occurred?

25  A.  I did.  Because we had her assigned to other shifts

D. DeLutis - Cross

1    and --

2    Q.  Can you repeat the last sentence you said.

3    A.  I was told she did not ever go in to do her drug test.

4    Q.  Okay.  And so the additional shifts you said that she was

5    on a schedule for, did she work those shifts?

6    A.  She did not.

7         MS. RUST:  Okay.  Those are all the questions I have

8    for you.  An attorney from the Department of Labor will ask

9    you a few questions, if you could just stay right there.

10        THE COURT:  Cross-examination.  Waiting on you

11   Ms. Lewis.

12                      CROSS-EXAMINATION

13   BY MS. LEWIS:

14   Q.  Good morning, Ms. DeLutis.  My name is Ryma Lewis.  I'm

15   an attorney with the U.S. Department of Labor.  I have a

16   couple of just follow-ups and clarifications because I

17   couldn't hear.

18        What facility did you say this occurred at?

19   A.  It was at Sentara in Hampton, nursing facility.

20   Q.  And what year was this?

21   A.  I believe it was around 2017.

22   Q.  So you told Ms. Smith to leave the facility; isn't that

23   right?

24   A.  Yes.

25   Q.  But that was after you spoke with Steadfast?

D. DeLutis - Cross

1   A.  Yes.

2   Q.  And you called Steadfast because Chantella Smith was

3   their nurse; is that right?

4   A.  Yes.

5   Q.  And you sought permission to remove their nurse, direct

6   her removal from the facility through Steadfast, on top of

7   what you testified with respect to sort of just your facility

8   safety concerns; is that right?

9           MS. RUST:  Objection.  Mischaracterization of

10  testimony.

11          THE COURT:  Well, it was a leading question.

12  Overruled.

13  BY MS. LEWIS:

14  Q.  You can answer.

15  A.  Yes.

16  Q.  You contacted Steadfast because within the contractual

17  relationship between Sentara-Hampton and Steadfast, Steadfast

18  has a responsibility to those nurses, correct?

19          MS. RUST:  Objection.  Foundation.

20          THE COURT:  Objection overruled.

21  BY MS. LEWIS:

22  Q.  You can answer the question.

23  A.  Yes.

24  Q.  And you talked to Lisa Pitts about the incident.  Am I

25  correct?

D. DeLutis - Cross

1    A.  Yes, ma'am.

2    Q.  And you talked to Lisa Pitts because it's Lisa Pitts's

3    responsibility to oversee supervisor charges of the nurses

4    when they were in that facility, right?

5            MS. RUST:  Objection.  Foundation.  Not in evidence.

6            THE COURT:  Sustained.

7            MS. RUST:  Beyond the scope.

8            THE COURT:  Not beyond the scope, but sustained in

9    the form of the question.

10           You need to change that around.  Does she know

11   whether that -- I mean, because there's no evidence.  There's

12   nothing in evidence to support the question you asked, so you

13   need to inquire whether that is the situation.

14   BY MS. LEWIS:

15   Q.  Did you know Lisa Pitts to be the point of contact at

16   Steadfast?

17   A.  Yes.  She was one of them.

18   Q.  Okay.  And you contacted Lisa Pitts because she was one

19   of the point of contacts that, if there was an issue with a

20   nurse, you would refer to at Steadfast; is that right?

21   A.  Yes.

22   Q.  And you talked to Lisa Pitts about this incident?

23   A.  Yes.

24   Q.  And you talked to Lisa Pitts about this incident because,

25   as one of the point of contacts at Steadfast, she was in

—————————D. DeLutis - Cross—————————

1    charge of those nurses?

2            MS. RUST:  Objection.

3            THE COURT:  Overruled.  If that's not the case, she

4    can testify that's not the case.

5            MS. RUST:  Okay.

6    BY MS. LEWIS:

7    Q.  You can answer the question.

8    A.  Yes.

9    Q.  Okay.  And when you contacted Ms. Pitts about this

10   incident, you were not the person that told Ms. Smith that

11   she needed to take a drug test; is that correct?

12   A.  Yes.

13   Q.  From your understanding, based upon your follow-up

14   conversation with Ms. Pitts, she was the one who told her to

15   take the drug test; is that right?

16   A.  I believe we had a three-way call; Ms. Pitts, myself, and

17   Chantella.

18   Q.  Okay.  And during that call, the direction to take the

19   drug test came from Lisa Pitts, not you; is that right?

20   A.  Yes.

21   Q.  You requested the result -- you indicated that you

22   requested the results of the drug/alcohol screen?

23   A.  Yes.

24   Q.  And you requested those results because the facility has

25   a responsibility to the residents, correct?

─────D. DeLutis - Cross─────

1   A.  Correct.

2   Q.  And based under those contractual terms, Steadfast,

3   likewise, has liability for their nurses.

4           MS. RUST:  Objection.  Vague.

5           THE COURT:  Sustained.

6   BY MS. LEWIS:

7   Q.  Are you familiar with the contract between Steadfast and

8   Sentara-Hampton?

9   A.  To an extent.

10  Q.  And based upon your understanding of the contractual

11  terms, does Steadfast have a duty to manage the

12  behavior/supervision of nurses at the facility?

13  A.  I think it was a joint effort.  We were there with them,

14  so we were able to see what was happening in front of us.

15  But it was their staff member.

16  Q.  Right.

17          And so within that joint responsibility, Steadfast

18  has an affirmative obligation to oversee that their nurses

19  are behaving appropriately, right?

20          MS. RUST:  Objection.  Asked and answered.

21          THE COURT:  Sustained.

22  BY MS. LEWIS:

23  Q.  You requested the -- you didn't seek the drug test

24  results directly back from Chantella, correct?

25  A.  Correct.

Carol L. Naughton, Official Court Reporter

D. DeLutis - Cross

1  Q.  You requested them from Steadfast?

2  A.  Yes.

3  Q.  And you told Steadfast that Ms. Smith could return with a

4  negative drug test; is that right?

5  A.  Yes.

6  Q.  But Steadfast did not send her back to that facility.

7          MS. RUST:  Objection.  Mischaracterization of

8  testimony.

9          THE COURT:  It's a leading question asking did they

10  send her back.  Maybe rephrase it, and it would be clearer.

11          MS. LEWIS:  Does she understand the question?  Or

12  the Court didn't understand the question?

13          THE COURT:  I'm just saying, she objected to your

14  question because of the way you phrased it, and the Court

15  simply said maybe if you rephrase it, it will be clearer to

16  the witness and maybe to counsel.  Just rephrase the

17  question.

18          MS. LEWIS:  I don't remember what my question was,

19  Your Honor.  It threw me off.  It was clear to me, but if it

20  wasn't clear to the Court, let me go back to my notes here.

21          THE COURT:  The question was:  Did they send back

22  the results of the drug test to Sentara?

23          MS. LEWIS:  Right.

24  BY MS. LEWIS:

25  Q.  Well, did Steadfast send the drug-test results to

────────D. DeLutis - Redirect────────

1    Sentara?

2    A.  Not to my building, no.

3    Q.  Did Steadfast place Chantella Smith back on the schedule

4    at Sentara?

5    A.  No.

6    Q.  You don't know what other or additional discussion

7    Steadfast may or may not have had with Ms. Smith regarding

8    this incident, do you?

9    A.  No.

10              MS. LEWIS:  No further questions.

11              THE COURT:  Any redirect?

12              MS. RUST:  Very briefly.

13                      REDIRECT EXAMINATION

14   BY MS. RUST:

15   Q.  Okay.  Ms. DeLutis, I just want to clarify a couple of

16   questions with you.

17              You discussed with Ms. Lewis regarding maybe a

18   three-way conference call with Ms. Pitts and yourself and

19   Ms. Chantella Smith.

20   A.  Yes.

21   Q.  And the discussion with Ms. Smith about taking the drug

22   test was -- you said that the direction to take the drug test

23   was from Lisa Pitts; is that right?

24   A.  Yes.

25   Q.  Was that information -- did you instruct or discuss with

D. DeLutis - Redirect

1   Ms. Pitts your request for the drug test?

2   A.   Yes.  We had to follow our protocol.

3   Q.   Okay.  So the request for the drug test was -- tell me if

4   I'm wrong, but the request for the drug test was based on

5   Sentara's protocol?

6   A.   Yes.

7   Q.   Okay.  And without the negative drug screen, could you --

8   could you accept Ms. Smith back at your facility?

9   A.   No.

10   Q.   Okay.  So if you -- you mentioned during the cross-exam

11   that Steadfast did not place Chantella Smith back on the

12   schedule.

13   A.   Correct.

14   Q.   Based on Sentara's policy, though, at that point, if she

15   had showed up for a shift through Steadfast, would Sentara's

16   policy have required you to send her home without -- if she

17   did not have that negative drug screen?

18         MS. LEWIS:  Objection, Your Honor.  Calls for

19   speculation.

20         MS. RUST:  No.  It would be based on present --

21         THE COURT:  Wait.  Don't do that.  Let me address

22   the objection first.

23         MS. RUST:  Sorry.

24         THE COURT:  Let me be clear on what the objection

25   was.  Based on what?

Carol L. Naughton, Official Court Reporter

————D. DeLutis - Redirect————

1      MS. LEWIS:  There was a number of ifs and thens.

2  She previously testified that they didn't receive a drug test

3  back.  So, Your Honor, I'd say it's an improper hypothetical

4  based upon her prior testimony, and speculation.

5      THE COURT:  All right.  So you can ask that question

6  again.  I believe the question was whether that was based on

7  Sentara's policy.  Can you ask your question again.

8      So right now the Court overrules your objection.

9      Ask the question again.

10      MS. RUST:  Yes, Your Honor.

11  BY MS. RUST:

12  Q.  Ms. DeLutis, at that time, if Steadfast had sent

13  Ms. Smith back to your facility on the schedule, would

14  Sentara's policy require you to send her home if you did not

15  have that negative drug screen from her at that point?

16  A.  Yes.

17      MS. RUST:  All right.  No further questions.  Thank

18  you.

19      THE COURT:  May the witness be permanently excused,

20  counsel?

21      MS. RUST:  Yes.

22      THE COURT:  Ms. Lewis, may the witness be

23  permanently excused?

24      MS. LEWIS:  We may want to reserve her.  She can be

25  excused for today, but I'd also request that counsel provide

—————D. DeLutis - Redirect—————

1   contact information, likewise.  Again, we have no idea who

2   this individual was.

3            THE COURT:  All right.  Just provide the contact

4   information for Ms. DeLutis to opposing counsel.

5            You may be excused for the time being.  You may be

6   subject to recall virtually again.  Thank you, ma'am.

7            THE WITNESS:  Thank you.

8            (Witness excused subject to recall.)

9            THE COURT:  Okay.  Next witness.

10           MS. RUST:  Your Honor, we will not be calling

11  Mr. Thorpe who is marked as tentative on our list.

12           We subpoenaed Ms. Adams.  She notified me last night

13  that she had -- we discussed the schedule with her.  She

14  notified me last night that she had worked a shift yesterday

15  and then drove out of state to visit family last night and

16  would not be testifying.

17           THE COURT:  You subpoenaed her?

18           MS. RUST:  Yes, Your Honor.

19           THE COURT:  And she drove on out of state even

20  though she had a subpoena?

21           MS. RUST:  Yes, Your Honor.

22           THE COURT:  Where is she located?

23           MS. RUST:  Normally she's local, the Virginia Beach

24  area.  I think she said last night that she had to visit her

25  mother in Pennsylvania to take care --

─────────D. DeLutis - Redirect─────────

 1          THE COURT:  Did you explain to her the nature of
 2   what a subpoena was?
 3          MS. RUST:  We did discuss the subpoena, and it was
 4   e-mailed to her over the last week or so when discussing the
 5   timing of her testimony, yes.
 6          THE COURT:  And she ignored the subpoena, in other
 7   words?
 8          MS. RUST:  Uh-huh.
 9          MS. LEWIS:  Your Honor, I would just make an
10   inquiry.  The timely subpoena pursuant to local rules is 14
11   days.  So the question is was it sent prior to 14 days with
12   respect to the enforcement of the subpoena?
13          THE COURT:  Well, we're coming to that issue,
14   because what the Court will do before the Court does issue
15   any show cause or anything of that nature, the Court will
16   want to find out when was the subpoena served, when was it
17   executed, whether it's all in proper form and order.  The
18   Court does not ignore circumstances where people just ignore
19   subpoenas from the Court.
20          So you will have to provide to the Court when she
21   was subpoenaed and when she was served, and then the Court
22   will find out whether the Court should issue a show cause at
23   some point, even after this case is over, for failure to
24   appear.
25          Now, since that was Ms. Adams, you said, so -- now,

D. DeLutis - Redirect

```
 1    I see Ms. Pitts is down here on the list again.  You know,
 2    it's wonderful.  It would have been very good if you had told
 3    the Court when they put on Christine Kim and they put on
 4    Ms. Pitts that you intended to call both witnesses, because
 5    what the Court in the past has done is to just simply permit
 6    you to go beyond sometimes the scope of the direct to avoid
 7    having a witness come back a second time.
 8              Now, so we've heard from Ms. Pitts.  We're not going
 9    to be repeating anything Ms. Pitts said on direct examination
10    and cross-examination.  We're not going to do that two times.
11              MS. RUST:  Absolutely, Your Honor.
12              THE COURT:  If you've got anything new, the Court
13    will permit you to do it, but ordinarily, in the interest of
14    judicial economy, we could have done that.  But this is where
15    we are.  So who is your next witness?
16              MS. RUST:  Our next witness is Ms. Pitts, and we are
17    certainly going to be dealing with her testimony under the
18    Court's direction on that issue.  Mr. Jewett will be taking
19    her testimony.
20              THE COURT:  Yes, ma'am.
21              MS. LEWIS:  Just a general inquiry with respect to
22    housekeeping.
23              Yesterday we were trying to get an understanding of
24    sort of where we're going to fall with respect to how much
25    longer we'll be down in this lovely city of Norfolk,
```

––––––––D. DeLutis - Redirect––––––––

1    Virginia.

2          THE COURT:  I'm not sure that that was meant to be

3    "lovely."  Go on.

4          MS. LEWIS:  So that's our inquiry.

5          THE COURT:  So what we're trying to find out -- only

6    one can talk at a time, Counsel.

7          What she's getting ready to ask is something the

8    Court was going to inquire about, looking at your witness

9    list.

10         How many more witnesses do you have?  Because this

11   doesn't look like this is going to get us to the end of the

12   day here, Ms. Rust.

13         MS. RUST:  Yes.  So we, based on the testimony that

14   we have, we do think this will bring us out to the end of the

15   day, and these will be our final witnesses.

16         THE COURT:  You think these two witnesses are going

17   to take from now till 5:00?

18         MS. RUST:  Yeah.  With the lunch break, yes, we do

19   expect that it will take us through the afternoon.

20         THE COURT:  We shall see.

21         I'll tell you what we are going to do.  I don't know

22   how long Ms. Pitts is going to be, but I'll tell what we're

23   going to do.  We're going to take our 15-minute break now.

24   Otherwise, she can start testifying, and then we're going to

25   quit in 15 minutes.  So to avoid that, we're just going to do

─────────────── L. Pitts - Direct ───────────────

1    that.

2           Now, you should confer with Ms. Rust because only

3    one counsel needs to address the Court at a time, Mr. Jewett.

4           MR. JEWETT:  Yes, Your Honor.  I think I jumped the

5    gun by standing up there.

6           THE COURT:  Okay.  We'll take a 15-minute break,

7    then we'll come back, and we'll call Ms. Pitts back.

8           (Recess from 11:11 a.m. to 11:28 a.m.)

9           THE COURT:  All right.  You may call your next

10   witness.

11          MS. RUST:  The defendants call Lisa Pitts.

12          THE COURT:  Ms. Pitts, you are still under oath from

13   your previous testimony.

14          THE WITNESS:  Yes, sir.

15          LISA PITTS, called by the Defendants, having been

16   previously duly sworn, was examined and testified as follows:

17                     DIRECT EXAMINATION

18   BY MR. JEWETT:

19   Q.  Good morning, Ms. Pitts.

20   A.  Good morning.

21   Q.  I realize you've already testified in this trial, but can

22   you please say and spell your name again for the court

23   reporter.

24   A.  Lisa, L-i-s-a P-i-t-t-s.

25   Q.  And you are the owner of Steadfast; is that correct?

L. Pitts - Direct

1    A.   Correct.

2    Q.   Okay.  And do you understand that you've also been sued

3    personally in your individual capacity?

4    A.   Yes.

5    Q.   Okay.  Now, before I get into your company and we talk

6    about some of the things you've heard in this trial so far, I

7    want to spend about two minutes with some background

8    information with you.  Okay?

9         You are from Virginia?

10   A.   No, I'm not.

11   Q.   What state?

12   A.   North Carolina.

13   Q.   Okay.  Military family?

14   A.   Yeah.  Camp Lejeune.

15   Q.   Camp Lejeune?

16   A.   Uh-huh.

17   Q.   Okay.  Is your father in the military?

18   A.   Yes.

19   Q.   His position?

20   A.   Retired warrant officer.

21   Q.   Okay.  I mentioned in my opening statement that you were

22   a runaway teenager; is that accurate?

23   A.   It's accurate.

24   Q.   Did you eventually graduate from high school?

25   A.   Barely, yes, but I did.

L. Pitts - Direct

```
 1   Q.  Okay.  And did you have any learning disabilities at that
 2   time?
 3   A.  Yes.
 4   Q.  Okay.  I mentioned in my opening statement that you had a
 5   third-grade reading level.
 6           Did I characterize that accurately?
 7   A.  Yes.
 8   Q.  Okay.  So you said you graduated from high school.
 9           Following high school, did you follow in your
10   father's footsteps and go into the military?
11   A.  A couple of years afterwards.  A couple of years
12   afterwards.
13   Q.  What branch?
14   A.  Navy.
15   Q.  And after the Navy, did you eventually become a nurse?
16   A.  Yes.
17   Q.  What kind of nurse?
18   A.  Licensed practical nurse.
19   Q.  Okay.  And how many years were you a nurse?
20   A.  Going on my 23rd year.
21   Q.  You are in your 23rd year, you said?
22   A.  Yes.
23   Q.  Okay.  When did you start practicing nursing?  Do you
24   recall?
25   A.  1999, right after graduation.
```

─────────── L. Pitts - Direct ───────────

1    Q.   Okay.  And were you working as a nurse at the time that
2    you had the idea to start Steadfast?
3    A.   Yes.
4    Q.   Okay.  Where were you working at at that time?
5    A.   Medical Facilities of America.
6    Q.   You said you were an LPN.
7         Were you in some type of specialty at that time?
8    A.   Geriatrics.
9    Q.   I see.
10        So while you're working at Medical Facilities of
11   America -- we've referred to them as MFA in this trial, I
12   believe -- what caused you to start Steadfast?  What were the
13   circumstances?
14   A.   Well, I was working at MFA, Medical Facilities of
15   America, as a floor nurse, and then I got promoted to a
16   nursing supervisor, 3:00 to 11:00 shift, and it was a
17   terrible nursing shortage.  It's worse than it is now.  It
18   just was unbelievable back then, but now it's just triple
19   shortage.
20        We had to use agency, and the agency was coming in
21   and out of our building.  I was in charge of agency staff
22   coming in and out, and I heard -- I overheard the nurses from
23   agency talking about working agency, picking up when they
24   want to pick up, and all the money they made working agency.
25        And I was a single mom with four kids, yet at the

———— L. Pitts - Direct ————

1    time MFA was only paying me $16 an hour, and I was working

2    like three and four jobs, and they had control over my life,

3    you know.

4            Whenever I wanted to take off, I had to ask, and

5    nine times out of ten, working for them, you didn't take off

6    unless they had another nurse.

7            So I just, you know, talking to the nurses and

8    seeing how their lives were, and one of the nurses was a

9    single mom, and she said, "I only work six months out of the

10   year."  And I said, "How is that possible?"

11           THE COURT:  Mr. Jewett.

12           MR. JEWETT:  Yes, sir?

13           THE COURT:  Two things:  Number one, I don't want

14   what we call a narrative where you're going on and on; and,

15   number two, avoid the hearsay about what other people said.

16           So I want you to guide her through her testimony so

17   she is able to testify concisely without a long narrative.

18           MR. JEWETT:  Okay.  Thank you, Your Honor.  We'll

19   adhere to that instruction.

20   BY MR. JEWETT:

21   Q.  All right.  Ms. Pitts, and so you just kind of recaptured

22   what was going on in your life at that time.  You said you

23   were a single mother with four children?

24   A.  Yes.

25   Q.  And you were working long hours?

```
                          ─── L. Pitts - Direct ───
```

 1    A.  Yes.

 2    Q.  And I believe you said something to the effect that you

 3    didn't have control of your hours; is that correct?

 4    A.  Exactly.

 5    Q.  Okay.  So you started Steadfast.

 6              Did you do any research about classifying nurses

 7    before you started Steadfast?

 8    A.  Well, I didn't know anything about classifying nurses

 9    until I talked to my attorney.  When I first decided to start

10    a staffing agency, I Googled it, "staffing agencies,"

11    "independent contractors."  It was way back.  It's been years

12    ago.  And a bunch of agencies came up, and they were talking

13    about they were doing 1099s, and I wasn't sure about that.

14              So before I started my company, I consulted an

15    attorney about all that.

16    Q.  Okay.  The name of that attorney?

17    A.  Wanda Cooper.

18              MS. LEWIS:  Your Honor, I'm going to object to this

19    line of testimony.  This issue and testimony with respect to

20    advice, information, et cetera, with respect to Ms. Cooper

21    was previously ruled on by the Court.  The Court excluded --

22    the Court issued a ruling with respect to advice,

23    information, or otherwise from Ms. Cooper.

24              I direct the Court's attention to ECF number -- the

25    "Motion in Limine to Exclude Wanda Cooper" was ECF 165.  The

─────────────── L. Pitts - Direct ───────────────

1   subsequent order granting that motion in limine and that

2   testimony is at --

3           THE COURT:  Okay.  First of all, with respect to

4   this objection, I don't know when you're talking about you

5   consulted an attorney.  When were you talking about it?  And,

6   number two, with respect to that order, I'm trying to figure

7   out whether I entered the order or Judge Leonard entered that

8   order.

9           MS. LEWIS:  202.

10          I'm sorry, Your Honor?

11          THE COURT:  Which judge entered the order?

12          MS. LEWIS:  I'm pulling it up now.

13          MR. JEWETT:  You entered the order, Your Honor.

14          MS. LEWIS:  No.  Magistrate Judge Leonard issued the

15  order.

16          MR. JEWETT:  And then we objected, and then you

17  confirmed your reasoning was a little bit different.  You

18  excluded Ms. Cooper from testifying in the trial -- that was

19  your ruling -- because she couldn't recall the substance of

20  the meeting.  I didn't read the order to say that Ms. Pitts

21  couldn't at least describe her consultation.

22          THE COURT:  Well, number one, in having her testify,

23  you didn't indicate -- she said she consulted an attorney.

24  You didn't talk about time frame.

25          MR. JEWETT:  Yes, sir.

L. Pitts - Direct

1          THE COURT:  What she is talking about, when it
2    allegedly happened, and so she can indicate she consulted an
3    attorney, but she is not going to tell us what the attorney
4    said, and certainly Ms. Cooper is not testifying.  So it's
5    very limited things you can do with the witness.
6          It's overruled.  She can indicate she consulted an
7    attorney, but it needs to be clear about on what subject and
8    when.
9          MR. JEWETT:  Sure.  I can focus the questions, Your
10   Honor.  Thank you.
11         THE COURT:  We'll keep it within the bounds of the
12   Court's previous ruling.
13         MR. JEWETT:  Yes, of course.
14   BY MR. JEWETT:
15   Q.  Did you consult with Ms. Cooper before you started your
16   company?
17   A.  Yes, sir.
18   Q.  Okay.  Now, did you meet with Ms. Cooper in her office?
19   A.  Yes, sir.
20   Q.  Did you review any documentation with Ms. Cooper?
21   A.  Yes, sir.
22   Q.  Okay.  Do you recall what documents you reviewed with
23   her?
24   A.  When I was in her office, we sat down, and she went over
25   the classification, like, what the 1099 was about and making

Carol L. Naughton, Official Court Reporter

1    sure that I was in the guidelines.

