1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
2                  Norfolk Division

3   - - - - - - - - - - - - - - - - - - -
                                         )
4    MARTIN J. WALSH, SECRETARY OF       )
     LABOR, UNITED STATES                )
5    DEPARTMENT OF LABOR,                )
                                         )
6          Plaintiff,                    )
                                         )        CIVIL ACTION NO.
7    v.                                  )           2:18cv226
                                         )
8    MEDICAL STAFFING OF AMERICA,        )
     LLC, etc., et al.,                  )
9                                        )
           Defendants.                   )
10   - - - - - - - - - - - - - - - - - - -

11

12                 TRANSCRIPT OF PROCEEDINGS

13                **  Bench Trial - Day 7  **

14                    Norfolk, Virginia

15                   September 9, 2021

16

17   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
18

19   APPEARANCES:

20           UNITED STATES DEPARTMENT OF LABOR
             By:  Ryma N. Lewis
21                Chervonti Jones
                  Mohamed E. Seifeldein
22                Counsel for the Plaintiff

23           PIERCE McCOY, PLLC
             By:  Joshua L. Jewett
24                Julia A. Rust
                  Aaron D. Siegrist
25                Counsel for the Defendants

1                         I N D E X

2

    DEFENDANTS'
3   WITNESSES                                          PAGE

4     JOHN BREDEHOFT
            Direct Examination By Mr. Jewett          1061
5           Cross-Examination By Mr. Seifeldein       1083
            Redirect Examination By Mr. Jewett        1115
6

7

8                       E X H I B I T S

9   PLAINTIFF'S
10  NO.                                               PAGE

11    PX-103                                          1092
      PX-104          (For ID only)                   1103
12

13  DEFENDANTS'
    NO.                                               PAGE
14
      DX-2                                            1123
15    DX-76                                           1127
      DX-77                                           1127
16

17

18

19

20

21

22

23

24

25

              Carol L. Naughton, Official Court Reporter

─────────────── J. Bredehoft - Direct ───────────────

1    (Proceedings resumed at 10:02 a.m.)

2    THE COURT:  Good morning, ladies and gentlemen.  We

3  are ready to commence with the next witness from the

4  defendants.

5    MS. RUST:  Your Honor, the defendants call John

6  Bredehoft.

7    THE COURT:  All right.  Step forward to be sworn.

8    MR. JEWETT:  Your Honor, within the stands with us

9  is Mr. Pat O'Donnell from Mr. Bredehoft's law firm.

10    THE COURT:  Will he be testifying in this case?

11    MR. JEWETT:  He is not.  He is here attending with

12  Mr. Bredehoft.

13    THE COURT:  All right.  Thank you.

14    (Witness sworn.)

15    JOHN BREDEHOFT, called by the Defendants, having

16  been first duly sworn, was examined and testified as follows:

17                       DIRECT EXAMINATION

18  BY MR. JEWETT:

19  Q.  Good morning, Mr. Bredehoft.

20  A.  Good morning, Counsel.

21  Q.  Could you please state your name and spell your last name

22  for the court reporter.

23  A.  Of course.  My name is John Michael Bredehoft,

24  B-r-e-d-e-h-o-f-t.

25  Q.  Thank you.

J. Bredehoft - Direct

1      Are you familiar with Lisa Pitts?

2   A.   Yes, I am.

3   Q.   How is that?

4   A.   I and my firm represented her for a while in matters

5   against the U.S. Department of Labor.

6   Q.   Okay.  Before I get into that, I would like to ask you a

7   few background questions.

8   A.   Sure.

9   Q.   In what states are you licensed to practice law?

10  A.   I am admitted to practice in Virginia, the District of

11  Columbia, and the state of Maryland and a number of federal

12  courts.

13  Q.   Did you read for the Bar, or did you graduate from law

14  school?

15  A.   No.  I graduated from law school.

16  Q.   Your law school and your year of graduation?

17  A.   I graduated in 1983 cum laude from Harvard.

18  Q.   You graduated in 1983.

19       About how long have you been practicing law?

20  A.   I began practicing immediately thereafter, upon my

21  admission to the Bar.  I worked with the firm in a nonlegal

22  capacity until Bar results came out in December, in D.C., and

23  I've been practicing continuously ever since.

24  Q.   And have you practiced in the area of labor and

25  employment during the course of your career?

J. Bredehoft - Direct

1    A.  Yes, I have.

2    Q.  In how many of those years have you practiced in the area

3    of labor and employment law?

4    A.  It has formed the predominant part of my practice since

5    approximately 1984, although I did do labor and employment

6    matters before that.  I'm sorry, 1994.

7    Q.  My acoustics aren't very good right here.  Could I ask

8    you to get a little bit closer to the microphone.

9    A.  Is this better?

10   Q.  That's better.  Thank you.  I appreciate it.

11          Your current position?

12   A.  I'm an equity member of the law firm of Kaufman & Canoles

13   in Norfolk.

14   Q.  Back to your practice experience, does your practice

15   experience include representing and advising clients on the

16   Fair Labor Standards Act?

17   A.  Yes, it does.

18   Q.  Have you previously advised companies regarding the

19   classifications of workers as independent contractors under

20   the Fair Labor Standards Act?

21   A.  Yes, I have.

22   Q.  About how many?

23   A.  I would be unable even to estimate.  I believe it would

24   be at least scores.  I don't want to say it was hundreds, but

25   it might be.

—————————————J. Bredehoft - Direct—————————————

1   Q.   Okay.  And have you also represented medical registries

2   in matters adverse to the Department of Labor?

3   A.   I have represented medical staffing agencies in matters

4   adverse to the Department of Labor.  I have also represented

5   medical registries in matters where the Department of Labor

6   was not adverse.

7   Q.   You make a distinction between medical staffing companies

8   and medical registries.  What is that distinction?

9   A.   What I call "medical staffing companies" hire nurses and

10  then place the nurses, and in that case, the nurses are

11  employees of the staffing company.  Registries merely set up

12  a matching service to allow nursing homes, hospitals, other

13  facilities to be matched with nurses who are willing to work

14  there.

15  Q.   Okay.  And just following up on that, in your experience,

16  are medical registries -- the nurses who accept positions out

17  of medical registries, are they typically classified as

18  independent contractors?

19          MS. LEWIS:  Objection, Your Honor.  Calls for a

20  legal conclusion.

21          MR. JEWETT:  Your Honor, Rule 701 allows the witness

22  to --

23          THE COURT:  Well, are you calling him as an expert,

24  or are you calling him as a lawyer for the defendants?

25          MR. JEWETT:  Well, 701 does accept from Rule 702

Carol L. Naughton, Official Court Reporter

———————J. Bredehoft - Direct———————

 1  certain opinions as long as it's based on --

 2          THE COURT:  Sustained.

 3          MR. JEWETT:  Okay.

 4  BY MR. JEWETT:

 5  Q.  So let me back up.

 6          You said that you have experience representing and

 7  advising companies on independent contractor questions.

 8          Are you familiar with the economic realities test,

 9  sometimes referred to as the *Silk* test?

10  A.  Yes.

11  Q.  Going back to Ms. Pitts, how is it that you came to

12  represent Ms. Pitts?

13  A.  An attorney in our firm was asked by a judge in Virginia

14  Beach, I believe a state court judge, to see if we could

15  assist Ms. Pitts.  And that attorney called me.  I called

16  Ms. Pitts.  We met, and we accepted representation.

17  Q.  When did you start representing Ms. Pitts?

18  A.  I don't know the date the engagement letter was signed,

19  but I believe my first meeting with Ms. Pitts occurred about

20  June 15, 2018.

21  Q.  Okay.  Before I get to that first meeting, did you meet

22  with Ms. Pitts -- your first meeting was around June 15th.

23          Did you meet with Ms. Pitts on multiple occasions

24  following that meeting?

25  A.  I am not sure -- pardon me, Your Honor.  May I move the

1  chair?  My wife gave me a new hip for Christmas, and it's not

2  fully unwrapped.

3         Thank you.

4         I know I met with Ms. Pitts in January of 2019,

5  probably in the third week.  I can't exclude the possibility

6  that we met physically other than those two times, but I

7  don't remember it.  It would have been in the context of

8  gathering documents to respond to discovery.

9  Q.  Okay.  Let's go back to the first meeting.

10        Was this first meeting in person or over the phone?

11 A.  It was in person.

12 Q.  Okay.  And about how long did it last?

13 A.  My best recollection is it lasted more than an hour,

14 perhaps up to two hours, but perhaps not.

15 Q.  Okay.  And did you obtain any information from Ms. Pitts

16 about her company during that meeting?

17 A.  Yes.  We met at the offices of her general corporate

18 lawyer, Wanda Cooper, who was also present, and Ms. Pitts

19 described for me the operations of Steadfast.  I asked

20 questions, and we talked back and forth about how it worked.

21 Q.  Okay.  And based on -- well, let me ask you this:

22        Can you give the Court some more details about the

23 operations that she provided to you -- strike that.

24        Can you give the Court more details about what she

25 informed you about the operations of her company during that

J. Bredehoft - Direct

1    first meeting?

2    A.  Sure.

3         During that first meeting, we discussed the

4    differences between a staffing agency and a registry.  We

5    discussed where her individual nurses would match themselves

6    with where -- I mean physically, geographically, in

7    facilities, how someone would get on the registry, what

8    Steadfast did for people who were on the registry, any

9    expenses that Steadfast assumed for people who were on the

10   registry, anything that Steadfast provided for people who

11   were on the registry, and restrictions or mandates regarding

12   how often they needed to work, whether they needed to call in

13   if they were going to be sick, whether they needed to call in

14   if they were taking vacation.

15        That is the general parameter of the things that we

16   discussed at the first meeting regarding the working

17   conditions.  We also discussed what documents existed, what

18   discovery would be possible.  And we did discuss the nature

19   of the economic realities test.

20   Q.  In that first meeting, did you walk through the factors

21   of the economic realities test with Ms. Pitts?

22   A.  Well, we didn't walk through the seven factors that are

23   set out in the Department of Labor's Publication 13.  We did

24   talk about a number of the factors that are in the

25   publication.  We didn't go through them seriatim.

