## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| MARTIN J. WALSH, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) ) |
| Plaintiff, | ) Case No. 2:18-cv-226 (LEAD) ) |
| v. | ) Case No. 2:19-cv-475 ) |
| MEDICAL STAFFING OF AMERICA, LLC, a limited liability company, d/b/a STEADFAST MEDICAL STAFFING, and LISA ANN PITTS, individually and as owner and officer of the aforementioned company, Defendants. | ) ) ) ) ) ) |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Joshua L. Jewett (VSB No. 76884)
Julia A. Rust (VSB No. 87270)
Aaron D. Siegrist (VSB No. 91072)
Pierce / McCoy, PLLC
101 West Main Street, Suite 101
Norfolk, VA 23510
Phone: (757) 216-0226
Fax: (757) 257-0387
jjewett@piercemccoy.com
julia@piercemccoy.com
asiegrist@piercemccoy.com

*Counsel for Defendants*

## I.     PROPOSED FINDINGS OF FACT.

1.     Steadfast is a limited liability company that was formed in 2015 by its sole owner, Lisa Pitts.  Stipulated Facts in Final Pretrial Order (ECF No. 261) ("Stip. Facts"), ¶¶ 2 & 6; Trial Transcript, August 31-September 9, 2021 ("Trial Transcript" or "Tr.") at 896:25-897:1.

2.     Steadfast is a nursing registry, meaning, in essence, that Steadfast maintains a database of independent, licensed nurses who seek to provide nursing services on an "as needed" basis.  Tr. 520:2-19, 907:1-24, 946:7-12, 989:24-990:7, 992:23-993:2; Plaintiff's Trial Exhibit ("PX") 24. The nurses on the registry consist of Licensed Practical Nurses (LPNs), Certified Nursing Assistants (CNAs), and Registered Nurses (RNs)[1].  Stip. Facts, ¶ 4; Tr. 519:19-25.

3.     Steadfast's business model is simple and straightforward.  It operates as a clearinghouse that matches nurses on its registry, who are seeking "as needed" work, with work opportunities at healthcare facilities, which are seeking supplemental nursing services.  Tr. 907:1-24, 920:20-921:4, 989:24-990:7, 992:23-993:2 (Test. of Lisa Pitts); Tr. 128:14-129:16, 210:6-18, 635:4-636:25, 660:7-24 (Test. of nurses).

4.     To operate the registry, Steadfast maintains an office staff of approximately 15 employees, including the front desk coordinator, administrative assistants, payroll department, recruiters, and the call center. Tr. 599:13-19, 906:22-24. Steadfast does not maintain any nurses on staff, and its front office is entirely removed from the actual practice of nursing. Tr. 26:15-27:10. Its role is that of a matchmaker – receiving staffing requests from the healthcare facilities, identifying nurses on the registry who satisfy the criteria set forth by the facilities, and providing

---

[1] For purposes of simplicity, Defendants will refer to LPNs, RNs, and CNAs collectively as "nurses," which is consistent with the usage of that term by both Defendants and Plaintiff at trial.

those nurses with an opportunity to accept or reject those assignments.  Tr. at 907:1-24, 920:4-21:4, 945:11-946:12, 947:11-948:25, 992:17-993:2; Defs.' Trial Exhibits ("DX") 58-59.

5.      Since the time of its formation, Steadfast has classified the nurses on the registry as independent contractors. Tr. 522:11-17 (Pitts).

How Nurses Obtain Placement on Steadfast's Registry

6.      In order to obtain temporary services from the nurses on Steadfast's registry, healthcare facilities enter into staffing contracts with Steadfast. Tr. 514:10-12, 525:8-10, 920:4-21; PX-10; DX-79-87.  The basic framework of the arrangement between Steadfast, the nurses on its registry, and the facilities with which it contracts, is as follows:

7.      First, a facility informs Steadfast of its staffing needs, identifying the licensures needed and specific shifts it needs filled. Tr. 945:11-946:12, 947:11-948:25, 992:17-993:2.

8.      Second, Steadfast then relays the available opportunities to nurses on its registry. Tr. 945:11-946:12, 947:11-948:25, 992:17-993:2, DX-58, DX-59.

9.      Third, the nurses on Steadfast's registry, who testified in virtually uniform fashion on this issue at trial, may accept or reject those assignments at their discretion, as they see fit.  Tr. 128:14-129:16 (S. Boykins), 189:5-12 (D. Wooten), 210:6-18 (J. Jones), 238:17-239:11 (K. Bellamy), 266:23-25 (T. Canady), 284:4-7 (C. Turner), 298:16-20 (T. White), 320:14-321:1 (C. Smith), 346:2-347:1 (A. Tirado), 635:4-636:25 (P. Clark), 660:7-24 (N. Alston), 683:22-684:25 (T. Hall), 703:25-704:22 (D. Hall), 814:1-815:1 (R. Coates), 851:3-21 (L.Boone).

10.     Because Steadfast does not and cannot control whether a nurse accepts or rejects an assignment, virtually all of the staffing contracts make clear that Steadfast cannot guarantee that all requests will be filled.  PX-10.001, .008, .014, .020, .024, .028, .038, .043, .076.

11.     Consistent with the registry model, the healthcare facilities rely on Steadfast to ensure that the nurses on its registry are licensed and/or properly certified.  Tr. 907:25-909:12; PX-10.001, .008, .014, .020, .024, .028, .034, .038.  Indeed, the staffing contracts require that Steadfast use its best efforts to match the skill and experience levels of the nurses on its registry with the specific needs of the facility. PX-10.001, .008, .014, .020, .024, .028, .034, .038.

12.     Steadfast does not "interview" or "hire" nurses on its registry. Tr. 600:3-13, 907:25-909:12, 918:10-919:5.  Rather, it conducts a standard credentialing process, the prerequisites of which consist of: (1) confirming the nurse is licensed and performing a basic background check; (2) passing a drug screening test and a tuberculosis test; (3) signing a HIPAA compliance form; and, (4) as of late, negative COVID test or proof of vaccination.  *See id.*; 916:24-917:11.[2]

13.     While Steadfast's application included a section for nurses to provide references, Steadfast never checked references before putting a nurse on the registry. Tr. 913-4-7.

14.     The nurses sign an Independent Contractor Agreement with Steadfast. Tr. 1009:8-10; PX-25.

15.     If the nurses "have the prerequisites and their credentials are valid, then they are simply added" to the registry; they are not "hired," have no start date, no mandatory training, and are not tasked with any work.  Tr. 600:6-7; *see* 907:25-909:12. They are merely able to accept or reject assignments available to the nurses on the registry, as discussed in the following section.

<u>How Nurses Schedule Shifts on the Registry</u>

---

[2] To the extent that nurses testified they were "interviewed" by Steadfast, the "interview" was limited to discussing the nurse's credentials and availability. Tr. 60:5-10 (Y. Taylor); Tr. 89:12-23 (C. Hopson), Tr. 115:8-20 (S. Boykins); Tr. 228:12-229:1 (K. Bellamy), Tr. 262:21-22 (T. Canady), Tr. 311:3-6 (C. Smith) ("Not so much of an interview; [Lisa Pitts] let me know which facilities she had and which shifts."); Tr. 329:24-330-1 (A. Tirado).

16. To select the assignments that they wish to work, nurses communicate with a "scheduler" at Steadfast to discuss available shifts. Tr. 646:14-25, 683:22-685:23, 702:10-704:18, 813:3-11, 851:3-21, 945:5-22. Other times, schedulers reach out to nurses directly or send out an email blast to nurses about available shifts for the licensures. Tr. 659:23-660:11, 945:11-946:12, 947:11-948:25; DX 58, 59. Either way, nurses are free to choose if, when, and where they want to work. *See* Proposed Statement of Fact ¶ 9, *supra*.

