

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

| | |
|---|---|
| MARTIN J. WALSH,<br>SECRETARY OF LABOR,<br>UNITED STATES DEPARTMENT OF LABOR,<br><br>                        Plaintiff,<br><br>          v.<br><br>MEDICAL STAFFING OF AMERICA, LLC, d/b/a<br>STEADFAST MEDICAL STAFFING, and LISA<br>PITTS,<br><br>                      Defendants. | Case No. 2:18–cv–226<br><br>Case No. 2:19–cv–475 |

### *MEMORANDUM OPINION AND ORDER*

The Court issues this Memorandum Opinion and Order after a bench trial in the above-styled matter to resolve the U.S. Department of Labor's ("Plaintiff" or "DOL") claims against Medical Staffing of America, LLC, d/b/a Steadfast Medical Staffing, and Lisa Pitts ("Defendants") for failing to pay overtime and maintain pay records in accordance with the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. § 201, et seq. For the reasons below, the Court **FINDS** that the nurses employed by Defendants are employees of Defendants. Accordingly, the Court **FINDS** Defendants liable for violating the FLSA and enters judgment for Plaintiff.

### I.      PROCEDURAL HISTORY

On May 2, 2018, Plaintiff filed the Complaint in this matter, initiating an enforcement action against Defendants for willfully misclassifying their workers as independent contractors and violating the FLSA. Complaint ("Compl."), ECF No. 1. Defendants answered the Complaint on July 11, 2018. Answer, ECF No. 8. On July 23, 2020, after full briefing by the parties, the Court denied the parties' cross-motions for summary judgment. Summary Judgment Order ("Summ. J.

Or."), ECF No. 251. The Court held a bench trial, which commenced on August 31, 2021. Note, ECF No. 301–311. The parties filed post-trial briefs, and this matter is now ripe for judicial determination. The Court issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II.    FINDINGS OF FACT

### A.    Stipulated Facts

The parties have stipulated to the following facts, which the Court accepts and finds:

1.    Since at least August 18, 2015, Steadfast Medical Staffing ("Steadfast") has been a limited liability corporation with a place of business at 5750 Chesapeake Boulevard, Norfolk, Virginia 23513, and under the ownership of Lisa Ann Pitts ("Ms. Pitts"). *Id.* at 2. Joint Pretrial Or. ("J. Pretrial Or."), ECF No. 261 at 1.

2.    Since at least August 18, 2015, Steadfast has had an annual gross volume of sales made or business done of not less than $500,000.00. *Id.*

3.    The individuals listed in Schedule A were paid straight-time hourly for all hours worked, including for all hours worked over 40 hours in a workweek. *Id.*

4.    Lisa Pitts has maintained 100% ownership interest in Medical Staffing of America, LLC since at least August 2015. *Id.*

5.    Since August 18, 2015, Steadfast has negotiated and established contracts with healthcare facilities. J. Pretrial Or. at 2.

6.    Steadfast's negotiated contracts established an hourly rate Steadfast would receive for placing nurses, including the individuals listed in Schedule A. *Id.*

7.    Since August 18, 2015, "Medical Staffing of America" appears on the earnings statements of individuals listed in Schedule A. *Id.*

2

**B.    Additional Factual Findings**

The Court makes the following additional factual findings (unless otherwise noted, the facts below are reflective of Defendants' business practices since August 18, 2015):

***Steadfast's Relationship with the Nurses***

1.    Lisa Pitts is responsible for the day-to-day operations of Medical Staffing of America, LLC ("Steadfast"). Trial Transcript ("Tr.") at 517:25–518:5.

2.    Steadfast is a nursing registry that maintains a database of licensed nurses and connects those nurses with work opportunities at healthcare facilities. Tr. at 23:9–11, 227:14–15, 514:5–16, 520:6–19, 907:1–6; Plaintiff's Trial Exhibit ("PX") 24.

3.    Specifically, Steadfast receives staffing requests from healthcare facilities with which it has contracted ("client-facilities" or "facilities"), identifies nurses on its registry who satisfy the facilities' needs, then provides the nurses with the opportunity to accept or reject assignments (or "shifts") with those facilities. J. Pretrial Or. at 2; Tr. at 907:1–6, 920:4–921–4, 945:11–946:12, 947:11–948:16; Defendants' Trial Exhibit ("DX") 58–59.

4.    The individuals listed in Schedule A of the Complaint include individuals who worked for Steadfast as Certified Nursing Assistants ("CNA"), Licensed Nurse Practitioners ("LPN"), and Registered Nurses ("RN")[1] at some point between August 18, 2015 and June 27, 2021. Tr. at 55:13–18, 86:7–9, 114:1–6, 520:5–19; Tenth Revised Schedule A, ECF No. 287 at Ex. 1; PX-7; PX-7a; PX-21; PX-22; PX-24.

---

[1] The Certified Nursing Assistants ("CNA"), Licensed Nurse Practitioners ("LPN"), and Registered Nurses ("RN") listed in Schedule A are hereinafter referred to as "nurses."

5.    Steadfast compensated the nurses for work performed on behalf of or for the benefit of Defendants at some point between August 18, 2015 and June 27, 2021. PX-7; PX-7a; PX-8; PX-22.

6.    Steadfast does not pay the nurses overtime (a rate of one and one-half times their regular rate of pay for hours worked over 40 hours in a week). Tr. at 32:23–25, 94:21–25, 95:1–6, 121:12–17, 176:7–10, 200:22–25, 231:11–20, 316:9–20, 551:1–14, 677:17–23; PX-7; PX-7a.

7.    Steadfast pays the nurses straight-time for all hours worked (except for holidays). Tr. at 527:11–15, 551:10–25; PX-21.

8.    "Medical Staffing America" appears on the nurses' paystubs and earnings statements. Joint Pretrial Statement ("J. Pretrial Statement"), ECF No. 84 at 2.

9.    The nurses provide staffing services for businesses located across state lines. Tr. at 128:11–17, 820:6–9.

10.    The nurses render services that are integral to Steadfast's business. Joint Pretrial Statement. J. Pretrial Statement at 2.

11.    The nurses do not have opportunities for profit or loss depending on their managerial skill. Tr. at 292:18–20, 317:13–15; PX-17.

12.    The nurses do not own their own businesses and have not advertised their services. Tr. at 92:8–12, 140:25–141:5, 176:25–177:5, 290:18–23; 715:10–716:3.

