```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3   _____

 4
     R. ALEXANDER ACOSTA
 5   SECRETARY OF LABOR,
     UNITED STATES DEPARTMENT OF LABOR,
 6                 Plaintiff,
     v                                    CASE NO.2:18-CV-226
 7
     MEDICAL STAFFING OF AMERICA, LLC,
 8   D/B/A STEADFAST MEDICAL STAFFING,
     AND LISA ANN PITTS
 9                 Defendants.

10   _____

11
                  The deposition of ALVARO MAZUERA, a
12
     witness in the above-entitled cause, taken before
13
     Danette M. Wilson, Notary Public in and for the
14
     Commonwealth of Virginia at Large, at Pierce McCoy,
15
     PLLC, 101 W. Main Street, Suite 101, Norfolk,
16
     Virginia, on February 28, 2019, commencing at or
17
     about the hour of 10:00 a.m.
18
19   APPEARANCES:  FOR THE PLAINTIFF:

20                 Pierce McCoy, PLLC
                   BY: CHRISTOPHER D. DAVIS, ESQUIRE
21                 101 West Main Street, Suite 101
                   Norfolk, Virginia 23510
22
                   FOR THE DEFENDANT:
23
                   Office of Regional Solicitor
24                 BY:  AVNI J. AMIN, ATTORNEY AT LAW
                   201 12th Street South
25                 Arlington, Virginia 22202
```

1                          **I N D E X**

2

**WITNESS:**                                              **PAGE:**

3

1.  Alvaro Mazuera

4

        Examination by Christopher Davis  ........... 3

5

6

**ALVARO EXHIBITS:**                                      **PAGE:**

7

No. 1  -  Notice of Deposition....................  3
8    No. 2  -  Exhibit B ............................ 168
     No. 3  -  Back Wages........................... 173
9    No. 4  -  Field Assistance Bulletin............. 227
     No. 5  -  Payroll Details...................... 230
10   No. 6  -  Wage Transcription Computation.......... 232
     No. 7  -  Redacted page....................... 233
11   No. 8  -  Acknowledgement and Waiver............. 234
     No. 9  -  MFA/MFNC Access Request Packet.......... 239
12   No. 10 -  MFA/MFNC Access Acknowledgement........ 245
     No. 11 -  Exhibit E............................ 249
13   No. 12 -  Webpage.............................. 252
     No. 13 -  Employment Application................. 254
14   No. 14 -  Confidentiality Statement............. 259
     No. 15 -  List of Names/Addresses................. 259
15   No. 16 -  List of Names/Addresses................. 261
     No. 17 -  Settlement Agreement.................... 264
16   No. 18 -  Memo of the Week....................... 267
     No. 19 -  Initiating Information................. 274
17   No. 20 -  Redacted pages........................ 278
     No. 21 -  Exhibit C............................ 279
18   No. 22 -  Exhibit D............................ 285
     No. 23 -  Letter.............................. 289

19

20                        -----oOo-----

21

22

23

24

25

 1                         **ALVARO MAZUERA,**

 2     having been produced and first duly sworn as a witness,

 3     testified as follows:

 4

 5                                    EXAMINATION

 6

 7     BY MR. DAVIS:

 8          Q       Would you please state your full name for

 9     the record, please?

10          A       My full name?

11          Q       Yes.

12          A       Alvaro Mazuera.

13          Q       And, Mr. Mazuera, I'm going to show you a

14     notice.

15                  MR. DAVIS:  I'll ask you to mark this as

16          Exhibit 1.  Alvaro 1.

17                  (Marked in evidence as Alvaro Exhibit

18          Number 1.)

19

20     BY MR. DAVIS:

21          Q       This is -- this is a notice -- our amended

22     notice of deposition to take your deposition here

23     today.  Is this the reason why you're here today?

24          A       Yes.

25          Q       Okay.  Very good.  Are you taking any kind

Mazuera - Davis                                        4

```
 1   of medication or under the influence of anything that

 2   would prevent you from giving full and truthful --

 3        A     No.

 4        Q     -- answers today?

 5        A     No.  Just coffee.

 6        Q     Okay.  Just coffee?  Me too.  Me too.

 7   Very good.  I'm assuming that you had your deposition

 8   taken before?

 9        A     No.  I testified in court but no

10   depositions.

11        Q     This is your first deposition?

12        A     Yes.

13        Q     Okay.

14        A     I witnessed several deposition, but this

15   is my first deposition.  Yeah.

16        Q     Okay.  Meaning -- when you say that you

17   witnessed several depositions, does that mean you sat

18   while someone else was deposed?

19        A     Yes.  I have in previous cases.

20        Q     Okay.  And -- and were the -- in the other

21   cases where you sat in a deposition, you were not being

22   deposed.  Were those all cases involving the Department

23   of Labor?

24        A     Yes, it was.

25        Q     Okay.  What -- since you haven't been
```

Mazuera - Davis                                    5

1    deposed, I'll just tell you a couple ground rules that

2    might be helpful just -- after I turn off my cell

3    phone.  The court reporter's going to take everything

4    down, of course, and it's important that we don't talk

5    over each other because she can't take down, you know,

6    when we're talking over each other.

7         A     Uh-huh.

8         Q     And just like you just did, try not to say

9    uh-huh.  Try to say yes or no.  I'm terrible at it.  I

10   do the same thing, so I'll watch you and you watch me

11   and Avni can watch both of us, but let's try to keep

12   our answers audible.  Make sense?

13        A     Okay.

14        Q     Okay.  Good.  All right.  What did you do

15   to prepare for this deposition?

16        A     What did I do to prepare for this

17   deposition?  I just talked to -- to my attorney -- our

18   attorney from the Department of Labor.  That's it.

19        Q     Okay.  I'm not going to ask you and I'm

20   not inquiring as to anything that you -- that you all

21   talked about.  That would be protected information.

22        A     Yes.

23        Q     But did you talk to anybody else other

24   than Avni here?

25        A     No.

Mazuera - Davis                                          6

```
 1        Q       Okay.  Did you review any documents to
 2   prepare for your deposition?
 3        A       No.
 4        Q       Okay.  Very good.  Have you ever been
 5   involved in a lawsuit personally before?  Not involving
 6   the Department of Labor?
 7        A       No.
 8        Q       Okay.  Can you tell me about your
 9   educational background?
10        A       I have -- I studied law school in
11   Colombia, South America.
12        Q       Did you?
13        A       Five years.  I was close to graduation but
14   the only thing left was the thesis.  I completed
15   everything but --
16        Q       The only thing was the what?
17        A       My thesis.
18        Q       Thesis?
19        A       Yeah.  That was the only thing left.
20        Q       We don't have to do a thesis here.
21        A       Yeah.  We have to do it over there.  We
22   have to do a year of consulting.  You know, free
23   consulting, you know, for the public, and then after
24   that we have to do some preparatories to cover all the
25   main laws, you know, civil law, you know, and -- and
```

 1  all of the labor law and everything.  Then after that

 2  we have to do a thesis, and the thesis has to be based

 3  on any subject that you -- my subject was going to be

 4  extradition, so --

 5        Q     Let me just stop you for a second.

 6        A     Yeah.

 7        Q     I don't need to know all that stuff.

 8  Great information.

 9        A     So I -- I -- I came to the U.S.  I had the

10  opportunity to come to the United -- United States.  I

11  joined the military three years after.  I did

12  twenty-four years in the United States Navy.

13        Q     Thank you for your service.

14        A     Yes.  While I was in Navy I started --

15  went to school too.  I graduated with a business

16  degree, and then I did a master's degree in -- in

17  business.

18        Q     So you have a bachelor's degree in

19  business and then a --

20        A     A master's in business.

21        Q     An MBA?

22        A     Uh-huh.  MBA.

23        Q     Okay.  Where -- where did you get your

24  MBA?

25        A     University of Maryland University College.

1       Q      Okay.

2       A      I did some course online and some others

3  in the classroom.

4       Q      The -- the law training that you had, so

5  that was a degree program but you didn't complete it,

6  so is there a certificate or anything that you have

7  from that program --

8       A      From the --

9       Q      In Colombia.

10       A      In Colombia?  No, I did not.  I just have

11  this much left (indicating).

12       Q      Okay.  So five years of training in law?

13       A      Yeah.  Law school.

14       Q      What was the name of the school?

15       A      It was University of Santiago de Cali.

16       Q      Okay.  All right.  And then the bachelor's

17  degree from --

18       A      The bachelor's from UMUC.

19       Q      Okay.  All right.  And then the MBA.  Any

20  other education?

21       A      Not really.  No.  No.  No need.

22       Q      Got it.  Did you have any -- any kind of

23  professional certifications of any kind?  I'm being

24  very vague.  I don't know --

25       A      No.  No, I don't.

Mazuera - Davis                                           9

```
 1        Q        Six Sigma or -- I mean, there's lots of

 2   certifications people can have.

 3        A        That's all in the military.

 4        Q        Okay.

 5        A        But that stay with the military.

 6        Q        Okay.  What was your position in the

 7   military?

 8        A        I was a chief.  An E-7.

 9        Q        An E-7?  Okay.

10        A        Uh-huh.

11        Q        Did you say which branch?

12        A        United States Navy.

13        Q        In the Navy?

14        A        Yeah.

15        Q        Okay.  Were you on a boat or a sub?

16        A        Boat and shore duty.  Sixteen years on the

17   boat.

18        Q        Got it.  When did you start working for

19   the Department of Labor?

20        A        I started in 2013.

21        Q        Okay.  And what -- what was your -- can

22   you walk me through -- not in a lot detail, but can you

23   walk me through what position you were initially,

24   leading up to what your position is today?

25        A        I was a GS-7 when I joined the Department
```

1   of Labor.  I went to school.  We have Basic 1, Basic 2,

2   and I attended --

3        Q      Let me stop you for a second.  You went to

4   school with the Department of Labor?

5        A      Yes.

6        Q      And what is that schooling?

7        A      That school is -- the first one, the Basic

8   1, is introduction to Fair Labor Standards Act --

9        Q      Uh-huh.

10       A      -- and other regulations.  The second one

11  was more into Davis-Bacon Act, Service Contract, H-1A,

12  H-1B, H-2A, and then after that I took several courses

13  on Section 14 also.  Then I went back --

14       Q      Section 14 of --

15       A      Section 14.

16       Q      Of what?

17       A      That's for minimum wage.

18       Q      Oh, okay.

19       A      Yes.  For people who have some

20  disabilities, you know.

21       Q      Okay.

22       A      Sub-minimum wage.  I also attended class

23  with agricultural -- H-2A classes with the Department

24  of Labor.  I went for H-2B also.  Yeah.  I've been

25  taking different courses with them.

1       Q       Okay.  When you take these courses, are
2   they offered internally with the Department of Labor?
3       A       It is internal.  Yeah.  Internally.  Yeah.
4   We travel to several locations and we sit down in the
5   classroom.  We discuss about our regulations.
6       Q       In other words, members of the public
7   would not be entitled to take these classes?
8       A       No.
9       Q       Is that correct?
10      A       No.
11      Q       All right.  Okay.  Any other training with
12  the Department to Labor?
13      A       Not that I'm aware.
14      Q       So you started with them in 2013.  What
15  was your job title in 2013?
16      A       I was an investigator, Wage and Hour
17  Investigator.
18      Q       And did you have to start the training
19  before you could have the position or did you take the
20  position and then train while you --
21      A       No.  I took the position and then started
22  training.
23      Q       Simultaneously?
24      A       Uh-huh.
25      Q       Okay.  And did your -- did your job title

1   and position change over time from 2013 until today?

2        A       Yeah.  I turned -- the second year I

3   became GS-9.

4        Q       Okay.

5        A       And then the third year I became a GS-11.

6        Q       Okay.

7        A       The fourth year I became GS-10.

8        Q       Okay.

9        A       I mean a GS-12.  I'm sorry.  Then I been a

10  GS-12 ever since.

11       Q       And my question is actually not going to

12  your -- the GS level refers to your pay scale and all

13  of that.  I understand.  I'm asking about your job

14  title.  Did you change?

15       A       Wage and Hour Investigator.

16       Q       Always a Wage and Hour Investigator?

17       A       Always.  Yeah.

18       Q       Okay.  Understood.  Okay.  And as a Wage

19  and Hour Investigator, I understand in this instance

20  you traveled to Norfolk and then we talked about going

21  to St. Croix.  Do you travel around the country

22  typically in -- in your role as a Wage and Hour

23  Investigator?

24       A       No.  Typically as a Wage and Hour

25  Investigator we travel in Virginia.

 1          Q       Okay.

 2          A       That's what I'm assigned.  Our office is

 3    assigned to the southern part of Virginia.

 4          Q       Okay.

 5          A       Now, if my district office says, You have

 6    to go somewhere else, you know, to provide support -- I

 7    did it before.  With H-2A employees I went to the

 8    Baltimore district --

 9          Q       Okay.

10          A       -- and I provided assistance over there.

11          Q       And I heard you say your office used to be

12    in this building, correct?

13          A       It used to be on the seventh floor.

14          Q       Okay.  And where -- where are you now?

15          A       Newport News in Merchants Walk.

16          Q       Very good.  Okay.  All right.  Do you

17    do -- in your role as a Wage and Hour Investigator, are

18    you mostly involved in FLSA matters or does that vary

19    to other things?  You mentioned Davis-Bacon.  Like

20    what -- do you deal with government contractors?  How

21    does that work?

22          A       No.  We all train to oversee any act.  We

23    supposed to be trained to oversee any Davis-Bacon Act,

24    Service Contract, all the acts.  However, FLSA is a

25    requirement for all the acts once we -- if we doing the

```
 1   Davis-Bacon, I'm not just going to concentrate -- you
 2   know, I wear different hats, so I always tell the
 3   employer, I'm changing my hat.  We going to FLSA.  We
 4   moving from mechanics -- you know, labor and mechanics
 5   and moving to the office.
 6        Q      Okay.
 7        A      Who are you -- the people that is working
 8   for you in the office?  And I always test the
 9   exemptions of the overtime with the office personnel.
10        Q      Okay.
11        A      So it changes hats.  For every -- for
12   every act, we always have to enforce also FLSA.
13        Q      Do you keep up with case law?  Meaning the
14   rulings of courts with regard to FLSA matters to know
15   what that current law is?
16        A      Yes.  We -- in a weekly basis we get
17   messages from the national office with letters --
18        Q      Okay.
19        A      -- with any changes.  Yeah.  We also have
20   changes and when we have training -- we have monthly
21   training with the district office.  We discuss about
22   any changes in the rules, you know, and regulations.
23        Q      Okay.  Can you walk me through -- I'm
24   going to get specific to this case in just a minute --
25        A      Sure.
```

```
 1      Q      -- but can you walk me through what the
 2  normal investigative process is for an FLSA matter?
 3      A      Okay.  For an FLSA matter, the first thing
 4  that we do is -- the first thing when we have a
 5  complaint is -- sometimes the investigation will start
 6  as a complaint.  Sometimes it starts as directed by the
 7  regional office or by the district office.
 8      Q      Okay.
 9      A      So if it's directed, we just go straight
10  to the employer.  If it's a complaint, we meet the
11  complainant or we call them depending on the
12  availability, and then we -- we take an interview.
13      Q      Okay.
14      A      And we discuss about his complaint and
15  that's it.  After that, you call the employer.  You
16  already have some basis of what's going on.  You read
17  your file and then you call the employer.  Normally I
18  send an appointment letter.  I wait about three days
19  until that appointment letter has arrived to the
20  point -- you know, the destination because sometimes
21  the address might be wrong, so within three to four
22  days I call the employer and I says, Hey, have you
23  received my letter?
24             Then at that time we discuss about the
25  letter.  What are requirements?  What does the letter
```

1   requires?  I explain to them about the Fact Sheet 44,

2   you know, visits to employers, and Fact Sheet 77 also,

3   retaliation against employees, because sometime

4   employers when they see the Department of Labor they

5   think someone complain and they start targeting their

6   employees and looking at everybody and asking, Okay.

7   Have you heard anybody complaining or saying anything?

8   The first thing I tell them is, Please, do not target

9   any employees.  That's it.

10            The day of the appointment, I visit the

11   employer and the first thing that we ask is for taxes,

12   you know, a copy of the taxes, to establish enterprise

13   coverage.  It all depends on the case.  If it's home

14   healthcare case, we automatically have coverage because

15   it's a health -- it's a health issue.  It's a health

16   case where we have people that are aged, sick, that

17   are, you know, old or that stay in hospitals or nursing

18   homes, so -- and that's the normal procedure.

19       Q       Okay.  Okay.  Keep going for me.  So then

20   you establish that there's coverage and then what's

21   next?

22       A       Yeah.  Once we establish coverage, I

23   explain to the employer what is coverage.

24       Q       Okay.

25       A       And I make the comparison like the FBI

 1    when they going to investigate a case, the first thing

 2    they have to do is establish jurisdiction.

 3           Q       Of course.

 4           A       And that's what I tell them because when

 5    you tell them coverage, like, What is that?

 6           Q       Right.

 7           A       If it's more than 500,000, then we proceed

 8    with the investigation, with the compliance inspection,

 9    and we tell the employer -- you know, we normally show

10    the Department of Labor leaflets, you know, guide and

11    reference, and say, This is what it says in there.

12           Q       Okay.

13           A       And then I continue to ask questions of

14    the employer and I have like a --

15           Q       Are those questions that are predetermined

16    or do you select the questions?  Where do they come

17    from?

18           A       No.  It's already predetermined.  We have

19    to follow FOH fundamentals --

20           Q       Okay.

21           A       -- the procedures, because you have to put

22    information in the -- in the system about this

23    employer.  You ask them for their legal name, to check

24    for -- for the, you know, FSLA posters and make sure

25    they're in there.

```
 1        Q      Yeah.

 2        A      That could be a violation.  Then after

 3   that we ask for taxes.  When we look at the taxes, we

 4   look at the employer's identification number.  We check

 5   that.  We ask, How many employees do you have?  Are you

 6   a corporation?  What -- what are you?  Then after

 7   that, there's several questions on that paper that --

 8   that you have to follow.

 9        Q      Okay.  So now after you do the interview

10   with the -- with the individual at the business, what's

11   the next step?

12        A      You mean with the employer?

13        Q      Well, I was going to ask you about that.

14   Do you always refer to them as an employer before

15   you've made a determination whether they're --

16        A      Well, normally when I walk into an office

17   I ask for the owner.

18        Q      The owner?

19        A      Yeah.  Of the business.

20        Q      Okay.

21        A      I identify who's the owner.  If they say,

22   The owner's not here, and I ask them, Can you please

23   call the owner?

24        Q      Okay.

25        A      And if they say, No, we can't contact them
```

1    right now, I say, Okay, so who's in -- who's in charge?

2         Q      Yes.

3         A      Who's representing the -- the owner?  Once

4    I identify that person, then I present the letter, you

5    know.  We talk about it.  Sometimes we -- I do

6    walk-ins, you know.  I say, It's very important for you

7    to locate the owner because I would like to talk to him

8    in person or over the phone and explain the

9    requirement.

10        Q      Can I stop you for a second?

11        A      Sure.

12        Q      I'm asking about the word employer.

13   Several times when you were telling me this process you

14   said that you talked to the employer, and my

15   understanding is --

16        A      The employer of the business --

17        Q      Correct.

18        A      -- that I'm -- that I'm investigating.

19        Q      Right.  And I'm asking about do you -- do

20   you always use the word employer when you're

21   investigating whether or not they're an employer or

22   somebody?

23        A      No.  No.  We use employer or owner.

24        Q      Or owner?

25        A      Yeah.  The determination of employer, it

Maldona - Davis                          20

1   gets decided, yeah, when we start that meeting.

2          Q      Right.  Okay.  It's decide -- when is it

3   decided?

4          A      When is it decided?

5          Q      Yeah.

6          A      Throughout the meeting that I have with

7   the owner of the establishment.

8          Q      Okay.  Got it.  Do you typically make a

9   decision as to whether the individual is an employer or

10  someone who retains independent contractors after that

11  first interview with the owner?

12         A      Well, the determination of calling someone

13  employer is after -- typically after I collect -- not

14  just the interview from the employee that complain but

15  sometimes it's not just one person but a bunch of

16  complaints, so when I talk to them I ask them -- I ask

17  them about the economic realities and I ask questions

18  about that and I ask them, Do you have business --

19  sometimes I ask questions, Do you have a business?  Are

20  you registered?  Do you have -- are you registered with

21  the Commonwealth of Virginia?  If they say no, Do you

22  have any employees?  No?  So if it's not relevant to

23  what I need to write on the interview -- but I ask

24  those questions to make sure that if the -- what is

25  complaint?  If the complaint is that if employee saying

1   that I'm not getting paid overtime because the employer

2   or the owner of the business has me as an exempt, then

3   we test it for that.  I ask him specific questions

4   based on the 541.100 exemptions.

5          Q      I see.

6          A      It depends on what type employee it is.

7   If it is an administrative employee, then we use the

8   541.100.  If it's professional -- in some cases

9   sometimes like cooks, cooks are sometimes misclassified

10  as a professional, so I ask questions --

11         Q      Really?

12         A      Yeah.  Sometimes they use -- employers,

13  owners of business of restaurants, they -- they

14  asked -- so we have to ask questions specific with the

15  regulation.  Everything is based on the regulation.

16         Q      Okay.  So I just want to finish up the

17  process.  So as I understand it, you have either a

18  complaint from an individual or you have -- or you're

19  directed from the organization to investigate.  You

20  send the letter.

21         A      Yes.

22         Q      You go and meet with the owner, and then

23  after meeting with the owner, then you conduct

24  interviews with the workers?

25         A      The workers.  I conduct interviews with

1    the office workers, and I also conduct interviews with

2    any individual that is working for this owner or

3    employee that is working outside.  Sometimes you have,

4    one example, sales representatives that working the

5    outside.  They have different rules than the salesman

6    that works in the office, so they all abide by

7    different rules and regulations.

8         Q      Is it typical that you find organizations

9    that have both employees and independent contractors

10   working with them?

11        A      Not really.

12        Q      Okay.  It's generally one or the other?

13        A      Yeah.  It's generally one or the other.

14   Yeah.

15        Q      Have you ever investigated an organization

16   that maintained both employees and independent

17   contractors at the same time?

18        A      Yes, I did.

19        Q      Okay.  And have you found instances where

20   the Department of Labor determined that it was proper

21   to have class -- these individuals, some individuals,

22   classified as employees while others would be

23   classified as independent contractors?

24        A      No.  It all depends on the test that -- if

25   they pass the test.  You know, the questions that I

1   ask.

2           Q       Okay.

3           A       But so far I have not seen anyone that was

4   working as an independent -- that was classified as an

5   independent contractor by his employer and -- and that

6   at the end he was independent contractor.  Normally a

7   lot of employers they misunderstand the regulation and

8   they -- it could be used -- the employer can use it and

9   decide, Well, this is an independent contractor, but

10  it's -- there's some requirements that you have to ask

11  in order to get somebody.  I have different cases like

12  that right now where I am on the island where employers

13  are alleging that someone is independent contractor and

14  it's not because the realities show different.  Yeah.

15          Q       Okay.  So what is the process after you --

16  after you interview the owner and the workers, what's

17  the next process?

18          A       After interviewing the owner, I ask for

19  the employers all the stuff that I asked in the

20  appointment letter.

21          Q       Okay.

22          A       So I verify the appointment letter.  I ask

23  them for the last payroll and I establish the SIP, the

24  statutory limitations.

25          Q       S-I-P?  Oh, standard -- statute of

1    limitations?

2         A      Yes.  Statutory limitations.  I establish

3    the statutory limitations and then I go back two years.

4         Q      Okay.

5         A      I tell the employer I need to have two

6    years of payroll records.  I need to have them in a

7    certain format to identify -- easily identify how many

8    hours they work, who the employee, what's rate of pay,

9    what's the gross, and what's the deductions.  That's

10   all -- this is all the information that I need because

11   they tell me -- the first one tells me, Okay. This is

12   the person that I'm -- that -- that -- you know, I have

13   to identify who the complainant was if he isn't there.

14        Q      Yes.

15        A      That's one thing.  The second one is

16   the -- the hours worked.

17        Q      Okay.

18        A      The hours worked are verified.  I ask

19   them, How are you paying your employees?  If he says

20   weekly or bi-weekly, if it's weekly, then I see that

21   it's bi-weekly, anything over forty hours will be

22   considered overtime.  Therefore, their employer owes

23   them an additional half time.  I look for that

24   additional half time or the overtime.  You know, the

25   regulation requires that you separate actual hours

1  worked on a weekly basis, so for us to identify how

2  many hours this person work, it has to be in that

3  payroll, so I tell them it should say Week 1, Week 2.

4  Normally a lot of employers fail on that one.  They

5  don't have it like that.  They don't have Week 1, Week

6  2, so in situations like that if it's only weekly

7  payroll, then anything over forty would be an

8  additional half time.

9           Then after that we check the rate of pay,

10  if it's less than 7.25.  If it's not less than 7.25, I

11  continue.  I look at the deductions to make sure that

12  the deductions are legal, there are no illegal

13  deduction such as cash shortages or any big deduction

14  that might reduce their rate of pay to less than 7.25.

15  That would be a minimum wage violation.

16      Q    Of course.  Okay.  So when you come --

17  this is in the initial meeting with the owner, correct?

18      A    Uh-huh.

19      Q    When you come in -- I'm just asking about

20  the general process and you've said several times

21  you've asked them about their employees, about their

22  employees, employees, employees, but at the time when

23  you go into the initial interview with the owner, do

24  you already assume that the individuals are employees?

25      A    No.  I just ask about the employees.  If

```
 1   the employer says, No, I don't have any employees.  I
 2   have independent contractor employees, then the first
 3   thing is take care of employees -- you know, the
 4   employees to make sure that they're correctly exempt.
 5   Then we talk about -- discuss about independent
 6   contractors, what you call independent contractors.
 7   Why you calling them independent contractors?  That's
 8   the first question.
 9        Q       Okay.  And do you find or in your
10   experience have you found that owners have
11   misclassified employees that should have been
12   classified as independent contractors?
13        A       No.
14        Q       Okay.  But you -- you find the opposite,
15   right?  Independent contractors that should have been
16   identified or should have been properly classified as
17   employees?
18        A       Yes.
19        Q       Okay.  All right.  Have you ever -- the
20   questions that you said you asked the owner and that
21   you asked the workers, those are standardized questions
22   that you ask everybody uniformly?
23        A       It all varies from case to case.  It
24   depends, but if it's independent contractors, I asked
25   them, What basis do you use to classify these
```

1    individuals as independent contractors?

2         Q     Right.  I guess -- I'm sorry to interrupt

3    but I just want to make sure -- be efficient.  So when

4    an owner says, I have independent contractors, do you

5    then just start to ask general questions from your head

6    from your experience or do you have a sheet that you

7    pull out and start to read a list of questions to them?

8         A     No.  No.  I ask the employer, What are --

9    are basis for you to -- what are the -- what basis do

10   you have to classify these individuals as independent

11   contractors?

12        Q     Okay.

13        A     And based on the employee answer, that's

14   when I start asking more questions.

15        Q     I see.  Okay.  And those questions come

16   just from you, though?  That's just your experience and

17   your training?

18        A     No.  Those questions are -- we -- we

19   follow the fundamentals, the FOH, the fundamentals of

20   an investigation.  In the FOH we have to follow certain

21   steps.

22        Q     Okay.

23        A     There is economic realities in the FOH.

24        Q     Walk me through those steps.

25        A     You have the economic realities.  Like say

```
 1   Fact Sheet Number 13, it talks about, Am I an employee
 2   or am I an independent contractor?
 3          Q      Okay.
 4          A      So we ask them questions.  Okay.  So what
 5   do you do?  What -- what is the -- what is -- who is
 6   the integral part of business?
 7          Q      I guess what I'm asking is the questions
 8   that you ask, are you reading them from a sheet or are
 9   you just asking -- you know, where -- do you understand
10   my question?
11          A      The questions to the employees or to --
12          Q      To -- to the owner or to the workers.  Are
13   those from a sheet that you're reading the questions
14   and writing the answers down or are they just general
15   things that you should look at and you form your own
16   questions?
17          A      No.  Normally I ask the employer, Why do
18   you consider this individual independent contractor?
19          Q      Yes.
20          A      Based on those answers, then I ask more
21   questions.
22          Q      Okay.
23          A      Like the case with Steadfast, she showed
24   me contracts and she explained that she -- she gave me
25   some explanation, but it's not -- it wasn't a full
```

```
 1   explanation until I received the letter from

 2   Mr. Rothlisberger, her first attorney.

 3        Q     Yes.

 4        A     And that's where -- because she didn't

 5   know about the economic realities.  She says that she

 6   had discussed with a lawyer and she was advised by

 7   another lawyer and now Mr. Rothlisberger that she could

 8   classify these individuals as independent contractors,

 9   so I asked her for the name of the lawyer and she said,

10   no, she will not give it to me.  I said okay.  So I

11   say -- basically I keep asking, What basis do you use

12   to classify these individuals independent contractors?

13        Q     Uh-huh.

14        A     And she showed me the contract, and the

15   contract -- and I'm sure you have a copy of that

16   contract.

17        Q     We'll -- we'll look at it.  Yeah.

18        A     But in that contract there some steps or

19   some numbers where she has in that contract where it

20   was questioned -- it was very questionable, so I ask

21   her, So you basing these individuals -- these employees

22   as independent contractors based on this, on your

23   contract, not on the law and the regulations?  She

24   says, No.  I say, you know, my -- my interaction with

25   Ms. Lisa Pitts was not too long because she has -- she
```

Maldonada - Davis                                    30

 1   has -- she was very temper.  She went off very -- very

 2   easy and I told her, I says, Just give me the basis why

 3   do you consider these individuals independent

 4   contractors, and she could not answer to me.  She says

 5   that -- the only thing she says is she was advised by

 6   her lawyer and I say, Ma'am, I think your information

 7   is wrong and -- and you owe this -- you have to pay

 8   these individuals.

 9            We discussed about what they do and how

10   she hires them.  She told me everything how she gets in

11   contact with employees.  She told me that she had

12   recruiters.  You know, looking at the web page, there

13   different page where they could apply for these jobs,

14   and I asked her questions about who has control of the

15   hours?  How do you hire?  What's the process?  What are

16   the requirements for these individuals to be -- you

17   know, to work for her.  I mean, How do you determine

18   that?  I ask, How do you determine the amount of hours?

19   She says that it was the employees' decision, but I

20   told her, Okay. But is the -- is the decision from the

21   employees based on what hours do you have available?

22   It's basically not the employees' decision when the

23   hours are available.  Just like when you go to

24   McDonald's, the hours available, the manager's going to

25   tell you, I've got a shift from 4:00 to 12:00.  If you

 1   want to take it, you take it.  If not, I find someone

 2   else.

 3              So we have a discussion about this and I

 4   told her at the end, Look, I think you misclassified

 5   employees as independent contractors.  I have -- I

 6   have -- I believe that you owe them an additional half

 7   time.  She just went off and told me she was going to

 8   fight me until the end.  That's what she said to me.

 9        Q      Okay.

10        A      When -- when I told her, I says -- I

11   witnessed all the things in there that I did not

12   discuss with the employee, but it determined to me that

13   she was in control of this business of these

14   independent contractors, and that's one of the economic

15   realities of -- of know how to -- when you classify an

16   independent contractor as employee.

17        Q      Okay.

18        A      So --

19        Q      All right.  So when you say that Ms. Pitts

20   went off on you and she has a temper, what -- what did

21   she do and say that --

22        A      She says that -- that I wrong, that the

23   government just is going against her business, and that

24   she was advised by a lawyer and that she believed what

25   the lawyer say is okay.  Just give the name of the

```
 1   lawyer.  She said, No, I'm not going to give you the
 2   name of the lawyer.  Then I just say, Okay, ma'am.  She
 3   said she's going -- she was going to hire a lawyer,
 4   that from now on I will not talk to her, so I say,
 5   Okay, ma'am. Thank you very much.  I walked away.
 6               There was no issue, no -- no -- no --
 7   friction between the two of us, but I received a
 8   letter -- I give her my business card and I receive a
 9   letter on the e-mail from Mr. Rothlisberger with a
10   letter.  In the letter he was analyzing the economic
11   realities he was basing why -- that's when he give me
12   the -- the -- a letter saying why the employer
13   classified the employees as independent contractors and
14   it was based on these economic realities.
15               So when I went to my office I just started
16   doing to the computations.
17         Q     Computations of what?
18         A     We do the back wages.  When we find a
19   case --
20         Q     Of back wages?
21         A     Yeah.  And then we normally have a -- a
22   final conference with employer.
23         Q     Let me -- let me go back.  I've got a
24   bunch of follow-up questions.  So back to when you said
25   she went off on you and she has a temper, did she --
```

1   did she use any expletives with you?

2        A        No.  No.

3        Q        Did she threaten you at all personally?

4        A        No.  No.

5        Q        Did she physically do anything?

6        A        No.  But she was -- no.  It's the

7   normal -- well, you can see when someone is upset.

8        Q        Okay.  Okay.

9        A        She was very upset.

10        Q        Did she do anything inappropriate?

11        A        No.  No.  She didn't do anything

12   inappropriate.

13        Q        Okay.  And then you -- you said that when

14   you were meeting with her you said, I think that the

15   information you have is wrong about these individuals

16   being independent contractors as opposed to employees.

17   Is this -- this meeting that you had with Lisa Pitts

18   that we're talking about, this was before you met or

19   interviewed --

20        A        No.  This was -- this was after -- after I

21   took some interviews in the office.  I took some

22   interviews prior to my --

23        Q        You said a word.  I'm sorry.  You had two

24   what interviews?

25        A        I took interviews in the office.

1       Q       Took interviews.  Okay.

2       A       From office employees and I took the

3   interview from the -- the first party, you know, the

4   complainant, and then I took some interviews from all

5   the individuals that the complainant refer me.  Then

6   after -- after I left the office, I took all the

7   interviews from list -- the only list that Ms. Pitts

8   provided me because I had request former and current

9   employees' addresses but she didn't want to give me all

10  the information.  I just ask, Can you give me a few

11  employees' information because I'm going to do some

12  more interviews?

13      Q       Help me with the structure here because

14  we've -- we've kind of moved on from your general

15  process to the specific process.

16      A       Uh-huh.

17      Q       I think before we get into some more

18  specifics I've got some questions about how this

19  process went down with Steadfast and what were -- what

20  were all of the meetings.  We talked about one of those

21  meetings where she -- you said she went off on you, but

22  in the standard process of things, just the way you

23  normally do things, going back, we left off with that

24  you do interviews with the owner.  You do interviews

25  with the workers, and then what -- what is the

1    process -- what are the steps after that to bring this

2    to a complete conclusion?

3          A      We're supposed to -- if there's an

4    allegation from the employee that they're not

5    independent contractors, we take more interviews.

6          Q      Okay.  So after the interviews, then

7    what's next?

8          A      After the interviews, we normally look at

9    the payroll records.

10         Q      Okay.

11         A      And we look if there's any violations on

12   the payroll records.  Anything that is over forty in

13   the weekly payroll record, then it gets transcribed

14   into a WS-55, a spreadsheet WS-55.  We have to -- this

15   the normal procedures.  Then after you do this, you

16   have to create a WH-56 and you put it into the system

17   and -- and you have to create this WH-56.  Then you

18   have a final conference with employer.

19               At that point there is no agreement to pay

20   or agreement to comply yet, but when you establish a

21   final conference with the -- with the employer --

22         Q      So then after you put this together, then

23   you arrange a second conference with the --

24         A      Yeah.  A second conference.

25         Q      Okay.

 1        A       Well, we call it -- yeah.  A second

 2   conference like a final conference with employer.

 3   That's where I discuss with employer the findings and

 4   that where, you know, I go over the same questions and

 5   same information that I went over the initial

 6   conference and then the findings, the disposition, the

 7   findings.  I tell, This is the finding from this

 8   investigation.

 9              Whether she agree or not, is -- is from

10   the employer.  I ask them, Do you agree to comply?

11   That's the first thing that we ask them.  They say, No,

12   I'm not going to agree to comply, then we -- we write

13   it down.  Then, Do you agree to pay these employees?

14   If they say, No, refuse to pay, then we move into a

15   second level conference because -- you know, because in

16   my regulation, my -- my standards procedures tell me

17   that once I do a final conference with employer, I have

18   to move -- move on, you know, complete the report and

19   bring it to my management for to review.

20        Q       Okay.  Okay.

21        A       Yeah.

22        Q       And then what happens?

23        A       Then -- well, in this case when

24   Steadfast -- she -- she had a lawyer.  Prior to the

25   final conference he sent me this letter.  On this

```
 1   letter he discussed economic realities, so when I have

 2   the conference with him -- with employer and her

 3   lawyer, we discussed everything that we discussed in

 4   initial conference.

 5        Q     Can I stop you for a second?

 6        A     Uh-huh.

 7        Q     I'm sorry.  I -- I want to go through the

 8   specific things from Steadfast from the beginning to

 9   the end, but right now -- and we'll get to that.  I

10   want to hear what you have to say about it, but I just

11   wanted to know the standard processes.  After -- the

12   last step is then you bring it to management and --

13        A     Well, that's what I'm getting to.

14        Q     Okay.  Okay.

15        A     I discussed with the lawyer --

16        Q     Yeah.

17        A     -- his letter because she wants me.

18        Q     Okay.

19        A     We discussed this copy of the letter, the

20   economic realities.  I gave him my answer.

21        Q     Okay.

22        A     And -- and -- and I ask them again, Do

23   agree to comply?  Do you agree to pay?  They say no.

24   Then we stop right there.

25        Q     Okay.
```

1        A      I walked away.  Then I tell the lawyer, I

2   would get back with you.