2         MS. LEWIS:  Your Honor, I re-assert the same

3    objection.  The Court affirmed Judge Magistrate Leonard's

4    order, and that order specifically stated that it is not

5    relevant because she did not advise defendants as to the

6    FLSA.  This was briefed extensively, and so to the extent

7    that she's testifying --

8         THE COURT:  Sustained.  And the Court is going to

9    stick by that order.  And I think if Ms. Cooper didn't give

10   her advice about what the FLSA required, then the Court

11   sustains the objection.  And you cannot put on testimony in

12   effect alleging that she was given advice about what the FLSA

13   requires, if that is what we've already ruled on.

14        MR. JEWETT:  To clarify our position, Your Honor, we

15   are not claiming advice-of-counsel defense with respect to

16   Ms. Cooper.  The purpose of this is to show that Ms. Pitts

17   did do some due diligence before she started the company.

18   She's talking about the start-up date.  I maybe have just 60

19   seconds left worth of questions for her.

20        THE COURT:  But if you're still saying she got

21   advice about independent contractors from Ms. Cooper, and

22   Ms. Cooper has been excluded because she doesn't recall

23   giving any such advice, then the Court sustains the

24   objection.

25        MR. JEWETT:  Okay.  I can move on from the

L. Pitts - Direct

```
1   discussions with Ms. Cooper.
2   BY MR. JEWETT:
3   Q.  Okay.  So when you started Steadfast, did you have an
4   office?
5   A.  No, I didn't.
6   Q.  Okay.  Did you have a computer?
7   A.  No, I didn't.
8   Q.  Where did you get your first computer?
9   A.  One of my bosses on my job gave me a computer.
10  Q.  Gave you a computer.  Okay.
11          How did you get your first contract?
12  A.  Well, I went to one of the nursing homes, and then I
13  went -- I had an appointment to meet with the administrator,
14  and I went in and sat and talked to the administrator, and he
15  basically told me he would never do business with the likes
16  of me.
17          MS. LEWIS:  Objection.  Hearsay.
18          THE COURT:  Sustained.
19  BY MR. JEWETT:
20  Q.  Remember the Court's instruction.  You will have to share
21  that experience without saying what anybody told you.
22  A.  I just went to a facility, tried to get a contract, and I
23  was rejected.
24  Q.  All right.  Were you turned down initially for that
25  contract?
```

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1   A.  Yes.

2   Q.  How did you end up getting it?

3   A.  They -- the DON called me back in, because they were so

4   desperate, and she said she got him to sign it.

5   Q.  Okay.  So that was your first contract.  Let me

6   fast-forward to today.

7   A.  Okay.

8   Q.  Your office, I believe you said, is located in Norfolk?

9   A.  Yes.

10  Q.  What part of Norfolk?

11  A.  Worst part.  5750 Chesapeake Boulevard.

12  Q.  What did you say before that?

13  A.  The worst part.

14  Q.  Can you please get a little closer to the microphone.

15  I'm having a hard time hearing you.

16  A.  I said the worst part in Norfolk.

17  Q.  Okay.  Thank you.

18          What do you pay for rent?

19  A.  27 -- 26-, 2,700 a month.

20  Q.  I'm not going to go through your staff.  I believe

21  Ms. Kim already covered that.

22          But how many total employees do you have actually

23  working in the office?

24  A.  About 15.

25  Q.  15.  Okay.  Great.

L. Pitts - Direct

1          You've heard Steadfast referred to as a registry
2    throughout this trial.  Do you recall that?
3    A.  Correct.
4    Q.  What is a registry?  What do you mean by that?
5    A.  It's like a holding house.  It's like a warehouse of
6    nurses, and we match jobs, temporary jobs, in the field.
7    Q.  Okay.  Does Steadfast facilitate matches between facility
8    clients and nurses on, I think you called it, a warehouse or
9    a clearing house?
10   A.  We're like a liaison.
11   Q.  Okay.
12          MR. JEWETT:  Could you please pull up the first
13   document.
14   BY MR. JEWETT:
15   Q.  This was previously admitted as PX-24.
16          Ms. Pitts, I believe you were shown this document
17   before, but do you recognize this document?
18   A.  Yes.
19   Q.  What is this a picture of?
20   A.  At the time it was a registry, a roster that we had.
21   It's updated now, but that's a very old roster.
22   Q.  Okay.  This is the registry that we're looking at right
23   here?
24   A.  Correct.
25   Q.  So can you explain how a nurse actually gets her name on

──────────L. Pitts - Direct──────────

1   this roster, on this registry?

2   A.  Usually, we have a website, and they send an e-mail

3   requesting information how to sign up with the -- with

4   Steadfast, and the recruiter gets that e-mail, and then she

5   reaches back out at them and tells them to submit their

6   credentials.

7          And she's just got to make sure their license is

8   current before she puts them up there.  They have to have a

9   current license, current license from the Board of Nursing,

10  because we can't work anyone unless they have a current

11  license.  So once they produce they have a current license,

12  then she puts them on the registry.

13  Q.  I want to -- well, let me ask you this:

14         Does the nurse submit an application in order to get

15  her name or his name on this document?

16  A.  They used to but not anymore.

17  Q.  Not anymore.  Okay.

18         Let me -- well, you said they used to.  What kind of

19  paperwork do they submit now?

20  A.  Well, now, it's required, just a resume -- make sure you

21  have everything on it because we might -- we will send that

22  to the facility -- a full resume; their PPD; CPR; and nursing

23  license.  There's documents that each facility requires.  So

24  like the prisons require documents, major documents.  MFA

25  requires major documents.  Each facility has their own set of

L. Pitts - Direct

1   documents.

2   Q.  I'm not familiar with this term.  What is the PPD?

3   A.  That's a skin test, TB skin test.

4   Q.  You said PPD and CPR.  And what was the third one?

5   A.  License.

6   Q.  License.  Okay.

7   A.  And now COVID, now COVID test.  They have to have the

8   COVID test or the vaccine.

9   Q.  Okay.  So once they submit that, they are then added to

10  the roster; is that correct?

11  A.  Correct.

12  Q.  All right.

13      MR. JEWETT:  Can you please pull up the next

14  document.

15  BY MR. JEWETT:

16  Q.  And what you are about to see was, I think, previously

17  admitted as PX-26.

18      Do you recognize what you see on the screen there?

19  A.  Which page am I looking at?

20  Q.  Sorry.  Let's start with Page 2.

21      Do you recognize this document?

22  A.  Yes.

23  Q.  Okay.

24      MR. JEWETT:  Can you zoom out just a little bit.

25      There we go.

L. Pitts - Direct

1    BY MR. JEWETT:

2    Q.  Is this a document that Steadfast currently uses?

3    A.  I'm not sure.  We did a lot of changes.  I'm not sure.

4    We've done a lot of changes in the application process.

5    Q.  Well, in any event, did Steadfast, at least at some

6    point, use this document as part of the application process?

7    A.  Yes.

8    Q.  Where did you get this document?  Did you create it

9    yourself?

10   A.  No.  I got it from another staffing agency when we first

11   started online.

12   Q.  Why did you use this document as part of the application

13   process?

14   A.  Because the other staffing agency did it, and we were

15   doing the same thing they were doing.

16           MR. JEWETT:  Can you go to Page 3, please.

17   BY MR. JEWETT:

18   Q.  Do you recognize this document?

19   A.  Page 2 or 3?

20   Q.  I believe this is Page 3.  Yeah.  You see at the bottom

21   there the page number is 003.

22   A.  Yes, I do.

23   Q.  Okay.  Did you get this document online too?

24   A.  Yes.

25   Q.  All right.  And why did you use it?

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1  A.  Because it was from another staffing agency that had

2  independent contractors.

3  Q.  And I'm not sure if I asked this question earlier, but

4  this document you are seeing on the screen, what has been

5  referred to as an application throughout this trial, does

6  Steadfast still use this document?

7  A.  No, we don't.

8  Q.  Okay.  There is a section on this document -- if you see,

9  there's a section called "Check the type of assignment you

10 are available for:  full time, part time, travel, per diem,

11 permanent."

12          Do you see that?

13 A.  Yes.

14          THE COURT:  Excuse me, sir.  Let me understand

15 something.  She says Steadfast no longer uses this document.

16          Was this document in use during the period of the

17 alleged violations in this case?  That's what I want to be

18 sure of.

19          MR. JEWETT:  I believe that -- I believe that it

20 was.

21          MS. LEWIS:  Yes, Your Honor.  It was confirmed

22 through both Ms. Pitts' prior testimony, Ms. Kim's, and the

23 previously admitted 30(b)(6) depositions, as well as employee

24 witnesses.

25          THE COURT:  Okay.  That's fine.  Thank you.

L. Pitts - Direct

1    BY MR. JEWETT:

2    Q.  Okay.  So back to the section, the type of assessment --

3    or, excuse me, assignment, full time, part time, travel,

4    per diem.

5          Do you see that?

6    A.  Yes.

7    Q.  Once the nurse -- when you were using -- when Steadfast

8    was using this application, once the nurse submitted that,

9    does Steadfast go back and evaluate that section to try to

10   figure out what kind of schedule to give the nurse?

11   A.  No.

12   Q.  Okay.

13          MR. JEWETT:  Turn to the next page, please.  The one

14   after that, there's a section for references.

15   BY MR. JEWETT:

16   Q.  Okay.  Do you see -- we're on Page 5 now of PX-26.

17          Do you see the "References" section?

18   A.  Yes.

19   Q.  Did you check references when you would receive an

20   application from a nurse?

21   A.  Not really.

22   Q.  What does that mean?  What does "not really" mean?

23   A.  Well, the facility usually, in the contracts, at the

24   bottom of the contracts, it lists what we need, and sometimes

25   they would ask us, "Please can you go back and check their

L. Pitts - Direct

1  references," if they are having behavior problems in a
2  facility.
3  Q.  Maybe the better question is this:
4          Did you check the references before putting the
5  nurse on that roster we looked at, on the registry roster?
6  A.  No.
7  Q.  Okay.
8          MR. JEWETT:  Can you scroll to Page 17, please.
9  BY MR. JEWETT:
10 Q.  I want to ask you a question that I don't think has been
11 covered yet in this trial.
12         Do you recognize this document?
13 A.  Yes.
14 Q.  What is this?
15 A.  It's a memo.
16 Q.  Okay.  This document references, it says at the bottom
17 there, "Any shifts not completed will result in a
18 chargeback."
19         What does that mean?
20 A.  Well, at the time the facility was charging us back
21 because we had nurses walking into their facility and didn't
22 like the assignment, and they walked out.  So they would
23 start charging the company back for the eight hours.
24 Q.  So in those instances --
25         MS. LEWIS:  Your Honor, I'm going to object to

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    hearsay.  She is representing with respect to what the

2    facility did.  So she is seeking to assert that the facility

3    did something for the truth of the matter asserted.  So with

4    respect to that, best evidence would be the chargeback

5    document.  She's building upon, you know -- building a

6    document here in the -- it's hearsay.

7            MR. JEWETT:  Your Honor, this sort of testimony is

8    common in employment cases, as the Court knows.  We're not

9    offering it for the truth of the matter asserted.  We're

10   offering it for Ms. Pitts to explain why she did something.

11           THE COURT:  Objection overruled.

12           MR. JEWETT:  Thank you.

13   BY MR. JEWETT:

14   Q.  So, Ms. Pitts, I believe the question that I was going to

15   ask you is:

16           This form here, did Steadfast charge back to the

17   nurses when the facility would charge Steadfast for a

18   chargeback?

19   A.  No.

20           MS. LEWIS:  Your Honor, same objection.  We don't

21   have that the facility actually charged back anything.

22           THE COURT:  I'll sustain that because there's

23   nothing in evidence to suggest that the facility -- you

24   suggested that the facilities charged.  She simply testified

25   the reason that language was there, and the Court didn't

L. Pitts - Direct

1    overrule that.  But you added something else there about what

2    the facilities were doing.

3             MR. JEWETT:  I think I took a step too quickly.

4    BY MR. JEWETT:

5    Q.  Did the facilities ever charge Steadfast under this

6    chargeback document that you have?

7    A.  Yes.  What they did was, when we submitted the invoice,

8    they didn't pay -- whoever walked out the building, they

9    didn't pay it on the invoice.

10   Q.  Okay.  So in those circumstances, within this relevant

11   time period we're talking about for this case, did Steadfast

12   charge back the nurses when that would happen?

13   A.  No.

14   Q.  Okay.  Do you still use this document?

15   A.  No.

16   Q.  Let me ask you about two more forms --

17   A.  Okay.

18   Q.  -- before we move on from this.

19            MR. JEWETT:  Can you please pull up the third

20   document.

21            MS. LEWIS:  Your Honor, just for recordkeeping, I

22   don't believe this exhibit was marked.

23            THE COURT:  Okay.  Has it been marked?

24            THE CLERK:  I think it's part of 26.

25            THE COURT:  Hold on.  She thinks it's part of 26.

L. Pitts - Direct

1          MS. LEWIS:  I don't believe 26 was admitted.  We

2     used it --

3          THE COURT:  26 is in.

4          MS. LEWIS:  26 is in.  Okay.

5     BY MR. JEWETT:

6     Q.  Ms. Pitts, you're looking at what I believe is PX-32, and

7     we're on Page 10 of PX-32.  This is a document titled

8     "Receipt of substance abuse and drug testing policy and drug

9     testing consent form."

10         Do you recognize this document?

11    A.  Yes.

12    Q.  This is a document that Steadfast used at some point?

13    A.  Yes.

14    Q.  Okay.  Why did Steadfast use this document?

15    A.  Because we were under contract with the different

16    facilities, and it's certain documents they require through

17    their rules and regulations, and drug testing was a big thing

18    with them.

19    Q.  Okay.  Do all facilities you contract with -- do they

20    require some type of drug test before the nurse can --

21    A.  Before and during.

22    Q.  Before and during.  Okay.

23         Let's look at -- this is PX-32 at Page 6.

24         Ms. Pitts, this is a document titled "HIPAA training

25    module test."  Do you recognize this document?

---

L. Pitts - Direct

1    A.  Yes, I do.

2    Q.  All right.  And this is a document that Steadfast says it

3    used at some point during the relevant time period in this

4    case?

5    A.  Yes.

6    Q.  Okay.  Why did Steadfast use this document?

7    A.  Because the nurses had to go through HIPAA training

8    before they can even go to the facilities.  We used to

9    have this in profile -- well, we still send profiles over,

10   and there's certain things certain facilities have, but I

11   know HIPAA, all the facilities are requiring that.

12   Q.  Okay.  So you mentioned you would send profiles on nurses

13   to the facilities.

14          Would this completed document for the nurse be part

15   of that profile?

16   A.  Yes.

17   Q.  Okay.  Have you ever had a nurse fail this true/false

18   test?

19   A.  Well, it's open book.

20   Q.  So is that a no?

21   A.  I'm not sure.  It's open book.  So nobody can fail.

22   Q.  Well, have you ever had a facility get back to you and

23   say, "Hey, one of the profiles you sent to us had a failed

24   HIPAA test?"  Do you recall that?

25          MS. LEWIS:  Objection.  Hearsay -- I withdraw the

---

Carol L. Naughton, Official Court Reporter

———L. Pitts - Direct———

1   objection, Your Honor.

2           THE COURT:  What did you say?

3           MS. LEWIS:  I initially had objected to hearsay, but

4   I said I withdraw it.

5           THE COURT:  Thank you.

6           THE WITNESS:  I don't recall.

7           THE COURT:  What was your answer?

8           THE WITNESS:  I don't recall.  I don't recall.

9   BY MR. JEWETT:

10  Q.  Okay.  Let me just circle back to a couple of questions

11  on the current practice.  We're talking about the practice to

12  actually get the name on the registry.  Okay?

13          I believe you said you no longer require an

14  application; is that correct?

15  A.  Correct.

16  Q.  Okay.  But does Steadfast still confirm the nurse's

17  credentials, such as with the Board of Nursing, before

18  placing a nurse on its registry?

19  A.  We have to.

20  Q.  Does Steadfast conduct background checks before placing a

21  nurse on its registry?

22  A.  Yes.

23  Q.  Okay.  Do you actually interview the nurse before placing

24  the nurse on the registry?

25  A.  I don't -- half the nurses, I've never seen before.  They

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    pick up online and reach out to the recruiters.  So, no, I
2    don't interview the nurses.
3    Q.  Okay.  Does anybody from your office at least talk to the
4    nurse on the phone sometimes before they get on the registry?
5    A.  Yes.
6    Q.  Are you aware of the substance of those conversations,
7    like what information they are gathering?
8    A.  I don't listen in on the conversations.  So they know
9    what they are supposed to do.
10   Q.  So, now, once the nurse is on the registry, the document
11   we looked at in the very beginning, the roster of nurses --
12   once the nurse's name is on there, what kind of orientation
13   does Steadfast provide to the nurse?
14   A.  We don't provide any orientation.
15   Q.  Okay.  What about a handbook?
16   A.  We don't have a handbook.
17   Q.  Policies and procedures?
18   A.  We don't have that.
19   Q.  What about a how-to guide?
20   A.  We don't have that.
21   Q.  Does Steadfast provide the nurses any training at all?
22   A.  No, we don't.
23   Q.  Okay.  I want to shift gears and ask you a few questions
24   about the facility contracts.
25   A.  Okay.

L. Pitts - Direct

1    Q.  I believe Ms. Lewis may have asked you a few questions
2    about those last week when you were testifying, but let me
3    circle back on a few items for that.
4             What categories of healthcare facilities does
5    Steadfast have contracts with?
6    A.  Geriatrics, long-term care facilities.
7    Q.  Any others?
8    A.  I can't recall any others.  We're a staffing agency, so
9    people call us.  Corrections, we have some with corrections.
10   Q.  Corrections.  Okay.
11   A.  They will call us.
12   Q.  And approximately how many contracts -- strike that.
13            Approximately how many facilities does Steadfast
14   have a contract with?
15   A.  I'm not sure of the number.  It shouldn't be more than
16   50, I don't think.
17   Q.  Okay.  And who at Steadfast has the authority to enter
18   into a contract with a facility?
19   A.  Me.
20   Q.  Can you explain to the Court how that process works, like
21   how you actually come to the point where you've entered into
22   a signed contract with the facility?
23   A.  Yes.
24            So what happens is they usually -- sometimes they
25   reach out to the office, and I get a message that a facility

L. Pitts - Direct

1    needs nurses.  Sometimes I get an e-mail.  Most of the times

2    I get a phone call.  And they probably heard of us through

3    other facilities, because most of the facilities are owned by

4    one corporation and with a lot of facilities.

5            And I tell them to submit an e-mail requesting a

6    contract.  And they submit the e-mail requesting the

7    contract.  And then I send them -- well, usually I talk to

8    the administrator, and I'll say, "Look" -- or the

9    administrator at the corporate office, whoever reached out --

10   "what are the rates?  What are you all paying?"  Because I

11   give them a chance, you know.

12           They refer me to corporate, usually a corporate

13   representative.  He starts telling me the rates, and I say,

14   "Well, let me see if we can do the same thing that you have

15   been doing."  And we'll send over a rate sheet first.  It's

16   the last page of a contract, and it lets them know we're

17   independent contractors, flat rate, blah, blah, blah.

18   Q.  I see.

19           Okay.  Now, you heard some testimony -- well, let me

20   ask it this way:

21           Did you hear testimony earlier in this trial about

22   Steadfast having a buyout clause in some of these contracts?

23   A.  Yes.

24   Q.  Okay.  What's the purpose of this buyout clause?

25   A.  Well, when we first started, one of our contracts, one of

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    the clients put -- told us that we had to put that in there

2    because they said we need nurses bad, we need to retain

3    nurses, and I guess they were using us as their headhunters

4    to find nurses for their organization.  That's how it came

5    about.

6    Q.  So did you start using the buyout clause after that

7    particular contract?

8    A.  Correct.

9    Q.  Okay.  But as the owner of the company, what is the

10   purpose of that buyout clause?

11   A.  Well, we spend a lot of money processing credentials, you

12   know.  Each facility, like at corrections, they require a lot

13   of stuff that we have to do.  So we've spent a lot of money

14   doing that, vetting these girls and getting them ready for

15   the facilities.

16   Q.  And do you pay your administrative team to conduct those

17   background searches?

18   A.  Yes.

19   Q.  Have you ever had a facility refuse to pay the buyout

20   clause, the matching fee?

21   A.  I can't recall.

22   Q.  Okay.  Have you ever had a nurse get placed with a

23   facility without a matching fee being paid?

24   A.  Yes.

25   Q.  Okay.  Have you ever refused to allow a nurse to work

L. Pitts - Direct

1  directly for a facility due to the buyout clause?

2  A.  No.

3  Q.  Okay.  I want to ask you a few questions about one of the

4  nurses who testified earlier in this trial, Teresa Morey.

5       Do you recall her testifying in this trial?

6  A.  Correct, yes.

7  Q.  And was she a nurse who took shifts through Steadfast's

8  registry?

9  A.  Yes.

10 Q.  Okay.  Do you recall that she testified that you blocked

11 her from working at another facility when she was here in the

12 courtroom?

13 A.  Yes.

14 Q.  And I believe she said you threatened to sue her.

15      Do you recall her saying that?

16 A.  Yes.

17 Q.  And I believe -- strike that.

18      And do you recall that she said that she had to sit

19 out a year because of something that you did?

20 A.  Yes.

21 Q.  Okay.  Did you prevent her from working for that facility

22 she's referring to?

23 A.  No.

24 Q.  And do you recall the facility she said she was trying to

25 work for?

─────────────── L. Pitts - Direct ───────────────

1   A.   Yes.

2   Q.   What is the name of the facility?

3   A.   Avante, Lynchburg.

4            MR. JEWETT:  Can you please pull up the next

5   document.

6            You know what, I have this one.

7   BY MR. JEWETT:

8   Q.   Okay.  Ms. Pitts, on your screen is an e-mail from -- do

9   you see that's from Teresa Morey?

10  A.   Yes.

11  Q.   Is that to you?  Is that your e-mail?

12  A.   Yes.

13  Q.   Dated November 13th, 2017?

14  A.   Yes.

15  Q.   It's a short e-mail.  I'll read it to you.  The e-mail

16  reads:

17           "First of all, let me start by saying thank you for

18  the amazing opportunity of working for your company.  It has

19  been such a joy.  It opened my eyes to travel nursing, which

20  was new for me outside of home health.  Per yours and

21  Nathan's conversation, effective 11/14/2017, I will be taking

22  the position of first shift full-time unit manager at Avante

23  Lynchburg working no longer through Steadfast but directly

24  through Avante.  Again, thank you, Lisa.  You have been

25  amazing to work for.  God bless."

L. Pitts - Direct

1          Did I read that correctly?

2     A.  Yes.

3          MS. LEWIS:  Your Honor, if counsel could scroll

4     down, please, I may have an objection.

5          Your Honor, I object to this document as it was not

6     produced in discovery.  We requested any and all records

7     related to personnel files and the like for employee

8     witnesses.  This does not have -- as counsel scrolled down,

9     there is no Bates-stamp number.  It was not previously

10    provided.

11         So even if they are using it for impeachment,

12    rebuttal, or otherwise, this was squarely within the realm of

13    discovery, which defendants declined or failed to produce.

14         MR. JEWETT:  So, of course, as the Court knows,

15    impeachment is exempt from Rule 26.  I don't know what

16    request she's referring to by a request for "all records."

17    And this is a "thank you" e-mail from a nurse that directly

18    contradicts her testimony.

19         THE COURT:  What are you impeaching?

20         MR. JEWETT:  I didn't hear you.

21         THE COURT:  What are you impeaching?

22         MR. JEWETT:  I am impeaching under 608.  I'm

23    bringing on evidence of contradictory -- of contradiction,

24    which is, of course, allowed, especially on a material issue

25    such as this where we have direct testimony in the courtroom

L. Pitts - Direct

 1    that Ms. Pitts blocked a nurse from working, and we have an

 2    e-mail from this particular nurse that says the opposite of

 3    that.

 4          MS. LEWIS:  But, Your Honor, my objection is with

 5    respect to a discovery abuse.  This document was not

 6    produced.  Whether or not he's using it for impeachment or

 7    rebuttal, it's directly responsive.

 8          Now, defendants produced personnel files for what

 9    they represented to be anything and everything they had.

10    There's other documents and e-mails between Ms. Pitts -- for

11    example, in our case in chief, they provided a personnel

12    record for an office employee, Courtney Draughn Hope, in

13    which there was issues of we don't have this document.

14          THE COURT:  Why wasn't that document produced?

15          MR. JEWETT:  She is referring to the personnel file.

16    The Court heard the testimony from Ms. Kim that the personnel

17    file for nurses are just simply the application and some

18    banking information.