———— J. Bredehoft - Direct ————

```
 1          Can I say this?  I'm not sure, Your Honor.
 2          In my experience, the most important factor has been
 3     a particular factor.
 4          MS. LEWIS:  Your Honor, objection with respect to --
 5          THE COURT:  I'm going to overrule it.  He can tell
 6     us what he discussed with her.  He can certainly do that.
 7          THE WITNESS:  Thank you, Your Honor.
 8          I did tell Ms. Pitts that, in my experience, the
 9     most important factor of the economic realities test, as set
10     out in Fact Sheet 13, was the fourth factor, which is the
11     degree of power or control that the entity exercises over the
12     performance of the job.
13          We also talked about scheduling, which is relevant
14     to one of the other factors, I think the second factor,
15     permanence.  And we talked about what the expenses were for a
16     nurse on the registry who assumed those -- the fact that
17     Steadfast did not assume any of those expenses, except for
18     paying for a background check, which goes to at least two of
19     the other factors on that list.
20     BY MR. JEWETT:
21     Q.  Okay.  Did you discuss classification of the nurses in
22     Steadfast's registry during this initial meeting with
23     Ms. Pitts?
24          THE COURT:  Mr. Jewett, you need to let him tell us
25     what he discussed.  The Court doesn't want you to lead him
```

————————J. Bredehoft - Direct————————

1    through some of the essential factors or issues.  Let him

2    tell us what he discussed.  In other words, that question, in

3    its own way, is a leading question and is something that the

4    Court is concerned about.  So you let him tell us what he's

5    discussed.  So far he's done a good job of telling you what

6    he discussed.

7             MR. JEWETT:  Your Honor, may I ask Mr. Bredehoft if

8    he discussed the classification question with Ms. Pitts in

9    this first meeting?

10            THE COURT:  All right.

11            MR. JEWETT:  Thank you.

12   BY MR. JEWETT:

13   Q.  Did you discuss the classification question with

14   Ms. Pitts during this initial meeting?

15   A.  Absolutely.  That's why I was there.

16   Q.  And what did you tell Ms. Pitts about that?

17   A.  Well, this was only on a brief acquaintance, but we

18   discussed at the first meeting, I remember, the fact that --

19   any of these facts are coming to me.  I don't know them of my

20   own -- but the fact that the individuals could call in or not

21   as their own decision and that there were no negative

22   consequences to any individual deciding not to call in or not

23   to work.

24            We discussed that individuals did not need to get

25   permission for taking a break, that some individuals -- I

—————————————J. Bredehoft - Direct—————————————

1  remember this clearly from both of our meetings -- some

2  individual nurses would call in once or twice, then not for a

3  couple of years, and then call in again after a couple of

4  years with no negative consequences.

5           We discussed that several nurses -- I don't know how

6  many, and I don't think we discussed that at the first

7  meeting -- that nurses would work for two or three weeks and

8  then take off for two or three weeks, or work a week on, a

9  week off, and again, there was no negative consequence to any

10 of the scheduling.

11          We discussed that there were no restrictions, I was

12 told at the first meeting, on any of the nurses working for a

13 facility outside the registry, not going through it, or from

14 working through another registry even at the same facility,

15 and that that was a not-uncommon occurrence, that nurses

16 would be registered with several different registries, work

17 through them at their disposal, at their own choice.

18          We discussed the fact that the nurses knew that,

19 that they had the ability to work at other facilities or

20 through other staffing agencies, because they frequently did

21 so, without negative consequence.

22          And at the first meeting --

23          THE COURT:  Well, I think you might want to stop

24 there and see where he goes next with his questions.

25          THE WITNESS:  Very good, Your Honor.

─────────────── J. Bredehoft - Direct ───────────────

1   BY MR. JEWETT:

2   Q.  Did you provide Ms. Pitts an opinion in that first

3   meeting about whether the nurses appeared to be classified

4   correctly?

5   A.  I did not provide a formal legal opinion, and she didn't

6   ask me if they were properly qualified.  I did, however, say

7   that it appeared to me that they were properly qualified

8   based on the information I had been provided so far.

9   Q.  You mentioned that you had a second meeting with Pitts, I

10  think, did you say January 2019?

11  A.  I believe it is the third week of January.

12  Q.  Before I get into what you advised Ms. Pitts in that

13  meeting, I want to ask you a few questions about what

14  information you had at your disposal heading into that

15  meeting.

16          Well, actually, let me ask you this:

17          That second meeting you had with Ms. Pitts, about

18  how long was it, and was it in person?

19  A.  It was in person.  It was several hours.  It was not only

20  to meet with her and discuss the case in general, but also to

21  prepare her for her deposition.

22          We also prepared one of her employees for her

23  deposition during those meetings, and I believe Ms. Pitts may

24  have sat in on that.  It was a number of hours, half a day,

25  perhaps more.

—————J. Bredehoft - Direct—————

1  Q.  So prior to that meeting, had you obtained any additional

2  information about Steadfast before that meeting?

3  A.  Yes.  We were engaging in responding to discovery, and we

4  had received, and I had reviewed, a large number of the

5  agreements between Steadfast and the nurses on the registry.

6  I have also received and, I believe, reviewed all of the

7  agreements between Steadfast and healthcare providers, such

8  as hospitals.  I believe I reviewed all of those.

9          We had also received a large number of invoices and

10  transactional documents.  I have to say, I reviewed what I

11  believed to be a representative sample of those, but I

12  certainly did not review all of the invoices personally.

13  Q.  You said that you reviewed a number of facility

14  contracts.  Are you aware that some of those facility

15  contracts included a buyout clause?

16  A.  Yes.

17  Q.  Did the fact that some of those contracts contained a

18  buyout clause -- did that give you concern about the

19  classification status of the nurses?

20  A.  No.

21  Q.  Why is that?

22  A.  Because -- well, for a number of reasons.  First, I had

23  previously seen agreements from other registries as well as

24  from staffing agencies that contained buyout clauses.

25  Second, it really doesn't go to any of the seven factors in

─────────────── J. Bredehoft - Direct ───────────────

 1  the Department of Labor Wage and Hour Fact Sheet 13, which is

 2  the Department's analysis of how to interpret the economic

 3  realities test.

 4          The Department says, and I agree, the economic

 5  realities test is really about whether this individual is

 6  dependent for the entity on their livelihood.  In this

 7  registry circumstance, the nurse is not, and the buyout

 8  clause doesn't change that.

 9  Q.  Okay.

10          MS. LEWIS:  Your Honor, I'm going to object to some

11  of this line of questioning.  If Mr. Bredehoft is here to

12  testify with respect to the legal advice and opinions he gave

13  Ms. Pitts, I think that that is perfectly permissible, but he

14  hasn't been presented as an expert, and much of this

15  commentary that he's providing is outside of the scope of

16  what information he gave her and based upon that information

17  she relied upon.

18          MR. JEWETT:  Your Honor --

19          THE COURT:  Wait a minute, before you say anything.

20          I heard what he said.  He can testify to what he

21  told her about the buyout clause, but all the analysis of why

22  he told her, the Court will sustain that.  I mean, he can

23  tell us what he told her.  He told her there's no problem

24  with the buyout clause, in his opinion, and other things.

25  But the Court doesn't need your analysis of the opinion of

J. Bredehoft - Direct

1    whether that is, in fact, correct or not.  The Court will

2    determine that itself.

3            MR. JEWETT:  Of course, Your Honor.  If I can just

4    respond with one brief comment.  We do have the burden of

5    proof, of course.

6            THE COURT:  I know you have the burden of proof.

7            MR. JEWETT:  One of the categories is that we have

8    to show that Mr. Bredehoft had a reasonable basis for giving

9    the opinion, which is why we're getting into this "why"

10   question, the basis for his opinion.

11           MS. LEWIS:  Your Honor --

12           MR. JEWETT:  That's one of the two prongs for the

13   good-faith defense.

14           MS. LEWIS:  Right, Your Honor, but the reasonable

15   basis is not -- it's information that Ms. Pitts provided him

16   and that he relied upon in giving that advice.  This

17   additional commentary goes to -- as the Court noted, the

18   Court's purpose in here is to make that determination.

19           He testified with respect to his credentials.  We

20   know he's been an attorney who has practiced for a number of

21   years in this area.  Much of his commentary goes beyond that.

22   He testified that he was provided documents, he reviewed

23   that, and based upon that, "X is my opinion."

24           The Secretary maintains that that is appropriate,

25   but there's been -- more so, he's relying on additional

J. Bredehoft - Direct

1    documents and information that haven't even been presented
2    into evidence.
3           THE COURT:  He provided us the basis for his opinion
4    based upon the information she provided.  He said he reviewed
5    the contract.  He found those buyout agreements to be proper,
6    based on having seen them other places, but what I'm saying
7    is I really do not need his legal analysis.
8           MR. JEWETT:  Understood, Your Honor.  Thank you.
9           THE COURT:  All right.  And I think, in terms of
10   your burden to show the reasonable basis, reasonable basis is
11   he said he reviewed the contract.  He's seen that before, so
12   he gave her advice.  Nothing wrong with the buyout
13   agreements.
14   BY MR. JEWETT:
15   Q.  Okay.  Mr. Bredehoft --
16   A.  Your Honor, may I clarify?
17          THE COURT:  Not unless he asks you a question.
18          THE WITNESS:  Very good, sir.
19   BY MR. JEWETT:
20   Q.  We were talking about the documents you reviewed, the
21   buyout clause.
22          Did Ms. Pitts, during that meeting, provide you any
23   additional information about the scheduling for nurses?
24   A.  The answer to that is yes.  We talked -- it was not new
25   information, by and large, but we confirmed that the nurses

———————J. Bredehoft - Direct———————

1   themselves had full autonomy as to whether or not they would

2   be scheduled, that there were no negative consequences --

3            (Brief interruption.)

4            THE WITNESS:  Thank you very much.  I'm COVID

5   negative, but I am allergic to everything.  Pardon me.

6            We discussed that there would be no negative

7   consequences to any of the nurses for not calling.  We

8   discussed a particular circumstance in which a nurse would go

9   to -- sign up for and go to a facility and then leave sick

10  and whether there would be any negative consequences to the

11  nurse for that, and I was told no.

12           We also discussed a particular instance -- and these

13  were not given instances, these were examples -- where a

14  nurse would say, yes, they were going to the facility and

15  they did not go, and I was told that, in that case, Steadfast

16  would merely attempt to match someone else on the registry,

17  and there were no negative consequences to the nurse who

18  didn't show, at least not from Steadfast.

19           And I think that is all the additional information

20  that I was provided regarding scheduling during the second

21  meeting.

22  Q.  I think you touched on this briefly when you were

23  answering my question, but did you discuss with Ms. Pitts the

24  nature in which nurses would take time off from the registry,

25  such as a vacation or --

J. Bredehoft - Direct

1    A.  Oh, yes.  We discussed that at the first meeting and at

2    the second meeting.  The discussion at the second meeting was

3    consistent with the discussion of the first meeting.  It

4    wasn't new information.  It was just that a nurse would take

5    a vacation by not calling in.  There was no need to get

6    permission from Steadfast or even to apprise Steadfast that

7    the nurse would not be calling in; same thing for sick days.