17. Occasionally, nurses will communicate directly with facilities, or vice versa, to schedule available shifts. Tr. 130:24-131:2, 183:13-25, 203:11-21, 274:23-25, 285:25-286:12, 298:1-4, 655:9-25, 683:22-684:5. In those situations, Steadfast requests the nurse or facility inform Steadfast that a particular assignment was selected, so as to prevent double-booking of more than one nurse for the same assignment. *See id.*; 949:14-950:16.

18. In or around January 2021, Steadfast implemented a scheduling application designed and supported by Zira Technologies, Inc., (the "Zira scheduling app"). Tr. 744:7-745:3. The Zira scheduling app reflects a "digital version" of the scheduling process that it has traditionally done through its call center. Tr. 745:8-9. More importantly, it streamlines Steadfast's original process of emailing, calling, and texting to match workers with opportunities at facilities and alleviates the double-booking issues described above. Tr. 951:4-17.

19. The Zira scheduling app allows for direct communication and scheduling between the nurses and facilities. The facility can post open shifts on the app. Tr. 751:5-8. The published shift shows the date and time of the shift, the licensure required for the shift, the pay rate, and the facility's name. Tr. 762:17-19, 799: 3-9, DX-77. Nurses can view open shifts published by the facilities and "claim the shift" they want to work and disregard the others. Tr. 761:7-22 (Kim), DX-77; *see* Tr. 951:19-25 (Pitts); Tr. 341:9-11, 349:19-23 (Tirado); Tr. 654:18-24 (Alston).

Nurses are not required to use the scheduling app. Tr. 346:8-347:2, 635:4-22, 654:18-655:8, 951:4-25.  But many of them do use the app, and some use both options for scheduling.  *See id.*

Timesheets & Invoicing

20.     Steadfast does not independently track a nurse's schedule or hours worked. Tr. 772:2-5, 805:20-806:14. Nurses are responsible for submitting their own timesheets so that they can get paid for shifts they work through Steadfast's registry. Tr. 597:1-3. The timesheets identify the nurse's name, licensure, the facility where the nurse performed the shift, and the start time and end time of the nurse's shift. *See* PX-9. An authorized staff member at the facility must sign the timesheet to verify the nurse's start and end time. Tr. 111:3-5, 132:1-6, 253:15-17, 275:4-8, 293:17-18, 641:22, 664:23-665:4, 690:14-21, 713:2-5, 821:5-9.

21.     Steadfast's only involvement in payroll is administrative: it receives the timesheet from the nurse, sends it to the facility for approval, and then pays the nurse for hours claimed on the timesheets that are approved by the facility. Tr. 589:712, 591:22-23, 767:18-25; 805:14-19. Steadfast does not process payment for a shift claimed by a nurse on her timesheet until it receives the timesheet from the nurse and approval from the facility. Tr. 772:6-11. If the facility does not approve the nurse's time, Steadfast does not pay the nurse for that time. Tr. 591:16-19, 772:9-11.

How Nurses Make Their Schedule and Decide When and Where to Work

22.     The nurses, not Steadfast, control their schedule.  Indeed, the nurses testified almost uniformly at trial that they choose how often, when, and where they work.  *See* Proposed Statement of Fact ¶ 9, *supra*; Tr. 702:10-704:18, 851:3-21, 945:5-22. The nurses are also free to choose what, if any, shifts they would like to work, how many days a week, and the particular hours.  *See id.*

23.     Steadfast never assigns any particular shifts to nurses, and the nurses are never required to accept an available shift.  *See id.*  Instead, when an opportunity is available, a nurse

5

can decline a shift for any reason (e.g. the nurse does not like or prefer the location, facility, specialty or field, date/time of shift, availability, or pay rate).  *See id.*; *see also* Tr. at 650:5-14 (P. Clark), 660:12-661:6 (N. Alston), 698:24-699:15 (D. Hall), 817:10-818:2 (R. Coates).

24.     Likewise, the nurses are not required to work any "minimum" number of hours, or limited to a maximum number of hours. Tr. 638:21-23, 662:19-21, 685:7-23, 705:11-16, 817:7-9.

25.     The nurses do not make any commitment to stay on Steadfast's registry for any length of time. Tr. 345:17-346:7, 638:18-20, 660:7-24, 668:19-669:7, 685:7-23, 707:20-708:17, 815:23-816:14.  Relatedly, nurses are not required to request time off, seek permission, or give notice for leave, and many of them frequently take extended breaks from accepting assignments, at their discretion.  *See id.*

26.     Nurses consistently testified that that they chose to work on a registry model like Steadfast's for the flexibility and ability to control their income:

> **Penny Clark**: "Well, with the agency, it's very flexible. You make -- I can make my own hours, and I do like having a home facility, but you, like a work family, but you know, some places aren't a good fit. So Steadfast is always there, has always been there, you know, in between with lots of work." (Tr. 642:9-13)

> **Napoleon Alston**: "The way I choose my shifts is according to what my lifestyle is. So let's say I want to go on a two-week vacation. I will schedule a lot of shifts, as many as I can, because I want to save money to go. Or if I have to take time off for school and I miss six days of not working, then I'll… pick up extra hours to make up what I didn't make. That's what I love about contracting." Tr. 660: 17-24. "It's the freedom to work the way I want to work, how I want to work, take what I want to make, when I want to make it." Tr. 665:23-25.

> **Tawanda Hall**: "The flexibility and the pay increase." Tr. 691:4-5.

> **Daseline Hall**: "To supplement my income and also to have extra flexibility over my hours of work." Tr. 713:6-10.

> **Racharlotte Coates**: "Because it pays more money… I don't like to be complacent. I like to come and go as I please… I look to move around." Tr. 821:13-21.

6

**Courtney Turner**: "[Your schedule is] as you set it. . . . You're in total control of what you do." Tr. 284:4-7

### The Nurses' Rate and Volume of Pay

27.     Steadfast's revenue model is straightforward and reflects the typical registry model. Steadfast performs certain administrative functions, such as background checks, drug screens, and license verification, and processing payroll and, by virtue of those functions, provides its client facilities with access to a roster of vetted nurses who may then work at the facilities if they so choose. Tr. 942:17-943:1, 991:22-992:5. Steadfast and the facilities negotiates on the amount that the facility will be charged for the work performed, *i.e.* the "bill rate." Tr. 942:1-9; *see id.* 941:12-16; PX-10.141. That rate then translates into the "pay rate" that is paid to the nurses for the work performed. Tr. 942:12-20. Steadfast's revenue is the difference between the bill rate and the pay rate, which Steadfast takes performing these administrative functions. *See id.,* Tr. 942:12-20.

28.     The pay rate is dependent on a few factors, such as the nurses' licensure (CNA, LPN, RN), the type of facility where the work opportunity is located, and the specific needs of that facility. Tr. 263:1-5, 330:12-15, 442:25-443:2, 679:17-25, 706:14-25, 720:13-16, 941:15-942.

29.     Nurses may negotiate their pay rate. For example, nurses attempt to negotiate the pay rate if a particular facility requires travel or is very difficult. Tr. 820:1-9, 943:11-944:4. Other times, particularly when there is an urgent need, nurses may negotiate a higher rate of pay for a particular assignment. Tr. 210:22-211:5, 240:4-6, 246:13-17, 664:7-17, 944:8-14.

30.     Moreover, if a facility has a need for a particular nurse or has an urgent last-minute need, the facility will sometimes change its rate to fit what that nurse wants. Tr. 944:15-18.