13.    Steadfast classifies the nurses on its registry as independent contractors. Tr. at 522:11–17.

14.    Before a nurse is added to Steadfast's registry, the nurse is required to complete an application that includes questions about the nurse's employment history, skill set,

and references. Tr. at 87:14–88:13; PX-26. Steadfast repeatedly refers to itself as an "employer" and the nurses as "employees" in the application. PX-26. Steadfast occasionally refers to the application as an "application for employment" in the application and related documents. *Id.*

15. Steadfast also pays for the nurses to undergo a credentialing process, in which Steadfast (1) performs a background check; (2) confirms that the nurse is properly licensed; (3) conducts a drug screening and tuberculosis test; (4) has the nurse sign a Health Insurance Portability and Accountability Act ("HIPAA") compliance form; and (5) confirms that the nurse has a negative COVID test or proof of vaccination. Tr. at 246:3–10, 282:2–19, 289:24–25, 290:1–2, 916:24–917:11; J. Pretrial Statement at 2.

16. Once a nurse applies and passes the credentialing process, Steadfast enters into an "independent contractor" agreement with the nurse and adds the nurse to its registry. Tr. at 522:11–17, 1009:8–10; PX 25.

17. Nurses must obtain and maintain their own licensure. Tr. at 83:23–25, 84:15–18, 99:5–10, 184:24–185:4, 211:6–17. Steadfast does not pay for or reimburse nurses for licensing or educational expenses. Tr. at 83:4–8.

18. Once a nurse is added to Steadfast's registry, Steadfast trains the nurse on the following topics: HIPAA compliance, substance abuse, and harassment. Tr. at 66:7–25; PX-32.

19. The nurses are also covered under Steadfast's insurance policy, and Steadfast is responsible for processing all workers' compensation claims for any injuries the nurses incur while working at a facility. Tr. at 42:25–43:15; PX-28.

20.    Steadfast does not have an "employee handbook." Tr. at 919:15–16.

21.    Nurses on Steadfast's registry are required to wear badges bearing the name, "Steadfast Medical," while working at client-facilities. Tr. at 72:16–73:3, 99:25–100:5, 124:14–20.

22.    Steadfast does not provide the nurses with any equipment. Tr. at 84:1–14, 98:8–16, 635:1–3, 682:19–21, 700:16–19, 812:5–8.

23.    During the 2020–2021 COVID-19 pandemic lockdowns, Steadfast provided the nurses with letters that the nurses could present to government officials, permitting them to travel to work. Tr. at 1002:12–1003:25.

24.    Steadfast's relationship with the nurses is permanent in nature, even if a term limit is stated in a nurse's contractor agreement. *See e.g.* Tr. at 86:5–11, 811:19–25; PX-11; PX-16; PX-25.

25.    Steadfast maintains "employee change" forms for the nurses that document each nurse's "hire/term date" and "tax jurisdiction." PX-16.

26.    Steadfast's agreements with the nurses include "non-competition" clauses, in which the nurses are prohibited from working for Steadfast's competitors without Steadfast's express, written consent. PX-10; PX-12; PX-25.

27.    The nurses are not permitted to hire other nurses, employees, or contractors to work for them at client-facilities. Tr. at 73:24–74:7, 122:15–25, 141:12–18, 270:7–16, 823:23–824:5.

28.    Steadfast identifies available shifts and then communicates with nurses regarding available shifts via phone, email, text, and/or a mobile application that Steadfast

launched in January 2021 to digitize the scheduling process (the "Zira app"). Tr. at 74:8–13, 96:12–16, 744:7–745:9.

29.    In the Zira app, Defendants are notified whenever a nurse accepts a shift, and Defendants can edit/decline shifts. Tr. at 800:23–801:2.

30.    Because Steadfast gives nurses the opportunity to accept or decline shifts, the nurses do not have a start date or set work schedule. *See e.g.* Tr. at 128:14–129:16, 189:5–12, 210:6–18, 238:17–239:11, 266:23–25, 284:4–7, 298:16–20, 702:10–704:18, 851:3–21, 945:5–946:1.

31.    Steadfast does not require the nurses to work a minimum number of hours or prohibit the nurses from exceeding a maximum number of hours. Tr. at 638:21–23, 662:19–21, 685:7–23, 705:11–16, 817:7–9.

32.    The nurses must notify and/or obtain approval from Steadfast, not client-facilities, when they are running late to a shift, want time off, are sick, or otherwise cannot complete a shift. Tr. at 37:15–38:5, 70:13–72:11, 95:7–23, 121:24–22:11, 335:18–338:20, 1035:13–17.

33.    Steadfast determines the nurses' hourly pay rate, and nurses cannot negotiate their pay rate with Steadfast unless changing the rate would benefit Steadfast. Tr. at 29:8–25, 61:3–11, 74:8–13, 96:12–16, 116:2–6, 144:15–22, 151:8–17, 198:18–23, 203:20–21, 210:22–211:5, 217:10–22, 222:13–19, 229:15–25, 232:15–18, 246:13–19, 292:1–5, 330:19–24.

34.    The nurses on Steadfast's registry can only increase their wages by working more hours. Tr. at 247:2–20, 252:1–11, 284:8–13, 674:21–23.

7

35.   Steadfast is solely responsible for compensating the nurses and handling any compensation related issues, including wage garnishments. Tr. at 33:19–35:6, 97:19–24, 93:5–11, 138:22–24, 184:4–6, 199:6–8, 222:20–25, 286:16–18, 292:14–17, 293:24–25, 297: 22–24, 33:19–34:10, 377:5–18, 531:22–532:11, 595:6–22, 673:18–21; PX-7a; PX-8; PX-19, PX-21–22.

36.   Steadfast pays the nurses an hourly rate from their own financial accounts on a weekly basis. Since April 2019, Steadfast has provided nurses the option to be compensated on an expedited basis via a program called, "Next Day Pay" or "NDP" Tr. at 60:24–25, 90:5–7, 115:24–116:1, 538:15–22, 539:22–540:14, 804:23–805:9, 1039:4–1042:1; PX-8; PX-19; PX-21, PX-34.

37.   Steadfast guarantees the nurses their hourly pay rate for hours worked, regardless of whether a client-facility pays Steadfast for the nurse's work. Tr. at 1041:22–1042:1.