3        Q      Okay.

4        A      That's where we go to management and we

5   start the procedure.  You know, we go -- we do an

6   analysis of the case.

7        Q      Okay.  Okay.

8        A      Yeah.

9        Q      You do an analysis of the case?

10       A      Not just me.  I have -- I have to bring

11  this case file -- I have to submit a report.

12       Q      Okay.

13       A      Once I finish the report, I put it in the

14  case file.  Then I submit it to management.

15       Q      Yes.

16       A      After that, management decides.  That's

17  their decision.  I cannot say what they do with it.

18       Q      I see.  It's out of your hands at that

19  point?

20       A      It's out of my hands.  Yes.

21       Q      Okay.  Do --

22       A      However, I still overseeing the

23  investigation.  You know, for whatever they call me, I

24  will have the answers.

25       Q      Okay.  You indicated that -- you said as

1   part of the process with the first meeting, the typical

2   process, you said, We look at the payroll records.

3   When you say we, does that mean it's typically you or

4   you with --

5        A       No.  When I -- when I say we, I'm

6   representing the Department of Labor.

7        Q       But it's you that does it?

8        A       Yes, I did.

9        Q       Got it.  Okay.  All right.

10        A       I'm the one -- the only one that looks at

11   the payroll records.

12        Q       And then in the -- have you -- have there

13   been any instances where you've been through this and

14   you looked at the payroll records and you determined

15   that the individuals were properly classified as

16   independent contractors?

17        A       Until this day, no.

18        Q       It's never happened?

19        A       Not yet.  No.  No.  Because --

20        Q       How many investigations --

21        A       -- normally --

22        Q       -- have you done --

23        A       How many investigations?

24        Q       -- in your career?

25        A       Well, I make an average of twenty-five to

1   twenty-eight investigations per year.

2        Q      Okay.

3        A      So on the top of my head, I don't have

4   exactly.  It's five times -- it's probably over 140

5   investigations --

6        Q      Okay.

7        A      -- so far, not include the ones I have

8   done since I started the new fiscal year.

9        Q      Okay.

10       A      Yeah.  But I think normally I do --

11       Q      So roughly 140 -- did you say 140

12   probably?

13       A      Uh-huh.

14       Q      So in your career working for the

15   Department of Labor, 140 roughly investigations that

16   have been initiated on FLSA matters regarding --

17       A      Let me correct that one.

18       Q      Sure.

19       A      I know what you trying to question.  The

20   investigation that I have -- I think I'm recalling one.

21   I mean, there's so many.  I can't recall every single

22   one.

23       Q      Sure.  Sure.

24       A      But I recall one where the individual

25   was -- he was classified as independent contractor.  We

1   questioned and when I looked at the payroll records,

2   their names were not on the payroll.  He has no -- that

3   business didn't have a payroll with that individual on

4   there.

5          Q     Okay.

6          A     That's what -- that's why I say in the

7   beginning when I get the payroll records --

8          Q     Ah.

9          A     -- I look for that individual --

10         Q     Sure.

11         A     -- to make sure that it's there.  If it's

12   not there, then I ask the employer, Do you have a 1099?

13   Do you have a W-2 form for him?  Or sometimes employers

14   forgot to put someone in there for reason.  I cannot

15   say, and then I question, How come this individual is

16   not included in your payroll?

17         Q     Yeah.

18         A     Then they say, Oh, I'm sorry.  We forgot.

19   He's an employee, but he was not -- he's no longer

20   working with us.

21         Q     Okay.

22         A     So I says, Can I see your payroll?  That's

23   why we look at the payrolls from the previous months.

24   You know, two years.

25         Q     Okay.

1        A        I'm looking for that person.

2        Q        Yes.

3        A        So if I see this person right here and I

4    see this person right here, there is a common, you

5    know, control.  That person appears in the payroll so

6    many times, so it's a dependency --

7        Q        Yeah.

8        A        -- from this individual.  That's also part

9    of economic realities.

10       Q        Okay.  Sure.

11       A        I'm looking at the individuals that I

12   interviewed to see they also in there too.  That's why

13   I'm looking at --

14       Q        Yes.

15       A        -- every single payroll to make sure that

16   they in there because normally independent contractors

17   like the -- the case of a painting company comes in

18   here, you not going to find the painting company inside

19   the payroll.  Normally it's a contract.

20       Q        Right.

21       A        So I ask for the contract.  But it's weird

22   to find a contract -- it's not normal to find a

23   contract and to find the person in -- in the payroll

24   and not only that, to find this person also that is

25   included on the pay stubs.  That is not the normal --

1  the normal situation where --

2         Q       Yeah.

3         A       -- an employer that classifies an

4  individual as independent contractor is provided with a

5  pay stub and is included in the payroll.

6         Q       Yeah.

7         A       So that -- this is -- that is part of

8  economic realities too.

9         Q       Okay.  But my question was -- am I

10  correct, though, in understanding that in 140 roughly

11  investigations that you've done, there have been no

12  instances were someone has complained that they were

13  improperly classified as an independent contractor that

14  you found that the owner was correct, that they were

15  properly classified?  Is that right?

16         A       There was probably one -- one individual

17  that -- one case that I have where --

18         Q       Just that one case?

19         A       Yeah.  It was just one case and he

20  classified them independent contractors.  He didn't

21  have any payroll at all.

22         Q       Okay.

23         A       And the -- the procedures in there is when

24  you have an individual --

25         Q       I don't need to know the facts.  You don't

Mancha - Davis                                    44

1   have to tell me.  It's okay.  I just wanted to know

2   what percentage.  So out of 140 investigations --

3          A        Maybe one or two.  Maybe.

4          Q        One or two?

5          A        Yeah.  Maybe.  Maybe.  If that many

6   because it was one only where I found --

7          Q        Got it.  So one or two investigations out

8   of 140-ish the owner was correct?  In your opinion they

9   were independent contractors, but all the others you --

10  you found or you determined --

11         A        Well, no.  I didn't say that it was

12  correct.

13         Q        Oh, okay.

14         A        That it was difficult to substantiate

15  because if -- if the individual says, I'm an employee,

16  and the other persons says, I'm -- I'm an employee,

17  then you cannot substantiate if you don't have any

18  other people saying and if you don't have any other

19  interviews or any other statements saying -- any

20  statements that confirm.

21         Q        Okay.

22         A        The same situation as this guy right here.

23         Q        Okay.

24         A        So in this situation we have different

25  statements confirming the same thing that this person

1    is alleging for that case.  It was -- it was only one

2    person and we ask some questions to that person.  I

3    asked them questions, Do you have any employee?  Do you

4    have anybody working for you?

5         Q     Yes.

6         A     And he says, Yes, I have a crew.  So -- so

7    in situations like that when you have employees working

8    for you -- working for an employer, for a -- for a

9    company, then you determine, Okay. This is a case where

10   you an independent contractor.  Maybe your company's

11   not registered in the Virginia Commonwealth as

12   business, so that's the determination, but normally I

13   don't have a case where -- I have not had a case where

14   the employee's alleging that this guy's an independent

15   contractor and when I look at the payroll, he's not

16   there.  If he's not there, then that tells me something

17   different.

18        Q     Okay.  So would it be safe to say that

19   given the overwhelming majority of instances that

20   you've investigated it turns out that these people were

21   misclassified, that when you go into the interview,

22   you're already assuming most likely they're

23   misclassified?

24        A     I don't assume.  I just ask questions, and

25   based on the answers from the employer --

```
 1        Q       Yeah.

 2        A       -- based on the evidence that I collect --

 3        Q       Okay.

 4        A       -- that's what -- that's what -- I collect

 5  evidence to substantiate something.

 6        Q       Okay.

 7        A       We get a contract.  I go online.  I do

 8  research online.  I find the contract that the company

 9  has online.  I read.

10        Q       Yes.

11        A       Normally when I go into conference, I show

12  the contracts to the employer.

13        Q       Yes.

14        A       If they identify the contract, that tells

15  me that they know this contract.

16        Q       Okay.

17        A       So I ask the questions about the contract.

18  I ask questions about what's inside the contract, but I

19  don't say -- I don't determine anything there.  I

20  collect more evidence from interviews.

21        Q       Yes.

22        A       We ask questions that -- you know, the

23  right questions on the interviews to make sure that

24  we -- we making the right decision.

25        Q       Okay.
```

```
 1       A       And once we do that, then I look at the

 2   economic realities and I analyze everything -- every

 3   answer that I have, every evidence or piece of evidence

 4   that I have.

 5       Q       Yes.

 6       A       I use it -- I compare -- you know, I

 7   analyze and I use the economic realities and I say,

 8   Okay. Is this -- what is the integral part of this

 9   business?  If this business doesn't have any CNAs --

10       Q       CNAs?

11       A       No -- yeah.  CNAs.  Certified Nurse

12   Assistants --

13       Q       Okay.

14       A       -- or LPNs -- I'm not sure if you know

15   that --

16       Q       Licensed --

17       A       Licensed Practice Nurse.  Or RNs.

18       Q       Yes.

19       A       Okay.

20       Q       Registered Nurse.  I know that one.

21       A       Yeah.  Registered Nurse.  So if -- if --

22   if this business will not have any of these employees,

23   would this business exist?  So what is the integral

24   part because this person can go and look job -- for job

25   somewhere else.
```

```
 1       Q       Yes.

 2       A       Well, you know, they could go to home care

 3  company.

 4       Q       Yes.

 5       A       There's plenty of those.  So the integral

 6  part of the business, that's what I look for.

 7       Q       Who -- you mentioned that -- you said that

 8  you want to make sure that we are making the right

 9  decision.  Who makes the decision?  Is that you?  The

10  initial decision that the individuals are employees,

11  not independent contractors?

12       A       The decision is based on the Department of

13  Labor regulations.

14       Q       But who makes it?  Who -- who --

15       A       I make the decision.

16       Q       You make that?

17       A       Yes.  And I submit my case to my

18  management.  Management reviews.

19       Q       Okay.

20       A       If I'm wrong, they come back and say, You

21  made the wrong decision.

22       Q       Has that ever happened?

23       A       No.  No.

24       Q       Okay.  Okay.  And I'm going to get into

25  the issues pertinent to Steadfast in just a minute, but
```

```
 1   in the initial meeting that you with Lisa Pitts, was
 2   that first meeting that you had with her the one where
 3   she went off on you?
 4        A      It was the first time that I have a
 5   meeting with her.  Yeah.. that was it.
 6        Q      Okay.
 7        A      Yeah.
 8        Q      And in that first meeting --
 9        A      And I think she was kind of upset not just
10   with me because she had -- she had a phone call from
11   one of the facilities that -- that she has business
12   with --
13        Q      Yes.
14        A      -- and they were discussing about one
15   employee.  The employee over there has issues and I
16   think it was with drugs, and the facility was
17   complaining -- was talking to her because what I heard
18   is that when -- whenever someone -- one of her CNAs,
19   LPNs, or RNs do not show up or they have to go, then
20   she has to look for a replacement.  Sometimes she --
21   she used replacements from the office, people that work
22   for her in the office.
23        Q      Okay.
24        A      So I think she aggravated not -- not with
25   me maybe because I was telling her they were
```

 1    independent -- they were not independent contractors,

 2    but she was aggravated also with the -- with the

 3    employee that was misbehaving at the other site, so to

 4    me that was really strange to have.  If they're not

 5    independent contractors -- why would the facility call

 6    the agency to complain about someone when they

 7    independent contractors?  If you have a -- a painting

 8    company or a plumbing company, you go directly to the

 9    plumbing company because they're the employer, not the

10    employee, so to me that was really strange.  Maybe she

11    was aggravated because of that.

12         Q      Okay.  You're not sure but maybe?

13         A      No.  That's what it seems.

14         Q      Okay.

15         A      I wasn't sure.  She was upset because

16    someone was on drugs.

17         Q      So in this initial meeting that you have

18    with Lisa Pitts that we're talking about --

19         A      Uh-huh.

20         Q      -- at that initial meeting was that before

21    you had done the interviews with the nurses that are in

22    your report?

23         A      At this individual meeting I had -- no.

24    That was only one.  It was the complainant.

25         Q      You had the complainant?

```
 1        A     Yes.

 2        Q     And you did an interview with the -- the

 3   nurse that complained?

 4        A     Uh-huh.

 5        Q     And then subsequent to that, then you had

 6   the interview with Lisa Pitts?

 7        A     Yes.  And I have some interviews with

 8   employees in -- inside there also --

 9        Q     I -- I want to get to Lisa Pitts --

10        A     -- that had worked as a --

11              MS. AMIN:  So let me just caution you.

12        Listen to his question and carefully answer the

13        question before you.

14              THE WITNESS:  Sure.

15              MS. AMIN:  And just make sure you just

16        don't talk over Attorney Davis because I think the

17        court reporter's going to have some --

18              THE WITNESS:  Okay.  Okay.

19              MS. AMIN:  -- a hard time getting

20        everything down, so just listen to the question.

21              THE WITNESS:  Okay.

22

23   BY MR. DAVIS:

24        Q     So I'm getting a sequence right now and

25   I'm -- I'm -- forgive me.  I'm super methodical and --
```

 1        A       Okay.  That's fine.

 2        Q       -- and -- and you are a wonderful

 3   conversationalist and I wish that we could have dinner

 4   and talk about all these things, but I'm getting into

 5   some very specific things.

 6        A       Okay.

 7        Q       Okay.  So the sequence in the Steadfast

 8   case, this is how I understand it.  I want to make sure

 9   I'm correct and then I'll ask you a question.  You

10   received a complaint from a nurse?

11        A       Yes.

12        Q       You interviewed that nurse?

13        A       Uh-huh.

14        Q       After that, you interviewed Lisa Pitts?

15        A       Uh-huh.

16        Q       And then after that, you interviewed other

17   people; is that correct?

18        A       Yes.

19        Q       Okay.  So prior to your initial meeting

20   with Lisa Pitts, the only interview you had conducted

21   was with the complaining nurse?

22        A       Yes.  Yes.  Yes.

23        Q       Okay.  Very good.  So let me ask you some

24   questions about that.  When you had the initial meeting

25   with Lisa Pitts, had -- during the course of that

```
 1    meeting before your other interviews, am I correct in
 2    understanding at that meeting you made a determination
 3    that the nurses were improperly classified?
 4         A     No.  I didn't make the determination by
 5    then.
 6         Q     Okay.
 7         A     I made the determination -- all I told
 8    was, I believe that you had misclassified the -- the
 9    employees.  I interviewed some employees in the office.
10         Q     Okay.  Let me stop you though.  Let me
11    stop you because I want to make sure I understand what
12    happens.
13         A     Uh-huh.
14         Q     So the sequence is that you
15    interviewed one nurse --
16         A     Uh-huh.
17         Q     -- then Lisa --
18         A     Yes.  And then --
19         Q     -- and then employees in the office?
20         A     Yes.
21         Q     Okay.  So I'm asking about the meeting
22    with Lisa before the employees in the office.  I'm just
23    asking about the initial meeting with Lisa.
24         A     Okay.  Okay.
25         Q     Just one at a time.  We'll get to each one
```

 1    of them.  Okay?

 2         A      No.  I didn't make any determination

 3    there.

 4         Q      Okay.

 5         A      I just -- I just asked her -- I just told

 6    her after the fact.  After I interviewed the other

 7    employes, I came back and talked to Ms. Lisa again.

 8         Q      Ah, I see.

 9         A      Yeah.  I collect interviews first.  I

10    collect -- I look at payroll records.  I look at

11    interviews.  I ask questions mostly related with the

12    payroll records.

13         Q      I see.

14         A      Then after that, I sit down with Ms. Lisa

15    again.

16         Q      Okay.  So this -- so you went onsite to

17    Steadfast.  You met with Lisa, and then you met with

18    employees in the office, and then you met with Lisa

19    again?

20         A      Yes.  In the same place.

21         Q      Same day?

22         A      Same day.  Same day.  Yeah.

23         Q      Okay.  Very good.  Now, the employees that

24    you met with in the office, were those the individuals

25    that answer the telephones that are in the room next

Mattera - Davis                    55

1   door?  Is that who you talked to?

2                   MS. AMIN:  I'm going to instruct the

3             witness to the extent that your answer -- to the

4             extent that your question seeks information that

5             encroaches upon on the informant's privilege, I'll

6             instruct you not to answer.

7                   THE WITNESS:  Okay.

8                   MS. AMIN:  But to the extent that it does

9             not, you may answer.

10                  THE WITNESS:  Okay.

11       A       No.  I can't answer that because then I

12  will reveal confidentiality.

13

14  BY MR. DAVIS:

15       Q       I'm asking -- I'm not asking a name right

16  now.

17       A       Yeah.  I understand that, but I can't --

18  repeat the question again.

19       Q       My question is did -- there are

20  individuals who work in the -- in that building, in the

21  Steadfast building, who answer the telephone.  There's

22  a secretary at the front and those --

23       A       I can't --

24       Q       Hold on.  Hold on.  And those people are

25  employees --

```
 1        A       Uh-huh.

 2        Q       -- and it's admitted that they're

 3   employees and they're paid as employees.  So my

 4   question is when you say that you met with employees in

 5   the office, are you referring to the individuals that

 6   we all agree are employees or did you meet with nurses

 7   that -- I don't know.  I'm looking for the class of

 8   people.

 9        A       I cannot give --

10                MS. AMIN:  That's a different question.

11                THE WITNESS:  Yeah.

12                MS. AMIN:  Let me just clarify.

13                MR. DAVIS:  Yeah.

14                MS. AMIN:  Are you asking whether he

15           interviewed office staff versus the individuals

16           you've misclassified as independent contractors?

17           Is that your question?

18                MR. DAVIS:  No.

19                MS. AMIN:  Okay.

20                MR. DAVIS:  I'm not -- well, in the way

21           you said it, yes, that's what I'm asking, but I'm

22           not agreeing that they've been misclassified.

23                MS. AMIN:  Sure.  Okay.

24                MR. DAVIS:  I'm asking -- I'm not asking

25           for names.  I'm asking for --
```

 1   BY MR. DAVIS:

 2        Q       There's two groups of people.  Let's

 3   just -- framework here.  We have the individuals who

 4   work in the office who are employees, who are paid as

 5   employees.  They answer telephones.  They are

 6   secretaries.  No one -- no one disagrees that they're

 7   employees.  Then there are other people that are nurses

 8   that are the subject of this lawsuit.  Those nurses, we

 9   contend, are independent contractors.  You contend that

10   they're employees.

11              Do you -- does that framework make sense?

12        A       Yes.  I understand that.

13        Q       Okay.  So in that -- so now we understand

14   that framework.  I'm going to refer to -- maybe for

15   simplicity, I'll refer to the people that work in the

16   office as office employees.  Okay?

17        A       Uh-huh.  I understand that.  Yeah.  But I

18   cannot --

19              MS. AMIN:  You may answer the question if

20         the question is, Did you speak to or interview

21         office employees?  You may answer that question.

22        A       Yes.  I interviewed office employees.

23   Yeah.

24

25

1    BY MR. DAVIS:

2        Q       Okay.  All right.  And during that day did

3    you also interview nurses that day or only office

4    employees?

5        A       After -- after the fact.  I interviewed

6    after I left the office --

7        Q       No.  I'm not --

8        A       -- and not during the time I was there

9    nurses.  They have no nurses available with them

10   because most nurses are -- I can't recall right now

11   if -- maybe if I look at the interviews it will tell

12   you that I did exactly interviews on one in there maybe

13   because I told her that -- Ms. Pitts that I will be

14   interviewing office -- office employees and I will be

15   interviewing any of her employees working in different

16   nursing homes.  I cannot recall exactly -- I can't

17   remember if I did interviews on one -- one of the

18   nurses in there because that's not normally the

19   situation where the employer brings some of his

20   employees, you know, to the office like the case it is

21   with home care offices and firms where they bring CNAs

22   to the office and I interview them for twenty minutes

23   and then they go back and take care of the clients, but

24   I cannot recall that exactly.  If I did interview

25   nurses, I would have to look at the interviews and

```
 1   recall the date of the interviews because normally I
 2   put a date on the interview --
 3         Q      Okay.
 4         A      -- if it's over the phone, if it's in
 5   person, or what else, but I did interview employees in
 6   the office.
 7         Q      Okay.
 8         A      I don't recall -- I can't remember if it
 9   was -- if I did interview any nurses that day while I
10   was in the office.
11         Q      Okay.  At the time when you interviewed
12   employees in the office, were you under the impression
13   that the office workers -- that they were also being
14   improperly classified?
15         A      I cannot answer that question because then
16   I would be revealing confidentiality.
17         Q      I don't know how.  I'm not asking names.
18   I'm asking --
19         A      I understand.
20         Q      There's fourteen individuals that work
21   there.
22         A      I understand that, but if I -- if I tell
23   you yes or no, then you practically could look into the
24   interview if you have access to the interviews and
25   could easily identify someone, so --
```

```
 1        Q       Yes.  But --

 2        A       -- I can't answer that.

 3        Q       Okay.  We -- we're not on the same page.

 4   We've got to get on the same page.  There's interviews.

 5   We'll go into those interviews, right?  The interviews

 6   are all with nurses.  Every interview I read --

 7        A       I understand, but if you look at the

 8   interviews --

 9        Q       Yes.

10        A       -- look at the type of job they do --

11        Q       Yes.

12        A       -- and that will give you the answer.

13   There is -- there was -- am I allowed?

14                MR. DAVIS:  Do you understand what I'm

15        saying?

16                MS. AMIN:  I think so.  So if you showed

17        him the interview statements, this might clarify

18        it.  I don't have them in front of me, but to the

19        extent that any office workers were interviewed,

20        their job titles may have been redacted for

21        purposes of informant's privilege.

22                MR. DAVIS:  Uh-huh.

23                MS. AMIN:  For example, if there was only

24        two receptionists and the job title is not

25        redacted, that would tend to identify who that
```

```
 1          individual is even though the name is redirected.

 2          So I don't know if that helps to clarify.

 3                THE WITNESS:  Yes.  Yeah.  In that -- in

 4          that title it could be a person working as a

 5          secretary --

 6                MR. DAVIS:  Yes.

 7                THE WITNESS:  -- and probably was working

 8          also as an LPN.

 9                MR. DAVIS:  Yes.

10                THE WITNESS:  Because they use --

11          Ms. Pitts sometimes use some of her employees to

12          cover for --

13                MR. DAVIS:  Right.

14                THE WITNESS:  -- out there when they have

15          no -- so I cannot answer that.

16                MR. DAVIS:  Understand.  Okay.  So I think

17          what we need to do here is -- I was hoping we

18          could get through some questions before we got to

19          this, but we're already there.  In my view,

20          identifying classes of people, we've got two

21          groups.  Did you interview in this group or

22          interview people in this group?  I don't even

23          think that consents to the informant's privilege

24          issue, but if you do, I understand.

25                MS. AMIN:  Well, so I -- I just -- maybe
```

```
 1          I'm unclear as to the question or

 2          misunderstanding.  Your question is, Did you

 3          interview individuals that work in the office that

 4          are classified as employees?

 5                    MR. DAVIS:  Yes.

 6                    THE WITNESS:  Okay.

 7                    MS. AMIN:  I think he answered -- did you

 8          answer that question?

 9                    THE WITNESS:  Yes.  I answered yes.

10                    MR. DAVIS:  Yes, he did.

11                    THE WITNESS:  And I also interviewed one

12          individual that work as a -- as a nurse outside

13          too.

14                    MR. DAVIS:  Yes.

15                    THE WITNESS:  So that's the one you wanted

16          me to answer.

17                    MR. DAVIS:  Right.  But I --

18                    THE WITNESS:  Beside the complainant.

19

20   BY MR. DAVIS:

21          Q     My specific question that we had the issue

22   with, when you interviewed -- you go into the Steadfast

23   office.  You've met with Lisa Pitts?

24          A     Uh-huh.

25          Q     Then you said, And then I met with
```

1    employees?

2         A       Yes.

3         Q       And I asked, Are those employees the

4    people who work in the office?  You said, I believe,

5    yes.  I think there may have been a nurse, but I don't

6    recall.  Okay?

7         A       Uh-huh.

8         Q       Okay.  That's fine.  And then you went

9    back and met with Lisa Pitts again, correct?

10        A       Uh-huh.

11        Q       So my question was when you met with the

12   office employees, were you at the time under the

13   impression or did you believe that those office

14   employees were also being improperly classified?

15        A       Some of them.  Yes.

16        Q       You --

17        A       Some.  Yeah.

18        Q       You -- you believe that the office workers

19   were also improperly classified?

20        A       I would say yes.

21        Q       They're all classified as employees and

22   paid as employees?

23        A       Yes.  But if you look at the payroll

24   records and if you see that someone has been working as

25   a, say, secretary and then is being sent to work as a

Maneesha - Davis                    64

1   Certified Nurse Assistant, a CNA --

2        Q      Yes.

3        A      -- and then you look at the payroll

4   records and they don't combine -- and that's one of the

5   violations in there.  They don't combine the hours and

6   they don't get paid overtime, so the assumption is that

7   Ms. Lisa Pitts is not paying overtime.  The questions I

8   ask are also questions in regards of what type of job

9   they do when they were working as CNAs.

10       Q      So you're saying you found instances where

11  there was an office worker who was working as maybe a

12  secretary or telephone -- I don't know.  Something --

13  but they were also simultaneously working as a nurse?

14       A      Correct.

15       Q      I see.

16       A      Yes.

17              MR. DAVIS:  I see.  I see.  Okay.  Here's

18         the issue.  Why don't we go off the record for a

19         second.

20              (At 11:10 a.m. a conversation was held off

21         the record.  A telephone call was made to Judge

22         Krask to mediate an issue.  All parties were

23         informed he would call back when available, and a

24         short break was taken.  At 11:24 a.m. all parties

25         went back on the record and the following took

```
 1        place:)

 2                 MR. DAVIS:  All right.  We're back on the

 3        record.  Let me see if I can remember where I left

 4        off.

 5

 6   BY MR. DAVIS:

 7        Q      Okay.  So during that -- that day when you

 8   had that initial meeting with Lisa, you interviewed

 9   some office employees and then you met with Lisa again.

10   Who -- who was in the room with you when you met with

11   Lisa?

12        A      I think it was her husband.  There was a

13   gentlemen in the back, but I don't recall.

14        Q      Okay.

15        A      I just -- I just -- I always ask, Who's

16   the owner of the business a hundred percent?

17        Q      Okay.

18        A      Are you a hundred percent?  If she's a

19   hundred percent, I don't call anybody else.

20        Q      Okay.

21        A      Every question is for -- for the owner of

22   the business.

23        Q      Okay.  I see.  Christine was not there

24   during that meeting?

25        A      No.  No.
```

```
 1        Q        And when you did the interviews, did you
 2   do them privately or did Lisa --
 3        A        Privately.
 4        Q        Privately?
 5        A        Uh-huh.
 6        Q        Did you meet with people in a separate
 7   room or how did -- how did that happen?  Did you pick
 8   people and say, Come meet with me?
 9        A        I believe Lisa Pitts stepped out of the
10   office and then I did interviews with the remaining
11   employees.
12        Q        Did you pick people at random or did you
13   have a certain idea in mind?
14        A        No.  I just asked for the -- when you --
15   when you go into a business, you ask for last, you
16   know, payroll.
17        Q        Yes.
18        A        You point, I want this and that, of what
19   you want to bring in here, you know.
20        Q        Yes.
21        A        And she -- and I asked her -- I always ask
22   her, Okay. What kind of work do you have? What type of
23   office employees you have?  Then she says, I have this.
24   I have that.  Then from that, I picked.
25        Q        Did you tell Ms. Pitts who you want to
```

1   meet with on that day?

2        A      She brought me some -- I say -- I normally

3   I want -- if there's a secretary, I say, Can I speak to

4   your secretary?  Can I speak to your office -- office

5   assistant?  Or if there's any office manager, I ask for

6   the office manager.  If she has -- if she has other

7   types of employees, then I say, Can I have one of

8   these?  I normally go into a business and I say, Can I

9   get two -- once I identify what type of employees they

10  have, Can I have two of these, two of these, and one

11  this?  That's it.

12       Q      And did Lisa select those people for you?

13       A      I believe so.  Yes.

14       Q      Okay.  So Lisa knows who these people are

15  that you met with?

16       A      I'm not sure.  You know, I can't recall

17  that day how -- if she did it or I did it.  I cannot

18  remember right now.

19              MR. DAVIS:  So if Lisa picked the people

20         he met with, how come we can't talk about who he

21         met with?  Lisa picked them.

22              MS. AMIN:  We would still invoke the

23         privilege.

24              MR. DAVIS:  How?  Why?

25              MS. AMIN:  Regardless.  So regardless of

```
 1            if she was aware -- if she picked the individual,
 2            if she saw who he was speaking to, I would not
 3            have my investigator confirm any individuals that
 4            he spoke to about the violations or interviewed
 5            and took statements from.
 6                 MR. DAVIS:  So my understanding is --
 7                 MS. AMIN:  Your client can certainly
 8            answer that question if she has a recollection to
 9            who she picked, but I won't have my investigator
10            confirm who he spoke to, whether it was an oral --
11            you know, information that has not been documented
12            in a statement or information that was just given
13            to him, so written or oral.  I would not have my
14            investigator confirm that based on the informant's
15            privilege.
16                 MR. DAVIS:  So, just for example, if -- if
17            Mr. Mazuera said, I'd like to speak to somebody,
18            and Lisa said, I'm going to let you speak to
19            Christine -- I don't know that that happened.  I'm
20            just saying in theory -- then he spoke to
21            Christine, and if I say, Who did you speak with?
22            You're going -- you're instructing him to not
23            identify her name even though --
24                 MS. AMIN:  Employees.  So to the extent
25            that they're supervisors or managers and that is
```

1          clear, those are -- that would not be covered by

2          the informant's privilege.

3                  MR. DAVIS:  So if Lisa went to the call

4          center and picked, I don't know, John -- a made up

5          name. Don't know -- and says, John, I want you to

6          speak to this investigator, and John gets up and

7          goes and meets with the investigator, even though

8          Lisa picked this person, you're instructing him

9          not to disclose who he spoke to?

10                 MS. AMIN:  Correct.

11                 MR. DAVIS:  Why?

12                 MS. AMIN: Because that is covered by the

13         informant's privilege.  Information -- the

14         identity of an individual who speaks to an

15         investigator about violations -- alleged

16         violations as well as statements given to an

17         investigator are privileged and are protected

18         until the government decides to waive that

19         privilege.

20                 MR. DAVIS:  What about individuals who are

21         employees and/or independent contractors who are

22         no longer working for Steadfast?

23                 MS. AMIN:  Same thing.

24                 MR. DAVIS:  Even though there's case law

25         that says if they're no longer working there, the

1        informant's privilege doesn't apply any more?

2               MS. AMIN:  There's case law that supports

3        government's continued invocation of the

4        informant's privilege for former employees.

5               MR. DAVIS:  Did you read the case I sent

6        you in the letter?

7               MS. AMIN:  I don't know if I did.  Which

8        one was that?

9               MR. DAVIS:  It's okay.  We'll get into it

10       with the judge.  Okay.  Okay.

11

12  BY MR. DAVIS:

13       Q     All right.  So going back to the day that

14  you met with Lisa that we were talking about, do you

15  recall approximately how many people you met with other

16  than Lisa that day?

17       A     Do I recall how many people I met?

18       Q     Yes.

19       A     The amount of people?  No.  I cannot

20  recall.

21       Q     Okay.  If -- if you interviewed somebody,

22  would -- in every instance would you have taken notes

23  on that interview?

24       A     No.  I don't take notes.  I just go from

25  the questionnaire, the -- the statement.  You know, the

1   interview statement.

2         Q      Yes.

3         A      That's where I write the information.

4   That's it.

5         Q      Okay.  So when I say take notes, so --

6         A      I don't have any -- yes, I write it down

7   by hand.  Yeah.

8         Q      On the statement?  Okay.

9         A      Yeah.  On the statement.

10        Q      Do -- would you have interviewed anybody

11  at any point in time regarding the Steadfast matter

12  where you did an oral interview and did not take notes?

13  Did you understand the question?  That was not a real

14  great question.

15        A      No.  No.

16        Q      Okay.  So let me rephrase.  So my question

17  is every -- am I correct in understanding that every

18  time you met with somebody you took notes about that

19  meeting?

20        A      Correct.

21        Q      Every time?

22        A      Yes.

23        Q      So there isn't anybody that you met with

24  that you had a discussion with that you didn't have

25  some note about that you wrote down?

Matosha - Davis                                72

```
 1        A     No.

 2        Q     Okay.  And in the -- in the report that

 3   you've given us that has the exhibits, some of them

 4   have been redacted, but it has notes.  We'll go through

 5   them, but are those notes from every interview you met

 6   with regarding the Steadfast case?

 7        A     Yes.

 8        Q     Okay.  Thank you.  All right.  Okay.  Then

 9   after you met with Lisa, met with the employees, you

10   said that you were concerned that some of -- or based

11   on something, that some of those individuals were also

12   nurses and then you met with Lisa again.  Was it the

13   first time you met with Lisa that day or the second

14   time that you met with Lisa that day that you

15   determined that the individuals on Schedule A -- do you

16   know what I mean when I say Schedule A?

17        A     Yes.  Yes.

18        Q     Okay.  That those individuals were

19   improperly classified as independent contractors?

20        A     That when I told her that I believe she

21   has misclassified some --

22        Q     The first meeting or second meeting?

23        A     On the second meeting.

24        Q     Okay.  Then after the second meeting, what

25   happened after that?
```

1        A        After the second meeting, I have -- I went

2   to my office and I collected more interviews.

3        Q        Okay.  Is that when you sent the letter

4   to -- I can't remember -- maybe fifteen people or

5   something saying, I'm doing an investigation. Please

6   call me?

7        A        Yes.

8        Q        Okay.  And then after you received phone

9   calls from those nurses -- they all didn't call you,

10  correct?

11       A        Uh-huh.

12       Q        Only some of them?

13       A        Yeah.  Some of them.

14       Q        And every time that a nurse would call

15  you, you always took notes on that meeting?

16       A        Yes.

17       Q        Okay.  The notes that you took, we'll look

18  at.  Do those notes reflect just the things that you

19  felt were important or do they reflect everything that

20  the nurse told you?

21       A        Everything that -- I just asked them for

22  how -- how did they get hired?  How did they start?

23  Who contact you?  How do you find out the business?

24  You know, questions that you have to ask normal in an

25  interview.

1        Q        Okay.  So my question is did -- were there

2    occasions where a nurse would tell you things and you

3    would decide that doesn't matter so you wouldn't write

4    it down?  Or did you write down everything they told

5    you?

6        A        No.  I just asked the same questions to

7    every single one and I just -- I just answer -- you

8    know, write down the answer.

9        Q        I'm sorry.  Yeah.  Let me try to rephrase

10   it.  So if you asked a question -- and you did.  You

11   asked questions, right?

12       A        Uh-huh.

13       Q        You ask questions.  They give you answers,

14   correct?

15       A        Uh-huh.

16       Q        If after you ask the question and they're

17   giving you an answer, did you write down every word

18   that came out of their mouth or --

19       A        No.  I write everything that -- that

20   they -- I asked the question.  They answer.  I write it

21   down.

22       Q        Okay.  Did -- were there occasions where

23   they would answer but you wouldn't write down what they

24   said?

25       A        No.

 1        Q        Okay.  That's all I wanted to know.
 2    Perfect.  Thank you.  All right.  And if you -- at any
 3    point in time, if you don't understand what I'm asking
 4    you, please stop me and say, I don't understand it.
 5        A        Okay.
 6        Q        Sometimes I ask terrible questions, and I
 7    will admit that.  If that happens --
 8        A        That's fine.
 9        Q        -- stop me and I'll rephrase it.  Okay?
10        A        Uh-huh.
11        Q        Okay.  So can we agree if you don't
12    understand, you're going to tell me to rephrase?
13        A        Yes, I will.
14        Q        Okay.  Very good.  Very good.  Okay.  All
15    right.  Okay.  So how long were these two meetings that
16    you had with Lisa on that day approximately?
17        A        I can't recall the time that I spent
18    there.
19        Q        Okay.  Was it the whole day?
20        A        No.
21        Q        A half day?
22        A        I can't recall that, exactly how long.
23        Q        Okay.
24        A        Because I normally get there at 10:00 so I
25    don't look.

1      Q      Yeah.

2      A      Well, I look at the time for recording

3  purposes, you know, for my time at the establishment --

4      Q      Okay.

5      A      -- but I can't recall that number.

6      Q      Okay.  So just roughly, it wasn't the

7  whole day, but it was --

8      A      It normally -- normally I take four to

9  five hours depending on the case.

10     Q      Okay.

11     A      Yeah.  If -- if I have all the employees

12  available right there, it make take a little bit

13  longer.

14     Q      Okay.  All right.  You said that while you

15  were there that you witnessed other things there that

16  led you to believe that the individuals were improperly

17  classified?

18     A      Correct.

19     Q      I'm going to ask you about that in one

20  second, but I want to ask you about -- well, tell me

21  what things you observed.  What other things?

22     A      That -- that was the only thing that I

23  observed.  Yeah.