19          THE COURT:  Where did that document come from?

20          MR. JEWETT:  Ms. Pitts searched for it after she

21    heard the story on the stand that she couldn't believe she

22    heard.

23          THE COURT:  Why didn't she search for it during the

24    search for all documents during discovery?

25          MR. JEWETT:  Because this document wasn't asked for

L. Pitts - Direct

1    during discovery, Your Honor.

2            MS. LEWIS:  It certainly was, Your Honor.

3            MR. JEWETT:  She is referring to a vague request for

4    personnel files and records.  This in no way is responsive to

5    that.  They don't keep personnel files on the nurses.  This

6    is a "thank you" e-mail that directly contradicts what the

7    nurse said.  It's admissible under the comments of Rule 608,

8    and it's very material to this case.

9            THE COURT:  You said that document -- well, counsel

10   always tells the Court what is material.  That document was

11   not in the personnel file.

12           MR. JEWETT:  No, it was not, Your Honor.

13           THE COURT:  It was in the personal file of

14   Ms. Pitts?

15           MR. JEWETT:  It was in her e-mail account.  She

16   started -- when she heard this testimony, she -- when she

17   heard the testimony, she started searching her e-mail because

18   she couldn't believe what she heard, and this is what she

19   found.

20           MS. LEWIS:  Your Honor, I can point to at least

21   three requests for production responses that that document

22   would be responsive to.

23           THE COURT:  You read to me the Request for

24   Production that covers documents that are in the possession

25   of Ms. Pitts.  Do you have anything?

L. Pitts - Direct

1           MS. LEWIS:  Yes, Your Honor.

2           Discovery was propounded upon Ms. Pitts individually

3   and on the corporation as a whole.  And those requests were

4   the same, both ways.  So Request for Production of

5   Documents -- I can start at the top.

6           MR. JEWETT:  Your Honor, while Ms. Lewis is looking,

7   I will note that the parties had an extensive hearing with

8   Judge Leonard on some of these issues, and he did enter an

9   order on the production.

10          THE COURT:  Let's put it this way:

11          Once you reach trial, the trial judge has the

12   authority to rule on any matter, either affirm it or reverse

13   it, pure and simple as that.

14          If she finds anything that required Ms. Pitts to

15   produce this document, then I'll sustain the objection, and

16   she can testify about what she told Ms. Morey, but the

17   document will not be used to affirm her testimony.  It's

18   simple as that.

19          MS. LEWIS:  Your Honor, I'll start with Request 8,

20   9, and 10.

21          Starting with Request 8:  "All documents,

22   correspondence, e-mails, and written guidance in the

23   possession of Steadfast and/or Lisa Pitts regarding the plans

24   or strategies to obtain work of employees who would be or

25   characterized or claimed by Steadfast as independent

———————L. Pitts - Direct———————

1    contractors for purposes of compensation, including any

2    analysis of costs, savings, changes in tax liability,

3    profitability analysis."

4              Request Number 9:  "All documents regarding

5    Steadfast's efforts or actions to advertise, recruit, and

6    contract employees as defined herein who have worked for

7    Steadfast, have been paid as independent contractors during

8    the relevant period."

9              Request for Production Number 10:  "All documents,

10   including but not limited to, contracts and invoices related

11   to any agreements or business relationships between Steadfast

12   and any third party covering any part of the last three

13   calendar years regarding staffing services and/or Steadfast

14   providing various -- all documents which" -- Your Honor, I

15   can --

16             THE COURT:  Don't go any further.

17             MS. LEWIS:  I can keep going.

18             MR. JEWETT:  May I please just say one thing?

19             She referenced a request for plans and strategies.

20   This is a "thank you" e-mail.  She referenced a request for

21   advertising notes.  This is a "thank you" e-mail.  She

22   referenced a request for things, including but not limited

23   to, contracts and invoices.  This is a "thank you" e-mail.

24   That's not responsive to any of these.

25             THE COURT:  It goes a little further than that.  The

L. Pitts - Direct

1    Court is going to sustain the objection.  You can have her

2    testify, and she can dispute, but the document is not coming

3    in.  It's not going to be used, period.

4          MR. JEWETT:  Your Honor, just a point of

5    clarification.

6          THE COURT:  What do you need to clarify?  The Court

7    just ruled the document would not be coming into evidence.

8    It's clearly covered by those three requests for production.

9    We're not going to argue it.  That's the Court's ruling.

10         And something that seems to be a pattern in this

11   case from both parties, the Court rules, and then you come

12   back after you have been told what the Court is going to do.

13   The Court is finished with that.

14         Now you can move on to something else.

15         MR. JEWETT:  My question is:  May I examine the

16   witness about the document without moving to admit it?

17         THE COURT:  No.

18         MR. JEWETT:  Okay.  Thank you.

19         THE COURT:  I just said it couldn't be used.

20         MR. JEWETT:  Okay.

21   BY MR. JEWETT:

22   Q.  Who is Nathan from Avante?  Are you familiar with that

23   name?

24   A.  He was administrator.

25   Q.  Okay.  Did you have a discussion with Nathan from Avante,

L. Pitts - Direct

1   the administrator, on or before November 13th about the

2   direct hire of Teresa Morey?

3   A.   Yes.

4   Q.   Okay.  Do you know if Teresa Morey began working for

5   Avante on or after November the 14th, 2017?

6   A.   Yes.

7   Q.   Is that a yes, she did?

8   A.   Yes, she did.

9   Q.   I want to shift gears and ask you a few questions about

10  the relationship with Dunlop House.

11  A.   Yes.

12  Q.   You were in the courtroom when David Rawlings, the

13  representative from Dunlop House, testified.

14          Do you recall that?

15  A.   Yes.

16  Q.   Have you ever spoken with David Rawlings before?

17  A.   No.

18  Q.   Have you ever heard of him?

19  A.   No.

20  Q.   You never talked with David Rawlings or anyone from your

21  company, to the extent you are aware, about scheduling nurses

22  or the relationship between Dunlop House and Steadfast?

23  A.   No.

24  Q.   Who is your point of contact at Dunlop House?

25  A.   The director of nursing.

L. Pitts - Direct

1   Q.  And how often did Steadfast communicate with the director

2   of nursing at Dunlop House?

3   A.  The call center schedulers communicated with her because

4   she sent the schedules over.

5   Q.  Weekly?  Daily?  Once a month?

6   A.  Sometimes daily, sometimes weekly.

7   Q.  When a nurse was being scheduled at Dunlop House, did

8   your team speak with David Rawlings or the director of

9   nursing?

10  A.  Director of nursing.

11  Q.  When a nurse needed to be DNR'd from Dunlop House, does

12  your team speak with David Rawlings or the director of

13  nursing?

14  A.  Director of nursing.

15  Q.  If there was a discrepancy over a time sheet for a nurse,

16  did your team speak with David Rawlings or the director of

17  nursing?

18  A.  Director of nursing.

19  Q.  In any conversation that you ever had with any person

20  from Dunlop House, did David Rawlings' name get mentioned?

21  A.  No.

22  Q.  I now want to ask you a few questions about the Princess

23  Anne contract.

24  A.  Okay.

25  Q.  The Court, if you recall, had some questions for you on

L. Pitts - Direct

1    that contract as well.

2    A.  Yes.

3             MR. JEWETT:  Could you please pull up PX-10 at 128.

4             THE COURT:  Did you cross-examine this witness on

5    PX-10 when she appeared in the plaintiff's case?  Did the

6    defense cross-examine Ms. Pitts on this exhibit when she

7    appeared in the plaintiff's case?

8             MR. JEWETT:  I did ask her several questions about

9    it.  I believe I asked her questions pertaining to the

10   formation of this contract.  I do not recall, Your Honor, if

11   I asked her specific questions about the contract itself.

12            My questions on this contract are fairly brief.

13            THE COURT:  Okay.  Continue.  As long as it's not a

14   repetition of something you have already done.

15            MR. JEWETT:  Okay.  Thank you.

16   BY MR. JEWETT:

17   Q.  Okay.  Ms. Pitts, do you see on your screen that this is

18   the contract between Steadfast and Princess Anne?

19   A.  Yes.

20   Q.  We're on PX-10, Page 128.

21   A.  Yes.

22   Q.  You see on this first page, at the bottom, there's a

23   section called "Supplemental Staffing Service."

24   A.  Yes.

25   Q.  And you understand that refers to Steadfast?

———— L. Pitts - Direct————

1    A.  Yes.

2          MR. JEWETT:  Can you please go to Page 129.

3    BY MR. JEWETT:

4    Q.  Let's look at Section 5.  It's short.  I'll read it to

5    you.  Section 5 states that Steadfast will "comply with and

6    ensure that temporary personnel placed at the healthcare

7    center comply with the guidelines of OSHA standards."

8          Did I read that correctly?

9    A.  Yes.

10   Q.  All right.  Did you ensure that Steadfast nurses complied

11   with OSHA standards while they were practicing nursing at

12   Princess Anne?

13         MS. LEWIS:  Your Honor --

14         THE WITNESS:  No.

15         MS. LEWIS:  -- I'm going to object to relevance.

16   This is an FLSA trial.  I'm not really sure where we're going

17   with this.

18         MR. JEWETT:  I believe the degree that Steadfast was

19   supervising -- the Fourth Circuit has said the degree that

20   Steadfast is supervising and evaluating the workers while

21   they are actually performing their work is highly relevant.

22   It's the most important question of the case.

23         THE COURT:  Objection overruled.

24   BY MR. JEWETT:

25   Q.  Let me repeat the question, Ms. Pitts.

L. Pitts - Direct

```
1              Did Steadfast ensure that its nurses were complying
2    with OSHA standards while they practiced nursing at Princess
3    Anne?
4    A.  No.
5    Q.  This particular section, Section 5, did it ever come up
6    in any conversation with Erica Johnson at Princess Anne?
7    A.  No.
8    Q.  Or any representative from Princess Anne?
9    A.  No.
10   Q.  Okay.
11             MR. JEWETT:  Let's look at Section 6.
12   BY MR. JEWETT:
13   Q.  Again, it's short.  I'll just read it to you.  Section 6.
14   A.  You said Section 4?
15   Q.  Section 6, right in front of you.
16             Can you see that?
17   A.  Yes.
18   Q.  "Be in compliance with..."
19             Do you see that in front of you?
20   A.  Yes.
21   Q.  Section 6 provides that Steadfast will "be in compliance
22   with all applicable provisions of federal, state, and local
23   laws, rules and regulations, including, but not limited to
24   patient care guidelines, and monitor the temporary personnel
25   placed at the healthcare center to insure that the temporary
```

L. Pitts - Direct

```
 1    personnel are in compliance with the same."
 2            Ms. Pitts, did Steadfast monitor the nurses placed
 3    at Princess Anne to ensure that they were in compliance with
 4    federal, state, local laws, rules, and regulations, that's
 5    provided in this section?
 6    A.  No.
 7    Q.  Okay.  Did this particular section of the contract ever
 8    come up in a conversation with Erica Johnson?
 9    A.  No.
10    Q.  Did this particular section of the contract ever come up
11    in a -- excuse me -- in a conversation with any
12    representative from Princess Anne?
13    A.  No.
14    Q.  Let's take a look now at Page 130.  I'm looking at
15    Section C, "Confidentiality."
16            Do you see that?
17    A.  Yes.
18    Q.  This is a long one.  I won't read it, except I will point
19    your attention to the second paragraph.
20            Are you with me?
21    A.  Yes.
22    Q.  It says that "Supplemental staffing service" -- so that's
23    Steadfast -- "shall also maintain and assure that" -- and I'm
24    skipping some words here but -- "maintain and assure that"
25    its temporary personnel "shall maintain strict
```

1   confidentiality of all proprietary information regarding

2   healthcare center or MFA."

3           Do you see that?

4   A.  Yes.

5   Q.  Okay.  Did Steadfast assure that its nurses were not

6   taking proprietary information while they were practicing

7   nursing at Princess Anne?

8   A.  No.

9   Q.  Did this particular section of the contract ever come up

10  in a conversation with Erica Johnson or any representative

11  for Princess Anne?

12  A.  No.

13  Q.  Did the topic of proprietary information ever come up in

14  any conversation with any representative from Princess Anne?

15  A.  No.

16  Q.  Okay.  I want to ask you now about something that Erica

17  Johnson -- well, strike that.

18          Do you recall Erica Johnson was in the courtroom

19  earlier --

20  A.  Yes.

21  Q.  -- in this trial, and she testified here?

22  A.  Yes.

23  Q.  Do you recall her saying that this contract that we're

24  looking at together --

25  A.  Yes.

L. Pitts - Direct

1  Q.  -- that it is the same or similar to the contract that

2  MFA uses for other staffing agencies?

3  A.  Correct.  Yes.

4  Q.  Okay.

5          MR. JEWETT:  Let's go back to Page 129.

6          THE COURT:  I will say this to you, Mr. Jewett:

7          Before you get into it, we're dealing with what is

8  written in this contract.  Whether it's similar to something

9  else makes no difference.  The question is, this is admitted

10 into evidence, and this is what we're dealing with, this

11 contract.

12         MR. JEWETT:  Thank you, Your Honor.  And I think

13 this is the last section of the contract that we'll be

14 looking at.

15         THE COURT:  In other words, its similarity to other

16 contracts is irrelevant.

17         MR. JEWETT:  Okay.

18 BY MR. JEWETT:

19 Q.  Ms. Pitts, let's look at paragraph 2 together.

20         Do you see that?

21 A.  Yes.

22 Q.  Paragraph 2 says that Steadfast will "assume sole and

23 exclusive responsibility for the payment of wages...to

24 temporary personnel for services performed at the healthcare

25 center to the extent temporary personnel are considered to be

L. Pitts - Direct

1   [Steadfast's] employees."

2          Do you see that?

3   A.  Hold on.  I think you skipped a line.  Wait a minute.

4          MS. LEWIS:  Your Honor, I'm going to object.  He

5   didn't read the full sentence.  The document speaks for

6   itself.  He skipped over the parentheses.  Completeness is my

7   objection.

8          THE COURT:  You can get back to that on

9   cross-examination.

10          MS. LEWIS:  Okay.

11          MR. JEWETT:  I'm just trying to summarize.

12          THE COURT:  We'll permit him to go through the

13   sections that he deems appropriate, and you go through the

14   sections you deem appropriate.

15   BY MR. JEWETT:

16   Q.  Do you see that there in paragraph 2 that I just read?

17   A.  Can you reread that for me, please.

18   Q.  I'll read the whole thing; the first sentence, that is.

19          It says that Steadfast will "assume sole and

20   exclusive responsibility for the payment of wages, including

21   overtime where applicable, to temporary personnel for

22   services performed at the healthcare center to the extent

23   temporary personnel are considered to be supplemental

24   staffing services' employees."

25          Did I read that accurately?

———— L. Pitts - Direct ————

1    A.  Yes.

2    Q.  Do you see that?

3    A.  Yes.

4    Q.  Let me draw your attention to paragraph 4 now.  I'm going

5    to read you the first sentence.  Paragraph 4 reads:

6            "Steadfast will assume sole and exclusive

7    responsibility for the payment of compensation to temporary

8    personnel for services performed at the healthcare center to

9    the extent temporary personnel are considered to be

10   independent contractors."

11           Do you see that?

12   A.  Yes.

13   Q.  So do you see that this contract contemplates that

14   temporary nurses may be considered either employees or

15   independent contractors of Steadfast?

16           MS. LEWIS:  Objection.  Calls for a legal

17   conclusion.

18           THE COURT:  Sustained.

19   BY MR. JEWETT:

20   Q.  Let me shift gears and ask you about the cancellation

21   policy.

22           You heard several nurses testify in this trial about

23   a two-hour cancellation policy.  Do you recall that?

24   A.  Yes.

25   Q.  Is that accurate?  There's a two-hour cancellation

L. Pitts - Direct

1    policy?

2    A.   Yes.

3    Q.   Okay.  And is that two-hour cancellation policy in

4    Steadfast's contracts, or the majority of the contracts?

5    A.   Correct, yes.

6    Q.   Why is that two-hour cancellation policy in the contract?

7    A.   Well, the facility -- the facility wanted enough time so

8    we could find someone else if somebody cancels.  If someone

9    cancels, they want enough time for us to find someone else,

10   even though two hours is not enough, but they wanted some

11   kind of clause in there.

12   Q.   Okay.  The last question I want to ask you about is about

13   the rate sheet.

14   A.   Uh-huh.

15   Q.   This is on Page 141 of PX-10.  This is -- I think this is

16   still part of the Princess Anne contract.

17          Can you see this okay?

18   A.   Yes.

19   Q.   Do you recognize this as the rate sheet for Steadfast and

20   Princess Anne?

21   A.   Yes.

22   Q.   Okay.  So there's three rates listed here:  RNs, 55 an

23   hour; LPNs, 40 an hour; CNAs, 25 an hour.

24          Do you negotiate these rates?

25   A.   Well, me and the facility negotiate the rates.  I submit

L. Pitts - Direct

1   them -- they tell me what they have been paying, what other

2   facilities charge, and I try to keep the rates there, and

3   sometimes they will mark them and say, hey, we need to go a

4   little lower.

5   Q.   Okay.  How is the rate ultimately determined in these

6   contracts?

7   A.   Between the facility and Steadfast.

8   Q.   And that's following a period of negotiation?

9   A.   Exactly.

10  Q.   The nurses don't take part in that?

11  A.   No.

12  Q.   So this particular rate sheet shows $55 an hour for RNs.

13          Is that what the nurse actually gets paid?

14  A.   No.  That's the bill rate.

15  Q.   That's the bill rate.  That is what Steadfast gets paid?

16  A.   Right.

17  Q.   So how does Steadfast get paid out of this?  What is its

18  cut, I guess?

19  A.   Well, if it's 55 an hour, usually the RNs are paid

20  anywhere from 40 to 45 an hour.

21  Q.   And what does Steadfast use that cut for?

22  A.   That's a processing fee.  That's for, you know, having

23  the office, processing payroll, someone we have to get to vet

24  all the nurses, extensive drug screen for corrections,

25  extensive background checks.  We have to pay people to do all

L. Pitts - Direct

1    that.

2    Q.   Okay.  So does Steadfast inform the nurses of the

3    contract rate or the actual rate they are going to make when

4    they are working at the facility?

5    A.   We give them their pay rate.

6    Q.   Their pay rate?

7    A.   Yes.

8    Q.   So in this example, not the 55, the 45 is what the nurse

9    sees?

10   A.   Exactly.

11   Q.   Have you ever had a nurse attempt to negotiate that rate?

12   A.   The rate that we tell them for the facility?

13   Q.   Yes.

14   A.   Yes.

15   Q.   So just to be clear, so if we're just sticking with the

16   $45-an-hour example, have you ever had a nurse attempt to

17   negotiate that rate?

18   A.   Yes, all the time.

19   Q.   Under what circumstances have you had nurses attempt to

20   negotiate the rate?

21   A.    If the facility is really, really bad.  The nursing homes

22   have a standard-of-care star, and some of these facilities

23   are bad, and the nurses are, like, "I can't go in there for

24   that.  I need more money."

25   Q.   Okay.  So if a nurse says that to you, "I'm not going to

L. Pitts - Direct

1    go there for that rate," what do you do with that
2    information?
3    A.   Sometimes I reach out to the facility and renegotiate the
4    bill rate, and if not, sometimes we just eat it.
5    Q.   Okay.  Do you recall some testimony earlier in this case
6    about late cancellations?
7    A.   Yes.
8    Q.   And I believe a few -- correct me if I'm wrong, but I
9    believe a few nurses testified that they can get a higher
10   rate if there's a last-minute cancellation.
11           Did I say that accurately?
12   A.   Yes.
13   Q.   Is that your experience too?
14   A.   Yes.
15   Q.   Okay.  Have you ever had a facility willing to negotiate
16   the rate for a nurse just because the nurse is really good at
17   what she does?
18   A.   Yes.
19   Q.   Okay.  I think we're done with that exhibit.
20           I want to shift gears, Ms. Pitts, to another topic
21   and ask you some questions about scheduling.
22   A.   Okay.
23   Q.   We'll go through this quickly.
24           At the beginning of your testimony, we looked at --
25   I don't recall the number now, but we looked at the database,

L. Pitts - Direct

1    the roster of nurses together.

2    A.   Right.

3    Q.   So once a nurse is actually on that roster --

4    A.   Correct.

5    Q.   -- how does the nurse go about getting scheduled for a

6    shift?

7            And I'm sorry.  That was kind of a big question.  I

8    realize that the company has now shifted to have the Zira

9    app.  So I want you to describe the process before the

10   company used the Zira app.

11           How would a nurse go about getting scheduled for a

12   shift before the company used the Zira app?

13   A.   Well, she would call to the office, or the schedulers

14   would reach out to her to get her availability -- he or she

15   availability.

16           And once they tell them their availability -- you

17   know, usually the facility will send over e-mails saying,

18   "Hey, we need all these nurses," blah, blah, blah; and we

19   reach out to the contractors and say, "Hey, look, these are

20   the facilities, and we need nurses for such and such.  What

21   is your availability?"  And they tell us which days they can

22   pick up.

23   Q.   Okay.  So does Steadfast -- does it provide the available

24   shifts to the nurses only once the facility provides the

25   available shifts to Steadfast?

———— L. Pitts - Direct————

```
 1    A.  Correct.

 2    Q.  Okay.  Let me zero in a little bit on your testimony

 3    about how the information flows to the nurses.

 4              Are there occasions where Steadfast will just --

 5    they will get a request for staffing from a facility --

 6    A.  Right.

 7    Q.  -- and Steadfast just sends a general blast to the whole

 8    database and says, "Hey, here's what's available.  Let us

 9    know if you can work"?

10    A.  Correct.  Yes.

11    Q.  Steadfast does that sometimes?

12    A.  Yes.

13    Q.  Let me show you two documents very quickly.  I think

14    these were premarked as Defendants' 58 and 59.

15              This is 58.  This is an e-mail -- well, do you

16    recognize this as an e-mail from your company?

17    A.  Yes.

18    Q.  And the names listed here, without going through all of

19    them, are these the nurses from your registry at this time?

20    A.  Correct, yes.

21              MR. JEWETT:  Can you please scroll down.

22    BY MR. JEWETT:

23    Q.  Have you seen the whole document?

24    A.  Yes.

25    Q.  Okay.  Was this e-mail sent to Steadfast's database in
```

L. Pitts - Direct

1   response to a request from a facility?

2   A.  Yes.

3              MR. JEWETT:  Your Honor, we move to admit DX-58.

4              THE COURT:  Any objection?

5              MS. LEWIS:  No objection, Your Honor.

6              THE COURT:  DX-58 will be admitted.

7              (Defendants' Exhibit DX-58 received in evidence.)

8              MR. JEWETT:  Can we please pull up the next

9   document.  This is DX-59.

10  BY MR. JEWETT:

11  Q.  Ms. Pitts, you are being shown what's been marked as

12  DX-59.  Do you recognize this e-mail as an e-mail coming from

13  Steadfast?

14  A.  Yes.

15  Q.  And is this a list of nurses on Steadfast's registry?

16  A.  Yes.

17             MR. JEWETT:  Can you please scroll down.

18  BY MR. JEWETT:

19  Q.  This e-mail refers to an "increase of crisis pay rates

20  for Citadel Salisbury in North Carolina."

21             Is that one of Steadfast's facility clients?

22  A.  Yes.

23  Q.  Was this e-mail sent out at the request -- strike that.

24             Was this e-mail sent out in response to the

25  facility's request for staffing?

948

─────── L. Pitts - Direct ───────

1  A.  Yes.

2          MR. JEWETT:  Your Honor, we move to admit DX-59.

3          THE COURT:  Any objection?

4          MS. LEWIS:  No objection.

5          THE COURT:  DX-59 will be admitted.

6          (Defendants' Exhibit DX-59 received in evidence.)

7  BY MR. JEWETT:

8  Q.  Okay.  So we've looked at a few examples, Ms. Pitts, of

9  larger blasts that went out to the database seeking available

10  nurses for shifts.

11          Are there circumstances where the schedulers kind of

12  zero in on a subgroup of nurses or a smaller group of

13  individuals to see if they are available for shifts?

14  A.  Well, we try to zero in on everybody; but, yes, we do

15  that.

16  Q.  Okay.  Under what situations does Steadfast, pre-Zira

17  days -- so pre-Zira days, under what situations did Steadfast

18  target a smaller group of nurses instead of sending out a

19  larger blast to the registry?