8            That information was provided to me by Ms. Pitts and

9    also by Christine Kim at the second meeting, who was

10   essentially the office manager, but that was consistent with

11   what I had heard at the first meeting.  It wasn't new

12   information.

13   Q.  Did you discuss with Ms. Pitts how the nurses were

14   actually paid?

15   A.  Yes, I did.

16   Q.  So based on the information you discussed with Ms. Pitts

17   at this second meeting, did you evaluate the economic

18   realities of the situation at the second meeting?

19   A.  Yes, I did.  There was a substantial additional

20   information that we discussed at the second meeting that also

21   came into my evaluation; but, yes, we discussed where the

22   economic realities test, as interpreted through the

23   Department of Labor Fact Sheet 13, would come out.

24   Q.  Did Ms. Pitts ask you during that meeting what factors

25   you thought were important?

J. Bredehoft - Direct

1  A.  I believe I stated the factors which I thought were most

2  important.  I do not believe she asked me the question "Which

3  factors do you think are most important?"

4  Q.  Did you convey to Ms. Pitts at the second meeting your

5  assessment of the control factor?  You mentioned that

6  earlier, the control factor.

7  A.  Yes, I did.

8       MS. LEWIS:  Your Honor, I'm going to, again, object

9  to this.  He's already answered and provided his opinion

10  about what is most important, but that is not what is

11  controlling here; it's the law and the Court's determination.

12       Moreover, the law is very clear.  No one factor is

13  dispositive, and we keep coming back to the same line of

14  questioning seeking to elicit a legal analysis or conclusion

15  with respect to the same.

16       MR. JEWETT:  I asked Mr. Bredehoft what he conveyed

17  to her in the first meeting, and I'm asking what he conveyed

18  to her in the second meeting.  I think what he advised her in

19  the meetings is important.

20       THE COURT:  Well, I think what you're doing is

21  you're leading him into the potential elements or issues.

22  That's what you're doing.  He said he discussed the economic

23  realities test with her, and he went through a series when he

24  first started testifying.  I think he laid out what he

25  considered to be most important.  He's done that.

——————J. Bredehoft - Direct——————

1    So your question, in its own way, leads him through

2  some things he has not raised.  But let's put it this way:

3    This is not a jury trial.  This is a bench trial,

4  and the Court can understand exactly what is happening with

5  respect to your questions, whether you are, in fact, leading

6  him or not.  So I'm going to let you ask him that question,

7  but just be aware about the way you phrase the question.  I

8  think he's been very clear about what he discussed on each

9  occasion.

10    MR. JEWETT:  Thank you, Your Honor.

11  BY MR. JEWETT:

12  Q.  So, Mr. Bredehoft, in the second meeting with Ms. Pitts,

13  did you convey to her your assessment based on the

14  information she provided you of the control factor?

15  A.  Yes, I did.

16  Q.  And what did you tell her?

17  A.  I told her -- and this is something I actually said to

18  her, Your Honor.  I hope I'm not transgressing -- but that in

19  my reading of the law, the control factor was the most

20  important factor.  And, here, Steadfast exercised no control

21  over the manner in which the nurses perform their tasks.

22    It did not have the ability to discipline them.  It

23  did not have the ability to initiate any type of progressive

24  proceeding against them.  It did not exert a quality control

25  function over them.  It did not review -- and this is all

——————————————————————J. Bredehoft - Direct——————————————————————

1  what I said to her -- it did not review their work to see if

2  it was acceptable for nursing or if improvements could be

3  made, and that all of that combined with the scheduling

4  issues and, in particular, the fact that they could work for

5  other staffing companies made it seem to me that the control

6  factor here -- and I did use this term -- would be

7  "dispositive."

8  Q.  Did you discuss with Ms. Pitts during that second meeting

9  the degree of skill required of the nurses?

10 A.  We discussed whether there was anything extraordinary or

11 different about -- I asked anything extraordinary or

12 different about the degree of skill required, and I believe

13 the response was, no, because once they have the licensure

14 and have met the requirements of the Board of Nursing,

15 Steadfast doesn't delve further into that.

16 Q.  Okay.  Did you discuss with Ms. Pitts your assessment of

17 the permanence factor in that second meeting?

18 A.  Yes, I did.

19 Q.  What did you tell her?

20 A.  I told her that I thought the fact that certain

21 individuals on the registry could call in and then not call

22 in for two years and still be matched on the registry of the

23 second call -in without any negative implication indicated

24 that there -- at least with respect to the structure of the

25 organization, there was not the degree of permanence that is

J. Bredehoft - Direct

1    usually found in employment relationships.

2    Q.  I just want to ask you about two more of the factors and

3    whether you discussed those with Ms. Pitts.

4            You are familiar with a profit-and-loss factor?

5    A.  Yes, I am.

6    Q.  Did you discuss that with her?

7    A.  Only in passing, and it didn't perform -- it didn't

8    affect my analysis much.  We discussed that the company paid

9    virtually none of the expenses and that any expenses incurred

10   in getting ready to work, such as licensure itself and the

11   tuberculosis test, which is required, I believe by the

12   Department of Nursing in Virginia, and the CPR certification,

13   which, I believe, is required by Nursing, that was all on the

14   dime of the nurse who wants to be on the registry.

15           So while I didn't think -- I told her I didn't think

16   that was an important factor, I thought that, to the extent

17   it existed, it was probably in her favor.

18   Q.  I think the last question on the factors and whether you

19   talked to Ms. Pitts about it in the second meeting is:

20           Are you familiar with the factor of whether the work

21   is integral to the business?

22   A.  Yes.

23   Q.  Did you discuss that factor with Ms. Pitts during that

24   meeting?

25   A.  Yes, we did.  And although I didn't use the term

J. Bredehoft - Direct

1    "integral," we actually discussed it during the first meeting

2    as well.

3           There are individuals whose work is integral to the

4    business of the registry.  Those are the call-in center

5    people, the office manager.  They are all employees because

6    their work is integral.

7           But the staffing agency in other cases and the

8    registry in this case does not nurse.  The work that is being

9    performed is nursing.  And the individuals who are on the

10   registry are nursing.  I mean, that's not the business of

11   this company.

12   Q.  All right.  Based on the information Ms. Pitts provided

13   you, did you provide an assessment during that meeting about

14   whether, in your judgment, the workers should be classified

15   as independent contractors?

16   A.  Yes, I did.

17   Q.  And what did you inform Ms. Pitts?

18   A.  I informed her to a very high degree of confidence that,

19   in my view, they were independent contractors, and I told her

20   that, in my view, she had a very good or excellent chance of

21   prevailing on the issue, if it should be challenged all the

22   way to trial.  And I remember using the word "excellent"

23   chance.

24          MR. JEWETT:  No further questions.  Thank you.  And,

25   of course, the Department may have some questions for you.

———————————J. Bredehoft - Cross———————————

```
1              THE COURT:  Cross-examination.

2              MR. SEIFELDEIN:  Thank you, Your Honor.  Good

3    morning, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. SEIFELDEIN:

6    Q.  Good morning, Mr. Bredehoft.  My name is Mohamed

7    Seifeldein.  I'm an attorney with the Department of Labor.  I

8    have a few questions for you here based on the discussion

9    that you had with defendants' counsel.  Let's just start from

10   the end here.

11             You did not advise defendants that they could

12   continue to classify the nurses as independent contractors,

13   correct?

14   A.  I was not asked to give that advice; that's correct.

15   Q.  So your advice was exclusively to the probability of

16   prevailing in this case.

17   A.  If I remember my exact words, the use of the word

18   "excellent" chance was --

19   Q.  It was a yes-or-no question.

20             THE COURT:  Well, hold on a second here.

21             The Court's procedure here is the witness may answer

22   "yes" or "no" and explain his or her reason for saying "yes"

23   or "no."

24             So if you can answer it "yes" or "no," you can, and

25   then you can give your opinion, your statement.
```

———J. Bredehoft - Cross———

```
 1            THE WITNESS:  I'm not sure I can answer that "yes"
 2     or "no," although I can say that the statement where I said
 3     there was an excellent chance of prevailing certainly related
 4     to chances of prevailing in this proceeding.
 5     BY MR. SEIFELDEIN:
 6     Q.  I'll come back to that in a second.
 7     A.  Sure.
 8     Q.  So you began representing Ms. Pitts and Steadfast in June
 9     of 2018?
10     A.  I believe that's correct.
11     Q.  And your representation ended on or about February 2019?
12     A.  Yes, I believe that is correct.
13     Q.  And your scope of representation was limited to defending
14     this lawsuit, correct?
15     A.  Yes, that's correct.
16     Q.  All right.  The probability of winning the lawsuit?
17            The scope of the representation was limited to
18     defending the lawsuit that the Department of Labor had
19     brought against defendants, correct?
20     A.  Yes.  I just said that.
21     Q.  Let's have you look at -- it's now going to be PX-103.
22            MR. SEIFELDEIN:  Ms. Lewis, it's the e-mail between
23     Mr. Bredehoft and the defendants' counsel.
24     BY MR. SEIFELDEIN:
25     Q.  And if we scroll to the bottom of that e-mail, you
```

---J. Bredehoft - Cross---

1    received an e-mail from defendants' counsel asking to speak

2    with you regarding the advice you gave to defendants,

3    correct?

4                MS. RUST:  Sorry, our screen is not on.

5                THE WITNESS:  My screen has just come on.

6                (Pause in the proceedings.)

7    BY MR. SEIFELDEIN:

8    Q.  And let's just begin by identifying the e-mail, who it

9    came from and to who, for the record, and then we'll get into

10   the vital part.

11               This is an e-mail that you received from Mr. Josh

12   Jewett, counsel for Steadfast and Lisa Pitts, on or about

13   January 11, 2020, and that's your e-mail, correct?

14   A.  That's my correct e-mail address, yes.

15   Q.  When you received it from defendants' counsel?

16   A.  Since 2006, that has been my correct e-mail address.

17   Q.  The question was:

18               This is the e-mail you received from defendants'

19   counsel on January 11, 2020, correct?

20   A.  Yes.  I said that.

21   Q.  Okay.  Thank you.

22               Now, defendants' counsel asked you -- I'm sorry.

23               This is defendants' counsel asking to speak with you

24   about the advice you rendered to the defendants, correct?

25   A.  Yes.

————J. Bredehoft - Cross————

1    Q.  All right.

2              MR. SEIFELDEIN:  And let's go up to -- higher, the

3    next e-mail.