### Steadfast Provides No Training or Orientation for Nurses

31.     Steadfast does not provide any orientation or offer any training to the nurses on its registry, Tr. 262: 3-5, 640:11-13, 689:4-6, 710:4-7, 819:1-3, 852:10-12, 919:10-22. To the extent

7

the nurses referenced "training" in their trial testimony, it was limited to standard documentation required by the facilities, such as HIPAA acknowledgments and restrictions on substance abuse and harassment, which was provided only once when the nurse joined the registry. Tr. 174:4-17, 201:24-202:8, 663:8-20, 916:6-917:11, 1010:17-20; PX-32. More importantly, none of these materials constitute training on the *manner* in which the job should be *performed*. *Id.*

32.     Both facility representatives testified that they do not provide training to nurses, as the nurses are expected to know how to practice nursing. Tr. 396:12-15 (E. Johnson), Tr. 445:8-13 (D. Rawlings). To the extent nurses receive any orientation from a facility, it may include a tour of the unit they are working on and "certain documents based on the assignment that they have." Tr. 445:22-445:2 (D. Rawlings).

33.     Similarly, Steadfast does issue any kind of "handbook" to nurses.  Tr. 919:15-16.

<u>Steadfast Does Not Control or Supervise the Nurses' Work</u>

34.     All work performed by the nurses who participate in Steadfast's registry is performed at the facilities, not at Steadfast's office.  Tr. 26:15-27:10, 518:19-519:5.

35.     Steadfast does not monitor, supervise, or control the nurses in the performance of their work at a facility, *i.e.*, the manner in which they nurse. Tr. 108:24-109:1, 133:19-21, 240:13-23, 640:14-22, 689:11-14, 710:8-23, 819:4-6, 956:3-5.  Indeed, no Steadfast representative is ever on-site at a facility to monitor or direct the nurses in performing their duties.  Tr. 82:24-25, 108:1-8, 133:15-18, 240:13-23, 276:17-20, 396:12-22, 640:17-22; 689:15-21, 710:24-711:1, 819:7-12.

36.     Since all the work performed by nurses on Steadfast's registry takes place at the facilities, the nurses work with those facilities directly regarding the particular job functions needed.  Tr. 396:12-22; 445:19-2.  Importantly, the facilities expect the nurses to be competent in performing the duties for which they have signed up to perform.  *See id.*; 445:8-446:11.

37.     Once at the facility, the nurses follow the existing chain of command, such as a Director of Nursing or a Charge Nurse.  Tr. 367:3-11. 445:19-24, 664:5-6.  Some nurses, by virtue of their licensure, act as supervisors at the facilities. Tr. 711:5-10 (D. Hall) (RN); Tr. 249:15-17 (T. Morey) (unit manager).

Steadfast Does Not Evaluate the Nurses' Work Performance and
Does Not Administer Any Corrective or Disciplinary Action

38.     Because Steadfast does not "hire" nurses and instead places them on its registry, Steadfast cannot "fire" those nurses.  Tr. 600:3-13, 980:3-4, 1053:12-21.

39.     In addition, Steadfast does not evaluate nurse performance and has never provided any performance reviews or evaluations.  Tr. 640:23-25, 689:24-690:1, 819:20-22, 956:6-9

40.     If the nurse's work performance is not meeting the facility's standards, the facility will merely put the nurse on a "do not return [DNR]" list and notify Steadfast so the nurse will not be able to select shifts with that facility in the future.  Tr. at 961:9-20.  This occurs, for example, where a nurse is intoxicated at the facility, fighting, neglectful of patients, or otherwise not meeting the facility's expectations.  Tr. 961:20-962:12.

41.     Importantly, the decision of whether to place a nurse on the DNR list is the facility's and the facility's alone, and Steadfast has no authority to challenge it. Tr. at 397:16-398:8, 962:23-963:9.  Indeed, Steadfast's client facilities have the contractual ability to decline any nurse that has accepted an assignment via the registry, for any reason. Tr. at 370:6-14, 429:11-15.  Steadfast does not place nurses on a do not return list unless the facility directs it.  Tr. at 956:19-957:1.

42.     Additionally, even if a nurse is placed on a do not return list, he or she is not taken off the Steadfast registry.  Tr. at 600:3-13, 964:14-965:9.  Rather, this only occurs in situations where, for example, there is an issue with the nurse's credentials such that she is unable to practice, or the if the Board of Nursing suspends the nurse's license.  *See id.*; Tr. at 980:5-20.

9

<u>The Nurses in Steadfast's Registry Provide All of Their Own Equipment and Whatever Else</u>
<u>They Need is Provided by the Facilities at Which They Have Elected to Work.</u>

43.     Steadfast does not provide the nurses with any equipment. Tr. 84:1-14, 98:8-16, 635:1-3, 682:19-683:13, 700:16-701:4, 812:5-21. Rather, the nurses purchase the equipment they need to perform their work, which generally consists of thermometers, pulse oximeters, blood pressure cuffs, and stethoscopes. *See id.*; Tr. 236:11-16, 272:14-24, 433:16-434:2.

44.     Moreover, though Steadfast maintains professional liability insurance, as is required under the terms of its facility contracts, the insurance only covers Steadfast, not the nurses on its registry. Tr. at 528-23-529:1, 544:15-555:8; PX-10. Relatedly, many of the nurses choose to pay for their liability insurance, or have at least considered doing so. Tr. 683:14-20, 701:24-702:3, 812:22-813:2. For those, and other business purchases, the nurses can and do write off the expenses on their taxes, consistent with the premise that they are, ultimately, in business for themselves as independent contractors. *See id.*; 701:5-702:5.

<u>The Nurses Are Responsible for Their Own Training, Licensing, Credentialing, and Education</u>

45.     Nurses on Steadfast's registry must obtain and maintain their own licensure, regardless of whether they are a Registered Nurse, Licensed Practical Nurse, or Certified Nursing Assistant. Tr. at 83:23-25, 84:15-18, 99:5-10, 184:24-185:4, 211:6-17. Steadfast does not pay for or reimburse nurses for licensing expenses, nor does it pay for or reimburse any portion of the nurse's educational expenses. *See id.*; Tr. at 83:4-8.

<u>Nurses in Steadfast's Registry Work Concurrently in the Registries of Steadfast's Competitors,</u>
<u>and their Hours Fluctuate Greatly</u>

46.     Steadfast does not restrict nurses on its registry from working for other entities, including competitive registries. Tr. 86:10-22, 105:3-20, 188:12-189:23, 196:16-21, 240:4-12, 294:17-25, 618:22-24, 639:10-640:5, 658:10-23, 700:6-11, 816:6-817:6, 980:21-982:13. In fact,

many of the nurses who accept shifts in Steadfast's registry concurrently accept shifts in registries that compete for the same facility contracts for which Steadfast competes.  *See id.*

47.     Though the purported "non-compete" language in certain of the nurses' independent contractor agreements was addressed at length at trial, testimony from both the nurses and Steadfast confirmed that, as a matter of practice, that provision is never enforced and the nurses are free to work for competitors when they want, as much as they want.  *See id.*; Tr. 980:21-982:13.

48.     Additionally, many nurses' working schedules fluctuate greatly from week to week, month to month, or year to year, depending on the needs and desires of the particular nurse.  Tr. 123:17-124:1, 133:1-5, 188:21-189:23, 639:2-9, 652:6-15, 672:10-17, 698:14-699:15, 838:15-18.

49.     While some nurses do regularly work shifts through the registry, many simply use the registry to pick up a few shifts here and there to supplement other income, at their discretion, subject to their needs.  *See id.*; Tr. at 790:6-791:9.

Defendants Relied Upon the Advice of Counsel in Continuing to the Nurses' Classification

50.     In or around June 2018, the law firm of Kaufman & Canoles, P.C. was retained to represent Steadfast and Ms. Pitts in the present litigation.  Tr. 1065:11-20.  In a meeting that took place in June 2018, John Bredehoft, Esq. communicated his belief to Ms. Pitts that, based on the information he had been provided, the nurses on the registry appeared to be properly classified as independent contractors under the economic realities test.  Tr. 1065:17-1067:19, 1072:1-16.