38.   Not receiving a paycheck from Steadfast would impact the nurses' ability to meet their financial obligations. *See e.g.* Tr. at 75:6–8, 97:25–98:2, 125:15–18, 184:7–10.

39.   Steadfast requires the nurses to track their hours when working at client-facilities using timesheets that were created by Steadfast and then submit those timesheets to Steadfast for payment. Tr. at 38:25–39:6, 92:13–93:11, 117:21–118:4, 178: 3–20, 204:6–17, 215:8–216:25, 224:11–17, 230:10–231:6, 265:25–266:9, 283:10–284:3, 315:1–13, 433:7–10; PX-9; PX-53; PX-55.

40.   Before Steadfast compensates a nurse for completing a shift, Steadfast requires a staff member at the client-facility to sign the nurse's timesheet to verify the start

and end times of the nurse's shift. *See e.g.* Tr. at 110:23–111:5, 131:25–132:6, 253:15–17.

41.     Steadfast disciplines nurses by cancelling nurses' shifts or otherwise "removing them from the schedule." Tr. at 30:1–9, 35:14–20, 40:1–42:2, 44:1–8, 119:17–120:12, 206:4–207:5, 335:18–336:7, 647:8–16.

42.     Steadfast disciplines nurses for a variety of reasons including, but not limited to, discussing compensation with a co–worker or client-facility; attempting to contact client-facilities to set their own schedules or rates; being recruited by a client-facility; working for a competitor; declining or cancelling shifts; and being intoxicated or otherwise engaged in unprofessional conduct while working at a client-facility. Tr. at 30:1–25, 31:5–22, 35:14–20, 37:1–5, 41:18–22, 62:6–63:3, 177:15–178:2, 248:22–250:20, 283:1–9, 647:8–16, 883:18–886:9–20.

43.     The nurses do not exercise independent judgment and perform activities typical of nurses in the medical industry including, but not limited to, administering medications, treating wounds, taking notes, and otherwise caring for patients. Tr. at 99:11–21, 360:3–387:19, 414:14–434:4; PX-10; PX-12.

44.     Steadfast instructs nurses on how they should behave while working at client-facilities by sending the nurses written memorandums on topics including, but not limited to, work attire, punctuality, and timekeeping. Tr. at 137:18–138:1, 181:3–8, 536:11–15, 1031:17–19, 1035:10–16.

45.     The Board of Nursing contacts Steadfast if it has any questions or issues with the nurses on Steadfast's registry. Tr. at 979:22–980:2, 1004:17–20, 1006:9–15.

46. The nurses complained to Steadfast on numerous occasions that they were not receiving overtime. Tr. at 78:3–13, 127:5–18, 185:24–186:7; 221:21–222:3, 344:10–345:1.

### *Steadfast's Relationship with Client-Facilities*

47. Healthcare facilities enter into staffing contracts with Steadfast to obtain healthcare services from the nurses on Steadfast's registry. Tr. at 514:10–12, 525:8–10, 920:4–21; PX-10.

48. Healthcare facilities that contract with Steadfast for nursing services are clients of Steadfast. Tr. at 922:25–923:1, 947:21–22, 1050:11–14.

49. Client-facilities rely on Steadfast to ensure that the nurses are properly licensed and otherwise qualified for work. Tr. at 407:19–23, 907:25–909:12; PX-10.

50. Steadfast does not provide client-facilities with a complete listing of the nurses on its registry or the nurses' contact information; Steadfast decides which nurse is sent to respond to the client-facilities' needs. Tr. at 365:3–7, 368:10–12, 426:23–427:9.

51. Client-facilities are prohibited from recruiting the nurses on Steadfast's registry. PX-10; PX-12. Steadfast enforces the prohibition by requiring facilities to first buy-out Steadfast's contract with a particular nurse or by removing nurses who receive employment offers from facilities from the registry. *Id.*; Tr. at 31:5–22, 177:15–178:2, 248:22–250:22, 273:6–14.

52. In some of Steadfast's staffing contracts with healthcare facilities, the nurses on Steadfast's registry are expressly designated as "employees" or "employed personnel" of Steadfast, and Steadfast assumes all legal responsibility as the nurses' "employer." *See e.g.* PX-10 at 48, 82–83, 90, 134–135, 142.

53. Steadfast and client-facilities negotiate the amount a facility will be charged for the work performed by the nurses. Tr. at 941:12–942:20, 943:2–10; PX-10.

54. Client-facilities require Steadfast to submit invoices detailing the total hours worked by the nurses and pay Steadfast a set hourly rate for the hours worked by the nurses at their respective facilities. Tr. at 135:9–20, 375:1–24, 376:1–10, 377:5–24, 378:6–9, 379:6–380:4, 380:5–381:19, 381:14–19, 430:21–433:10, 586:11–17, 431:15–432:5, 432:8–19, 587:3–15, 527:5–10; PX-10; PX-11.

55. The hourly rate a facility pays Steadfast is not the same rate Steadfast pays the nurses. Steadfast retains a percentage of the hourly rate charged to facilities as revenue. Tr. at 534:6–16, 942:12–20, 943:2–10; PX-10.

56. Steadfast requires client-facilities to provide Steadfast with feedback on the nurses' performance. Tr. at 374:7–19, 400:2–5, 423:21–25.

57. If a client-facility no longer wants a particular nurse to work at its facility, the facility contacts Steadfast and requests that the nurse be put on a "do not return" or "DNR" list. *See e.g.* Tr. at 397:8–398:4.

58. By not paying overtime, Steadfast can charge client-facilities lower rates for their services than their competitors who do pay overtime. These lower rates make Steadfast's services more desirable to healthcare facilities than their competitors' services, creating unfair competition in interstate commerce. Tr. at 623:18–624:6.

### *The Nurses' Relationship with Client-Facilities*

59. There is no contractual relationship between the nurses and client-facilities. Tr. at 514:10–12, 525:8–10, 920:4–21.

60.  Client-facilities do not interview applicant nurses. Tr. at 317:23–318:1, 428:10–15, 369:4–9.

61.  Steadfast does not permit the nurses to negotiate their hourly pay rate with client-facilities directly. *See e.g.* Tr. at 123:8–16, 183:3–9, 198:18–21, 203:12–21, 270:20–23, 282:24–25.