24     Q      What was the only thing?

25     A      That why would a facility that the

```
 1   employer or the owner of this business is in contact

 2   with her?

 3       Q      Oh, the telephone call?

 4       A      Yeah.  The telephone call.  Yeah.

 5       Q      Okay.  Anything else other than the

 6   telephone call?

 7       A      No.

 8       Q      Okay.  Got it.  All right.  You said you

 9   look for posters.  Was there an FSLA poster?

10       A      Yeah.  There was a FSLA poster.  That's

11   the first thing that we check.

12       Q      Okay.  So -- so the things that caused you

13   to come to the conclusion on that day that the Schedule

14   A individuals were improperly classified were your

15   meeting with Lisa, that telephone call, and your

16   meetings with employees onsite; is that correct?

17       A      Well, I did not make a conclusion on that

18   day, but --

19       Q      Led you to believe.

20       A      -- the evidence that made me believe there

21   might be a misclassification of employees, you know,

22   being -- it gave my some evidence there.

23       Q      Okay.

24       A      Now, when you take more interviews, that

25   where you confirm more.
```

1        Q        Yes.

2        A        You know, the more evidence, the more --

3    the more confirm and you put -- say, Okay, a hundred

4    percent sure.  Then once you collect all this evidence,

5    you -- you have to look at the regulation.

6        Q        Did you talk to Ms. Pitts about settlement

7    that day?

8        A        No.

9        Q        Okay.  That was a different day that you

10   talked about settlement?

11       A        No.  The day of the initial conference,

12   Ms. Pitts said, You will talk to my lawyer.  That's it.

13   So that's the end of the conversation.  Once -- once

14   the employee or the owner of business tells me that,

15   I'm going to talk to a lawyer, I don't talk to a

16   lawyer.  I just --

17       Q        You stop?

18       A        I just stop and I wait for the lawyer to

19   call me.  Then every information goes through the

20   lawyer.

21       Q        Okay.  And so then after that -- you

22   already told me about your letters with the lawyer.  I

23   know that.  Then you sent out letters to the nurses,

24   and then you did some phone interviews.  Then what

25   happened after that?

Maldonada - Davis                                    79

```
 1        A       After getting interviews with the nurses?

 2        Q       Yes.

 3        A       I do -- I sit down with the -- well, once

 4   I analyze the -- the interviews and I look at the

 5   regulations, what it says, and I analyze the economic

 6   realities that Mr. Rothlisberger provided me --

 7        Q       Yes.

 8        A       -- I analyze that with the elements of

 9   economic realities that we have on Fact Sheet Number

10   13 --

11        Q       Yes.

12        A       -- and the regulation, what it says.  Am I

13   an employee?  Who's an employee?  Who's an independent

14   contractor?  Then based on that, I make a decision to

15   start doing back wages.

16        Q       Okay.  And in this case you made that

17   decision?

18        A       Yes.

19        Q       And then after you made the calculations,

20   then what?

21        A       After I made the calculations and I'm done

22   and I put them in the system because, you know, we have

23   to create different documents like I mentioned earlier.

24        Q       Right.

25        A       A WH-58.  A WH-58 is the receipts that the
```

 1    employer normally presents to the employee when they

 2    pay back wages and they have to sign and I present it.

 3    I also created a WH-56 and the instruction letter.

 4           Q      Okay.

 5           A      So once you get all these documents, then

 6    you call the employer's representative, if there's any

 7    attorney, and I says, I would like to have a final

 8    conference with you, and that's what -- that was my

 9    procedure.

10           Q      Is that what happened in this case?

11           A      Yes.

12           Q      Okay.  So did you -- did you have a final

13    conference with the attorney?

14           A      Yes.  At his office and Ms. Lisa Pitts was

15    there too.

16           Q      Okay.  And in that office did you talk to

17    Ms. Pitts about a settlement?

18           A      I did not talk to Ms. Lisa Pitts.  I

19    talked to the lawyer.  I presented the WH-56.

20           Q      Okay.

21           A      And I presented it and I say, This is how

22    much money you owe.

23           Q      Okay.

24           A      And then I told her that -- the rest of

25    the information.  We discussed what we discussed

1    earlier.  Yeah.

2        Q       What was it that caused you to make the

3    final determination that the Schedule A workers were

4    improperly classified?  Was it the interviews with the

5    nurses?

6        A       The interviews -- not really.  Well, the

7    interviews -- of course the interview with the nurses

8    and their -- their office records.  You know,

9    everything black and white that is on the payroll

10   determines the dependency.  When you look at the

11   payroll, the payroll is the certified payroll that the

12   employer or the owner of the establishment has overseen

13   and that he has that person.  Once I look at the

14   payroll and the previous certification of the payroll

15   where the employee -- the employer has agreed is

16   correct, that information becomes a true document.

17       Q       Okay.

18       A       And like I tell you earlier, I look at the

19   names of the individuals that I interviewed, look at

20   the dependency.

21       Q       Okay.

22       A       And I ask them for pay stubs, you know,

23   items that will help me to make a determination.

24       Q       Okay.

25       A       And that is based on the economic

 1    realities.

 2          Q       Okay.  And do you -- I don't know your

 3    process.  I don't work in your -- in your enterprise,

 4    so is -- is the process that you make a determination

 5    that they're improperly classified and then you submit

 6    it to your supervisors and they approve or disapprove

 7    or do you just make the decision?

 8          A       No.  I just make the decision.

 9          Q       Okay.

10          A       What I -- what I do is sometimes I really

11    analyze the case.

12          Q       Okay.

13          A       Everything is -- my decisions are based on

14    the FOH and the -- the 29 Code of Federal Regulations.

15          Q       Yes.

16          A       And that's where I look.  I look at the --

17    the information that the law provides.

18          Q       Yeah.

19          A       And based on that, I make the

20    determination.

21          Q       Got it.  Okay.  Good.  So the economic

22    realities test, is that -- is that the primary test

23    that you use to make a determination?

24          A       Well, the economic realities -- not just

25    that but in the FOH you ask, Am I an employee?  Who's

```
 1   an employee?  You have to look at the factors.  There
 2   are some factors that help you determine.  There are no
 3   final facts, but there are some facts that determine --
 4   that help you determine whether someone is independent
 5   contractor or an employee.
 6        Q      You said something and I think I
 7   misunderstood you.  So you said that you look at the
 8   economic realities test and FOH factors?
 9        A      Well, the FOH help you to -- it guides you
10   to make a determination.
11        Q      Okay.  FOH stands for?
12        A      I can't recall.  It's the Fundaments of --
13   of -- I can't remember.  I always forget that one, but
14   it's -- FOH is the Fundamental of --
15               MR. DAVIS:  Hold on.  Do you know what FOH
16        stands for?  I just don't --
17               MS. AMIN:  Field Operations.
18               THE WITNESS:  Field Operations.
19               MR. DAVIS:  There we go.
20               THE WITNESS:  Field Operations.
21               MR. DAVIS:  Field Operations?  Field
22        Operations -- H is what?  Handbook?
23               MS. AMIN:  Handbook.
24               MR. DAVIS:  There we go.
25        A      We have to go by the Field Operations.  We
```

1   have to follow every step in the Field Operations.

2   Yeah.

3

4   BY MR. DAVIS:

5        Q        Okay.  And do you know if the Field

6   Operations Handbook, FOH, is that -- is that based on

7   the economic realities test or is that based on

8   something else?

9        A        It is based on the 29 Code of Federal

10  Regulations.  You know, most of the information comes

11  from there.  Yeah.

12       Q        Okay.  Some of it doesn't come from there?

13       A        No.  Most -- all the information comes

14  from there.  It reflects it.  It's just a handbook to

15  help you -- it's easier to read one handbook than

16  reading so many --

17       Q        Understood.  Understood.  Piles and piles

18  of cases.

19       A        Yeah.  Well, not piles of cases, but to --

20  when you pull the Code of Federal Regulations, you

21  could have a thousand or more than a thousand pages.

22       Q        Okay.

23       A        When you read the FOH, it might have less

24  pages.  I'm not sure how many pages, but it's more

25  compressed.

1         Q       Yes.

2         A       And it give you the information that --

3    you know, the information you need.

4         Q       Okay.

5         A       But I not rely just on the FOH.  I always

6    rely -- I always look at the regulations, you know, the

7    Code of Federal regulations, depending on what -- what

8    case do I have, you know, and I look at the act, the

9    Fair Labor Standards Act, whatever it applies to the

10   case.

11        Q       Okay.

12        A       That's what I'm looking at.

13        Q       All right.  Are you familiar with the

14   economic realities test?

15        A       Yes.  I would say yes.

16        Q       What does that mean to you?  Tell me what

17   you know about the economic realities test?

18        A       The economic realities test, it tell you

19   whether someone is an independent contractors or not.

20        Q       Okay.  Do you -- do you know what factors

21   are -- are often considered a part of that test?

22        A       Yes.

23        Q       What -- what do you recall?

24        A       Profit or loss, control, integral part of

25   the business.  It's about six factors.  Yeah.

```
 1       Q       Very good.  We'll go through those.  And
 2   in this case -- we'll go through them one by one, so --
 3   but were there any particular factors of the economic
 4   realities test that to you stood out more than others
 5   in this case with Steadfast?
 6       A       I don't think so.  I can't remember which
 7   one stood out.
 8       Q       They were all about the same?
 9       A       I would say -- no.  There were some that
10   stood out, yeah, more than others.
11       Q       Which -- which stood out?
12       A       Control.
13       Q       Okay.
14       A       Profit or loss.
15       Q       Okay.
16       A       Integral part of the business.
17       Q       Okay.
18       A       Maybe all six are the ones that --
19       Q       Okay.  We'll just go through them one at a
20   time.
21       A       Sure.  Sure.
22       Q       Okay.  That's fine.
23       A       Sure.
24       Q       All right.  Did any of the -- any of the
25   factors, did you find any of them weighed in favor of
```

1    the workers being independent contractors?

2         A       I would say yes.

3         Q       Okay.  Which ones favored them being

4    independent contractors?

5         A       That I can remember, maybe the three that

6    I just mentioned, profit, loss, integral part of the

7    business.

8         Q       Yeah.

9         A       Control of the -- of -- who has control.

10        Q       Sure.  And I don't want to confuse you,

11   and maybe I said this badly.  Let's go back for a

12   second.  Of those six factors, right, sometimes a

13   factor might go in favor of them being employees,

14   sometimes a factor might go in favor of them being

15   independent contractors.  I'm not asking you to give me

16   a detailed legal analysis.  I'm asking of the

17   factors -- this is my first question --

18        A       Uh-huh.

19        Q       -- which one of the factors did you find

20   weighed in favor of them being employees?

21        A       Okay.  To me, I think all six.

22        Q       All six?

23        A       Yes.

24        Q       None of them weighed in favor of them

25   being independent contractors, in other words?

1       A       No.

2       Q       Okay.  Very good.  That's what I was

3   asking.  All right.  What about the failure to maintain

4   records that was also a part of the complaint at issue?

5   Is that something you found, that Steadfast didn't

6   maintain proper records?

7       A       Yeah.  Part 516 of the Code to Federal

8   Regulations, 7-Alpha, requires the employer to separate

9   hours worked from the overtime.  The first forty has to

10  be separate from the overtime.  That doesn't assess any

11  penalties to the employer, but it's a requirement.  You

12  have to separate.  If you look at the payroll where

13  someone worked more than forty hours, you've got to

14  separate and identify that there was overtime.

15      Q       Did you come to the conclusion that

16  Steadfast did not maintain proper records of that?

17      A       Yes.

18      Q       And that was based totally on the payroll

19  records; is that right?

20      A       It was totally on the payroll records and

21  also on the interviews that I took.

22      Q       Okay.  What -- what, from the interviews

23  that you took, led you to believe that there were

24  improper records being kept?

25      A       I cannot -- I cannot reveal that

 1   information.  You know, it's -- you have to look at the

 2   interviews.  Whatever information's in there, it's

 3   going to tell you whether the person had -- I'm not

 4   sure if you read the report, but --

 5        Q      I did.

 6        A      -- if you look at failure to combine

 7   hours --

 8        Q      Yes.

 9        A      -- that's another regulation that they

10   failed to do.

11        Q      Yes.

12        A      In the recordkeeping, when you fail to

13   combine hours for a worker who has worked --

14        Q      Okay.

15        A      -- that becomes a violation and a

16   violation of the overtime.

17        Q      Yeah.  And I'm asking just generally

18   speaking what type of information did you elict from

19   nurses that led to you to the conclusion that Steadfast

20   was not maintaining proper records?

21        A      The payroll.  You know, the payroll.  You

22   combine -- you -- you have to take interviews, take the

23   payroll, look for the names on the -- on the payroll.

24        Q      Yes.

25        A      And that's what tells you if there's a

1    violation -- recordkeeping violation.

2        Q    Okay.  I think I understand.  Let me

3    repeat it to make sure I understand.  So you're saying

4    that to determine if improper records was an issue --

5        A    Uh-huh.

6        Q    -- you looked at the payroll and then you

7    interviewed the nurses and based on your determination

8    that a nurse was improperly classified, you went back

9    to the payroll and that's how you made the decision

10   that --

11       A    No.

12       Q    No?  That's not correct?  Okay.

13       A    A week stands alone.  You know, seven

14   days.

15       Q    Yes.

16       A    If the person works more than forty

17   hours --

18       Q    Yes.

19       A    -- anything after forty is overtime.  If I

20   look at the records --

21       Q    Right.

22       A    -- and to me all the people that are in

23   payroll -- payroll records --

24       Q    Yes.

25       A    -- are employees --

```
 1        Q      Yes.
 2        A      -- and I see that there is no
 3   identification of who paid overtime or not but that she
 4   just paid straight time for overtime --
 5        Q      Yeah.
 6        A      -- then it becomes a violation.
 7        Q      I totally understand your position on
 8   that, but my question is very specific, so just bear
 9   with me.  Okay?
10        A      Uh-huh.
11        Q      So my question was what information did
12   you look at that brought you to the conclusion that
13   Steadfast did not maintain proper records?  You said --
14        A      I --
15        Q      Hold on.  Hold on.
16        A      Uh-huh.
17        Q      And you said the payroll records and my
18   interview with the nurses.  So my second question,
19   okay, what information did you get from the nurses that
20   led to you to believe that Steadfast was not
21   maintaining proper records?  In other words -- in other
22   words, not information from payroll.  What information
23   did you get from nurses that led you to believe that
24   they were not maintaining records?
25        A      Well, when I -- when I interview an
```

Matienzo - Davis                                        92

1   employee, I ask them, Do you work -- it goes for a

2   specific case, you know.

3          Q     Okay.

4          A     For this case, Do you work in the office?

5   Do you work outside?  Then if they say yes, Do you

6   get -- do you get paid overtime?  If they say no or

7   they say yes, I go and look in the -- in the payroll

8   records.  With those individuals that I interviewed and

9   payroll records I see that there's a -- an amount of

10  hours worked but not office work which is supposed to

11  get paid overtime but in the payroll it's not, then it

12  becomes a violation of the recordkeeping.

13         Q     And that's it?

14         A     Yes.

15         Q     Okay.  Okay.  Okay.  Are you familiar with

16  the concept of a -- of a registry?  In other words,

17  there's -- you can have a staffing agency that -- you

18  understand that concept, correct?  A staffing agency?

19         A     Yes.  I investigated staffing agencies

20  before.

21         Q     Understood.  Okay.  And did you come to

22  the conclusion that Steadfast was a staffing agency?

23         A     She said that.  Yes.

24         Q     Okay.

25         A     The employer says she was a staffing

Mascara - Davis                                        93

 1   agency, but it doesn't show that it was a staffing

 2   agency.  The employer says that, claimed that she was a

 3   staffing agency.

 4        Q      What does staffing agency mean to you?

 5        A      Someone who hires people to provide

 6   staff -- individual staffing to other companies.

 7        Q      Does staffing agency to you mean

 8   independent contractors?

 9        A      Not necessarily.

10        Q      Okay.  It may or may not?

11        A      Not necessarily.  Most of the

12   individuals -- most of the staffing companies that I've

13   interviewed -- that I have investigated they -- they

14   are employees.  They have been employees, so I never

15   encountered an independent contractor being -- working

16   for a staffing agency working for someone else as an

17   independent contractor.

18        Q      So are you -- are you familiar with the

19   term a registry as opposed to a staffing agency?  Is

20   that something familiar to you or not?

21        A      No.  No.

22        Q      Have you ever heard of a registry?

23        A      The first time when I went to see Lisa

24   Pitts, a registry.

25        Q      Okay.  Did -- what did she tell you about

1    a registry?

2         A       She says that she has some of these nurses

3    that are registered in the -- with Virginia.  That's

4    what -- but I didn't go into in-depth with her about

5    that registry.

6         Q       Okay.  Registered you mean as nurses?

7         A       Registered as nurses.  Yes.

8         Q       Okay.  And is it your understanding that

9    nurses have to -- they have to be licensed with the

10   Commonwealth of Virginia to be a nurse in Virginia,

11   correct?

12        A       Yes.  They have to be registered in order

13   to -- to -- to work as a nurse.

14        Q       Okay.

15        A       But they also have to have qualifications.

16   They have to have -- well, registered nurse, most of

17   the times they have four-year college.

18        Q       Yeah.  Right.

19        A       A registered nurse, not an LPN or CNA.

20   They don't have college degrees.

21        Q       So when I'm talking about a registry, are

22   you understanding that I'm talking about -- do you

23   think that I'm talking about like a registered nurse?

24   Is that what -- that's not what I'm talking about.

25        A       That's what I think you trying to say.

Mataska - Davis                                95

1    No?

2         Q        I'm not talking about that.  I'm talking

3    about another concept that there are -- there are

4    companies that are called registries that are different

5    than a staffing agency.  Is that a new concept to you?

6         A        It's a new concept for me.  Yeah.

7         Q        Okay.  Okay.  Very good.

8         A        Uh-huh.

9         Q        Okay.  Well, when you interviewed with

10   Lisa or did your interview with Lisa, at any point in

11   time, the first one, the second one, the same day, or

12   the -- the final one with the attorney --

13        A        Just twice.  The first one and the

14   attorney.  That's it.

15        Q        But the first one was twice in one day,

16   right?

17        A        It was in her office.  Inside the office.

18   Yes.

19        Q        So one day you met with her twice?

20        A        Uh-huh.

21        Q        And then the second time was a different

22   day you met with her and her attorney?

23        A        Uh-huh.

24        Q        Okay.  So in all of those interviews --

25        A        Yes.

1        Q       -- did -- did you ever say to Ms. Pitts,

2    probably in the last meeting, either to her or through

3    her attorney maybe, did you ever say something like,

4    you know, Most people just pay this fine?  Why are you

5    going to fight me on this?

6        A       No.

7        Q       All right.  When you do interviews with

8    people, and including this case, but when you call

9    workers, do you find that the workers sometimes use the

10   wrong word to describe themselves, meaning they call

11   themselves an employee when they're an independent

12   contractor or they call them an independent contractor

13   when they're an employee?

14       A       No.  I've never had a situation like that

15   because I'm the one who asks the questions.

16       Q       Okay.

17       A       And I'm very thorough with them before I

18   start the interview statement and I ask them to tell me

19   the truth and nothing but the truth because it's --

20   it's like the same like you use in a court of law.

21       Q       Okay.

22       A       So I just ask questions -- straight

23   questions and I expect straight answers too.

24       Q       Okay.

25       A       No more than that.

 1        Q        When you do -- when you did the interviews
 2    with the nurses in this case, before -- well, not
 3    before.  At any point in time did you ever tell any of
 4    the nurses that depending on the investigation they
 5    might be entitled to additional compensation?
 6        A        I don't ever promise anything to anybody.
 7        Q        I know you didn't promise.  No.  But did
 8    you tell them that could be a potential result?
 9        A        No.
10        Q        Okay.  So they have --
11        A        No.  I normally tell the complainant, if
12    there's a complainant, I say, I don't guarantee
13    anything.
14        Q        Okay.
15        A        I just want to visit the employer, collect
16    evidence, and if the evidence is in your favor, then
17    it's in your favor.  If it's not in your favor, then I
18    tell me their rights.  That's it, but I don't guarantee
19    anything to anyone.
20        Q        Okay.  What was the last thing you said?
21    If it's not your in favor, and then you said some
22    words.  I didn't understand you.
23        A        If it falls on in your favor --
24        Q        Yes.
25        A        -- you know, if you find out that you are

1    this, you know, what you alleging, then we might be

2    able to get something.

3          Q     Got it.

4          A     But if -- but if --

5                MR. DAVIS:  One second.  Off the record.

6                (A conversation was held off the record.)

7                MR. DAVIS:  Back on the record then.

8          A     It is illegal to promise a complainant.

9

10   BY MR. DAVIS:

11         Q     Okay.

12         A     I never promise because then I can get

13   myself in trouble.

14         Q     Okay.  Understood.  So when you the nurses

15   are answering questions in this case, I read in some of

16   the reports sometimes a nurse would say, I'm an

17   independent contractor, and sometimes a nurse would

18   say, My employer.  Okay.  So you agree with me that the

19   nurses use these words, correct?

20         A     Sometimes they do.  Yeah.

21         Q     Okay.  So do you agree then that sometimes

22   the nurses in their reports use the wrong word?

23         A     Well, they don't use the wrong word unless

24   I -- I -- I'm -- what should I say?  I'm the one who

25   asks the question.

1      Q      Understood.

2      A      And I normally ask the question, How long

3 you've been working for this company?  Then I'm the one

4 who refers to them as an employer.  That's what I

5 normally deal with, employers.

6      Q      Yeah.  But just to make sure we're clear,

7 so it's your opinion today, your position, that these

8 nurses on Schedule A were employees and not independent

9 contractors, correct?

10     A      My -- my decision was based on what they

11 told me and what they -- what they feel.  They feel

12 that they were employees, not independent contractors.

13 They would work for this -- this company and they were

14 not free to make decisions like -- such as like taking

15 off like an independent contractor will do like such as

16 taking time off, you know, for vacation or stuff like

17 that.  They would have to talk to Ms. Pitts in regards

18 to that, so they felt that they were employees and they

19 call her an employer because there's an established

20 relation -- relationship, you know, with them --

21 between them -- the two of them.

22     Q      Okay.  Ultimately you came to the

23 conclusion that the Schedule A workers were employees

24 and not independent contractors; is that correct?

25     A      I came to the conclusion -- yes.  I came

```
 1   to the conclusion that the employees that I interviewed
 2   are employees, that supposedly independent contractors
 3   were classified -- that they were supposed to be
 4   classified as an employees.  So that determination
 5   means that everything -- everybody that is on that
 6   payroll record that worked more than forty hours in a
 7   work week should be paid an additional half time for
 8   overtime.
 9          Q     Okay.  How did you come to the conclusion
10   that Schedule A was improperly classified?  You didn't
11   interview everybody on Schedule A, right?
12          A     No.  But the payroll records show
13   different.
14          Q     I know.  But how did you pick the number
15   of people you decided to interview?
16          A     How did I pick the number?
17          Q     Let me stop you.  Stop.  In other words,
18   why did you interview only some?  Why didn't you
19   interview everybody?
20          A     Sometimes it's really hard to -- to
21   contact everybody.
22          Q     Okay.
23          A     And they just -- you interview -- you
24   know, the letters that I sent, I interview the people
25   that responded to me.
```

1       Q       Okay.  Is it -- was it just an arbitrary

2   number they you came up with?  You're going to

3   interview, I think --

4       A       No.  It's just based on the responses.

5   Who's going to respond to --

6       Q       But you -- but you only sent letters to a

7   select few.

8       A       I sent letters to the ones that Ms. Pitts

9   provided me.  That's it.  I requested for more

10  addresses, but I was not provided all the addresses

11  that are requested in my appointment letter.  She gave

12  me a list of employees.  That's it.  That was -- it was

13  written in paper.

14      Q       Okay.

15      A       She didn't provide me a document where I

16  could look for everybody.  If I had -- I had some phone

17  numbers where she provided me, but some of those

18  employees were no longer working.  You know, I don't

19  have -- I didn't have any addresses.  Some of those --

20  some of those phone numbers didn't -- were not even

21  working.  No one was answering the phone numbers.

22  People change numbers.  So I have to make a decision.

23  Of few numbers that were good --

24      Q       Right.

25      A       -- I selected fifteen.  I sent it to them

1  and I says, Can I get an interview?  Please call me.

2      Q      Okay.  Did you send a letter to everybody

3  that you had an address for?

4      A      What?

5      Q      Did you send a letter to everybody on the

6  Schedule A list that you had an address for?

7      A      No.

8      Q      Okay.  That's my -- that was my question.

9  How did -- why did you select only some?  Why didn't

10  you send a letter to everybody that you had an address

11  for?

12      A      Because some of the individuals did not

13  have -- I didn't have the address to contact.

14          MS. AMIN:  So I think he's misunderstood

15      your question.

16          MR. DAVIS:  I know.  I know.  I'm trying

17      to clarify.  Okay.  So let's just walk through

18      this.

19

20  BY MR. DAVIS:

21      Q      So you asked Ms. Pitts for a list of

22  names --

23      A      Uh-huh.

24      Q      -- and addresses?

25      A      I asked for everybody's.

```
 1                 MR. DAVIS:  Hold on.

 2                 MS. AMIN:  Let him finish his question.

 3

 4    BY MR. DAVIS:

 5        Q     So she gives you a list.  You did not send

 6    a letter to everybody with an address.  You sent it to

 7    some, correct?

 8        A     Uh-huh.  Uh-huh.

 9        Q     My question is why did you pick some?  Why

10    did you not send it to everybody on the list with an

11    address?  You --

12        A     Well -- yes.  I sent -- I sent to fifteen.

13        Q     Okay.

14        A     And that was approximately the amount of

15    people that I -- normally I make phone calls based on

16    the information that Ms. Pitts give me.  Some of those

17    phone numbers were inaccurate.

18        Q     Yes.

19        A     So once I get the correct address --

20        Q     Yes.

21        A     -- then I write down the letter and I read

22    out the letter and I send it to them.

23        Q     Yeah.  I still think we're

24    misunderstanding.  So let's just say she sends you a

25    list of, let's just say, a hundred names and addresses.
```

```
 1       A      Uh-huh.

 2       Q      Okay.  You've got a name.  You've got an

 3   address.  It's a list -- it's more than that.  I forgot

 4   the number, but let's just say a hundred just for

 5   conversation.  So she sends you this.  You choose to

 6   send it to only a few of them.  There were other people

 7   that you had an address for and you did not send them a

 8   letter; is that right?

 9       A      Uh-huh.

10       Q      How did you choose which ones -- you had

11   addresses for John, Jack, Sue and Jim, but you only

12   sent letters to John and Sue.

13       A      Well, that's -- that was a random pick.

14   We don't --

15       Q      Thank you.

16       A      We don't select every single one.

17       Q      It was random?

18       A      It was random.  Yeah.  We select random.

19   It's just like when we go to -- to the employers we ask

20   for different pay -- payroll records.

21       Q      Yes.

22       A      Random payroll records.

23       Q      Okay.

24       A      If I see the random payroll records do not

25   show any violations, the information that is provided
```

1    to me shows me that --

2          Q       I understand.

3          A       -- there is not more violations on the

4    other ones.  However, I always tell the employer, I've

5    checked random, because it's hard to check every

6    single -- twelve -- I mean, twenty-four months of

7    payroll records in one day.  I say, I don't see any

8    violations.  However, if anyone comes forward and

9    submits a complaint --

10         Q       Yes.

11         A       -- I will come back.

12         Q       I understand.

13         A       We will know exactly where --

14         Q       You answered my questions.  I got it.

15   That's good.  Thank you.  Forgive me.  I just want to

16   make sure we're communicating and understanding clearly

17   because I don't want to misunderstand anything you say.

18         A       Uh-huh.

19         Q       Okay.  So we talked about the fact that

20   you interviewed nurses and you asked them questions and

21   on some of these -- we're going to look at them and

22   talk about them later, but on some of them the nurses,

23   responding to your question said, I'm an independent

24   contractor.  We'll see that.  It's in your notes.

25         A       Uh-huh.

```
 1       Q       So they said, I'm an independent
 2  contractor.  You later determined that that's
 3  incorrect, right?
 4       A       Uh-huh.
 5       Q       Is that correct?
 6       A       Yes.  Yes.
 7       Q       Okay.  So my question to you earlier was
 8  do you agree with me that sometimes individuals that
 9  you interviewed say that wrong word?  They call
10  themselves employees or an independent contractor, but
11  they use the wrong word.  Do you agree with that?
12       A       Well, yes, I do agree because sometimes
13  employees don't know the law or the regulations and
14  they think in their heads because they employer --
15  they trust employer.
16       Q       Okay.
17       A       And the employer tell them, You
18  independent contractor and you make a contract, their
19  assumption is I'm an independent contractor, but in
20  reality, they're not.
21       Q       Okay.  So -- but you agree with me that
22  the nurse, they're not a lawyer.  They don't have your
23  skill and your training, correct?
24       A       Uh-huh.
25       Q       Yes?
```

Mateeha - Davis                                    107

1      A      Yes.

2      Q      Yes?  Okay.  Good.  Thank you.  So the

3  word that the nurse uses doesn't really matter, is that

4  correct, because it's your decision that matters, not

5  the nurse's self-description?

6      A      Not necessarily.  Like I said, employees

7  sometimes believe what the employer tells them --

8      Q      Yes.

9      A      -- what they are.

10     Q      Yes.

11     A      And -- and they say, Okay, you classified

12  as an independent contractor, and that's why they call

13  themselves independent contractor even though their

14  reality shows different.

15     Q      I know, but my question was that -- I

16  think what you're saying is it doesn't matter if the

17  nurse describes themselves as employee or independent

18  contractor.  It doesn't matter.  The only thing that

19  matters is your decision as to whether they're an

20  independent contractor or an employee?

21     A      It's not my decision, but the rest of the

22  interview reveals if the person is -- is an employee or

23  an independent contractor.

24     Q      Okay.  So -- right.  And so we got caught

25  up in whether it's your decision, so I'll -- I'll

1    rephrase the question.  Do with agree with me that

2    whether the nurse describes him or herself as an

3    independent contractor or an employee, that does not

4    matter?  The only thing that matters is whether the law

5    determines that they're an independent contractor or an

6    employee; is that correct?

7          A      It's what the law determines.

8          Q      Okay.  So that's a yes?

9          A      Yes.

10         Q      Okay.  Thank you.  Did you ask any of the

11   nurses that you interviewed if they worked for other

12   companies?

13         A      Yes.  If they work for other companies?

14   Yes.  Yes.

15         Q      Okay.  I didn't see that in any of the

16   notes.

17         A      They -- it is in there.  They work for

18   facilities -- for the facilities where the company send

19   them.

20         Q      Okay.  Did any of the nurses you

21   interviewed say that they worked for other registries

22   or staffing agencies?

23         A      Yes.  I asked questions on that and they

24   say no.

25         Q      Okay.  The ones that you picked said no?

```
 1        A        Uh-huh.  Some of them, yeah, they say no.

 2        Q        Did some of them say yes?

 3        A        I can't remember exactly because I can't

 4  remember all of the interviews I have taken.

 5        Q        Sure.  I'm not trying to trick you.

 6        A        Okay.

 7        Q        We'll look at them together.

 8        A        Okay.  Yes.  Okay.

 9        Q        But you -- but that is a question that you

10  asked, Do you work for other facilities?  Do you work

11  for other staffing agencies?

12        A        Yeah.  Normally I ask them if they have --

13  if they have a business, if they have an office.  Do

14  you have -- do you have business card?

15        Q        Yes.

16        A        Are you registered employee identification

17  number?

18        Q        Yes.

19        A        And do you have any employees?  I ask them

20  them those questions.

21                 MR. DAVIS:  It's 12:15, so I would imagine

22        we're going to have a call at some point in time.

23                 MS. AMIN:  Sure.  Yeah.

24                 MR. DAVIS:  And we'll just continue until

25        that time.
```

1  BY MR. DAVIS:

2       Q     Did you interview any of the individuals

3  at any of the hospitals that the nurses work for?

4       A     At the hospitals?

5       Q     Yes.

6       A     No.  Because Ms. Lisa Pitts did never --

7  never provided me with that information.  Those are

8  clients -- those are her clients.  She didn't want to

9  give me anything.

10      Q     Yes.  But when you interviewed with the

11 nurses, some of the nurses, did they disclose to you

12 which hospitals they worked at?

13      A     Some of them.  Yes.

14      Q     Okay.  So after they disclosed -- I'm not

15 asking you to tell me, I'm saying -- about the

16 hospitals, but after the nurse told you, I work for

17 Sentara Leigh, for example, did you then call up

18 Sentara Leigh and interview someone at Sentara Leigh?

19      A     No, I didn't.

20      Q     Why not?

21      A     Because those companies are not in -- in

22 the -- they're not being investigated.  Then I will

23 have to -- I will have to overlook my investigation and

24 then try to claim that they are joint employers.

25      Q     Okay.  Did you feel that the hospitals

 1   would not have any relevant information to help you

 2   determine whether the Steadfast individuals were

 3   employees or independent contractors?

 4        A        Repeat that again?

 5        Q        Sorry.  Yeah.  Did you believe that the

 6   hospitals wouldn't be able to give you any information

 7   that would help you make the decision about whether

 8   Steadfast was -- whether these individuals were

 9   independent contractors or employees?

10        A        No.

11        Q        No meaning you didn't think the -- am I

12   correct in understanding --

13        A        Yeah.

14        Q        -- that you didn't think the hospitals had

15   relevant information?

16        A        Well, they could -- they could have

17   relevant information, but the thing is when you

18   interviewing individuals for one company and then you

19   go to interview another company --

20        Q        Yeah.

21        A        -- then you have to go to the HR and

22   explain what is your purposes for your investigation

23   and then you have to go provide them an appointment

24   letter and -- and it would be like opening

25   investigation.  We would have to add them as a case and

1  open a case file --

2        Q       Uh-huh.

3        A       -- as -- as a probable second company to

4  be investigated --

5        Q       Of course.

6        A       -- because the subject of the

7  investigation is on Steadfast Medical Staffing.  It

8  just -- it was sole concentrated on Medical Staffing,

9  not on facilities.

10       Q       So did it not concern you or did you not

11  think it was relevant to maybe find out if the

12  hospitals -- what if you interviewed a hospital

13  supervisor that said, No, we control these individuals.

14  Steadfast doesn't control them. We control them?

15       A       Okay.  When you do a -- when you

16  question -- when you interview employees and you ask

17  them, Who's paying you --

18       Q       Yes.

19       A       -- and they say, Steadfast is paying me.

20  Everything comes from Steadfast, there's no other

21  company involved in it, so we know that the company to

22  be investigated is Steadfast.

23       Q       Yes.

24       A       We don't need to go out and verify this

25  person is working for other people because they don't

1   appear on the pay stubs.  The person doesn't -- the

2   other company does not appear on the payroll records.

3        Q     I understand that, but my question is in

4   the economic realities test, for example, one of them

5   is in control, right?

6        A     Uh-huh.

7        Q     You said that you felt like that was an

8   important factor here?

9        A     Yes.

10       Q     And my question is why did you not ask

11  some of the hospitals at random to tell you if they

12  knew who controlled these individuals?

13       A     Because some of the interviews that you

14  can read --

15             MR. DAVIS:  Let's pause this.

16             (At 12:20 p.m. a phone call was received

17        and the following took place on the record:)

18             THE COURT:  All right.  Let me just before

19        we get started, is the court reporter reporting

20        now?

21             MR. DAVIS:  She is.  This is Chris Davis,

22        Judge, and she's here transcribing as we speak.

23             THE COURT:  Very well.  So for the record,

24        we're in the matter of R. Alexander Acosta, the

25        Secretary of Labor, versus Medical Staffing of

1      America and Lisa Pitts.  Civil Action Number

2      2:18-CV-226.

3            My chambers were contacted by counsel this

4      morning who asked for my participation or -- in

5      this deposition to deal with certain objections.

6      If counsel would identify themselves for the

7      record, first for the plaintiff.

8            MS. AMIN:  Good afternoon, Your Honor.

9      Avni Amin on behalf of the Secretary of Labor and

10     I have --

11           THE COURT:  Good afternoon.

12           MS. AMIN:  Good afternoon.  And I have

13     here our investigator, Alvaro Mazuera, who is with

14     the Department of Labor who is being deposed.

15           MR. DAVIS:  And, Judge, this is

16     Christopher Davis on behalf of the defendant, and

17     other than the court reporter, there is no one

18     else in the room.

19           THE COURT:  Very well.  All right.  And

20     who is being deposed?

21           MR. DAVIS:  Mr. Mazuera.

22           THE COURT:  Very well.  All right.  Who --

23     what is the nature of the objection?  And we'll

24     start with the party who's objecting.

25           MS. AMIN:  So that would be me, Your

1      Honor.  Thank you.

2             The nature of the objection is based on

3      the informant's privilege.  From my understanding,

4      defendant's counsel is seeking or asking the

5      government to waive the privilege with respect to

6      all employees, and I'll let Attorney Davis kind of

7      add to that.

8             It seems like the defendants are seeking

9      some sort of blanket waiver based on my

10     representation that I may rely on the statements

11     of certain informants prior to trial and my

12     intention to produce un-redacted statements prior

13     to trial.

14            As Your Honor knows, we are still in the

15     midst of discovery, which closes on Monday, so the

16     government's position is that it is premature and

17     improper for us to have to waive any informant's

18     privilege until we make the determination that we

19     are doing to rely, for example, on a certain

20     statement from one of the affective workers, most

21     likely because we are going to call that person a

22     witness at trial.