20  A.  Well, during -- well, you're talking about pre-COVID or

21  COVID?

22  Q.  Just, in general, during the relevant time period.

23  A.  Well, when a facility says they have a need and they need

24  a lot of nurses and they have a lot of needs at multiple

25  facilities the corporation owns, we send out e-mail blasts.

L. Pitts - Direct

1    Q.  But my question is -- I understand that.  Okay.  Thank

2    you.

3            But my question is:  When would the schedulers --

4    instead of sending out a large blast to the whole registry,

5    when would they look at the roster and start calling or

6    texting nurses to see who is available to take the shifts?

7    A.  Well, if no one is picking up the shifts that the

8    facility sends us --

9    Q.  I see.

10   A.  -- who is on it -- who is already on the schedule, we

11   reach out to the registry and just start calling people and

12   getting their availability.

13   Q.  I see.

14           Do nurses in your registry -- do they ever schedule

15   directly with the facility?

16   A.  Yes.

17   Q.  How is it that you know that?

18   A.  Because they usually, when they schedule -- when the

19   facility calls them and they pick up shifts with the

20   facility, they've already picked up shifts in another

21   building.  So it's double-booking.  So we have, like, that

22   nurse at two different places.

23   Q.  Okay.  Let me back up.

24           So when the nurse schedules directly with the

25   facility, does that ever cause issues for Steadfast?

L. Pitts - Direct

1  A.  Yes.

2  Q.  And what are those issues?

3  A.  Double-booking.

4  Q.  Double-booking.

5       Why is double-booking an issue?

6  A.  Because if she's already -- we already have -- say, for

7  example, we have her scheduled at Nansemond Pointe, and

8  Princess Anne calls her and says, "Hey, look, we need a nurse

9  this morning.  Can you help us out?"

10       And nine times out of ten -- I don't know how they

11  forget that they are already supposed to be working for

12  someone.  I don't know how that happens.  But then if she

13  goes to Princess Anne -- he or she goes to Princess Anne but

14  she is on Nansemond Pointe's schedule also, so Nansemond

15  Pointe is looking for her, but she's at another building

16  double-booking.

17  Q.  Let me ask you a few questions, just a few, about the

18  Zira app.

19       Steadfast is now scheduling through the Zira app; is

20  that correct?

21  A.  That's correct.

22       MR. JEWETT:  Can you please pull up DX-75.  This is

23  the next document in the list.

24  BY MR. JEWETT:

25  Q.  Now, Ms. Kim already testified about this, but do you

951

L. Pitts - Direct

 1   recognize this as screenshots of the Zira app that Steadfast

 2   uses?

 3   A.   Correct.

 4   Q.   Why did Steadfast change from this e-mail and

 5   calling-and-texting scheduling model to the Zira app model?

 6   A.   Double-booking.

 7   Q.   Okay.  Did the Zira app alleviate the double-booking

 8   problem?

 9   A.   Once we tweaked it, yes, it did.

10   Q.   Any other reason that Steadfast switched to the Zira app?

11   A.   It gives -- we don't have to send out individual e-mails,

12   and when you're doing Gmail, you're limited to how many

13   e-mails you can send out.  With Zira, we can just send out

14   one e-mail, and it goes out all over the country.

15   Q.   Has the Zira app resulted in less effort to get nurses

16   scheduled by your schedulers?

17   A.   Yes, it has.

18   Q.   Why is that?

19   A.   Because, you know, the nurses -- the nurses who get

20   picked up in the Zira app, who's already registered for the

21   Zira app, it just makes it easier for the facility to go in,

22   and they can text the nurses from the Zira app.  If they

23   click on the personal information, they can go in and call

24   the nurses.  Everything is right there for them.  It's like a

25   one-stop shop.

L. Pitts - Direct

1           Now, we have four buildings that's not in here, and
2      we're in the process of putting the rest of the buildings in
3      here.  So most of the facilities that now call to
4      troubleshoot, "Hey, I'm having trouble getting in here," we
5      tell them to reach out to the software guy.
6           And the girls in the call center kind of manage this
7      app saying, "Hey, you've got a bunch of people that want to
8      work in your building, and you need to check and confirm
9      them," or whatever.
10     Q.  Let me pull back on something that you just mentioned,
11     and I want to ask you this:
12          What percentage of the facilities Steadfast has
13     contracts with are using the Zira app for scheduling?
14     A.  All of them except four.
15     Q.  All except four.
16          So does Steadfast tell the nurses what shifts to
17     select in the Zira app?
18     A.  No.  No, we don't.
19     Q.  Does Steadfast tell the nurses what shifts they are
20     eligible for in the Zira app?
21     A.  No, we don't.
22     Q.  Once a nurse selects a shift in the Zira app, does
23     Steadfast go into the app to approve or decline the nurse
24     claiming the shift?
25     A.  Well, unless a facility calls us and lets us know --

L. Pitts - Direct

1    usually, you know, if we see a lot of people that sign up for
2    a shift and the facility is not getting back to them, I tell
3    the schedulers to reach out to them and figure out why they
4    are not, you know, confirming those girls' shifts.
5            Nine times out of ten, they are not in the office;
6    they can't access it on their phone.
7    Q.   Let me make sure I understand the testimony.
8            Are you saying that the times that a Steadfast
9    scheduler would go in and either accept or decline a shift,
10   is that when the facility has not gotten around to it?
11   A.   Or they are not in the building.
12   Q.   Okay.
13   A.   So what happens is, if they don't, they're going to lose
14   out, and the nurse is going to go pick up somewhere else.
15           MS. LEWIS:   Your Honor, I'm going to object to this
16   line of questioning with respect to what the facilities do
17   when they are in the app, their needs, et cetera.
18           Moreover, as previously admitted into testimony,
19   there were excerpts and counter-designations with respect to
20   the functionality of the Zira app, both designations by
21   plaintiff and defendants, regarding how the tool actually
22   functions.
23           So two objections:   One, it calls for speculation;
24   and then, secondly, it misstates prior evidence.
25           THE COURT:   What we can do here, Counsel, is to the

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1   extent that the questions that you ask are consistent with
2   what both parties have already determined in their discovery,
3   then I'll let you continue, but we don't need to have her
4   speculate to anything beyond what both parties have agreed
5   about how the app works.
6          MR. JEWETT:  Certainly.  I will ask one more
7   question and then move on.
8   BY MR. JEWETT:
9   Q.  In the Zira app, Ms. Pitts, are the facilities able to
10  log into the app to accept or decline nurses who have tried
11  to claim a shift?
12  A.  Yes.
13  Q.  Okay.  Now, I want to ask you some questions about what
14  happens once a nurse reports for duty at the facility.  Okay?
15          Before the nurse reports to the facility for her
16  shift, does she first report to Steadfast's office?
17  A.  No.
18  Q.  Under what circumstances do nurses come to Steadfast's
19  office?
20  A.  Well, they used to come -- local nurses would come and
21  see how they get on the registry or pick up a check.
22  Q.  Okay.  Now, do the nurses clock in with Steadfast once
23  they arrive at the healthcare facility?
24  A.  No.  Some facilities have a time clock there, and they
25  require our nurses to clock in and out at the facility.

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

```
1   Q.  If you know, is that like a Kronos system?
2   A.  It's really a tracking system for them, because they have
3   had a lot of theft with time.
4   Q.  Now, so the nurses don't clock in with Steadfast when
5   they start their shifts, but do they otherwise notify
6   Steadfast?  Do they call up and say, "Hey, I made it to my
7   shift"?
8   A.  No.
9   Q.  Okay.  So if the nurses don't notify Steadfast that
10  they've made it to their shift, how does Steadfast actually
11  know if a nurse has shown up to work?
12  A.  We'll get the time sheet, or the facility will call and
13  say, "I just tried to reach out to so-and-so.  We can't reach
14  her.  Can you give her a call?"
15  Q.  I'm going to go through a few additional questions about
16  working at the facility.
17          Once the nurse is at the facility filling a shift,
18  does Steadfast send a representative to the facility to
19  monitor the nurse's work?
20  A.  No.
21  Q.  What about just to check in to see how the nurses are
22  performing?
23  A.  No.
24  Q.  Does Steadfast ever check in with the facility clients
25  while the nurses are performing work to see if things are
```

956

L. Pitts - Direct

1   going smoothly?

2   A.   No.

3   Q.   So how does Steadfast, then, monitor the nurse's

4   performance?

5   A.   We can't.

6   Q.   You don't provide performance evaluations?

7   A.   No.

8   Q.   What about critical feedback on performance?

9   A.   No.

10  Q.   Okay.  What about just questions about the work?  Do you

11  ever receive calls from a nurse, while she is or he is

12  nursing at a facility, with questions about how to do

13  something?

14  A.   No.

15  Q.   Do you recall, in the earlier parts of this trial,

16  several nurses testifying that you had removed them from

17  their schedule?

18  A.   Yes, I remember.

19  Q.   Okay.  Is it true that you remove nurses from the

20  schedule?

21  A.   Only if the facility tells me to.

22  Q.   Okay.  Do you ever receive -- well, let me go back to

23  that.

24        Do you remove nurses from the schedule if the

25  facility doesn't tell you to?

L. Pitts - Direct

```
 1   A.  No.
 2   Q.  Do you ever receive e-mails from a facility instructing
 3   Steadfast to remove a nurse from the schedule?
 4   A.  Yes.
 5   Q.  Okay.
 6           MR. JEWETT:  Can you please pull up the next
 7   document.
 8   BY MR. JEWETT:
 9   Q.  This is an e-mail from Jessica Sledge at Accordius
10   Courtland --
11           MS. LEWIS:  Your Honor, I'm going to object again to
12   this document.  Once again, there's no Bates stamp number.
13   It was not produced in discovery.
14           THE COURT:  Is this another document in her e-mails?
15           MR. JEWETT:  It is.  It is a document, Your Honor,
16   under 608, offered to provide contradiction, which it's our
17   understanding is permitted under the rules, based on specific
18   testimony in the trial earlier in the case.
19           THE COURT:  Are we going over the same thing we went
20   over before where they made a request for production of
21   documents with respect to the performance, agreements,
22   et cetera, et cetera, and this came out of her e-mails, but
23   it was not in the personnel file?
24           Just answer that.  Is that what we have?
25           MR. JEWETT:  Yes, because they don't keep --
```

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1          THE COURT:  Is this another document --

2          MR. JEWETT:  Yes, because they don't keep personnel

3   files on the nurses, Your Honor.

4          THE COURT:  So you didn't produce, based upon those

5   requests for production, any documents out of Ms. Pitts'

6   files?

7          MR. JEWETT:  We did.  We did, Your Honor, and we

8   have produced -- I don't want to exaggerate the number, but

9   it's close to hundreds of thousands of documents in this

10  case.  We've had countless conferral sessions.  Judge Leonard

11  had to get involved.  He narrowed the scope of the requests.

12         THE COURT:  You didn't produce anything out of her

13  e-mails.  Is that it?

14         MR. JEWETT:  Yes, we did.

15         THE COURT:  How did you miss this one?

16         MR. JEWETT:  I need to confer with Ms. Rust on this,

17  because she was really -- it was not responsive to any

18  particular request.

19         MS. LEWIS:  Your Honor, I'd be happy to continue to

20  read the requests.

21         THE COURT:  Wait a minute.  Are you getting ready to

22  read the same three requests for production you previously

23  read?

24         MS. LEWIS:  Well, there's more.  This one could,

25  likewise, be responsive to other ones.  The answer of

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    "nonresponsive" is too cute to pass muster, Your Honor.

2           This request was clearly within the request for

3    production of documents.  It asked for -- I'm going to go

4    to -- let me use, for example, request for production

5    number 14.

6           "All documents that refer or relate to the

7    instructions, policies and procedures, or guidelines that any

8    individuals listed in Schedule A were required or recommended

9    to follow in performing any job tasks, assignments, duties,

10   or functions during the relevant period."

11          Request for production number 15:

12          "All manuals, handbooks, memorandums, or other

13   documentation provided by Steadfast to any individual listed

14   in Schedule A during the relevant period of time."

15          Your Honor, these document requests, whether you

16   could say that they are responsive to a personnel file or

17   otherwise, it covers the gambit.  So to say that it's

18   nonresponsive -- all of these documents that have been

19   presented to the Court clearly are responsive to some

20   document request.

21          THE COURT:  Is there a particular reason the e-mails

22   of Ms. Pitts pertaining to matters involving the execution

23   and the performance of Steadfast contracts and relationships

24   with the facilities were not provided?  You said they were

25   nonresponsive?

L. Pitts - Direct

1          MR. JEWETT:  The request -- I did not hear the

2    second request.  The one I heard was a request for policies

3    and procedures.  That does not encompass e-mails.

4          And, Your Honor, I will just say, there have been

5    scores and scores of hours of phone calls between counsel in

6    this case.  It was a very difficult discovery process, and

7    there are many letters that narrow in the finest scope of

8    these requests.  There's no --

9          THE COURT:  Let me tell you something.

10         MR. JEWETT:  Yes, sir.

11         THE COURT:  It's very unusual to the Court that

12   Ms. Pitts was sued in an individual capacity.  She's the

13   owner of the company.  So any documents or any e-mails that

14   she has, it's very unlikely that they would not be something

15   that you would be producing, Mr. Jewett.

16         MR. JEWETT:  Okay.  I understand the Court's

17   concern.  This is her business e-mail, Your Honor.  This is

18   not her personal e-mail.  The business uses a Gmail account.

19         THE COURT:  It's her business e-mail?

20         MR. JEWETT:  Yes, sir.

21         THE COURT:  And we're talking about her business

22   here, right?

23         MR. JEWETT:  Yes.

24         THE COURT:  This lawsuit is against her business as

25   well as her.

L. Pitts - Direct

```
 1          MR. JEWETT:  Yes.
 2          THE COURT:  I'm not going any further.  Objection
 3  sustained.  This e-mail is out.
 4          MR. JEWETT:  Okay.
 5          THE COURT:  Don't produce another one out of her
 6  e-mails if you haven't turned it over, Mr. Jewett.
 7          MR. JEWETT:  Understood, Your Honor.
 8  BY MR. JEWETT:
 9  Q.  Ms. Pitts, I want to circle back to your testimony.  I
10  believe you said that the only circumstance that you remove a
11  nurse from a schedule is if requested by the facility.
12          Is that what you said?
13  A.  Yes.
14  Q.  Okay.  How often does Steadfast receive these sort of
15  requests -- I'm going to call them do-not-return requests, or
16  DNR requests.
17          How often does Steadfast receive a DNR request from
18  a facility?
19  A.  Every day, all day.
20  Q.  Every day, all day.  Okay.
21          What are some circumstances where Steadfast has
22  received a DNR request based on information provided by the
23  facility?
24          Let me be more specific.
25          What I'm asking is, is the facility reporting to
```

L. Pitts - Direct

1    Steadfast that, for example, somebody is a no call/no show?

2    A.  Yes.

3    Q.  So can you give the Court some examples of the sort of

4    things that the facilities notify Steadfast about that causes

5    them to give Steadfast a DNR request?

6    A.  No call/no shows; if the nurse shows up at the facility,

7    doesn't like the assignment and walks out, they DNR them;

8    neglect; abuse; fighting; sleeping in patients' beds.

9    Q.  These would be at long-term facilities?

10   A.  Yeah.

11   Q.  What about purported intoxication?

12   A.  All the time.

13   Q.  So when Steadfast receives a DNR request like this, what

14   is Steadfast's general practice when it receives one of these

15   DNR notifications from a facility?

16   A.  Usually we would tell the nurses, say, "You need to call

17   the facility.  Evidently you had an issue with them.  DON is

18   taking you off."

19        We used to tell them why, but it was so

20   controversial, you know, the arguments back and forth.  And

21   we weren't there.  We tell them to call the facility.  "Call

22   the facility."

23   Q.  Does Steadfast have the right to challenge the facility's

24   determination to DNR a nurse?

25   A.  No.  That's the company's right.  We signed a contract.

L. Pitts - Direct

1    It's their right to tell us that they can't have someone
2    there.  It's their right to tell us not to bring them in.
3    Q.  Okay.  After a DNR has been issued for a nurse, does the
4    facility refuse the nurse from all future shifts?
5    A.  Yes.  Depends on how extent it is.
6           Like, if you go in there intoxicated or you're
7    sleeping or fighting, they'll do that, and usually the police
8    gets involved, if they go in there intoxicated or fighting.
9    So, yes.
10   Q.  Just to be clear, say a nurse had signed up for a
11   three-week stint, or gig or shift that lasts three weeks with
12   a facility, and the facility DNRs the nurse after the first
13   week.  Does the facility cancel the remaining shifts for the
14   next two weeks?
15   A.  Depends on what it is.  Depends on --
16   Q.  You've seen that happen, though?
17   A.  Yes, it happens.
18   Q.  Let me just start over, and I'll try not to interrupt you
19   anymore.  I'm sorry about that.
20          So my question is:
21          Say a nurse signed up for a three-week-long
22   assignment with a facility and then the facility DNRs the
23   nurse after the first week.  Okay?  Does the facility cancel
24   the remaining two weeks of the nurse's assignment after it
25   issued that DNR?

L. Pitts - Direct

1    A.  More likely they do.  It depends on if it was something

2    involving fighting or drugs or sleeping or abuse.  Some

3    barrier crimes, they will.

4            THE COURT:  You realize that there are two things

5    wrong with that whole exchange:  Number one, it's a

6    hypothetical; number two, it calls for speculation.

7            MR. JEWETT:  Okay.  Noted, Your Honor.

8    BY MR. JEWETT:

9    Q.  You talked about this briefly.

10           I believe you said when Steadfast receives a DNR

11   notification from the facility, you generally communicate

12   that to the nurse.

13   A.  Yes.

14   Q.  Okay.  What does Steadfast do to the nurse once the nurse

15   is DNR'd?

16   A.  Depends on if it's a barrier crime.  If it's a barrier

17   crime, we can't put them back on the schedule until

18   everything is resolved.  But if it's something dealing with

19   personality conflicts, which we have all the time, we will

20   just move them to another building.

21   Q.  Does Steadfast remove the nurse from its registry when a

22   nurse is DNR'd from a facility?

23   A.  No.

24   Q.  Does Steadfast -- did you say something?

25   A.  No.

L. Pitts - Direct

1    Q.  Does Steadfast make the nurse sit out from its registry

2    for a period of time, like a few weeks, once a nurse receives

3    a DNR from a facility?

4    A.  No.

5    Q.  Does Steadfast allow a DNR'd nurse to take shifts at

6    another facility?

7    A.  Depends on if it's a barrier crime.  If it's alcohol or

8    something like that, we have to wait, because usually the

9    Board of Nursing is involved.

10   Q.  I see.

11       When a nurse is DNR'd, does Steadfast then go tell

12   all the other facilities that that nurse has been DNR'd by

13   this particular facility?

14   A.  No.

15   Q.  I want to ask you a couple questions about Dixie

16   DeLutis's testimony today.

17       Do you recall that?

18   A.  Yes.

19   Q.  I believe she testified that she was involved in a

20   three-way conversation with you and Ms. Smith.

21   A.  Yes.

22   Q.  Without getting back into that story, what did you do in

23   response to the phone call that you received from

24   Ms. Smith -- I'm sorry -- from Ms. DeLutis?

25   A.  Well, we told Chantella that she had to go get a drug

L. Pitts - Direct

1    screen before she reported back into the building.

2    Q.   Did Ms. Smith -- did she provide a drug screen to

3    Steadfast for that?

4    A.   No.

5            MR. JEWETT:  Your Honor, I want to be sensitive to

6    the Court's typical schedule.  I was about to move on to a

7    new topic.  Would you like me to do that?

8            THE COURT:  Well, it depends on how long the topic

9    is.  How many questions on the topic?

10           MR. JEWETT:  Well --

11           THE COURT:  If it's a prolonged series of questions,

12   we'll quit right here.

13           MR. JEWETT:  Yeah, I'm about to get into -- I'm just

14   looking at my outline, Your Honor.

15           THE COURT:  Tell you what, we'll just stop right

16   here and come back at 2:30 to finish this witness.  We'll

17   come back at 2:30 to finish your direct on this witness.

18           MR. JEWETT:  Yes, sir.

19           THE COURT:  During this break, Ms. Pitts, you're

20   still under examination.

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Counsel, you know what that means.

23           MR. JEWETT:  We won't talk to her.

24           THE COURT:  All right.  Recess court until 2:30 p.m.

25           (Recess at 12:55 p.m. to 2:38 p.m.)

Carol L. Naughton, Official Court Reporter

─────────────── L. Pitts - Direct ───────────────

```
 1          THE COURT:  Okay.  You may resume your cross --
 2   first, Ms. Pitts, do you want to come back to the stand?
 3          (The witness resumed the stand.)
 4          THE COURT:  You may resume.
 5          MR. JEWETT:  Thank you.
 6   BY MR. JEWETT:
 7   Q.  Ms. Pitts, I want to ask you a couple of questions about
 8   Roxanne Adams.
 9          How are you familiar with her?
10   A.  She was one of the nurses on the registry.
11   Q.  Did you have a personal relationship with her outside of
12   work?
13   A.  Yes.
14   Q.  Okay.  Do you know her family?
15   A.  Yes.
16   Q.  And where does she work now?
17   A.  Essential Medical Staffing.
18   Q.  Do you recall the name of the position she said she has
19   at that company?
20   A.  She said she was a finance manager.
21   Q.  Do you recall her testifying in the court that she had
22   been investigated by the Department of Labor in this case?
23   A.  Yes.
24   Q.  And then you saw her come to testify for the Department
25   of Labor last week.
```

L. Pitts - Direct

```
1              Do you recall that?

2    A.  Yes.

3    Q.  And do you recall that she testified that she does not

4    have a financial interest in Essential Medical Staffing?

5    A.  Yes.

6    Q.  Do you know who Troy Meads is?

7    A.  Yes.

8    Q.  Who is Troy Meads?

9    A.  Her husband.

10             MS. LEWIS:  Your Honor, before we get too far down

11   this line, I object to the relevance of her husband.

12             THE COURT:  So where are we going with this,

13   Mr. Jewett?

14             MR. JEWETT:  This is impeachment by contradiction

15   under Rule 608.

16             THE COURT:  Wait a minute now.

17             You keep citing Rule 608.  She said that she had no

18   interest in it, so you're going to impeach her by saying her

19   husband had an interest?

20             MR. JEWETT:  We're going to show the State

21   Corporation Commission document, which, of course, is

22   authenticated, showing that her husband formed and organized

23   the company, according to the records for the State

24   Corporation Commission.

25             THE COURT:  It doesn't show she has any interest,
```

1    does it?

2           MR. JEWETT:  Well, Ms. Pitts testified that she is

3    married to Mr. Meads.

4           THE COURT:  She made the statement "I do not have an

5    interest in it."  You think this contradicts it?

6           MR. JEWETT:  I do, Your Honor, because she's married

7    to Troy Meads.  And I would take the position that she was

8    not forthcoming when she was asked repeatedly by Ms. Rust

9    whether she had a financial interest in this company.

10          THE COURT:  Well, she didn't ask her, "Does your

11   husband have a financial interest in it?"

12          MS. LEWIS:  Moreover, Your Honor, we re-assert the

13   objection with respect to relevance, but I can dig back into

14   my domestic relations background.  There could be all sorts

15   of documents that divest her of any sort of interest in the

16   company.

17          MR. JEWETT:  It could also come in under the bias

18   clause for 608 too.  Contradiction or bias is a --

19          THE COURT:  What is the bias?  What are you driving

20   at, anyway, about the Essential Medical?  What is the

21   relevance of that to whether Ms. Pitts and Steadfast violated

22   the Fair Labor Standards Act?

23          MR. JEWETT:  Ms. Adams came into court, after

24   signing two sworn statements in this case, after being

25   investigated by the Department of Labor, and then she

1    testified that she had essentially settled up with them, and

2    then she shows up into court as their witness, and then she's

3    asked if she has a financial interest in this company, and

4    she says, "No, I don't."  And it turns out her husband owns

5    the company.  I think that shows bias, and it is,

6    respectfully, we believe, an appropriate way to impeach a

7    witness.

8            THE COURT:  You have not answered the Court's

9    question.

10           What does that have to do with the bias that you're

11   trying to show?

12           MR. JEWETT:  It is the -- it was impeaching the bias

13   of a single witness in this case out of a course of many

14   witnesses.

15           THE COURT:  You still haven't answered my question.

16           What does Essential Medical have to do with whether

17   the defendants in this case, Steadfast and Ms. Pitts,

18   violated the Fair Labor Standards Act?  What does that have

19   to do with it?