4    BY MR. SEIFELDEIN:

5    Q.  And this is your response, correct?

6              Let's identify it for the record, the date.

7              So that's your e-mail address again.  You responded

8    on January 13, 2020, at 8:49 a.m., to defendants' counsel

9    Josh Jewett saying, of course, you're willing to discuss it

10   with them, "although we were not retained to provide that

11   advice."

12             You recognize this document, correct?

13   A.  I'm sorry.  Did you --

14   Q.  Do you recognize this document as your e-mail?

15   A.  Sure.

16   Q.  Okay.  And the advice that you're talking about there is

17   the classification to Ms. Pitts and defendants about their

18   contractors, correct?

19   A.  That's exactly correct.  We were not retained to provide

20   that advice.

21   Q.  Okay.

22             MR. SEIFELDEIN:  Keep going to the highlighted part.

23   BY MR. SEIFELDEIN:

24   Q.  And this is an e-mail from you to one of your attorneys

25   in the law firm, correct?

—————J. Bredehoft - Cross—————

```
 1   A.  That's correct.  Sharon Reyes is the associate who was
 2   working with me on the matter.
 3   Q.  This is an e-mail from February 20, 2020, correct?
 4   A.  That's correct.
 5   Q.  And, here, you are checking with one of your associates
 6   about the advice you have given, and you asked them to review
 7   the documents, although you were almost certain that you had
 8   not provided advice regarding classification, correct?
 9   A.  I don't see anything there on reviewing the documents.
10   I'm sorry.
11   Q.  Let's read it.
12        She's relying on advice of counsel -- defendants --
13   saying that "We" -- "we," that's your firm -- "told her that
14   they -- the way she was doing it was correct, the
15   classifications.  I do not remember giving her advice --
16   giving her this advice, although I do remember telling her on
17   many occasions that she had a much stronger case than most I
18   have seen."
19   A.  And that I believed her individuals were, in fact,
20   independent contractors.  This may be a distinction without a
21   difference.  Yes, I wrote that.  It's correct.
22   Q.  So the question was:
23        You didn't give her advice on the classification,
24   and that's you saying that to your counsel and saying it to
25   her counsel as well.
```

J. Bredehoft - Cross

1    MR. JEWETT:  Objection.  He's mischaracterizing

2    Mr. Bredehoft's testimony.

3    THE COURT:  Objection overruled.  We're talking

4    about the e-mail here.  Now, let's just stick with the e-mail

5    and make it clear what you're talking about, Mr. Seifeldein.

6    BY MR. SEIFELDEIN:

7    Q.  I am talking about the e-mail, sir.

8    A.  Sure.  I wrote it.  It is correct.  We didn't give

9    advice, but I did tell her on many occasions that she had a

10   much stronger case and that I believed her individuals were,

11   in fact, independent contractors.  I told her that.

12   Q.  Yes, you told her that.

13   A.  If you call that advice or not advice or something that

14   comes up in the defense of a case, that's what I said.

15   Q.  Well, that's for the Court to decide.

16   I'm just asking you about what you said and the

17   distinctions that you made.

18   THE COURT:  I think the e-mail is clear to the Court

19   what has been said.

20   MR. SEIFELDEIN:  Absolutely, Your Honor.

21   BY MR. SEIFELDEIN:

22   Q.  So this is the e-mail that your associate sent to you.

23   Could you just read it and identify who the

24   associate is.

25   A.  Sure.  Ms. Reyes at this time continued to be the

—————J. Bredehoft - Cross—————

1   associate who had been assigned to the case.  She's still an
2   associate with our firm.  That is an e-mail that I received
3   from her on February 20th, and I remember reading it, yes.
4   Q.  Okay.  And this, again, goes to the same topic.
5        Your associate is saying "I did not advise her that
6   they were properly classified.  I would only have explained
7   the argument that we were planning to make for summary
8   judgment."  Correct?
9   A.  That's exactly correct, and that's consistent with my
10  recollection today.
11  Q.  Okay.  So let's go back to the June 15, 2018, meeting
12  that you had at Ms. Cooper's office.
13       During this meeting, you mainly obtained information
14  from Ms. Pitts, correct?
15  A.  That's correct.  Ms. Cooper did chime in on a number of
16  cases, but it was mostly Ms. Pitts.
17       I'm sorry.  If you're rolling your eyes at me, I
18  will stop doing whatever does that.
19  Q.  At the first meeting, sir, you mainly discussed the
20  control factors, such as discipline, schedule control, and
21  the nurses holding multiple jobs, correct?
22  A.  That formed the majority of the conversation, yes, in the
23  context of discussing -- yes, in the context of discussing
24  what the overall test was, yes.
25  Q.  You also discussed the nurses being registered or working

 1   for another agency and you discussed the control factor,

 2   right?

 3   A.  I don't understand your question.  We did discuss what

 4   you say we discussed.  I don't know what the second half of

 5   the question means.

 6   Q.  Let me clarify, Mr. Bredehoft.

 7   A.  Sure.

 8   Q.  And I appreciate you saying that you don't understand the

 9   question.  So if you don't understand the question, just for

10   the record, let me know before you provide an answer, and

11   then I'll restate the question.

12           Does that make sense?

13   A.  Okay.

14   Q.  Thank you.

15           During the first meeting in June 2018, you discussed

16   with Ms. Pitts that her nurses could work at another job,

17   correct?

18   A.  Yes.

19   Q.  And you discussed that this is part of the control

20   factor, correct?

21   A.  I don't understand the question, and the reason is --

22   Q.  Okay --

23   A.  -- there's no such thing as a control factor.

24           THE COURT:  The Court understands the question.  In

25   the last series of questions to you from her counsel, he

─────────J. Bredehoft - Cross─────────

1   asked you about the control factor, and you gave testimony

2   about the ability of the nurses to work for other people and

3   that it would not have a negative consequence.

4           So the Court understands what he's asking you.  Did

5   you discuss it or didn't discuss the control factor in the

6   first meeting?

7           THE WITNESS:  We discussed factor 4, which is the

8   degree of control, absolutely.

9           THE COURT:  All right.  Let's move on.

10          MR. SEIFELDEIN:  Your Honor, just some housekeeping.

11  I'll move to admit PX-103, the e-mail.

12          THE COURT:  You don't admit those.  You admit --

13  hold on.

14          For what purpose did you do that?  No, it wasn't to

15  refresh recollection.  So they are admissible.

16          Any objection to the e-mail?

17          MR. JEWETT:  Your Honor, these e-mails were not

18  provided as part of the Final Pretrial Order.  Consistent

19  with the Court's prior ruling, we object to their admission.

20          MR. SEIFELDEIN:  This is rebuttal, and these

21  documents actually were provided by Mr. Bredehoft in response

22  to a subpoena, which I believe that defendants --

23          MR. JEWETT:  It wasn't impeachment because

24  Mr. Bredehoft agreed with what the e-mail said.

25          THE COURT:  Objection is overruled.  The document is

Carol L. Naughton, Official Court Reporter

———J. Bredehoft - Cross———

1    admitted.

2              (Plaintiff's Exhibit PX-103 received in evidence.)

3              THE COURT:  The Court has a totally different

4    approach on a situation where you are doing it by bench.  The

5    Court understands the Rules of Evidence, so a lot of things

6    you counsel have been arguing about is really a waste of your

7    time, because the Court understands what is admissible and

8    what is not admissible, what weight to give to it, what

9    weight to not give to it.  So let's move past the e-mail and

10   get to the core issue that you might want to raise.

11             MR. SEIFELDEIN:  Thank you, Your Honor.

12   BY MR. SEIFELDEIN:

13   Q.  Mr. Bredehoft, when you met with Ms. Pitts, she

14   demonstrated her knowledge of the Fair Labor Standards Act

15   requirement of overtime and independent contractors, correct?

16   A.  Yes, if we're still talking about the first meeting.

17   Q.  She demonstrated and expressed an understanding that an

18   employee is one who is economically dependent on the

19   employer, correct?

20             Let me give you an example.  She gave you a case

21   where the employees working in her office are classified as

22   employees and paid overtime, if applicable, correct?

23   A.  Yes, we discussed that.

24   Q.  Okay.  She expressed her understanding that Steadfast is

25   responsible to comply with the Fair Labor Standards Act,

─────J. Bredehoft - Cross─────

1   correct, regarding the office employees?

2   A.  Of course.

3   Q.  Ms. Pitts explained that she was fully aware of her

4   obligations to pay overtime for the individuals who were

5   employees, correct?

6   A.  Yes.

7   Q.  She also expressed her understanding that employers are

8   required to pay employees time and a half for hours worked

9   over 40 in a workweek, correct?

10  A.  I don't recall discussing the one and a half times, but

11  we did discuss, quote, overtime, unquote.

12  Q.  Let's go to the second meeting that you had with

13  Ms. Pitts in January of 2019.

14          And this was a meeting in person, correct?

15  A.  Yes.

16  Q.  In this meeting, you rendered advice to Ms. Pitts --

17  actually, Ms. Kim was at this meeting as well, correct?

18  A.  I'm sorry.

19  Q.  Let me strike that.

20          In the meeting, you rendered advice to Ms. Pitts

21  after you spoke with Ms. Pitts and Ms. Kim and after you

22  reviewed some documents, correct?

23  A.  I told her what I testified I told her.  If that's

24  advice, that's advice.

25  Q.  At the second meeting, sir, you met with Ms. Pitts,

─────────── J. Bredehoft - Cross ───────────

1  correct?

2  A.  Yes.

3  Q.  And prior to this meeting, you received information from

4  Ms. Pitts, Ms. Kim, and then some documents, correct?

5  A.  I don't believe I received any new documents at that

6  meeting.  I believe I brought a document to the meeting.  But

7  the answer to the rest of your question is yes.

8  Q.  Prior to the meeting, prior to you rendering advice to

9  Ms. Pitts, you had spoken with Ms. Pitts and Ms. Kim,

10  correct?

11  A.  I don't recall my conversations, if any, with Ms. Kim

12  prior to that meeting.

13  Q.  Okay.

14  A.  Otherwise, the answer to your question is yes.

15  Q.  And you received some documents sometime between

16  January -- excuse me -- June 2018 and the second meeting in

17  January of 2019, correct?

18  A.  Yes.

19  Q.  And you reviewed those documents?

20  A.  As I discussed, I didn't review all of them, but I did

21  review many of them.

22  Q.  And the advice that you gave to defendants at that second

23  January 2019 meeting was based on information provided to you

24  by Ms. Pitts and Ms. Kim, correct?