51.     In another meeting that took place in January 2019, Mr. Bredehoft communicated to Ms. Pitts that, based on the information he had been provided, he believed, with "a very high degree of confidence," that the nurses on the registry appeared to be properly classified as independent contractors under the economic realities test.  Tr. 1082:17-23.

52.     Prior to rendering these opinions, Mr. Bredehoft evaluated a considerable amount of evidence and information concerning Steadfast's business practices, its relationship with the

nurses on its registry, and the facilities with which it contracts, among other topics.  Tr. 1071:9-1082:23.  In forming his opinions, Mr. Bredehoft evaluated this information under the economic realities test.  *See id.*

53.     Defendants relied on Mr. Bredehoft's advice and counsel in continuing to classify the nurses on Steadfast's registry as independent contractors. Defendants also relied on Mr. Bredehoft's advice and counsel in continuing to classify the nurses on Steadfast's registry as independent contractors after the Secretary filed a second lawsuit, Steadfast II (No. 2:19-cv-475), which was ultimately consolidated with this action.  Tr. 985:3-13.

## II.     PROPOSED CONCLUSIONS OF LAW.

### A.     The Department of Labor Bears the Burden of Proving that the Individuals Listed on Schedule A are "Employees" within the meaning of the FLSA.

1.     The FLSA's protections apply only to "employers" and "employees," *see* 29 U.S.C. §§ 203(d), (e)(1), & (g), and independent contractors are not "employees" within the meaning of the FLSA.  Thus, "if the worker in question is an independent contractor, there is no employment relationship to speak of, and the FLSA does not apply as a threshold matter."  *Acosta v. At Home Personal Care Services LLC*, No. 1:18-CV-549, 2019 WL 1601997, at *7 (E.D. Va. Apr. 15, 2019); *see also Hall v. DIRECTV, LLC*, 846 F.3d 757, 764 (4th Cir. 2017) (observing that "independent contractors [are] outside of the FLSA's scope[.]").

2.     Accordingly, "[t]hose seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act."  *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (citing *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir.1986)). Under the Fourth Circuit, therefore, the Department of Labor bears the burden of proving that the individuals identified on Schedule A are "employees" within the meaning of the FLSA.  *See Kerr v. Marshall*

12

*Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016) ("FLSA conditions liability on the existence of an employer-employee relationship, and the employee bears the burden of alleging and proving the existence of that relationship."); *Purdham v. Fairfax County School Bd.*, 637 F.3d 421, 427 (4th Cir. 2011) (same) (quoting *Benshoff*, 180 F.3d at 140 (4th Cir.1999); *Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007) ("A plaintiff bears the burden of establishing that she is an employee under the FLSA").[3]

## B.   Overview of the "Economic Realities" Test.

3.      Whether a worker is an employee or independent contractor under the FLSA is ultimately a legal question. *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (citations omitted).   To answer that question, courts look to the "economic realities of the relationship between the worker and the putative employer," *id.* at 304, for which the Fourth Circuit employs a six-factor test:  (1) [T]he degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business. *Id.* at 304-05.

4.      Under this test, "[i]t is plaintiff's burden to establish each [*Silk*] factor, and no single factor is dispositive in the decision calculus." *Scruggs v. Skylink, Ltd.*, No. 3:10–0789, 2011 WL 6026152, at *2 (S.D.W. Va. Dec. 2, 2011) (citing *Benshoff*, 180 F.3d at 140–41).  And, rather than

---

[3] Notwithstanding this clear statement of law under the Fourth Circuit, the Secretary took the position in this litigation that Defendants bear the burden of proof in this case; that is, to show the *non-existence* of an employment relationship. As Defendants have addressed at length in prior filings, however, the Court will find little to no basis for the Secretary's position on this issue in the cases on which He relies. *See* ECF No. 239 at 3-6.

"applying these factors 'mechanically,'" *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 671 (D. Md. 2000), the Court looks to the "totality of the circumstances presented" to determine the economic reality of the relationship. *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 241 (4th Cir. 2016). Accordingly, the Secretary must establish that the Schedule A nurses were employees of Steadfast rather than independent contractors under the six *Silk* factors.

## C.    Control

5.      The Fourth Circuit has repeatedly emphasized that the "control" factor is the "most critical" *Silk* factor to determine the existence of an employment relationship. *McFeeley*, 825 F.3d at 241. Under the control factor, the Fourth Circuit looks to the "degree of control the putative employer has over the *manner* in which the work is performed." *Schultz*, 466 F.3d at 305 (emphasis added).   "In evaluating this factor, ...[Courts] have considered such details as whether workers may choose how much and when to work, ... whether they must wear uniforms, and how closely their work is monitored and controlled by the purported employer." *Scruggs*, 2011 WL 6026152, at *3 (S.D.W.Va. Dec. 2, 2011) (internal quotations and citations omitted) Given the importance of the control factor – and the likelihood that this case will be appealed by the losing party – a survey of the Fourth Circuit's decisions on this factor follows.[4]

### i.   Fourth Circuit's Guidance on the Control Factor.

6.      First, in *Chao v. Mid-Atlantic Installation Services, Inc.*, 16 Fed. App'x. 104 (4th Cir. 2001) (unpublished), the Fourth Circuit underlined affirmed a trial court decision in an action brought by the Secretary involving a group of cable installers due to, *inter alia*, an absence of control. That

---

[4] For the duration of the litigation, the Secretary relied almost exclusively on a series of non-binding home health cases from other jurisdictions, rather than precedent from this jurisdiction, including in their filing today. *See* ECF No. 321 at 25 (listing cases). That is an odd request for the Court to follow, given that on appeal the Fourth Circuit is going to look, not to district court decisions from other jurisdictions, but to its own decisions. In any event, Defendants previously addressed the Secretary's non-binding home healthcare cases in prior filings, and therefore will not repeat those same arguments here. *See* ECF No. 229 at 25-27.

was so, the Court held, even though the company required the Installers to meet strict installation specifications, "assign[ed] daily routes to the Installers and require[d] them to report their progress to a dispatcher periodically." *Id.* at 106. On the other hand, the Installers were free to select the order and pace of their daily routes and attend to personal affairs during the day when not on the job. In other words, the Installers were not tethered to a schedule, which weighed in favor of independent contractor status.

7.     Five years after *Chao*, the Fourth Circuit <u>reversed</u> a district court decision in *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006), holding that a group of security agents had been misclassified as independent contractors. In that case, however, the security agents were subject to an "eight-page SOP" that "strictly dictated the manner in which the agents were to carry out their duties of providing security," and therefore the manner in which they *carried out* their duties was tightly controlled by defendants. In reversing the District Court's decision, the Court clarified that "the issue" under the control factor "is not the degree of control that an alleged employer has over the manner in which the work is performed in comparison to that of *another employer.* Rather, it is the degree of control that the alleged employer has in comparison to the control exerted by the *worker.*" *Id.* at 305 (emphasis in original). Here, in other words, the question is not the degree of control that Steadfast has over the nurses in comparison to the control exerted by the *healthcare facilities*. Rather, it is the degree of control that Steadfast exerts over the manner in which the nurses nurse in comparison to the control exerted by the *nurses* over their own work.