62.  Client-facilities do not require nurses to complete timesheets for compensation and are not involved in any compensation issues between Steadfast and the nurses. Tr. at 135:9–20, 375:1–18, 377:5–24, 378:6–9, 379:6–380:4, 380:5–381:19, 381:14–19, 430:25–433:10, 431:15–432:5, 432:8–19.

63.  While some nurses prefer to use their own equipment (e.g. stethoscopes, blood pressure cuffs, etc.), the nurses are not required to use their own equipment because client-facilities provide all tools and equipment the nurses need to perform their work. Tr. at 84:1–14; 98:8–99:4; 184:16–23, 825:13–826:8.

64.  Client-facilities do not discipline the nurses and contact Steadfast regarding any issues they may have with a nurse's performance. Tr. at 150:20–24, 373:24–374:19, 396:1–11, 423:16–17, 424:9–18.

65.  Client-facilities do not train the nurses, but some client-facilities provide nurses with an "orientation" that includes a tour of the facility and "certain documents" related to the nurse's specific work assignment. Tr. at 396:12–15, 445:22–446:2.

### *Steadfast's Recordkeeping*

66.  When working with Zira Technologies, Inc. to develop the Zira app, Steadfast declined the option to include a feature that would have tracked the number of hours

the nurses worked in excess of 40 hours each workweek. Tr. at 1016:23–1017:23; PX-2 at 74–75, 81–82; PX-3 at 5.

67. Steadfast does not record the nurses' total overtime pay and total additions or deductions from wages for each pay period. PX-7; PX-7a; PX-8.

68. Steadfast does not record the hours worked for straight-time pay separately from the hours worked for overtime pay. Tr. at 803:3–8; PX-7; PX-7a; PX-8.

### *Good Faith Defense*

69. Defendants never contacted any personnel within the U.S. Department of Labor ("DOL") to determine whether their compensation policies complied with the FLSA. Tr. at 552:14–19.

70. In 2018, after concluding an initial administrative investigation into Defendants' pay practices, Plaintiff informed Defendants that their pay practices violated the FLSA. Tr. at 550:25–551:25.

71. Prior to Plaintiff's investigation, Defendants never consulted an attorney to determine how the nurses on their registry should be classified before Defendants classified the nurses as independent contractors. Tr. at 904:2–24, 1106:10–13.

72. After Plaintiff's administrative investigation, Ms. Pitts met with John Michael Bredehoft, Esq. on two occasions—in June 2018 and January 2019—and discussed the classification status of Steadfast's nurses. Tr. at 1069:13–15, 1096:2–3.

73. Mr. Bredehoft spoke with Ms. Pitts and Steadfast Payroll Manager, Christine Kim, to glean information about Defendants' business operations. Tr. at 1069:13–15, 1077:8–12, 1096:2–3.

74.     In addition to speaking with Ms. Pitts and Ms. Kim, Mr. Bredehoft reviewed
        Steadfast's application form for nurses, all of Steadfast's nurse contracts, all of
        Steadfast's contracts with healthcare facilities, and some of Steadfast's invoices to
        client-facilities. Tr. at 1100:2–1101:8, 1096:7–14. Defendants provided Mr.
        Bredehoft the above-referenced documentation. *Id.*

75.     Based on the information Defendants provided Mr. Bredehoft, in January 2019, Mr.
        Bredehoft communicated to Ms. Pitts "to a very high degree of confidence" that
        Defendants' nurses were independent contractors because Steadfast did not
        exercise significant control over its nurses. Tr. at 1071:2–8, 1075:22–1077:12,
        1079:2–1082:23. He also indicated that Ms. Pitts had an "excellent chance" of
        prevailing on the issue of worker classification under the FLSA. *Id.*

76.     Mr. Bredehoft also advised Defendants, however, to remove the non-compete
        clause in their contractor agreements and cease using a document called,
        "Employment Application," when recruiting nurses as those features are
        inconsistent with the nurses being classified as independent contractors. Tr. at
        1097:21–1098:5, 1100:2–1101:15, 1116:13–16.

77.     Mr. Bredehoft never conducted an independent factfinding to verify whether the
        information Defendants provided to Mr. Bredehoft reflected Steadfast's actual
        business practices. Tr. at 1069:19–20, 1095:1–1096:14. Mr. Bredehoft never
        discussed Steadfast's business practices with any of Steadfast's nurses or office
        employees (apart from Ms. Kim, who was convicted for felonious embezzlement);
        he did not discuss Steadfast's business practices with any of Steadfast's client-

facilities; and Mr. Bredehoft only reviewed documentation provided by Defendants in evaluating Defendants' business practices. *Id.*; Tr. at 792:11–13, 793:11-13.

78.   Mr. Bredehoft did not review any of the memorandums Defendants sent to the nurses before advising Defendants regarding the nurses' classification status. Tr. at 1110:21 – 1111:4.

79.   Mr. Bredehoft did not discuss the DOL Wage and Hour Division ("WHD")'s Field Assistance Bulletin No. 2018–4 ("FAB") with Defendants. Tr. at 1107:15–21.

80.   Defendants are familiar with the WHD's FAB No. 2018–4 ("FAB"). Tr. at 993:12–16, 1029:13–17.

81.   Defendants know that they must pay employees overtime under the FLSA. Tr. at 535:24–536:2; 1092:13–1093:11.

### *Back Wages*

82.   Plaintiff used the information in Steadfast's payroll summaries and Next Day Pay ("NDP") records to calculate the total hours worked and alleged backpay for the nurses from August 18, 2015 through June 27, 2021. J. Pretrial Statement at 2; Tr. at 453:21–454:6, 459:3–6, 474:21–475:3, 476:13–477:1, 478:2–479:2, 480:4–18, 485:11–25; PX-7; PX-7a; PX-21; PX-22.

83.   Between February 1, 2019 and June 27, 2021, where the total number of hours a nurse worked in one workweek exceeded 168 (the maximum number of hours in a week), Plaintiff used an average of 112 hours as the maximum hours worked to adjust the back–wage calculation based on employee interviews. Tr. at 481:8–25.

84.    Plaintiff calculated backpay by dividing each nurse's gross weekly wage by the nurse's total hours worked for that workweek[2] to determine the nurse's regular rate of pay. Plaintiff then multiplied each nurse's regular rate of pay by the hours worked over 40 in that workweek and multiplied the resulting number by .5 to account for the fact that Steadfast paid these individuals straight-time for every hour worked. The resulting number equaled the total backpay owed to that nurse for that workweek. Tr. at 459:21–460:13, 482:8–20; PX-21; PX-22.