23            That's my understanding of the issue of

24     the informant's privilege.  I'll let Attorney

25     Davis maybe clarify or add to that.

```
 1              MR. DAVIS:  Judge --

 2              THE COURT:  All right.  Hold just one

 3      moment, please.

 4              MR. DAVIS:  Yes, sir.

 5              THE COURT:  All right, Counsel.  My

 6      apologies.  Mr. Davis?

 7              MR. DAVIS:  Yes, Judge.  Thank you.

 8              THE COURT:  Hold for just a second.

 9              MR. DAVIS:  Yes.

10              THE COURT:  Are you still there?

11              MR. DAVIS:  I'm here, Judge.

12              THE COURT:  All right.  Try again.

13              MR. DAVIS:  Yes.  Can you hear me now?

14              THE COURT:  I can.  Thank you.

15              MR. DAVIS:  Okay.  Thank you.  So, Judge,

16      the issue is that the investigator conducted a

17      number of interviews which have been documented

18      with individuals that are subject to this issue --

19      this lawsuit.  In fact, we call them the Schedule

20      A individuals on the back of the complaint.  Those

21      individuals are all of these nurses that the

22      Department of Labor is -- is claiming were

23      employees and we're saying that they were

24      independent contractors.

25              THE COURT:  Okay.
```

1           MR. DAVIS:  In addition to that group of

2      people, there are about fourteen individuals that

3      work in the office of defendant who we all agree

4      are employees.  They are classified as employees.

5      They were paid as employees.  With maybe some

6      exceptions, there seems like there's not a dispute

7      over that, although I understand there might be a

8      dispute over a few of them, but I don't know that

9      that's the issue.

10          But the close of discovery is coming and

11     I'm here with the investigator and I have his

12     notes and investigation reports of his meetings

13     with the Schedule A workers.  Perhaps there are

14     also meetings with these employees.  I don't know.

15          The issue is arising on a couple of

16     different things.  The first issue was trying to

17     determine if the investigator was speaking to one

18     of the employees in the office as opposed to one

19     of the nurses, and we received an objection on

20     that to the extent that the discussion could cause

21     the revelation of something that would be

22     protected by informant's privilege.

23          The second issue is I'm about to go

24     through in great detail the investigative reports

25     themselves and the investigative reports have

```
 1        large blocks of information that have been
 2        redacted and the privilege log indicates a single
 3        entry of informant's privilege.  Judge, I'll just
 4        flag this.  We have a good faith communication
 5        about that, and unless we can reach a resolution
 6        today, we intend to file a motion to compel on
 7        them.
 8             But today is our last opportunity to
 9        depose this individual that's here with us now and
10        I'd like to know who he spoke with and I'd like to
11        know some details about these large, blocked out
12        areas.  It's my last opportunity to depose him,
13        and counsel indicates that that's protected by
14        informant privilege.  However, I'm informed that
15        the individuals are going to be revealed to us, or
16        at least the ones to be used at trial, one to two
17        weeks before trial.
18             Judge, the informant's privilege is
19        designed to protect individuals from retaliation
20        by an employer or a supervisor, and I understand
21        that, but the issue here is that these individuals
22        have agreed to make an interview.  The Department
23        of Labor is going to disclose them to us, I
24        understand, so their names are going to be
25        revealed.  I think they should be revealed now
```

1          when I can ask questions about it.  That's Issue

2          Number One.

3               Issue Number Two is I asked Ms. Amin,

4          counsel for the Department of Labor, Well, what

5          about -- it's one thing if these people are

6          currently employed or working as independent

7          contractors.  What about people who have been

8          fired or left?  Not fired, but there's people in

9          these interviews that said that they quit.

10         Counsel indicated that she would take the same

11         position, that their information is protected by

12         informant's privilege, which in both instances I

13         don't believe that the objection is proper.  In

14         the second instance under the Eastern District --

15         EDVA case law that I've looked at, that privilege

16         certainly doesn't apply to a former worker because

17         there's no risk of retaliation at all.

18              But even with somebody that currently

19         works there, it would -- this is essentially --

20         the Department of Labor is trying to do a trial by

21         ambush because during my time to depose the

22         individual, I should be able to know who he spoke

23         with and ask questions.  You know, I've got --

24         it's not just their name.  I've got huge blocks of

25         information that has been redacted, and I want to

```
1      ask questions about that.  It would be prejudicial
2      if I don't get to know the name until two weeks
3      before trial and then I have no opportunity to ask
4      this investigator about it.
5              THE COURT:  All right.  Ms. Amin, let me
6      hear from you.  I guess I am troubled by this idea
7      that you're telling me you may identify these
8      individuals but -- but it's premature today.  You
9      know, I think -- at least my initial gut reaction
10     is that, you know, we need to know that answer
11     today so that -- and then, you know, if the court
12     needs to evaluate whether or not the identity
13     should be disclosed, that's another matter, but
14     you can't have your cake and eat it too.  You
15     can't say you want to think about it.  So what say
16     you in response?
17             MS. AMIN:  Your Honor, thank you.  So I
18     think that this conversation is premature
19     procedurally.  The reason that we're here at a
20     crossroads is that the defendants delayed in their
21     request for discovery.  I timely produced my
22     responses in a redacted format with respect to
23     what Attorney Davis has referred to as the report.
24     It's really interview statements with these
25     employees that are the primary issue.  I attached
```

1          a privilege log and addressed the privileges that

2          were invoked.  I redacted information with respect

3          to those statements that would protect the

4          identity of the informants.

5                So procedurally what typically happens is

6          the parties engage in a Meet and Confer, which we

7          are in the midst of that.  I received a letter, I

8          think, earlier this week, maybe Friday, with

9          respect to their concerns.  I have noted that I

10         will provide more detail in my privilege log and I

11         will take a look at my redactions, so we are in

12         the process of engaging in the Meet and Confer.

13               Should we not ultimately agree on the

14         Secretary's invocation of the privileges, I expect

15         defendants will file a motion to compel and the

16         Secretary would then have to look at the

17         redactions again and have the head of the agency

18         affirm the invocation of any privileges that we

19         would want to continue to maintain.  So there are

20         multiple steps that we would go through before we

21         even get to this point of having defendants ask

22         plaintiff -- ask the Secretary to wholly un-redact

23         all of the statements and provide the names of all

24         the individuals that my investigator interviewed

25         during his investigation.

```
 1              I will point out that all of the Schedule
 2      A employees are -- are or were under the control
 3      of Ms. Pitts, the owner of this company.  Her
 4      attorney is welcome to interview those employees.
 5      They have their contact information.  They can do
 6      the same thing that we did, that my investigator
 7      did, during his investigation, so there is no
 8      prejudice in them not knowing which employees we
 9      spoke to during the investigation.  They can talk
10      to all eighty-four employees on the Schedule A,
11      and they have access --
12              THE COURT:  Let me ask you this.
13              MS. AMIN:  Yes, Your Honor.
14              THE COURT:  Let me ask you this.  Why
15      shouldn't defense counsel be entitled to a prior
16      statement made by those individuals who are, you
17      know, arguably the likely beneficiaries of the
18      suit now?  If they've made prior statements, then
19      why -- why isn't the defense entitled to those
20      prior statements?
21              MS. AMIN:  The informant's privilege
22      allows the government to continue to protect the
23      identity of -- of its informants prior to trial.
24      Our office typically -- once we make a
25      determination that we are going to rely on those
```

```
1          statements, those are the statements that we would

2          produce prior to trial and the names that we would

3          produce.

4               To the extent that we do not intend to

5          rely on those statements, the government has the

6          continued interest in protecting the identity of

7          those individuals.  For example, if an employee

8          gave a statement to my investigator and we decided

9          to call that person, we would certainly produce

10         his or her statement in an un-redacted format.  We

11         could not introduce it at trial in a redacted

12         format, nor should we.

13              THE COURT:  And are we talking today about

14         the -- is this really a matter of the Schedule A

15         individuals or are we talking about other persons

16         who aren't listed on Schedule A?

17              MR. DAVIS:  Well, Judge, the -- I'm not

18         sure -- who are you addressing the question to

19         Your Honor?

20              THE COURT:  To Ms. Amin.

21              MR. DAVIS:  Sorry.

22              MS. AMIN:  I think the line of questioning

23         has been with regard to the Schedule A employees

24         and also the office employees.  To the extent that

25         there are questions as to whether my investigator
```

1      interviewed office employees versus Schedule A --

2      you know, the independent contractors, I think

3      that has already been answered, so the first point

4      that Attorney Davis makes I think is a non-issue.

5            THE COURT:  I'm not sure what you're

6      referencing when you say the first point.

7            MS. AMIN:  When he -- when he started the

8      call, he made a point that I had taken issue with

9      whether my investigator had spoken to the

10     employees or the independent contractors,

11     employees meaning --

12           THE COURT:  And what is your -- what is

13     your answer?  Are you saying, Yes, he has, or, No,

14     he hasn't, or you're not --

15           MS. AMIN:  He's already answered that

16     question.  We didn't really go down that path too

17     far, but my point with that line of questioning is

18     that I instructed him not to answer to the extent

19     that he interviewed employees that were in the

20     office.  For example, if there was only one

21     receptionist in that office, he could not state

22     that he -- he could not affirm that he interviewed

23     a receptionist because that could give away that

24     person's identity, so that was my limiting

25     instruction with respect to whether interviews

```
1        took place with the employees in the office or the

2        alleged independent contractors.

3             THE COURT:  Well, I guess I'm a little

4        confused still.  Are you, in essence -- are you

5        willing to confirm when he has interviewed

6        Schedule A personnel but with respect to

7        non-Schedule A personnel you're -- you're not

8        willing to confirm?

9             MS. AMIN:  Well, he can confirm generally

10       if there are questions, which Attorney Davis

11       didn't go far down that path, but questions about

12       office employees -- I guess we haven't gotten

13       there, but my limiting instruction was if you're

14       going to ask the job titles of who he interviewed,

15       to the extent that that would reveal the person's

16       identity, he cannot answer that question because

17       that is covered by the informant's privilege.

18       It's a small staff of individuals that work in the

19       office.

20            THE COURT:  All right.  Well, talk to me

21       about the -- I'd be happy to hear both of you on

22       this point, but what the law is concerning the

23       informant's privilege in this context.

24            I'm familiar with how it works in the

25       criminal context certainly.  Basically the key
```

1        case is Roviaro v. United States that provides

2        that, you know, if an informant aided in a

3        criminal investigation, that defendant would not

4        normally be entitled to that informant's identity,

5        you know, upon invocation of assertion of the

6        privilege provided that the person was, you know,

7        more in the nature of a tipster, his involvement

8        or her involvement in the matters giving rise to

9        the -- the charge or the transaction at issue was

10       not particularly significant and he, you know, or

11       she wasn't expected to be a witness at the trial.

12              What -- how -- tell me what the law is in

13       this regard.  You know, on the other hand, if the

14       person was, you know, integral to the transaction

15       and the government intended to rely upon on him,

16       then, you know, there are circumstances under

17       which the government would be required to disclose

18       the identify of an informant.

19              MS. AMIN:  So I'll go first, Your Honor.

20       We do rely on Roviaro and the case law that is

21       used in a criminal context in the same way.  I

22       would say that statements that were taken of the

23       Schedule A workers are the workers that are at

24       issue in the case that were misclassified and that

25       are owed back wages.  Theoretically, all -- I

1          think it's eighty-four that are on this Schedule

2          A -- could be potential witnesses in this case and

3          may have given statements in this case, so the

4          government has an interest in protecting their

5          identity not just because there's a potential for

6          retaliation to the extent that they're employed,

7          but also to the extent that they might be former

8          employees, you know, there's still that continued

9          interest.

10              Beyond that, the government -- we would be

11         unable to secure the statements of employees

12         without any -- without assurances that their

13         identities would remain confidential, meaning

14         these employees would not cooperate with my

15         investigator to assist us in affirming our

16         allegations of misclassification if we could not

17         assure them that we would protect their identities

18         and identifying information.

19              So the case law I think -- the case law

20         that we would rely on in a civil context is

21         similar to what we would -- what is relied upon in

22         a criminal context.  Obviously there might be

23         variances, but generally speaking it is the same.

24         It is the same interest, and I wouldn't

25         necessarily call the Schedule A workers tipsters

1              because they are present -- presently employed or

2              are potentially former employees.  You know, they

3              have -- there's issues with retaliation and they

4              have a vested interest in the outcome of this

5              litigation.

6                     Again, I'll just reiterate, Your Honor,

7              the employees at issue are -- we're not hiding the

8              ball.  The employees has equal access to

9              interviewing and speaking to all eighty-four

10             workers that are on the Schedule A -- that are on

11             the Schedule A.

12                    THE COURT:  All right.  Mr. Davis, let me

13             hear you about what you think the case law says

14             and why you think that isn't adequate.  If they're

15             going to call these people, you know who these

16             individuals are who are identified in Schedule A.

17             You know, they were appended to the complaint.

18             You know, why can't you go out to speak to them on

19             your own if you want?  They're not parties to this

20             action.  And what do you think the case law is?

21                    MR. DAVIS:  Well, I've got case law that

22             I'll get into directly in one second, Judge, but

23             from a practical perspective, it's just not

24             practical.  We've got eighty-four different people

25             and of those only seven of them were interviewed.

```
1        Some of these eighty-four people are no longer --
2        they -- they -- I think two of them at least state
3        expressly that they quit.  They're no longer even
4        there, so, you know, we'd have to find them,
5        convince them to talk to us.  They could just say
6        no.  Any of them could say no.
7             The point is they did talk to the
8        investigator and they -- they've got statements
9        and --
10            THE COURT:  Let me ask you about that.
11       You said only seven were interviewed.  Is that by
12       you or by the plaintiffs?
13            MR. DAVIS:  By the plaintiff.  I've got --
14       I've got seven interview statements.  I've got
15       them.  They're heavily redacted based on
16       informant's privilege, and I want to ask the
17       investigator about the individuals.  I want to
18       know who they were.  I want to know these redacted
19       parts.  There's like -- I know the court doesn't
20       have it in front of Your Honor, but there's huge
21       blocks of information that are blocked off and the
22       privilege log says informant's privilege.
23            I want to ask the investigator, you know,
24       What did they tell you?  I don't want to get the
25       objection it's informant's privilege because the
```

Mastria - Davis                           130

 1          information might reveal their identify,

 2          especially when -- you know, if we get -- when we

 3          get to trial, Your Honor, the investigator is not

 4          going to be able to testify as to what these

 5          nurses told him.  That would be hearsay.  These

 6          nurses are going to have to testify.

 7                So, you know, they have -- we have a

 8          recorded statement from them and I'd like to know

 9          what they told the investigator and I would like

10          to be able to efficiently find these people and

11          interview them myself because I could -- you know,

12          in theory over the next few weeks, I supposed we

13          could -- we could call eighty-four people and talk

14          to them, find the former ones.  They might lie to

15          us.  I don't know.  I would be able to -- you

16          know, not a trial by ambush.

17                It would be as if this is a murder trial

18          and a police officer says, Yes, I have three

19          witnesses that saw them shoot the gun, but we're

20          not entitled to know who they are until, you know,

21          two weeks before trial and then they say, Well,

22          you could interview everybody in the community and

23          maybe you could find the same people, but that's

24          not the standard.

25                Here's what the standard is.  Your Honor

1          cited the Roviaro versus the United States, which

2          that's the 1957 Supreme Court case.  That lays out

3          the basic standard, but I'll point out another

4          case.  This is not a EDVA but this one's Chao v.

5          Westside Dryway, Inc.  It's 254 Frd 651, 2009, out

6          of Oregon.  It -- it talks about the fact that the

7          informant's privilege is a balancing of interests.

8          You have to balance between the need of the

9          government to keep the identities confidential to

10         protect against retaliation versus the need of the

11         defendant to be able to conduct their own

12         discovery on that.  It's not a set thing.

13              I'll note in the interview statements it

14         doesn't say there's a guarantee of protecting

15         their identity.  It says, We will protect your

16         identity to the extent permitted by law.  The law

17         says -- I'll cite another case.  This one is Perez

18         v. Kazu construction, which is a case -- that is

19         217 Westlaw 628, 455.  It says that the

20         government's interest dwindles over time the

21         closer you get to trial.  At some point that

22         interest weighs in favor of the defendant

23         expressly to prevent an ambush, and that's what we

24         have here.  It's my only opportunity to talk to

25         this investigator.

1           I'll note that the Department of Labor did

2       not issue a protective order ahead of time or seek

3       one to protect us from asking these questions.

4       You know, counsel also indicated that she said

5       with regard to former workers that the government

6       still has an interest.  She didn't say what the

7       interest is because there can't possibly be an

8       interest in a former worker.  What -- what fear of

9       retaliation would there be?  But there can't be

10      any concern of retaliation because their

11      identities are going to have to be disclosed prior

12      to trial.

13          What the Department of Labor is actually

14      trying to do, I would pause it to the court, is to

15      prevent us from getting the information until the

16      last possible second when there's very little we

17      can do, and so at this point in time it is near

18      the end of discovery.  It ends on Monday.  We're

19      in a live deposition.  I would suggest that now is

20      the time to allow the disclosure of this

21      information so we're not prejudiced and ambushed

22      at trial.

23          THE COURT:  Ms. Amin, are we talking about

24      seven -- seven individuals?  Is that what's at

25      issue right now?

    1              MS. AMIN:  I don't have, Your Honor, our
    2        responsive documents, including those statements,
    3        but I will trust that Attorney Davis'
    4        representation is accurate.
    5              If I could --
    6              THE COURT:  Wait a minute.  Wait a minute.
    7        With respect to the seven, can you determine how
    8        many of those are current versus former employees?
    9        And, if so, I'd like that information.
   10              MS. AMIN:  I think that the statements may
   11        in and of themselves disclose that.  I would not
   12        have redacted the date of employment in those
   13        statements, so they either say they're presently
   14        employed or they note the date -- the end date of
   15        their employment with Steadfast, although I will
   16        say I have not independently as of today verified
   17        whether they went back to Steadfast or --
   18              THE COURT:  That's just speculation.
   19        We're not going -- we're not going to speculate.
   20              MS. AMIN:  Okay.
   21              THE COURT:  I'm just asking you based on
   22        the information that's in front of you, I'd like
   23        to know now who are current employees are who are
   24        former employees.
   25              MR. DAVIS:  Judge, we could get a

```
 1         definitive answer, but my recollection is that

 2         there are two of the seven that indicated that

 3         they're no longer current because I made notes --

 4         I made contemporaneous notes.  I've got one here

 5         that says that she quit, and I recall there was

 6         another one.  I'm trying to find it.  I believe

 7         it's two out of seven.  Yes.  There's two.  Here's

 8         one and here's a second.  It's possible there's

 9         more than two, but I can confirm that there's at

10         least two of the seven.

11              THE COURT:  All right.  Ms. Amin, can you

12         shed any light on the other five?  Do you have the

13         statements in front of you?

14              MS. AMIN:  One moment, Your Honor.

15              Well, you know what, Your Honor?  I'm

16         looking at the statements now and I'm going to

17         amend what I said earlier.  The dates of

18         employment have been redacted.  I'm not looking at

19         the body of the statement just yet.  I'm just

20         flipping.  It's basically a form that notes the

21         approximate dates of employment, and the reason

22         those would have been redacted is that exact dates

23         of employment could lead to the identity of the

24         individuals, so I would have to look at the body

25         of each statement to say -- to determine whether
```

 1            the employee is saying that they're still

 2            employed.  Just give me a moment, Your Honor.

 3                 THE COURT:  All right.  I'm going to put

 4            you on hold for a minute.

 5                 MS. AMIN:  Sure.

 6                 THE COURT:  All right.  I'm back on the

 7            line.  I'm sorry.  If you're still working, that's

 8            fine.

 9                 MS. AMIN:  Your Honor, I've taken a look

10            at the body of each statement and I don't see that

11            there's an indication as to when -- whether the

12            employee is claiming that they're still employed

13            with Steadfast or not.

14                 THE COURT:  Do you have available to you

15            the un-redacted statements?  Can you get -- figure

16            that out?

17                 MS. AMIN:  Yes.  Yes.  I can, Your Honor.

18                 THE COURT:  Are you going to look at them

19            now or what are you --

20                 MS. AMIN:  I -- yes.  I'm -- I'm pulling

21            it now, Your Honor, if you'd give me one moment.

22                 THE COURT:  Yes.

23                 MR. DAVIS:  Judge, would it be appropriate

24            for me to give an example while counsel is doing

25            that or I can wait?

```
 1              THE COURT:  Why don't you wait.

 2              MS. AMIN:  Your Honor, I've counted three

 3      individuals that state that they were -- they are

 4      presently employed with -- with Steadfast as of

 5      the date of the interview statements, which date

 6      back to the summer of 2017.  June and August of

 7      2017 it looks like.

 8              THE COURT:  All right, Counsel.  I'm

 9      sorry.  I had you back on hold.  So if you were

10      talking, I may have missed it.

11              MS. AMIN:  Yes, Your Honor.  So I've

12      counted three individuals who stated that they

13      were presently employed with Steadfast as of the

14      date of their statement.  The statements vary.

15      They were taken in 2017, so quite some time ago,

16      and they vary in terms of the dates that they were

17      taken, but June, August, September are the dates

18      that I am seeing.

19              THE COURT:  All right.  So the other four

20      do not indicate they are currently employed or

21      they were then employed with the defendant?

22              MS. AMIN:  That's correct, Your Honor.

23              THE COURT:  All right.  And of these

24      seven -- you know, we are fairly close to trial.

25      Can you tell me whether you intend to call any of
```

```
 1        them as witnesses?

 2             MS. AMIN:  We have not made a

 3        determination as to whether -- as to who we're

 4        going to call at trial.  You know, we would

 5        certainly do that in accordance with the court's

 6        scheduling order, but it's premature for us to --

 7        to make that call at this point.

 8             THE COURT:  All right.  Then, Mr. Davis,

 9        you indicated that you wanted to say something?

10             MR. DAVIS:  Yes.  In the initial

11        disclosures and interrogatory responses, they've

12        identified all of these potential individuals as

13        potential witnesses, so they could be anybody.

14        For the first time I'm learning right now four out

15        of the seven are not even currently there.  I

16        don't know what interest the government could

17        possibly have.

18             One example is a document that's Bates

19        stamped -- I know the court doesn't have it, but

20        for the record -- DOL 135.  It's an interview

21        statement, and, Judge, everything in the entire

22        page is blacked out other than the date, the fact

23        that the interview took place at the

24        establishment, the name of their employer, they're

25        over eighteen in Norfolk, and then at the end
```

```
1          there's a couple non-blacked out lines that are
2          just not relevant.  Well, they might be relevant,
3          but they say, I don't get paid overtime when I
4          work there, et cetera, but the entire rest of the
5          page is blacked out.
6                Judge, this is one of the main things that
7          I want to talk to this investigator about because
8          the investigator is the one who made the decision
9          ultimately and made a determination that these
10         individuals were, in fact, in his opinion,
11         employees, not independent contractors.  I asked
12         him when did that happen, and he already testified
13         that it happened -- that he made the initial
14         determination on the date that he had this initial
15         meeting with my client and he said he met with
16         some people at the establishment.
17                Well, I've got an example right here where
18         I'd like to ask him, Who did you meet with?  What
19         did they tell you?  I don't see any prejudice or
20         harm to the individual or the Department of Labor
21         from -- from knowing their identity being that it
22         sounds like they might be called as a witness at
23         trial.  How could this prejudice them if they're
24         going, you know, to be called to trial and
25         subpoenaed to testify anyways?
```

1           THE COURT:  And you say he -- when he met

2      with your clients and then you referenced at the

3      at an establishment, are you saying at your

4      client's place of business or are you referring to

5      something else?  I'm not clear about that.

6           MR. DAVIS:  Yes.  At my client's place of

7      business, which I'm assuming is referred to as the

8      establishment.  Although that -- you know, to look

9      at the interview statement and ask the deponent

10     questions about that, I think I would -- without

11     the court's intervention, I think I would get an

12     objection as to maybe even that.  I don't know,

13     but -- because the earlier objection was any

14     information that could potentially lead to their

15     disclosure.  You know, any information at all

16     would be objectionable, so that's part of the

17     issue.

18          MS AMIN:  And, Your Honor --

19          THE COURT:  Ms. Amin, with respect to the

20     form, is there -- you know, it seems like the

21     government's interest in non-disclosure is -- is

22     less if there's no current information that

23     they're still working for the defendant.  What's

24     your response to that?  I mean, I'm supposed to

25     balance the defendant's need for the information

1           to prepare a defense versus the plaintiff's and

2           the public's interest in protecting the flow of

3           information to the government.  Let me hear what

4           you have to say.

5                MS. AMIN:  Your Honor, we have a continued

6           interest in protecting the identities of

7           employees, whether they are presently employed by

8           this employer or not.  It's not just an issue of

9           retaliation.  It's -- it's the manner in which

10          we're able to secure statements at all, whether

11          they are present employees or the former.  The

12          reason -- one of the main reasons they agree to

13          cooperate is because we -- we assure them that

14          we're not going to reveal their identities.  Even

15          if they are former employees, they get the benefit

16          of the same protection by the Department of Labor.

17               Respect -- with respect to the issue of

18          balancing, one of the factors is, you know, the

19          defendant's ability to gain access to the

20          information that the government has.  I've already

21          said that the defendants have equal access, if not

22          greater access, to individuals that are under

23          their control or formerly were, contact

24          information, relationships.  The defendants are

25          certainly able to talk to these employees

```
 1          voluntarily or to depose the employees if
 2          necessary if there's an issue, as Attorney Davis
 3          said, as to whether the employee is going to tell
 4          the truth.  The defendants are welcome to depose
 5          them, so, you know, I think in terms of the
 6          balancing, there's no prejudice to defendants.
 7               Attorney Davis is correct.  We typically
 8          in our initial disclosures, we don't know which
 9          Schedule A employees we're going to call.
10          Certainly not all eighty-four.  All that wouldn't
11          be feasible and I know Your Honor wouldn't
12          appreciate that, but, you know, we make that
13          determination as the case proceeds based on
14          multiple factors of availability and helpfulness
15          to the government.
16               At this point trial is still a couple of
17          months out.  It's not scheduled until May 21st.
18          It's certainly too -- too early for the government
19          to have to turn over the identities of any of its
20          informants.  At a point in which we make the
21          determination that we are going to call -- which
22          employees we're going to call and which statements
23          we're going to rely on, we would produce that in
24          accordance with the court's scheduling order
25          before trial.
```

1          I -- I just don't see here, Your Honor,

2     the prejudice to defendants when it's their own or

3     former employees, whether it's the office staff or

4     the independent contractors.

5          THE COURT:  Well, you know, part of it --

6     part of the issue that the court is concerned

7     about is, you know, the notion that these are

8     people that are at the heart of the case.  I mean,

9     this isn't somebody who dropped a dime for a phone

10    call one day and said, Hey, Medical Staffing is

11    crooked and you guys should take a look at them.

12    Good bye.  I mean, these are people affiliated

13    with the company for some period of time and, you

14    know, are familiar with the practices of the

15    company.

16         It doesn't strike -- you know, we're in a

17    far different situation from a tipster type

18    situation.  I think the risk of retaliation when

19    we're dealing with former employees -- there's no

20    current information that you presented that they

21    are currently affiliated with them and it strikes

22    me as much less significant.

23         I'm -- I guess I'm prepared to, you know,

24    hear you with respect to current employees, but

25    also -- I mean, their -- their activities and

```
 1        their dealings with the company go to the heart of
 2        what's at issue in this case.  It's -- it doesn't
 3        sound like what we're talking about is -- is, you
 4        know, somebody who in the situation where a true
 5        tipster has called in and this information doesn't
 6        go to, you know, like where the government has a
 7        need to preserve that person's anonymity.
 8              You know, I guess I am concerned, you
 9        know, cases move faster here in the Eastern
10        District of Virginia.  This case hasn't been --
11        it's not like this was just filed yesterday and
12        you need time to sort out, you know, where the
13        case is going to be.  It was filed -- the
14        complaint was filed in May of 2018.  The
15        investigation occurred, you told me, some time in
16        2017, at least part of it.  You know, that -- this
17        case has got some age on it, you know, and the
18        government should be at a point where it knows now
19        whether it's going to assert this privilege or not
20        and who -- and have a pretty good idea.  I
21        understand that you might not know who you're
22        going to call right now, but you probably have an
23        idea about who you may call.
24              Quite frankly, if some of this information
25        is protected, it may be that if the privilege is
```

```
 1          upheld with respect of any of them, if you later
 2          disclosed it, I might very well give the defense
 3          an opportunity to depose Mr. Mazuera again with
 4          respect to that information if they want to do
 5          that because it does strike me as problematic that
 6          we're not, you know, farther along in making these
 7          decisions.
 8                  I understand you say, We need to go
 9          through a process, but -- but we are at the end of
10          discovery and it seems to me that process should
11          be much farther along, rather than, you know,
12          stepping through at a snail's pace.
13                  MS. AMIN:  And, Your Honor, if I could
14          just address that?  The reason that we're at the
15          end of the process is due to defendant's conduct
16          in terminating her prior attorney.
17                  THE COURT:  Well, I -- I understand that,
18          but let me just say you're the one interposing the
19          objection.  It's still discovery and you have the
20          right to assert any objection you want, but to
21          say, Well, it's premature, when we're at the close
22          of discovery is -- you know, premature for you all
23          to make a decision strikes me as problematic.
24                  MS. AMIN:  Well, that -- it's --
25                  THE COURT:  And are there any additional
```

```
 1            facts other than sort of this general, you know,

 2            notion that there could be this risk?  Do you have

 3            any facts to suggest that any employee has been

 4            retaliated against?  This matter's been public for

 5            quite some time, probably back to 2017 if that's

 6            when the initial interview of the business took

 7            place.  Do you have any evidence of current

 8            retaliation?

 9                 MS. AMIN:  We don't have any evidence of

10            current retaliation, but I do not think that the

11            case file --

12                 THE COURT:  Have any employees said

13            they've been retaliated against or fired by -- by

14            the defendant?

15                 MS. AMIN:  To my knowledge, no.

16                 THE COURT:  All right.  I cut you off.  I

17            apologize.  What did you want to say?

18                 MS. AMIN:  No.  That's fine.  I actually

19            lost my train of thought, but I'm sure it will

20            come back to me.

21                 MR. DAVIS:  Judge, may I address a few

22            things?

23                 THE COURT:  You may.

24                 MR. DAVIS:  The -- the interviews for

25            the most part, at least the un-redacted parts,
```

```
 1            these aren't interviews where they're saying

 2            horrible things about my client where there's

 3            really even a risk of retaliation.  They're

 4            factual interviews.  Tell -- they're questions

 5            that the interview -- the investigator asked about

 6            control and hours, the standard six-factor tests

 7            from the economic realities test, so I don't see

 8            how there'd be a risk of retaliation anyways.

 9                 I'll point out that the -- I believe that

10            the government's position is illogical in this

11            way.  Counsel has indicated that the government

12            has an interest in protecting the information and

13            that the interest is that they have, quote,

14            assured these people that their information would

15            not be revealed.  If they did that, that's

16            improper and that's actually not what their own

17            interview statement says.  It says that, We will

18            attempt to keep it confidential to the extent

19            allowed by law.  That's -- that is the point of

20            intersection where we find ourselves today.

21                 But counsel indicates that there's no

22            prejudice because in theory we could depose or

23            interview all eighty-four people, and that's a

24            true statement, but if the interest is to protect

25            their identity, then our right to depose
```

```
 1         eighty-four people would defeat that interest.

 2              Instead, the true interest of the

 3         government is knowing that we have limited

 4         resources and doing a deposition of eighty-four

 5         people would difficult, time consuming, and

 6         expensive, so they're relying on the fact that we

 7         likely won't do that.  They assert this privilege

 8         so that we are not able to cull down the

 9         eighty-four to seven.  That's the only thing.

10         We're culling down eighty-four to seven.  There's

11         no government interest that protects -- we know

12         who the group of eighty-four people are, so

13         there's no government interest in preventing us

14         basically from having an efficiency issue.

15              THE COURT:  Speak to that, Ms. Amin.  So

16         the normal -- your interest is to protect people

17         from retaliation, but the defendant already knows

18         who they are, all of them.

19              You know, to the extent that they still

20         work for Medical Staffing, you know, they're

21         already subject to retaliations as an interested

22         party in this matter or to pressure to tow the

23         company line, if you will, to support the defense

24         in this the case.  What do you have to say about

25         that?
```

 1              MS. AMIN:  Well --

 2              THE COURT:  Did you have any cases in

 3      which there's an FSLA case addressing a Roviaro

 4      assertion of a Roviaro privilege?

 5              MS. AMIN:  Not handy, Your Honor.  I can

 6      certainly brief that.  It's an issue that my

 7      office deals with fairly routinely.  I just don't

 8      have the case law at my fingertips.

 9              What I will say is that procedurally if --

10      if the court is inclined to require the government

11      to take that next step of revealing the identities

12      of its informants or identifying information, we

13      would -- we would conduct an in camera review.

14      I'm not sure if that is something that's on the

15      table or if we're just having a general discussion

16      about the government's ability to continue to

17      invoke the informant's privilege for current or

18      former employees.

19              But just because the employer is aware of

20      the individuals we've assessed back wages for

21      doesn't change the analysis with respect to the

22      statements that we've taken.  I don't think that

23      it's a feasible argument to say that the

24      government is claiming eighty-four people are owed

25      back wages.  Therefore, they're all at risk for

```
 1          retaliation because those employees, they
 2          didn't -- they don't get to determine whether they
 3          are affected workers.  Our investigator and our
 4          division makes that determination as to who is
 5          owed money, so an employer could not reasonably
 6          say that all eighty-four employees are working
 7          with the government in any way.  We have -- we
 8          have investigations where maybe we have little to
 9          no statements from employees but we still affirm
10          our violations, so I don't think that that
11          argument is logical.
12               THE COURT:  All right.  Well, let me --
13          I'm going to have to -- I've got another
14          engagement that I'm already fifteen minutes late
15          for.  What I'm going to ask you to do is it
16          strikes me -- I'm going to ask you both to consult
17          and confer with these matters.  I have a hard time
18          believing based on the information that's been
19          provided to me that the former employees -- that
20          an assertion of privilege would be justified with
21          respect to them.  I'm concerned, quite frankly,
22          about whether or not there's really a basis for
23          the assertion of the privilege with respect to the
24          other three employees.
25               It strikes me that you could perhaps do a
```

```
 1          little more digging to determine whether or not

 2          you think these folks are still employed there.

 3          Also I find it significant that there's no

 4          evidence of any retaliation yet.

 5                  This isn't the typical kind of tipster

 6          Roviaro type situation that strikes me where -- I

 7          understand the government has the right to assert

 8          these privileges, but typically it's done very

 9          carefully to evaluate the circumstances under

10          which it should be asserted, and to just make a

11          blanket assertion strikes as potentially

12          problematic, so I'm going to ask you to consult

13          with one another.

14                  Ms. Amin, I'm going to ask you to consult

15          with a -- a supervisor to see if you can either

16          completely narrow the differences or narrow them

17          more substantially given the circumstances,

18          particularly if you find that you're going to be

19          in a situation in a matter of weeks where you're

20          going to disclose this same information.  You

21          know, we don't want to find ourselves in that box.

22          I'm not hearing from you the kind of facts that

23          would justify the assertion of the privilege here.

24                  I'm also -- I'm concerned about the issue

25          of the redaction, which appears to be -- you know,
```

```
 1              at a minimum it strikes me that the defense should
 2              be entitled to a lot more of the factual
 3              information concerning the interviews in question.
 4              It strikes me that some very narrow redactions, if
 5              any, concerning the identity and/or, you know,
 6              sufficient information that would allow the
 7              identification of the person, if there was a
 8              predicate for the assertion of the privilege
 9              itself, but it does sound like these things are
10              over redacted, so I would also encourage you to go
11              back and consider that.
12                   But with respect to the defendant, I will
13              say this doesn't strike my as a case where there's
14              a whole lot of secrets.  It's a -- it's a
15              straightforward case.  The defendant made a
16              decision to classify these individuals in one
17              fashion.  The facts should be largely known to
18              both sides and maybe that reduces the defense's
19              justification for getting information to which
20              there is a proper assertion of privilege.  You've
21              already identified individuals.  Your client
22              should know how their business operates and the
23              reason that they operated the business the way
24              they operated it.
25                   So I want you both to go back to the
```

1        drawing board and try to narrow, if not eliminate,

2        this issue.  If you need to have a conversation

3        with me, I can sit down with you again at -- let

4        me just look at my schedule.  I've got some

5        hearings at 2:30, and I've got somebody coming to

6        see me on a search warrant later this afternoon as

7        well, but I need time to review.  I'll be glad to

8        talk to you at ten after 2:00 and we'll see where

9        we go from there.  All right?

10              MR. DAVIS:  Very good.  Thank you, Judge.

11              MS. AMIN:  Thank you, Your Honor.

12              THE COURT:  All right.  Good bye.

13              (At 1:12 p.m. the phone call ended.)

14              MR. DAVIS:  We'll take a break.

15              (A 1:12 p.m. a recess was taken.  At 2:25

16        p.m. all parties were present.  A phone call was

17        received and the following to place on the

18        record:)

19              MR. DAVIS:  Judge, I apologize.  Ms. Amin

20        is just walking back into the room.  She just sat

21        down.  I didn't want to say anything until she got

22        back into the room.

23              MS. AMIN:  Hello, Your Honor.

24              THE COURT:  That's fine.  Good afternoon,

25        Ms. Amin.  I apologize.  I'm running late myself

```
 1        and do have some court hearings that I'm supposed
 2        to be starting right now.
 3              I put the question -- and I assume we
 4        still have the court reporter?
 5              MR. DAVIS:  Yes.  We do, Judge.
 6              THE COURT:  Okay.  Thank you.
 7              I put the question to both counsel.  Have
 8        you made any progress in narrowing or resolving
 9        the dispute?
10              MS. AMIN:  We have not, Your Honor.  I
11        have conferred with my office.  Our position has
12        remained unchanged.  I do have additional case law
13        at my fingertips, case law that's specific to the
14        FLSA and case law in the Fourth Circuit and other
15        civil cases that address the informant's privilege
16        because I know that was a question that was raised
17        by Your Honor.  You know, I think the conversation
18        was more along the lines of in a criminal context,
19        but obviously this is a civil matter, so I want
20        the opportunity to note some of those cases for
21        Your Honor if you deem it, but our -- our position
22        has not changed with respect to our invocation of
23        the informant's privilege with respect to any
24        former or current employee.
25              THE COURT:  All right.  And the case law
```

1          you want to provide to me, if you had to briefly

2          summarize it, how does it apply to the context of

3          what we're addressing here today?