20           MR. JEWETT:  They have -- I agree with you, Your

21   Honor; their practices have nothing to do with Steadfast's

22   practices.  But it does show that a particular witness, who

23   testified very negatively against Steadfast, came in here

24   with a bias and that she was not forthcoming with the Court.

25           THE COURT:  It still doesn't answer the Court's

─────L. Pitts - Direct─────

1   question.

2           Objection sustained.  I gave you a couple of chances

3   to tell the Court how it was relevant, and you didn't answer

4   it.

5           MR. JEWETT:  Well, Your Honor, I agree with the

6   Court that it's not -- okay.

7   BY MR. JEWETT:

8   Q.  Ms. Pitts, when Ms. Lewis called you as a witness, do you

9   recall being shown a series of memos that you had authored?

10  A.  Yes.

11  Q.  Okay.  And my acoustics aren't real great over here.

12  Would you mind getting a little closer to the microphone so I

13  can hear you.

14  A.  I said "yes."

15          MR. JEWETT:  Pull up the 13th document.

16          And, Your Honor, this particular document was

17  previously marked as Defendants' 42 in the Joint Pretrial.

18  BY MR. JEWETT:

19  Q.  Before I ask you about this particular document,

20  Ms. Pitts, let me ask you this:

21          Speaking generally about your practices, under what

22  circumstances have you sent out memos to nurses?

23  A.  On request of the facilities.

24  Q.  So let's look at this first one.  This is DX-42.

25          Okay.  This is your signature?  Did you send this

———— L. Pitts - Direct ————

1   memo?

2   A.   Yes.

3   Q.   Do you recognize this memo?

4   A.   Yes.

5   Q.   Why did you send this memo reminding the nurses to be on

6   time for their shifts?

7   A.   Because I received correspondence from the facility

8   stating "Can you please relay to the nurses they need to be

9   on time."

10          MS. LEWIS:  Your Honor, I'm going to object with

11   respect to best evidence in terms of she's representing --

12   this is being presented for the truth of the matter asserted.

13   The best evidence is this memo here.  Likewise, the direction

14   of the memo that she received from the facility, we don't

15   have an opportunity, nor do we know which facility allegedly

16   gave her this direction.  It's speculation, hearsay, and best

17   evidence.

18          MR. JEWETT:  I think we had this conversation

19   earlier.  It's not hearsay because the question is not being

20   presented for the truth of the matter.  It gets into why she

21   did what she did.  And these kinds of questions are very

22   common in employment cases.

23          THE COURT:  It goes exactly to the truth of the

24   matter asserted.  Why she did what she did, the Court wants a

25   truthful response of why she did it.  I mean, if you're just

L. Pitts - Direct

1   saying it's not for the truth of the matter asserted, then

2   nothing needs to come into evidence.

3          What we do need is we need the truth of why she sent

4   it out, because this goes to the question of how much

5   involvement she has, how much control she has over these

6   nurses.  So we need a truthful response to this.

7          So is there another reason you're submitting this?

8          MR. JEWETT:  Yeah.  And I agree with that, Your

9   Honor, and maybe my question wasn't very clear.

10         THE COURT:  Okay.

11  BY MR. JEWETT:

12  Q.  Ms. Pitts, why did you circulate this memo?

13  A.  Because the facilities called me and sent an e-mail and

14  said, "Ms. Pitts, can you send something out so the nurses

15  can be on time," because nurses were showing up late to the

16  facilities.

17         THE COURT:  What facilities?  All the facilities?

18  You deal with a lot of them.  Which facilities?

19  BY MR. JEWETT:

20  Q.  Do you recall, Ms. Pitts, this is -- let me just point

21  you to the date here to help give you a frame of reference.

22         The memo is dated March 2017.

23         Do you recall which particular facility gave you

24  this request?

25  A.  It was several facilities.  I have to think of the main

L. Pitts - Direct

1   one who started it.

2   Q.  Okay.  Take your time.

3           MS. LEWIS:  Your Honor, again, this is hearsay.  Why

4   or who directed her to do that, that's not answering the

5   question.

6           THE COURT:  It's not hearsay for her to say "I sent

7   it out."  It's hearsay for her to say "I sent it out because

8   John Jones of such-and-such facility said the nurses were" --

9   then it's hearsay.  But for her to testify "I sent this out

10  for concerns that nurses were being late," that would not be

11  hearsay.

12          Now, if she cannot name who told her to send it out,

13  it simply goes to the weight of it, the weight of the

14  document.  In terms of the Court measuring the credibility,

15  it goes to the weight.

16          MS. LEWIS:  Understood.

17          THE COURT:  You can cross-examine her on it further

18  when you stand up, but it goes to the weight.

19          It doesn't carry very much weight, Mr. Jewett, if

20  she can't even remember who told her to send it out.

21  BY MR. JEWETT:

22  Q.  Let me ask the question again.  Maybe you've had a chance

23  to think about it.

24          This memo is dated March 2017.

25          Do you recall which facility or facilities had

L. Pitts - Direct

1  approached you about this issue?

2  A.  I think it was Avante healthcare systems.

3          THE COURT:  If you don't know, you don't speculate.

4  I tell witnesses that all the time.  "I think."  Okay?

5          MR. JEWETT:  Understood, Your Honor.

6          Brief moment, Your Honor, to confer with counsel.

7          (Pause in the proceedings.)

8          MR. JEWETT:  Can you please pull up the next

9  document.  This is DX-44, Defendants' 44.

10  BY MR. JEWETT:

11  Q.  Ms. Pitts, do you recognize this document?

12  A.  Yes.

13  Q.  That's your signature on it?

14  A.  Yes.

15  Q.  Okay.  This document says "No sleeping in the residents'

16  rooms.  Some residents have a camera in the room."

17          Without talking about what was told to you, do you

18  recall why you sent this memo?

19  A.  Yes.

20  Q.  Why did you send this memo?

21  A.  Because Armor Corrections and Nansemond Pointe were

22  having issues with our staff sleeping in the resident's room.

23  Q.  Let's go to the next one.  This is Defendants' 46.  This

24  is a memo dated January 27th, 2017.

25          That's your signature on it?

─────────── L. Pitts - Direct ───────────

1   A.  Yes.

2   Q.  Okay.  This memo says "Humility goes a long way.  Please

3   be on time for all shifts."

4        Do you recall why you sent this memo?

5   A.  Yes.

6   Q.  Why did you send this memo?

7   A.  Because Avante healthcare systems, they were having

8   trouble with our nurses being on time in their facilities,

9   and they asked me to send something out to the nurses because

10  they had spoken to them and it's not working.

11  Q.  Okay.  Let's go to Defendants' 52.  This is the

12  "no smoking" one.

13       THE COURT:  While we're doing this, what was the

14  first exhibit?  I had 42.  What was the first one we talked

15  about, about being on time?

16       MR. JEWETT:  That was Defendants' 42, and I failed

17  to move to admit it.  I will say, there is some overlap

18  between these memos, and then the Department had a whole

19  category of them.

20       I think, for completeness, I would ask that

21  Defendants' 42, 44, and 46 be admitted.

22       MS. LEWIS:  Just as a housekeeping matter, we didn't

23  admit those prior ones, so no overlap.  And no objection to

24  any of these memos; 42, 44, 52, and whatever other memos he

25  wants to move to admit.

L. Pitts - Direct

1           THE COURT:  42, 44, 46, 52, you want all those
2    admitted?
3           MR. JEWETT:  42, 44, and 46, so far, and then the
4    next one we just pulled up is 52.
5           THE COURT:  All right.
6           (Defendants' Exhibit DX-42, DX-44, and DX-46 were
7    received in evidence.)
8    BY MR. JEWETT:
9    Q.  Ms. Pitts, showing you this memo, this is a memo dated
10   from August 2016.  It says -- well, your name isn't on this.
11          Did you send this memo, or did somebody else?
12   A.  I can't recall.
13   Q.  Okay.  All right.  Well, then, if you can't recall, I
14   won't ask you about it.
15          MR. JEWETT:  Let's go to Defendants' 41.
16   BY MR. JEWETT:
17   Q.  Okay.  Is that your signature on Defendants' 41?
18   A.  Yes.
19   Q.  Dated 6/26/2017.
20          All right.  The memo reads:
21          "When you are working at Atlantic Shores private
22   duty, please be advised:  Leave your badge in your car.  If
23   you are asked who you work for, please let them know you are
24   contracted through Atlantic Shores, and your supervisor is
25   LaShawn."

─────────── L. Pitts - Direct ───────────

1          Did you send this memo?

2    A.  Yes, I did.

3    Q.  Why did you send this memo?

4    A.  Because Atlantic Shores Retirement center is where a lot

5    of wealthy clients live at, and the administrator there told

6    me she didn't want her clients --

7          THE COURT:  Wait a minute.

8    BY MR. JEWETT:

9    Q.  Wait a minute.  We're getting into hearsay.

10          THE COURT:  Sustained.

11   BY MR. JEWETT:

12   Q.  Just to adhere to the Court's instructions --

13   A.  Okay.

14   Q.  -- the question is "Why did you send it?"  And maybe I

15   need to ask this:

16          Did Atlantic Shores request that you send this memo?

17   A.  Yes.  LaShawn did.

18   Q.  Okay.

19          MR. JEWETT:  Move to admit Defendants' 41.

20          MS. LEWIS:  No objection.

21          THE COURT:  It will be admitted.

22          (Defendants' Exhibit DX-41 received in evidence.)

23   BY MR. JEWETT:

24   Q.  And the last one is Defendants' 50.  Well, it looks like

25   this was sent by Catherine Martinez.

─────────────L. Pitts - Direct─────────────

1          Did Ms. Martinez work for Steadfast during this time

2     period?

3     A.  Yes.  She was my receptionist.

4     Q.  She was a receptionist.  Okay.

5          The memo is dated 11/4/2016.

6          Did you instruct Ms. Martinez to send this memo?

7     A.  Yes, I did.

8     Q.  Why did you instruct Ms. Martinez to send this memo?

9     A.  Because it was a holiday, and EDP cuts off their holiday

10    pay cycle and was trying to get everybody to get all of their

11    time sheets in and everything so we could get enough time to

12    enter payroll.

13          MR. JEWETT:  We move to admit Defendants' 50.

14          THE COURT:  Any objection?

15          MS. LEWIS:  No objection.

16          THE COURT:  It will be admitted.

17          (Defendants' Exhibit DX-50 received in evidence.)

18    BY MR. JEWETT:

19    Q.  Ms. Pitts, has Steadfast ever reported a nurse in its

20    registry to the Board of Nursing?

21    A.  No, we haven't directly.

22    Q.  Has Steadfast ever received inquiries from the Board of

23    Nursing about a nurse in its registry?

24    A.  Yes.

25    Q.  Okay.  What does Steadfast do in response to these Board

L. Pitts - Direct

1  of Nursing inquiries?

2  A.  We cooperate.

3  Q.  Has Steadfast ever terminated a nurse?

4  A.  No, we haven't.

5  Q.  Has Steadfast ever removed a nurse from its registry,

6  that database we looked at?

7  A.  Yes.

8  Q.  Okay.  What are some circumstances where Steadfast has

9  removed a nurse from its database?

10 A.  Well, one of the reasons, if your credentials -- if your

11 nursing license has expired.  And you have so many months to

12 reinstate your license, and if you don't, we can't keep you

13 on the registry because you can't go in the facilities.

14 Q.  Okay.

15 A.  And number two --

16 Q.  Oh, I'm sorry.  You have a second reason.  Go ahead.

17 A.  There's a second reason.  If the Board of Nursing

18 reprimands them or deals with them on an issue, we -- and

19 they are found guilty, I have to take them off the registry.

20 Q.  Okay.

21        MR. JEWETT:  Can you go back to PX-26.  And then

22 when you pull it up, can you scroll down to the Independent

23 Contractor Agreement.

24 BY MR. JEWETT:

25 Q.  Ms. Pitts, you're looking at Plaintiff's Exhibit 26,

—————L. Pitts - Direct—————

1   Page 12.

2          Do you recognize the first page of this document as

3   a copy of one of the Independent Contractor Agreements that

4   your company has used?

5   A.   Yes.

6   Q.   Can you please turn to Page 3, paragraph 8.

7          Do you see in paragraph 8 where it says

8   "Noncompetition"?

9   A.   Correct.

10  Q.   Does Steadfast enforce this noncompete?

11  A.   No.

12  Q.   Who are Steadfast's competitors?

13  A.   Other staffing agencies.

14  Q.   Do you remember Peyton Lex testifying earlier in this

15  case?

16  A.   (Inaudible response.)

17  Q.   Do you recall him saying that his company and your

18  company share nurses?

19  A.   Yes.

20  Q.   Is that accurate?

21  A.   Yes.

22  Q.   Outside of Mr. Lex's company, are you aware of nurses who

23  work for other staffing agencies?

24  A.   Yes.

25  Q.   Okay.  Have you ever sent a notice or called a nurse when

L. Pitts - Direct

1    you found out she was working for one of Steadfast's
2    competitors and said, "Hey, you have a noncompete here"?
3    A.   No.
4    Q.   Does Steadfast's Independent Contractor Agreement -- does
5    it still contain this noncompete language?
6    A.   I'm not sure.
7    Q.   Okay.  I believe we also heard some nurses testify in the
8    trial in this case that they also have jobs with healthcare
9    facilities.
10            Do you recall hearing that?
11   A.   Yes.
12   Q.   Is that accurate?
13   A.   Yes.
14   Q.   Okay.  Let me shift to a new topic on you.  I want to ask
15   you some questions about your decision to continue
16   classifying the nurses as independent contractors after the
17   Department of Labor initiated its investigation in this case.
18   Okay?
19   A.   Okay.
20   Q.   Okay.  After the Department of Labor initiated this case,
21   did you consult with an attorney?
22   A.   Yes.
23   Q.   Who was that?
24   A.   John Bredehoft.
25   Q.   After the Department of Labor filed this case, did you

L. Pitts - Direct

1   rely on Mr. Bredehoft's advice to continue classifying nurses

2   as independent contractors?

3   A.  Yes, I did.

4   Q.  Okay.  Before you -- well, I shouldn't assume that.

5            Did you actually meet with Mr. Bredehoft?

6   A.  Yes, I did.

7   Q.  Okay.  Before you met with Mr. Bredehoft, did you do any

8   research on him or check on his credentials?

9   A.  Yes, I did.

10  Q.  What did you find?

11  A.  He was an attorney who deals with the labor board and

12  labor board issues.

13  Q.  And approximately when was it that you sought

14  Mr. Bredehoft's advice?

15  A.  2018, I think it was.

16  Q.  And how many total times did you meet with him?

17  A.  About three times.

18  Q.  Okay.  Were these in-person meetings?

19  A.  One was over the phone, when I first talked to him.

20  Q.  Okay.

21  A.  And then the other two were in person.

22  Q.  Okay.  And let's talk about, I guess, the first in-person

23  meeting.

24           How long did that first in-person meeting last?

25  A.  Maybe about an hour.

L. Pitts - Direct

1  Q.  What did Mr. Bredehoft tell you in that meeting about the
2  classification of nurses on your registry?
3          THE COURT:  Wait a minute, now.
4          Are you going to ask her basically for hearsay about
5  what the attorney told her?
6          MR. JEWETT:  Excuse me, Your Honor?
7          THE COURT:  Are you going to ask her for hearsay
8  about what the attorney said to her?  That's what you're
9  doing.
10          MR. JEWETT:  Well, it gets into the reasonableness
11  of her belief.
12          THE COURT:  Well, it's still hearsay.
13          MR. JEWETT:  Okay.  Mr. Bredehoft is a witness in
14  this case.  We could ask him those questions.
15          THE COURT:  Well, then, you ask him the questions,
16  but she's not going to testify "he said," "she said," "she
17  said."  That is just outright hearsay.
18          MR. JEWETT:  Understood, Your Honor.
19          THE COURT:  You can formulate the question to avoid
20  the hearsay.
21          MR. JEWETT:  Sure.
22  BY MR. JEWETT:
23  Q.  In the meeting with Mr. Bredehoft, did he go through any
24  documents with you?
25  A.  Yes.

L. Pitts - Direct

1    Q.   Did he go through, like, any factors with you?

2    A.   Yes.

3    Q.   Now, the Department of Labor filed a second lawsuit in

4    this case against your company and you in October 2019.

5         Do you recall that?

6    A.   Yes.

7    Q.   And I'll refer to the second lawsuit as "Steadfast II."

8         Okay?  Does that make sense?

9    A.   Okay.

10   Q.   Okay.  Did you rely on Mr. Bredehoft's advice in your

11   decision to continue classifying nurses as independent

12   contractors after the Department of Labor filed Steadfast II?

13   A.   Yes.

14   Q.   After the Department of Labor filed -- initiated this

15   case against you, did you review any publications or memos

16   from the Department of Labor?

17   A.   Yes.

18        MR. JEWETT:  Can you pull up Defendants' 64.

19   BY MR. JEWETT:

20   Q.   I need to finish the question, actually.

21        Did you rely on any publications or memos from the

22   Department of Labor as part of your decision to continue

23   classifying nurses as independent contractors?

24   A.   Yes.

25   Q.   Okay.

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1          MS. LEWIS:  Your Honor, I'm going to raise an

2     objection with respect to this exhibit.

3          Within the final pretrial conference, the Department

4     asserted the objections relevance, confusion, and hearsay

5     with respect to this document.  The Court at that time

6     deferred ruling on our objections to the same.

7          THE COURT:  What is your specific objection?  First

8     of all, what document is he about to show the witness?

9          MS. LEWIS:  Defendants' 64 is a Field Assistance

10    Bulletin dated 2018-4.  For shorthand, call them FABs within

11    the Department of Labor.  And it provides sort of -- there's

12    a prompt, and then the Department of Labor provides

13    information based upon the Department's interpretations of

14    its own regulations.

15         This document as a whole, Your Honor, in terms of

16    relevance, it predates these violations here at issue.  The

17    dates of the violations, whether we're talking about

18    Steadfast I or Steadfast II, or if we just refer to it

19    generically in this matter as "Steadfast" because the matter

20    has been consolidated, started in 2015.  This document was

21    issued three years after the relevant period of time for this

22    matter.

23         Secondly, to the extent that they are relying on it

24    with respect to Steadfast II, again it predates that time

25    because these practices -- Steadfast II begins June 10, 2017,

L. Pitts - Direct

 1    nearly a year before this document was issued or made

 2    available online.

 3            So in terms of just the timing of any reliance on

 4    this document with respect to any arguments as to

 5    willfulness, knowledge, et cetera, this is an ad hoc reliance

 6    on something that came well after the time that these

 7    practices, as Ms. Pitts and everyone else has testified, have

 8    been at issue in this case.

 9            THE COURT:  All right.  What it boils down to is she

10    can be questioned, he can admit the document, but on

11    cross-examination, you can raise the very same points.

12            MS. LEWIS:  Thank you.

13            THE COURT:  And the Court is fully capable of

14    understanding that you're attempting to persuade the Court

15    that she relied on something that probably wasn't in

16    existence, that probably predates the violations.  So the

17    Court is perfectly capable of understanding that.

18            You can cross-examine her on that.  You'll get an

19    opportunity.

20            But you're on notice, Mr. Jewett.

21            MR. JEWETT:  Your Honor, I need to correct something

22    that Ms. Lewis said.

23            In the case of *McFeeley vs. Jackson State*, a Fourth

24    Circuit case, in that case, the District Court held that the

25    company seeking advice after the lawsuit was filed was

```
1    sufficient to meet the good-faith defense.
2            The plaintiffs appealed that to the Fourth Circuit,
3    among other issues, and the Fourth Circuit agreed you can get
4    advice; you can look into things after a suit is filed; and
5    it can still count as good faith.
6            And this document is dated 2018.  I think we all
7    agree that the time period is 2015 up until the present,
8    2021.  So this one splits the baby.  I agree it would not
9    have an impact on anything prior to 2018.
10           MS. LEWIS:  Your Honor, we'll take it up on cross as
11   I think the Court understands the Secretary's position with
12   respect to the relevance and confusion of this document.
13           THE COURT:  Okay.  The Court understands.
14           MR. JEWETT:  Okay.
15   BY MR. JEWETT:
16   Q.  Ms. Pitts, do you recognize this document?
17   A.  Yes, I do.
18   Q.  Okay.  Have you seen this document before?
19   A.  Yes.
20   Q.  Okay.  When did you first see this document?
21           THE COURT:  What exhibit number is that again?
22           MR. JEWETT:  This is Defendants' 64.
23           THE COURT:  I don't think the Court has
24   Defendants' 64 up here.
25           THE CLERK:  I have it, Your Honor.
```

L. Pitts - Direct

1          THE COURT:  Okay.  I think the Court is familiar

2     with this bulletin.  Go on.

3          MR. JEWETT:  Thank you, Your Honor.

4     BY MR. JEWETT:

5     Q.  Ms. Pitts, I think my last question was -- I don't recall

6     if you answered it.

7          When did you first see this document?

8     A.  It was in 2018 or -- I think it was 2018 when I saw this

9     document.

10    Q.  Would it have been -- this document is dated July 2018.

11    Would it have been the later half of 2018, then?

12    A.  I'm not sure of the date.  I'm not sure.

13    Q.  Okay.  That's fine.

14         Let's start with Page 1.  I'd like to -- I'd like

15    you to take just a quick minute and take a look at Page 1

16    there, the first two paragraphs.

17    A.  (Witness reviewing.)

18    Q.  Have you had a chance to read it?

19    A.  Yes.

20    Q.  In that first paragraph there, is there anything in that

21    first paragraph that you relied on when you made the decision

22    to continue classifying nurses as independent contractors?

23    A.  Yes.

24    Q.  Okay.  Can you explain to the Court what that is?

25    A.  The one that says "A registry is an entity that typically

L. Pitts - Direct

1    matches people who need caregiving services with caregivers

2    who provide the services, usually nurses, home health aides,

3    personal care attendants, or home care workers with other

4    titles (collectively, caregivers)."

5    Q.   Okay.  Does that sentence accurately describe your

6    company?

7    A.   Yes.

8    Q.   Let's look at the second paragraph.

9    A.   Yes.

10   Q.   Have you had a chance to read the second paragraph?

11   A.   (Witness reviewing.)

12           Yes.

13   Q.   Is there anything in the second paragraph that you relied

14   on as part of your decision to continue classifying nurses as

15   independent contractors after the Department initiated this

16   action?

17   A.   Yes.

18   Q.   What is that?

19   A.   The part that says "A registry that simply facilitates

20   matches between clients and caregivers, even if the registry

21   also provides certain other services, such as payroll

22   services, is not an employee under the FLSA."

23   Q.   Okay.  Does that sentence accurately describe your

24   company?

25   A.   Yes.

L. Pitts - Direct

1    Q.  Let me try to speed this along a little bit.

2    A.  Oh, please.

3    Q.  I'll ask you more specific questions.

4            MR. JEWETT:  Can you please turn to Page 2.  I'm

5    sorry, can you please scroll to Page 2.

6    BY MR. JEWETT:

7    Q.  Looking at the first full paragraph, "WHD has previously

8    issued..."

9            Do you see that paragraph?

10   A.  Hold on a minute.

11           Yes, I see it.

12   Q.  Okay.  And then there's a sentence halfway down that

13   starts with "A registry may confirm caregiver..."

14           Do you see that?

15   A.  Yes.

16   Q.  Let me read it to you.

17           "A registry may confirm caregiver credentials,

18   conduct background checks, contact professional references,

19   and engage in quality-control measures."

20           Does that sentence accurately describe your company?

21   A.  Yes.  Yes.

22   Q.  Let's look at the last paragraph together on this page.

23           The sentence in the last paragraph says "In addition

24   to providing matchmaking services, a registry may provide

25   administrative services to the caregivers and clients.  These

———L. Pitts - Direct———

1    services include recordkeeping, invoicing, collecting, and

2    disbursing payments, and other administrative services that

3    are ministerial in nature."

4            Does that sentence accurately describe your company?

5    A.  Yes.

6    Q.  I won't belabor the point too much longer.  I have just a

7    few more questions.

8            MR. JEWETT:  Can you please turn to Page 5.

9    BY MR. JEWETT:

10   Q.  Under "Scheduling and Assigning Work," can you take a

11   look at the second paragraph there where it says "At times a

12   registry may post..."