25  A.  And the documents, yes, correct.

─────J. Bredehoft - Cross─────

1   Q.  You never conducted an independent factfinding to verify

2   whether the information Ms. Pitts and Ms. Kim gave you were

3   the actual practices of the business?

4           MR. JEWETT:  Objection.  The question is vague.

5           THE COURT:  Objection overruled.  The question is

6   clear.

7           THE WITNESS:  The answer is no, Your Honor.

8           THE COURT:  Okay.  He answered it "no."

9   BY MR. SEIFELDEIN:

10  Q.  You did not speak to any of the nurses, correct?

11  A.  No -- I mean, sorry, yes, correct, I did not speak to any

12  of the nurses.

13  Q.  And you did not speak to Steadfast client facilities,

14  correct?

15  A.  Yes, that is correct.

16  Q.  You did not speak to any office employees, schedulers at

17  Steadfast, correct?

18  A.  I had no substantive discussions.  I may have said "hi,"

19  but no substantive discussions, no.

20  Q.  Well, excluding Ms. Kim, who was the manager, correct,

21  you had no discussion with any of the office employees?

22  A.  No substantive discussions, that's correct.

23  Q.  So you've had conversations with office employees?

24  A.  No.  I may have said "hi" to them.  That's what I said.

25  But I've had no substantive discussions with any of those

J. Bredehoft - Cross

1  office employees.

2  Q.  So you went to her office?

3  A.  Yes.  That's where the second meeting took place.

4  Q.  All right.  And the purpose of your document review was

5  to determine if Steadfast was in compliance with the Fair

6  Labor Standards Act?

7  A.  That plus to comply with the discovery requests that had

8  been served by the Department of Labor.

9  Q.  And you reviewed information that Steadfast provided to

10  you, some of it, as you said?

11  A.  I reviewed, I believe, all of the nurse contracts, all of

12  the contracts with the facilities, and what I thought to be

13  a, and still think to be, representative sample of the

14  invoices, but not all of them.

15  Q.  Sure.

16          Based on your review of the information provided to

17  you, you provided defendants with advice as to how to comply

18  with the Fair Labor Standards Act with respect to the nurses

19  in January of 2019, correct?

20  A.  I believe the advice -- no, that's incorrect.  The advice

21  that I --

22  Q.  You answered the question.

23          THE COURT:  Let him finish.  I don't think he

24  finished his answer.

25          MR. SEIFELDEIN:  Sure.

————J. Bredehoft - Cross————

1      THE WITNESS:  Thank you, Your Honor.

2      I did not provide them with advice going forward on

3   what to do at all.  I had provided my view that what they

4   were doing was in compliance with the Fair Labor Standards

5   Act to a very high degree of certainty.  And I said those

6   words.

7   BY MR. SEIFELDEIN:

8   Q.  You provided two pieces of advice to defendants during

9   that meeting, correct?

10  A.  Two prophylactic pieces of advice, yes, I did.

11  Q.  And during the course of your representation,

12  Mr. Bredehoft, you provided -- well, the first one was a

13  review -- you reviewed their website, correct?

14  A.  Yes, I did.

15  Q.  Okay.  And in reviewing the website, Steadfast sought

16  input from you regarding a document entitled "Employment

17  Application" that the nurses used to apply to work for

18  Steadfast, correct?

19  A.  No, that's not correct.  They did not seek the advice.  I

20  proffered it.

21  Q.  Okay.  You proffered advice regarding a document entitled

22  "Employment Application," correct?

23  A.  That's correct.  And I sought additional information

24  about its use.

25  Q.  Okay.  And you had concerns about this, quote, Employment

—————J. Bredehoft - Cross—————

1   Application Form, correct?

2   A.  No, "concerns" is not the correct word.

3   Q.  You told Steadfast and Ms. Pitts that they should not use

4   a form labeled as "Employment Application," correct?

5   A.  That's correct, because they weren't hiring employees.

6   Q.  Because it shows an employee-employer relationship,

7   correct?

8   A.  Absolutely not.  And as the Court knows, the label -- and

9   I told Ms. Pitts this during the meeting.

10          The label on an agreement has virtually no meaning

11  in this context.  You can call somebody an "independent

12  contractor" 30 times from Sunday.  It doesn't mean a darned

13  thing.  But I told her that since she was not hiring

14  employees, she shouldn't use something that says "Employment

15  Application."

16  Q.  If it didn't matter, why did you ask her to not use it?

17  A.  Because it was wrong.

18  Q.  Wrong in what sense?

19  A.  She was not hiring employees.

20  Q.  So she was not hiring employees, it was wrong, and you

21  asked her to remove it?

22  A.  That's correct.

23  Q.  But you had no concern about that?

24          THE COURT:  Well, I think we're going around in

25  circles here.  I think that question has been answered.

——————J. Bredehoft - Cross——————

1          MR. SEIFELDEIN:  I understand, Your Honor.  Thank

2    you.

3    BY MR. SEIFELDEIN:

4    Q.  And you did not follow up with defendants to see, in

5    fact, if they had stopped using the Employment Application

6    Form, correct?

7    A.  Yes, it is correct; I did not follow up.

8    Q.  So Steadfast used this Employment Application from at

9    least 2015 through 2019, as far as you know, when your

10   representation ended -- February 2019, to be exact?

11   A.  There -- no, that's not correct.

12   Q.  Okay.  You have no knowledge that they stopped using the

13   application after February 2019?

14   A.  I have no knowledge relating to that.

15   Q.  Okay.  All right.

16          So you discussed this with counsel, and one of the

17   documents that you reviewed and just talked about are the

18   Independent Contractor Agreements, correct?

19   A.  I'm sorry.  I don't understand what your question means

20   when I discussed it with counsel.

21   Q.  Well, you reviewed a document that Steadfast gave you

22   that's been labeled by Steadfast as Independent Contractor

23   Agreement?

24   A.  I reviewed many of them.  They were not all the same.

25   Q.  Okay.  But you reviewed some of them?

Carol L. Naughton, Official Court Reporter

J. Bredehoft - Cross

1   A.   I reviewed each that I was given.

2   Q.   Okay.  And this is what Steadfast required the nurses to

3   sign, correct, the Independent Contractor Agreement?

4   A.   Every one that I read -- yes, to the best of my

5   knowledge, they were all signed by nurses.  It was not a

6   form.

7   Q.   And when you reviewed the Contractor Agreement, did you

8   proffer or express some concerns about a clause in the

9   Independent Contractor Agreement -- actually, let me rephrase

10  that.  Strike that.

11          When you reviewed the contract, you proffered or

12  expressed some concerns about a clause in the contract,

13  correct?

14  A.   It was a clause present, yes, in a number but not all of

15  the contracts.

16  Q.   And this clause has been referred to as a "covenant not

17  to compete," correct?

18  A.   Yes, I understand what you mean by that; and, yes, it

19  was.

20  Q.   And you informed defendants, Ms. Pitts and Steadfast,

21  that the clause was inappropriate because, quote, it was

22  inconsistent with their classifications as independent

23  contractors, correct?

24  A.   I first informed them that it was inconsistent with their

25  practices as described to me, and then I, yes, did say it

—J. Bredehoft - Cross—

1  would, in the context of their employment, be inconsistent
2  with the independent contractor status.
3  Q.  So you determined that this restrictive covenant or
4  covenant not to compete was "inappropriate" -- your word --
5  because it demonstrates an element of control, correct?
6  A.  I think it may go more to permanence than control, but it
7  does go to control.  In any event, I think in the context of
8  the registry, it is inappropriate and shouldn't be there.
9  Q.  All right.  So this element of control or permanency that
10 you're talking about is inconsistent with the nurses being
11 classified as independent contractors, correct?
12 A.  If any of the nurses obeyed it and if Steadfast ever
13 enforced it, yes, it would have been, in this context,
14 inconsistent with my notion that they were independent
15 contractors.
16      MR. SEIFELDEIN:  Your Honor, I move to strike that.
17 The witness didn't answer the question, and he answered with
18 a hypothetical.  I believe the Court instructed the witness
19 to say "yes" or "no" and then provide an explanation.
20      THE COURT:  Well, I think the Court understood the
21 response, and I think it was responsive.  Even though he
22 didn't follow the Court's instructions to answer "yes" or
23 "no," I think it was responsive.  At least the Court
24 interpreted it as being inconsistent with being an
25 independent contractor.  That's the way the Court interpreted

———J. Bredehoft - Cross———

1    it.  So let's just move on.

2          MR. SEIFELDEIN:  Thank you, Your Honor.

3    BY MR. SEIFELDEIN:

4    Q.  And you instructed Ms. Pitts and Steadfast to remove the

5    language from the Independent Contractor Agreement, correct?

6    A.  Yes.

7    Q.  You also told Steadfast and defendant Ms. Pitts to make

8    sure that the covenant-not-to-compete clause is not in any of

9    the current agreements, correct?

10   A.  Yes.

11   Q.  And you did not follow up to see whether they had, in

12   fact, removed that?

13   A.  No, I did not.

14   Q.  And that's because your representation ended in

15   February 2019?

16   A.  I don't remember the date, but that's about the time.

17   Q.  Okay.  And this advice was in January of 2019, correct?

18   A.  That's correct.

19   Q.  So you had, maybe, a month that you did not follow up

20   with her?

21   A.  No.  I didn't review her agreements that were generated

22   in that month, no.

23   Q.  And you were not retained, Mr. Bredehoft, to determine

24   the classification of the workers as employees or independent

25   contractors, correct?

————J. Bredehoft - Cross————

1    A.   That's correct.  I was retained to defend the lawsuit.

2            THE COURT:  I think that's been asked and answered.

3            MR. SEIFELDEIN:  Apologize, Your Honor.

4            THE COURT:  Okay.

5    BY MR. SEIFELDEIN:

6    Q.   In fact, defendants never asked you if the workers can

7    continue to be classified as independent contractors,

8    correct?

9    A.   No, not in those words.

10   Q.   Well, let's look at your exact words in the transcript.

11           THE COURT:  What exhibit number is that?

12           MR. SEIFELDEIN:  This exhibit has not been marked

13   yet.  So it will be PX-104, Your Honor, the deposition of

14   Mr. Bredehoft.

15           THE COURT:  PX-104 for identification.

16           (Plaintiff's Exhibit PX-104 marked for

17   identification purposes only.)

18   BY MR. SEIFELDEIN:

19   Q.   Do you recall being deposed on March 13th, 2020, by the

20   Department of Labor?

21   A.   Yes, I do.

22   Q.   And you were under oath during that deposition?

23   A.   Yes, I was.

24   Q.   All right.  Those are your words, correct, sir?

25           THE COURT:  Wait a minute, now refer him to the line

———J. Bredehoft - Cross———

1    and the question.