8.     The Fourth Circuit's most recent decision on the control factor came in *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235 (4th Cir. 2016), an exotic dancer case. In *McFeeley*, the exotic club (1) required the dancers to perform a private audition before they could work in the club; (2) required the dancers to sign in at the club upon the start of a shift; (3) dictated the dancer's

15

schedules; (4) subjected the dancers to written guidelines "with considerable detail," the violation of which could subject the dancers to disciplinary action; (5) set the dancer's fees; and (6) personally instructed the dancers on work behavior and conduct. *See id.* at 239, 242. The Court seemed to be swayed, moreover, by the fact that the dancers performed their work *at* the facility owned by the employer and that the employer, rather than the dancers, controlled and set the "club's atmosphere." *Id.* at 242, 243. In finding the existence of an employment relationship, however, the Fourth Circuit cautioned that "if any sign of control could convert an independent contractor into an employee, there would be nothing left of the former category."   Therefore:

> [A] worker [does not] automatically become[ ] an employee covered by the FLSA the moment a company exercises any control over him. After all, a company that engages an independent contractor seeks to exert some control . . . over the performance of the contractor's duties and over his conduct on the company's premises. It is rather hard to imagine a party contracting for needed services with an insouciant 'Do whatever you want, wherever you want, and however you please.' *Id.*at 242.

9.     Thus, under the Fourth Circuit, some degree of involvement with independent contractors is inevitable, ordinary, and entirely lawful. *Id.* What matters is the "degree of control over the *manner* in which the work is performed." *Schultz*, 466 F.3d at 305 (emphasis added). And, in making that determination, rather than comparing Steadfast's purported control to the control exerted by the health care facilities, the Court must compare the degree of control that Steadfast exerts over the manner in which the nurses carry out their nursing duties in comparison to the control exerted by the nurses over their own work. *Id.* at 305.

### ii.     The Secretary's Case Theory is At Odds with Fourth Circuit Law, His Own Published Guidance, and His Trial Evidence is Insufficient to Establish Control.

10.     With a survey of the Fourth Circuit's cases in mind, it is evident that the Secretary cannot meet his burden of proof to establish "control" under the Fourth Circuit's standard. ***First***, and for starters, the Secretary's case-in-chief relied heavily on the fact that Steadfast (1) verifies

nurse credentials, (2) requires a drug screening, and that (3) registry nurses must complete a basic application (PX-26) and review and sign a series of forms (PX-32), which the Secretary refers to as "training." None of this, however, appears to have legal significance under the *Silk* test. Not only has the Fourth Circuit given little or no weight to such onboarding documents, but the Secretary's *own guidance*, *Field Assistance Bulletin* 2018-4 (DX-64) ("FAB"), confirms that onboarding practices, such as confirming credentials and conducting background checks, are permissible under the law.[5]

11.     The "training" forms the nurses complete merely consist of standard documentation required by the facilities, such as acknowledgments for HIPAA and restrictions on substance abuse and harassment, all of which are *required* by the healthcare facilities before a nurse can practice nursing in their facility, and not Steadfast. PX-32; Tr. 916-918:15; 1010:17-20; *see also* Tr. 392 (E. Johnson). Here, again, the Secretary's own guidance confirms that requiring the nurse to complete such forms is lawful as part of the matchmaking process. *See* n.5, *supra*, at 17. Thus, in contrast to the policy/training documents the Fourth Circuit found as relevant in both *McFeeley* and *Schultz* – which dictated the manner in which the workers performed their work – the documents signed by the nurses as part of the onboarding process, here, have nothing to do with dictating how the nurses performed nursing. That distinction makes a dispositive difference.

12.     **Second**, several of the Secretary's witnesses testified that they were "interviewed" by Steadfast before being "hired," both of which are legally charged terms. Yet, the trial witnesses who were asked for specifics about the nature of these "interviews" confirmed that the interview

---

[5] "A registry often performs basic background checks of caregivers. These background checks typically include the collection of objective information concerning the caregiver, such as the caregiver's criminal history, credit report, licensing, and other credentials. A registry may also perform additional tailored background checks pursuant to either state or local laws. A registry's performance of such basic or legally required background checks by itself does not indicate that the registry is an employer of the caregiver." FAB 2018-4 at 4.

merely consisted of coordinating the nurse's availability and obtaining basic credential information. Tr. 60:5-10 (Y. Taylor); Tr. 89:12-23 (C. Hopson), Tr. 115:8-20 (S. Boykins); Tr. 228:12-229:1 (K. Bellamy), Tr. 262:21-22 (T. Canady), Tr. 311:3-6 (C. Smith); Tr. 329:24-330-1 (A. Tirado). This not only stands in contrast to the interviews that the Fourth Circuit held were legally relevant in *McFeeley*, which focused on the dancer's ability to dance, 825 F.3d at 239, but also the Secretary's own guidance on the topic, which confirms that a registry may "obtain[] information from the caregivers about the type of work they are willing to perform, their target compensation, [and] their availability[.]" FAB 2018-4 at 2.

13.     ***Third***, in response to the government's question, "who is your supervisor" – which presupposes that they must have one – a number of the Secretary's witnesses testified that their supervisor is Ms. Pitts. But, to the extent any of the nurses were asked about the basis for their opinion, not a single nurse testified that either Lisa Pitts or any other individual from Steadfast supervised or otherwise controlled the manner in which they nursed at the health care facilities, which is the most important question under the Fourth Circuit's test. Tr. 108:24-109:1, 133:19-21, 240:13-23, 640:14-22, 689:11-14, 710:8-23, 819:4-6, 956:3-5.

14.     ***Fourth***, at trial, the Secretary relied on the language of a lengthy facility contract between Steadfast and MFA, which appeared to include language at odds with the reality of the nurses' working relationship with Steadfast. *See* PX-10.128-146. The Fourth Circuit's consideration of the six-factor test, however, does not include a factor that looks to "terms of a vendor contract," as the Secretary asks for here. Indeed, the Fourth Circuit does not even consider the terms of the *independent contractor* agreement between the worker and the company as relevant to the Economic Reality test, and so the Secretary's argument that the Court should rely on a contract to which the worker is *not even a party* is questionable at best. Instead, what matters

is the "economic realities of the relationship between the worker and the putative employer," *Schultz*, 446 F.3d at 304, and how that relationship plays out in real life when the boots are on the ground, when schedules are being made, and when the work is being performed. The Secretary's request that the Court shift the emphasis away from that reality to the terms of a corporate contract would place the Court on shaky legal ground at best.[6]

15.    *Fifth*, the Secretary relied on a series of memos issued by Ms. Pitts as evidence of controlling nurse behavior. The vast majority of these memos, however, concern reminders to submit timesheets. PX-37, DX-42. Of the few that do address nurse behavior, *see*, *e.g.*, DX-41, 44, 46, 50, 58, 59, Ms. Pitts testified that she only issues such memos when requested by the client healthcare facility. Tr. 971:13-23. She also testified with specificity about the circumstances of why each memo in the record was requested by the health care facility, which the Secretary chose not to rebut. *See* Tr. 972-975 (regarding DX-42), 975:9-22 (regarding DX-44), 975:23-976:10 (regarding DX-46), 977-978 (regarding DX-41); 978-979 (regarding DX-50). In any event, the number of behavioral memos in the record is so few (6) within the context of the lengthy statutory period at issue (6.5 years), that it equates to a fewer than one memo per year; hardly the sort of numerosity sufficient to exhibit control as a matter of law.