85.    Based on the calculations explained above, the total alleged backpay for Steadfast's nurses from August 18, 2015 through June 27, 2021 is $3,619,716.49. Tr. at 487:7–10; PX-21; PX-22; PX-43.

86.    Defendants were ordered to review Plaintiff's back wage calculations for accuracy. J. Pretrial Statement at 4.

87.    Defendants did not offer evidence to refute Plaintiff's damages calculations or offer a counter-calculation of damages.

### III.    CONCLUSIONS OF LAW

The Court has made the following conclusions of law:

1.    Subject matter jurisdiction in this action is conferred upon the Court by 29 U.S.C. § 217 and 28 U.S.C. §§ 1331.

2.    This Court has personal jurisdiction over Plaintiff pursuant to 28 U.S.C. § 1345 and personal jurisdiction over Defendants because Defendants are domiciled in Virginia.

---

[2] Amounts for gross weekly wage and total hours worked appear in Defendants' payroll summaries. PX-21; PX-22.

3.    Venue is proper under 28 U.S.C. § 1391 in any judicial district in which the defendant is properly subject to personal jurisdiction. 28 U.S.C. § 1391(b) and (c). Venue is proper pursuant to § 1391 because a substantial part of the acts giving rise to the claims occurred in this District; Defendants have sufficient connection with this District; and Defendants are domiciled in this District.

4.    Under the FLSA, employers are required to pay their employees overtime (not less than one and one-half times an employee's regular rate of pay for every hour worked over 40 hours in a workweek). 29 U.S.C. § 207.

5.    Employers subject to the FLSA are also required to "make, keep, and preserve" records of those who work for the employer and their applicable "wages, hours, and other conditions and practices of employment," including employees' total overtime earnings each week. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. Employers must also produce those records to the Government when "necessary and appropriate" for enforcing the FLSA. *Id.*

6.    Under the FLSA, "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. §203(d). "Employee" means "any individual employed by an employer," and "employ" means "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), (g).

7.    Federal courts utilize a six-factor test to determine whether an individual is an employee or independent contractor under the FLSA: "(1) the degree of control that the putative employer has over the manner in which the work is performed, (2) the worker's opportunities for profit or loss dependent on his managerial skill, (3) the worker's investment in equipment or material, or his employment of other workers,

(4) the degree of skill required for the work, (5) the permanence of the working relationship, and (6) the degree to which the services rendered are an integral part of the putative employer's business." *McFeeley v. Jackson St. Entm't*, LLC , 825 F.3d 235, 241 (4th Cir. 2016); *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298 (4th Cir. 2006); *Alley v. Quality Eco Techs., LLC*, No. 3:20CV355, 2021 WL 1196188, at *6 (E.D. Va. Mar. 29, 2021).

8.    No single factor in the six-factor test is dispositive as "the test is designed to capture the economic realities of the relationship between the worker and the putative employer." *McFeeley*, 825 F.3d at 241; *Schultz*, 466 F.3d at 305. "The touchstone of the 'economic realities' test is whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" *McFeeley*, 825 F.3d at 241 (quoting *Schultz*, 466 F.3d at 304). The degree of control a putative employer has over the way an alleged employee's work is performed is the "most important factor" in making this determination. *Smith v. CSRA*, No. 20–1377, 2021 U.S. App. LEXIS 26390, at *31 (4th Cir. Sep. 1, 2021) (citing *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 982 (4th Cir. 1983)).

9.    Any employer who is subject to the FLSA and willfully fails to pay overtime wages to its employees is liable for all unlawfully kept overtime wages and an equal amount as liquidated damages. 29 U.S.C. § 216(e)(2).

10.    The FLSA also authorizes district courts to issue injunctive relief to "restrain violations" of Sections 206 and 207 of the Act upon a showing of cause. 29 U.S.C. § 217. Whether to issue an injunction under the FLSA is within the discretion of

the district court. *See Sec'y of Labor, United States DOL v. Access Home Care, Inc.*, Civil Action No. 1:18–cv–581 (AJT/MSN), 2019 U.S. Dist. LEXIS 231687, at *12–13 (E.D. Va. Mar. 20, 2019) (citing *McComb v. Homeworkers' Handicraft Coop.*, 176 F.2d 633, 641 (4th Cir. 1949); *see also Tobin v. Flippo*, 91 F. Supp. 302, 304 (E.D. Va. 1950) (holding that whether to issue an injunction is "discretionary with the trial court").

11.     In deciding whether to issue an injunction under the FLSA, courts may consider: (1) the employer's previous conduct; (2) whether it is currently compliant (or non-compliant) with the FLSA; and (3) the dependability of any assurances that it will comply with the Act in the future. *See Access Home Care*, 2019 U.S. Dist. LEXIS 231687, at *12–13 (E.D. Va. Mar. 20, 2019) (citing *Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir. 1992)); *see also Acosta v. Emerald Contractors Inc.*, Civil Action No. TDC–18–3762, 2019 U.S. Dist. LEXIS 160500, at *14–15 (D. Md. Sep. 19, 2019).

12.     If, however, an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260; *Van Dyke v. Bluefield Gas Co.*, 210 F.2d 620, 622 (4th Cir 1954).

13.     The employer has the "plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984). An

19

employer's subjective "'[g]ood faith' and 'reasonable grounds' are measured objectively, 29 C.F.R. § 790.22(c), and establishing either element is sufficient to satisfy the statute." *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 116 (4th Cir. 2015). An employer must meet this burden by a preponderance of the evidence. *Troutt v. Stavola Bros.*, 905 F. Supp. 295, 298 (M.D.N.C. 1995).

14.    To support a good faith defense, an employer must attempt to "look into the law," "seek legal advice," or otherwise take "active steps to ascertain the dictates of the FLSA and then move to comply with them." *McFeeley*, 825 F.3d at 245. *See also Anderson v. Penn Nat'l Gaming, Inc.*, Civil Action No. 3:04CV42, 2007 U.S. Dist. LEXIS 71703, at *6 (N.D.W. Va. Sep. 26, 2007) (citing *Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)).