4                  MS. AMIN:  So the U.S. v. Hemphill matter,

5          it's 369 F2d, 539.  It's a Fourth Circuit

6          case that addresses when the government is -- when

7          it is appropriate for the government to produce

8          its -- the names of its informants.  Brennan v.

9          Engineer Production.  That's an Eight Circuit

10         case, 506 F2d, 299.  Generally speaking those

11         cases note that shortly before and during trial is

12         appropriate, and I will note the Hemphill matter

13         is a case -- is an FLSA case.

14                 I have a string of cases, Your Honor, that

15         uphold the theory or our argument that the

16         Secretary's assertion of the informant's privilege

17         as it applies in an FSLA action is appropriate.  I

18         can -- that's probably more appropriate for a

19         brief at some point, but there's case law out of

20         various jurisdictions including this one that deem

21         that that is appropriate.

22                 The -- and another issue that I think has

23         been the focal point of this conversation is the

24         current versus former employees.  There's a Sixth

25         Circuit case that addresses that as really

 1            indistinguishable, that the privilege applies to

 2            both former and current.  That Sixth Circuit case

 3            is Dunlop versus Carriage Carpet Company.  It's

 4            548 F2d 139.

 5                 There is also --

 6                 THE COURT:  129 you said?

 7                 MS. AMIN:  548 F2d 139.  It's out of the

 8            Sixth Circuit.

 9                 THE COURT:  Thank you.

10                 MS. AMIN:  There's also Charles Martin

11            Inspectors of Petroleum, and I'm going to give you

12            the jurisdiction in one moment, Your Honor.

13            That's a Fifth Circuit case.  The citation is 459

14            F2d, 303.

15                 So essentially, Your Honor, there is case

16            law that supports the government's invocation for

17            former employees as well.  The focal point in many

18            of these cases is not that these employees are

19            less likely to be retaliated against, although

20            that is one factor that the court should consider.

21                 To that point I would note that

22            defendant's position is that this company is a

23            registry and I believe it's their position that

24            there's probably a lot of turnover, that they

25            might go to different staffing agencies to work at

1          some of these facilities, so they might leave for
2          a period of time and they might come back, so the
3          court has an interest in continuing to allow to
4          protect the identify of, quote/unquote, former
5          employees, although that has not been established
6          beyond a statement from over a year ago where the
7          individual has said they no longer work for the
8          company.  That's nothing that I can verify today,
9          but regardless I think the issue of whether
10         they're former or current goes beyond the scope of
11         the analysis that the court needs to make here,
12         but to the extent that Your Honor finds that that
13         is relevant, the nature of this business is
14         cyclical, according to the defendants.  There
15         might be turnover and these employees might come
16         back, so there is continued fear of retaliating.
17              Beyond that, these employees might rely --
18         former employees might rely on Ms. Pitts, the
19         owner of this company, as a reference and to the
20         extent that their names are revealed in the course
21         of this action, they might be prejudiced in terms
22         of getting future employment, so that is one
23         factor that the court should consider.  There is
24         case law on that, and I can pull that, but, you
25         know, I wanted to express that point, that the

Mastalska - Davis                    157

1          focal point should not be is it -- is this

2          employee likely to be retaliated against or beyond

3          that, has there been evidence of retaliation.  The

4          government need not prove that there has been

5          actual retaliation against any of these employees.

6              I would tell you, Your Honor, the names of

7          the informants have not been revealed, so to the

8          extent they are, it's sort of a wait and see

9          situation of how the defendant's going -- what is

10         she going to do with those names.  How is she

11         going to treat those employees?  Are they not

12         going to get matched with any facilities?  Are

13         they all of a sudden just going to be told, you

14         know, We don't have any hours for you?  That's a

15         real concern here.

16             THE COURT:  Mr. Davis, any response?

17             MR. DAVIS:  Judge, the -- well, first of

18         all, I've gone through the cases that counsel

19         cited and without going into great detail, because

20         I know the court doesn't have time, the primary

21         case counsel cited is a Fourth Circuit case.  The

22         other cases are all Third Circuit, District of

23         Pennsylvania, Eighth Circuit, so it might make

24         sense to look at the only case that is not just

25         persuasive but binding.

```
 1                    In the U.S. v. Hemphill case, the court
 2          does an analysis that's spot in line with our
 3          argument all along, and that is the court
 4          expressly says that -- I'm reading from the
 5          case -- when the United States comes into the
 6          court as a plaintiff, they are subject to the same
 7          rules as private litigants and the open disclosure
 8          which is now demanded of litigants in federal
 9          courts because of its fairness and its
10          contribution to the accuracy in the fact-finding
11          process is equally demanded.
12                    Then the court says that when it comes to
13          informant's privilege that it is a balancing test
14          and it does discuss it, but the court goes into
15          great detail in explaining that that privilege is
16          a qualified privilege that does give way when,
17          quote, Fair and orderly trials deem that it needs
18          to give way.
19                    In that U.S. v. Hemphill case what
20          happened was the procedural posture was the -- the
21          district court had ordered the disclosure or in
22          discovery had ordered the disclosure of all of the
23          informants.  There were groups.  Some of the
24          informants had relevant knowledge to the case and
25          were potential witnesses and some of them, parties
```

1    agreed, did not have relevant knowledge.  The --

2    the district court ordered all of them.  The

3    Fourth Circuit on mandamus overturned the district

4    court with regard to the second group only and

5    said that there was no interest in a litigant

6    obtaining the identities of informants that

7    everyone agreed had no relevant information.

8            I think the Fourth Circuit logic is

9    absolutely sound on that, and it applies really

10   well here.  In this case we only have seven people

11   that have relevant information.  They're the only

12   people that can testify to this.  The investigator

13   can't take the stand and testify to hearsay.

14           So counsel's indicated, Well, there's this

15   risk of retaliation, but that risk of retaliation

16   is -- is non-existent because to the extent that

17   they call these people to trial as witnesses --

18   I'm certainly not suggesting my client's going to

19   retaliate, but once they become a witness, they're

20   known.  You know, there is not a risk of that.  If

21   there is, it already exists, regardless if this

22   goes now or later.

23           So the Fourth Circuit case law is very

24   clear that it's a balancing test.  Your Honor has

25   the discretion to look at the need of a defendant

```
 1            to not be ambushed at trial, to be able to fairly

 2            participate in discovery, and obtain it now versus

 3            later.

 4                 THE COURT:  All right.  I'm prepared to

 5            rule with respect to the matter that's at least

 6            been presented to me thus far.

 7                 I am going to order the disclosure of the

 8            statements of the four employees who are

 9            identified so far as we've been able to determine

10            today as no longer currently employed.  They were

11            no longer currently employed at the time they were

12            apparently interviewed by the investigator, so I'm

13            going to order the disclosure of those statements.

14                 In making that order, I know that Roviaro

15            requires that this be a balancing test where I am

16            supposed to balance the public interest in

17            ensuring the flow of information to government

18            agencies such as the Department of Labor, which

19            does have a significant interest in ensuring that

20            employers abide by the law when it comes to paying

21            and properly classifying their employees, against

22            the interest of the defense -- the defendants in

23            preparing a defense to this case.

24                 I note that this matter was filed in May

25            of 2018.  In conjunction with the filing of the
```

```
 1            complaint, plaintiff attached a schedule of
 2            eighty-four individuals who stand to potentially
 3            benefit should the plaintiff be successful with
 4            its argument in this case, so the individuals in
 5            question in this case are identified and known to
 6            the defense already, so to the extent
 7            identities -- we're talking about identities,
 8            those identities have been disclosed, so that
 9            doesn't fully extinguish the plaintiff's interest
10            in receiving reports of alledgedly unlawful labor
11            practice by employers, but here where there is
12            information before the court that these are not
13            current employees, given the fact that we are
14            roughly four to five days away from the end of
15            discovery, I'm not satisfied that with the
16            government's position saying that it's premature
17            to make these determinations about these matters
18            is -- is the appropriate position to take.
19                 This is a problem that is one that is
20            certainly predictable and known to the government
21            and I think they should have been in better
22            posture with respect to this deposition, knowing
23            that this issue is going to be out there, to
24            decide who they're going to call because according
25            to counsel she has indicated that they, in fact,
```

```
 1          will disclose these statements of individuals who

 2          they do intend to call.  Given the need for the

 3          defendant to obtain discovery from a significant

 4          witness in the case, the investigator, disclosing

 5          this information after the close of discovery puts

 6          the defendant in a very difficult case --

 7          situation with respect to preparing its case.

 8               I'm balancing the two interests and

 9          recognizing that the privilege is qualified rather

10          than absolute.  I am directing that the statements

11          of the four former employees be disclosed in fully

12          non-redacted form.

13               I will uphold the privilege with respect

14          to the remaining three employees whose status is

15          unknown.  Given that there were seven interviews,

16          that is providing the defense with more than fifty

17          percent of the interviewed individuals in

18          question, which certainly is -- puts them in a

19          position to be able to discern the facts and to

20          prepare whatever defense they may have to the

21          claims in the complaint.

22               I would note that if -- and I'm not sure

23          in light of what I just said whether this would be

24          necessary, and frankly I think it probably would

25          not be necessary given the nature of this case and
```

 1              the nature of the dispute between the parties, but

 2              if the plaintiff later decides to call any of the

 3              other three witnesses, they will have to promptly

 4              disclose these statements, and if the defendant

 5              seeks the opportunity to depose Mr. Mazuera -- is

 6              that the name?  Am I saying it correctly?

 7                     MS. AMIN:  Yes, Your Honor.

 8                     THE COURT:  If the defendant wants the

 9              opportunity to re-depose Mr. Mazuera, the court

10              will be very likely inclined to grant that request

11              for the re-deposition of him relative to those

12              matters, though quite frankly I think given the

13              nature of the case, I'm not sure that I see the

14              necessity for defense to do that.

15                     MR. DAVIS:  Understood.

16                     MS. AMIN:  And, Your Honor, I didn't

17              realize that you were going to enter an order.

18              Had I, I would have requested that we -- the

19              parties have an opportunity -- the plaintiff have

20              an opportunity to brief the issue because it is

21              such a complex and sensitive issue.  It's the

22              identity of the informants in this case.  I would

23              like to move to have the opportunity to brief the

24              issue.

25                     THE COURT:  I've considered the matter.

```
 1        I've ruled.  I'm not -- I don't need further

 2        briefing on the matter.  You're free to pursue the

 3        matter with what other remedies you may desire to

 4        pursue.

 5              MS. AMIN:  Okay.  And I want to be clear

 6        that if Your Honor intends to issue this order,

 7        which it sounds like you are and I understand

 8        that, the Secretary's position is that we will

 9        continue to advise Mr. Mazuera to not reveal the

10        identities of the former employees that Your Honor

11        has addressed in this order and we will -- we will

12        appeal the decision to the district court or

13        appeal the order to the district court in a timely

14        manner.

15              THE COURT:  Well, you better brief the

16        matter then very promptly because discovery is

17        closing and we're not going to draw this out

18        another month to resolve this issue, so let's set

19        a briefing schedule then.

20              MR. DAVIS:  Judge --

21              THE COURT:  Your brief -- I'm sorry?

22              MR. DAVIS:  Judge, perhaps -- I just want

23        to understand the posture we're going here, and

24        I'm sorry to have this conversation live with the

25        court, but if counsel's going to instruct -- if
```

 1          the court is ordering that the deponent answer

 2          these questions and if counsel is indicating she's

 3          going to instruct the deponent not to answer

 4          despite the court's order, I'm not sure what the

 5          briefing would be other than a contempt motion

 6          from our side.  I'm not sure where we're going

 7          with that.

 8              MS. AMIN:  Well, Your Honor, we're going

 9          to appeal your order, respectfully, Your Honor,

10          and I believe we have ten days to do that, so I

11          would not have my witness or have the deponent

12          answer questions which in my mind are going to be

13          at issue in an appeal because once he's waived --

14          once I've waived the privilege, it's out there.

15          The names of these informants are out there, so my

16          office's position is that we will maintain our

17          position with respect to confidentiality and

18          appeal any order that Your Honor issues today.

19              THE COURT:  All right.  Hold the line for

20          just a minute.

21              MS. AMIN:  Okay.

22              THE COURT:  All right.  So again,

23          Ms. Amin, I would suggest that you consult with an

24          appropriate supervisor before directing and

25          refusing to comply with the order or considering

```
 1          whether to comply with the order that I've just

 2          issued in the case, but if you elect to take that

 3          option, then I'm going to issue an order and I'll

 4          direct that you file a brief no later than Monday,

 5          March 4th, at noon asking the district judge to

 6          reconsider my order.  I will direct the defendant

 7          to file a response there too by the close of

 8          business Wednesday, March 6th.  Any reply shall be

 9          filed by close of business March 7th, and we will

10          let the district judge address it when she's

11          available to get to the matter.

12              MS. AMIN:  I appreciate that, Your Honor.

13          I'm wondering if we can have just a little more

14          time only because we're going to try to complete

15          this -- well, the deposition and one more 30(B)6

16          that's yet to be completed and I'm traveling

17          tonight, so that leaves the plaintiff with very

18          little time to get a brief together.  I understand

19          the sensitivity of discovery is closing on Monday,

20          but if we could have a couple more days, I would

21          certainly appreciate that, at least until maybe

22          noon on Wednesday?

23              THE COURT:  No.  I'm not going to grant

24          you any more time.  This issue is pretty

25          straightforward.  You seem to know the law.  The
```

```
 1          facts are fairly discrete, so I think you can get

 2          this done within the timeframe I've specified.

 3               MS. AMIN:  Okay.  Thank you.

 4               MR. DAVIS:  Judge, a clarification from

 5          our perspective as defense counsel.  So we're

 6          going to, of course, re-ask the questions.

 7          Counsel's going to instruct her client not to

 8          answer.  It's my intention to then stop the

 9          deposition and continue it, although the discovery

10          deadline will then pass before the court -- the

11          district judge makes a ruling.  Does the court

12          have any direction to defendant as what -- what we

13          do with this deposition when the close of

14          discovery moves past us on this?

15               THE COURT:  No.  I'm not in a position to

16          give you any advice.  What I would direct the

17          parties to do is make sure that you've covered all

18          other areas that don't involve this alleged claim

19          of privilege and to ensure that no matter what the

20          ruling is that you've completed as much of the

21          discovery as you can within a timely fashion.

22               MR. DAVIS:  Understand.

23               MS. AMIN:  And, Your Honor, we would

24          agree -- plaintiff would agree to allow

25          Investigator Mazuera's deposition to continue out
```

```
 1          of time after the close of discovery to address

 2          these issues.

 3                THE COURT:  Very well.  Well, you know,

 4          I'm not going to extend the discovery today, so if

 5          that's the question, that motion's not before me.

 6          The discovery deadline that's in place remains in

 7          place unless and until the court rules otherwise.

 8                MR. DAVIS:  Thank you, Judge.

 9                THE COURT:  All right.  Thank you both.

10          Have a good day.

11                MR. DAVIS:  You too.

12                THE COURT:  Good bye.

13                (At 2:55 p.m. the phone call ended.)

14                MS. AMIN:  Can we have five minutes and

15          then --

16                MR. DAVIS:  Yeah.

17                (At 2:55 a short recess was taken.  At

18          3:00 p.m. all parties were present and the

19          following took place on the record:)

20                MR. DAVIS:  I'm going to show the

21          witness -- you have a copy of this already,

22          Counsel, what we'll marked as Exhibit 2, please.

23                (Marked in evidence as Alvaro Exhibit

24          Number 2.)

25                MR. DAVIS:  Off the record for a second.
```

```
 1                  (A conversation was held off the record.)

 2                  MR. DAVIS:  Okay.  What we've marked as

 3        Exhibit 2 is a document that has been Bates

 4        stamped as DOL00123 through DOL00142.  I'm going

 5        to ask the witness to turn Page 2, which is Bates

 6        stamped DOL00124.

 7                  In light of the court's order, I'm going

 8        to ask counsel to identify which of the listed

 9        seven individuals are the former workers as

10        opposed to the current ones.

11                  MS. AMIN:  And I have just put away my

12        laptop, so give me a moment.  You can go off the

13        record.

14                  (A conversation was held off the record.)

15                  MS. AMIN:  So B-1 is former.

16                  MR. DAVIS:  So we're back on the record.

17        Counsel's indicated B-1 is former.

18                  MS. AMIN:  A former employee.  B-2 is a

19        former employee at least with respect to this

20        statement.  B-3A is a former employee.  B-3B is a

21        former employee.  B-4 is presently employed or was

22        at the time of this statement.  B-5, presently

23        employed.  B-6, presently employed.  B-7, former.

24        B-7B, former.  I think that's it.

25                  MR. DAVIS:  All right.  The first thing,
```

1          just for the record, it would appear that perhaps

2          there was a discrepancy between what we disclosed

3          to the court and that there's not seven

4          individuals.  There are nine because there are

5          these two Bs.  The analysis perhaps isn't any

6          different being that the other two Bs are also

7          former, but in any case I will start.

8

9  BY MR. DAVIS:

10         Q     I'll ask the witness, if you -- with

11  regard to -- if you'd turn to this page here with the

12  DOL00125.

13         A     Uh-huh.

14         Q     Counsel's indicated this is a former

15  employee or independent contractor or worker or however

16  we describe this individual.  I'm going to ask counsel

17  to please -- the witness to please disclose the name of

18  the individual that's indicated on this exhibit DOL125?

19              MS. AMIN:  I'll instruct the witness not

20         to answer based on the informant's privilege

21         despite the court's order today.  It is not the

22         intention of plaintiff to run afoul of the court's

23         order but to have an opportunity to brief the

24         issue and raise the issue with the district court

25         judge.  So, again, I will advise the deponent not

1              to answer based on informant's privilege.

2                   THE COURT:  And is counsel instructing the

3              witness not to answer not only the identifying

4              information on DOL125 but also the other redacted

5              information that is redacted on the basis of

6              informant privilege?

7                   MS. AMIN:  Correct.

8

9   BY MR. DAVIS:

10       Q     I'm going to ask the witness now to please

11  turn to -- if you look at the bottom right, do you see

12  those numbers right there?

13       A     Uh-huh.

14       Q     So we call those Bates stamps.

15       A     Yeah.  That's what I've been looking at.

16       Q     Good.  Good.  Okay.  If you would turn to

17  DOL127, please?

18       A     Uh-huh.

19       Q     Based on counsel's representation, this is

20  a former worker.  I'm going to ask the witness to

21  identify the name, the identifying information, as well

22  as the information that has been redacted in the pages

23  that follow through DOL128.

24                   MS. AMIN:  Objection.  Informant's

25              privilege.  I'm instructing the witness not to

Matsina - Davis                           172

```
 1          answer based on the privilege.

 2

 3   BY MR. DAVIS:

 4          Q      I'd ask the witness to turn to DOL129,

 5   which as been marked as B-3-A.  It's been identified as

 6   a former employee.  I'll ask the witness again to

 7   identify the name and the information that has been

 8   redacted.

 9               MS. AMIN:  Objection.  Informant's

10          privilege.  I'm instructing the witness not to

11          answer.

12

13   BY MR. DAVIS:

14          Q      Turn to DOL131, which is B-3-B.  It's been

15   indicated that this is a former contractor.  I'm going

16   to ask the witness to identify the information that's

17   been redacted.

18               MS. AMIN:  Objection.  Informant's

19          privilege.  I'm instructing the witness not to

20          answer.

21

22   BY MR. DAVIS:

23          Q      I'm going to ask the witness now to turn

24   several pages into B-7, which is going to be DOL00139,

25   and I'm going to ask the witness to identify the
```

```
 1   information that has been redacted on the document.

 2              MS. AMIN:  Objection.  Informant's

 3        privilege.  I'm instructing the witness not to

 4        answer.

 5

 6   BY MR. DAVIS:

 7        Q     And finally I would ask the witness to

 8   turn to DOL141, which is B-7-B.  They indicated this

 9   was a former independent contractor.  I'll ask the

10   witness to identify the information that has been

11   redacted.

12              MS. AMIN:  Objection.  Informant's

13        privilege.  I'm instructing the witness not to

14        answer.

15              MR. DAVIS:  All right.  Off the record.

16              (A conversation was held off the record.)

17              MR. DAVIS:  Okay.  Back on the record.

18

19   BY MR. DAVIS:

20        Q     I will now present the witness with a

21   document that we'll please mark as Exhibit 3.

22              (Marked in evidence as Alvaro Exhibit

23        Number 3.)

24

25
```

1    BY MR. DAVIS:

2         Q       Exhibit 3 has been Bates stamped DOL00001

3    through DOL000017.  Sir, are you familiar with this

4    document?

5         A       Yes.

6         Q       Okay.  Is this the report that you put

7    together?

8         A       Yes.

9         Q       And this report makes reference to the

10   interviews that you did that we just looked at as

11   Exhibit 2, correct?

12        A       Yes.

13             MR. DAVIS:  Okay.  Just to go through this

14             quickly, there are a number of redactions that

15             have been made in this report, for example,

16             beginning on DOL00009 through DOL00013.  The half

17             page has been redacted and then the entirety of

18             the subsequent pages through the last one, the top

19             part.  This information has been redacted in large

20             part because, I believe, again, informant's

21             privilege was a material component of it.  I'm

22             going to ask counsel to identify which parts of

23             this have been redacted pursuant to the

24             informant's privilege regarding the individuals

25             who are no longer working with Steadfast and to

```
 1              provide the information that has been redacted for

 2              those, which would be actually six individuals

 3              that are former workers.

 4                   MS. AMIN:  So tell me your question again?

 5                   MR. DAVIS:  Yes.  I'm going to ask counsel

 6              to identify or provide to me the un-redacted

 7              components of this report that lists the

 8              information, the identifying information and other

 9              information, that has been redacted pursuant to

10              informant's privilege relating to those six

11              individuals that are former workers for Steadfast.

12                   MS. AMIN:  Plaintiff continues to rely on

13              the informant's privilege and will not produce any

14              statements with respect to this narrative that

15              would identify or tend to identity the identities

16              of its informants, present or former.

17

18  BY MR. DAVIS:

19       Q      And I'm going to ask the witness now the

20  same thing.  I'm going to ask you, sir, to please tell

21  me the information that has been redacted in your

22  report anywhere that has otherwise been redacted

23  pursuant to the informant's privilege for the six

24  individuals that no longer are working with Steadfast.

25                   MS. AMIN:  And I'll instruct the
```

1          witness -- objection.  Informant's privilege.

2          I'll instruct the witness not to answer to the

3          extent that the question seeks information that's

4          protected by the privilege.

5               MR. DAVIS:  Okay.  Thank you.  And based

6          on the position that has been taken by the

7          plaintiff in this case of instructing the witness

8          not to answer and not complying with the court's

9          order, I will again assert my position as stated

10         on the record to the court.  I object to counsel

11         not providing this information and assert that it

12         is a violation of this court's order and we intend

13         to seek appropriate relief from the court,

14         including sanctions as applicable, for failure to

15         comply with the court's order.

16               All right.  Let's move onto some other

17         things.  All right.

18

19    BY MR. DAVIS:

20         Q     Do you recall -- I'm not going to mark a

21    copy of this, but I'll show you a copy.  The document

22    that I have in my hand is called -- and I'll show you.

23    It's entitled, Plaintiff's answers and objections to

24    defendant's first set of request -- of request -- I

25    guess that's an error but -- interrogatories.  Do you

 1  recall seeing this document previously?  Obviously my

 2  highlights are on the document, but --

 3      A     Yes.

 4      Q     Okay.  And -- and you signed this

 5  document, correct?

 6      A     Yes.

 7      Q     Okay.  So the first thing I'm going to ask

 8  you about is Interrogatory Number 10 requests --

 9  Interrogatory Number 10 states, Identify the factual

10  basis for your allegation in Paragraph 6 of the

11  complaint that defendants willfully violated the Fair

12  Labor Standards Act in all documents concerning or

13  relating to the same.  There are objections, but then

14  it indicates that plaintiff states he does not contend

15  the defendant willfully violated the Fair Labor

16  Standards Act.

17            Can you tell me what happened to cause

18  the -- to cause your answer to be that you no longer

19  contend that there was a willful violation?

20            MS. AMIN:  Objection.  Attorney/client

21      privilege.

22

23  BY MR. DAVIS:

24      Q     I'm not asking you to disclose any

25  communications that you had with counsel.  I'm asking

1  from your perspective you signed this and initially it

2  was found that -- in the complaint that there was a

3  willful violation.  But you signed this saying it was

4  your answer, and I'm asking why the answer here is that

5  you do not contend that there was a willful violation.

6          MS. AMIN:  So you can speak to the

7      findings of your investigation.

8          THE WITNESS:  I can speak the findings of

9      my investigation?

10         MS. AMIN:  Yes.

11     A      Well, the findings of the investigation

12 was the subject firm has misclassified all -- you know,

13 these employees as independent contractors.

14

15 BY MR. DAVIS:

16     Q      I understand, but you understand initially

17 it was claimed that there was a willful violation?

18     A      Yes.  I understand that initially it was

19 claimed it was a willful violation, but the employer

20 when I spoke to the -- her attorney the first time --

21     Q      Okay.

22     A      -- I -- I put a request asking --

23         MS. AMIN:  I'm going -- I'm going to

24     instruct the witness to the extent you -- the

25     question seeks information that might be

1          deliberative in process -- deliberative in nature,

2          meaning conversations you had with any other

3          government officials internally about this issue,

4          that information is privileged, so beyond that,

5          you may answer the question that's before you.

6          A      Okay.  Before me.  The employer -- okay.

7    If I'm -- if I'm incorrect on this one, the employer

8    alleged that she had a good faith defense and because

9    we didn't have the information what lawyer advise

10   her -- she didn't give us the information of what

11   lawyer advise her for the good faith defense.  Then

12   we -- we were under the assumption that it was a

13   willful violation.

14

15   BY MR. DAVIS:

16        Q      And then that position changed after

17   you --

18        A      Yes, it is.

19        Q      Okay.  Understood.  Okay.  Fine.  All

20   right.  And then Interrogatory Number 11 asked -- it

21   says, Identify the factual basis for your allegation in

22   Paragraph 6 of the complaint that defendants improperly

23   classified individuals including CNAs, LPNs, and RNs,

24   as independent contractors and all documents concerning

25   or relating to the same.  There's some objections, but

```
 1   there's a response that says, See plaintiff's response

 2   to defendant's first set of request for production of

 3   documents.  Do you recall answering that?

 4        A      I did answer that one.  Yes.

 5        Q      Okay.  So this is -- I printed it out.

 6        A      Sure.

 7        Q      Everything's been printed.  I'm going to

 8   ask you to identify for me and just tell us by page

 9   number which -- which documents support the factual

10   basis of the allegations that defendants improperly

11   classified the individuals?

12        A      Okay.  The first one is Exhibit A-O-a to

13   b -- I'm sorry, A-O-a through A-O-e.

14        Q      A-O-e?

15        A      Uh-huh.

16        Q      Okay.

17        A      I believe that's A-O-e.  That's what it

18   look like.  Yeah.

19        Q      I think it's your handwriting, isn't it?

20        A      Yeah.

21        Q      If you can't read it, we're in trouble.

22        A      When you copying the things, it changes --

23   this one.

24        Q      Well, actually --

25        A      A-1-a.
```

 1        Q        -- instead of saying A-1-a, can you give

 2   us the Bates number?

 3        A        Okay.  Exhibit 8.

 4        Q        No.  No.  I'm sorry.  Instead of telling

 5   us the exhibit, can you tell --

 6        A        This one right here?

 7        Q        Yeah.  Start from the beginning.  That

 8   would be better.

 9        A        Okay.

10        Q        So to be clear, I'm asking you to identify

11   the documents that support the government's position

12   that the individuals were improperly classified as

13   employees.

14        A        The documents that support is DOL0006.

15   That's the -- to the DOL0017.

16        Q        Okay.

17        A        DOL0018 through DOL21.

18        Q        Okay.

19        A        I'm sorry.  22.

20        Q        Okay.

21        A        And then DOL23 all way through DOL122.  Of

22   course, then DOL125 through DOL142 and the DOL216

23   through DOL238.  That's it.

24        Q        That's it?  Okay.  Wonderful.  I want to

25   ask about that more in just a minute, but let me go on

Matsuda - Davis                                        182

```
 1   to -- I think the answer might be the same.  I don't
 2   know.  For Interrogatory Number -- so Number 11.  Maybe
 3   it would help if you look at it with me.  10 is what I
 4   asked you about, right?  I'm sorry.  I asked you about
 5   11.  Identify the factual basis for your allegations in
 6   Paragraph 6 of the complaint that defendants improperly
 7   classified individuals as independent contractors, and
 8   you made this identification for me.
 9        A      Yes.
10        Q      Okay.  Then Interrogatory Number 12 says,
11   Identify the factual basis for your allegations in
12   Paragraph 7 that the defendant failed to make, keep,
13   and preserve adequate and -- adequate and accurate
14   records of their employees.  You also say, See
15   everything.  Can you identify which ones of these
16   documents demonstrate the defendants failed to make and
17   keep and preserve adequate --
18        A      That would be --
19        Q      The same ones or different ones?
20        A      No.  Different ones.
21        Q      Okay.
22        A      That would be the first one, A-O-a, 6 all
23   the way through way through A-O-a, 22.  Then DOL216
24   through DOL 238.
25        Q      Okay.
```

Mastoa - Davis                                    183

```
 1        A       Yeah.

 2        Q       Okay.  Very good.  All right.  With regard

 3   to Interrogatory Number 13, 13 says, Identify the

 4   factual basis for your allegation that Lisa Ann Pitts

 5   is personally liable for any violations of the Fair

 6   Labor Standards Act as alleged in -- in your complaint

 7   and all documents concerning or relating to the same,

 8   and you've identified all documents.  I'm asking you to

 9   identify specifically which documents show that

10   Ms. Pitts is personally liable.

11        A       DOL147 through 149.  DOL 150.  DOL 151 and

12   152 and DOL00006 through DOL00017.  DOL216 through 238.

13   DOL125 --

14        Q       Through 142?

15        A       -- through 142.  DOL145 through 146.  I

16   think that's it.

17        Q       Okay.

18        A       Yeah.

19        Q       Very good.  And then with regard to Number

20   14 -- I'll wait until you're ready.

21        A       Number 14?

22        Q       Yeah.  Identify the factual basis for your

23   allegation in Paragraph 7 of the complaint that

24   defendants failed to accurately record compensation and

25   all documents concerning or relating to the same.  Then
```

Mastrota - Davis                          184

1    your response after some objections is, Please see

2    response.  So which of these documents identify the

3    factual basis for the failure to accurately record

4    compensation as asked in Interrogatory Number 14?

5         A      DOL -- hold on one second -- 18 to 22.

6         Q      To 22 you said?

7         A      To 22.  Yeah.

8         Q      222?

9         A      No.  0022.

10        Q      Okay.

11        A      DOL23 through DOL122.

12        Q      I'm sorry.  23 through 122?

13        A      Uh-huh.

14        Q      Okay.

15        A      What --

16        Q      Go ahead.  It's record compensation.

17        A      DOL25 through DOL 142.  DOL145.  And the

18   last one would be DOL216 through --

19        Q      You said 145 by itself or is that a range?

20        A      145 by itself.  Yeah.

21        Q      Okay.  And then the next one was what?

22        A      216 through 238.

23        Q      Very good.  Thank you.  All right.  And

24   Interrogatory Number 16, the request -- I'll let you

25   read it with me to make it easier.  It says, If any

1   statement as identified by federal civil procedure,

2   that's the rule, in any form, including but not limited

3   to audio or video tape recordings, have been made by

4   you or any person having knowledge of the facts, and it

5   goes on, but your response says, See plaintiff's

6   response to defendant's first set of request for

7   production of documents.  My question to you iswere

8   there any -- there's some objections.  So were there

9   any audio or video recordings made by you?

10          A       No.

11          Q       No.  Okay.  To be clear, what I mean is

12   when you did the interviews of Ms. Pitts, of any

13   nurses, any employee, any independent contractors --

14          A       No.

15          Q       -- no audio or video recordings?

16          A       No.

17          Q       Okay.  All right.  All right.  I'm going

18   to ask you about -- well, we're going to plow through

19   some of these documents soon.  For now, why don't we

20   just set this aside.  I'm not going to ask you about

21   this for now.  In fact, let me take it to get it out of

22   your way.  I want to walk you through some of the

23   factors of the economic realities test.

24          A       Sure.

25          Q       And I'm going to ask you -- maybe we'll

```
1   leave this here in case you want to point me to

2   something, but the first factor is the control factor

3   we talked about.  The Fourth Circuit says -- defines it

4   as the degree of control that the putative --

5                MR. DAVIS:  Do you say putative or

6        putative?

7                MS. AMIN:  I say putative, but I don't

8        know.

9                MR. DAVIS:  I've never known how to say

10       it.

11               MS. AMIN:  Potato.  Potato.

12               MR. DAVIS:  That's not going to come out

13       in the transcript no matter.  She's going to spell

14       it the same way.

15               MS. AMIN:  Potato.  Potato.

16               MR. DAVIS:  Sorry.

17

18  BY MR. DAVIS:

19       Q     All right.  The first factor from the

20  economic realities test is the degree of control that

21  putative employer has over the manner in which the work

22  is performed.  Are you aware that that's the first

23  factor?

24       A     Uh-huh.

25       Q     Okay.  Can you tell me generally speaking
```

```
 1   what evidence did you uncover, gather, elicit, from

 2   anybody?  I'm not asking you to identify the names of

 3   anybody right now, but --

 4        A        Uh-huh.

 5        Q        -- but I'm just asking what was the

 6   evidence that you gathered regarding this first element

 7   of control?

 8        A        Interviews.

 9        Q        Okay.  And I'm not -- I'm sorry.  Let

10   me -- I want to be specific.  I'm not asking like what

11   type of evidence, whether it's a document or an

12   interview.  I'm asking what -- what did you uncover?

13   What is the evidence of control that you found?

14        A        Okay.  Control.  The employee -- the

15   employees don't have a chance to take off from the job

16   like a normal independent contractor.  They cannot

17   decide -- say, I'm getting up today and I'm not going

18   to work.  You know, I'm not working today, just like

19   regular painter, independent contractor, or anyone

20   working as independent will do.

21        Q        Okay.

22        A        If -- if the employee failed to show up

23   for work, then there will be -- there was some evidence

24   on the interviews that the employees reveal that

25   Ms. Pitts will take some actions.  I don't know what
```

 1   kind of action, but it was a control.  The control

 2   that -- she controlled the money paid to these

 3   individuals, even though Ms. Lisa Pitts say that it was

 4   negotiable.  The control of, you know, who pays every

 5   paycheck, you know, every week.  The evidence was on

 6   the pay stubs.  It appears that none of these

 7   independent contractors have any -- any accounting

 8   procedures or any -- anything that will reveal that

 9   they have an accounting, that they have employees, that

10   they have their own business.

11             So the evidence that during my initial

12   conference if the employer has control -- if the other

13   employer has control over these employees or

14   independent contractors as she might claim to call

15   them, then why is the facility calling them, the

16   employer -- what do you call that -- the registry

17   office to complain about somebody else?  That's a fact

18   that should be discussed between the facility and the

19   employee, not the three of them because that's what --

20   that's what an independent contractors does.  If I'm an

21   independent contractor working as a painter painting

22   the office, you should direct everything to me, not you

23   going to the agency and say, Your painter's not working

24   for me.  Hold on.  If the painter's not working for

25   you, then I'm not independent contractor.  It should

 1  be -- the relationship should be between the two of us.

 2  That was -- that was the basis for control that I have.

 3  Why would Ms. Lisa Pitts have to take -- make a

 4  decision on behalf of facility on how to respond to an

 5  issue with someone -- one of her employees taking

 6  drugs?

 7        Q     Okay.  Anything else?

 8        A     No.  That should -- that should be it.

 9  That's -- that takes control -- you know, if someone

10  has control, the same control that I have with my kids,

11  they can't go nowhere else unless I say so.

12              MR. DAVIS:  Off the record.

13              (A conversation was held off the record.)

14              MR. DAVIS:  Let's plow ahead.  Let's go.

15

16  BY MR. DAVIS:

17        Q     Okay.  All right.  You've answered the

18  question with control.  Let me ask a few follow-up

19  questions.  The first thing you said was that the

20  employees can't take off from a job.  What -- what does

21  that mean?  Do you mean that after they've accepted a

22  job, they can't just leave?

23        A     They cannot -- the decision is if I'm

24  working as an independent contractor -- I'm a painter

25  and then I stop painting and go and take my business --

```
1            Q      Yes.

2            A      -- outside.  These employees can -- can't

3    do that.  They have to ask Ms. Pitts.  They have to ask

4    their supervisor there.  Kind of, I need to take time

5    off, you know.  Everything has to be -- any decision

6    has to go through her, even though she denies it, but

7    all the decisions from these employees, whatever

8    decision.  If they have an appointment -- they schedule

9    to work on Thursday but they have an appointment, you

10   have -- every decision has to go through her.

11           Q      Okay.

12           A      She will make decision and say, Yeah, we

13   cover you.  We cover with somebody else.  They will

14   cover it, so that's -- that's control.  If you have --

15   if I'm independent contractor, I come and go as I

16   please.  No one stop me.

17           Q      So is -- is it your understanding that

18   these nurses would call Steadfast and say, Do you have

19   availability for me to work tomorrow? and they would

20   present them with some options?

21           A      They will present them with -- what do you

22   mean?  The employee -- the nurses will present them

23   with some options?

24           Q      Let me tell you my understanding of how it

25   works.  Tell me if you understand it differently.
```

1       A       Yeah.

2       Q       My understanding is that Steadfast has

3   contracts with different hospitals and a nurse will

4   call Steadfast and say, I'm looking to work on Tuesday,

5   Tuesday afternoon.  Do you have anything?  Then

6   Steadfast will say, Yes. On Tuesday two different

7   hospital are available. This hospital pays this amount.