13           Do you see that?

14   A.  Yes.

15   Q.  I'll read it to you.

16   A.  Yes.

17   Q.  "At times a registry may post to an online message board

18   or send a text or e-mail to all qualified caregivers asking

19   them to contact a particular client if they are interested in

20   working for the client."

21           Is that something your company does?

22   A.  Yes.

23   Q.  "The registry may also narrow the offer to a subset of

24   caregivers screened by objective criteria, such as those

25   whose availability matches the needs of the client..."

—————————————————L. Pitts - Direct—————————————————

 1          Is this something that your company does?

 2   A.  Yes.

 3   Q.  Ms. Pitts, did you rely on -- excuse me.

 4          MR. JEWETT:  I forgot to move to admit -- I move to

 5   admit Defendants' 64.

 6          MS. LEWIS:  Maintain the previously stated

 7   objections of relevance and confusion.

 8          THE COURT:  Objection is overruled.  Exhibit 64 will

 9   be admitted.

10          (Defendants' Exhibit DX-64 received in evidence.)

11   BY MR. JEWETT:

12   Q.  Ms. Pitts, did you rely on Defendants' 64, Field

13   Assistance Bulletin 2018-4, as part of your decision to

14   continue to classify nurses as independent contractors in

15   this case?

16   A.  Yes.

17          MR. JEWETT:  I have no further questions.  Thank

18   you.

19          THE COURT:  Cross.

20                    CROSS-EXAMINATION

21   BY MS. LEWIS:

22   Q.  Good afternoon, Ms. Pitts.

23   A.  Good afternoon.

24   Q.  I want to come back to the sort of very beginning.  I

25   know you have been up there for a while.  So I'm going to try

─────L. Pitts - Direct─────

1   to be as streamlined as possible in my inquiries to you.

2           Earlier when you were giving us a little bit of your

3   history, your background, you indicated that you have a

4   third-grade reading level; is that right?

5   A.  I did.

6   Q.  You did.

7           You did in the third grade or in the recent relevant

8   time period?

9   A.  When I was in high school.

10  Q.  Okay.  But since then, you've been an LPN for over 20

11  years?

12  A.  Exactly.

13  Q.  To be an LPN, you have to have a level of competency to

14  provide care to people, right?

15  A.  Exactly.

16  Q.  And you keep your license current?

17  A.  Yes.

18  Q.  And to become an LPN, you have to take boards.  You took

19  a test which required you to read and use analytical

20  reasoning skills; isn't that right?

21  A.  Yep.

22  Q.  And since that time, when you started Steadfast, you have

23  entered into over 50 contracts with facilities, which you

24  have read and signed those agreements, right?

25  A.  Yes.

L. Pitts - Direct

1   Q.  And you've worked with a number of attorneys to draft and
2   enter into contracts with nurses and CNAs for independent
3   contract agreements, right?
4   A.  Yes.
5   Q.  Okay.  And throughout this litigation, and even with the
6   FAB that we just looked at, you understand that the title of
7   an entity does not determine a company's obligation to comply
8   with the FLSA, correct?
9           MR. JEWETT:  Objection.  It's a legal question.  It
10  calls for a legal answer.
11          THE COURT:  Overruled.
12          THE WITNESS:  Can you repeat the question?
13  BY MS. LEWIS:
14  Q.  Sure.
15          So within all these discussions with attorneys, and
16  even the FAB that you just reviewed with your attorney,
17  you've come to understand that the title of an entity
18  relationship, that does not determine whether or not a
19  company is obligated to comply with the FLSA.
20  A.  Can you break that down a little?  I'm not understanding.
21          THE COURT:  Just say you don't understand.
22          THE WITNESS:  I don't understand the question.
23  BY MS. LEWIS:
24  Q.  Okay.  So courts, attorneys, they look at a number of
25  things to say "This is what this is."  You can call your

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    business a cat, but that doesn't mean it's a cat, right?

2    A.  Right.

3    Q.  So there's a number of factors that the Courts look at to

4    determine what makes a company have to comply with the Act,

5    the Fair Labor Standards Act.

6           MR. JEWETT:  Objection.  Your Honor, she's basically

7    making a closing argument here.  She's telling her what --

8           THE COURT:  No.  That's a fair question, Mr. Jewett.

9           THE WITNESS:  I can't answer that question because I

10   really don't understand that question.

11          MS. LEWIS:  Okay.  I'll move on.

12          THE COURT:  Just move on.

13          MS. LEWIS:  I'll move on.

14   BY MS. LEWIS:

15   Q.  I want to direct your attention to -- well, before I

16   direct your attention to an exhibit, throughout this

17   litigation process, you've worked with your attorneys to

18   write answers to discovery and provide documents to them

19   which were then turned over to plaintiff, the Department of

20   Labor in this matter, right?

21   A.  Yes.

22   Q.  And you've done that quite frequently and periodically

23   throughout the three-plus years of this litigation.

24   A.  Yes.

25   Q.  And you provided, within those discovery requests -- now

L. Pitts - Direct

 1    I'd like to direct your attention to Plaintiff's 26.

 2              THE COURT:  Are you putting that on the screen?

 3              MS. LEWIS:  Yes.  It should be coming up on the

 4    screen.  There we go.  26.

 5    BY MS. LEWIS:

 6    Q.  Within those requests, you've provided a number of

 7    employment applications for a number of the nurses and CNAs

 8    that work with Steadfast, right?

 9    A.  Yes.

10    Q.  And this was the application that had been used

11    throughout, at least since 2015?

12    A.  Yes.

13    Q.  And directing your attention to Plaintiff's 32.

14              Likewise, you also confirmed that what has

15    previously been admitted as 32, these, likewise, were

16    documents that Steadfast has used in conducting its business

17    of signing and onboarding nurses to its registry, correct?

18    A.  Yes.

19    Q.  Also during discovery, you provided at least 62 different

20    facility contracts, correct?

21    A.  Yes.

22    Q.  And several of those contracts -- if I could direct your

23    attention to Plaintiff's 12.

24              These are all of the contracts that we received

25    throughout discovery, all of these, but we've only provided a

L. Pitts - Direct

1  sampling to the Court.

2       Please take a moment to review the farthest column

3  that says "Facility or Entity."

4       So several of the contracts that were provided, it's

5  not just for that specific facility; it's the company as a

6  whole.

7       So, for example, Bon Secours -- is that how you

8  pronounce it?

9  A.  Yes.

10 Q.  Directing your attention to Plaintiff's 10 --

11 Plaintiff's 10.056.

12      MS. LEWIS:  Excuse me, one second, Your Honor.  If I

13 could help Ms. Jones with this.

14      (Pause in the proceedings.)

15 BY MS. LEWIS:

16 Q.  So like Bon Secours, they have a number of facilities,

17 and all of these facilities Steadfast, likewise, can place --

18 you guys get requests to have nurses cover per diem

19 assignments at any Bon Secours, correct?

20 A.  Yes.

21 Q.  So even though it's 62 contracts, I mean, there's more

22 than 62 facilities that Steadfast places nurses at; there's

23 many, right?

24 A.  Well, there's many, but some of them fall under one

25 umbrella.

L. Pitts - Direct

1  Q.  Okay.  Right.

2        So I want to come back to Plaintiff's 10.120.

3        MS. LEWIS:  I think it's the Princess Anne one.

4  That's the PX-10 additions one, Ms. Jones, the one you were

5  at initially.

6  BY MS. LEWIS:

7  Q.  So this is Farmville, one of the contracts that we've

8  talked about over the past couple of days.

9        And so within these contracts, we talked about all

10  of them have -- on your initial, when I called you up in my

11  case in chief, about how all the contracts -- they have very

12  similar terms, specifically directing your attention to where

13  it talks about Steadfast's staffing responsibilities.

14        Directing your attention to paragraph B, Steadfast

15  has complied with its contractual obligations for each of the

16  facilities that it works with, correct?  It places nurses?

17  A.  Yes.

18  Q.  So in line with that, B(a) says that it's Steadfast's

19  responsibility to have nurses complete an application.

20        Steadfast does that, correct?

21  A.  Are you saying B -- which one are you talking about?

22  Q.  B(a).

23  A.  Yes, that's correct.

24  Q.  And that application is the application that you talked

25  about earlier, which was previously marked as Plaintiff's 26.

L. Pitts - Direct

```
 1  A.  Yes.

 2  Q.  Steadfast does that.

 3  A.  Yes.

 4  Q.  And Steadfast has also complied with the contractual

 5  obligations to do the skills inventory.

 6          Directing your attention to Plaintiff's 33.

 7          Well, anyway, Steadfast has -- it was in the

 8  application.  There's a skills checklist that Steadfast makes

 9  sure, depending upon the discipline of nurses, they have to

10  do, correct?

11  A.  Yes.

12  Q.  And the PPD test is another contractual obligation.

13  Steadfast makes sure that PPDs are up to date.

14  A.  Yes.  Yes.

15  Q.  And you also testified a moment ago about having to keep

16  up and make sure that licenses are current -- license,

17  registration, certifications and the like are current.

18          Steadfast has done that, correct?

19  A.  Yes.

20  Q.  So Steadfast has also done the negative drug screen and

21  the background check as well.

22  A.  Yes.

23  Q.  Steadfast has done all of those things?

24  A.  Yes.

25  Q.  I want to direct your attention to Plaintiff's 10.128.
```

L. Pitts - Direct

1    Give it a moment to come up here.

2         You were questioned whether Steadfast complies with

3    the OSHA standards.

4         MS. LEWIS:  If you could scroll down, I believe that

5    was at paragraph 5.  Yes.

6         I'm sorry, Your Honor, I'm not sure who this is that

7    just walked in the courtroom.  Is this a witness?

8         MR. JEWETT:  No, it's not a witness.

9    BY MS. LEWIS:

10   Q.  So this indicates that -- you indicated one of the

11   requirements is about complying with the OSHA standards, and

12   your question about whether or not you complied, do you

13   recall that?

14   A.  Yes.

15   Q.  And you indicated that you all don't do anything to

16   comply with OSHA standards; is that right?

17        MR. JEWETT:  Objection.  Misstates testimony.  The

18   question was whether she monitors the nurses to see if they

19   are complying with OSHA standards.

20        MS. LEWIS:  Okay.  I'll adopt that, then.

21   BY MS. LEWIS:

22   Q.  Do you monitor the nurses to assure or see that they

23   comply with OSHA standards?

24        And your testimony was "no," correct?

25   A.  Not in the facilities, I don't.

L. Pitts - Direct

1   Q.  I want to direct your attention to Plaintiff's 24 again.

2           This is a document that was provided in discovery

3   that at least is current -- that at least has dates current

4   through '21-'22.  There's some deadlines here.  It looks like

5   it was probably produced sometime in 2020.

6           Steadfast does keep up to date.  In fact, you added

7   a column about COVID-19.

8           That's an OSHA standard, isn't it?

9   A.  Yes.  That's a CDC guideline they came out with.

10  Q.  A CDC/OSHA standard correct?

11  A.  Exactly.

12  Q.  I want to direct your attention to Plaintiff's 33.008.

13          Steadfast also -- this is a letter that, scrolling

14  down to the signature, that you signed.  And you drafted this

15  letter to provide to your nurses, correct?

16  A.  Can I take a minute to read it, please?

17  Q.  Absolutely.

18  A.  (Witness reviewing.)

19          Yes.

20  Q.  Again, this is a letter, and you've designated it's

21  dealing with essential personnel related to the COVID-19

22  pandemic, again relative to OSHA/CDC standards, correct?

23  A.  This letter had nothing to do with the standards of CDC.

24  This letter was so when the police -- we were on lockdown,

25  and if the police stopped the nurses, they would let them

L. Pitts - Direct

1    keep going, so they would know that they were working in
2    COVID facilities.
3    Q.  So you gave this letter to nurses and CNAs that Steadfast
4    placed at facilities so they could get to work?
5    A.  Well, what happened was, we gave the letter to nurses who
6    were having trouble getting to work.
7    Q.  Okay.  So just select field nurses who needed letters
8    from Steadfast to get to work?
9    A.  Whoever asked.  Because the facility was calling.  The
10   nurses wasn't showing up during COVID, and they were being
11   stopped by the police.
12   Q.  Okay.
13   A.  And they don't have any identification or paper saying
14   they're on their way to work when we had the lockdown.  So
15   this letter really had nothing to do with CDC.  This was like
16   a pass for the police to see that they weren't horsing
17   around, they were on their way to work.  Because the
18   facilities were saying people weren't showing up during
19   COVID, they're getting stopped.  They were having a lot of
20   issues.
21   Q.  So this was adequate for them to get through to get to
22   work?
23   A.  Yes, if they needed it.
24   Q.  A letter from Steadfast?
25   A.  Yes.

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1   Q.  You also made sure that -- you also had to make sure that
2   Steadfast is in compliance, pursuant to the contract terms.
3            MS. LEWIS:  So let's go back to Plaintiff's 10,
4   please, Ms. Jones.
5   BY MS. LEWIS:
6   Q.  You've also had to make sure that Steadfast is in
7   compliance -- paragraph 6 -- "with all federal, state, and
8   local laws, rules, and regulations, including patient care
9   guidelines."
10           That's one of the responsibilities under the
11  contract for Steadfast to do, correct?
12  A.  Yes.
13  Q.  And you have reported to the Board of Nursing to update
14  them about nurses' background checks, haven't you?
15  A.  Repeat that question again.
16  Q.  Sure.
17           You have been in touch with the Board of Nursing to
18  update them about the background checks and results of nurses
19  that Steadfast gives assignments to, correct?
20  A.  Not many.  It's just when requested.
21  Q.  Okay.  I want to direct your attention to -- do you
22  recall having a deposition back in March of last year, right
23  before the shutdown happened -- March last year?
24  A.  Yeah.  Briefly.
25  Q.  And during that deposition, you were sworn.  You were

Carol L. Naughton, Official Court Reporter

─────────── L. Pitts - Direct ───────────

1   under oath, correct?

2   A.  Yes, I was.

3           MS. LEWIS:  Ms. Jones, I want to direct her to

4   Page 189.

5           THE COURT:  Unfortunately, usually when you're using

6   a deposition, you have to end up marking it.

7           MS. LEWIS:  I'm sorry, Your Honor?

8           THE COURT:  You end up having to mark the

9   deposition.

10          MS. LEWIS:  It's been marked.  It's been admitted.

11          THE COURT:  Oh, okay.

12  BY MS. LEWIS:

13  Q.  And I asked you then:  "How does the Board of Nursing

14  know to get in touch with you?"

15          And you answered:  "Because, you know, come on.

16  When you're doing a background, they tell you your job.  It

17  tells you where you work at, you see what I'm saying, on the

18  background check."

19          And then I asked you:  "Is there a particular point

20  of contact at the Board of Nursing that will contact

21  Steadfast?"

22          And you indicated:  "They will contact me, or they

23  will call Christine, or they will send an e-mail."

24          And I said:  "Who from the Board of Nursing?"

25          And you indicated:  "I coordinate.  I coordinate.

—————— L. Pitts - Direct ——————

1   I'm like best friends with them."

2          Then I asked:  "With who?"

3          And you indicated:  "The Board of Nursing."

4          And then I asked you:  "Is there a particular

5   individual?"

6          And you stated:  "It doesn't matter.  They are

7   enforcement with the Department.  It can be anybody, you

8   know."

9          So you are in regular contact with the Board of

10  Nursing about the nurses that are on Steadfast's registry;

11  isn't that right?

12  A.  I think that's kind of taken out of context because what

13  I was talking about, they call me every day because they have

14  issues with my nurses.  So they know Steadfast well.  They've

15  been having a lot of problems.

16  Q.  So they know that there are nurses that work with

17  Steadfast, so they know to contact you about those nurses?

18  A.  Not necessarily.

19  Q.  Let me move on.

20         So you've communicated with the Board of Nursing

21  about, sort of leading into that, when nurses that Steadfast

22  has at facilities have failed to provide a certain standard

23  of care.

24  A.  I didn't.  The facility has -- the facility calls the

25  Board of Nursing.  Then the Board of Nursing sends me a

L. Pitts - Direct

 1  subpoena and requests files.

 2          MS. LEWIS:  Let's scroll down to Page 190.

 3  BY MS. LEWIS:

 4  Q.  So here I asked you some more questions about the

 5  standard of care, and so we started -- the discussion was

 6  about, you know -- very much like this discussion right now.

 7  Is it the facilities?  Was it you?  Was it Steadfast?

 8          And then I asked you:  "So this really sounds to me

 9  like nurses -- they have two masters.  They've got the Board

10  of Nursing, who ultimately can pull the plug, but why are

11  they communicating with you?"

12          And you answered:  "Because they are on our

13  registry."

14          And I said:  "Okay."

15          And then you further stated:  "They are on our

16  registry.  They have to communicate.  The Board of Nursing

17  has to call us.  It's not even about the labor board.  It's

18  about healthcare.  The people are taking care of live humans.

19  The Board of Nursing has to reach out to us.  They can be

20  fined for not calling us."

21          So that's inconsistent with what you just said.

22  That's not a subpoena.  That's just the Board of Nursing

23  reaching out to you, as the entity with which these

24  individuals work, to get information about the standard of

25  care and the care that they provide; isn't that right?

L. Pitts - Direct

1   A.  That's not correct.

2   Q.  Okay.  I want to direct your attention going back to

3   Plaintiff's 10 at Page 130.

4           Your attorney also asked you some questions about

5   the confidentiality clauses within these contracts that

6   Steadfast has with the facilities and asked whether or not

7   you enforce those clauses, and you indicated you don't.

8           But that's not accurate, is it?

9   A.  Well, we have a confidentiality statement that they fill

10  out as part of their package that the facilities want, that

11  we send over to the facility.

12  Q.  Okay.  So within Steadfast's relationship with these

13  nurses you have, it starts at the top.  You've got the

14  relationship with the facilities, right, and that's where you

15  have these contracts that have these terms, correct?

16  A.  Correct.

17  Q.  And then you have the relationship with the nurses, and

18  within those relationships with the nurses, you also have a

19  confidentiality clause in at least two documents that you

20  require them to sign before they are able to take

21  assignments; isn't that right?

22  A.  I don't require them to sign it.  It's part of the

23  facility.  It's part of their profile with the facility,

24  because they're looking at all these patients' documents.

25  It's part of the HIPAA package.

────────────── L. Pitts - Direct ──────────────

1   Q.  I want to direct your attention going back to

2   Plaintiff's 25, Page 51.

3          So Plaintiff's 25 were a sampling of the Independent

4   Contractor Agreements that you, Steadfast, require the nurses

5   to sign before they can start picking up shifts at

6   facilities, correct?

7   A.  Repeat that again one more time.

8   Q.  Steadfast requires nurses who work with Steadfast to

9   complete an Independent Contractor Agreement; is that right?

10  A.  Right.

11  Q.  And Plaintiff's 25, it's a sampling of those Independent

12  Contractor Agreements.

13          MS. LEWIS:  You can scroll through it, just to

14  refresh her recollection, since she doesn't have it in front

15  of her.  Maybe just go to the top of this one.

16  BY MS. LEWIS:

17  Q.  Recognize this document?

18  A.  Right.

19  Q.  Okay.  So coming back down to the page, within the

20  contract that Steadfast has with the nurses, you have a

21  confidentiality clause.  That's not the facilities.  That's

22  Steadfast and the nurses, right?

23  A.  Correct.

24  Q.  Okay.  And you also indicated that there's also a

25  confidentiality clause as part of the HIPAA training

L. Pitts - Direct

 1   agreements, correct?

 2        MS. LEWIS:  If you could jump down to 51, please.  I

 3   think that's what it is.

 4   BY MS. LEWIS:

 5   Q.  This is the confidentiality statement you were referring

 6   to, correct?

 7   A.  Yes.

 8   Q.  So in two places that Steadfast has, and scrolling to the

 9   top of this document, that's Steadfast's name on this

10   document, not a facility, correct?

11   A.  Most of our forms have our name on it because --

12   Q.  So this is a Steadfast form?

13   A.  It's a Steadfast form, correct.

14   Q.  And it's a Steadfast form that Steadfast requires nurses

15   to sign before they can work in facilities, correct?

16   A.  No.  It's not correct.

17   Q.  It's part of the application, correct?

18   A.  Well, the facility requires a confidentiality statement,

19   as part of the HIPAA, before they come into the facility, so

20   they won't discuss patients' personal information.

21   Q.  And so following through with that, coming back to what

22   we were talking about at the top in terms of Steadfast's

23   conduct, Steadfast makes sure that it follows those

24   contractual terms by making sure that the nurses that it

25   places at the facility sign the confidentiality statement,

—————L. Pitts - Direct—————

1   correct?

2   A.  Yes.

3   Q.  And that's a Steadfast requirement.  Regardless of how it

4   flows, that's a Steadfast requirement.  If a nurse doesn't

5   sign it, a nurse can't get placed.

6   A.  No --

7             MR. JEWETT:  Objection.  Mischaracterizes testimony.

8   She testified that it's the facility's requirement as part of

9   their package.

10            THE COURT:  That's a leading question, Mr. Jewett.

11   Overruled.

12   BY MS. LEWIS:

13   Q.  You can answer.

14   A.  Well, the facility requires a certain amount of

15   information before they come -- certain amount of documents

16   have to be filled out before they can come into the facility.

17   So the confidentiality statement is one of their documents.

18   They won't let them in unless they have certain

19   documentation.  It's not Steadfast who won't let them in.

20   They won't let them in.

21   Q.  Let me wrap this up.

22            This is Steadfast's form, correct?

23   A.  Yes.

24   Q.  And Steadfast has this form in its personnel files for

25   nurses and CNAs, correct?

──────── L. Pitts - Direct ────────

1    A.  Correct.

2    Q.  And let's sort of stick with these Independent Contractor

3    Agreements for a moment.

4         Since Steadfast has been in business, there's been

5    at least four different iterations of this Independent

6    Contractor Agreement; is that right?

7    A.  That's correct.

8    Q.  I want to direct your attention back to plaintiff's --

9    the contract, the Independent Contractor Agreements.

10        MS. LEWIS:  Is that 25 still?  Jump down to 40,

11   please, Ms. Jones.

12   BY MS. LEWIS:

13   Q.  In Plaintiff's 25, we had a sampling in the beginning of

14   signed ones, and towards the bottom, there's four different

15   versions that Steadfast has used over the years.  I want to

16   just take a moment to review them.

17        So we'll call this one version.  I'm sorry.  One

18   version starts at 43, Plaintiff's 25.43.

19        You have another version that starts at

20   Plaintiff's -- Plaintiff's 25.54.

21        THE COURT:  This entire exhibit, as the Court

22   understands it, is not admitted, just a couple of pages.

23        So are you moving to admit these sections?

24        MS. LEWIS:  Yes, Your Honor, I move to admit the

25   entirety of Plaintiff's 25.

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1        THE COURT:  Any objection?

2        MR. JEWETT:  No objection.

3        THE COURT:  Exhibit 25 will be admitted.

4        (Plaintiff's Exhibit PX-25 received in evidence.)

5        THE COURT:  So where are we?

6        MS. LEWIS:  She's going through -- this is the

7   second version, and then we're going to jump to 58.

8        You can keep going.  Just keep scrolling.

9        THE COURT:  Exhibit 58?

10       MS. LEWIS:  No, Page 58 within Exhibit 25.

11       This is another version.

12       And then finally at Plaintiff's 25.68, the Bates

13  number -- jump down to 68.  This is a fourth version.

14  BY MS. LEWIS:

15  Q.  Now, within each of these versions -- you indicated

16  earlier in your testimony that Steadfast doesn't enforce the

17  noncompete agreement, correct?

18  A.  Correct.

19  Q.  But in each iteration of these contracts, you have that

20  term in it.  So you have had at least four opportunities to

21  remove it, if it's of no consequence, correct?

22  A.  Correct.

23  Q.  But you've left it in?

24  A.  Because I was instructed by my attorney to leave it in.

25  Q.  And, likewise, each version also has that confidentiality

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1   clause as well, correct?

2   A.  Yes.

3   Q.  I want to jump a bit to your testimony about the Zira

4   app.

5           So you started using the Zira app sometime earlier

6   this year, in 2021; is that right?

7   A.  Correct.

8   Q.  And to identify that app, you completed an online

9   questionnaire, spoke to someone about Steadfast's needs and

10  desires in terms of developing or using an app; is that

11  right?

12  A.  Yes.  Someone referred their company to us.  We were

13  referred to that company.

14  Q.  And then you spoke to someone and discussed what

15  Steadfast's needs were in terms of an app, correct?

16  A.  Correct.

17  Q.  And your needs for the app was not limited to avoid

18  double-booking, but there was a plethora of needs, correct?