2    BY MR. SEIFELDEIN:

3    Q.  Mr. Bredehoft, I'm referring to the highlighted portion

4    of the deposition beginning with line 12, ending with

5    line 20.

6    A.  Yes, those are my words.  Those are my answers, and that

7    is correct and consistent with what I just testified to.

8                 THE COURT:  For the record, you should read the

9    question and then let him read the answer because otherwise

10   the Court doesn't have the transcript.  Those are your words.

11                MR. SEIFELDEIN:  Correct.  I was giving him an

12   opportunity to review it.

13   BY MR. SEIFELDEIN:

14   Q.  Mr. Bredehoft, let me just state for the record the

15   question that was asked of you.

16               "Okay.  Did you ultimately advise Ms. Pitts that the

17   RNs, CNAs, and LPNs could remain classified as independent

18   contractors?"

19               Your answer?

20   A.  "She did not ask me that question, so I did not answer

21   it."

22   Q.  "Did you ever follow up with Ms. Pitts about the

23   classification of the nurses following the advice you

24   provided?"

25               We're reading the transcript here.  Your answer,

———J. Bredehoft - Cross———

1  line 20?

2  A.  "No."

3  Q.  Okay.  And I asked you:

4          "Defendants never asked you if the workers can

5  continue to be classified as independent contractors,

6  correct?"

7  A.  "That's correct."

8  Q.  And you did not advise Ms. Pitts that the defendants

9  could continue to be -- excuse me -- the nurses --

10  A.  I'm sorry.  Sir, I'm having a problem hearing you.

11  Q.  I apologize, Mr. Bredehoft.

12          You did not advise defendants to continue to

13  classify the nurses as independent contractors, correct?

14          MR. JEWETT:  Objection.  This has been asked and

15  answered.  He's gone around the same question multiple times

16  now.

17          THE COURT:  I think the question -- the objection is

18  sustained.  The answer is clear.  You've refreshed his

19  recollection, or if you want to call it impeachment with the

20  transcript, but the question has been answered.

21          MR. SEIFELDEIN:  All right.

22  BY MR. SEIFELDEIN:

23  Q.  Mr. Bredehoft, you did not discuss the degree of skill

24  required with defendants as you assumed that there is some

25  degree of skill required, correct?

—————J. Bredehoft - Cross—————

```
 1   A.  We discussed it only to the extent I previously testified

 2   today, that there was no unusual degree of skill either

 3   required or maintained by these nurses.

 4   Q.  Okay.  And based on your conversation with Ms. Pitts, you

 5   were not aware of the average length of placement

 6   opportunities of the nurses and did not ask about it,

 7   correct?

 8   A.  That is correct; I did not ask about it.  We discussed

 9   not averages but examples.

10   Q.  Okay.  And, in fact, Mr. Bredehoft, you do not know what

11   led defendants to classify the nurses as independent

12   contractors, correct?

13   A.  No.  That was done before I was involved.

14   Q.  Okay.  You testified about a distinction between

15   registries and staffing agencies.

16        You are aware, sir, that the Department of Labor

17   does not make a distinction between agencies and registries

18   and that it's economic realities that determines the

19   relationship, correct?

20        MR. JEWETT:  Objection.  Your Honor, this is the

21   same line of questioning that the Court instructed me not to

22   go down.  We're getting into his opinions about

23   classifications and registries, and I adhered to that.

24        THE COURT:  The Court doesn't recall dealing with

25   any objection talking about the difference between the
```

J. Bredehoft - Cross

1    staffing agency and the registry, and I think he gave

2    testimony on direct about what a staffing agency was versus

3    what a registry was.  So I permitted him to basically examine

4    on that, and that only.

5            THE WITNESS:  I'm aware of no regulation, guidance,

6    or opinion letter that discusses the difference or the

7    similarities that has been issued by the Department of Labor.

8    They are examined by the same economic realities test.  It

9    applies across the board.

10   BY MR. SEIFELDEIN:

11   Q.  And, Mr. Bredehoft, you did not discuss what's been

12   referred to as Field Bulletin 2018-4 with Ms. Pitts, correct?

13   A.  2004-18 [sic] does not come immediately to mind.

14   Q.  Let me ask it in a general way.

15           You did not discuss -- you did not discuss with

16   defendants a field bulletin that the Department of Labor has

17   put out regarding classification?

18   A.  Regarding -- I'm sorry, classifications of nurses in

19   staffing agencies?

20   Q.  Uh-huh.

21   A.  No, I did not discuss that.

22           Now I am familiar with it that you've refreshed my

23   recollection.  I haven't looked at it in years, but I know it

24   exists.  I know I've read it.

25   Q.  And you were the second attorney that defendants have

—————J. Bredehoft - Cross—————

1    hired in this matter, correct?

2              MR. JEWETT:  Objection.  Relevance.

3              THE COURT:  Well, before you -- I'll sustain it.

4    Let's see where you're going with that question,

5    Mr. Seifeldein.

6              What is the relevance of that question?

7    BY MR. SEIFELDEIN:

8    Q.  Is that correct, sir?

9    A.  I don't know if I'm second.  I know I wasn't first.

10             THE COURT:  Wait a minute.  You didn't answer my

11   question.  I asked you what was the relevance of asking that

12   question?

13             MR. SEIFELDEIN:  I'll move on, Your Honor.

14             THE COURT:  You'll move on?

15             MR. SEIFELDEIN:  Yes.

16             THE COURT:  Wonderful.

17             THE WITNESS:  My answer was I don't know.

18             THE COURT:  It doesn't matter.  It's a relevance

19   issue.

20   BY MR. SEIFELDEIN:

21   Q.  Based on your discussion, Mr. Bredehoft, with defendants,

22   were you aware that Steadfast nurses could not directly

23   negotiate the rate of pay with the facilities?

24   A.  Yes, I was told that the facility sets the rate of pay.

25   Q.  And you relied on that?

—— J. Bredehoft - Cross ——

1   A.  Yes, I did.

2   Q.  And you testified about having experience in advising

3   others about Fair Labor Standards Act compliance, correct?

4   A.  I didn't hear the third word.

5   Q.  You -- based on your experience, you advised others about

6   compliance with the Fair Labor Standards Act, correct?

7   A.  Yes.

8   Q.  And you've advised clients generally about when an

9   individual can be classified as an independent contractor or

10  an employee, correct?

11  A.  Yes.

12  Q.  And does the name "First Choice" ring a bell?

13          MR. JEWETT:  Objection, Your Honor.  I think the

14  identification of Mr. Bredehoft's clients are privileged to

15  the extent they are not on the public docket.

16          THE COURT:  I don't know where he's going with the

17  question yet, Mr. Jewett.  So I can't sustain it, so I'll

18  overrule it.

19          Let me see where you're going with the question.

20  The question was:

21          Does the name "First Choice" ring a bell?

22          THE WITNESS:  Yes, it does.

23  BY MR. SEIFELDEIN:

24  Q.  How do you know First Choice?

25  A.  Over 20 years ago, when I was a partner at Venable, I

—————J. Bredehoft - Cross—————

1    represented a First Choice Automotive.  In Florida, I also

2    provided advice and currently am providing advice to First

3    Choice Credit Union.  It's a common name.  I really don't

4    recall any others.

5             THE COURT:  So what is the question?

6    BY MR. SEIFELDEIN:

7    Q.  Are you familiar with the staffing agency in the Hampton

8    Roads area that is called "First Choice"?

9    A.  The name does not ring a bell for me.  It may be a

10   partner's client who asked me a question once, but it does

11   not ring a bell for me in that context.

12   Q.  All right.  Well, let's move on.

13            You were aware that Steadfast provided Workers'

14   Compensation to the nurses, correct?

15   A.  Yes, gratuitously so.

16   Q.  And you took that determination in rendering your advice

17   about defending this case, correct, when you represented

18   Steadfast?

19   A.  I didn't ignore it, but it did not form any part of the

20   basis for my determination.

21   Q.  And in your discussion with Steadfast and the documents

22   that were provided to you, you were not provided with memos

23   that Steadfast had sent to the nurses, correct?

24   A.  I believe that is correct.  We had not been provided any

25   of those at that time.

—————J. Bredehoft - Cross—————

```
 1   Q.  Okay.  And so in rendering that advice that you gave

 2   Steadfast, these memos were not part of that consideration,

 3   correct?

 4   A.  That's correct.

 5   Q.  Okay.  And would that have an impact -- would that have

 6   an impact on the advice you have given Steadfast?

 7   A.  Depends on what the memos say.

 8   Q.  Right.  So absent the memos, you wouldn't know.

 9   A.  That's correct.

10   Q.  You are aware, sir, that mere reliance on the advice of

11   counsel alone is insufficient to satisfy the burden of

12   proving good faith in the Fair Labor Standards Act?

13         THE COURT:  Sustained.  That is something the Court

14   will deal with, and he doesn't have to deal with that.  So

15   objection to that question.

16   BY MR. SEIFELDEIN:

17   Q.  You didn't receive memos.  You didn't review them.  You

18   don't know what is in them.

19   A.  I just testified to that.

20   Q.  And you've also discussed with Steadfast its -- some of

21   its reimbursement policies and practices, correct?

22   A.  Yes.  We discussed several of those.

23   Q.  And you took that into consideration in rendering your

24   opinion regarding defending the case?

25   A.  Yes, I did.
```

──────J. Bredehoft - Cross──────

```
1          MR. SEIFELDEIN:  Your Honor, may I refer with my
2    co-counsel?
3              THE COURT:  You may.
4              (Pause in the proceedings.)
5          MR. SEIFELDEIN:  Thank you, Your Honor.
6              May I confer with counsel again?
7              THE COURT:  Last time.
8              (Pause in the proceedings.)
9    BY MR. SEIFELDEIN:
10   Q.  Mr. Bredehoft, you are aware that Steadfast sets the rate
11   of pay for the nurses, correct?
12   A.  It is my understanding that the hospitals say what they
13   are willing to pay, and that is used to generate a rate of
14   pay for the nurses by Steadfast.
15   Q.  Mr. Bredehoft, you are aware that defendants did not take
16   into account the nurses' skills and experience when they
17   determined the rate of pay, correct?
18   A.  Yes.  Absolutely, they did not.
19   Q.  They did not?
20   A.  Absolutely not.
21   Q.  Okay.  Based upon your conversation with Ms. Pitts, you
22   are aware that Steadfast nurses had no contractual or
23   economic relationship with the facilities, correct?
24   A.  Other than through Steadfast, yes, that's correct.
25   Q.  Okay.
```

J. Bredehoft - Cross

```
 1   A.  I'm sorry.  That may not be correct.

 2        We did discuss that others may have had -- and this

 3   is in my deposition -- some of the nurses may have had

 4   separate non-Steadfast economic relations or contracts and

 5   that I did not know if that occurred.

 6   Q.  Based upon your conversation with Ms. Pitts, you are

 7   aware that Steadfast nurses are required to track their hours

 8   as a requirement to receive compensation, correct?

 9   A.  Of course.

10   Q.  And based on your conversation with Ms. Pitts, you are

11   aware that Steadfast nurses could not directly negotiate

12   their pay rate with the facilities, correct?

13   A.  I think I just testified to that by saying the facilities

14   set the rate and that Steadfast adjusted it.  That's right.

15   That's what I just said.

16   Q.  I'll make it clear for the record because I didn't

17   understand you, Mr. Bredehoft.

18   A.  Sure.  My understanding is -- sorry.  Would you like to

19   ask me a different question?

20   Q.  If I could.  And forgive me.

21        The question is:

22        Based upon your conversation with Ms. Pitts, the

23   nurses could not directly negotiate their pay rate with the

24   facilities?

25   A.  Yes, that's correct.
```

———J. Bredehoft - Cross———

1  Q.  Mr. Bredehoft, Steadfast, as far as you know, only

2  provides nurses to facilities, correct?