16.    *Sixth*, the Secretary also relied on a series of anecdotes about Ms. Pitts removing nurses from the schedule as a form of disciplining them. Many of these anecdotes, however, either

---

[6] Even if the Court finds that the terms of the MFA contract have legal relevance here, there was ample evidence at trial that, at a minimum, should give the Court pause about its efficacy. For starters, Erica Johnson, MFA's corporate representative, testified that the contract was "the same or similar" as MFA's contracts with other temporary staffing companies. Tr. 391:13-19. It includes odd terms, such as requiring automobile liability insurance. PX-10.133. It even includes competing terms indicating that the nurses may be considered either "employees" or "independent contractors" of Steadfast. *See* PX-10.134 at ¶ 10. Ms. Pitts testified that she objected to some of the language in the contract, but MFA informed her that they don't change the terms of their contracts. Tr. 559:8-17. As a compromise, MFA agreed to include language in the rate sheet confirming that Steadfast's nurses are "independent contractors," which MFA signed. Tr. 402:25-403:3; *see also* PX-10.141 (term sheet).

lacked context, perspective, and/or involved a good amount of speculating by the nurses. Moreover, the weight of the trial evidence shows that Ms. Pitts only removed nurses from the schedule when requested by the facility. Tr. 956-57, 61-62. Indeed, the credibility of Ms. Pitts's testimony on this topic is bolstered by the testimony of Erica Johnson and David Rawlings (the two facility representatives), who testified (1) that the facilities have the "right" to DNR a nurse, (Tr. 397-398; 447:4-10); (2) that Steadfast has no right to challenge the facility's DNR determination, (Tr. 398:2-4; 447:11-15); (3) that the facility communicates DNR decisions to Steadfast to communicate to the nurse in question, (Tr. 429:11-15), and, finally, (4) once a nurse is DNR'd, the facility, not Steadfast cancels all future nurse shifts (Tr. 429:11-25). Though it is clear that some nurses did not care for Ms. Pitts's messaging of these decisions, the weight of the evidence at trial is that she was the messenger for the facilities, not the one actually making the removal decision.[7]

17.    In sum, the Secretary's evidence of "control" does not align with Fourth Circuit precedent and, in some instances, is inconsistent with its own published guidance. But, at a minimum, it is in no way sufficient for the Secretary to meet its burden to show that Steadfast controlled "the *manner* in which the work is performed," *Schultz*, 466 F.3d at 305 (emphasis added), which is the question that matters under the Fourth Circuit.

### iii.    *Steadfast Exercises Virtually No Control over the Manner in Which the Nurses Perform their Work.*

---

[7] The Secretary also relied the testimony of Teresa Morey to argue that Steadfast used the buyout clause in the facility contracts as a form a control. Ms. Morey testified that after he was offered a job by a facility she worked for through Steadfast, Ms. Pitts warned Ms. Morey that she had to wait a full year before working for them until the facility bought out Ms. Morey's contract with Steadfast. *See* Tr. 249-51. *See* Tr. 249-51. On cross, however, Morey admitted that she began working for the client (Avante) right away, Tr. 256:1-3, which Ms. Pitts confirmed in her testimony. Tr. 923, 930-31. In any event, Ms. Pitts testified, without any rebuttal from the Secretary, that (1) she has never refused to allow a nurse work directly for a facility due to the buyout clause, and (2) she also has had nurses get placed with facilities without receiving a buyout payment. *Id.*

18.    Juxtaposed to the Secretary's novel legal theory of the case, and its attempts to demonstrate control at trial, the weight of evidence shows that Steadfast exercised almost no control over the manner in which the nurses performed their work under the relevant framework.

19.    *First*, and most importantly, Steadfast has no involvement in supervising or directing the work of the registry nurses. Steadfast does not send a representative to the facility where the nurses perform their work, (Tr. 82:24-25, 108:1-8, 133:15-18, 240:13-23, 276:17-20, 396:12-22, 640:17-22; 689:15-21, 710:24-711:1, 819:7-12), and it otherwise provides no oversight, direction, or instruction to the nurses about the *manner* in which they perform nursing. Tr. 108:24-109:1, 133:19-21, 240:13-23, 640:14-22, 689:11-14, 710:8-23, 819:4-6, 956:3-5

20.    *Second*, Steadfast does not provide the nurses with an orientation or any actual training. Tr. 262: 3-5, 640:11-13, 689:4-6, 710:4-7, 819:1-3, 852:10-12, 919:10-22.

21.    *Third*, Steadfast does not provide the nurses with performance evaluations, or otherwise provide feedback to the nurses on their performance, which weighs in favor of independent contractor status. *See Faludi v. U.S. Shale Solutions, L.L.C.*, 950 F.3d 269, 275 (5th Cir. 2020) (finding independent contractor status where worker "was not expected to be at the office during a set period of time each day, and he did not receive performance evaluations").

22.    *Fourth*, unlike the workers at issue in *Schultz, McFeeley,* and, to a lesser extent, *Chao*, Steadfast does not even provide a handbook or how-to guide to nurses on its registry, which weighs in favor or independent contractor status.  *See Remsberg v. Docupak*, No. 3:12–CV–41, 2013 WL 704657, at *5 (N.D. W.Va. Feb. 27, 2013) ("Plaintiff did not have a supervisor, a set work schedule, or an employee handbook, and Plaintiff did not receive performance evaluation."); *Cf. Hardison v. Healthcare Training Sols., LLC*, PWG-15-3287, 2017 WL 2276840, *3 (D. Md.

May 25, 2017) (independent contractor relationship for a nurse instructor found, even where the nurse "used [the] curriculum and lesson plans developed by [the Defendant].")

23.      **Fifth**, as addressed at length in the Proposed Findings of Fact, Steadfast does not set or make the nurses' schedules, as virtually every nurse testified at trial. Rather, once the nurse joins Steadfast's registry, the nurses choose how often, when, and where to work. *See Scruggs*, 2011 WL 6026152, at *3 ("In evaluating th[e control] factor, [Courts] have considered such details as whether workers may choose how much and when to work ...).

24.      **Sixth**, once on the job site at the facility, the nurses largely practice nursing independently, and the Secretary declined to put on any trial evidence to the contrary. Indeed, the nurses testified, for example, that "the facilities never supervise us." Tr. 150:20-24. On this point, the corporate representatives for the healthcare facilities largely agreed. *See, e.g.*, Tr. 396 (Steadfast nurses are expected to know how to practice nursing); *id*. at 395 (facility does not train or provide a how-to guide to Steadfast nurses on the variety of nursing duties they perform in their facilities); *id*. at 446 (Steadfast nurses are given discretion in the manner in which they practice nursing within the scope of their responsibilities and standards of practice).

25.      **Seventh**, the weight of the evidence shows that Steadfast does not actually issue disciplinary action to nurses. Instead, if a nurse has performance issues or engages in misconduct at the facility, the facility DNRs the nurse, removes her from the schedule, and asks Steadfast to communicate the facility's decision. And, to the extent the nurse's conduct raises patient safety or standard of practice issues, the facility addresses the issue directly with the nurse. Tr. 424:9-18.

26.      **Eighth**, Steadfast does not terminate the nurses.  Instead, a nurse is only removed from the registry if their credentials expire or are otherwise invalid. Tr. 600:5-13; 980:5-19.

27.     *Ninth*, Steadfast does not even "approve" timesheets for the nurses, which, like virtually every other aspect of the nurses' work, is a matter handled between the nurses and the facilities where they have elected to work via the registry.  Once filled out by a nurse, timesheets must be approved and signed by an authorized staff member at the facility. As is typical of the registry model, Steadfast's only involvement is receiving the timesheet from the nurse, sending it to the facility for final approval and payment, and paying the nurse for her work.

28.     In sum, Steadfast's only involvement is providing the economic opportunity through the registry – of which the nurse is free to take advantage or not – and submitting the nurse's timesheets to the facility for final approval before payment.  Steadfast exercises no control over the manner in which the nurses perform their work.  The "most critical" *Silk* factor, *McFeeley*, 825 F.3d at 242, therefore shows the complete absence of an employment relationship.