15.    "[T]o reap the benefit of the good faith defense of § 260 based on the advice of counsel[,] the defendant must honestly and truly seek the advice of counsel, counsel must give advice that is reasonable in a legal sense, and the defendant must act in strict conformity with that advice." *Fuentes v. CAI Int'l, Inc.*, 728 F. Supp. 2d 1347, 1358–59 (S.D. Fla. 2010) (citing *Townley v. Floyd & Beasley Transfer Co.*, No. 88–AR–0907–S, 1989 WL 205342, at *4 (N.D. Ala. Dec. 8, 1989)). "[W]hat advice was sought, what disclosures were made by the defendants to their counsel, whether the legal advice was reasonable, and whether the defendants strictly complied with the legal advice" are all factors the court can consider in deciding whether a defendant proved its good faith defense "to the satisfaction of the court." *Id.* at 1359; 29 U.S.C. § 260.

## IV.   DISCUSSION

In analyzing the economic realities of the relationship between the nurses and Steadfast, the Court must determine whether the nurses are employees of Steadfast or independent contractors by considering: (1) the degree of control Steadfast had over the manner in which the nurses performed their work; (2) the nurses' opportunities for profit or loss based on their managerial skill; (3) the nurses' investment in equipment or material, or the employment of other workers; (4) the degree of skill required for the nurses' work; (5) the permanence of the working relationship between the nurses and Steadfast; and (6) the degree to which the nurses' services are integral to Steadfast's business. *McFeeley*, 825 F.3d at 241; *Schultz*, 466 F.3d at 298; *Alley*, 2021 WL 1196188, at *6. If employer liability is established, the Court will need to determine whether Defendants are liable for willfully failing to pay overtime and maintain pay records under the FLSA.

### A.   Defendant's Degree of Control Over the Manner of Work

The evidence shows that Defendants exercise extensive control over the nurses' manner of work, and therefore, employ the nurses under the FLSA. The U.S. Wage and Hour Division ("WHD") published Field Assistance Bulletin No. 2018–4 ("FAB") to "provide guidance to Wage and Hour Division (WHD) field staff to help them determine whether home care, nurse, or caregiver registries . . . are employers under the Fair Labor Standards Act (FLSA)." U.S. DEP'T OF LABOR, WAGE & HOUR DIV., FIELD ASSISTANCE BULL. NO. 2018–4, DETERMINING WHETHER NURSE OR CAREGIVER REGISTRIES ARE EMPLOYERS OF THE CAREGIVER 1 (2018) ("FAB No. 2018–4"). The FAB also details "specific examples of common registry business practices, which may, when the totality of factors is analyzed, establish the existence of an employment relationship under the FLSA." *Id.* The FAB generally describes a registry that is *not* an employer as an entity

that "act[s] as the liaison between the caregiver and the client but does not typically negotiate the terms or conditions of the job on either party's behalf." *Id.* at 2. The Court relies on the FAB as guidance in assessing the extent to which Defendants exercise control over the nurses' manner of work below.

### 1.    Scheduling and Assigning Work

First, the record clearly establishes that Defendants have an extensive degree of control over the scheduling and assigning of work between the nurses and client-facilities. According to the FAB, "a registry's exercise of control over the caregiver's work schedules and assignments may indicate that the registry is an employer of the caregiver." FAB No. 2018–4 at 5. In this case, Defendants are in complete control of what information, if any, nurses receive regarding available shifts at client-facilities. Findings of Fact ("FOF") ¶¶ 28–29, 32, 42, 50, 59. It is only through contact with Defendants via phone, email, text, or the Zira app that nurses can learn of available shifts at client-facilities. *Id.* Moreover, Defendants prohibit nurses from communicating with facilities directly regarding available shifts and scheduling. *Id.* For these reasons, the way nurses are scheduled and assigned work is indicative of an employment relationship with Defendants.

### 2.    Investment in Training and Insurance

Defendants also invest in the nurses' training and insurance, which weighs in favor of an employment relationship. A registry's investment in "a caregiver's training or pay for his or her licenses, insurance, or medical supplies . . . may indicate that the registry is acting as the caregiver's employer, instead of simply a referral service." FAB 2018-4 at 8. The record reflects that Defendants train nurses on a variety of topics (e.g. HIPAA compliance, substance abuse, and harassment); cover nurses under their own malpractice insurance policy; and provide nurses worker's compensation benefits. FOF ¶ 18–19. The evidence also demonstrates that Defendants

send nurses written memorandums with guidance on healthcare worker professionalism. *Id.* ¶ 44. Therefore, Defendants have demonstrated an investment in the nurses' training and insurance that is equivalent to the investment of an employer.

    *3.    Setting the Pay Rate*

Defendants admit that they set the nurses' pay rate, an action typical of an employer. According to the FAB, "[a] registry typically does not determine a caregiver's rate of pay. The client instead negotiates the rate of pay directly with the caregiver." FAB 2018-4 at 6. "[A] registry's decision to effectively set a caregiver's rate of pay without the caregiver making the ultimate determination indicates that the registry is acting as the caregiver's employer." *Id.* at 7. In this case, not only do Defendants determine the nurses' pay rates without any input from the nurses, Defendants expressly forbid nurses from negotiating their pay rates with facilities directly and withhold the nurses' contact information from facilities. FOF ¶ 33, 61. Even the nurses' ability to negotiate their pay rate with Defendants is limited by the extent to which changing the pay rate would benefit Defendants. *Id.* ¶ 33. Thus, Defendants' decision to set the nurses' pay rates is consistent with the actions of an employer.

    *4.    Continuous Payments for Caregiver Services*

Like an employer, Defendants receive continuous payments from client-facilities for the nurses' services. As the FAB advises:

> "A registry may instead choose to charge fees that fluctuate based on the number of hours that a caregiver works for the client. Such a registry may have an ongoing interest in the employment relationship, including in the number of hours the caregiver works and whether those hours are tracked accurately. The registry's fees are based on the ongoing caregiver relationship, not the registry's initial referral or administrative efforts. The caregiver's pay then depends, in part, on the amount the registry charges. Such charges, therefore, may indicate that the registry is the caregiver's employer."

FAB 2018-4 at 7. Here, the amount Defendants invoice client-facilities is based directly on the numbers of hours worked by the nurses, not the initial referral or administrative efforts. FOF ¶ 54–55. Defendants set the nurses' hourly rate, negotiate a higher hourly rate with client-facilities, and retain the difference as revenue. *Id.* For these reasons, the record clearly establishes that Defendants have an ongoing interest in its relationship with the nurses and facilities, which is indicative of an employment relationship.