8   This pays this amount. Which one do you want?  Then the

9   nurse will say, The first one pays more. I'll take that

10  one.  Is that different than your understanding?

11      A       That's different than my understanding.

12      Q       How -- what is your understanding?

13      A       The employee has been set to scheduled to

14  work for these days.  Something happens at the time.  I

15  cannot show up for those jobs or one of the -- for one

16  of the hours or I have to attend an appointment at a

17  certain time.

18      Q       Where -- who told you that these

19  individuals -- that their schedule was dictated by

20  Steadfast?  Who told you that?

21      A       The interviews.

22      Q       And so in the interview notes we're going

23  to see that?

24      A       You have some of the interviews saying

25  that they were not allowed to take time off and if they

1    take some time off, Ms. Pitts will get upset because

2    she will be losing money.

3          Q       Yes.  I saw that interview.

4          A       Yeah.  She will be losing money.

5          Q       Is everything you just said regarding

6    taking time off from that one interview that says that?

7    I didn't see that anywhere else.

8          A       I can't remember everything else.

9          Q       We'll look through them.

10         A       Yeah.  Yeah.

11         Q       Okay.  All right.  When you say if they

12   failed to show up, Ms. Pitts would take action, what

13   action would she take?

14         A       She might not call them again, and that's

15   in their interviews.

16         Q       Okay.  So is it your understanding that

17   Ms. Pitts calls these nurses or that the nurses call

18   Ms. Pitts to find work?

19         A       Either way.

20         Q       It goes both ways?

21         A       Yes.  It goes both ways.

22         Q       And what you said is that's in the

23   interview notes?

24         A       I can't recall that.  I can't remember if

25   it's in the interviews, so I cannot recall it.

1        Q        So help me understand how would it be that

2   you have a fact like you said and it might not be in

3   the notes?

4        A        Uh-huh.

5        Q        Is it -- are there some things that you

6   didn't put in the notes?

7        A        No.  Everything's in the notes.

8        Q        So if it happened, it's in the notes?

9        A        Yes.

10       Q        Okay.  All right.  You said Ms. Pitts

11  controlled the money.  What does that mean?

12       A        She dictates -- well, she dictates the

13  pay -- the rate of pay is going to be for it.  She has

14  different pay rates for different jobs, and that's in

15  there in the interviews.

16       Q        Okay.  Did you --

17       A        She tells -- and that's in the -- I

18  believe on the initial conference also notes that I

19  have where the employer establish pay -- you know, the

20  rate for the facility.  This is what the facility is

21  paying them.

22       Q        Okay.

23       A        And then based on how much money the

24  facility's paying them, the -- Steadfast -- then she

25  dictates what rates is going to be because that's what

1    determines her profit or lost.

2         Q      What the -- but the facility, the hospital

3    or whatever, they're the ones that determine the rate.

4         A      No.

5         Q      They're not?

6         A      The rate, no.  The rate is determined by

7    Steadfast.

8         Q      Did you call the hospitals to see if

9    that's true?

10        A      No.  Because that information was not

11   given to me by Ms. Pitts.

12        Q      Okay.  But -- but you had the information

13   from which hospitals because --

14        A      No.

15        Q      -- the nurses told you.

16        A      The nurses told me, but I was not -- I

17   didn't get no information, you know, exactly the

18   number -- the phone number to call them, but I took the

19   information from Ms. Lisa Pitts where she told me

20   she -- she has an agreement with -- and that's in the

21   contracts.  We have contract she has with the

22   facilities and they dictate what's the rate of pay

23   for -- so why would I have to call?

24        Q      Did you say that the facility determines

25   the rate of pay?

```
 1        A        No.  The facility has -- I'm an agency.  I
 2   work at employee agency and I need ten CNAs.  I will
 3   pay the CNAs.  There's an agreement between the -- the
 4   CNA -- the registry office, you know, the agency, and
 5   the facility.  The agreement between employee or
 6   independent contractor as -- as they -- she wants to
 7   call them is a different agreement on rates.  They
 8   negotiate the rate, but the rate is dictated by
 9   Ms. Pitts, not by an employee.
10        Q        Okay.  Did you talk to some of the nurses
11   who -- who had negotiated the rates regularly with
12   Steadfast?
13        A        It's on the interviews.
14        Q        Some of the ones that negotiated it?
15        A        Not negotiated.  It was dictated by
16   Ms. Pitts.
17        Q        Did you know that many of these agents
18   negotiate their rates with Steadfast?
19        A        No.
20        Q        Would that have changed your analysis if
21   you knew that fact?
22        A        If they negotiated the rate?  Some of this
23   agency or you talking about independent contractors?
24        Q        The nurses negotiate how much they're
25   going to get paid with Steadfast.  They do it all the
```

Maruca - Davis                    196

1   time.

2        A      It would not change my -- my view because

3   when you go to McDonald's or to a Burger King or to any

4   job -- just like if you go to a company, you dictate --

5   you say, Hey, how much you going to pay me?

6        Q      Yeah.

7        A      And if you say, I want to pay you 50,000 a

8   year. I say, No. I'll go for 55.  It's bargaining.

9   It's an agreement between employee and employer.

10        Q      Did you know that the nurses negotiate the

11   rates for each independent job and that sometimes they

12   want special perks and benefits?

13        A      Yes.  That was based on the distance that

14   they have -- that's in the -- in the interviews.  Based

15   on the distance that they had to travel to work for

16   these jobs.  Some of them they have to travel like

17   fifty miles away from their residence.  That's why the

18   negotiation was --

19        Q      Okay.

20        A      -- in place.

21        Q      All right.  Now, during this phone call

22   that you overhead where the facility was calling

23   Ms. Pitts and complaining, how do you know what the

24   facility was saying to Ms. Pitts?

25        A      Because it was done in front of me.

 1         Q        You could hear the phone?

 2         A        Yeah.  I could hear what the conversation

 3    was and what Ms. Pitts was saying.

 4         Q        Okay.  How -- was that a really important

 5    factor for you?

 6         A        It was -- it was not really -- they have

 7    different factors, but that tells me -- that explain to

 8    me why would somebody call the agency to complain about

 9    someone when it is a relationship between the

10    independent contractor and facility, you know.

11         Q        Couldn't it have been that they said, When

12    you send contractors to us, pick a different one.  We

13    don't want this one anymore?

14         A        No.

15         Q        Why couldn't it have been that?

16         A        It wasn't like that because it was very

17    clear what they were talking about in front of me.

18         Q        Okay.  What did they say?

19         A        The problem was that one of the nurses was

20    using some of the medications that were supposed to be

21    the patients in that nursing home or whatever and she

22    was on drugs.  You know, I guess painkillers.

23         Q        Okay.  And what did Ms. Pitts say?

24         A        She says to call the police.

25         Q        Okay.  So Ms. Pitts didn't take any action

Ma5749a - Davis                                     198

1   herself?  She told --

2        A      She call the police.  I don't know what

3   else happened after that because I left right after

4   that.

5        Q      So I'm trying to understand what the issue

6   here is because the facility called to complain about

7   an independent contractor and Ms. Pitts says, It's not

8   my problem. Call the police.

9        A      She did not say it wasn't my problem.  She

10  says, Just call the police.  That was her

11  recommendation.

12       Q      Okay.  Do you know --

13       A      And -- call the police and then we deal

14  with it later.

15       Q      Did Ms. Pitts says those words --

16       A      Yes.

17       Q      -- we'll deal with it later?

18       A      Yes.  Yes.

19       Q      Did she say that she would take any

20  disciplinary action against the contractor?

21       A      Not in front of me.  No.

22       Q      Okay.  Did you -- not in front of you?  So

23  you don't know?

24       A      No.  I don't know.

25       Q      Okay.  All right.  Let's talk about Factor

1    2, the worker's opportunity for profit -- profit or

2    loss dependant on his managerial skill.  Did this

3    factor -- was this an important factor for you?

4         A      Yes, it is.  Because CNAs, RNs, and LPNs

5    don't have to apply any managerial skills to do their

6    job.  Their jobs is basically check temperatures,

7    provide medicines, check pulse, and do things that --

8    this is a matter of -- this is not a -- you know,

9    decisions that have significant impact in the company.

10   That's what you call managerial skills.  You don't need

11   managerial skill to do that job.

12        Q      Okay.  So was there anything on this

13   factor?

14        A      No.

15        Q      Okay.  Number 3 is the worker's investment

16   in equipment or material or his employment of other

17   workers.  Did this factor have any -- there's -- did

18   this factor apply to you in one way or the other?

19        A      Yes.  Because if you are independent

20   contractor, then that means you have all your

21   equipment.  I recall again the painters.  They have

22   their own compressors and everything.  All the

23   equipment's provided by them in order to -- to conduct

24   the job.  When they go to these facilities, they get

25   provided with scrubs.  They might have a stethoscope,

 1   you know, because that's normal.  Maybe they use --

 2   well, I don't know what equipment -- wheelchairs or

 3   stuff like that.  That's all used from the facility.

 4   It's not the independent contractors or the employees

 5   providing all this equipment.

 6         Q      But let's be clear.  What -- what

 7   equipment was your understanding was provided by

 8   Steadfast, not the hospitals?  We're talking about

 9   Steadfast.  What equipment did Steadfast provide to

10   these people?

11         A      What equipment?  It was -- there not

12   equipment proved by Steadfast.

13         Q      Okay.  So --

14         A      It was -- it was provided by the facility

15   where they work.

16         Q      Right.  But that's not Steadfast.  That's

17   a hospital.

18         A      Yeah.  Yeah.

19         Q      So I'm just trying to understand how this

20   factor applies to Steadfast because this is the

21   worker's investment in equipment or material.

22         A      Well, the question in there is if the

23   independent contractors are investing in -- in

24   materials, and they're not investing in materials.

25   They just -- everything is provided.  Most of the tools

1    are provided by the facility.

2          Q        What about stethoscopes?  Did you ask the

3    nurses about stethoscopes?

4          A        Yes.  Some of them, they have

5    stethoscopes.  Some of them don't.

6          Q        Did you ask --

7          A        But that's not -- that's not a large

8    equipment that they need to operate -- to conduct --

9    you know, to conduct the job.  That's -- that's a minor

10   thing.

11         Q        Okay.  What about -- let me -- let me ask

12   you this.  For this factor to go the other way, would a

13   nurse have to bring her own wheelchair?

14         A        If i was an independent contractor and I

15   have a business and I have -- if it's my business --

16         Q        Yes.

17         A        -- I mean, I'm providing all these

18   services, yes, I should have all this equipment in

19   order to provide my -- my services in the proper way as

20   an independent contractor.  If I -- if I'm painter and

21   the person that I'm doing the job says, Can you give me

22   a compressor because I don't have a compressor to do

23   the job --

24         Q        Yes.  Can a nurse ever be an independent

25   contractor?

Case 2:18-cv-00226-RAJ-LRL   Document 356-1   Filed 08/17/22   Page 202 of 306 PageID#
15783
Ma**t**na - Davis                                              202

```
 1           A       A nurse can be an independent contractor?

 2           Q       Yeah.

 3           A       Yes.  She can be an independent contractor

 4    if she has her own business.  I know nurses that have

 5    their own business and they have like home care

 6    providers.  They have different employees working for

 7    them and they have like a home -- home health agency.

 8           Q       Okay.

 9           A       Yeah.  They could be independent

10    contractors.

11           Q       So let's say a nurse wants to be an

12    independent contractor for a hospital.  She's just one

13    nurse.  Could she ever be an independent contractor for

14    a hospital?

15           A       If --

16           Q       She hasn't started a business.  She just

17    wants to work a few hours here and there.

18           A       She could do that?  Yeah.

19           Q       So if she was, would she have to bring all

20    of her own equipment to the hospital or could she show

21    up at the hospital and use their equipment?

22           A       Well, if she's in a hospital -- and I know

23    independent contractors in hospitals.  Most of the

24    equipment is provided by the hospital.  I don't --

25    yeah.  They could be independent contractor.  They
```

```
 1   don't have to bring all the wheelchairs.  It depends on

 2   the agreement with the employer.

 3           Q      Okay.  So would you agree with me that in

 4   the nursing field, independent contractors or nurses

 5   typically rely on the equipment that's in the hospital?

 6   They don't bring their own equipment other than maybe

 7   scrubs, stethoscopes?

 8           A      Yes.  Registered -- registered nurses,

 9   yes.

10           Q      Okay.

11           A      LPNs, CNAs, I don't think so.

12           Q      Okay.

13           A      There is difference between a registered

14   nurse and an LPN.

15           Q      So let's say an LPN.  An LPN -- if an LPN

16   didn't bring their own equipment, they'd be an

17   independent contractor?

18           A      I don't think so.

19           Q      Why?

20           A      Well, there's all the factors that

21   determine -- it's not just having the equipment that

22   determines -- you know, determines whether a person is

23   independent contract or not.  The equipment doesn't

24   decide --

25           Q      I know --
```

```
 1        A        -- whether person is independent
 2   contractor.
 3        Q        -- but we're just talking about one
 4   factor.  I know there's other factors.
 5        A        Yeah.  Yeah.
 6        Q        So why would an LPN -- so you said a
 7   registered nurse could be --
 8        A        If she agrees -- if she agrees to be an
 9   employee, yes.  If she agrees to be independent
10   contractor, of course, if that's in the agreement, but
11   other factors have to come in place.  You know, she has
12   to be free -- she has to be free to make a decision on
13   her own without being, you now, punished by the
14   employer --
15        Q        Yes.
16        A        -- or -- or -- yeah.
17        Q        I understand.  I'm just asking just this
18   factor.
19        A        All right.  Okay.
20        Q        I understand these are factors.
21        A        Okay.
22        Q        But I said could a nurse be an independent
23   contractor --
24        A        Yes.
25        Q        -- and not bring their own equipment and
```

```
 1  you said yes for an RN but not for an LPN.  I'm trying

 2  to understand why it's different.

 3        A     Well, normally RN -- well -- well, I --

 4  maybe I should retract that answer.  I should say, Yes,

 5  they could be independent contractors.

 6        Q     Any person could be?

 7        A     Anybody could be an independent contractor

 8  as long as you have your own business.  Yeah.

 9        Q     So what does that mean, As long as you

10  have your own business?

11        A     That --

12        Q     What does that mean?

13        A     There's -- it's a thin line that defines

14  independent contractors, so making the determination

15  whether someone is independent contractor doesn't mean

16  if this person has equipment or not.  That's not -- my

17  determination was not decided on that factor only.

18        Q     But what does it mean to have your own

19  business?

20        A     What does it mean being independent?

21        Q     No.  What does it mean to have your own

22  business?  You said if they have their own business.

23  What does that mean?

24        A     If they have their own business they could

25  come and go whenever they want.
```

```
 1        Q       Okay.  So does having your own business
 2   mean that you have to have an LLC or a corporation?
 3        A       Normally, yes.
 4        Q       Are there exceptions to that or not?
 5        A       Not that I'm aware.
 6        Q       So if a -- if an -- okay.  So if -- if a
 7   nurse is going to be an independent contractor, the
 8   first step that they have to do is they've got to form
 9   an LLC or a corporation?
10        A       I'm not aware of that decision, so I can't
11   answer that.
12        Q       Well, you said to be an independent
13   contractor you have to have your own business, right?
14        A       You have to have your own business.  Yeah.
15   Correct.
16        Q       And to have your own business --
17        A       That some of the questions that we always
18   ask.  Yeah.
19        Q       Okay.  And to have your own business you
20   have to have an LLC or a corporation, right?
21        A       Uh-huh.
22        Q       Is that a yes?
23        A       Yes.
24        Q       Okay.  So put them together.  So if a
25   nurse wanted to be an independent contractor, he or
```

1   she, generally a she -- gosh, I don't know.  It just

2   seems like they're a she but I have friends that are

3   male nurses.  Sorry.  That didn't matter.

4            MS. AMIN:  It's been long day.  I'm going

5        to give you that.

6

7   BY MR. DAVIS:

8        Q      Let's start from scratch.

9        A      If she -- if she wants to make the legal

10  way, yes, that's the requirement.

11       Q      Okay.  Yeah.  So in other words, in order

12  for a nurse to be an independent contractor, that nurse

13  would have to form an entity like an LLC or a

14  corporation; is that right?

15       A      I would say yes.  Yeah.

16       Q      Okay.  Okay.  Very good.  All right.

17  The -- anything else with regard to Factor 3, the

18  worker's investment in equipment or material, that you

19  felt favored that these individuals were, in fact,

20  employees?

21       A      No.

22       Q      Okay.  And to be clear, are you aware of

23  any equipment or material provided by Steadfast to the

24  nurses?

25       A      No.

1      Q      The fourth factor is the degree of skill

2  required for the work.  Did this factor weigh in favor

3  of employee or independent contractor?

4      A      Steadfast requires every single employee

5  to have their certification.  You know, like CPR

6  qualified, stuff like that.  They have to have those

7  qualifications in order for them to be able to work at

8  the facilities.  That -- those requirements don't -- if

9  they don't meet their requirements, then they can't

10  have -- they can't work for either the facility or

11  Steadfast.

12      Q      Okay.  So how did this factor weigh in

13  favor of them being employees, not independent

14  contractors?

15      A      How?  Because in order for them to work,

16  they have -- they required to have certification.  The

17  same thing as in home health agencies.  If they -- if

18  they don't have these certifications, the facilities --

19  could be either Medicare or, you know, whoever inspects

20  them, you know, for those requirement -- that's the

21  first thing they going to check because they have to

22  have a folder where they have all these --

23      Q      So let me just make sure I understand.

24  Your position is because Steadfast requires these

25  nurses to have a certification, because of that fact,

 1   that's one of the reasons why they should be classified

 2   as employees?

 3          A       That's one of the reasons.  Yes.

 4          Q       Anything else?

 5          A       Uh-huh.

 6          Q       Five is the permanence of the working

 7   relationship.  How did this factor go in favor of

 8   employee or independent contractor?

 9          A       Employee -- employee/employer relations.

10   That's determined on the payroll records.  How long had

11   they been working for this company?  Pay stubs also

12   show that there is a relationship between the two of

13   them.  What else?  I think that's it.

14          Q       Nothing else?  Just the payroll records

15   and the pay stubs?

16          A       The payroll records.  The pay stubs.  No.

17   That's it, I think.

18          Q       Okay.  And six is the degree to which the

19   services rendered are an integral part of the

20   putative -- excuse me, putative employer's business.

21   How did that factor weigh in favor of independent

22   contractor versus employee?

23          A       Well, Steadfast is one entity.

24   Employee -- quantity of employees is like 200, 300 RNs,

25   LPNs, and CNAs.  If they disappear, this disappear.

1    This appears they could work for on -- you know, they

2    could go and look for jobs somewhere else, but this one

3    the weight is -- this becomes integral part of this --

4    of this company.

5          Q      So anything else?

6          A      No.

7          Q      Okay.  So am understanding what you're

8    saying is that it's -- it's because the nurses are --

9    they play an important role?

10         A      They're an integral part of the company.

11         Q      How do you know that?

12         A      How do I know that?  Because when I asked

13   Ms. Lisa Pitts what type of workers do you have here,

14   that's what she mentioned, CNAs, LPNs, and -- and the

15   other one, LPNs.  Yeah.  That's it.

16         Q      How do you know that they're an integral

17   part of the business though?

18         A      Because she told me -- Lisa Pitts told me

19   that's the only employees that she always searching

20   for, you know, to provide the facilities, the nurses

21   homes, the hospitals.  That's the integral part of this

22   business.

23         Q      Okay.

24         A      If she fails to find any -- any CNA

25   required for any job, then she cannot make money.

 1    That's basically it.  She cannot make money.  If these

 2    people doesn't show up for work, she cannot make money.

 3    There is a contract between facilities and Steadfast.

 4         A     Okay.  Let's look at --

 5              MR. DAVIS:  Let's go off the record.

 6              (At 4:00 p.m. a recess was taken.  At 6:00

 7         all parties were present and the following took

 8         place on the record:)

 9

10    BY MR. DAVIS:

11         Q     All right.  Let me ask you some questions

12    regarding -- this is similar to the factors that I

13    asked you about, but I'm going to ask you about some

14    specific scenarios.  I'm just asking if -- if based on

15    these scenarios if -- if they applied to Steadfast or

16    if they didn't, if they would indicate that Steadfast

17    was an independent contractor -- or that the Schedule A

18    individuals were independent contractors or employees.

19    Does that make sense?

20         A     Uh-huh.

21         Q     So if Steadfast provided basic background

22    checks of the nurses prior to putting them on the

23    registry or on their list, would that be an indication

24    whether they were independent contractors or employees?

25    Would you go either way?

```
 1        A       I'm not sure about that one.

 2        Q       You don't know?

 3        A       No.

 4        Q       Okay.  That's fine.  If they -- if they

 5   did a check, like if they checked criminal history,

 6   credit report, licensing, credentials, things like

 7   that, does that suggests that they were employees?  The

 8   fact that they did that kind of check?

 9        A       I cannot answer yes or no on that one.

10        Q       Okay.  No problem.  All right.  Do -- is

11   it your understanding that the -- that Steadfast has no

12   ability to, quote, hire or fire these nurses?  They

13   could come and go whenever they wished?

14        A       I'm not sure.  I'm not sure about that

15   one.

16        Q       You don't know if they could come or go?

17        A       Well, Ms. Pitts can fire them.  Yes.

18        Q       Who can fire them?

19        A       Lisa Pitts can fire them.

20        Q       How do you know that?

21        A       Because it was told by the -- on

22   interviews.  She could make the decision of not

23   providing the hours to anybody.  She controls that.

24        Q       Let's look at that because I didn't see

25   that anywhere in the interviews.  I'd like to know
```

1    where you saw that.  Show me -- these are all the

2    interviews.  Show me where it says --

3                MR. DAVIS:  Actually, this is my copy.  Do

4         we have the witness copy of Exhibit 2?

5

6    BY MR. DAVIS:

7         Q       Could you give me an example in any of

8    them that nurses said that Lisa could, quote, hire or

9    fire them?

10        A       They might not have said precisely fire or

11   and hire them.  Well, they could hire them because

12   that's when -- it's not the words that they use, but --

13        Q       Well, it's not the word that they use

14   because Steadfast finds hospitals for nurses and says,

15   If you want to work there, you can, and if you don't,

16   you don't have to.

17        A       It's the same way as if you call

18   independent contractor and say, You hired. You fired.

19        Q       No.  How is it the same?

20        A       If you painting and I don't like the way

21   you're painting, I fire you.  If it your business, you

22   could go and get someone else.

23        Q       But you're confusing the issue, right,

24   because --

25        A       No.  I'm not confusing the issues.  I'm

1   comparing the issues.  You gave me a scenario.  I'm

2   giving you my scenario.

3        Q       Okay.  But it is your position --

4        A       Okay.

5        Q       But is it your position the hospital could

6   say, I don't want you here anymore, or that Steadfast

7   could say, I don't want you here anymore?  That's the

8   difference.

9        A       It could be from either way.

10       Q       Okay.  So --

11       A       The facility could tell Steadfast, We

12  don't want this lady anymore.  Don't send us this lady

13  anymore.  Then she decides not to bring her anymore.

14       Q       Okay.

15       A       That's firing.

16       Q       How do you know -- that's firing?

17       A       Yeah.  That's -- that's terminating

18  somebody's opportunity to work.

19       Q       But they could go work for a different

20  facility.

21       A       Yeah.  They could go to a different

22  facility, not Lisa Pitts.  They could go to a different

23  company.

24       Q       Wait a minute.  How do you know that fact?

25  You're assuming -- you're making that fact up.

Matossa - Davis                                    215

```
 1      A      Because some of these employees that no

 2   longer work for them, for Lisa Pitts, they work for

 3   somebody else.

 4      Q      Okay.  But I want to know what evidence

 5   supports it.  You're saying it.  Where -- where is that

 6   coming from?

 7      A      Okay.  With Ms. Lisa Pitts, if I wasn't

 8   called by her, I will not have a job.  Ms. Lisa tell --

 9   will text us the places where I could work.  Ms. Pitts

10   never have any situations where I do have to be

11   counseled or -- this is one of them.  You want me to

12   look at all the interviews and tell you where?

13      Q      I read them all.

14      A      Okay.

15      Q      I read them all.  I just don't

16   understand --

17      A      Well, sometimes people can read something

18   and not find the words in there, you know.  So you want

19   me to look for the answer for you?  Is that what you

20   want me to do?

21      Q      Maybe pause for a minute.  This is what

22   I'm trying to understand.  If a nurse calls

23   Steadfast -- are you tracking with me?

24      A      Yeah.  I'm listening.

25      Q      Okay.  A nurse calls Steadfast and says,
```

1   Hey, I want to work on Wednesday. Do you have any

2   openings?  Steadfast says, Let's look. One of these

3   hospitals has an opening. Do you want to work there?

4   and the nurse says, Sounds good.  So she accepts it and

5   she goes and works there, right?

6        A      Uh-huh.

7        Q      What -- that's the relationship.  How --

8   do you have evidence at all from anybody where

9   Steadfast has said to a nurse, Get out of here. You're

10  not allowed to work, or, We are not going to place you

11  with any hospitals ever?

12       A      No.  I don't have that.

13       Q      Okay.  That's what I'm saying.  You don't

14  have any evidence that Steadfast, quote, fired anybody;

15  is that right?

16       A      I don't have any evidence that she fired

17  someone.  You're right.  I don't have anything that

18  where it says that someone was fired.

19       Q      So how do you -- what evidence do you have

20  that they could?

21       A      What evidence do I have that they could?

22       Q      Yes.

23       A      The law -- the law says that if an

24  employer hires  -- they could have, you know, the power

25  to hire or fire someone.

1        Q       Okay.

2        A       Right?  Basically -- so you basically

3   telling me that an employee cannot be fired.

4        Q       But how is that different than an

5   independent contractor?

6        A       How can you prove if someone has been

7   fired, not fired?  The only way to find out is look at

8   the record, the payroll.  Yeah.  The payroll records

9   the timeframe where someone works for somebody and when

10  they was terminated.  I believe one of -- one of the

11  documents in the case file -- I cannot recall right

12  now, but she has when they were terminated, when they

13  finished their job or not.  Whether they were fired or

14  not, I don't know.  Whether they quit or not, I don't

15  know.  Whether they were laid off or not, I don't know.

16  I don't know the answer.  Only Ms. Pitts knows the

17  answer.  I'm only allowed to see what Ms. Pitts provide

18  me.  She provide with only a few addresses from some

19  employees because she didn't want to provide with the

20  whole thing, so I'm limited to whatever information

21  that the employer provides.

22       Q       Okay.  All right.  Are you aware of the

23  fact that after Steadfast -- you can stop.  It's okay.

24       A       I'm listening.

25       Q       Okay.

```
 1          A       I'm listening.

 2          Q       I just don't -- are you aware that after

 3   Steadfast links a nurse up to a hospital that at that

 4   point Steadfast no longer participates in the

 5   connection between them?  It's now between --

 6          A       That's not true.  Pay stubs, payroll

 7   records shows different.  If person was in somebody

 8   else payroll, then it will appear in the facility's

 9   payroll.

10          Q       So if the payroll is --

11          A       Now, if the payroll shows that this

12   employee is working for this individual, for this

13   employer --

14          Q       Okay.

15          A       -- the payroll shows a common -- a

16   constant behavior, you know, the same name appears

17   every payroll record.

18          Q       Okay.

19          A       It doesn't appear on the facility's

20   payroll record.

21          Q       But how do you know?  You didn't ask the

22   facility.

23          A       How do I know?  Because it's here.  Who

24   pays the -- who's paying the wages?

25          Q       Let me ask you about that.
```

```
 1       A       No.  Who -- who's paying the wages?  Is it

 2  Steadfast?  Did you see the proof?  Who's paying the

 3  wages?  Steadfast.  Medical Staffing of America is

 4  paying the wages.  Who owns the Medical Staffing of

 5  America?  Ms. Lisa Pitts.  So who's paying the wages?

 6  Not the facility.  The employer.

 7       Q       So is the fact that Steadfast is paying

 8  the money to those individuals, does that mean that

 9  they're employees?

10       A       It is.

11       Q       Okay.

12       A       It's common control.  I'm paying you.  I

13  have you every week you coming to work for me.  That's

14  common control right there.

15       Q       Let me -- I'm going to read a statement to

16  you and tell me if you agree with this.  Okay?

17       A       Okay.

18       Q       Okay.  A registry often performs payroll-

19  related functions for its clients.  These functions

20  include, for example, calculating the amount of wages

21  owed based on hours worked at the previously determined

22  rate of pay, making the appropriate tax deductions,

23  administering benefits that the caregiver has requested

24  and for which the caregiver pays, and issuing a check

25  or electronic deposit if the client provides the funds
```

```
 1   directly or via an escrow account.  The registry's

 2   performance of such payroll functions does not indicate

 3   that the registry is the caregiver's employer.

 4        A     What are you reading this from?

 5        Q     I'm just asking if you agree.

 6        A     Yes.

 7              MS. AMIN:  I'm just going to object.  I

 8        think that's a pretty long statement and

 9        narrative, so if you could break down the

10        question.

11

12   BY MR. DAVIS:

13        Q     Let me just ask you to read this.  Can you

14   just read just that paragraph there?

15        A     Okay.

16        Q     I'm just going to hold the document

17   because I'm going to go -- I have my notes on it so --

18        A     What does this document comes from?

19        Q     I'll get to that, but I just want to know

20   if you agree with this paragraph right here.

21        A     No.  I disagree with that.

22        Q     You disagree with it?

23        A     Yeah.

24        Q     Okay.  Okay.

25        A     Is that a document that I reproduced or --
```

```
 1          Q      I'll get to it in just a minute.

 2          A      Okay.

 3                 MS. AMIN:  Unfortunately he gets to ask

 4          all the questions.

 5                 THE WITNESS:  Okay.

 6                 MR. DAVIS:  It's totally unfair.  I'm

 7          sorry.

 8                 THE WITNESS:  Okay.

 9                 MS. AMIN:  So you just wait for the

10          question and your job is to answer the question

11          before you.

12                 MR. DAVIS:  I know seems mean because I

13          can ask and you can't, but that's the way rules

14          are.

15

16   BY MR. DAVIS:

17          Q      Okay.  Here's another statement.  A

18   registry -- if I read it is that okay or do you need to

19   read it?

20          A      Okay.

21          Q      A registry often informs its client that a

22   potential caregiver meets the client's threshold

23   perimeters and preferences and then introduces the two.

24   The registry does not further participate in the hiring

25   process.  The client is free to accept or decline
```

```
 1   services from the referred caregiver.  If the client

 2   hires the caregiver, the registry usually has no right

 3   to alter or terminate the terms and conditions of the

 4   caregiver's employment.  As with hiring, the ultimate

 5   determination decision is the client's.  A registry's

 6   inability to hire and fire employees indicates that the

 7   registry is not an employer of the caregiver.  Do you

 8   agree with that or disagree?

 9        A      I disagree with that.

10        Q      Okay.  Okay.  I'll keep going.  Here's

11   another statement.  Are you ready?  Is this okay

12   reading?  Is this okay?

13        A      Yeah.

14        Q      Okay.  A registry commonly facilitates

15   initial communication between the caregiver and the

16   client.  The caregiver and the client thereafter may

17   independently determine work schedules and assignments.

18   A registry's lack of control over work schedules and

19   assignments may indicate that a registry is not the

20   caregiver's employer.  Conversely, a registry's

21   exercise of control over the caregiver's work schedules

22   and assignments may indicate the registry is an

23   employer of the caregiver.  Do you agree with that or

24   disagree?

25        A      Disagree.
```

```
 1        Q       Okay.  Okay.  I'm moving through this
 2   fast.  All right.  A registry does not plan and provide
 3   care for the client, but might seek information
 4   concerning the type of care the client needs for
 5   matching purposes.  The caregiver may not receive any
 6   instruction from the registry about how to care for
 7   clients.  After that referral, a registry may choose to
 8   not monitor or manage the caregiver's methods or work
 9   habits.  The registry may not, for example, instruct
10   caregivers how to provide caregiver services, monitor
11   or supervise caregivers in clients' home or evaluate
12   caregiver's performance.  The absence of such control
13   indicates that a registry is not an employer of the
14   caregiver.  Do you agree or disagree?
15        A       Well, I cannot agree or disagree on this
16   one because I'm not aware of this information, where
17   you get it from, so --
18        Q       But this -- so this one you don't know?
19   It could go either way?
20        A       It could go either way.  Yeah.
21        Q       Okay.  Okay.  On the other hand, a
22   registry may provide training and control of the
23   caregiver's services after making the referral.
24   Control over the caregiver's services indicates that a
25   registry is an employer of the caregiver.  Do you agree
```

 1   with that?

 2       A       The registry's an employer?  Yes.  I agree

 3   with that.

 4       Q       Do you -- do you believe that registries

 5   are always employers?

 6       A       I agree with that.

 7       Q       Registries are always employers?

 8       A       Uh-huh.

 9       Q       Okay.  A registry typically does not

10   determine a caregiver's rate of pay.  The client

11   instead negotiates the rate of pay directly with the

12   caregiver.  In the alternative, Medicaid or another,

13   excuse me, government program may determine the actual

14   rate -- wage if they are funding the services.  Either

15   scenario indicates that the registry is not determining

16   the caregiver's rate of pay and, therefore, may

17   indicate that the registry is not an employer.  Do you

18   disagree with that?

19       A       Disagree with that.  I believe Ms. Lisa

20   Pitts was doing the opposite.

21       Q       Okay.  Very good.  But you disagree with

22   that statement?

23       A       Yes.  I disagree because she was the doing

24   the opposite.

25       Q       Similarly, a registry's action as a

1    liaison that merely relays communications, offers, or

2    counteroffers between the client and caregiver does not

3    indicate that the registry is controlling the caregiver

4    or acting as the caregiver's employer.  Do you disagree

5    with that?

6          A      I disagree with that.

7          Q      Okay.  All right.  A registry may charge

8    clients a one-time up front fee for the services of

9    matching caregiver and client.  It may likewise perform

10   and charge fees for administration or administerial

11   functions like processing payroll or producing tax

12   documents.  Such charges do not indicate that the

13   registry is an employer.  Disagree?

14         A      Disagree.

15         Q      A registry may instead choose to charge

16   fees that fluctuate based on the number of hours that a

17   caregiver works for a client.  Such a registry -- I'll

18   skip that one.  I think we've already talked about

19   that.

20                Okay.  Okay.  Here's another one.  A

21   registry does not typically create and confirm records

22   of a caregiver's hours worked.  It may perform payroll

23   services after the client or caregiver submits time

24   records as discussed above, but that does not indicate

25   that the registry is the caregiver's employer.

1    Disagree?

2         A       I disagree with what.

3         Q       Okay.  A registry might collect time

4    sheets from caregivers or offer an electronic time

5    verification system.  A registry may also require the

6    correct completion and submission of certain time

7    sheets for purposes of payroll processing.  These

8    activities do not indicate that the registry is the

9    caregiver's employer.  Disagree?

10        A       Disagree.

11        Q       A registry typically invests in office

12   space, payroll software, timekeeping systems, and other

13   products to operate its business.  A registry may also

14   provide caregivers with an option to purchase

15   discounted equipment or supplies from either the

16   registry or a third party.  These actions alone do not

17   indicate that a registry is a caregiver's employer.

18   Disagree?

19        A       Disagree.

20                MR. DAVIS:  Okay.  I'm going to mark this

21        one as Exhibit 3, please.

22                THE COURT REPORTER:  It would be Exhibit

23        4.

24                MR. DAVIS:  Really?  You're right.  It's

25        good thing you're on top of it.  Then I shouldn't

```
 1          mark it as Exhibit 3, should I?

 2                    (Marked in evidence as Alvaro Exhibit

 3          Number 4.)

 4

 5   BY MR. DAVIS:

 6          Q     All right.  Okay.  I'm showing you a

 7   document and I just read some statements to you.  Have

 8   you ever seen this document?

 9          A     I believe so.

10          Q     Okay.  And tell us what this document is.

11          A     This is a field assistance bulletin --

12   bulletin that, you know, it comes monthly or -- or --

13   but it's information from Department of Labor.

14          Q     Is this one of those documents we talked

15   about earlier that you get that helps you with kind of

16   continuing education and what's -- understanding what's

17   happening?

18          A     This is -- yes.  This is one of them.

19          Q     Okay.

20          A     Uh-huh.

21          Q     This one is July 13, 2018.  It's Field

22   Assistance Bulletin Number 2018-4.

23          A     Uh-huh.

24          Q     Would you have received a copy of this?

25          A     We get a copy of this.  This was before
```

1    the -- that -- my investigation -- prior to my

2    investigation when I did my final conference and

3    everything was done, so I was not aware of this during

4    my investigation.

5         Q       Okay.  But when I asked you those

6    questions, the -- well, strike that.  Would you

7    consider this -- this document I'm showing you,

8    assuming this is an accurate of the original, an

9    authoritative source for you in making your

10   determinations?