19          For example, generally speaking, you wanted to

20  increase the efficiency of which Steadfast operates, right?

21  A.  Operates how?

22  Q.  Scheduling, sending out shifts.

23  A.  Yeah.

24  Q.  Just make the business more efficient.

25  A.  Yes.

1    Q.   And you also wanted to avoid underbooking staff,

2    underbooking nurses at facilities.

3           In other words, a facility reaches out; you guys are

4    scrambling, trying to find someone.  You also wanted to make

5    sure that you guys were working at maximum ability to fill

6    shifts and assignments.  That's also part of the reason,

7    correct?

8    A.   Yes.

9    Q.   Okay.  So you used the app to streamline the

10   paper-and-pen process, the paper-and-pen calling process,

11   which we've heard about how schedulers go about soliciting

12   and giving out shifts, right?

13   A.   That's one of the reasons.

14   Q.   Okay.  But even though the app is partially automated,

15   Steadfast still has to be involved in the administration of

16   the app, correct?

17   A.   We have to troubleshoot the app.

18   Q.   Okay.  I want to direct your attention to

19   Plaintiff's 2.088.

20          So you had a number of conversations with Mr. Arjun

21   Vora at Zira about customizing the app based upon Steadfast's

22   needs, right?

23   A.   Yes.

24   Q.   And there was e-mails exchanged between you and the Zira

25   people about getting the app up and running to work for

L. Pitts - Direct

1  Steadfast, essentially, right?

2  A.  Yes.

3  Q.  And so on the app -- we talked a lot about how it looks

4  on a higher level with Steadfast, the facilities, the users,

5  et cetera, but within all of that, Steadfast, unlike the

6  facilities and unlike the -- unlike the facilities and unlike

7  the nurses, Steadfast sees everything that the app has to

8  offer.  In other words, there's not an area that is blocked

9  off that Steadfast can't see.

10         MR. JEWETT:  Objection.  Calling for speculation.

11         THE COURT:  Well, if she knows it, she can testify

12  to it.  Overruled.

13         THE WITNESS:  There are some things that they had in

14  the package that we didn't get.

15  BY MS. LEWIS:

16  Q.  Okay.

17  A.  I'm not sure exactly what it is, but some things we

18  didn't need because we didn't do it.  In the package, when I

19  first sat down and interviewed the developer, some things

20  they offered, we didn't get.

21  Q.  You jumped ahead of me, but let me direct your attention

22  to -- I know we're on 88, but let's go to 87.

23         One of those things in the package that you didn't

24  want that you told them to take off was "Take off overtime.

25  We don't pay it."

L. Pitts - Direct

1        That was an option in the app, and you told them to
2   disable that feature; isn't that right?
3   A.  Yes, because that's not the way our company was set up.
4   This app was specialized.  I paid money for this app to be
5   equipped for Steadfast.
6   Q.  Within the app, there's an ability for Steadfast to know
7   whether or not a nurse or a CNA is working over 40 hours in a
8   workweek, and you didn't want to know that information.
9   A.  That's not how we're set up.  We didn't need to know
10  overtime because we had our independent contractors in there.
11  Q.  My question is --
12  A.  We didn't need that feature.
13  Q.  So my question is:
14        In the app, is there that feature?
15  A.  Not in my app.  Now, it was offered in a package, but we
16  don't have it in our app.
17  Q.  So it was offered in the package.  You didn't just
18  decline it, you sent an e-mail directing them to take it off,
19  correct?
20  A.  Yes, because it was part of their overall package, and
21  you had to let them know what you wanted on it and what you
22  did not need.  Our app is specialized to meet Steadfast's
23  needs.
24  Q.  Going down to 88, in terms of how we're talking about how
25  Steadfast has the ability to see things within the app,

—————————————— L. Pitts - Direct ——————————————

1   Steadfast receives a notification of accepting shifts in the
2   app, correct?
3   A.  Excuse me.  Repeat that.
4   Q.  Yeah.
5           Steadfast receives notifications where a nurse or
6   CNA accepts the shift?
7   A.  Yes, we do.
8   Q.  Steadfast receives notifications where a shift is
9   cancelled?
10  A.  Yes, we do.
11  Q.  Steadfast also can edit and delete and confirm shifts
12  within the app, correct?
13  A.  With the facilities, we can.
14  Q.  Well, it's both, right?
15  A.  Correct.
16  Q.  So coming back to that, you said "It's a feature we
17  didn't want.  We don't need it because that's how we handle
18  our nurses."
19          Although you've taken all of these steps to
20  streamline and make things easier for scheduling from the
21  pen-and-paper process and you were in the middle of this
22  lawsuit when this was going on, you took active steps to
23  avoid knowing about it, avoid knowing if a nurse was working
24  more than 40 hours a week, by not requesting or specifically
25  requesting to disable a feature that would have had you to at

──────── L. Pitts - Direct ────────

1   least have the knowledge, correct?

2          MR. JEWETT:  Objection.  It's mischaracterizing.

3   I'm starting to question the relevance of this inquiry.

4          THE COURT:  Objection overruled.

5          THE WITNESS:  Repeat that again.  I'm sorry.

6   BY MS. LEWIS:

7   Q.  Sure.

8          So I said, so although you took steps of adopting

9   this app which would make it easier and more efficient for

10  Steadfast to streamline scheduling, make the business more

11  efficient, while in the middle of this lawsuit, just seven

12  months ago, you got this app, and you actively avoided

13  knowing whether or not your nurses, the nurses and CNAs that

14  Steadfast placed, were working more than 40 hours in a

15  workweek.  You didn't want to know.

16  A.  That's not true.  You're saying I didn't want to know.

17  That's not true.  That was not how my company was set up.

18  And I only use the features on his software that my company

19  uses.

20         THE COURT:  I think we can move on from this

21  question.

22         MS. LEWIS:  Right.  Almost done.

23  BY MS. LEWIS:

24  Q.  I want to direct your attention to Plaintiff's 7a.  It's

25  the PDF Page 35.

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

```
 1              There was a question about whether or not Steadfast

 2    charges back nurses when they don't show up or there's a

 3    discrepancy, a chargeback.  And you indicated that Steadfast

 4    doesn't.

 5              But Steadfast does charge back nurses; isn't that

 6    right?

 7    A.  No, we don't.

 8    Q.  This is a Next Day Pay record which was previously

 9    admitted into evidence.  At Carlenna Mosley, there's a

10    negative .67 hours.

11              That's a chargeback, isn't it?

12    A.  No.

13    Q.  What is it?

14    A.  When we got her time from Farm, additionally in the

15    e-mail, they deducted some hours because she didn't show up

16    on time.

17    Q.  And so you had paid her -- so you didn't pay her for

18    that, so that's a chargeback, right?

19    A.  That's not a chargeback.  That's being honest.  If you

20    didn't show up, that's lying, paying you for 7:00 and you

21    didn't show up at 7:00.

22    Q.  But it was her representation that she was there?

23    A.  But the facility didn't confirm it.

24    Q.  My question was:

25              Was it her representation that she was there?
```

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1    A.  I have no idea.

2    Q.  So you just deducted the time without confirming with her

3    whether or not she was there or not?

4    A.  We did confirm with her.  And evidently, when we

5    confirmed with her, she couldn't give us an explanation, and

6    the facility sent something back stating the actual time she

7    worked.

8    Q.  I want to -- almost done.  Let's talk about the FAB a

9    bit.

10           MS. LEWIS:  Ms. Jones, we're going to be on the 3/12

11   deposition, if you want to pull it up.

12           THE WITNESS:  Can we back up to that?

13   BY MS. LEWIS:

14   Q.  No, ma'am.  I don't have any further questions on that.

15           So during your testimony, you talked about -- well,

16   before I get to the FAB, Steadfast vets nurses in order to

17   provide them assignments?  The vetting process?

18   A.  We vet the nurses because that's required in our

19   contract.

20   Q.  And so you -- the business of Steadfast, you're not in

21   the business of vetting nurses, correct?

22   A.  If we have to do it, we have to do it.

23   Q.  But that's not the primary purpose of your business.

24   It's not to vet nurses and place them; it's to place nurses

25   at facilities to work on a per diem basis.  Is that right?

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

```
 1   A.   That's correct.
 2   Q.   Okay.  And so there was an inquiry about whether or not
 3   Steadfast has received a fee on the buyout provisions, the
 4   solicitation clauses, if one of your nurses is hired
 5   permanently.
 6            Do you remember that line of questioning from
 7   Mr. Jewett?
 8   A.   Yes.
 9   Q.   And Steadfast has received fees from facilities if one of
10   your nurses is hired permanently; isn't that right?
11   A.   Not often.
12   Q.   But it's happened?
13   A.   In the past, it's happened, but it's not often.
14   Q.   And "the past" being within sometime since at least 2015,
15   Steadfast has received a fee from a facility when nurses have
16   permanently gone there to work; is that right?
17   A.   I have to look at it.  I have to see it to confirm --
18   Q.   You don't know whether or not Steadfast has received a
19   buyout fee?
20   A.   I don't have the documentation in front of me.  So I
21   don't know when we received the buyout fee.  We have, but I
22   can't tell you when.
23   Q.   I wasn't asking when.  I wanted to know whether you have
24   received a buyout fee.
25   A.   We have received a buyout fee.
```

L. Pitts - Direct

1   Q.  And that fee is charged, in part, because you expend the

2   money -- you make the investment on the nurses to vet them,

3   and then Steadfast could lose the opportunity to earn

4   additional profits from that nurse because they're not

5   available to work further shifts, correct?

6   A.  There's a processing fee.

7   Q.  Okay.  Directing your attention to 173.

8        During your deposition back in April, you

9   likewise -- I asked you about the same thing.  I asked you --

10       THE COURT:  What line are you on?

11       MS. LEWIS:  I am starting on line 18.

12  BY MS. LEWIS:

13  Q.  And I asked:  "So why did you say we don't need this

14  registry?  I mean, Steadfast is the one who would get the

15  compensation, correct?"

16       And there you, like today, said:  "Right, right.

17  We're the one who gets the fee."

18       And I questioned:  "So do the nurses get a portion

19  of that compensation fee if, indeed, the registry fee is

20  paid?"

21       And you stated:  "The reason we do a registry fee is

22  we do all the vetting, and that costs money to vet."

23       So you all are seeking to recover the investment

24  that you've made in these nurses and recover that with these

25  fees that you charge to the facilities; isn't that right?

L. Pitts - Direct

1    A.   No, that's not correct.

2    Q.   Okay.  Now, shifting to the FAB, you indicated that you

3    reviewed the FAB with your attorney; is that right?

4              THE COURT:  Let's stop right there.  Take a

5    15-minute break, and then you can come back and start with

6    that question.  Mark it.  15-minute break and then we'll be

7    back.

8              (Recess from 3:58 p.m. to 4:17 p.m.)

9              THE COURT:  You may resume.

10             MS. LEWIS:  Thank you.

11   BY MS. LEWIS:

12   Q.   So we had started talking about the FAB 2018-4.

13             So you indicated during your testimony that you

14   reviewed that with your attorney; is that correct?

15   A.   Yes, it is.

16   Q.   And during your deposition last year in March, you also

17   indicated that you did not actually recall reviewing that

18   FAB.  Do you remember that?

19   A.   I guess, because I didn't realize it was a FAB until my

20   attorneys pointed out to me it was a FAB that I looked at.

21   Q.   I want to direct your attention to that deposition.

22             MS. LEWIS:  And, Your Honor, before I jump into

23   that, I have a housekeeping matter that was brought to my

24   attention.

25             So the exhibits that were previously admitted under

Carol L. Naughton, Official Court Reporter

L. Pitts - Direct

1  Plaintiff's 2, which are the deposition summaries, I'd like
2  to -- I'll need to consolidate these deposition pages that
3  I'm referencing and using for impeachment and refreshing
4  recollection purposes, and I would like to have them marked.
5          THE COURT:  Well, first of all, if any party uses a
6  deposition in here during the course of testimony to impeach
7  people, though we mark it, it's not admissible.
8          MS. LEWIS:  Right.  I understand.  But this is just
9  for housekeeping purposes.
10          THE COURT:  For housekeeping purposes.  Well, you
11  can consolidate them and have them marked.
12          MS. LEWIS:  Yes.  That's all I was making sure of.
13          THE COURT:  All right.
14          MS. LEWIS:  If you could scroll up, Ms. Jones.
15  BY MS. LEWIS:
16  Q.  So at the deposition, I provided you a copy of this.
17  Directing your attention to deposition -- it's PDF Page 167,
18  but I believe the actual page is 166 -- yes, 166, at line 10.
19          And I asked you -- I provided you the FAB, and I
20  said:  "If you can take -- do you recognize the document
21  that's been received and marked as Plaintiff's 7?  And that
22  document, for the record, is dated July 13th, 2018, Field
23  Assistance Bulletin Number 2018-4.  Do you recognize that
24  document?"
25          Your answer was:  "Yes, yes."

L. Pitts - Direct

 1          And then I asked you:  "What is your familiarity
 2   with the document?"
 3          And you indicated:  "I think my attorneys went over
 4   it with me."
 5          Then I questioned you:  "Did you -- when was the
 6   first time that you saw this document?  Was it this year?"
 7          And "this year" would have been last year,
 8   March 2020.
 9          And you indicated:  "I'm not even sure.  I'm not
10   sure.  I remember seeing it, but I don't remember what year
11   it was or what month it was."
12          Next page, please.
13          So I said:  "Okay.  What is the date of it?"
14          And your response was:  "Uh-huh."
15          And you indicated -- my response was:  "Okay.
16   Uh-huh."
17          And you indicated:  "I remember my attorneys going
18   over it with me, but I don't know when exactly that was."
19          I asked you whether or not you independently located
20   the document or whether it was just provided by your
21   attorneys.
22          "ANSWER:  I'm not sure.
23          "QUESTION:  Have you had an occasion to research the
24   Department of Labor's website after the investigation?
25          "ANSWER:  I think that -- I can't recall."

────────── L. Pitts - Direct──────────

 1          So I asked more broadly.

 2          "QUESTION:  Have you ever gone to the Department of

 3  Labor's website for guidance, for materials, or research?"

 4          Your response:  "I can't recall.  I just can't

 5  recall if I went to the website or not.  I just can't

 6  remember."

 7          Next question:  "Okay.  Do you have this document

 8  saved on your computer?

 9          "ANSWER:  I'm not sure.  I have a lot on my

10  computer.  I'm not sure."

11          THE COURT:  I think we can stop right there in terms

12  of what you were trying to do by going through the

13  deposition.

14  BY MS. LEWIS:

15  Q.  At least last year, 2020, which would only have been two

16  years versus this year, three years later, you didn't

17  remember then whether or not you had ever seen the FAB, but

18  your testimony today is that you used that document or relied

19  upon it to continue your practices of classifying nurses as

20  independent contractors?

21          MR. JEWETT:  Objection.  She completely

22  mischaracterized the deposition testimony she just read.

23          THE COURT:  Well, I don't know about that.  The

24  Court read the same deposition that she just read,

25  Mr. Jewett, and the question she's following up now is not an

L. Pitts - Direct

1    inappropriate question.

2            MR. JEWETT:  Your Honor, in the deposition

3    transcript, she testified that she had seen it before.

4    Ms. Lewis just characterized her testimony from the

5    deposition transcript as saying "I don't recall if I seen it

6    before."

7            THE COURT:  Well, she said, "I just can't recall if

8    I went to the website earlier."

9            Well, you can redirect, but the Court overrules the

10   objection.

11           Rephrase the question and put it to her again.

12   BY MS. LEWIS:

13   Q.  So is it your testimony, then, today, that now you did

14   remember reviewing that and you relied upon this document

15   which -- closer to the time that you allegedly reviewed it,

16   that's what you used to rely upon to continue your practice

17   of classifying nurses as independent contractors rather than

18   employees?

19   A.  This is -- this transcript here says I can't recall, like

20   I can't remember.

21   Q.  But that's not my question.

22           My question is whether or not you used the FAB --

23   you didn't remember -- you didn't remember the document last

24   year, but today you remember it.

25           Is that your testimony?

—————— L. Pitts - Direct ——————

1    A.  Yes, after reading it.

2    Q.  Okay.  So sometime between last year and today, you've

3    read it and you remembered it?

4        MR. JEWETT:  Objection.  She's mischaracterizing the

5    testimony, Your Honor.  The deposition transcript does not

6    say that.

7        THE COURT:  It's based on the answer she just gave,

8    Mr. Jewett.  Let's see if we can get through one exchange,

9    and then we can figure out what is going on here.

10       MR. JEWETT:  Yes, sir.

11       THE COURT:  Back up again.

12   BY MS. LEWIS:

13   Q.  Okay.  At the time of the deposition testimony, the most

14   you could testify to regarding the FAB 2018 was that you

15   remembered seeing it and reviewing it with your attorney,

16   correct?

17   A.  Correct.

18   Q.  But you weren't familiar with the details of that

19   document, correct?

20   A.  I didn't read the document until my attorney --

21   Q.  So you didn't read the document.

22       So you could not have relied upon that document to

23   continue your practice of classifying nurses as independent

24   contractors rather than employees.  You did not rely on that

25   document, did you?

Carol L. Naughton, Official Court Reporter

——————L. Pitts - Direct——————

1    A.  Yes, I did.

2          MR. JEWETT:  Object --

3          THE COURT:  Okay.  She said she did.  Follow up.

4    Keep on going.

5    BY MS. LEWIS:

6    Q.  You've classified nurses as independent contractors since

7    2015?

8    A.  Yes.

9    Q.  And again, coming back to this deposition testimony,

10   which was focused on the practices of Steadfast from the

11   Steadfast II moving forward, you still classified the nurses

12   as independent contractors, correct?

13   A.  Correct.

14   Q.  There hadn't been any change from 2015 to 2017 on how you

15   conducted the onboarding and staffing process of nurses at

16   Steadfast, correct?

17   A.  Correct.

18   Q.  So you still required them to complete an application?

19   A.  Now or --

20   Q.  We're talking about back then.

21   A.  2015?

22   Q.  Uh-huh -- 2017.

23   A.  '17.

24   Q.  Yeah, 2017.  They were still required to complete an

25   application.

──────────────── L. Pitts - Direct ────────────────

1   A.  I have to check that date when they stopped --

2   Q.  Let's go to one of the Plaintiff's 25 applications.

3   A.  I didn't say I didn't.  I said I have to check the date.

4           MS. LEWIS:  26, Ms. Jones, Employment Application

5   PX-26.  Let's look for a date that's signed 2017, the

6   application date.  There's one.

7   BY MS. LEWIS:

8   Q.  12/6/2017, you still required an application, correct?

9   A.  At the time, some people were still doing apps, and some

10  people were sending in resumes.  So both were coming to the

11  office.

12  Q.  Okay.  You still required the completion of a background

13  check?

14  A.  Yes.  Yes.

15  Q.  You still required a drug screen?

16  A.  Yes.

17  Q.  Going to the memos that were sent out, you were still

18  sending out memos?

19  A.  Yes.

20  Q.  Nothing had changed in the way that Steadfast conducted

21  and interacted with the nurses in 2017 from how it was doing

22  in 2015?

23  A.  Yes.

24  Q.  Nothing had changed in 2018, either, because some of

25  those memos were in 2018, correct?

Carol L. Naughton, Official Court Reporter

—————L. Pitts - Direct—————

1   A.   Correct.

2   Q.   Let's talk a little bit in more detail about the FAB and

3   some of the information that's contained therein.

4          The FAB confirms that it's a case-by-case analysis.

5   Do you recall reviewing that within the FAB, it's a

6   case-by-case circumstance?

7   A.   No, I didn't recall that.  I was looking at the subject

8   line.

9          MS. LEWIS:  You can take that off, Ms. Jones.

10  BY MS. LEWIS:

11  Q.   Let's start with the first page, and we'll go through it

12  as you did with your attorney.  This was previously admitted.

13         THE COURT:  Let's move, Ms. Lewis.  Let's move to a

14  question here.

15         MS. LEWIS:  I'm trying to display the FAB on the

16  projector, Your Honor.

17  BY MS. LEWIS:

18  Q.   The FAB indicates that "A registry that controls the

19  terms and conditions of the caregiver's employment activities

20  may be an employer of the caregiver and, therefore, subject

21  to the requirements of the FLSA."

22         It says "may be."  It's not definitive, correct?

23  A.   That's what it says.

24  Q.   And coming back to my question earlier, when we had

25  talked about understanding the factors and a lot of

L. Pitts - Direct

1    discussion back and forth about independent contractors or
2    employees, it doesn't matter; it's the relationship that
3    controls.
4            Do you recall seeing that within the FAB, the
5    highlighted portion?
6            "The title an entity uses does not determine whether
7    it's obligated to comply with the FLSA; instead, the
8    particular facts and circumstances..." do.
9            THE COURT:  You need to push that up on the screen.
10   Thank you.
11           Thank you, Mr. Jewett.
12   BY MS. LEWIS:
13   Q.  Do you recall seeing that?
14   A.  I just saw that when you showed it to me.
15   Q.  You just saw it.
16           And, again, nothing -- not one thing matters.  This
17   is the thing that we've heard about throughout this entire
18   testimony.
19           Do you recall reviewing the first paragraph where
20   it's highlighted?
21           I want to talk about some specifics.
22           The FAB indicates that "A registry that directs and
23   controls the caregiver's work and sets the caregiver's rate
24   of pay may be an employer of the caregiver."
25           In this case, the nurses are the caregiver in this

L. Pitts - Direct

1 scenario, and Steadfast sets the rate of pay which they
2 receive by the facilities; isn't that right?
3          Let me rephrase that question.
4          Steadfast sets the rate nurses are paid, correct?
5 A.  Yes, we have the rates.
6 Q.  And Steadfast also keeps a log of the assignments where
7 nurses go.  That's part of the scheduling process, part of
8 the new scheduling process with the Zira app, part of the
9 scheduling process even before where schedulers would call,
10 contact the nurses, find out where they were going.  That's
11 part of the process, correct, that Steadfast does?
12 A.  Yes.
13 Q.  And you all do that because you all need to know where
14 the nurses are.  Like you said, one of the concerns is
15 overbooking and underbooking; is that right?
16 A.  I didn't say underbooking.  You did.  I said overbooking.
17 Q.  Overbooking.  Okay.
18          As the FAB indicates, in that situation, that may be
19 an employee.
20          I want to go to --
21          MR. JEWETT:  I object.  I don't know if there's been
22 a question asked.
23          MS. LEWIS:  I haven't asked anything yet.
24          THE COURT:  I think you need to ask the question.
25 BY MS. LEWIS:

L. Pitts - Direct

1  Q.  I want to go to Page 6.  We've heard a lot of testimony

2  over the course of this matter about scheduling shifts.

3       The FAB here states that "requiring a caregiver to

4  call only the registry, instead of the client, if the

5  caregiver will be late or miss a shift; and disciplining a

6  caregiver for his or her performance" is another thing that

7  may be indicative of an employer/employee relationship.

8       Do you see that statement there?

9  A.  Yes, I see the statement.

10 Q.  And Steadfast -- in this scenario, the nurse is the

11 caregiver; the registry is Steadfast; and the client is the

12 facility.  Correct?

13      And so Steadfast requires the nurses to contact the

14 registry if they are going to be late or miss or cancel a

15 shift.  In fact, you've sent memos to that regard; isn't that

16 right?

17 A.  Yes.

18 Q.  Another example that's within this FAB, "prohibiting a

19 caregiver from working directly with clients outside of the

20 registry."

21      You all have a noncompete clause in your Independent

22 Contractor Agreements, don't you?

23 A.  Yes, we do.

24 Q.  And it prohibits those nurses from working with outside

25 agencies.  As you indicated, outside agencies like First

———— L. Pitts - Direct————

1    Choice, those are your competitors.

2    A.  I'm not reading that like that.

3    Q.  No, no.  I'm asking the question.

4           The Independent Contractor Agreements that Steadfast

5    requires nurses to sign has a noncompete agreement, correct?

6    A.  Correct.

7    Q.  And those noncompete agreements prohibit the nurses from

8    working with other entities.  That's what it says; is that

9    right?

10   A.  Can I look at that again?

11   Q.  Sure.

12          MS. LEWIS:  May you please pull up one of the

13   Independent Contractor Agreements, Ms. Jones.

14   BY MS. LEWIS:

15   Q.  Directing your attention to what has been previously

16   marked as Plaintiff's 25, there's a noncompete agreement

17   here, and it states -- I'm reading from the last sentence of

18   this paragraph.