3       That's the main line of business.  Nurses are needed

4  at facilities, and Steadfast provides those nurses, correct?

5  A.  No.  Steadfast provides a registry to match facilities

6  and nurses.

7  Q.  Okay.  So they send nurses to certain facilities.

8  A.  They match them.  The nurses go themselves.

9       I'm not sure what else you are asking.

10 Q.  I understand.

11      So nurses are an integral part of Steadfast's

12 business, correct?

13 A.  No.  Steadfast's business is operating the registry.  It

14 doesn't practice medicine.  It doesn't have a license to

15 practice nursing, and if it tried to practice nursing, it

16 would be prosecuted by the State.

17 Q.  So in Steadfast's matching the nurses with the

18 facilities, would you agree that absent the nurses, the

19 business would cease to exist?

20 A.  Yes.

21      MR. SEIFELDEIN:  No further questions, Your Honor.

22      THE COURT:  Any redirect?

23      MR. JEWETT:  Very briefly, Your Honor.

24      THE COURT:  Very briefly, you may redirect.

25      MR. JEWETT:  Yes, sir.

———————J. Bredehoft - Redirect———————

1        REDIRECT EXAMINATION

2    BY MR. JEWETT:

3    Q.  Thank you, Mr. Bredehoft.

4           Mr. Seifeldein asked you a few questions about a

5    noncompete.

6    A.  Yes, sir.

7    Q.  And do you recall that?

8    A.  Yes, sir.

9    Q.  Did Ms. Pitts provide you any information about whether

10   that noncompete was actually enforced?

11   A.  I was told both at the first meeting in June of 2018 and

12   emphatically at the second meeting in January of 2019 -- and

13   I believe Ms. Kim was in the room and seconded this, but

14   Ms. Pitts was emphatic that it had never been enforced, it

15   had never been threatened to be enforced, and she also told

16   me that all the nurses knew it because they signed up with

17   other registries and services.

18   Q.  Mr. Seifeldein asked you a couple of questions about some

19   prophylactic advice that you provided.

20   A.  Yes, sir.

21   Q.  I believe you testified that you recommended to Steadfast

22   to remove the noncompete language.

23   A.  That's correct.

24   Q.  And that they remove the term "employment" from the

25   application paperwork; is that correct?

———J. Bredehoft - Redirect———

1  A.  From the application that was on their website.  It was

2  not a frequently used one.  They told me that.

3  Q.  The opinion that you provided to Steadfast, was that

4  contingent on them making those two changes that you just

5  testified to?

6         Let me clarify that.

7         The opinion that the nurses are properly classified,

8  was it contingent on her making those two changes?

9  A.  The views I expressed about the proper classification are

10 not at all contingent on stopping using the employment

11 agreement, although it would be a silly thing not to have

12 done.

13        With respect to the noncompete, if the noncompete

14 was enforced or threatened to be enforced, then my views

15 would change; but, otherwise, no, they were not contingent

16 views.

17        MR. JEWETT:  Thank you.  I have no further

18 questions.

19        THE COURT:  Counselor, the Court heard you say you

20 were not asked to give advice about whether the nurses were

21 properly classified as independent contractors versus

22 employees; is that correct?

23        THE WITNESS:  That is correct, Your Honor.

24        THE COURT:  At the same time, it appears as though,

25 the testimony is, that you told her that they were

———————J. Bredehoft - Redirect———————

 1    independent contractors.

 2            THE WITNESS:  Yes.  In the course of evaluating the

 3    case, I told her that it -- well, she had an excellent chance

 4    of prevailing on that.  And I used the term "excellent."  And

 5    that, yes, they were independent contractors, in my view.

 6            THE COURT:  And whatever advice you gave to

 7    Ms. Pitts was dependent upon your opinion or belief that you

 8    had all the facts necessary to reach that conclusion; is that

 9    correct?

10            THE WITNESS:  Yes, that I had all material facts.

11            THE COURT:  Now, if, in fact, there were critical

12    issues that you were not provided, then you would not be able

13    to issue that opinion with such confidence.  Would that be

14    correct?

15            THE WITNESS:  By definition, if they were critical,

16    then, yes, that is correct.

17            THE COURT:  All right.  May this witness be

18    permanently excused?

19            MR. JEWETT:  Yes, Your Honor.

20            MR. SEIFELDEIN:  Yes, Your Honor.

21            THE COURT:  Thank you, sir.

22            THE WITNESS:  Thank you, Your Honor.

23            (Witness excused.)

24            THE COURT:  We're going to take a 15-minute recess,

25    and then we'll come back and continue.

```
 1                  (Recess from 11:23 a.m. to 11:43 a.m.)

 2            THE COURT:  Okay.  You may call your next witness.

 3            MR. SIEGRIST:  Your Honor, we have some designations

 4      from some depositions to admit into the record, if you would

 5      permit.

 6            THE COURT:  All right.

 7            MR. SIEGRIST:  Your Honor, we have two sets of

 8      depositions here.  The first is -- the plaintiffs have filed

 9      supplemental designations of the deposition of Zira

10      Technologies, the 30(b)(6) deposition.  We filed our

11      counter-designations, and I would move to admit those into

12      the record, unless there's an objection.

13            THE COURT:  This deposition is from Zira

14      Technologies?

15            MR. SIEGRIST:  Yes, Your Honor.

16            THE COURT:  Hopefully you have already made your

17      designations?

18            MS. LEWIS:  I'm sorry, Your Honor?

19            THE COURT:  Have you already made your designations?

20            MS. LEWIS:  We made our designations, and we,

21      likewise, filed our objections too.

22            THE COURT:  All right.  Then the Court will admit

23      your designations from that deposition.

24            MR. SIEGRIST:  Thank you, Your Honor.

25            THE COURT:  We need exhibit numbers on them.
```

```
 1              What are the exhibit numbers on your depositions?

 2              MS. LEWIS:  Our depositions are all under PX-2, and

 3   then pursuant to local rules, there's deposition summaries

 4   for the same at PX-3.

 5              THE COURT:  So that the Court can match these things

 6   up easily when we look at them, if all of yours are under

 7   PX-2 --

 8              MS. LEWIS:  That is correct.

 9              THE COURT:  -- what we're going to do is see if we

10   can adopt a number so that the defendants' will be DX-2, or

11   whatever, so that the Court can easily match them up when

12   we're going through.

13              Is that number available, Madam Clerk?

14              THE CLERK:  Yes, sir.

15              THE COURT:  All right.  And you will tender them to

16   the clerk.  Just pass them to her.

17              MR. SIEGRIST:  Your Honor, we also have some

18   designations from the deposition transcript of the Wage and

19   Hour investigator who was unavailable at this trial due to

20   his illness.

21              THE COURT:  Are there any objections to those?

22              MS. LEWIS:  Yes, sir.  We, likewise, filed

23   objections and counter-designations to those additional ones.

24              THE COURT:  Are all of those under PX-2?

25              MS. LEWIS:  All of ours are all under PX-2, yes.
```

1          THE COURT:  Then we'll do the same thing with

2     respect to that one.

3          MR. SIEGRIST:  I would like to raise that issue with

4     the Court on this topic.

5          We have a number of designations in the pretrial

6     order that were not objected to and that concern,

7     essentially, the same subject matter as our supplemental

8     designations which we filed after Mr. Mazuera became

9     unavailable.

10          In response to that, we got a number of objections

11     from the plaintiff that, one, many of them are objections to

12     designations that were in the Pretrial Order and waived; but,

13     secondly, if waived, they have designated, essentially, the

14     entire deposition transcript, Page 3 to 305.  I've never,

15     frankly, seen that before, Your Honor.

16          THE COURT:  How many pages in the deposition?

17          MR. SIEGRIST:  I think it's 305.  So they designated

18     302 pages of the deposition as a counter-designation.

19          Frankly, Your Honor, I think there are two issues

20     with this one.  I don't think that's efficient for the

21     Court's review of the relevant portions; but, also, I don't

22     think it cures the -- some of the objections, for example,

23     are to completeness.