### D.  The Secretary is Unable to Meet His Burden on the Remaining *Silk* Factors

#### i.  *Permanence*

29.     The working relationships between Defendants and the nurses identified on Schedule A are impermanent as a matter of law, which is a critical factor under *Silk*. Indeed, the Secretary declined to put on *any* evidence at trial about the permanence of the working relationship between the Schedule A workers and Steadfast, even though "[i]t is plaintiff's burden to establish each [*Silk*] factor" under the economic realities test.  *Scruggs*, No. 3:10–0789, 2011 WL 6026152, at *2 (citing *Benshoff*, 180 F.3d at 140–41). Under the permanence factor, courts within the Fourth Circuit consider whether the "worker is 'free to find other work,'" whether the worker worked "for multiple [employers] at the same time," *Hardison*, 2017 WL at *4 (quoting *Randolph v. PowerComm Const., Inc.*, 309 F.R.D. 349, 356–57 (D. Md. 2015) and *McFeeley v. Jackson St.*

*Ent., LLC*, 47 F. Supp. 3d 260, 272 (D. Md. 2014), aff'd, 825 F.3d 235 (4th Cir. 2016)), and the permanency of the relationship. *Schultz*, 466 F.3d at 309. Several points follow.

30.     **First**, the nurses are "free to find other work" at their discretion. *Hardison*, PWG-15-3287, 2017 WL 2276840 at \*4.  If a nurse decides to remove himself or herself from the registry, there is no penalty for doing so, just as there is no penalty or disincentive for seeking other work opportunities while on the registry.  Indeed, Steadfast's working relationships with the nurses are inherently impermanent *because* Steadfast is a nursing registry.  The nurses and the nurses alone determine (i) whether and to what extent they want to accept or reject available assignments; and (ii) and whether and to what extent they want to work for other entities.

31.     **Second**, the nurses work as much or as little as they want.  They are not "assigned" shifts, they have no set schedule, and their hours (and, by extension, their income) fluctuate greatly. Indeed, out of the 200 or so nurses for whom Steadfast runs weekly payroll, only a "handful" of them appear "regularly" on the Company's payroll. Tr. 791. *See Chao*, 16 Fed. App'x at 107 (holding that the permanence factor weighed toward independent contractor status where long-term relationship was possible, but was "not necessarily the norm, nor [was] it required."); *Heningburg v. CSS Corp.*, 1:13-CV-2184-ODE, 2015 WL 13081182, at \*9 (N.D. Ga. Aug. 14, 2015) ("There could be long gaps in between assignments. [This] . . . suggest that the CNAs lacked the 'permanence of relationship' that is indicative of an employment arrangement.").

32.     **Third**, and critically, the nurses are also free to accept work from competing registries or work directly for a healthcare facility as an employee, a hallmark of independent contractor status. Indeed, not only did many nurses testify that they concurrently work for competing nurse agencies, *see* Tr. at 86:10-22, 105:3-20, 188:12-189:23, 196:16-21, 240:4-12, 294:17-25,  618:22-24,  639:10-640:5,  658:10-23,  700:6-11,  816:6-817:6,  980:21-982:13,

Steadfast's *chief competitor* confirmed that First Choice and Steadfast have contracts at some of the same facilities and "share" in the same nurses. Tr. 618.[8] Thus, like the cable installer in *Freund* and the nurse instructor in *Hardison*, the Schedule A nurses are free "to take jobs from other [registries] . . . [and] could take as many or as few jobs as [they] desired." 185 Fed. App'x. at 784. This factor decisively weighs in finding independent contractor status.

### ii. Skill

33.     Next, the Court must evaluate the degree of skill required for the work performed. *Schultz*, 466 F.3d at 304.  Importantly, the Secretary, who bears the burden of proof on this, and the other *Silk* factors, presented virtually no evidence at trial suggesting that the degree of skill required for the work the Schedule A nurses perform suggests an employment relationship. Rather, the record establishes that the workers at issue are "skilled" within the meaning of the *Silk* framework, indicating contractor status.  Each of the nurses on Steadfast's registry obtain and maintain their own licensure, regardless of whether they are a Registered Nurse, Licensed Practical Nurse, or Certified Nursing Assistant.  Tr. 83:23-25, 84:15-18, 99:5-10, 184:24-185:4, 211:6-17. By virtue of that licensure alone, the nurses possess a degree of skill that suggests an independent contractor relationship, as the Secretary has conceded elsewhere.  *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2nd Cir. 1988) ("As the Secretary concedes, the nurses are skilled workers who require several years of specialized training.").

34.     Indeed, the Fourth Circuit has previously held that cable installers possess a degree of skill that favors independent contractor status, *Chao*, 16 Fed. App'x. at 107 (the "skills of cable

---

[8] Though it is true that several versions of Steadfast's independent contractor agreement contained a non-compete agreement, the undisputed testimony at trial is that (1) it has never been enforced, and (2) nurses routinely work for competing registries. Indeed, there was no evidence presented at trial that the non-compete language ever even dissuaded any nurses from accepting shifts with Steadfast's competitors. To the contrary, the nurses testified openly and without any apparent concern about working for Steadfast's competitors as if it was the norm for the industry.

installers are akin to those of carpenters, construction workers, and electricians, who are usually considered independent contractors"). The skills possessed by the Schedule A nurses surpass those of the cable installers in *Chao* by a considerable margin, compelling the same conclusion here.[9]

### iii.    Equipment

35.    The Court must next evaluate the workers' "investment in equipment or materials required for the task[.]". *See Schultz*, 466 F.3d at 308. This factor weighs in favor of independent contractor status because the Schedule A nurses' investment in the equipment or materials required to complete their tasks exceeds that of Defendants. In *McFeeley*, 825 F.3d at 241, for example, when addressing the dancers' investment in their work under the *Silk* test, the Court explicitly did so by comparing the dancers' investment to the investment of the club:

> In terms of investment, defendants paid "rent for both clubs; the clubs' bills such as water and electric; business liability insurance; and for radio and print advertising," as well as wages for all non-performing staff. The dancers' investment was limited to their own apparel and, on occasion, food and decorations they brought to the clubs.

*Id.* at 243 (internal citations omitted). The same analysis of the trial record reveals that the nurses' investment in equipment exceeds that of Defendants. In fact, Steadfast provides *none* of the equipment that the nurses use to perform their tasks. Tr. 84:1-14, 98:8-16, 635:1-3, 682:19-683:13, 700:16-701:4, 812:5-21.

36.    Thus, in stark contrast to *Schultz*, where the defendant, "supplied almost every piece of equipment the agents used", 466 F.3d at 308, here, Steadfast provides only the registry. It does not provide equipment, does not fund or reimburse the nurses' education or licensing expenses, Tr. 83:4-8, 211:6-17, and, crucially, does not even provide the place at which the nurses perform their work, Tr. 26:15-19, 518:19-519:5. *See, e.g.*, *McFeely*, 825 F.3d at 243 (noting that club's

---

[9] Moreover, it surely is not lost on the Court that while the cable installer profession and other trade professions validated by *Chao* are skilled, they are also the skilled professions of an industry that is largely male. Nursing, on the other hand, is largely the chosen skilled profession of women. *See* ECF No. 80 at 28 n.16 (listing statistics).

investment under the *Silk* test included, *inter alia*, paying the rent at the club where the exotic dancers performed their work); *Farlow v. Wachovia Bank of North Carolina, N.A.*, 259 F.3d 309, 314 (4th Cir. 2001) (working remotely "clearly suggests and independent contractor relationship" under *Reid* test). The DOL therefore cannot meet its burden of proof on this factor.

### iv.    Profit or Loss

37.    Next, the Court must assess the nurses' "opportunity for profit or loss." *Schultz*, 466 F.3d at 308. Here, despite the work being time-oriented, several factors militate against finding that the "profit or loss" factor favors an employment relationship. *See Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (pipe welders paid hourly could nonetheless control their profit or loss by consistently finding welding work with other companies and maximizing costs). For starters, the nurses "can control their own profits and losses by agreeing to work more or fewer hours," as the installers in *Chao*, 16 Fed. App. At 107. Indeed, the nurses may negotiate their pay rate based on a few factors, such as the nature of the particular facility that has a need for nursing services, when there is an urgent need for such services, or where, for example, a facility seeks out a particular nurse for a particular assignment. *See* Proposed Findings of Fact ¶¶ 29-30.