5. *Paying Wages*

Defendants are acting as the nurses' employer by guaranteeing direct payment of wages from Defendants' own financial accounts. A registry "may be exercising control over the caregiver, [if] the caregiver may economically depend on the registry's preferences and decisions." FAB 2018-4 at 6. Specifically,

> "[a] registry's direct payment of its own funds to the caregiver . . . may indicate that the registry is the caregiver's employer. This is true regardless of whether the registry typically receives reimbursement from the client because, in this situation, the registry may be effectively guaranteeing the payment even if the client does not ultimately pay. In such circumstances, the caregiver may be economically dependent on the registry, which indicates that the registry is the caregiver's employer."

FAB 2018-4 at 7. In this case, Defendants pay the nurses directly, from their own accounts, and regardless of whether client-facilities pay Defendants for its nurses' services. FOF ¶ 35–37. Defendants guarantee nurses straight-time pay for virtually all hours worked on a weekly or, at the nurses' election, an expedited basis. *Id.*; Stipulated Findings of Fact ("SFOF") ¶ 3. Moreover, "Medical Staffing of America" appears on all the nurses' earnings statements. SFOF ¶ 7. Testimony from several nurses supports that not receiving a paycheck from Defendants would

impact the nurses' ability to meet their financial obligations. FOF ¶ 38. Ultimately, the nurses are economically dependent on Defendants as their employer.

6.     *Tracking Caregiver Hours*

Defendants' efforts to maintain detailed and accurate records of the nurses' time is more like the efforts of an employer than an agency providing a mere administrative function. "[A] registry's active creation and verification of time records may indicate that the registry . . . [is] an employer of the caregiver. Tracking and independently verifying time worked is generally a form of supervision on which the caregiver depends to ensure proper payment." FAB 2018-4 at 8. In the instant matter, Defendants create the timesheets the nurses must use to record their time and submit to Defendants for payment. FOF ¶ 39. While Defendants require a staff member at client-facilities to verify nurses' hours by signing the timesheets, generally, client-facilities do not require the nurses to track their hours nor do they maintain a record of the nurses' hours. *Id.* ¶ 40, 62. Thus, Defendants' method of tracking caregiver hours is indicative of an employment relationship.

7.     *Supervision and Discipline*

Finally, the record reflects that Defendants exercise excessive control over the nurses by supervising the nurses' performance and disciplining them when Defendants' deem necessary. According to the FAB, "[a] registry usually has no right to alter or terminate the terms and conditions of the caregiver's employment[,]" "monitor or supervise caregivers[,] . . . or evaluate caregivers' performance" without assuming employer liability. FAB 2018-4 at 5–6. Testimony from several nurses and client-facility representatives establish that Defendants are responsible for supervising and disciplining nurses. FOF ¶ 21, 23, 25, 32, 41, 42, 44. Defendants require facilities to provide Steadfast with feedback on the nurses' performance. *Id.* ¶ 56. Client-facilities do not discipline the nurses and contact Defendants regarding any issues they may have with a nurse's

performance. *Id.* ¶ 64. And finally, several nurses testified that Defendants discipline nurses by cancelling nurses' shifts or otherwise diminishing their ability to obtain work through the registry. *Id.* 41–42. Defendants "remove nurses from the schedule" at their discretion for a variety of reasons, e.g. discussing compensation with a co–worker or client-facility; attempting to contact client-facilities to set their own schedules or rates; being recruited by a client-facility; working for a competitor; and declining or cancelling shifts. *Id.* Thus, the level of supervision and discipline Defendants exercise over the nurses is indicative of an employment relationship.

For the reasons above, Defendants have extensive control over the nurses' manner of work, a level of control that far exceeds the administrative functions in which a registry may engage without creating an employment relationship with the caregivers on its registry.

**B.     The Remaining Factors**

Virtually all the remaining factors—workers' opportunities for profit/loss; the permanence of the working relationship; workers' investment in equipment/other workers; and the degree to which the work is integral to Defendants' business—indicate that Defendants are the nurses' employer. First, it is evident that the nurses' have no opportunities for profit/loss in its relationship with Defendants. FOF ¶ 11. Ms. Pitts is the sole owner of Steadfast, and there is no evidence that the nurses have an interest in Steadfast beyond their role as workers for a set hourly pay rate. *Id.* ¶ 4; SFOF ¶ 4. Furthermore, the non-competition clauses in the contracts between Defendants and the nurses significantly hinder the nurses' ability to accumulate profit independent of Defendants.[3] FOF ¶ 26. Second, Defendants' pay records indicate that the relationship between Defendants and the nurses is permanent in nature, even if a term limit is stated in a nurse's contractor agreement. *Id.* ¶ 24. Third, the evidence shows that nurses do not invest in equipment to an extent indicative

---

[3] *See* FAB 2018-4 at 6 (stating that "prohibiting a caregiver from registering with other referral services . . . [or] clients outside of the registry" indicates the existence of an employment relationship).

of an independent contractor status and that Defendants prohibit nurses from hiring other nurses, employees, or contractors to work for them at client-facilities. *Id.* ¶ 22, 63. Finally, the parties agree that the work the nurses perform is integral to Defendants' business. *Id.* ¶ 10.

Therefore, like the control factor, the totality of the remaining factors courts consider in determining whether workers are employees or independent contractors weigh in favor of the nurses being properly classified as Defendants' employees. The degree of skill (via education and licensures) required for the nurses' work suggests that the nurses could work in an independent capacity, but the economic realities of the nurses' relationship with Defendants under the other factors outweigh this factor significantly. Ultimately, under the FLSA, the nurses on Defendants' registry are Defendants' employees, not independent contractors.

## C.    Good Faith Defense

Defendants have failed to prove a good faith defense under 29 U.S.C. § 260 that would defeat or diminish their liability for willfully violating the FLSA's overtime and recordkeeping provisions. Defendants allege that they have a reasonable, good faith belief that they are not violating the FLSA after being advised by legal counsel that their nurses are likely properly classified as independent contractors. Defendants' Supplemental Brief ("Defs.' Supp. Br."), ECF No. 322 at 28–29. Ultimately, Defendants' alleged good faith belief is not objectively reasonable.