11        A       The -- I might be able to use it as a tool

12   to make a determination, but -- but this will not mean

13   it's final.  It's just an assisting bulletin, but it's

14   not the final --

15        Q       Okay.

16        A       -- decision, you know.

17        Q       Sure.  Are these designed, these field

18   assistance bulletins, are they designed to provide

19   guidance to people in your position?

20        A       Yes.  Sometimes we use them as guidance.

21   You know, cases, you know, that we can't recall.

22        Q       Okay.  Yeah.  If -- if you receive, for

23   example, this particular one, would you consider it to

24   be something that you're supposed to follow or can you

25   just disregard it?

1      A      I can follow it, you know, if it has good

2    information that could help me to -- for a case.  Yeah.

3    I can follow it.

4      Q      Are you permitted to go completely against

5    it?

6      A      No.  Not necessarily.  No.

7      Q      All right.  So -- so you're supposed to

8    follow it?

9      A      I will -- I will -- I will verify this and

10   I will verify it to make sure that also the regulation

11   has been changed, whether they match.

12     Q      Okay.  Do you know, have the rules -- the

13   case law on the -- on FLSA, do you know -- have the

14   rules substantially changed between, let's say, 2015

15   and today?  Any substantial changes?

16     A      Yeah.  There's been a lot of substantial

17   changes.  Caregivers.  Home caregivers.

18     Q      Okay.

19     A      There's been changes overtime for home

20   caregivers.

21     Q      What about those questions I asked you,

22   your answers to those questions, is it the same in 2015

23   as it is today though?

24     A      In 2015 it would have been different.

25   Yeah.

Mal~sda - Davis                               230

```
 1        Q       What --

 2        A       The -- the ones in 2015?

 3        Q       Yeah.

 4        A       I'm not sure about that.  I cannot answer

 5   that because I didn't -- I don't recall looking at --

 6        Q       Sure.  Well, let's talk about 2017 really.

 7   You did your investigation in 2017?

 8        A       Uh-huh.

 9        Q       Okay.  All of those questions I just asked

10   you, all of those obnoxious long questions --

11        A       Uh-huh.

12        Q       -- the answer to those questions applies

13   today -- your answer applies today as it did in 2017

14   and 2018, right?

15        A       Uh-huh.  Correct.

16                MR. DAVIS:  Okay.  All right.  Let's mark

17        this --

18                THE WITNESS:  Would you like this?

19                MR. DAVIS:  Yeah.  Just stick it in this

20        pile here.

21                We'll mark this as Number 5.

22                (Marked in evidence as Alvaro Exhibit

23        Number 5.)

24

25
```

1  BY MR. DAVIS:

2      Q      What we've marked as Exhibit 5 is

3  something that was included in the -- in your report.

4  What did you feel was the significance of this

5  document?

6      A      This is the last payroll record prior --

7  prior to my visit to employer.

8      Q      Okay.  And was there anything about

9  this -- the fact that it says, RUN powered by ADP, did

10  that mean anything to you?

11     A      Different companies have different --

12  different accounting companies.  You know, they use

13  different software, so I don't pay attention to RUN

14  by --

15     Q      I was referring to this right here.  That.

16     A      Powered by ADP?  ADP has different --

17  yeah.  Some people use ADP.  Some people use other

18  programs.  Yeah.

19     Q      Do you know, does ADP -- with ADP can you

20  run independent contractors or employees through ADP?

21  Either one?

22     A      No.

23     Q      You can't?

24     A      I'm not sure.

25     Q      Oh, you don't know.  It could be?

1        A      I don't know.  I don't know that.

2        Q      Okay.  No problem.  Does the fact that

3   that says employee right here, does that -- just

4   because it says it, does that mean that they are

5   employees or you can't tell?  Just because it says it,

6   you don't know?

7        A      I see it in there, but it can't tell.  I

8   don't base my decision on that.

9        Q      Okay.  Got it.  Very good.

10             MR. DAVIS:  We'll mark this as Number 6.

11             (Marked in evidence as Alvaro Exhibit

12         Number 6.)

13

14  BY MR. DAVIS:

15        Q      This is a document that was also attached

16  to your report.  Can you tell us why you included

17  this -- this is one of many.  Why did you include this

18  and what was the significance of this?

19        A      Well, this is a template that we use, what

20  we call a WH-55.  It's --

21        Q      That's what you were telling me about

22  earlier.  Okay.  Is this how you make calculations as

23  to what you think the -- the overtime should have been?

24        A      This is how I transcribe -- I transcribe

25  all the information --

 1          Q       Okay.

 2          A       -- into this.

 3          Q       Got it.  All of this information you

 4   inputted yourself?

 5          A       Uh-huh.

 6          Q       Okay.  Got it.  And then the second page

 7   it says compliance officer.  Is that you?

 8          A       That's my initials.  Yes.

 9                  MR. DAVIS:  Okay.  Very good.  All right.

10          Just mark this as an exhibit too.  We'll mark this

11          as Exhibit 7.

12                  (Marked in evidence as Alvaro Exhibit

13          Number 7.)

14                  MR. DAVIS:  I forgot this one.

15

16   BY MR. DAVIS:

17          Q       This is DOL167.  We marked it as 7.

18   According to the privilege log, this is e-mail

19   communications that have been withheld on the single

20   basis of informant's privilege.  I'm going to ask the

21   witness to identify what has been redacted in DOL-165

22   to the extent it includes individuals who are no longer

23   working with Steadfast.

24                  MS. AMIN:  Objection.  Informant's

25          privilege, and I'm going to instruct the witness

```
 1          not to answer based on our invocation of the
 2          privilege.
 3                  MR. DAVIS:  Okay.
 4                  We'll mark this as Exhibit 8.
 5                  (Marked in evidence as Alvaro Exhibit
 6          Number 8.)
 7
 8  BY MR. DAVIS:
 9          Q      This is a document that was included as
10  part of your report.  It's an acknowledgement and
11  waiver.  Did this document have any impact on your
12  determination that the individuals on Exhibit A were
13  employees as opposed to independent contractors?
14          A      Yeah.  This definitely was provided by one
15  of the people that I interviewed.
16          Q      Okay.
17          A      Actually, it came from one of the
18  facilities.
19          Q      It came from a facility?
20          A      Yeah.  If you look at the -- if you read
21  it, it says, Steadfast perform services Alamance --
22  Alamance Health and Rehabilitation Center.
23          Q      Yes.
24          A      That's what it says there.
25          Q      But it was provided to you by one of the
```

1   Schedule A individuals?

2        A      Yes.

3        Q      Okay.  And why is it not signed?

4        A      Not Schedule A.  It was provided by one of

5   the individuals in the -- that I interviewed.  Yeah.

6        Q      Are the people that you interviewed -- did

7   you interview people that are not listed on Schedule A?

8               MS. AMIN:  You can answer that.

9        A      There is some people that are not listed

10  on the -- yeah.  I believe so.  Yes.  There are some

11  people that I -- that I interviewed that are not listed

12  on Exhibit A.  There might be one -- one -- yeah, one

13  person because I collecting -- remember, I collect

14  interviews in the office.

15

16  BY MR. DAVIS:

17       Q      You think it's just one person?

18       A      I'm not sure exactly how many, but there

19  was -- I can't remember.

20       Q      Yeah.  Well, there's -- we counted it up

21  and there's actually nine people that you interviewed.

22       A      Okay.

23       Q      I think it's nine.

24               MS. AMIN:  Nine.  Uh-huh.

25

1  BY MR. DAVIS:

2       Q     Right.  Nine.  And you think it's one,

3  maybe more?

4       A     It might -- maybe more.  Yeah.  It could

5  be maybe more because I'm supposed -- when I doing

6  interview --

7              MS. AMIN:  Can I interject too?

8              THE WITNESS:  Yeah.

9              MS. AMIN:  It's a mix of statements from

10        the independent -- from independent contractors

11        and the office staff.  To the extent that that

12        highlights his answer, I just wanted to put that

13        out there.

14              MR. DAVIS:  That's -- that was my

15        assumption as well.

16              MS. AMIN:  Okay.

17

18  BY MR. DAVIS:

19       Q     When you look at these interviews -- you

20  can look at my copy.  This one says phone.

21       A     Yeah.  Most of them say phone.  Yeah.

22       Q     But if we skip ahead maybe towards the

23  end, some of them say establishment.

24       A     Uh-huh.

25       Q     The ones that say establishment, were

1   those the ones that were of the office workers?

2        A       Correct.

3        Q       And so the establishment, those might be

4   the ones that are not on Exhibit A?

5        A       They might not be on Exhibit A.

6        Q       And it looks like there is one, two --

7   maybe just two, so if there's only two that say

8   establishment, those are the people that -- there would

9   be two then?

10       A       Uh-huh.

11       Q       Okay.  Okay.  So now with regard to

12  Exhibit 8, did this document play any role in your

13  determination that the Schedule A individuals were or

14  were not employees?

15       A       Any document that is submitted by -- by

16  the people that I interview with the complaint --

17       Q       Yeah.

18       A       -- I have to put it in -- in the case

19  file.

20       Q       Oh, sure.  I understand that.

21       A       Yeah.

22       Q       I'm just asking -- you put it in there --

23       A       Yes.

24       Q       -- but I'm asking did this document -- was

25  there anything in this document that caused you to go

```
 1   one way or the other?

 2        A     No.

 3        Q     Did this have any bearing on your

 4   decision?

 5        A     No.  I didn't make any decisions on this

 6   one.  No.

 7        Q     Okay.  All right.  So the fact, for

 8   example -- okay.  All right.

 9        A     Because I receive -- I receive -- I'm

10   sorry.

11        Q     It's okay.  You can answer the question.

12        A     I was -- along with this type document, I

13   received other contracts that you might have in there

14   that say the opposite.

15        Q     Yeah.

16        A     So it was contradictory.  You know, this

17   one says one thing and another says another thing,

18   so --

19        Q     This Exhibit 8 is contradictory to what

20   document?

21        A     Exhibit 8?

22        Q     The one you have in front of you.  What

23   document?

24        A     Because there's another -- I thinking one

25   of the depositions we look at another contract.  I
```

 1   can't remember what is it.  I have a copy -- I think

 2   there was a copy in my case file from that contract,

 3   and that contract says something different than what

 4   this one says, so Ms. Lisa Pitts have different

 5   contract online.  There was an online contract,

 6   application, so this not -- this document was not a

 7   turning -- a turning point for me to decide whether

 8   she's an employee or not.

 9        Q     No -- it had no weight at all?

10        A     No.

11        Q     None?

12        A     No.

13              MR. DAVIS:  Okay.  Got it.

14              All right.  This we'll mark this as 8.  Or

15        that one was 8.  This is 9.

16              (Marked in evidence as Alvaro Exhibit

17        Number 9.)

18

19   BY MR. DAVIS:

20        Q     This document was also part of your file.

21   Do you know what this document is?  I couldn't figure

22   it out.

23        A     Yeah.  Missing some.

24        Q     I was hoping you --

25              MR. DAVIS:  You know what?  Let's do

```
 1            something.  This is the second page.  Let's mark

 2            these together.  I wish I had a stapler, but let's

 3            make that a part of Exhibit 9.

 4

 5   BY MR. DAVIS:

 6            Q       Do you know what this document is?

 7            A       Yeah.  This is an application that they do

 8   online.

 9            Q       Who does on online?

10            A       The employees or the candidate goes online

11   and they fill this application.  Then it goes to

12   Ms. Lisa Pitts.  She's the one that checks, either her

13   or the recruiters that she -- that were working at that

14   time for her.  They look at these applications and then

15   they --

16            Q       Okay.

17            A       I don't know what -- what else they do

18   after that, but I believe they do like a screening

19   process to see if this person is a person -- a good

20   candidate to fill any positions in the company.

21            Q       Are you sure that this is something that

22   Steadfast has them fill out and not the facility?

23            A       I'm not absolutely a hundred percent sure,

24   but this is something that it was online.

25            Q       Okay.  But does this document have any
```

```
 1   bearing at all on your determination of independent

 2   contractor versus employee?

 3        A      Yes.  It could be a bearing point.  Yes.

 4        Q      How -- how did this document impact that

 5   determination of independent contractor or --

 6        A      This like an application for a job.  You

 7   know, a job application.  But let me rephrase.  It

 8   would not be a bearing point because it's just an

 9   application.

10        Q      Okay.

11        A      The application -- the elements, you know,

12   it doesn't talk about any applications, you know.

13        Q      So Exhibit 9 is a job application?

14        A      This is a job application.  Yes.  Like not

15   really -- well, I'm not sure if it's a job application,

16   but this is something that they trying to fill

17   information for the employee to be picked.

18        Q      Okay.  But it could be something that the

19   facility asked them to fill out?

20        A      I'm not sure about that.

21        Q      But it had -- but based on this document,

22   it had -- it caused -- it helped you come to the

23   conclusion that the individuals were --

24        A      Like I say, if the employee or the

25   complainant provide me with information, I have to put
```

 1   it in my case file.  Anything that -- any document that

 2   is given to me during that compliance inspection, I

 3   have to put this in another place in the case file.

 4        Q      Understood.  There's a lot of stuff in the

 5   case file.  You did a great job.  You put it all in

 6   there.  I've got it all.  I'm just wanting to know

 7   how -- how did this -- you said that this document

 8   helped you come to the determination that the

 9   individuals were not independent contractors and I'm

10   just --

11        A      I never say that to make a decision

12   whether they were independent contractor.  That is --

13   you say that.  I didn't say that.

14        Q      Oh, I misunderstood.  I thought you

15   said --

16        A      I say that they used these to fill

17   applications for the job.  That's it.

18        Q      Oh, okay.  So did this -- did Exhibit 9

19   have any impact on your determination?

20        A      No.

21        Q      No?  No impact?

22        A      It's just an application.

23        Q      Okay.  Got it.

24        A      At this point this person is not an

25   employee so this cannot be an employee yet.

```
 1        Q      Got it.  Is it your position that if
 2    somebody -- the mere fact of filling out an
 3    application, that by itself makes -- has no impact on
 4    whether they're an employee or independent contractor;
 5    is that what you're saying?
 6        A      No.  Not yet.  Because you become an
 7    employee once I come to work for you.  That's it.
 8        Q      The application doesn't mean anything?
 9        A      The application doesn't mean anything.
10        Q      Okay.  Got it.
11        A      The --
12               MS. AMIN:  Wait for the question.
13               THE WITNESS:  No.  I was going to say
14        something else.
15               MR. DAVIS:  Okay.
16        A      The only -- and it came into my head.  The
17    only -- the only portion of the only thing that I could
18    get from an application is who has the control because
19    if I have the jobs, I've got the control.  I'll give
20    you the job.  If you want the carrot, I give it to you.
21    If -- if you fill out the application, I will give you
22    the carrot to work for me.
23
24    BY MR. DAVIS:
25        Q      And to you --
```

Mastrana - Davis                                    244

```
 1        A       To me that is like control.  It slightly
 2   and directly control of the -- of the employers.
 3        Q       So help me understand the difference
 4   between that and the painter because let's say that --
 5   let me ask the question.  Let's say I want to hire
 6   somebody to paint this and somebody comes to me and
 7   says, I've got a painting business, and there's two
 8   other guys out there and they're standing in line and I
 9   say, You want the job painting?  Bottom dollar and I
10   want you to show up and paint it right now.  Are they
11   my employee or are they independent contractors?
12        A       Well, normally when you have a painter you
13   have -- you ask for bids.  Whoever has the lowest bid
14   is the one who gets the contract.
15        Q       So to be an independent contractor, you
16   have to have bids?
17        A       Not necessarily.
18        Q       But say there's only one painter
19   available.  Everybody's busy.  There's one guy out
20   there and I say --
21        A       And he will tell you, I'll do it for $100,
22   and --
23        Q       And I say, No.  No.  50 bucks.  I'm dangling
24   the carrot.
25        A       That is bargaining, yeah, between a
```

```
 1   contractor -- a contractor and independent contractor.

 2       Q      I'm controlling him though, aren't I?  I'm

 3   controlling him.

 4       A      In a way, yeah, you control, yeah.

 5       Q      So control by itself like that is not

 6   enough?

 7       A      It's not enough to?

 8       Q      To make somebody an employee.

 9       A      It's part.

10       Q      It's part?

11       A      Yeah.  It's part of that body.

12       Q      Okay.  Got it.

13       A      We cannot decide just on one thing.

14       Q      Okay.

15       A      You have -- you have to fulfil certain

16   other requirements.

17              MR. DAVIS:  Right.  Okay.  Let's look at

18       Exhibit 10.

19              (Marked in evidence as Alvaro Exhibit

20       Number 10.)

21

22   BY MR. DAVIS:

23       Q      This is a part of your file, another thing

24   that I don't know what it is.  Do you know what this is

25   and did this have --
```

1       A       This was something provided to me by one

2    of the complainants, by one of the persons that I

3    interviewed.

4       Q       Okay.  Did this have any impact on your

5    determination that the Schedule A individuals were

6    employees?

7       A       Well, there is something here.  We

8    actually talked about this in the last deposition.

9       Q       When you say the last deposition, you mean

10   earlier today?

11      A       No.  No.  The deposition that they did to

12   the other individual -- to Ms. Lisa Pitts.

13              MS. AMIN:  He's referring to the

14         deposition I took.

15              THE WITNESS:  Yes.

16              MR. DAVIS:  Was he present for the

17         deposition?

18              THE WITNESS:  Yes, I was.

19      A       Okay.  This is a -- I think this is a

20   contract between the client and Ms. Lisa Pitts, so this

21   is a contract between a facility and -- and that's what

22   it is.  I can't -- now I remember this one, and during

23   the last deposition with Ms. Lisa Pitts she says -- I

24   believe that she mentions that independent contractor

25   have to have their insurance in order to work for --

1   for the facilities, but then on this one it says that

2   the client shall maintain at his own expense at all

3   times insurance, you know, so it -- it contradicted

4   itself, you know, with what Ms. Lisa Pitts was trying

5   to say.  None of the interviews mentioned that they

6   have any insurance -- that they have to buy insurance.

7   Yeah.

8

9   BY MR. DAVIS:

10        Q     So you're saying that the Schedule A

11   individual signed this?

12        A     The Schedule A did not sign this.  This is

13   not a Schedule A.

14        Q     Who would sign this?

15        A     This is -- this is between the client --

16        Q     Like a hospital?

17        A     Not independent contractor.  Yeah.

18        Q     Okay.

19        A     A hospital.

20        Q     And a company/university?

21        A     And Lisa -- and Lisa Pitts.  Yes.

22        Q     How do you know it's with Lisa Pitts?

23        A     Because when we have -- in the last

24   deposition when we have -- when we talk about it, she

25   mentioned that this was an -- a contract between -- the

 1   contract that she has -- you were not here.  You

 2   were -- it was another lawyer.

 3        Q     Yeah.  I know.

 4        A     Yeah.

 5        Q     Okay.  This MFA/MFNC access

 6   acknowledgement that is with MFA.net talks about --

 7   you're saying this is between Lisa Pitts and --

 8        A     And the facilities.

 9        Q     Okay.  All right.

10        A     Yeah.  And I'm sure if you look back at

11   when Ms. Amin in the deposition, the lawyer -- the

12   employer for the first time -- there's a document where

13   Ms. -- Ms. Lisa Pitts signed.  I remember.

14        Q     Okay.  And did this document cause you to

15   come -- to go one way or the other as to whether the

16   individuals on Schedule A are employees or independent

17   contractors?

18        A     Not really because at that point I didn't

19   know some of this information.  I was provided this

20   document by one of the -- the individuals I

21   interviewed.

22        Q     Okay.  So it didn't have an impact either

23   way?

24        A     No.

25              MR. DAVIS:  Okay.  We'll mark this as

```
 1           Exhibit 11.

 2                    (Marked in evidence as Alvaro Exhibit

 3           Number 11.)

 4           A       Yeah.  It could have made an impact --

 5   sorry.  It made an impact on the deposition that we had

 6   because were not -- I was given this empty document,

 7   but then once we received -- once we reviewed what the

 8   actual documents were, Lisa Pitts signature was there.

 9

10   BY MR. DAVIS:

11           Q       Okay.

12           A       It made more impact when you have

13   somebody -- somebody's filling the information.

14           Q       What was the impact?

15           A       The impact is, like I just explained to

16   you, Ms. Pitts says that all the independent contractor

17   required to have insurance, and it's not true.  In here

18   it says that independent contractor have to have

19   insurance.

20           Q       Show me where.  So this is --

21           A       For liability.

22           Q       Where does it say --

23           A       For anything that -- anything that

24   happens, the liability will be on the -- on the

25   facility.  The client shall maintain at its own expense
```

```
1   and at all times during the term of -- of this access

2   cyber liability insurance -- liability insurance

3   covering himself/herself, employees, agents, and

4   assigns with limits.

5        Q      Right.  So who's the client?

6        A      The client is the facility.

7        Q      Okay.  And so the facility is maintaining

8   insurance?

9        A      They -- they -- she -- that's what the

10  contract talks about.

11       Q      So this is saying the facility, the

12  hospital in other words, shall maintain at its own

13  expense and all times insurance?

14       A      Uh-huh.

15       Q      So how does that contradict what Ms. Pitts

16  said?

17       A      How did it what?

18       Q      How does that contradict what Ms. Pitts

19  said?  This --

20       A      Because she says that -- if -- she says

21  that independent contractor are required to have

22  insurance and they're not.

23       Q      How does this contradict that?

24       A      It -- well, it doesn't contradict, but it

25  shows that why would an independent contractor needs
```

1  insurance when it's covered by this?

2      Q     Why would they or why would they not?

3  They just -- this is saying that the facility has to

4  have insurance.  A lot times both people have

5  insurance.

6      A     Uh-huh.

7      Q     I have malpractice insurance.  The

8  attorney on the other side has malpractice insurance.

9  You drive a car with insurance.  The other guy drives a

10 car with insurance.  How does this contradict?

11     A     I can't explain that.

12     Q     So it doesn't contradict, does it?

13     A     Yeah.

14     Q     Okay.  Let's look at this next exhibit.

15 Ready?

16     A     Uh-huh.

17     Q     Okay.  We're going to look at this one

18 now.  These are -- I believe this is Exhibit 11 now.

19 These are Bates stamped DOL189 through DOL201.  Are you

20 familiar with these documents?

21     A     Yes.

22     Q     I'm going to ask you to identify the

23 redacted information to the extent it identifies a

24 Schedule A or individual that is no longer working with

25 Steadfast.

```
 1                    MS. AMIN:  Objection.  Informant's
 2           privilege.  I'm going to instruct the deponent not
 3           to answer based on the privilege.
 4                    MR. DAVIS:  Mark this as 12.
 5                    (Marked in evidence as Alvaro Exhibit
 6           Number 12.)
 7
 8    BY MR. DAVIS:
 9           Q      I'm going to show you what's been marked
10    as 12.  This is something that was attached to your
11    report.  It looks like a printout from the Steadfast
12    website.
13           A      Uh-huh.
14           Q      Did you print this out?
15           A      Yes, I did.
16           Q      Did this -- did the website have any
17    impact on your determination that the Schedule --
18           A      No.  This is a document that we use when
19    we research about the company to make sure that it's
20    located in the right place.
21           Q      Okay.  So my question is did --
22           A      No.  No.  I say no.
23                    MS. AMIN:  Make sure that he's able to
24           sort of finish his question.
25                    THE WITNESS:  Okay.  But I say no.
```

1              MR. DAVIS:  I know.  But I didn't ask the

2        question.

3              THE WITNESS:  No.  But before you asked

4        the question and I say no.  This is a document

5        that we use only to identify the location for the

6        case.

7              MS. AMIN:  Just be mindful.  We want the

8        transcript to be clear.  He may re-ask the

9        question --

10             THE WITNESS:  Okay.  Okay.

11             MS. AMIN:  -- or maybe ask it in a

12       different way after you've said no.

13             THE WITNESS:  Uh-huh.

14             MS. AMIN:  So let him do the follow-up.

15       Don't assume what he's going to ask because then

16       the record isn't clear.

17             THE WITNESS:  Okay.

18             MR. DAVIS:  In normal interaction, if we

19       were out to dinner together -- not that you would

20       ever want to go to dinner with me probably after

21       this, but --

22             MS. AMIN:  Why not?

23             MR. DAVIS:  -- maybe you would.

24             MS. AMIN:  You're a very nice guy.

25             MR. DAVIS:  I understand what you're

```
 1          saying.  We'll move on.

 2                  All right.  Let's mark this as 13.

 3                  (Marked in evidence as Alvaro Exhibit

 4          Number 13.)

 5

 6   BY MR. DAVIS:

 7          Q     Are you familiar with this document?

 8          A     Oh, yes.  Employee application.  This was

 9   another document that was given to me by interview

10   people.

11          Q     Okay.  And did this document -- did this

12   document cause you to determine or not determine that

13   the Schedule A employees were employees or independent

14   contractors?

15          A     It put a little weight on it.  Yes.

16          Q     What -- tell me what -- what weight, which

17   way, and why?

18          A     Well, just the label, when -- when you

19   call yourself an employer, you know, and this is used

20   for -- for the CNAs and for the LPNs and RNs only.

21          Q     How do you know that it was used for the

22   RNs and LPNs only?

23          A     How do I know?

24          Q     Yes.

25          A     Because it says right here.
```

1        Q        Sure.  It says --

2        A        It could be other, but other -- I don't

3   know what others means.  RNs, NPs, LPN, CNAs, ST, TECH.

4   You know this is the employers -- the employees that go

5   to work to all these facilities.

6        Q        What is an ST?

7        A        And the area of work desired, hospital --

8   I don't know.  You need to ask Ms. Lisa Pitts.

9   Hospitals, home health, long-term care, rehab centers,

10  clinics.  It doesn't say secretaries, recruiters.  It

11  doesn't say anything, and then you have the experience

12  information right here.

13       Q        Uh-huh.  Okay.

14       A        And colleges.  They have to have some

15  experience.

16       Q        And the more experience they have, the

17  more that favors them being employees?

18       A        Yes.  The more -- no.  It's not employees.

19  They more they favor to be candidate for to be picked

20  as an employee.

21       Q        Okay.

22       A        And then they asking previous employment.

23  Why would somebody call an independent contractor, What

24  was your previous employer name?  Maybe, Where did you

25  work?  Where did you do some jobs before?  That's

1   what -- that would be the real question.  Independent

2   contractors -- I know you mentioned earlier about the

3   RNs, they could be independent contractors.  You know,

4   they could be independent contractors and they could

5   say who they were employed by.  This like a history,

6   but -- yeah.  This is a document that is used for --

7   for these individuals that we discussing.

8        Q      Did you ask the office workers if they

9   also fill out this application?

10       A      At the point when I went to Lisa Pitts'

11  office, I was not shown this one.  She didn't show me

12  anything.  She just give me the minimum.

13       Q      Did you go to -- let's see.  Is there a

14  date on this?  This is 2017.  Did you go to the

15  Steadfast website prior to going to Ms. Pitts office?

16  Did you go to the website before you went to her

17  office?

18       A      Yes.

19       Q      Okay.  This wouldn't be a printout --

20  well, this is dated September 21, 2017, but I'm asking

21  before you went to her office, do you go to the

22  website?

23       A      I always have -- I do the research on the

24  company to make sure what they do, what type of

25  business, and --

Masakna - Davis                                257

```
 1        Q      Did you know --

 2        A      -- and where are they located.  I didn't

 3   remember seeing this one.

 4        Q      This was on the website then and it's on

 5   the website, I believe, even now.  Did you know that?

 6        A      It probably was in the -- in the -- the

 7   application, but by that point I was not -- once I get

 8   an allegation, I'm not assuming the allegation is true,

 9   so when I get the allegation, I have to gather some

10   facts.  I go into the company -- to the company.  I

11   talk to the employer or to the owner of the

12   establishment or whoever is in -- representing the

13   employer, and then that's where I gather information.

14   When I do my interviews, I ask questions and --

15        Q      Can I stop you?  Because you've answered

16   that.  I don't need you to tell me that again, and I

17   don't want to keep you too late.

18        A      I'm just on where did I get this from.

19        Q      Yeah.  But --

20        A      I don't remember seeing it at this time.

21        Q      Okay.  That's fine.  So what about this

22   document specifically, like point to words somewhere on

23   this page -- any of the three pages.  What about this

24   specifically caused you to lean towards employee as

25   opposed to independent contractors?  Just point out
```

1   really quickly, this, this, this or maybe it's only one

2   thing.

3         A     No.  I didn't -- this is just a tool that

4   confirms that she's having these individuals.  That's

5   it.  But this is not a document that tells you about

6   the economic realities.  You know, this is not included

7   with the economic realities.

8         Q     Well --

9         A     It is just an application for a job.

10  These individuals, like I say before, they just

11  candidate.  They're not employees.

12        Q     Okay.  I understand that.  In fact, I

13  agree with you on that, but my -- earlier I asked did

14  this document have any weight and you said, yes, it had

15  some weight.

16        A     It has some weight, but it's a very light

17  weight.

18        Q     Very light weight?

19        A     Very light weight.  It's not a point to

20  determine that this person is an employee.

21        Q     Is -- is everything that you told me just

22  in the last two minutes, is that -- did you explain to

23  me all of whatever that weight is?

24        A     Yes.  Yes, I did.

25        Q     Is there anything else?

```
 1        A      Uh-uh.

 2               MR. DAVIS:  Okay.  Okay.

 3               Mark this as 14.

 4               (Marked in evidence as Alvaro Exhibit

 5        Number 14.)

 6

 7   BY MR. DAVIS:

 8        Q      Is this a document that you reviewed as

 9   part of your investigation?

10        A      Uh-huh.  Yes.

11        Q      Did this document have any weight towards

12   independent contractor or employee?

13        A      No.

14        Q      No weight?

15        A      This is about HIPAA.

16               MR. DAVIS:  Okay.

17               Would you mark this as Exhibit 15?

18               (Marked in evidence as Alvaro Exhibit

19        Number 15.)

20

21   BY MR. DAVIS:

22        Q      This is something that was attached to

23   your investigative files.  I don't know what this is.

24   Can you tell me what this is?

25        A      This is information that Lisa Pitts give
```

1   me.

2            Q       Who are these people?

3            A       Employees.

4            Q       Okay.  Why did she -- who were -- why did

5   she give you this list?

6            A       Because I asked her to give me information

7   of some employees, the employees' address.  This is the

8   only piece of employees' address that I got.

9            Q       Okay.  Did you interview any of these

10  people?

11                   MS. AMIN:  Objection.  Informant's

12           privilege.  I'll instruct the deponent not to

13           answer based on my invocation of the privilege.

14                   MR. DAVIS:  Okay.

15

16  BY MR. DAVIS:

17           Q       Who crossed out these names?

18           A       I didn't.  She did.

19           Q       Lisa crossed them out?

20           A       Yes.

21           Q       Okay.  Is the -- on the left hand side

22  there's an asterisk in front of Brockman.  Is that your

23  asterisk?

24           A       No.

25                   MR. DAVIS:  We'll mark this as 16.

```
 1                    (Marked in evidence as Alvaro Exhibit

 2          Number 16.)

 3

 4    BY MR. DAVIS:

 5          Q        This document has been marked as Exhibit

 6    16.  It was part of your packet.  Can you tell us what

 7    this is?

 8          A        This is some employees' addresses.  This

 9    is another thing that she give me.  I forgot about this

10    one.

11          Q        Okay.  On the -- I see a bunch of

12    checkmarks.  Who had made these checkmarks?

13          A        I think I did the checkmarks.  When you

14    call -- start calling people, they answer --

15                   MS. AMIN:  I'm going to object based on

16             the informant's privilege and instruct the

17             defendant not to answer to the extent that

18             checkmarks reveal the identity of individuals that

19             were interviewed.

20                   MR. DAVIS:  I mean, he checked them.

21                   MS. AMIN:  Your question is, Did you check

22             them because you spoke to them and took

23             interviews?  That's informant's privilege, and I'm

24             instructing him not to answer.

25
```

1    BY MR. DAVIS:

2         Q      What is this that says, Get address plus?

3    Is that your handwriting?

4         A      No.

5         Q      That's Lisa's you think?

6         A      Yes.  That's not my handwriting.  That's

7    too -- that's too nice handwriting.

8         Q      Got it.

9         A      It might have been Lisa, but it could have

10   been Sharon Jones, I believe.

11        Q      Okay.  If you turn to the second page --

12        A      Yeah.

13        Q      -- do you see -- do you see this blacked

14   out part on the bottom left?  Do you know why that's

15   blacked out?

16        A      Nope.

17               MR. DAVIS:  Do you know why that's blacked

18        out?

19               MS. AMIN:  I'd have to look at the

20        original.

21               MR. DAVIS:  There's -- there's no

22        indication in your privilege log of anything

23        regarding this document.

24               MS. AMIN:  I'd have to look at the

25        original.

1          MR. DAVIS:  Well --

2     A     I never blacked anything.

3          MS. AMIN:  And those redactions would have

4     been obviously by the investigator -- redactions

5     would have been done by my office and I'd have to

6     look at the original to determine --

7          MR. DAVIS:  Would you make a note and get

8     back to me as to -- because it's not in the

9     privilege log.  If you could look right now real

10    quick, that would be great.

11         THE WITNESS:  I think this might have been

12    blocked by the employer, Lisa Pitts.

13         MR. DAVIS:  Okay.

14         THE WITNESS:  Because, I mean, there's no

15    reason for her to block these and not block the

16    name.

17         MS. AMIN:  I mean, do you want to continue

18    with your questioning and then --

19         MR. DAVIS:  Do you mind if -- can we go

20    simultaneously?

21         MS. AMIN:  Sure.

22         MR. DAVIS:  All right.  We'll pause this.

23         We'll mark this as Exhibit 17.

24         (Marked in evidence as Alvaro Exhibit

25    Number 17.)

1  BY MR. DAVIS:

2      Q     This is a settlement in lieu of

3  litigation.  Is this a document you drafted?

4      A     Yes.  I believe so.

5      Q     Okay.  Is this -- did you -- is this

6  something you presented to Ms. Pitts at that second

7  meeting?

8      A     I had it in my hand.

9      Q     Okay.  Did you ever give it to her?

10     A     No.  Because I was told, Talk to my

11  lawyer.

12     Q     Okay.  So you never gave this to

13  Ms. Pitts?

14     A     I have never had a chance to -- to talk to

15  Ms. Lisa Pitts about this.

16     Q     Okay.

17     A     She just like, Talk to my lawyer.

18     Q     Got it.

19     A     And then when I talked to her lawyer, he

20  didn't want to sit in there.

21     Q     So you never actually gave this to her

22  lawyer either?

23     A     But I tried to, but they were not

24  interested.

25     Q     Okay.  Got it.  Okay.  No problem.

     1        A       It's something that we use for the final
     2   conference when we can settle, you know.
     3        Q       I understood.
     4                MS. AMIN:  So just going back to Exhibit
     5        16.
     6                MR. DAVIS:  Yeah.
     7                MS. AMIN:  DOL-211.
     8                MR. DAVIS:  Yes.
     9                MS. AMIN:  It looks like -- I don't have
    10        the version that I redacted in front of me.  I
    11        have the original, but it looks like something
    12        based on how those boxes appear that I would have
    13        redacted.  The top right hand corner of DOL211 --
    14                MR. DAVIS:  Yes.
    15                MS. AMIN:  -- the basis would be
    16        informant's privilege.  The bottom left hand
    17        corner of DOL212, also informant's privilege.
    18                The boxes that appear within the charts
    19        were already redacted.  Those were not my
    20        redactions.
    21                MR. DAVIS:  Well, help me understand.
    22        Obviously I'm not trying to get into the issue
    23        that we got into with the court, but --
    24                MS. AMIN:  So let me -- let me -- so if I
    25        see handwriting and I have reasons to believe it

Mastrianna - Davis                                    266

```
 1          is the investigator's notations for some reason, I
 2          would redact based on that privilege, but to the
 3          extent that this is -- the investigator's
 4          confirmed it is not his handwriting, that he
 5          believes it is either Ms. Pitts or someone else in
 6          the office, I would waive that privilege because
 7          now it is clear that it is not someone from Wage
 8          and Hour, I.E., my investigator, who has made a
 9          notation.
10               So I can send you the original -- well,
11          the un-redacted portions of those two pages.
12               MR. DAVIS:  Do you have it there or are
13          you saying you don't have it?
14               MS. AMIN:  I do.  I do.
15               MR. DAVIS:  What does it say in the top
16          right?
17               MS. AMIN:  So it says, Get address
18          Chantelle something.  Chantelle -- I believe it's
19          also the person's last name, so it's the name of
20          an employee.
21               MR. DAVIS:  Okay.  And then on the second
22          page?
23               MS. AMIN:  Same thing.  It is the
24          individual's first name, Chantelle.  I can't read
25          what's next to it, but I'm presuming that's her
```

1        last name.

2               MR. DAVIS:  Okay.  And then what's on the

3        third page?  Are those just boxes that I just

4        can't read?

5               MS. AMIN:  Those are not my -- the

6        remaining boxes are not my redactions.  That's the

7        formatting in which we received this document.

8               MR. DAVIS:  So is there anything left

9        that's informant's privilege redacted on this?

10              MS. AMIN:  No.  The only thing that I

11       redacted are on Page DOL2011 and DOL212.  The

12       remaining boxes are not mind.

13              MR. DAVIS:  So you'll send me un-redacted

14       of this?

15              MS. AMIN:  Uh-huh.

16              MR. DAVIS:  You got a note on that?

17              MS. AMIN:  Yes.

18              MR. DAVIS:  Thanks.  All right.  Well,

19       that was easy.