19          Well, let me just read the whole thing.

20          "Noncompetition.  Commencing from the first date of

21   the contractor's work for SMS under this agreement and

22   continuing for a period of 12 months from the expiration or

23   termination date of this agreement, whether initiated by SMS

24   or the contractor, with or without notice or cause,

25   contractor agrees that the contractor shall not directly

L. Pitts - Direct

1    provide the same type of services provided to SMS under this

2    agreement to any competitors of SMS without first obtaining

3    the express written permission of SMS.

4           "Contractor agrees that during the term of this

5    agreement and for 12 months thereafter, contractor will not

6    enter into, be engaged in, or be interested in any capacity

7    whatsoever, directly or indirectly, in any business or

8    undertaking with any person or entity that competes with

9    SMS."

10          So there's a noncompetition clause within the

11   contracts that you require the nurses to sign before they can

12   pick up assignments with Steadfast in each version, each of

13   the four versions, that you've had over the years; isn't that

14   right?

15   A.   Yes.

16   Q.   And so coming back to the FAB, the FAB says that when you

17   prohibit that, it's, again, indicative of an

18   employer/employee relationship.

19          Directing your attention to paragraph E, it states

20   "The client instead negotiates the rate of pay directly with

21   the caregiver."

22          That's prohibited under Steadfast's practices, isn't

23   it?

24   A.   Yes.

25   Q.   Nurses are not allowed to negotiate their rate of pay

L. Pitts - Direct

1    with the facilities directly.

2    A.   They do, but they're not supposed to.

3    Q.   They are not supposed to.

4           Steadfast sets a wage range for the nurses and CNAs

5    that it places on assignment at a facility, correct?

6    A.   Yes.

7    Q.   And that wage range is set based upon the negotiated

8    contract price that Steadfast has made with each of the

9    facilities; isn't that right?

10   A.   Yes.

11   Q.   And the FAB indicates "Such behavior indicates the

12   existence of an employment relationship between the registry

13   and caregiver."

14          You read that sentence and still maintained the

15   position that the nurses were not misclassified?

16   A.   Yes, because the nurses can choose whether they want to

17   take that pay rate or not.  They have a choice.

18   Q.   So there were some changes in Steadfast's pay over the

19   years.

20          You guys started to do Next Day Pay in 2019,

21   February 2019, correct?

22   A.   Correct.

23   Q.   And you still do Next Day Pay to this day?

24   A.   Correct.

25   Q.   And as we heard, that comes after a nurse submits

L. Pitts - Direct

1  whatever time sheet to Steadfast the day of, and presumably,
2  they are paid the next day or within a day or so, right?
3  A.  Right.
4  Q.  And so the FAB indicates "A registry's direct payment of
5  its own funds to the caregiver, however, may indicate that
6  the registry is the caregiver's employer.  This is true
7  regardless of whether the registry typically receives
8  reimbursement from the client because, in this situation, the
9  registry may be effectively guaranteeing the payment even if
10 the client does not ultimately pay."
11        So my question is this:
12        When you all do Next Day Pay and there is an issue,
13 you all don't seek a chargeback to the nurses if the client
14 refuses to pay that invoice, do you?
15 A.  Restate that question.  Can you say that again?
16 Q.  Sure.
17        So a nurse submits a time sheet for Next Day Pay.
18 Steadfast pays them the next day or the next two days, before
19 the regular Friday payday.  Steadfast then, as Christine Kim
20 testified, submits an invoice to the facility on its regular
21 cycle, and the facility says, "I'm not paying."
22        Based upon your testimony earlier, if the facility
23 doesn't pay, you all then don't charge back the nurse for
24 that time that -- for the payment that they received via Next
25 Day Pay, do you?

L. Pitts - Direct

1   A.  No.  What happens is -- we don't submit the invoice when
2   we confirm.  We submit an e-mail with the time that the
3   nurses put on their time sheet, then they will send it to the
4   facility.  The facility then says yes, that's the time they
5   got there, or if they got there late.
6   Q.  Okay.  But you all still would do the Next Day Pay before
7   you get the confirmation from the facility.  That's the way
8   Next Day Pay works, correct?
9   A.  That's not true.  We have to get confirmation from the
10  facility before we pay them.
11  Q.  Let me direct your attention to Plaintiff's -- the Next
12  Day Pay memo.  We previously talked about this in your case
13  in chief.
14          Do you recall this memo that was sent out to the
15  nurses when you started Next Day Pay?
16  A.  Yes.
17  Q.  And the memo states that "Steadfast Medical is
18  introducing the option of SMS instant pay for all 1099
19  contractors effective Tuesday, February 19.  Please note,
20  this is optional."
21          And scrolling down, it talks about the instructions
22  and what the nurses have to do to get paid.
23          This indicates that nurses have to, one, take a
24  picture of the time sheet and to ensure the image quality is
25  clear and legible; you submit the time sheets to an e-mail

L. Pitts - Direct

1   address; then it says "Upon receipt of the time sheet, it

2   will be forwarded to the facility to confirm hours worked";

3   four, "once the facility approves, the deposit will be

4   initiated into your requested direct deposit account.  Be

5   mindful that deposits are made upon confirmation from the

6   facility of the time sheet submitted."

7            So within this process of Next Day Pay, it's

8   automated in that the nurse submits it, the facility

9   confirms, and then payment is made, but Steadfast hasn't

10  necessarily received payment for that confirmed invoice; is

11  that right?  They've just confirmed the hours worked.

12  A.  They confirmed the hours worked, but we have a finance

13  company that gives us the money before the facility does.

14  Q.  So Steadfast advances the money.  You wait for

15  reimbursement from the facility to reconcile the invoice,

16  essentially.

17  A.  No, we don't advance the money.  That is our money.  So

18  we use our money, and we pay the staff.

19  Q.  Okay.  You use your money to pay the nurse via the Next

20  Day Pay.

21  A.  No, they don't have to wait.

22  Q.  Okay.  And so once the time is confirmed, Steadfast

23  guarantees that payment to the nurse whether or not Steadfast

24  has received the actual deposit from the facility into your

25  account.

Carol L. Naughton, Official Court Reporter

———————L. Pitts - Direct———————

```
1    A.   Exactly.

2    Q.   Okay.  So coming back to the FAB, we'll go to the next

3    page -- I skipped a page.  That was 7.  I want to go back to

4    Page 6.

5              No.  Sorry.  I'm on Page 8 now.

6              Within this process that we just talked about, and

7    also from your prior testimony, Steadfast verifies time

8    records, time sheets, to make sure nurses worked the hours

9    that they worked; is that right?

10   A.   No.  We verify it to make sure it's truthful and nobody

11   is stealing time and to make sure that those hours are

12   correct that we're paying them for.

13   Q.   So based upon the FAB, it says "A registry's active

14   creation and verification of time records may indicate that

15   the registry may be, in fact, an employer of the caregiver.

16   Tracking and independently verifying time worked is generally

17   a form of supervision on which the caregiver depends to

18   ensure proper payment and, therefore, may indicate the

19   existence of an employment relationship."

20             So Steadfast does track and independently verify the

21   hours worked of nurses; isn't that right?

22   A.   Yes, we do verify their hours.

23   Q.   So within -- so, in fact, a number of the things that

24   Steadfast does to conduct its business are in opposite to

25   what the FAB says makes an independent contractor; is that
```

──────────L. Pitts - Direct──────────

1    right?

2    A.  Repeat that again.  What did you say?

3    Q.  A number of the practices that Steadfast implements are

4    in opposite to what the FAB says regarding may be indicative

5    of being an independent contractor.

6    A.  I don't agree with that.

7    Q.  Okay.  Steadfast did not revise any of its practices to

8    conform with the examples set forth in the FAB, did it?  You

9    made no changes?

10   A.  But I don't agree with the FAB.

11   Q.  You don't agree with the FAB?

12   A.  I don't agree with the wording of the document.

13   Q.  So your position is not that you rely upon the document,

14   you just disagree with it.

15   A.  No, I didn't say I disagree with the document.  I

16   disagree with what you're saying in part of the document

17   where you're saying the "may be" part, the part -- the part

18   you're pointing out, I don't agree with.  The other parts I

19   read, that's what I agree with.

20   Q.  So there's parts of the FAB that you agree with and parts

21   that you disagree with.

22   A.  Yeah.  Because it's so vague.

23        MS. LEWIS:  No further questions for this witness,

24   Your Honor.

25        THE COURT:  The Court has a couple of questions for

L. Pitts - Direct

 1    Ms. Pitts.

 2         Ms. Pitts, you identified several memos you sent out

 3    to various facilities.  You indicated that the facilities

 4    asked you to send those memos out.

 5         THE WITNESS:  Yes, sir.

 6         THE COURT:  There's nothing to prevent the

 7    facilities from putting out guidance within the facility

 8    about what they wanted done with respect to the persons you

 9    call independent contractors in their facility, is there?

10         THE WITNESS:  They did put memos out, but they

11    wouldn't heed to it, and they were thinking people weren't

12    getting it, so they wanted us to reiterate it.

13         THE COURT:  So they asked you, as a registry, to put

14    out memos directing the independent contractors what to do?

15         THE WITNESS:  Not what to do.  They were saying

16    things they were having issues with, and they asked us could

17    we put out a memo, because they talked to them numerous

18    times, can we send out a memo, also, because maybe everybody

19    is not getting the message.

20         THE COURT:  That's not what I said.

21         They asked you to put out a memo which, in effect,

22    directed the independent contractors what to do; be on time,

23    don't sleep in the patients' beds.

24         The number of things that you put in here as

25    guidance to the independent contractors, that's what they had

Carol L. Naughton, Official Court Reporter

─────────── L. Pitts - Direct ───────────

1    you put out.  Am I correct?

2              THE WITNESS:  Yes.

3              THE COURT:  So did you view this as guidance and

4    supervision of the independent contractors?

5              THE WITNESS:  No.  I viewed it as obeying the

6    contract that I filled out with the facility, that if they

7    need help reiterating or anything, if they needed help, that

8    I was going to do what they told me they needed me to do.

9    And per their decision and per their discretion, they asked

10   me for the help, you know, and I intervened.

11             But I didn't do it as supervisor.  I did it because

12   my facility asked me to do it.

13             THE COURT:  Did you seek any legal guidance before

14   you put these memos out?

15             THE WITNESS:  I don't recall.  I don't recall

16   talking to anyone about the memos.  I didn't think it was a

17   big deal because the facility told me to.

18             THE COURT:  You didn't think that was a big deal?

19             THE WITNESS:  Because the facility asked me to do

20   it.

21             THE COURT:  A couple witnesses testified, at least

22   one of them testified that there was an issue that came up --

23   I can't even think of her name -- and a false complaint or

24   something was filed against her.  And she indicated that you

25   investigated the situation, and apparently, I guess it

————————L. Pitts - Direct————————

1    resolved in her favor.

2            Do you recall that?

3            THE WITNESS:  I didn't investigate anything.  What

4    happened was somebody Black hit a resident, and we have all

5    Black females.  So they said it was her, but it wasn't her;

6    it was another Black female.

7            I didn't investigate anything.  They asked me do I

8    know who all worked that day, and we had to look back on our

9    schedule to see who all worked that day.

10           THE COURT:  So you disagree; you did not make an

11   inquiry?

12           THE WITNESS:  No.  No.  I didn't know anything about

13   it until the facility couldn't reach her.  She said, "The

14   facility couldn't reach me, so they reached out to Lisa."

15   And they were going to file a fraud with the Board of Nursing

16   if they couldn't get some explanation on it.  I didn't do the

17   investigation.

18           THE COURT:  I think there is one other witness from

19   Sentara-Hampton who indicated there was a three-way call

20   regarding a nurse who was allegedly intoxicated.

21           Do you recall that testimony?

22           THE WITNESS:  Yeah.

23           THE COURT:  And they indicated that you became

24   involved in a three-way teleconference call wherein you

25   eventually indicated that the nurse had to take a drug test

L. Pitts - Direct

1   before she could go back.

2           Do you remember that?

3           THE WITNESS:  I didn't indicate it.  The facility

4   relayed to me, before she can come back there, she had to

5   have a drug test.

6           THE COURT:  So you didn't tell her that she had to

7   take a drug test?

8           THE WITNESS:  I told her the facility was not going

9   to let her back unless she took a drug test.

10          THE COURT:  Okay.

11          THE WITNESS:  Some of this stuff, I have to say.  I

12  mean, I can't just sit on the phone with them, Your Honor,

13  and just keep my mouth shut.  I signed a contract.  Sometimes

14  I have to act as a liaison, because these girls are violent,

15  and I have to act as a liaison with these facilities.

16          So if the facility tells me, "Hey, she needs to get

17  a drug test," I'm going to call her on the phone and tell

18  her, "Yes, you need to go get a drug test.  The facility

19  wants you to get a drug test.  Go get a drug test.  They say

20  you can't come back until you have the drug test."

21          THE COURT:  My next question has to do with the

22  rates.

23          You set the rates on the hours the persons on your

24  registry would receive for their work with the facilities; is

25  that correct?

Carol L. Naughton, Official Court Reporter

```
                              ┌─ L. Pitts - Direct ─┐
```

1           THE WITNESS:  I don't set the hours, but we have
2      different rates for different facilities.
3           THE COURT:  You set the rates?
4           THE WITNESS:  We set the rates.
5           THE COURT:  Okay.  Now, the Court noted, in one of
6      these exhibits, that you charge the facilities for overtime
7      rates for holidays; is that correct?
8           THE WITNESS:  Yes.
9           THE COURT:  And do you share any of those overtime
10     rates with the nurses?
11          THE WITNESS:  Yes.  The stars on our invoices mean
12     the nurse got time and a half for that day.
13          THE COURT:  So they get time and a half during what
14     period?
15          THE WITNESS:  Holidays.  All the holidays that
16     facilities say they are paying time and a half for.
17          THE COURT:  So you give the time and a half that you
18     get on the holidays from the facility to the nurses?
19          THE WITNESS:  I don't have to give it to the
20     facility because the nurses get -- the nurses get time and a
21     half of what they made that day.  It's a holiday.  So it's
22     like the rate -- our rate may be $60 an hour, and their rate
23     might be $40 an hour or $50 an hour, so they get 50 times
24     time and a half.  That's their rate.
25          THE COURT:  Okay.  Thank you.

─────L. Pitts - Redirect─────

1        THE WITNESS:  You're welcome.

2        THE COURT:  Do either counsel have any questions

3   based on the questions the Court's asked?  You may ask them.

4        Any redirect?

5        MR. JEWETT:  Yes, Your Honor.

6                    REDIRECT EXAMINATION

7   BY MR. JEWETT:

8   Q.  Ms. Pitts, Ms. Lewis asked you some questions about

9   Next Day Pay.  Do you recall that?

10  A.  Yes.

11  Q.  Does Steadfast require verification of the hours from a

12  facility before it will pay the actual money in Next Day Pay?

13  A.  Yes.  We have to get the hours verified.

14  Q.  So if a facility won't verify the hours, Steadfast won't

15  pay the Next Day Pay until the facility verifies it?

16  A.  We pay them, but the facilities have to verify the hours.

17  That's how we know that they actually showed up for the

18  shift.  So we don't pay them if they weren't really there.

19  Q.  Okay.  Ms. Lewis asked you a few questions about the

20  Field Assistance Bulletin.  I have a few additional ones for

21  you.  Let's look at Section H here.

22        It says "A registry does not typically create and

23  confirm records of a caregiver's hours worked."

24        Does Steadfast do this?  Do you understand that

25  sentence?  Can you see the sentence?

──────────── L. Pitts - Redirect ────────────

1   A.   Yeah, I'm looking at it.  I'm reading it.

2   Q.   Do you understand the sentence?

3   A.   Yes, I understand what it's saying.

4   Q.   Okay.  Does Steadfast do that?  Does Steadfast create the

5   records of the caregiver's hours worked?

6   A.   No.

7   Q.   It says "It may perform payroll services after the client

8   or caregiver submits time records, as discussed above, but

9   that does not indicate that the registry is the caregiver's

10   employer."

11        Does Steadfast perform payroll services once the

12   client -- in this scenario, the facility -- submits or

13   verifies the time records?

14   A.   Yes.

15   Q.   This next green paragraph:

16        "A registry might collect time sheets from

17   caregivers or offer an electronic time verification system."

18        Does Steadfast collect the time sheets from

19   caregivers?

20   A.   Yes.

21   Q.   Okay.  It says "A registry may also require the correct

22   completion and submission of certain time sheets for purposes

23   of payroll processing."

24        Does Steadfast do that?

25   A.   Yes.

L. Pitts - Redirect

1  Q.  "These activities do not indicate that the registry is
2  the caregiver's employer, as long as the client" -- that is,
3  here, the facility -- "is the one actually verifying and
4  adjusting the timekeeping information for accuracy."
5          Is the facility -- in Steadfast's model, it's the
6  facility that verifies the hours?
7  A.  Correct.
8  Q.  Ms. Lewis -- forgive my marks here.  I'm on Page 6 of the
9  FAB.
10          Ms. Lewis asked you about this section here.  She
11  pointed out that "prohibiting a caregiver from working
12  directly with clients outside of the registry" -- I'll just
13  parenthetically say -- indicates that the registry is the
14  employer and not an independent contractor relationship.  And
15  she pointed out the company's noncompete agreement.
16          Do you recall that?
17  A.  Yes.
18  Q.  Have you ever enforced a noncompete agreement?
19  A.  (Inaudible response.)
20  Q.  And, in fact, do your nurses work for your competitors in
21  other registries?
22  A.  Yes.
23  Q.  Ms. Lewis also pointed out this sentence to you.  I don't
24  believe she asked you about this last section, about
25  controlling the caregiver.

L. Pitts - Redirect

1    The FAB indicates that disciplining a caregiver for

2    his or her performance would indicate that the registry is an

3    employer and not a 1099 relationship.

4    Does Steadfast discipline its nurses --

5    A.   No.

6    Q.   -- for their performance?

7    A.   No.

8    Q.   Okay.  Let's go up to the next paragraph.  This is the

9    control factor again.

10    It provides "The registry may not, for example,

11    instruct caregivers how to provide caregiving services."

12    Does Steadfast instruct nurses how to conduct

13    nursing services?

14    A.   No.

15    Q.   Moving on, "The registry may not...monitor or supervise

16    caregivers in clients' homes."

17    Does Steadfast monitor or supervise nurses in the

18    facilities?

19    A.   No.

20    Q.   Moving on, it also says "A registry may not...evaluate

21    caregivers' performance."

22    Does Steadfast evaluate caregivers' performance?

23    A.   No.

24    Q.   "The absence of such control indicates that a registry is

25    not an employer."

──────────── L. Pitts - Redirect ────────────

1    Okay.  Let me go back to Page 5.  Let's look at this

2  last sentence.  I think I already asked you about this one.

3    It says the registry -- I'm doing some phrasing here

4  to have the question make sense for you.

5    The registry provides -- it does not assign -- the

6  work opportunities because it is matching the client with

7  caregivers who meet the requisite qualifications.

8    Does Steadfast "provide" rather than "assign" work

9  opportunities?

10 A.  We just provide it.  It's up to them to pick what they

11 want to pick up.

12 Q.  Okay.  This sentence here says -- moving up, still under

13 cancelling and assigning.

14    "A registry's lack of control over work schedules

15 and assignments may indicate that a registry is not the

16 caregiver's employer."

17    Does Steadfast control the work schedules of the

18 nurses who take shifts in its registry?

19 A.  No.

20 Q.  Hiring and firing?

21 A.  No, we don't fire.

22 Q.  You don't fire.

23    This says "A registry's inability to hire and fire

24 employees indicates that the registry is not an employer of

25 the caregiver."

─────────── L. Pitts - Redirect ───────────

1    "As with hiring" -- I'm going to the previous

2    sentence -- "the ultimate termination decision is the

3    client's."

4         Is it Steadfast's determination to remove a nurse

5    from a facility, or is it the facility's?

6    A.  It's the facility's.

7    Q.  Okay.  I'm going to ask you a question more broadly about

8    some questions Ms. Lewis asked you about your review of the

9    FAB.  There was some confusion about that.

10        She showed you your deposition transcript.  Do you

11   recall that?

12   A.  Yes.

13   Q.  Okay.  I'm going to show this to you.  She asked you

14   about the question concerning whether and when you went over

15   the FAB.  This is Page 167 of your deposition.

16        "What is the date of it?  2018?"

17        I'm sorry.  That's your answer.  You're asking her a

18   question.

19        And you said:  "I remember my attorneys going over

20   it with me, but I don't know when it was exactly."

21        Where were you at when you went over the FAB with

22   your attorneys?

23   A.  I think I was at Bredehoft's.  I'm not sure.

24   Q.  You don't recall?

25   A.  I just -- you guys have shown me thousands of documents.

———L. Pitts - Redirect———

1   Q.  I understand.

2          When you went over -- when you went over this FAB

3   with your attorney, did the attorney who went over this FAB

4   with you go through the entire FAB with you?

5   A.  I can't remember what exactly he went over, but we went

6   over stuff in that document.

7   Q.  Okay.

8          THE COURT:  When you leave the podium in the middle

9   of your questioning, it's appropriate to ask the Court for a

10  moment to confer.

11         MR. JEWETT:  I'm sorry, Your Honor.  May I please

12  confer with my co-counsel?

13         THE COURT:  Yes, you may.

14         (Pause in the proceedings.)

15  BY MR. JEWETT:

16  Q.  Ms. Pitts, I have one final question for you.

17         When you structured your registry, what was the most

18  important thing to you when you decided to classify the

19  nurses as independent contractors?

20  A.  Flexibility for them.

21  Q.  Okay.

22         MR. JEWETT:  I have no further questions.  Thank

23  you.

24         THE COURT:  If there are no further questions, may

25  the witness step down?

1    MR. JEWETT:  Yes, Your Honor.

2    THE COURT:  You may step down, Ms. Pitts.

3    (The witness stepped down.)

4    THE COURT:  Okay.  Back to counsel for the defense.

5 Now you have, I think, another witness?

6    MR. JEWETT:  We do, Your Honor.

7    I think, from a timing standpoint, between direct

8 and cross, I don't know how long the cross would be, but the

9 Court might be looking at another 35 to 60 minutes, and then

10 we also have some -- we have deposition designations that we

11 need to go through and objections we need to go through with

12 the Court as well.

13    Whatever the Court pleases, obviously.  We've

14 confirmed with the witness who is, I think, available to hang

15 out tonight, or can also come back in the morning.

16    THE COURT:  We will start again 10:00 tomorrow

17 morning.  The Court will be in recess until --

18    MS. RUST:  I'm sorry, Your Honor.

19    Just as far as the trial schedule, after we complete

20 those, we'll be resting, and then I'm not sure how long the

21 plaintiffs' rebuttal case might be, but I'm just trying to

22 get an idea that we might be presenting closing arguments on

23 Friday or if the Court would like to...

24    THE COURT:  Here is the Court's practice:

25    The Court doesn't usually have closing arguments

1    from counsel.  What the Court has is you both file

2    memorandums of proposed factual findings and conclusions of

3    law.

4              What the Court usually will do is direct the parties

5    to file a supplemental memo of proposed facts, findings, and

6    conclusions of law, and that substitutes for any closing

7    argument that either counsel can make.

8              And the Court will give you an opportunity to do

9    that, but first, the Court is going to ask you to get

10   together and order the transcript.  Now, I do not know, I've

11   not conferred with my court reporter on how long it will take

12   to produce the transcript.

13             But after that transcript is produced, you will be

14   given a certain number of days to file your proposed findings

15   of fact -- supplemental, because you have already filed

16   something pretrial -- supplemental proposed findings of fact

17   and conclusions of law.

18             And the Court will then take your filings, and the

19   Court will try to seasonably issue an opinion and ruling in

20   the case.  And I say "seasonably" because the Court's docket

21   is a train wreck between here and Christmas, and I may be

22   sitting in here most of the time.

23             I hope I'm not.  I prefer to be there working on an

24   opinion than probably sitting in here every day, but the work

25   goes on.  Though you're in here, it keeps on rolling back

1    there.

2          So that's what the Court proposes so that you won't

3    have to worry about having to fashion a closing argument.

4    That is what the Court is going to be doing.

5          So we'll recess until tomorrow morning at 10:00.

6          (Proceedings adjourned at 5:09 p.m.)

7

8

9                         CERTIFICATION

10

11      I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14

15          _____/s/_____

16                    Carol L. Naughton

17                    October 4, 2021

18

19

20

21

22

23

24

25