24          In my experience, typically if there is a

25     completeness objection and a counter-designation, you

1    supplement -- you counter-designate the portion that you
2    believe renders a complete narrative on a discrete topic.
3    But, frankly, I don't think the Court is going to be assisted
4    by a counter-designation of the entire transcript.
5              THE COURT:  Okay.  What is the name of the
6    deposition, anyway?  You said from the Wage and Hour
7    Division.
8              MR. SIEGRIST:  Investigator Alvaro Mazuera.  He was
9    the Wage and Hour investigator for the Department of Labor.
10             THE COURT:  What I was trying to get, Ms. Lewis, is
11   why so many objections to the transcript, the deposition?
12             MS. LEWIS:  Your Honor, the answer to the Court's
13   question, there's objections to the depositions because,
14   within the designations that they've made, the deposition
15   didn't necessarily flow, and so they have an answer here, but
16   the question may have been asked 30 pages earlier.  And so
17   with respect to the designations that they made, they are
18   really incomplete.  So to understand the context of what the
19   question came up, they only picked out a single line.
20             The designation of the -- the objection -- first, to
21   be clear with respect to the previous designations that were
22   made in the Pretrial Order, that was before times had changed
23   and the deponent was unavailable, and we lodged our
24   objections because they said he would be available.  Now
25   they've identified counter-designations which, frankly, this

```
 1   isn't about what the Department of Labor did; it's about what
 2   defendants did.
 3           So to the extent that they believe that they're
 4   necessary and relevant to the Court's determination and he's
 5   not available here to testify, Your Honor, I think it's
 6   important for the Court to have the completeness of what his
 7   testimony was, particularly in light of the cherry-picking of
 8   answers that just, frankly, are confusing and don't make any
 9   sense.
10           THE COURT:  Here is what the Court is going to do:
11           The Court is just going to have to admit the whole
12   deposition.  Counter-designations, et cetera, et cetera, the
13   Court is going to have to deal with the whole deposition.
14   Because you all have picked it apart so badly, the Court is
15   going to have to deal with the whole deposition.
16           MR. SIEGRIST:  Your Honor, I would ask to be heard
17   on that topic.
18           Plaintiff's counsel's representation on the manner
19   in which we designated this is entirely inaccurate, and we've
20   mixed discrete topics.  I'm not aware of any designations
21   that are a one-line response; and, frankly, Your Honor, I'm
22   prepared to address each and every one of these objections in
23   detail.
24           I understand the --
25           THE COURT:  We're not going to do it.
```

```
 1          MR. SIEGRIST:  -- Court may not want to do that;
 2     but, Your Honor, it's simply incorrect to say that we have
 3     cherry-picked these.  These are discrete topics, and I don't
 4     agree with the characterization.
 5          THE COURT:  The Court will make its own
 6     determination about the deposition.  You can put your
 7     counter-designations in there, and the Court will simply have
 8     to look at the entire deposition.
 9          So that will be DX-2, whatever, your deposition
10     there, and we'll just take a look at the entire deposition
11     and the Court will make its own determination about what is
12     relevant and what is not relevant in that deposition.
13          (Defendants' Exhibit DX-2 received in evidence.)
14          THE COURT:  Next.  Your next witness.
15          MS. RUST:  Your Honor, we do not have any further
16     witnesses.  I do have one housekeeping item to address with
17     the Court before we rest.
18          THE COURT:  All right.  You have a further
19     housekeeping note?
20          MS. RUST:  Yes.
21          THE COURT:  All right.  That's fine.
22          MS. LEWIS:  Your Honor, I, likewise, just have one
23     housekeeping note with respect to PX-101.  I don't think I
24     made it clear yesterday with respect to that one.
25          THE COURT:  All right.  Well, I'll deal with yours
```

1    in a minute.

2            Let's see what your housekeeping note is.

3            MS. RUST:  Okay.  Your Honor, we wanted to address

4    an issue that was raised by the plaintiff regarding the

5    production of DX-76, 77, and 78 on Tuesday.

6            During Ms. Kim's testimony, the Secretary

7    represented to the Court that those were not produced in

8    discovery, and as we understand it, the Court excluded DX-78

9    as a result of that representation.

10           Because it was more of a discovery issue, which is

11   the function of the pretrial conference and order, that came

12   as a surprise, since it was the first time that the Secretary

13   had ever made any indication of not being in possession of

14   those exhibits.

15           So after those representations were made, we

16   reviewed our files, reviewed the information and

17   communications on these, and as we understood it, it was not

18   accurate, and we just wanted to take an opportunity to

19   correct the record by reviewing a couple of the relevant

20   dates on which these exhibits were produced and discussed

21   with the Secretary.

22           On February 23rd and 24th, DX-76, 77, and 78 were

23   all produced to the Department of Labor via their file share

24   platform Kiteworks, which they required us to use to produce

25   large files.  That same week, within a couple of days, the

1   attorneys had their attorney conference to -- prior to the

2   pretrial conference to review all the exhibits, objections,

3   discuss, confirm those.  It was never represented that those

4   video files were not in their possession.

5         On March 3rd, we had a several-hour-long pretrial

6   conference with Judge Leonard.  The Secretary asserted five

7   different objections to DX-78, five different objections to

8   77, and five different objections to 76.  At no point did the

9   Secretary assert that they were not even in possession of

10  these exhibits.  The objections went to substantive aspects

11  of the content of those exhibits.

12        And then on March 13th, the Secretary's counsel sent

13  proposed topics to our office for the corporate deposition of

14  Zira Technology.  The first topic in the proposed topics was

15  the subjects addressed in your DX-77 and 78.

16        On March 19th, they issued their notice of corporate

17  deposition.  The first topic was knowledge about the subjects

18  addressed in Steadfast Exhibits DX-75 through 78 and when and

19  who recorded them.  It would be impossible or difficult to

20  depose Zira Technologies regarding exhibits that they did not

21  have in their possession.

22        And on March 30th, they actually conducted the

23  deposition of Zira.  In that transcript, they deposed

24  Mr. Vora regarding a video that was a minute and 44 seconds

25  long and described it as the training videos for facilities.

```
 1    The Pretrial Order describes DX-78 as the "Steadfast Zira

 2    Workforce Video for Facilities."

 3            During Ms. Kim's testimony, I specified that DX-78

 4    was one minute and 44 seconds long.  So this is the same

 5    video as DX-78, which the Secretary represented during her

 6    testimony that they were not in possession.

 7            So, again, after all of that, during the testimony,

 8    this was the first time that they indicated that they did not

 9    have possession of that file, without even taking the

10    opportunity to review the video to confirm whether it was the

11    same video that they had in their possession.  As we

12    understood it, as a result of that misrepresentation, the

13    Court excluded DX-78 from evidence.

14            Since that is typically dealt with in pretrial

15    conference and orders, we wanted to make sure that we had an

16    opportunity to address that and correct that for the record,

17    since it apparently impacted the admission of certain

18    evidence.

19            THE COURT:  All right.  Well, I thank you very much.

20            Two things here:  Number one, 76 is already in.

21            The Court is going to admit 77.  If we didn't, 77

22    is coming in, because I've said that I will withhold and

23    delay admission of 77 until cross-examination takes place.

24    So 77 is coming in.

25            (Defendants' Exhibits DX-76 and DX-77 received in
```

```
 1   evidence.)
 2           THE COURT:  So that just leaves 78.  Let me hear
 3   from the plaintiff.
 4           Ms. Lewis, come around to the podium, please.
 5           So we're just talking about 78.  76 and 77 are not
 6   at issue here.  The question is this:
 7           I know it was represented that you didn't have it.
 8   According to what she said, you did have it.  So was that
 9   just an error or omission or what?
10           MS. LEWIS:  No, Your Honor.  First of all, I would
11   like to correct, one, what the contentions were that
12   defendants just made.
13           The representation from the Court was that Christine
14   Kim created 76, 77, and 78.  Based upon that proposition, the
15   Secretary asserted and still maintains that if those
16   documents, those videos, were created by Christine Kim, we
17   did not receive videos created by Christine Kim; hence the
18   reason why we had and the Court ordered defendants to make
19   available Arjun Vora, a 30(b)(6) representative for Zira
20   Technologies, who confirmed and has already been admitted
21   onto the record that he created those videos.
22           So the issue is not that we didn't have the videos.
23   It was based upon the representations of the testimony that
24   defendants asserted that they were created by Christine Kim,
25   and we maintain that position.
```

1     THE COURT:  Let's put it this way:

2     The Court excluded 78.  The Court is not going to

3  change that.  And I'm going to tell you something else.  For

4  the record, Counsel, this case is not going to rise and fall

5  on Exhibit 78.  It's just not going to happen.  Or 77 or 76.

6  All right?

7     MS. LEWIS:  But I do want to make clear, the

8  Secretary did not make any misrepresentations to the Court

9  regarding what we received.

10     THE COURT:  The Court will accept that, and now the

11  Court has resolved the dispute.  So we're finished with that.

12     Anything else?  Is there any rebuttal evidence?

13     Wait.  Hold on.

14     Does the defense rest?

15     MS. RUST:  The defense rests, Your Honor.

16     THE COURT:  Is there any rebuttal witnesses or

17  evidence?

18     MS. LEWIS:  No, Your Honor.  I think the evidence is

19  quite robust.

20     THE COURT:  All right.  Well, I tell you what, then,

21  here's what we're going to do:

22     I want you to check with the courtroom deputy to

23  make sure we have all the exhibits that are supposed to be in

24  this case.

25     And maybe I just need to take a brief recess for you

1   to do that.  Do you need time to do that?  Are you confident

2   they are all here?

3           Ms. Thompson, do you have everything?

4           THE CLERK:  There are some that are marked for

5   identification that I don't have, but I've made arrangements

6   with counsel for them to e-mail them to me.

7           (Pause in the proceedings.)

8           THE COURT:  All right.  The Court is going to ask

9   that you get with the court reporter to order the transcript.

10  Once the transcript is in your possession, the Court will

11  give you 30 days to provide any supplemental proposed

12  findings of fact or conclusions of law in this case.  The

13  Court said 30 days.  You've already got a head start.

14          And once the Court receives your proposed findings

15  of fact and conclusions of law, the Court will then review

16  the record and try to "seasonably," the word I use, get out a

17  ruling in this case.

18          It has been the Court's experience that closing

19  argument doesn't really assist the Court as much as your

20  proposed findings of fact and conclusions of law.  The

21  traditional page limit, 30 pages, because you've already

22  filed 30 pages, and this is supplemental.

23          Yes, ma'am?

24          MS. LEWIS:  Your Honor, the Secretary just had one

25  housekeeping matter, and that was the excerpts that were

```
1    PX-101, the Pitts deposition, we've made arrangements with
2    Ms. Thompson to get those to her, but I just wanted to, for
3    tracking purposes, et cetera, it's PX-101 that are the Pitts
4    deposition excerpts.
5              THE COURT:  All right.
6              MS. LEWIS:  Thank you.
7              THE COURT:  That's fine.
8              Anything else, Mr. Jewett, Ms. Rust, Mr. Siegrist?
9              MS. RUST:  I don't believe so, Your Honor.
10             THE COURT:  Okay.  Thank you, counsel.  If you will
11   make sure that you pick up all extra exhibits and anything
12   you left in here.  The Court has a copy of all the exhibits
13   needed in this case.  The Court will be in touch.
14             (Proceedings adjourned at 12:01 p.m.)
15
16                           CERTIFICATION
17
18       I certify that the foregoing is a correct transcript
19   from the record of proceedings in the above-entitled matter.
20
21
22            _____/s/_____
23                         Carol L. Naughton
24                         October 4, 2021
25
```

Carol L. Naughton, Official Court Reporter