38.    The nurses on Steadfast's registry, moreover, have opportunity to increase profits based on their efforts, skills, and the assignments they take. Indeed, the opportunities available to the nurses vary in many respects, including the credentials required, what work needs to be performed, where, and for what price. Tr. 263:1-5, 330:12-15, 442:25-443:2, 679:17-25, 706:14-25, 720:13-16, 941:15-942. The nurses, therefore, select the assignments that work best for them, based on the criteria of their choosing, whether it be the location of the facility, the nature of work at the facility, compensation, or some other factor. *See* Proposed Findings of Fact ¶ 29. What's more, the nurses are not limited to the assignments available through Steadfast, because they are

free to work for competing registries, as many choose to do based on the which company is offering the best deal.  *See* Proposed Findings of Fact ¶ 46; *see also* Tr. 618.

42.     In sum, the nurses have the ability to choose the assignments they want, at the facilities they want, with whatever degree of frequency they want, whether via Steadfast or one or more of its competitors.  *See Heningburg*, 2015 WL 13081182, at *9 (noting that CNAs in nurse registry could exercise managerial skill to increase profits by selecting assignments closer to home and thereby reducing travel costs).  The Secretary cannot meet his burden of proof on this factor.

### v.     *Integral*

43.     The final *Silk* factor the Court must consider is "whether the service the worker performed was integral to the business."  *Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F. Supp. 2d 569, 582 (D. Md. 2008).  At its core, Steadfast is in the business of providing placement services; it has no involvement in the actual provision of nursing. Steadfast, fundamentally, functions as a clearinghouse – facilitating the mutually beneficial alignment of the needs of healthcare facilities with the needs of the nurses on its registry.  And while Steadfast arguably depends on the nurses on its registry for its business, what Steadfast truly relies upon is that healthcare facilities will continue to need supplemental nursing services, and that both facilities and nurses will continue to rely on the registry Steadfast has built to facilitate the matching of such opportunities with those who desire to take them. In the context of this action, therefore, this factor should either be afforded little weight, or rendered neutral.  *See Heningburg v. CSS Corp.*, 2015 WL 13081182, at *9 ("[I]t is also appropriate to say that placement services are the core of CSS's business; CSS acts as a placement agency, connecting patients to qualified caregivers. . . . Thus, the Court considers this factor neutral.") (internal citation omitted).

**E.   Defendants Have Satisfied the Good Faith Defense Based on the Advice of Counsel.**

44.     The Good Faith Defense contained in 29 U.S.C. § 260 gives the Court discretion to limit or deny liquidated damages where the employer is found to have acted in good faith and had reasonable grounds to believe its act or omission did not violate the FLSA. *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 162 F. Supp. 3d 490, 515 (W.D.N.C. 2016).  In order to establish the Good Faith Defense, a defendant must establish (1) that it subjectively believed its actions comported with the relevant statutes and (2) that its belief was objectively reasonable. *See Bunley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984).  Both elements are satisfied here.

45.     In or around June 2018, Ms. Pitts retained the law firm of Kaufman & Canoles, P.C. to represent her and Steadfast in the litigation.  Tr. 1065:11-20.  As part of that representation, Ms. Pitts met with and consulted with attorney John Bredehoft, a highly regarded practitioner in the realm of employment law.  Tr. 982:14-983:3. Indeed, Mr. Bredehoft's credentials, which Ms. Pitts herself researched before to their first meeting, included substantial prior experience. *See id.*; 1063:2-1064:6. As part of this representation, Ms. Pitts and Mr. Bredehoft met in person on at least two occasions.  In June 2018, during their first meeting, Mr. Bredehoft and Ms. Pitts discussed the differences between the registry business model and the staffing agency business model, Steadfast's operations, and the nature of the economic realities test. Tr. 1065:17-1067:19. Thereafter, in addition to the information and documents he had already received, Mr. Bredehoft reviewed a large number of additional documents, including (1) facility invoices; (2) agreements between Steadfast and healthcare facilities; and (3) agreements between Steadfast and the nurses on its registry.  Tr. 1072:1-16.  In January 2019, during a meeting that lasted several hours, Mr. Bredehoft and Ms. Pitts discussed the economic realities test as applied to Steadfast's business model at length and in detail. Tr. 1071:9-1082:23.

46.     Importantly, Mr. Bredhoft's legal analysis of Steadfast's operations, and its classification of the nurses as independent contractors, remained the same at both meetings.  At the first meeting, in June 2018, Mr. Bredehoft conveyed to Ms. Pitts "that it appeared to [him] that they [the nurses] were properly qualified based on the information I had been provided so far." Tr. 1071:2-8.  At the second meeting, in January 2019, his conclusion was even more forceful:

> A. I informed her to a very high degree of confidence that, in my view, they were independent contractors, and I told her that, in my view, she had a very good or excellent chance of prevailing on the issue, if it should be challenged all the way to trial. And I remember using the word "excellent" chance.

Tr. 1082:17-23.  As Ms. Pitts testified, she relied on such advice of Mr. Bredehoft in continuing to classify the nurses on Steadfast's registry as independent contractors.  Tr. 982:14-983:21.

47.     Accordingly, Defendants have met both the subjective and objective elements of this Defense.  Such evidence is more than sufficient to establish both that Ms. Pitts and Steadfast subjectively believed the classification was proper, and that they had objectively good reasons for that belief.  *See Acosta v. Team Environmental, LLC*, No. 2:16-cv-03491, 2017 WL 6734169, *5 (S.D. W.Va. Dec. 29, 2017) ("In some cases, the Fourth Circuit found decisive alone the establishment of conscious and proactive steps, such as consultation with legal counsel.").

48.     In fact, to date, the only argument the Secretary has mustered to refute the thoroughness and soundness of Mr. Bredehoft's advice and counsel is that it was provided after the Secretary initiated this action.  Legally, however, this is irrelevant, as the Fourth Circuit in *McFeeley* found good faith when, after a lawsuit was filed, an employer consulted an attorney concerning FLSA and "rei[ed] on the attorney's advice from that point onward."  *McFeeley*, 825 F.3d at 245.  Such is the case here, and the same result should follow.

For the above reasons, the Court should find that the Schedule A nurses are independent contractors and enter judgment for Defendants.

Dated:  November 3, 2021

Respectfully Submitted,

By: */s/ Joshua L. Jewett*

Joshua L. Jewett (VSB No. 76884)
Julia A. Rust (VSB No. 87270)
Aaron D. Siegrist (VSB No. 91072)
Pierce / McCoy, PLLC
101 West Main Street, Suite 101
Norfolk, VA  23510
Phone: (757) 216-0226
Fax: (757) 257-0387
jjewett@piercemccoy.com
chris@piercemccoy.com
julia@piercemccoy.com
asiegrist@piercemccoy.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November 2021, I electronically filed this document with the Clerk of the United States District Court for the Eastern District of Virginia using the CM/ECF system which will copy of the following users:

Ryma Lewis (VSB 83322)
Chervonti Jones (*pro hac vice*)
Office of the Regional Solicitor
U.S. Department of Labor
201 12th Street South, Suite 401
Arlington, VA 22202
Telephone: (202) 693-9369
Facsimile: (202) 693-9392
Lewis.Ryma@dol.gov
Jones. Chervonti.J@dol.gov

*Counsel for Plaintiff*

By: */s/ Joshua L. Jewett*

Joshua L. Jewett (VSB No. 76884)
Julia A. Rust (VSB No. 87270)
Aaron D. Siegrist (VSB No. 91072)
Pierce / McCoy, PLLC
101 West Main Street, Suite 101
Norfolk, VA  23510
Phone: (757) 216-0226
Fax: (757) 257-0387
jjewett@piercemccoy.com
julia@piercemccoy.com
asiegrist@piercemccoy.com

*Counsel for Defendants*