As an initial matter, the evidence clearly demonstrates that Defendants could not have classified their nurses as independent contractors in good faith prior to seeking legal counsel in June 2018. Defendants failed to present any evidence that it sought legal advice on the classification of its nurses or took any proactive steps to educate themselves on the FLSA prior to meeting Mr. Bredehoft in June 2018. FOF ¶ 69, 71.

Moreover, Defendants' continuing reliance on Mr. Bredehoft's legal opinion on and after June 2018 is not objectively reasonable. First, the DOL conducted a multi–year administrative investigation into Defendant's pay practices and informed Defendants in 2018 that their pay practices violated the FLSA. *Id.* ¶ 70. *See Burnley*,730 F.2d at 140 (citing *Marshall v. Brunner*, 668 F.2d 748, 753–54 (3d Cir. 1982), which affirmed an award of liquidated damages where the employer deliberately circumvented FLSA requirements after the DOL Wage and Hour Division investigated the employer's pay practices). Second, Defendants admit that they are familiar with FAB 2018-4, which expressly identifies several of Defendants' pay practices as indicative of an employment relationship with the nurses. *Id.* ¶ 80. *See Richard v. Marriott Corp.*, 549 F.2d 303 (4th Cir.), *cert. denied*, 433 U.S. 915, 53 L. Ed. 2d 1100, 97 S. Ct. 2988 (1977) (affirming liquidated damages where the employer was aware of an opinion letter issued by the Wage and Hour Administrator that indicated that its pay practices were illegal). Therefore, while Mr. Bredehoft did not review this bulletin with Defendants, they are independently aware of the guidance and have not sought counsel regarding whether their practices comply with the guidance. *Id.* ¶ 79, 80.

And finally, Defendants failed to prove that they provided Mr. Bredehoft all the information he would have needed to provide a fully informed, reasonable legal opinion on Defendants' pay practices. For example, there is no evidence that Mr. Bredehoft spoke with the nurses, client-facilities, or anyone other than Ms. Pitts and the Payroll Manager, Ms. Kim (who was convicted for felonious embezzlement), regarding Defendants' actual business practices. FOF ¶ 77. Mr. Bredehoft did not review the memorandums Steadfast sends nurses regarding best work practices. *Id.* ¶ 44; 78. And there is no evidence that Defendants informed Mr. Bredehoft that Defendants, not the client-facilities, require nurses to notify them if they are late, sick, or otherwise

cannot fulfill a shift and discipline nurses by cancelling their shifts. *Id.* ¶ 41, 42. In fact, Defendants convinced Mr. Bredehoft of the exact opposite despite being fully aware at the time of their meetings with Mr. Bredehoft of the reasons the DOL found Defendants' pay practices in violation of the FLSA. *See Fuentes*, 728 F. Supp. 2d at 1358–59 (citing *Townley*, 1989 WL 205342, at *4, which rejected an employer's good faith defense when the employer "did not furnish counsel information necessary for a legitimate legal opinion upon which it could rely and base a subsequent defense of 'good faith'"). Thus, Defendants' reliance on Mr. Bredehoft's legal advice was not in good faith or objectively reasonable, and they failed to prove their good faith defense by a preponderance of the evidence.

Defendants rely on precedent from within the Fourth Circuit where courts have declined to award liquidated damages where an employer adheres to legal advice regarding its compliance with the FLSA. Defs.' Supp. Br. at 28–29 (citing *Burnley*, 730 F.2d 136 and *McFeeley*, 825 F.3d 235). This case is distinguished from *Burnley* and *McFeeley* because Defendants, unlike the employers in those cases, were subject to an administrative investigation by the DOL Wage and Hour Division, the sole agency responsible for enforcing the FLSA and sole beneficiary of judicial deference on issues relating to the FLSA. *See* 29 U.S.C. § 259 (instructing courts to bar court actions against employers that rely on the DOL Wage and Hour Division's interpretation of the FLSA). At the conclusion of that investigation, the DOL advised Defendants that their pay practices were illegal. FOF ¶ 70. Moreover, regardless of this distinction, Defendants did not adhere to Mr. Bredehoft's advice to forgo the non-compete clauses in its contractor agreements. FOF ¶ 26; *McFeeley*, 825 F.3d at 245 (holding that an employer must adhere to the legal advice received to prevail on their good faith defense). Mr. Bredehoft testified that if the non-compete clause is enforced, "then [his] views would change" regarding the nurses' classification. *Id.* ¶ 76.

Therefore, the record reflects that Defendants acted willfully and did not violate the FLSA in good faith.

### D.    Recordkeeping Violations

As the nurses' employer under the FLSA, Defendants are liable for failing to "make, keep, and preserve" records of those who work for the employer and their applicable "wages, hours, and other conditions and practices of employment . . . ." 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. The record reflects that Defendants declined to include an overtime-tracking function in the Zira app and otherwise failed to accurately record the nurses' total overtime pay and total additions or deductions from wages for each pay period. *Id.*; FOF ¶ 66–68. Therefore, Defendants are liable to Plaintiff for failing to meet the recordkeeping requirements under the FLSA.

### E.    Injunctive Relief

The evidence demonstrates that Defendants have never complied with the FLSA and will continue to violate the FLSA, rendering injunctive relief appropriate. 29 U.S.C. § 217; *Access Home Care*, 2019 U.S. Dist. LEXIS 231687, at *12–13. Defendants' deposition and trial testimony as well as other documentary evidence supports Defendants' intent to continue misclassifying the nurses on their registry despite their familiarity with DOL guidance and law to the contrary. *Id.* ¶ 3, 6–7, 80–81. Therefore, Plaintiff has shown good cause for enjoining Defendants from violating the FLSA's overtime and recordkeeping provisions. *Id.*

### V.    CONCLUSION

For the foregoing reasons, the Court **FINDS** Defendant liable for failing to pay overtime and maintain pay records in accordance with the FLSA. Accordingly, **JUDGMENT IS ENTERED FOR PLAINTIFF**, and Defendants are **ENJOINED** from committing further violations of the FLSA.

Plaintiff is **ORDERED** to provide the Court with an updated calculation of back pay and liquidated damages within sixty (60) days of the date of this opinion. Defendants are **ORDERED** to cooperate with Plaintiff by providing Plaintiff with all information necessary for compliance with this order.

The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

**IT IS SO ORDERED**.

Norfolk, Virginia

January/3 , 2022

Raymond A. Jackson
**United States District Judge**