20              MS. AMIN:  Uh-huh.

21              (Marked in evidence as Alvaro Exhibit

22       Number 18.)

23

24   BY MR. DAVIS:

25       Q    All right.  Exhibit 18.  This was in your

```
 1   report.  Did this document have any impact in your

 2   determination of independent contractor or employee?

 3         A      This was in my report?

 4         Q      It was.  Well, yeah.

 5         A      No.  I didn't receive any -- it would

 6   be --

 7         Q      It was in the pile.  It was -- yeah.

 8         A      If you see my reports, they all have

 9   exhibits.

10         Q      You're right.  It was in the -- it was in

11   the production, so --

12         A      It's not mine.  No.

13         Q      Well, looking at this, does this have any

14   impact going towards independent contractor versus

15   employee?

16         A      I won't be able to answer because this the

17   first time I seen it.

18         Q      It's not long.  Just read it.  I'll wait.

19         A      Steadfast Medical Staffing Memo of the

20   Week.  Office Number.  If you need to reach Lisa,

21   please.  You can contact her twenty-four hours day,

22   seven days a week.  Okay.  Yeah.  It shows that she's

23   the HR, you know, when they show up on time for all the

24   shift.  If they have any problems they have to call

25   Lisa Pitts.  That's what it says in here, and it tells
```

1   you to fax all time sheets -- you know, all time sheets

2   before -- must be submitted before Monday, 12:00 p.m.

3   This is something that is from Lisa Pitts so --

4        Q      So in your view this -- this document

5   supports the position that the Schedule A workers are

6   employees?

7        A      Part of it.  Yes.  Uh-huh.

8        Q      Because -- is it because it talks about

9   time sheets?

10       A      Well, not necessarily.  It -- it's like,

11  I'm the supervisor. Let me know when you get there.

12  Let me know when you leave. Let me know if you need to

13  go. Let me know if you can't show up for work.  It's a

14  twenty-four hour open line, and then she's like a --

15  a -- timekeeping for everybody, so -- and plus she says

16  she's the CEO of the company.  That makes her to be in

17  control.  I probably would include this in my file if

18  I'd seen it.

19              MR. DAVIS:  Okay.  I only brought one of

20         this.  Let's make this -- I don't have a copy.

21              MS. AMIN:  That's fine.  We can share.

22              MR. DAVIS:  It has initiating information

23         here, and then every other page is blacked out.

24         There's no exceptions.  Every page.  I believe

25         that this one is --

```
1                MS. AMIN:  What's the Bates stamp number?
2                MR. DAVIS:  250 and 252.  It's blacked out
3          for informant's privilege and deliberative process
4          privilege.
5
6   BY MR. DAVIS:
7          Q     I'm going to show you this document.
8          A     Uh-huh.
9          Q     Are you familiar with this document?
10         A     Yes, I do.
11         Q     What is it?
12         A     This is the case file -- the second part
13  of the case file where the information about the
14  complainant, the communication that was submitted by
15  the complaint.  That's it.  All the information that
16  was submitted by the complainant.
17         Q     By the who?
18         A     Complainant.
19         Q     By the complaining?
20         A     Yes.
21                MS. AMIN:  Complainant.
22
23  BY MR. DAVIS:
24         Q     The complainant?
25         A     Yeah.  Complainant.  Yeah.
```

1       Q       So all of these blacked out pages,

2    they're -- it's information from the individual who --

3       A       I'm assuming it is.  Yes.

4               MR. DAVIS:  Okay.  So could you tell me

5           why the information from the complaining

6           individual's all blacked out as informant's

7           privilege even though -- I mean, why would you

8           block out the content about what they had to say?

9               MS. AMIN:  I think that those are

10          copies -- can you just look at the Bates stamps on

11          some of those?

12              THE WITNESS:  Pay stubs.

13              MS. AMIN:  Pay stubs.  Great.

14              MR. DAVIS:  So why is not just the

15          identifiers blacked out?

16              MS. AMIN:  So pay stubs are redacted

17          because the case file does not include pay stubs

18          for each Schedule A employee or each affected

19          worker, so to the extent that we produce pay

20          stubs, it will indicate who the complainant in

21          this case may be.

22              MR. DAVIS:  I know.  But you could black

23          out the name and the amount.

24              MS. AMIN:  Amounts could be correlated to

25          payroll records.

1          MR. DAVIS:  I said you could black out the
2     name and the amount.
3          MS. AMIN:  At the end of the day when
4     we're making redactions, and you know this, you
5     make a judgement call.  If ninety-eight percent of
6     something is informant's privilege, I might go
7     ahead and just redact the entire pay stub.  If the
8     only thing left might be the name of, you know,
9     Steadfast, for example, but --
10         MR. DAVIS:  Yeah.  But what about these
11    whole pages?  They're all just black.  What's
12    that?
13         MS. AMIN:  258.  That also relates to the
14    complainant.
15         MR. DAVIS:  Is it just their name over and
16    over again?  My name is, my name is?
17         THE WITNESS:  Yeah.  This -- this -- no.
18    This is information -- I'm sorry to interrupt you,
19    but --
20         MS. AMIN:  Yeah.  So let me answer the
21    question just because it relates to a sensitive
22    issue.  It is information that relates to who the
23    complainant is and the intake of that complaint.
24         MR. DAVIS:  The whole page?
25         MS. AMIN:  Yes.

1          MR. DAVIS:  I'm just --

2          MS. AMIN:  The name of the title of the

3     page I think is in my privilege log, the WHISARD

4     complainant information form.

5          MR. DAVIS:  In your privilege log it says,

6     Letters to employee.

7          MS. AMIN:  Are you looking at 258?

8          MR. DAVIS:  Yeah.  Let's see.  I was

9     looking at 257.

10         MS. AMIN:  Okay.  257 is a letter to -- to

11    the complainant.

12         MR. DAVIS:  So --

13         MS. AMIN:  258 is the WHISARD complainant

14    information form.

15         MR. DAVIS:  So how -- how can a letter to

16    the complainant be all -- I mean, the name and

17    address I see what you're saying.  I don't agree

18    with it, but I see what you're saying, but how is

19    the content of the letter subject to informant's

20    privilege?

21         MS. AMIN:  So we take the position in

22    discovery initially that we may protect the manner

23    in which a violation comes to the department, that

24    that could be considered deliberative, so to the

25    extent that it's complaint driven versus an

```
 1              initiative that the department has and how they

 2              decide which industries they want to pursue for

 3              whatever reason, there is initiatives that the

 4              agency has.

 5                   We take the position in discovery

 6              typically that that information is going to be

 7              protected by deliberative process privilege.  I

 8              have allowed him to answer that question to the

 9              extent that you've asked, you know, How did this

10              come to the agency's attention?  Through a

11              complaint.  Beyond that, that's going to be

12              informant's privilege.

13                   MR. DAVIS:  Let's just mark this Exhibit

14              19.

15                   (Marked in evidence as Alvaro Exhibit

16              Number 19.)

17

18   BY MR. DAVIS:

19        Q     I'm going to ask you to identify the

20   information contained in here that's been blacked out

21   to the extent it doesn't contain the name of the

22   informant and -- and/or to the extent it contains

23   information from any of the four individuals or

24   actually -- yeah.  I think it's four -- that are no

25   longer working with Steadfast.
```

 1          MS. AMIN:  So to the extent that you've

 2     been asked to identify information that pertains

 3     to the four individuals, I'm invoking informant's

 4     privilege.

 5          MR. DAVIS:  And then --

 6          MS. AMIN:  I'm instructing him not to

 7     answer.

 8          MR. DAVIS:  Thank you.  And just for

 9     purposes of the record, I'm going to ask you, can

10     you get this back to me and just --

11          MS. AMIN:  I'll take a look at it.  I

12     mean, that's what I agreed to do last week.  I

13     mean, you guys got discovery out --

14          MR. DAVIS:  I know, but we haven't gotten

15     it though.

16          MS. AMIN:  Well, let's just be -- let's be

17     clear and let's keep this on the record.  Prior

18     counsel got discovery out last month, so I'm --

19     you issued a deficiency letter or brought points

20     of concern to me Monday or maybe at some point

21     last week.  Now we're at deposition about a week

22     later with no specificity.  I think I got the

23     letter on Monday, so I have agreed to look at my

24     redactions and to amend -- I've already agreed to

25     amend the privilege log to the extent that it

```
 1            provides more information as to the basis of the
 2            privileges.  While I noted that that might not be
 3            the best use of the parties' time, I agreed to
 4            look at the -- at the redactions, so we're still
 5            in the process of the Meet and Confer.
 6                 Unfortunately, your client has put us in a
 7            position where now discovery is closing on Monday
 8            and, you know, a few days before discovery closes
 9            you're --
10                 MR. DAVIS:  How --
11                 MS. AMIN:  -- interviewing or you're
12            deposing the key witness.
13                 MR. DAVIS:  How have I put you in a
14            position?  I haven't put you in any position.
15                 MS. AMIN:  Well, your client has let go of
16            her prior counsel.  They did not issue -- we
17            issued discovery back in September, you know,
18            knowing that this is EDVA that moves quickly.
19            Your client -- prior counsel for your client
20            issued discovery in January, so this is why -- why
21            we're here.  We're not able to resolve this, and
22            you're attempting to try to resolve it on the fly
23            in a deposition where normally this would have
24            been cleared up prior to deposition, so that's
25            why --
```

1          MR. DAVIS:  But I called you two weeks

2     ago.

3          MS. AMIN:  -- we're here.

4          MR. DAVIS:  That's why I called you two

5     weeks ago to resolve it.

6          MS. AMIN:  With vague -- vague statements

7     as to objections, and you get into more detail

8     just recently with respect to the privileges, so

9     with a 300 page case file -- in excess of 300

10    pages, you're asking me to amend in the Meet and

11    Confer and you're putting a limited time

12    constraint --

13         MR. DAVIS:  You -- you shouldn't have

14    redacted page after page, black, black, black.

15    This is not good faith.  This is ridiculous.

16         MS. AMIN:  It is good faith.  We have --

17    we have a basis for each of the privileges that

18    we've invoked to the extent -- like the

19    handwriting that's been clarified, that is going

20    to be produced obviously because he has confirmed

21    that that's not his handwriting.  That is probably

22    Ms. Pitts or someone else in the company.  We're

23    only here because defendants have cut it so close

24    to the close of discovery to issue discovery and

25    to depose Mr. Mazuera.

 1          MR. DAVIS:  Can you mark this as 20?  I

 2      only have one copy.  We'll look at it together.

 3          (Marked in evidence as Alvaro Exhibit

 4      Number 20.)

 5

 6  BY MR. DAVIS:

 7      Q     This is a document that has -- the

 8  entirety has been blacked out with basically no

 9  exceptions based on, in part, informant's privilege.

10  I'm going to ask you to tell me to the extent there's

11  information in this document that is discussing any

12  content that does not include the informant and to

13  discuss with me any information that is -- was

14  otherwise protected by the informant's privilege but

15  pursuant to the court's ruling is a discussion now

16  regarding the four individuals who are no longer

17  working with Steadfast, I'm going to ask you to tell me

18  what that information is and provide it to me and

19  discuss it with me.

20          MS. AMIN:  Objection.  Informant's

21      privilege.  I'm instructing the witness not to

22      answer based on the privilege.

23          MR. DAVIS:  All right.

24          MS. AMIN:  To the extent it invokes the

25      informant's privilege.

```
 1                  MR. DAVIS:  All right.  We'll mark this
 2          as -- what are we at?  20?
 3                  THE COURT REPORTER:  21.
 4                  MR. DAVIS:  All right.
 5                  (Marked in evidence as Alvaro Exhibit
 6          Number 21.)
 7
 8  BY MR. DAVIS:
 9      Q    All right.  Can you tell me what this
10  document is in Exhibit C?
11      A    Information about the employer.
12      Q    Okay.  Is this something you put together?
13      A    I -- I put the information on the system
14  and it creates these documents.
15      Q    Okay.  Very good.  If you turn in to Page
16  2 -- right -- just Page 2.  This is DOL144.  This one
17  right here.
18      A    Okay.
19      Q    The second page.
20      A    Uh-huh.
21      Q    It says Nature of Business.  Do you see
22  that?
23      A    Uh-huh.
24      Q    Who -- it's a medical staffing agency.
25  Where did you come up with that description, agency?
```

1       A       That comes automatically on -- on the

2    system.  When you -- when you looking for a -- a --

3    well, no.  Medical staffing agency, I put this

4    information in.  I got it from Lisa Pitts.

5       Q       You --

6       A       She's a medical staffing agency.  That's

7    what she told me.

8       Q       Okay.

9       A       Medical Staffing Agency of America.

10       Q       All right.  If you turn one more page in,

11    it's -- it has a date on the top left, June the 9th,

12    2017.

13       A       The next one?

14       Q       Yeah.  Right here.  Do you see that?

15       A       Uh-huh.

16       Q       Okay.  Is this the date that you met with

17    Lisa the first time?

18       A       The initial conference.  Yes.

19       Q       Okay.  And I noticed that you use -- it

20    appears to use -- well, let me ask.  Would this -- that

21    day you met with Lisa twice, right?  You met with her

22    and then you left and you met with her again?

23       A       I didn't leave.

24       Q       Well --

25       A       I stayed in the place.  In the office.

Matsuda - Davis                                    281

```
 1        Q       -- but you -- you had two --
 2        A       I never moved from the office.  She moved
 3   out of the office.  She came back.
 4        Q       Okay.
 5        A       So I didn't leave.
 6        Q       Gotcha.
 7        A       I didn't leave.
 8        Q       But you had two separate meetings with
 9   Lisa, right?
10        A       Yes.
11        Q       Okay.  Thank you.  Would this have been
12   taken during the first meeting with Lisa?
13        A       Correct.
14        Q       Okay.  And at that first meeting with
15   Lisa, had you already determined that the Schedule A
16   individuals were employees?
17        A       No.
18        Q       Do you use this abbreviation EE to refer
19   to employee?
20        A       Yes.
21        Q       Okay.  So it says, Business nature, and
22   then it -- do you see where it says, Staffing company
23   provides EE to hospitals, group homes, assisted living,
24   and nursing homes?  Do you see that?
25        A       Uh-huh.  Uh-huh.
```

1        Q        Okay.  Why did you write EEs if you hadn't

2    made the decision?

3        A        That's normal way, you know, when you go

4    into a business to call them employees or workers.  You

5    don't call independent contractors.  You know, I'm

6    walk -- I'm walking into a business and I ask -- I ask,

7    How many employees do you have?  What type of employees

8    do you have?  Then she tell me.  I write that based on

9    the information that Lisa Pitts tell me.  I don't

10   assume that they're employees.  You know, I ask the

11   question, How many employees do you have?  She says,

12   100 plus.  How many employees are working in the

13   office?  Five.  That's what she says.

14       Q        Are you sure she said, I have employees,

15   and she didn't say independent contractors?

16       A        When I ask her, yes, I wrote it down.

17   Everything that I write in here is -- is coming from

18   her.  This is the questions that I ask her.  What's the

19   nature of your business?  If she says, Staffing

20   company, I write staffing company and provides

21   employees to hospitals, group homes, assisted living.

22   She never says she provides independent contractors to

23   hospitals.

24       Q        You're sure she used the word employee,

25   not just you?

1        A       I'm sure she did.

2        Q       Okay.  All right.  Let's turn to the next

3   page.  On this page -- these are all your notes, right?

4        A       Uh-huh.

5        Q       All the way at the bottom, that last

6   paragraph, do you see that?  The last paragraph?

7        A       Yes.

8        Q       If an independent contractor works more

9   than or -- what does that say?  More than --

10       A       Forty hours.

11       Q       -- forty hours, Ms. Pitts said that she

12   does not pay them the additional half time required by

13   law to regular employees.

14       A       That's what she says.  Yes.

15       Q       Okay.  Where does the independent

16   contractor word come from?

17       A       She came from her -- it came from her.

18   Yeah.

19       Q       So -- so she described them as

20   independent --

21       A       Everything that I write in here is what

22   I'm listen -- what I listen to from the employer.

23       Q       Okay.

24       A       So everything from employer.  She might

25   say that it's not true, but it would be her word

1    against my word.

2         Q      Okay.

3         A      But this is the information that we

4    collect from the employer on the initial conference.

5         Q      Okay.  What -- of anything in these notes,

6    is there anything here that she said that helped you

7    come to the conclusion that the individuals were

8    employees?

9         A      No.

10        Q      Nothing in here?

11        A      No.

12        Q      Okay.  The thing that took you over the

13   edge or made you go that way was when you did the

14   interviews after that first meeting, right?

15        A      Uh-huh.  Uh-huh.

16        Q      Okay.

17        A      The interviews, the payrolls.  It's

18   several things.  You know, it's just not the interviews

19   because I could claim in an interview to be God, but

20   I'm not.

21        Q      Yeah.  Sure.

22        A      Yeah.

23        Q      And during the interview you

24   interviewed -- I just want to make sure I'm remembering

25   this right because it was a little fuzzy as I thought

1   about it.  You interviewed office workers and you also

2   interviewed at least one individual that you believe

3   may have been both an office worker and a nurse?  Is

4   that what you said?

5                 MS. AMIN:  You can answer.

6        A     Yes.

7                 MR. DAVIS:  Okay.

8                 (Marked in evidence as Alvaro Exhibit

9        Number 22.)

10

11  BY MR. DAVIS:

12       Q     Have you seen this document before?

13       A     Yeah.  We just look at it.

14       Q     Yes.  We did.  We did.  Yeah.  Well,

15  not -- you and I didn't.

16       A     I think we saw this one.  Well, not with

17  you.  With the other.

18       Q     Yeah.  Yeah.  Yeah.  You and I --

19       A     She have so many lawyers.  They come and

20  go.

21       Q     Okay.  Did you -- did this document play

22  any role in your determination as to whether the

23  individuals were independent contractors or employees?

24       A     There was a part in here where it really

25  caught my attention.

```
 1          Q      Okay.

 2          A      Contractor agrees that during the term of

 3    the agreement --

 4          Q      Wait.  Where -- where are you reading

 5    from?

 6          A      Number 8.

 7          Q      Okay.

 8          A      DOL156.

 9          Q      Yep.

10          A      Commencing from the first day of the

11    contractor's engagement by company and continuing from

12    the period of twelve months --

13                 MS. AMIN:  Can I stop you one second?

14                 THE WITNESS:  Okay.

15                 MS. AMIN:  You're -- you're talking really

16          fast and she's --

17                 THE WITNESS:  I'm sorry.

18          A      Well, the last part of this paragraph it

19    says, The contractor -- contractor will not enter, be

20    engaged in, or be interested in any capacity in any

21    business or -- or undertaking which competes with --

22    with that of company.  It means that -- what she's

23    trying to say is that if -- if the person -- if you --

24    once you enter into agreement with this company, this

25    contractor will not enter, be engaged with somebody
```

1   else.  The independent contractor, that's who she's

2   talking about.

3             Contractor agrees that during the term of

4   agreement and twelve months thereafter, contractor will

5   not enter, be engaged in, or be interested in any

6   capacity whatsoever directly or indirectly in any

7   business or undertaking which competes with that of the

8   company.  That's like me telling like a painter -- I'll

9   go back to the painting company -- you cannot have

10  business with anybody for this period of time

11  basically.

12

13  BY MR. DAVIS:

14       Q      Okay.

15       A      That's restricting somebody -- that's

16  killing someone's ability to make money because this

17  person cannot go and work for somebody else.

18       Q      Did you feel that Paragraph 8 favored in

19  terms of the Exhibit A people being employees instead

20  of independent contractors?

21       A      I believe so.

22       Q      Okay.  Was there anything other than

23  Paragraph 8 that caused you to make that determination?

24       A      I can't remember right now, so --

25       Q      Well, I need to know.

Matsuura - Davis                              288

```
 1        A      There's something else in here --

 2        Q      Just take a look.

 3        A      -- but I can't --

 4        Q      Sure.  Sure.  Just take a minute and then

 5   see if there's something else.

 6        A      No.  I can't recall anything else.  My

 7   stomach's winning.

 8        Q      Okay.  But -- but to be clear then, the

 9   only thing in here that you felt favored them being --

10        A      As I remember, that would be one of them.

11   Yeah.  I can't remember the other ones, but -- because

12   I read this but I can't remember right now.

13        Q      Well, but this is important.  I'm sorry,

14   but I need to know, so if there's something else, I

15   need to know what else.

16        A      Okay.

17               MR. DAVIS:  Off the record while he's

18        reading.

19               (A discussion was held off the record.)

20               MR. DAVIS:  All right.  Are you ready to

21        go back on the record?

22               THE WITNESS:  Yeah.

23

24   BY MR. DAVIS:

25        Q      All right.  Anything else?
```

```
 1        A        I don't see anything else.  No.

 2                 MR. DAVIS:  Okay.  Very good.

 3                 (Marked in evidence as Alvaro Exhibit

 4        Number 23.)

 5

 6   BY MR. DAVIS:

 7        Q        This is a document, 23, that we or that

 8   you included as a part of your packet.  It looks like

 9   this is the initial letter that you sent Ms. Pitts?

10        A        Yeah.  This is the appointment letter.

11        Q        Okay.  I noticed that in this letter you

12   multiple times say that you want to schedule an

13   interview so that you can interview and you want a list

14   of, quote, employees.  Why -- why did you choose to use

15   the word employees and not workers or independent

16   contractors?

17        A        Because at this point I didn't know.  We

18   don't know what's there, you know, so employees -- the

19   complainant -- you know, the complainant says that he

20   was an employee, so we assuming they all employees.  I

21   cannot send a -- a letter where I say, I need the

22   information of all your independent contractors.

23        Q        Why couldn't you say that?

24        A        Well, I could say that, but it's an

25   agency -- medical staffing agency.  I have staffing
```

Mastela - Davis                                   290

1   agencies, and they all employees so I never heard about

2   independent contractors in a staffing agency, so --

3        Q      Got it.  So at the time you sent the

4   letter, you were already assuming they were probably

5   employees?

6        A      No.  I was not assuming.  It's just a

7   technical term that we use.

8        Q      Yeah.  A -- it's a technical term?

9        A      Yeah.  She could correct me when I get

10  there.

11       Q      Yeah.

12       A      She can say, No, I don't have any

13  employees.  I have independent contractors, but --

14       Q      How is employee a technical term?  What's

15  technical about it?

16       A      Well, not technical, but that's a word

17  that we normally use when we expressing to -- to --

18  towards a business.  You know, how many employers do

19  you have?

20       Q      So when you say employee, you mean

21  employee or independent contractor?

22       A      It could be that.  Yeah.  But I didn't

23  include only independent contractor, you know.  If

24  the -- the employer corrects me when I get there, then

25  I would say, Okay, you call them independent

```
 1   contractors.  You know, it's a term that we use,

 2   employee, independent contractors, you know.  Who's an

 3   employee?  Who's an independent contractor?  At this

 4   point I don't know who is what, so I just ask for

 5   information about current employment, employees, during

 6   the past two years.  I assuming they all employees.  I

 7   don't know if they're independent contractors or not,

 8   so it's -- it's just a word that we use, but it doesn't

 9   mean nothing to make a decision.  It doesn't determine

10   anything.  It's like me using the word federal employer

11   identification number.  I should call federal

12   contractor identification number?  There is nothing

13   that says so, you know.

14             MR. DAVIS:  All right.  Well, I think

15        we're finishing up.  The only thing that I need to

16        do is we never talked about the first three

17        documents, so I need to go over those.  Let's

18        start with Exhibit 2 -- well, 3.  You know, let's

19        start with Exhibit 2.

20

21   BY MR. DAVIS:

22        Q      Did -- when you spoke to the nurses in

23   your interviews, did you ever explain to any of the

24   nurses the difference between an employee and an

25   independent contractor?
```

```
 1      A       Did I explain?  No, I didn't.  I didn't
 2  explain that.
 3      Q       Did they ever ask you, What's the
 4  difference?
 5      A       No.  I just ask questions and they answer
 6  the questions.
 7      Q       Did -- is -- did they ever -- did the
 8  nurses ever use the word control?
 9      A       No.  We ask the questions to the employee.
10      Q       Like, for example -- I'll just show you.
11  This is DOL130.  Like here you say, Ms. Pitts never had
12  any situation where I have to be counseled.  Do you
13  know what that means?
14      A       Counseling.  Yeah.  Counseling.
15      Q       Like -- oh, like therapy counseling?
16      A       No.  When you -- you -- I give you a
17  counseling sheet because you misbehave, something like
18  that, that's what she's talking about.
19      Q       Oh, she's, Never had any situation where I
20  have to be counseled.  Okay.
21      A       Yeah.  I ask her, Do you -- have you ever
22  been counseled by Ms. Pitts for not doing your job?
23      Q       Like disciplined?
24      A       Disciplined, yeah, for not showing up on
25  time, you know.
```

```
 1          Q       Okay.

 2          A       For having a discrepancy at the job and --

 3     and --

 4          Q       She says no?

 5          A       No.  I guess not.

 6          Q       All I know is that Ms. Pitts have control

 7     over how I was doing my job.  Would she have used that

 8     word or that was your word?

 9          A       Yes, she did.  Everything that -- well,

10     this -- when I ask them, I'm writing down what they

11     tell me on the phone.

12          Q       Okay.  How -- how did it come to be that

13     people would sign these documents?  Would they -- would

14     you mail it to them and have them sign it and send it

15     back?

16          A       Yes.  Once I finish the interview, I tell

17     them I'm going to mail you this interview --

18          Q       Okay.

19          A       -- and please read it.  If you agree with

20     what I saying here, will you send it to me?  Sign it.

21     Some of them refuse to sign the paper because they

22     don't want to be, I guess, afraid of -- you know,

23     because these are jobs that they have --

24          Q       Uh-huh.  Okay.

25          A       -- and they don't want to lose their job.
```

```
 1    They don't want to be blackballed by employees --
 2    employers.  You know, it's -- it's an industry where
 3    you don't have that many places to go.
 4                MR. DAVIS:  Okay.  All right.  In the
 5          interest of time -- I'm assuming we're in
 6          agreement on this, but -- well, we're probably not
 7          actually.  I should probably just go through this.
 8
 9    BY MR. DAVIS:
10          Q      This -- this individual, she says --
11    whoever it was.  I'm saying she.  I don't know if it
12    was a she, but it says, I obtained my license in
13    Virginia, the state Board of Nursing.  I used to work
14    as an independent contractor per the DOD, but when I
15    started worked for Steadfast, the agreement was that I
16    was going to be an employee.  Did you follow up with
17    her to ask her, What do you mean by that?  When she
18    says that, would you ask her questions, What does that
19    mean?
20          A      No.  When I ask them -- I ask them, Have
21    you ever worked as an independent contractor?  That's
22    how she answered.  Yes.  I worked for the Department of
23    Defense as an independent contractor before I start
24    working for Ms. Pitts.
25          Q      But when she says, The agreement was that
```

Mashota - Davis                           295

```
1    I was going to be an employee, did you stop her and
2    say, What does that mean?  Explain this?
3         A     No.  I didn't ask that.
4         Q     You just write it down?  That's it?
5         A     I just write it down.  I ask questions.  I
6    write it down.  That's what --
7         Q     But is there a follow-up question that you
8    ask?
9         A     I -- sometimes we do.  You know, Why do
10   you call yourself employee?  But at that point I didn't
11   think there was a need for me to ask -- ask her.
12        Q     So you send out the letters.  It has your
13   phone number on it?
14        A     Uh-huh.
15        Q     And you're in your office here or
16   someplace you're working.  The phone rings.  How does
17   that -- they say -- they ask for you and then you just
18   pull out one of these?
19        A     No.  They didn't ask for me.  I call them.
20        Q     Oh, you call them?
21        A     I -- I -- yes.  I call them.  I interview
22   them over the phone.
23        Q     Your letter that you sent said, Please
24   call me?
25        A     Some of them.  Yes.  Some -- some of those
```

```
1   letters, but it was -- it cannot be done because
2   some -- some individuals answer the phone when I -- I
3   call them.  You know, I have a list of information in
4   there.
5           Q      You do?
6           A      Yes.  You saw it.  You saw in one of these
7   exhibits --
8           Q      Yeah.  I know.
9           A      -- there's a lot of phone calls on one of
10  them, so I start calling people.  If they answer the
11  phone and says, Hey, I'm from the U.S. Department of
12  Labor --
13          Q      Yeah.
14          A      -- I'm conducting a compliance inspection
15  on this company. Do you have time right now?  Could you
16  give me ten, fifteen minutes to, you know, collect
17  information?  I do an interview.  If they say, Yes, I
18  have time, I say, Okay.  Then I finish -- when I finish
19  the interview I says, I'm going to mail you this
20  interview and if you -- if you don't mind, please sign
21  the interview for me.
22          Q      Okay.
23          A      Some of them did.  Some of them didn't
24  because I guess that they're afraid of -- of, you know,
25  losing their jobs or -- you know, they're read -- the
```

1   bottom says where we can use this to the maximum

2   extent.

3        Q      Right.

4        A      So some of them, the ones that read that,

5   they don't want to move forward.

6        Q      Ah.

7        A      Because they get afraid of being

8   blackballed by the employer.  It could be -- that

9   person could be working for this individual and they

10  identify that this person is working for this

11  individual and they find out their names, you know,

12  they could get fired.

13       Q      So when -- when you -- when you sent the

14  initial letter to them -- I saw the letter.  The only

15  thing that was blocked off was their address, right?

16  The letter doesn't say on it that their -- that the

17  information they provide to you will be kept

18  confidential.

19       A      No.  When I send the letter --

20       Q      It doesn't say that.

21       A      Okay.  Hold on.  When I send the letter

22  I'm sending the letter for them to call me.

23       Q      I know that.  I know that.

24       A      When I send the letters because I fail to

25  contact them through the phone.

1        Q       Got it.  I understand.

2        A       But I didn't say no confidentiality.

3        Q       Okay.  I know.  So when you talk to them

4    on the phone though --

5        A       I tell them.  Yes.

6        Q       -- what do you tell them about

7    confidentiality?

8        A       I tell them -- oh, I tell them that

9    anything that you say in this statement will be kept to

10   the maximum extent -- you know, it will be kept

11   confidential to the maximum extent, and they agree with

12   me sometimes.

13               MR. DAVIS:  Okay.  When -- okay.  All

14           right.  I think this is the last document that

15           we'll go through.  I need Number 3, which is this

16           one.  I'll let you.  I don't know how you --

17               THE COURT REPORTER:  I pulled out the

18           first three for you.

19               MR. DAVIS:  Very good.

20

21   BY MR. DAVIS:

22       Q       Can you look at this, please?

23       A       Uh-huh.

24       Q       All right.  Now we're looking at Exhibit

25   3, which is the one that begins with DOL00001.  This is

1   your compliance action report?

2        A        Yes.

3        Q        This is kind of the primary report that

4   you put together, correct?

5        A        Correct.

6        Q        Okay.  And the -- this -- I guess this

7   third page here, DOL00003, is this kind of the front

8   page of the computer system?

9        A        Yes.

10        Q        Okay.  All right.  On DOL004, what is

11   the -- is this -- is this -- the BW, is that back

12   wages?

13        A        Back wages.

14        Q        And LD is?

15        A        Liquidated damages.

16        Q        Got it.  All right.  Can you go to Number

17   6?  This narrative.  You say that the firm -- go where

18   it says here, The firm serves.  It's right here.  The

19   firm serves as a clearing house.

20        A        Where does it say?

21        Q        The third sentence or the third line.

22   It's the third sentence too.  The firm -- I'm sorry.

23   The firm -- the fourth sentence.  The firm serves as --

24   the fourth line down.  The firm serves as a clearing

25   house by providing personnel according to the skills

```
 1   needed.  Do you see that?

 2        A      Yes.

 3        Q      What does that mean?  Clearinghouse?

 4        A      A clearinghouse is -- I can't recall, but

 5   it's -- it's like where people comes in and, you know,

 6   they -- they -- they get sent somewhere else, you know.

 7        Q      Okay.

 8        A      That's -- that's basically what it is, a

 9   clearinghouse.

10        Q      Does clearinghouse, does that mean

11   employer?

12        A      Don't know.  It's just a term that we use,

13   but it doesn't say employer.

14        Q      Okay.  You use an acronym, ADV.

15        A      Amount dollar value.

16        Q      What is it?

17        A      Amount dollar value.

18        Q      Amount dollar value?

19        A      The -- the annual dollar value.

20        Q      Okay.

21        A      And that's coming from the taxes.

22               MR. DAVIS:  Okay.  There's a number of

23        pages in here.  I forgot to go through them --

24               MS. AMIN:  All right.

25               MR. DAVIS:  -- for her objection.
```

1   BY MR. DAVIS:

2        Q       One Page Number 8 at the top there, yeah,

3   it says, The complainant provided the investigator with

4   copies of the employment application.  Do you see that?

5        A       Uh-huh.

6        Q       The employment application that we looked

7   at was blank.  How -- how did the complainant provide

8   you with a blank employment application?  Do you know?

9        A       With employment applications.  You know,

10  the application.

11       Q       Yeah.

12       A       Just the blank application.

13       Q       How -- but do you know how the complainant

14  had a blank one?  I mean, it didn't have her

15  information on it.

16       A       I never asked, you know, why -- where did

17  she get it from.

18       Q       Okay.

19       A       I mean, she provided me with that.  That's

20  what I put in the case file.

21       Q       Did you ever verify that was one actually

22  used by --

23       A       Yes, I did.

24       Q       How did you verify it?

25       A       Well, when we -- if it's an application, I

 1    normally ask where did she get it from.  I think it was

 2    an e-mail where it was provided to her by someone else,

 3    so she forwarded it to me.  I can't remember exactly

 4    how I got it.

 5         Q      What did you do to verify that that was,

 6    in fact, an application for the -- the Medical Staffing

 7    of America?

 8         A      I can't recall what -- what did I do with

 9    that employment application.  Maybe that employment

10    application has the name of Steadfast so I didn't

11    verify because it have Steadfast already in it, so why

12    should I need to verify something that is -- has the

13    Steadfast name on it?

14         Q      Do people ever falsify a document in your

15    experience?

16         A      Yeah.  People falsify, but it's really

17    hard to falsify a template.

18         Q      Okay.

19         A      You can tell.

20         Q      Okay.  All right.  If you go to Number --

21    Page Number 9.

22         A      Page Number 9.

23         Q      I think you're going too far.  Number 9.

24    You're too far.

25         A      Oh, Number 9.  I thought it was my 9.

1   Okay.

2        Q      Look at that.  You turned right to it.

3   All right.  Right here.  Let's see.  It's three lines

4   down or, let's see, four lines.  The fifth line down,

5   The employer also failed.  Do you see that?  The

6   employer also failed to combine hours for one employee.

7   Do you see that?

8        A      Uh-huh.

9        Q      Is that the one person that you're talking

10  about that was a -- somebody who was an office worker

11  who was also a nurse?

12              MS. AMIN:  You can answer that.

13       A      Yes.

14

15  BY MR. DAVIS:

16       Q      All right.

17       A      And -- and that off the payroll records.

18  It was from the payroll that I saw this violation.

19       Q      Okay.

20       A      Yeah.

21       Q      Did you look at the payroll before -- the

22  payroll records before you made the determination

23  that -- before or after you made the determination that

24  the Schedule A people were employees?

25       A      I looked at the payroll records before.

```
 1        Q      Before?

 2        A      Yes.  Because that's when Ms. Lisa Pitts

 3  gave me the -- the last payroll and then -- then I took

 4  my time to look at information.

 5        Q      Okay.

 6        A      Because we look at the information there

 7  that might be used on the interviews to ask questions.

 8        Q      Let's look at Page 13.

 9        A      Uh-huh.

10        Q      On Page 13 that back wage computation

11  method --

12        A      Uh-huh.

13        Q      -- it says, After making the determination

14  that the workers -- firm's workers were employees

15  rather than independent contractors, the investigator

16  proceed to analyze the payroll.  Can you explain that?

17        A      Yeah.  When -- after making the

18  determination, the analysis of the payroll records is

19  to figure out what -- what employees have been working

20  more than forty hours in a week.  That's the analysis,

21  you know.

22        Q      Right.  But it doesn't say -- it suggests

23  that you didn't do that until after the fact.

24        A      It's standard to proceed to analyze the

25  payroll to determine who work -- this is you -- you do
```

1   the back wage computation method.  You analyze, okay,

2   who's working more than forty hours.  Then you start

3   computing and transcribing that information.

4            MR. DAVIS:  Okay.  All right.  What I'm

5        going to do at this time is continue the

6        deposition subject to -- I don't have any

7        questions right now, but continuing the deposition

8        subject to the issues that we flagged earlier

9        pursuant to the court's order, so it's continued.

10           MS. AMIN:  And to the extent that the

11       deposition is continued, I might have some limited

12       questions on cross-examination and I reserve my

13       right to ask those questions at that time.

14           MR. DAVIS:  Okay.  Very good.

15           (The deposition of Mr. Mazuera concluded

16       at 7:53 p.m.)

17

18                    -----oOo-----

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3    COMMONWEALTH OF VIRGINIA:

4    CITY OF VIRGINIA:

5

6         I, Danette M. Wilson, Notary Public in and for

7    the above county and state, do hereby certify that the

8    foregoing testimony was taken before me at the time and

9    place herein-before set forth; that the witness was by

10   me first duly sworn to testify to the truth, the whole

11   truth, and nothing but the truth, that thereupon the

12   foregoing testimony was later reduced by computer

13   transcription; and I certify that this is a true and

14   correct transcript of my stenographic notes so taken to

15   the best of my ability.

16        I further certify that I am not of counsel to

17   either party, nor interested in the event of this

18   cause.

19

20   Given under my hand this ____ day of _____, 2019.

21

22   My commission expires March 31, 2020.

23

24                    _____
                      Danette M. Wilson
25                    Court Reporter  #345203


                    Fiduciary Reporting, Inc.
                       (757) 482-2729